AFFIDAVIT OF HEIDI ELDRIDGE

Introduction

I hereby affirm that I am undertaking the following Affidavit in Support of the Defense's § 2255 motion, wherein I raise concerns regarding the lack of demonstration of reliable application of the ACE-V method during analysis and comparison of a latent palm print impression developed on Item 100 to the provided exemplars of Daniel Troya.

This statement is broken into four main sections. First, it describes the level of variability that surrounds both the way the ACE-V method is applied and the conclusions reached using the ACE-V method. It then goes on to discuss arguments in support of the need for contemporaneous documentation of latent print casework and clear reporting of conclusions. Third, it contains a summary review of the notes, report, court visual aids, and policies provided through discovery in the above-named case. Finally, it examines several problematic aspects of the trial testimony provided by Jack McCall.

Qualifications

I hold a Master of Science degree in Biology from Duke University (granted in 2002).

I am currently enrolled in the PhD program in Forensic Science at the University of Lausanne, Switzerland under the supervision of Professor Christophe Champod.

I was employed as a forensic scientist from 2004 to 2015, first at the Springfield Laboratory of the Oregon State Police (OSP); then in the Forensic Evidence Unit of the Eugene Police Department (EPD), from 2007 to 2012; and finally at the Las Vegas Metropolitan Police Department (LVMPD).

My training in the area of latent prints began in 2005 and was intensive, including rigorous in-house training at all three agencies, as well as external training courses, each lasting between 2 hours and 2 weeks.

Each of these external trainings has been taught by nationally or internationally recognized leaders in each of their respective areas of specialty (including Ashbaugh, Langenburg, Neumann, Maceo, Stimac, Gische, and Ron Smith, among others).  In this way, I have received the best training available from the most respected authorities in the discipline.

These external trainings alone have totaled over 300 hours of coursework in areas related to fingerprints, to say nothing of the approximately 2.5 years of internal training I received.

I recently left active casework in police agencies to focus on research in forensic science, where most of my work focuses on developing standards for analysis,

comparison, and documentation of latent print work and education of practitioners and legal professionals.

I am currently an active member of 2 national and international forensic organizations and am a Certified Latent Print Examiner with the International Association for Identification (IAI).

I have authored articles on forensic science, two of which have been peer-reviewed and published in IDentification News and the Journal of Forensic Identification, both publications of the IAI.

I am frequently an invited speaker on topics concerning forensic science, latent fingerprints, and testimony, and have lectured and provided workshops at regional and national professional conferences; law schools; and practitioner and legal professional in-services.

I served as a member of the Scientific Working Group on Friction Ridge Analysis, Study and Technology (SWGFAST) prior to its dissolution, then became an inaugural member of the Organization of Scientific Area Committees (OSAC), serving on the Friction Ridge Subcommittee (FRS). I also serve as a member of the Editorial Board of the Journal of Forensic Identification (JFI).

<u>Application of the ACE-V Method is Variable and Results in Variable Conclusions</u>

ACE-V is the commonly described method of conducting a friction ridge (aka "fingerprint") comparison. It is an acronym that stands for the four phases of the task: Analysis, Comparison, Evaluation, and Verification. While these phases present a useful framework for describing the steps an examiner goes through to reach a decision, they essentially describe a visual comparison task.

Two images are presented to an examiner. He **analyzes** them to see what exploitable information they contain, sets them side by side to **compare** them for similarities and differences, then **evaluates** his findings to reach a conclusion regarding source, which is **verified** by another examiner.

The National Academy of Science report entitled "Strengthening Forensic Science in the United States: A Path Forward" [hereafter "NAS Report"] is invoked as the basis of a number of claims against the application of the ACE-V method in the practice of fingerprint comparison, particularly that the "method is not specific enough to qualify as a validated method…[it] does not guard against bias; is too broad to ensure repeatability and transparency; and does not guarantee that two analysts following it will obtain the same results." (NAS Report, 2009).

These claims are not without merit. The ACE-V method is simply a description of an interpretive mental process, and as such, is both subjective in nature and variable in practice.

Even a cursory investigation into the literature reveals that examiners *do*, in fact, sometimes reach different conclusions when presented with the same images and that even the way they apply the method varies from examiner to examiner. Studies have shown that not only do different examiners select different features to use in their examinations (Langenburg 2012, Neumann et al 2013, Swofford et al 2013), but even the same examiner on a different day will very often select different features (Langenburg 2012).

Large-scale research studies, such as the FBI/Noblis "black box" study (Ulery et al. 2011, 2012) have demonstrated variability in conclusions between different examiners, and within the same examiner on different viewings of the same evidence.

While the aforementioned studies corroborating the level of variability between examiners are fairly new, the discipline's knowledge of the potential for different examiners to reach different (or incorrect) conclusions is not. For example, in 2004, the infamous Brandon Mayfield case in which the FBI erroneously identified Mr. Mayfield as the source of a latent print on a bag of detonators used in the Madrid Train Bombing case gained international recognition. Going back further, in 1995, the Collaborative Testing Services (CTS) fingerprint proficiency test included a latent print from a subject whose exemplars were *not* included among the exemplars in the test packet; instead those of the subject's identical twin were included. Approximately 1 in 5 examiners taking the test erroneously identified the latent print to the identical twin of the true donor.

In fact, given the subjectivity of interpretation of features, variability in feature selection and ultimate conclusions, and the logical statistical framework for decision-making under uncertainty that has been proposed by numerous scholars, the very idea of individualizing a latent print back to a single source has been called into question for many years. As far back as 2001, Stoney asked "what made us ever think we could individualize using statistics?" and described the process of reaching a conclusion of individualization as "a leap of faith" that was unjustified by the strength of the evidence. Champod and Evett (2001) reached a similar conclusion, stating that absolute certainty of identification is "not logically attainable".

These early warnings about the inadvisability of proclaiming an absolute identification to a single source are bearing fruit today, as more and more laboratories are abandoning language of absolute certainty, SWGFAST has removed the phrase "to the exclusion of all others" from its definition of an identification, and the US Department of Defense's Defense Forensic Science Center (DFSC) has recently stopped using the term "identification" altogether.

While use of the term "identification" was common practice throughout the early 2000s, certainly there was ample literature available to make practitioners aware that variability was present, was a concern, and that they should exercise caution in meticulously

demonstrating the basis for their conclusions, and conscientiously presenting those conclusions in a modest framework that did not overstate their evidentiary value.

<u>Contemporaneous Bench Notes and Clear Reports Are Critical to Demonstrating a Reliable Application of the Method</u>

In light of the demonstrated natural variability between examiners, it is clear that the only way to demonstrate the validity and basis of a conclusion is through clear and thorough documentation of the process used to reach that conclusion. This documentation should take the form of detailed Standard Operating Procedures (SOPs) prescribing the standards and methods to be used, as well as applicable thresholds; contemporaneous bench notes that chronicle the data observed and steps taken to reach a conclusion; and an analytical report that summarizes the two.

As an important aside, when science talks about the validity of a conclusion, they are not referring to the accuracy of the outcome; they are referring to the appropriateness of the path taken to reach the outcome. Was the procedure done in a scientifically appropriate, or valid, way? It can be compared to middle-school math, where students are asked to show their work on an exam. The instructor is less interested in whether the student reached the correct answer than if they demonstrated understanding of the underlying concept.

In latent print comparisons, the concept is much the same. Because there is variability between practitioners over the concept of "sufficiency" (i.e. how much is "enough" to reach a conclusion of same source between two images?), and in casework ground truth (i.e. "the right answer") is not known, it is not enough to simply say that the comparison of two images resulted in an identification; it is necessary to demonstrate that the conclusion was sufficiently supported by the data.

By way of example, I could undertake to offer an opinion regarding whether a latent fingerprint came from a particular source. But I might decide that the comparison looked difficult, so rather than actually comparing the two images, I was going to simply flip a coin; if I get heads, I will declare an identification. Now, if this exercise were done under controlled circumstances where ground truth was known, I might flip the coin, get heads, declare an identification, and be *correct*. That is, it might happen that the true state of the two images was that they did come from the same source. However, I have not reached that conclusion in a scientifically valid way. I have not provided sufficient support for my opinion of same source.

The rational way to demonstrate the basis for the validity of a conclusion is through the documentation practices described above.

This is hardly a novel idea. In all of science, documentation of the process has always been the norm; lab notebooks are an essential part of any school laboratory course or professional experimental process. As the adage goes, "if it isn't written down, it didn't happen".

Such authorities as the American Society of Crime Lab Directors – Laboratory Accreditation Board (ASCLD-LAB), the NAS Report, SWGFAST, and the National Institute of Standards and Technology (NIST) / National Institute of Justice (NIJ) Report of the Expert Working Group on Human Factors in Latent Print Analysis (2012) have all agreed that documentation of the comparison process is necessary.

The NAS Report states that:

> Better documentation is needed of each step in the ACE-V process or its equivalent. At the very least, sufficient documentation is needed to reconstruct the analysis, if necessary. By documenting the relevant information gathered during the analysis, evaluation, and comparison of latent prints and the basis for the conclusion (identification, exclusion, or inconclusive), the examiner will create a transparent record of the method and thereby provide the courts with additional information on which to *assess the reliability of the method for a specific case*. Currently, there is no requirement for examiners to document which features within a latent print support their reasoning and conclusions. [emphasis added].

Recent research has even supported that there may be a higher error rate among practitioners who do not document their analyses (Langenburg et al 2012).

In any scientific endeavor, there is a potential for error.  The ACE-V method, in conjunction with agency policies and procedures, seeks to reduce that potential as much as possible by building in safeguards.  The first safeguard is the Verification step mentioned above.

It is important to note that when a proper Verification is taking place, the verifier does not initially refer to the Analysis or Comparison notes of the original analyst.  This is to prevent any potential bias that may be introduced by knowing how the analyst reached his or her conclusion before the verifier has had a chance to reach his or her own conclusion.

In some cases, **blind verification** may be warranted.  Typically, blind verification will be used when only one print has been identified in a case, or if the print is unusually complex. In a blind verification, the verifying examiner is unaware of the conclusion reached by the original analyst, the identity of the analyst, or even of the fact that an ID was made since in a good blind verification program, non-IDs are periodically passed through the process to each examiner as a quality control measure. The use of blind verification is an additional safeguard against bias and is a quality assurance measure.

Blind verification was not used in the well-known Brandon Mayfield case (2004). Investigation of this error suggested that one of the contributing causes to the error was an expectation bias introduced by the verifying examiners having knowledge of the high profile nature of the case, the identify of the original examiner (who was a well-respected senior examiner), and the conclusion of the original examiner (Stacey 2004). Today, the FBI utilizes blind verifications.

In addition to verification, blind verification, and retention of prints for future review, an additional safeguard (required for accredited laboratories) is **technical review**.  In technical review, a qualified examiner reviews the entire case note packet after the report has been written.  The purpose of this review is to follow the steps taken by the analyst and ensure that everything was done technically correctly, that statements made in the report are supported by the notes, and that nothing was overlooked.

<u>Documentation of Latent Print Work in This Case Was Not Sufficient to Demonstrate the Method Was Applied Reliably</u>

During discovery, a request was made for all standard operating procedures, bench notes, and reports associated with the latent print identification to Daniel Troya in this case.

*Standard Operating Procedures (SOPs)*

SOPs were received for crime scene processing and collection, but none were received for latent print training, processing, comparison, or report-writing. Without SOPs, there is no way to know what methods were followed during the analysis and comparison of the latent print evidence, or during its verification.

For instance, one best practice that can reduce the chance of error due to circular reasoning is to always do a full analysis of the latent (crime scene) image prior to looking at the exemplar (standard) provided for the suspect. This ensures that features being used for comparison were truly perceived by the analyst, not suggested to him by their presence in the exemplar. This very error was believed to be a large contributing factor to the Mayfield error (Office of the Inspector General, 2006). Without SOPs for the comparison process, there is no way to know if this critical practice is in use at the agencies that performed comparisons in this case.

This statement has laid out some best practices for verification, such as the verifier completing his own analysis before looking at the notes of the original analyst to avoid possibilities of bias; or the implementation of blind verification in a high-profile case with only a single identification (such as this case). Without SOPs, it is unknown if either of these practices were undertaken, but it must be assumed they were not, since laboratories generally do not use these procedures unless there is a policy that says they must.

Without appropriate quality measures in place for the verification process, its validity must be seriously called into question. Was a careful and thorough analysis done by the verifier, or was it simply a "rubber stamp"? Without SOPs describing the process used, there is no way to know.

Additionally, without SOPs, there is no way to know if a technical review of the comparison work in this case was done, and if it was, what it entailed. As outlined

above, the technical review is a critical step to ensure that the work was carried out in an appropriate and valid manner, and that the conclusions are appropriately supported by the evidence. There is no evidence provided through discovery that a technical review was performed.

*Bench Notes*

No bench notes relating to the Troya identification were provided. While there were photographs provided that allowed it to be inferred that ninhydrin processing was used; allowed both the original state, and processed state, of the evidence to be seen; and allowed the position of the latent print on the evidence to be seen, none of these demonstrates how the method was applied, or that it was applied reliably in this case.

Without documentation of the analysis, we have no way of knowing what data was considered, how possible inconsistencies were explained, or whether the analyst found sufficient evidence to support an opinion of identification.

Likewise, no notes were provided for any of the individuals who purported to have identified the latent print subsequently. Not one of them provided either written or visual notes in support of their opinions. Without these notes, it is impossible to evaluate the validity of their conclusions.

One of the examiners, Jack McCall, indicated in his report that "14 points of identification" were located during his analysis. However, without notes showing what 14 points he considered, this information is of limited value. The FBI claimed to have located 15 points of identification in their erroneous identification of Brandon Mayfield.

Nor is it considered good practice to invoke a numerical standard in support of a friction ridge identification. As far back as 1973, the IAI, after extensive study, stated, and reaffirmed in 1995, that "No scientific basis exists for requiring a pre-determined minimum number of friction ridge features must be present in two impressions in order to establish a positive identification."

Even countries long-known for their numerical standard, such as the United Kingdom, have since abandoned the numerical standard.

A numerical standard is inappropriate in the application of ACE-V for several reasons, the largest of which being:

1.  Minutiae vary widely in type and position within the fingerprint.  Therefore, what may be a sufficient number of points to identify above the core of a whorl, for example, may be woefully inadequate near a delta.

2.  When clarity is high enough to reproduce Level 3 detail (small details such as the distinct shape of the edge of a ridge), that detail adds great discriminative weight

to the comparison and ultimately aids in the decision.  A point standard is unable to take this critical information into account.

For these reasons, it is recognized by practitioners of the ACE-V methodology that the assignation of a point standard (when an agency chooses to incorporate one in their SOPs) is an arbitrary and administrative decision, not a scientific one. However, once again, without SOPs describing an agency point standard, it must be assumed that none exists. Thus, Mr. McCall had no basis (either scientific *or* administrative) for claiming that "14 points of identification" sufficiently demonstrated a valid identification. The only way to demonstrate the validity of his conclusion would have been to visually present the 14 points he found, in order that another competent examiner could assess its sufficiency for the conclusion.

However, as none of the other examiners involved in this case gave any indication of the amount of information they found in agreement at all, at least the claim of 14 points gives us some indication of what Mr. McCall considered to be sufficient for an identification, inadequate as this information was.

In *NH v. Langill*, (2010) the presentation of a court chart detailing the information used during the comparison was found by the state Supreme Court to meet the requirements of demonstrating the method was applied reliably, because analyst Lisa Corson walked through the steps of her analysis with the jury, explaining what she saw in the two images, and how that information led her to a conclusion of identification.

This was not done in this case. While allusion was made in Mr. McCall's testimony transcript to a court exhibit that would "show the jurors exactly what portion of Defendant Troya's palm you may or may not have been able to identify with the unknown palm print of value", exhibit 15, when received on discovery, was found to be nothing but an indication of what general region of the palm was identified to the latent print. While this information can help the jury to understand the direction of the palm in relation to the evidence object when contact was made, it does nothing to support the identification. In order to demonstrate that sufficient data was found in common with the two images to warrant an opinion of identification, the court chart would have had to illustrate the exact features selected by Mr. McCall that supported his claim.

*Reports*

The reports relating to the Troya identification received in this case were:

1)  Signed, "Latent Fingerprint Report" of Sgt. Gregg (#149), dated 10/[illegible]/2006
2)  Signed, written report of Jack McCall (#970), dated 05/02/2007
3)  Written, unsigned, undated statement of Robin N. Pettey (#3550)
4)  Initialed, Supplemental report of Sgt. Carl Muschweck (#158), dated 04/01/2007
5)  Initialed, Supplemental report of Sgt. Carl Muschweck (#158), dated 05/01/2007
6)  Initialed, Supplemental report of Carmichael (#1030), not dated

A clear, complete report of examination should include several basic elements, such as: the name of the agency, case number, victim name, name of analyst performing the work, date evidence was received and returned, dates of any conclusions, date of the report, page numbers, signature of the analyst performing the work and generating the report, signature of the technical reviewer, description of the evidence received, description of the analyses performed, and clear results for each item examined.

None of the provided reports includes all of these elements.

Report 1, which appears to have been the first report generated, is missing page numbers, contains an illegible date, and has no writing at all on the "Verified by" line. From this report, it looks like the identifications were neither verified nor technically reviewed. It is unclear if pages are missing from the report, since the page that was provided was not numbered.

Report 2 comes the closest to being complete, as it is clear from reading it what was done, by whom, and what was concluded. However, it does not appear that Mr. McCall's work was either verified or technically reviewed.

Report 3 is unsigned and undated, nor does it appear to be an official report, but looks more like a memo. It does clearly state what items were compared and what conclusions were reached, and on what dates the work was done.

Report 4 gives a complete review of the items examined and their conclusions. However, it purports to speak for both Sgt. Muschweck and Robin Pettey, but Sgt. Muschweck has only initialed the report, and Robin Pettey has not in any way certified that she agrees with its contents.

Report 5 is an amended report correcting an earlier clerical error.

Report 6 is undated, and discusses that Sgt. Gregg made identifications, but this is not the report of Sgt. Gregg; it is Carmichael's report. Typically, a report of analysis should be written by the person who performed the analysis, not by someone else. At the very least, if Carmichael is going to write a report attesting to work done by Sgt. Gregg, Sgt. Gregg should also have signed the report to indicate that his work was correctly represented.

The end result of these reports in various states of completeness is that it is very difficult to read them and get a clear picture of what was done, when, and by whom. It also does not appear that appropriate quality assurance measures, such as technical review, were undertaken at all.

<u>Trial Testimony of Jack McCall</u>

The trial testimony of Jack McCall was problematic in several places that could have been subjected to additional scrutiny at the time of the original trial. While Mr. McCall

had good qualifications in being certified by the IAI and possessing over twenty years of experience, his responses were in several places misleading, lacking in scientific rigor, or just plain inaccurate. While several of his responses were unfortunately representative of the common mode of presenting latent print evidence at the time, there were others where, simply put, he should have known better.

Beginning with his basic description of ridge structures on page 158, Mr. McCall begins deviating from industry standard explanations, naming off several ridge features (ridge ending, bifurcation, enclosure, short ridge) without first laying an appropriate foundation of what the basic building blocks of ridge features are, which is to say, ridge endings and bifurcations (enclosures and short ridges are not).

He then goes on (page 159) to describe the material secreted by the pores on the palmar surfaces of the hands as "a fluid", which is certainly true, but more descriptively, that fluid is sweat, a common fluid that jurors are likely to understand. He describes this fluid as being comprised of 99% water and 3% amino acids and fats. Not only does this reckoning add up to more than 100%, but it leaves out additional important constituents of the eccrine (sweat) fluid that is secreted by the sweat pores. While this misinformation may be of small consequence to a non-scientific jury, the fact that an expert of twenty-plus years doesn't seem to know the true facts leaves one in some doubt as to his level of expertise in the field. These are basic facts that are typically taught in the first few weeks of training for a latent print examiner.

On page 162 of the trial testimony record, Mr. McCall then presents the concept of a standard as something that is collected during the booking process. This characterization is not only biasing, but quite misleading. While a booking process is *one* source of exemplar prints, the true definition is simply that a standrd is a recording taken under controlled conditions in which the identity of the donor is known. A standard can come from a suspect, a victim, an officer, someone with legitimate access to a scene, someone who had their fingerprints taken for pre-employment purposes, someone who works in law enforcement, someone who has applied for a concealed carry permit, or many other reasons, depending on jurisdiction. To imply that the only way to get a standard is by arresting someone is simply not true. A sidebar in the transcript did touch briefly on this question, but the discussion was limited largely to the provenance of the standard that was used for this specific comparison, and did not really deal with the larger issue of the bias that was introduced by the implication that only arrestees produce standards.

When describing on page 170 the identification that he made between the palm of Mr. Troya and the latent print developed on item 100, Mr. McCall states that the latent has to be "exactly the same as a standard that you are working with with no exception whatsoever". Again, this is a mis-statement of the facts about latent print comparison. When a finger or palm is pressed against a receptive surface to leave behind a latent impression, a 3-dimensional object (the finger) is being transferred to a 2-dimensional impression (the fingerprint). Due to this transferring process, and to the various inconsistencies presented by surface differences, pressure, amount of matrix present

on the skin's surface, etc, no two impressions of the same friction ridge skin will ever be exactly alike, nor will they exactly match the source skin from which they came. Thus, to say that in order to make an identification, the latent and standard must be the same with no exceptions whatsoever is to say that there will never *be* an identification, for there are *always* exceptions between the latent and the standard.

Even if Mr. McCall is referring to the oft-cited "one dissimilarity doctrine", which states that if a single unexplainable dissimilarity is found between a latent and a standard, an identification cannot be declared, this theory has been often criticized and is not uniformly followed within the discipline. Further, if this *was* the idea he meant to invoke, it should have been done clearly so as not to mislead anyone that he was talking about differences in appearance caused by the normal deposition of a latent from the same source, and he should also have presented it with the necessary caveats, such as that in order to disqualify an identification, any dissimilarities noted must be *unexplainable* by distortion or other factors.

On page 175 when Mr. McCall is asked to present his opinion on the comparison he performed, he stated, "[t]here is no question about it, his hand is on that ticket". This statement of absolute certainty is an overstatement of the strength of the evidence. While it would have been appropriate for Mr. McCall to state his opinion, the strength of his confidence in that opinion, and the basis for both the opinion and his confidence level, it is not appropriate for him to couch his conclusion in absolute terms, as though they were a fact, and not an opinion based upon careful interpretation of objective data.

During cross-examination on page 185, Mr. McCall takes the overstatement of the evidence a step further when he claims he "will show you how it happened", by which he means (as one can see by continuing to read the transcript) that he can divine how Mr. Troya touched the ticket to leave behind the latent that was identified to him. Here Mr. McCall makes a statistical and conceptual leap, jumping from what is known as a source level proposition (was Mr. Troya the source of the latent print, or was some other person) to an activity level proposition (what did the person who left the latent print do to transfer his print to the surface, or in other words, how did he hold the item?). While Mr. McCall had already overstated the strength of the evidence on direct examination by purporting to know with absolute certainty the *source* of the latent print, he was now professing the same absolute certainty in the *activity* that led to its being deposited.

While Mr. McCall may have relied on some sort of common sense explanation to guess how the latent print may have been deposited on the ticket, it is outside of the scope of his expertise to opine on it, especially an opinion that is being dressed up as a fact. Mr. McCall has been called to testify due to his expertise in latent print comparisons. He has not demonstrated any expertise in the manner of deposition, nor any scientific basis for his conclusion. By claiming to know how the latent print was deposited under guise of his expertise, he confers on his opinion a weight it does not deserve, leading the jury to believe that he has special knowledge of the deposition based on his expertise, when in fact, he is just making a guess the same way as any layperson, or member of the jury, could do without his help.

## Conclusion

The latent print comparison discipline involves observing objective data, interpreting it, and reaching an opinion regarding source. Due to that subjective interpretation step, variability has been observed between different examiners, and within the same examiner at different viewings of the same evidence.

In order to demonstrate that this process has been applied reliably to reach a valid conclusion, careful and thorough documentation of the process used, and the data observed, must be completed to allow others to assess the work.

It is my opinion that the documentation provided in this case is insufficient to demonstrate what procedures **should have** been followed, what procedures **were** followed, or what basis there was for the **validity of the conclusion**.

The opinions expressed in this affidavit are those of Heidi Eldridge, dba On the Mark Forensics, L.L.C., and do not necessarily reflect those of any other employer, past or present.


Heidi Eldridge