CA No. 09-12716-P

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) |
| | ) |
| DANIEL TROYA, | ) |
| | ) |
| Defendant-Appellant. | ) |
| | ) |

_____
On Appeal from the United States District Court
for the Southern District of Florida
_____
_____

# APPELLANT DANIEL TROYA'S PRINCIPAL BRIEF

_____

Barry J. Fisher, Esq.
Sean J. Bolser, Esq.
Federal Capital Appellate Resource Counsel
Federal Public Defender, NDNY
39 North Pearl Street, 5th Floor
Albany, NY 12207
(518) 436-1850, ext. 116
barry_fisher@fd.org

Robert L. McGlasson, Esq.
1024 Clairemont Avenue
Decatur, Georgia  30030
(404) 314-7664
rlmcglasson@comcast.net

Attorneys for Defendant-Appellant Daniel Troya

**United States v. Daniel Troya, CA No. 09-12716-P**

**<u>CERTIFICATE OF INTERESTED PERSONS</u>**

Bolser, Sean J., counsel for Appellant Troya;

Carlton, Stephen, counsel for Appellee;

Cohen, Michael B., former counsel for Co-Appellant Sanchez;

DiRosa, Phillip, counsel for Appellee;

Eisenberg, James L., former counsel for Appellant Troya;

Escobedo, Jose Luis, victim;

Escobedo, Luis Damian, victim;

Escobedo, Luis Julian, victim;

Escobedo, Yessica Guerrero, victim;

Ferrer, Wifredo A., counsel for Appellee;

Fisher, Barry J., counsel for Appellant Troya;

Gannett, Sarah S., counsel for Co-Appellant Sanchez;

Garcia, Ruben M., former counsel for Appellant Troya;

Hurley, Daniel T. K., United States District Judge;

Kastrenakes, John Steven, counsel for Appellee;

McClain, Martin J., appellate counsel for Co-Appellant Sanchez;

McGlasson, Robert L., counsel for Appellant Troya;

**United States v. Daniel Troya, CA No. 09-12716-P**

Murrell, Jr., Larry Donald, former counsel for Co-Appellant Sanchez;

Kathleen Salyer, counsel for Appellee;

Sanchez, Jr., Ricardo, Co-Appellant;

Schultz, Anne R., counsel for Appellee;

Troya, Daniel, Appellant;

Vitunac, Ann E., United States Magistrate Judge;

Yera, Evelio Jesús, counsel for Appellee.

## **STATEMENT REGARDING ORAL ARGUMENT**

Appellant Daniel Troya requests oral argument.  This is a direct appeal from the first death sentence imposed by a federal court in Florida in the modern era. Troya's brief raises a number of serious and complex issues, many of them matters of first impression in this Circuit.  Troya's counsel respectfully suggests that the Court's consideration of his appeal would benefit from oral argument.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS. . . . . . . . . . . . . . . . . . . . . . . . C-1

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CITATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xii

STATEMENT REGARDING ADOPTION
        OF BRIEFS OF OTHER PARTIES. . . . . . . . . . . . . . . . . . . . . . . xxviii

STATEMENT OF SUBJECT-MATTER
        AND APPELLATE JURISDICTION.. . . . . . . . . . . . . . . . . . . . . . xxix

STATEMENT OF ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

COURSE OF PROCEEDINGS
        AND DISPOSITIONS IN THE COURT BELOW.. . . . . . . . . . . . . . . . . 5

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.      Guilt-Innocence Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.      Introduction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        B.      The proof showed that Troya had a relatively low-level, collateral
                involvement with Varela's large-scale narcotics operation... . . . . . . 11

        C.      The circumstantial evidence connected Troya with Sanchez on the
                evening of the crime, and placed him at or near the crime scene.. . . 14

        D.      The direct evidence against Troya, statements he allegedly made to
                two felons, was inconclusive and, in any event, of questionable
                credibility.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

E.      The evidence did not clearly establish that Escobedo's children, the only victims for whom Troya was sentenced to death, were killed intentionally.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

II.     Sentencing Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

A.      The government case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

1.      Notwithstanding the government's formal withdrawal of the future-dangerousness aggravator, it made sure the jury still heard and considered the evidence it had earlier said it would use to prove Troya would be dangerous.. . . . . . . . . . . . . . . . 27

2.      The government also presented victim-impact testimony.. . . . 32

B.      The defense case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

1.      Troya's happy early childhood in a loving and caring family, which continues to love him.. . . . . . . . . . . . . . . . . . . . . . . 32

2.      Troya's early teenage years marked by trauma and loss. . . . . 34

3.      The bad influence exerted on Troya by his Uncle Isidro.. . . . 37

4.      Daniel Varela, the head of the drug conspiracy and alleged instigator of the murders, did not face the death penalty or even a murder charge.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

C.      After extended deliberations, the jury rendered split sentencing verdicts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

STANDARDS OF REVIEW.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

SUMMARY OF ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

I.      The court wrongly allowed cooperator testimony accusing Troya of several other serious gun crimes involving innocent victims.  Worse, the government improperly urged jurors to consider it as propensity evidence that he was a "killer" who could "execute an entire family.". . . . . . . . . . . . 62

        A.      The court erred in admitting evidence of two drive-by shootings, an armed home invasion, and Troya's prior imprisonment, all of which concededly had no relation to the capital charges, and zero or trivial relevance even to other counts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

                1.      The Haverhill Avenue shooting. . . . . . . . . . . . . . . . . . . . . . . 62

                        a.      Factual background.  . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

                        b.      The Haverhill Avenue shooting should not have been admitted.  It was not "intrinsic" to the drug conspiracy or relevant to prove Troya's intent to participate in it.  And any scant probative value was far outweighed by its unfair prejudice on the capital charges.. . . . . . . . . . . . . 66

                2.      The Mercer Avenue shooting and Troya's prior imprisonment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

                        a.      Factual background. . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

                        b.      The Mercer Avenue shooting and Troya's prior imprisonment were not relevant under Rule 404(b) to show that he possessed an AK-47 six months later when police found it in Varela's bedroom.  Moreover, this highly prejudicial evidence was not admissible under Rule 403, especially as the AK-47 was one of 14 guns found in Varela's home by police, and the government amply proved Troya's access to the other guns in the garage and thus his guilt on the two gun-possession counts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

3.      The attempted armed home invasion. . . . . . . . . . . . . . . . . . . 76

a.      Factual background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

b.      The attempted armed home invasion had little if any relevance, and concededly none to the capital charges. Thus it was inadmissible as "intrinsic" or Rule 404(b) evidence, and certainly did not pass the Rule 403 balancing test.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

B.      In summation, the government engaged in flagrant misconduct by explicitly urging jurors to use the Haverhill and Mercer Avenue shootings as proof of Troya's propensity to kill the Escobedos.. . . . 79

1.      The prosecutors invited jurors to treat the two uncharged drive-by shootings as proof "that a killer like" Troya "could execute an entire family," and as proof of his proclivity for "violence" against "individuals who have no play in his criminal involvement"     like the Escobedo children.. . . . . . . . . . . . . . 79

2.      The court erred in licensing the prosecutors' propensity arguments.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

C.      The evidentiary and summation errors were not harmless.  They likely induced jurors to treat uncharged crimes as proof of Troya's propensity to kill the Escobedos.  And the other evidence of Troya's guilt on the capital charges was not overwhelming, but rather plagued by significant gaps and conveyed by witnesses of questionable credibility.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

II.     The court plainly erred by prompting a cooperating witness to testify Troya said, "I have killed some people," when in fact the witness was claiming Troya had only said he was "involved in" killing some people, and had also used the term "we."  This alteration, resulting from the court's directive to change the plural to the singular, was not necessary to safeguard a codefendant's confrontation rights, and it unfairly prejudiced Troya's defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

A.      The court violated Troya's rights by altering the critical piece of Carlos Rodriguez's testimony in a way that prejudicially distorted the meaning of Troya's alleged statement and deprived the defense of an exculpatory inference jurors could have drawn from the actual version.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

B.      The court's error, in prompting Rodriguez to alter his testimony in a way that prejudiced Troya's defense, was exacerbated by the fact that no "redaction" of any kind was needed to safeguard Sanchez's Bruton rights.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

C.      The court's alteration of Rodriguez's testimony was a patent, highly prejudicial misstep, and thus constituted plain error.. . . . . . . 96

III.    The court erred in excluding critical expert testimony that, if sentenced to life, Troya would likely adjust well to prison and not pose a threat, and could be safely managed.  This testimony was admissible, both to rebut evidence and argument suggesting he would be violent and present an escape risk if incarcerated, and independently as mitigating evidence.. . . . . . . . . . . . . . 98

A.      The court kept the jury from hearing rebuttal testimony by the defense expert, Dr. Mark Cunningham, on the ground that the government had formally withdrawn the dangerousness aggravator... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

B.      The trial and sentencing hearing were replete with evidence and government argument suggesting that, if spared execution, Troya would pose a danger of violent acts against other inmates, prison staff, and, possibly, members of the community, in the event of his escape or accidental release.. . . . . . . . . . . . . . . . . . . . . . . . 105

1.      Evidence and argument concerning Troya's violent background and nature. . . . . . . . . . . . . . . . . . . . . . . . . . . 105

2.      Evidence of dangerous prisons plagued by violence... . . . . . . 108

3.      Evidence of escape risk and institutional misconduct... . . . . . 111

C. The court erred by precluding Cunningham from testifying. His testimony would properly have rebutted "future dangerousness," since the government's evidence and argument had put it "at issue.". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

    1. The FDPA and the United States Constitution confer upon a capital defendant the right to rebut the government's case in aggravation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

    2. Troya's future dangerousness was placed "at issue," triggering his right of rebuttal.. . . . . . . . . . . . . . . . . . . . . . . . 115

    3. Cunningham's proffered testimony would have rebutted the inferences of Troya's future dangerousness.. . . . . . . . . . . . . 124

D. Cunningham's testimony was further admissible as mitigation, independent of its relevance as rebuttal.. . . . . . . . . . . . . . . . . . . . . . 130

E. The court's exclusion of Cunningham's testimony is not subject to further analysis for "harmlessness." In any event, it clearly prejudiced Troya at the sentencing hearing.. . . . . . . . . . . . . . . . . . . 135

IV. The court wrongly kept out evidence of, and affirmatively instructed jurors to ignore as mitigation, the relationships Troya would maintain with his family were he allowed to live in prison, and the grief and loss they would suffer if he were executed.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

A. The court told jurors not to consider the forward-looking significance of Troya's relationships with his relatives, and excluded testimony on the subject.. . . . . . . . . . . . . . . . . . . . . . . . 140

B. The court violated Troya's rights under the Eighth Amendment and FDPA by excluding evidence of, and instructing the jury to ignore, the value of the relationships his family would maintain with him in prison and the loss and harm they would experience if he were removed from their lives.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

vii

1.    The court acknowledged that Troya's "loving relationships" with his family could illuminate his character, yet it excluded testimony from relatives critical to fully demonstrating the nature and strength of those relationships.. . . . . . . . . . . . . . 149

2.    The future value to his family of keeping Troya in their lives, and the harm they would suffer if he were executed, also constituted relevant mitigation in its own right. Thus, the court erred by excluding evidence about this, and worse, by instructing the jury to ignore it entirely... . . . . . . . . . . . . . . 154

C.    Because the court allowed significant, emotional victim-impact evidence, its drastic narrowing of mitigation from Troya's family also violated his right to due process.. . . . . . . . . . . . . . . . . . . . . . . 161

D.    The court's exclusion of execution impact and its instruction to jurors to ignore such mitigation seriously prejudiced Troya.. . . . . . 164

V.    No legally sufficient evidence supported the jury's important aggravation findings that Troya had substantially planned and premeditated the murders of the two child victims and that he did so to eliminate them as witnesses... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

A.    The jury relied on findings of the substantial-planning and witness-elimination aggravators.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

B.    There was legally insufficient evidence that Troya substantially planned and premeditated the children's murders, or that his motive was to eliminate them as witnesses.. . . . . . . . . . . . . . . . . . . . . . . . 170

C.    The jury's reliance on these faulty aggravating factors was prejudicial... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

VI.    Because the child victims were not more vulnerable than the adult ones to being killed by surprise gunshots from close range, nor were they targeted because they were children, their youth had no logical connection to their deaths.  Thus, the evidence was legally insufficient to support the statutory aggravating factor that they were "particularly vulnerable due to their youth," and so the jury's reliance on it was error.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

VII.   There was no evidence the children were killed in order to steal the cocaine in Escobedo's jeep.  Accordingly, there was legally insufficient proof to support the statutory aggravating factor that Troya murdered the children for pecuniary gain... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

VIII.  The court plainly erred in allowing the jury to base a death sentence on uncharged crimes attributed to Troya without finding, unanimously and beyond a reasonable doubt, that he had committed each (or, indeed, any particular) one of them.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

       A.     The jury heard testimony accusing Troya of several other serious violent offenses.  But he was never charged with any of those, and the proof against him on each of them was highly questionable... . 185

       B.     By inviting jurors to find the "other uncharged violence" aggravator, without unanimous agreement or proof beyond a reasonable doubt as to each or any individual crime, the court's instructions violated the FDPA, due process, and the Eighth Amendment.. . . . . . . . . . . 186

       C.     Troya was seriously prejudiced by the jurors' being licensed to find this aggravator without having to unanimously agree that any particular uncharged crime had been proven beyond a reasonable doubt... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

IX.    The prosecutors blunted a key mitigating factor, Daniel Varela's non-prosecution for his equally culpable role in the murders, by improperly vouching to jurors that the government would continue its investigation, and would charge him with murder and seek the death penalty as soon as it gathered enough evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

X.     The sentencing instructions erroneously conveyed to jurors that mitigation unrelated to the crime, and thus not "similar" to any statutory mitigator, presumptively carried less or perhaps no significance.  The government exploited the error by arguing that Troya's mitigating factors were "excuses" that the jury should disregard because they had nothing to do with the shootings.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

XI.    The Court erroneously failed to instruct jurors that, before they could vote for death, the government needed to establish "beyond a reasonable doubt" that aggravating factors sufficiently outweighed mitigating ones.. . . . . . . 214

       A.     Apprendi applies to statutory findings required for an enhanced sentence, even if they involve subjective or moral determinations like the finding of sufficient outweighing.. . . . . . . . . . . . . . . . . . . . 216

       B.     The Supreme Court's decision in Kansas v. Marsh does not cut against Troya's claim.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

       C.     Under the Supreme Court's decision in Sullivan v. Louisiana, this error is structural, and thus *per se* reversible.. . . . . . . . . . . . . . . . . 222

XII.   The court instructions, including its false suggestion that a "lesser sentence" than life was an option for Troya, left jurors to speculate that a not-unanimous verdict might result in his eventual release.  This misimpression may have helped coerce life-leaning jurors to change their votes.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

       A.     The court authorized jurors to render a verdict of not-unanimous. But it refused to tell them that, if they did, Troya would receive, at minimum, a *de facto* life sentence.  Instead, it misleadingly left them to speculate that a deadlock might result in the court imposing a "term of years.".. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

       B.     The court unconstitutionally risked coercing a death verdict by allowing jurors to speculate wrongly that a not-unanimous verdict might produce an extremely unpalatable result: Troya's eventual release back into society.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 228

C.     The Court should set aside Troya's death sentences.. . . . . . . . . . . . 233

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

CERTIFICATE OF FILING AND SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## TABLE OF CITATIONS

### CASES

Abdul-Kabir v. Quarterman, 550 U.S. 233 (2007). . . . . . . . . . . . . . . . . . . 205, 211

Ake v. Oklahoma, 470 U.S. 68 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

Andres v. United States, 333 U.S. 740 (1948). . . . . . . . . . . . . . . . . . . . . . . 189

Andrews v. Commonwealth, 699 S.E.2d 237 (Va. 2010). . . . . . . . . . . . . . . . . . . 19

*Apprendi v. New Jersey, 530 U.S. 466 (2000). . . . . . . . . . . . . . . . . . . . . . *passim*

Arizona v. Fulminante, 499 U.S. 279 (1991). . . . . . . . . . . . . . . . . . . . . . . 98

Atkins v. Virginia, 536 U.S. 304 (2002). . . . . . . . . . . . . . . . . . . . . . . . . 1154

Ayers v. Belmonte, 549 U.S. 7 (2006). . . . . . . . . . . . . . . . . . . . . . . . . 132

Barefoot v. Estelle, 463 U.S. 880 (1983). . . . . . . . . . . . . . . . . . . . . 115, 132

Batson v. Kentucky, 476 U.S. 79 (1986). . . . . . . . . . . . . . . . . . . . . . . . . 61

Bedford v. Collins, 567 F.3d 225 (6th Cir. 2009). . . . . . . . . . . . . . . . . . . . . 213

Blakely v. Washington, 542 U.S. 296 (2004). . . . . . . . . . . . . . . . 217, 218, 219, 220

Bolender v. Singletary, 16 F.3d 1547 (11th Cir. 1994). . . . . . . . . . . . . . . . . . 165

Boyde v. California, 494 U.S. 370 (1990). . . . . . . . . . . . . . . . . . . . . . . . . 231

Brewer v. Quarterman, 550 U.S. 286 (2007). . . . . . . . . . . . . . . . . . . . . . . 205

*Brooks v. Kemp, 762 F.2d 1383 (11th Cir.1985). . . . . . . . . . . . . . . . 201, 212, 213

Bruton v. United States, 391 U.S. 123 (1968). . . . . . . . . . . . . . . . 87, 91, 94-97

Buchanan v. Angelone, 522 U.S. 269 (1998). . . . . . . . . . . . . . . . . . . . . . . . . 231

Buck v. Thaler, 132 S. Ct. 32 (2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

Caldwell v. Mississippi, 472 U.S. 320 (1985).. . . . . . . . . . . . . . . . . . . . . . . 229

Clemons v. Mississippi, 494 U.S. 738 (1990).. . . . . . . . . . . . . . . . . . . . . . . 135

Coble v. State, 330 S.W.3d 253 (Tex. Cr. App. 2010). . . . . . . . . . . . . . . . 102, 126

Crane v. Kentucky, 476 U.S. 683 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . 113

Cullen v. Pinholster, 131 S. Ct. 1388 (2011).. . . . . . . . . . . . . . . . . . . . . . . 160

Cunningham v. California, 549 U.S. 270 (2007). . . . . . . . . . . . . . . . . . . 218, 219

Davis v. Coyle, 475 F.3d 761 (6th Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . 165

DePew v. Anderson, 311 F.3d 742 (6th Cir. 2002).. . . . . . . . . . . . . . . . . . . 211

Deal v. United States, 508 U.S. 129 (1993). . . . . . . . . . . . . . . . . . . . . . . . 224

Deck v. Missouri, 544 U.S. 622 (2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . 121

Delaware v. Van Arsdall, 475 U.S. 673 (1986).. . . . . . . . . . . . . . . . . . . . . . 97

*Eddings v. Oklahoma, 455 U.S. 104 (1982). . . . . . . . . . . . . . . . . . . . . 149, 205

Ellis v. District of Columbia, 84 F.3d 1413 (D.C. Cir. 1996).. . . . . . . . . . . . . 134

Gardner v. Florida, 430 U.S. 349 (1977).. . . . . . . . . . . . . . . . . . 113, 114, 115

Getsy v. Mitchell, 495 F.3d 295 (6th Cir. 2007).. . . . . . . . . . . . . . . . . . . . . 203

Gore v. Dugger, 933 F.2d 904 (11th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . 164

Gray v. Maryland, 523 U.S. 185 (1998). . . . . . . . . . . . . . . . . . . . . . 94, 95, 96

Hallford v. Culliver, 459 F.3d 1193 (11th Cir. 2006). . . . . . . . . . . . . . . . . . 43, 169

Hanson v. State, 206 P.3d 1020 (Okla. Crim. App. 2009) . . . . . . . . . . . . . . . 102

Harrington v. California, 395 U.S. 250 (1969). . . . . . . . . . . . . . . . . . . . . . . . 94

*Hitchcock v. Dugger, 481 U.S. 393 (1987). . . . . . . . . . . . . . . . . . . . . . 152, 204

*Hodges v. Epps, 648 F.3d 283 (5th Cir. 2011). . . . . . . . . . . . . . . . . . 230, 231

Holmes v. South Carolina, 547 U.S. 319 (2006). . . . . . . . . . . . . . . . . . . . . 112

Hooks v. Workman, 606 F.3d 715 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . 229

Huddleston v. United States, 485 U.S. 681 (1988). . . . . . . . . . . . . . . . . . 68, 74

J.D.B. v. North Carolina, 131 S. Ct. 2394 (2011). . . . . . . . . . . . . . . . . . . . 155

Jackson v. Dretke, 450 F.3d 614 (5th Cir. 2006). . . . . . . . . . . . . . . 155, 157, 163

Jackson v. Virginia, 447 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . 169

Johnson v. Louisiana, 406 U.S. 356 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . 189

Johnson v. Mississippi, 486 U.S. 578 (1988). . . . . . . . . . . . . . . . . . . . . . . . 200

Jones v. United States, 527 U.S. 373 (1999). . . . . . . . . . . . . . . . . . . 224, 229, 230

Jurek v. Texas, 428 U.S. 262 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . 115, 132

Kansas v. Marsh, 548 U.S. 163 (2006). . . . . . . . . . . . . . . . . . . . . . . . . 220, 221

*Kelly v. South Carolina, 534 U.S. 246 (2002). . . . . . . . . . . . . . . . . . . . . . . . *passim*

Kennedy v. Herring, 54 F.3d 678 (11th Cir. 1995). . . . . . . . . . . . . . . . . . . . . 45

Kyles v. Whitley, 514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

Lamarca v. Secretary, Dep't of Corr., 568 F.3d 929 (11th Cir. 2009). . . . . . . . . . 91

Lawrie v. State, 643 A.2d 1336 (Del. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

Lewis v. Jeffers, 497 U.S. 764 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

*Lockett v. Ohio, 438 U.S. 586 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

Lowenfeld v. Phelps, 484 U.S. 231 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 232

Lugo v. State, 845 So. 2d 74 (Fla. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

Marshall v. Cathel, 428 F.3d 452 (3d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . 165

Marshall v. Hendricks, 313 F. Supp. 2d 423 (D. N.J. 2004). . . . . . . . . . . . . . . . 155

Mollet v. Mullin, 348 F.3d 902 (10th Cir. 2003). . . . . . . . . . . . . . . . . . . . 135, 136

*Morris v. Woodford, 273 F.3d 826 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . 230, 231

Nelson v. Quarterman, 472 F.3d 287 (5th Cir. 2006). . . . . . . . . . . . . . . . . . 165, 166

Old Chief v. United States, 519 U.S. 172 (1993). . . . . . . . . . . . . . . 68, 69, 74, 75

Olden v. Kentucky, 488 U.S. 227 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Osborne v. Ohio, 495 U.S. 103 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

Palmer & Cay Co. v. Marsh & McLennon Cos.,
        404 F.3d 1297 (11th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 217

Parker v. Dugger, 498 U.S. 308 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

Payne v. Tennessee, 501 U.S. 808 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

People v. Hill, 952 P.2d 638 (Cal. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

People v. Ochoa, 966 P.2d 442 (Cal. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

People v. Padilla, 906 P.2d 388 (Cal. 1995). . . . . . . . . . . . . . . . . . . . . . . . 20

Penry v. Lynaugh, 492 U.S. 302 (1989). . . . . . . . . . . . . . . . . . . . . . . . 154, 157

Porter v. McCollum, 130 S. Ct. 447 (2009). . . . . . . . . . . . . . . . . . . . 48, 139, 166

Richardson v. Marsh, 481 U.S. 200 (1987). . . . . . . . . . . . . . . . . . . . . . . . . 95

*Richardson v. United States, 526 U.S. 813 (1999). . . . . . . . . . . 187, 188, 190, 191

Richmond v. Lewis, 506 U.S. 40 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . 159

*Ring v. Arizona, 536 U.S. 584 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . 215

Romano v. Oklahoma, 512 U.S. 1 (1994). . . . . . . . . . . . . . . . . . . . . . . . . 229

Romine v. State, 305 S.E.2d 93 (Ga. 1983). . . . . . . . . . . . . . . . . . . . . . . . 159

Rompilla v. Beard, 545 U.S. 374 (2005). . . . . . . . . . . . . . . . . . . . . . . . . 166

*Satterwhite v. Texas, 486 U.S. 249 (1988). . . . . . . . . . . . . . . . . . . . . . *passim*

Schad v. Arizona, 501 U.S. 624 (1991). . . . . . . . . . . . . . . . . . . . . . . 188, 190

Scott v. Dugger, 604 So. 2d 465 (Fla. 1992). . . . . . . . . . . . . . . . . . . . . . . 203

Sears v. Upton, 130 S. Ct. 3259 (2010). . . . . . . . . . . . . . . . . . . . . . . . . 160

Sexton v. State of Texas, 93 S.W.3d 96 (Tex. Crim. App. 2002). . . . . . . . . . . . . 20

Shurn v. Delo, 177 F.3d 662 (8th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . 202

*Simmons v. South Carolina, 512 U.S. 154 (1994). . . . . . . . . . . . . . . . . . . *passim*

*Skipper v. South Carolina, 476 U.S. 1 (1986). . . . . . . . . . . . . . . . . . . . . *passim*

Smith v. Commonwealth, 389 S.E.2d 871 (Va. 1990). . . . . . . . . . . . . . . . . . . 20

Smith v. Commonwealth, 734 S.W.2d 437 (Ky. 1987). . . . . . . . . . . . . . . . 161

Smith v. Texas, 543 U.S. 37 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

Sochor v. Florida, 504 U.S. 527 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . 169

State v. Brooks, 762 So. 2d 879 (Fla. 2000). . . . . . . . . . . . . . . . . . . . . . . 211

State v. Calliham, 55 P.3d 573 (Utah 2002). . . . . . . . . . . . . . . . . . . . . . . . 20

State v. Douglas, 800 P.2d 288 (Or. 1990). . . . . . . . . . . . . . . . . . . . . . . . 102

State v. Gilliam, 827 So. 2d 508 (La. 2002). . . . . . . . . . . . . . . . . . . . . 19, 20

State v. Rhines, 548 N.W.2d 415 (S.D. 1996).. . . . . . . . . . . . . . . . . . 159, 163

State v. Simmons, 944 S.W.2d 165 (Mo. 1997). . . . . . . . . . . . . . . . . . . . . 159

State v. Stacy, 680 So. 2d 1175 (La. 1996). . . . . . . . . . . . . . . . . . . . . . . . . 20

State v. Stenson, 940 P.2d 1239 (Wash. 1997). . . . . . . . . . . . . . . . . . . . . 155

State v. Stevens, 879 P.2d 162 (Or. 1994).. . . . . . . . . . . . . . . . . . . . . . . . 152

State v. Wise, 596 S.E.2d 475 (S.C. 2004). . . . . . . . . . . . . . . . . . . . . . . . 159

Stenson v. Lambert, 504 F.3d 873 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . 155

Sullivan v. Louisiana, 508 U.S. 275 (1993). . . . . . . . . . . . . . . . . . . . . . . . 222

*Tennard v. Dretke, 542 U.S. 274 (2004). . . . . . . . . . . . . . . . . . 149, 150, 166, 205

Thessing v. State, 230 S.W.3d 526 (Ark. 2006). . . . . . . . . . . . . . . . . . . . . 159

Toolate v. Borg, 828 F.2d 571 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . 120

Townsend v. Burke, 334 U.S. 736 (1948).. . . . . . . . . . . . . . . . . . . . . . . . . 201

United States v. Lopez, 649 F.3d 1222 (11th Cir. 2011). . . . . . . . . . . . . . . . 7, 94

United States v.  Cisneros, 363 F. Supp. 2d 827 (E.D. Va. 2005). . . . . . . . . . . . 191

*United States v. Agurs, 427 U.S. 97 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . 199

United States v. Allen, 247 F.3d 741 (8th Cir. 2001). . . . . . . . . . . . . . . 43, 113, 168

United States v. Baker, 432 F.3d 1189 (11th Cir. 2005). . . . . . . . . . . . . . . . . . . . 234

United States v. Barnette, 211 F.3d 803 (4th Cir. 2000). . . . . . . . . . . . . . . 134, 138

United States v. Barnette, 390 F.3d 775 (4th Cir. 2004). . . . . . . . . . . . . . . 181, 182

United States v. Barrett, 496 F.3d 1079 (10th Cir. 2007). . . . . . . . . . . 215, 220, 221

United States v. Battle, 173 F.3d 1343 (11th Cir. 1999). . . . . . . . . . . . . 52, 154, 155

United States v. Bernard, 299 F.3d 467 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . 182

United States v. Bin Ladin, 156 F. Supp. 2d 359 (S.D.N.Y. 2001). . . . . . . . . . . 156

United States v. Blackie, 548 F.3d 395 (6th Cir. 2008). . . . . . . . . . . . . . . . . . 161

*United States v. Blakey, 14 F.3d 1557 (11th Cir. 1994). . . . . . . . . . . . . . . . . . . . 83

United States v. Bolden, 545 F.3d 609 (8th Cir. 2008). . . . . . . . . . . . 151, 182, 183

United States v. Bourgeois, 423 F.3d 501 (5th Cir. 2005). . . . . . . . . . . . . . . . . 179

United States v. Bradberry, 466 F.3d 1249 (11th Cir. 2006). . . . . . . . . . . . . . . . 42

United States v. Bradley, 644 F.3d 1213 (11th Cir. 2011). . . . . . . . . . . . . . . . 178

United States v. Brokemond, 959 F.2d 206 (11th Cir. 1992). . . . . . . . . . . . . . . . 45

*United States v. Brown, 441 F.3d 1330 (11th Cir. 2006). . . . . . . . . . 137, 181, 182

United States v. Burns, 162 F.3d 840 (5th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . 93

United States v. Cage, 451 F.3d 585 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . 160

*United States v. Calderon, 127 F.3d 1314 (11th Cir. 1997). . . . . . . . . . . . . . . . 82

United States v. Caro, 433 F. Supp. 2d 726 (2006). . . . . . . . . . . . . . . . . . . . . . . 156

United States v. Caro, 461 F. Supp. 2d 459 (W.D. Va. 2006). . . . . . . . . . . . . . 157

United States v. Chandler, 996 F.2d 1073 (11th Cir. 1993). . . . . . . . . . . . . . . . 217

United States v. Chanthadara, 230 F.3d 1237 (10th Cir. 2000). . . . . . . . . . . . 182

United States v. Dale, 614 F.3d 942 (8th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . 94

United States v. Davis, 132 F. Supp. 2d 455 (E.D. La. 2001). . . . . . . . . . . . . . 156

United States v. Davis, 609 F.3d 663 (5th Cir. 2010). . . . . . . . . . . . . . . . . 43, 168

United States v. Day, 405 F.3d 1293 (11th Cir. 2005). . . . . . . . . . . . . . . . . . . 178

United States v. Deleveaux, 205 F.3d 1292 (11th Cir. 2000). . . . . . . . . . . . . . . 45

United States v. Diaz-Lizaraza, 981 F.2d 1216 (11th Cir. 1993). . . . . . . . . . . . 67

United States v. Dixon, 593 F.2d 626 (5th Cir. 1979). . . . . . . . . . . . . . . . . . . 116

United States v. Dominguez Benitez, 542 U.S. 74 (2004). . . . . . . . . . . . . . . . . 96

United States v. Eckhardt, 466 F.3d 938 (11th Cir. 2006). . . . . . . . . . . . . . . . 190

United States v. Edelin, 180 F. Supp. 2d 73 (D.D.C. 2001). . . . . . . . . . . . . 124, 133

United States v. Edwards, 159 F.3d 1117 (8th Cir. 1998). . . . . . . . . . . . . . . . . 92

United States v. Eyester, 948 F.2d 1196 (11th Cir. 1991). . . . . . . . . . . . . . . . 201

United States v. Farley, 607 F.3d 1294 (11th Cir. 2010). . . . . . . . . . . . . . . . . 134

United States v. Fell, 360 F.3d 135 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . 115

United States v. Fell, 2005 WL 1634067 (D. Vt. July 5, 2005). . . . . . . . . . . . . 150

United States v. Fields, 483 F.3d 313 (5th Cir. 2007).. . . . . . . . . 200, 215, 220, 221

United States v. Foree, 43 F.3d 1572 (11th Cir. 1995). . . . . . . . . . . . . . . 42, 44, 96

United States v. Frazier, 387 F.3d 1244 (11th Cir. 2004). . . . . . . . . . . . . . . . . 125

United States v. Funt, 896 F.2d 1288 (11th Cir. 1990). . . . . . . . . . . . . . . . . . . 201

United States v. Gabrion, 648 F.3d 307 (6th Cir. 2011).. . . . . . . . . . . 217, 220, 221

*United States v. Garber, 471 F.2d 212 (5th Cir. 1972). . . . . . . . . . . . . . . . 82, 85

United States v. Gilbert, 120 F. Supp. 2d 147 (D. Mass. 2000). . . . . . . . . . . . . 191

United States v. Gonzalez, 183 F.3d 1315 (11th Cir. 1999). . . . . . . . . . . . . . . . 95

United States v. Gutierrez, 373 Fed. Appx. 13 (11th Cir. 2010) . . . . . . . . . . . . . 12

United States v. Hall, 664 F.3d 456 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . . 134

*United States v. Hands, 184 F.3d 1322 (11th Cir. 1999). . . . . . . . . . . . 69, 83, 84

United States v. Harriston, 329 F.3d 779 (11th Cir.2003). . . . . . . . . . . . . . . . . 86

United States v. Higgs, 353 F.3d 281 (4th Cir. 2003). . . . . . . . . . . . . . . . . . . 224

United States v. Huckins, 529 F.3d 1312 (10th Cir. 2008). . . . . . . . . . . . . 160, 161

United States v. Jacques, 2011 WL 1675417 (D. Vt. May 4, 2011). . . . . . . . . . . 175

United States v. Jass, 569 F.3d 47 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . 92

xx

United States v. Johnson, 136 F. Supp. 2d 553 (W.D. Va. 2001). . . . . 176, 177, 179

United States v. Johnson, 223 F.3d 665 (7th Cir. 2000). . . . . . . . . . . . . . . 122, 133

United States v. Klebig, 600 F.3d 700 (7th Cir. 2009). . . . . . . . . . . . . . . . . . . . 86

United States v. LeCroy, 441 F.3d 914 (11th Cir. 2006). . . . . . . . . . . . . . . . . 118

United States v. Lee, 274 F.3d 485 (8th Cir. 2001). . . . . . . . . . . . . . . . . . . . . 115

United States v. Lee, 612 F.3d 170 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . 201

United States v. Lighty, 616 F.3d 321 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . 91

United States v. Long, 900 F.2d 1270 (8th Cir. 1990). . . . . . . . . . . . . . . . . . . 91

United States v. Long, 935 F.2d 1207 (11th Cir. 1991). . . . . . . . . . . . . . . . . 178

United States v. Lopez-Medina, 596 F.3d 716 (10th Cir. 2010). . . . . . . . . . . . . 91

United States v. Malone, 78 F.3d 518 (11th Cir. 1996). . . . . . . . . . . . . . . . . . 178

United States v. Marshall, 173 F.3d 1312 (11th Cir. 1999). . . . . . . . . . . . . . . 84

United States v. McVeigh, 153 F.3d 1166 (10th Cir. 1998). . . . . . . . . . . . . . . . 43

United States v. Meester, 762 F.2d 867 (11th Cir. 1985). . . . . . . . . . . . . . . . . 67

United States v. Menyweather, 447 F.3d 625 (9th Cir. 2006). . . . . . . . . . . . . 160

United States v. Mercks, 304 F.2d 771 (4th Cir. 1962). . . . . . . . . . . . . . . . . 120

*United States v. Mikos, 539 F.3d 706 (7th Cir. 2008). . . . . . . . . . . . . . . . . 176

United States v. Mitchell, 502 F.3d 931 (9th Cir. 2007). . . . . . . . . . . . . . . . *passim*

United States v. Moriarty, 429 F.3d 1012 (11th Cir. 2005). . . . . . . . . . . . . . 104

United States v. Mothersill, 87 F.3d 1214 (11th Cir. 1996). . . . . . . . . . . . . . . . 67

United States v. Moussaoui, 382 F.3d 453 (4th Cir. 2004). . . . . . . . . . . . . . . . . 93

United States v. Munoz-Camarena, 621 F.3d 967 (9th Cir. 2010). . . . . . . . . . . . 160

United States v. Natson, 444 F. Supp. 2d 1296 (M.D. Ga. 2006). . . . . . . . . . . . . 177

United States v. Olano, 507 U.S. 725 (1993). . . . . . . . . . . . . . . 42, 44, 96, 202, 203

United States v. Paul, 175 F.3d 906 (11th Cir. 1999). . . . . . . . . . . . . . . . . . . 42, 45

United States v. Paul, 217 F.3d 989 (8th Cir. 2000). . . . . . . . . . . . . . . . . . . . . 177

United States v. Phaknikone, 605 F.3d 1099 (11th Cir. 2010). . . . . . . . . . . . . . . 42

United States v. Purkey, 428 F.3d 738 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . 217

*United States v. Range, 94 F.3d 614 (11th Cir. 1996). . . . . . . . . . . . . . . . . . . 91

United States v. Rivera Pedin, 861 F.2d 1522 (11th Cir. 1988). . . . . . . . . . . . . . 91

United States v. Rodriguez, 581 F.3d 775 (8th Cir. 2009). . . . . . . . . . . . . . . . . 212

United States v. Roman, 371 F. Supp. 2d 36 (D.P.R. 2005). . . . . . . . . . . . . 176, 177

United States v. Sampson, 335 F. Supp. 2d 166 (D. Mass. 2004). . . . . . . . 129, 156

United States v. Sampson, 486 F.3d 13 (1st Cir. 2007). . . . . . . . . . . 177, 217, 218

United States v. Schwartz, 541 F.3d 1331 (11th Cir. 2008). . . . . . . . . . . . . . . . 93

United States v. Sinisterra, 600 F.3d 900 (8th Cir. 2010). . . . . . . . . . . . . . . . . 155

United States v. Stitt, 760 F. Supp. 2d 570 (E.D. Va. 2010). . . . . . . . . . . . . . . . 191

United States v. Taylor, 316 F. Supp.2d 730 (N.D. Ind. 2004). . . . . . . . . . . . . . 177

United States v. Taylor, 583 F. Supp. 2d 923 (E.D. Tenn. 2008). . . . . . . . . 123, 133

United States v. Utter, 97 F.3d 509 (11th Cir. 1996). . . . . . . . . . . . . . . . . . . . 69

United States v. Vasquez, 903 F.2d 1400 (11th Cir. 1990).. . . . . . . . . . . . . 68, 74

United States v. Veltmann, 6 F.3d 1483 (11th Cir. 1993).. . . . . . . . . . . . . . . . . 69

United States v. Webster, 162 F.3d 308 (5th Cir. 1998). . . . . . . . . . . . . . . . . . 168

United States v. Whitten, 610 F.3d 168 (2d Cir. 2010).. . . . . . . . . . . . . . . . . . 232

United States v. Williamson, 339 F.3d 1295 (11th Cir. 2003). . . . . . . . . . . . . . 96

United States v. Wilson, 493 F. Supp. 2d 491 (E.D.N.Y. 2007).. . . . . . . . . 122, 152

*United States v. Young, 470 U.S. 1 (1985).. . . . . . . . . . . . . . . . . . . . . 212, 213

United States v. Yount, 960 F.2d 955 (11th Cir. 1992). . . . . . . . . . . . . . . . . . . 178

United States v. Yousef, 327 F.3d 56 (2d Cir. 2003). . . . . . . . . . . . . . . . . . 91, 92

United States v. Zambrano, 421 F.2d 761 (3d Cir. 1970).. . . . . . . . . . . . . . . . 120

Weems v. Little Rock Police Department, 453 F.3d 1010 (8th Cir. 2006). . . . . . 134

Wilcher v. State, 697 So.2d 1123 (Miss. 1997).. . . . . . . . . . . . . . . . . . . . . . . 164

Windom v. Secretary, Dep't of Corr., 578 F.3d 1227 (11th Cir. 2009). . . . . . . . 175

In re Winship, 397 U.S. 358 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189, 220

Wood v. Allen, 542 F.3d 1281 (11th Cir. 2008).. . . . . . . . . . . . . . . . . . . . . . . 175

Woodson v. North Carolina, 428 U.S. 280 (1976). . . . . . . . . . . . . . . . . . . 161, 212

# CONSTITUTION, STATUTES, AND RULES

18 U.S.C. § 922. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 72

18 U.S.C. § 924. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10, 228, 223, 224

18 U.S.C. § 2119. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10, 223

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 3553. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

18 U.S.C. § 3592. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 3593. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 3594. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

18 U.S.C. § 3595. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

21 U.S.C. § 841. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 224

21 U.S.C. § 846. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 224

21 U.S.C. § 848. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 217

Fed. R. App. P. 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Crim. P. 52. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96, 203

Fed. R. Evid. 106. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

Fed. R. Evid. 401. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

U.S.S.G. § 3A1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177, 178

U.S. Const., amend. V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const., amend. VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const., amend. VIII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## OTHER AUTHORITIES

A.B.A. Guidelines for the Appointment and Performance of  Defense
     Counsel in Death Penalty Cases, reprinted in, 31 Hofstra L. Rev. 913
     (Summer 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

John H. Blume *et al.*, Beyond Repair? America's Death Penalty, (Duke
     University Press 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

John H. Blume, Stephen P. Garvey & Sheri Lynn Johnson,
     Future Dangerousness in Capital Cases: Always "At Issue,"
     86 Cornell L. Rev. 397 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

William J. Bowers *et al.*, Foreclosed Impartiality in Capital Sentencing:
     Jurors' Predispositions, Attitudes and Premature Decision-Making,
     83 Cornell L. Rev. 1504 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . 175

Congressional Research Service, The Death Penalty: Capital Punishment
     Legislation in the 110th Congress, (Sept. 7, 2007). . . . . . . . . . . . . . . . . . 183

Mark D. Cunningham, Thomas J. Reidy, and Jon R. Sorensen, Assertions of
     "Future Dangerousness" at Federal Capital Sentencing: Rates and
     Correlates of Subsequent Prison Misconduct and Violence,
     32 Law & Hum. Behav. 46 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . 129

Mark D. Cunningham, Jon R. Sorensen, Thomas J. Reidy, Capital Jury
     Decision-Making: The Limitations of Predictions of Future Violence,
     15 Psychol., Pub. Pol'y & L. 223 (2009). . . . . . . . . . . . . . . . . . . . . 138

Mark D. Cunningham, *et al.*, Life and Death in the Lone-Star State: Three
     Decades of Violence Predictions by Capital Juries,
     29 Behav. Sci. Law 1 (Jan.-Feb. 2011). . . . . . . . . . . . . . . . . . . . . . . 129

Daphne Duret, <u>Brutality to Children Left Juror No Doubts</u>, Palm Beach Post
(Apr. 3, 2009), Westlaw, 2009 WLNR 9072225. . . . . . . . . . . . . . . 199, 228

Theodore Eisenberg, *et al.*, <u>But He Was Sorry: The Role of Remorse in
Capital Sentencing</u>, 83 Cornell L. Rev. 1599 (1998). . . . . . . . . . . . . . . . 175

Federal Death Penalty Resource Counsel Website, www.capdefnet.org,
<u>Declaration of Kevin McNally Regarding Execution Impact Testimony</u>.. 148

Federal Death Penalty Resource Counsel Website, www.capdefnet.org,
<u>Declaration of Kevin McNally Regarding Use of Defense Expert
Testimony</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Paige H. Forster, <u>An Argument for the Admissibility of Execution Impact
Evidence in Pennsylvania</u>, 67 U. Pitt. L. Rev. 429 (Winter 2005). . . . . . . 153

Darcy F. Katzin, <u>The Relevance of 'Execution Impact' Testimony as Evidence
of Capital Defendants' Character</u>, 67 Fordham L. Rev. 1193 (1998).. . . . 153

Wayne A. Logan, <u>When Balance and Fairness Collide: An Argument for
Execution Impact Evidence in Capital Trials</u>, 33 U. Mich. J. L. Ref. 1
(Fall 1999 & Winter 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

Katherine Norgard, <u>What About Our Families?  Using the Impact on Death Row
Defendants' Family Members as a Mitigating Factor in Death Penalty
Sentencing Hearings</u>, 26 Fla. St. U. L. Rev. 119  (Summer 1999). . . . . . . 153

Leonard B. Sand, *et al.*, <u>Modern Federal Jury Instructions,</u> (2008) . . . . . . . 177, 216

Susannah Sheffer & Renny Cushing, <u>Creating More Victims: How Executions
Hurt the Families Left Behind     A Report by Murder Victims' Families
for Human Rights</u>, (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

Scott E. Sundby, <u>The Jury as Critic: An Empirical Look at How Capital Juries
Perceive Expert and Lay Testimony</u>, 83 Va. L. Rev. 1109 (Sept. 1997). . 167

Scott E. Sundby, <u>War and Peace in the Jury Room: How Capital Juries
Reach Unanimity</u>, 62 Hastings Law Journal 103 (Nov. 2010). . . . . . . 137, 231

Kim Taylor-Thompson, Empty Votes in Jury Deliberations, 113 Harv. L. Rev. 1261 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Tad Thomas, Execution Impact Evidence in Kentucky: It Is Time to Return the Scales to Balance, 27 N. Ky. L. Rev. 411 (2000). . . . . . . . . . . . . . . . . . . . 153

## STATEMENT REGARDING ADOPTION
## OF BRIEFS OF OTHER PARTIES

Troya adopts the following portions of Co-Appellant Ricardo Sanchez's

brief:

(1)     The claim that the district court's incomplete, imprecise, and one-

sided voir-dire questioning created an unacceptable risk that the jurors who

condemned Sanchez and Troya harbored disqualifying pro-death-penalty biases.

(Point I of Sanchez's brief).

(2)     The claim that the court wrongly accepted at face value the

government's race-neutral explanations for its disproportionate peremptory striking

of black and female jurors, without considering factors that have been recognized

as probative of discrimination.  (Point II of Sanchez's brief).

(3)     The claim that the court erred in permitting Troya and Sanchez to

exercise peremptory challenges only if the noncapital codefendants consented to

them.  (Point III of Sanchez's brief).

For the Court's convenience, Troya also notes that his counsel understands

that Sanchez intends to adopt, in whole or in part, every point in Troya's brief,

with the exception of Point II.

Moreover, Points I, IV, and IX-X of Troya's brief correspond with partially

similar points that, as counsel understands, Sanchez intends to raise in his brief.

xxviii

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

Troya appeals from a judgment of conviction and sentence of death entered on May 14, 2009, by the United States District Court for the Southern District of Florida (Hurley, J.). (DE900).[1] Troya filed a timely notice of appeal on May 13, 2009. (DE891). See Fed. R. App. P. 4(b)(2). The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3595.

---

[1] All transcripts and court filings are referred to by their district court docket number ("DE") and page number. "GX" and "DX" refer to government and defense trial exhibits, respectively, and "GX-PP" and "DX-PP" refer to sentencing-hearing exhibits.

**STATEMENT OF ISSUES**

**A.     TRIAL**

**Issues Involving Government Evidence Improperly Admitted at Trial**

1.      The court wrongly admitted uncorroborated testimony from a cooperating witness, Kevin Vetere, implicating Troya in two uncharged drive-by shootings and an armed home invasion.  These lacked relevance to the charged offenses under Federal Rule of Evidence 404(b), they were unduly prejudicial under Rule 403, and the government used them for propensity purposes in summation.

2.      By directing a cooperating witness, Carlos Rodriguez, to alter his testimony from the plural to the singular, based on a specious concern about a codefendant's confrontation rights, the court led him to testify that Troya said "I have killed some people," rather than just that he had been "involved" in some killings.  This prejudicially distorted the meaning of Troya's alleged statement and deprived the defense of an exculpatory inference jurors could have drawn from the original version.

**B.     SENTENCING**

**Issues Involving Exclusion of Defense Sentencing Evidence**

3.      The court erred in excluding concededly relevant and reliable expert

1

testimony that Troya would make a positive adjustment to prison and could safely be managed if sentenced to life.  This testimony, which is routinely admitted in other federal capital cases, was directly relevant to rebut extensive evidence and government argument implying Troya would be violent and present an escape risk while incarcerated, and was also independently admissible as mitigation.

4.     The court wrongly prohibited Troya's family from testifying about the relationships they would maintain with him if he were sentenced to life in prison and about the loss and harm they would experience if he were executed.  Worse, the court, *sua sponte*, specifically and repeatedly warned jurors to disregard these considerations.

### Issues Involving Unproven or Improperly Considered Aggravating Factors

5.     The jury's aggravation findings that Troya had substantially planned and premeditated the killings of the two child victims for which he was sentenced to die and had done so to eliminate them as witnesses lacked legally sufficient supporting evidence.  There was no proof that he knew the children were in the car with their parents, and the government itself acknowledged that they may even have been collateral casualties, killed by bullets intended for the adults.

6.     The government failed to present legally sufficient evidence to support the statutory aggravating factor of victim vulnerability, because there was

2

no proof that the youth of the child victims facilitated their shooting deaths, which courts have consistently required before applying this factor.

7.     The jury wrongly weighed the aggravating factor of pecuniary gain in sentencing Troya to die for the deaths of the two children, since the government did not prove, or even allege, that they were murdered to effectuate the theft of their father's jeep or the drugs it contained, a well-established prerequisite for this factor.

8.     The court's instructions invited the jury to find and weigh the nonstatutory aggravating factor that Troya had engaged in other "uncharged serious acts of violence" even if jurors did not unanimously agree or find proof beyond a reasonable doubt as to each such crime, or, indeed, any particular one. This improperly circumvented the reasonable-doubt and unanimity requirements of the Federal Death Penalty Act and the Constitution.

**Issues Involving Arguments and Instructions on Mitigation**

9.     The prosecutors falsely vouched to jurors that Daniel Varela, the kingpin of the drug operation and the apparent instigator of the murders, would continue to be investigated and ultimately would be capitally prosecuted     so they should disregard the important mitigating factor, explicitly recognized in the Federal Death Penalty Act, that an equally culpable codefendant is not facing the

3

death penalty.

10.    The court's instructions, as amplified by the government's summation, wrongly conveyed to jurors that, as matter of law, a mitigating factor not listed in the statute and unconnected to the crime presumptively carried less or perhaps even no significance.

### Issues Involving the Jury's Sentencing Determination

11.    The court violated Troya's Sixth Amendment right to jury trial by refusing to instruct that aggravating factors needed to outweigh mitigating ones "beyond a reasonable doubt" before jurors could vote for a death sentence.

12.    The verdict sheet licensed jurors to return a not-unanimous verdict, but left them free to speculate about its consequences.  This, and the court's misleading instruction that a "lesser sentence" of a "term of years" was an option    Troya actually could not have received less than 115 years    created the risk of a coerced, arbitrary death sentence.

**C.    JURY SELECTION (Issues Adopted from Co-Appellant's Brief)**

The court's incomplete, imprecise, and one-sided voir-dire questioning created an unacceptable risk that the jurors who condemned Troya harbored disqualifying pro-death-penalty biases.

The court wrongly accepted at face value the government's race-neutral

4

explanations for its disproportionate peremptory striking of black and female jurors, without considering factors that the Supreme Court has recognized are probative of discrimination.

The court erroneously refused to permit Troya and his capital codefendant to exercise any peremptory challenge unless the two noncapital codefendants both consented to it.

## COURSE OF PROCEEDINGS AND DISPOSITIONS IN THE COURT BELOW

In October 2006, Daniel Varela, Ricardo Sanchez, Liana Lopez, and Daniel Troya were arrested in connection with a narcotics-trafficking business, headed by Varela.  (DE1; DE2; DE3; DE4; DE6).

A federal grand jury in the Southern District of Florida indicted the defendants for various drug and weapons-possession offenses.  (DE305) (Counts 1-5, 11-16).  These centered on the allegation that the defendants, led by Varela, had engaged in a conspiracy with the intent to distribute large quantities of cocaine in the months leading up to their arrests, 21 U.S.C. §§ 841(a)(1), 846 (Count 1).[2]

---

[2] Of the remaining counts, those involving Troya, Counts 3 and 13-15, charged him and Varela with possession of a firearm by a convicted felon, for two handguns found in Varela's car during a police stop on June 10, 2006, 18 U.S.C. § 922(g)(1), (2); Troya and the other defendants, for possession with intent to distribute cocaine and possession of firearms in relation to a drug-trafficking offense, involving narcotics and weapons found by police when they arrested the

5

(DE305).

Sanchez and Troy were also indicted for the killings of Jose Luis ("Lou")

Escobedo, Varela's narcotics supplier, Lou's wife Yessica, and their two young

sons Luis Damian and Luis Julian.  The four were shot to death by the side of the

Florida Turnpike, on the night of October 13, 2006, two weeks before the

defendants' arrests.  The final indictment included five capital counts.  These

charged Troya and Sanchez with carjacking resulting in death (Count 6), 18 U.S.C.

§ 2119, for the killings of all four victims, and four counts (one for each victim) of

murder with a firearm during a crime of violence or drug-trafficking offense

(Counts 7-10), 18 U.S.C. § 924(c)(1), (j).[3]  (DE305).

In February 2008, the government gave notice of its intent to seek the death

penalty against Troya and Sanchez on the capital charges, under the Federal Death

Penalty Act, 18 U.S.C. § 3593(a). (DE311; DE312).

After a jury trial that began in January 2009, Troya and his codefendants

_____

defendants and searched Varela's house, where they were staying, 21 U.S.C. §
841(a)(1), 18 U.S.C. § 924(c)(1)(A)(I); and Troya, Sanchez, and Varela, for
possession of weapons by a convicted felon, involving the guns found in Varela's
house, 18 U.S.C. §§ 922(g)(1), 924(a)(2). (DE305).

[3] Troya and Sanchez were also charged with conspiracy to commit
carjacking  (Count 5).  (DE305).

6

were convicted on all counts.[4]  (DE791; DE792; DE793; DE796).  At a joint

sentencing hearing before the same jury in March 2009, he and Sanchez were each

sentenced to life imprisonment on the three capital counts involving the adult

victims     the carjacking count, and the two 924(j) counts involving Lou Escobedo

and his wife.  But the jury sentenced Troya and Sanchez each to death on the two

924(j) counts involving just the child victims. (DE859:16-18; DE860:18-20).

Troya is currently incarcerated on federal death row at the United States

Penitentiary in Terre Haute.

## STATEMENT OF FACTS

### I.   Guilt-Innocence Trial[5]

### A.   Introduction

This case involves the murders of Jose ("Lou") Escobedo, a cocaine supplier

in South Florida, and his family.  They were shot and killed in a grassy area off the

---

[4] This Court affirmed Varela's and Lopez's convictions in a separate appeal. United States v. Lopez, 649 F.3d 1222 (11th Cir. 2011).

[5] Troya focuses here predominantly on the evidence relevant to the killings. He does so because, with the exception of one issue (the prosecution's discriminatory use of peremptory strikes, see Adopted Point II in Co-Appellant Sanchez's brief), his appeal challenges only his capital convictions and death sentences.  Additional facts are also set forth, as appropriate, in various points in the brief.  Moreover, some of the trial facts are also described in the Court's opinion in Varela's and Lopez's separate appeal.  See United States v. Lopez, 649 F.3d 1222 (11th Cir. 2011).

7

side of the Florida Turnpike south of Fort Pierce, just before 2:30 in the morning on October 13, 2006. Two different guns were used; neither was ever recovered. The evidence showed that the killings occurred during a robbery of drugs that Escobedo was transporting, which was instigated by one of his customers, Daniel Varela, a large-scale narcotics distributor.

Sanchez, Varela's cousin, was prominently involved in his drug trafficking, including his dealings with Escobedo. In the eight hours preceding the murders, Sanchez, in a van belonging to Varela, and Escobedo and his family, in their jeep, each drove about 200 miles, from West Palm Beach to Daytona Beach, and then turned around and headed back south. Cell-phone tower records showed the two vehicles were no more than few miles apart at various points on the trip. Along the way, Sanchez and Escobedo made 15 telephone calls to each other, the last one about five minutes before the murders. Sanchez also had four calls with Varela, the last one about an hour before the Escobedos were killed.

The government presented strong evidence that Troya, who was a low-level participant in Varela's drug enterprise, accompanied Sanchez, and that both defendants were at or near the scene when Escobedo and his family were slain. It also showed that, following the murders, Sanchez drove off in Escobedo's jeep which contained cocaine, and Troya returned with the van. The two later met up

8

with Varela, who had remained in West Palm Beach.

But, as the defense noted in both opening statement and summation, there were significant "gaps" in the prosecution's proof.  (DE728:3093; DE766:7218; DE767:7284).  There was no forensic evidence, no confession to police, and no eyewitness testimony that Troya killed any of the victims.  His alleged statements to two felons were inconclusive and of questionable credibility.  And, critically, the government could not account for another, close-by vehicle whose occupants may have been involved in the murders.

Indeed, notwithstanding the encyclopedic detail of the trial presentation, the government was never able to conclusively account for who did what by the side of the road, why Escobedo had driven to Daytona Beach, why Escobedo had Sanchez and Troya caravan with him on this route, what Sanchez discussed in his phone calls with Escobedo and Varela along the way, or what Troya was thinking, saying, or hearing from Sanchez in the period leading up to the robbery.[6]

Thus, the evidence did not unquestionably establish that Troya actually

---

[6] As Troya's counsel argued in summation: "[T]he Government's circumstantial evidence [places] Mr. Troya on or near the Turnpike or I-95 during the time of late hours of the 12th of October to early hours of the 13th of October, 2006.  What it doesn't tell you to any degree that I believe can be measured as beyond a reasonable doubt as to why he was there, what he was doing there or what did do or not do while he was there." (DE767:7279-80).

killed anyone.[7]   Moreover, the proof left open the possibility, as acknowledged by the prosecution, that the Escobedo children were not even killed intentionally, but rather were casualties of shots meant for their parents.  Troya's role in the their murders proved to be a critical issue at sentencing, since the jury imposed death sentences *only* on the counts involving just the two boys, and life sentences for the killings of Escobedo and his wife and for the murders as a group.  The death sentences were based on, among others, the aggravating factors that Sanchez and Troya substantially planned the children's murders.  See Section II.C, *post*.  But the evidence never even showed that he knew or had any way to know in advance that Escobedo had brought them along while transporting cocaine in the middle of the night.[8]

　　To fill these gaps in its proof, the government presented extensive trial

---

[7] If he did not, even if he acted as an accessory after the fact, and even if he was present at the scene of the killings, he would not be guilty of carjacking or the 924(j) charges if he did not otherwise intentionally help facilitate the slayings.  See 18 U.S.C. § 2119 (requiring "intent to cause death or serious bodily harm"); 18 U.S.C. § 924(j) (incorporating 18 U.S.C. § 1111, which requires malice).

[8] In Point V, *post*, Troya challenges the sufficiency of the evidence on the substantial-planning and witness-elimination aggravators.  Because the proof also failed to establish that the children's youth contributed to their deaths or that their murders helped effectuate the robberies, two of the other aggravating factors on which Troya's death sentences rest, "pecuniary gain" and "vulnerable victims," are also challenged in Points VI and VII, *post*.

testimony from one of its cooperators accusing Troya of three serious uncharged gun crimes      two drive-by shootings and an armed home invasion.  Then, in summation, prosecutors explicitly and repeatedly urged jurors to convict him on a propensity theory, saying the uncharged offenses provided ample reason "to believe that a killer like Daniel Troya could execute an entire family."[9]

**B.      The proof showed that Troya had a relatively low-level, collateral involvement with Varela's large-scale narcotics operation.**

Varela ran a drug-trafficking business in West Palm Beach from at least May 2006 until his and the other defendants' arrests in October.  In the summer of 2006, he operated the business out of a large house he rented on Garden Court. (DE737:4302, 4305; DE752:5147, 5149-50; DE754:5536-41).

Sanchez, Varela's cousin stayed there, as did the other defendants: Liana Lopez, Varela's girlfriend; Juan Gutierrez, who pled guilty to drug charges before

---

[9] As discussed in detail in Point I, *post*, in which Troya challenges its admission under Federal Rules of Evidence 403 and 404(b), this evidence concededly had no bearing on the capital counts (and scant, if any, relevant to establishing Troya's connection with Varela's drug enterprise).  Moreover, in Point VIII, *post*, Troya argues that the court further erred by inviting jurors to consider these and other uncharged crimes in support of a death sentence, without regard to whether each (or, indeed, any) was proven beyond a reasonable doubt to the unanimous satisfaction of the jury, as required by the FDPA.

trial; Troya; and Kevin Vetere, the government's key cooperator.[10] (DE731:3921-24; DE754:5422-24).

Unlike Sanchez, Troya was not implicated either in Varela's dealings with Escobedo, who supplied him with large quantities of cocaine obtained from Texas and Mexico, or Varela's multi-kilo cocaine sales, which included a series of sales to just two customers totaling 150 kilograms     about two million dollars worth of narcotics.[11] Nor was he charged in either of the two cocaine-transportation incidents that were included in the indictment.[12] (DE738:4528-49, 4658, 4673-75, 4681; DE751:4736-59, 4790-96, 4892-4903; DE752:4997-5017, 5075-99, 5152-54, 5158, 5187, 5245-48; DE754:5282-84, 5444; DE753:5585-86, 5604-05, 5620-21; see DE766:7087-97; DE767:7282).

Rather, Troya sporadically acted as a low-level seller or deliverer of

---

[10] Gutierrez was sentenced to 216 months imprisonment, and this Court affirmed his sentence. United States v. Gutierrez, 373 Fed. Appx. 13 (11th Cir. 2010).

[11] Two of the indictment counts, charging Varela with distributing cocaine and carrying a firearm in relation to that offense, arose out of a controlled buy between him and one of those customers, who had become a police informant, on October 21, 2006 (Counts 11 and 12) (DE305).

[12] The indictment charged Varela and Lopez with possession with intent to distribute cocaine found in her car during a police stop on May 10, 2006 (Count 2), and Sanchez with the same offense involving cocaine he abandoned during a vehicle stop on July 10, 2006 (Count 4).

narcotics, on his own or for Varela.  When the Garden Court house was raided and the defendants arrested, a relatively small quantity of drugs     less than 500 grams of cocaine and some ecstasy     was found in Troya's bedroom, along with a scale and some narcotics-packaging materials; a witness also testified he kept Ecstasy pills there.  A police officer had observed him involved in an apparent drug deal in a parking lot a few days before his arrest, and, earlier that month, he supposedly asked a friend if she wanted to get paid delivering drugs.  At some point in the summer, he and Vetere had gone to Chicago for a month, taking nine ounces of cocaine with them, which they sold there.  And, finally, he had been arrested four months before that for possession of a very small amount of marijuana, while driving with Varela.  (DE730:3584-94; DE732:4066-83; DE752:5147-48, 5152-55, 5159, 5246-48; DE754:5318-27).

Though Vetere claimed that he often went with Troya to sell or deliver narcotics, those alleged transactions appear to have involved relatively small amounts, except for one larger sale where he said Troya was present with Sanchez and others but was not the one who was armed or conducted the transaction.[13]

---

[13] A piece of paper found in the Garden Court house, attributed to Varela and dated three months before the killings, had a "2400" notation besides Sanchez's nickname, and two "1000" notations, each besides Troya's nickname. (DE732:4020).  The government never sought to explain these entries.

Vetere acknowledged that Troya had very little money despite residing with and being connected with Varela, the high-living drug kingpin.  (DE754:5444, 5478; DE753:5586-87, 5621, 5678).

**C.     The circumstantial evidence connected Troya with Sanchez on the evening of the crime, and placed him at or near the crime scene.**

On the night of the killings, Sanchez and Escobedo placed a series of 15 short cell-phone calls to one another between approximately 6 p.m. and 2 a.m. (GX760.1-760.15).  They did so as they traveled 200 miles north from West Palm Beach to Daytona Beach, and then back south to Fort Pierce, where it appears they got onto the Florida Turnpike heading towards West Palm Beach.  Escobedo drove his jeep, while Sanchez was in a van owned by Varela.  The two vehicles were no more than a few miles apart each time they spoke, since the sending and receiving signals for each call bounced off the same or nearby cell towers.  (GX760.1-760.15; DE764:6705-6821; see also DE758:6406-12).

During this eight-hour period, Sanchez also received three calls from, and made one call to, Varela, who was in West Palm Beach.  The last was a 48-second call at 1:17 a.m., about an hour before the Escobedos were killed.  (GX760.1-760.15).  At trial, both sides seemed to agree that Varela must have instigated the

14

robbery and perhaps the killings too if his organization was responsible.[14]  See

Point IX, *post*.

Troya never called or received a call from Escobedo.  Instead, in that period,

he placed or received four calls to or from other numbers that apparently had

nothing to do with this case, and also checked his voice mail once.  (GX760.4,

GX760.8).  Troya had called Varela once from West Palm Beach at 6:30 p.m.,

before the trip up the Turnpike began (the call apparently was not answered, since

it only lasted eight seconds); but had no further communication with him until after

the killings.  (GX760.1-760.15; DE764:6756).

Nevertheless, according to cell-tower records, Troya appeared to be

traveling with Sanchez on the trip to and from Daytona Beach that night: Though

his calls were at different times than the ones between Sanchez and Escobedo, his

locations were approximately where Sanchez would have been at those times.

(GX760.1-760.15).

That last call between Sanchez and Escobedo occurred at 2:19 a.m. around

---

[14] The government told jurors that Varela would do anything "to protect his operation and commit murder if necessary." (DE766:7116).  At Varela's sentencing, the court found him "as much responsible for the killings of the Escobedo family" as the defendants, because he was "calling the shots from his home base in Palm Beach County." (DE957:55).  And, according to a post-trial interview with one of the jurors, almost all of them believed that Varela was behind the murders.  See Point IX, *post*.

Fort Pierce.  One minute before, Escobedo's jeep and, immediately behind it, the van belonging to Varela went through the Fort Pierce toll plaza and entered the Turnpike.  This was captured on video at the toll plaza.  (DE728:3230-37; DE729:3475; DE731:3886; DE738:4529; DE754:5299-5305; see also DE729:3518; DE732:3961-62, 3986; DE751:4947; DE752:5175; DE754:5444).

Three miles south of the Fort Pierce toll plaza, by the side of the Turnpike, the Escobedos were shot and killed.  (DE728:3231).  A nearby resident, who was awakened by the sound, testified that her clock had read 2:24 a.m.     about five minutes after the jeep and van had entered the Turnpike, and Sanchez had made his last call to Escobedo.  (DE728:3100-01).

About a half hour later, at 3:01 a.m., another toll plaza video at the Okeechobee exit near West Palm Beach (about 50 miles south of the Fort Pierce toll plaza) showed the same two vehicles exiting the Turnpike, this time with the jeep directly behind the van.  (DE729:3340-44).

But the toll video revealed another startling fact, one the government was never able to explain: Although traffic was naturally sparse in the middle of the night, an unidentified silver vehicle entered the Turnpike at the same Fort Pierce toll four minutes before the jeep and the van, and also exited at the same Okeechobee toll, again four minutes before both vehicles.  (DE729:3347-51).  The

timing is notable for, if the silver vehicle were unconnected to the killings and had driven straight through in the half hour it was on the Turnpike, it presumably would have exited sooner.  Instead, it kept precise pace with the jeep and the van, and thus must have spent as much time stopped off the road as they did.  Thus, the government never eliminated the distinct possibility that, even if Troya was involved in the incident, one or more of the people who actually shot the Escobedos were traveling in the silver vehicle.[15]

The government also could not explain the evidence that someone had been given or had taken the Escobedo's cell phones, and made several calls with them shortly after the murders.  Records showed that, an hour after the killings, Escobedo's phone (the one he had used to talk with Sanchez) was used in West Palm Beach to call his wife's cell phone.  (DE758:6541-42; GX708:2; GX755:2; DX32:1).  At around the same time, a call was made on his wife's phone to a number in Texas.[16]  (DX32:2; see DE767:7350-52; DE772:7653-56).  The

---

[15] Thus, as Troya's counsel argued to the court in support of his motion for judgment of acquittal: "There is no evidence who else was there, who went with them. There is no evidence who was actually in what car or were there any other vehicles. All we know is cell phones show that people were going north.  They went to Daytona Beach.  No evidence what happened at Daytona Beach, who they met in Daytona  Beach, what vehicles everyone was in or switched or came out of when they left Daytona Beach."  (DE772:7653).

[16] As the defense noted, the records suggested that this call, and two earlier ones at around midnight, had somehow been made from near McAllen, Texas,

government made no effort to show why Sanchez or Troya would have used the victims' phones or placed these calls.[17]

When the toll tickets handed in at the Okeechobee exit were later retrieved, Sanchez's palm print was found on the ticket for Escobedo's jeep, and Troya's on the one for Varela's van. (DE728:3238; DE729:3294-3303, 3339-40; DE730:3731-41, 3743-45).

A few minutes after the neighbor said she had heard shots, Troya called Sanchez's cell phone; over the next half hour, he called Sanchez again four more times, and received two calls from him.  (GX760.6, GX760.9).  (There had been no calls between Sanchez and Troya since 6 p.m. the previous evening).  The first two of these were from the Ft. Pierce area, and the later ones from in or near West Palm

---

since the label "McAllen" appeared next to each call under the heading, "serving area."  (DX32:1; DE767:7350-52; DE772:7653-56).  The government responded that this was simply because the account for the phone was based in that part of Texas.  (DE767:7453; DE772:7660).  But the records themselves show that to be false, since the "serving area" varied for each call.  Moreover, the government's own representative from the telephone company confirmed that "serving area" mean the geographical area from where the call was placed.  (DE757:6124).

[17] The government speculated that yet a third call made after the killings, from Sanchez's phone to Escobedo's (DE764:6825-27; GX708:2), may have been for the purpose of locating Escobedo's phone in the jeep so that it could be destroyed.  (DE766:7156; DE767:7453).  But even this odd theory could not account for why, after that, Sanchez would have used Escobedo's phone to call his wife's phone, or his wife's phone to call Texas.

Beach.  During that same period, there were also two calls between Sanchez and Varela; his was the first call to Varela after the killings.  Troya, too, placed a pair of calls to Varela.  (GX760.6, GX760.9).

The jeep was found three days later, behind a warehouse near the airport, and the van two weeks after that, at a body shop where Varela had arranged for it to be repainted.  (DE728:3049; DE730:3664-89; DE731:3889-3900; DE754:5474-75).[18]  An empty suitcase belonging to one of the victims, Yessica Escobedo, and a hotel receipt in her name were found in the van.  (DE731:3833-35).

Ballistics evidence showed that the victims had died from multiple gunshot wounds (a total of 26) to their heads and torsos, fired at relatively close range.  Yessica's body was found entangled with her children's, and Lou's close by.  (GX1.1).  Lou, Yessica, and the older child, Luis Julian, had been shot with the same 9 millimeter pistol, and Yessica and the younger child, Luis Damian, with the same 40 caliber pistol.[19]  (DE728:3140-3203; DE729:3368-3466; DE764:6600-33).

---

[18] The radio and rear seat of the jeep had been pulled out, and a can of gasoline and book of matches were found lying near it.  (DE731:3892-3900).

[19] The government argued that, therefore, there had to have been two shooters.  But it never eliminated the possibility that there was only one who moved about firing two guns or whose gun ran out of bullets or jammed after which he switched to another.  Such a scenario is hardly unheard of.  See, e.g., Andrews v. Commonwealth, 699 S.E.2d  237, 274-75 (Va. 2010); People v. Paredes, 2010 WL 1839349 *3 (Cal. App. May 10, 2010) (unpublished); State v.

19

These guns were never recovered, and the projectiles and spent casings found at the scene or removed during the autopsies did not match any of the various firearms that police seized from Varela's house at Garden Court. Several casings from the scene did have markings similar to those on loose, unfired cartridge cases in Varela's garage. From this, a government expert concluded that they both had once been inside the same handgun, though he was not able to examine the weapon that supposedly left the markings.[20] (DE764:6634-59; see also DE767:7446-47).

Here, the physical evidence     pointing towards Troya's presence with Sanchez that evening, including at or near the scene of the killings; his connection with the red van; and both defendants' connection to the killings     was also supported by Vetere's testimony.

Vetere was a drug addict who stayed in Varela's house and helped run

---

Gilliam, 827 So. 2d 508, 510 (La. 2002); State v. Calliham, 55 P.3d 573 (Utah 2002); State v. Stacy, 680 So.2d 1175, 1177 (La. 1996); People v. Padilla, 906 P.2d 388, 398-401 (Cal. 1995), overruled on other grounds, People v. Hill, 952 P.2d 638 (Cal. 1998); Smith v. Commonwealth, 389 S.E.2d 871, 874, 878-79 (Va. 1990).

[20] Although the defendants' trial lawyers neglected to raise this issue, the one published decision appellate counsel have found that has addressed precisely this sort of comparison testimony rejected it as unreliable. See Sexton v. State of Texas, 93 S.W.3d 96, 98-99 (Tex. Crim. App. 2002).

20

errands, including delivering cocaine.  His nickname was "Crackhead Kevin."[21]

Already a twice-convicted felon before he was charged in this case, Vetere was

facing life imprisonment for his participation in the drug conspiracy headed by

Varela; but in return for his cooperation, he was allowed to plead guilty and

receive a sentence of 12 years; this was reduced to 42 months on a Rule 35 motion

following Troya's trial.[22]  (DE752:5250, 5422-28, 5745-64, 5778-85; DE1058).

Vetere testified he saw Sanchez and Troya leave Varela's home in the late

afternoon of October 12, driving the red van.  (He sought to go with them, but

when Troya asked if this would be all right, Varela said no).  Around 2 a.m. the

next morning (or perhaps as late as 4 a.m., Vetere elsewhere testified), he awoke to

see Varela, Sanchez, Troya and Gutierrez carrying bags to Varela's bedroom; they

were the kind Vetere had seen kilos of cocaine wrapped in.[23]  When Vetere awoke

---

[21] Interviewed by investigators, he told them: "I take a lot of drugs, so I'm sleeping whenever I can."  (DE753:5756).

[22] Vetere gave two statements denying knowledge about the murders before implicating Troya.  "It took me a while to put all this together," he told police. "Like I have been putting this together knowing I am going to talk to you all." (DE753:5764-68).

[23] David Doran was a friend of Varela's and Escobedo's who testified that he went out drinking with Varela the night of the murders and then returned to Varela's house where he says he saw Gutierrez, Lopez, and Vetere.  (Vetere, though, did not say Doran was with them that night.  DE754:5446-52).  Doran, who acknowledged he was intoxicated, claimed that, the next morning, when he left the gated community where Varela lived at about 4:30 or 5 a.m. on October 13,

a short time later and took the van for a tryst with a stripper, Troya and Varela called his cell phone and told him to bring it to Varela's uncle's home. He did so, and the defendants met him there. When Vetere arrived, he saw Escobedo's jeep. At Varela's direction, Vetere moved the jeep to his grandmother's house, where Gutierrez picked it up. (DE754:5444-69; DE753:5697-5701).

Later that day, Troya bought a 1970's convertible. He told Vetere he had paid for it with a kilo of cocaine. Vetere testified that he had never known Troya to have access to that amount of drugs or the kind of money needed to purchase such a car. (DE754:5476-79; see also DE729:3521; GX211.9). Around the same time, Sanchez had bragged to Vetere of having $5,000 to spend. When Vetere replied that this was a lot of money, Sanchez told him: "[Y]ou going to knock off the next big timer." (Later, Vetere observed Sanchez with a "finger"-thick gold chain.). (DE753:5651-53).

The next day, when Vetere read about the killings in the newspaper and asked Troya about them, Troya said that Escobedo was dead. Still later, he told Vetere that he had wiped prints from the jeep, it had been discovered by police before they were able to burn it, and he was glad he had taken a welding class. (DE754:5486, 5489; DE753:5674).

---

he saw the red van and a jeep like Escobedo's entering it. (DE732:3959-93).

As for what happened on the Turnpike, Vetere testified only that Troya acknowledged driving the van and exiting through the toll plaza by opening the door and paying the toll, without opening the window or waiting for change (which the toll video confirmed).  (DE754:5487-5525; DE729:3343).

In addition to robbing Escobedo of cocaine, another motive for his killing suggested by the government was Varela's desire to erase a series of drug debts, totaling $187,000, that his organization owed Escobedo.  (DE766:7134-36; DE305:5-11).  A drug ledger found in Escobedo's home after his death appeared to record money owed by Varela, Sanchez, and Lopez, including for drugs that had been "stolen" or seized by police when Sanchez and Lopez were arrested during the two charged drug-transportation incidents.[24]  (GX103c; DE731:3871-76, DE758:6471-79).  But the government never explained why Varela, who had sold over a million dollars of cocaine to just one customer in recent months, would have wanted to kill his supplier over such a relatively small amount of money, or why he would have thought that Escobedo's murder would erase any debt, which was ultimately owed to suppliers in Texas and Mexico.

---

[24] In addition to multiple references to the codefendants and kilogram quantities of cocaine, one page from Escobedo's ledger contained the phrase "200 Homer," Troya's nickname, just above an entry that said "200 Fathe[r]s Day." (GX103c; DE731:3873).  The government offered no explanation for this reference.

**D.      The direct evidence against Troya, statements he allegedly made to two felons, was inconclusive and, in any event, of questionable credibility.**

The only direct evidence of Troya's involvement in the robbery of cocaine from Escobedo and the killings came from two felons.

Melvin Fernandez, a regular abuser of cocaine, pills, and marijuana, was a friend of Troya's and Vetere's.  He testified that Troya told him he had come across 15 kilos of cocaine    specifically, that he had robbed ("licked") them. (DE729:3489-90, 3502-04).  But Fernandez's account did not directly implicate Troya in the killings, since the robbery reference could have meant he helped steal cocaine from the jeep after the victims were killed.

Carlos Rodriguez was a large-scale drug importer with four years left on his federal sentence when he appeared as a witness.  He testified that he had overheard Troya tell another inmate at the federal detention facility in Miami, "I have killed some people."  But, remarkably, this was not what Rodriguez was actually maintaining Troya had said.  As the government told the court before he took the stand, Rodriguez actually claimed only to have overheard Troya make a vague, collective acknowledgment of involvement in the killings: "I did something very bad, or I have something to get off my chest," and then, later: "I was involved in killing some people, it involved children . . . I had to do it . . . . I got paid money and drugs."  The prosecutor added that Troya had also used "the word 'we'" at

24

some point in the conversations. (DE737:4378-79, 4390-91).

But the court ordered Rodriguez to avoid the plural and stick to the singular in his testimony, in order to accommodate Sanchez's confrontation objection. In response, it appears Rodriguez altered his account and came up with the "I have killed" construction.[25] (DE737:4378-79, 4390, 4395-96).

### E. The evidence did not clearly establish that Escobedo's children, the only victims for whom Troya was sentenced to death, were killed intentionally.

As the government itself essentially admitted to the jury, the crime-scene evidence suggests that the children may have been casualties of bullets intended for their parents.[26]

The pathologist's testimony demonstrated that Lou Escobedo and his wife Yessica were purposefully murdered. He was shot at very close range, right between the eyes, with the bullet exiting out the back of his head. (DE729:3368-91; GX30D). She was shot four times in the head (in the back of the head, behind the ear, and under the jaw). Apparently each was shot while standing up, and then

---

[25] That redaction, which the Confrontation Clause certainly did not require and which prejudiced Troya's defense, is challenged in Point II, *post*.

[26] Again, this was a significant issue, especially at sentencing, since the jury imposed death sentences only for the homicides of the two boys, based on findings that they were killed intentionally and with substantial premeditation. (DE859:2, 7).

again after falling to the ground.  (DE729:3393-94, 3398-3431; GX31C).

But it appears that some bullets, fired in the dark by the side of the road, struck the children as Yessica was grabbing or holding them, including several shots that passed through her torso and into her sons.  (DE729:3431-66; GX1.1; see also DE767:7445).  Moreover, one of the boys, Luis Damian, died from a shot that entered his shoulder and passed through his chest.[27]  (DE729:3454-66; GX33D).  And the other, Luis Julian, suffered a gunshot wound to the top of his head, but at a somewhat glancing angle and, according to the pathologist, fired from some feet away.[28]  (DE729:3431-51; GX32D).  Neither would seem an obvious "execution" shot, like the ones that killed their parents.

Indeed, in both trial and sentencing summations, the government acknowledged the possibility that the children died from shots meant for the parents.  Thus, at trial, the prosecutor told the jurors it was important they keep in mind the doctrine of "transferred" premeditation:

> So *if there was only an attempt to kill the father and then . . . three other people got shot*, that is sufficient under the law for

---

[27] Luis Damian was also hit by shots to his wrist, his upper arm, and his thigh.  And he had stippling on his face, indicating proximity to the gun when it was fired.  (DE729:3454-66; GX33D).

[28] Luis Julian also sustained several other gunshot wounds to his lower torso, one to his thigh, and one to his wrist.  (DE729:3451-52; GX32D)

26

premeditation, because the intent to kill the father . . . recall he got that execution shot above the eye, that intent is transferred to everybody else.[29]

(DE766:7167) (emphasis added).

Similarly, at sentencing, the prosecutor took care to remind jurors that, even if Troya and Sanchez did not intentionally murder the children, by law, they could still receive a death sentence on those counts, based on a mental state of "reckless disregard" for the boys' lives: "If you recall, in the guilt phase I said if they intended to kill the parents but the mother holding the child, natural consequences the firearms hitting the adults, and if the kids were hit in that, that is the fourth factor." (DE847:9493).

## II.   Sentencing Hearing

## A.   The government case

### 1.   Notwithstanding the government's formal withdrawal of the future-dangerousness aggravator, it made sure the jury still heard and considered the evidence it had earlier said it would use to prove Troya would be dangerous.

On the eve of the sentencing hearing, the prosecutors made a surprise announcement: The government was formally withdrawing the aggravating factor that Troya was "likely to commit criminal acts of violence in the future."  They had

---

[29] The government also had the court instruct the jury on this theory of transferred premeditation.  (DE771:7542).

read a report from Troya's expert, Mark Cunningham, a psychologist and nationally-recognized expert on predictors of prison misconduct. He was to testify that Troya was "likely to make a positive prison adjustment," "unlikely to personally perpetrate serious acts of violence in prison," and "unlikely to escape from the custody of the Bureau of Prisons." According to the prosecutors, Cunningham's report had persuaded them that the Bureau of Prisons could manage Troya, and Sanchez too, and that they would not present a future threat. See Point III.A, *post*.

Therefore, the prosecutors urged, the court should exclude Cunningham's testimony, since there was nothing left for him to rebut. The court agreed. It rejected the defense's argument that the government's evidence, particularly of Troya's violent history, still put his dangerousness at issue, entitling him to rebut it. The court also ruled that Cunningham's testimony was not independently admissible as mitigation. See Point III.A, *post* (challenging these rulings).

Nevertheless, the government continued to rely on the very evidence its death notice had said it would use to prove Troya's dangerousness. This included trial testimony from its lead cooperator, Vetere, about two drive-by shootings and an armed home invasion he attributed to Troya. See Point I, *post*; Point III.A, B, *post*. It also included additional evidence, presented at sentencing, about other

violence by Troya, as well as his attempted escape from a youthful-offender facility.

Yuselena Jarrett testified to an incident that allegedly occurred a few months before the homicides, when Troya was 22.  At the time, she worked in a clothing store with his then-girlfriend.  She described witnessing a confrontation when she accompanied the girlfriend to retrieve her possessions from Troya after an argument the night before.  Troya, she testified, cursed angrily at the girlfriend for calling the police, pointed a gun at her, grabbed her by the neck, and struck her with the gun, causing her to fall to the ground.[30]  At that point, Jarrett said, a man she took to be Troya's father distracted him, and she and the girlfriend ran away.  According to Jarrett, police were called (though the government introduced no police report or otherwise corroborated this); but no charges were pursued, and the girlfriend moved out of the country.  Troya's father, Lorenzo, testified he had not been present for or seen any such attack.  (DE818:8041-42, 8045-53; DE845:8960-61).

In 2000, when he was 17 years old, Troya pled guilty to felony battery.  He admitted that he struck the mother of a friend in the face with his fist, which

---

[30] Jarrett identified the gun as among the ones police seized from Varela's house (DE818:8051; GX207.40), although the girlfriend had told her that Troya had used a "bee-bee gun. " (DE818:8061-62).

knocked her to the ground, and then he struck her again. (DE825:8741). As a result, she suffered nerve damage and broken bones in her face and eye socket, requiring reconstructive surgery. (DE825:8741-42). The woman's son and another friend of Troya witnessed the incident; they testified that she initiated the physical confrontation, and her son testified she was drunk at the time. (DE825:8703, 8707, 8761-65, 8768-69).

At age 12, in elementary school, Troya was involved in an altercation with a classmate. According a police report, a girl pushed a desk into Troya, who pushed it back, causing her to fall and hit her head. (DE846:9232-33). When she taunted him, Troya, according to the police, punched her in the head. (DE846:9233). He told the investigator that he only pushed her. (DE846:9234). Troya's parents were called to the school, and he was suspended for five days. (DE845:8921, 8965-8966; DE846:9234-35).

The government also presented evidence that, when Troya was 19, he and two other inmates "almost escaped" from a youthful-offender facility. Two years before that, at age 17, he had been sentenced to three years incarceration when he was convicted of punching his friend's mother, as well as of auto theft and burglary. (DE818:7981-82). With less than five months remaining on his sentence, he and the other inmates were caught outside their "dormitory" in the

30

prison yard.   This area was separated from the outside by several security fences; the most interior one bore signs of attempts to lift or breach it.  (DE818:7980-84, 7991-92, 8008, 8015).  An investigation by the prison revealed a sophisticated plan to escape, involving stolen and make-shift tools, home-made ropes, manikins, and disguises to escape detection.  (DE818:7985-92).  No weapons had been used or recovered in the incident, and no one had employed violence or had resisted when apprehended.  (DE818:8011).  Troya was subsequently convicted of the escape attempt and sentenced to an additional 20 months.  (DE818:7993).

Testimony from a prison investigator and Troya's mother showed that, two weeks before the attempt, he had reported that correctional officers physically assaulted him with punches and kicks in the laundry room.  (DE818:8001-02, 8004; DE845:8909).  As a result, however, the prison transferred Troya to administrative confinement, a more restrictive setting, for his own safety. (DE818:8002-04)  He told his mother that he intended the escape attempt, so near the end of his sentence, as a way to force a transfer to another facility. (DE845:8909; see also DE847:9563).

On the verdict sheet, six jurors found to be mitigating the fact that the attempted escape followed the assault by guards.  (DE859:14).  Six jurors found mitigating that none of Troya's prior convictions involved deaths or weapons

31

offenses.  (DE859:13).

### 2.    The government also presented victim-impact testimony.

The government also called members of the victims' families: Rita Flores,

Lou Escobedo's sister (DE823:8101-10); Sara Guerrero, Yessica Escobedo's

mother (DE823:8112-21); Felipe Guerrero, her brother (DE823:8123-30); and

Monica Moreno, her aunt (DE823:8132-45).  They provided moving memories of

the Escobedos' lives, and described the loss that they and the other survivors

suffered and would continue to suffer as a result of their deaths.[31]

## B.    The defense case

The defense introduced significant mitigating evidence concerning Troya's

childhood, youth, and record.  Counsel also relied heavily on the fact that Daniel

Varela, an equally culpable codefendant, would not face capital punishment or

even a murder prosecution.

### 1.    Troya's happy early childhood in a loving and caring family, which continues to love him.

Troya was just 23 years old at the time of the homicides.  He was part of a

large family who loved him.

---

[31] See also Point IV.C, *post* (challenging exclusion of, and instruction to the jury to ignore, "execution impact" mitigation, which would have paralleled the government's victim-impact presentation).

32

Several relatives testified on his behalf: his parents, Maria and Lorenzo Troya; his two younger brothers, Alex (age 23) and Adrian (age 12); his paternal grandmother, Maria Troya, Sr.; his maternal aunt, Mercedes Fortineaux; and his maternal uncle, Juan Quinones.

His family described him as happy and outgoing as a young child    joking, laughing, and something of a clown.  (DE825:8785; DE845:8800, 8950-51, 8999, 9000, 9019).

The family memorably related, for example, that Troya, between ages 8 and 10, often accompanied his grandmother to Morse Geriatric Center in West Palm Beach, where she worked.  He helped out, interacting with residents, pushing wheelchairs, assisting in the kitchen, and setting the tables for meals.  Troya enjoyed his time there     "[h]e loved going."  (DE825:8799-8800, 9017-18, 9021, 9028-29).  And the residents enjoyed having the young boy, who would joke and make them laugh. (DE825:8800; DE845:9031).

Troya's family members testified about their past and current relationships with him.  His mother said that she loved him "dearly."  (DE845:8908).  Troya's father also testified that he loved his son.  (DE845:8962).  Both parents described how, during his prior incarcerations, the family had been in constant contact with Troya.  (DE845:8911-12, 8961-62).  Alex testified that he had a close relationship

33

with his brother, "I still love him to this day," and that Troya and Adrian were especially attached.  And Adrian testified that he too loved his brother, and that, during their jail visits, Troya had given him helpful advice about keeping his grades up, listening to his parents, and avoiding trouble.  (DE845:8962, 9001, 9117).  His grandmother testified that she loved him "very much" and would never leave him.[32]   (DE845:9020-21).

### 2.   Troya's early teenage years marked by trauma and loss

When Troya was 13, his friend, Gene Kamel, a boy with an artificial leg and a heart defect, was shot by another student at their middle school.  (DE825:8814-19; DE845:9066).  Troya was outside, across the street at the time and, after hearing the shots, looked over and saw his friend collapse.  (DE825:8819; DE845:9067-68).  As the other students fled, Troya ran to him.  (DE825:8819-20; DE845:9068).  According to his uncle, Juan Quinones, who also witnessed the event, Kamel died there, in Troya's arms.  (DE845:9069; DE825:8820-21; see also DE945:9079).  Afterwards, Troya was in shock, unable to discuss it with his

---

[32] The court, however, refused to permit the family members to talk about the loss they would experience were Troya executed, or to discuss the relationships they would have with him even if he were sentenced to life and sent to federal prison.  Worse, the court instructed jurors to ignore entirely the effect of their sentence on Troya's family and their relationships with him.  These errors are challenged in Point IV, *post*.

parents, who tried repeatedly to talk to him.  (DE825:8822-23).  The event appeared to have a lasting impact on him, as he became strangely distant and quiet. (DE825:8826; DE845:8950-51, 8954, 9000, 9070-71).  Troya never received any kind of counseling.  (DE825:8821-25; DE845:8951-52).

A few months later, Lisa Schmidt, a long-time neighbor, committed suicide. (DE825:8831-32; DE845:8953).  Her family and the Troyas had lived next door for years and were close, including spending the holidays together each year. (DE825:8832-33; DE845:8954).  Troya had been close to Schmidt; she had spent time with him, helping him with his homework.  (DE825:8832; DE845:8955, 9000).  The suicide was shocking and hard, emotionally, on everyone, including Troya.  (DE825:8833; DE845:8955).  Again, he withdrew and refused to discuss the loss or his feelings, and, again, he received no counseling.  (DE825:8833-34; DE845:8955).

Finally, during this same time period, Troya's grandmother became ill with cancer and died following a two-year battle.   After being diagnosed, she had moved from Chicago to lI've with the Troyas, where she stayed while her health deteriorated.  Troya grew close to her, and was affected by her worsening condition.  And, as he had with the prior losses, he buried his feelings. (DE825:8836).  Knowing that the end was near, his grandmother decided to return

35

to her home in Chicago, and the family gathered together to say good-bye, for the last time. (DE825:8837). Troya's mother could tell, from the hug that he gave his grandmother then, how upset he was, "trying to show his affection without crying." (DE825:8838).

It seems that Troya was deeply affected by the losses he suffered at that time in his life. Indeed, at one point fairly soon after his friend was shot, Troya's father Lorenzo was called to the school because Troya was behaving erratically: He was running in circles, endlessly, around the baseball field, and the teachers could not get him to stop and come inside. (DE825:8826; DE845:8956). No one, including Troya, was ever able to explain this behavior. (DE825:8826; DE845:8956-57). Another time soon after, during an argument with his father, Troya literally jumped out of a bedroom window. (DE825:8828; DE845:8957-58). He became withdrawn and slept most of the time while he was in the house. (DE825:8828). Troya's performance at school suffered; his grades declined and he began to act out. (DE825:8827; DE845:9019).

On one occasion a few months after Kamel died, Troya was so upset that he ran out of the house, with his mother following him, and wedged himself onto railroad tracks nearby. He refused to leave, even as a train approached, and his mother, frantic, was only able to pull him up at the last minute. (DE825:8829). He

36

never explained why, and, again, he never received counseling.  (DE825:8829-8830).

The verdict sheet reports that nine jurors found the fact that Troya was traumatized by his friend's shooting death to be mitigating; nine jurors also found mitigating the fact that he did not receive grief counseling.  (DE859:14).

**3.    The bad influence exerted on Troya by his Uncle Isidro.**

When Troya was 12, his maternal uncle, Isidro, who was then around 18, was sent to live with the Troyas.  Isidro had been in Chicago with his own family, but was often in trouble with the law and gangs: He stole from family members, was "gangbanging," and had been held in detention.  (DE825:8804-05; DE845:8917, 9038-40, 9041).  The Troyas did not know the full extent of his troubles.  (DE825:8804-05; DE845:8917, 9038, 9042).  With Troya's parents at work, he spent a lot of time with Isidro, who was essentially his babysitter.  Isidro must have created an impression on the younger Troya:  He dressed nicely, had his own spending money, and was a smooth talker, in particular with women     a "cool guy."  (DE825:8811; DE845:8997, 9041, 9058).  Troya's mother testified that Isidro was capable of manipulation.  (DE825:8811).  He left at the end of the summer.  (DE825:8812).

The verdict sheet reflects that seven jurors found mitigating the fact that

37

Troya had been affected adversely by his uncle Isidro. (DE859:13-14). The evidence bears this out: After the summer with Isidro, Troya's school attendance and academic performance began to drop precipitously, to the point that he had 31 absences in 7th grade and, by 8th grade, almost all F's. (DE825:8827; DE845:8900-04; DX15; see also DE825:8795-96, 8813). That year, Troya was kicked out of the middle school. (DE825:8830-31).

And he began to have trouble with the law, as had his Uncle Isidro. At age 17, he was sent to Florida DOC as a result of stealing a golf cart. (DE845:8905-06). Later that year, he was sentenced to three years imprisonment, as a youthful offender, for stealing a car, which he subsequently abandoned, and for the felony battery involving his friend's mother. (DE845:8906, 8931-32, 8968). While incarcerated, Troya earned his GED. (DE845:8906; DPX3.5). Released in 2003, he returned to live with his parents. (DE845:8911). He tried to find work, but potential employers refused to hire him when they learned of his record. (DE845:8911, 8959). Troya was rearrested a few months later and ultimately sentenced to prison on a parole violation, the escape attempt (described above), and two new auto-theft charges. (DE845:8968-69). Released again in December 2005, he again tried unsuccessfully to find work. (DE845:8960). Ten months later, in October 2006, he was arrested in this case. (DE845:8969).

38

**4.     Daniel Varela, the head of the drug conspiracy and alleged instigator of the murders, did not face the death penalty or even a murder charge.**

The defense also submitted to the jury the mitigating factor, explicitly listed in the Federal Death Penalty Act, that "[a]n equally culpable co-defendant, Danny Varela, will not be punished by the death penalty." (DE859:12). See 18 U.S.C. § 3592(a)(4). Counsel began his summation with this factor and emphasized it, calling it "huge" and something that "in and of itself demands" a life sentence. He reminded jurors that the indictment had described Varela as an unnamed co-conspirator in the carjacking of the Escobedos. (See DE854:4-7). And, accurately drawing on the trial evidence, see Statement of Fact, Section I, *ante*; Point IX, *post*, he catalogued in detail how the government's presentation cast the murders as having occurred at the behest of, and to benefit, Varela. Moreover, argued Troya's attorney, the evidence about the defendants' interactions with Varela suggested that he "was in charge," he "directed all of the others in this case," and that Troya was, at most, just a "worker," a "follower." (DE847:9567-72).[33] Ten jurors found this mitigating factor. (DE859:12).

---

[33] The prosecutors, however, misleadingly and without evidentiary support, argued in summation that the government's investigation of Varela would continue and that, in time, when sufficient evidence was uncovered, he would be prosecuted for the murders and face the death penalty. This is challenged in Point IX, *post*.

**C.**     **After extended deliberations, the jury rendered split sentencing verdicts**.

Jurors deliberated over the course of four days before reaching verdicts.[34]

They imposed life sentences on three of the capital counts, and death sentences on

the remaining two.  They voted unanimously for life on the carjacking conviction

(Count 6), which involved all four victims, as well as on the two convictions for

use of a firearm resulting in deaths of each of the adults, Yessica Escobedo (Count

9) and Lou Escobedo (Count 10).  Only on the two convictions for use of a firearm

resulting in the deaths of each of the children, Luis Damian (Count 7) and Julian

(Count 8), did the jury impose death.  (DE859:16-18).

The verdict form reflected that, for each of the five capital counts, the jury

found four statutory aggravating factors: (1) Troya committed each killing in the

expectation of receipt of something of pecuniary value; (2) he committed each

killing after substantial planning and premeditation; (3) the children were

particularly vulnerable victims due to youth;[35] and (4) Troya intentionally killed or

---

[34] Deliberations began on March 26 at 11:43 a.m.  (DE848:9762).  Jurors deliberated that afternoon, and all day March 27 and March 30.  (See DE855:9776; DE856:9801).  It was 4:55 p.m. on the following day, March 31, when the court finished receiving the verdicts.  (DE857:9846).

[35] This aggravating factor was found only for the two counts involving the children alone (Counts 7 and 8) and for the carjacking count involving all four victims (Count 6).  (DE859:8).

40

attempted to kill multiple victims in a single criminal episode.  (DE859:6-9).[36]

For each of the capital counts, the jury also found three nonstatutory aggravating factors, that Troya (1) participated in other, uncharged acts of serious violence;[37] (2) killed the victims to eliminate them as potential witnesses; and (3) caused harm and loss to the family of the victims.  (DE859:9-12).

Jurors also found numerous mitigating factors; as discussed, most related to Troya's childhood, youth, and prior record, and to Varela's escape from capital prosecution despite his equal culpability for the killings.[38]  (DE859:12-14).  Eleven jurors further found as a mitigating factor that "Jose Luis Escobedo engaged in criminal conduct that contributed to the circumstances leading to his family's death."  (DE859:14).

This appeal followed.

---

[36] Points V-VII, *post*, challenge the sufficiency of the evidence, as to the killings of the children, of three of the four statutory aggravating factors: substantial planning, vulnerable victim, and pecuniary gain, and of a related nonstatutory aggravator, witness elimination.

[37] Point VIII, *post*, challenges the court's instructions on this aggravating factor, which failed to require jurors to find unanimously or beyond a reasonable doubt that Troya had committed each (or, indeed, any particular one) of the uncharged crimes.

[38] Point X*, post*, challenge the government's arguments and the court's instructions on the nonstatutory, non-crime-related mitigating factors, which suggested to jurors that, as a matter of law, they were presumptively entitled to less or no weight.

41

## STANDARDS OF REVIEW

Point 1: *The admission of other-crimes evidence and the prosecutor's propensity arguments in summation*:  The court reviews the admission of evidence under Federal Rules of Evidence 403 and 404(b) for the abuse of discretion. United States v. Phaknikone, 605 F.3d 1099, 1107 (11th Cir. 2010); United States v. Bradberry, 466 F.3d 1249, 1253 (11th Cir. 2006).  The court assesses whether challenged summation comments by the prosecution were improper and, if so, whether they prejudiced the defendant's substantial rights.  United States v. Paul, 175 F.3d 906, 909 (11th Cir. 1999).

Point 2: *The court's ruling that prompted a cooperating witness to testify to an altered, incorrect version of a statement attributed to Troya*: The plain-error standard applies, which requires that the error was obvious and that it violated the defendant's substantial rights.  If so, the Court may grant relief, guided by whether the error affected the fairness, integrity or public reputation of the judicial proceedings.  See United States v. Olano, 507 U.S. 725, 734-35 (1993); United States v. Foree, 43 F.3d 1572, 1579 (11th Cir. 1995).

Point 3:  *The exclusion of expert rebuttal testimony that Troya would not pose a risk of violence in federal prison and could be safely managed by the BOP*: The Court reviews *de novo* the relevance of evidence or information proffered by a

42

capital defendant to rebut future dangerousness but excluded by the district court.

See Simmons v. South Carolina, 512 U.S. 154, 164-65 (1994); Skipper v. South

Carolina, 476 U.S. 1, 4-5 (1986).

Point 4: *The exclusion of testimony about, and the court's instructions to the jury to ignore, the value of Troya's future relationships with family members if he were sentenced to life and the loss and grief they would suffer if he were executed*: See United States v. McVeigh, 153 F.3d 1166, 1211 (10th Cir. 1998) ("We review *de novo* the question of whether a particular set of facts may be considered a mitigating factor . . . . the abuse-of-discretion standard applies to whether" particular "evidence was relevant to" the "proffered mitigating factor").

Points 5, 6, and 7: *The sufficiency of the evidence to support the aggravating factors of substantial planning, witness elimination, vulnerable victim, and pecuniary gain*: The Federal Death Penalty Act, 18 U.S.C. § 3595(c)(1), mandates that, in every capital direct appeal, the court of appeals must address whether the evidence supports the jury's findings of aggravating factors, both statutory and nonstatutory.  See United States v. Davis, 609 F.3d 663, 674 (5th Cir. 2010); United States v. Allen, 247 F.3d 741, 795 (8th Cir. 2001), vacated on other grounds, 536 U.S. 953 (2002); United States v. Webster, 162 F.3d 308, 319, 353-54 (5th Cir. 1998).  The Court must determine whether, "viewing the evidence in

43

the light most favorable to the prosecution," a "rational trier of fact could have found the [aggravating factor] beyond a reasonable doubt." Hallford v. Culliver, 459 F.3d 1193, 1206 (11th Cir. 2006).

Point 8: *The jury instruction on the "uncharged acts of violence" aggravating factor*. The plain-error standard applies, which requires that the error was obvious and that it violated the defendant's substantial rights. If so, the Court may grant relief, guided by whether the error affected the fairness, integrity or public reputation of the judicial proceedings. See United States v. Olano, 507 U.S. 725, 734-35 (1993); United States v. Foree, 43 F.3d 1572, 1579 (11th Cir. 1995).

Point 9: *The government's summation comments on the mitigating factor that Daniel Varela, an equally culpable codefendant, was not facing the death penalty*: The plain-error standard applies, which requires that the error was obvious and that it violated the defendant's substantial rights. If so, the Court may grant relief, guided by whether the error affected the fairness, integrity or public reputation of the judicial proceedings. See United States v. Olano, 507 U.S. 725, 734-35 (1993); United States v. Foree, 43 F.3d 1572, 1579 (11th Cir. 1995).

Point 10: *The jury instructions and summation comments on mitigating factors not listed in the statute and not related to the crime*: Whether instructions impermissibly limited the jury's consideration of mitigating evidence involves

44

mixed questions of law and fact and is reviewed *de novo*.  Kennedy v. Herring, 54 F.3d 678, 682 (11th Cir. 1995).  The Court assesses whether challenged summation comments by the prosecution were improper and if so, whether they prejudiced the defendant's substantial rights.  United States v. Paul, 175 F.3d 906, 909 (11th Cir. 1999).

Point 11: *The court's refusal to include a "reasonable doubt" standard for weighing aggravators and mitigators*: The Court reviews *de novo* whether the district court misstated the law in instructing on the burden of proof.  United States v. Deleveaux, 205 F.3d 1292, 1296 (11th Cir. 2000).

Point 12: *The district court's misleading and potentially coercive verdict form and jury charge regarding the consequences of a non-unanimous verdict*: The standard of review is "whether the "instruction by itself so infected the entire [proceeding] that the resulting [verdict] violated due process."  United States v. Brokemond, 959 F.2d 206, 208 (11th Cir. 1992).

**SUMMARY OF ARGUMENT**

**A.   TRIAL**[39]

**Points I-II:  Inadmissible 404(b) evidence and propensity arguments, and the unnecessary, prejudicial alteration of trial testimony about Troya's alleged confession to a jail inmate**

At trial, the government illegitimately filled key gaps in its proof about Troya's role in the murders, see Statement of Facts, Section I, *ante*, because court errors allowed it to (1) appeal to propensity reasoning based on irrelevant, uncharged violence attributed to Troya by a cooperator that should never have been admitted, and (2) "redact" testimony about Troya's alleged statements to a jail inmate from ones vaguely claiming collective responsibility for "involvement" in the Escobedo killings, to ones confessing, "I killed some people."

Over repeated defense objections, the court licensed the jury to hear extensive evidence about two drive-by shootings and an armed home invasion. Troya was never charged with any of these offenses, and only a single government cooperator implicated him in them.

Neither the government nor the court ever suggested that any of these crimes

---

[39] For clarity, the points are grouped chronologically according to the phase of the proceedings.  Thus, the argument section begins with the two points involving the trial, and then addresses the ten points involving the sentencing hearing.  (Three additional points involving jury selection, raised in Co-Appellant Sanchez's brief, are adopted by Troya).

were relevant to prove the capital counts, which, for Troya, were the main event at trial. Moreover, contrary to the court's rulings, this evidence also had no or virtually no probative value even to the drug-conspiracy or weapons charges on which it was offered. Thus, it should have been excluded under Federal Rules of Evidence 404(b) and 403 as well as the "intrinsic"-evidence doctrine.

Worst of all, though, were the government's propensity arguments in summation. Again, over defense objections, which the court overruled in front of the jury, the prosecutors explicitly, repeatedly, and emphatically urged jurors to use the two uncharged shootings as proof of Troya's proclivity for "violence" against "individuals who have no play in his criminal involvement" (like the Escobedo children), and thus a reason "to believe that . . . Daniel Troya could execute an entire family." Under well-established law, and by any standard, those arguments were egregiously improper.

Another serious error led to misleading trial testimony by a second cooperator that Troya had confessed: "I have killed some people"    the only direct evidence of his guilt of the murders that the jury heard. Before Carlos Rodriguez took the stand, the government proffered his expected testimony: He had overheard Troya make several inculpatory but ambiguous statements to another jail inmate, namely: "I did something very bad," and then, later: "I was

47

involved in killing some people, it involved children . . . I had to do it."  The

prosecutor added that Troya had also used "the word 'we'" in the conversations.

But, out of a baseless concern for Sanchez's confrontation rights, the

prosecutor, with the court's blessing, directed the witness to eliminate use of the

plural.  In an apparent effort to obey this directive, Rodriguez crucially altered his

account and testified that Troya had said "I have killed some people."  This

"redaction" violated Troya's right to due process by prejudicing his defense that

the government had not proved he personally killed anyone.

## B.    SENTENCING

The jury apparently regarded Troya's as a close case.  They engaged in

lengthy deliberations over the course of four days.  Some jurors found substantial

mitigation for him.  And, most telling, the jury rendered split verdicts, voting for

life on the majority of the capital counts, including one involving all the victims

and all the aggravating factors.  See Statement of Facts, Section II.C, *ante.*

Thus, jurors thought that, for the case as a whole, Troya deserved a life sentence,

but something about the two counts involving just the children tipped the balance

the other way.  (Perhaps that the mitigating factor of Escobedo's drug dealing

having "contributed" to the deaths should not matter for those).  Against this

backdrop, the numerous serious errors in the evidence, argument, and instructions

at Troya's sentencing hearing, as summarized below, were particularly prejudicial.

See Porter v. McCollum, 130 S. Ct. 447, 454 (2009) (similar split verdict indicated

case was a close one and that omitted mitigation might have altered the outcome).

**Points III-IV:**     **Exclusion of important defense sentencing evidence about future dangerousness and family impact**

At Troya's sentencing hearing, a critical issue involved the future

implications of a death versus a life sentence.  If he were confined to prison, would

he pose a threat of violence to staff or other inmates, or a risk of escape?  Could he

be safely managed by the Federal Bureau of Prisons?  Would his family remain

close to him, and would he serve as a positive force in their lives, even while he

was imprisoned far from home?  If he were executed, what, if any, lasting loss

would they suffer?

How capital jurors answer these kinds of questions can enormously

influence their deliberations, as verdict sheets and studies of actual jurors

consistently show.  Being able to demonstrate that Troya "would pose no undue

danger to his jailers or fellow prisoners and could lead a useful life behind bars,"

Skipper v. South Carolina, 476 U.S. 1, 6-7 (1986), was especially critical to the

defense here, since the jury heard significant evidence and government summation

comments implying he presented a risk of violence and escape.

The court, though, broadly prohibited Troya from introducing testimony on

these pivotal questions.

This included concededly reliable expert defense testimony that, based on his characteristics, he would likely adjust well to federal prison and could be safely managed. In response to the aggravating factor of "future dangerousness" alleged in the government's death notice, the defense retained Dr. Mark Cunningham, a psychologist and nationally recognized expert on the causes and predictors of prison misconduct. Cunningham interviewed Troya, reviewed his records, and conducted an individualized assessment of his risk. As stated in his report, Cunningham would have testified that Troya was "likely to make a positive prison adjustment," "unlikely to personally perpetrate serious acts of violence in prison," and "unlikely to escape from the custody of the Bureau of Prisons."

But, on the government's motion, the court kept Cunningham from testifying. It did so because the government, in response to his report, acknowledged that Troya could be safely managed by the BOP, and formally withdrew the "future dangerousness" aggravator. The government then urged, and the court agreed, that this left nothing for Cunningham to rebut.

Not so. The United Supreme Court has rejected such a mechanistic analysis, and held that future dangerousness is "at issue," triggering a capital defendant's due-process right to rebut it, whenever it is a "logical inference" from the evidence,

even if it is not a formal aggravating factor.  <u>Kelly v. South Carolina</u>, 534 U.S. 246, 248 (2002).  That was true here, as defense counsel warned in pressing to let Cunningham take the stand: The jury heard evidence (1) that alleged Troya had committed other, uncharged violent crimes, and had a violent nature; (2) that, when incarcerated before, he had tried to escape and, later, had mistakenly been released from prison; and (3) that falsely portrayed prisons as unremittingly dangerous, filled with violent predators and barely under the authorities' control.

Cunningham's testimony would have rebutted the inference of Troya's dangerousness that this evidence, and the government's related summation arguments, must have raised in jurors' minds.  It also should have been admitted independently as mitigation.

The court further erred in excluding family-impact mitigation.

Testimony from Troya's parents and brother was somewhat spare and prosaic, because the court had prohibited them from telling jurors what kinds of relationships they would maintain with Troya even if he were imprisoned for life, and what loss and harm they would experience if he were executed.  Worse, the court, *sua sponte*, gave an instruction, unprecedented in federal death penalty cases, repeatedly warning jurors to exclude any such-future-oriented factors which it labeled "execution impact"    from their consideration.

51

As the defense informed the court, the overwhelming practice across the country, including in this Circuit, is to admit and instruct on this testimony in federal death-penalty trials.  In those cases where it has been challenged, courts have predominantly recognized that it constitutes relevant mitigation under the Eighth Amendment and the Federal Death Penalty Act (FDPA).  And this Court has expressly validated the use, in a FDPA case, of evidence about a life sentence's impact on third parties.  United States v. Battle, 173 F.3d 1343 (11th Cir. 1999) (approving government testimony from victim's fellow prison guards about "the effect the sentence in this case," for defendant inmate, "would have on the prison population").

The ruling in Troya's case was particularly unfair since the jurors heard extensive and emotional "*victim* impact" evidence, about the loss and grief the Escobedos' relatives would continue to suffer as a result of their deaths.

**Points V-VIII:     Lack of sufficient evidence of four aggravating factors  substantial planning, witness elimination, vulnerable victim, and pecuniary gain     and flawed instructions on a fifth  serious acts of uncharged violence.**

Five of the seven aggravating factors the jurors relied on in imposing death for the children's murders were invalid.  The FDPA mandates that this Court review and determine whether each aggravation finding was supported by legally sufficient evidence.  Four were not.  Moreover, the court's instructions on a fifth

52

were plain error.  The government's summation arguments, other aspects of the record, the results of prior FDPA cases, and empirical studies of actual capital jurors all suggest that these aggravators likely exerted some influence with Troya's jury.

The evidence was legally insufficient to support three statutory aggravating factors: that Troya substantially planned and premeditated the children's killings, that their youth made them particularly vulnerable to being shot to death, and that Troya murdered them for pecuniary gain.  18 U.S.C. § 3592(c)(8), (9), (11).  The same was true of an additional, nonstatutory aggravating factor: that the children were slain to eliminate them as witnesses.

There was no proof that Troya substantially planned or premeditated the children's killings.  For the government did not show he had contemplated in advance that they would be murdered, or that he had even known they were in the car with their parents.  The government never excluded the possibility that their presence at the scene surprised him, and that any involvement he had in their deaths was on the spur of the moment.  And there was no proof that the children, who did know Sanchez, had ever met Troya so that he would have had reason to fear they could identify him.  Moreover, as the government itself acknowledged to the jury, the crime-scene evidence suggests that the children may even have been

53

casualties killed by bullets intended for their parents.

Another statutory aggravating factor, that the child victims were "particularly vulnerable" to being shot to death because of their youth, also was unsupported. This aggravator has been interpreted to require a logical connection between the victim's vulnerability and the killing; in other words, it must have facilitated the murder. Here, it obviously did not. For the youth of the two boys had nothing to do with the fact they died from a sudden assault by multiple, close-range gunshots, just like their parents who were able-bodied adults.

Finally, the government also failed to establish a fourth aggravating factor on which Troya's death sentences rest, that he killed the children "in the expectation of the receipt of anything of pecuniary value." As interpreted by this and other circuits, this required proof that Troya killed the boys to effectuate the theft of cocaine from Escobedo's jeep. But the children obviously were not killed because they posed an obstacle to making off with the vehicle and the drugs it contained. And the government never advanced any such theory.

In addition, the jury's finding of another aggravator, involving uncharged crimes supposedly committed by Troya, was tainted by the court's plainly erroneous instruction that jurors need only answer the amorphous, global question whether Troya had "participated in other, uncharged serious acts of violence." The

54

jury could have checked "yes" on the verdict form, as it did, even if jurors disagreed about which uncharged crimes were proven beyond a reasonable doubt, or agreed that each was supported only by some evidence. The collective phrasing also may have discouraged them from even trying to figure out which particular crimes, if any were, proven. All of these scenarios would have contravened the unanimity and beyond-a-reasonable-doubt standards expressly mandated for aggravation findings, statutory and non-statutory, by the FDPA, 18 U.S.C. § 3593(c)-(d), and by the Constitution.

**Points IX-X:** **Government summation arguments and court instructions that unfairly misled jurors from weighing key mitigation about the fact that Varela, who was ultimately responsible for the killings, is not facing the death penalty, and about Troya's childhood.**

Two central areas of mitigation, on which Troya's case for a life sentence depended, were the fact that Danny Varela, the kingpin of the drug operation and the apparent instigator of the murders, was not even capitally prosecuted something expressly recognized as a mitigating factor by the FDPA     and the traumatic and damaging experiences Troya experienced in childhood.

But, through a series of improper summation comments, the government seriously undermined these twin considerations, and rendered Troya's resulting death sentences constitutionally unreliable, in violation of the Eighth Amendment:

55

The prosecutors vouched, falsely, to jurors that Varela would face murder charges and, they implied, the death penalty, as soon as they had finished collecting enough additional evidence. And the mitigating factors involving Troya's childhood, prosecutors told jurors, were just "excuses," which counsel were hoping to trick jurors to "fall for."

The court's instructions, erroneous in their own right, exacerbated the latter comments. For they conveyed that mitigators listed in the FDPA as illustrative examples, almost all of which involve circumstances of the offense, are the ones Congress has recognized deserve weight — and that unenumerated factors proposed by Troya were only truly mitigating if "similar" to one of the illustrative examples. But, under the FDPA and Supreme Court precedent, factors unrelated to the offense, such as those involving Troya's upbringing, were entitled to just as much consideration as the predominantly-crime related ones listed in the statute.

**Points XI-XII:** **The jury's sentencing decision: the court's refusal to instruct on the constitutionally mandated reasonable-doubt standard for weighing aggravating and mitigating factors, and the court's potentially coercive invitation to jurors to speculate incorrectly that a not-unanimous verdict could result in Troya's eventual release.**

In addition to the all the errors that skewed the evidence and findings of aggravating and mitigating factors, two additional instructional defects directly undercut the reliability of the jury's ultimate sentencing decision: the court's

refusal to direct jurors to apply the reasonable-doubt standard to the weighing of aggravators and mitigators, as mandated by the Constitution, and its misleading, potentially coercive charge encouraging them to speculate that a not-unanimous verdict might result in a Troya's eventual release into the community.

After the FDPA was enacted, the Supreme Court recognized that the Sixth Amendment right to jury trial requires that any fact that increases the maximum punishment for a crime must be not only submitted to a jury but also proved beyond a reasonable doubt.  In a federal capital proceeding, the determination that aggravating factors outweigh mitigating ones is absolutely required before the jury may render a death verdict.  See 18 U.S.C. § 3593(e).  And, as recent decisions of the Supreme Court indicate, it qualifies as a fact finding under the Sixth Amendment.

Defense counsel urged this at Troya's sentencing hearing.  But the court disagreed, and so jurors were only instructed that they should impose a death sentence if they determined that the aggravating factors "sufficiently outweighed" the mitigating ones, per the language of the FDPA.  The court told them nothing about how certain they needed to be of this before they could vote for death.  Under Supreme Court precedent, an erroneous failure to instruct on reasonable doubt constitutes structural error.

The instructions also led jurors astray on the consequences of a not-unanimous verdict.  The verdict form authorized this if jurors could not agree on any of the sentencing options.  But the instructions left them free to speculate about its consequences.  And the court aggravated the situation by insisting on misleadingly describing the third option as a "lesser sentence" of a "term of years"; in fact, Troya's noncapital convictions and requirements for consecutive sentencing meant that he faced a minimum of 115 years imprisonment     in effect, the same as life.

Jurors, who deliberated over four days, may have filled the instructional gap by assuming that a not-unanimous verdict would also authorize the court to impose a "lesser" "term of years" sentence, allowing Troya (whom the government had cast as a serious danger) to return to society some day.  In truth, however, the same 115-year minimum would have bound the court if the jurors deadlocked.  Such a misconception would have tended to coerce life-leaning jurors toward a death verdict.

## C.    JURY SELECTION

**Adopted Points:    The court's refusal to ask the voir-dire questions minimally necessary to identify jurors with disqualifying pro-death penalty biases; its failure to consider factors probative of discrimination in turning aside Troya's <u>Batson</u> challenge; and its allowing the capital defendants to exercise peremptory challenges only with the consent of both noncapital ones.**[40]

The court took several serious missteps during voir dire that clearly rendered inadequate the questioning on death-penalty attitudes, and thus deprived Troya of his rights to an impartial jury and due process under the Fifth and Sixth Amendments, and to a reliable sentencing determination under the Eighth Amendment.

First, the court refused either to say the indictment charged an intentional killing, or even to use the shorthand term "murder."  Instead, it told veniremembers only that Troya was to be tried for conspiring to commit, or participating in, a carjacking that resulted in the victims' deaths.  If anything, this suggested that the deaths may have been unintentional or Troya's responsibility for them indirect.  As a result, subsequent questioning could not possibly identify veniremembers who would always vote the death penalty for someone convicted of murder.

---

[40] Troya summarizes these points here, but adopts Co-Appellant Sanchez's briefing on them.  <u>See</u> Statement Regarding Adoption of Briefs of Other Parties, *ante*.

Second, the court refused even to ask whether jurors would always impose the death penalty if Troya were convicted.  This is the kind of simple, straightforward question the Supreme Court has approved, and is routinely used in other federal capital cases.  Indeed, at the government's behest, the court asked the mirror image of it, whether jurors would *never* impose the death penalty if Troya were convicted.  The question the court did pose for the defense was no substitute: Asked whether they would vote for death *without first considering* aggravating and mitigating factors, jurors could have truthfully answered "no," while still harboring fixed opinions that such consideration would invariably yield a death verdict.

Third, the court also refused to inquire whether the fact two of the victims were very young children would interfere with potential jurors' ability to consider mitigating factors.  Instead, it merely mentioned these victims' ages, along with a slew of other facts, in its extremely lengthy and complex introductory remarks to each panel     but later declined to ask any question that would have drawn jurors' attention to the issue.  This is especially troubling, since the jury ultimately imposed death only for the capital counts involving just the child victims.

Finally, while the court noted in those pre-voir dire instructions that the sentencing process would require consideration of "mitigating factors," it never said what this meant, and refused to let veniremembers know that, under the

60

FDPA, it included "factors in the defendant's background, record, or character." 18 U.S.C. § 3592(a)(8). Accordingly, jurors' could have affirmed their ability to consider "mitigating factors," while still holding strong, unwavering views that any evidence about the defendant's history should be dismissed out of hand     as a version of the "abuse excuse."

Troya also had the right "to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." Batson v. Kentucky, 476 U.S. 79, 85-86 (1986). Here, the government disproportionately struck black jurors and female ones. It peremptorily challenged black jurors at four times the rate of white ones, eliminating two of the three black veniremembers. And, although women were slightly more than half the venire, the government used all but one of its eight strikes against them.

In evaluating the prosecutor's explanations for these challenges, the court was supposed to analyze all relevant circumstances. That includes certain factors the Supreme Court and this Court have specifically recognized are probative of discrimination. But here, the court appears to have accepted the government's explanations without considering those factors. Had it considered them, it would have found that the government's reasons were pretextual.

Finally, a third error also tainted jury selection. Troya and Sanchez, who

61

were facing the death penalty, had fundamentally different interests in that process

than the noncapital codefendants, Lopez and Varela, did; the latter obviously had

no concern for weeding out veniremembers who might be biased at a sentencing

hearing.  Nevertheless, the court erroneously refused to allow any peremptory

challenges to be exercised by the defense unless all four defendants unanimously

agreed to it.  This altered the complexion of the actual jury, since it resulted in at

least two jurors being seated whom Troya and Sanchez would have struck.

## ARGUMENT

## I.

**The court wrongly allowed cooperator testimony accusing Troya of several other serious gun crimes involving innocent victims. Worse, the government improperly urged jurors to consider it as propensity evidence that he was a "killer" who could "execute an entire family."**

A.   **The court erred in admitting evidence of two drive-by shootings, an armed home invasion, and Troya's prior imprisonment, all of which concededly had no relation to the capital charges, and zero or trivial relevance even to other counts**.

1.   **The Haverhill Avenue shooting**

a.   **Factual background**

Kevin Vetere, the government's lead cooperator, testified that, two months

before the murders, at a townhouse where Varela and the other defendants were

staying and drugs and money were kept, he saw a car with three black men drive

62

past twice and then park nearby.  He could see the driver pointing, and was concerned they might be planning to rob the house.[41]  Vetere summoned Troya, who came outside with an AK-47, accompanied by Sanchez, who had another assault rifle.  (DE753:5624-26).  The other vehicle sped off.  Vetere observed it had some type of Miami Hurricanes license plate.  (DE753:5627-28).  He testified that the AK-47 Troya had looked like the one police later found in Varela's bedroom.  (DE753:5666-68).

A couple of months later, according to Vetere, he noticed what he thought might be the same car parked outside a strip club at about 10 p.m. one night, while driving past with Troya, Sanchez, and Varela.  (DE753:5629, 5636).  By this time, they had moved to a different house.  Vetere reminded the others of the earlier incident.  They supposedly hatched a plan for Troya to shoot the driver of the car when he came out of the club.  They drove home, where Troya changed into black clothes and donned a wig of fake dreadlocks.  But it was raining when they returned, so they decided instead they would follow the driver and Troya would "shoot the car up."  (DE753:5637-39).

Thus, when the other car left the club at about 3 a.m., they followed.  Troya

---

[41] Liana Lopez, Varela's girlfriend and a codefendant, had told Vetere about an earlier incident in which robbers had taken money, drugs, and guns from the home at gunpoint.  (DE753:5569-70, 5624).

rode in the front passenger seat, armed with a 9 mm. handgun.  From the rear seat, Vetere could not tell the race, gender, or age of the other car's driver, let alone whether it was one of the same people who had driven past the house two months before.  When the other car turned onto Haverhill Avenue, Vetere claimed, Troya leaned out the passenger window and fired at least eight shots.  (DE753:5642-44).  The other car swerved off the road, and the defendants drove off.  (DE753:5645).  According to Vetere, Troya later threw away the gun.  (DE753:5646).

The government presented additional evidence about the shooting, though none of it corroborated Troya's involvement.  The incident had occurred about a month before the Escobedo killings, in early September 2006.[42]  A Sheriff's investigator went to the strip club that morning and found a vehicle scarred by multiple gunshots.  (No explanation was offered for how the car had gotten back there).  A black woman was sitting in a chair outside; she was bleeding profusely from a gunshot wound to her thigh.  (DE758:6395-6402).

Another investigator found the vehicle with its glass shattered, a flattened tire, and bullet fragments on the floorboard.  She displayed pictures to the jury.

---

[42] This contradicted the time line described by Vetere.  According to him, the initial incident in front of the old house took place right after he and Troya returned from Chicago in late August, and the shooting happened a couple of months later. That would have been late October.  (DE753:5703-04).

(DE757:6190-6203).  She also testified about and displayed photos of the injuries sustained by the victim, whom she visited in the hospital. (DE757:6204-07).

The court allowed this evidence over defense objection.  Pretrial, the government had announced an intent to introduce it under Rule 404(b).  (DE398-2:3).  In response, Sanchez disputed its relevance and moved to exclude it.[43] (DE361:1-7).  When Vetere began testifying about the shooting, Troya's counsel (and Sanchez's) reminded the court of the motion, and renewed their objection. (DE753:5630, 5632, 5635; see also DE757:6192, 6195).

The government never claimed this evidence bore on the capital charges involving the Escobedo killings.  Instead, it said that the shooting was "inextricably intertwined" with "the ongoing drug trafficking activity."  Thus, it was "in the heart of the conspiracy.  It is not 404(b)."  (DE753:5631).

The court accepted this argument.  (DE753:5631).  Alternatively, it said, the testimony was admissible under Rule 404(b) to establish Troya's intent to engage in the drug conspiracy.  And that, under Rule 403, the probative impact of the evidence would not be outweighed by undue prejudice.  (DE753:5632-34).

---

[43] On consent, the court ordered that any motion or objection by one defendant was automatically deemed adopted by every other defendant for purposes of appellate preservation, unless another defendant affirmatively opted out.  (DE245; DE732:4052).  Thus, Sanchez's motions and objections, together with Troya's, served to preserve the issues raised in this point for both defendants.

**b.      The Haverhill Avenue shooting should not have been admitted.  It was not "intrinsic" to the drug conspiracy or relevant to prove Troya's intent to participate in it.  And any scant probative value was far outweighed by its unfair prejudice on the capital charges.**

Even accepting Vetere's uncorroborated claims, the evidence did not show the shooting was in furtherance of the drug conspiracy, let alone inextricably intertwined with it.  Troya had no idea if the driver of the car was one of the same men who had suspiciously come by Varela's house a couple of months earlier.  As Vetere testified, he could not see who was driving the car, or even tell the race or sex of the driver    who turned out to be a woman.[44]  And Varela and the other defendants had since moved to a different house, in a gated community, so there was no apparent basis to fear the men would return, even assuming they had been casing the house.

In short, as the government itself suggested in summation, see Section D, *post*, Vetere's account portrayed Troya as having shot into the car indiscriminately    not knowing or caring who was driving    because he was a volatile, violent

---

[44] The court itself also commented on this at Troya's formal sentencing, noting that "the only significant thing that was noted was a Hurricane's license plate on the back of that car, perhaps it is color, and we know months later, literally a couple months later while the group went to a club . . . . Think about it for a minute, and how many Hurricane license plates there are today, and what was the likelihood that that was really the car in question."  (DE955:25).

man, not to protect Varela's drug operation.  Cf. United States v. Mothersill, 87 F.3d 1214, 1218 (11th Cir. 1996) (a discrete crime is "in furtherance of" a conspiracy when it "facilitates the implementation of [the conspiracy's] goals").

For this reason, the shooting was not "intrinsic" to the drug conspiracy.  Cf. United States v. Meester, 762 F.2d 867, 875 (11th Cir. 1985) (killing of pilot was for purpose of maintaining access to plane used in drug-smuggling venture).  Nor was it relevant to prove Troya's "intent" to participate in the drug conspiracy.  Cf. United States v. Diaz-Lizaraza, 981 F.2d 1216, 1224 (11th Cir. 1993) ("Diaz's 1988 arrest for possessing marijuana with intent to distribute was relevant to the issue of his intent to conspire to possess and distribute cocaine in the present case").

This shooting should also have been excluded under Rule 403, because the undue prejudice it caused Troya vastly outweighed any conceivable probative value it might have had.[45]  Not only was the shooting unrelated to the drug conspiracy.  The drug conspiracy itself was secondary to the trial as a whole.  Rather, the capital charges involving the carjacking and killings of the Escobedo

---

[45] The court's token Rule 403 balancing, in which it stated that "the jury is not going to be misled by this" and "the other considerations of Rule 403 are not involved" (DE753:5633-34), simply ignored the obvious risk that this evidence would irresistibly tempt jurors to convict Troya based on propensity reasoning.

family constituted the main event, especially as to Troya.  See Statement of Facts, Section I, *ante*.  And, as discussed, neither the government nor the court ever suggested that the shooting had anything to do with proving those charges.

Moreover, the government had plenty of witnesses, including Vetere, who testified to Troya's direct (albeit low-level) involvement in helping Varela and the other defendants possess and sell drugs.  (DE730:3594; DE732:4066-83; DE752:5147-48, 5152-54, 5158, 5245-48; DE754:5282-84, 5444; DE753:5585-86, 5604-05, 5620-21).  See Statement of Facts, Section I.B, *ante*.  Thus, there was no need for Vetere to accuse Troya of the Haverhill Avenue shooting on a tortured theory that it would somehow indirectly prove his support for the drug conspiracy. See Old Chief v. United States, 519 U.S. 172, 184-85 (1993); United States v. Vasquez, 903 F.2d 1400, 1403-04 (11th Cir. 1990) ("the government's need for additional evidence on the issues is relevant" to Rule 403 balancing).

Finally, that only a single government cooperator linked Troya to this shooting further detracted from its probative value.  See Huddleston v. United States, 485 U.S. 681, 689 n.6 (1988).

Yet it is hard to imagine anything more unfairly prejudicial to Troya on the capital charges.  By accusing him of randomly firing a burst of shots at the innocent, unknown driver of a car on a public road, leaving her seriously wounded

68

and bleeding, this evidence portrayed him as indiscriminately homicidal, the sort of person who might shoot to death an entire family. See Old Chief, 519 U.S. at 185 (where evidence involves a crime "similar" to charged one, "the risk of unfair prejudice" under Rule 403 would be especially obvious"). It is no surprise that this is precisely how the prosecution argued the evidence in summation.[46] See Section D, *post*.

Accordingly, this is a paradigmatic example of the situation this Court has often said Rule 403 is intended to reach, one where "matters of scant or cumulative probative force" are "dragged in by the heels for the sake of their prejudicial effects." United States v. Veltmann, 6 F.3d 1483, 1500 (11th Cir. 1993) (internal quotation omitted). See United States v. Hands, 184 F.3d 1322, 1328-29 (11th Cir. 1999) (reversible error to admit separate crime that had "minimal probative value" to conspiracy charge, but "dramatic, graphic impact"); United States v. Utter, 97 F.3d 509, 514-15 (11th Cir. 1996) (same, where separate crime was "tangential" to conspiracy charge and "carried a high risk of prejudice").

---

[46] Indeed, testimony and argument about the uncharged Haverhill Avenue shooting had a lasting impact on the court, for it discussed this crime in detail at Troya's formal sentencing, and in propensity terms, saying it demonstrated his "willingness to resort to deadly force." (DE955:25-26).

**2.    The Mercer Avenue shooting and Troya's prior imprisonment**

**a.    Factual background**

Vetere also testified that Troya told him he had "shot up a house on Mercer Avenue" at about 3 a.m. one night, using the same AK-47 he had brandished at Varela's old residence.  (DE753:5670).  According to Vetere, Troya said that "[w]hen he got arrested three years prior to that [shooting], the guy, was a co-defendant on his case.  And I guess he cooperated and he told on him.  When he got out of prison, he shot the house up."  (DE753:5670-71).

This testimony put before the jury allegations of not only a second shooting by Troya against innocent victims, but also an unnamed, additional offense, severe enough to have landed him in prison.  The government coupled Vetere's account with extensive testimony about the results of the Mercer Avenue shooting, from a patrol officer, an investigator, and a firearms expert.  But, again, only Vetere connected this incident to Troya.

That shooting, it turned out, had occurred in April 2006, almost six months before the Escobedos were killed.  When police arrived at the scene, they found that a woman and her two children had been inside when shots were sprayed into the home.  They discovered seven bullet holes in exterior walls of the house, plus more in the door.  Several projectiles had entered the living room and passed

70

through the kitchen.  One was lying near the living-room couch.[47]  (DE757:6162-90, 6266-94; DE758:6341-44).

Police also recovered eleven casings from the scene.  The firearms expert matched eight of these to the AK-47 found in Varela's bedroom six months later.  The government introduced a number of photographs and diagrams to illustrate this testimony.  (DE757:6162-90, 6266-94; DE758:6341-44).  While the court encouraged the government to narrow the number of exhibits, it declared: "On the other hand, the Government has an absolute right to show the kind of destruction, the danger that was occasioned by shooting into homes."  (DE757:6218).  The court never explained how this bore on any material issue.

This testimony, like the other Rule 404(b) evidence, came in over repeated objections.  Flagged by the government in its notice, which had also referred to a similar shooting by Sanchez on Suwanee Avenue (DE398-2:1), it was first challenged by his counsel.[48]  (DE361).  When Vetere testified about Troya's supposed admission to the Mercer Avenue shooting, his lawyer objected.

---

[47] In his questioning of Vetere on this matter, the prosecutor also made sure jurors were alerted to their own proximity to the scene, which was, "relatively near, within a mile or two [of] this federal courthouse."  (DE753:5670).

[48] The notice said that, on the same day as the Mercer Avenue shooting, Sanchez had used the same AK-47 to shoot up the home of a romantic rival.  (DE757:6207-55).

71

(DE753:5671; see also DE756:5811).

Here again, the prosecutor acknowledged that the evidence did not relate to the capital counts (or, it turned out, even to the drug conspiracy). For the government's firearms expert conceded that the AK-47 was not connected in any way to the killings. (DE764:6612-15).

Instead, the prosecutor claimed only that this shooting bore on two other counts that charged Troya and the other defendants had constructively possessed 14 guns that were found in Varela's house when police searched it on October 25, 2006     including the same AK-47, which was discovered in Varela's bedroom closet.[49]  (DE732:4003, 4035-36, 4086-88, 4097-4103; DE756:5813; see DE305:14-15). The prosecutor dismissed the fact that the Mercer Avenue shooting had occurred six months before that search and at a different location. (DE756:5818).

Over objections from both Troya and Sanchez, the court accepted the government's argument and allowed the evidence as proof that Troya

---

[49] Count 14 charged Troya together with Varela and Sanchez with being a felon in possession of "one or more" of these 14 weapons, under 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Count 15 charged these three and defendant Lopez with using or carrying "one or more" of these weapons  "during and in relation to a drug trafficking crime" or possessing them in furtherance of such a crime. In the indictment (and occasionally at trial), this particular AK-47 was referred to by its model name, as a "Romarm" rifle.  (DE305:14-15).

72

constructively possessed the AK-47 at the time of the search and that he did so intentionally. (DE756:5814-21; see also DE757:6165, 6174, 6176, 6178, 6181, 6183, 6187, 6189). The court also said the evidence was not unfairly prejudicial under Rule 403. (DE756:5820).

> **b.      The Mercer Avenue shooting and Troya's prior imprisonment were not relevant under Rule 404(b) to show that he possessed an AK-47 six months later when police found it in Varela's bedroom. Moreover, this highly prejudicial evidence was not admissible under Rule 403, especially as the AK-47 was one of 14 guns found in Varela's home by police, and the government amply proved Troya's access to the other guns in the garage and thus his guilt on the two gun-possession counts.**

That Troya (according solely to Vetere) had possessed this AK-47 when the apartment on Mercer Avenue was sprayed with shots, had no bearing on whether he had access to this same gun when police found it in Varela's bedroom closet six months later. The one, unpublished case the government cited on this point, United States v. Moore, 174 Fed. Appx. 540 (11th Cir. 2006), was inapposite. There, the government offered evidence that the defendant, who was charged as a felon-in-possession of a gun the police saw him physically touch, had also possessed a different firearm as a felon six months before. The prior crime was relevant, the Court said, to show that the charged possession was intentional. Id. at 542-44. There was no issue of constructive possession. It hardly follows from this

73

decision that evidence of the Mercer Avenue shooting was admissible under Rule 404(b) to prove Troya's access to the same AK-47 at a different place, under different circumstances, and at a significantly removed time.

Moreover, since those counts charged him with possessing "one or more" of the 14 firearms found in Varela's house (DE305:14-15), the government had no genuine need to establish his particular access to the AK-47 in Varela's bedroom. For the proof amply showed he and the other defendants had access to the other weapons in the garage, a common area, (DE753:5560-76), and that he personally owned and possessed in his bedroom a 44 caliber revolver (DE753:5576; see also DE752:5152), one of the guns mentioned in the weapons counts.  (DE305:14-15).

This complete lack of prosecution need for the Mercer Avenue evidence should have weighed significantly against its admission under Rule 403.[50]  See Old Chief, 519 U.S. at 184-85; United States v. Vasquez, 903 F.2d 1400, 1403-04 (11th Cir. 1990).

So should the obvious propensity implications of the shooting.  As with the Haverhill Avenue incident, the cavalier spraying of bullets into an apartment occupied by three innocent residents (a woman and her children) may have

---

[50] As with the other collateral crimes, the fact that only a single government cooperator linked Troya to this shooting further detracted from its probative value. See Huddleston, 485 U.S. at 689 n.6.

74

suggested to jurors that Troya was the kind of person who could execute a family by the side of the road. See Old Chief, 519 U.S. at 185. Indeed, as with the Haverhill Avenue shooting, this was precisely how the government argued the evidence in summation.[51] See Section D, *post*.

Finally, the details of the incident certainly should not have come in; contrary to the court's view, "the Government" did not have "an absolute right to show the kind of destruction, the danger that was occasioned by shooting into homes." (DE757:6217). This added nothing to proof of Troya's possession of the gun. See United States v. Moss, 290 Fed. Appx. 234, 245 (11th Cir. 2008) (though evidence that defendant fired gun was relevant, neighbor's testimony "describing the bullet holes she found in her daughter's bedroom wall days after" likely was not).

Nor, for the same reason, should Vetere have been allowed to testify that Troya said he committed this shooting because "[w]hen he got arrested three years prior to that [shooting], the guy, was a co-defendant on his case. And I guess he cooperated and he told on him. When he got out of prison, he shot the house up." (DE753:5670-71). While irrelevant to proving possession of the AK-47 six

---

[51] And the court itself later drew this same obvious connection: At formal sentencing, it observed that this incident, like the Haverhill Avenue one, showed "Troya's willingness to resort to deadly force" and what an "enormously dangerous person" he was. (DE955:24-26).

75

months later, this significantly exacerbated the prejudicial effect including alerting the jury that Troya had served time in prison, presumably for some additional serious crime, and conveying Vetere's speculation ("I guess . . .") that this was a witness-retaliation shooting.[52]

### 3. The attempted armed home invasion

#### a. Factual background

Vetere also testified that, at some unspecified point before the Escobedo killings, the defendants made plans to arm themselves and rob cocaine from the home of someone nicknamed "B Real," whose girlfriend Varela was dating. Vetere noted the area in West Palm Beach where he lived (but not the address). (DE753:5653-55, 5663). The defendants, according to Vetere, went to an Army surplus store to buy ski masks, gloves, and handcuffs, but were rebuffed in their efforts to purchase police shirts. (DE753:5654, 5661). They also failed in their plan to rent a vehicle to use in the crime, since Gutierrez had only an I.D. with a different name and dissimilar-looking photograph. (DE753:5661-62).

---

[52] Later while Vetere was on the stand, he also testified that Troya said he was glad he had taken a welding class in prison. (DE753:5674). But that reference to Troya's prison history was no more relevant or admissible than the earlier one. (Troya's training as a welder, if relevant, could have been conveyed without indicating where he had gained it). Moreover, it is of no moment that defense counsel did not object to the second reference, since the first had already come in, over their objection, as part of the Mercer Avenue evidence, and thus the damage had already been done.

Nevertheless, said Vetere, the defendants, wearing ski masks, drove to the house in Varela's van, intending to rob "B" and steal his drugs.  Supposedly Troya, who had a 9 mm. handgun, and Sanchez walked up and knocked on the front door.[53]  Then, they went around and tried to open the back door with a crowbar.  But they heard a voice inside yell about calling the police, so Troya and Sanchez ran back to the van, and they all fled.  (DE753:5662-64).

The government not only never corroborated Troya's involvement in this strange-sounding incident; it offered no evidence, aside from Vetere's accusation, that it ever really happened.

Again, the defense objected unsuccessfully.  Sanchez's counsel drew the court's attention to the Rule 404(b) motion.  (DE753:5657).  The court, however, ruled that, as with the Haverhill Avenue shooting, the "home invasion robbery for the purpose of acquiring drugs" was "inextricably intertwined" with the drug conspiracy.  Alternatively, said the court, it was admissible under Rule 404(b) to establish "intent to commit the crime, absence of mistake and so on."  Moreover, under Rule 403, "its probative force would not be outweighed by any undue prejudice."  (DE753:5659-60; see also DE756:5810-11).

Again, though, there was no suggestion that this evidence carried *any*

_____

[53] The government never claimed any connection between that gun and the ones used in the Escobedo killings.

77

relevance to the capital charges.

> **b.     The attempted armed home invasion had little if any relevance, and concededly none to the capital charges.  Thus it was inadmissible as "intrinsic" or Rule 404(b) evidence, and certainly did not pass the Rule 403 balancing test.**

For the same reasons that the Haverhill Avenue incident should have been kept out, the court should not have admitted Vetere's testimony about the attempted home invasion.

This outlandish-sounding plan at an unknown address, which (even by Vetere's own account) came to nothing, was tenuously, if at all, related to the charged drug conspiracy.  The two were certainly not "inextricably intertwined," as the court found.  The government's evidence showed that the conspiracy consisted of Varela purchasing drugs from large suppliers, like Escobedo, and reselling them, mostly to local dealers.  See Statement of Facts, Section I, *ante*.  The supposed plan to steal cocaine, apparently from a user, hardly fit with this.  Indeed, Vetere did not even testify about the amount they hoped to steal or what they planned to do with it.  Thus, this bungled plot was not "intrinsic" to the drug conspiracy or probative of Troya's intent to participate in it.  See Section A.1.b, *ante*.

Even more clearly, any conceivable probatI've value this evidence carried could not outweigh the unfair prejudice it likely caused Troya on the capital charges, for the same reasons that apply to the Haverhill Avenue shooting.  See

78

Section A.1.b, *ante*. Thus, it also should have been excluded under Rule 403.

**B.      In summation, the government engaged in flagrant misconduct by explicitly urging jurors to use the Haverhill and Mercer Avenue shootings as proof of Troya's propensity to kill the Escobedos.**

**1.      The prosecutors invited jurors to treat the two uncharged drive-by shootings as proof "that a killer like" Troya "could execute an entire family," and as proof of his proclivity for "violence" against "individuals who have no play in his criminal involvement" like the Escobedo children.**

In opening summation, the prosecutor recounted the evidence of these other crimes. He reminded jurors that, in the Haverhill Avenue shooting, "Troya donned this wig and fired into a car whose driver nor occupants could be seen by anybody, and fired away eight 9 millimeter rounds . . . . This is violent activity . . ." (DE766:7102). The prosecutor showed jurors the AK-47, observing: "You've seen this many times." (DE766:7112; see also DE766:7093). He reminded them how Troya had "confessed [to Vetere] to committing a shooting with this AK-47 on Mercer Avenue," and discussed the evidence of that incident. (DE766:7119). Then the prosecutor focused again on "this firearm. The AK-47." He invited jurors to bring it to the deliberations room and examine it: "The AK-47 is [exhibit] 202m. The AK is 202m."[54] (DE766:7120-21).

At first, the prosecutor ostensibly tied these arguments to the drug and

_____

[54] Sure enough, during deliberations, jurors sent a note asking to see the AK-47. (DE789:5).

79

weapons counts on which the other-crimes evidence had been admitted.  But that was lip service, for these comments were just the prelude.  In his summation, Troya's lawyer responded by reminding  jurors that the 404(b) evidence had nothing to do with "what happened on the Turnpike."  (DE766:7236; DE7676:7269-70).  But in the government's rebuttal summation, another prosecutor nevertheless wove these incidents into a powerful argument that Troya was just the kind of man who could have committed the Escobedo killings.

These comments were not addressed to the drug or weapons charges.  Rather, they occurred after the prosecutor had introduced a new line of argument, saying "I would like to talk to you about the murder[s]," and specifically how there was "other circumstantial evidence in this case that talks about and points to these Defendants."  (DE767:7443, 7446):

> Is it really pushing credulity to believe that a killer like Daniel Troya could execute an entire family?  All you have to look at is the Haverhill shooting, all you have to look at is what he did to

(DE767:7448).

Troya's counsel objected and moved to strike these comments.  But, in front of the jury     after having the prosecutor clarify that the Haverhill shooting involved "the young lady in the car"     the court announced: "No.  I will overrule the objection and allow counsel to make this argument."  (DE767:7449).

So the prosecutor continued:

> The Haverhill shooting . . . . Troya sprayed a car, not seeing anybody inside that car, not knowing who it was, and he strikes a young black lady in the leg.  But for the Grace of God, she is alive.  She could have been killed.
>
> 11 casings at the scene firing into a car you don't know who it is.
>
> This is Daniel Troya.
>
> This is the person who is seated before you and you will pass judgment on.
>
> This is the violence that is reeked [sic] on individuals who have no play in his criminal involvement.  This young lady was not involved in anything.  It was a guy who was in that car, or a car that looked like that car.

(DE767:7449-50).

After the government's summation, Sanchez's counsel renewed his objection to related comments about use of the AK-47 in the Suwanee Avenue shooting (see DE767:7450), and moved for a mistrial.  Counsel complained that this evidence had only been admitted under Rule 404(b) on the gun counts, yet the prosecutor had "left the jury with the unmistakable inference that that incident was tied to the murder."  (DE767:7459-60; see also DE767:7461).

The court disagreed.  It said counsel was "mixing a couple things up," and that it thought the government's summation comments about the uncharged

shootings had all been suitably limited. Thus, it denied the mistrial motion.

(DE767:7460-62).

### 2. The court erred in licensing the prosecutors' propensity arguments.

The government's propensity comments in closing argument, allowed over defense objection, were explicit, repeated, and emphatic. This was obvious misconduct, even standing alone     although it does not stand alone, but rather served as the climax to a series of prejudicial evidentiary errors.

This Court has condemned such propensity appeals, even where (unlike here) the evidence they misused was relevant and thus properly admitted for some other purpose.   See United States v. Calderon, 127 F.3d 1314, 1337 (11th Cir. 1997) ("prosecutor should not have used" defendant's prior drug conviction, admitted to show intent, "in the manner he was attempting here," *i.e.*, to show defendant had "propensity to break the law"); United States v. Garber, 471 F.2d 212, 216-17 (5th Cir. 1972) (plain-error reversal where prosecutor used defendant's conviction, offered to impeach his credibility, to show his propensity to commit charged offense, by arguing, among other things, "'you should consider that evidence when you . . . consider whether or not this defendant could commit an act like this'").

Here, moreover, as with the evidentiary errors, the defense objected to the

improper comments.  But, in front of the jury, the court licensed them by prompting the prosecutor to identify one of the victims of the uncharged shootings, overruling the objection, and stating that it would "allow counsel to make this argument."

**C.  The evidentiary and summation errors were not harmless.  They likely induced jurors to treat uncharged crimes as proof of Troya's propensity to kill the Escobedos.  And the other evidence of Troya's guilt on the capital charges was not overwhelming, but rather plagued by significant gaps and conveyed by witnesses of questionable credibility.**

This series of preserved errors, in admitting extensive evidence about other uncharged gun crimes together with sustained propensity arguments about them, combined to seriously prejudice Troya.

The jury heard detailed evidence about these offenses, and about the Suwanee Avenue shooting by Sanchez, over the course of three days.[55]  Even worse were the government's accompanying propensity remarks in closing argument, which were pointed and hardly isolated or fleeting.  See United States v. Blakey, 14 F.3d 1557, 1561-62 (11th Cir. 1994) (prosecutor's propensity argument required reversal where it involved three comments); Hands, 184 F.3d at 1326-32

---

[55] This began with Vetere's testimony on February 11; covered most of the next day, with testimony from three law enforcement officers and a fingerprint examiner about the Mercer and Haverhill Avenue shootings (and from two more witnesses about the Suwanee Avenue one); and extended into a third day, with testimony from another police witness about Haverhill Avenue (and from Sanchez's former girlfriend, about Suwanee Avenue).

(same, where jury received testimony, pictures, and summation argument about other crime); United States v. Marshall, 173 F.3d 1312, 1318 (11th Cir. 1999) (same, where "the potential prejudice was exacerbated by the Government's use of the prior arrest evidence in its closing argument").

The court's response to all this did not cure the prejudice but, indeed, worsened it.  See Blakey, 14 F.3d at 1561-62 (curative instruction "failed to blunt the damage that the prosecutor's [propensity] comment caused because it did not rebut the inference that the prosecutor attempted to draw"); Hands, 184 F.3d at 1332 ("court did not give a limiting instruction regarding the [other-crimes] evidence, a step that could have diminished [its] prejudicial impact").

Here, the defense objected right after the prosecutor argued: "Is it really pushing credulity to believe that a killer like Daniel Troya could execute an entire family?  All you have to look at is the Haverhill shooting . . ."  By prompting the prosecutor to pause and remind the jury of one of the incidents supporting this emphatic propensity argument ("the young lady in the car"), and then declaring that the defense objection to the argument was "overrule[d]" and the prosecutor's appeal "allow[ed]," the court sent a clear message to the jury that such reasoning was entirely proper and justified.

To be sure, the court did, in its final charge, instruct jurors not to consider

84

the Mercer Avenue shooting (or the Suwanee Avenue one attributed to Sanchez) except on the weapons-possessions counts.[56] (DE772:7500-02). But this hardly mitigated, let alone remedied, the damage that had already been done.

First, the instruction never told jurors that the prosecutor's argument was improper and should be ignored, or that the uncharged crimes should not be used for propensity purposes. See Garber, 471 F.2d at 217 (government's propensity argument, uncorrected at the time, required reversal; "the trial judge's later charge to the jury, in which he instructed that the prior conviction evidence was admissible only to impeach Garber's credibility, was at best too little and too late"). Second, as to Troya, the court addressed only the Mercer Avenue shooting, and did not mention the Haverhill Avenue incident or the attempted armed home invasion.

In any event, the instruction likely proved almost unintelligible to jurors. It said that, if they found Troya and Sanchez "did commit the physical acts" of possessing the weapons found in Varela's home, then the other shootings could somehow be considered "to determine whether [they] had the state of mind or the intentness to commit" the weapons offenses. (DE771:7501-02). Even had jurors untangled this opaque verbiage, it is unlikely they would have grasped *how* the defendants could have *un*intentionally possessed the stockpile of weapons found in

---

[56] Two weeks earlier, after Vetere testified, the court had given a similar instruction. (DE756:5982-85).

the garage, or how the other shootings could have related to their "intentness" especially since neither Sanchez's nor Troya's defense summation had discussed, let alone denied, possession of those.

On the other hand, jurors would have had no difficulty understanding the intuitively simple use of the other shootings as proof that Troya "could execute an entire family"    the very use the prosecution had urged and the court (in overruling the defense objection to those comments) had licensed.

Finally, the remaining, untainted proof against Troya on the capital counts was not "so overwhelming" as "to make this error harmless." United States v. Harriston, 329 F.3d 779, 789 (11th Cir.2003) (*per curiam*). See Statement of Facts, Section I, *ante*.

Apparently, the jury also did not see the 404(b) evidence as beside the point. They were out for almost three full days before reaching guilty verdicts. (DE771:7577; DE774:7693). And, during deliberations, they specifically asked, and were allowed, to see the AK-47 that was used in the Mercer Avenue shooting, and which the prosecution had displayed during summation as part of his propensity arguments. (DE789; DE772:7594; see Section D, *ante*). See United States v. Klebig, 600 F.3d 700, 719 (7th Cir. 2009) (among reasons prosecutor's propensity argument required reversal was that jury asked to see the firearms

evidence that was the subject of the remarks).

Accordingly, for all these reasons, the Court should reverse Troya's capital convictions and sentences and remand for a new trial on those five counts.

## II.

**The court plainly erred by prompting a cooperating witness to testify Troya said, "I have killed some people," when in fact the witness was claiming Troya had only said he was "involved in" killing some people, and had also used the term "we." This alteration, resulting from the court's directive to change the plural to the singular, was not necessary to safeguard a codefendant's confrontation rights, and it unfairly prejudiced Troya's defense.**

Just before Carlos Rodriguez, a large-scale drug importer with four years left on his sentence (DE737:4405 09; DE738:4456 60), took the stand at trial, the government advised the court he would testify he had overheard Troya make several vague and collectively inculpatory statements to another inmate at the FDC jail in Miami two years before. According to the prosecutor, Rodriguez claimed he had heard Troya say there was "I did something very bad, or I have something to get off my chest," and then, later: "I was involved in killing some people, it involved children . . . I had to do it . . . . I got paid money and drugs." (DE737:4378-79, 4390). The prosecutor added that Troya had also used "the word 'we'" in the statements claiming to have been "involved" in killings. (DE737:4378-79, 4390-91).

87

The court held that <u>Bruton v. United States</u>, 391 U.S. 123 (1968), required eliminating the word "we" and having the witness alter his account and testify that Troya spoke only in the first person singular.[57] (DE737:4390, 4391; DE738:4431). The prosecutor concurred, and volunteered that he had "told" the witness of "the judge's ruling," and repeatedly instructed him "not to use the word 'we' to implicate any other co-defendant . . ."[58] (DE737:4378; DE738:4433).

So instructed, Rodriguez crucially altered his account. He testified to the jury that he had overheard Troya's conversation with a cellmate who had served in the military in Iraq. Troya asked the cellmate "what is [it] like to have to kill . . . children." (DE737:4414). According to Rodriguez, Troya also said he had "something on his chest the he want to tell him about . . . . he say he done something very wrong . . . . There is some people involved. He say, he said *I have killed some people* . . . . Then he say, and those people were children involved . . .

---

[57] Sanchez's counsel agreed that the witness should not "use the word 'we.'" He further asserted, unsuccessfully, that the statement attributed to Troya, even if changed so, still "necessarily implicates" Sanchez, and thus its admission would necessitate a severance or, alternatively, a mistrial. (DE737:4382-83, 4392, 4425-27; DE738:4430-32). The court instructed jurors that Rodriguez's testimony could only be considered against Troya. (DE738:4541).

[58] Although Troya's counsel had received no grand-jury testimony or prior statements by Rodriguez as <u>Jencks</u> material (DE737:4398), they did not seek further clarification of what Rodriguez had actually claimed Troya said, or how his testimony about those statements would now be altered.

He say that is something he have to do." (DE737:4416-17; see also DE737:4419-20) (emphasis added).

Thus, before the jury, Rodriguez, apparently trying to follow the prosecutor's directive to avoid the plural, altered his testimony to create an allegation that Troya had confessed, in the first person singular: "I have killed some people." The prosecutor's representation of what Rodriguez had told the government had included no such clear, direct, personal confession of guilt; rather, it had been limited to vague, collective acknowledgments of responsibility (e.g., "I was involved in killing," "it involved children," etc.). If the debriefing of Rodriguez had solicited "I have killed some people," certainly the prosecutor would have relayed that to the court in his proffer. Indeed, the prosecutor seemed surprised by the version Rodriguez testified to, and asked him to repeat it (A: . . . he said, "I have killed some people." Q: "He said, I have killed some people?" A: "Yes, sir." (DE737:4417)).

It was also telling that, when defense counsel broached it on cross-examination, Rodriguez momentarily corrected him and retrenched to the actual version:

Q. And that later on he said that . . . . he had killed some people?

A. That he said he was involved in

89

Q. In killing some people?

A.  Killing some people.[59]

(DE738:4462).

Nonetheless, the damage had been done.  In his main trial summation, the

prosecutor argued Rodriguez's testimony that Troya had confessed that "I"

singular     "have killed some people":

> Carlos Rodriguez, the Federal prisoner from the Dominican Republic
> who was living in the Bahamas before he got caught up in drug
> trafficking, he testified during the trial and he is serving a 78 month
> sentence, and he just wants to serve that sentence.  He has no
> agreement requiring him to cooperate in this case.  He learned English
> in the Bahamas, his English wasn't perfect, but he recounted to you a
> conversation he had with Daniel Troya in which Troya confessed, I
> have done something very wrong, I have killed some people and those
> people were children involved.

(DE766:7173).  In rebuttal summation, the prosecutor returned to Rodriguez's

testimony twice, including assuring jurors that he "gave the same information" to

law enforcement agents who first interviewed him "that he gave in court."

(DE767:7422-24, 7455).

---

[59] Because the government never disclosed verbatim what Rodriguez had
told them, in the form of any written statement or proffer (DE737:4398), it is
impossible to know for sure precisely how he had used the word "we" in
describing Troya's statement.  But it stands to reason that it must have been
attached to the portion in which Troya acknowledged having been "involved" in
killing some people.  Alternatively, if this Court has questions or concerns about
the lack of clarity of the record on this point, it should remand the case to the
district court to supplement the record.

**A.     The court violated Troya's rights by altering the critical piece of Carlos Rodriguez's testimony in a way that prejudicially distorted the meaning of Troya's alleged statement and deprived the defense of an exculpatory inference jurors could have drawn from the actual version.**

When the government introduces a criminal defendant's statement, it is elemental that the jury should be provided with an accurate, complete version. An accused has due-process rights not to be convicted based on misleading evidence or evidence that creates a false impression, see United States v. Rivera Pedin, 861 F.2d 1522, 1530 n.14 (11th Cir. 1988), and to present a defense, see Lamarca v. Secretary, Dep't of Corrections, 568 F.3d 929, 942 (11th Cir. 2009). Moreover, the Federal Rules of Evidence explicitly entitle a defendant to require the admission of any portion of his statement "which ought in fairness to be considered contemporaneously" with that introduced by the government. Fed. R. Evid. 106. See United States v. Lopez-Medina, 596 F.3d 716, 735 (10th Cir. 2010) ("The purpose of Rule 106 is to prevent a party from misleading the jury . . .").

Thus, a court errs when, aiming to protect a jointly tried codefendant's Bruton rights, it alters or redacts the defendant's statement in a way that "effectively distorts the meaning of the statement or excludes information substantially exculpatory." United States v. Range, 94 F.3d 614, 621 (11th Cir. 1996). Accord United States v. Long, 900 F.2d 1270, 1279 (8th Cir. 1990). See also United States v. Lighty, 616 F.3d 321, 350 (4th Cir. 2010) (redaction may not

91

"change the tenor of the utterance as a whole"), quoting United States v. Yousef, 327 F.3d 56, 150 (2nd Cir. 2003).

Such distortion is exactly what occurred here when the court directed Rodriguez to alter his testimony to say Troya had admitted solely personal responsibility for the killings by saying only "I," rather than "we," and the witness used this directive to craft an apparently fictive statement from Troya, "I have killed some people." See United States v. Jass, 569 F.3d 47, 56 n.5 (2nd Cir. 2009) (court correctly declined further redaction, which "would have changed the substance of Leight's confession because acknowledgment of a confederate was critical . . ."). See also United States v. Edwards, 159 F.3d 1117, 1126 (8th Cir. 1998) ("When an admission refers to joint activity, it is often impossible to eliminate all references to the existence of other people without distorting the declarant's statement").

To be sure, in some cases, a mere change from the plural to the singular might not prejudice a defendant if it does not cast his own involvement in a more blameworthy light. For example, if a defendant told police, "John and I each shot the victim a number of times in the head and the chest," there might be no problem with redacting out any mention of John. For this would not change the meaning or

92

import of the defendant's statement about what he himself had done.[60]

Here, though, that was not the case.  Had the government presented Rodriguez's actual, unaltered claim that Troya had acknowledged "involvement" and used the plural noun "we" when he spoke of the killings, jurors could have inferred that he was not saying that he had personally shot anyone.  That inference would have been consistent with Troya's defense that significant gaps in the government's account of events left open the possibility that he was at or near the scene, but did not himself commit any of the murders.  See Statement of Facts, Section I, *ante*.

But with those statements altered to create the stark and damning admission "I have killed some people," such an inference was no longer possible.   On the contrary, the jury was misled to think Troya had unequivocally confessed to having personally shot one or more of the victims.  See United States v. Moussaoui, 382 F.3d 453, 481 (4th Cir. 2004) (purpose of Rule 106 is "to shield a party" from misleading, "adverse inferences").  Thus, it should not surprise that this phrase is the one the government emphasized in summation.

---

[60] See, e.g., United States v. Burns, 162 F.3d 840, 853 (5th Cir. 1998) ("There is an important distinction, we think, between statements that implicate others in shared wrongdoing, and statements that free one from blame. In this case, most of the omitted statements [by two, jointly tried codefendants] portray [defendant] August as the head of the conspiracy, but do nothing to lessen the guilt of" the codefendants.)

93

**B.      The court's error, in prompting Rodriguez to alter his testimony in a way that prejudiced Troya's defense, was exacerbated by the fact that no "redaction" of any kind was needed to safeguard Sanchez's <u>Bruton</u> rights.**

The government and the court assumed, without discussion, that changing "we" to "I" in Rodriguez's testimony was required to accommodate Sanchez's confrontation rights under <u>Bruton</u>.  But that was simply not so.  That the alteration was completely unnecessary renders the court's error even more glaring.

First, Troya's alleged jailhouse remarks to another inmate obviously were not testimonial.  Thus, their admission at a joint trial did not implicate Sanchez's confrontation rights; and so <u>Bruton</u>, which rested on the Confrontation Clause, simply does not apply.  See <u>United States v. Dale</u>, 614 F.3d 942, 955-56 (8th Cir. 2010) (following other circuits).  Indeed, this Court held as much in Varela's and Lopez's appeal, in rejecting their claim that they were unfairly prejudiced by the admission of other non-testimonial statements attributed to Troya and Sanchez. <u>United States v. Lopez</u>, 649 F.3d 1222, 1237 (11th Cir. 2011).

Second, even had <u>Bruton</u> applied, it would not have been violated by leaving Rodriguez to testify truthfully.  The "we" supposedly used by Troya did not name Sanchez, as the statement in <u>Bruton</u> itself had.  391 U.S. at 124.  Nor did it describe Troya's accomplice in a way that clearly identified Sanchez, such as by using a nickname or physical description.  See <u>Gray v. Maryland</u>, 523 U.S. 185, 195

94

(1998); Harrington v. California, 395 U.S. 250, 253 (1969); United States v. Gonzalez, 183 F.3d 1315, 1323 (11th Cir. 1999).  See also United States v. Schwartz, 541 F.3d 1331, 1352 (11th Cir. 2008) (Bruton violated where statement named and inculpated corporation that defendant owned and controlled).

It appears that the government and court nonetheless believed that the alteration was necessary because other evidence tended to show that Troya and Sanchez were together at the time of the killings, and, from that, the jury would infer that Troya's "we" referred to Sanchez.

But the Supreme Court clearly rejected such an argument in Gray.  It distinguished "statements that did not refer to the defendant himself" and which "became incriminating 'only when linked with evidence later introduced at trial,'" from ones that "obviously refer directly to someone, often obviously [the defendant], and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial."  523 U.S. at 195-96, quoting Richardson v. Marsh, 481 U.S. 200, 208 (1987).  Bruton, it said, is violated only by the latter, which "facially incriminate" the defendant not by the former, which only "incriminate inferentially."[61]   Gray, 523 U.S. at

_____

[61] The Court explained that the "facial incrimination" test is also the only workable one for trial courts, for it allows them to "easily identif[y]" a Bruton-violative statement "prior to trial and does not depend, in any special way, upon the other evidence introduced in the case."  Gray, 523 U.S. at 197.

195-96.  See also United States v. Williamson, 339 F.3d 1295, 1303 (11th Cir.

2003).

Rodriguez's use of "we" would not have violated Bruton, because any

inference that it incriminated Sanchez depended entirely on the government's

remaining trial evidence, which tended to show that he and Troya were together at

the time of the killings.  In other words, any inference from the "we" incriminating

of Sanchez was not one "that a jury ordinarily could make immediately, even were

the confession the very first item introduced at trial."[62]  Gray, 523 U.S. at 195-96.

**C.    The court's alteration of Rodriguez's testimony was a patent, highly prejudicial misstep, and thus constituted plain error.**

Troya acknowledges that his trial counsel inexplicably did not object to the

court-ordered alteration of Rodriguez's testimony.  But the error was so obvious

and its effect so damaging that relief is appropriate under the plain-error standard

of Fed. R. Crim. P. 52(b).  See United States v. Olano, 507 U.S. 725, 734-35

(1993); United States v. Dominguez Benitez, 542 U.S. 74, 81-82 (2004).  See also

United States v. Foree, 43 F.3d 1572, 1579 (11th Cir. 1995) (in assessing whether

---

[62] Indeed, in Gray, the Court said Bruton would have been satisfied if, rather than using the word "deleted," the codefendant's statement had been redacted to say that "me and a few other guys" had committed the crime.  Id. at 196.  There is simply no meaningful distinction between such a statement and Rodriguez's unaltered claim that Troya said he had been "involved" in killing some people and had also used the word "we."

unpreserved constitutional error violated substantial rights, we apply a "modified version" of the harmless-beyond-a-reasonable-doubt standard, "with the burden of persuasion shifted to the appellant").

It is clear (as it was at the time of Troya's trial), as a matter of logic and under well-established caselaw, that redaction was unnecessary under Bruton, that Rodriguez's testimony following the court's directive prejudicially distorted the meaning of the statement, and, thus, that this was error.  (DE737:4383-89).

Moreover, the ultimate prejudice proved to be quite substantial.  While the actual remarks Rodriguez attributed to Troya, taken as a whole, suggested that he was involved in the crime but did not personally commit the killings, the altered version the jury heard, "I have killed some people," removed any doubt, if Rodriguez's testimony were believed.[63]  Notwithstanding the circumstantial evidence tying Troya generally to the incident, this statement ended up being the *only* direct evidence that he personally killed anyone; it further suggested that he himself had actually murdered one or both children, the only crimes for which he was sentenced to death.  See Statement of Facts, Sections I, II.C, *ante*.  "A

---

[63] And, in assessing harm, the Court should assume that the jury believed it. Cf. Olden v. Kentucky, 488 U.S. 227, 232 (1988) (court reviewing confrontation violation must "assume[] that the damaging potential of the cross-examination" would have been "fully realized"), quoting Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).

97

confession is like no other evidence.  Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him . . . ." Arizona v. Fulminante, 499 U.S. 279, 296 (1991) (internal quotation omitted).  No doubt that is why the prosecutor highlighted the "I have killed some people" statement in summation.

Accordingly, the Court should reverse Troya's capital convictions and afford him a new trial.

## III.

**The court erred in excluding critical expert testimony that, if sentenced to life, Troya would likely adjust well to prison and not pose a threat, and could be safely managed.  This testimony was admissible, both to rebut evidence and argument suggesting he would be violent and present an escape risk if incarcerated, and independently as mitigating evidence.**

The government never questioned the qualifications of Troya's future-dangerousness expert, Dr. Mark Cunningham, or the reliability of his methods and conclusions.  Indeed, the prosecutors told the court they themselves were persuaded by the opinion, detailed in his report, that Troya could be safely managed by the Federal Bureau of Prisons and would not pose a threat.

Nevertheless, on the eve of the sentencing hearing, they successfully moved to keep him off the stand, by the stratagem of withdrawing dangerousness as a formal aggravating factor, and then claiming that the withdrawal left nothing for

98

Cunningham to rebut.

But, as defense counsel warned in resisting the government's motion, Troya's dangerousness had already become, and would remain, a substantial, looming issue for the jury, even without the formal aggravator. Indeed, by the end of the sentencing hearing, jurors had heard evidence and argument alleging that he had a history and propensity for violence, that he had tried to escape from a state youthful-offender facility, and that prisons are poorly managed places where dangerous inmates and rampant violence put the staff at constant, grave risk. Because all this unavoidably made Troya's future dangerousness in prison a "logical inference" for jurors, the Supreme Court's decision in Kelly v. South Carolina, 534 U.S. 246, 248 (2002), clearly holds that, as a matter of due process, he was entitled to rebut it, even though it was not formally an aggravator factor.

And Cunningham's testimony would have powerfully rebutted it. (Indeed, his opinion persuaded the prosecutors themselves). He would have explained that intuitive factors such as the nature of the capital offense, Troya's criminal background, and the circumstances of his attempted escape are actually *not* empirically associated with a higher risk of serious misconduct in federal prison. He would have informed jurors that, on the contrary, considerations like Troya's family ties, education, age, and lack of affiliation with any existing criminal

99

organization all point to a diminished risk. And Cunningham also would have testified about the sophisticated security conditions of a United States Penitentiary where Troya would be housed, and the generally very low incidence of inmate violence there.

All this would have countered the misleading impression jurors had been given that a life sentence for Troya would be like releasing a vicious dog into a chaotic and uncertainly secured kennel. Cunningham's testimony also would have been admissible independently as mitigation, as Troya's counsel alternatively urged.

The court's ruling here is unprecedented in a federal capital trial. No district court has denied that the kind of presentation made to Troya's jury placed future dangerousness at issue under <u>Kelly</u> and thus entitled the defendant to rebut it. On the contrary, in numerous cases, including many in which dangerousness was not formally noticed as an aggravator, courts overseeing federal capital trials have routinely admitted the type of expert, predictive testimony Troya sought to introduce.

**A.** **The court kept the jury from hearing rebuttal testimony by the defense expert, Dr. Mark Cunningham, on the ground that the government had formally withdrawn the dangerousness aggravator.**

Almost a year before trial, the government filed a death notice declaring it

would rely on the non-statutory aggravator of "Future Dangerousness of the Defendant."  It alleged that Troya "is likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others . . ."  The notice said the government would prove this with, among other evidence, Troya's "continuing pattern of violence, attempted violence, and threatened violence" and his "prior institutional misconduct, including" a "prior escape from prison."  (DE311:4-5).  The death notice for Sanchez included a nearly identical aggravating factor.  (DE312:4-5).

After the jury convicted Troya, and a week before the sentencing hearing, his counsel, complying with the court's scheduling order (DE774:7734), provided the government with a report from its future-dangerousness expert, Cunningham, along with his curriculum vitae.  (DE1103-3:1-2; DE862-2:1-9).

As the government (and later the court) were told, Cunningham, who is board certified in clinical and forensic psychology, is nationally recognized for his research and scholarship on the factors that cause or predict prison violence, including among federal capital offenders serving life.[64]  (DE1103-3:1-

---

[64] As Texas's high court recently observed, Cunningham is "a forensic psychologist" who won "the 2005 Texas Psychology Association award for his outstanding contribution to science and, in 2006, he was awarded the American Psychological Association (APA) award for distinguished contributions to research in public policy.  Both awards were for his research concerning factors that predict violence in prison and his research in capital sentencing.  He is also among the

101

2; DE862-2:1-9).  In scores of capital cases, federal courts have admitted testimony from Cunningham or similar experts relating to the defendant's future dangerousness in prison.[65]

The next day, the government, orally and with no prior notice, announced it was formally withdrawing dangerousness as an aggravating factor for both defendants.  The prosecutor cited Cunningham's report: "Based on the reports we have read, Mr. [sic] Cunningham's reports, we are satisfied that the Bureau of Prisons can put together a situation that would prevent [defendants Troya and Sanchez] from committing future crimes."[66]  (DE795:7823-24).  Accordingly, the government said, it would not seek to prove or argue that Troya or Sanchez would be a danger in the future.  (DE795:7824, 7825-26).

_____

2,000-3,000 psychologists elected as a Fellow of the APA out of the 155,000 members.  He has published a significant number of peer-reviewed studies and articles."  Coble v. State, 330 S.W.3d 253, 282 (Tex. Cr. App. 2010).  (See also DE862-2:1-9 (Cunningham's curriculum vitae)).

[65] This includes more than a dozen in which dangerousness had not been noticed as an aggravator.  See Federal Death Penalty Resource Counsel Website, Declaration of Kevin McNally on Use of Defense Expert Testimony, available at http://www.capdefnet.org/FDPRC/WorkArea/DownloadAsset.aspx?id=5386.  Such expert testimony is also regularly presented by capital defendants in states that provide for consideration of future dangerousness.  See, e.g., Perkins v. Quarterman, 254 Fed. Appx. 366, 371 (5th Cir. 2007); Hanson v. State, 72 P.3d 40, 52-53 (Okl. Cr. App. 2003), on return from remand, 206 P.3d 1020 (2009); State v. Douglas, 800 P.2d 288, 296 (Or. 1990).

[66] Sanchez's future-dangerousness expert, James Aiken, had not written a report.  (DE795:7797)

Citing this withdrawal, the government also moved to preclude Cunningham's testimony (as well as that of Sanchez's dangerousness expert, James Aiken).  It claimed that, since no formal dangerousness aggravator would be argued by prosecutors or instructed on, nothing remained for Cunningham to rebut.[67]  (DE795:7825-7827, 7832; DE823:8331; DE1113-1:1-2).

But the government maintained it could still rely on the evidence its death notice had cited as probative of Troya's dangerousness, namely, his "continuing pattern of violence" and his "escape risk and institutional misconduct."  Thus, it would introduce an escape attempt and a felony battery by Troya to give the jury the full picture of his "moral culpability."  (DE795:7825; see DE311:4).  And it would rely on the trial evidence of his uncharged violent crimes.   While it had withdrawn the aggravating factor of future dangerousness for both defendants, "[t]hat does not mean, however, Your Honor, that we should not be able to argue they have been a danger in the past based on their conduct."  (DE823:8341).

The government insisted that, since the jury charge would specify the aggravating factors and would not mention dangerousness, the court could safely assume jurors would not consider the issue, no matter how much the evidence

---

[67] Nor, the government argued, was Cunningham's testimony independently admissible as mitigating evidence.  The court's error in also accepting that argument is addressed separately below in Section D, *post*.

might focus their attention on it.   (DE823:8326-29).

The defense pressed to admit the expert testimony, disputing that withdrawing the aggravator had mooted the issue.[68]  (DE795:7827, 7833; DE812). "Dr. Cunningham's testimony remains relevant and material to the penalty phase of this trial." (DE812:2).  Troya's counsel argued that, even without the "future dangerousness" label, the underlying evidence would remain before the jurors, and the issue, therefore, would continue to be raised in their minds: "Even though the government has withdrawn the element, aggravating circumstance of future dangerousness, they established what they said was future dangerousness." (DE812: DE823:8319-21, 8332-33).

After the government rested, the court granted its motion to exclude Cunningham's testimony.  It agreed with the prosecutors that the right to rebut extends only to those aggravating factors expressly relied upon by the government. As the court explained, the proffered testimony "is simply not relevant to rebutting any aggravating factor that has been put forth."  (DE824:8354).  As for evidence like that about Troya's alleged history of violence and escape, the court said: "I do not think . . . that moves over to the type of testimony that would normally be

---

[68] Troya relies here, as elsewhere in his brief, on the objections by Sanchez's counsel as well those by his own lawyers.  By agreement, an objection for one defendant constituted an objection for all for purposes of preserving an issue for appellate review.  (DE732:4052; see also DE245).

introduced regarding future dangerousness that . . . would allow the defense to come in with evidence to rebut that." (DE823:8337-38; see also DE824:8358: court again notes inadmissibility of defense evidence on "future dangerousness" absent "consideration" of it as "an aggravating factor").

**B.     The trial and sentencing hearing were replete with evidence and government argument suggesting that, if spared execution, Troya would pose a danger of violent acts against other inmates, prison staff, and, possibly, members of the community, in the event of his escape or accidental release.**

As promised in its death notice, the government presented evidence and argument clearly tending to establish the supposedly withdrawn aggravating factor that Troya "is likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others." (DE311:4).

**1.     Evidence and argument concerning Troya's violent background and nature**

In addition to the Escobedo homicides, the government's lead cooperator, Vetere, testified at trial that Troya had committed two other drive-by shootings of innocent victims (including one with an AK-47), and an attempted armed home invasion. The government also introduced evidence about the details of those

105

uncharged incidents (although none corroborating Troya's involvement in them).[69]

In addition, the trial proof showed that Troya, along with the other defendants, possessed an "arsenal of weapons" found in Varela's home.  See Statement of Facts, Section I, *ante*; Point I, *ante*.

At sentencing, the government added to the theme of Troya's violent past, by introducing evidence of three additional assaultive acts, dating back to his childhood.  (Troya was 25 at the time of trial).  When he was 12, another student claimed he punched her in the head, though Troya said he only pushed her after she shoved a desk into him.  When he was 17, he pled guilty to felony battery; he admitted that, during an argument with a friend's mother, he punched her in the face and then slapped her after she fell.  She sustained injuries to her face and eye, including broken bones and nerve damage, which required surgery.  And, the year before the Escobedo killings, Troya allegedly struck his then-girlfriend with a gun during an argument.  See Statement of Facts, Section II.A.1, *ante*.

In closing arguments at trial, the prosecutors explicitly urged that Troya's violent past demonstrated a violent, murderous nature.  They described him as a "killer" who could "execute an entire family."  (DE767:7448-49).  See also Point

_____

[69] The admission of this highly prejudicial evidence, which the prosecutors conceded bore no relevance to proving the capital counts, and the government's improper propensity arguments about the incidents in summation, are challenged in Point I, *ante*.

I.B, *ante*.  The sentencing summations expanded on this theme.  The prosecutors argued that Troya "is obsessed with guns, he uses guns like cookies, he uses them to shoot people."  And they referred to him as "the absolute career criminal, brutal career criminal Daniel Troya," who had "committed himself to "a life of violence, unrepentant violence . . . without regard to the consequences."  Summing him up, they said:  "There is one consistency here, it is violent, unmitigated violence against anybody and everybody."  (DE847: 9507-08, 9513, 9629, 9633).

Again drawing a present-tense character inference from evidence of past violence, the prosecutors also argued: "Here is a man who embraces violence, does not shy away from violence, he is evil."  (DE847:9634).  Similarly, they summed up Troya, currently as he sat before the jury, as "the personification of violence, personification of brutality . . . . he cares not one lick about the rights of other human beings, their feelings.  He doesn't care who he hurts, when he hurts them, or how he hurts them."  (DE847:9632).

All this evidence and argument inescapably raised the inference that Troya would continue to act, as he always had according to the government, consistent with his violent character.  Indeed, the prosecutor's pointed question to the jury "How many more murders will it take?"     suggested the prospect expressly.[70]

---

[70] "Ladies and gentlemen, if this case doesn't fit the need for the maximum penalty, where are we?  If not this case, what case?  How many more murders will

(DE847:9521; <u>see also</u> DE847:9519: "How many murders and attempted murders are required before you forfeit your right to exist in this society?"; DE847:9622: "Where does the line get drawn?  When is enough enough?").

### 2.    Evidence of dangerous prisons plagued by violence.

The sentencing jurors also heard evidence that misleadingly portrayed prison as a barely controlled environment in which violence was rampant and security a constant struggle.  Jurors may well have concluded from this that a life sentence would offer Troya a favorable setting for further assaultive conduct, against staff and other inmates.

James Aiken, a former South Carolina prison administrator, testified as an expert for Sanchez.  The government agreed, and the court allowed, that he could only discuss Sanchez's past good behavior while in jail awaiting trial. (DE823:8343).  But, in providing a context for this limited opinion, Aiken only further focused the jury's attention on future dangerousness.  And he did so by misleadingly portraying prison as a horrific setting in which violence and criminal acts are prevalent and difficult to control.

One of Aiken's first jobs in the state system included "break[ing] up fights," working "the gun towers," and "escape prevention."  (DE825:8672).  And the

---

it take?  Does it take six to qualify for the death penalty?  Does it take 20?  We have four here, and two little kids."  (DE847:9521).

population in that medium-security facility was "not [even] as dangerous as the population you would have in a maximum security environment." (DE825:8672). He later became a deputy warden at the state penitentiary, which housed the "most deadly, dangerous, predator population . . . we had inmates that were so dysfunctional, a predator behavior pattern in the jails, that the jails could send them to us for safekeeping because they were so dangerous." (DE825:8673). Aiken was involved in all aspects of security, including dealing with "inmates that were . . . trying to inflict violence." (DE825:8673).

He compared Sanchez's adjustment to incarceration very favorably to that of most inmates. Aiken characterized Sanchez's few disciplinary infractions over a two-year period as "doing excellent"; by contrast, he observed, "I have inmate populations we had to gas three times before lunch." (DE825:8679). He elaborated that, by "gas," he meant the "use of force to include chemical emissions, force[d] cell movements, restraints to include throwing them down and tying them to a bed to control their behavior." (DE825:8679). Aiken contrasted Sanchez with other pretrial detainees who, he said, engage in behaviors such as "fighting staff, trying to get weapons, sexual assault, all types of adverse behaviors"     behaviors that Aiken characterized as "normal," but which Sanchez had not exhibited. (DE825:8681-82).

On cross-examination, the government exacerbated the fear this testimony must have inspired in jurors, by focusing on prison administrators' concerns for their staff's safety, in particular, the threat posed by inmates who fashion homemade weapons.  (DE825:8690).  Indeed, the prosecutor twice asked Aiken whether inmates could hide contraband, including "small weapons that could be a threat to the employees of the prison," in long hair or beards.  (DE825:8690).  This appears to have been intended as a reference to Troya, who as the government had informed the jury, had worn a long goatee or beard, including while incarcerated. (See, e.g., DE754:5324; DE737:4411; GX811b).

On cross-examination of Aiken, the government also detailed a number of other capital defendants for whom he had testified.  (DE825:8685-89).  He repeatedly acknowledged having testified about the prisons' ability to "manage" each of those individuals.  (See, e.g., DE825:8687-89).  Jurors must have wondered why they were not hearing similar testimony regarding Troya and Sanchez     and perhaps assumed it was because experts like Aiken did not believe the BOP could safely manage *them*.

Indeed, Aiken's testimony emphasized the need for, and intense focus on, strong security measures, but, paradoxically, he was not permitted to discuss the availability, use, and success of such measures.  (See, e.g., DE825:8683: objection

110

sustained when Aiken began to describe family visits as a prison management tool). And he never distinguished the settings in which he had worked, or their rates of violence, from the highly secure, professionally managed United States Penitentiaries run by the BOP, where Troya would be housed if sentenced to life. On the contrary, as soon as he mentioned one such facility, the highest-security federal prison in Florence, Colorado, the government successfully objected. (DE825:8676).

### 3.   Evidence of escape risk and institutional misconduct.

Finally, the government also introduced evidence that Troya had previously tried to escape from prison; that, abetted by his family, he had engaged in other institutional misconduct while incarcerated; and that, incredibly, a prison had once mistakenly released him from custody. All of this evidence raised the specter that Troya, a convicted killer, might someday return to the community, endangering innocent lives.

The government began its sentencing presentation with testimony that, when he was 19 years old, and incarcerated as a youthful-offender, Troya "almost escaped" from custody. An investigation of the incident by the prison revealed a sophisticated plan to escape. As the government repeated in its questioning of a prison official, the inmates were caught only 60 yards from "getting out"     from

111

"actually escaping onto the public streets or public thoroughfares of Brevard County."  (DE818: 7980-82, 7984, 7992).  See also Statement of Facts, Section II.A.1, *ante*.

Although no weapons had been used or recovered in the incident and no one had employed violence or resisted when apprehended (DE818:8011), the prosecutors, in summation, argued that "any escape when you are in jail is inherently a violent offense, has the potential for violence when you are trying to get free." (DE847:9505).

The government also elicited surprising testimony that, although criminal charges for the escape were filed against Troya to keep him from being released at the end of his original sentence, prison officials made an "error" and set him free anyway.  (DE818:7994-95).  He was only returned to custody, and prosecuted for the escape attempt, when, eight months after his release, he was rearrested for auto theft and his parole was violated.  (DE818:7995).

The government also introduced evidence that may have suggested to jurors that, in prison, Troya might commit crimes in coordination with relatives on the outside.  At sentencing, the jury heard that, while incarcerated as a youthful offender, Troya had been disciplined for arranging with his mother (in a call monitored by prison officials) to mail him two ten-dollar bills hidden in a card.

112

This violated regulations that only allow money to be routed through prison officials into an inmate's account.  (DE846:9241-46; GX1015).

**C.     The court erred by precluding Cunningham from testifying.   His testimony would properly have rebutted "future dangerousness," since the government's evidence and argument had put it "at issue."**

**1.     The FDPA and the United States Constitution confer upon a capital defendant the right to rebut the government's case in aggravation.**

"The Constitution guarantees all criminal defendants a meaningful opportunity to present a complete defense."  Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citations and internal quotations omitted).  See also Holmes v. South Carolina, 547 U.S. 319, 324 (2006).  This right applies fully at a capital sentencing hearing in federal court, under the Constitution and by statute.  In Gardner v. Florida, 430 U.S. 349, 358, 362 (1977) (plurality opinion), the Court found that a condemned prisoner was "denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain."  The Federal Death Penalty Act similarly requires that the defendant "be permitted to rebut any information received at the [sentencing] hearing."  18 U.S.C. § 3593(c).  See, e.g., United States v. Allen, 247 F.3d 741, 773 (8th Cir. 2001) (Section 3593 guarantees "fair opportunity" for rebuttal), vacated on other grounds, 536 U.S. 953 (2002).

113

In a series of decisions drawing on the principle of Gardner, the Supreme Court has specifically held that, when a capital defendant's future dangerousness or prison adjustment is placed "at issue," either because of government evidence or argument, the defendant must be afforded the opportunity to rebut it.

In Skipper v. South Carolina, 476 U.S. 1 (1986), where the prosecution relied on future dangerousness in summation (although it was not listed for the jury as an aggravating factor, see id. at 5 n.1), the Court unanimously invalidated the death sentence because the defendant had not been permitted to introduce evidence on the subject, namely, "testimony . . . that [he] had 'made a good adjustment' during his time spent in jail." Id. at 3, 5 & n.1. See also id. at 9-10 (Powell & Rehnquist, JJ., & Burger, C.J., concurring).

In Simmons v. South Carolina, 512 U.S. 154 (1994), again, although dangerousness was not listed for the jury as an aggravator, id. at 162-63, the prosecution "raised the specter of" the capital defendant's "future dangerousness generally." Therefore, the Court held, the defendant was entitled to let the jury know he would never be eligible for parole if sentenced to life imprisonment. Id. at 165 (plurality). See also id. at 177 (O'Connor & Kennedy, JJ., & Rehnquist, C.J., concurring). Because such information "allows the defendant to 'deny or explain' the showing of future dangerousness, due process plainly requires that he

114

be allowed to bring it to the jury's attention."  Id. at 169 (plurality), quoting

Gardner, 430 U.S. at 362.

Skipper and Simmons are fully consistent with Supreme Court case law

licensing future-dangerousness predictions in capital sentencing.  See Barefoot v.

Estelle, 463 U.S. 880, 898-99 (1983); Jurek v. Texas, 428 U.S.  262, 275-76 (1976)

(joint opinion of Stewart, Stevens & Powell, JJ.).  What is "essential" is that, in

making such a prediction, "the jury have before it all possible relevant

information."[71]  Id. at 276.  See Barefoot, 463 U.S. at 898 (dangerousness

assessments are not constitutionally unreliable, since capital jury will also have the

benefit of "contrary evidence by the opposing party").  See also Ake v. Oklahoma,

470 U.S. 68, 83-87 (1985) (where prosecution presents psychiatric evidence of

indigent capital defendant's future dangerousness, due process entitles him to

assistance of a psychiatrist to develop defense).

**2.    Troya's future dangerousness was placed "at issue," triggering his right of rebuttal.**

While the court here did not question these basic principles, it kept

Cunningham off the stand because it accepted the government's assertion that his

---

[71] The FDPA also recognizes the need for "more evidence, not less" to achieve "heightened reliability," United States v. Fell, 360 F.3d 135, 143 (2d Cir. 2004), and thus "erects very low barriers to the admission of evidence at capital sentencing hearings."  United States v. Lee, 274 F.3d 485, 494 (8th Cir. 2001).

testimony was "not relevant to rebutting any aggravating factor that has been put forth." (DE824:8354).

The Supreme Court, however, has squarely considered and rejected this limited view of rebuttal. Kelly v. South Carolina, 534 U.S. 246, 248 (2002). Under Kelly, it is clear that the court erred in excluding Cunningham's testimony simply because future dangerousness was not a formal aggravator factor.

There, the state defended the trial court's refusal to inform the jury of the defendant's parole ineligibility, by trying to distinguish Simmons: Because the prosecution had never expressly argued that Kelly posed a future threat, the state claimed, his dangerousness was not "at issue," and thus his right to rebut was not triggered. Id. at 248-51.

But the Supreme Court held that whether future dangerousness was "at issue" in the case turned not solely on the prosecution's express assertions, but more broadly on whether the defendant's dangerousness was "*a logical inference from the evidence or was injected into the case through the State's closing arguments*."[72]  Id. (citations and internal quotation marks omitted) (emphasis

---

[72] Kelly did not blaze a new trail in this view of the broad scope of rebuttal. In federal criminal cases, this Court has long allowed rebuttal of not only express allegations, but also matters that are implied or suggested by the opposing party's evidence or arguments. See, e.g., United States v. Dixon, 593 F.2d 626, 630 (5th Cir. 1979) (permissible to counter "inference" that defendant's testimony had "arguably created").

116

added).

After reviewing the record in Kelly, the Court held that, even in the absence of an express allegation of future dangerousness, the evidence and prosecution arguments there were "flatly at odds with" the state's contention that dangerousness was not "at issue." Id. at 252-53.

The Court noted the prosecution had presented evidence that, while in prison, Kelly had taken part in an escape attempt. Id. at 248. It had also elicited testimony about his sadism at an early age and inclination to kill anyone who rubbed him the wrong way. Id. at 248-49. Such evidence and that of the "brutal" capital crime, alone, according to the Court, raised a "clear implication" of future dangerousness. Id. at 255. "A jury hearing evidence of a defendant's demonstrated propensity for violence reasonably will conclude that he presents a risk of violent behavior, whether locked up or free." Id. at 253-54.

The state's closing arguments "accentuated" that implication. The prosecutor spoke of Kelly as a "butcher," and "Bloody Billy," and told jurors: "He's intelligent. . . . He's quick-witted. Doesn't that make someone a little more dangerous . . . for [the victim] . . . doesn't that make him more unpredictable for [the victim]?" And the prosecutor continued that "murderers will be murderers. And he is the cold-blooded one right over there." Id. at 249-50.

117

So, too, in Troya's case did the evidence and government's arguments put his dangerousness "at issue," such that denying him an opportunity to rebut deprived him of due process. As in <u>Kelly</u>, the government introduced significant evidence of Troya's violent past and drew from it conclusions about his character and personality and, thus, his propensity to engage in violence wantonly: for example, "[h]e is the personification of violence, personification of brutality"; "[h]e doesn't care who he hurts, when he hurts them, or how he hurts them." As <u>Kelly</u> explained, "evidence of dangerous 'character' may show 'characteristic' future dangerousness, as it did here." 534 U.S. at 254. <u>See also</u> <u>United States v. LeCroy</u>, 441 F.3d 914, 930 (11th Cir. 2006) (evidence of prior crimes, including burglary and statutory rape, was "clearly probative" of defendant's dangerousness).

As in <u>Kelly</u>, the government introduced evidence of a sophisticated escape attempt and other misconduct by Troya while incarcerated. The Court there noted that Kelly's plan to take a guard hostage with a shank "underscored a propensity for violence in addition to a predilection to escape." 534 U.S. at 256 n.5. No weapons or violence was used in Troya's escape attempt, and he surrendered without resistance; nevertheless, the government's summation urged that "any escape when you are in jail is inherently a violent offense, has the potential for violence when you are trying to get free." (DE847:9505). In any event, suggesting

118

the possible escape of one allegedly so violent as Troya broadened the potential scope of his dangerousness from the prison setting to the community at large.

Finally, as in Kelly, the government did not limit its arguments to descriptions of the past.  Prosecutors repeatedly used the present tense to describe Troya's violent tendencies and nature.  And they invited jurors to look into the future, asking: "How many more murders will it take?"  As the Supreme Court said of the  prosecutor's argument that "murderers will be murderers," the comment "speaks not to Kelly's past conduct, but to his future deportment."  534 U.S. at 255 n.6.  In any event, the Court insisted that even evidence and argument about his past conduct still went Kelly's future dangerousness, not just to his "character and characteristics."  "Evidence of future dangerousness . . . is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms."[73]  534 U.S. at 254.

Additional evidence at Troya's sentencing, of a kind not presented in Kelly, further suggested to jurors that his assaultive tendencies could not be managed by correctional officials if he were sentenced to life: Aiken's testimony, including the

---

[73] Thus, here, the government's explanation that it would continue to rely on evidence of Troya's prior violence and escape history to show his "moral culpability" (see, e.g., DE795:7825), did not remove the issue of dangerousness.

government's pointed cross-examination questions (*e.g.*, about the dangers to staff, including from inmates who hide shanks), suggested to jurors that prisons are chaotic places racked by violence, which the staff can barely control.[74]

The jury instructions could and did not change any of this. They directed jurors to consider various aggravating factors, including Troya's "other serious acts of violence," and factors involving the murders, including that four people were killed and that the killings were substantially premeditated, committed for pecuniary gain and to eliminate witnesses, and targeted vulnerable victims. (DE848:9721-30). While the court also told jurors they were "limited to the aggravating factors . . . the Government has actually asserted" and that "[e]ven if you believe that the evidence reveals other aggravating factors, you may not consider them" (DE848:9720), it never expressly warned them against taking account of dangerousness. Moreover, reasonable jurors would not have thought the court meant to prohibit them from considering obvious, logical inferences from the aggravating factors, such as that the circumstances of the Escobedo killings and Troya's other "serious acts of violence" made him a future threat    especially

---

[74] That some of the evidence prejudicial to Troya, namely Aiken's direct testimony, was elicited by Codefendant Sanchez, is of no moment. Troya obviously was entitled to challenge it just as much as the evidence presented by the government. See, e.g., Toolate v. Borg, 828 F.2d 571, 572 (9th Cir. 1987); United States v. Zambrano, 421 F.2d 761, 762 (3rd Cir. 1970); United States v. Mercks, 304 F.2d 771, 772 (4th Cir. 1962).

since the issue of his dangerousness would have struck them as naturally quite important to their sentencing decision.  See Section E, *post*.

In any event, the Supreme Court has recognized that, when the prosecution's evidence and arguments implicitly encourage jurors to focus on the defendant's dangerousness, even an explicit cautionary instruction cannot suffice to put the genie back in the bottle and defeat the defendant's right to rebut.[75]   See Simmons, 512 U.S. at 171 (because defendant's future dangerousness was "at issue" in Skipper, preventing rebuttal but providing "an instruction directing the jury not to consider the defendant's likely conduct in prison would not have satisfied due process").  Indeed, in Kelly itself, the instructions similarly cautioned jurors not only that the listed aggravators were the only ones they could consider, but also that evidence of the defendant's prior crimes went only to his "character." Respondent's Brief, Kelly v. South Carolina, 2001 WL 1268982, *12 (Oct. 17, 2001).

Plainly, under Kelly, the evidence and argument in Troya's case placed his future dangerousness "at issue."  Indeed, as defense counsel noted, the government

_____

[75] The Court acknowledged that, because of this, "it may well be that" future dangerousness will be placed at issue "in a substantial proportion, if not all, capital cases."  Id. at 254 n.4.  See also Deck v. Missouri, 544 U.S. 622, 633 (2005) (future dangerousness is "nearly always a relevant factor in jury decisionmaking" in capital sentencing, "even where the State does not specifically argue the point").

121

continued to rely on precisely the same categories of conduct that its death notice had averred "evidenced" his "future dangerousness." (DE823:8319-21, 8332-33; DE311, DE812). The court, too, at one point, seemed to recognize that the government's presentation raised an inference of dangerousness, telling prosecutors: "[Y]ou've established things in the background and you say to the jury now, don't think about whether this could happen in the future, you think that is a rational limitation that someone will apply to that?" (DE823:8328). The court kept Cunningham from testifying, not because it doubted that future dangerousness was "at issue," but because it erroneously believed that Troya's right to rebut extended only to the government's express aggravating factors.

Nor do any of the five lower court decisions cited by the government below on the admissibility of Cunningham's testimony as rebuttal actually support its position or detract from Troya's argument based on Kelly. (DE795:7832; DE1113-1:2-5).

Both United States v. Johnson, 223 F.3d 665, 671 (7th Cir. 2000), and United States v. Wilson, 493 F. Supp. 2d 491, 508 (E.D.N.Y. 2007), approved defense expert testimony about prison security where the government alleged future dangerousness as an aggravating factor. Neither decision addressed whether the evidence would have been admissible if, as here, dangerousness had been put at

issue, though not explicitly asserted as an aggravator.

In United States v. Taylor, 583 F. Supp. 2d 923 (E.D. Tenn. 2008), the court excluded such testimony as rebuttal only because it found that "no rational fact-finder could conclude that Defendant is likely to personally injure someone while in custody, whether a fellow inmate or prison staff member," "especially . . . given the jurors' observations of Defendant's slight build and physique."  But it cautioned that "[h]ad the government introduced evidence that Defendant was likely to personally injure other inmates or prison staff members while incarcerated" or "was . . . a 'predator' with a propensity to personally harm others," then "obviously, the Court's decision would have been different."  583 F. Supp. 2d at 937-39 & n.13.

In an unpublished decision, Schmitt v. Kelly, 189 Fed. Appx. 257 (4th Cir. 2006), the Fourth Circuit, applying the very deferential standard of review for habeas cases, held it was not "unreasonable" for the state courts to approve preclusion of testimony about "general prison security and prison life," where the government had not placed any prison-security evidence before the jury.  Id. at 265-66.  In Troya's case, by contrast, such evidence was very much before the jury, in the form of Troya's escape attempt (only sixty yards from "getting out"), his mistaken release by the prison following that attempt, and Aiken's testimony

123

about the prevalence of inmate violence.[76]

The only cited case that even arguably supported the government's narrow view of rebuttal was United States v. Edelin, 180 F. Supp. 2d 73 (D.D.C. 2001). Because the government had not "asserted" dangerousness as an aggravating factor, the court there said it would preclude rebuttal unless "the Government's evidence and argument rose to such a level that defendant Edelin's 'future dangerousness' were an *inescapable* conclusion to be drawn by the jury." Id. at 78 (emphasis added).  Edelin, however, was decided before Kelly, and its narrow view of the right of rebuttal is flatly inconsistent with the broad standard announced by the Supreme Court.  See Kelly, 534 U.S. at 252 (dispositive question is whether future dangerousness was "a logical inference from the evidence or was injected into the case through the State's closing arguments") (internal quotation omitted). In any event, here, even under Edelin's "inescapable conclusion" test, Troya's dangerousness was placed at issue.

### 3.   Cunningham's proffered testimony would have rebutted the inferences of Troya's future dangerousness.

Cunningham's testimony would have directly and substantially countered

---

[76] Schmitt also distinguished the excluded testimony there, which "merely describes the general conditions of incarceration," from "evidence about how the conditions of confinement would affect a particular defendant," which, it suggested, would be fair rebuttal.  Id. at 265.  Here, as discussed further below, Cunningham's proffered testimony was individualized to Troya.

the inferences of dangerousness raised by the evidence and the government's

arguments.  See United States v. Frazier, 387 F.3d 1244, 1269 (11th Cir. 2004)

("purpose of rebuttal evidence is to explain, repel, counteract, or disprove the

evidence of the adverse party") (internal quotation marks and citations omitted).

To rebut the implications that Troya would be violent if sentenced to life and

that prison provided a fertile setting for such conduct, Cunningham would have

explained that his individual characteristics actually point to a diminished risk of

assaultive conduct while incarcerated, below even the already low rate for

maximum-security federal prisoners generally; that he would "likely make a

positive prison adjustment (i.e., without serious violence)"; and that he could be

safely managed given the security conditions in a United States Penitentiary.[77]

(DE862-2; DE 1103-3).

As Cunningham observed in his report, "prison represents a fundamentally

different context from the community."  (DE862-2:10).  He would have explained

how factors about Troya, cited in the government's evidence and summation

---

[77] The court invited the defense to proffer Cunningham's testimony,
explaining: "If I am in error on this, I want that to be corrected, and I want to make
sure no one suggests" the issue is not preserved.  (DE823:8339-40).  So, in
addition to both sides' telling the court some of what Cunningham would testify to
(DE795:7778, 7825), Troya's counsel submitted copies of his original report,
which had been shared with the government before the sentencing hearing, and a
shorter, supplemental report that largely summarized the original one.  (DE862-2;
DE1103-3)

comments, from which jurors would naturally infer dangerousness, are actually not associated with a greater incidence of *prison* violence, as empirical studies show. These factors include: (1) the seriousness of the capital crime, including the fact it involved multiple victims; (2) the fact it involved a criminal enterprise; (3) Troya's alleged record of other violence in the community; and (4) the fact he would be serving a life sentence without any hope of release.[78] (DE862-2:10-11; DE1103-3:2-3).

On the contrary, Cunningham would have described for jurors how these same studies show that inmates who share Troya's individual characteristics actually display a *lower* incidence of prison violence, thus indicating that he too would pose a diminished risk. (DE862-2:12: "Troya's risk of violence in prison is considered to be well below the broad group rates."). These characteristics, as

---

[78] The high court in Texas, ground zero for the use of dangerousness in capital cases, recently expressed concern about predictions based on factors that, like these, have intuitive appeal but lack empirical validation. Thus, in finding a state expert's testimony had not been shown to be reliable and should not have been admitted, it said: "Dr. Coons stated that he relies upon a specific set of factors: history of violence, attitude toward violence, the crime itself, personality and general behavior, conscience, and where the person will be (*i.e.*, the free community, prison, or death row). These factors sound like common-sense ones that the jury would consider on its own, but are they ones that the forensic psychiatric community accepts as valid? Have these factors been empirically validated as appropriate ones by forensic psychiatrists? And have the predictions based upon those factors been verified as accurate over time? Some of Dr. Coons's factors have great intuitive appeal to jurors and judges, but are they actually accurate predictors of future behavior?" Coble, 330 S.W.3d at 277-78.

explained in Cunningham's reports, include:

(1)    *Age*: "Age is one of the most powerful predictive factors for prison misconduct, and aging inmates having progressively lower rates of misconduct." Troya was 25 years-old at the time of sentencing, and thus less of a risk that inmates in their late teens or early twenties.  (DE862-2:11-12; DE1103-3:2).

(2)    *Education*: Troya had completed his GED in 2002, and "large scale studies have demonstrated" that inmates who have a high-school or equivalency diploma have "significantly lower rates of violence in prison," *i.e.*, are "half as likely to be involved in assaultive conduct" in high-security prisons.  (DE862-2:12; DE1103-3:2).

(3)    *"Continuing community relationships"*: Through the time of trial, Troya received regular visits from his parents and sister, and routinely talked on the phone and corresponded with other family members.  "Inmates who have continuing contact with community members tend to have better prison adjustments."  (DE862-2:12; DE1103-3:2).

(4)    *Correctional history*: Notwithstanding the escape attempt and the incident in which his mother sent him money without authorization, Troya had been incarcerated in state prison for more than four years, and in federal jail for more than two years without *any* incident involving a serious assault.  This too

pointed "to a continuing pattern of nonviolence in BOP."[79]  (DE862-2:12;

DE1103-3:2).

That some of these factors, such as age and education, do not seem

intuitively related to non-dangerousness made it all the more critical for the jury to

hear Cunningham's testimony.

Cunningham also would have testified that "rates of serious violent

misconduct among inmates in BOP are relatively low, even at a U.S. Penitentiary

level," and that "[c]orrectional procedures and security interventions are available

in BOP to manage inmate conduct."[80]  (DE862-2:11,13).  The low base rates of

---

[79] About eight months before trial, apparently at the behest of the prosecutors, the Attorney General ordered that Troya be subjected to Special Administrative Measures ("SAMs"), to monitor and limit his contacts with people on the outside, including friends and family.  Although the exact reason for this step was not disclosed to the defense, it appears to have involved an alleged threat against a witness.  (DE350-2; see DE862-2:13-14).  It is unclear whether the threat was anything more than "mouthing off."  (DE862-2:14).   In any event, had Cunningham been permitted to testify, he could have explained that, if sentenced to life imprisonment in a USP, Troya would not be in a position to solicit violence in the community, particularly since he lacked any "criminal organization under his continuing direction and/or financial resources in the community to effect the threat" and because the BOP could dramatically constrict his contacts with the outside world through the continuing use of SAMs, if it saw the need.  (DE862-2:14; DE1103-3:3).  (Apparently it did not, since the SAMs were lifted after Troya was committed to federal death row at USP Terre Haute).

[80] A study by Cunningham and a group of other researchers, published shortly before Troya's trial, has shown that, in USP's, the overall rate of significant prison violence specifically by federal capital offenders is vanishingly small: over a 14-year period, just 0.7% for assaults with moderate injuries     an annualized

128

violence were relevant rebuttal because they were needed to explain and convey the significance of Troya's posing a lesser risk than most other USP prisoners. See United States v. Umana, 2010 WL 1688441, *3 (W.D.N.C. Apr. 26, 2010) (permitting Cunningham to testify, and observing that "it appears he intends to use these statistics to make an individualized prediction of whether the defendant will commit future acts of violence"). The security conditions were relevant to explain and bolster Cunningham's conclusions that Troya could be safely managed, for "[t]he danger any individual presents is a function not only of that individual, but also of his environment." United States v. Sampson, 335 F. Supp. 2d 166, 227 (D. Mass. 2004). See, e.g., Umana, 2010 WL 1688441, *3 (Cunningham permitted to testify in rebuttal about BOP security measures and confinement conditions, and how they would affect "this particular defendant"). And both the low violence rates and the security conditions were highly relevant to correct the misimpression, created by Aiken's testimony (and by testimony that state prison officials had once

---

rate of 1.1 such incidents per 1000 inmates     and no fatalities or assaults with major injuries. Cunningham, M.D., Reidy, T.J. and Sorensen, J.R., Assertions of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence, 32 Law & Hum. Behav. 46, 55-57 & Table 3 (2008). Yet jurors who find future-dangerousness often believe the likelihood to be dramatically higher. See, e.g., Cunningham, *et al.*, Life and Death in the Lone-Star State: Three Decades of Violence Predictions by Capital Juries, 29 Behav. Sci. Law 1, 2 (Jan.-Feb. 2011) (post-trial interviews of Texas capital jurors showed they "estimated a 50 percent probability that the defendant would kill again in the future if not given the death penalty").

mistakenly freed Troya), of the federal prison environment as a lawless community, barely under control, where contraband, weapons, fights, and assaults are prevalent.

Finally, Cunningham also could have reassured jurors that Troya would not pose an escape risk. He would have explained that, if sentenced to life, Troya would be confined to a USP or an even higher security institution. He would have described the security architecture, staffing, and procedures of a USP, which are "vast[ly] different" from those of a state youthful-offender "dormitory." And he would have testified that escapes from USP's are "extraordinarily rare," with "only two instances . . . in the past 10 years." (DE862-2:13; DE1103-3:2).

The government never argued that any of this testimony from Cunningham would not rebut an inference of future dangerousness; it only denied that such an inference triggered the right to rebut, in the absence of an expression allegation. Indeed, the government itself said that it withdrew its dangerousness aggravator because it was persuaded by Cunningham's report. (DE795:7823-24).

## D.    Cunningham's testimony was further admissible as mitigation, independent of its relevance as rebuttal.

The court also rejecting the defense's alternative argument, that Cunningham's testimony was independently admissible as mitigation. (DE823:8322). This too was error. Cunningham's expert opinion that Troya was

130

"likely to make a positive prison adjustment (*i.e.*, without serious violence),"

(DE1103-3:2) was, indeed, relevant mitigating evidence under the Eighth

Amendment to the United States Constitution and the FDPA, 18 U.S.C. § 3592(a).

The government argued that only the defendant's past good conduct while

confined could constitute mitigation, because "[t]hat type [of] evidence show[s]

their character [and] background."  Such evidence, it said, like the government's

proof of the defendant's history of violence, "is looking to conduct in the past, and

has nothing to do with what is going on in the future."  (DE823:8324-26).

The court seems to have accepted this distinction.  Thus, as noted, it

permitted Aiken, the former warden, to testify to Sanchez's past adjustment in jail

while awaiting trial, but sustained government objections when he began to touch

on Sanchez's future adjustment.  (DE825:8683).  And the court explicitly invoked

this distinction when it struck future-oriented mitigating factors proposed by both

defendants, involving their close relationships with their families, but permitted

past-focused ones.[81] (DE830; DE858; DE846:9424-29, 9438-39, 9456-57;

DE846:9424, 9428, 9442-43).

Such a distinction, however, conflicts with Supreme Court precedent.  The

---

[81] In Point IV, *post*, Troya challenges the court's errors in excluding
evidence and instructing jurors to ignore the importance to family members of the
close relationships they would maintain with Troya if he were sentenced to life and
the loss and grief they would experience if he were executed.

131

Court has expressly held that, just as evidence of future dangerousness may be treated as an aggravating factor, see Barefoot, 428 U.S. at 896-97; Jurek, 428 U.S. at 275, "[l]ikewise, evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating" and thus "may not be excluded from the sentencer's consideration."  Skipper, 476 U.S. at 5.   See also Ayers v. Belmonte, 549 U.S. 7, 15 (2006) ("Just as precrime background and character and postcrime rehabilitation may extenuate the gravity of the crime, so may some likelihood of future good conduct count as a circumstance tending to make a defendant less deserving of the death penalty.") (internal quotation marks and citations omitted).

Indeed, Skipper expressly rejected the state court's view that "future adaptability to prison [is] irrelevant evidence because it does not bear on a defendant's character [or] prior record," while "[p]ast behavior in prison does bear on a defendant's character and, therefore, is relevant."  476 U.S. at 7 (internal quotation omitted).  To the extent this distinction would preclude evidence that the defendant "would pose no undue danger to his jailers or fellow prisoners" and "could lead a useful life behind bars," the Court said it "would not pass muster" under the Court's Eighth Amendment precedents.  476 U.S. at 7.

Cunningham's proffered opinion of Troya's likely positive adjustment,

132

together with the accompanying support and explanation for this opinion, see

Section C.3, *ante*, fell squarely within the heartland of the mitigating factor

endorsed by Skipper.

The government also argued that, in contrast to evidence about a defendant's

past jail adjustment or "personality," Cunningham's testimony rested not on

Troya's character and background, but rather on factors such as prison security

common to all defendants.  Thus, the government complained, it was "not

individualized."  The government compared it to evidence that the death penalty

lacks deterrent value, which has been held inadmissible.  (DE823:8325, 8329-31).

The court seemed to agree.  It relied on some decisions that kept out expert

testimony about general prison conditions because it amounted to a policy

challenge to the death penalty in general.  (DE823:8333, 8335-36; DE824:8352).

See Johnson, 223 F.3d at 675; Taylor, 583 F. Supp. 2d at 936-37; Edelin, 180 F.

Supp. 2d at 73, 76.

But Cunningham's assessment that Troya would not pose a threat in prison

was not, like the evidence in those cases, limited to general security measures or

conditions in USP's.[82]  While he factored these in, his opinion revolved around

---

[82] Though, even had it been, it still would have been admissible as
mitigation, under not only the Eighth Amendment, but also the FDPA.  See Point
IV.B.2, *post*.

characteristics individual to Troya, such as the nature of his crime, his age,

education, family ties, and lack of gang affiliation, and empirical studies that show

how these particular characteristics do or do not predict a higher or lower incidence

of prison violence.[83]  See Section C.3, *ante*.

The prosecutors understood this, since they acknowledged having read

Cunningham's original report (DE862-2:10-15) before the sentencing hearing.

(DE795:7823-24).  Indeed, the government told the court that Cunningham's (and

Aiken's) testimony would discuss not just prison conditions, but individual

characteristics of the defendants such as their "age" and "proclivity to violence."

(DE795:7825).  "And they have the statistics and studies, and what occurs in

prisons, what types of violence, whether the Defendants meet any of that statistical

criteria."  (DE795:7825).  Moreover, before Troya presented his mitigation case,

---

[83] As Cunningham's supplemental report explained, a scientifically sound assessment of an individual's risk of prison violence must incorporate group statistical data.  (DE1103-3:3).  Indeed, government experts on dangerousness in FDPA cases also rely on such an approach.  See, e.g., Barnette, 211 F.3d at 810-11, 816 (government expert relied an "actuarial analysis comparing Barnette to groups of people with characteristics similar to him.").  Actuarial data is also incorporated into risk assessments in non-capital sentencings, see, e.g., United States v. Farley, 607 F.3d 1294, 1318 (11th Cir. 2010), and a variety of other criminal-justice proceedings, including civil commitments, see., e.g., United States v. Hall, 664 F.3d 456, 464 (4th Cir. 2012), sexual-offender registry classifications, see, e.g., Weems v. Little Rock Police Dep't, 453 F.3d 1010, 1013 (8th Cir. 2006), and parole determinations, see, e.g., Ellis v. District of Columbia, 84 F.3d 1413, 1415-16 (D.C. Cir. 1996).

his lawyers submitted a supplemental report (DE1103-3) in which Cunningham highlighted the features of his original report that (in counsel's words to the court) bore on "criteria directly unique to Mr. Troya" and "how Mr. Troya would adapt." (DE824:8355-56; DE825:8721).

**E.      The court's exclusion of Cunningham's testimony is not subject to further analysis for "harmlessness."  In any event, it clearly prejudiced Troya at the sentencing hearing.**

The court's error in keeping Cunningham off the stand is *per se* reversible.[84] Since dangerousness was placed "at issue," and the excluded testimony would have directly rebutted it, that is end of the necessary assessment of prejudice.  "[T]he Supreme Court has never performed a harmless error analysis in any of the three cases where the Court found a Simmons violation," one analogous to the due-process error in Troya's case, as discussed.[85]  Mollet v. Mullin, 348 F.3d 902, 921

---

[84] Moreover, the exclusion of Cunningham's testimony as mitigation was structural error.  See Point II.D, *post*.

[85] In Skipper, which was decided before Simmons, the Supreme Court observed that "under any standard," the exclusion of evidence of the defendant's non-dangerousness "was sufficiently prejudicial to constitute reversible error." 476 U.S. at 8.  But the Court based this conclusion solely on the facts that established the due-process error in the first place, namely, that the government's summation had put future dangerousness at issue and the excluded evidence would have countered it.  Id.  Notably, the Court did not engage in a traditional harmless-error analysis, which, in the capital-sentencing context, includes considering the remainder of the government's aggravation as well as the mitigating factors established by the defendant.  See Parker v. Dugger, 498 U.S. 308, 319-22 (1991); Clemons v. Mississippi, 494 U.S. 738, 753-54 (1990).

n.6 (10th Cir. 2003) ("It is not entirely clear whether a Simmons error is subject to harmless-error analysis."); id. at 925 n.2 (Murphy, J, dissenting) ("In light of the nature of the due process problem identified in Simmons, however, it is not surprising that the Court has never subjected such an error to a harmless-error analysis.").

In any event, the government certainly could not show that this fundamental deprivation of Troya's right of rebuttal was harmless beyond a reasonable doubt. See Satterwhite v. Texas, 486 U.S. 249, 257-58 (1988); 18 U.S.C. § 3595(c)(2). As in Simmons, the government put the defense in a "straitjacket," 512 U.S. at 165, by advancing, through evidence and argument, the clear implication that Troya would be violent in prison or, worse, in the community if he escaped or was mistakenly released     yet at the same time preventing the jury from hearing, in rebuttal, reliable expert testimony that, on the contrary, Troya would likely make a positive adjustment to federal prison and could be safely managed.

Empirical studies of actual capital jurors show that, whether formally alleged or not, future dangerousness weighs heavily on their minds. See, e.g., John H. Blume, Stephen P. Garvey & Sheri Lynn Johnson, Future Dangerousness in Capital Cases: Always "At Issue," 86 Cornell L. Rev. 397, 398 (2001). And, in a case like this, where the evidence and argument went beyond Troya's violent past

136

and nature, beyond even a portrayal of prison as a predatory environment, to raise the specter of his possible return to the community, either through escape or mistake, the impact of jurors' apprehensions cannot be overstated.[86] See Scott E. Sundby, War and Peace in the Jury Room: How Capital Juries Reach Unanimity, 62 Hastings Law Journal 103, 117 (Nov. 2010) (capital jurors "consistently expressed the view   even those who were strongly moved by the defendant's case for life   that they would vote for a death sentence if they were not assured that the defendant would be safely locked away").

Cunningham's testimony would have reliably countered, point by point, the evidence and argument implying Troya's future dangerousness.  Furthermore, he would have provided affirmative evidence that Troya would be a lower-risk inmate who likely would make a positive adjustment to prison and could be safely managed by the BOP.  As a psychologist with recognized expertise, scholarship,

---

[86] In United States v. Brown, 441 F.3d 1330 (11th Cir. 2006), by contrast, there was little reason to believe the jury had considered the defendant a future danger.  Not only did the government not assert this as an aggravating factor, but there was apparently little or no evidence of prior violence (the defendant's record was for property crimes, with the exception of one robbery).  And the capital murder seemed to have occurred on the spur-of-the-moment when the victim resisted the defendant during a robbery.  Moreover, the jury heard "ample" lay testimony that the defendant had been a model prisoner while awaiting trial in this case and during earlier incarcerations.  Under these circumstances, the Court found that the defendant was not prejudiced by the denial of funds to hire a dangerousness expert.  Id. at 1342, 1365, 1368, 1371.

and impressive credentials, his opinion might have carried great weight with the jury. See Barnette, 211 F.3d at 824 (preclusion of certain surebuttal testimony from Cunningham on future dangerousness was prejudicial, particularly in light of the special "impact" that testimony by a mental-health "specialist" may have on a jury), citing Satterwhite, 486 U.S. at 259.

The jury's view on the critical issue of Troya's future dangerousness may well have been dispositive. Verdict sheets in federal capital trials demonstrate that it represents the most critical aggravating consideration: A study of 72 cases over the last 13 years discovered that 82.4 percent of those defendants who were found to pose a future danger were sentenced to death, while 81.6 percent of those who were not so found were spared by juries. Mark D. Cunningham, Jon R. Sorensen, Thomas J. Reidy, Capital Jury Decision-Making: The Limitations of Predictions of Future Violence, 15 Psychol., Pub. Pol'y & L. 223, 234-35, 244-45 & Table 1 (2009).

Here, moreover, it appears that jurors viewed Troya's as a close case. They deliberated over the course of four days before reaching a verdict. And they unanimously voted life on the three capital counts, including the carjacking one, which involved all four victims and featured all the aggravating factors asserted by the government. See Statement of Facts, Section II.C, *ante*. This indicates jurors

138

thought that, for the case *as a whole*, even with *all the aggravators*, Troya

deserved a life sentence.  True, something about the two counts involving just the

children tipped the balance the other way; perhaps the jurors felt that the mitigating

factor that Lou Escobedo "engaged in criminal conduct that contributed to . . . his

family's death[s]" (DE859:14) should not matter for these counts.  Still, the

lengthy deliberations and three life verdicts, including for all the victims, certainly

belie any claim that the case for death on the other two counts was overwhelming.

Indeed, the Supreme Court has treated such split verdicts for multiple capital

murders as evidence that the sentencing case was fairly evenly balanced and, thus,

that certain omitted mitigation might well have altered the outcome.  Porter v.

McCollum, 130 S. Ct. 447, 454 (2009).

And jurors had ample basis to perceive Troya's as a close case, even though

the aggravating factors were serious.[87]  For, despite additional errors that affected

the jury's consideration of mitigation, see Points IX, X, *post*, there were substantial

mitigating factors some jurors found involving his childhood and youth, his prior

record, an equally culpable codefendant who was not facing the death penalty, and

---

[87] The majority of those aggravating findings, moreover, were either legally unsupported or tainted by flawed instructions.  See Points V-VIII, *post*.

139

Lou Escobedo's having contributed indirectly to the crime.[88]

Accordingly, because of the erroneous exclusion of Cunningham's critical expert testimony on Troya's non-dangerousness, the Court should reverse his death sentences and order a new capital sentencing hearing.

**IV.**

**The court wrongly kept out evidence of, and affirmatively instructed jurors to ignore as mitigation, the relationships Troya would maintain with his family were he allowed to live in prison, and the grief and loss they would suffer if he were executed.**

A.     **The court told jurors not to consider the forward-looking significance of Troya's relationships with his relatives, and excluded testimony on the subject.**

A few days before the sentencing hearing, the government warned of the need to prevent any "[t]estimony that a verdict of death would have a negative impact on the defendant's family."  (DE1113-1:15; see also DE823:8344-45; DE795:7849-50).

---

[88] Nine jurors found that Troya was traumatized by witnessing the shooting death of his close friend, Jean Kamel, who died in his arms when Troya was 13 years old, and that Troya received no grief counseling for this.  Six jurors found that he was beaten by guards at a work camp when he was 17.  Six jurors found he had no prior convictions involving killings or weapons.  Ten jurors found that Varela was an equally culpable codefendant who would not be punished by the death penalty.  And 11 jurors found that Lou Escobedo engaged in criminal conduct that contributed to the circumstances leading to his family's deaths.  (DE859:12-14).

The court agreed.  On the second day of the hearing, it announced that "testimony regarding the impact of a sentence upon the Defendant's family" was inadmissible.  This included, for example, the "suggestion that a sentence of life imprisonment without the possibility of release would allow Mr. Sanchez's son to continue to visit his father" or conversely, that "the son would be devastated by the loss of his father."  (DE823:8338, 8344-45).

Sanchez's counsel protested.[89]  (DE823:8344).  The next day, they renewed the objection.  But the court maintained its ruling, saying this kind of evidence did not relate to the defendant's "character or record," and thus did not qualify as admissible mitigation.  (DE824:8356-60).

When each defendant presented his case, the court sustained government objections to questions it believed ran afoul of its ruling.  This occurred when Sanchez's counsel began to elicit testimony from a corrections expert, James Aiken, about how relationships with inmate parents can positively influence their children's lives.  (DE825:8683-85; see also Point III.B.2, ante).  The court later noted that inquiry had been "moving toward what is normally called execution impact evidence."  The offending questions, it believed, "while not quite posed in

---

[89] By agreement, an objection for one defendant constituted an objection for all for purposes of preserving an issue for appellate review.  (DE732:4052; see also DE245).

terms of whether the child would be devastated by the loss of his father, I think we were achieving the very same thing through the alternate means." (DE825:8717-20).

The next day, the court sustained another, similar government objection during Troya's case. At the conclusion of her testimony, his mother, Maria, was asked about her future relationship with Troya if he were sentenced to life imprisonment:

Q. And you are going to love him and keep your relationship even if he is in prison for the rest of his life

MR. CARLTON: Objection, Your Honor.

THE COURT: Right, I sustain the objection. Let's go ahead.

BY MR. EISENBERG:

Q. All right. You are going to continue to love him?

A. Yes.

MR. CARLTON:  Same objection.

THE COURT: Yes, let's go ahead.

MR. CARLTON: Move to strike.

THE COURT: I grant the motion to strike. Let's go ahead.

(DE845:8914).

Troya's counsel presented evidence that he was part of a large family that

142

loved him.  See Statement of Facts, Section II.B.1, *ante*.  But, in apparent deference to these rulings, when Troya's father, Lorenzo, and his two younger brothers, Alex (age 23) and Adrian (age 12), testified later that day, defense counsel studiously avoided any future-oriented questions about the relationships they intended to maintain with Troya in the future, the value those would have, or the loss they would suffer were he executed.[90]  Troya's father testified that he loved his son.  His brother Alex told jurors that they were "close" and "I still love him to this day," and that Troya and Adrian were especially attached.  And Adrian testified that he too loved his brother, and that, during their visits at the jail, Troya had given him helpful advice about keeping his grades up, listening to his parents, and avoiding trouble.  (DE845:8962, 9001-02, 9117).  Finally, Troya's grandmother testified she loved him very much, would never leave him, and wanted to be able to keep communicating with him.  (DE845:9020-21).

The following day, the court struck several mitigating factors that Sanchez and Troya had proposed for the instructions and verdict form.  These included that

---

[90] On the day Troya's relatives testified, Sanchez filed a "Memorandum in Support of Execution Impact Evidence." This identified various federal and state courts that had allowed such evidence in capital cases, and also cited the ABA Guidelines in support of its admissibility.  (DE826:1-10).  (Two days later, Sanchez struck this filing and refiled it as DE836, because his counsel had mistakenly entered it onto ECF as covering the noncapital defendants too.  (See Docket Sheet, DE826)).

"[t]he execution of Daniel Troya will cause unnecessary trauma to the Troya family," and that "[i]f sentenced to life in prison . . . Ricardo Sanchez can continue to be a father to his son, Ricardo III." (DE830:2; DE858:88-89; DE846:9424-29, 9438-39, 9456-57). The court characterized the negative effects the defendant's family would suffer from losing their relationship with the defendant, and the positive contribution he could make to them if allowed to live, as two sides of the same, inadmissible coin. (DE846:9428, 9439).

The court allowed Troya to submit a mitigating factor that he "had a loving relationship with his family" and Sanchez a similar one regarding his son. (DE846:9424, 9442-43). The court explained that this mitigator was limited to the relationship the defendant "presently" has, while the ones it had struck focused on the future. (DE846:9428).

The next day, in Sanchez's summation, his attorney cited his connection with his son and Aiken's testimony that advice from inmate parents sometimes helped their children stay out of trouble. Counsel ended by urging jurors to allow Sanchez to live to provide love for his son. (DE847:9546-48).

Troya's lawyer also closed his summation by emphasizing his "loving and caring relationship with his family . . . who continue to love him." Troya, he said "is still a benefit to society," as demonstrated through the testimony of his young

144

brother, Adrian. Counsel reminded jurors how Troya had tried to positively influence Adrian, and suggested that Aiken's observation, that contact with prisoners helped their children, applied also to other young relatives. In concluding, Troya's lawyer said: "That is being beneficial to society. That also is a reason why the death penalty is not appropriate in this case." (DE847:9598, 9601-02).

Reacting *sua sponte* to the summations, the court announced the following morning that, singling out this issue, it would add to its final charge a caution against considering "execution impact." (DE848:9683). Both Sanchez and Troya objected. (DE848:9683-84, 9689-90). The court maintained its position, but acknowledged that the law was not conclusively established and "if I am in error . . . I know the appellate court would speak to that, and certainly it would be useful to have a clear ruling on this." (DE848:9691). Notably, the court cited no precedent for affirmatively cautioning against "execution impact." (And, as far as undersigned counsel are aware, no such instruction has ever been given in a FDPA case).

In its final charge later that day, the court warned the jury, *three times*, to ignore "execution impact," which it defined broadly to include *any* harm or loss the defendant's family might experience as a result of being deprived of their

145

relationship with the defendant.  Rather, all that could be considered was the

defendant's present relationship with his relatives, and that only to the extent it was

an "indication" of the defendant's "qualities."  (DE848:9746-47, 9751-52, 9754-

55).

Thus, when the court instructed on the mitigator involving Sanchez's

relationship with his son, it devoted a page and a half of transcript to this caution:

> Let me stop for a moment and just talk about this, and I wanted to tell you about a ruling I made in the case.
>
> If the jury found that a Defendant in the case had a loving relationship with a family member, that is a characteristic about that person that certainly the jury would be able to consider . . . . But I made a ruling in the case . . . and here is the ruling that I made.
>
> The jury, if it finds this to be true, absolutely is entitled to consider a relationship that a person had with their family members. That is perfectly permissible.  But *what the jury cannot consider and what would not be a legitimate mitigating factor would be the loss that the family member might suffer because of the execution of the Defendant*.
>
> So the jury in this case has an absolute right to consider whether Mr. Sanchez has established that indeed he has a loving relationship with his son and that he is a person capable of having those kinds of loving relationships.  But *what would not be appropriate to consider would be any loss that the son would suffer if the father were not there to continue in that relationship*.
>
> *That sometimes is referred to in the law as execution impact testimony, and I have excluded that as a factor in the case . . . .*
>
> . . . the jury has an absolute right to consider any relationship

> that a person has with their family as an indication of themselves and the qualities that they possess.

(DE848:9746-47) (emphasis added).

The court gave similar, though less extensive, instructions when it charged the jury on the mitigator involving Troya's relationship with his family (DE848:9751-52), and then again, for a third time, at the close of its discussion of mitigating factors.  (DE848:9754-55).

On the verdict forms, zero jurors found that the fact Troya "has a loving and caring relationship with his family, who continue to love him" deserved to be weighed as a mitigating factor.[91]  (DE859:12).  But, at his formal sentencing the next month, the court twice acknowledged his loving, supportive family.  (DE955:22, 28).

---

[91] It is apparent jurors found this to be *factually* true for, on the verdict form, they checked "yes" next to it but put a zero by it to indicate none had found it established a mitigating factor.  (DE859:12; see also DE857:9807-08).  Eight jurors found the mitigating factor that Sanchez "has a loving relationship with his son."  (DE860:14).  It is impossible to know why they thought that this, but not Troya's loving relationship with his family, deserved at least some mitigating weight.

**B.      The court violated Troya's rights under the Eighth Amendment and FDPA by excluding evidence of, and instructing the jury to ignore, the value of the relationships his family would maintain with him in prison and the loss and harm they would experience if he were removed from their lives.**

The court's instructional and evidentiary rulings excluding "execution impact" were anomalous.  For, as the defense informed it, this mitigating factor is routinely allowed in federal death-penalty cases.  According to data maintained by the Federal Death Penalty Resource Counsel Project, much of which Sanchez included in his memorandum of law (DE836:2-5), federal capital juries have found "execution impact," in some form, as a mitigating factor in at least 61 cases; that includes several cases in this Circuit.[92]

More important, the rulings here were erroneous, for two reasons.

---

[92] See Federal Death Penalty Resource Counsel Website, Declaration of Kevin McNally on Execution Impact Testimony, available at http://www.capdefnet.org/FDPRC/WorkArea/DownloadAsset.aspx?id=3728.  That declaration identifies four cases from this circuit, and undersigned counsel's review of the completed verdict forms from other FDPA trials has uncovered two more: United States v. Michael Natson, No. 4:05-cr-00021, DE178:5 (M.D. Ga. Mar. 21, 2007) (mitigating factor that death sentence would "increase the number of victims and their loss . . . to include" defendant's parents, brother, child, and mother); United States v. Denis, No. 99-714, DE390:4 (S.D. Fla. Mar. 26, 2003) (mitigating factor that defendant's family "will suffer loss, harm and grief if he is killed").  Only one of the defendants in these six cases was sentenced to death.

148

**1. The court acknowledged that Troya's "loving relationships" with his family could illuminate his character, yet it excluded testimony from relatives critical to fully demonstrating the nature and strength of those relationships.**

The court unfairly stripped down the mitigation that Troya was a person who had formed close, emotional bonds with others and had a life worth saving. It is one thing for relatives to testify, as Troya's were allowed to, that they have been visiting the defendant in the local jail while he awaits trial for his life; any family member with a heart would do that. But it requires a different kind of love and devotion to maintain those connections for years or decades to come after the defendant is shipped across the country and imprisoned with no hope of ever returning. By the same token, professions by Troya's family that they loved him paled in significance to the testimony they were kept from giving, about the unimaginable loss and grief they would experience if he were executed.

By acknowledging that Troya's family relationships evidenced his personal "qualities," yet excluding evidence that would have helped reveal the depth and enduring nature of these relationships, the court violated his right under the Eighth Amendment and the Federal Death Penalty Act to present "'any relevant mitigating evidence'" about "any aspect" of his "character or record." Skipper v. South Carolina, 476 U.S. 4, 6 (1986), quoting Eddings v. Oklahoma, 455 U.S. 104, 110 (1982). See 18 U.S.C. § 3592(a)(8), 3593(c). "Relevant" means having "any

tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." Tennard v. Dretke, 542 U.S. 274, 284 (2004) (quotation omitted).  See Fed. R. Evid. 401.  This "low threshold," Tennard, 542 U.S. at 284, licenses any evidence from which the sentencer "could . . . draw[] . . . inferences" about the defendant that "might serve as a basis for a sentence less than death."  Skipper, 476 U.S. at 6 (quotation omitted).

Under this liberal standard, testimony by Troya's relatives that they were deeply committed to keeping him in their lives through regular communications and visits even if he were imprisoned for life, and about how scarring it would be for them to lose those relationships, constituted relevant evidence.  For it would have shown how powerful and unshakeable an attachment they had formed with Troya     one hardly true of all blood relations, especially with a relative who is a convicted felon.  And the jury certainly could have inferred that there must be something redeeming about Troya to have evoked this.

Moreover, while the court's *sua sponte*, thrice-repeated cautionary instruction noted that Troya's family relationships were relevant not in themselves but only to the extent they evidenced his "qualities," it is questionable whether jurors could comprehend and implement that elusive distinction     even putting

aside that, as discussed, they had been deprived of relevant testimony about those relationships.  Some jurors may simply have taken away the message that this entire area of mitigation was fraught and legally dubious.[93]

Other FDPA cases have approved the kind of testimony excluded here because it constitutes circumstantial proof of the defendant's character.  United States v. Mitchell, 502 F.3d 931, 991 (9th Cir. 2007), held that it was "appropriate" for the district court to "allow[] witnesses to testify regarding their affection for Mitchell *and their wish for his life to be spared"* (emphasis added).  It said this was "relevant mitigating evidence" because it "tend[ed] to logically . . . prove" something about Mitchell's "record and character."[94]  Id.

_____

[93] Indeed, Sanchez's counsel expressed this concern, suggesting "it is asking too much of this jury to understand execution impact."  (DE848:9689-90).

[94] In its memorandum to the court, the government cited Mitchell but did not mention this portion of the holding.  (DE1113-1:15).  The government also cited United States v. Bolden, 545 F.3d 609 (8th Cir. 2008), which found no error in a refusal to instruct on the mitigator that "Bolden's execution will cause his family great emotional pain and distress."  Beyond the distinguishing fact that no evidence was excluded in Bolden, the government's description was incomplete and misleading, for it failed to note the decision's rationale was that the instruction "would have been duplicative," not improper.  Id. at 627.  Indeed, the verdict form in Bolden included execution-impact factors, such as that the defendant could "make a positive contribution to others while incarcerated."  United States v. Bolden, No. 02-cr-557, DE442 (E.D. Mo. May 23, 2006).  In still another case cited by the government (DE1103-1:15), the court only prohibited defense witnesses "from expressing an opinion as to what the defendant's sentence should be."  United States v. Caro, 461 F. Supp. 2d 459, 465 (W.D. Va. 2006), rather than the broader range of mitigation the court here excluded and directed the jury to

Similarly, in United States v. Fell, 2005 WL 1634067 (D. Vt. July 5, 2005), the court refused to strike the mitigating factor, "Donald Fell's execution would detrimentally affect persons who care about him." The court explained that it "may shed light on Fell's background and character," including his "positive qualities, his capacity to be of emotional value to others, and the nature of his interpersonal relationships." Id. at *1-2. See also United States v. Wilson, 493 F. Supp. 2d 491, 506 (E.D.N.Y. 2007) ("evidence the Government seeks to preclude, *i.e.*, how Wilson's family would feel if he were executed, may fairly be considered part of Wilson's 'background'"); United States v. Rodriguez, 2007 WL 466752 *43 (D. N.D. Feb. 12, 2007) ("The Court recognizes that execution impact evidence is relevant mitigating evidence under the Federal Death Penalty Act.").

Several state supreme courts have also accepted this reasoning. For example, in State v. Stevens, 879 P.2d 162 (Or. 1994), the court reversed a death sentence because the defense had been prevented from asking the defendant's wife whether it would be better for their daughter if he lived in prison for the rest of his life rather than being executed. See id. at 576. The witness's answer, said the court, would have offered "circumstantial evidence" about "defendant's character or background":

---

ignore.

152

> A rational juror could infer . . . that she believed that her daughter would be affected adversely by defendant's execution because of something positive about his relationship with his daughter and because of something positive about defendant's character or background.

Id. at 584-85.

Similarly, in People v. Ochoa, 966 P.2d 442, 505-06 (Cal. 1998), the court held: "A defendant may offer evidence that . . . family members or others" close to the defendant "want him or her to live . . . . this evidence is relevant because it constitutes indirect evidence of the defendant's character," *i.e.*, that "he must possess redeeming qualities" to have engendered such feelings.

Commentators have uniformly invoked the same rationale to defend the admissibility of such evidence.[95]

---

[95] See, e.g., P. Forster, An Argument for the Admissibility of Execution Impact Evidence in Pennsylvania, 67 U. Pitt. L. Rev. 429, 441 (Winter 2005) ("Execution Impact Evidence is a form of character evidence"); W. Logan, When Balance and Fairness Collide: An Argument for Execution Impact Evidence in Capital Trials, 33 U. Mich. J. L. Ref. 1, 35 (Fall 1999 & Winter 2000) (execution impact "powerfully conveys the quality, depth, and range of emotional attachments enjoyed by capital defendants, mitigating evidence universally deemed highly relevant to death decisions"); T. Thomas, Execution Impact Evidence in Kentucky: It Is Time to Return the Scales to Balance, 27 N. Ky. L. Rev. 411, 428 (2000) ("execution impact evidence is evidence related to the defendant's character"); K. Norgard, What About Our Families?  Using the Impact on Death Row Defendants' Family Members as a Mitigating Factor in Death Penalty Sentencing Hearings, 26 Fla. St. U. L. Rev. 119, 1149 (Summer 1999) ("a person's character should be measured, at least in part, by how that person's death will affect his family");  D. Katzin, The Relevance of 'Execution Impact' Testimony as Evidence of Capital

**2.** **The future value to his family of keeping Troya in their lives, and the harm they would suffer if he were executed, also constituted relevant mitigation in its own right.  Thus, the court erred by excluding evidence about this, and worse, by instructing the jury to ignore it entirely.**

Even to the extent that the future benefits of their relationships with Troya, and, conversely, the future loss from his execution, had to do with his relatives rather than his own character, it still constituted relevant mitigation.  Accordingly, the court erred by not only excluding testimony on this, but also specifically directing jurors to *disregard it entirely*.  This is even worse than when a charge provides jurors with "no vehicle" to weigh relevant mitigation      which still violates the Eighth Amendment.  Penry v. Lynaugh, 492 U.S. 302, 326, 328 (1989), overruled on other grounds, Atkins v. Virginia, 536 U.S. 304 (2002).  See also Hitchcock v. Dugger, 481 U.S. 393, 396-97 (1987).

This Court, in a FDPA case, validated the government's use of aggravating evidence about how the sentence would affect third parties, not because this shed light on anything about the defendant or the victim, but rather because those consequences carried independent significance.  In United States v. Battle, 173 F.3d 1343 (11th Cir. 1999), which involved an inmate's killing of a prison guard,

---

Defendants' Character, 67 Fordham L. Rev. 1193, 1212-13 (1998) ("'execution impact' is evidence of character," for it permits jurors to infer that "[i]f the defendant did not possess good character, then people would not miss him").

154

the Court rejected a defense challenge to sentencing testimony from other guards about how a *life* sentence would undermine discipline and security at the prison through its effect "on the prison population."  See id. at 1348-49.

A defendant must be entitled to rely on the same kind of third-party sentencing impact as direct mitigation.  See Marshall v. Hendricks, 313 F. Supp. 2d 423, 456-57 (D. N.J. 2004) (evidence of the "harmful impact [defendant's] execution would have on his family, particularly his then fifteen-year old son" would have been important mitigation), aff'd, 428 F.3d 452, 470 (3rd Cir. 2005).  Cf. United States v. Sinisterra, 600 F.3d 900, 909 (8th Cir. 2010) (no error where "[t]he prosecutor's closing argument did not direct the jury to disregard the mitigation evidence that Sinisterra's execution would have a negative effect on his children").[96]

Indeed, the FDPA itself supports this view, for it further broadens the

_____

[96] Decisions from the Fifth and Ninth circuits, applying the deferential habeas standard, have ruled against inmates on the ground that, absent a directly controlling Supreme Court decision, it was not "objectively unreasonable" for a state court to exclude "execution impact."  Stenson v. Lambert, 504 F.3d 873, 892 (9th Cir. 2007); Jackson v. Dretke, 450 F.3d 614, 618 (5th Cir. 2006).  (The government cited Jackson to the district court.  (DE1103-15)).  As the Supreme Court recently reiterated, a prior habeas decision that a particular view of the law was not objectively unreasonable does not necessarily say anything about "whether such a view would be correct under the law" in a direct appeal.  J.D.B. v. North Carolina, 131 S. Ct. 2394, 2405 (2011) (holding incorrect a view of the law that, in a case seven years before, it had found was not objectively unreasonable).

expansive Eighth Amendment standard for mitigation.  It lists, as an illustrative mitigating factor, one going well beyond the defendant and the offense, namely, that an equally culpable codefendant will not face the death penalty.  18 U.S.C. § 3592(a)(4).  And its language envisions that there will be mitigation that extends beyond the catch-all provision ("Other factors in the defendant's background, record, or character . . ."). See 18 U.S.C. § 3592(a) (list of illustrative factors, including catch-all, is prefaced by requirement that "finder of fact shall consider any mitigating factor, *including the following* . . .") (emphasis added); 18 U.S.C. § 3593(c) ("information may be presented as *to any matter relevant to the sentence, including* any mitigating . . . factor permitted or required to be considered under section 3592") (emphasis added).

Citing these provisions, a number of district courts have held that, under the FDPA, relevant mitigation goes *beyond* the defendant's character and record and the circumstances of the offense. See, e.g., United States v. Caro, 433 F. Supp. 2d 726, 727-28, aff'd in part and rev'd in part on other grounds, 461 F. Supp.2d 459 (W.D. Va. 2006); United States v. Bodkins, 2005 WL 1118158 *8 (W.D. Va. May 11, 2005); United States v. Sampson, 335 F. Supp. 2d 166, 194-95 (D. Mass. 2004); United States v. Bin Ladin, 156 F. Supp. 2d 359, 370 (S.D.N.Y. 2001); United States v. Davis, 132 F. Supp. 2d 455, 464-65 (E.D. La. 2001).

156

Furthermore, to bar consideration of forward-looking family-relationship evidence on a theory it does not directly bear on the defendant's culpability would fly in the face of well-established law and practice allowing aggravating evidence of a capital defendant's future dangerousness.  Jurors may weigh such dangerousness even to the extent it flows from factors outside the defendant's control (*e.g.*, mental illness, age, gender, *etc.*) and therefore irrelevant to his moral blameworthiness.  See Penry v. Lynaugh, 492 U.S. 302, 324 (1989); Buck v. Thaler, 132 S. Ct. 32, 33 (2011) (Statement of Alito, Scalia & Breyer, JJ., respecting denial of certiorari).

In that sense, execution-impact mitigation simply mirrors future-danger aggravation: each calls upon jurors to make a utilitarian calculus about how allowing the defendant to live in prison (rather than executing him) would affect those around him.[97]  In fact, the Supreme Court has expressly acknowledged the constitutional relevance of evidence that seeks to "convinc[e] the jury that [the

---

[97] In contrast to future-dangerousness predictions, one cannot doubt the reliability of family-member testimony about the loss and suffering that will result from a loved one's execution.  Numerous interviews with relatives of executed inmates show they experience wrenching emotional and physical trauma and often mental-health problems.  See Susannah Sheffer & Renny Cushing, Creating More Victims: How Executions Hurt the Families Left Behind     A Report by Murder Victims' Families for Human Rights, (2006), available at http://www.fcnetwork.org/reading/executions.pdf.

defendant] should be spared the death penalty because he would pose no undue danger to his jailers or fellow prisoners *and could lead a useful life behind bars*." Skipper v. South Carolina, 476 U.S. 1, 6-7 (1986) (emphasis added).  It is difficult to justify licensing jurors to consider only one side of this equation (the likelihood the defendant would threaten staff or fellow prisoners) and not the other (the likelihood he would benefit his loved ones).  See Jackson v. Dretke, 450 F.3d 614, 620 (5th Cir. 2006) (Dennis, J., dissenting) ("Testimony that a defendant is beloved and valued by family and friends outside of prison is directly relevant to the question of whether he can lead a 'useful life' if sentenced to life imprisonment because it tends to show that other people consider the defendant valuable as a human being and would benefit from the defendant's survival.").  Yet just that disparity was at work in Troya's sentencing hearing.[98]

Thus, it is not surprising that, as noted, the prevailing practice in federal capital cases is to permit consideration of the harm the defendant's execution

---

[98] Here, although future dangerousness was not explicitly identified in the sentencing instructions as an aggravating factor, nevertheless, through various testimony and argument, the government was able to convey to jurors that, if sentenced to life, Troya might act violently in prison or even escape and threaten the community.  See Point III.B, C, *ante*.  The government also relied on another future prediction, improperly promising that it would continue investigating Varela for the murders and eventually prosecute him capitally, and so jurors need not concern themselves with the key mitigating factor that an equally culpable codefendant was not facing the death penalty.  See Point IX, *post*.

would cause to his family and close friends.   Or that a number of additional states

have allowed "execution impact" in capital sentencing.[99]  Or that the A.B.A.

Guidelines, a recognized standard for adequate representation, instructs capital

lawyers to consider calling "[w]itnesses who can testify about the adverse impact

of the client's execution on the client's family and loved ones."  A.B.A. Guidelines

for the Appointment and Performance of  Defense Counsel in Death Penalty Cases,

Guideline 10.11.F.4, reprinted in, 31 Hofstra L. Rev. 913, 1056 (Summer 2003).

Indeed, so well-established is the use of such mitigation that Justices Scalia

---

[99] See, e.g., Richmond v. Lewis, 506 U.S. 40, 44 (1992) (Arizona sentencing court found mitigator that "the Defendant's family . . . will suffer considerable grief as a result of any death penalty that might be imposed"); Thessing v. State, 230 S.W.3d 526, 544 (Ark. 2006) (trial court submitted mitigating factor that "if Billy Thessing is executed, this will have a tremendous detrimental effect on his son"); State v. Wise, 596 S.E.2d 475, 481 (S.C. 2004) ("A close relative of a defendant, such as his sister, may be asked whether she wants the defendant to die, which is akin to asking her to make a general plea for mercy"); Lugo v. State, 845 So. 2d 74, 115 (Fla. 2003) ("the impact that Lugo's execution would have on his mother and children is properly cognizable" as a mitigating factor); State v. Simmons, 944 S.W.2d 165, 189 (Mo. 1997) (noting with approval that "defense counsel raised [with jurors] the issue of the impact of the death sentence on Simmons's family"); State v. Rhines, 548 N.W.2d 415, 446 (S.D. 1996) (noting defendant's sisters testified about "the negative effect his death would have on their family");  Lawrie v. State, 643 A.2d 1336, 1339 (Del. 1994) (sentencing court considered mitigator that "Lawrie's execution would have a substantially adverse impact on his seven-year old son"); Romine v. State, 305 S.E.2d 93, 101 (Ga. 1983) (witness's "testimony that he did not wish to see his grandson die would have been admissible in mitigation and the trial court's opinion to the contrary was wrong").

and Thomas have characterized a defense built on testimony "that sentencing

[defendant] to death would devastate his family and friends" as a perfectly

"reasonable mitigation theory."  Sears v. Upton, 130 S. Ct. 3259, 3268 (2010)

(Scalia & Thomas, JJ., dissenting).[100]  So, now, has a majority of the Court.  See

Cullen v. Pinholster, 131 S. Ct. 1388, 1409 n.19 (2011) (mitigation defense

focused on "creating sympathy for the defendant's family," was reasonable

strategy . . . . "the whole premise of the family-sympathy defense is *the family's*

*interest*").

Nor is third-party impact evidence unique to capital litigation.  In ordinary

federal sentencing, courts of appeal have recognized that a judge may consider the

harm that incarceration will cause the defendant's children or other dependent

relatives, as an aspect of the defendant's "history and characteristics,'" 18 U.S.C. §

3553(a)(1), and, thus, the basis for a more lenient sentence.  See, e.g., United States

v. Menyweather, 447 F.3d 625, 634 (9th Cir. 2006), abrogation on other grounds

recognized, United States v. Munoz-Camarena, 621 F.3d 967, 969 (9th Cir. 2010);

United States v. Cage, 451 F.3d 585, 595 (10th Cir. 2006), abrogation on other

grounds recognized, United States v. Huckins, 529 F.3d 1312, 1318 (10th Cir.

---

[100] The majority and dissent in that case parted ways over whether the defendant was prejudiced by his lawyers' failure to discover and present additional mitigation.

2008); United States v. Blackie, 548 F.3d 395, 399 (6th Cir. 2008).

Here, though, the court not only excluded testimony on the subject; its instruction directed jurors to *ignore entirely* the future implications of the sentence for Troya's family. Surely, the court here should not have narrowed the scope of the mitigation he could present or have jurors consider, from that available to a noncapital defendant. See Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (capital defendant has more fundamental, constitutional right to present mitigation because "[d]eath, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two").

A few state decisions have disapproved of execution impact as a matter of parity, noting that, in those cases or jurisdictions, victim-impact aggravation was not permitted.[101] But, as discussed in the next section, the government operated under no such restriction in Troya's case.

**C.     Because the court allowed significant, emotional victim-impact evidence, its drastic narrowing of mitigation from Troya's family also violated his right to due process.**

Victim-impact evidence, in general and as presented in Troya's case, puts the lie to the court's theory that any testimony from his relatives about the harm

---

[101] See, e.g., State v. Stenson, 940 P.2d 1239, 1280 (Wash. 1997); Smith v. Commonwealth, 734 S.W.2d 437, 451-52 (Ky. 1987).

they would experience if he were executed would have told the jury only something about them, but nothing about him.  The core premise of allowing family members to testify, as they did here, about the grief and loss *they* suffer is that this illuminates the victim's unique individuality.  The same must be true of execution-impact testimony.  Thus, to exclude one while admitting the other creates an imbalance that violates fundamental unfairness and due process.

Here, the government presented a substantial victim-impact case. (DE823:8100-8119, 8121-8147; GX1301.1-1301.12).  It was not limited to direct descriptions of the victims' character and background.[102]  In addition, Lou Escobedo's older sister and Yessica Escobedo's mother, younger sister, and aunt offered broad-ranging, dramatic testimony about how their deaths and those of their two young sons had affected and would continue to affect their families in the future, directly and indirectly.  For example, jurors heard from these witnesses about how shocked and grief-stricken they were on learning of the murders. (DE823:8106-08, 8118, 8137-42).  They also described the continuing emotional pain of the victims' deaths, the destructive effects on the family as a whole, and what they would miss most about the victims in the future.  (DE823:8108-10,

---

[102] Indeed, the government offered relatively little testimony about Lou Escobedo's character, perhaps because the evidence showed that he was a large-scale drug supplier who had put his family in harm's way.

8119, 8130-31, 8143-45).

The reason all this testimony was admitted is that portraying the deceased as an "individual" requires considering the "unique loss" her survivors will suffer from her death.  Payne v. Tennessee, 501 U.S. 808, 825 (1991).  "[V]ictims are not human islands, but individuals with parents or children, spouses or friends or dependents.  [Every killing] threatens an association of others, who may be distinctly hurt."  Id. at 838 (Souter & Kennedy, JJ., concurring).  Accordingly, such future "consequences" to relatives have "direct moral relevance," and it would be "arbitrary" for the sentencer not to take account of them.  Id. at 838-39.

The Supreme Court also allowed victim impact to avoid "unfairly weight[ing] the scales in a capital trial."  Id. at 822.  "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer . . . that the victim is [also] an individual whose death represents a unique loss . . . in particular to his family."  Id. at 825 (internal quotation omitted).

Not surprisingly, then, some judges have recognized the contradiction between allowing victim-impact aggravation while keeping out analogous "execution-impact" mitigation.  See, e.g., Jackson v. Dretke, 450 F.3d 614, 621 (5th Cir. 2006) (Dennis, J., dissenting) (exclusion of execution impact was

163

particularly unfair where "the State introduced potent evidence of the effects of the murders on the victims' relatives"); Wilcher v. State, 697 So. 2d 1123, 1144 (Miss. 1997) (Sullivan, P.J., & McRae, J., dissenting) ("I cannot agree with the majority that allows victim impact statements but does not allow a defendant's family to testify as to the impact upon them of the defendant's execution."). See also State v. Rhines, 548 N.W.2d 415, 446 (S.D. 1996) (analogizing execution impact to victim impact and holding that both were properly presented below).

Troya's case vividly demonstrates just how such a double-standard "unfairly weight[s] the scales," Payne, 501 U.S. at 822, and creates an "unequal playing field," Wilcher, 697 So. 2d at 1144. This hardly represents the parity the Supreme Court intended in Payne.

**D.     The court's exclusion of execution impact and its instruction to jurors to ignore such mitigation seriously prejudiced Troya.**

Here, the court's evidentiary rulings and instruction combined to place the entire future-oriented subject of Troya's relationships with his relatives and the loss they would suffer from his execution out of bounds.

Because of that, even the limited family evidence Troya was able to present may have backfired. The court' instructions never disclosed that it had curtailed the relatives' testimony. Thus, jurors may well have inferred that these witnesses had no deep bond with him    perhaps even that their appearance in court had been

164

pressed on them by Troya or his lawyers.  Otherwise, jurors must have wondered, why would the relatives have testified so unemotionally, rather than about how devastated they would be if he were executed — much as the victims' relatives had, and as any person would if a truly loved one were on trial for his life?  See Marshall v. Cathel, 428 F.3d 452, 471 (3rd Cir. 2005) ("[s]urely the jury was left wondering why the sons would not have pled for their father's life, and could have reasonably drawn a negative inference" from the absence of such testimony).

The errors in keeping Troya's jury from hearing and considering relevant mitigation require a new capital sentencing hearing.  Such errors are structural and thus not subject to harmless-error analysis.  See Nelson v. Quarterman, 472 F.3d 287, 314-15 (5th Cir. 2006); Davis v. Coyle, 475 F.3d 761, 774-75 (6th Cir. 2007).  But see Gore v. Dugger, 933 F.2d 904, 905 (11th Cir. 1991) (*per curiam*) (noting that "disagreement remains with respect to the issue of the scope of the harmless error doctrine" when mitigating evidence is wrongfully excluded).[103]  "[T]he Supreme Court has *never* . . . given any indication that harmless error might apply in its long line of . . . cases addressing the jury's ability to give full effect to a

---

[103] Admittedly, in subsequent habeas cases, this Court has frequently subjected such errors to harm analysis.  See, e.g., Bolender v. Singletary, 16 F.3d 1547, 1567 (11th Cir. 1994).  But that is not precedent for doing so on direct appeal.  Even if it were, Troya challenges it here to preserve the issue for *en banc* or Supreme Court review.

capital defendant's mitigating evidence." Nelson, 472 F.3d at 314-15 (citing cases). To the contrary, it has suggested that reviewing courts may not substitute their moral judgment for the jury's, except "insofar as evidence of a trivial feature of the defendant's character . . . is unlikely to have any tendency to mitigate" the sentence. Id. at 310, quoting Tennard v. Dretke, 542 U.S. 274, 286 (2004). Obviously, the value of Troya's future relationship with his family and the harm his execution would cause them was hardly trivial.

Even were harm analysis permissible, these errors still would require reversal because the government cannot prove "beyond a reasonable doubt" that they had no effect on the sentencing verdict. See Satterwhite v. Texas, 486 U.S. 249, 257-58 (1988); 18 U.S.C. § 3595(c)(2).

The record indicates that jurors viewed Troya's as a close case for death, and had ample basis for doing so. See Point III.E., *ante*. And the Supreme Court has recognized that the omission of additional, important mitigation can be reversible, even in a highly aggravated case (and even under the more difficult standard for ineffective-counsel claims). See, e.g., Porter, 130 S. Ct. at 448-49 (defendant committed home invasion and, with substantial premeditation, shot to death two victims); Rompilla v. Beard, 545 U.S. 374, 377-78, 383 (2005) (defendant, who had prior rape and assault convictions, repeatedly stabbed and set fire to victim).

166

Notably, even highly aggravated cases frequently end in life verdicts in federal court, including ones, like this, involving multiple murders and child victims. See, e.g., United States v. Kehoe, No. 97-243 (E.D. Ark.) (murders of man, his wife, and their eight-year old child); United States v. Minerd, No. 99-215 (W.D. Pa.) (murders of woman, her three-year old daughter, and her unborn child).

Here, it might have made a difference had the jury heard and been told to consider execution-impact mitigation, rather than being thrice warned against it. As noted, five of the six FDPA cases in which execution-impact mitigation was allowed in this Circuit ended in life sentences. Moreover, empirical studies of actual capital jurors reveal that they often find such evidence compelling, and it sometimes proves decisive to their votes against a death sentence. See, e.g., Scott E. Sundby, The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony, 83 Va. L. Rev. 1109, 1152-56 (Sept. 1997). To cite just one example, execution-impact testimony by the defendant's sister had a "profound" effect on the jury; "every juror interviewed characterized it as highly influential." One juror, "who had been a holdout for death because of the circumstances of the crime," identified "the effect the death penalty would have" on the defendant's family "as what persuaded him to vote for life": "I think that was the most mitigating thing that would lead us away from the death penalty

167

just how it was devastating to the defendant's family.  That basically, having him put to death is just going to create more victims."  Id. at 1154-55.

Accordingly, the Court should reverse Troya's death sentences and order a new capital sentencing hearing.

## V.

**No legally sufficient evidence supported the jury's important aggravation findings that Troya had substantially planned and premeditated the murders of the two child victims and that he did so to eliminate them as witnesses.**

The Federal Death Penalty Act mandates that, in every direct capital, the "court of appeals shall address . . . whether the evidence supports the special finding of the existence of an aggravating factor required to be considered under section 3592."  18 U.S.C. § 3595(c)(1).  Although Section 3592 lists certain "statutory" aggravating factors, see 18 U.S.C. § 3592(c)(1)-(16), the review requirement of Section 3595(c)(1) applies to all jury aggravation findings, including those of "non-statutory" factors.  See United States v. Davis, 609 F.3d 663, 674 (5th Cir. 2010); United States v. Allen, 247 F.3d 741, 795 (8th Cir. 2001), vacated on other grounds, 536 U.S. 953 (2002); United States v. Webster, 162 F.3d 308, 319, 353-54 (5th Cir. 1998).

Under the well-established standard for sufficiency review, the proof on the substantial-planning and witness-elimination factors fell short in Troya's case.

168

For, even "viewing the evidence in the light most favorable to the prosecution," no "rational trier of fact could have found the [aggravating factor] beyond a reasonable doubt."  Hallford v. Culliver, 459 F.3d 1193, 1206 (11th Cir. 2006), citing Jackson v. Virginia, 447 U.S. 307 (1979).  Accordingly, the jury's consideration of each factor individually, and both collectively (together with three other factors illegitimately found, see Points VI-VIII, *post*), violated not only Section 3595, but also Troya's right to due process under the Fifth Amendment and his right against cruel and unusual punishment under the Eighth Amendment.  See Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  See also Sochor v. Florida, 504 U.S. 527, 538 (1992) (invalidating death sentence that was based in part on insufficiently proven premeditation aggravator).  The court should reverse Troya's death sentences and remand for a new sentencing hearing.

**A.     The jury relied on findings of the substantial-planning and witness-elimination aggravators.**

A key statutory aggravating factor asserted by the government, and found by the jury, was that Troya had engaged in "substantial planning and premeditation to cause the death" of each of the two children. (DE305:19 20; DE311:3; DE859:7, 16-17; see also DE846:9394-97; DE848:9722-23).  See 18 U.S.C. § 3592(c)(9). Another was that Troya had killed the children "to eliminate them as potential witnesses" to his and Sanchez's other crimes, *i.e.*, the murders of their parents.

169

(DE859:10-11; DE860:10-11; DE848:9728-29).

**B.     There was legally insufficient evidence that Troya substantially planned and premeditated the children's murders, or that his motive was to eliminate them as witnesses.**

There was no proof that Troya had contemplated in advance that the children would be killed, or that he had even known they were in the car with their parents. The government never excluded the possibility that their presence at the scene surprised Troya, and that any involvement he had in their murders was on the spur of the moment. Indeed, as the government itself acknowledged to the jury, the crime-scene evidence suggests the children may even have been collateral casualties, killed by bullets intended for their parents.

There was no direct evidence of an advance intent to kill the children. Instead, the prosecutors asked jurors to infer premeditation from the crime's motives, to rob Escobedo of drugs he was carrying and perhaps also to erase Varela's drug debt to him. (DE766:7134-35). See also Statement of Facts, Section I.C, *ante*. These motives and the events leading up to the incident may have supported the view that Sanchez and Troya too had plotted in advance to kill Escobedo, and perhaps his wife: Erasing the drug debt supposedly required Escobedo's death, and their slayings could have been seen as necessary to accomplish the robbery and prevent retaliation. But neither motive provided any

170

reason to plan to kill Escobedo's three- and four-year old sons.[104] While the government claimed their deaths were part of the plan because they could have recognized Sanchez, whom they had met at Varela's house one day (DE738:4531; DE766:7132, 7137; see also DE847:9498, 9610), there was no evidence they had ever seen or knew Troya, or that he knew they had met Sanchez.

More important, regardless of why the boys were ultimately killed, it is entirely possible they were targeted on the spur of the moment, as there was no evidence that Troya, or even Sanchez, knew in advance that they were with Escobedo.

There was no evidence that, before the shootings, Troya had ever known, met, or even spoken with, Lou Escobedo or anyone in his family, or, for that matter, even knew he had children. True, on the night of the slayings, Troya and Sanchez were in one car and, within a few miles, the Escobedos in another as they traveled up and down the Turnpike. And Sanchez had a number of phone calls with Escobedo during the trip. But the government never proved beyond a reasonable doubt that Sanchez or Troya ever saw or were in a position to see that

---

[104] Indeed, if the goal was to kill Escobedo, why would the defendants have knowingly chosen to do so when he was with his wife and children, thus making the entire venture much more complicated and risky, rather than waiting for an opportunity to confront him alone?

the children were in Escobedo's car along the way: The trip began in the evening and, in any event, a three- and a four-year old child would not have been tall enough to be observed by a trailing automobile, even in daylight and even assuming Sanchez and Troya were close enough to see inside Escobedo's jeep. Nor was there any evidence, or even a suggestion by the government, that the Escobedos had ever gotten out of their car and met up with Sanchez and Troya at some earlier point along the way. And, while Sanchez knew Escobedo had children, the government never explained why he would have suspected they were in the car: After all, who, even among the most cynical of drug dealers, would bring his three- and a four-year old sons along on an eight-hour drive to transport cocaine in the middle of the night? Finally, but also critical, the government did not prove that, even if Sanchez, the only one of the two who spoke with Escobedo on the phone, did know or suspect the children were in jeep, he ever told Troya. See Statement of Facts, Section I.C, *ante*.

The only statement about the children's deaths that the government attributed to Troya also belied premeditation. Carlos Rodriguez testified to having overheard him tell a jail cellmate he had "something on his chest the he want to tell [the cellmate] about . . . . he say he done something very wrong": He had been "involved" in the murders of children; "I had to do it." (DE737:4416-17, 4419-20;

172

see also Point II, *ante*).  Such regret (and the comment, "I had to do it") squared more with spontaneous shootings than premeditated ones.  Cf. Government of Virgin Islands v. Donovan, 335 Fed. Appx. 206, 210 (3rd Cir. 2009) (statement by defendant manifesting lack of remorse was "indicative" of "premeditation").

Notably, the government's summation did not cite a shred of evidence that Troya had planned or premeditated the children's deaths specifically.  Rather, the prosecutors simply lumped all the victims together, and argued that the robbery motive, the cell-phone calls, and the trip up and down the Turnpike demonstrated that the crime as a whole was "a premeditated act" rather than "an impulsive" one. (DE847:9497-98).

In addition, the government's evidence never excluded another scenario at odds with substantial planning and witness elimination: that the children were *never* targeted, on the spur of the moment or otherwise, but rather were killed by shots aimed at their parents.  Indeed, the prosecutors essentially acknowledged this possibility to the jury in their trial and sentencing summations.  See Statement of Facts, Section I.D.2, *ante*.  And there was no reason to want to kill the boys; the crimes against their parents occurred in the dark by the side of the road, and such young children could not have provided a description, even had they been able to see the shooter or shooters.  Indeed, for these reasons, even the witness-elimination

173

factor lacked legally sufficient evidence to support it.

**C.    The jury's reliance on these faulty aggravating factors was prejudicial.**

This absence of legally sufficient proof beyond a reasonable doubt to support the substantial-planning and witness-elimination aggravators cannot be dismissed as harmless beyond a reasonable doubt.  See Satterwhite v. Texas, 486 U.S. 249, 257-58 (1988); 18 U.S.C. § 3595(c)(2).  The jurors engaged in lengthy deliberations, over four days.  Ultimately, they unanimously imposed life sentences on three counts, including one involving all four victims, and death only on the two counts involving just the children.  See Point III.E, *ante*.

Against this backdrop of what the jurors thus viewed as a close case, the death sentences may well have been influenced by the faulty findings that Troya had not only helped kill two innocent young children, but had acted for the basest of motives and, most importantly, after carefully and thoroughly plotting their deaths.  The prosecutor devoted an entire section of his summation to the substantial-planning factor.[105]  (DE847:9493, 9495-98, 9500).  No doubt he did so because he understood that capital jurors often consider premeditation highly

---

[105] He also repeatedly discussed the witness-elimination motive. (DE847:9498, 9501, 9508-10).

aggravating, as empirical studies show,[106] and this Court too has recognized.  See,

e.g., Wood v. Allen, 542 F.3d 1281, 1295 (11th Cir. 2008), aff'd, 130 S. Ct. 841

(2010); Windom v. Sec'y, Dep't of Corrections, 578 F.3d 1227 (11th Cir. 2009).

Accordingly, the Court should reverse Troya's death sentences and order a

new capital sentencing hearing.

## VI.

**Because the child victims were not more vulnerable than the adult ones to being killed by surprise gunshots from close range, nor were they targeted because they were children, their youth had no logical connection to their deaths.  Thus, the evidence was legally insufficient to support the statutory aggravating factor that they were "particularly vulnerable due to their youth," and so the jury's reliance on it was error.**

In sentencing Troya to die on the two capital counts involving the children,

the jury found and weighed the statutory aggravating factor that each "victim was

particularly vulnerable due to old age, youth, or infirmity."  18 U.S.C. §

3592(c)(11).  (DE859:8).

But this aggravating factor requires a logical connection between the

---

[106]  See, e.g., John Blume et al., Lessons from the Capital Jury Project, Chapter 5 in Beyond Repair?  America's Death Penalty, at 151-52 (Duke University Press 2003); William J. Bowers et al., Foreclosed Impartiality in Capital Sentencing: Jurors' Predispositions, Attitudes and Premature Decision-Making, 83 Cornell L. Rev. 1476, 1504 (1998); Theodore Eisenberg, et al., But He Was Sorry: The Role of Remorse in Capital Sentencing, 83 Cornell L. Rev. 1599, 1617 (1998).

victim's vulnerability and the murder.  In other words, the vulnerability must have somehow way facilitated the killing.  If it was simply irrelevant, so that a similarly situated non-vulnerable person clearly would have suffered the same fate, then the aggravator does not apply.  And that was unquestionably true here, given the circumstances.[107]

Federal courts that have considered this aggravator have interpreted it to require such a nexus.  See United States v. Mikos, 539 F.3d 706, 717 (7th Cir. 2008) (sufficient evidence that victim's "obesity contributed to her demise");[108] United States v. Johnson, 136 F. Supp. 2d 553, 560 (W.D. Va. 2001) (victim-vulnerability aggravator struck where "no . . . nexus" between victim's pregnancy and her murder); United States v. Roman, 371 F. Supp. 2d 36, 47-48 (D.P.R. 2005) ("vulnerable-victim aggravator focuses on . . . the nexus between [victim's]

---

[107] The FDPA requires this Court consider the legal sufficiency of the supporting evidence for this aggravating factor.  Circuit precedent provides that the test is whether, viewing the evidence in the light most favorable to the prosecution, could a rational trier of fact have found the factor beyond a reasonable doubt.  See Point V, *ante*.

[108] In Mikos, Judge Posner dissented, saying the evidence showed the victim would have been killed no matter how mobile she was, and thus "missing from this case is evidence that the victim's vulnerability did contribute to her death."  Id. at 721.  The majority agreed that if "the first sign of the attack" had been the shooting, "then her disability would indeed be immaterial.  But Mikos instead entered her apartment and walked up to her chair.  She was powerless to escape, because she was unable to rise . . . . her physical condition made her a sitting duck."  Id. at 717.

characteristics and the cause of death," citing Johnson); United States v. Jacques,

___ F. Supp. 2d ___, 2011 WL 1675417, *21 (D. Vt. May 4, 2011) ("there must be

a connection between the victim's vulnerability and the offense committed upon

the victim").[109]  See also 1 Leonard B. Sand, *et al.*, Modern Federal Jury

Instructions    Criminal, Inst. 9A-14, Comment (2008) ("aggravating factor

should not pertain to situations where a victim is killed due to a circumstance

entirely unconnected to the person's vulnerability").

Moreover, this Court has also required a nexus between the victim's

vulnerability and the particular crime in applying a similar provision in the

Sentencing Guidelines permitting enhancement "[if] the defendant knew or should

have known that the victim of the offense was a vulnerable victim . . . ."  U.S.S.G.

§ 3A1.1(b)(1).  The enhancement is permissible when the characteristic rendered

---

[109] In other cases where this factor has been approved, such a nexus had been established.  See, e.g., United States v. Sampson, 486 F.3d 13, 48-49 (1st Cir. 2007) (sufficient evidence that victim's obesity and recent open-heart surgery "easily could have contributed to his death"); United States v. Paul, 217 F.3d 989, 1001 (8th Cir. 2000) (victim was 82 and physically unable to resist attackers who robbed and beat him); United States v. Natson, 444 F. Supp. 2d 1296, 1306 (M.D. Ga. 2006) (government's claim that victim's pregnancy "made her less able to escape and avoid the attack that resulted in her death" held "sufficient to withstand" pretrial motion to dismiss); United States v. Taylor, 316 F. Supp.2d 730, 738-39 (N.D. Ind. 2004) (refusing to dismiss aggravator for defendants charged with robbery-murder of storeowner who was "an elderly man with substantial hearing loss and a pacemaker" whose "ability to fend off or flee his attackers would have been minimized by his age and physical limitations").

the victim "particularly susceptible to the criminal conduct" in the case at hand. United States v. Bradley, 644 F.3d 1213, 1288 (11th Cir. 2011), quoting U.S.S.G. § 3A1.1, comment. (n.2).[110]

Thus, for example, a cab driver is not vulnerable *per se*, but has been held to be particularly susceptible to a carjacking where he was "obliged to drive to the rather deserted neighborhood . . . and then admit two strangers" to his vehicle. United States v. Malone, 78 F.3d 518, 522 (11th Cir. 1996). For the same reasons, age alone is generally regarded as "insufficient to render an individual unusually vulnerable." United States v. Day, 405 F.3d 1293, 1296 (11th Cir. 2005) (internal quotation omitted); United States v. Long, 935 F.2d 1207, 1211 (11th Cir. 1991) ("a judgment as to vulnerability is not reducible to a calculation of the victim's age") (internal quotation omitted), superseded on other grounds by statute as stated in United States v. Yount, 960 F.2d 955 (11th Cir. 1992).

Here, even construing the evidence in the light most favorable to the government, no such nexus was ever established between the youth of the two child victims and their murders. Lou Escobedo appears to have been caught

---

[110] Indeed, this Court has interpreted the Guidelines enhancement to further require that the victim have been selected at least in part based on that susceptibility. Bradley, 644 F.3d at 1288. See also United States v. Yount, 960 F.2d 955, 957 (11th Cir. 1992). That obviously was not true here.

178

unaware by the attack.  According to the government, he was duped into stopping at a dark, unfamiliar deserted area off the side of the highway for what he thought was an innocuous purpose.  Then, theorized prosecutors, Troya and Sanchez ambushed the victims, firing multiple gunshots at them from close range.  The bodies of all of them, adults and children, were found grouped together.  See Statement of Facts, Section I.C, *ante*.

Thus, that two of them were young boys had nothing to do with the fate they suffered.  They could have done nothing to resist or flee from this sudden and lethal assault even had they been able-bodied adults, like their parents.[111]  See, e.g., Johnson, 136 F. Supp. 2d at 560 ("Nothing about Ms. Baker's physical condition weakened her capacity to resist the fatal blast.").  Cf. United States v. Bourgeois, 423 F.3d 501, 504, 510-11 (5th Cir. 2005) (statutory vulnerability aggravator properly focused jury on "whether" two-year old victim was "especially vulnerable to Bourgeois' attack," in which he "grabbed her by her shoulders and slammed the back of her head . . . four times").

The jurors' mistaken reliance on the victim-vulnerability factor, despite

---

[111] Moreover, the Escobedo children obviously were not selected as victims because they were children; rather, even the government claimed only that they were killed because they happened to be with their father, and the defendants did not want to leave any witnesses.  See Statement of Facts, Section I.C, *ante*.

179

legally insufficient evidence, cannot be dismissed as harmless beyond a reasonable doubt. See Satterwhite v. Texas, 486 U.S. 249, 257-58 (1988); 18 U.S.C. § 3595(c)(2). They imposed death sentences only on the two counts involving just the children's murders, and life sentences on all the other counts, including one involving all the victims and all the aggravating factors. This, together with their lengthy deliberations, over four days, suggests jurors viewed the case for death as a close call. See Point III.E, *ante*. The *only* aggravating factor permitting consideration of the children's youth was the vulnerability one. (FDPA does not include any aggravator that embraces a victim's age). Had jurors discounted this factor, as they should have because it was not proven, that could have weakened the case for death sufficiently to tip the balance and prompt a life verdict on these two counts as well.

## VII.

**There was no evidence the children were killed in order to steal the cocaine in Escobedo's jeep. Accordingly, there was legally insufficient proof to support the statutory aggravating factor that Troya murdered the children for pecuniary gain.**

Another statutory aggravating factor under the FDPA applies when "the defendant committed the offense . . . in the expectation of the receipt of anything of pecuniary value." 18 U.S.C. § 3592(c)(8). Troya's jury also weighed this in sentencing him to death on the two counts involving just the children, finding the

180

factor specifically for the killings of both Luis Damian and Luis Julian. (DE859:6).

Here again, however, those findings lacked legally sufficient supporting evidence.[112]  What was needed to establish the pecuniary-gain factor was proof that the actual killing of each boy     and not simply the underlying carjacking or the killings of Lou Escobedo and his wife     was committed in order to steal the cocaine from Escobedo's jeep, some of which Troya and Sanchez personally profited from.  But this was absent from the record, and not even asserted by the government.  (See DE818:7923; DE849:9494, 9508: Government tells jury, in opening statement and summation, that this factor was proven by Troya's statement to a friend that he had "licked" someone for "15 kilos").

The word "offense," as used in Section 3592(c)(8), refers to the killing of the victim, not to an accompanying felony, such as robbery.[113]  United States v. Brown, 441 F.3d 1330, 1370 (11th Cir. 2006); United States v. Mitchell, 502 F.3d 931, 975 (9th Cir. 2007); United States v. Barnette, 390 F.3d 775, 805-06 (4th Cir. 2004),

_____

[112] The FDPA requires this Court consider the legal sufficiency of the supporting evidence for this aggravating factor.  Circuit precedent provides that the test is whether, viewing the evidence in the light most favorable to the prosecution, could a rational trier of fact have found the factor beyond a reasonable doubt.  See Point V, *ante*.

[113] See also DE848:9722 (sentencing jury instructed that defendant must expect pecuniary gain "from the victim's death").

vacated on other grounds, 546 U.S. 803 (2005).  Thus, for this aggravator to apply, the defendant must have expected to obtain something of pecuniary value as a "direct result" of the victim's death.  United States v. Bolden, 545 F.3d 609, 615 (8th Cir. 2008); United States v. Bernard, 299 F.3d 467, 483 (5th Cir. 2002); United States v. Chanthadara, 230 F.3d 1237, 1263-64 (10th Cir. 2000).  It is not sufficient that the defendant killed to prevent the victim "from reporting" the felony "to the police."  Bernard, 299 F.3d at 483.  See also Bolden, 545 F.3d at 615 (factor does not apply where victims are killed "to eliminate them as witnesses"); Mitchell, 502 F.3d at 975 (same, if murder committed "to cover up a crime").

Thus, where, as here, the killing and an accompanying robbery occur close in time, the issue is whether the "jury could properly infer" that the murder was committed "for the express reason to effect the robbery" or was "necessary so that" the defendant could "complete the robbery."  Brown, 441 F.3d at 1370-71 (citation omitted).  In that case, the defendant had vaulted over a postal counter, and stabbed the clerk to death, before making off with money orders he had asked her to print. Noting that the clerk had defensive wounds, this Court concluded that a reasonable jury could have concluded she "was struggling and that Brown had to kill her in order to successfully complete the robbery."  Id. at 1371.  Critically, while the Court observed that the stabbing occurred before the defendant gained control of

182

the money orders, it ultimately relied on the logical relationship between the robbery and the killing, rather than just the temporal one. Id.

Other circuits have engaged in the same kind of analysis in approving a jury's finding of pecuniary gain. See, e.g., Bolden, 545 F.3d at 616 (evidence supported inference that defendant shot guard outside bank, before he could enter, "to remove an obstacle to completing the robbery"); Barnette, 390 F.3d at 781, 807-08 (same, for inference that defendant shot driver of car, whom he had ordered out at gunpoint, in order to complete carjacking, especially given defendant's confession that he shot because he thought victim was "going to stop me" from taking the vehicle).[114]

In Troya's case, though, there was absolutely no evidence that killing the two children was necessary or even useful in effecting the theft of Escobedo's jeep and the cocaine it contained     or that the defendants would have perceived it as such. All of the victims were shot and killed after they had already gotten out of the jeep. Whatever may be said about the murders of Lou Escobedo and his wife,

---

[114] See also Congressional Research Service, The Death Penalty: Capital Punishment Legislation in the 110th Congress, at 22 n.5 (Sept. 7, 2007) (in supporting proposal to expand pecuniary-gain aggravating factor     which Congress declined to pass     Justice Department acknowledged it only applies "when the murder, as viewed by the defendant, is necessary to initially secure the pecuniary gain").

183

the three- and four-year old boys posed no obstacle to making off with the vehicle and the drugs.  Indeed, the government never claimed otherwise, but rather argued only that the children were killed to eliminate them as witnesses.  See Point V, *ante*.  Yet, as discussed above, a witness-elimination motive has been held legally insufficient to establish this aggravating factor.[115]

Here, as with the jury's faulty findings of the substantial-planning and vulnerable-victim aggravators, see Points V, VI, *ante*, its reliance on the pecuniary-gain factor, despite legally insufficient evidence, cannot be dismissed as harmless beyond a reasonable doubt.  See Satterwhite v. Texas, 486 U.S. 249, 257-58 (1988); 18 U.S.C. § 3595(c)(2).  The jury may well have viewed this as a close case, given the length of their deliberations (four days), their split verdicts (life, on the majority of the counts), and the findings of some significant mitigating factors for Troya.  See Point III.E, *ante*.  And, as noted above, the government argued the pecuniary-gain factor in opening statement and in summation at sentencing.  The jurors' mistaken weighing of it, particularly in combination with other illegitimate aggravation findings, may well have helped tip the balance on the two counts for which they voted death.

---

[115] In any event, the government also failed to prove the witness-elimination motive as to Troya.  See Point V, *ante*.

**VIII.**

**The court plainly erred in allowing the jury to base a death sentence on uncharged crimes attributed to Troya without finding, unanimously and beyond a reasonable doubt, that he had committed each (or, indeed, any particular) one of them.**

**A.** **The jury heard testimony accusing Troya of several other serious violent offenses.  But he was never charged with any of those, and the proof against him on each of them was highly questionable.**

At trial, the government presented testimony that, while he was living with Varela, in the months before the Turnpike killings, Troya engaged in several gun crimes for which he was never charged, including a shooting and an attempted shooting of innocent victims in separate incidents on Mercer and Haverhill Avenues, and an attempted armed home invasion against someone nicknamed "B Real."  While other evidence from police investigators confirmed that the shootings occurred, only a single government cooperator, Kevin Vetere, implicated Troya in them.  See Point I.A.1.a, B.1.a, C.1.a, *ante*.  A drug addict known as "Crackhead Kevin," he stayed in Varela's home and helped deliver cocaine."[116] (DE752:5162, 5249).  He was already a twice-convicted felon before he was charged in this case; facing life imprisonment, he received a sentence of only 42 months in return for his cooperation.  See Statement of Facts, Section I.C, *ante*.

---

[116] Interviewed by investigators, he told them: "I take a lot of drugs, so I'm sleeping whenever I can."  (DE753:5756).

At sentencing, the government supplemented Vetere's accusations with testimony from a Yuslena Jarrett, that, several years earlier, she had seen Troya strike his then-girlfriend (a friend of Jarrett's) with a gun during an argument. Troya was never charged with this either, and the government offered nothing whatsoever to corroborate the woman's account.  See Statement of Facts, Section II.A.1, *ante*.

**B.      By inviting jurors to find the "other uncharged violence" aggravator, without unanimous agreement or proof beyond a reasonable doubt as to each or any individual crime, the court's instructions violated the FDPA, due process, and the Eighth Amendment.**

Unlike any other aggravating factor in this case, the one accusing Troya of having "participated in other, uncharged serious acts of violence" collected together several completely unrelated incidents.  See United States v. Kee, 2000 WL 863119, at *7 (S.D. N.Y. June 27, 2000) ("the aggravating factor of participation in other serious acts of violence is merely the aggregation of specific acts").  But the instructions did not require jurors to find proof beyond a reasonable doubt or to be unanimous about any individual act.  Instead, they were only called on to answer the amorphous, global question whether Troya had "participated in other, uncharged serious acts of violence."  (DE859:9; DE848:9728).

Thus, some jurors might have believed that he committed the assault on the girlfriend, to which Jarrett, a non-cooperator, testified.  Others may have believed

186

that he was responsible for the Mercer Avenue shooting, since at least the ballistics evidence matched a gun from Varela's bedroom. See Point I.A.1.a, *ante*. Still other jurors might have been convinced Troya committed one or more acts, but either did not believe that any particular one was proven, or never even tried to figure this out because the instructions did not require it.

These scenarios represent precisely the kind of "unfairness" that led the Supreme Court to condemn a similar charge permitting jurors to find a "continuing series of [drug] violations" in a Continuing Criminal Enterprise case without having to "agree unanimously about which specific violations make up" the series. Richardson v. United States, 526 U.S. 813, 815 (1999). As the Court recognized, one risk of such an instruction is that "permitting a jury to avoid discussion of the specific factual details of each violation, will cover up wide disagreement among the jurors about just what the defendant did, or did not, do." Another is "that jurors, unless required to focus upon specific factual detail, will fail to do so, simply concluding from testimony . . . that where there is smoke there must be fire." Id. at 819.

Accordingly, the Court in Richardson interpreted the CCE statute to require "jury unanimity in respect to each individual 'violation.'" Id. at 824. While acknowledging that a federal jury need not always agree on the *means* by which a

187

crime was committed, id. at 817, citing Schad v. Arizona, 501 U.S. 624, 631 (1991), the Court distinguished this from the fundamental issue of *which* criminal acts the defendant committed. 526 U.S. at 820 ("'We would not permit . . . an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday . . .'"), quoting Schad, 501 U.S. at 632-33 (Scalia, J., concurring). A failure to require specific unanimity in this context would "come close to, or . . . test . . . constitutional limits." 526 U.S. at 820.

Moreover, said Richardson, it would be out of step with history and tradition, including in federal noncapital sentencing: "If one looks to recidivism, one finds that commission of a prior crime will lead to an enhanced punishment only when a relevant factfinder, judge, or jury has found that the defendant committed that specific individual prior crime." Id. at 822.

The FDPA must also be construed to prohibit a mix-and-match verdict on an aggravating factor embracing multiple uncharged crimes. To assure a high degree of confidence in death verdicts, Congress designed the sentencing process to require unanimous decisionmaking beyond a reasonable doubt on concrete, specific facts about the defendant, the capital offense, or the victim, before government allegations may be weighed in favor of a death verdict. Thus, statutory aggravating factors include, for example, that the defendant had

previously been convicted of an offense "resulting in the death of a person," that he

intentionally killed or attempted to kill "more than on person in a single criminal

episode," and that the victim was a specified type of "Federal public servant."  18

U.S.C. § 3592(c)(3), (c)(14)(D), (c)(16).

Neither these nor any of the other enumerated aggravating factors is broad or

amorphous like the "other acts of violence" one here.  Congress required federal

juries to apply the same standards to non-statutory aggravators and statutory ones:

proof beyond a reasonable doubt, and juror unanimity.  See 18 U.S.C. § 3593(c)-

(d).[117]  This suggests it envisioned that nonstatutory factors would similarly consist

of concrete, specific facts, which the government would have to prove with the

same high degree of confidence.[118]  Permitting the government, as here, to create a

kitchen-sink aggravator and invite jurors to find it based on subsidiary facts not

---

[117] These standards are also required under the due process clause of the
Fifth Amendment and the Sixth Amendment's right to jury trial.  See Richardson,
526 U.S. at 819.  See also Johnson v. Louisiana, 406 U.S. 356, 369-371 (1972)
(Powell, J., concurring); Andres v. United States, 333 U.S. 740, 748 (1948) (same).

[118] Congress likely intended the reasonable-doubt and unanimity
requirements to help capital juries safeguard against any significant risk of factual
error.  See In re Winship, 397 U.S. 358, 363 (1970) ("The reasonable-doubt
standard . . . . is a prime instrument for reducing the risk of" verdicts "resting on
factual error."); Kim Taylor-Thompson, Empty Votes in Jury Deliberations, 113
Harv. L. Rev. 1261, 1273 (2000) (empirical studies have found that non-unanimity
rules "discourage[] painstaking analyses of the evidence and steer jurors toward
swift judgments that too often are erroneous or highly questionable").

subject to those (or, indeed, any) standards of proof, contravenes the entire

aggravating-factor scheme and subverts Congress's core intent.

By allowing fragmented, mix-and-match findings of different aggravating

facts by different jurors, the court's charge also violated due process and the

Eighth Amendment's requirement of reliable, non-arbitrary sentencing.

**C.  Troya was seriously prejudiced by the jurors' being licensed to find this aggravator without having to unanimously agree that any particular uncharged crime had been proven beyond a reasonable doubt.**

Although trial counsel did not object on these grounds to submission of the

"other crimes" factor, the error was plain and warrants reversal.  See United States

v. Moriarty, 429 F.3d 1012, 1019 (11th Cir. 2005) (error is plain if "there is (1)

error, (2) that is plain, and (3) that affects substantial rights"; if all three conditions

are met, court may reverse, guided by whether error "seriously affects the fairness,

integrity or public reputation of judicial proceedings").

"An error is plain if it is obvious and clear under current law."  United States

v. Eckhardt, 466 F.3d 938, 948 (11th Cir. 2006).  Between the requirements of the

FDPA and the Supreme Court's decisions in Richardson and Schad, it should have

been apparent that the aggravator violated due process.  In fact, a number of other

district courts have required the government to prove each underlying act

separately when it relies on multiple acts in support of an uncharged-crimes

190

factor.[119]  See United States v. Cooper, 91 F. Supp. 2d 90, 108 (D.D.C. 1990)

(individual acts submitted in support of "pattern of criminal conduct" aggravator

must be proved beyond a reasonable doubt); United States v. Gilbert, 120 F. Supp.

2d 147, 152 n.2 (D. Mass. 2000) ("Government will have to prove the commission

of such crimes beyond a reasonable doubt," citing Cooper); United States v.

Cisneros, 363 F. Supp. 2d 827, 839 (E.D. Va. 2005) ("[T]o make sure that the

requisite indicia of reliability are met, the court will instruct the jurors that they

must conclude beyond a reasonable doubt that each of these offenses occurred in

determining whether Mr. Cisneros was engaged in a pattern of criminal activity.");

United States v. Kee, 2000 WL 863119, at *7 (S.D. N.Y. June 27, 2000) (same

with respect to "other serious acts of violence" aggravator).

The error also caused significant prejudice and affected Troya's substantial

rights and the fairness and integrity of the proceeding.  As discussed, allowing

jurors to pass on broad, duplicitous allegations risks compromising reliable

evaluation of the facts.  Richardson, 526 U.S. at 819.  And that risk was heightened

here, for two reasons.

First, the government's proof of the uncharged crimes was highly

---

[119] Of course, the government is also free simply to allege each uncharged crime in a different aggravating factor.  See, e.g., United States v. Stitt, 760 F. Supp. 2d 570, 585-87 (E.D. Va. 2010).

questionable, and thus it is unlikely that jurors would have all agreed that each had been proven beyond a reasonable doubt. The significantly impeached testimony of Vetere, a government cooperator, represented the only evidence implicating Troya in the Haverhill and Mercer shootings and the attempted home invasion against "B Real." See Point I.A.1.a, A.2.a, A.3.a, *ante*. Similarly, only a single witness, Jarrett, testified that Troya's then-girlfriend had suffered an attack years before and that Troya was responsible; there was no corroborating evidence from the purported victim or any police officer, nor any law-enforcement or medical records, to support her account.[120]

Second, the government's summation arguments, which blended the various uncharged crimes, encouraged the jury to take an impressionist view of Troya's history of violence as a whole (and, indeed, that of both defendants, together) as a powerful justification for a death sentence:

---

[120] In sentencing summation, Troya's counsel questioned Jarrett's account (DE847:9565-66). As to the other uncharged crimes, from the trial, counsel said: "And we know from, also, that Daniel did two other shootings," but that those were part "of the guilt/innocence . . . we know don't by themselves justify the imposition of the death penalty" which, according to counsel, was why the government had offered additional evidence at the sentencing hearing. (DE847:9558-59). It appears counsel inartfully sought to convey "we know" that Vetere had testified to Troya's involvement in two other shootings, not to concede that Troya had actually committed those. Indeed, it would be difficult to imagine a reason for such a concession.

Encapsulating this aggravating factor, the prosecutor argued: "Sanchez and Troya both made conscious choices to pursue a life of crime, a life of violence, unrepentant violence, unremorseful violence without regard to the consequences, and without caring who they injured." (DE847:9507-08). Moments later, he returned to the uncharged allegations of violence ("more attempted murders"), and, in mentioning each incident by name, quipped that, if Troya and Sanchez had shown "good aim" in those, "it would have been eight" victims. (DE847:9516).

The prosecutor continued to hammer this theme, two pages later, again mentioning each incident, noting the victims of the uncharged crimes were "lucky" not to "get killed," and then asking: "How many murders and attempted murders are required before you forfeit your right to exist in this society?" (DE847:9518-19).

The evidence as a whole, said the prosecutor, showed Troya was "the absolute career criminal, brutal career criminal." He "embraced violence, he coveted violence, he continued a life of violence. He is the personification of violence, personification of brutality . . . . He doesn't care who he hurts, when he hurts them, or how he hurts them." (DE847:9629-30; see also DE847:9634: "Here is a man who embraces violence, does not shy away from violence, he is evil . . . . Balance . . . this life of crime, this life of violence . . .").

The error here was ultimately so damaging to the outcome because the "uncharged violence" aggravator played a significant role at sentencing. The prosecutor himself entreated jurors to see that it was "huge in this case." (DE847:9632). And the government dwelt on it at length, not only in the passages quoted above, but elsewhere in opening statement and summation.[121] (See DE818:7924-25; DE847:9501-05, 9615-16, 9631-32).

Given the jurors' split verdicts on the capital counts (including a life sentence for one involving all the victims), the length of their deliberations (over four days), and the substantial mitigating factors they found for Troya, see Point III.E., *ante*, there is a reasonable probability that the death verdicts were influenced by the uncharged-crimes aggravator, which they were allowed to find under erroneous standards of proof. Accordingly, the Court should reverse Troya's death

---

[121] The sentencing jury also heard evidence that Troya had a prior battery conviction, at age 17, for punching the mother of a friend in the face during an argument, and an escape conviction, at age 19, for trying to sneak out of a youthful-offender facility. (DE818:7981-8040; DE825:8695-8770). See Statement of Facts, Section II.A.1, *ante*. Given the convictions, he does not challenge the failure of the jury intructions to require unanimous agreement that these incidents had been proven beyond a reasonable doubt. But the underlying conduct in those incidents was not nearly as serious as that attributed to Troya in the uncharged crimes, especially since neither involved a weapon. Thus, not surprisingly, the government devoted far less attention to the convictions than to the uncharged conduct. (See DE818:7924-25; DE847:9501-05, 9507-08, 9615-16, 9618-19, 9629-32, 9634).

194

sentences and order a new capital sentencing hearing.

## IX.

**The prosecutors blunted a key mitigating factor, Daniel Varela's non-prosecution for his equally culpable role in the murders, by improperly vouching to jurors that the government would continue its investigation, and would charge him with murder and seek the death penalty as soon as it gathered enough evidence.**

One of the primary defense themes in mitigation was that, according to the government's own evidence, Varela was the leader of the drug-trafficking organization and was ultimately responsible for the deaths of the Escobedos      yet did not face murder charges, let alone a potential death sentence.

Thus, the first mitigator that Troya's counsel turned to in summation, and the one he emphasized above all (calling it "huge" and something that "in and of itself demands" a life sentence), was the statutory factor, explicitly recognized by Congress, that "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death."  18 U.S.C. § 3592(a)(4).  The defense reminded jurors that the indictment had described Varela as an unnamed co-conspirator in the carjacking of the Escobedos.  (DE854:4-7).  Counsel also catalogued in detail how the government's trial presentation cast the murders as having "occurred to benefit Daniel Varela," who supposedly wanted to erase his "large debt of $187,000" to Escobedo.  Moreover, argued Troya's attorney, the evidence about

the defendants' interactions with Varela suggested that he "was in charge," he "directed all of the others in this case," and that Troya was, at most, just a "worker," a "follower."  (DE847:9567-72, 9600).

The government's proof amply supported these arguments.  It showed that Varela employed Sanchez and Gutierrez in his drug business, and paid them to deliver drugs.  (DE756:5972-73).  Varela owned the cocaine that was seized when Lopez and Sanchez were each arrested several months before the killings, and thus it was, according to the government, Varela who owed a debt to Escobedo.  (DE758:6471-77).  Varela rented the Garden Court residence (DE737:4300-01), in which a significant quantity of drugs and multiple weapons were stored.  (DE732:4035-40; DE754:5430).  Varela decided that Vetere could not accompany Sanchez and Troya when they went out on the night of the killings.  (DE754:5446).  Varela was in close phone contact with Sanchez in the hours leading up to them.  (GX760.1-760.15).  Afterwards, he directed Vetere to hide the Escobedos' jeep at Vetere's grandmother's house (DE754:5465-66).  Varela asked the owner of a body shop to alter the appearance of the van that was involved in the crime.  (DE730:3672-74).  And Varela kept the bulk of the 15 kilograms of cocaine that were taken from Escobedo's jeep.  See Statement of Facts, Section I.C, *ante*.

Indeed, the government itself would later invoke this litany of trial evidence

at Varela's sentencing to argue that he was legally responsible for the deaths. (DE957:49-51). And, in imposing the maximum available punishment, life imprisonment, the court would find that it was "absolutely satisfied far beyond a preponderance of the evidence that Danny Varela is as much responsible for the killings of the Escobedo family as Mr. Troya and Mr. Sanchez." As the court would put it, Varela "may not have been on the side of the Turnpike, he may not have had a gun in his hands, but he was calling the shots from his home base in Palm Beach County." (DE957:55).

But at Troya's sentencing hearing, the prosecutors undercut the amply proven, Congressionally recognized mitigator of Varela's non-exposure to a murder charge (let alone the death penalty) despite his (at least) equal culpability, with an unsupported and misleading argument: that the government would continue to investigate Varela and would reprosecute him capitally as soon as it obtained enough evidence against him. This argument, which was both false and a flagrant form of vouching, violated the Eighth Amendment and the Due Process Clause of the Fifth Amendment, as well as the FDPA, 18 U.S.C. § 3592(a).

The prosecutors planted this idea in their closing argument at the trial:

> Rest assured, there are no deals from the United States of America with that drug kingpin, there are no deals. And this investigation is not over, and the investigators who have dedicated the last three years to this case will continue to look for evidence and

197

gather evidence and when and if there is sufficient evidence to charge Mr. Varela with murder, it will be brought before a jury of his peers.[122]

(DE767:7414).

They then reprised this argument at the sentencing hearing during rebuttal summation:

Danny Varela is not an equally culpable co-defendant not facing the death penalty.

Have you heard any evidence that anybody from the Government's side of the table made some deal with Danny Varela? None, zero. There is no deal with Danny Varela. When the evidence is there, he will be prosecuted, and he will face another jury of his peers.

(DE847:9637-38).

On the verdict form, most of the jurors accepted *the fact* that Varela was equally culpable but was not presently facing the death penalty, as ten of them found the statutory mitigator. (DE859:12). But even they may have given the

_____

[122] Jurors had further reason to trust that the investigators would doggedly continue to "gather evidence" against Varela, for, in summation, the prosecutor also vouched for the "effort and dedication," as well as the skill, they had displayed thus far. (See, e.g., DE767:7415-16: referring to government witnesses as "these fine agents," and noting the "evidence was gathered by dedicated, hard working law enforcement"; DE767:7426-27: "The Drug Enforcement Administration should be proud of the work they did in this case . . . . Agent Weeks, Agent Birch, fabulous job . . . Palm Beach Sheriff's Office . . . has a good group of people working for him . . . . The effort and dedication, they deserve praise from this community"; DE767:7437: "Folks, the cases don't get better than this").

factor little or no weight.  Indeed, it appears from a newspaper article, published

after trial, that jurors intently focused on Varela's culpability and punishment, but

accepted the government's misleading argument and used it to help justify their

death verdicts.  Juror Rick DeCresce provided powerful evidence of the prejudice:

> There were two things . . . that DeCresce said jurors spent the most time discussing before returning their verdict.

> The first was what they believed was the equal culpability of Danny Varela . . . . almost all of the jurors believed that Varela was behind the murders.

> "I'll say this, and I said this several times while we were back there, the biggest travesty in this case is that Danny Varela wasn't sitting at that table," he said.

> *Assistant U.S. Attorney John Kastrenakes provided the only explanation as to why that never happened, DiCresce said. Kastrenakes said authorities didn't have enough evidence to charge Varela, but were still investigating.*[123]

As a practical matter, it strained credulity to suggest that the federal

government was going to expend huge additional resources to search for evidence

against, and prosecute, Varela, whom it chose not to charge with murder after a

three-year investigation even though the indictment said he conspired with Troya

and Sanchez to carjack the Escobedos.  Such a suggestion was doubly dubious

---

[123] Daphne Duret, Brutality to Children Left Juror No Doubts, Section A, Page 1A, Palm Beach Post (Apr. 3, 2009), available on Westlaw, 2009 WLNR 9072225 (emphasis added).

since, by the time of Troya's sentencing, Varela had been convicted of the drug conspiracy and faced a life sentence.  Knowing how wildly unrealistic a future prosecution would be, the government nonetheless sought to quash jurors' fears about the inequity of sentencing equally culpable defendants to vastly different punishments, by suggesting that Varela would ultimately meet the same fate, and so jurors need not trouble themselves with the imbalance.

Unsurprisingly, as of the filing of this brief, Varela has not been charged with killing the Escobedos.

The prosecutors' comments were grossly improper.  By deliberately suggesting a scenario that is grossly implausible and almost certainly untrue, they violated due process.  See United States v. Agurs, 427 U.S. 97, 103 (1976) (due process is violated where prosecutor presents false evidence he knew or should have known was false).  Accord Kyles v. Whitley, 514 U.S. 419, 433 (1995).

They also violated the Eighth Amendment's reliability requirement.  See Johnson v. Mississippi, 486 U.S. 578, 590 (1988) (reversing death sentence where "the jury was allowed to consider evidence that has been revealed to be materially inaccurate"); United States v. Fields, 483 F.3d 313, 337 (5th Cir. 2007) ("A [capital] defendant may not be sentenced on the basis of misinformation of

constitutional magnitude") (citation omitted).[124]

In addition to its falsity, the government's argument was a classic form of improper vouching, for it provided jurors an "assurance . . . based on either the prosecutor's personal knowledge, or other information not contained in the record." United States v. Lee, 612 F.3d 170, 195 (4th Cir. 2010).  This Court's decisions have focused their criticism on prosecutorial vouching for a witness's credibility.  But the principle is the same: A prosecutor may not try to bolster his case before the jury by "plac[ing] the prestige of the government behind" it or by "indicating that information not presented to the jury supports" it.  United States v. Eyester, 948 F.2d 1196, 1206 (11th Cir. 1991).  Such vouching "severely impairs the likelihood of a fair trial."  Id.

This principle specifically prohibits a prosecutor from describing or touting his office's death-penalty decisionmaking in the case.  See Brooks v. Kemp, 762 F.2d 1383, 1410 (11th Cir.1985) (en banc) (argument "improperly implied to the jury that the prosecutor's office had already made the careful judgment that this case, above most other murder cases, warranted the death penalty"), vacated on other grounds, 478 U.S. 1016 (1986); United States v. Mitchell, 502 F.3d 931, 995

---

[124] Indeed, even a non-capital defendant "has the right . . . not to be sentenced on the basis of erroneous information or assumptions."  United States v. Funt, 896 F.2d 1288, 1298-99 (11th Cir. 1990), citing Townsend v. Burke, 334 U.S. 736, 741 (1948).

(9th Cir. 2007) (prosecutor "should not have made" comments that information received by Attorney General showed defendant's case "was different" from accomplice's and that is why death penalty was sought). See also Shurn v. Delo, 177 F.3d 662, 666 (8th Cir. 1999) (same, where prosecutor emphasized his position of authority as official who decides in which cases to seek the death penalty).

Here, the prosecutors did not present any evidence at trial about a continuing investigation against Varela. Nevertheless they assured the jury that they knew more than they were letting on at trial, and had made all of the appropriate decisions in determining whom to prosecute and for what. They claimed that "the investigators . . . will continue to look for evidence" and Varela would face another jury "[w]hen the evidence is there." (DE767:7414; DE847:9637). This, and a similar argument in trial summation, in which they added that there was no mitigating factor of Varela's "not facing the death penalty," left the distinct impression that Varela would eventually be subject to capital punishment.

Admittedly, defense counsel inexplicably failed to object to this improper commentary. Nonetheless, the prosecutors' arguments were so patently impermissible and resulted in such severe prejudice, that they violated Troya's substantial rights and constituted plain error. See United States v. Olano, 507 U.S.

202

725, 732 (1993); Fed. R. Crim. Pro. 52(b).  This is particularly so in a close case where the jurors deliberated over the course of four days, ultimately imposed life sentences for the majority of the capital counts, and found substantial mitigation. See Point III.E, *ante*.

The prejudice here is not speculative, as the juror interview discussed above indicates.[125]  It tends to confirm that the consequence of this summation misconduct was to illegitimately undermine a key element of Troya's mitigation case in the eyes of jurors: They were misled by the prosecutors' vouching to think that Varela would be prosecuted capitally for murder and face the death penalty, and, thus, that they could simply ignore the statutory proportionality consideration of his equal (if not greater) culpability.

Accordingly, this Court should set aside Troya's death sentences.

---

[125] Some judges, like Troya's jurors, also consider the fact an equally culpable codefendant is not facing the death penalty to be a powerful consideration disfavoring a death sentence.  See, e.g., Scott v. Dugger, 604 So. 2d 465, 469 (Fla. 1992) ("This Court probably would have found Scott's death sentence inappropriate had Robinson's life sentence been factored into our review on direct appeal").  See also Getsy v. Mitchell, 495 F.3d 295, 318-25 (6th Cir. 2007) (*en banc*) (six dissenting judges would hold that life sentence for codefendant who instigated killing renders defendant's death sentence unconstitutionally disproportionate).

## X.

**The sentencing instructions erroneously conveyed to jurors that mitigation unrelated to the crime, and thus not "similar" to any statutory mitigator, presumptively carried less or perhaps no significance. The government exploited the error by arguing that Troya's mitigating factors were "excuses" that the jury should disregard because they had nothing to do with the shootings.**

Under the Eighth Amendment, a defendant is entitled to rely on any mitigating factor relating to himself or the crime that he proffers as the basis for a sentence less than death, and not just on particular mitigators specified by statute. See Hitchcock v. Dugger, 481 U.S. 393, 398-99 (1987). The Federal Death Penalty Act tracks this principle. While it includes seven examples of mitigating factors, 18 U.S.C. § 3592(a)(1)-(7), it also includes a catch-all provision directing the jury to consider any "factors in the defendant's background, record, or character or any . . . circumstance of the offense that mitigates against imposition of the death sentence." 18 U.S.C. § 3592(a)(8).

The seven examples are, therefore, merely illustrative, rather than a special category of mitigation entitled to greater or presumptive weight as compared with other factors.

This is also clear from the fact that all but one of the seven examples relate to the circumstances of the crime: the defendant's capacity was impaired or he was mentally or emotionally disturbed when he committed it, he acted under duress, he

204

was a minor participant, there was another more culpable codefendant, or the victim consented to the criminal conduct that resulted in death.  See 18 U.S.C. § 3592(a)(1)-(4), (6)-(7).  The only exception is the factor that the defendant lacked a significant prior criminal history.  See 18 U.S.C. § 3592(a)(5).

Thus, to give statutory mitigating factors heightened or presumptive weight as compared with nonstatutory ones also would effectively undermine the Supreme Court's long repeated teaching that mitigators involving the defendant's background and life history are just as valid and entitled to just as much consideration as crime-related ones.  See Hitchcock, 481 U.S. at 397-99; Skipper v. South Carolina, 476 U.S. 1, 4-5 (1986); Eddings v. Oklahoma, 455 U.S. 104, 113-14 (1982); Lockett v. Ohio, 438 U.S. 586, 605 (1978).

Indeed, the Supreme Court has expressly recognized that mitigating factors need not relate *at all* to the defendant's "culpability for the crime."  Tennard v. Dretke, 542 U.S. 274, 285 (2004).  "We cannot countenance the suggestion that low IQ evidence is not relevant mitigating evidence . . . unless the defendant also establishes a nexus to the crime."  Id. at 287.  See also Brewer v. Quarterman, 550 U.S. 286, 290 (2007); Abdul Kabir v. Quarterman, 550 U.S. 233, 239 40 (2007); Smith v. Texas, 543 U.S. 37, 44 45 (2004).

Here, though, the court repeatedly told jurors that the seven, almost entirely

crime-related factors enumerated in FDPA, which it listed for them, were the ones that Congress had determined always qualified as mitigation and always should be given weight.[126] "If Congress has listed . . . a mitigating factor, Congress has made the judgment that if the facts underlying that particular factor are established, they do constitute . . . a mitigating factor and they must be considered by the jury."[127] (DE848:9727, 9733-34).

By contrast with "the mitigating factors laid out in the statute" the court charged, other factors that "the defense has asserted" (DE848:9734-35) might or might not be mitigating at all, even if they were factually true; jurors had to decide before weighing any of them. "If you are looking at a . . . nonstatutory mitigating factor, you need to go one step further and you have to say, okay, I find that the party proved this but . . . . Is this indeed a mitigating factor[?]" (DE848:9728).

The court offered as an example "a reported case where in a trial one defendant listed as a mitigating factor that he was a human being. Well of course, that is true, but the jury needed to go to the next step and say all right, but does that constitute a mitigating factor." (DE848:9736). The obvious message was that

---

[126] The listing of all seven statutory factors was gratuitous, since the defendants were relying on only one of those: that Varela, an equally culpable codefendant, was not facing the death penalty. (DE848:9743-54).

[127] While the court instructed on the catch-all factor, it did not identify it as one that Congress had also explicitly included. (DE848:9733-36).

some asserted nonstatutory factors might be fanciful or otherwise deserve to be dismissed out of hand.

The court emphasized this distinction between statutory and nonstatutory mitigating factors by repeating it twice more. (DE848:9735; see also DE848:9742-43).

Worst of all, though, the court encouraged jurors to determine whether an unenumerated factor was truly mitigating by asking if it bore a "close relationship" to any of the statutory ones:

> When you look at what the Defendant     particular Defendant has pled, I think you can also compare that to the statutory mitigating factor, and if you see that there is a close relationship between the two, I think that is a factor that you can consider in determining whether the nonstatutory assertion is in fact a mitigating factor.[128]

 (DE848:9735-36).

The court reiterated this principle when it listed one of Sanchez's mitigating factors, that he had no felony convictions.  It noted that this was similar to the "statutory mitigating factor[]" that the defendant lacked a significant prior criminal history.  "You certainly have a right to consider the similarity it has with what Congress listed as a mitigating factor," in determining its mitigating weight, the

---

[128] As far as undersigned counsel have been able to establish, this particular charge, which the court gave *sua sponte*, was unprecedented in federal death penalty trials.

court told jurors.  (DE848:9744).

The clear implication of these instructions, delivered over repeated defense objections (DE847:9479-88, 9641-9666; DE848:9763), was that a mitigating factor neither listed by Congress nor similar to one listed was somehow presumptively suspect or inherently weak.  To be sure, the court did, at other points, seem to contradict itself, advising jurors they had discretion to find such mitigators; that mitigation included facts about the defendant's life or character, not just ones arising from the crime; and that the law did not presume nonstatutory mitigators should be given less weight.  (DE848:9731-32, 9736, 9741).  But the repeated invocation of Congress's view that only statutory factors were *per se* mitigating, and the invitation to gauge each nonstatutory factor's value by whether it bore a "close relationship" to a statutory one, together conveyed that unenumerated factors lacking such a relationship were of dubious significance.  And because all but one of the seven specific mitigating factors listed in FDPA related to the crime, the message jurors ultimately were left with was that crime-related mitigation was what really mattered.[129]

---

[129]  The government's aggravating factors were not relegated to second-class status under the court's instructions.  While the court distinguished statutory and nonstatutory aggravators, telling jurors they needed to determine whether the latter were, in fact, aggravating, it did not say that determination should governed by whether each nonstatutory factor bore a "similarity" or "close relationship" to a statutory one.  Moreover, of the three nonstatutory aggravators asserted by the

To make matters worse, the government amplified that very message in its summation comments.  The prosecutors pressed the theme that the defendants' mitigation amounted to nothing more than a series of "excuses" and that, for jurors to give them weight, let alone find they justified a life sentence, would be to "excuse" the murders.  The prosecutors also told jurors that, in urging reliance on this mitigation, defense counsel was trying to dupe or deceive them.

The government employed this tactic early in its initial summation.  One prosecutor compared the mitigation presentations to seeing "how much mud can be thrown against a wall and how much of it sticks."  (DE847:9510).  He said Sanchez's lawyers "want you adopt" his dubious mitigation "hook, line, and sinker," but urged jurors: "[D]on't fall for it."  (DE847:9514).  Soon, after, the prosecutor explained the supposed deception:

> The defense will say there are many mitigators.  Those mitigators, I submit to you, despite the attempt to close [sic] them in a different title, are nothing more than a different translation of it's not my fault.

> To excuse a conscious choice exercised to take innocent lives, you should not fall for it, ladies and gentlemen.

(DE847:9516-17).

_____

government, two involved  the crime's motive (to eliminate witnesses) and its effects (victim impact), and thus were "similar" to statutory factors (pecuniary motive and causing the deaths of four people).  (See DE848:9722-30).

209

The prosecution continued to explicitly push this mitigation-as-excuse theme:

> There may be a lot [of mitigators].  Each one of them . . . has nothing to do with excusing a conscious and deliberate choice to kill an entire family, four people, and almost kill other people in the community . . . .
>
> Are four murders . . . really excused by [these factors]?  Is that what it comes down to, that those are the excuses?

(DE847:9519).

And again, two pages later, the prosecutor argued that this array of mitigation from both defendants should be disregarded because it "has nothing to do with" the crime in this case, and could not "excuse" it:

> I don't care what your background is . . . . That has nothing to do with your choice later on in life on October 13th, 2006 in the middle of nowhere in St. Lucie County to choose to wipe out an entire family and to execute in cold blood two little kids.
>
> A line was crossed that cannot be excused.  It cannot be excused with life in prison that this is just like any other murder, just drug dealers.

(DE847:9521-22).

The prosecutor concluded by telling jurors than accepting these "excuses" would be "avoiding your duty and passing the buck.  Don't pass the buck." (DE847:9522-23).

In their summations, defense counsel reiterated that mitigating evidence was

*not* presented with the aim of excusing their conduct, but of giving the jury a complete picture of each defendant and his background before deciding whether to sentence them to death. (DE847:9534, 9551-52: *e.g.*: "Nobody is making excuses, nobody is coming here to make an excuse for anyone, certainly not for Daniel Troya.").

Nevertheless, the government returned to this theme in rebuttal summation: the mitigation should be dismissed out of hand because it did not "le[a]d to" the murders. (DE847:9617).

At the conclusion of the government's rebuttal closing, Sanchez moved for a mistrial based upon the prosecutors' repeated arguments that the mitigation should be disregarded because it did not relate to the offense.[130] The court denied the motion, and reaffirmed this ruling after reading the transcript of the summations during the overnight recess. (DE847:9643, 9645; DE848:9679).

These summation comments not only exacerbated the defects in the instructions, but constituted error in their own right. Jurors may be improperly diverted from considering relevant mitigation not only by a judge's instructions, "but also as a result of prosecutorial argument." Abdul-Kabir v. Quarterman, 550

---

[130] By agreement, an objection for one defendant constituted an objection for all for purposes of preserving an issue for appellate review. (DE732:4052; see also DE245).

211

U.S. 233, 259 n.21 (2007).  Accordingly, "[a] prosecutor errs by directing the jury to ignore a proposed mitigating factor."  United States v. Rodriguez, 581 F.3d 775, 800-801 (8th Cir. 2009) (citations omitted).  See also DePew v. Anderson, 311 F.3d 742, 749 (6th Cir. 2002) (prosecution's comments "were designed to keep the jury from properly considering and weighing the mitigating evidence offered by the defendant").

Since, by definition, a murder conviction means the jury has determined the defendant lacked an "excuse," the government's argument that only such an "excuse" can constitute mitigation amounts to an appeal for executing all capital killers.  Such mandatory death sentencing would, of course, be unconstitutional.  See Woodson v. North Carolina, 428 U.S. 280, 304-05 (1976).  Thus, arguments, like these, which implicitly call for it, are also prohibited.  See Brooks v. Kemp, 762 F.2d 1383, 1413 (11th Cir. 1985) (*en banc*) (urging death sentence simply because defendant was a criminal "undermine[d] the requirement that sentencing consideration be individualized"), vacated on other grounds, 478 U.S. 1016 (1986).

Here, moreover, the prosecutors heightened the prejudice to Troya from this line of argument in two ways.  First, they tied it to an attack on his lawyers' sentencing defense as throwing "mud" at a "wall" to see "how much of it sticks," and a subterfuge that jurors should not "fall for."  See United States v. Young, 470

212

U.S. 1, 9 (1985) (counsel "must not be permitted to make unfounded and inflammatory attacks on the opposing advocate"); <u>Bedford v. Collins</u>, 567 F.3d 225, 233 (6th Cir. 2009) ("the prosecutor may not . . . deride legitimate defenses.") (citations omitted).

Second, prosecutors further warned jurors not to avoid their "duty" and "pass the buck" by accepting the defense "excuses." <u>See</u> <u>Young</u>, 470 U.S. at 18 (prosecutor engaged in misconduct in exhorting a jury to "do its job" by convicting the defendant; "that kind of pressure, whether by the prosecutor or defense counsel, has no place in the administration of criminal justice"). This Court has condemned such "duty"-based arguments in capital sentencing summations. <u>See</u> <u>Brooks</u>, 762 F.2d at 1413. <u>See also</u> <u>State v. Brooks</u>, 762 So. 2d 879, 903-04 (Fla. 2000) (improper to argue "I'm concerned . . . that you may want to . . . take the easy way out and just quickly vote for life. I submit to you, don't do that: follow the law, do your duty.").

These errors violated Troya's rights to due process under the Fifth Amendment, to present a defense under the Sixth Amendment, and to be free from cruel and unusual punishment under the Eighth Amendment, as well as his rights under the FDPA to present and have the jury consider mitigating factors, 18 U.S.C. § 3592(a).

The government cannot establish that these errors were harmless beyond a reasonable doubt.  See Satterwhite v. Texas, 486 U.S. 249, 257-58 (1988); 18 U.S.C. § 3595(c)(2).  On the contrary, especially since the jury seems to have considered Troya's a close case at sentencing, see Point III.E, *ante*, he likely was prejudiced by the court's instructional message that nonstatutory, noncrime mitigators presumptively bore less significance, and by the prosecutor's repeated mitigation-as-excuse theme, which amplified that message.  A number of jurors found, as factually true, such important *non*statutory mitigating factors as, for example, that Troya "was traumatized by witnessing the shooting death of his friend" as a child (9 jurors), and he "was adversely influenced by his Uncle Isidro," who directed Troya, then an impressionable teenager, toward a criminal lifestyle (7 jurors).  (DE859:12-14).  But it stands to reason that jurors may have given these little or no weight because they did not relate to the crime (and certainly did not "excuse" it), and thus were not "similar" to any statutory mitigator.

These prejudicial errors therefore require a new capital sentencing hearing.

## XI.

**The Court erroneously failed to instruct jurors that, before they could vote for death, the government needed to establish "beyond a reasonable doubt" that aggravating factors sufficiently outweighed mitigating ones.**

Six years after the Federal Death Penalty Act (FDPA) was enacted, the

214

Supreme Court recognized that, under the Sixth Amendment right to jury trial, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, *and proved beyond a reasonable doubt*." Apprendi v. New Jersey, 530 U.S. 466, 490 (2000) (emphasis added).  Two years later, the Court applied this principle to fact findings that are a prerequisite to imposing a death sentence.  Ring v. Arizona, 536 U.S. 584, 588 (2002).

In a federal capital proceeding, the determination that aggravating factors outweigh mitigating ones is absolutely required before the jury may render a death verdict.  See 18 U.S.C. §3593(e).  And, as recent decisions of the Supreme Court indicate, it qualifies as a fact finding under the Sixth Amendment.

At Troya's sentencing hearing, his jurors were instructed that, to impose a death sentence, the aggravating factors had to "sufficiently outweigh[]" the mitigating ones.  (DE848:9710, 9755-57).  This tracked the language of the FDPA. See 18 U.S.C. § 3593(e).

Defense counsel had unsuccessfully challenged the statute, arguing that the weighing determination had to be made "beyond a reasonable doubt."  They contended that the Sixth Amendment right to jury trial required this, since the weighing determination was necessary to render Troya eligible for death. (DE375:9-13).  Other district courts have so instructed in close to 20 FDPA

215

cases.[131]

The court rejected Troya's argument. It ruled that "a jury's weighing of the aggravating factors against the mitigating factors in the final phase of their inquiry does nothing to increase the sentence authorized for the defendant; and is therefore, not subject to Apprendi or the reasonable doubt standard." (DE474:9-12). This ruling, and the court's failure to include a "reasonable doubt" charge on weighing, were error.[132]

**A.      Apprendi applies to statutory findings required for an enhanced sentence, even if they involve subjective or moral determinations like the finding of sufficient outweighing.**

The circuits that have found the Sixth Amendment's reasonable-doubt standard inapplicable have viewed the weighing decision in a federal capital sentencing as "subjective" and "largely moral," and thus not a finding of fact

---

[131] These cases are named, and the instructions described, in a declaration available on the website of the Federal Death Penalty Resource Counsel Project at http://www.capdefnet.org/FDPRC/WorkArea/DownloadAsset.aspx?id=5361. See also 1 LEONARD B. SAND, et al., MODERN FEDERAL JURY INSTRUCTIONS Criminal, Inst. 9A-19 (2008) (directing courts to give reasonable-doubt instruction on weighing).

[132] Although Troya did not subsequently ask for this instruction, any such request would have been futile given the court's previous rejection of the underlying constitutional argument. See Osborne v. Ohio, 495 U.S. 103, 123 24 (1990) (declining to find procedural default for defendant's failure to request jury instruction that rested on legal theory the court had already rejected in denying motion to dismiss).

216

covered by Apprendi.[133]   United States v. Barrett, 496 F.3d 1079, 1107 (10th Cir.

2007), quoting United States v. Fields, 483 F.3d 313, 346 (5th Cir. 2007).  See also

United States v. Mitchell, 502 F.3d 931, 993 (9th Cir. 2007) ("weighing step is an

equation that merely channels a jury's discretion"); United States v. Sampson, 486

F.3d 13, 32 (1st Cir. 2007) ("weighing constitutes a process . . . . not an objective

truth"); United States v. Purkey, 428 F.3d 738, 750 (8th Cir. 2005) ("it makes no

sense to speak of the weighing process . . . as an elemental fact").  But see United

States v. Gabrion, 648 F.3d 307, 325-29 (Apprendi applies to weighing

determination, and thus requires it be made beyond a reasonable doubt), en banc

review granted and opinion vacated, ___ F.3d __ (6th Cir. Nov. 17, 2011).

But such an analysis is flawed and incomplete, since it ignores the Supreme

Court's more recent pronouncements in Blakely v. Washington, 542 U.S. 296

---

[133] In a pre-Apprendi case, this Court held that a reasonable-doubt instruction is not constitutionally required.  United States v. Chandler, 996 F.2d 1073, 1091-92 (11th Cir. 1993).  Chandler argued for such an instruction under the Eighth Amendment and the Anti-Drug Abuse Act, 21 U.S.C. § 848, a precursor of the Federal Death Penalty Act.  But he does not appear to have raised, and this Court did not consider, any claim based on the Sixth Amendment.   996 F.2d at 1091-92.  Thus, the Court is not, strictly speaking, being asked to overrule Chandler.  In any event, the intervening Supreme Court decisions in Apprendi and its progeny would justify such an overruling.   See Palmer & Cay Co. v. Marsh & McLennon Companies, 404 F.3d 1297, 1307 n.15. (11th Cir. 2005).

(2004) and <u>Cunningham v. California</u>, 549 U.S. 270 (2007).[134]  Both applied a functional test for identifying a fact-finding subject to <u>Apprendi</u>, a test that embraces even moral or subjective judgments like the finding of sufficient outweighing at a federal capital sentencing.

<u>Blakely</u> invalidated a Washington statute that permitted a sentence beyond the standard range if the judge found "substantial and compelling reasons."  The law listed some factors that would justify this, but the list was only illustrative, not exhaustive.  542 U.S. at 299.  The Court made clear that the test for whether a determination is subject to <u>Apprendi</u> is functional, not formal: The relevant statutory maximum for <u>Apprendi</u> purposes is the sentence that may be imposed based on the findings made by the jury beyond a reasonable doubt.  <u>Id.</u> at 303-04.  The Court thus "flatly reject[ed]" the state's effort to distinguish "hard" historical fact findings from "soft constraints" like the statutory allowance for an enhanced sentence based on "substantial and compelling reasons."  It also rejected the state's suggestion that the latter "survive <u>Apprendi</u>."  <u>See id.</u> at 325 (O'Connor, Breyer, Kennedy, JJ., & Rehnquist, C.J., dissenting).

---

[134] <u>Mitchell</u> cited <u>Blakely</u> but did not discuss it.  <u>Sampson</u> mentioned <u>Blakely</u>, but then ignored that, as discussed below, the ultimate finding that was statutorily required for enhancement was subjective and amorphous.  None of the other three contrary circuit decisions cited <u>Blakely</u>, and none of the five cited <u>Cunningham</u>.

218

The Court, in Cunningham, further solidified this functional test when it invalidated a California sentencing statute allowing an upward departure when "justified by circumstances in aggravation or mitigation" not found by the jury beyond a reasonable doubt.  549 U.S. at 278-79, 288-89.  The Court rejected the dissent's view that Apprendi did not apply simply because, under state law, a circumstance in aggravation could include a policy judgment or even the judge's subjective belief about the appropriate sentence.  Id. at 862.  See id. at 879 (Alito, Kennedy & Breyer, JJ., dissenting).

As the Supreme Court has recognized, this functional test also makes practical sense, because it is easily applied by lower courts.  By contrast, it would require difficult, case-by-case decisions if judges had to characterize each type of determination as a "true" fact finding (subject to Apprendi) or a "moral" or "subjective" one (not so subject).  Would Apprendi cover only the purest findings of historical fact (e.g., there were five or more grams of cocaine)?  Or also characterizations of historical fact (e.g., the victim suffered "serious" bodily injury)?  Or even broader characterizations (e.g., the crime was "especially heinous")?  "[T]he need to give intelligible content to the right of jury trial" is sufficient reason to eschew such a vague test.  Blakely, 542 U.S. at 306-07 (rejecting dissenters' view because, "in operation," it would result in a

219

"subjectiv[e] . . . standard," telling lower courts only that legislatures "must not go too far").

Finally, a functional test for identifying a fact-finding subject to <u>Apprendi</u> also comports with the Supreme Court's linking of the Sixth Amendment right to jury trial with the due process reasonable-doubt requirement.  See <u>Apprendi</u>, 530 U.S. at 477-78, <u>citing</u> <u>In re Winship</u>, 397 U.S. 358 (1970).  The criminal law is replete with elements that turn on moral judgments (*e.g.*, negligence, depravity, provocation, obscenity, even causation) and on subjective modifiers (e.g., "unreasonable," "unjustifiable," "substantial," or "adequate").  Yet no one would think to suggest that due process permits such elements to be withdrawn from the jury or found on less than proof beyond a reasonable doubt.

**B.**     **The Supreme Court's decision in <u>Kansas v. Marsh</u> does not cut against Troya's claim.**

Two of the circuits that have rejected claims like Troya's have relied on the Supreme Court's decision in <u>Kansas v. Marsh</u>, 548 U.S. 163 (2006).  See <u>Barrett</u>, 496 F.3d at 1107, <u>quoting</u> <u>Fields</u>, 483 F.3d at 346.  See also <u>Gabrion</u>, 648 F.3d at 364 (Batchelder, C.J., dissenting).

But <u>Marsh</u>, it turns out, is simply inapposite.  There, the Court reviewed a capital statute that, unlike the FDPA, placed a reasonable-doubt burden of proof on the government as to the jury's ultimate sentencing decision     though it defined

the issue that had to be so proven as whether the aggravating factors were "not outweighed" by mitigating ones. Id. at 166. In a decision that did not discuss Apprendi or any of its progeny or the Sixth Amendment, the Court found that allowing a death sentence when the aggravators and mitigators were in equipoise did not violate the Eighth Amendment. Id. at 173-80.

Not only did Marsh involve an entirely different constitutional principle than the Sixth Amendment right to jury trial; it also focused on an aspect of the instructions distinct from the one on which Troya trains: It is one thing to allow legislatures, as Marsh does, broad discretion to define the ultimate issue of death-worthiness according to different calibrations of aggravating and mitigating factors (*e.g.*, the aggravators outweigh the mitigators, the mitigators do not outweigh the aggravators). But this says nothing about what level of *certainty* jurors must reach about that calibration before voting for death.

Barrett, Fields, and the dissent in Gabrion also cited the concurring opinion in Marsh that Justice Scalia authored only for himself. In it, he included a footnote with the passing dicta that, if the scheme there (providing for death if aggravators were "not outweighed" by mitigators) were disallowed, the state could "as Marsh freely admits," replace it with one requiring the prosecution to prove that aggravators outweighed mitigators by a preponderance. Id. at 187 n.2. Justice

221

Scalia's point in seizing on counsel's concession at oral argument was that no "defense counsel would accept this trade," and thus the existing scheme, with its reasonable-doubt standard, provided an important protection.  Id.  But, like the majority and the dissent in Marsh, Justice Scalia never mentioned whether his hypothetical alternative scheme would pass muster under Apprendi and the Sixth Amendment, since, again, no such issue was raised in the case.

**C.      Under the Supreme Court's decision in Sullivan v. Louisiana, this error is structural, and thus *per se* reversible.**

Because an error involving a reasonable-doubt instruction (and certainly the omission of such a charge when required) is structural and can never be harmless, Sullivan v. Louisiana, 508 U.S. 275, 281-82 (1993), the constitutional violation here requires a new capital sentencing hearing.[135]

---

[135] Even were harm analysis permissible, the error would still require reversal because the government cannot prove "beyond a reasonable doubt" that it had no effect on the sentencing verdict in Troya's case.  See Point I.E, *ante*.

## XII.

**The court instructions, including its false suggestion that a "lesser sentence" than life was an option for Troya, left jurors to speculate that a not-unanimous verdict might result in his eventual release.  This misimpression may have helped coerce life-leaning jurors to change their votes.**

**A.**    **The court authorized jurors to render a verdict of not-unanimous.  But it refused to tell them that, if they did, Troya would receive, at minimum, a *de facto* life sentence.  Instead, it misleadingly left them to speculate that a deadlock might result in the court imposing a "term of years."**

On the eve of sentencing, one thing was clear: Even if jurors declined to recommend either a death sentence or life imprisonment, and the court imposed the minimum punishment, Troya would still receive 115 years to life     in effect, imprisonment until he died.  Thus, no matter what the jury chose, he would never walk free.

Under the FDPA, the sentencing jury may vote unanimously for death or life imprisonment; in either event, the court must impose the chosen sentence.  18 U.S.C. § 3593(e).  The jury also has a third option: It may unanimously choose "some other lesser sentence"     with the precise sentence selected by the court if  authorized by the statute defining the crime.  Id.  Here, the statutes under which Troya was found guilty, 18 U.S.C. §§ 924(j), 2119, authorized a sentence of any "number of years."

223

But, because of statutory mandatory minimums and consecutive sentencing requirements, Troya was guaranteed a *minimum* aggregate sentence of 115 years life imprisonment, in effect     even if the jury unanimously selected this third, "lesser sentence" option on each of the five capital counts.[136]

FDPA also provides for such a "lesser sentence" as the required result if jurors are not unanimous.  (In that event, the court may also impose life imprisonment if, as here, it is authorized by the statute of conviction.  18 U.S.C. § 3594.  See Jones v. United States, 527 U.S. 373, 380 (1999)).  Thus, for Troya, the "lesser sentence" outcome would actually have resulted in a life sentence, either explicitly or, at a minimum, *de facto*.

Accordingly, both defendants asked the court to alter the misleading references to the possibility of a "lesser sentence" of a "term of years."  Sanchez

---

[136] At trial, he was convicted of possessing firearms (those found in Varela's house) in relation to a drug-trafficking crime.  Under 18 U.S.C. § 924(c)(1)(A)(I), this carried a mandatory five-year minimum.  (DE305:15; DE792:7).  It also meant that each of his other four convictions under Section 924(c), for the shootings of each victim, was a "second or subsequent conviction,"  18 U.S.C. § 924(c)(1)(C), and therefore punishable by a 25-year mandatory minimum.  18 U.S.C. § 924(c)(1)(C)(I).  Moreover, all five Section 924(c) sentences had to run consecutively to one another.  18 U.S.C. § 924(c)(1)(D)(I).  See Deal v. United States, 508 U.S. 129, 131-34 (1993); United States v. Higgs, 353 F.3d 281, 333-34 (4th Cir. 2003).  They also had to run consecutively to the 10-year mandatory minimum Troya faced on his additional convictions for the drug conspiracy, under 21 U.S.C. §§ 841(a)(1) and 846.  (DE305:2, 13; DE792:1-2, 5-6).  See 18 U.S.C. § 924(c)(1)(D)(ii); 21 U.S.C. § 841(a)(1)(A)(viii).  Thus, the aggregate minimum was 5 + 25 + 25 + 25 + 25 + 10 = 115 years.

first broached this subject about a week before the sentencing hearing. (DE790-2:39; see also DE824:8579-80, 8585).  Three days later, before it began, and then again on the morning it started, Troya followed suit, objecting to the court's preliminary instruction that a "lesser sentence" was the alternative to unanimous death or life imprisonment.  (DE809:3-4; DE818:7880).  Counsel observed that "the jury could be misled to believe that Troya could be sentenced . . . to a relatively minor jail sentence" in the event of a deadlock.  In fact, the real "minimum sentence" would be "120 years in prison, with no possibility of parole."[137]  Thus, the defense argued, the jury should be instructed that the third, court sentencing option would result in a sentence between 120 years and life. (DE809:3-4; DE818:7880-81).

But the court refused to eliminate the language about a "lesser sentence" from its preliminary jury charge.[138]  (DE818:7881-86, 7902, 7913, 7916).

At the conference on the final charge, the prosecutor demurred to the idea of

---

[137] Troya's trial counsel was off by five years in his calculations.  (DE809:4).

[138] The discussion then shifted to the possibility of removing the third sentencing option entirely from the jury's consideration.  Over the next several days during the sentencing hearing, counsel and the court discussed whether Troya and Sanchez wanted to waive the third option entirely and, if so, whether the court would let them.  (The court questioned its authority to do so.). (DE818:7882-87; DE823:8306-07; DE824:8360-63; DE825:8843-60; DE845:9151-56).  Ultimately, each defendant declined to offer a waiver.  (DE845:9160-66).

correcting or adding to the language about a "lesser sentence" of a "term of years." First, he muddied the waters by warning that "the statutory scheme is really very confusing," and claiming it was unclear what sentences would have to run consecutively. Second, the prosecutor ridiculed the idea of even "trying to figure out" the minimum punishment; this, he insisted, would result in "a sentencing hearing where we would debate how many minimum mandatories are there, how they stack, do they stack or not stack." Instead, the court should simply instruct that the third option was a lesser sentence of "any number of years up to and including life." (DE825:8850-55).

In addition to struggling to persuade the court to accurately describe the third option, Troya (and Sanchez) repeatedly asked it to instruct jurors on the consequences of a not-unanimous verdict. (DE809:2-4; DE818:7867 69, 7871 73, 7876 78, 7880; DE845:9159, 9164 65, 9169; DE831:1 5; DE846:9377; see also DE436 2:36; DE795:7854 57; DE790 2:6, 24, 39; DE824:8579 80). Indeed, Troya himself weighed in personally, telling the court: "I don't want the jury to have a fear that hearing a lesser sentence and ultimately have a perception that I might get out one day and have a fear like we need to kill him and give me a death sentence because they fear I might get out of prison." (DE845:9155).

But the government steadfastly resisted any such instruction. (DE438:19-

226

20; DE459:3; DE795:7856-57; DE818:7875; DE824:8581; DE845:9167-68, 9170).

The court sided with the government.  (DE818:7878-80; DE824:8580-85; DE845:9159-61, 9164-65, 9170-72; DE846:9180).  Thus, the verdict form allowed jurors to render a not-unanimous verdict, but did not tell them what would happen if they did.  For each of the five capital counts, the form licensed a divided jury to check "no" to unanimous death, unanimous life without release, and a "lesser sentence"    thus amounting to a not-unanimous verdict.  (DE859:16-19).  And the oral charge told jurors to move from considering death to considering life to considering a lesser sentence "if you do not unanimously make" each respective "finding."  (DE848:9757).[139]  But nowhere did the verdict form or the instructions disclose to jurors the consequences of such a not-unanimous verdict. (DE848:9757; DE859:23-24).

Moreover, the court repeatedly and *misleadingly* referred to the third option as potentially a "lesser sentence," one involving a "term of imprisonment." (DE851:6,14,23-24; see also DE818:7902, 7913, 7916).  It never told jurors that

_____

[139] Each juror received a written copy of the court's preprinted charge.  (See DE848:9692).  The oral charge (DE848:9692-9762) varied slightly from the preprinted one.

this actually meant a *de facto* life sentence.[140]

The jury deliberated over the course of four days.  They eventually rendered split verdicts, voting for life sentences on the majority of the counts.  Newspaper interviews with one juror indicated that "[i]n the initial votes during deliberations, nine jurors voted for death and three weren't sure."[141]

**B.    The court unconstitutionally risked coercing a death verdict by allowing jurors to speculate wrongly that a not-unanimous verdict might produce an extremely unpalatable result: Troya's eventual release back into society.**

To be sure, a district court may decline to give federal capital jurors the option of a not-unanimous verdict, and instead require them to choose between

---

[140] On the day before summations, the court circulated a draft of its final instructions that (as had the preliminary charge) omitted the kind of explanation of the third option the defendants had sought, and instead referred to it only as a "lesser sentence."  (DE851:31, 32, 40, 51).  When they convened to discuss this draft, Sanchez's lawyer said he assumed the court only wanted to hear objections "other than the [ones] we have raised" previously.  The court agreed, saying: "Anything lodged previously and ruled upon, that is in the record, and I don't think you really need to repeat that . . . . I don't think anyone is suggesting that anyone is abandoning that." (DE846:9369).  Since the Court's draft implicitly continued to turn aside the defense's previous complaint that the reference to a "lesser" sentence omitted the mandatory minimums, and given the Court's assurance that such prior objections need not be reurged, Troya's counsel shifted his focus to a more modest request: asking the court to at least add to the "lesser" sentence language the possibility of a sentence "up to" life imprisonment.  The court granted this alternative request.  (DE840:1; DE847:9672-76).

[141] Daphne Duret, Brutality to Children Left Juror No Doubts, Section A, Page 1A, Palm Beach Post (Apr. 3, 2009), available on Westlaw, 2009 WLNR 9072225.

228

unanimous verdicts for either death, life, or, a lesser sentence.  Jones v. United

States, 527 U.S. 373 (1999).  In Jones, that this is what the trial judge had done by

providing the jury with several verdict forms, each of which required a unanimous

vote, together with "an explicit instruction that it had to be unanimous."  Thus,

jurors had no reason to speculate about the consequences of a deadlock.  527 U.S.

at 387-88, 392.  For this reason, the Court found no error in the denial of a defense

instruction that jurors could render a not-unanimous verdict and that this would

result in a life sentence.  The Court cited "the governmental interest . . . in having

the jury render a unanimous sentence recommendation."[142]  Id. at 383-84.

But when, as in Troya's case, a court *does* authorize a not-unanimous

verdict, it must do so in a constitutionally acceptable fashion.  As to any capital-

sentencing verdict, Jones recognized that the jury must not be "affirmatively

misled."  Id. at 381-82, quoting Romano v. Oklahoma, 512 U.S. 1, 8 (1994).  See

Caldwell v. Mississippi, 472 U.S. 320, 329-30 (1985).   See also Hooks v.

Workman, 606 F.3d 715 (10th Cir. 2010) (under Jones no instruction on

consequences of non-unanimity is required "unless to fail to do so would

affirmatively mislead the jury").  And once the option of a not-unanimous verdict

---

[142] The Court did not, however, forbid either giving capital sentencing jurors a non-unanimity option or truthfully telling them the consequences of such a verdict.  Id.

229

is offered to a capital jury, silence about what it means, if it misleads the jury, obviously cannot be rationalized in the name of the "governmental interest" in unanimity.

Well before Jones, the Supreme Court had refused to allow a death sentence to stand where jurors were left to speculate inaccurately about what one of the sentencing options really entailed.  See Simmons v. South Carolina, 512 U.S. 154, 168-70 (1994) (due process violated by refusal to explicitly tell the jury that a verdict of "life imprisonment" meant life with no chance for parole).  And other circuits have specifically found constitutional error when a capital jury was misinformed that a not-unanimous verdict would result in a sentence of life *with* parole, when state law actually required a sentence of life *without* parole if jurors could not agree.[143]  See Hodges v. Epps, 648 F.3d 283, 289-90 (5th Cir. 2011); Morris v. Woodford, 273 F.3d 826, 841 (9th Cir. 2001).

In those decisions, the Fifth and the Ninth Circuits were concerned that such misinformation may have coerced jurors leaning toward life without parole to

---

[143] Where a not-unanimous verdict *would* permit the court to impose a wide range of sentences, including ones allowing for release, it is not error to simply instruct jurors that such a sentence would be "determined by the Court alone" and that jurors should "not . . . be concerned with the question of what sentence the defendant might receive" in that event.  United States v. Chandler, 996 F.2d 1073, 1085-86 (11th Cir. 1993).  In contrast to what occurred in Troya's case, there is nothing misleading about such an instruction.

change their votes to death, in order to avoid the far less palatable third alternative of a convicted murderer's eventual release back into society. Hodges, 648 F.3d at 289-90; Morris, 273 F.3d at 841. That concern was well-grounded: In interviews, jurors who have served on capital cases "consistently expressed the view    even those who were strongly moved by the defendant's case for life    that they would vote for a death sentence if they were not assured that the defendant would be safely locked away." Scott E. Sundby, War and Peace in the Jury Room: How Capital Juries Reach Unanimity, 62 Hastings Law Journal 103, 117 (Nov. 2010).

That fear of the defendant's release back into society may have been particularly acute in Troya's case, since the government's evidence and argument not only portrayed him as irredeemably violent, but also pointedly raised the prospect that he might escape or perhaps even be mistakenly released from prison. See Point III.B, *ante*.

Admittedly, here the court did not explicitly tell jurors that a not-unanimous verdict would result in a release-eligible sentence. But it left them to speculate to that effect    by authorizing such a verdict, concealing accurate information about its life-imprisonment consequences, and making illusory references to the possibility of "a lesser sentence" of a "term of years" as an available punishment. There is a "reasonable likelihood" that jurors may have assumed the court would

have that same third option if they were not unanimous.[144]  See Buchanan v.

Angelone, 522 U.S. 269, 276 (1998); Boyde v. California, 494 U.S. 370, 380

(1990).

Because of this, Troya's case is distinguishable from United States v.

Whitten, 610 F.3d 168 (2d Cir. 2010).  There, the court found no reasonable

likelihood that the sentencing jury was misled or confused about the consequences

of non-unanimity, citing "repeated instructions that Wilson would be sentenced

either to death or to life in prison without the possibility of parole" and the fact that

the "jury unanimously found proven the mitigating factor that Wilson would stay

in prison for the rest of his life if he were not sentenced to death."  Id. at 203.  By

contrast, here, as discussed, the court never said the only possible sentencing

outcomes were life imprisonment without parole or death; on the contrary, it

expressly told jurors a "lesser" sentence was an option for all the counts.  And it

refused to submit to the jury the mitigating factor that Troya and Sanchez would

spend the rest of their lives in prison if not sentenced to death.  (DE846:9406-09,

9441).

---

[144] Since the verdict form, by suggesting complete non-unanimity might
result in a lesser sentence of a term of years, affirmatively invited such speculation,
it mattered little that the court's oral instruction told jurors not to speculate about
the exact sentence Troya would receive in that event.  (DE848:9758-59).

**C.     The Court should set aside Troya's death sentences.**

The court's instructional rulings combined to create an unacceptable and unnecessary risk that one or more life-leaning jurors were coerced into switching their votes to death to avoid the prospect of Troya's release back into the community.  This violated his right to due process and to a reliable determination of sentence, as guaranteed by the Fifth and Eighth Amendments.  See Lowenfeld v. Phelps, 484 U.S. 231, 241 (1988) ("Any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body.").

The government cannot establish that this error was harmless beyond a reasonable doubt.  See 18 U.S.C. § 3595(c)(2)(c); Satterwhite v. Texas, 486 U.S. 249, 257-58 (1988).  For it cannot eliminate the possibility that one or more jurors hesitated to impose a death sentence or were influenced by an apprehension that a not-unanimous verdict might result in Troya's eventual release.  Indeed, as discussed, the jurors deliberated over four days and ultimately rendered split verdicts, voting for life sentences on the majority of counts.

For these reasons, the Court should order a new capital sentencing hearing.

## CONCLUSION

Troya requests that the Court consider the various asserted errors

233

cumulatively as well as individually. "The cumulative error doctrine provides that an aggregation of non-reversible errors (*i.e.*, plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005) (internal quotation and citation omitted).

This is especially important for the sentencing errors, which exerted a synergistic effect on the outcome. See 18 U.S.C. § 3595(c)(2) (requiring Court to determine whether death sentence was imposed "under the influence of passion, prejudice, or any other arbitrary factor"). The aggravating factors were illegitimately inflated because the court wrongly kept Troya from rebutting evidence and argument that he posed a future danger, and because the government relied on five invalid factors. The court seriously constricted Troya's mitigation by keeping out testimony about his non-dangerousness, and instructing jurors to disregard the value of his future relationships with his relatives and the loss they would suffer from his execution. Improper summation arguments and instructions misled jurors from considering important factors that Troya had been allowed to establish, involving his upbringing and the fact that Varela, the drug kingpin who apparently instigated the killings, would not face death. The jurors' ultimate sentencing determination was tainted by the court's refusal to instruct them on the

234

constitutionally mandated reasonable-doubt standard, and its misleading, coercive suggestion that a not-unanimous verdict might result in a sentence less than life. And, finally, the jurors themselves were never asked the basic voir-dire questions necessary to ensure that, if they convicted Troya, they would not be biased against considering a life sentence and mitigation.

Thus, at the end of the day, this Court should vacate the death sentences.  18 U.S.C. § 3595(c)(2)(C).  See Points III-XII, *ante*; Adopted Point I from Co-Appellant Sanchez's Brief.  Troya's capital convictions (Counts 6-10) should also be reversed.  See Points I-II, *ante*.  So should his noncapital convictions.  See Adopted Points II-III from Co-Appellant Sanchez's brief.

DATED:    Albany, New York, the 26th day of March, 2012.

Respectfully submitted,

/s/ Barry J. Fisher
Barry J. Fisher, Esq.
Sean J. Bolser, Esq.
Federal Capital Appellate Resource Counsel
Federal Public Defender, NDNY
39 North Pearl Street, 5th Floor
Albany, NY 12207
Tel. (518) 436-1850 ext. 116
barry_fisher@fd.org

Robert L. McGlasson, Esq.
Attorney at Law
1024 Clairemont Ave
Decatur, Georgia  30030
(404) 314-7664
rlmcglasson@comcast.net

Attorneys for Defendant-Appellant
Daniel Troya

236

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of the Court's order granting appellant's motion to file a brief exceeding the ordinary page limit because: this brief contains 55,791 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect X5 in Times New Roman 14.

DATED:     Albany, New York, the 26th day of March, 2012.


/s/ Barry J. Fisher
Barry J. Fisher, Esq.
Sean J. Bolser, Esq.
Federal Capital Appellate Resource Counsel
Federal Public Defender, NDNY
39 North Pearl Street, 5th Floor
Albany, NY 12207
(518) 436-1850 ext. 116
barry_fisher@fd.org

Robert L. McGlasson, Esq.
Attorney at Law
1024 Clairemont Ave
Decatur, Georgia  30030
(404) 314-7664
rlmcglasson@comcast.net

Attorneys for Defendant-Appellant
Daniel Troya

## CERTIFICATE OF FILING AND SERVICE

I, Sean J. Bolser, hereby certify that I have, this same day, filed with the

Court and served upon counsel for all parties *Appellant Daniel Troya's Principal*

*Brief,* in both paper and electronic form, by delivering a paper copy, together with

a CD-ROM containing an electronic copy, to a commercial carrier, FedEx, for

overnight delivery to the Clerk of the Court, as well as to:


Phillip DiRosa
Assistant United States Attorney
500 East Broward Boulevard
Ft. Lauderdale, Florida 33394
*Counsel for the Plaintiff-Appellee*
*United States of America*

Sarah S. Gannett
Assistant Federal Defender
Federal Community Defender Office
Curtis Building, Suite 540 West
601 Walnut Street
Philadelphia, PA 19106
*Counsel for Defendant-Appellant*
*Ricardo Sanchez*


/s Sean Bolser
SEAN J. BOLSER

DATE: March 26, 2012