IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CIVIL NO. 9:16-CV-80700-DTKH

| | | |
|---|---|---|
| DANIEL A. TROYA, | : | |
| | : | |
| Movant | : | THIS IS A CAPITAL CASE |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA | : | |

DANIEL TROYA'S AMENDED MOTION TO
VACATE, SET ASIDE, OR CORRECT
SENTENCE PURSUANT TO 28 U.S.C. § 2255

*/s/ Steven H. Malone*
STEVEN H. MALONE
Steven H. Malone, P.A.
1217 South Flagler Drive
Second Floor
West Palm Beach, FL 33401
Tele: 561-805-5805
Email: stevenhmalone@bellsouth.net
Florida Bar No. 305545

*Counsel for Daniel A. Troya*

*/s/ D. Todd Doss*
D. TODD DOSS
Assistant Federal Defender
Federal Defender's Office, MDFL
201 South Orange Ave., Ste. 300
Orlando, FL 32801
Tele: 407-648-6338
Email: todd_doss@fd.org
Florida Bar No. 0810384

*Counsel for Daniel A. Troya*

Dated: May 31, 2016

Table of Contents

I.   PRELIMINARY MATTERS ........................................................................................................ 2

   A.   Statement Regarding Form ................................................................................................. 2

   B.   Statement Regarding Incorporation. ................................................................................. 2

II.   STATEMENT OF THE CASE – TRIAL AND APPEAL ................................................................ 2

   A.   The case. ............................................................................................................................ 2

   B.   The direct appeal. .............................................................................................................. 4

III.   STATEMENT OF THE FACTS ............................................................................................... 10

   A.   Guilt-Innocence Trial ...................................................................................................... 10

      1.   Introduction .............................................................................................................. 10

      2.   The proof showed that Troya had at most a low-level, collateral involvement with Varela's large-scale narcotics operation. ...................................................................................... 12

      3.   The circumstantial evidence connected Troya with Sanchez on the evening of the crime, and placed him on the Turnpike. .............................................................................................. 14

      4.   The direct evidence against Troya, statements he allegedly made to two felons, was inconclusive and of questionable credibility. ........................................................................ 21

      5.   The evidence did not clearly establish Escobedo's children, the only victims for whom Troya was sentenced to death, were killed intentionally. ............................................................ 22

   B.   The Other Crimes Evidence ............................................................................................ 23

      1.   The Haverhill Avenue shooting ................................................................................ 23

      2.   The Mercer Avenue shooting and Troya's prior imprisonment ................................ 25

      3.   The attempted armed home invasion .......................................................................... 26

   C.   Sentencing Hearing ........................................................................................................ 28

      1.   The government case. ................................................................................................ 28

      2.   The defense case ....................................................................................................... 30

      3.   After extended deliberations, the jury rendered split sentencing verdicts. ................ 39

IV.   INTRODUCTION ................................................................................................................. 40

V.   JUROR MISCONDUCT DEPRIVED MR. TROYA OF HIS RIGHT TO A FAIR AND IMPARTIAL JURY UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND 28 U.S.C.A. § 1865 ............................................................................................................... 42

   A.   Diane Gooch was a convicted felon and a cooperating government witness in a prior case and failed to disclose those and other facts. ................................................................................ 42

   B.   Mark Sollenberger failed to disclose the full nature and extent of various family members' problems with illegal drugs. ..................................................................................................... 45

C.     Connie Thomas failed to disclose information regarding the illegal firearms and drug problems of her family members. ....................................................................................................................... 47

D.     Dorothy Barba failed to disclose her family member's problem with illegal drugs. ....................... 49

E.     Donald Little failed to disclose information regarding the illegal firearms and drug problems of his family members. .............................................................................................................................. 49

F.     Donald G. Boser failed to disclose the illegal drug problems of his brother-in-law. ..................... 51

G.     Prejudice. ....................................................................................................................................... 51

H.     Conclusion. .................................................................................................................................... 53

VI.     TRIAL COUNSEL FAILED TO TIMELY CHALLENGE THE COMPOSITION AND SELECTION OF THE GRAND AND PETIT JURY VENIRES IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS ... 54

A.     Trial Counsel's Failure to Timely Challenge the Composition and Selection of the Grand and Petit Jury Venires Constituted Deficient Performance. ...................................................................................... 54

B.     Mr. Troya Was Prejudiced by Trial Counsels' Failures Because the Process by Which Grand and Petit Juries are Selected Produces an Unconstitutional Under-representation of Hispanics and African Americans, in Violation of The Fifth, Sixth, and Eighth Amendments. ................................................. 55

C.     At an Appropriately Scheduled Evidentiary Hearing, Mr. Troya Can Present Proof Sufficient to Establish a *Prima Facie* Showing of Underrepresentation. ................................................................... 56

     1.    Hispanics and African Americans are distinct classes in the community which merit constitutional protection. .................................................................................................................... 57

     2.    Underrepresentation ....................................................................................................................... 57

     3.    This underrepresentation is the product of an unconstitutional selection process. ...................... 63

VII.     MR. TROYA'S MURDER CONVICTIONS AND RESULTING DEATH SENTENCES ARE BASED ON AN IMPERMISSIBLY VAGUE STATUTE, IN VIOLATION OF DUE PROCESS AND THE FIFTH, SIXTH, EIGHTH AMENDMENTS .................................................................................................................................. 64

A.     Section 924(c)'s residual clause is unconstitutionally vague ......................................................... 66

     1.    *Johnson* expressly overruled the "ordinary case" approach to determining whether a felony qualifies as a crime of violence ..................................................................................................... 66

     2.    *Johnson* renders § 924(c)(3)(B) unconstitutionally vague .......................................................... 68

B.     Carjacking under § 2119 does not categorically qualify as a crime of violence under the force clause ......................................................................................................................................................... 71

     1.    Principles of Analysis ................................................................................................................... 71

     2.    Under This Analysis, Carjacking Does Not Constitute a Crime of Violence. ............................. 72

C.     Mr. Troya's convictions and death sentences are invalid because the jury was given the option of convicting him for either a drug trafficking offense or the constitutionally invalid crime of violence .. 74

VIII.    MR. TROYA WAS DENIED HIS RIGHT TO DUE PROCESS AND TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS WHEN HE WAS CHARGED WITH A NON-EXISTENT CRIME OF FELONY MURDER AND HIS JURY WAS ERRONEOUSLY INSTRUCTED THAT IT COULD RETURN A VERDICT OF GUILT ON 18 U.S.C. § 924(J)(1) BASED ON A PREDICATE CRIME THAT WAS LEGALLY INSUFFICIENT TO SUPPORT THE VERDICT OR AUTHORIZE

ENHANCED SENTENCING. MR. TROYA WAS DENIED HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF  COUNSEL WHEN HIS TRIAL AND DIRECT APPEAL COUNSEL FAILED TO CHALLENGE THIS CONVICTION AND SENTENCE,  PREJUDICING MR. TROYA THEREBY ................................................. 76

    A.   Introduction ..................................................................................................................... 76

    B.  Because the Court Improperly Instructed the Jury That It Could Make a Determination of Guilt Under 18 U.S.C.§  924(j) On the Basis of Finding Him Guilty of A Crime Not Defined by 18 U.S.C. § 1111 as Murder, Mr. Troya's Convictions and Sentences on Counts 7 through 10 Are Invalid..........79

        1.   The Court's Jury Instruction on Counts 7 through 10 Authorized a Finding of Guilt Under § 924 (j) For Use of a Firearm in Relation to Either the Crime of Murder in Connection with    a Drug Trafficking Crime or of a Killing Resulting from a Carjacking. .......................................................... 79

        2.   Death Resulting from a Carjacking Is An Insufficient Basis for A Determination of Guilt  Under § 924(j). ............................................................................................................................. 79

        3.   The Court's Instruction on Unanimity Did Not Require the Jury to Be Unanimous As To Whether It Had Found Murder In Connection with A Drug Trafficking Crime or A Killing  Resulting from Carjacking Nor Was the Jury Asked to Indicate Whether or As to What  Elements It Might Have Been Unanimous. ................................................................................................................ 81

        4.   This Combination of Factors Resulted In Plain and Reversible Error. ...................................... 82

    B.   Trial Unreasonably Failed to Challenge the Indictment Improperly Charging Mr. Troya, and  to Object to the Court's Jury Instruction.  Appellate Counsel Unreasonably Failed to Raise the  Improper Instruction as a Ground for Reversal on Direct Appeal.  Counsel's Ineffectiveness Resulted in Mr. Troya Having Been Improperly Convicted and Sentenced to Death, and Cures  Any Procedural Default Caused by Counsel's Failure to Raise These Claims At Trial or on Direct  Appeal. ............................... 83

        1.   Under Prevailing Professional Norms, Trial and Appellate Counsel Rendered  Deficient Performance ..................................................................................................................... 83

        2.   Mr. Troya Was Prejudiced by the Deficient Performance of Counsel Both at Trial and on  Direct Appeal. .......................................................................................................................... 84

IX.    MR. TROYA RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL, WHERE DEFENSE COUNSEL FAILED TO MOVE TO  DISMISS HIS INDICTMENT DUE TO DUPLICITY AND APPELLATE COUNSEL FAILED TO RAISE THE ISSUE ON APPEAL IN VIOLATION OF HIS FIFTH, SIXTH AND EIGHTH AMENDMENTS ................................... 85

    A.   Mr. Troya received ineffective assistance of counsel, where the indictment duplicitously  charged him with both murder and manslaughter as well as both premeditated and felony  murder .................... 88

    B.   Mr. Troya received ineffective assistance of counsel, where the indictment duplicitously  charged him with use of a firearm in relation to both 'drug trafficking' and 'crime of violence.'89

X.    MR. TROYA'S COUNSEL WAS INEFFECTIVE IN FAILING TO REQUESTTHAT THE JURY BE INSTRUCTED ON  MANSLAUGHTER; A CRIME THAT WAS PROPERLY CHARGED IN THE INDICTMENT IN VIOLATION OF HIS FIFTH, SIXTH AND  EIGHTH AMENDMENTS ........................................................................................... 91

    A.   Manslaughter was clearly charged and should have been read because  there was evidence of manslaughter ..................................................................................................................... 92

B.    Mr. Troya was prejudiced by counsel's ineffective representation, because if he had been convicted of manslaughter, instead of murder, he would have been subject to 15 year maximum sentence. .......... 93

XI.    TRIAL COUNSEL INEFFECTIVELY FAILED TO RETAIN COMPETENT AND APPROPRIATE EXPERTS, FAILED TO CONSULT WITH THOSE WHO WERE RETAINED, TO FILE APPROPRIATE MOTIONS TO EXCLUDE GOVERNMENT EXPERT AND OTHER WITNESS EXPERT-LIKE TESTIMONY, TO EFFECTIVELY CROSS EXAMINE AND OBJECT TO IPROPER TESTIMONY OF GOVERNMENT EXPERTS, AND TO INTRODUCE EXPERT TESTIMONY HELPFUL TO THE DEFENSE AT GUILT AND SENTENCING PHASES, ALL CONTRARY TO THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS ...................................................................................... 94

A.    Forensic pathologist. ................................................................................................... 94

1.    Defense counsel failed to adequately challenge the government's case by failing to object to the impermissible testimony of a substitute medical examiner and failing to retain an independent forensic pathologist. .................................................................................................................. 94

2.    Defense Counsel was Ineffective in Failing to Retain an Independent Forensic Pathologist and That Failure Prejudiced Mr. Troya. .................................................................................................. 97

3.    Defense Counsel was Ineffective in Failing to Object to the Testimony of a Substitute Medical Examiner. .................................................................................................................................... 100

4.    Trial Counsel's Error Prejudiced Mr. Troya. .............................................................. 103

B.    Firearms and toolmark expert. ................................................................................... 105

1.    Trial Counsel Rendered Ineffective Assistance of Counsel by Not Requesting a *Daubert* Hearing as to the General and Specific Methodology Utilized by Firearm/Toolmark Examiners in Mr. Troya's Case, By Not Moving In Limine to Restrict Terminology Regarding Supposed Matches of Casings, Cartridges and Firearms, By Failing to Rebut Testimony of Government Experts With Their Own Expert, and Ineffectively Cross-Examining the Government Experts, and the Government presented false or misleading expert testimony, all in Violation of Mr. Troya's Fifth, Sixth and Eighth Amendment Rights. ............................................................................................................................. 105

C.    Fingerprint Expert. ..................................................................................................... 125

1.    Trial Counsel's Failure to Challenge the Fingerprint Evidence Constitutes Ineffective Assistance of Counsel .................................................................................................................................. 125

2.    Prejudice ...................................................................................................................... 142

3.    Conclusion ................................................................................................................... 143

D.    Cell Tower Tracking Expert........................................................................................ 145

1.    Counsel ineffectively failed to consult with and utilize the cell tower tracking expert funded by the Court, and the government presented knowingly false or misleading testimony to Mr. Troya's prejudice........................................................................................................................................ 145

2.    Trial counsel were ineffective for failing to adequately challenge the cell site tracking testimony....................................................................................................................................... 148

3.    The Government's reliance on erroneous and misleading cell tower evidence deprived Mr. Troya of due process and a fair trial............................................................................................ 150

E.    GIS Mapping Expert...................................................................................................... 153

    1.    Counsel ineffectively failed to consult with the GIS mapping expert....................................... 153

XII.    DEFENSE COUNSEL FAILED TO OBJECT TO NUMEROUS ERRORS BEFORE AND DURING THE TRIAL, THEREBY DEPRIVING MR. TROYA OF HIS CONSTITUTIONAL RIGHT TO EFFECTIVE COUNSEL UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS............. 154

A.    Guilt Phase Trial. ........................................................................................................... 154

    1.    Defense counsel forgot about the transcript of the co-defendant's statement and made an (accidentally) untruthful claim in the jury's presence that it had not been provided to the defense. Counsel also failed to object to the Court's comment, in the jury's presence, that what he said was not true. ...........................................................................................................................154

    2.    Counsel failed to object to improper arguments by the government during guilt phase opening and closing. ...........................................................................................................................156

B.    Sentencing Trial. ............................................................................................................. 162

    1.    Trial counsel allowed Crawford and related reliability errors to permeate the penalty phase, permitting the jury to consider unreliable evidence. ........................................................................163

    2.    Trial counsel failed to object to misleading questions and an inaccurate portrayal of Daniel Troya as the leader of the attempted escape. ......................................................................................168

    3.    Counsel should have objected to improper testimony and argument of future danger and otherwise undermining life-without-parole as a valid sentencing option.........................................169

    4.    Counsel failed to object to misleading testimony on whether Mr. Troya was wearing civilian clothes ............................................................................................................................. 171

    5.    Trial counsel were ineffective in failing to object to comment on Mr. Troya's silence. ........... 172

    6.    Counsel's ineffective cross misrepresented facts to the jury, and counsel had to be corrected by the witness.............................................................................................................................173

    7.    Counsel were ineffective for calling a witness they knew or should have known would invoke his right to remain silent in the jury's presence, significantly undermining the defense case for life...173

    8.    Trial counsel's failure to object to repeated, improper questioning of defense witnesses about the improper consideration of whether Mr. Troya was taught and knew right from wrong was prejudicial...........................................................................................................................177

    9.    Trial counsel's failure to move for a mistrial for improper cross examination of defense law enforcement witness was prejudicial. ...............................................................................................177

    10.    Without objection, the government conducted knowingly misleading cross-examination of defense witnesses charging Uncle Tito was not actually at their home in the summer of 1995. .179

    11.    Trial counsel 's ineffective neglect to timely and accurately proffer the testimony of its expert witness Cunningham which would have been admissible as outside the Court's order excluding prison conditions evidence.............................................................................................180

v

12.    The government's improper and false vouching, along with its reference to non-record facts, in its assertion that it would continue to investigate and prosecute Varela for the murders was improper and unlawful; was met with no objection from the defense; and essentially canceled out the "culpable codefendant" mitigation presented by Mr. Troya. ............................................................183

13.    There were a number of additional improper arguments to which counsel failed to object ...188

14.    During sentencing summation, trial counsel ineffectively conceded Mr. Troya's involvement in two uncharged shootings which were included in the nonstatutory aggravating circumstance, contrary to the Fifth, Sixth and Eighth Amendments..........................................................................190

XIII.    MR. TROYA'S CONVICTIONS FOR CONDUCT PRIOR TO THE AGE OF EIGHTEEN WERE UTILIZED IN AGGRAVATION TO OBTAIN A DEATH SENTENCE FOR MR. TROYA. COUNSEL'S FAILURE TO OBJECT TO THEIR USE AND THE CORRESPONDING SENTENCE VIOLATES THE SIXTH AND EIGHTH AMENDMENTS......................................................................................................................192

XIV.    TRIAL COUNSEL FAILED TO PROPERLY CHALLENGE THE "THREE-STEP PROCESS" DURING THE SELECTION PHASE, WHICH UNLAWFULLY REQUIRED THE JURY TO MAKE A FINDING OF LAW REGARDING THE PROFFERED MITIGATING FACTORS ...........................................................194

A.    Counsel's Failure to Properly Challenge the "Three Step Process" was Objectively Unreasonable and Constituted Deficient Performance. ........................................................................................198

B.    Counsel's Deficient Performance Resulted in Prejudice. ..............................................................203

XV.    TRIAL COUNSEL FAILED TO OBJECT TO IMPROPER QUESTIONING AND TO EFFECTIVELY CROSS-EXAMINE THE GOVERNMENT'S COOPERATING WITNESSES, SERIOUSLY PREJUDICING MR. TROYA IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS...........................................208

A.    Ineffective failure to adequately proffer and utilize impeaching information of government witnesses. .................................................................................................................................209

    1.    Melvin Fernandez. ............................................................................................................210

    2.    Kevin Vetere .....................................................................................................................210

    3.    Carlos Rodriguez.............................................................................................................218

XVI.    THE GOVERNMENT VIOLATED BRADY V. MARYLAND AND GIGLIO V. UNITED STATES BY FAILING TO ACCURATELY REVEAL THE EXTENT OF THE PROMISES MADE TO COOPERATING WITNESSES, IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS..................................................222

A.    The Government Shirked its Brady/Giglio Obligations. ................................................................222

B.    The Cooperators. .......................................................................................................................223

    1.    Melvin Fernandez ............................................................................................................223

    2.    Kevin Vetere .....................................................................................................................224

    3.    Carlos Rodriguez. ............................................................................................................225

XVII.    THE GOVERNMENT VIOLATED ITS OBLIGATIONS PURSUANT TO BRADY V. MARYLAND BY FAILING TO DISCLOSE EXCULPATORY INFORMATION TO THE DEFENSE THAT WAS MATERIAL TO THE GUILT AND PENALTY PHASES OF TRIAL..................................................................................................227

A.    The Government Failed to Disclose Material Exculpatory Information Regarding Danny Varela. ...228

B.     The Government Failed to Disclose Material Exculpatory Information Regarding Potential Third Party Guilt, Including Information Regarding Yessica Escobedo's Cell Phone. ................................... 237

C.     The Government Failed to Disclose Material Exculpatory Information Regarding the Alleged Drug Deal in Daytona Beach. ...................................................................................................................... 237

D.     The Government Failed to Disclose Material Exculpatory Information From the Security Booth at the Briar Bay Neighborhood. ....................................................................................................... 238

E.     The Government Failed to Disclose Material Exculpatory Information of Mr. Troya's Lessened Culpability for the Murders. ............................................................................................................. 240

XVIII.     THE GOVERNMENT FAILED TO DISCLOSE EXCULPATORY EVIDENCE ABOUT MR. TROYA'S BRAIN DAMAGE  CONTRARY TO THE FIFTH, SIXTH AND EIGHTH AMENDMENTS ................................... 240

XIX.     TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE MR. TROYA'S FELONY BATTERY CONVICTION THAT  WAS UTILIZED IN AGGRAVATION TO OBTAIN A DEATH SENTENCE FOR MR. TROYA. COUNSEL'S FAILURE TO OBJECT TO    THEIR USE AND THE CORRESPONDING SENTENCE VIOLATES THE SIXTH AND EIGHTH AMENDMENTS ..................................................................................................... 241

A.     The Facts of the 2000 Battery .......................................................................................................... 242

B.     The Claim of Ineffective Assistance of Defense of Counsel in 2000 ........................................... 243

C.     Trial Counsel Failed to Challenge the Use of the Battery Conviction. ........................................ 245

XX.     TRIAL COUNSEL INEFFECTIVELY FAILED TO OBJECT TO INSTRUCTIONS AND VERDICT FORM PERMITTING THE JURY TO FIND THE NONSTATUTORY AGGRAVATOR WITHOUT CONCLUDING UNANIMOUSLY AND BEYOND A REASONABLE DOUBT TROYA COMMITTED THE PARTICULAR UNCHARGED CRIMES, CONTRARY TO THE FIFTH, SIXTH AND EIGHTH AMENDMENTS. ................................................... 245

A.     Trial counsel's failure to object to the verdict form and instructions constituted deficient performance ...................................................................................................................................... 248

B.     Trial counsel's deficient performance prejudiced Mr. Troya. ....................................................... 250

XXI.     DURING SENTENCING SUMMATION, TRIAL COUNSEL INEFFECTIVELY CONCEDED MR. TROYA'S INVOLVEMENT IN  TWO UNCHARGED SHOOTINGS WHICH WERE INCLUDED IN THE NONSTATUTORY AGGRAVATING CIRCUMSTANCE, CONTRARY  TO THE FIFTH, SIXTH AND EIGHTH AMENDMENTS ......... 253

A.     Trial counsel's concession during summation that Mr. Troya had participated in two uncharged shootings constituted deficient performance. ...................................................................................... 253

B.     Trial counsel's deficient performance was prejudicial. ................................................................. 255

XXII.     Mr.Troya Received Ineffective Assistance Of Counsel, Where Counsel Failed To Challenge The Government's Evidence Regarding His Escape, By Failing To Properly Object To Testimony, Failing To Effectively Cross-Examine Inspector Glover, And Failing To Call Rebuttal Witnesses........................... 255

A.     Trial counsel was on notice that the Government would rely upon Mr. Troya's prior escape conviction as aggravation in their pursuit of obtaining a death sentence against Mr. Troya. ................. 256

B.     Counsel failed to call witnesses in rebuttal to establish mitigation of the escape attempt, including the prison conditions that drove Mr. Troya to participate in the escape ............................................... 257

C.     Trial counsel failed to present evidence to counter the inaccurate portrayal of Daniel Troya as the leader of the escape attempt.............................................................................................................. 267

XXIII.    MR. TROYA'S DEATH SENTENCES VIOLATE THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION'S  PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENTS ................................... 268

A.    The death penalty is a disproportionate sentence even for the gravest of offenses........................ 270

1.    There is a national trend toward abolition................................................................................. 270

2.    The death penalty is excessive. ................................................................................................ 273

3.    The United States is out of step with the international community's consensus against the  death penalty................................................................................................................................... 273

B.    The capital punishment schemes in the United States, including the Federal Death Penalty Act, are unconstitutional because they fail to ensure reliability, consistency, and equal protection of law....... 275

1.    Reliability................................................................................................................................. 275

2.    Arbitrariness............................................................................................................................ 276

3.    Racial discrimination .............................................................................................................. 277

C.    The conditions under which Mr. Troya is confined under sentence of death, and the length of  time under which he will be confined prior to execution, constitute conditions of physical and  psychological torture and inhumane treatment. ..................................................................................... 279

1.    Physical conditions of confinement ....................................................................................... 279

2.    The psychologically torturous nature of the prolonged confinement under the conditions  detailed above while under a sentence of death constitutes a violation of the Eighth Amendment  ban on cruel and unusual punishment.................................................................................................. 283

D.    Method of execution ................................................................................................................... 283

E.    Conclusion. ................................................................................................................................. 285

XXIV.    LIFE-THREATENING DANGERS IN AND AROUND MATAMOROS PRECLUDED THE TRIAL TEAM FROM  INVESTIGATING THE DEFENSE CASE THERE, AND CONTINUES TO PRECLUDE POSTCONVICTION COUNSEL FROM  INVESTIGATING IN THE AREA; TRIAL COUNSEL FAILED TO MOVE FOR APPROPRIATE RELIEF DUE TO THESE DANGERS, AND  THIS COURT SHOULD GRANT RELIEF NOW............................. 285

A.    Overall Risk Summary................................................................................................................ 287

XXV.    TRIAL COUNSEL'S INVESTIGATION AND DEVELOPMENT OF MENTAL HEALTH EVIDENCE TO MITIGATE THE DEATH   PENALTY IN MR. TROYA'S CASE FAILED TO MEET MINIMAL STANDARDS OF CAPITAL REPRESENTATION, PREJUDICING MR.  TROYA CONTRARY TO THE FIFTH SIXTH AND EIGHTH AMENDMENTS ................................................................................................................................... 293

A.    The Jury Never Heard Mr. Troya Was Brain Damaged Because of Trial Counsels' Failure to Adequately Investigate and Corroborate the PET scan......................................................................... 300

B.    Trial counsel unreasonably failed to consult an expert in trauma, which prevented the jury from understanding a full picture of Mr. Troya's development and functioning. ......................................... 305

C.    Trial Counsel's Preparation Of The Mental Health Case Failed To Comply With The Standards Of Practice In Capital Cases.................................................................................................................... 311

1.    Counsel failed to adequately vet, direct and supervise the experts they hired. ......................... 311

2.   Counsel neglected to timely provide the defense mental health experts with information about Mr. Troya's social history because he failed to timely investigate it ...............................................312

3.   Trial counsel's litigation on the issue of psychopathy was objectively unreasonable................ 313

4.   Trial Counsel Failed to Properly Challenge this Unreliable and Irrelevant Evidence. .............. 319

5.   Trial Counsel Failed to Object to use of the PPI-R by the government expert, Dr. Brannon in testing Mr. Troya........................................................................................................................... 319

6.   Trial Counsel Failed to timely and adequately secure a ruling on the defense motion to exclude this improper evidence ...................................................................................................................... 320

7.   Trial counsel failed to fully investigate and develop evidence which would have undermined  the assertion that Mr. Troya had Anti-Social Personality Disorder or Psychopathy. .............................. 322

8.   Failure to adequately investigate Mr. Troya's social history and to otherwise prepare a competent mental health case. ...................................................................................................... 323

D.   In his opening statement, counsel ineffectively promised the jury they would hear mental health testimony, even naming the witnesses and describing their testimony, including the damaging detail    of antisocial personality disorder, then did not call the witnesses. ........................................................... 324

E.   Mr. Troya Was Prejudiced By Trial Counsel's Failures. ................................................................. 327

XXVI.   COUNSEL UNREASONABLY NEGLECTED TO TIMELY AND EFFECTIVELY INVESTIGATE MR. TROYA'S PERSONAL   HISTORY AND BACKGROUND, RESULTING IN AN INACCURATE, A MISINFORMED AND POOR MITIGATION PRESENTATION TO  THE JURY,  CONTRARY TO FIFTH, SIXTH AND EIGHTH AMENDMENT REQUIREMENTS .................................................................................................................. 333

A.   Trial counsel's investigation and preparation of mitigating evidence was conducted largely  during the weeks before the trial began and even after it had started. ............................................................... 337

B.   Although substantial mitigating evidence was available from witnesses the defense belatedly interviewed, trial counsel did not pursue the evidence or did not know how to effectively make use  of it..341

1.   There were teachers available who could have testified about Mr. Troya, his family, and the neighborhood in which he was raised. ............................................................................................... 342

2.   There were witnesses who could have testified about Danny Troya's experiences  volunteering and the relationships he developed at Morse Geriatric Center.......................................................... 344

3.   Also available were witnesses to the John Kamel shooting,  who saw Daniel Troya cradle  the victim's head and were aware of his reactions in the aftermath, and could also have provided important testimony about the crime-filled neighborhood and schools to which the  young Mr. Troya was exposed. .................................................................................................................................... 346

4.   Other witnesses were available who could similarly have described the crime in the neighborhood and at Conniston, as well as given testimony about Danny Troya as a follower  and loyal friend. .................................................................................................................................... 351

5.   Witnesses were available to testify, if asked, about the Troya home. ...................................... 354

6.   Witnesses were available to address the effect on Danny of the suicide of his friend and neighbor. ............................................................................................................................................ 355

7.     Testimony mitigating the escape conviction and showing the brutality Danny was exposed to at Brevard Correctional Institution was also available but not investigated or presented by trial counsel...357

8.     Witnesses were available to provide a fuller family history of difficulties in the family, Tito's temper, and an explanation of Tito's summer stay at the Troyas. ......................................................358

C.     The trial team's failures regarding available mitigation witnesses included one who had powerful evidence to offer but who was interviewed only in the days *after* the trial and sentencing. .................360

D.     Information from witnesses interviewed before trial, as well as and from witnesses the defense team failed to interview at all, was not presented to the jury, and is reasonably likely to have affected the outcome of the sentencing hearing. ...............................................................................................363

1.     Extraordinarily mitigating evidence unknown to the defense was not known to the jury because the trial team failed to properly investigate and present it ................................................................363

E.     It is the duty of the defense team members to aid counsel in the selection and preparation of witnesses who will testify, including but not limited to: . . . 2. Lay witnesses, or witnesses who are familiar with the defendant or his family, including but not limited to:................................................370

F.     Trial counsel's failures to properly investigate, interview and present witnesses singly and together prejudiced Daniel Troya.......................................................................................................................433

XXVII.     MR. TROYA'S CONVICTION AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE ...................................................................................434

**Table of Authorities**

**Cases**

*Alcorta v. Texas*, 355 U.S. 28 (1957) ...................................................................................... 122

*Alexander v. Louisiana*, 405 U.S. 625 (1972) ...................................................................... 55, 57

*Alston v. Manson*, 791 F.2d 255 (2d Cir. 1986) ......................................................................... 57

*Anderson v. Butler*, 858 F.2d 16 (1st Cir. 1988) ..................................................................... 327

*Atkins v. Virginia*, 536 U.S. 304 (2002) ..................................................................... 271-272, 272

*BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467 (11th Cir. 1992) .............. 53

*Batson v. Kentucky*, 476 U.S. 79 (1986) ................................................................................... 57

*Begay v. United States*, 553 U.S. 137 (2008) ............................................................................ 67

*Berghuis v. Smith*, 559 U.S. 314 (2010) .................................................................................... 58

*Blockburger v. United States*, 284 U.S. 299 (1932) .................................................................. 87

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................................ *passim*

*Bragan v. Morgan*, 791 F. Supp. 704 (M.D. Tenn. 1992) ................................................. 124-125

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) .......................................................................... 435

*Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985) (en banc) ................................................... 188

*Brown v. Allen*, 344 U.S. 443 (1953) ........................................................................................ 55

*Brown v. Ohio*, 432 U.S. 161, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977) ................................... 87

*Brownlee v. Haley*, 306 F.3d 1043 (11th Cir. 2002) ............................................................... 337

*Bruton v. United States*, 391 U.S. 123 (1968) ................................................................... *passim*

*Campbell v. Louisiana*, 523 U.S. 392 (1998) ............................................................................ 56

*Carter v. Jury Comm'n*, 396 U.S. 320 (1970) ........................................................................... 55

*Castaneda v. Partida*, 430 U.S. 482 (1977) ........................................................... 54, 55, 57, 58

*Castro v. United States*, 540 U.S. 375 (2003) ........................................................................ 245

*Chrzanoski v. Ashcroft*, 327 F.3d 188 (2d Cir. 2003) ............................................................... 74

*Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000) ....................................................................... 248

*Commonwealth v. Gambora*, 457 Mass. 715, 933 N.E.2d 50 (2010) ...................................... 129

*Commonwealth v. Pytou Heang*, 458 Mass. 827 (2011) ......................................................... 117

*Cox v. Donnelly*, 432 F.3d 388 (2d Cir. 2005) ........................................................................ 102

*Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) ........... *passim*

*Dando v. Yukins*, 461 F.3d 791 (6th Cir. 2006) ....................................................................... 102

*Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) ..................................................... *passim*

*Descamps v. United States*, 133 S. Ct. 2276 (2013) ............................................................. 71, 72

*Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015) .................................................... 69, 70

*Dobbs v. Kemp*, 790 F.2d 1499 (11th Cir. 1986) ........................................................ 56

*Dobbs v. Turpin*, 142 F.3d 1383 (11th Cir. 1998) .............................................. 191, 253

*Dobbs v. Zant*, 506 U.S. 357 (1993) ................................................................. 191, 253

*Dugas v. Coplan*, 428 F.3d 317 (1st Cir. 2005) .......................................................... 434

*Duren v. Missouri*, 439 U.S. 357 (1979) .................................................................. 56, 57

*Eddings v. Okla.*, 455 U.S. 104 (1982) ....................................................................... 207

*Estelle v. Gamble*, 429 U.S. 97 (1976) ....................................................................... 193

*Everett v. Beard*, 290 F.3d 500 (3d Cir. 2002) ........................................................... 248

*Francis v. Spraggins*, 720 F.2d 1190 (11th Cir. 1983) ......................................... 191, 254

*Furman v. Georgia.*, 408 U.S. 238 (1972) ........................................... 268, 272-73, 275

*Gardner v. Johnson*, 247 F.3d 551 (5th Cir. 2001) .................................................... 331

*Gerberding v. United States*, 471 F.2d 55 (8th Cir. 1973) ........................................... 86

*Giglio v. United States*, 405 U.S. 150 (1972) ......................................................... *passim*

*Gilson v. Sirmons*, 520 F.3d 1196 (10th Cir. 2008) .................................................... 304

*Glossip v. Gross*, 135 S. Ct. 2726 (2015) ................................................................. 269

*Gonzales v. McKune*, 247 F.3d 1066 (10th Cir. 2001) ............................................... 434

*Goodwin v. Balkcom*, 684 F.2d 794 (11th Cir. 1982) ................................................... 54

*Graham v. Collins*, 506 U.S. 461 (1993) .................................................................. 193

*Graham v. Florida*, 560 U.S. 48 (2010) ............................................................. 272, 274

*Gray v. Lynn*, 6 F.3d 265 (5th Cir. 1993) .................................................................. 248

*Gregg v. Georgia*, 428 U.S. 153 (1976) ............................................................... 269, 272

*Hardwick v. Crosby*, 320 F.3d 1127 (11th Cir. 2003) ................................................. 102

*Harris v. Reed*, 894 F.2d 871 (7th Cir. 1990) ............................................................. 327

*Hennon v. Cooper*, 109 F.3d 330 (7th Cir. 1997) ....................................................... 124

*Hernandez v. Texas*, 347 U.S. 475 (1954) ................................................................... 57

*Hinton v. Alabama*, 571 U.S. ___, 134 S. Ct. 1081 (2014) ......................................... 83

*Hollis v. Davis*, 912 F.2d 1343 (11th Cir. 1990) .......................................................... 55

*Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012) .................................... 300, 304, 331

*Horsley v. Alabama*, 45 F.3d 1486 (11th Cir. 1995) ............................................. 148-149

*In re Medley*, 134 U.S. 160 (1890) ........................................................................... 282

*J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127 (1994) ...................................................... 277

xii

*Johnson v. Mississippi*, 486 U.S. 578 (1988) ............................................................................... 187

*Johnson v. Texas*, 509 U.S. 350 (1993) ........................................................................... 206-207

*Johnson v. United States*, 135 S. Ct. 2551 (2015) ................................................................ *passim*

*Johnson v. United States*, 559 U.S. 133 (2010) ........................................................................ 72

*Knight v. Florida*, 120 S. Ct. 459 (1999) ................................................................................. 274

*Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989) ............................................................... 248, 434

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ............................................................... 110

*Kyles v. Whitley*, 514 U.S. 419 (1995) ............................................................................... *passim*

*Lackey v. Texas*, 514 U.S. 1045 (1995) .................................................................... 269, 282-283

*Leocal v. Ashcroft*, 543 U.S. 1 (2004) .............................................................................. 70, 72

*Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001) ............................................... 191, 254, 434

*Littlejohn v. Trammell*, 704 F.3d 817 (10th Cir. 2013) ..................................... 300, 304, 305, 311

*Lockett v. Ohio*, 438 U.S. 586 (1978) .............................................................................. 198, 207

*Luchenburg v. Smith*, 79 F.3d 388 (4th Cir. 1996) ................................................................. 248

*Machetti v. Linahan*, 679 F.2d 236 (11th Cir. 1982) ................................................................. 55

*Mack v. United States*, 853 F.2d 585 (8th Cir. 1988) ................................................................. 77

*Martinez-Macias v. Collins*, 810 F. Supp. 782 (W.D. Tex. 1991) ............................................. 102

*McAleese v. Mazurkiewicz*, 1 F.3d 159 (3d Cir. 1993) ............................................................. 327

*McCleskey v. Kemp*, 481 U.S. 279 (1987) ............................................................................... 277

*McDonough Power Equip. v. Greenwood*, 464 U.S. 548 (1984) .......................................... 52-53

*Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009) ......................... 129

*Miller v. Alabama*, 132 S. Ct. 2455 (2012) .............................................................................. 272

*Mooney v. Holohan*, 294 U.S. 103 (1935) .............................................................................. 122

*Morgan v. Illinois*, 504 U.S. 719 (1992) .......................................................................... *passim*

*Napue v. Illinois*, 360 U.S. 264 (1959) ............................................................................ *passim*

*Northcross v. Bd. of Educ.*, 412 U.S. 427 (1973) (per curiam) ................................................... 69

*Ortiz v. Bezy*, 281 F. App'x 594 (7th Cir. 2008) ...................................................................... 282

*Penry v. Lynaugh*, 492 U.S. 302 (1989) .......................................................................... 202, 271

*People v. LaValle*, 3 N.Y.3d 88 (2004) ..................................................................................... 269

*Peters v. Kiff*, 407 U.S. 493 (1972) ........................................................................................... 56

*Phillips v. Woodford*, 267 F.3d 966 (9th Cir. 2001) ................................................................. 434

*Powers v. Ohio*, 493 U.S. 1068 (1991) ..................................................................................... 56

*Ramirez v. State*, 810 So. 2d 836 (Fla. 2001) ................................................................. 107, 111

*Reagan v. Norris*, 365 F.3d 616 (8th Cir. 2004) ....................................................... 248

*Richardson v. United States*, 526 U.S. 813 (1999) ........................................... 249, 251

*Roane v. Leonhart*, 741 F.3d 147 (D.C. Cir. 2014) ................................................ 283

*Rodriguez-Castellon v. Holder*, 733 F.3d 847 (9th Cir. 2013) ................................... 70

*Rolan v. Vaughn*, 445 F.3d 671 (3d Cir. 2006) ........................................ 321-322, 323

*Roper v. Simmons*, 543 U.S. 551 (2005) ........................................ 193, 272, 274-275

*Rose v. Mitchell*, 443 U.S. 545 (1979) .................................................................. 54, 55

*Schad v. Arizona*, 501 U.S. 624 (1991) ................................................................... 249

*Sexton v. State*, 93 S.W.3d 96 (Tex. Crim. App. 2002) ............................... 106-107, 111

*Smith v. City of Jackson*, 544 U.S. 228 (2005) ......................................................... 69

*Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004) ............................................... 300, 331

*State v. Caldwell*, 322 N.W. 574 (Minn. 1982) ....................................................... 140

*Stitt v. United States*, 369 F. Supp. 2d 679 (E.D. Va. 2005) ............................... 318, 321

*Stouffer v. Reynolds*, 214 F.3d 1231 (10th Cir. 2000) ....................................... 191, 254

*Strickland v. Washington*, 466 U.S. 668 (1984) .................................................. *passim*

*Stromberg v. California*, 283 U.S. 359 (1931) ......................................................... 75

*Taylor v. Louisiana*, 419 U.S. 522 (1975) ........................................................... 55, 56

*Taylor v. United States*, 495 U.S. 575 (1990) ..................................................... 66, 67

*Tennard v. Dretke*, 542 U.S. 274 (2004) ........................................ 177, 179, 190, 202

*Thompson v. McNeil*, 129 S. Ct. 1299 (2009) ....................................................... 269

*Trop v. Dulles*, 356 U.S. 86 (1958) ................................................ 193, 269, 274

*United States ex rel. Hampton v. Leibach*, 347 F.3d 219 (7th Cir. 2003) .................. 327

*United States v. Acosta*, 470 F.3d 132 (2d Cir. 2006) ............................................. 71

*United States v. Agurs*, 427 U.S. 97 (1976) .................................................... 124, 187

*United States v. Andrade*, 83 F.3d 729 (5th Cir. 1996) ........................................... 77

*United States v. Barket*, 530 F.2d 189 (8th Cir. 1976) .......................................... 124

*United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015) ...................................... 331

*United States v. Blandford*, 33 F.3d 685 (6th Cir. 1994) ......................................... 86

*United States v. Brown*, 752 F.3d 1344 (11th Cir. 2014) ......................................... 77

*United States v. Bruce*, 89 F.3d 886 (D.C. Cir. 1996) ............................................. 86

*United States v. Carpa*, 271 F.3d 962 (11th Cir. 2001) ................................... 52-53, 53

*United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000) ........................... 89, 92

*United States v. Correa-Ventura*, 6 F.3d 1070 (5th Cir. 1993) ................................. 86

*United States v. Davis*, 306 F.3d 398 (6th Cir. 2002) ...................................................................... 86

*United States v. Davis*, 471 F.3d 783 (7th Cir. 2006) ...................................................................... 86

*United States v. Dixon*, ___ F.3d ___ (9th Cir. 2015) .................................................................... 72

*United States v. Ealy*, 363 F.3d 292 (4th Cir. 2004) .................................................................... 332

*United States v. Eyster*, 948 F.2d 1196 (11th Cir. 1991) ........................................... 187-188, 188

*United States v. Fell*, 372 F. Supp. 2d 766 (D. Vt. 2005) ........................................... 197-198, 203

*United States v. Foree*, 43 F.3d 1572 (11th Cir. 1995) ................................................................ 183

*United States v. Gomez-Leon*, 545 F.3d 777 (9th Cir. 2008) .................................................... 69-70

*United States v. Green*, 405 F. Supp. 2d 104 (D. Mass. Dec. 20, 2005) ........... 106, 107, 111, 124

*United States v. Haddy*, 134 F.3d 542 (3d Cir. 1998) ..................................................................... 86

*United States v. Huguenin*, 950 F.2d 23 (1st Cir. 1991) ................................................................. 86

*United States v. Ignasiak*, 667 F.3d 1217 (11th Cir. 2012) ................................................. 101, 102

*United States v. Johnson*, 366 F. Supp. 2d 822 (N.D. Iowa 2005) ............................................. 203

*United States v. Jose*, 425 F.3d 1237 (9th Cir. 2005) ............................................................. 89, 92

*United States v. Kattar*, 840 F.2d 118 (1st Cir. 1988) .................................................................. 124

*United States v. Kee*, 2000 WL 863119 (S.D.N.Y. June 27, 2000) ............................................. 248

*United States v. Kills Ree*, 691 F.2d 412 (8th Cir. 1982) ............................................................... 80

*United States v. King*, 200 F.3d 1207 (9th Cir. 1999) .................................................................... 86

*United States v. Lee*, 612 F.3d 170 (4th Cir. 2010) ..................................................................... 187

*United States v. Lloyd*, 462 F.3d 510 (6th Cir. 2006) ..................................................................... 52

*United States v. Main*, 113 F.3d 1046 (9th Cir. 1997) .................................................................... 80

*United States v. McIntosh*, 704 F.3d 894 (11th Cir. 2013) ............................................................. 77

*United States v. Miguel*, 338 F.3d 995 (9th Cir. 2003) ............................................................ 88-89, 92

*United States v. Mills*, 446 F. Supp. 2d 1115 (C.D. Cal. 2006) ........................................... 167-168

*United States v. Olano*, 507 U.S. 725 (1993) .............................................................................. 183

*United States v. Olmeda*, 461 F.3d 271 (2d Cir. 2006) .................................................................. 86

*United States v. Ovalle*, 136 F.3d 1092 (6th Cir. 1998) ................................................................. 54

*United States v. Perez-Vargas*, 414 F.3d 1282 (10th Cir. 2005) ................................................... 74

*United States v. Perkins*, 748 F.2d 1519 (11th Cir. 1984) ............................................................. 53

*United States v. Peter*, 310 F.3d 709 (11th Cir. 2002) ................................................................... 77

*United States v. Ramos–Medina*, 706 F.3d 932 (9th Cir. 2013) .................................................... 70

*United States v. Range*, 94 F.3d 614 (11th Cir. 1996) ................................................................. 221

*United States v. Rosa*, 11 F.3d 315 (11th Cir. 1993) ................................................................... 101

*United States v. Royal*, 731 F.3d 333 (4th Cir. 2013) ................................................................ 71

*United States v. Sampson*, 335 F. Supp. 2d 166 (D. Mass. 2004) .................................... 197, 203

*United States v. Schlei*, 122 F.3d 944 (11th Cir. 1997) ......................................................... 85, 87

*United States v. Serafin*, 562 F.3d 1105 (10th Cir. 2009) ............................................................ 71

*United States v. Shackelford*, 777 F.2d 1141 (6th Cir. 1985) ...................................................... 52

*United States v. Sharpe*, 193 F.3d 852 (5th Cir. 1999) ............................................................... 86

*United States v. Span*, 75 F.3d 1383 (9th Cir. 1996) ................................................................. 102

*United States v. Stanley*, 597 F.2d 866 (4th Cir. 1979) .............................................................. 86

*United States v. Starks*, 472 F.3d 466 (7th Cir. 2006) ............................................................... 86

*United States v. Stitt*, 441 F.3d 297 (4th Cir. 2006) .................................................................. 318

*United States v. Stitt*, 459 F.3d 483 (4th Cir. 2006) .................................................................. 318

*United States v. Streater*, 70 F.3d 1314 (D.C. Cir. 1995) .................................................. 102-103

*United States v. Taylor*, 320 F. Supp. 2d 790 (N.D. Ind. 2004) ................................................ 320

*United States v. Taylor*, 663 F. Supp. 2d 1170 (D.N.M. 2009) ................................................ 129

*United States v. Thomas*, 34 F.3d 44 (2d Cir.) ........................................................................... 80

*United States v. Torres-Miguel*, 701 F.3d 165 (4th Cir. 2012) .............................................. 72, 74

*United States v. Trammell*, 133 F.3d 1343 (10th Cir. 1998) ....................................................... 86

*United States v. Vargas*, 563 F. App'x 684 (11th Cir. 2014) ...................................................... 77

*United States v. Willock*, 696 F. Supp. 2d 536 (D. Md. 2010) ................................................. 129

*Walbey v. Quarterman*, 309 F. App'x 795 (5th Cir. 2009) ....................................................... 331

*Weems v. United States*, 217 U.S. 349 (1910) ................................................................... 193, 269

*Wiggins v. Smith*, 539 U.S. 510 (2003) ..................................................................... 208, 321, 337

*Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008) .................................................................. 337

*Williams v. Taylor*, 529 U.S. 362 (2000) .......................................................... 300, 303, 336, 337

*Zant v. Stephens*, 462 U.S. 862 (1983) ..................................................................................... 275

**Statutes**

5 U.S.C. § 551 (2012) ................................................................................................................ 283

18 U.S.C. § 16 (2012) ..................................................................................................... 69, 70, 71

18 U.S.C. § 922 (2012) ................................................................................................................. 3

18 U.S.C. § 924 (2012) ....................................................................................................... *passim*

18 U.S.C. § 1111 (2012) ...................................................................................................... *passim*

18 U.S.C. § 1112 (2012) ...................................................................................................... *passim*

18 U.S.C. § 2119 (2012) ............................................................................................... *passim*

18 U.S.C. § 3592 (2012) ............................................................................................... *passim*

18 U.S.C. § 3593 (2012) ............................................................................................ 3, 52, 250

18 U.S.C. § 3594 (2012) ............................................................................................... 52

18 U.S.C. § 3599(f) (2012) ........................................................................................... 149

21 U.S.C. § 848 (2012) ............................................................................................... 277

21 U.S.C. §§ 841 (2012) ............................................................................................... 3

28 U.S.C. § 1863 (2012) ............................................................................................... 59

28 U.S.C. § 2254 (2012) ............................................................................................... *passim*

28 U.S.C. § 2255 (2012) ............................................................................................... *passim*

28 U.S.C. § 1865 (2006) ............................................................................................... 42

28 U.S.C.. §§ 841, 846 (2006) ..................................................................................... 87

Tenn. Code Ann. § 40-23-114 ...................................................................................... 284

**Other**

Adina Schwartz, *A Sytemic Challenge to the Reliability and Admissibility of Firearms and Toolmarks Identification*, 6 Colum. Sci. & Tech. L. Rev. 2 (2005) ......................................... 107

Commentary to Guideline 1.1, Objective and Scope of Guidelines, at pp. 5-6 (internal citations omitted) ........................................................................................................................... 335

Eighth Amendments to the United States Constitution ............................................................. 434

Fed. R. Civ. P. 26 ........................................................................................................... 435

Fed. R. Crim. P. 7(c) ...................................................................................................... 87

Fed. R. Crim. P. 8(a) ...................................................................................................... 85

Fed. R. Crim. P. 12(b)(3)(B) ........................................................................................... 54

Fed. R. Evid. 702 ........................................................................................................... 110, 111

Fed. R. Evid. 803.8 ........................................................................................................ 101

*Fingerprint Error Rates and Proficiency Tests: What They Are and Why They Matter. Jonathan J. Koehler*, 59 Hastings L.J. 1077, 1093 n.53 (2008) ...................................................... 139, 140

Garrett & Neufeld, *Invalid Forensic Science Testimony and Wrongful Convictions*, 95 Va. L. Rev. 1, 636 (2009) ........................................................................ 132, 137, 138, 139, 142

Peter A. Detre, Note, *A Proposal for Measuring Underrepresentation in the Composition of the Jury Wheel*, 103 Yale L.J. 1913, 1917 (1994) ..................................................................... 58

*Supplementary Guidelines for The Mitigation Function of Defense Teams in Defense Penalty Cases, in 36 Hofstra. L. Rev.* (2008) ................................................................................ *passim*

U.S. Const. amends. V, ................................................................................................... *passim*

U.S. Const. amend. VI ............................................................................................ *passim*

U.S. Const. amend. VIII .......................................................................................... *passim*

U.S. Const. amends. XIV ........................................................................................ *passim*

Daniel Troya, through undersigned counsel, respectfully requests, pursuant to 28 U.S.C. § 2255 and Rule 2 of the *Rules Governing Section 2255 Proceedings in the United States District Courts*, that this Court grant him a new trial, vacate the judgments entered against him, and/or vacate, set aside or correct the sentences Through counsel, Mr. Troya states the following grounds for granting this motion:

## I. PRELIMINARY MATTERS

### A. Statement Regarding Form

In accordance with Rule 2 of the *Rules Governing Section 2255 Proceedings in the United States District Courts*, this Motion sets forth only the facts and claims entitling Mr. Troya to relief. It contains minimal legal argument or citation. Mr. Troya will file separate pleadings regarding discovery, evidentiary development, and legal briefing later in the proceedings.

### B. Statement Regarding Incorporation.

The affidavits and declarations contained in the appendix are incorporated by reference in this motion.

The factual basis of each claim is realleged and reincorporated into subsequent ones.

## II. STATEMENT OF THE CASE – TRIAL AND APPEAL

### A. The case.

In October 2006, Daniel Varela, Ricardo Sanchez, Liana Lopez, and Daniel Troya were arrested in connection with a narcotics-trafficking business headed by Varela. Doc. 1; Doc. 2; Doc. 3; Doc. 4; Doc. 6. A federal grand jury in the Southern District of Florida indicted the defendants for various drug and weapons possession offenses. Doc. 305.  (Counts 1-5, 11-16). These charges centered on the allegations the defendants, led by Varela, had engaged in a conspiracy with the intent to distribute large quantities of cocaine in the months leading

1

up to their arrests, contrary to 21 U.S.C. §§ 841(a)(1), 846 (Count 1).[1] Doc. 305.

Sanchez and Troya were also indicted for the killings of Jose Luis ("Lou") Escobedo, Varela's narcotics supplier, Lou's wife Yessica, and their two young sons Luis Damian and Luis Julian. The four were shot to death by the side of the Florida Turnpike, in the early morning hours of October 13, 2006, two weeks before the defendants' arrests. The final indictment included five capital counts. These charged Troya and Sanchez with carjacking resulting in death (Count 6), 18 U.S.C. § 2119, for the killings of all four victims, and four counts (one for each victim) of murder with a firearm during a crime of violence or drug-trafficking offense (Counts 7-10), 18 U.S.C. § 924(c)(1), (j).   Doc. 305. Troya and Sanchez were also charged with conspiracy to commit carjacking (Count 5). Doc. 305.

In February 2008, the government gave notice of its intent to seek the death penalty against Troya and Sanchez on the capital charges pursuant to the Federal Death Penalty Act, 18 U.S.C. § 3593(a). (Doc. 311; Doc. 312). After a jury trial that began in January 2009, Troya and his codefendants were convicted on all counts. Doc. 791; Doc. 792; Doc. 793; Doc. 796.[2] At a joint sentencing hearing before the same jury in March 2009, he and Sanchez were each sentenced to life imprisonment on the three capital counts involving the adult victims — the carjacking count, and the two 924(j) counts involving Lou Escobedo and his wife. But the jury

---

[1] Of the remaining counts, those involving Troya, Counts 3 and 13-15, charged him and Varela with possession of a firearm by a convicted felon, for two handguns found in Varela's car during a police stop on June 10, 2006, 18 U.S.C. §922(g)(1), (2); Troya and the other defendants, for possession with intent to distribute cocaine and possession of firearms in relation to a drug-trafficking offense, involving narcotics and weapons found by police when they arrested the defendants and searched Varela's house, where they were staying, 21 U.S.C. §841(a)(1), 18 U.S.C. § 924(c)(1)(A)(I); and Troya, Sanchez, and Varela, for possession of weapons by a convicted felon, involving the guns found in Varela's house, 18 U.S.C. §§ 922(g)(1), 924(a)(2). Doc. 305.

[2] The Eleventh Circuit affirmed Varela's and Lopez's convictions in a separate appeal. *United States v. Lopez*, 649 F.3d 1222 (11th Cir. 2011).

sentenced Troya and Sanchez each to death on the two 924(j) counts involving just the child

victims.  Doc. 859:16-18; Doc. 860:18-20. He was also sentenced on the remaining counts.

Mr. Troya is currently incarcerated on federal death row at the United States Penitentiary,

Terre Haute, Indiana.

### B.      The direct appeal.

Mr. Troya appealed from the judgments of conviction and sentences of death entered on

May 14, 2009, by the United States District Court for the Southern District of

Florida (Hurley, J.). Doc. 900. He raised the following issues on direct appeal, most of which

were founded on plain error due to trial counsel's failure to object:

I.      The court wrongly allowed cooperator testimony accusing Troya of several other serious gun crimes involving innocent victims. Worse, the government improperly urged jurors to consider it as propensity evidence that he was a "killer" who could "execute an entire family."

    A.      The court erred in admitting evidence of two drive-by shootings, an armed home invasion, and Troya's prior imprisonment, all of which concededly had no relation to the capital charges, and zero or trivial relevance even to other counts.

        1.      The Haverhill Avenue shooting.

            a.   Factual background.

            b.   The Haverhill Avenue shooting should not have been admitted. It was not "intrinsic" to the drug conspiracy or relevant to prove Troya's intent to participate in it. And any scant probative value was far outweighed by its unfair prejudice on the capital charges.

        2.      The Mercer Avenue shooting and Troya's prior imprisonment.

            a.   Factual background.

            b.   The Mercer Avenue shooting and Troya's prior imprisonment were not relevant under Rule 404(b) to show that he possessed an AK-47 six months later when police found it in Varela's bedroom. Moreover, this highly prejudicial evidence was not admissible under Rule 403, especially as the AK-47 was one of 14 guns found in Varela's home by police, and the government amply proved Troya's access to the

other guns in the garage and thus his guilt on the two gun-possession counts.

    3.    The attempted armed home invasion.

        a.    Factual background.

        b.    The attempted armed home invasion had little if any relevance, and concededly none to the capital charges. Thus it was inadmissible as "intrinsic" or Rule 404(b) evidence, and certainly did not pass the Rule 403 balancing test.

B.    In summation, the government engaged in flagrant misconduct by explicitly urging jurors to use the Haverhill and Mercer Avenue shootings as proof of Troya's propensity to kill the Escobedos.

    1.    The prosecutors invited jurors to treat the two uncharged driveby shootings as proof "that a killer like" Troya "could execute an entire family," and as proof of his proclivity for "violence" against "individuals who have no play in his criminal involvement" — like the Escobedo children.

    2.    The court erred in licensing the prosecutors' propensity arguments.

C.    The evidentiary and summation errors were not harmless. They likely induced jurors to treat uncharged crimes as proof of Troya's propensity to kill the Escobedos. And the other evidence of Troya's guilt on the capital charges was not overwhelming, but rather plagued by significant gaps and conveyed by witnesses of questionable credibility.

II.    The court plainly erred by prompting a cooperating witness to testify Troya said, "I have killed some people," when in fact the witness was claiming Troya had only said he was "involved in" killing some people, and had also used the term "we." This alteration, resulting from the court's directive to change the plural to the singular, was not necessary to safeguard a codefendant's confrontation rights, and it unfairly prejudiced Troya's defense.

A.    The court violated Troya's rights by altering the critical piece of Carlos Rodriguez's testimony in a way that prejudicially distorted the meaning of Troya's alleged statement and deprived the defense of an exculpatory inference jurors could have drawn from the actual version.

B.    The court's error, in prompting Rodriguez to alter his testimony in a way that prejudiced Troya's defense, was exacerbated by the fact that no "redaction" of any kind was needed to safeguard Sanchez's Bruton rights.

4

C. The court's alteration of Rodriguez's testimony was a patent, highly prejudicial misstep, and thus constituted plain error.

III. The court erred in excluding critical expert testimony that, if sentenced to life, Troya would likely adjust well to prison and not pose a threat, and could be safely managed. This testimony was admissible, both to rebut evidence and argument suggesting he would be violent and present an escape risk if incarcerated, and independently as mitigating evidence.

 A. The court kept the jury from hearing rebuttal testimony by the defense expert, Dr. Mark Cunningham, on the ground that the government had formally withdrawn the dangerousness aggravator.

 B. The trial and sentencing hearing were replete with evidence and government argument suggesting that, if spared execution, Troya would pose a danger of violent acts against other inmates, prison staff, and, possibly, members of the community, in the event of his escape or accidental release.

  1. Evidence and argument concerning Troya's violent background and nature.

  2. Evidence of dangerous prisons plagued by violence.

  3. Evidence of escape risk and institutional misconduct.

 C. The court erred by precluding Cunningham from testifying. His testimony would properly have rebutted "future dangerousness," since the government's evidence and argument had put it "at issue."

  1. The FDPA and the United States Constitution confer upon a capital defendant the right to rebut the government's case in aggravation.

  2. Troya's future dangerousness was placed "at issue," triggering his right of rebuttal.

  3. Cunningham's proffered testimony would have rebutted the inferences of Troya's future dangerousness.

 D. Cunningham's testimony was further admissible as mitigation, independent of its relevance as rebuttal.

 E. The court's exclusion of Cunningham's testimony is not subject to further analysis for "harmlessness." In any event, it clearly prejudiced Troya at the sentencing hearing.

5

IV.    The court wrongly kept out evidence of, and affirmatively instructed jurors to ignore as mitigation, the relationships Troya would maintain with his family were he allowed to live in prison, and the grief and loss they would suffer if he were executed.

     A.    The court told jurors not to consider the forward-looking significance of Troya's relationships with his relatives, and excluded testimony on the subject.

     B.    The court violated Troya's rights under the Eighth Amendment and FDPA by excluding evidence of, and instructing the jury to ignore, the value of the relationships his family would maintain with him in prison and the loss and harm they would experience if he were removed from their lives.

          1.    The court acknowledged that Troya's "loving relationships" with his family could illuminate his character, yet it excluded testimony from relatives critical to fully demonstrating the nature and strength of those relationships.

          2.    The future value to his family of keeping Troya in their lives, and the harm they would suffer if he were executed, also constituted relevant mitigation in its own right. Thus, the court erred by excluding evidence about this, and worse, by instructing the jury to ignore it entirely.

     C.    Because the court allowed significant, emotional victim-impact evidence, its drastic narrowing of mitigation from Troya's family also violated his right to due process.

     D.    The court's exclusion of execution impact and its instruction to jurors to ignore such mitigation seriously prejudiced Troya.

V.    No legally sufficient evidence supported the jury's important aggravation findings that Troya had substantially planned and premeditated the murders of the two child victims and that he did so to eliminate them as witnesses.

     A.    The jury relied on findings of the substantial-planning and witness elimination aggravators.

     B.    There was legally insufficient evidence that Troya substantially planned and premeditated the children's murders, or that his motive was to eliminate them as witnesses.

     C.    The jury's reliance on these faulty aggravating factors was prejudicial.

VI.    Because the child victims were not more vulnerable than the adult ones to being killed by surprise gunshots from close range, nor were they targeted because they were children, their youth had no logical connection to their deaths. Thus, the evidence was legally insufficient to support the statutory aggravating factor that they

6

were "particularly vulnerable due to their youth," and so the jury's reliance on it was error.

VII.    There was no evidence the children were killed in order to steal the cocaine in Escobedo's jeep. Accordingly, there was legally insufficient proof to support the statutory aggravating factor that Troya murdered the children for pecuniary gain.

VIII.   The court plainly erred in allowing the jury to base a death sentence on uncharged crimes attributed to Troya without finding, unanimously and beyond a reasonable doubt, that he had committed each (or, indeed, any particular) one of them..

   A.    The jury heard testimony accusing Troya of several other serious violent offenses. But he was never charged with any of those, and the proof against him on each of them was highly questionable.

   B.    By inviting jurors to find the "other uncharged violence" aggravator, without unanimous agreement or proof beyond a reasonable doubt as to each or any individual crime, the court's instructions violated the FDPA, due process, and the Eighth Amendment.

   C.    Troya was seriously prejudiced by the jurors' being licensed to find this aggravator without having to unanimously agree that any particular uncharged crime had been proven beyond a reasonable doubt.

IX.     The prosecutors blunted a key mitigating factor, Daniel Varela's nonprosecution for his equally culpable role in the murders, by improperly vouching to jurors that the government would continue its investigation, and would charge him with murder and seek the death penalty as soon as it gathered enough evidence.

X.      The sentencing instructions erroneously conveyed to jurors that mitigation unrelated to the crime, and thus not "similar" to any statutory mitigator, presumptively carried less or perhaps no significance. The government exploited the error by arguing that Troya's mitigating factors were "excuses" that the jury should disregard because they had nothing to do with the shootings.

XI.     The Court erroneously failed to instruct jurors that, before they could vote for death, the government needed to establish "beyond a reasonable doubt" that aggravating factors sufficiently outweighed mitigating ones.

   A.    Apprendi applies to statutory findings required for an enhanced sentence, even if they involve subjective or moral determinations like the finding of sufficient outweighing.

   B.    The Supreme Court's decision in Kansas v. Marsh does not cut against Troya's claim.

7

C.    Under the Supreme Court's decision in Sullivan v. Louisiana, this error is structural, and thus *per se* reversible.

XII.    The court instructions, including its false suggestion that a "lesser sentence" than life was an option for Troya, left jurors to speculate that a not-unanimous verdict might result in his eventual release. This misimpression may have helped coerce life-leaning jurors to change their votes.

A.    The court authorized jurors to render a verdict of not-unanimous. But it refused to tell them that, if they did, Troya would receive, at minimum, a *de facto* life sentence. Instead, it misleadingly left them to speculate that a deadlock might result in the court imposing a "term of years."

B.    The court unconstitutionally risked coercing a death verdict by allowing jurors to speculate wrongly that a not-unanimous verdict might produce an extremely unpalatable result: Troya's eventual release back into society.

C.    The Court should set aside Troya's death sentences.

In addition, Mr. Troya adopted three arguments in the brief of Mr. Sanchez:

(1) The claim that the district court's incomplete, imprecise, and onesided voirdire questioning created an unacceptable risk that the jurors who condemned Sanchez and Troya harbored disqualifying pro-death-penalty biases. (Point I of Sanchez's brief).

(2) The claim that the court wrongly accepted at face value the government's race-neutral explanations for its disproportionate peremptory striking of black and female jurors, without considering factors that have been recognized as probative of discrimination. (Point II of Sanchez's brief).

(3) The claim that the court erred in permitting Troya and Sanchez to exercise peremptory challenges only if the noncapital codefendants consented to them. (Point III of Sanchez's brief).

*Appellant Daniel Troya's Principal Brief, Appendix A.*

The Eleventh Circuit affirmed the convictions and sentences. *United States v. Troya*, 733 F. 3d 1125 (11th Cir. 2013). As to each issue raised save three, that Court rejected them as "without merit" without further discussion.[3] It wrote on and rejected issue I A, concluding there

---

[3] The Court described the issues raised in shorthand as: "(1) the district court's voir dire was insufficient to identify unqualified jurors; (2) the district court did not properly permit Appellants

8

was no abuse of discretion in the admission of the evidence of the uncharged crimes of the Haverhill and Mercer Avenue shootings and the attempted home invasion (as well as the Suwanee Drive shooting).[4]   The Court found error in the exclusion of Dr. Cunningham's testimony (Point III), but concluded the error was harmless. As to Sanchez, the Court determined there was no error in the admission of the government expert Dr. Brannon's testimony.

### III.       STATEMENT OF THE FACTS.

####    A.       Guilt-Innocence Trial

#####       1.       Introduction

This case involves the murders of Jose ("Lou") Escobedo, a cocaine supplier in South Florida, and his family. They were shot and killed in a grassy area off the side of the Florida Turnpike south of Fort Pierce, around 2:30 in the morning on October 13, 2006. Two different guns were used; neither was recovered. The evidence showed that the killings occurred during a robbery of drugs that Escobedo was transporting, and was instigated by one of his customers, Daniel Varela, a large-scale narcotics distributor.

---

to exercise peremptory challenges during jury selection; (3) the district court erred in rejecting several of Appellants' *Batson* challenges; (4) the district court erred in admitting into evidence at trial uncharged acts of misconduct involving firearms and drug trafficking; (5) the district court erred in admitting into evidence at trial redacted versions of statements made by Troya; (6) the district court wrongly excluded expert testimony from forensic psychologist Dr. Mark Cunningham during the penalty phase concerning Troya's lack of future dangerousness; (7) the district court erred in excluding from evidence in the penalty phase execution-impact testimony; (8) the evidence presented at trial was insufficient to support the aggravating factors justifying the death penalty; (9) the prosecutor's remarks in the penalty phase during closing argument were improper; (10) the district court erred during the penalty phase in its jury instructions; (11) the district court erred in admitting testimony based on Sanchez's statements to government psychologist Dr. Michael Brannon; and (12) the multitude of errors in the guilt and penalty phases rendered Appellants' trial and sentencing hearings unfair." *Troya*, 733 F.3d at 1129.

[4] Id. at 1130-34. The Court did not address in writing an issue raised in Point IA, the testimony about Mr. Troya's imprisonment, or subsection B of the same point, which challenged the misuse of the uncharged crime evidence as propensity to violence in the government's argument.

Sanchez, Varela's cousin, was prominently involved in his drug trafficking, including his dealings with Escobedo. In the eight hours preceding the murders, Sanchez, in a van belonging to Varela, and Escobedo and his family, in their jeep, each drove about 200 miles, from West Palm Beach to Daytona Beach, and then turned around and headed back south. Cell tower records purported to show the two vehicles were no more than a few miles apart at various points on the trip. Along the way, Sanchez and Escobedo made 15 telephone calls to each other, the last one about five minutes before the murders. Sanchez also had four calls with Varela, the last one about an hour before the Escobedos were killed.

The government presented evidence that Troya, who was barely a low-level participant in Varela's drug enterprise, accompanied Sanchez, and that both defendants were on the Turnpike near the time Escobedo and his family were slain. It also showed that, following the murders, Sanchez had possession of Escobedo's jeep, which most likely contained cocaine, and Troya most likely returned with the van. Other evidence tended to show the two later met up with Varela, who had remained in West Palm Beach.

There were significant "gaps" in the prosecution's proof. There was no forensic evidence, no confession to police, and no eyewitness testimony whatsoever that Troya killed any of the victims. His alleged statements to two felons were inconclusive and of questionable credibility. And, critically, the government could not account for another, close-by vehicle whose occupants may have been involved in the murders or a later cell phone call from one of the decedent's phone.

The government postulated, but never proved, exactly what happened by the side of the road, why Escobedo had driven to Daytona Beach, why Escobedo apparently had Sanchez and Troya caravan with him on this route, what Sanchez discussed in his phone calls with Escobedo

10

and Varela along the way, or what Troya was thinking, saying, or hearing from Sanchez in the period leading up to the robbery.

The evidence did not unquestionably establish Troya actually killed anyone. Moreover, while the prosecution argued otherwise, the proof left open the possibility the Escobedo children were not even killed intentionally, but rather were casualties of shots meant for their parents. Troya's role in their murders proved to be a critical issue at sentencing, since the jury imposed death sentences *only* on the counts involving the two boys, and life sentences for the killings of Escobedo and his wife and for the murders as a group. The death sentences were based on, among others, the aggravating factors that Sanchez and Troya substantially planned the children's murders. But the evidence never showed he knew or had any way to know in advance that Escobedo had brought them along while transporting cocaine in the middle of the night, or other plan to kill them.

To fill these gaps in its proof, the government presented extensive trial testimony from one of its cooperators accusing Troya of three serious uncharged gun crimes — two drive-by shootings and an armed home invasion. Then, in summation, prosecutors explicitly and repeatedly urged jurors to convict him on a propensity theory, saying the uncharged offenses provided ample reason "to believe that a killer like Daniel Troya could execute an entire family."

### 2. The proof showed that Troya had at most a low-level, collateral involvement with Varela's large-scale narcotics operation.

Varela ran a drug-trafficking business in West Palm Beach from at least May 2006 until his and the other defendants' arrests in October of that year. In the summer of 2006, he operated the business out of a large house he rented on Garden Court. T4302, T4305; T5147, T5149-50; T5536-41. Sanchez, Varela's cousin, stayed there, as did the other defendants: Liana Lopez,

11

Varela's girlfriend; Juan Gutierrez, who pled guilty to drug charges before trial,[5] Troya; and Kevin Vetere, the government's key cooperator. T3921-24; T5422-24.

Unlike Sanchez, Troya was not implicated either in Varela's dealings with Escobedo, who supplied him with large quantities of cocaine obtained from Texas and Mexico, or Varela's multi-kilo cocaine sales, which included a series of sales to just two customers totaling 150 kilograms — about two million dollars worth of narcotics.[6] Nor was he charged in either of the two cocaine-transportation incidents that were included in the indictment.[7] (T4528-49, T4658, T4673-75, T4681; T4736-59, T4790-96, T4892-4903; T4997-5017, T5075-99, T5152-54, T5158, T5187, T5245-48; T5282-84, T5444; T5585-86, T5604-05, T5620-21; *see* T7087-97; T7282).

Rather, Troya sporadically acted as a low-level seller or deliverer of narcotics, mostly on his own and sometimes for Varela. When the Garden Court house was raided and the defendants were arrested, a relatively small quantity of drugs — less than 500 grams of cocaine and some ecstasy — were found in Troya's bedroom, along with a scale and some narcotics-packaging materials; a witness also testified he kept ecstasy pills there. A police officer had observed Mr. Troya involved in an apparent drug deal in a parking lot a few days before his arrest, and earlier that month, he supposedly asked a friend if she wanted to get paid for delivering drugs.

---

[5] Gutierrez was sentenced to 216 months imprisonment, and the Eleventh Circuit affirmed his sentence. *United States v. Gutierrez*, 373 Fed. Appx. 13 (11th Cir. 2010).

[6] Two of the indictment counts, charging Varela with distributing cocaine and carrying a firearm in relation to that offense, arose out of a controlled buy between him and one of those customers, who had become a police informant, on October 21, 2006 (Counts 11 and 12) Doc. 305.

[7] The indictment charged Varela and Lopez with possession with intent to distribute cocaine found in her car during a police stop on May 10, 2006 (Count 2), and Sanchez with the same offense involving cocaine he abandoned during a vehicle stop on July 10, 2006 (Count 4).

At some point during the summer, Troya and Vetere had gone to Chicago for a month, reportedly taking nine ounces of cocaine with them, which they sold there. Finally, Mr. Troya had been arrested four months before that for possession of a very small amount of marijuana, while a passenger in a car driven by Varela. (T3584-94; T4066-83; T5147-48, T5152-55, T5159, T5246-48; T5318-27.

Though Vetere claimed that he often went with Troya to sell or deliver narcotics, those alleged transactions appear to have involved relatively small amounts, except for one larger sale in which he said Troya was present with Sanchez and others but was not the one who was armed or conducted the transaction.[8] Vetere acknowledged Troya had very little money despite residing with and being connected with Varela, the high-living drug kingpin. T5444, T5478; T5586-87, T5621, T5678.

### 3.      The circumstantial evidence connected Troya with Sanchez on the evening of the crime, and placed him on the Turnpike.

On the night of the killings, Sanchez and Escobedo engaged in a series of 15 short cell-phone calls to one another between approximately 6 p.m. and 2 a.m. (GX760.1-760.15). They did so as Sanchez traveled 200 miles north from West Palm Beach to Daytona Beach, and then back south to Fort Pierce, where it appears they got onto the Florida Turnpike heading towards West Palm Beach. Escobedo drove his jeep while Sanchez was in a van owned by Varela. According to testimony about cell towers portrayed by non-expert witnesses called by the government, the two vehicles were no more than a few miles apart each time they spoke, since

---

[8] A piece of paper found in the Garden Court house, attributed to Varela and dated three months before the killings, had a "2400" notation besides Sanchez's nickname, and two "1000" notations, each besides Troya's nickname. T4020. The government never sought to explain these entries.

13

the sending and receiving signals for each call bounced off the same or nearby cell towers. (GX760.1-760.15; T6705-6821; *see also* T6406-12).

During this eight-hour period, Sanchez also received three calls from, and made one call, to Varela, who was in West Palm Beach. The last was a 48-second call at 1:17 a.m., about an hour before the government contended the Escobedos were killed. (GX760.1-760.15). At trial, both sides seemed to agree that Varela must have instigated the robbery and perhaps the killings too if his organization was responsible.[9]

On the other hand, Troya never called or received a call from Escobedo. Instead, in that period, he placed or received four calls to or from other numbers that apparently had nothing to do with this case, and also checked his voice mail once. (GX760.4, GX760.8). Troya had called Varela once from West Palm Beach at 6:30 p.m., before the trip up the Turnpike began (the call apparently was not answered, since it only lasted eight seconds); but had no further communication with him until after the killings. (GX760.1-760.15; T6756).

Nevertheless, according to the government witness testimony about the cell-tower records, Troya appeared to be traveling with Sanchez on the trip to and from Daytona Beach that night: Though his calls were at different times than the ones between Sanchez and Escobedo, if the nonexpert government cell phone company witnesses were to be believed, his locations were approximately where Sanchez would have been at those times. (GX760.1-760.15).

---

[9] The government told jurors that Varela would do anything "to protect his operation and commit murder if necessary." T7116. At Varela's sentencing, this court found him "as much responsible for the killings of the Escobedo family" as the defendants, because he was "calling the shots from his home base in Palm Beach County." Doc. 957 at 55. And, according to a post-trial interview with one of the jurors, almost all of them believed that Varela was behind the murders. The Eleventh Circuit expressed the same view of Varela's involvement in the killings as this Court.

The last call between Sanchez and Escobedo occurred at 2:19 a.m. around Fort Pierce. One minute before, Escobedo's jeep and, immediately behind it, the van belonging to Varela went through the Fort Pierce toll plaza and entered the Turnpike. This sequence was captured on video at the toll plaza. T3230-37; T3475; T3886; T4529; T5299-5305; *see also* T3518; T3961-62, T3986; T4947; T5175; T5444. Three miles south of that Fort Pierce toll plaza, by the side of the Turnpike, the Escobedos were shot and killed. T3231. A nearby resident who was awakened by the sound testified her clock read 2:24 a.m. — about five minutes after the jeep and van had entered the Turnpike, and Sanchez had made his last call to Escobedo. T3100-01.

About a half hour later, at 3:01 a.m., another toll plaza video at the Okeechobee exit near West Palm Beach (about 50 miles north of the Fort Pierce toll plaza) showed the same two vehicles exiting the Turnpike, this time with the jeep directly behind the van. T3340-44.

The toll video revealed another fact, one the government was never able to explain: although traffic was naturally sparse in the middle of the night, an unidentified silver vehicle entered the Turnpike at the same Fort Pierce toll four minutes before the jeep and van, and also exited at the same Okeechobee toll, again four minutes before both vehicles. T3347-51. The timing is notable for, if the silver vehicle was unconnected to the killings and had driven straight through in the half hour it was on the Turnpike, it presumably would have exited sooner. Instead, it kept precise pace with the jeep and the van, and thus must have spent as much time on the Turnpike as they did. Thus, the government never eliminated the distinct possibility that, even if Troya was involved in the incident, one or more of the people who actually shot the Escobedos were traveling in the silver vehicle.

The government also could not explain the evidence that someone had been given or had taken the Escobedo's cell phones, and made several calls with them shortly after the murders.

15

Records showed that, an hour after the killings, Escobedo's phone (the one he had used to talk with Sanchez) was used in West Palm Beach to call his wife's cell phone. T6541-42; GX708:2; GX755:2; DX32:1). At around the same time, a call was made on his wife's phone to a number in Texas.[10] (DX32:2; see T7350-52; T7653-56). The government made no effort to show why Sanchez or Troya would have used the victims' phones or placed these calls.[11]

When the toll tickets handed in at the Okeechobee exit were later retrieved, Sanchez's palm print was found on the ticket for Escobedo's jeep, and Troya's on the one for Varela's van. T3238; T3294-3303, T3339-40; T3731-41, T3743-45).

A few minutes after the neighbor said she had heard shots, Troya called Sanchez's cell phone; over the next half hour, he called Sanchez again four more times, and received two calls from him. (GX760.6, GX760.9). (There had been no calls between Sanchez and Troya since 6 p.m. the previous evening). The first two of these calls were, according to nonexpert cell tower testimony, from the Ft. Pierce area, and the later ones from in or near West Palm Beach. During that same period, there were also two calls between Sanchez and Varela; his was the first call to Varela after the killings. Troya, too, placed a pair of calls to Varela. (GX760.6, GX760.9).

---

[10] The records suggested that this call, and two earlier ones at around midnight, had somehow been made from near McAllen, Texas, since the label "McAllen" appeared next to each call under the heading, "serving area." (DX32:1; T7350-52; T7653-56). The government responded that this was simply because the account for the phone was based in that part of Texas. T7453; T7660. But the records themselves show that to be false, since the "serving area" varied for each call. Moreover, the government's own representative from the telephone company confirmed that "serving area" mean the geographical area from where the call was placed. T6124.

[11] The government speculated that yet a third call made after the killings, from Sanchez's phone to Escobedo's T6825-27; GX708:2, may have been for the purpose of locating Escobedo's phone in the jeep so that it could be destroyed. T7156; T7453. But even this odd theory could not account for why, after that, Sanchez would have used Escobedo's phone to call his wife's phone, or his wife's phone to call Texas.

16

The jeep was found three days later behind a warehouse near the airport, and the van two weeks after that, at a body shop where Varela had arranged for it to be repainted. T3049; T3664-89; T3889-3900; T5474-75.[12] An empty suitcase belonging to one of the victims, Yessica Escobedo, and a hotel receipt in her name were found in the van. T3833-35.

Ballistics evidence showed that the victims had died from multiple gunshot wounds (a total of 26) to their heads and torsos, according to the government expert fired at relatively close range. Yessica's body was found entangled with her children's, and Lou's close by. (GX1.1). Lou, Yessica, and the older child, Luis Julian, had been shot with the same 9 millimeter pistol, and Yessica and the younger child, Luis Damian, with the same .40 caliber pistol. T3140-3203; T3368-3466; T6600-33. These guns were never recovered, and the projectiles and spent casings found at the scene or removed during the autopsies did not match any of the various firearms that police seized from Varela's house at Garden Court.

A government expert testified several casings from the scene did have markings similar to those on loose, unfired cartridge cases in Varela's garage. From this, the government "expert" concluded they both had once been inside the same handgun, even though he was not able to examine the weapon that supposedly left the markings. T6634-59; see also T7446-47.

A medical examiner who had not conducted the autopsies was substituted as a government witness, and testified one of the children died from drowning in his own blood, and two other prejudicial facts about stippling on the childs' face and hypotheticals about the sequence of shots and positions of the victims during them.

---

[12] The radio and rear seat of the jeep had been pulled out, and a can of gasoline and book of matches were found lying near it. T3892-3900.

17

The physical evidence pointing to Troya's presence in contact with Sanchez that evening, including on the Turnpike; his connection with the red van; and both defendants' connection to the killings, was also supported by Vetere's testimony.

Vetere was a drug addict who stayed in Varela's house and helped run errands, including delivering cocaine. His nickname was "Crackhead Kevin."[13] Already a twice-convicted felon before he was charged in this case, Vetere was facing life imprisonment for his participation in the drug conspiracy headed by Varela. In return for his cooperation, he was allowed to plead guilty and receive a sentence of 12 years; this was reduced to 42 months on a Rule 35 motion following Troya's trial.[14] T5250, T5422-28, T5745-64, T5778-85; Doc. 1058.

Vetere testified he saw Sanchez and Troya leave Varela's home in the late afternoon of October 12, driving the red van. (He sought to go with them, but when Troya asked Varela if this would be all right, Varela said no). Around 2 a.m. the next morning (or perhaps as late as 4 a.m., Vetere elsewhere testified), he was rustled briefly from his "sleep" at the Garden apartment to see Varela, Sanchez, Troya and Gutierrez carrying bags to Varela's bedroom. Vetere testified the bags were the kind he had seen kilos of cocaine wrapped in.[15] When Vetere awoke a short time later he took the van for a tryst with a stripper. Troya and Varela shortly after called his cell

---

[13]   Interviewed by investigators, he told them: "I take a lot of drugs, so I'm sleeping whenever I can." T5756.

[14] Vetere gave two statements denying knowledge about the murders before implicating Troya. "It took me a while to put all this together," he told police. "Like I have been putting this together knowing I am going to talk to you all." T5764-68

[15]   David Doran was a friend of Varela's and Escobedo's who testified that he went out drinking with Varela the night of the murders and then returned to Varela's house where he says he saw Gutierrez, Lopez, and Vetere. (Vetere, though, did not say Doran was with them that night. T5446-52. Doran, who acknowledged he was intoxicated, claimed that, the next morning, when he left the gated community where Varela lived at about 4:30 or 5 a.m. on October 13, he saw the red van and a jeep like Escobedo's entering it. T3959-93.

18

phone and told him to bring the van to Varela's uncle's home. He did so, and the defendants met him there. When Vetere arrived, he saw Escobedo's jeep. At Varela's direction, Vetere moved the jeep to his grandmother's house, where Gutierrez picked it up. T5444-69; T5697-5701.

Later that day, Troya bought a "dunk," a 1970's convertible.  He told Vetere he had paid for it with a kilo of cocaine. Vetere testified that he had never known Troya to have access to that amount of drugs or the kind of money needed to purchase such a car. T5476-79; see also T3521; GX211.9. Around the same time, Sanchez had bragged to Vetere of having $5,000 to spend. When Vetere observed this was a lot of money, Sanchez told him: "[Y]ou going to knock off the next big timer." (Later, Vetere observed Sanchez with a "finger"-thick gold chain.). T5651-53.

The next day, when Vetere read about the killings in the newspaper and asked Troya about them, Troya said Escobedo was dead. Still later, he told Vetere he had wiped prints from the jeep, it had been discovered by police before they were able to burn it, and he was glad he had taken a welding class in prison. T5486, T5489; T5674.

In addition to robbing Escobedo of cocaine, another motive for his killing suggested by the government was Varela's desire to erase a series of drug debts, totaling $187,000, his organization owed Escobedo. T7134-36; Doc. 305:5-11. A drug ledger found in Escobedo's home after his death appeared to record money owed by Varela, Sanchez, and Lopez, including for drugs that had been "stolen" or seized by police when Sanchez and Lopez were arrested during the two charged drug-transportation incidents.[16] GX103c; T3824 T3871-76, T6471-79). But the government never explained why Varela, who had sold over a million dollars of cocaine to just one customer in recent months, would have wanted to kill his supplier over such a

---

[16] In addition to multiple references to the codefendants and kilogram quantities of cocaine, one page from Escobedo's ledger contained the phrase "200 Homer," Troya's nickname, just above an entry that said "200 Fathe[r]s Day." (GX103c; T3873). The government offered no explanation for this reference.

relatively small amount of money, or why he would have thought Escobedo's murder would erase any debt, which was ultimately owed to suppliers in Texas and Mexico.

**4.       The direct evidence against Troya, statements he allegedly made to two felons, was inconclusive and of questionable credibility.**

The only direct evidence of Troya's involvement in the robbery of cocaine from Escobedo, and the killings, came from two felons. Melvin Fernandez, a regular abuser of cocaine, pills, and marijuana, was a friend of Troya's and Vetere's. He testified Troya told him he had come across 15 kilos of cocaine - specifically, that he had robbed ("licked") them. T3489-90, T3502-04.

Carlos Rodriguez was a large-scale drug importer with four years left on his federal sentence when he appeared as a witness. He testified he had overheard Troya tell another inmate at the federal detention facility in Miami, "I have killed some people." But, remarkably, this was not what Rodriguez was actually maintaining Troya had said. As the government told the court before he took the stand, Rodriguez actually claimed only to have overheard Troya make a vague, collective acknowledgment of involvement in the killings: "I did something very bad, or I have something to get off my chest," and then, later: "I was involved in killing some people, it involved children . . . I had to do it . . . . I got paid money and drugs." The prosecutor added that Troya had also used "the word 'we'" at some point in the conversations. T4378-79, T4390-91.

But the court ordered Rodriguez to avoid the plural and stick to the singular in his testimony, in order to accommodate codefendant Sanchez's confrontation objection. In response, Rodriguez altered his account and came up with the "I have killed" construction. T4378-25 T4379, T4390, T4395-96.

**5.    The evidence did not clearly establish Escobedo's children, the only victims for whom Troya was sentenced to death, were killed intentionally.**

As the government itself essentially admitted to the jury, the crime-scene evidence suggests the children may have been casualties of bullets intended for their parents. The substitute Medical Examiner's testimony demonstrated Lou Escobedo and his wife Yessica were purposefully murdered. He was shot at very close range, right between the eyes, with the bullet exiting out the back of his head. T3368-91; GX30D. She was shot four times in the head (in the back of the head, behind the ear, and under the jaw). According to the substitute medical examiner's answers to hypotheticals, apparently each was shot while standing up, and then again after falling to the ground. T3393-94, T3398-3431; GX31C).

It appears some bullets, fired in the dark by the side of the road, struck the children as Yessica was grabbing or holding them, including several shots that passed through her torso and into her sons. T3431-66; GX1.1; see also T7445. Moreover, one of the boys, Luis Damian, died from a shot that entered his shoulder and passed through his chest.[17] T3454-66; GX33D. The other, Luis Julian, suffered a gunshot wound to the top of his head, but at a somewhat glancing angle and, according to the pathologist, fired from some feet away.[18] T3431-51; GX32D. Neither would seem an obvious "execution" shot, like the ones that killed their parents. But the substitute medical examiner attested to additional incriminating facts which went unchallenged by the defense.

---

[17] Luis Damian was also hit by shots to his wrist, his upper arm, and his thigh. And he had stippling on his face, indicating proximity to the gun when it was fired. T3454-66; GX33D.

[18] Luis Julian also sustained several other gunshot wounds to his lower torso, one to his thigh, and one to his wrist. T3451-52; GX32D.

21

In both trial and sentencing summations, the government invoked the doctrine of transferred premeditation.[19] T7167. At sentencing, the prosecutor took care to remind jurors that, even if Troya and Sanchez did not intentionally murder the children, by law, they could still receive a death sentence on those counts, based on a mental state of "reckless disregard" for the boys' lives. T9493.

### B.       The Other Crimes Evidence.

#### 1.       The Haverhill Avenue shooting

##### A.       Factual background

Kevin Vetere, the government's star cooperator, testified that, two months before the murders, at a townhouse where Varela and the other defendants were staying and drugs and money were kept, he saw a car with three black men drive past twice and then park nearby. He could see the driver pointing, and was concerned they might be planning to rob the house.[20] Vetere summoned Troya, who came outside with an AK-47, accompanied by Sanchez, who had another assault rifle. T5624-26. The other vehicle sped off. Vetere observed it had some type of Miami Hurricanes license plate. T5627-28. He testified the AK-47 Troya had looked like the one police later found in Varela's bedroom. T5666-68.

A couple of months later, according to Vetere, he noticed what he thought might be the same car parked outside a strip club at about 10 p.m., while driving past with Troya, Sanchez, and Varela. T5629, T5636. By this time they had moved to a different house. Vetere reminded the others of the earlier incident. They supposedly hatched a plan for Troya to shoot the driver of

---

[19] The government also had the court instruct the jury on this theory of transferred premeditation. T7542.

[20] Liana Lopez, Varela's girlfriend and a codefendant, had told Vetere about an earlier incident in which robbers had taken money, drugs, and guns from the home at gunpoint. T5569-70, T5624.

the car when he came out of the club. They drove home, where Troya changed into black clothes and donned a wig of fake dreadlocks. But it was raining when they returned, so they decided instead they would follow the driver and Troya would "shoot the car up." T5637-39.

When the other car left the club at about 3 a.m., they followed. Troya supposedly rode in the front passenger seat armed with a 9 mm handgun. From the rear seat, Vetere could not tell the race, gender, or age of the other car's driver, let alone whether it was one of the same people who had driven past the house two months before. When the other car turned onto Haverhill Avenue, Vetere claimed, Troya leaned out the passenger window and fired at least eight shots. T5642-44. The other car swerved off the road, and the defendants drove off. T5645. According to Vetere, Troya later threw away the gun. T5646.

The government presented additional evidence about the shooting, though none of it corroborated Troya's involvement. The incident had occurred about a month before the Escobedo killings, in early September 2006.[21] A Sheriff's investigator went to the strip club that morning and found a vehicle scarred by multiple gunshots. (No explanation was offered for how the car had gotten back there). A black woman was sitting in a chair outside; she was bleeding profusely from a gunshot wound to her thigh. T6395-6402. Another investigator found the vehicle with its glass shattered, a flattened tire, and bullet fragments on the floorboard. She displayed pictures to the jury. T6190-6203. She also testified about and displayed photos of the injuries sustained by the victim, whom she visited in the hospital. T6204-07.

---

[21] This contradicted the time line described by Vetere. According to him, the initial incident in front of the old house took place right after he and Troya returned from Chicago in late August, and the shooting happened a couple of months later. That would have been late October. T5703-04.

23

This Court allowed this evidence over defense objection, accepting the government's "intextricably intertwined" argument, an alternative intent theory, and a finding it was not unduly prejudicial. T5631; T5632-34.

### 2. The Mercer Avenue shooting and Troya's prior imprisonment

Vetere also testified Troya told him he had "shot up a house on Mercer Avenue" at about 3 a.m. one night, using the same AK-47 he had brandished at Varela's old residence. T5670. According to Vetere, Troya said that "[w]hen he got arrested three years prior to that [shooting], the guy, was a codefendant on his case. And I guess he cooperated and he told on him. When he got out of prison, he shot the house up." T5670-71.

This testimony put before the jury allegations not only of a second shooting by Troya against innocent victims, but also an unnamed, additional offense, severe enough to have landed him in prison. The government coupled Vetere's account with extensive testimony about the results of the Mercer Avenue shooting, from a patrol officer, an investigator, and a firearms expert. But again, only Vetere connected this incident to Troya.

That shooting, it turned out, had occurred in April 2006, almost six months before the Escobedos were killed. When police arrived at the scene, they found that a woman and her two children had been inside when shots were sprayed into the home. They discovered seven bullet holes in exterior walls of the house, plus more in the door. Several projectiles had entered the living room and passed through the kitchen. One was lying near the living-room couch. T6162-90, T6266-94; T6341-44.

Police recovered eleven casings from the scene. The firearms expert matched eight of these to the AK-47 found in Varela's bedroom six months later. The government introduced a number of photographs and diagrams to illustrate this testimony. T6162-90, T6266-94; T6341-44. While the court encouraged the government to narrow the number of exhibits, it declared:

24

"On the other hand, the Government has an absolute right to show the kind of destruction, the danger that was occasioned by shooting into homes." T6218.

This testimony, like other Rule 404(b) evidence, came in over objection. The government noticed the evidence pretrial, as well as a similar shooting by Sanchez on Suwanee Avenue (Doc. 398-2:1.[22] Doc. 361. [23] This Court accepted the government's argument and allowed the evidence as proof that Troya constructively possessed the AK-47 at the time of the search and that he did so intentionally. T5814-21; *see also* T6165, T6174, T6176, T6178, T6181, T6183, T6187, T6189). This Court also said the evidence was not unfairly prejudicial under Rule 403. T5820.[24]

### 3.       The attempted armed home invasion

Vetere also testified that, at some unspecified point before the Escobedo killings, the defendants made plans to arm themselves and rob cocaine from the home of someone nicknamed "B Real," whose girlfriend Varela was dating. Vetere noted the area in West Palm Beach where he lived (but not the address). T5653-55, T5663. The defendants, according to Vetere, went to an Army surplus store to buy ski masks, gloves, and handcuffs, but were rebuffed in their efforts to purchase police shirts. T5654, T5661. They also failed in their plan to rent a vehicle to use in the crime, since Gutierrez had only an I.D. with a different name and dissimilar-looking photograph. T5661-62.

---

[22] The notice said that, on the same day as the Mercer Avenue shooting, Sanchez had used the same AK-47 to shoot up the home of a romantic rival. T6207-55.

[23] The government's firearms expert conceded the AK-47 was not connected in any way to the killings. T6612-15.

[24] Later while Vetere was on the stand, he also testified that Troya said he was glad he had taken a welding class in prison. T5674.

Nevertheless, said Vetere, the defendants, wearing ski masks, drove to the house in Varela's van, intending to rob "B" and steal his drugs. Supposedly Troya, who had a 9 mm handgun, and Sanchez walked up and knocked on the front door. Then, they went around and tried to open the back door with a crowbar. When they heard a voice inside yell about calling the police, Troya and Sanchez ran back to the van and they all fled. T5662-64.

The government not only never corroborated Troya's involvement in this strange-sounding incident; but it never offered any evidence, aside from Vetere's accusation, that it ever really happened.

The defense objected unsuccessfully. The court ruled that, as with the Haverhill Avenue shooting, the "home invasion robbery for the purpose of acquiring drugs" was "inextricably intertwined" with the drug conspiracy. Alternatively, said the court, it was admissible under Rule 404(b) to establish "intent to commit the crime, absence of mistake and so on." Moreover, under Rule 403, "its probative force would not be outweighed by any undue prejudice." T5659-60; see also T5810-11.

In closing summation, the government used the evidence to argue "Is it really pushing credulity to believe that a killer like Daniel Troya could execute an entire family? All you have to look at is the Haverhill shooting, all you have to look at is what he did to — T7448," and after objection was overruled the prosecutor continued: "The Haverhill shooting . . . . Troya sprayed a car, not seeing anybody inside that car, not knowing who it was, and he strikes a young black lady in the leg. But for the Grace of God, she is alive. She could have been killed. 11 casings at the scene firing into a car you don't know who it is. This is Daniel Troya. This is the person who is seated before you and you will pass judgment on. This is the violence that is reeked [sic] on

26

individuals who have no play in his criminal involvement. This young lady was not involved in anything. It was a guy who was in that car, or a car that looked like that car." T7449-50.

Troya's counsel objected and moved to strike these comments. But, in front of the jury— after having the prosecutor clarify that the Haverhill shooting involved "the young lady in the car" — the court announced: "No. I will overrule the objection and allow counsel to make this argument." T7449. Later the Court denied a mistrial motion by Sanchez focusing on the AK-47 argument only. T7460-62.

### C. Sentencing Hearing

#### 1. The government case.

The government continued to rely on the evidence its death notice had said it would use to prove Troya's dangerousness. This included trial testimony from its lead cooperator, Vetere, about two drive-by shootings and an armed home invasion he attributed to Troya. It also included additional evidence, presented at sentencing, about other violence by Troya, as well as his attempted escape from a youthful-offender facility.

Yuselena Jarrett testified to an incident that allegedly occurred a few months before the homicides, when Troya was 22. At the time, she worked in a clothing store with his then-girlfriend. She described witnessing a confrontation when she accompanied the girlfriend to retrieve her possessions from Troya after an argument the night before. Troya, she testified, cursed angrily at the girlfriend for calling the police, pointed a gun at her, grabbed her by the neck, and struck her with the gun, causing her to fall to the ground. At that point,[25] Jarrett said, a man she took to be Troya's father distracted him, and she and the girlfriend ran away. According to Jarrett, police were called (though the government introduced no police report or otherwise

---

[25] Jarrett identified the gun as among the ones police seized from Varela's house T8051; GX207.40, although the girlfriend had told her that Troya had used a "bee-bee gun." T8061-62.

corroborated this); but no charges were pursued, and the Troya's father, Lorenzo, testified he had not been present for or seen any such attack. T8041-42, T8045-53; T8960-61.

In 2000, when he was 17 years old, Troya pled guilty to felony battery. He admitted he struck the mother of a friend in the face with his fist, which knocked her to the ground, and then he struck her again. T8741. As a result, she suffered nerve damage and broken bones in her face and eye socket, requiring reconstructive surgery. T8741-42. The woman's son and another friend of Troya witnessed the incident. While they testified she initiated the physical confrontation, and her son testified she was drunk at the time, T8703, T8707, T8761-65, T8768-69, the woman's son, Karl Busch, ended up invoking his right to remain silent on cross examination regarding other crimes he was said to have engaged in with Mr. Troya and made other impeachable statements.

At age 12, in elementary school, Troya was involved in an altercation with a classmate. According to a police report, a girl pushed a desk into Troya, who pushed it back, causing her to fall and hit her head. T9232-33. When she taunted him, Troya, according to the police, punched her in the head. T9233. He told the investigator that he only pushed her. T9234. Troya's parents were called to the school, and he was suspended for five days. T8921, T8965-66; T9234-35.

The government also presented evidence that when Troya was 19 he and two other inmates "almost escaped" from a youthful-offender facility. Two years before that, at age 17, he had been sentenced to three years incarceration when he was convicted of punching his friend's mother, as well as of auto theft and burglary. T7981-82. With less than five months remaining on his sentence, he and the other inmates were caught outside their "dormitory" in the prison yard. This area was separated from the outside by several security fences; the most interior one bore signs of attempts to lift or breach it. T7980-84, T7991-92, T8008, T8015. An investigation by the

28

prison revealed a plan to escape, involving stolen and make-shift tools, home-made ropes, manikins, and disguises to escape detection. T7985-92. No weapons had been used or recovered in the incident, and no one had employed violence or had resisted when apprehended. T8011. Troya was subsequently convicted of the escape attempt and sentenced to an additional 20 months. T7993. The defense did little to mitigate this offense.

Testimony from a prison investigator and Troya's mother showed that, two weeks before the attempt, he had reported that correctional officers physically assaulted him with punches and kicks in the laundry room. T8001-02, T8004; T8909. As a result, the prison transferred Troya to administrative confinement, a more restrictive setting, "for his own safety." T8002-04.  He told his mother that he intended the escape attempt, so near the end of his sentence, as a way to force a transfer to another facility. T8909; see also T9563. The government crossed his mother about a card with money hidden inside she supposedly sent him.

On the verdict sheet, six jurors found to be mitigating the fact that the attempted escape followed the assault by guards. Doc. 859:14. Six jurors found mitigating that none of Troya's prior convictions involved deaths or weapons offenses.  Doc. 859:13.

The government also called members of the victims' families: Rita Flores, Lou Escobedo's sister (T8101-10); Sara Guerrero, Yessica Escobedo's mother T8112-21; Felipe Guerrero, her brother T8123-30; and Monica Moreno, her aunt T8132-45. They provided moving memories of the Escobedos' lives, and described the loss that they and the other survivors suffered and would continue to suffer as a result of their deaths.

### 2.	The defense case

The defense introduced minimal mitigating evidence concerning Daniel Troya's childhood, youth, and record, and failed to produce mental health evidence it promised the jury.

Counsel also relied heavily on the fact Daniel Varela, an equally culpable codefendant, would not face capital punishment or even a murder prosecution.

### A.   Troya's happy early childhood in a loving and caring family, which continues to love him.

The defense evidence in mitigation showed Mr. Troya was 23 years old at the time of the homicides and was part of a large family who loved him. Several relatives testified on his behalf: his parents, Maria and Lorenzo Troya; his two younger brothers, Alex (age 23) and Adrian (age 12); his paternal grandmother, Maria Troya, Sr.; his maternal aunt, Mercedes Fortineaux; and his maternal uncle, Juan Quinones.

His family described him as happy and outgoing as a young child — joking, laughing, and something of a clown. T8785; T8800, T8950-51, T8999, T9000, T9019. The family related, for example, that Troya, between ages 8 and 10, often accompanied his grandmother to Morse Geriatric Center in West Palm Beach, where she worked. He helped out, interacting with residents, pushing wheelchairs, assisting in the kitchen, and setting the tables for meals. Troya enjoyed his time there — "[h]e loved going." T8799-8800, T9017-18, T9021, T9028-29. And the residents enjoyed having the young boy, who would joke and make them laugh. T8800; T9031.

Troya's family members testified about their past and current relationships with him. His mother said that she loved him "dearly." T8908. Troya's father also testified that he loved his son. T8962.  Both parents described how, during his prior incarcerations, the family had been in constant contact with Troya. T8911-12, T8961-62. Alex testified that he had a close relationship with his brother, "I still love him to this day," and that Troya and Adrian were especially attached. And Adrian testified that he too loved his brother, and that, during their jail visits, Troya had given him helpful advice about keeping his grades up, listening to his parents, and

30

avoiding trouble. T8962, T9001, 9117. His grandmother testified that she loved him "very much" and would never leave him.[26] T9020-21.

Even with such milquetoast mitigation, the government went after Mr. Troya's family witnesses. On cross and through a rebuttal witness, it accused his mother Maria Troya of sending a card to her son while in prison with currency hidden within it. *See* T8923 (cross); T9235 (rebuttal testimony of Birch). It quizzed her also on having to go to the school because of the incident in which her son Daniel was accused of hitting a girl while both were in elementary school,T8921, and the extent she knew of when he had punched another woman, other crimes he had been imprisoned for, and whether when he went to Chicago it was to flee a charge. T8925-26.

The government questioned his grandmother whether in his youth Daniel Troya had volunteered all that much at Morse Geriatric. *See* T9021-22.  It similarly got the chef at Morse, Mr. Sepulveda, to say Daniel stopped volunteering at about age 12. T9032. For other family members, the government continued to prod the extent to which they were aware of other bad acts, and their reaction. For instance, with Daniel Troya's father, Lorenzo, the government asked about his conversation with the mother of the girl young Daniel was accused of hitting while both were students at Palm Beach Public School. The government accused him of telling the girl's mother that if his son Daniel was a bully she should stay away from him, T8966, even asking if police recorded such a statement made by him from interviewing the girl's mother, whether that would be wrong. T8967.  The government continued to ask his father about other crimes it believed it had proven Daniel Troya engaged in, such as punching a woman, thefts, and

---

[26] This court, however, refused to permit the family members to talk about the loss they would experience were Troya executed, or to discuss the relationships they would have with him even if he were sentenced to life and sent to federal prison. This court also instructed jurors to ignore entirely the effect of their sentence on Troya's family and their relationships with him.

that he had only been out of prison a short time. T8968.  The government tried its best to imply Daniel Troya did mostly well in school.

The government continued to impeach Mr. Troya's witnesses on other mitigation that was offered up.

### B.      Troya's early teenage years marked by trauma and loss.

The defense introduced evidence that when Troya was 13, his friend, John Kamel, a boy with an artificial leg and a heart defect, was shot by another student at their middle school. T8814-19; T9066.  Troya was outside, across the street at the time and, after hearing the shots, looked over and saw his friend collapse. T8819; T9067-68.  As the other students fled, Troya ran to him.  T8819-20; T9068.  According to his uncle, Juan Quinones, who also witnessed the event, Kamel died there in Troya's arms.  T9069; T8820-21; see also T9079.  Afterwards, Troya was in shock, unable to discuss it with his parents, who tried repeatedly to talk to him. T8822-23. The event appeared to have a lasting impact on him, as he became strangely distant and quiet. T8826; T8950-51, T8954, T9000, T9070-71.  Troya never received any kind of counseling. T8821-25; T8951-52.

The government closely cross examined Mr. Troya's family on the issue of the effect of the Kamel shooting on Daniel as an adolescent as well, in a mostly successful effort to undermine its impact on the jury. The government questioned whether Daniel was even a close friend of John Kamel, and asked leading questions to his father Lorenzo such as whether he was aware his son was closer friends with the shooter than he was with the victim, T8973, and was aware the victim was a person his son had just met at lunch that school year in 7th grade. T8973 (Lorenzo was not aware). The government disputed one of the central facts of the event, even asking Lorenzo if he knew his son was only one of a number of kids who ran up to the victim. T8900.    The government didn't stop there. From the defense witness Officer Key, the

32

government elicited testimony he had determined Daniel Troya was not the only person who went up to the victim after he was shot, there were more than three people, and eventually teachers approached. T9085. The government also asked the officer whether he knew if this shooting had any connection to Daniel Troya stealing a car, a connection with his punching or pistol whipping women, or any connection with his murdering a family. An objection to that questioning was sustained. T9087.

The defense introduced testimony that a few months after the killing of John Kamel, Lisa Schmidt, a long-time neighbor, committed suicide.  T8831-32; T8953.  Her family and the Troyas had lived next door for years and were close, including spending the holidays together each year.  T8832-33; T8954.  Defense counsel tried to show Troya had been close to Ms. Schmidt: she had spent time with him, helping him with his homework. T8832; T8955, T9000. The defense also introduced testimony the suicide was shocking and hard emotionally on everyone, including Troya, T8833; T8955, and that again, he withdrew and refused to discuss the loss or his feelings, and, again, he received no counseling. T8833-34; T8955.

Though the court later corrected any misperception, T8981, the government sought to undermine this point as well, drawing a parallel between Ms. Schmidt's overdose and its contention Mr. Troya was later selling pills. After testimony about the effect of the suicide on Daniel Troya, on cross of Mr. Troya's father, the government asked whether he was aware Mr. Troya was distributing pills in this case or that he had them on October 25, and whether he had ever talked with him about that. T8977.

Finally, during this same time period, Troya's grandmother became ill with cancer and died following a two-year battle. After being diagnosed, she had moved from Chicago to live with the Troyas, where she stayed while her health deteriorated. Troya grew close to her, and

33

was affected by her worsening condition. And, as he had with the prior losses, he buried his feelings. T8836. Knowing the end was near, his grandmother decided to return to her home in Chicago, and the family gathered together to say good-bye, for the last time. T8837. Troya's mother could tell, from the hug that he gave his grandmother then, how upset he was, "trying to show his affection without crying." T8838. At closing, the government argued this was just like any life experience anyone would have.

The defense sought to show Troya was deeply affected by the losses he suffered at that time in his life. Indeed, at one point fairly soon after his friend was shot, Troya's father Lorenzo was called to the school because Troya was behaving erratically: He was running in circles, endlessly, around the baseball field, and the teachers could not get him to stop and come inside. T8826; T8956. No one, including Troya, was ever able to explain this behavior. T8826; T8956-57.

Without explanation, the defense also presented evidence of another time soon after, during an argument with his father, Troya literally jumped out of a bedroom window. T8828; T8957-58. He became withdrawn and slept most of the time while he was in the house. T8828. Troya's performance at school suffered; his grades declined and he began to act out. T8827; T9019.

On one occasion a few months after Kamel died, Troya was so upset that he ran out of the house, with his mother following him, and wedged himself onto railroad tracks nearby. He refused to leave, even as a train approached, and his mother, frantic, was only able to pull him up at the last minute. T8829. He never explained why, and, again, he never received counseling. T8829-8830.

34

The verdict sheet reports that nine jurors found the fact that Troya was traumatized by his friend's shooting death to be mitigating; nine jurors also found mitigating the fact that he did not receive grief counseling.  Doc. 859 at 14.

### C.        The bad influence exerted on Troya by his Uncle Tito.

When Troya was 12, in the summer of 1995, his maternal uncle, Isidro (aka "Tito"), who was then around 18, was sent to live with the Troyas. Tito had been in Chicago with his own family, but was often in trouble with the law and gangs: He stole from family members, was "gangbanging," and had been held in detention.  T8804-05; T8917, T9038-40, T9041.  The Troya adult family testified they did not know the full extent of his troubles.  T8804-05; T8917, T9038, T9042. With Troya's parents at work, he spent a lot of time with Tito, who was essentially his babysitter. Tito must have created an impression on the younger Troya: He dressed nicely, had his own spending money, and was a smooth talker, in particular with women — a "cool guy." T8811; T8997, T9041, T9058. Troya's mother testified that Tito was capable of manipulation. T8811. He left at the end of the summer.  T8812. The defense did not call Uncle Tito to testify, or anyone else who could have explained the effect on young Daniel Troya.

Again, the government undermined the defense mitigation testimony. Its main line of attack was that Uncle Tito had not actually spent much, if any, time at the Troya home during the summer of 1995. On its cross of just about every family member, the government questions implied Uncle Tito had not been there for long, if at all. Questioning Daniel Troya's mother, the government questioning suggested trouble with Danny began before his uncle even visited. T8916.

Pressing on, the government confirmed Danny's mother Maria thought he and Uncle Tito were close. The government then elicited from his mom that in the summer of 1995, uncle Tito was close to 18, and Daniel Troya was 12. T8918. The government questioned whether Maria

35

Troya wanted the jury to believe she left her twelve year old child with an eighteen year old she knew was a criminal. T8918. On objection, that question was stricken. But the government was undeterred. It continued to suggest to Ms. Troya she was a bad mother, asking about why she didn't supervise the two, make Uncle Isidro get a job, or understand what he would show her son. T8919. It even got her to agree the shooting of John Kamel occurred one and a half years after Uncle Isidro left. T8919, 8935.

As for Daniel Troya's father, the government got him to acknowledge that Danny's problems began earlier than Uncle Tito's visit, at age 12. T8965. The government, as it turns out quite falsely, also questioned Mr. Troya's father closely about the time Uncle Isidro was with the family. It implied in its questions to Lorenzo that Uncle Isidro was actually in prison in Jacksonville, Florida, starting in July 1995, for a year; Lorenzo answered he was not sure. T8972.

In its assault on the defense mitigating case, the government even invoked its trope of warning a witness he was under oath. On the cross of Mr. Troya's brother Alex, the government asked whether it was his specific recollection under oath that his uncle was at their house the entire summer of 1995. Alex answered he did not know the time span, but that the uncle was here that summer. T9003. His grandmother Maria, asked a similar question, said she did not specifically remember the Summer of 1995. T9022.  Ms. Fortineaux, Daniel's aunt, was asked if she knew Uncle Isidro was charged in Chicago with probation violation in August 1995, and she did.  T9049.

The verdict sheet reflects seven jurors found mitigating the fact that Troya had been affected adversely by his Uncle Tito.  Doc. 859 at 13-14. The evidence bears this out: After the summer with Tito, Troya's school attendance and academic performance began to drop

36

precipitously, to the point that he had 31 absences in 7th grade and, by 8th grade, almost all F's. T8827; T8900-04; DX15; *see also* T8795-96, T8813). That year, Troya was kicked out of the middle school. T8830-31.

The government countered this testimony.

The defense theory was that Daniel Troya began to have trouble with the law, as had his Uncle Tito. At age 17, he was sent to Florida DOC as a result of stealing a golf cart. T8905-06. Later that year, he was sentenced to three years imprisonment, as a youthful offender, for stealing a car, which he subsequently abandoned, and for the felony battery involving his friend's mother. T8906, T8931-32, T8968. While incarcerated, Troya earned his GED.  T8906; DPX3.5. Released in 2003, he returned to live with his parents. T8911. He tried to find work, but potential employers refused to hire him when they learned of his record. T8911, T8959.  Troya was rearrested a few months later and ultimately sentenced to prison on a parole violation, the escape attempt (described above), and two new auto-theft charges. T8968-69. Released again in December 2005, he again tried unsuccessfully to find work. T8960. Ten months later, in October 2006, he was arrested in this case. T8969.

The government made mincemeat of this mitigation, directing the jury to the fact Daniel Troya had served most of his life since adolescence in jails and prisons, and was out only a short time before the killings in this case.

> **D.      Daniel Varela, the head of the drug conspiracy and alleged
> instigator of the murders, did not face the death penalty or
> even a murder charge.**

The defense also submitted to the jury the mitigating factor, explicitly listed in the Federal Death Penalty Act, that "[a]n equally culpable co-defendant, Danny Varela, will not be punished by the death penalty." Doc. 859 at 12. See 18 U.S.C. § 3592(a)(4). Counsel even began his summation with this factor and emphasized it, calling it "huge" and something that "in and of

37

itself demands" a life sentence. He reminded jurors that the indictment had described Varela as an unnamed coconspirator in the carjacking of the Escobedos. (See DE854:4-7), and catalogued in detail how the government's presentation cast the murders as having occurred at the behest of, and to benefit, Varela. Moreover, argued Troya's attorney, the evidence about the defendants' interactions with Varela suggested that he "was in charge," he "directed all of the others in this case," and that Troya was, at most, just a "worker," a "follower." T9567-72.[27] Ten jurors found this mitigating factor. Doc. 859 at 12.

### 3. After extended deliberations, the jury rendered split sentencing verdicts.

Jurors deliberated over the course of four days before reaching verdicts.[28] They imposed life sentences on three of the capital counts, and death sentences on the remaining two. They voted unanimously for life on the carjacking conviction

(Count 6), which involved all four victims, as well as on the two convictions for use of a firearm resulting in deaths of each of the adults, Yessica Escobedo (Count 9) and Lou Escobedo (Count 10). Only on the two convictions for use of a firearm resulting in the deaths of each of the children, Luis Damian (Count 7) and Julian (Count 8), did the jury impose death. Doc. 859 at 16-18.

The verdict form reflected that, for each of the five capital counts, the jury found four statutory aggravating factors: (1) Troya committed each killing in the expectation of receipt of

---

[27] The government, however, misleadingly and without evidentiary support, argued in summation without objection that the government's investigation of Varela would continue and that, in time, when sufficient evidence was uncovered, he would be prosecuted for the murders and face the death penalty.

[28] Deliberations began on March 26 at 11:43 a.m. T9762. Jurors deliberated that afternoon, and all day March 27 and March 30. T9776; T9801. It was 4:55 p.m. on the following day, March 31, when the court finished receiving the verdicts. T9846.

something of pecuniary value; (2) he committed each killing after substantial planning and premeditation; (3) the children were particularly vulnerable victims due to youth;[29] and (4) Troya intentionally killed or attempted to kill multiple victims in a single criminal episode. Doc. 859 at 6-9.

For each of the capital counts, the jury also found three nonstatutory aggravating factors, that Troya (1) participated in other, uncharged acts of serious violence; (2) killed the victims to eliminate them as potential witnesses; and (3) caused harm and loss to the family of the victims. Doc. 859 at 9-12.

Jurors also found mitigating factors, most related to Troya's childhood, youth, and prior record, and to Varela's escape from capital prosecution despite his equal culpability for the killings. Doc. 859 at 12-14. Eleven jurors further found as a mitigating factor that "Jose Luis Escobedo engaged in criminal conduct that contributed to the circumstances leading to his family's death." Doc. 859 at 14.

## IV.        INTRODUCTION.

In this circumstantial case, Mr. Troya faced capital counts, among others, that relied substantially upon cooperators trying to reduce the lengthy sentences they were facing and iffy, unreliable forensic analysis and testimony. Mr. Troya's trial counsel failed to investigate, failed to utilize expert assistance this Court made readily available to them, and failed to utilize the skill and expertise demanded of capital litigators.

The failures of trial counsel continued into the penalty phase and resulted in a jury sentencing Mr. Troya without the means to render the individualized sentencing constitutionally

---

[29] This aggravating factor was found only for the two counts involving the children alone (Counts 7 and 8) and for the carjacking count involving all four victims (Count 6). Doc. 859 at 8.

39

mandated in a capital trial. Only a cursory social history was presented by trial counsel in a truncated fashion. Mental health experts, although funded and ready to testify, were not called to testify. This failure to call mental health experts was only magnified when trial counsel announced in his opening to the penalty phase that the jury would hear from renowned mental health experts to explain Mr. Troya's actions and then failed to call them as witnesses. This failure was pounced on by the Government who skewered defense counsel for the failure and portrayed Mr. Troya as a ruthless "thug enforcer."

Just one example of how profound trial counsel's failures were is, that unknown to the jurors deciding his fate, Mr. Troya suffered from significant brain damage. The damage was in his frontal lobe, the area of the brain which controls executive functioning and is supposed to control impulsivity, regulate emotions, and respond to stress. Trial counsel knew some of this, because a Petscan obtained by them prior to trial showed significant abnormalities in Mr. Troya's brain. For no good reason, however, counsel neglected to follow up with the doctor who conducted and interpreted the Petscan, so they never obtained his final opinion about the brain damage and failed to present to the jury the extensive effects it had on Mr. Troya's behavior. The prejudice was profound. The jury sentenced him to death totally unaware of this significant fact, one which in and of itself is very likely to have changed the outcome.

Counsels' many deficiencies in their investigation and performance at both the guilt and penalty phases of trial are addressed in this motion, as well as deficiencies by counsel on appeal. The facts show counsel failed to adequately challenge the government's case for guilt and death at trial. But it was not just defense counsel who acted improperly. The government knowingly engaged in grossly improper argument to obtain the convictions and sentences here. After

permitting further briefing and discovery, this Court should order an evidentiary hearing and vacate the convictions and sentences.

**V.      JUROR MISCONDUCT DEPRIVED MR. TROYA OF HIS RIGHT TO A FAIR AND IMPARTIAL JURY UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND 28 U.S.C.A. § 1865**

Mark Sollenberger, Connie Thomas, Donald E. Little, and Donald G. Boser all served on the jury that convicted Mr. Troya in the above-styled cause; Diane Gooch and Dorothy Barba were alternates who sat with the panel daily until excused. As in any trial, these jurors went through the *voir dire* process, including answering juror questionnaires and questioning under oath. In answering the *voir dire* questions posed to them, the listed jurors appear to have provided answers that were untrue and/or seriously misleading. Specifically, the listed jurors failed to reveal certain telling personal information that was highly relevant to matters at issue at both guilt and sentencing in Mr. Troya's capital case. If this critical information had been properly and truthfully disclosed, Mr. Troya would have challenged these jurors for cause and excluded them from jury service; at least one juror would have been statutorily disqualified.[30]

Mr. Troya's defense team has investigated the listed jurors and has thus far uncovered the following:

**A.      Diane Gooch was a convicted felon and a cooperating government witness in a prior case and failed to disclose those and other facts.**

Diane Gooch served on the jury as an alternate, yet she was statutorily unqualified for jury service pursuant to 28 U.S.C.A. § 1865(b)(5), which disqualifies someone who: "has a charge pending against him for the commission of, or has been convicted in a State or Federal

---

[30] Mr. Troya's attorneys will file a Motion to Interview Jurors to contact and interview these jurors to explore the circumstances of the misconduct further and obtain additional necessary facts to successfully present this information to this Court in a fully pled §2255 motion.

41

court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored." Diane Gooch had been previously convicted of a crime punishable by imprisonment for over a year. Mrs. Gooch was engaged in the following questions and answers during *voir dire*:

- *Jury Question #18*: "Have you or any family members or friends ever worked for, or applied to work for, any state attorney's office, United States Attorney's Office, **or any other** city, county, **state** or federal **office or agency**? If YES, who, and for what agency?" Mrs. Gooch responded, "No."

- *Jury Question # 20*: "Have you ever been a witness to a crime? If YES, please explain the circumstances:" Mrs. Gooch checked the "No" line, avoiding further explanation.

Mrs. Gooch **failed to disclose** she previously worked in the Title Section of New Jersey's State Department of Motor Vehicles from approximately 1997-2003. According to public records, as a result of her employment at this agency Mrs. Gooch suffered a felony conviction for official misconduct and was sentenced to two (2) years of probation, 30 hours of community service, and forfeit of public office position. *Appendix D-001*. The records show that on June 20, 1996, Ms. Gooch was originally indicted on one count of second degree felony of conspiracy to commit the crime of Official Misconduct, one count of Official Misconduct in the second degree, and one count of Tampering with Public Records, all occurring on or about November 7, 1994. *Appendix D-008-014*. The allegations of the indictment were Mrs. Gooch purportedly received two checks made payable to the New Jersey Division of Motor Vehicles and the Automobile Insurance Surcharge Collection Fund. These checks were prepared and backdated by a co-conspirator for the purpose of restoring that co-conspirators' driver's license prior to November 7, 1994, the date on which that co-conspirator was issued a summons for driving while license suspended. On October 15, 1996, she pled to and was adjudicated guilty of a lesser offense of

42

third degree Official Misconduct on Count 2, and the other two counts were dismissed. *Appendix D-004-007*.

The 1994 version of the crime to which Ms. Gooch pled is at *Appendix D-015*. The statutory subsection to which she pled is 2C:30-2, which provides in part: "Official misconduct is a crime of the second degree. If the benefit obtained or sought to be obtained, or of which another is deprived or sought to be deprived, is of a value of $200.00 or less, the offense of official misconduct is a crime of the third degree." While she was ultimately sentenced to probation, the third degree crime to which Mrs. Gooch pled was a felony punishable by three to five years in prison pursuant to *N.J.S.* 2C:43-6 (3), which provides: "a. Except as otherwise provided, a person who has been convicted of a crime may be sentenced to imprisonment, as follows: ...(3) "In the case of a crime of the third degree, for a specified term of years which shall be fixed by the court and shall be between three and five years." *Appendix D-230-231*.

Had this felony been disclosed in response to the aforementioned question or the basic juror qualification questions, Mrs. Gooch would have been disqualified from jury service.

The circumstances of the offense with which Mrs. Gooch was charged – a conspiracy – as well as the plea papers show Mrs. Gooch was also a witness to a crime. In fact, she agreed to cooperate with the government as a witness as part of her plea. Her plea papers show a condition of the plea was that "Diane Gooch will cooperate with state in all matters pertaining to this investigation." *Appendix D-007*. Mrs. Gooch had obviously been a witness to a crime, as well as a government cooperator, both extremely relevant to her ability to serve fairly, and both contrary to what she swore to in her *voir dire* answers.

During the trial, the Government brought to the Court's attention that a United States Probation Officer had received information that Diane Gooch was discussing the case at work.

43

The Court decided to not inquire into the matter because she was an alternate. *Appendix D-016-020.*

      **B.**      **<u>Mark Sollenberger</u> failed to disclose the full nature and extent of various family members' problems with illegal drugs.**

Mark Sollenberger served on the jury at both guilt and penalty phases and was engaged in the following questions and answers during *voir dire*:

- *Jury Question #24:* **"Have you or any family members or friends ever had a problem with illegal drugs?"** Mr. Sollenberger stated, "Yes", "Three brother-in-law's – several convictions. DUI." The Court only probed to the point of asking if anything about their difficulties would affect his ability to judge the evidence in this case and he stated "no."

Contrary to Mr. Sollenberger's sworn statements, a number of his family members in addition to his brothers in law appear to have had substantial problems with illegal drugs: those problems did not just include DUI's, and they were far closer to home than the juror revealed. Mr. Sollenberger **<u>failed to disclose</u>** his son, David Andrew Sollenberger, had been arrested in Florida on December 22, 2008, for drug paraphernalia – 11 counts – and for possession of cannabis. *Appendix D-021-023*. Mr. Sollenberger initially appeared before this Court for jury selection on January 06, 2009, a mere fifteen days after his son's arrest and first appearance on December 22, 2009. *Appendix D-024-027*. The Information was filed in Mr. Sollenberger's son's case on January 2 and 5, 2009, right on the eve of trial. Subsequently, while the trial was in progress Mr. Sollenberger's son resolved his case with a deferred prosecution agreement on January 29, 2009. *Id*. Mr. Sollenberger completely failed to disclose this information to this Court.

Mr. Sollenberger also **<u>failed to disclose</u>** that his brother, Robert Kent Sollenberger, was arrested in 1987 for possession of cocaine with intent to deliver and delivery of a controlled substance to a minor. *Appendix D-028-041*. Allegedly, Robert Sollenberger worked at American

Prep School and was the target of an investigation about his receipt of cocaine from students in return for higher grades and extra credit. *Appendix D-041*. Law enforcement reportedly placed a sixteen year-old confidential informant in the school and that informant arranged a drug deal with Mr. Sollenberger. *Id*. Mr. Sollenberger assured the confidential informant that he had taken care of the grades. Then, the sixteen year-old confidential informant gave Mr. Sollenberger two grams of cocaine and Mr. Sollenberger gave the sixteen year-old three 500 mg. Darvon tablets and told him he should take them with beer. *Id*.

Additionally, Mr. Sollenberger **failed to disclose** two of his brothers-in-law, Roy Livermore and Richard Livermore, had extensive criminal records which included drug charges.[31] Roy Livermore's criminal history reveals that between 1980 and 2006 he was convicted on three occasions of possession of a controlled substance, once for an aggravated assault, and once for a grand theft. These drugs reportedly include Quaaludes, Darvocet, and marijuana. *Appendix D-042-065*.

Reportedly, during one criminal incident in March 1981, Roy Livermore was observed staggering and bumping into people at a bowling alley and generally causing a disturbance. A search incident to arrest revealed 43 Lemmon 714 Quaaludes. *Appendix D-066-078*. Mr. Livermore's sentence included a term of probation, a special condition of which was to attend the Spectrum Program for drug rehabilitation. *Id*.

Mr. Sollenberger further **failed to disclose** that a second brother-in-law, Richard Livermore, also has a long history of offenses between 1977 and 2006 including possession of weapons, possession of a controlled substance, obtaining a substance by fraud, assault,

---

[31] Mr. Sollenberger has been married to his wife since 1981.

aggravated assault, aggravated battery and cocaine possession. *Appendix D-079-085*. In addition, Mr. Livermore has a 2006 felony DUI, which was generally disclosed by Mr. Sollenberger.

Richard Livermore's first criminal offense involving drugs occurred in 1986. He was convicted of obtaining a controlled substance by fraud and possession of Diazepam. *Appendix D-086-099.* Reportedly, a fraudulent prescription was called in for Diazepam, using someone's name other than Mr. Livermore's. *Appendix D-090*. When Mr. Livermore arrived at the pharmacy he was arrested, subsequently convicted, and sentenced to a term of probation. Ultimately, Mr. Livermore violated his probation and served time in prison. *Id*.

After serving his prison term, Mr. Livermore was again sentenced to two years of prison on May 1, 1989, for a drug offense, possession of cocaine. *Appendix J*. Mr. Livermore was reportedly observed by undercover officers buying crack cocaine and attempted to flee upon detection. *Appendix D-113*.

Shortly after his release from prison in late 1989, Mr. Livermore committed another drug offense and was convicted of possession of cocaine and possession of cannabis. *Appendix D-114-125.* Reportedly, Mr. Livermore was again observed by an officer buying crack cocaine. *Appendix D-125*.

C.   **Connie Thomas** **failed to disclose information regarding the illegal firearms and drug problems of her family members.**

Connie Thomas served on the jury and engaged in the following questions and answers during voir dire:

- *Jury Question #18:* **"Have you or any family members or friends ever worked for, or applied to work for, any state attorney's office, United States Attorney's Office, or any other city, county, state or federal office or agency? If YES, who, and for what agency?"** Ms. Thomas answered "No."

46

Defense investigation reveals that Teresa Thomas, believed to be Connie Thomas' sister, has worked in the State Attorney's Office, however, the dates of her service are unclear. *Appendix F-126.*

- *Jury Question #23:* **"Have you or any family members or friends ever had a problem involving firearms, whether used legally or illegally? If YES, please explain."** Ms. Thomas answered "no".

Ms. Thomas **failed to disclose** her ex-husband, John Thomas Mincey, Jr., did have a substantial problem involving the illegal possession of firearms. He was convicted during their marriage of possession of firearm by a convicted felon and sentenced on that charge in 1993. *Appendix D-127.*

Ms. Thomas also **failed to disclose** her ex-brother-in-law, John Burrows Hutchinson, Sr., served time in the Florida Department of Corrections for carrying a concealed firearm. *Appendix D-128.*

- *Jury Question #24:* **"Have you or any family members or friends ever had a problem with illegal drugs? If YES, please explain."** Ms. Thomas answered "Yes," "Possession / selling drugs. Never used." The Court questioned her about this response on 01/06/2009, pgs. 238-240. She explained it was her **nephew** and that she did not attend any of his court hearings.

Ms. Thomas further **failed to disclose** that her brother, Willie James Thomas, had an extensive criminal history involving problems with illegal drugs prior to the dates of *voir dire*. The convictions include trafficking cocaine, multiple possession of cocaine charges, possession of marijuana, and perjury. Her brother appears to have served at least 39 months in federal prison on a perjury charge and his supervised release was violated for separate incidents involving trafficking cocaine and possession of cocaine. *Appendix D-130-135.*

Ms. Thomas additionally **failed to disclose** that her ex-brother-in-law, John Burrows Hutchinson, Sr., served time in the Florida Department of Corrections for purchase of cocaine in 1994. *Appendix D-136-137*.

### D. Dorothy Barba failed to disclose her family member's problem with illegal drugs.

Dorothy Barba served on the jury as an alternate and engaged in the following questions and answers during voir dire:

- *Jury Question #24:* **"Have you or any family members or friends ever had a problem with illegal drugs? If YES, please explain."** Mrs. Barba responded, "Yes," "My son 20 years ago for smoking pot." During voir dire she stated, "…I was glad he got caught." Accurint reveals her son, Dustin Walker, was sentenced with the Florida Department of Corrections on 09/23/1986 for constructive possession of controlled substance. Dustin Walker has not had any subsequent offenses except for one DUI.

Mrs. Barba **failed to disclose** her grandson, Justin Patrick Guthrie, had a problem with illegal drugs. He had three arrests and two convictions for drug possession prior to her jury service. *Appendix D-138-147,  D-148, D-149 and D-150.*  It appears her grandson's drug issues were likely occurring during the time of her service as well. A mere two months after deliberations concluded, Mrs. Barba's grandson was arrested for trafficking oxycodone and obtaining drugs by fraud  on June 15, 2009,  obtaining drugs by fraud and marijuana possession on August 27, 2009, trafficking oxycodone and obtaining drugs by fraud on February 9, 2010, and multiple charges of possession with intent to sell on March 22, 2010. Mrs. Barba's grandson served time in the Florida Department of Corrections for these offenses. *Appendix D-144*.

### E. Donald Little failed to disclose information regarding the illegal firearms and drug problems of his family members.

Donald Little served on the jury at both guilt and sentencing phases and provided the following answers to questions during jury selection:

- *Jury Questionnaire #23:* **"Have you or any family members or friends ever have a problem involving firearms, whether used legally or illegally? If YES, please explain."** Mr. Little answered: "No."

- *Jury Questionnaire #24:* **"Have you or any family members or friends ever had a problem with illegal drugs? If YES, please explain."** Mr. Little answered: "Yes" and further stated, "A step sister who passed away." When questioned further on 01/22/2009, he explained it was "… a new step sister, new family. My mother-in-law remarried, and I didn't know them that well".[32]

Mr. Little **failed to disclose** that his son-in-law, Juan Francisco Gonzales, was convicted of felonies involving firearms and violence, including the Florida offenses of possession of firearm by a convicted felon, delivery of cocaine, possession with intent to sell, burglary, grand theft, and robbery. These offenses spanned the time period from 1993-2007, before jury selection in this case began.

Records reveal that Mr. Gonzales was sentenced to four years in the Florida Department of Corrections for robbery with a firearm.[33] The armed robbery case ran concurrently with a four year sentence in the Florida Department of Corrections for burglary of a car, aiding and abetting the burglary of a conveyance, and aiding and abetting a grand theft. *Appendix D-151-177) and D-178-180.*

Subsequent to serving his prison sentence for the armed robbery and burglary of the car, Mr. Gonzales served time for delivery of cocaine. Mr. Gonzales was allegedly set up in a controlled buy of cocaine. *Appendix D-181-184 and D-185-192.*

Mr. Little further **failed to disclose** that another son-in-law, Cecil Astor Harper, was arrested for possession of cocaine with intent to sell and served time in the Florida Department of Corrections for aggravated battery with great bodily harm pursuant to a sentence imposed in

---

[32] If it was his mother-in-law, Betty Wineman Bentinoff, it would not be a step sister; it would be a step sister-in-law.

[33] Three years of the sentence was the mandatory minimum.

49

1998. Allegedly, Mr. Harper stabbed the victim with a broken bottle that caused great bodily harm. *Appendix D-193-207 and D-208-210.*

> **F.** **Donald G. Boser** **failed to disclose the illegal drug problems of his brother-in-law.**

Donald G. Boser served on the jury at both phases of the trial and was engaged in the following questions and answers during voir dire:

- *Jury Question #24:* **"Have you or any family members or friends ever had a problem with illegal drugs?"** Mr. Boser stated, "no."

Mr. Boser **failed to disclose** that his brother-in-law, Robert Ries, has a long criminal history that indicates a substance abuse problem. Mr. Ries' criminal history between 1988 and 2006 includes arrests for possession of heroin, possession of cocaine, and possession of a controlled substance.[34] In addition, Mr. Ries appears to have served some time in prison in New York for a drug offense. *Appendix D-211-222, D-223-225, and D-226-229.*

> **G.** **Prejudice.**

This prosecution involved both drugs and firearms (as well as government cooperators), so the experiences of prospective jurors with these issues was at the top of the list of bases for excusal by defense counsel. Several jurors had family issues with drugs and weapons, or both, and the defense would have sought to excuse the jurors harboring such issues identified here for cause or otherwise had the jurors answered truthfully. Such an excusal motion would have been granted by this Court upon honest juror answers. Juror deceit during jury selection cannot be tolerated by the Court.

---

[34] Mr. Boser has been married to his wife since 1999.

The First Circuit, while reviewing a Government appeal from a grant of a new trial in a capital §2255 petition, aptly articulated the legal framework that governs post-conviction claims of juror dishonesty:

> It is constitutional bedrock that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury.' U.S. Const. amend VI. an impartial jury is one 'capable and willing to decide the case solely on the evidence before it.' *McDonough*, 464 U.S. at 554, 104 S.Ct. 845 (internal quotation marks omitted). The right to an impartial jury is nowhere as precious as when a defendant is on trial for his life. *See Ross v. Oklahoma*, 487 U.S. 81, 85, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

*Sampson v. United States*, 724 F.3d 150, 163 (1st Cir. 2013).

District Court Judge Sessions further observed when granting a new trial to capital §2255 litigant, Donald Fell, that:

> The Federal Death Penalty Act ("FDPA") requires a unanimous jury to conclude that the death penalty is warranted. *See* 18 U.S.C. §§ 3593, 3594. "[E]ach juror has the power to decide that a defendant will live rather than die. Each juror must be able to make that decision based solely on the evidence, uninfluenced by personal experiences that he or she may have had." *United States v. Sampson*, 820 F. Supp. 2d 151, 157 (D. Mass. 2011) ("*Sampson I*"). "'When possible juror misconduct is brought to the trial judge's attention he has a duty to investigate and to determine whether there may have been a violation of the [S]ixth [A]mendment.'" *United States v. Lloyd*, 462 F.3d 510, 518 (6th Cir. 2006) (quoting *United States v. Shackleford*, 777 F.2d 1141, 1145 (6th Cir. 1985)). "If even one [partial] juror is empaneled" and the death sentence is imposed, "the [government] is disentitled to execute the sentence." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992).

*United States v. Donald Fell*, case no. 2:01-cr-12, Doc. 514 (D.Vt. Jul. 24, 2014).

This Court should permit Mr. Troya's defense team to interview the identified jurors to gather sufficient evidence in support of his §2255 petition. "To obtain a new trial for juror misconduct during voir dire, a party must: (1) demonstrate that a juror failed to answer honestly a material question on voir dire, and then (2) show that a correct response would have provided a valid basis for a challenge for cause." *United States v. Carpa*, 271 F.3d 962, 967 (11th Cir. 2001)

51

(citing *McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 556 (1984)). First, there must be a determination of whether the juror's answer(s) were honest and then a showing of bias that would disqualify a juror. *Id.*; *see also, Bank Atlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1473 (11th Cir. 1992); *United States v. Perkins*, 748 F.2d 1519, 1532 (11th Cir. 1984). If the first prong is met, the question then becomes would that juror be subject to a valid challenge for cause. Jurors are typically subject to challenges for cause if they are biased or do not meet the statutory qualifications. 2 Charles Alan Wright et al., Federal Practice and Procedure § 382 (4th ed. Updated Apr. 2013).

### H.      Conclusion.

Without leave of Court, Mr. Troya's defense team was precluded from interviewing jurors to further develop this claim. *See* S.D. Fla. Local R. 11.1(e) (prohibiting attorneys from communicating with jurors after a trial in any manner without first obtaining leave of court). On February 29, 2016, counsel filed an *ex parte*, sealed motion to interview jurors. On March 1, 2016, this Court denied the motion without prejudice to refiling with notice to the government and codefendant Sanchez. Doc. 1183. Due to the impending §2255 filing deadline and concerns about revealing work product and attorney client privileged information to the government prior to filing, the defense will instead now pursue a renewed motion to interview jurors. The facts set forth above certainly show good cause for juror interviews.

The facts set forth above are those Mr. Troya's defense team were able to uncover through researching record databases, social media, and various internet sites. They indicate that jurors lied about issues that would have kept them off this jury and that were highly relevant to the allegations Danny Troya was facing. Moreover, there may have been other grounds on which the jurors were not forthcoming.

These facts must be explored further in order to meet the § 2255 proof requirements and ensure a constitutionally seated jury. The facts set forth above surely reveal that jurors were not fully forthcoming, and that some may have outright lied to this Court and counsel during *voir dire*. Juror interviews and an evidentiary hearing are required.

**VI.   TRIAL COUNSEL FAILED TO TIMELY CHALLENGE THE COMPOSITION AND SELECTION OF THE GRAND AND PETIT JURY VENIRES IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

**A.   Trial Counsel's Failure to Timely Challenge the Composition and Selection of the Grand and Petit Jury Venires Constituted Deficient Performance.**

Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), a challenge to the grand jury venire must be made before trial commences. Failure to raise such a challenge before the start of trial results in a waiver of the claim. *United States v. Ovalle*, 136 F.3d 1092, 1107 (6th Cir. 1998). Trial counsel for Mr. Troya failed to challenge the process whereby grand juries in the West Palm Beach Division of the Southern District of Florida underrepresent racial and ethnic and minorities (including Hispanics and African Americans) and, thus, failed to preserve a meritorious claim.

It cannot be disputed that the defense bar recognized the ability to challenge the grand jury process, as such a challenge had been available for years prior to Mr. Troya's trial, *see, e.g., Castaneda v. Partida,* 430 U.S. 482 (1977) (successful challenge to grand jury system); *Rose v. Mitchell*, 443 U.S. 545 (1979) (acknowledging that discrimination in the selection of grand jury constitutes reversible error). In 2006 through 2009, at the time of Mr. Troya's indictment and trial, the composition of Southern District of Florida grand juries raised serious concern.

Such a challenge was never investigated nor pursued before trial began. Trial counsel's failure to challenge the grand and petit jury venires deprived Mr. Troya of effective assistance of counsel. *See Goodwin v. Balkcom*, 684 F.2d 794 (11th Cir. 1982) (ineffective assistance for

53

failing to raise grand jury claim); *Hollis v. Davis*, 912 F.2d 1343 (11th Cir. 1990) (ineffective assistance in failing to challenge grand jury composition). As discussed below, a timely challenge to the grand and petit juries would have succeeded, and Mr. Troya's indictment would have been dismissed.[35]

      **B.**      **Mr. Troya Was Prejudiced by Trial Counsels' Failures Because the Process by Which Grand and Petit Juries are Selected Produces an Unconstitutional Under-representation of Hispanics and African Americans, in Violation of The Fifth, Sixth, and Eighth Amendments.**

Had counsel timely raised a challenge to the grand and petit jury venires, Mr. Troya could have established that his rights under the Fifth and Sixth Amendments to the United States Constitution were violated by the process which brought about his indictment and conviction. The Sixth Amendment guarantees criminal defendants "a speedy and public trial, by an impartial jury..." This language has been interpreted to require that the panels from which petit juries are selected, be drawn from a "fair cross section" of the community in which the proceedings are held. *See, e.g., Taylor v. Louisiana*, 419 U.S. 522, 527 (1975) (citing *Brown v. Allen*, 344 U.S. 443 (1953)). In jurisdictions where a grand jury system is employed, the fair cross section requirement applies to this process as well. *Alexander v. Louisiana*, 405 U.S. 625, 635-637 (1972) (Douglas, J. concurring) (relying on *Carter v. Jury Commission*, 396 U.S. 320, 330 (1970); and *Brown v. Allen*, 344 U.S. 443, 474 (1953)); *Machetti v. Linahan*, 679 F.2d 236, 239 (11th Cir. 1982), *cert. denied*, 457 U.S. 1127 (1983).

In addition to the Sixth Amendment fair cross section requirement, the equal protection clause of the Fifth Amendment prohibits the discriminatory selection of the panel from which a grand jury is drawn if that process produces disproportionately unrepresentative results. *Castaneda v. Partida*, 430 U.S. 482, 494 (1977).

---

[35] A claim of racial discrimination in the grand jury process, moreover, is not subject to harmless error analysis. *See Rose v. Mitchell*, 443 U.S. 545 (1979).

Since a movant need not be a member of the underrepresented group in question to have standing to raise a Sixth or Fifth Amendment claim, there is no dispute that Mr. Troya, a Hispanic man, has standing to mount these challenges. *Campbell v. Louisiana*, 523 U.S. 392 (1998); *Taylor v. Louisiana*, 419 U.S. 522, 526 (1975) (male raising gender claim); *see also Duren v. Missouri*, 439 U.S. 357, 359 n.1 (1979); *Peters v. Kiff*, 407 U.S. 493 (1972) (white male raising claim of African Americans' absence from jury); *Powers v. Ohio*, 493 U.S. 1068 (1991); *Dobbs v. Kemp*, 790 F.2d 1499, 1510-11 (11th Cir. 1986), *cert. denied*, 481 U.S. 1059 (1987) (male defendants have standing to raise equal protection claim that women were underrepresented on grand jury).

**C.    At an Appropriately Scheduled Evidentiary Hearing, Mr. Troya Can Present Proof Sufficient to Establish a *Prima Facie* Showing of Underrepresentation.**

To establish a *prima facie* claim that the Government has violated the fair cross section requirement, a movant must show:

- that the group alleged to be excluded is a "distinctive" group in the community;

- that the representation of the group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

- that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).[36]

Proving a *prima facie* showing of discrimination under the equal protection clause requires similar proof. A claimant must show "the procedure employed resulted in substantial underrepresentation of his race or identifiable group," by demonstrating:

---

[36] Under this standard, "systematic" is defined by showing that the pattern recurred over time and was "inherent to the particular jury selection process utilized." *Id.* at 366.

- the group is a "recognizable, distinct class, singled out for different treatment under the laws, as written or as applied";

- underrepresentation of the group in the grand jury process *over a significant period of time*; and

- a selection procedure "that is susceptible of abuse *or* is not racially neutral."

*Castaneda*, 430 U.S. at 494 (emphasis added).[37]

Mr. Troya can demonstrate a *prima facie* case of discriminatory underrepresentation, under both the Fifth and Sixth Amendments, of Hispanics and African Americans on grand jury and petit jury panels in the West Palm Beach Division of the Southern District of Florida.

### 1.      Hispanics and African Americans are distinct classes in the community which merit constitutional protection.

It is clear Mr. Troya satisfies the first prong of the *prima facie* showing. Hispanics and African Americans have long been recognized by the courts as "distinct classes," the exclusion of whom from possible jury service and the rest of the criminal justice system is constitutionally suspect. *See Castaneda v. Partida*, 430 U.S. at 495; *Hernandez v. Texas*, 347 U.S. 475 (1954) (Hispanics are distinct class); *Batson v. Kentucky*, 476 U.S. 79 (1986) (reaffirming that African Americans are distinct class).

### 2.      Underrepresentation

Although the Supreme Court has "never announced mathematical standards for determining the significance of under-representations," *Alexander v. Louisiana*, 405 U.S. 625, 630 (1972), courts have recognized both an examination of absolute disparity and, where the underrepresented group is a small portion of the community, a test of comparative disparity.

---

[37] Under the equal protection clause, the claimant must also prove intentional discrimination, *see Duren, supra*, 439 U.S. at 368 n.26, while the Sixth Amendment fair cross-section requirement "forbids any substantial underrepresentation of minorities, regardless of whether the State's motive is discriminatory." *Alston v. Manson*, 791 F.2d 255, 258 (2d Cir. 1986), *cert. denied*, 479 U.S. 1084 (1987).

56

*Smith v. Berghuis*, 559 U.S. 314, 329-30 (2010). Courts have also applied a standard deviation test. *Id*.

Absolute disparity measures the difference between the percentage of members of the distinctive group in the relevant population and the percentage of that group on the jury wheel. In order to calculate the absolute disparity between a group's representation in the population and its representation on the jury wheel, one simply subtracts the latter percentage from the former. Peter A. Detre, Note, *A Proposal for Measuring Underrepresentation in the Composition of the Jury Wheel*, 103 Yale L.J. 1913, 1917 (1994). Thus, if a group forms 10% of the population as a whole, but accounts for only 7% of the jury wheel, the absolute disparity is three percentage points.

Comparative disparity is calculated by dividing the absolute disparity by the percentage of the group in the overall population, and then multiplying by 100%. *Id*. The comparative disparity in the above example of a group comprising 10% of the community and 7% of the jury wheel is 30% (3% divided by 10%, multiplied by 100%). Comparative disparity imagines how many members of the group in question would be on the wheel if there were full representation, and then calculates the percentage decrease from this figure due to the underrepresentation.

Under the standard deviation test, the court must first compare the actual number of the distinct class on the grand or petit juries with the expected number based on total population over a significant portion of time. The measure of the predicted fluctuations from the expected value is the standard deviation, defined as the square root of the product of the total number in sample times the probability of selecting a member of the distinct class times the probability of selecting a non-member of the distinct class. *Castaneda*, 430 U.S. at 496 n. 17. In instances where the "difference between the expected value and the observed number is greater than two or three

57

standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist." *Id*. Such situations establish a *prima facie* case of discrimination.

The West Palm Beach Division of the Southern District of Florida is comprised of a single county: Palm Beach County. *See* Plan of the United States District Court For the Southern District of Florida For the Random Selection of Grand and Petit Jurors at 2. In the period prior to Mr. Troya's trial, the total population of Palm Beach County was, according to the 2000 census, 1,131,186. The Hispanic population was 140,675 or 12.44% of the population. The African American population was 156,055 or 13.80% of the total population.

Mr. Troya alleges that the actual numbers of these protected classes on petit and grand jury venires does not meet constitutional muster.[38]

### A.    *Hispanics*

Mr. Troya's petit jury was selected in January of 2009. That petit jury was likely drawn from the master wheel that was filled on September 7, 2007. The data concerning that wheel was reported by the district court clerk on form AO 12 on February 15, 2008. *See* Appendix C-1. Section IV of the report contains the racial and ethnic breakdown of the jury wheel sample: the first column states the number of persons in the wheel sample, the second column states the percentage that this group represents in the wheel sample, and the third column states the percentage that this group represents in population for the jury division (Palm Beach County). According to the AO 12 report, Hispanics made up 7.7% of the wheel, and 7.2% of the

---

[38] Mr. Troya has sought the forms (labelled JS 12 and AO 12) wherein a district court clerk collects data of the race of jurors each time a pool is drawn from the wheel as required by 28 U.S.C. § 1863(a). The clerk's office provided Mr. Troya with some, but not all, of the forms covering the 10-year period up to and including his trial. Specifically, Mr. Troya was not provided with the AO 12 form for the relevant period that the grand jury was drawn from the wheel. Based on the forms that were provided, however, Mr. Troya has a good faith basis for alleging that Hispanics and African Americans were underrepresented in the grand jury that indicted him, and he will seek additional discovery and factual development of this claim pursuant to the applicable federal rules.

population:

| | | | |
|---|---|---|---|
| Hispanic or Latino | 26 | 7.7 | 7.2 |
| Non-Hispanic or Non-Latino | 282 | 83.2 | 92.8 |
| Unknown | 31 | 9.1 | 0.0 |

(Ethnic)

According to the AO 12 report, the jury wheel sample has an over-representation of Hispanics as compared to the population in the jury division. However, the third column – the reported percentage of the group in the population – appears to be inaccurate.

Census data for Palm Beach County for the years 2000 and 2010[39] establish that Hispanics made up 12.44% of the population in 2000, and 19% of the population in 2010:

| Palm Beach County, Florida - Overview | 2010 Census | | 2000 Census | | 2000-2010 Change | |
|---|---|---|---|---|---|---|
| | Counts | Percentages | Counts | Percentages | Change | Percentages |
| Total Population | 1,320,134 | 100.00% | 1,131,186 | 100.00% | 188,948 | 16.70% |
| | | | | | | |
| Population by Race | | | | | | |
| American Indian and Alaska native alone | 6,043 | 0.46% | 2,466 | 0.22% | 3,577 | 145.05% |
| Asian alone | 31,100 | 2.36% | 17,127 | 1.51% | 13,973 | 81.58% |
| Black or African American alone | 228,690 | 17.32% | 156,055 | 13.80% | 72,635 | 46.54% |
| Native Hawaiian and Other Pacific native alone | 770 | 0.06% | 692 | 0.06% | 78 | 11.27% |
| Some other race alone | 53,138 | 4.03% | 33,709 | 2.98% | 19,429 | 57.64% |
| Two or more races | 30,272 | 2.29% | 26,928 | 2.38% | 3,344 | 12.42% |
| White alone | 970,121 | 73.49% | 894,209 | 79.05% | 75,912 | 8.49% |
| | | | | | | |
| Population by Hispanic or Latino Origin (of any race) | | | | | | |
| Persons Not of Hispanic or Latino Origin | 1,069,311 | 81.00% | 990,511 | 87.56% | 78,800 | 7.96% |
| Persons of Hispanic or Latino Origin | 250,823 | 19.00% | 140,675 | 12.44% | 110,148 | 78.30% |

In other words, at the time that Mr. Troya's petit jury was drawn in 2009, Hispanics did not make up 7.2% of the population of Palm Beach County, as was reported on AO 12 form. Rather, the Hispanic population was far larger: in 2000, Hispanics already made up 12.44% of the population, and between 2000 and 2010, Hispanics had grown to 19.00% of the population. It is extremely unlikely, then, that Hispanics only made up 7.2% of the population at the time the petit jury was drawn in 2009.

Using the 2000 census data, there was an absolute disparity of 4.74%, and a comparative

---

[39] This chart was obtained at the following URL: http://censusviewer.com/county/FL/Palm%20Beach <last visited on April 20, 2016>.

disparity of 38.10%. But given that the Hispanic population was on a clear upward growth trajectory between 2000 and 2010, the absolute and comparative disparity was likely far larger. Assuming that at the time of Mr. Troya's trial in 2009 the Hispanic population in Palm Beach County was closer to 19.00% (per the 2010 census data), then the jury wheel sample (7.7%) represents a greater than 10% absolute disparity (11.3%), and a comparative disparity of 59.47%.[40]

### B.   *African Americans*

According to the AO 12 report, African Americans made up 12.4% of the wheel, and 10% of the population:

| This table reflects ( ) persons returning questionnaires, or ( X ) persons qualified as jurors | Number in Wheel Sample | Percent of Sample | Percent this class is found in citizen population of the: ( ) district ( X ) jury division |
|---|---|---|---|
| TOTAL | 339 | 100% | 100% |
| White | 272 | 80.2 | 86.2 |
| Black or African American | 42 | 12.4 | 10.0 |
| American Indian or Alaska Native | 0 | 0.0 | 0.2 |
| Asian | 10 | 2.9 | 0.9 |
| Native Hawaiian or Pacific Islander | 0 | 0.0 | 0.0 |
| Other | 10 | 2.9 | 1.4 |
| Multi-Racial | 1 | 0.3 | 1.3 |
| Unknown | 4 | 1.2 | 0.0 |

According to the AO 12 report, the jury wheel sample has an over-representation of

---

[40] On information and belief, the Administrative Office provides clerk's offices with current census estimates when an AO 12 report is to be completed. *See* Instructions for Part IV of AO 12 ("To assist you with these comparisons, the Administrative Office will provide specially programmed Census Bureau information that show racial, ethnic, and sex data and percentages to the citizen population by county for every federal jury division in your district.") It does not appear that the clerk recorded those census estimates on the AO 12 form that was completed on February 15, 2008. Mr. Troya will seek to use appropriate discovery mechanisms to obtain the relevant census estimates at the time his petit jury was drawn. As demonstrated above and in the sections that follow, however, Mr. Troya has a good faith basis for alleging that Hispanics and African Americans were underrepresented in the jury wheel that was drawn at the time of his trial.

African Americans as compared to the population in the jury division. However, the third column – the reported percentage of the group in the population – once again appears to be inaccurate.

At the time Mr. Troya's petit jury was drawn in 2009, African Americans did not make up 10% of the population of Palm Beach County, as was reported on AO 12 form. Rather, the African American population was larger: in 2000, African Americans made up 13.80% of the population, and between 2000 and 2010, that group had grown to 17.32% of the population. It is extremely unlikely, then, that African Americans only made up 10% of the population at the time the petit jury was drawn in 2009.

Using the 2000 census data, there was an absolute disparity of 1.4 %, and a comparative disparity of 10.14%. But given that the African American population was on a clear upward growth trajectory between 2000 and 2010, the absolute and comparative disparity was likely larger. Assuming that at the time of Mr. Troya's trial in 2009 the African American population in Palm Beach County was closer to 17.32% (per the 2010 census data), then the jury wheel sample (7.7%) represents an absolute disparity of 4.92%, and a comparative disparity of 28.41%.

### C.      *Improper exclusions based on the voter registration list*

The relevant AO 12 report indicates that the wheel from which the petit jury was drawn was filled with names from the voter registration list. The wheel was filled on September 9, 2007, but it does not indicate the date of the voter registration list that was used. On information and belief, however, as well as based on the previously aforementioned analysis, the voter registration list that was used to fill the wheel for both the grand and petit juries in Mr. Troya's case underrepresented Hispanics and African Americans in Palm Beach County.

Additionally, on information and belief, the voter registration list that was used to fill the wheel for both the grand and petit juries in Mr. Troya's case improperly excluded from the wheel

18 to 21-year-olds who were otherwise eligible to serve. That is, Mr. Troya's trial occurred in 2009, but his wheel was filled in 2007; if the 2007 wheel was filled with a voter registration list from 2006 (or possibly even 2004), then it would have excluded a number of potential jurors that would have been old enough to serve on his jury in 2009, but who were not old enough to register to vote when the voter registration list was created. (Indeed, the further the trial date is from the date the wheel was created, the greater the risk there is that potential jurors will have been excluded on the basis of age.) The same is also true of the wheel that was used for the grand jury.

### 3. This underrepresentation is the product of an unconstitutional selection process.

Mr. Troya alleges that the underrepresentation of Hispanics and African Americans is inherent in the particular process by which the petit and grand juries are selected.

Additionally, an analysis of the AO 12/JS 12 forms that were provided to the undersigned suggest that African Americans and Hispanics have been underrepresented in the wheels in the West Palm Beach Division for a number of years. The district court clerk's office provided the undersigned with AO 12/JS 12 forms for the following years: 1998, 2002, 2003, 2004, 2008 and 2010. In almost every form, the citizen population data for Hispanics and African Americans – the number that is recorded in the third column of Section IV of the form – is incorrect:

- The population data for African Americans in the jury division is reported as 10% in 1998, 11.3% in 2002, then back to 10% in 2003 – *and then it stays at 10% in every subsequently filed report that was provided to the undersigned, up to and including the 2010 report*. Although the increase from 10% in 1998 to 11.3% in 2002 appears accurate, as it correlates with the 2000 census data showing an upward trajectory, the rest of the data – which suggests that the African American population dropped back to 10% in 2003 and stayed at that level through to 2010 -- is clearly inaccurate.

- The population data for Hispanics in the jury division is reported as 6.8% in 1998, 11.1% in 2002, then down to 7.2% in 2003 – *and then it stays at 7.2% in every subsequently filed report that was provided to the undersigned, up to and including*

*the 2010 report*. Although the increase from 6.8% in 1998 to 11.1% in 2002 appears accurate, as it correlates with the 2000 census data showing an upward trajectory, the rest of the data – which suggests that the Hispanic population dropped back to 7.2% in 2003 and stayed at that level through to 2010 --  is clearly inaccurate.

The consistently inaccurate reporting of population data on the AO 12/JS 12 forms makes the process by which the grand and petit juries were selected susceptible to abuse. That is, the data reported in the AO 12/JS 12 forms as to the percentage of Hispanics and African Americans in the jury division is consistently reported as much smaller than what is actually reflected in the census data; consequently, the jury wheel sample consistently appears to over-represent Hispanics and African Americans, when the reverse is actually true. And, as noted above, the underrepresentation is so stark that in some instances (e.g., Hispanics), it likely exceeds a 10% absolute disparity.

**VII.   MR. TROYA'S MURDER CONVICTIONS AND RESULTING DEATH SENTENCES ARE BASED ON AN IMPERMISSIBLY VAGUE STATUTE, IN VIOLATION OF DUE PROCESS AND THE FIFTH, SIXTH, EIGHTH AMENDMENTS.**

Mr. Troya was convicted and sentenced to death for using a firearm during and in relation to a federal crime of violence which resulted in a murder, in violation of 18 U.S.C. § 924 (c)(1) and (j).[41]  The jury was instructed that it could find Mr. Troya guilty of a "crime of violence" based either on a drug trafficking crime or on carjacking in which a killing occurs, under 18 U.S.C. § 2119(3).  Pursuant to *Johnson v. United States*, __ U.S. __, 135 S. Ct. 2551 (2015), however, carjacking fails to qualify categorically as a "crime of violence."  Because the jury was given the option to convict Mr. Troya and sentence him to death based on an invalid "crime of violence," the convictions under § 924(c) should be vacated.

Section 924(c)(3) defines "crime of violence" in either of two ways.  It must be a felony that:

---

[41] Mr. Troya was also convicted of carjacking that resulted in death, a violation of 18 U.S.C. § 2119(3), and was sentenced to life imprisonment without the possibility of parole.

(A)     has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B)     that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

The first clause – § 924(c)(3)(A) – is commonly referred to as the "force" or "elements" clause.

The other – § 924(c)(3)(B) – is commonly referred to as the "residual" clause.

As discussed in the next sections, carjacking categorically fails to qualify as a "crime of violence" under the residual clause because that clause is void for vagueness under *Johnson*.  In *Johnson*, the Supreme Court struck down the Armed Career Criminal Act's (ACCA) residual clause (18 U.S.C. § 924(e)(2)(B)(ii)) as unconstitutionally vague.  135 S. Ct. at 2557.  Under *Johnson*, § 924(c)'s materially indistinguishable residual clause (§ 924(c)(3)(B)) must similarly be stricken as unconstitutional.  Therefore, Mr. Troya cannot be guilty of a crime of violence if such a determination rested on the unconstitutionally vague residual clause of § 924(c).

Moreover, carjacking as prescribed by 18 U.S.C. § 2119 does not constitute a crime of violence under § 924(c)(3)(A) (the "force clause") because it can be accomplished by "intimidation," which does not require violent physical force and does not require an intentional threat, and because the killing element need not be intentional and can be established by accident and happenstance.

Accordingly, the predicate offense of carjacking in which a killing occurs, as defined by § 2119, which serves as the basis for Mr. Troya's § 924(j) conviction and death sentence for using a firearm during and in relation to a federal crime of violence which results in a murder, does not qualify as a "crime of violence" pursuant to *Johnson*.

Because the Supreme Court has now held that *Johnson* must be retroactively applied, *Welch v. United States,* __ U.S. __ (April 18, 2016), the fact that trial counsel did not raise or

64

preserve this issue at trial or on direct appeal does not create an obstacle to a grant of relief.  Mr. Troya's claim is timely.

### A.        Section 924(c)'s residual clause is unconstitutionally vague

Because § 2119(3) fails to qualify as a "crime of violence" under § 924(c)(3)'s force clause, the validity of Mr. Troya's conviction depends on the validity of § 924(c)(3)(B)'s residual clause.  Under *Johnson*, however, § 924(c)(3)(B) is void for vagueness.

In *Johnson*, the Supreme Court analyzed the Armed Career Criminal Act's (ACCA) "residual clause," 18 U.S.C. § 924(e)(2)(B)(ii), which parallels § 924(c)(3)(B)'s residual clause in all material respects.  As § 924(c)(3)(B) suffers from the identical flaws that compelled the Supreme Court to declare the ACCA residual clause unconstitutionally vague, the conclusion is inescapable that § 924(c)(3)(B) is unconstitutional as well.

### 1.        *Johnson* expressly overruled the "ordinary case" approach to determining whether a felony qualifies as a crime of violence

In *Johnson*, the Supreme Court held that the ACCA residual clause is unconstitutionally vague because the process by which courts categorize prior convictions as violent felonies is unacceptably "wide ranging" and "indeterminate."  *Johnson*, 135 S. Ct. at 2557.  As a result, the residual clause "both denies fair notice to defendants and invites arbitrary enforcement by judges."  *Id. Johnson* concluded that the Supreme Court's four previous attempts to articulate a workable test to determine whether a felony falls under the residual clause had failed.  *Id*. at 2558-59.

The Court began its analysis by explaining that, under *Taylor v. United States*, 495 U.S. 575 (1990), the residual clause requires the categorical approach to determine whether a

particular statute qualifies as a violent felony.[42]  *Id.* at 2557.  Courts must assess whether a crime qualifies as a violent felony "in terms of how the law defines the offense and not in terms of how an individual might have committed it on a particular occasion."  *Id.* (quoting *Begay v. United States*, 553 U.S. 137, 141 (2008)).

The Court clarified that, under prior precedents, the residual clause "require[d] a court to picture the kind of conduct that the crime involves 'in the ordinary case,' and to judge whether that abstraction presents a serious risk of potential injury."  *Id.* (citation omitted).  The Court concluded that the process of determining what is embodied in the "ordinary case" is fatally flawed, rendering it unconstitutionally vague.  *Johnson*, 135 S. Ct. 2557-58.  "[G]rave uncertainty" abounds in determining "how to estimate the risk posed by a crime" in the "judicially imagined 'ordinary case'"  *Id.* at 2557.  "The residual clause offers no reliable way to choose between . . . competing accounts of what 'ordinary' . . . involves."  *Id.*

The *Johnson* Court considered and rejected different ways that a court might envision the hypothetical "ordinary case" where the statute offers no guidance.  The Court explained that statistical analysis, surveys, expert evidence, Google, and gut instinct are all equally unreliable in determining the "ordinary case."  *Id.* (citation omitted).  Although earlier cases attempted to rely on statistical analysis and "common sense," the Court concluded that such methods "failed to establish any generally applicable test that prevents the risk comparison required by the residual clause from devolving into guesswork and intuition."  *Id.* at 2559 (citations omitted).

This flaw alone established the residual clause's unconstitutional vagueness.  *Id*. at 2557-58.  The Court explained that a closely related flaw only exacerbated the problem.  The Court noted that the residual clause lacks a meaningful gauge for determining when the quantum of

---

[42] The Court endorsed the categorical approach, despite the government's and a dissenting justice's invitation to abandon it in residual clause cases.  *Id.*at 2557, 2562.

risk under the "ordinary case" of a particular statute is enough to constitute a "serious potential risk of physical injury." *Id.* at 2558. Although the level of risk required under the residual clause must be similar to the enumerated offense (burglary, arson, extortion, or crimes involving use of explosives), *Johnson* rejected the notion that comparing a felony's "ordinary case" to the risk posed by certain enumerated offenses cures the constitutional problem. *Id.* The Court held that such indeterminacy, unpredictability, and arbitrariness inherent in the "ordinary case" analysis is more than the "Due Process Clause tolerates." *Id.*

Thus, *Johnson* not only invalidated the ACCA residual clause; it also invalidated the "ordinary case" analysis in upholding statutory provisions against vagueness challenges. In other words, the only way to apply such a residual clause is through "ordinary case" analysis, but the "ordinary case" analysis is impossible to apply in a constitutional manner. The Court's decision in *Johnson* is a substantive rule that is retroactively applicable. *Welch v. United States*, No. 15-6418, -- U.S. --, slip op. at 9 (April 18, 2016).

### 2. *Johnson* renders § 924(c)(3)(B) unconstitutionally vague

The residual clause in § 924(c) suffers the same defects as the ACCA residual clause.[43] Although the risk at issue in the ACCA is a risk of injury, and the risk at issue in § 924(c) is a risk that force will be used, this difference is immaterial to the due process problem and has no impact on *Johnson*'s rationale. The Court's holding did not turn on the type of risk but rather how courts assess and quantify the risk.

---

[43] ACCA's residual clause defines violent felony as an offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another." § 924(e)(2)(B)(ii). Section 924(c)(3)(B)'s residual clause defines a crime of violence as one that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in committing the offense."

The inquiry is the same under the ACCA and § 924(c).  The residual clause in § 924(c) and the residual clause in the ACCA suffer from the same constitutional flaws; they both require an "ordinary case" analysis to assess the predicate offense, and also require the court to determine how risky that ordinary case is.

Because this is the same defect that rendered the ACCA residual clause unconstitutional, the residual clause in § 924(c) is also unconstitutional.

Subsequent to *Johnson*, the Ninth Circuit held in *Dimaya v. Lynch*, 803 F.3d 1110 , 1111 (9th Cir. 2015) that, in the immigration context, the "crime of violence" definition in 18 U.S.C. § 16(b) "suffers from the same indeterminacy as ACCA's residual clause" and is therefore also unconstitutionally vague in violation of the Due Process Clause.  18 U.S.C. § 16(b) defines "crime of violence" in identical language to that of § 924 (c)(3)(B), as an offense "that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  Moreover, the Solicitor General has acknowledged that the wording of 18 U.S.C. § 16(b) is "equally susceptible to petitioner's central objection to the residual clause."  *Johnson v. United States*, S.Ct. No. 13-7120, Supplemental Brief of Respondent United States at 22-23 (available at 2015 WL 1284964 at *22-*23.)

Because the residual clause found in § 924(c)(3)(B) is identical to that found in 18 U.S.C. § 16(b), it is just as susceptible to a finding of unconstitutionality for vagueness.  Under principles of statutory construction, a term is given the same meaning "when Congress uses the same language in two statutes having similar purposes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) (plurality opinion); *see also Northcross v. Board of Ed. of Memphis City Schools*, 412 U.S. 427, 428 (1973) (per curiam); *Gomez-Leon*, 545 F.3d at 788 (definitions of "crime of

68

violence" using the same language are subject to the same construction). The statutes at issue here—18 U.S.C. § 924(c) and 18 U.S.C. § 16—serve the same purpose of identifying violent crimes and subjecting defendants who commit them to harsher sanctions.

In *Dimaya*, 803 F.3d at 1114, the Ninth Circuit explained why § 16(b), as incorporated into the Immigration and Nationality Act, is—like the ACCA's residual clause— unconstitutionally vague:

> Importantly, both the provision at issue here and ACCA's residual clause are subject to the same mode of analysis. Both are subject to the categorical approach, which demands that courts "look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime." *Leocal v. Ashcroft*, 543 U.S. 1, 7 [] (2004). Specifically, courts considering both § 16(b) and the residual clause must decide what a "'usual or ordinary' violation" of the statute entails and then determine how great a risk of injury that "ordinary case" presents. *Rodriguez–Castellon v. Holder*, 733 F.3d 847, 854 (9th Cir. 2013) (quoting *United States v. Ramos–Medina*, 706 F.3d 932, 938 (9th Cir. 2013)).

The *Dimaya* Court noted the Supreme Court's recognition of "two features of the ACCA's residual clause that 'conspire[d] to make it unconstitutionally vague.'" 803 F.3d at 1115 (citing *Johnson*, 135 S. Ct. at 2557). First, the clause left "'grave uncertainty' about 'deciding what kind of conduct the 'ordinary case' of a crime involves,'" and thus "'denie[d] fair notice to defendants and invite[d] arbitrary enforcement by judges' because it 'tie[d] the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements.'" *Id.* Second, the "ACCA's residual clause left 'uncertainty about how much risk it takes for a crime to qualify as a violent felony.'" *Id*. (citing *Johnson*, 135 S. Ct. at 2558).

The *Dimaya* Court held that "because of the same combination of indeterminate inquiries, § 16(b) is subject to identical unpredictability and arbitrariness as ACCA's residual

clause" and is therefore also void for vagueness. *Id.* As the *Dimaya* Court concluded, these vagueness concerns rise to the level of a Due Process violation in the immigration context because of the harsh consequences of deportation. *Id.* at 1113. Due Process concerns, however, are even more pronounced in the context of a criminal statute like § 924(c), under which a conviction subjects the defendant to a complete deprivation of liberty. *Johnson*, 135 S. Ct. at 2557.

As a result, the residual clause cannot be used to support a conviction under § 924(c).

**B.      Carjacking under § 2119 does not categorically qualify as a crime of violence under the force clause.**

### 1.      Principles of Analysis

To determine whether a crime constitutes as a "crime of violence," such that it may be subject to enhanced sentencing, courts must adhere to the following fundamental principles:

First, the courts apply a "categorical" approach to determining whether a crime is or is not a crime of violence.  It makes no difference how the crime was actually committed in the particular case.  The court may only look to whether the crime's *elements* require the use of force. *See Descamps v. United States*, 133 S. Ct. 2276, 2283 (2013); *United States v. Royal*, 731 F.3d 333, 341-42 (4th Cir. 2014); *see also United States v. Serafin*, 562 F.3d 1105, 1107-08 (10th Cir. 2009); *United States v. Acosta*, 470 F.3d 132, 135 (2d Cir. 2006).  This approach requires that courts "look only to the statutory definitions – i.e., the elements – of a defendant's [offense] and not to the particular facts underlying [the offense]" in determining whether the offense qualifies as a "crime of violence." *Descamps*, 133 S. Ct. at 2283 (citation omitted); *Royal*, 731 F.3d at 341-42; *Serafin*, 562 F.3d at 1107; *Acosta*, 470 F.3d at 135.

70

Second, under the categorical approach, an offense can only qualify as a "crime of violence" if the most innocent conduct penalized by a statute constitutes a "crime of violence." *United States v. Torres-Miguel*, 701 F.3d 165, 167 (4th Cir. 2012).

Third, the force contemplated by the statute is "physical force." "Physical force" has been interpreted by the courts to mean "*violent* force" – that is "strong physical force," which is "capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010) (emphasis in original).

Fourth, the use of force must be intentional. *Leocal v. Ashcroft*, 543 U.S. 1, 12-13 (2004). Thus, if one can violate the statute by using force in a manner that does not require intentionality, the crime does not constitute a crime of violence for purposes of 18 U.S.C. § 924(c).

Finally, a court must consider whether the statute is divisible. To be divisible, a statute must contain alternative elements of "functionally separate" crimes. *United States v. Dixon*, --- F.3d --- (9th Cir. 2015). If the statute is of such a nature that the jury is not called upon to reach a unanimous verdict on the alternate elements of the crime, the crime is not considered to be divisible. *See, e.g., Descamps,* 133 S.Ct at 2290. If the element is not divisible, the court must consider all possible ways a person could be found to have violated the statute and if any one of them does not require the use of violent physical force, employed intentionally against the person or property of another, it is not a crime of violence. *Id.*

### 2.     Under This Analysis, Carjacking Does Not Constitute a Crime of Violence.

Accordingly, for carjacking under § 2119 to qualify as a "crime of violence" under § 924(c)(3)(A)'s force clause, the offense must necessarily include as a required element the intentional use of physical, violent force.

71

Carjacking in which a killing occurs, as defined by § 2119(3), does not meet this requirement. Although the statute requires that the perpetrator have the intent to cause death or serious bodily harm, the statute authorizes a finding of guilt if the perpetrator uses intimidation to accomplish the act of taking the car, and does not require a finding that the perpetrator intentionally used physical violent force, regardless of his or her intent to cause physical harm. Moreover, under § 2119(3), a killing that results from the carjacking (or any other injury) can be the result of accident, negligence, or recklessness. Neither of these states of mind requires the intent to use, or the attempted use or threatened use of "violent force."

To satisfy the intimidation element of carjacking, the government need only prove that the defendant committed an act or made a statement "that would put a reasonable person of ordinary sensibilities in fear of bodily harm." T7534 (jury instructions). An act such as saying in a menacing voice, "Get out of the car," would satisfy the intimidation element of the statute, even though no violent force was involved and the defendant did not intend to put another in fear of injury.

Moreover, even if the intimidation element is assumed to require a threat, it does not require a threat of violent physical force. A threat that puts someone in fear of bodily harm does not require a threat to use violent physical force, but rather to take some other action, such as to follow someone home, lock someone in a hot car, etc.

The death element of § 2119(3) does not qualify as a crime of violence under the force clause because it also does not require the use of "violent force." Rather, the death element can be satisfied if the death is caused by recklessness, negligence, or accident, including accidents that occur during flight after the taking of the motor vehicle.

72

In *United States v. Torres –Miguel*, 701 F.3d 165 (4th Cir. 2012), the Fourth Circuit blanketly held that "[a]n offense that *results* in physical injury, but does not involve the *use or threatened use* of force, simply does not meet the Guidelines definition of crime of violence." *Id.* at 168 (emphasis added). According to *Torres-Migues*, "a crime may result in death or serious injury without involving use of physical force." *Id. See also, Chrzanoski v. Ashcroft*, 327 F.3d 188, 194 (2d. Cir. 2003); *United States v. Perez-Vargas*, 414 F.3d 1282, 1287 (10th Cir. 2005).

Because neither violent force nor the intentional use of violent force are necessary to establish the death element under § 2119(3), it does not qualify under the force clause of § 924(c)(3)(A).

**C.    Mr. Troya's convictions and death sentences are invalid because the jury was given the option of convicting him for either a drug trafficking offense or the constitutionally invalid crime of violence**

The trial court instructed the jury that carjacking "is in fact classified under the law as a crime of violence" for purposes of 18 U.S.C. § 924(c). T7080, 7536. As set forth above, that instruction was erroneous under *Johnson*.

The trial court similarly instructed the jury that the drug conspiracy charge (of which Petitioner was convicted) was "as a matter of law … classified as a drug trafficking crime" for purposes of 18 U.S.C. § 924(c). T7080, 7536.

The trial court then instructed the jury regarding the elements of Counts 7 through 10 (the murder with a firearms charges), as follows:

> Number one, that the Defendant committed the crime of violence which is set out in Count 6 [(carjacking)], or the drug trafficking crime charged in Count 1.
>
> And two, that during the commission of either or both of those offenses, that the Defendant knowingly carried or used a

73

firearm during and in relation to the crime of violence and/or the drug trafficking crime.

And three, that in the course of using the firearm, the Defendant caused the death of the person described in the particular count of the indictment.

And four, that the killing was murder, that is, the unlawful killing of a human being with malice aforethought and premeditation in connection with the drug trafficking offense or the killing resulted from the perpetration of or attempted perpetration of the crime of violence alleged in Count 6.

T7537.

Not only did the court instruct the jury that the carjacking counts were as a matter of law crimes of violence under § 924(c), the court also gave the jurors the option of convicting Mr. Troya if they found that he committed murder with a firearm "during the commission of" *either* carjacking *or* the drug conspiracy.

Under *Stromberg v. California*, 283 U.S. 359 (1931), and its progeny, a defendant's due process rights are violated if a jury is instructed it is authorized to convict on alternate grounds where one is valid and the other is invalid.  Here, Mr. Troya's jury was authorized to do just that: convict him under § 924(c) on the basis of using a firearm in relation to a drug trafficking offense *or* on the basis of the invalidly designated "crime of violence."

Mr. Troya was prejudiced by the due process violation.  There is no question that the Government's theory was that the killings were carried out as part of the drug conspiracy orchestrated by codefendant Varela.  Yet there was nothing that amounted to proof of that theory.  Indeed, while the Government asserted that it would charge Varela with the murders as soon as it got the evidence to do so, T7414, it did not do so at the time of trial and has never done so since.

74

Accordingly, it would have been difficult for the jury to have reached a unanimous finding of guilt on the basis of the drug trafficking charge because the evidence for it was lacking. Thus, it is likely that one or more members of the jury convicted Mr. Troya of Counts 6 through 10 on the basis of the "crime of violence" option rather than the "drug trafficking crime" option. In these circumstances, the due process violation was not harmless.

These violations also prejudiced Mr. Troya at capital sentencing. The jury imposed the death sentence only for the murders of the children. It is highly likely that one if not all of the jurors believed that the murders of the children were committed in the course of carjacking, not of a drug offense. But for the instruction on the invalid carjacking predicate offense, the jury likely would not have imposed the death sentence.

Accordingly, this Court should vacate Mr. Troya's murder convictions and death sentences.

**VIII.   MR. TROYA WAS DENIED HIS RIGHT TO DUE PROCESS AND TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS WHEN HE WAS CHARGED WITH A NON-EXISTENT CRIME OF FELONY MURDER AND HIS JURY WAS ERRONEOUSLY INSTRUCTED THAT IT COULD RETURN A VERDICT OF GUILT ON 18 U.S.C. § 924(J)(1) BASED ON A PREDICATE CRIME THAT WAS LEGALLY INSUFFICIENT TO SUPPORT THE VERDICT OR AUTHORIZE ENHANCED SENTENCING. MR. TROYA WAS DENIED HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL AND DIRECT APPEAL COUNSEL FAILED TO CHALLENGE THIS CONVICTION AND SENTENCE, PREJUDICING MR. TROYA THEREBY.**

### A.     Introduction

Mr. Troya was convicted and sentenced, *inter alia*, pursuant to 18 U.S.C. § 924(j) after the trial court instructed the jury that it could convict him based on a finding *either* that Mr. Troya had committed murder in connection with a drug trafficking crime, or that a killing had occurred as the result of a carjacking. Section 924(j)(1) only authorizes a finding of guilt for crimes that constitute murder, as murder is defined in 18 U.S.C. § 1111. While the jury could

properly have based a guilty verdict on an unanimous finding of murder in connection with a drug trafficking offense under § 1111, as explained more fully below, § 1111 does not define a death that results from carjacking as a crime of murder.  Thus, a verdict of guilt based on a jury determination that Mr. Troya committed a carjacking resulting in death is legally invalid and Mr. Troya must be considered innocent of any such crime.

In its instructions to the jury, the trial court did not call for unanimity as to which offense it considered the operative violation of § 924(j), and even if the jury made reached a unanimous decision, the jury was not asked to indicate (nor did it indicate) the basis for its guilty verdicts. Thus, there is no way to tell whether the jury reached a verdict of guilt on the valid predicate crime of murder in connection with a drug trafficking offense, or on the invalid, legally insufficient ground of carjacking.  In the absence of any evidence that the jury unanimously found Mr. Troya guilty of these Counts based on a valid predicate crime, rather than the invalid predicate crime, the verdicts of guilt on all four § 924(j) counts, and the attendant sentences of death and life imprisonment that were later imposed, must be deemed legally invalid.

Below, Mr. Troya asserts a substantive claim that his rights under the Fifth and Eighth Amendments were violated because this Court lacked jurisdiction to try him for, and convict and sentence him of, a non-existent crime and these jurisdictional claims can never be waived.[44]  He

---

[44] A court can never sentence a defendant for a charge over which it has no jurisdiction. *See United States v. Brown*, 752 F.3d 1344, 1347 (11th Cir. 2014); *United States v. Peter*, 310 F.3d 709, 712 (11th Cir. 2002) ("Since jurisdictional error implicates a court's power to adjudicate the matter before it, such error can never be waived by parties to litigation.").  A jurisdictional defect exists "when the indictment affirmatively alleges conduct that does not constitute a crime at all because that conduct falls outside of the sweep of the charging statute." *Brown*, 752 F.3d at 1352 (citing *Peter*, 752 F.3d at 715).  When such a defect exists, "proof of the alleged conduct, no matter how overwhelming, would [bring] it no closer to showing the crime charged than would . . . no proof at all." *Peter*, 752 F.3d at 715.  "The problem [with such defect] is not that the government failed to allege a fact or an element that would have made the indictment's criminal charge complete. Instead, 'it is that the Government affirmatively alleged a specific

76

also asserts his Fifth and Eighth Amendment rights on the basis that, because he was charged with a crime that does not exist in law, he is actually, factually, and legally innocent of these crimes.  It would, therefore, constitute a grave miscarriage of justice for this Court to allow these verdicts and sentences to stand.

Finally, Mr. Troya's rights under the Sixth Amendment were violated by trial and appellate counsel's failure to raise this issue.  To the extent Mr. Troya was required to raise and preserve these claims at trial and on direct appeal, any ensuing procedural default should be excused by the deficient performance rendered by trial and appellate counsel, and by the prejudice that has resulted therefrom.

---

course of conduct that is outside of the reach of the [statute charged].'" *Brown*, 752 F.3d at 1352 (citing *Peter*, 752 F.3d at 715); see also *United States v. Vargas*, 563 Fed. Appx. 684, at \*686 (11th Cir. April 17, 2014) ("Indictments that affirmatively allege conduct that does not represent a federal offense contain jurisdictional defects because Congress's grant of jurisdiction to the district courts in criminal cases extends only to offenses against the laws of the United States,") (citation and internal quotation marks omitted); *United States v. McIntosh*, 704 F.3d 894, 902 (11th Cir. 2013)("If an indictment fails to charge [] an offense, then a court has no basis for exercising jurisdiction.");  *United States v. Andrade*, 83 F.3d 729, 731 (5th Cir. 1996) ("A plea of guilty typically waives all non-jurisdictional defects in the proceedings below . . . . Nonetheless, in this particular context, where intervening law has established that a defendant's actions do not constitute a crime and thus that the defendant is actually innocent of the charged [§ 924(c)] offense, application of this rule is misplaced"); *Mack v. United States*, 853 F.2d 585, 586 (8th Cir. 1988) (affirming that "[i]n order for a defendant who has pleaded guilty to sustain a challenge to the district court's jurisdiction, he must establish that the face of the indictment failed to charge a federal offense"); *United States v. Barboa*, 777 F.3d 1420, 1423 n.3 (10th Cir. 1985) ("If Barboa pled guilty to something which was not a crime, he is not now precluded from raising this jurisdictional defect, which goes 'to the very power of the State to bring the defendant into court to answer the charge brought against him.'" (quoting *Blackledge v. Perry*, 417 U.S. 21, 30 (1974)); *United States v. Caperbell*, 938 F.2d 975, 978 (9th Cir. 1991) ("[c]laims that the . . . indictment fails to state an offense are jurisdictional claims not waived by the guilty plea") (citation and internal quotation marks omitted).

77

**B.**     **Because the Court Improperly Instructed the Jury That It Could Make a Determination of Guilt Under 18 U.S.C.§ 924(j) On the Basis of Finding Him Guilty of A Crime Not Defined by 18 U.S.C. § 1111 as Murder, Mr. Troya's Convictions and Sentences on Counts 7 through 10 Are Invalid.**

    **1.**     **The Court's Jury Instruction on Counts 7 through 10 Authorized a Finding of Guilt Under § 924 (j) For Use of a Firearm in Relation to Either the Crime of Murder in Connection with a Drug Trafficking Crime or of a Killing Resulting from a Carjacking.**

In instructing the jury on Counts 7 through 10, the Court told the jury it could find Mr. Troya guilty under 18 U.S.C. § 924(j) if they found the following facts : 1) "that [he] committed the crime of violence **or** drug trafficking crime charged in the indictment;" 2) "that during the commission of **that** offense, [he] knowingly carried or used a firearm during and in relation to **the** crime of violence **and/or** drug trafficking crime;" 3) "that in the course of using the firearm, [he] caused the death of the person described in the particular count of the indictment;" and 4) "that the killing was murder, that is, the unlawful killing of a human being with malice aforethought and premeditation in connection with the drug trafficking offense, **or**, the killing resulted from the perpetration of, or attempted perpetration of, the crime violence [sic] (the crime of carjacking)." Doc. 769 at 22.

    **2.**     **Death Resulting from a Carjacking Is An Insufficient Basis for A Determination of Guilt Under § 924(j).**

In order to find a defendant guilty and eligible for sentencing under 18 U.S.C. § 924(j), the defendant must be found guilty of an act punishable by 18 U.S.C. § 1111, the federal statute that defines murder. Section 1111 defines murder as:

> the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary or robbery; … is murder in the first degree.

Any other murder is murder in the second degree.

18 U.S.C. § 1111(a).  Section 1111 does *not* define a killing committed in the perpetration, or attempted perpetration of, carjacking as first degree murder.[45]  Nor is any one of the enumerated types of felony murder identified in § 1111 a lesser included offense of carjacking.

Carjacking is not second degree murder, either.  Second degree murder is never considered a lesser included offense of felony murder, regardless of the predicate crime.  *See, for example,* 2-41, *Modern Federal Jury Instructions-Criminal P. 41.01*.  "[B]ecause felony-murder requires proof of an underlying predicate felony but does not require proof of malice as a factual matter, second-degree murder is not a lesser included offense of first degree felony murder." *See United States v. Main,* 113 F.3d 1046, 1050 (9th Cir. 1997);  *United States v. Swallow*, 198 F.3d 656, 659 (10th Cir. 1997); *United States v. Kills Ree*, 691 F.2d 412, 415 (8th Cir. 1982).

Moreover, § 924(j) does not include any provision that a finding that someone has committed a "crime of violence," as defined in § 924(c) (or anywhere else) is a basis for a finding of guilt under § 924(j).  In other words, the fact that carjacking, or even carjacking resulting in death, may have constituted a "crime of violence" could not provide an independent basis for a verdict of guilt under § 924(j).  To the extent the Court's instruction suggested that the jury could find Mr. Troya guilty under § 924(j) because he had committed a crime defined as a "crime of violence," this was also an improper instruction.

Accordingly, no finding by the jury that Mr. Troya committed carjacking resulting in death or, more generically, that he had committed a crime of violence pursuant to § 924(c), could

---

[45] Only the perpetration of an enumerated crime is sufficient to satisfy the malice aforethought requirement of § 1111. *See United States v. Thomas*, 34 F.3d 44, 49 (2d Cir.), *cert. denied*, 513 U.S. 1007, 115 S. Ct. 527 (1994); *see also* 11th Circuit Pattern Jury Instruction 45.2, 2003 ed., Annotations and Comments.

have made him guilty under § 924(j)(1),  or eligible for enhanced sentencing under § 924(j)(1), because a killing resulting from the perpetration or attempt to perpetrate carjacking does not constitute murder under 18 U.S.C. § 1111.  Nor is committing something defined as a "crime of violence" a sufficient predicate for a conviction or sentence under § 924(j)(1).

Thus, if the jury reached its verdict based on a non-unanimous finding, or if it was only unanimous in finding guilt based on Mr. Troya having committed a carjacking that resulted in death, these verdicts and sentences cannot stand.

> **3.      The Court's Instruction on Unanimity Did Not Require the Jury to Be Unanimous As To Whether It Had Found Murder In Connection with A Drug Trafficking Crime or A Killing Resulting from Carjacking Nor Was the Jury Asked to Indicate Whether or As to What Elements It Might Have Been Unanimous.**

In fact, the Court did not require the jury to reach unanimity with regard to its basis for a finding of guilt under § 924(j)(1). With regard to unanimity, the Court instructed that:

> [t]he indictment charges that the Defendants knowingly carried and used a firearm during and in relation to both a drug trafficking crime and a crime of violence.  In other words, Counts 7 through 10 charge that the Defendants violated the law in two separate ways.  It is not necessary, however, for the Government to prove that the Defendant violated the law in *both* of those ways.  It is sufficient if the Government proves, beyond a reasonable doubt, that the Defendant knowingly violated the law in *either* way; but, in that event, you must unanimously agree upon the way in which the Defendant committed the violation.

Doc. 769 at 25.   Thus, while the Court specifically instructed the jury that it had to reach unanimity on the second charged element of these counts --whether Mr. Troya had knowingly carried a firearm in relation to either a drug trafficking crime or a crime of violence -- the jury was never instructed it had to reach unanimity on the fourth element -- whether Mr. Troya had committed murder with regard to a drug trafficking crime or if the killing resulted from the perpetration or attempted perpetration of the crime of carjacking.

Even had the jury been so instructed, it was not asked to, and did not, indicate on the verdict form whether it had reached a unanimous verdict finding Mr. Troya guilty of premeditated murder with malice aforethought in connection with the drug trafficking offense or of a killing resulting from the perpetration or attempted perpetration of the crime of carjacking.

In other words, the Court gave the jury no reason to believe it had to be unanimous as to all the elements of § 924(j) and provided no mechanism by which any reviewing court can determine whether the jury was unanimous, or on which count it was unanimous.

### 4. This Combination of Factors Resulted In Plain and Reversible Error.

This confluence of factors would have required reversal on appeal. Finding Mr. Troya guilty of killing by use of a firearm during the perpetration of a carjacking is not a legally sufficient basis for a finding of guilt under 18 U.S.C. § 924(j)(1). No court had jurisdiction to find Mr. Troya guilty of these crimes and he was legally and factually innocent of them because these crimes do not exist under the law.

Without appropriate findings of guilt under §924(j), there was similarly no valid basis for the jury's imposition of sentences of death on Counts 7 and 8, or of life sentences on Counts 9 and 10.  The jury was not instructed to reach unanimity on all elements of Counts 7 through 10, and even if they had been, there is no way to know from the jury's verdict form on what basis the jury might have reached unanimity.  Since Mr. Troya's convictions and sentences on these counts must be presumed to have a legally insufficient basis, Mr. Troya's convictions under 18 U.S.C. § 924(j), and their attendant sentences, must fail.

The Court of Appeals could not have permitted such convictions and sentences to stand and would have reversed if this issue had been raised on direct appeal.

This Court should now grant relief.

**C.**      **Trial Unreasonably Failed to Challenge the Indictment Improperly Charging Mr. Troya, and to Object to the Court's Jury Instruction.  Appellate Counsel Unreasonably Failed to Raise the Improper Instruction as a Ground for Reversal on Direct Appeal.  Counsel's Ineffectiveness Resulted in Mr. Troya Having Been Improperly Convicted and Sentenced to Death, and Cures Any Procedural Default Caused by Counsel's Failure to Raise These Claims At Trial or on Direct Appeal.**

**1.**      **Under Prevailing Professional Norms, Trial and Appellate Counsel Rendered  Deficient Performance.**

Reasonably effective counsel representing a defendant in a capital trial in 2009  would have objected to legal error in the indictments and in the jury instructions, and would have taken all steps necessary to preserve their client's objections for appellate review.  The commentary to the 2003 ABA Guidelines notes that "[o]ne of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review."  2003 ABA Guidelines, Guideline 10.8. Trial counsel's failure to object to the trial court's erroneous instructions and preserve the objection for later review constitutes deficient performance.

Likewise, reasonably effective appellate counsel representing a death-sentenced defendant in 2009 would have raised all reasonable claims on direct appeal, including those subject to plain error review.  Even an appellate lawyer seeking to limit a direct appeal to the most salient issues his or her client may have for review, would not cull out a claim such as this that could have resulted in the reversal of the convictions upon which their client was sentenced to death. Appellate counsel's failure to raise this issue on direct appeal constitutes deficient performance.

Counsel both at trial and on direct appeal are presumed to know the law, and held responsible for knowing it. *Hinton v. Alabama*, 571 U.S ____, 134 S.Ct. 1081 (2014).

### 2. Mr. Troya Was Prejudiced by the Deficient Performance of Counsel Both at Trial and on Direct Appeal.

Mr. Troya was prejudiced by trial and appellate counsel's deficient performance. Had trial counsel objected to the instruction given by the Court, allowing the jury to find Mr. Troya guilty of a crime under § 924(j) that is not defined as murder under § 1111, the Court would have had to narrow substantially the bases upon which the jury could have considered him guilty of a crime that made him death-eligible. Had the Court done so, there is a reasonable probability that the jury would have failed to find the requisite elements for first or second degree murder.[46]

Mr. Troya was also clearly prejudiced by appellate counsel's failure to raise this issue on direct appeal. The jury was not instructed that it had to be unanimous on all elements that undergirded the § 924(j) and never asked to indicate on which of the two possible predicate offenses – drug-trafficking or carjacking resulting in death – its verdicts rested.

If they rested on carjacking, the convictions under § 924(j) could not have been sustained by the Court of Appeals. When both valid and an invalid bases are presented as alternatives to a jury for a possible conviction, and the court cannot determine upon which the jury has reached its determination of guilt, it must invalidate those convictions. Here, the Court of Appeals would have had no way to determine whether the jury based its verdict under § 924(j) on finding that Mr. Troya committed first degree murder in connection with the drug trafficking offenses or on carjacking resulting in death so would have to have vacated these convictions. Because Mr.

---

[46] The fact that Mr. Troya was indicted for manslaughter, as a lesser included offense on the charge of the killing in connection with drug-trafficking, strongly suggests that the Government recognized it might have difficulty convincing a jury that he had engaged in first or second degree murder. Manslaughter is not a lesser included offense to felony murder so the inclusion of manslaughter in the indictment can only have related to the drug trafficking charge. There was significant evidence that someone other than Mr. Troya had been the perpetrator of the drug trafficking offense. Thus, it is not only possible that the jury's verdict of guilt rested on the invalid carjacking basis rather than the drug trafficking offense, but a strong likelihood that the verdict rested on it.

Troya was *only* sentenced to death pursuant to § 924 (j), his sentences of death on those counts would likewise have to have been vacated.

Accordingly, Mr. Troya asks this Court to find that he was denied the effective assistance of counsel on trial and on appeal, and reverse his convictions and sentences on Counts 7 through 10.

**IX.   MR. TROYA RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL, WHERE DEFENSE COUNSEL FAILED TO MOVE TO DISMISS HIS INDICTMENT DUE TO DUPLICITY AND APPELLATE COUNSEL FAILED TO RAISE THE ISSUE ON APPEAL IN VIOLATION OF HIS FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

Mr. Troya's death sentence is based upon four counts which are so rife with duplicity that there is no possible way to determine whether the verdict was unanimous.

When drafting a federal indictment for more than one offense, the government is required to charge each criminal offense in a separate count. *See Federal Rules of Criminal Procedure*, Rule 8(a).[47] The aim is to avoid duplicity, which occurs where two or more distinct and separate offenses are joined in a single count. *United States v. Schlei,* 122 F.3d 944, 977 (11th Cir. 1997). In Mr. Troya's case however, the government chose to ignore this rule and, instead, filed an indictment that charged sixteen different offenses in only four counts. *See* Doc. 305 at 8-11 (counts 7-10).   Rather than organize the charges in the indictment based on the individual criminal offenses, the government chose to list a single count for each of the four victims and then lumped together all the offenses committed against each victim. The resulting confusion for the jury was exacerbated when the government failed to provide complete jury instructions on all the charged offenses and failed to provide a detailed jury verdict form, thereby depriving Mr.

---

[47] Rule 8(a), *Federal Rules of Criminal Procedure* provides, "The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged--whether felonies or misdemeanors or both--are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."

Troya of his Sixth Amendment right to a trial by jury. Neither trial nor appellate counsel raised this issue of duplicity; the failure to do so constitutes ineffective assistance of counsel.

The Eleventh Circuit has noted duplicitous counts are prohibited for several reasons:

> A duplicitous count poses three dangers: "(1) A jury may convict a defendant without unanimously agreeing on the same offense; (2) A defendant may be prejudiced in a subsequent double jeopardy defense; and (3) A court may have difficulty determining the admissibility of evidence."

*Schlei*, 122 F.3d at 977(quoting *United States v.* Wiles, 102 F.3d 1043, 1061(10th Cir. 1996).

Other Courts of Appeal have added to the list of dangers duplicitous counts pose. These include the dangers of failing to provide adequate notice to the defendant,[48] and failing to provide a basis for appropriate sentencing.[49] Courts have also recognized duplicitous counts may result in limited review on appeal.[50] Finally, and perhaps most importantly, court have cautioned duplicitous counts may result in a general guilty verdict that might conceal a finding of guilty as to one of the crimes charged in a duplicitous count and not guilty as to other counts.[51]

---

[48] *See United States v. Davis*, 471 F.3d 783, 790 (7th Cir. 2006); *United States v. Olmeda,* 461 F.3d 271, 281 (2nd Cir. 2006)*; United States v. King*, 200 F.3d 1207, 1212 (9th Cir. 1999); *United States v. Sharpe*, 193 F.3d 852, 870 (5th Cir. 1999); *United States v. Haddy*, 134 F.3d 542, 548 (3d Cir. 1998); *United States v. Trammel*, 133 F.3d 1343, 1354 (10th Cir. 1998); *United States v. Blandford*, 33 F.3d 685, 699 n.17 (6th Cir. 1994); *United States v. Huguenin*, 950 F.2d 23, 26 (1st Cir. 1991).

[49] *United States v. Starks*, 472 F.3d 466, 470 (7th Cir. 2006); *Olmeda*, 461 F.3d at 281; *Haddy*, 134 F.3d at 548; *United States v. Bruce*, 89 F.3d 886, 890 D.C. Cir. 1996); *Blandford*, 33 F.3d at 699 n.17; *United States v. Correa-Ventura*, 6 F.3d 1070, 1081 (5th Cir. 1993).

[50] *Davis*, 471 F.3d at 790; *Sharpe*, 193 F.3d at 870; *Haddy*, 134 F.3d at 548; *Trammel*, 133 F.3d at 1354; *Blandford*, 33 F.3d at 699 n.17.

[51] *See Starks*, 472 F.3d at 470; *Olmeda,* 461 F.3d at 281; *Davis*, 306 F.3d at 415; *Haddy*, 134 F.3d at 548; *Correa-Ventura*, 6 F.3d at 1081; *United States v. Stanley*, 597 F.2d 866, 871 (4th Cir. 1979); *Gerberding v. United States*, 471 F.2d 55, 59 (8th Cir. 1973).

In determining whether a count is duplicitous, this Court has explained that a critical component is the definition of the criminal offenses, in other words, "under this analysis, the key issue to be determined is what conduct constitutes a single offense." *Schlei*, 122 F.3d at 977. The framework for this analysis is not specifically spelled out as to duplicity, but is defined as it relates to a primary concern that duplicity protects a defendant from and that is double jeopardy. "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. *Blockburger v. United States*, 284 U.S. 299, 304 (1932)(citations omitted). *See also Brown v. Ohio*, 432 U.S. 161, 166, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977). A count is not duplicitous where it merely lays out alternative means of committing the same offense. *See Federal Rule of Criminal Procedure*, Rule 7(c).

In Mr. Troya's case, the duplicitous counts are s 7 through 10. Doc. 305. Count seven provides:

> On or about October 13, 2006, in St. Lucie County, in the Southern District of Florida, the defendants,
>
> DANIEL TROYA
> a/k/a/ "Homer,"
> and
> RICARDO SANCHEZ, JR.
> a/k/a "Rick,"
>
> **did knowingly carry and use a firearm during,** and in relation to, a crime of violence, and a drug trafficking crime, for which they may be prosecuted in a court of the United States, that is, **armed carjacking**, in violation of Title 18, United States Code, Section 2119, as set forth in Count Six of this Third Superseding Indictment, and **conspiracy to possess with intent to distribute one or more controlled substances**, in violation of Title 21, United States Code, Sections 841(a)(l) and 846, as set forth in Count One of this Third Superseding Indictment, respectively,

> which allegations are realleged and incorporated by reference herein, in violation of Title 18, United States Code, Section 924(c)(l), and in the course of this violation caused the death of a person through the use of a firearm, which killing is a murder as defined in Title 18, United States Code, Section 1111, in that the defendants, with malice aforethought, did unlawfully kill Luis Damian Escobedo by shooting him with the firearm willfully, deliberately, and maliciously, and with premeditation, and in the perpetration of, and attempt to perpetrate, a robbery.
> In violation of Title 18, United States Code, **Sections 924(j)(1) and 2**.

Doc. 305 at 8 (emphasis added). Counts 8 through 10 are identical except for the name of the victim. *Id*. at 9-11.

> **A. Mr. Troya received ineffective assistance of counsel, where the indictment duplicitously charged him with both murder and manslaughter as well as both premeditated and felony murder.**

The counts are duplicitous as to the charges of murder and manslaughter. The distinguishing factor between murder and manslaughter and how it relates to Counts 7-10 is more nuanced. In each of these counts, Mr. Troya is charged with violating both 18 U.S.C. § 924 (j)(1) and 18 U.S.C. § 924(j)(2). Subsection (1) specifically references the murder statute under § 1111, while subsection (2) specifically references the manslaughter under § 1112. The indictment also charged Mr. Troya with felony murder, as well as premeditated murder. And this Court read the felony murder jury instruction for the jury to consider as one possible way in which the Government could convict Mr. Troya of Counts 7-10 of murder under § 1111. While manslaughter is a lesser included offense of premeditated murder, it is a separate and distinct offense from felony murder and is not a lesser included offense. Manslaughter is a separate and distinct crime from felony murder, because second degree murder, voluntary manslaughter, and involuntary manslaughter are not lesser included offenses of felony murder. *United States v.*

*Miguel*, 338 F.3d 995 (9th Cir. 2003), *United States v. Jose*, 425 F.3d 1237, cert. denied, 126

S.Ct. 1664; *United States v. Chanthadara*, 230 F.3d 1237, 1258 (10th Cir. 2000).

> **B.    Mr. Troya received ineffective assistance of counsel, where the indictment duplicitously charged him with use of a firearm in relation to both 'drug trafficking' and 'crime of violence.'**

To begin with, the counts are duplicitous as to the predicate offenses.  The indictment

charged Mr. Troya with two predicate offenses for the 924(j) violation which are separate and

distinct crimes, carjacking and drug trafficking. Carjacking was held by this court to be a crime

of violence, thus falling within 924(j)(1).[52] The drug trafficking allegation also falls within

924(j); however, it is separate and constitutes a separate crime from carjacking. The fact that

carjacking and drug trafficking are separate crimes is beyond peradventure.

Therefore, counts 7-10 each individually charge four separate crimes. Each count alleges

the defendants committed the following crimes: (1) knowingly carry and use a firearm during

and in relation to a crime of violence, armed carjacking, that resulted in a murder; (2) knowingly

carry and use a firearm during and in relation to a crime of violence, armed carjacking, that

resulted in a manslaughter; (3) knowingly carry and use a firearm during and in relation to a drug

trafficking crime that resulted in a murder; (4) knowingly carry and use a firearm during and in

relation to a drug trafficking crime that resulted in a manslaughter.

The harm of this duplicitous indictment was compounded by this Court's failure to read

the manslaughter jury instruction whatsoever. The manslaughter jury instruction should have

been read as a separate and distinct offense, as well as a lesser offense of pre-meditated murder.

---

[52] See Claim VI for argument that carjacking is not a crime of violence.

88

*See* Rule 31(c)(1).[53] The failure to do so was plain error. However, this error was a result of the obfuscation caused by the duplicity of Counts 7-10 as neither the parties nor the Court realized that manslaughter was even in play within these counts. This is an example of how the duplicity failed to give adequate notice of exactly what was charged within Counts 7-10 and exactly what charges Mr. Troya needed to defend against.

The same obfuscation resulted in a limited review on appeal as the appellate attorneys, like the trial attorneys never caught this error and brought it to either the trial or appellate courts attention.

The duplicity of these counts also resulted in the jury possibly convicting Mr. Troya without unanimously agreeing on the same offense and possibly rendering a general guilty verdict that may have concealed a finding of guilt as to one of the crimes charged in a duplicitous count and not guilty as to other counts. Although the verdict form listed the counts in an interrogatory format in the penalty phase, the guilt phase used a general verdict form that renders no insight whatsoever as to the jury's findings as to guilt. Docs. 792, 859. The guilt phase verdict form listed Counts 7-10 generally as follows:

> As to the charge that the Defendant **DANIEL TROYA** knowingly carried or used a firearm during and in relation to a crime of violence and/or a drug trafficking crime, and in the course thereof caused the death of [*name of victim*], which killing is a murder defined by law, as charged in Count [*7-10*] of the indictment.

Doc. 792. (emphasis in original).

The general verdicts eliminated any possibility as to a finding for manslaughter on any of the counts and any opportunity to ascertain whether Mr. Troya was found unanimously guilty of either felony murder or premeditated murder in furtherance of either the crime of violence or

---

[53] Rule 31(c)(1) states: "A defendant may be found guilty of any of the following: (1) an offense necessarily included in the offense charged."

the drug trafficking crime. Of particular note is the fact that "and/or" is placed between the reference to a crime of violence and a drug trafficking crime. This specific election only serves to magnify the likelihood and the impossibility at this time of determining whether the jury found unanimously at the time of rendering the guilt phase verdict as to any of the four separate offenses listed in counts 7-10.

Additionally, the duplicity of Counts 7-10 combined with the possible errors above deprived this Court of a proper basis for appropriate sentencing. If manslaughter had been offered as an alternative as charged and the trial attorneys had argued it as a possibility, the jury may have rendered a verdict for manslaughter rather than murder. If this had occurred, Mr. Troya would have been subject to a maximum of fifteen years incarceration as opposed to the life or death option the jury was presented with in the penalty phase.

Neither trial nor appellate counsel previously raised the issue of duplicity. The failure to do so constitutes ineffective assistance of counsel. The prejudice is that the referenced counts would have been dismissed upon proper motion and meritorious on appeal. *See Strickland.*

## X. MR. TROYA'S COUNSEL WAS INEFFECTIVE IN FAILING TO REQUESTTHAT THE JURY BE INSTRUCTED ON MANSLAUGHTER; A CRIME THAT WAS PROPERLY CHARGED IN THE INDICTMENT IN VIOLATION OF HIS FIFTH, SIXTH AND EIGHTH AMENDMENTS.

Simply put, manslaughter was charged in the indictment and, therefore, it was error to fail to request that the jury receive an instruction on manslaughter .

Mr. Troya received death sentences on counts 7 and 8. Both of these counts were charged under § 924(j), which states that if a death results from the use of a firearm during the commission of a 924(c) crime then a death sentence is a possibility. The Government alleged violations of both § 924(j)(1) & (2). The significance of this fact is that subsection (2) addresses a manslaughter committed in furtherance of a crime under § 924(c). A manslaughter instruction

90

was not read at Mr. Troya's trial. Failure to do so is fundamental error. This issue was not raised at the trial or appellate level in Troya's case.

### A. Manslaughter was clearly charged and should have been read because there was evidence of manslaughter

In counts 7 through 10, Mr. Troya is charged with a violation of 18 U.S.C. §§ 924 (j) (1) and (2). Doc. 305. [54] Each of these subsections constitute a separate and distinct crime. Subsection (1) specifically references the murder statute under § 1111, while subsection (2) specifically references the manslaughter under § 1112. Although second degree murder is a lesser included offense of first degree pre-meditated murder, second degree murder, voluntary manslaughter, involuntary manslaughter are not lesser included offenses of felony murder. *United States v. Miguel*, 338 F.3d 995 (9th Cir. 2003), *Jose,* 425 F.3d 1237, *cert. denied*, 126 S.Ct. 1664; *United States v. Chanthadara*, 230 F.3d 1237, 1258 (10th Cir. 2000). However, manslaughter is a lesser included offense of pre-meditated first degree murder.

Specifically, counts 7-10 each individually charge four separate crimes: (1) that Daniel Troya and Ricardo Sanchez did knowingly carry and use a firearm during and in relation to a crime of violence, armed carjacking, that resulted in a murder in violation of § 1111;  (2) that Daniel Troya and Ricardo Sanchez did knowingly carry and use a firearm during and in relation to a crime of violence, armed carjacking, that resulted in a manslaughter in violation of § 1112; (3) that Daniel Troya and Ricardo Sanchez did knowingly carry and use a firearm during and in relation to a drug trafficking crime that resulted in a murder in violation of § 1111; (4) that

---

[54] A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall--

**(1)** if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life; and
**(2)** if the killing is manslaughter (as defined in section 1112), be punished as provided in that section.
18 U.S.C.A. § 924(j)

Daniel Troya and Ricardo Sanchez did knowingly carry and use a firearm during and in relation to a drug trafficking crime that resulted in a manslaughter in violation of § 1112.

Due to counsel's ineffective assistance, this Court did not read the manslaughter jury instruction whatsoever. The manslaughter jury instruction should have been read as a separate and distinct offense, as well as a lesser offense of pre-meditated murder. *See* Rule 31(c)(1).[55] The failure to do so was plain error.

### B. Mr. Troya was prejudiced by counsel's ineffective representation, because if he had been convicted of manslaughter, instead of murder, he would have been subject to 15 year maximum sentence.

Counsel's ineffectiveness deprived this Court of a proper basis for appropriate sentencing. If manslaughter had been offered as an alternative as charged and the trial attorneys had argued it as a possibility, the jury may have rendered a verdict for manslaughter rather than murder. If this had occurred, Mr. Troya would have been subject to a maximum of fifteen years incarceration as opposed to the life or death option the jury was presented with in the penalty phase.

Neither trial nor appellate counsel previously raised the issue of a jury instruction on the offense of manslaughter. The failure to do so constitutes ineffective assistance of counsel. *See Strickland.*

---

[55] Rule 31(c)(1) states: "A defendant may be found guilty of any of the following: (1) an offense necessarily included in the offense charged."

92

**XI.**   **TRIAL COUNSEL INEFFECTIVELY FAILED TO RETAIN COMPETENT AND APPROPRIATE EXPERTS, FAILED TO CONSULT WITH THOSE WHO WERE RETAINED, TO FILE APPROPRIATE MOTIONS TO EXCLUDE GOVERNMENT EXPERT AND OTHER WITNESS EXPERT-LIKE TESTIMONY, TO EFFECTIVELY CROSS EXAMINE AND OBJECT TO IPROPER TESTIMONY OF GOVERNMENT EXPERTS, AND TO INTRODUCE EXPERT TESTIMONY HELPFUL TO THE DEFENSE AT GUILT AND SENTENCING PHASES, ALL CONTRARY TO THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

Except for mental health experts (and a fingerprint expert), counsel for both defendants moved for and were granted funding for several joint experts. Counsel for Mr. Troya did not speak with any of those experts, deferring to counsel for Mr. Sanchez to handle consultation with and presentation of their testimony, if those attorneys so decided. None of these defense experts were called to testify. As it turns out, consultation with competent experts, including those in the respective fields for which counsel sought and received funding, would have produced questions for an effective cross examination of the government experts, as well as, in some cases, testing of their proposed testimony in a *Daubert* hearing. Where government experts ended up testifying, such consultation would have also resulted in effective defense testimony undermining the opinions of those experts.

**A.**   **Forensic pathologist.**

**1.**   **Defense counsel failed to adequately challenge the government's case by failing to object to the impermissible testimony of a substitute medical examiner and failing to retain an independent forensic pathologist.**

There is no doubt the crime in this case was tragic and horrible. Nevertheless, because there was no eyewitness testimony, it was important for the government to highlight the gruesome facts before the jury, both to ensure a finding of intent and to set the table for asking for the death penalty in the punishment phase. For this, the government relied on Dr. Mittleman, a medical examiner who substituted for the medical examiner who actually conducted the autopsy, Dr. Diggs.

93

Dr. Mittleman, who had only reviewed Dr. Diggs' reports and additional photographs, testified there was stippling on the left side of the child Damien Escobedo's face, indicating his face was a couple feet from the muzzle of a gun. T3455. Describing the death in horrifying terms, the substitute medical examiner testified the child had a gunshot wound in his left shoulder that traveled through his lungs, through his chest, and exited on the right side under the armpit. T3457. He opined the wound was fatal, but not instantly.  Dr. Mittleman testified the fatal wound made it hard to breathe. He pointed to blood in the air spaces surrounding the lungs, and said the heart would slow, leading to a suffocating type of death, like drowning in one's own blood. T3458. To buttress his opinion, he pointed to a scene photo, saying it was consistent with his opinion, because it shows blood coming out of the nose and mouth, and that was typical when there was a bullet through the lungs. T3458. He opined it took less than a minute for the child to die, but death could have come quite quickly. T3466. There was no cross-examination by Mr. Troya's lawyers, or any defense lawyer, challenging this testimony. Furthermore, defense counsel failed to utilize a defense expert pathologist to rebut Dr. Mittleman's erroneous testimony.     Relying on Dr. Mittleman, the government's opening focused on testimony the child died by drowning in his own blood stating, "The three year old, the medical examiner will testify that the autopsy revealed that the three year old boy was shot through the lungs and his heart, and that the death was not instant, and that the cause of death was basically drowning in his own blood." T3043.  In closing, the Government furthered this line of argument by stating:

> . . . . Luis Damian Escobedo, he is the youngest child. Medical Examiner testified five gunshot wounds, stippling to the left cheek, powder burns, close shot, so close the powder coming out of the gun burned the child's cheek. This child was shot through the heart and lungs, and that the sensation suffered by this little boy was the same as drowning in one's own blood. A horrific way to die.

T7161.

94

The Government subsequently argued:

Before we left for lunch I was talking about the uncomfortable yet necessary evidence that must be discussed concerning the murder of this little boy, Damian Escobedo, and I was covering with you the fact this child suffered before he died according to the testimony of Dr. Mittleman and the child died in his own blood. . . The point I was raising in talking about the death of Damian Escobedo, I was mentioning that before the lunch break this child, according to Dr. Mittleman, after being shot through the heart and lung had drowned in his own blood.

T7164-65 (emphasis added).

Based on Dr. Mittleman's report that a wound to the mother, Yessica Escobedo, was a supported wound (meaning it was a wound caused when the skin where the bulled exited was pressed against another object) and matched the wound on the leg of one of her children, the government told the jury this was evidence she was desperately trying to protect her children when they were shot:

Yessica Escobedo had both the Defendants open up on her as she is trying to get away and save her kids. She has her kids, one of them on her hip, and you know this because the shots that go through her go into the child, go into the four year old, go into Damian from his side. It was a re-entry wound that lines up with her back or front. Remember we spent time with Dr. Mittleman talking about perforating gunshot wounds. She has her kids right there, next to her.

T7446.

Despite receiving funds from this Court, the defense never retained a forensic pathologist and so even before trial effectively abandoned any response to the government's case regarding the death of the Escobedos. Instead, when the government notified the Court the medical examiner who conducted the autopsies had retired, the defense, without objection, agreed to let the government present a substitute medical examiner, Dr. Mittleman, to testify from the medical examiner's records.

Dr. Mittleman's testimony was devastating regarding one of the children, Damien, and provided the basis for the government's argument to the jury that there was a "triangulation of

95

fire" by "military style operation" "thug enforcers". T7444-445.  Had trial counsel effectively challenged this evidence, the jury would never have heard this prejudicial testimony or, if they had, they would have, at a minimum, learned it was speculative and not based in accepted science.

### 2.    Defense Counsel was Ineffective in Failing to Retain an Independent Forensic Pathologist and That Failure Prejudiced Mr. Troya.

Especially given the circumstantial nature of the facts of the shooting, counsel's failure to consult with an independent forensic pathologist was unreasonable. It is all the more indefensible because defense counsel themselves recognized the importance of such an expert and filed a request for approval to hire an independent medical examiner which this Court found to be reasonable and granted. Docs.  236, 238. Inexplicably, Mr. Troya's trial counsel never sought out, hired, or utilized the services of an independent forensic pathologist.  Had Mr. Troya's counsel consulted with an independent medical examiner the jury would have learned that the government pathologist's testimony was, in part, unscientific and unprovable and that wounds to the victims did not occur as the government argued, including a *radically different explanation of the fatal wound* suffered by Damien Escobedo.

Mr. Troya's post-conviction counsel has consulted with one of the foremost forensic medical experts in the country, Dr. Charles Wetli. Dr. Wetli is certified by the American Board of Pathology in Anatomical, Clinical, and Forensic Pathology and has served as a pathologist in the United States Army, Deputy Chief of the Medical Examiner's Office of Miami-Dade County and Chief Medical Examiner for Suffolk County. He has personally performed thousands of autopsies and authored two forensic texts, numerous book chapters, and over 100 research articles in peer-reviewed scientific journals.

96

After reviewing the autopsies in Mr. Troya's case, the scene photos, and the testimony of Dr. Mittleman, Dr. Wetli has concluded the scene and autopsy reports and photos in this case were so inadequate it is simply not possible for any reasonably competent forensic pathologist to evaluate and interpret the injuries and trajectories of the projectiles. According to Dr. Wetli, "any testimony as to projectile pathways or organ damage (except for head injuries) is not possible to a degree of reasonable medical or scientific certainty or even probability." Appendix D-1.

Large portions of Dr. Mittleman's testimony were speculative and not based on supported fact.

> For example, for Jose Escobedo, it was noted [in the autopsy report] that a there was liter of blood in his abdominal cavity yet there is no mention[] as to where this blood came from…[I]n subsequent trial testimony Dr. Mittleman opined this came from injuries to abdominal fat and mesentery. This is purely speculative based on the information available. The importance is that this information may be relevant to establishing a likely sequence of events: a gunshot wound to the abdomen injuring only fat and mesentery would bleed very slowly whereas if a major blood vessel were injured (e.g. aorta of vena cava) the bleeding would be quite rapid.

Appendix D-1.

The quality of the photos taken during autopsy also precluded accurate and reliable conclusions:

> The standard practice for photographic documentation of gunshot wounds is to depict the injury so as to indicate the location on the body and then a closer view to delineate the features of the injury. This was certainly not done in these victims. Generally, there are depictions as to where on the body there were injuries, but most gunshot wounds were not adequately depicted with closer photographs. This was evident in trial testimony of Dr. Mittleman who indicated he could not explain with the photographs as to which was the entry and exit wounds of the perforating gunshot wound of the leg of Jose Escobedo.

*Id.*

Dr. Wetli's review and opinion contradicts the Government's theory of how the crime was committed. For example, Dr. Mittleman's testimony of how Damien Escobedo died was

97

erroneous and flawed. A scientifically accurate analysis would have revealed near immediate death after being shot, and not, as Dr. Mittleman claimed, that the child "drowned in his own blood."

Similarly, Dr. Wetli opines there is no scientific support for the conclusion the mother Yessica Escobedo was holding her son Luis when she was shot, a scene description the government argued to the jury. Because the autopsy description of the wound to Ms. Escobedo was so deficient, it was not possible to determine which were entrance wounds and which were exit wounds. This is a problem for a reviewing pathologist who did not conduct the autopsy because

> shored or supported exit wounds mimic entry gunshot wounds, and the photographic documentation is inadequate to assess the projectile pathway and, again, there is no description of the wounds or wound track in the autopsy report…it was apparently opined that the entry gunshot wound to the right thigh of Luis Julian was a re-entry wound related to the supported exit wound on the back of the mother, indicating that the thigh of Luis Julian was pressed against his mother when that shot was fired. However, the scene photographs depict the left thigh was in contact with the mother, not the right. Hence, this conjecture is purely speculative and probably erroneous.

*Id.*

Because of trial counsel's abject failure to challenge Dr. Mittleman's testimony in any manner, key elements regarding Damien Escobedo's death and fatal wound were never presented to the jury. Had trial counsel consulted with his expert or another forensic medical expert, they would have realized failing to challenge Dr. Mittleman's testimony meant critical evidence would fail to reach the jury. For example, the jurors should have been presented with the testimony that the fatal wound did not result in Damien Escobedo dying from "drowning in his own blood." Dr. Wetli was then and is now prepared to testify that:

> From the materials examined, it is therefore my opinion to a degree of reasonable medical certainty that Luis Damian Escobedo died from a gunshot wound to his chest resulting in near immediate death because of the projectile damage to his

98

heart and lungs, and that his mechanism of death was from destruction of these vital organs and not from "drowning in his own blood."

Appendix D-1 at 2.

Additionally, Dr. Wetli would have been able to refute the contention that a gun was discharged near the head of Damien Escobedo while he was alive. Dr. Wetli would have been able to testify in contravention of Dr. Mittleman's testimony by testifying that, "the sparse gunshot stippling on his left cheek and ear occurred after death and is unrelated to any gunshot injury sustained by this child." Appendix D-1 at 2.  Dr. Wetli could have further challenged and undermined the credibility of the Government expert's opinion by opining that:

> The autopsy report specifically notes that there is no gunpowder stippling related to the entry wound at the top of the left shoulder. Examination of the autopsy photographs, however, reveals a widely dispersed pattern of gunpowder stippling over the left cheek and ear. The stippling is black, not erythemic (red) as is usually seen. This would indicate that this stippling occurred after death (i.e. there is no vital reaction to the embedded gunpowder particles). Scene photographs depicted on the left cheek and ear are not related to the gunshot wound to the left shoulder, that the stippling took place after death, and is unrelated to any gunshot injury to this child.

Appendix D-1 at 2.

Had an independent medical examiner been consulted, the jury would have had grave doubts about the Government's case and would have known that Damien Escobedo did not suffer near as torturous a death as the Government argued. Trial counsel's failure to consult with an expert left the jury hearing only Government's inaccurate account of the crime.

### 3. Defense Counsel was Ineffective in Failing to Object to the Testimony of a Substitute Medical Examiner.

Despite many opportunities to object, trial counsel failed to raise any objection to Dr. Mittleman testifying in place of Dr. Charles A. Diggs, the medical examiner who actually conducted the autopsies. Consistent with a defense agreement, the government filed unopposed motions for a substitute medical examiner due to the fact Dr. Diggs had retired to another area of

the state and had difficulty traveling due to dialysis. Doc. 522, 531. There was, however, no showing that Dr. Diggs was legally unavailable to testify at trial.

In support of the motions, the government recited some outdated and distinguishable cases to argue the autopsy reports were admissible as business records; however, all but one of these case were decided before the landmark case of *Crawford v. Washington*, 541 U.S. 36 (2004). Defense counsel apparently agreed with the legal analysis, but it was plainly wrong in light of *Crawford*. At trial, the government announced the appearance of their substitute medical examiner, saying he would testify based on business records, because the actual medical examiner was retired and "gone." T3255.

This Court announced outside of the jury's presence that the defense was not objecting, probably because the autopsy reports were admissible under Eleventh Circuit case law and FRE 803.8. T3395-96. The case the Court cited, *United States v. Rosa*, 11 F.3d 315 (11th Cir.1993), predated *Crawford* by eleven years and was no longer good law post-*Crawford*. Defense counsel, however, failed to alert this Court to the actual legal principles governing the substitution of the medical examiner, and failed to make any argument challenging the testimony.

Had counsel raised the proper objection, Dr. Mittleman's testimony would have been excluded. As the Eleventh Circuit explained in *United States v. Ignasiak*, 667 F.3d 1217, 1231 (11th Cir. 2012), because the reasoning of *Crawford* does apply to autopsy protocols:

> we conclude that the five autopsy reports admitted into evidence in conjunction with Dr. Minyard's testimony, where she did not personally observe or participate in those autopsies (and where no evidence was presented to show that the coroners who performed the autopsies were unavailable and the accused had a prior opportunity to cross-examine them), violated the Confrontation Clause.

100

Although the *Ignasiak* decision was subsequent to the trial in Mr. Troya's case, the reasoning and argument was clearly available to his lawyers. *Crawford* itself was a 2004 case and it was routinely being argued by Florida lawyers to exclude the hearsay testimony of government witnesses.  The trial in the *Ignasiak* case, for example, was conducted from October 6, 2008 to November 3, 2008, two months before the start of Mr. Troya's case, and the *Ignasiak* trial lawyers raised and preserved the issue. *United States v. Ignasiak*, United States District Court for the Northern District of Florida, No. 08-00027-CR-3-LAC-MD, 3:08-cr-00027-LC-MD-1, Docs. 128, 187.

Even though trial counsel agreed in court the autopsy reports were business records, there is still a *Strickland* violation. A decision based on a misunderstanding of the law is not a strategic decision. *Dando v. Yukins,* 461 F.3d 791, 799 (6th Cir.2006) ("The evidence in this case suggests that the attorney's decision was not an exercise in professional judgment because it reflected a misunderstanding of the law regarding the availability of a mental health expert."); *see also United States v. Span,* 75 F.3d 1383, 1390 (9th Cir.1996) ("Counsel's errors with the jury instructions were not a strategic decision to forego one defense in favor of another. They were the result of a misunderstanding of the law.") (citing *Martinez-Macias v. Collins,* 810 F. Supp. 782, 786 (W.D.Tex. 1991)); *Cox v. Donnelly,* 432 F.3d 388, 390 (2d Cir.2005) (finding deficient performance where trial attorney admitted that "he did not challenge the trial court's intent instructions because he did not then know that they were illegal under state and federal law . . . [and] had he been aware of the unconstitutional nature of the instruction, he would have lodged an objection to it"); *Hardwick v. Crosby,* 320 F.3d 1127, 1163 (11th Cir.2003) ("[A] tactical or strategic decision is unreasonable if it is based on a failure to understand the law."); *United States v. Streater,* 70 F.3d 1314, 1321 (D.C.Cir.1995) ("While this court remains unwilling to

101

second-guess 'reasonable strategic or tactical judgments,' [trial counsel]'s erroneous legal advice to Streater on a critical point cannot be excused as a strategic or tactical judgment, but could have sprung only from a misunderstanding of the law." (internal citation omitted)).

### 4.     Trial Counsel's Error Prejudiced Mr. Troya.

Dr. Mittleman's testimony provided graphic detail about the murder of the Escobedos. Through Dr. Mittleman, the jury heard about the pathway of each projectile, where each entered the body and where each exited, which organs were damaged, and where blood pooled in the body. Dr. Mittleman also provided testimony about shot sequencing and the position of the shooters and the victims based on diagrams created by Dr. Diggs. According to Dr. Mittleman, stippling on two of the victims showed that the muzzle of the gun was as close as six inches away.

The prosecution used these facts to great effect in argument, telling the jury about the number of shots in each victim and expounding in graphic detail about how the four year old child "suffered a head wound…entered at one side and went out, not the other side but on the same side, consistent with a murderer shooting at close range while the child is on the ground and giving him a kill shot." T3042-43.

Although some of this evidence should not have been before the jury because it was actually scientifically inaccurate (as discussed above), none of it would have been admitted had counsel raised a timely C*rawford* objection. As Dr. Charles Wetli, an independent medical examiner hired in post-conviction, avers, absent the autopsy protocol none of this testimony was possible: "All that could be ascertained from the scene documentation is that all died of gunshot wounds but no determination could be made about projectile pathways and, except for gunshot wounds to the head, what organs were damaged. Because of blood on the face near the gunshot wound to the head of Jose Escobedo, gunpowder stippling could not be evaluated." Appendix D-

1. Thus, if trial counsel had made an appropriate *Crawford* objection, the jury would have been spared hearing the gruesome details Dr. Mittleman provided; it would have seen none of the autopsy photographs; and the government would not have been able to argue a highly prejudicial version of the crime that included the children's mother shielding them from shots and "execution-style" close-range shots to the victims' heads. This was certainly relevant to punishment phase, but it was also had a significant bearing on guilt phase and the selection process. As the government told the jury in closing:

We can determine premeditation from the number of shots fired. Folks, when you shoot somebody in the head four times, you intend to kill them. When you shoot Jose Luis Escobedo within a foot of his head, you intend to kill him. When you execute a child when he is laying on the ground, you intend to kill that child.

T7444.

This argument about intent was only possible based on the improper testimony of Dr. Mittleman. As Dr. Wetli noted, based solely on the scene photos it was impossible to determine the number of shots, the distance or sequencing of the shots, or the location of any of the victims when they were shot.

The exclusion of medical examiner evidence based on *Crawford* had consequences for other parts of the government's case. For example, the government's ballistic examiner, Mark Chapman's testimony would have been severely curtailed. Mr. Chapman's testimony was important to the government's case because he reviewed the projectiles recovered from the victims' bodies by Dr. Diggs and compared them to other ballistics evidence recovered in the case. Based on that review he told the jury how many guns were involved and which guns were responsible for which injuries. This evidence—repeated by the government in closing—allowed

103

the prosecution to tell the jury that the crime was a "triangulation of fire", a "military style operation and execution by the thug enforcers". T444-445.

Absent Dr. Mittleman's testimony there is a reasonable probability that at a minimum at least one juror would have viewed the crime, the selection process and the punishment phase differently.

**B.      Firearms and toolmark expert.**

**1.      Trial Counsel Rendered Ineffective Assistance of Counsel by Not Requesting a *Daubert* Hearing as to the General and Specific Methodology Utilized by Firearm/Toolmark Examiners in Mr. Troya's Case, By Not Moving In Limine to Restrict Terminology Regarding Supposed Matches of Casings, Cartridges and Firearms, By Failing to Rebut Testimony of Government Experts With Their Own Expert, and Ineffectively Cross-Examining the Government Experts, and the Government presented false or misleading expert testimony, all in Violation of Mr. Troya's Fifth, Sixth and Eighth Amendment Rights.**

At trial, the Government presented expert testimony that spent casings recovered at the scene of the homicide matched a live cartridge and a firearm purportedly found at the residence of Mr. Troya and his alleged co-conspirators. This expert testimony was invalid and unreliable, and trial counsel's failure to challenge it constituted ineffective assistance of counsel. Trial counsel unreasonably failed to retain an expert to challenge the general and specific methodology utilized by the Government experts and timely request a *Daubert* hearing; failed to utilize an expert to move in *limine* to restrict terminology regarding supposed matches of casings, cartridges, and firearms; failed to rebut the government expert's testimony with their own expert; and failed to effectively cross-examine the government expert. Trial counsel's deficient performance prejudiced Mr. Troya.

104

### A.        Introduction: The Invalidity of Firearm and Toolmark Identification Evidence

The premise underlying firearms and toolmark identification is that individual tools leave unique marks on surfaces. Firearms identification is a subspecies of toolmark identification dealing with toolmarks that ammunition components, such as bullets and shell casings, acquire by being fired. Firearm analysis rests on the twin assumptions that the surface contours of every gun are unique and that, every time that gun is fired, some of those unique markings, along with markings caused by the act of firing itself, are transferred to the shell casing and bullet, leaving distinctive patterns on each of them. *See*, *e.g.,* Daniel L. Cork et al., *Ballistic Imaging* at 30-46 (Nat'l Research Council & Nat'l Acad. of Sci. 2008) ("NRC Report"). Firearms and toolmark examiners use comparison microscopes to compare toolmarks on ammunition components found at crime scenes. A comparison microscope allows an examiner to see, for example, two shell casings through a single eyepiece. If an examiner determines the toolmarks are sufficiently similar on both shell casings, a firearm is identified as the one tool to the exclusion of all others that produced the identical marks on the shell casings that are being compared.

At the time of Mr. Troya's trial, the premise underlying firearms and toolmark identification – that firearms leave unique marks on ammunition components – had never been proven. Indeed, such evidence was being successfully challenged in courts around the country. *See, e.g*., *United States v. Green*, 405 F. Supp. 2d 104 (D. Mass. Dec. 20, 2005) (Memorandum and order re: Motion to exclude ballistics testimony) (recounting problems inherent in firearm and toolmark identification and prohibiting firearms examiner from testifying that the match he found allows for identification "to the exclusion of every firearm in the world"); *Sexton v. State*, 93 S.W.3d 96 (Tex. Crim. App. 2002) (firearms identification testimony held inadmissible where expert testified that toolmarks on shell casings had been made by the same magazine, even

105

though, because no weapon had been recovered, expert had only compared the toolmarks on the casings and had not examined the suspect magazine); *cf. Ramirez v. State*, 810 So. 2d 836 (Fla. 2001) (toolmarks expert's identification of the expert's knife as the murder weapon, to the exclusion of all others, was unreliable and inadmissible).

At the time of Mr. Troya's trial, there was never a firm statistical empirical foundation for the claim that firearms leave unique toolmarks on ammunition components such that a firearms examiner can make a positive "match" based on such toolmarks. *See* Adina Schwartz, *A Sytemic Challenge to the Reliability and Admissibility of Firearms and Toolmarks Identification*, 6 Colum. Sci. & Tech. L. Rev. 2 (2005) (discussing lack of adequate statistical empirical foundations for firearms and toolmarks idenitifications). Moreover, at the time of Mr. Troya's trial – and in the years since -- the field of firearms and toolmark identification lacked national objective standards concerning how many marks must match before an examiner can make a positive identification between two pieces of evidence. *See Green*, 405 F. Supp. at 114. In sum, an expert opinion that ammunition components "match" each other is not grounded in empirical science; it involves a subjective qualitative judgment by an examiner based on unarticulated standards and no statistical foundation for estimation of error rates.[56]

---

[56] The National Academy of Sciences ("NAS") issued a report in 2009 that identified two main problems with firearms and toolmarks identification: (1) the validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related toolmarks had not yet been fully demonstrated; and (2) a lack of a precisely defined process or protocol concerning the specific features to be examined and compared between toolmarks, and the level of agreement that must exist in the pattern of two sets of marks before an examiner can determine with a degree of confidence that there is a correlation between the items being examined. *See* National Academy of Sciences, *Strengthening Forensic Science: A Path Forward* at 154-55 (February 2009) (available online at https://www.ncjrs.gov/pdffiles1/nij/grants/228091.pdf) (last visited May 2, 2016). Although the NAS report was published in 2009, the basis for the report's criticisms of firearms and toolmarks identification existed at the time of Mr. Troya's trial – i.e., the *lack* of any empirical foundation for the underlying premise that firearms leave unique

## B.      Government Experts' Testimony

The Government qualified two individuals as firearm/toolmark experts, Allison Quereau and Mark Chapman. Of the two experts, Allison Quereau testified first. Ms. Quereau testified she was employed by the Palm Beach County Sheriff's Office crime lab in West Palm Beach and was currently assigned to the Firearm and Tool Mark Unit. She had been employed there for a year, but did the exact same job in New Mexico for their Department of Public Safety for four years. She started her career with the Florida Department of Law Enforcement in Orlando and was there for five years. T6256.

When the Government offered Ms. Quereau as an expert in the field of firearm and toolmark examination Mr. Sanchez's attorney, Mr. Murrell, objected and moved for a *Daubert* hearing on the question of whether there is "a legitimate scientifically verifiable way of linking up a casing to a weapon that is reliable that one can find an accurate result." T6264; *see also* T6258-65. The Court denied that request as untimely and ruled that defense counsel could ask those types of questions during cross-examination. T6264. The transcript reveals counsel was aware of the pre-trial order setting the time parameter for filing pre-trial motions and had received proper notice from the Government identifying their experts, their qualifications, and their anticipated testimony. T6264-65.

Mr. Troya's counsel had not consulted an expert, despite the fact they had been granted funds by the Court to do so. Nor did Mr. Troya's counsel move for a *Daubert* hearing. Both Sanchez's counsel and Troya's counsel had agreed that Mr. Murrell would handle the bulk of the cross-examination of the Government firearm experts. As a result, Mr. Garcia engaged in an extremely limited cross-examination of Ms. Quereau that encompassed a mere three pages in the

marks, and the *lack* of any objective national standards governing the subjective determinations of firearms and toolmarks examiners.

trial transcript. T.6378-81. Essentially, he had Ms. Quereau agree that the caliber of a gun is a class characteristic and that the millions of AK-47s manufactured would all share that same class characteristic. Then Mr. Garcia had Ms. Quereau agree that regardless of the number of items compared they would all be possibilities as a match if the class characteristics were the same and that only if she found individual characteristics that differed could she "match" a casing or bullet to an individual gun. *Id.*

Once the Court ruled that Ms. Quereau could testify as an expert she testified on direct that she compared the casings and projectiles from the scenes at Suwanee and Mercer to an exhibit already in evidence and positively identified them based on tool marks coming from the AK-47. Ms. Quereau then went on to testify to several very arguable claims.

First, Ms. Quereau testified that the methodology primarily used by a firearm and toolmark examiner matches markings and patterns imparted by a firearm when fired by finding sufficient agreement in the patterns of marking. T.6266. Ms. Quereau then also made the unsubstantiated claims that: firearm and toolmark examination is founded in the scientific method with blind test situations using tests with controls and standards; all of her identifications are 100% verified; firearm and toolmark identification has been thoroughly tested using empirical research;  she does not need the suspected firearm to conclude that bullets and/or casings are from the same unknown gun; and that the opinions she offered were certain to a reasonable degree of scientific certainty.  T.6267-68, 6283, 6344. Ms. Quereau repeatedly used language that implied a degree of certainty that is not substantiated by or based upon a reliable scientific foundation.

Likewise, the Government's expert, Mark Chapman, testified that a casing found at the scene matched a live cartridge at the Garden Court residence of the four co-conspirators. T6645.

108

This incredible assertion was made despite the fact that both the casing and the live cartridges were reloads, there was no gun recovered to compare the live cartridge and the casing to, and Mr. Chapman allegedly "matched" the casing to the live cartridge from an ejector mark and a mark from the magazine where the live cartridge was found. Additionally, Mr. Chapman testified the 9mm casings and the .40 caliber casings found at the scene were shot from the same gun respectively. However, the 9mm casings were eliminated as being fired from any of the 9mm firearms recovered from the Garden Court residence and law enforcement did not recover any .40 caliber firearms during their investigation. T6607, 6609, 6612-13. Mr. Troya's counsel failed to cross-examine Mr. Chapman and deferred to Sanchez's counsel.

### C. Trial Counsel's Failure to Adequately Challenge the Firearms and Toolmarks Evidence Constituted Deficient Performance

Trial counsel could have – and should have – filed a pre-trial motion to preclude the Government's expert evidence. For example, trial counsel should have filed a motion to exclude this evidence on the ground the field of firearms and toolmarks identification is not based on sufficiently reliable methods to satisfy the threshold requirements for admissibility under *Daubert/Kuhmo Tire* and Rule 702 of the Federal Rules of Evidence. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

The Supreme Court made clear in *Daubert* that no purportedly scientific expert testimony could be admitted unless it met certain rigorous requirements. *See Daubert*, 409 U.S. at 593-94 (directing courts to examine: (1) whether the expert's theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error" in the theory's application and "the existence and maintenance of standards controlling the technique's operation"; and (4) the

"general acceptance" of the theory or technique in the relevant scientific community). Here, the Government's evidence would not have met the *Daubert* standard; as noted above, the underlying premise of firearm and toolmark identification lacks an adequate statistical empirical foundation to be considered scientifically valid. However, even if the Court had declined to reach the question of the underlying scientific validity of firearm and toolmark identification, at a minimum, there is a reasonable probability that under a *Daubert* analysis, the Government's experts would have been precluded from testifying definitively that ammunition components matched or were fired from the same weapon, and that such opinions were rendered "within a reasonable degree of scientific certainty." *See*, *e.g.*, *Green*, 405 F. Supp. 2d 104 (prohibiting firearms examiner from testifying the match he found allows for identification "to the exclusion of every firearm in the world"); *Sexton*, 93 S.W.3d 96 (prohibiting firearms identification testimony that toolmarks on shell casings had been made by the same magazine where magazine was never recovered); *cf. Ramirez*, 810 So. 2d 836 (Fla. 2001) (prohibiting toolmarks expert's identification of the expert's knife as the murder weapon, to the exclusion of all others).

Had Mr. Troya's attorneys chosen to challenge the Government experts, they could have moved to exclude the testimony altogether based on the fact that it did not comport with FRE 702 and *Daubert*. At a minimum, cross-examination on the same bases would have undermined the reliability of the opinions and testimony of the Government's experts. Sanchez's attorney was armed with the latest research, *Strengthening Forensic Science in the United States: A Path Forward*, National Academy of Sciences, 142 (February, 2009) ("*NAS Report*," attached as Appendix D-2, when attempting to cross-examine the Government experts. However, several avenues of cross-examination were left unpursued and both Mr. Troya's and Mr. Sanchez's

110

counsel failed to call their own expert in rebuttal despite this Court appropriating funds for them to do so.

Troya's attorneys could have cross-examined regarding the fact that firearm and toolmark analysis has unanswered questions regarding the supposed science relative to variability, reliability, repeatability, and the number of correlations needed to determine whether sufficient agreement exist to establish that the case, projectile, or cartridge was from a specific firearm. *NAS Report* at 155. Additional problems exists as to the firearm examiners claims relative to uniqueness and that there is not an adequate foundation to adequately address confidence limits regarding probabilistic statements made by firearm examiners. Appendix D-3 Tobin Affidavit. Additional issues were present due to the unproven claims that examiner Chapman could supposedly link casings at the scene to a live cartridge at the Garden Court home, particularly where the ammunition was a "reload," and that the gun that purportedly left the markings relied upon by the examiner was never recovered. The bottom line is that a properly developed cross-examination and rebuttal presentation could have established that the protocols for firearm and toolmark analysis do not represent a precisely specified, and scientifically justified, series of steps that lead to results with well-characterized confidence limits, and that is the goal for all the methods of forensic science. *NAS Report* at 155. The failure to engage in such cross-examination and rebuttal presentation was defective and prejudiced Mr. Troya.

### 1.  Forensic Firearm and Toolmark Identification is Not a Science

Trial counsel unreasonably failed to present available expert evidence of its own to rebut the Government's expert testimony, despite the fact that the Court had granted trial counsel funds to retain an expert. A qualified expert could have established that forensic firearm and

111

toolmark identification is not a science. At a minimum, a qualified expert could have provided testimony at both a *Daubert* hearing and at trial there was no scientific basis for the Government's experts' conclusions about matches between the firearms evidence, or that such conclusions could be rendered "within a reasonable degree of scientific certainty." Representative testimony would be similar to defense expert Tobin's statements that:

> The guiding principle used by toolmarks examiners is the "AFTE Theory of Identification", regardless of whether or not they are AFTE members.  AFTE (Association of Firearms and Toolmarks Examiners) is not a scientific body, but rather is a trade association.  It should also be noted that forensic firearms/toolmarks identification practice is not a science, contrary to repetitive self-defined claims by toolmarks identification authors in numerous domain publications, claims which imply an unwarranted perception of infallibility to a trier of fact or law. Some courts have recognized this fact.  There are numerous reasons why firearms identification pattern-matching practice cannot be considered a science. It has no falsifiable hypothesis (premise), no scientifically acceptable protocol articulating parameters of detection, no rules of application of such parameters, is missing the critical cornerstones of repeatability, reproducibility, and falsifiability required of the true scientific method and, thus, is a virtually 100% subjective practice once the possible sample pool is narrowed by class characteristic elimination (*e.g*., caliber, number of lands and grooves, direction of twist, *etc.*). There is no science that allows for 100% subjectivity or a non-falsifiable hypothesis. In fact, that is why the Scientific Method was developed: to eliminate subjectivity from the inferential process.
> Forensic individualization, also known as specific source attribution, is the process by which a questioned item, such as a cartridge case or bullet, is purportedly associated with a specific source such as a specific firearm.  Source attribution may or may not be enhanced with probabilistic language like "to the exclusion of all others," "infinitesimal chance" of a coincidental match, "unique signature," "100% certainty", "to a reasonable degree of [scientific, ballistic, practical] certainty", or even "to a reasonable degree of certainty", *inter alia*. With or without this enhancing language, however, for all worksheet observations, conclusions, reports, and testimonies of toolmarks identification examiners with claims or assumptions that striations observed are purportedly "individual," the examiner is still engaging in specific source attribution ("individualizing").  In doing so, the forensic examiner intuitively rules out - - by subjective belief as it turns out - - all other possible sources for the combination of characteristics ('striations' or 'striae', and/or 'impressions') observed in the questioned markings, including the vast universe of possible sources he or she has never examined.
> Individualization in forensic firearms/toolmarks practice is rejected by a unanimous consensus of my colleagues and collaborators from the true

(mainstream) scientific community with scientific backgrounds and/or specializing in forensic evidence.

Appendix D-3 Tobin affidavit at 11-12.

Mr. Tobin's affidavit further illustrates the lack of scientific foundation for firearm and toolmark analysis where he states:

> The underlying premise of "uniqueness", required by logical necessity for conclusions rendered by the firearms examiners in this matter, has never been established to exist, as confirmed by the National Academy of Sciences. The notion that forensic toolmarks examiners are trained to recognize a phenomenon that has never been scientifically established is nonsensical. Individualization in firearms/toolmarks is without scientific basis or foundation, but rather is "based on anecdote, intuition and speculation rather than on a scientific foundation. Consequently, individualizations in casework rely on a 'leap of faith'." [57,58] In fact, the belief by firearms/toolmarks examiners that their practice can render specific source attributions with any scientific basis is considered a fallacy in the relevant [true] scientific community.[59]
>
> The fallacy of individualization "…arises when the forensic scientist rules out all other possible sources for the unknown marking, including the multitude he has not examined, once he has found a single object or person that matches the features of the unknown marking. The fallacy is deeply entrenched in forensic science practice, where most examiners say that their *knowledge*, *training*, and *experience* enable them to make the inferential leap from observed consistencies between markings and their putative source to a conclusion that no other object in the world could have produced those markings."[60] [Emphasis added] Additionally, Koehler and Saks indicate, "[i]n our view, the existing and foreseeable scientific knowledge falls far short of providing criminalists with enough scientific support to claim that the objects that they study are either unique or discernibly unique. Certainly the uniqueness question cannot turn on the beliefs that forensic scientists have about this issue based on their training and

---

[57] Saks, Michael J., Koehler, Jonathan J., "The Individualization Fallacy in Forensic Science Evidence", *Vanderbilt LR* 6:1, at 10.

[58] See also *Williams, supra*, at Fn. 6, where Judge Easterly observed that firearms identification pattern matching "…has the same probative value as the vision of a psychic" with regard to its scientific foundations, at 26.

[59] Saks & Koehler, *supra,* at Fn. 8. *See also* Koehler, Jonathan J., and Saks, Michael J., "Individualization Claims in Forensic Science: Still Unwarranted", *Brooklyn LR* 75:4.

[60] Koehler & Saks, *supra*.

experience."[61] Yet that is exactly the *sole* basis by which firearms/toolmarks expert witnesses can realistically cite as the foundation for their proffered opinions, inasmuch as there exists no scientifically valid studies supporting claims of uniqueness, discernible uniqueness, or individualization. . .

. . . For conclusions of individualization (specific source attribution), one of two crucial premises upon which toolmarks examiners rely is that each tool imparts individual characteristics (generally striations or striae, and impressions) to objects against which they are in contact that are purportedly unique to that tool. Scientific acceptance of the uniqueness premise is problematic.

Appendix D-3. Tobin at 14-15, 16.

### 2. Lack of Foundation for Probabilistic Statements

Multiple statements of certainty and probability were made in Mr. Troya's case without any scientific or probabilistic foundation. As Mr. Tobin noted in his affidavit:

The testimony transcripts of both **Chapman** and **Quereau** reveal repetitive claims of "same gun", "same firearm", "same rifle", "same tool", "unique", "individual", "reliable science", "scientific discipline", use of the "scientific method", and expressions of "scientific certainty" and "impractical impossibility" [sic], *inter alia.* These claims are patently unacceptable as without scientific foundation and constitute the exaggerated claims denounced by two separate National Research Council committees of the National Academy of Sciences. From both probabilistic and pragmatic perspectives, these constitute statements of certainty (probability of 1) which I, the unanimous consensus of my scientific colleagues, the U.S. Department of Justice, the National Institute of Standards and Technology (NIST), and the National Academy of Sciences conclude to be objectionable as scientifically unfounded.

Appendix D-3 Tobin at 48. (footnotes omitted)

Within the omitted footnotes, Mr. Tobin references a report of the Ballistics Imaging Committee of the National Academy of Sciences and the *NAS Report*. As to the Ballistics Imaging Report Mr. Tobin pointed out that the committee observed,

"*Conclusions drawn in firearms identification should not be made to imply the presence of a firm statistical basis when none has been demonstrated.* Specifically, ... examiners tend to cast their assessments in bold absolutes, commonly asserting that a match can be made "to the exclusion of all other firearms in the world." Such comments cloak an inherently subjective assessment

---

[61] *Ibid*.

of a match with an extreme probability statement that has no firm grounding and unrealistically implies an error rate of zero." *Ballistic Imaging*, Report of the National Research Council; National Academies Press, Wash., D.C. (2008), at 82. The committee went on to note that, "It is ironic that those areas of forensic science that have real underlying data offer more modest statements of individualization, while those limited to subjective or impressionistic data make the strongest statements, sometimes of absolute certainty.

Appendix D-3 Tobin at Fn. 77.

Mr. Tobin goes on to make specific reference to the *NAS Report* by noting that, the Strengthening Forensic Science Committee (2009) of the NAS observed, "no forensic method has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between evidence and a specific individual or source." "*Strengthening Forensic Science in the United States: A Path Forward*," National Research Council, National Academy of Science; National Academies Press (2009), at S-5.

The recent report from the U.S. Department of Justice National Institute of Standards and Technology addressed the use of the term "reasonable scientific certainty" in testimony and stated that,

Multiple problems abound with this phrase, whether "scientific certainty" or "[discipline] certainty." These include the following:

- There is no common definition across science or within disciplines as to what threshold establishes certainty. Therefore, whether couched as "scientific certainty" or "[discipline] certainty," the term is idiosyncratic to the witness.

- A juxtapose to the term "beyond a reasonable doubt" is appropriate here. While not precisely quantifiable, it can be measured by comparison (it is greater than both the "preponderance" standard of 50.1% and the much higher "clear and convincing" standard) *and* has a definition as being convinced beyond having a doubt of the size that would cause a reasonable person to pause or refrain from acting in a matter of high importance.

115

- Use of the term "scientific" implies that the discipline is indeed a science, which in some instances may be putting the cart before the horse. As the Supreme Judicial Court of Massachusetts explained, "The phrase 'reasonable degree of scientific certainty' should also be avoided because it suggests that forensic ballistics is a science, where it is clearly as much an art as a science." Commonwealth v. Pytou Heang, 458 Mass. 827, 849 (Mass. 2011).

- Coupled with the term "reasonable," a juror might equate it with certainty at the level of beyond a "reasonable" doubt.

- The term invites confusion when presented with probabilistic evidence. How is a lay person, without either scientific or legal training, to understand an expert's 'reasonable scientific certainty' that evidence is 'probably' linked to a particular source?

NIST Report, "*Testimony using the term "Reasonable Scientific Certainty*," Appendix D-4 at 4.

Unfortunately Mr. Troya was prejudiced by the failure of his counsel to object to any of the testimony referenced, move to exclude the testimony, limit the testimony relative to probability or certainty of a supposed "match" in the examiner's comparisons, or even conduct adequate cross examination based on these issues.

### D.    Additional Ineffective cross-examination

Arguably assuming Chapman and Quereau were properly accepted as an expert and permitted to testify as such, counsel missed abundant opportunities to establish, not only the inadequacies of the scientific foundation of firearm/toolmark examination as mentioned above, but the inadequate, unreliable methods used by Chapman and Quereau.

### 1. The .40 caliber analysis was problematic

Several issues pertinent to the .40 Smith & Wesson caliber material that were not raised include:

1.    The live round in **Item 251A13** allegedly has magazine marks, extractor marks, and possibly a second set of magazine marks. The presence of the extractor is not mentioned in the report dated May 29, 2008.

2.      It has been recognized by the analyst that this live round (and a number of others) is **RELOADED**. This is when a cartridge case has been fired in one gun, then fitted with a new primer, propellant and bullet. Therefore the marks on it may be from that previous gun or, it may have been placed into any number of unknown magazines (magazine marks are not always reproducible as evidenced by many of the live rounds removed from magazines in this case) or cycled in any number of unknown guns before coming into the possession of Mr Troya.

3.      Marks on  **Item 251A13** may have been from

    a.      a gun that previously fired it;

    b.      a gun that it was previously cycled in;

    c.      put into and taken out of one or more unknown magazines before the incident;

    d.      the gun used in the incident.

4.      The origin of those marks in supposed agreement is both unknown, and may have been created by guns not actually used in the incident. There is also no comment in the analyst's reports whether or not the ejector marks on the live round and the fired cases **E1, 2, 6, 8-10** agree or disagree.

5.      It is not possible to conclusively state at what point those marks were made. There are no exemplary firearms/magazines that were identified to **251A13**. Submitted magazines were eliminated as the source tool.

6.      Trial counsel failed to emphasize that:

    a.      the analyst's notes indicate that every other live .40 S&W cartridge that was a reload had an abundance of similar types of marks (extractor, ejector, magazine, chamber) and these were not identified to five of the six fired cases.

    b.      None of the magazines in which the live .40 S&W cartridges were found were identified as consistent with marks on the fired cases at the scene.

7.      It is not possible to conclusively state that the magazine marks and extractor mark were created by one complete firearm unit (i.e. gun and magazine). They could have been created at different times, by different gun/magazines.

8.      There are 46 reloaded .40 Smith & Wesson cartridges total.

117

9. Trial counsel failed to emphasize that the analyst's notes indicate that every other live .40 S&W cartridge that was a reload had an abundance of similar types of marks (extractor, ejector, magazine, chamber) and these were not identified to five of the six fired cases.

10. There does not appear to be any information regarding the .40 Smith & Wesson fired case **E41** regarding magazine marks, extractor marks, ejector marks, etc. nor its mention of having been compared to the live round in **251A13**.

11. What should have been determined, but was not, is if the fired cartridge cases **E1, 2, 6, 8-10** are also indicative of RELOADED ammunition. A microscopic examination would determine whether or not they had, for example, multiple different ejector/extractor marks. This could have impacted the interpretation, yet was not considered by the analyst.

12. There is no reference to the fired 40 S&W cartridge case **E-41** AT ALL in the notes/report. Counsel should have questioned what happened to it, if it was compared, and if it had similar/different marks.

13. There is nothing in the notes/photomicrographs to indicate that any of the fired cartridge cases from the scene, other than **E-6,** bore an extractor mark in agreement with **251A13**. Counsel should have asked were the remaining **E-1, 2, 8 to 10** similar or different, and how would that affect the interpretation/presentation of that evidence.

14. There is nothing in the notes to indicate whether or not **E-1, 2, 6, 8 to 10** had multiple cycling marks on them to explore the possibility that they were also RELOADS.

15. Counsel should have questioned which studies the analyst relied upon that related to the significance/uniqueness of magazine marks, because there are none.

16. The analyst's notes on page 6 of the report dated October 31, 2006 state for **E-1, 2, 6, 8 to 10** that there was similarity in "EXT and EJT shape and position" – these were not used for individualization purposes in the first instance, but was there a similar/different ejector on **251A13**? If the extractors were not all identified then how could one (**E-6**) be used to identify with **251A13**, and how would that effect the interpretation/presentation of that evidence if only one out of six fired cases from the scene were identified to one out of 46 in **251A13**?

## 2. The 9mm analysis was problematic

Several issues pertinent to the 9mm material that were not raised include:

118

1.      The fired cartridge cases recovered from the scene (**E-3 to 5, 7**) were identified to each other based on breech face and firing pin marks. Page 7 of analyst's notes from 10/31/06 state that "EXT and EJT shape and position" – in other words, they were not used for identification purposes. There is no mention of the presence/absence or reproducibility of magazine marks at this time, nor any toolmarks to the edge of the rim of the cases which are later relied on to identify **E-7** to **E-177APBSO1** (1 and 2) and **E-3/E-5** to **177APBSO1**.

2.      These were not identified as reloads. These are magazine/unknown/possibly cycling marks only. They may or may not have been imparted by the gun that fired them at the scene.

3.      The marks used for **E-3/E-5** could be related to an extractor, but it is not possible to determine from notes alone. If that mark were from an extractor, then why had the actual extractor mark found in the extractor groove in the case not been compared/photographed/considered?

4.      **E-4** did not bear any of those same marks in sufficient quantity. It is unclear as to whether or not **E-3, 5, 7** all bore the same magazine marks and mark to the rim or if they were different. It is unclear if the ejector/extractor marks on **E-3 to 5, 7** were present/absent similar/different to those two live rounds in **177APBSO1**. The analyst notes do not indicate these facts were ever considered.

5.      **E4** was fired in the same gun as **E3, E5, E7,** but does not share any of those same markings. Therefore, given that there were a total of 56 loose 9mm Luger cartridges (versus "brand new in box"), fifteen of them had toolmarks on them, and only two of them bore any agreement with E3, E5, E7. The remaining 54 may or may not have bore marks suitable for comparison purposes, but notes (page 6 of 5/12/08) suggest that there was nothing to indicate that marks on those remaining 9mm Luger rounds were the same as those depicted in photomicrographs. Therefore, the analyst should not be able to state with any degree of confidence that those marks were caused by the gun used at the scene.

6.      The Class Characteristics on the damaged bullet jacket **Item E-3** are different to those from the crime scene on the Turnpike.

### 3.  The AK-47 Kalashnikov analysis was problematic

1.      Over 100 million Kalashnikovs have been made. Some of the manufacturing processes include stamping the metal. The analyst made no indication in the notes or testimony that this fact was considered.

2.      If the Breech Face were stamped then what level of certainty can the analyst give to that roughly circular mark around the firing pin with regards to it being individual or sub class?

     a.      Has the analyst studied Kalashnikovs to explore this?

119

b.      Is the analyst aware of any studies that have been conducted in this regard? There are none.

3.      Eight out of sixteen fired 7.62 by 39mm caliber cartridge cases are identified as having been fired in recovered AK-47 type rifle. Six out of sixteen are identified as having been cycled in that rifle. How can this be so, knowing that each fired cartridge case would have had to be cycled through the weapon as well?

#### 4.      The issue of False Positives

1.      Was the analyst aware of one of the generally accepted principles of False Positives, that an examiner can place too much significance on too little detail?

2.      What would be considered "enough" in this case, given that there are no/few published articles/studies on reproducibility/uniqueness of magazine marks/extractor marks?

3.      Did the analyst know that false positives typically result from placing too much significance on too little detail, i.e., focusing on similarities versus differences potentially seen on all possible toolmarks imparted to a cartridge case(s)? *See* Bonfanti & DeKinder, *The Influence of Manufacturing Processes on the Identification of Bullets and Cartridge Cases – a Review of the Literature*, Science & Justice 1999, 39:3-10.

a.      Was the analyst aware of the importance of solving problems of false positives by comparing all of the marks present on a cartridge case (breech face impressions, firing pin impression, ejector mark, extractor mark, and marks generated by dynamic processes e.g. chamber marks) and that it is less likely that all these parts are manufactured consecutively and that they all bear sub class characteristics? Id. **It is doubtful the analyst did this as there are no references within his reports or testimony as to evaluating for sub class characteristics.** *See infra/supra* for subclass explanation.

#### E.      Mr. Troya was Prejudiced by Trial Counsel's Ineffectiveness

The prejudice from the ineffective assistance counsel within this claim is clear. The firearm toolmarks examiners were purportedly able to "match" casings from the scene of the homicide to ammunition found in the Garden Court residence where all of the co-conspirators, including Mr. Troya, resided. In this circumstantial case, such evidence was instrumental in providing a link from the scene to the home. The supposed "match" was a key part of the Government's argument that Mr. Troya and Mr. Sanchez were at the crime scene and armed with

supposedly the same ammunition utilized to commit the homicides. Furthermore, the firearms were allegedly able to connect the occupants of the Garden Court home, including Mr. Troya, to the purported Suwanne and Mercer shootings that were utilized to argue regarding the dangerousness of Mr. Troya. The Suwannee and Mercer shootings were used in part to establish the non-statutory aggravating factor that Daniel Troya participated in other, uncharged serious acts of violence. The jury clearly found that aggravator and just as clearly, the firearm and toolmark examiner's testimony was critical. Doc. 859 at 9. The only other evidence regarding the Suwannee and Mercer shootings was of the cooperator, "Crackhead Kevin" Vetere, who was facing the possibility of life in prison, but for his cooperation.

> **F.** **The Government's Reliance on Erroneous "Expert Testimony" Deprived Mr. Troya of Due Process and a Fair Trial.**

Prosecutors violate due process by presenting material testimony that is false, by presenting material testimony that creates a false impression, or allowing such testimony to stand uncorrected. *See, e.g.*, *Mooney v. Holohan*, 294 U.S. 103 (1935) (presenting knowingly false testimony violates due process); *Giglio v. United States*, 405 U.S. 150 (1972) (failing to correct false testimony violates due process); *Napue v. Illinois*, 360 U.S. 264 (1959) (failing to correct testimony that creates a false impression, though not perjured, violates due process). Due process is equally offended by direct statements which are untrue and the eliciting of testimony which "taken as a whole" gives the jury a "false impression." *Alcorta v. Texas*, 355 U.S. 28, 31 (1957). This is true even where the particular prosecutor does not know that the testimony being presented is false or misleading. *See Giglio*, 405 U.S. at 154. Indeed, the truthfulness of the process is of the utmost importance even when a specific prosecutor acts in good faith. *Id*. at 153. As the Supreme Court stated in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), "society wins not

only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly."

Here, Mr. Troya was denied due process because the Government presented misleading, inaccurate and prejudicial testimony at his trial under the guise of forensic science. Specifically, the Government presented evidence through its expert witnesses Allison Quereau and Mark Chapman that shell casings recovered from the crime scene matched cartridges and a firearm purportedly found at the residence of Mr. Troya and his alleged co-conspirators. The Government then relied on this evidence throughout its closing arguments to argue that it proved that Mr. Troya participated in the capital crime, and that this evidence established several of the aggravating factors that warranted a death sentence in this case.

Under *Napue v. Illinois*, 360 U.S. 264 (1959), and its progeny, Mr. Troya need only establish the following three elements to properly state a claim for relief: (1) the testimony in question was false; (2) the government knew or should have known the testimony was false; and (3) the testimony was material. Those elements are easily met here.

First, as noted above, there was no basis for the expert witnesses' testimony that the relevant firearms evidence "matched" or that such opinions could be rendered "within a reasonable degree of scientific certainty." The lack of statistical empirical evidence for the underlying premise of firearm and toolmark analysis was just as true at the time of Mr. Troya's trial as it is today. The same is true of the lack of objective national standards governing the subjective determination of an examiner that two pieces of firearms evidence "match."

Second, the Government knew or should have known such testimony was false, or at the very least that it was misleading; at the time of Mr. Troya's trial, the Government was engaged in litigation in various criminal cases where this very same *Daubert* challenge was being raised,

122

and where hearings were held documenting the significant deficiencies of firearm and toolmark analysis. *See United States v. Green*, *supra*; *United States v. Kain*, Crim No. 03-573-1 (E.D. Pa. 2004). The fact that the particular challenges were litigated by U.S. Attorney's Offices in other jurisdictions is not legally relevant under a *Napue* analysis. *See United States v. Kattar*, 840 F.2d 118, 127 (1st Cir. 1988) ("The Justice Department's various offices ordinarily should be treated as an entity, the left hand of which is presumed to know what the right hand is doing."); *United States v. Barkett*, 530 F.2d 189 (8th Cir. 1976) ("[O]ne office within a single federal agency must know what another office of the same agency is doing. … This is no more than to hold the Government to the same standard of conduct as governs private individuals in transmitting notice from agent to principal.")

Finally, in order to establish materiality under *Napue*, one must demonstrate "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, (1976). That standard is easily met here. As noted above, the expert testimony that the relevant firearms evidence matched was the heart of the Government's case for conviction. Moreover, the Government relied on the expert evidence to establish various aggravating factors, including evidence of other uncharged shootings. Indeed, the Government specifically invoked those uncharged shootings as a reason for why the jury should sentence Mr. Troya to death. *See* Claim XIX (ineffectiveness for failing to challenge verdict form and instructions regarding uncharged shootings). There is a reasonable likelihood that the false expert evidence could have affected the judgment of the jury, especially considering how frequently the Government relied on these aggravating factors to argue its case for death to the jury. *See*, *e.g.*, *Hennon v. Cooper*, 109 F.3d 330, 332 (7th 1997) (due process precludes a prosecutor from making an argument which misleads the jury); *Bragan v. Morgan*,

791 F. Supp. 704, 713 (M.D.Tenn. 1992) (*Napue* violation found where prosecutor misled jury in argument).

### C.  Fingerprint Expert.

#### 1.  Trial Counsel's Failure to Challenge the Fingerprint Evidence Constitutes Ineffective Assistance of Counsel

There are two components to trial counsel's failure to properly challenge the fingerprint evidence in this case. First, counsel failed to properly utilize a competent defense fingerprint expert (despite being provided with the funds to do so). Second, even without an expert, trial counsel could have mounted an effective challenge to the fingerprint evidence and wholly failed to do so. This becomes more than just a tactical decision in Mr. Troya's case: the fingerprint here was pivotal because it put him on the turnpike on the day the crime occurred.

In Mr. Troya's case, trial counsel's performance is deficient if it falls below the range of reasonable effective assistance. To perform within this range, counsel must make all significant decisions in the exercise of reasonable professional judgment. The combined effect of counsel's various professional deficiencies should be considered together in determining whether counsel rendered ineffective assistance.  Simply passing decisions off as "tactic" and "strategy" does not immunize trial counsel; those decisions were patently and objectively unreasonable. The fingerprint evidence was thin and procedurally lacking, thus the mistakes of trial counsel amount to *both* deficient performance and consequent prejudice.

### A.  Deficient Performance

The dual errors of trial counsel—failure to utilize the appointed defense expert beyond a barebones supposed confirmation and the failure to challenge the fingerprint evidence were so serious as to divest Mr. Troya's right to a fair trial from the process, and this deficient performance prejudiced the defense. This Court must assess the reasonableness of trial counsel's

124

acts and omissions. Such an assessment reveals they fall far outside the wide range of professionally competent assistance.

### 1.  Pre-Trial Investigation and the Failure to Utilize Defense Expert

Mr. Troya's trial counsel failed to conduct an adequate pre-trial investigation. While the defense did have an expert witness at its disposal, trial counsel's failure to fully utilize fingerprint and other experts constituted ineffective assistance because petitioner's strongest defense was to undermine the reliability and accuracy of the fingerprint evidence that placed him at the scene of the crime. This amounts to ineffective assistance of counsel.

The facts of this case reveal trial counsel's failures to investigate went far beyond the norms of reasoned tactical decisions. It certainly does not appear from the record that trial counsel reviewed any significant scientific reports, nor did they keep abreast of best practices for cases involving fingerprint evidence. Reasonable professional judgments cannot support the limitations on investigation. Trial counsel has a duty to make reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary.

Mr. Troya's case was precisely the type of case where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both. As part of trial counsel's function in providing the effective assistance of counsel during the pre-trial phase of litigation, counsel has a duty to make adequate pre-trial investigation of defenses. That did not happen in Mr. Troya's case.

While the decision to not pursue a certain line of defense will not be second guessed after counsel has made investigation into that line of defense, trial counsel here deserves no such benefit of the doubt when he wholly failed to investigate. Trial counsel had a duty to at least

make an investigation into the reasonable options in a case and it can never be a reasonable choice to fail to investigate such options.

Here, the failure to adequately utilize a qualified expert constitutes deficient performance—especially where counsel should have questioned the validity of the government's own evidence on that issue. The fingerprint evidence was the "cornerstone" of the government's case, and trial counsel should have been aware of the problems with the government's experts and fingerprint evidence. Indeed, trial counsel should have known that there were gaps in the government's proof, and the failure to use its own expert to rebut the government's expert testimony about physical evidence linking the defendant to the crime scene constituted deficient performance.

Mr. Troya's case was one where expert testimony was required. The government's case against Mr. Troya turned on placing him in the vicinity of the crime. Aided by its own expert, trial counsel could have introduced evidence similar to that presented by Ms. Eldridge in her affidavit - evidence that the fingerprint identification in this case was deficient in process and science.  Appendix D-5 Eldridge Aff. at 2-3; 6-9. If trial counsel had presented similar testimony at trial—either through the testimony of an expert or by cross-examination of the government's experts—he could have created reasonable doubt as to whether Mr. Troya could be connected to the crime in a way that would infer he participated in its commission.

To be clear, the point is not that trial counsel had a duty to shop around for another expert who would refute the conclusions of his expert and the government's experts. The point is that counsel had a duty to know enough to make a reasoned determination about whether he should develop possible defenses based on his expert's opinion. Having simply been served up with the government's theory and the government's fingerprint witness, and not having known either

126

what those print examiners did to arrive at the conclusion that Mr. Troya was the source of the prints or why they arrived at that conclusion, meant that trial counsel was in no position to make this determination. Thus, trial counsel's resignation to defeat does not pass muster as a reasonable strategy capable of supporting the decision to meet the government's case without the assistance of an expert.

This is particularly the case given that trial counsel was on notice that he had reason to investigate further before ceding any terrain to the government on the issue of whether fingerprint identification in this case was good.  Trial counsel had in his possession a copy of the report which left all of the analysis wanting.  Appendix D-5 Eldridge Aff. 8-9.  Here, the known evidence should lead a reasonable attorney to investigate the fingerprint evidence further. Trial counsel missed an opportunity to use this resource to impeach the government's fingerprint evidence and instead used it to corroborate the evidence.

The government expert's report was not the only known evidence that trial counsel had that would have lead a reasonable attorney to investigate the fingerprints further. Trial counsel should have been aware of the need to fully examine the fingerprint evidence and had no basis for not pursuing his investigation of fingerprint testimony further. That trial counsel simply accepted the defense expert's validation of the fingerprint rather than exploring the basis for it highlights just how unreasonable his course of action was. Even the most minimally competent attorney would have consulted at least one of the experts suggested to him.

Given the need to ensure that qualified expert testimony is presented when a critical issue in a criminal case turns on specialized knowledge beyond the experience of a layman, trial counsel's failure to do so was patently in error. While it is true that the defense expert ratified the identification of Mr. Troya, an evidentiary hearing is needed to determine whether it was

127

ineffective assistance of counsel to stop the inquiry there. *At best,* it is questionable whether trial counsel consulted with the defense fingerprint expert beyond simply reading a conclusion.

### B.      Failure to Challenge the Evidence at Trial

Even if trial counsel *reasonably* concluded that exploring other defense strategies with the expert was not in Mr. Troya's best interest, he still deprived Mr. Troya of right to the effective assistance of counsel by failing to undermine the government's testimony that essentially identified Mr. Troya's prints to the exclusion of all other prints in the world. Trial counsel rendered ineffective assistance of counsel by completely failing to challenge this highly prejudicial and scientifically implausible claim. As discussed in detail below, the National Academy of Sciences has squarely rejected the claim that latent fingerprint identifications can definitively attribute a questioned print to one and only one person. *Strengthening Forensic Science in the United States: A Path Forward*, National Academy of Sciences, 142 (February, 2009) "*NAS Report*," attached as Appendix D-2.[62]

------

[62] The NAS 2009 Report, written by a group of distinguished scientists and other scholars on a Committee chaired by Harry T. Edwards, Judge, United States Court of Appeals for the District of Columbia Circuit, is discussed in more detail below. Because of the importance of the NAS 2009 Report to this motion it is being provided to the Court in its entirety as CD Exhibit 3. As the Court is probably aware, the NAS is generally considered the most prestigious scientific organization in the United States, "election to the Academy is considered one of the highest honors that can be accorded a scientist or engineer," and it holds a charter "to 'investigate, examine, experiment, and report upon any subject of science or art' whenever called upon to do so by any department of the government." Reports published by the NAS's research arm, the National Research Council, "provide a public service by working outside the framework of government to ensure independent advice on matters of science, technology, and medicine. They enlist committees of the nation's top scientists, engineers, and other experts, all of whom volunteer their time to study specific concerns. The results of their deliberations have inspired some of America's most significant and lasting efforts to improve the health, education, and welfare of the population." See About the NAS, http://www.nasonline.org/site/PageServer?pagename=ABOUT_main_page. The NAS Report, therefore, constitutes an assessment not by individual scientists or scholars, but by a scientific institution, the first such assessment of forensic science evidence by a mainstream scientific

This Report concluded that, with the exception of DNA, no forensic method has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between evidence and a specific individual or source. In other words, courts and juries were frequently relying on "junk" science in criminal proceedings. The *NAS Report* stated that new doubts about the accuracy of some forensic science practices have intensified with the growing numbers of exonerations resulting from DNA analysis (and the concomitant realization that guilty parties sometimes walk free). Beyond the *NAS Report*, trial counsel had numerous opportunities and avenues under which he could have challenged the fingerprint evidence.

### C. Trial counsel should have cross-examined Mr. McCall on issues regarding the reliability of the ACE-V methodology.

As Ms. Eldridge's affidavit notes, and the National Academy emphasized, the methodology employed by government's witnesses in this case necessarily relies on the

---

institution of any kind. When the NAS speaks, courts listen. *See, Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527, 2536, 2537, 174 L.Ed.2d 314 (2009)(quoting the 2009 NAS Report for the propositions that "[f]orensic evidence is not uniquely immune from the risk of manipulation," and that " '[t]he forensic science system, encompassing both research and practice, has serious problems that can only be addressed by a national commitment to overhaul the current structure that supports the forensic science community in this country.'" ); *United States v. Willock*, 696 F.Supp.2d 536, 569 (D. Md. 2010)("Suffice it to say that the concerns expressed by the NRC [in its *NAS Report*] ought to be heeded by courts in the future regarding the limits of toolmark identification evidence, and courts should guard against complacency in admitting it just because, to date, no federal court has failed to do so.") *United States v. Taylor*, 663 F. Supp. 2d at 1178 (quoting the 2009 NAS Report's conclusion that "[e]ven with more training and experience using new techniques, the decision of the toolmark examiner remains a subjective decision based on unarticulated standards and no statistical foundation for estimation of error rates."); *Commonwealth v. Gambora*, 457 Mass. 715, 933 N.E.2d 50 (Mass. 2010)("[C]ourts historically have found fingerprint identification evidence to be admissible. We recognize, however, that the issues highlighted in the NAS report are important, and deserve consideration.").

129

subjective judgments by the examiner and does not provide a specific enough framework to qualify as a validated method for latent print identification.

Fingerprints are not foolproof. Scientific studies and results of latent print examiner proficiency exams suggest significant errors in latent print identifications.[63] And, there have been several noteworthy cases of misidentification based on latent fingerprint evidence.[64] Three FBI fingerprint examiners and a defense expert wrongly identified Brandon Mayfield, a Portland, Oregon, attorney, as the source of a fingerprint recovered near the site a train bombing in Madrid, Spain, that killed more than 200 people. The fingerprint "match" and Mr. Mayfield's arrest were publicized worldwide. Only after Spanish police positively identified someone else did the FBI experts acknowledge their error.[65] Following the Mayfield error, multiple federal

---

[63] U.S. Department of Justice, Office of Inspector General, *A Review of the FBI's Progress in Responding to the Recommendations of the Office of the Inspector General Report on the Fingerprint Misidentification in the Brandon Mayfield Case* (2011); National Institute of Standards and Technology, National Institute of Justice, *Latent Print Examination and Human Factors: Improving the Practice Through a Systems Approach, Report on the Expert Working Group on Human Factors in Latent Print Analysis,* 211-15 (2012) (finding claims that a latent print identified to one individual that excludes every other source to be "needlessly strong, not yet adequately supported by fundamental research, and impossible to validate." The NIST/NIJ Report further recommended that crime laboratories should "foster a culture in which it is understood that some human error is inevitable and that openness about error leads to improvement"

[64] Chief among them is the FBI's erroneous identification of Brandon Mayfield's fingerprint identification in the Madrid bombing case. Government investigations of that incident concluded that the problem was not the quality of the digital images reviewed, but rather the bias and 'circular reasoning' of the FBI examiners. U.S. Department of Justice, Office of the Inspector General. 2006. *A Review of the FBI's Handling of the Brandon Mayfield Case. See also*, R.B. Stacey, *Report on the Erroneous Fingerprint Individualization in the Madrid Train Bombing Case* (2005), available at www.fbi.gov/hq/lab/fsc/current/special_report/2005_special_report.htm.

[65] U.S. Department of Justice, Office of Inspector General, *A Review of the FBI's Progress in Responding to the Recommendations of the Office of the Inspector General Report on the Fingerprint Misidentification in the Brandon Mayfield Case* (2011).

agencies and forensic scientists embarked on a wholesale examination of the methodologies and procedures used in fingerprint identification. The research revealed that errors can occur, which ultimately forced the discipline to implement new methodologies and procedures that have heightened the ability of forensic analysists to identify distinguishing features that eliminate faulty matches and improve accuracy.[66]

Trial counsel had access to the *NAS Report* and its Executive Summary, and one of the report's chapters dealt with concerns about fingerprint examiners. It noted numerous deficiencies in the system, unmasked only by the development of DNA evidence. In 1989, just as DNA testing arrived in criminal cases, one prominent scientist noted, "At present, forensic science is virtually unregulated-with the paradoxical result that clinical laboratories must meet higher standards to be allowed to diagnose strep throat than forensic labs must meet to put a defendant on death row."[67] Twenty-five years later, our forensic laboratories and scientists have not changed much. Because they are not subject to significant oversight or accreditation, it is not surprising to see "bad" science and "bad" scientific testimony in our courtrooms.[68]

Despite a wealth of scientific and anecdotal evidence undermining fingerprint examiner McCall's claim to infallibility and the reliability of his methodology, trial counsel made no

---

[66] See National Institute of Standards and Technology, National Institute of Justice, *Latent Print Examination and Human Factors: Improving the Practice Through a Systems Approach, Report on the Expert Working Group on Human Factors in Latent Print Analysis,* 211-15 (2012) (finding claims that a latent print identified to one individual that excludes every other source to be "needlessly strong, not yet adequately supported by fundamental research, and impossible to validate." The NIST/NIJ Report further recommended that crime laboratories should "foster a culture in which it is understood that some human error is inevitable and that openness about error leads to improvement."

[67] Eric Lander, National Research Council, *DNA Technology in Forensic Science* 55 (1992).

[68] Garrett & Neufeld, Invalid Forensic Science Testimony and Wrongful Convictions, 95 Va. L. Rev. 1, 14 (2009).

attempt to meaningfully cross-examine or otherwise challenge the methodology, analysis, or conclusions.

If trial counsel had done anything to undermine the expert testimony, there is a reasonable probability that the outcome of the case would have been different. For example, Mr. McCall apparently detected some general similarities with Mr. Troya's print, and then noted 14 points he plucked out. We cannot know—without the detail that is wholly absent in this case—whether the examiner was using comparison procedures now known, through research and improved methodology to produce errors. He explains that there are 14 points in agreement, but there is no documentation of that. In addition, if there was documentation or bench notes, then one might be able to tell, for example, that the identification decision made was based in large part on characteristics in the delta area of the fingerprint. Recent research has shown that identifications made strictly upon ridge details in this common area are less definitive than identifications made from other areas of the finger.[69] Mr. Troya's case contains forensic evidence for which there is a risk of error.

Trial counsel had a wealth of research at his disposal in 2009, and it is part of a criminal lawyer's duty to keep current with the field of forensic sciences at the time, as well as policies of local law enforcement. It appears that trial counsel did not ask for the St. Lucie County Sheriff's Office's Standard Operating Procedures, so he would have no way of knowing any analytical

---

[69] *See* e.g., National Institute of Standards and Technology, National Institute of Justice, Latent Print Examination and Human Factors: Improving the Practice Through a Systems Approach, Report on the Expert Working Group on Human Factors in Latent Print Analysis, 62 (2012) (compiling research on factors known to produce errors and recommending that examiners give less weight to similarities found in delta areas because these areas are known to produce combinations of features that appear similar among different individuals, specifically noting that ridges ending within a delta zone provide significantly less useful information in making an identification that other characteristics, and thus require more unique features).

deficiencies either in policy or practice that would establish that the government's fingerprint evidence was flawed in any respect.

Ms. Eldridge's affidavit furnishes every reason to believe a further expert analysis "would have created an issue" regarding the fingerprint methodology and its application. It follows that the unreliability of the evidence would have been evident at the time of trial because it would have conflicted with the available scientific research. Even if trial counsel did not need the *NAS Report* to refute the reliability of the forensic evidence at trial, because trial counsel could have mounted a challenge with vigorous cross-examination.

The Government's evidence connecting Mr. Troya to the crime was the fingerprint examiner's testimony that his fingerprints had been found on a toll ticket. The government's fingerprint witness, Jack McCall, testified that "[t]here is no question about it, his hand is on that ticket." T3733. As Ms. Eldridge notes, "[t]his statement of absolute certainty is an overstatement of the strength of the evidence." Trial counsel failed to properly challenge this scientifically dubious claim, during his exceedingly brief cross-examination, despite the fact that McCall's expert testimony was absolutely critical to the government's case. Trial counsel's failure to make any effort to challenge McCall's testimony constitutes ineffective assistance of counsel.

McCall's claim that the latent fingerprint identification in this case is unquestionable and beyond doubt is simply false and could easily have been challenged on cross-examination. T3733. Effective counsel would have challenged problems with the methodology employed (i.e. ACE-V), the complete lack of any detail regarding McCall's analysis, and McCall's testimony that effectively claims 100% certainty. Absent such a challenge, any claim that Mr. Troya did not commit this crime constituted empty words to a jury.

133

As previously mentioned, in 2009, the National Academy of Sciences, at Congress's request, established an independent Forensic Science Committee and published a detailed report evaluating the existing state of forensic science and offering recommendations for improvement. In the *NAS Report*, the National Academy examined a broad range of "forensic science disciplines" including latent fingerprint analysis. *NAS Report* at 3-7. One of the NAS Report's key findings is that *no forensic method,* with the exception of nuclear DNA analysis, "has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between evidence and a specific individual or source." *NAS Report* at 7.

With respect to the latent fingerprint analysis method employed by the expert in this case, the National Academy concluded that ACE-V does not provide a specific enough framework "to qualify as a validated method for" latent print identification (or friction ridge analysis). *NAS Report at* 142. Latent print identification necessarily relies on "subjective judgments by the examiner" and thus "is not necessarily repeatable from examiner to examiner." *NAS Report* at 139. Moreover, it explained that ACE-V "does not guard against bias; is too broad to ensure repeatability and transparency; and does not guarantee that two analysts following it will obtain the same results." *NAS Report at* 142.

Although the ACE-V methodology employed by McCall has generally survived *Daubert* challenges to its admissibility, there remain significant questions about its reliability that could and should have been addressed by effective counsel. In *State of Maryland v. Rose,* Judge Susan Souder excluded any testimony about latent print identifications made using the ACE-V methodology because there were no "objective or universal standards that govern the application

134

of the ACE-V technique that would establish its reliability" and it is a "subjective, untested, unverifiable identification procedure that purports to be infallible."

In short, trial counsel should have challenged the reliability of the fingerprint identification methodology employed by McCall—by bringing a motion *in limine* and then subsequently challenging that evidence at trial. The requisite and vigorous cross-examination was completely absent in this case, as evidenced through a mere three pages of cross-examination T3742-3746. If trial counsel had challenged the expert's methodology on cross-examination (or with the presentation of countervailing evidence), he would have given the jury ample grounds to doubt the only evidence of guilt presented by the government in this case.

> **D.**  **Trial counsel should have cross-examined Mr. McCall on his application of the ACE-V methodology and the basis for his conclusion.**

McCall's "report" provided no explanation about how or why he reached his conclusion that the latent fingerprint on the toll ticket matched Troya. His testimony at trial similarly lacks any discussion of how he reached that conclusion. Indeed, McCall admitted that he didn't really spend that much time with the latent print evidence. T3746. Effective counsel would have questioned McCall about his application of the ACE-V methodology and inquired into the basis for his conclusion.

McCall testified that fingerprint identifications are made if the examiner decides that there's enough quality and quantity of ridge characteristics to make a comparison. T3719. In other words, he just eyeballs the evidence and focuses on a bare-bones quantity of ridge characteristics that are not capable of re-analysis. He did not testify, however, as to quality, and trial counsel did not ask him a single question about the basis of the comparison in this case, thus utterly failing to challenge or confront him.

135

Trial counsel's failure to even passably ask any questions about the quality of the latent print and the corresponding quality of the ridge characteristics matched was inexcusable given that "[f]ingerprint identifications in criminal cases are typically made from small distorted fingerprint fragments detected at crime scenes." *Fingerprints Meet Daubert: The Myth of Fingerprint "Science" is Revealed.* 75 S. Ca. L. Rev. 605, 607.  According to the Department of Justice, the average size of a latent fingerprint is "only one-fifth the size of a full fingerprint." *Id.* And, while an "average human fingerprint contains between 75 and 175 ridge characteristics," the limited size of the latent fingerprint often limits comparisons to "fifteen or fewer visible ridge characteristics." *Id.* at 608-609. The difficulties of making a comparison are compounded by the fact that "[l]atent fingerprint fragments found at crime scenes are often very distorted." *Id.* at 609. Although there is no uniform identification standard in the United States, many other countries have set standards - France and Italy, for instance, have a minimum standard of sixteen matching ridge characteristics. *Id.* at 636.

At a minimum, trial counsel should have explored the basis for McCall's conclusion and questioned him about the quality of the latent print and the ridge characteristics present for analysis. Such questioning would have provided the jury with a reasonable basis to doubt McCall's conclusion. The failure to ask a single question about the basis for his extraordinary conclusion of certainty is simply unreasonable.

### E.      Trial counsel should have challenged McCall's scientifically implausible claims

Jack McCall offered the flawed and erroneous, "scientific" conclusion that it definitively was Mr. Troya's fingerprint on that toll ticket. On cross-examination, trial counsel assists Mr. McCall in taking the exaggeration into the realm of absurdity by claiming that he could "show" how the print might be made on the toll ticket. T3745.  McCall manufactures:

…a statistical and conceptual leap, jumping from what is known as a source level proposition (was Mr. Troya the source of the latent print, or was some other person) to an activity level proposition (what did the person who left the latent print do to transfer his print to the surface, or in other words, how did he hold the item?).

Appendix D-5 Eldridge Aff. at 11.

While McCall had already embellished the strength of the evidence on direct examination by assigning absolute certainty to the source of the latent print, he was now professing the same absolute certainty in the conduct of the defendant that led to its being deposited. By essentially assisting Mr. McCall in making these overhyped claims, trial counsel allowed McCall to testify outside his area of expertise and then permitted it that testimony to carry expert weight. McCall lacked the expertise to opine on the manner of deposition, nor did he have "any scientific basis for his conclusion." Appendix D-5 Eldridge Aff. at 11. This, of course, led the jury down the road of hearing about this special ability to make a conclusion as to how the print found its way onto the receipt. In reality, he was "just making a guess the same way as any layperson, or member of the jury, could do without his help." *Id.*

In failing to challenge this erroneous and highly prejudicial testimony (either objecting to it on direct or exploring it on cross), trial counsel's representation fell well below an objective standard of reasonableness. One of the issues, about which, the NAS report is most critical is the very claim McCall made in this case that "a fingerprint examiner can state with absolute certainty that a particular latent print matches a known print, and that fingerprint comparisons . . . are essentially error free."

"Although there is limited information about the accuracy and reliability of friction ridge analysis [or latent fingerprint analysis], claims that these analyses have zero error rates are not scientifically plausible." *NAS Report* at 142. The method, and the performance of those who use it, are inextricably linked, and both involve multiple sources of error (e.g., errors in executing the

137

process steps, as well as errors in human judgment). *NAS Report at 143*. Indeed, even experienced fingerprint examiners may reach different conclusions with respect to the same prints "when the examination is presented in a different context some time later." *NAS Report* at 139. In one study, highly experienced and highly-trained fingerprint examiners changed their determinations in 12% of the cases. *Why Experts Make Errors.* Dror, I.E. and Charlton, D. J. Forensic Identification, Vol. 56, No. 3 at 607-610 (2006).

Latent print examiners' performance on proficiency exams also suggest a significant error rate. On the 1995 exam, only 44% of the examiners who participated were "able to both correctly identify the five latent print impressions that should have been identified, and correctly note the two elimination latent prints that were not to be identified." Robert Epstein, *Fingerprints Meet Daubert: The Myth of Fingerprint "Science" is Revealed,* 75 S. Ca. L. Rev. 605, 634 (2002). At least one examiner made an erroneous identification on each of the seven latent prints and 22% of examiners "made erroneous identifications on one or more of the questioned prints for a total of forty-eight misidentifications." *Id.* On the 1998 proficiency exam, only 58% of the participants were able to correctly identify all of the latents and recognize the two elimination latents as being unidentifiable and 21 erroneous identifications were made by fourteen of the participants. *Id.* at 635.

More recent proficiency tests have had lower, though still significant, error rates but they have also been "less difficult" tests. *Fingerprint Error Rates and Proficiency Tests: What They Are and Why They Matter.* Jonathan J. Koehler, 59 Hastings L. J. 1077, 1093, n. 53 (2008). Even a very conservative error rate of .8% "would lead to an enormous number of false convictions." *More than Zero: Accounting for Error in Latent Fingerprint Identification,* Cole, Simon A. J., Crim. Law & Criminology, Vol. 95, No. 3, 1034 (2005). Given that United

138

States crime labs processed 238,135 requests for latent print analysis in 2002, an .8% error rate would lead to 1,905 false identifications. *Id.* It should be noted the preceding studies and articles (in addition to the *NAS Report*) were available to trial counsel at the time of the Mr. Troya's trial.

Beyond simply challenging McCall's scientifically implausible claim to infallibility, trial counsel could have impeached him with noteworthy cases of misattribution, or misidentification, based on latent fingerprint identification evidence. As elaborated on earlier, in 2004, Brandon Mayfield was implicated in a terrorist attack in Madrid based on a latent fingerprint identification made by the FBI's Senior Fingerprint Examiner which was verified by no less than three other fingerprint examiners with decades of experience, including a court-appointed expert. *More than Zero* at 985-86. Although the FBI initially asserted "the match to be a 100% identification," the identification was unquestionably wrong and later retracted altogether. *Id.* at 986. That same year, Stephen Cowans was exonerated by DNA after serving more than six years of a 30- to 45-year sentence for shooting a police officer. Cowans's conviction was the product of an erroneous fingerprint identification made by "multiple experts, including defense experts." *Id.* at 986-87. In 1982, the Minnesota Supreme Court reversed Roger Caldwell's murder conviction due to an erroneous fingerprint identification made not only by the State's expert, but also by the defense retained expert. *State v. Caldwell*, 322 N.W. 574, 580 (Minn. 1982).

"Fingerprint practitioners seek to create an error-free aura around fingerprint identification that has the potential to dangerously mislead finders of fact." *Id.* at 991. It was trial counsel's job to explain to the jury (either through cross-examination or the presentation of evidence) why McCall's claim to scientific infallibility was false. Trial counsel's failure to do so was both objectively unreasonable and clearly prejudicial. The fingerprint evidence was critical to the Government's case against Mr. Troya. If trial counsel had demonstrated that McCall's

139

claim of absolute certainty was incorrect, then there is a "reasonable probability" that the result of the proceeding would have been different.

**F.      Trial counsel should have challenged the non-testifying fingerprint examiners**

It is impossible to know whether or not there was any verification of McCall's fingerprint analysis in this case. Appendix D-5 Eldridge Aff. at 9. There are, however, multiple other examiners who participated in the print examination in this case at various times. It appears from the documentation, that McCall's testimony was used as a conduit to verify the conclusions made by these nontestifying examiners since his report is the last to come chronologically Eldridge Aff. at 9. As the most qualified examiner, McCall was the witness the government put on, but given that no verification of McCall's identification occurred, it seems that he may have served as the verifier of those prior examinations. For example, in an April 1, 2007 report, Sgt. Muschweck and Robin Pettey indicate both the items were examined and that the toll receipt prints belong to Mr. Troya. An even earlier report from Sgt. Gregg in October 2006, likewise draws that conclusion. It would be highly unlikely that these conclusions existed in a vacuum and that McCall was unaware of them. Neither the Standard Operating Procedures nor the actual fingerprint reports in this case indicate any level of blind verification (and the notion of verification is painfully absent from most of them).  Appendix D-5 Eldridge Aff. at 6.

Consequently, it appears these prior examinations of Mr. Troya's prints—while critical to the fingerprint analysis—escaped the constitutionally required rigors of review and cross-examination. This inadmissible evidence cannot be bootstrapped into a trial and should have been objected to. The unquestioned conclusions violate the Confrontation Clause. The Sixth Amendment provides the accused with the right to be confronted with and cross-examine the witnesses against him. The Confrontation Clause bars testimonial out-of-court statements made

140

by a witness not present at trial unless the declarant is unavailable *and* the defendant had a prior opportunity to cross-examine.

Forensic testing does not escape the strictures of the Confrontation Clause. One study, in reviewing overturned convictions due to exonerating evidence, concluded that "invalid forensic testimony contributed" to 60% of the wrongful convictions. *Invalid Forensic Science Testimony and Wrongful Convictions,* Garret & Neufeld, 95 Va. L.Rev. 1, 14 (2009). This failure was clearly prejudicial as McCall's testimony reflected the non-testifying experts' conclusions, leaving those opinions and procedures untested as to accuracy or reliability.

In short, the totality of trial counsel's failings as it pertains to the fingerprint evidence constitutes deficient performance. Because the balance of Mr. Troya's conviction rested on the fingerprint evidence, there is a reasonable probability that the outcome of the proceedings would have been different if trial counsel had properly investigated and challenged the fingerprint analysis.

### 2. Prejudice

The totality of trial counsel's errors in this case prejudiced Mr. Troya. There is a reasonable probability that, but for trial counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. As explained above, the investigation was far from complete and is indefensible by any reasonable assessment.

No reasonable attorney would have acted in the circumstances as trial counsel acted at trial; the adversarial process failed to function adequately. The known evidence and research on

141

fingerprints should lead a reasonable attorney to investigate further. McCall's fingerprint report combined with the available scientific understanding should have prompted trial counsel to investigate it further.

In this case, trial counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Prejudice is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is one sufficient to undermine confidence in the outcome. It is not just that trial counsel's errors had some plausible effect on Mr. Troya's case. Rather, it put Mr. Troya on the course to a conviction. Trial counsel was ineffective for failing to utilize a fingerprint expert and then failing to challenge any of the fingerprint evidence offered by the government.

To be effective, a defense attorney must reasonably investigate the law and the facts of a case. Trial counsel's unreasonable performance resulted in prejudice. He did not fulfill his obligation to know the facts. Unaware of the facts, he allowed unreliable and unchallenged testimony to infect Mr. Troya's case. Had he mounted any articulable defense, there is a reasonable probability that the outcome would have been different. Trial counsel's duty was not only to investigate the facts of the case, but also included the obligation to know how the specific facts applied to a given case. The jury in this case was left without any evidence about the weakness in the fingerprint analysis by way of cross examination, or the use of a defense-appointed expert to establish the weakness regarding the analysis of fingerprints which, as the National Academy of Science report found, is a subjective, rather than a scientifically sound process. That is prejudicial, ineffective representation. It requires granting habeas corpus relief.

### 3. Conclusion

Accordingly, trial counsel's utter failure to challenge the latent fingerprint identification was clearly prejudicial. While trial counsel did not necessarily have to mount every conceivable

challenge to the fingerprint examiner's testimony, it was objectively unreasonable for counsel to do nothing. At a minimum, counsel should have contested the fingerprint examiner's claim to scientific infallibility in light of the *NAS Report* and numerous other sources that squarely reject such a claim. If counsel had done anything to undermine the expert testimony, there is a reasonable probability that the result of the proceeding would have been different.

Trial counsel's ineffective handling of the testifying fingerprint expert was compounded by his failure effectively use his own expert and also his failure to object to McCall's implied verification and/or adoption of earlier examinations performed in this case. These untested conclusions of the nontestifying experts likely affected McCall's own conclusion, but trial counsel ignored it all. The failure to make any effort to exclude or challenge the nontestifying experts' conclusions on either ground constitutes ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

Trial counsel had obtained leave of court for a court-appointed fingerprint expert. That resource, however, simply rubber stamped the government's fingerprint evidence, and trial counsel accepted it at face value. Trial counsel did not use, for example, the *NAS Report* which determined that comparison of fingerprints and an analysis is, in actuality, an individual, subjective analysis made by the examiner, which is not scientifically reliable. A defense expert, such as Ms. Eldridge, and the National Academy of Science Report should have been used, therefore, to impeach the government's witness, McCall. Trial counsel, however, did not impeach McCall regarding his analysis of the prints.

The analysis of trial counsel's defective performance regarding the fingerprints (along with the substance of Ms. Eldridge's Affidavit) demonstrates that the performance was unreasonable and the effect was prejudicial.

143

### D.      Cell Tower Tracking Expert.

**1.      Counsel ineffectively failed to consult with and utilize the cell tower tracking expert funded by the Court, and the government presented knowingly false or misleading testimony to Mr. Troya's prejudice.**

#### A.      Introduction

Well before trial, counsel were provided with discovery indicating the Government would use cell tower location testimony in an effort to try to show the location of phones attributable to Messrs. Troya, Sanchez, Varela and the Escobedos. Counsel jointly moved for appointment of a cell location expert, and Jeff Fischbach was appointed as an expert for both defense teams. However, counsel for Mr. Troya barely, if ever, spoke with Mr. Fischbach, and thus never learned the substantial bases for cross examination of government witnesses. That job was supposed to have been undertaken by counsel for Sanchez, but they also defaulted.

In fact, codefendant's counsel had listed Mr. Fischbach as an expert prior to trial, but removed him from the witness list after the Government represented it would not be presenting an expert.  After the codefendant's counsel saw the cell location map prepared by the lead agent, however, GEX760.1, T6703, codefendant's counsel Cohen told the Court he believed that decision was in error.  T6020. There was discussion about relisting the cell tower expert and providing a report, but nothing ever came of it. *See* T6223-31.

At trial the Government relied heavily on cell site testimony through testimony of witnesses who were not qualified as experts. Its evidence showed on the night of the killings, Sanchez and Escobedo engaged in a series of fifteen short cell-phone calls to one another between approximately 6 p.m. and 2 a.m.(GX760.1-760.15). They did so, according to the government, along a route by which it could trace Sanchez traveling 200 miles north from West Palm Beach to Daytona Beach, and then back south to Fort Pierce, where it appears they got onto the Florida Turnpike heading towards West Palm Beach. According to non-expert testimony

144

about cell towers, as well as a summary exhibit map, the two vehicles were no more than a few miles apart each time they spoke, since the sending and receiving signals for each call bounced off the same or nearby cell towers. GX760.1-760.15; T6705-6821; *see also* T6406-12.

During this eight-hour period, Sanchez also received three calls from, and made one call to, Varela, who, according to cell site testimony, was in West Palm Beach. The last was a 48-second call at 1:17 a.m., about an hour before the government contended the Escobedos were killed. GX760.1-760.15. The cell phone that the Government claimed belonged  to Mr. Troya showed a single call to Varela from West Palm Beach at 6:30 p.m., but no further communication with him until after the killings. GX760.1-760.15; T6756.

Nevertheless, according to the government witness testimony about the cell-tower records, Mr. Troya appeared to be traveling with Sanchez on the trip to and from Daytona Beach that night: Though his calls were at different times than the ones between Sanchez and Escobedo, if the government cell phone company witnesses were to be believed, his locations were approximately where Sanchez would have been at those times. GX760.1-760.15. The last call between Sanchez and Escobedo occurred at 2:19 a.m. around Fort Pierce. Three miles south of that Fort Pierce toll plaza, by the side of the Turnpike, the Escobedos were shot and killed. T3231. A nearby resident who was awakened by the sound testified her clock read 2:24 a.m. — about five minutes after the jeep and van had entered the Turnpike, and Sanchez had made his last call to Escobedo. T3100-01.

The Government also could not explain the evidence that someone had been given or had taken the Escobedo's cell phones, and made several calls with them shortly after the murders. Records showed that, an hour after the killings, Escobedo's phone (the one he had used to talk with Sanchez) was used in West Palm Beach to call his wife's cell phone. T6541-42; GX708:2;

145

GX755:2; DX32:1. At around the same time, a call was made on his wife's phone to a number in Texas.[70] DX32:2; *see* T7350-52; T7653-56. The Government made no effort to show why Sanchez or Troya would have used the victims' phones or placed these calls.[71]

As Mr. Fischbach's declaration shows, Mr. Troya's counsel did not confer with him; in fact, he thought he had only been retained by counsel for Mr. Sanchez. He describes the extent of the consultation:

> 3. In January 2008, I was retained by counsel for Ricardo Sanchez to provide expert assistance in the area of cellular forensics. Although counsel provided me with all of the cellular records produced in discovery, I was asked to focus my attention on determining the location of a 911 call that counsel believed was placed by one of the victims. I was not asked to conduct a more general review and analysis of the cellular tower data that the government provided in discovery and intended to present at trial until close to the time of trial. By that time, I was operating under time constraints, and it was my understanding that I would not testify at trial. Counsel contacted me during the proceedings and asked that I review trial testimony presented by the government and provide an expert declaration. In the declaration I provided to counsel on February 22, 2009, I expressed only general opinions based on my experience in cellular forensics.

Appendix D-6.

---

[70] The records suggested that this call, and two earlier ones at around midnight, had somehow been made from near McAllen, Texas, since the label "McAllen" appeared next to each call under the heading, "serving area." DX32:1; T7350-52; T7653-56. The Government responded that this was simply because the account for the phone was based in that part of Texas. T7453; T7660. But the records themselves show that to be false, since the "serving area" varied for each call. Moreover, the Government's own representative from the telephone company confirmed that "serving area" mean the geographical area from where the call was placed. T6124.

[71] The Government speculated that yet a third call made after the killings, from Sanchez's phone to Escobedo's (T6825-27; GX708:2), may have been for the purpose of locating Escobedo's phone in the jeep so that it could be destroyed. T7156; T7453. But even this odd theory could not account for why, after that, Sanchez would have used Escobedo's phone to call his wife's phone, or his wife's phone to call Texas.

**2.      Trial counsel were ineffective for failing to adequately challenge the cell site tracking testimony.**

The cell tracking testimony of the records keepers from various cell phone companies, eventually summarized and presented to the jury on a tracking map prepared by lead Agent Weeks, was misleading. Counsel failed to adequately investigate this cell site evidence; had counsel done so, they would have discovered that the testimony about that evidence was unsupported, unreliable, and lacking in any foundation. For example, had trial counsel actually consulted with their cell site expert, they would have learned of the numerous deficiencies in the Government's cell site tracking evidence, and could have used this information to effectively cross examine the government witnesses on the issue. As Mr. Fischbach attests:

> In this case, the testimony at trial suggested that the cellular tower data could narrow the origination point of a call to a specific area one and a half to two miles from the location of the cellular tower that processed the call. Based on my examination of the records, the discovery produced at trial was patently insufficient to substantiate the whereabouts of an individual handset on a given date and time with such accuracy or precision. The records are only sufficient to determine the location and engineered capabilities of the particular cellular tower that provided cellular service.

> The various factors that affect cellular tower range and coverage area – such as geography, cell site design and engineering, network integrity, obstructions, density, and congestion – are not predictable or constant. Though a tower may have been engineered to provide a certain range of coverage, there is no guarantee that the entire coverage area will receive the same quality of service or any service at all.

> Each major cellular network provider maintains standard business records that could substantiate the approximate range and operating conditions of their cellular towers, including records that describe the towers' operational behavior, engineered capabilities, tuning and alignment, maintenance, and service history. Such records, which do not appear to have been provided in this case, dictate the actual range of service and would provide a more accurate estimation of an individual's location within the provider network.

Appendix D-6.

Trial counsel has a duty to conduct a competent investigation, including consulting with relevant experts; trial counsel's failure to do so here constituted ineffective assistance. *See, e.g.,*

147

*Horsley v. Alabama*, 45 F.3d 1486, 1495 ("[T]o prove prejudice by failure to investigate and failure to produce a certain kind of expert witness, a habeas petitioner must demonstrate a reasonable likelihood that an ordinarily competent attorney conducting a reasonable investigation would have found an expert similar to the one eventually produced.") There was simply no tactical or strategic reason for trial counsel to fail to provide their retained expert with the relevant discovery concerning the cell tower expert and discuss the quality of that evidence with him. Trial counsel knew well before trial that the Government intended to use such evidence in its case against Mr. Troya, and the very fact that trial counsel requested funds to retain the expert in the first place demonstrated that counsel acknowledged the services of such an expert were "reasonably necessary" for adequately defending Mr. Troya. *See* 18 U.S.C. § 3599(f) (noting that authorization to expend funds on experts in a federal capital case require "a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant").

But for trial counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different. The defense was highly prejudiced by the government's misleading testimony. The map prepared by Agent Weeks, GEX760.1, drawn from that testimony, presented a compelling picture of the locations and times of the calls between the phones, and pointed to Mr. Troya and Sanchez being at the scene of the crime at the time other testimony strongly suggested it had been committed. The testimony was relied upon heavily during the government closing argument.  Effective counsel would have cross examined the witnesses on the lack of underlying data for their misleading testimony, but neglected to speak with their expert about it.

**3.      The Government's reliance on erroneous and misleading cell tower evidence deprived Mr. Troya of due process and a fair trial.**

As noted in the firearms and tool marks expert claim, prosecutors violate due process by presenting material testimony that is false or creates a false impression, or allowing such testimony to stand uncorrected. *See*, *e.g.*, *Giglio v. United States,* 405 U.S. 150 (1972) (failing to correct false testimony violates due process); *Napue v. Illinois,* 360 U.S. 264 (1959) (failing to correct testimony that creates a false impression, though not perjured, violates due process). This is true even where the particular prosecutor does not know that the testimony being presented is false or misleading. *See Giglio*, 405 U.S. at 154.

As demonstrated above, Mr. Troya was denied due process and a fair trial because the Government presented misleading, inaccurate and prejudicial evidence at his trial about cell site tracking under the guise of it being reliable and accurate evidence with a scientific veneer. Under *Napue* and its progeny, Mr. Troya need only establish the following three elements to properly state a claim for relief: (1) the testimony in question was false; (2) the government knew or should have known the testimony was false; and (3) the testimony was material. Those elements are easily met here.

First, the declaration of Mr. Fischbach, discussed above, establishes the falsity of the testimony elicited at trial by the Government regarding cell site tracking. Second, there is no question that the Government knew or should have known this testimony was false; it had retained its own cell tower expert, who surely must have known that the underlying data was insufficient to substantiate the whereabouts of an individual handset on a given date and time with the kind of accuracy or precision testified to at trial by Agent Weeks, and that the underlying data was only sufficient to determine the location and engineered capabilities of the particular cellular tower that provided cellular service. (Similarly, to the extent that the

149

Government was in possession of additional cell company records or information that undermined its cell site tracking testimony and failed to disclose them, that would be a violation of its obligation under *Brady* and its progeny.) Third, there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Augurs*, 427 U.S. 97, 103 (1976). The cell site tracking data was a critical piece of the Government's case allegedly tying Mr. Troya to the scene of the crime, and it heavily relied on that evidence in its arguments to the jury.

Additionally, the Government also misled the jury in its characterizations of the late night calls on Yessica Escobedo's phone, which appeared to come from Texas in the time before and hours after the crime. Indeed, the Government rebutted co-defendant counsel's theory of the involvement of another person in the killings by disparaging the theory as misleading, despite the fact that the theory was not inconsistent with the cell phone data.

In his declaration, Mr. Fischbach has attested:

> 11. I also reviewed the toll records, CDRs, and subscriber information for (956) 266-2004. The number was assigned to Yessica Escobedo by T-Mobile in May 2006. The toll records state that the handset was in the McAllen, Texas when it placed three outgoing calls to (956) 742-9994 at 11:58 PM on October 12, 2006, 12:00 AM on October 13, 2006, and 3:18 AM on October 13, 2006. The CDRs, which provide the cell site and switch data needed to identify the specific cellular towers responsible for providing cellular service, are incomplete for these calls.

> 12. The toll records, CDRs, and subscriber information provided by T-Mobile for (786) 853-8416, which the government alleged was used by Ricardo Sanchez, are similarly incomplete. There are calls in early October where the toll records show that the service area is Rio Grande, Texas or Houston, Texas. The CDRs provided by T-Mobile only cover October 12-14, 2006. As a result, the specific towers that processed those calls cannot be identified.

150

13.     Because these records are incomplete, it is not possible to definitely determine whether the ([9]56) 266-2004 handset traveled to Texas at some point on October 12, 2006. In order to perform a more comprehensive forensic evaluation, I would need to review system information, cell site, and switch data for relevant T-Mobile cellular towers in Florida and Texas during October 2006. Because network providers continuously update their cell site and switch center data, the data provided from 2007 and 2008 is not historically accurate. Historically accurate data is particularly important in this case because T-Mobile acquired wireless spectrum from the FCC in September 2006 and was in the process of upgrading its equipment and network capabilities during this time. I also would need to review the CDRs for (786) 853-8416 and ([9]56) 266-2004 for the entire month of October 2006. As noted above, the CDRs for (786) 583-8416 only covered two days, and the CDRs produced by T-Mobile for (756) 266-2004 were generated by a third party subsidiary – Fraudbusters.

Appendix D-6.

The prejudice is evident. As it was, there was no testimony at trial describing who fired the fatal shots, and only government speculation as to how the killings unfolded. The evidence of another person's involvement-even another person- would have been extraordinarily exculpatory, and likely changed the jury's verdict at either guilt or sentencing.

Moreover, to the extent that the Government failed to disclose to defense counsel cell company records to explain the locations of these other calls made on the Escobedos' phones, the Government violated its obligation under *Brady* and its progeny; if such information tended to corroborate the defense theory, there is a reasonable likelihood that the outcome of the proceedings would have been different if that information had been disclosed to defense counsel.

Alternatively, to the extent that the relevant cell company records could have been independently obtained by trial counsel, counsel's failure to do so constituted ineffective assistance. Trial counsel had retained a qualified expert who could analyze those records and assist counsel with the presentation of such evidence in Mr. Troya's defense. For the same

151

reasons cited above, the failure to present evidence supporting a theory of third-party culpability was prejudicial.

### E. GIS Mapping Expert.

#### 1. Counsel ineffectively failed to consult with the GIS mapping expert.

Amy Nguyen, of Capital Maps, was funded by the Court well prior to trial for the joint use of the defense teams. Once again, counsel for Mr. Troya failed to speak with or utilize this expert even though the defense sought to have her appointed. Ms. Nguyen is a GIS mapping expert. She gathers and analyzes census and other data from the geographic areas in which a particular person was raised (as well as adjoining areas) from birth through the time of the alleged offenses. The data includes economic, crime, education, and other statistics. She then develops maps and descriptions of each community and adjoining communities which assist in demonstrating the poverty and crime to which, in this case, Mr. Troya was exposed to. Differences, and generally, different outcomes for children raised in adjoining communities is also developed.

The data and maps the GIS expert has recently developed would have been extremely useful to the jury in visualizing and understanding mitigating evidence, and greatly assist forensic mental health experts in explaining mitigation flowing from the defendant's childhood and adolescence. The maps that have been developed show the patterns of education, crime and economics in the area in which Mr. Troya, was raised and the community risk factors to which he was exposed as a child and adolescent.

The Troya trial team neglected to pursue the information and mapping Ms. Nguyen could have developed demonstrating the neighborhoods in which Mr. Troya grew up were low income and education and high crime during the time of his childhood and adolescence. The data developed relating to these issues and the maps produced are contained in the Appendix D-7.

The data and maps, had they been used by trial counsel, would have provided stark visual proof of the difficult circumstances under which Mr. Troya grew up, and assisted influencing the jury to reject a death verdict.

**XII. DEFENSE COUNSEL FAILED TO OBJECT TO NUMEROUS ERRORS BEFORE AND DURING THE TRIAL, THEREBY DEPRIVING MR. TROYA OF HIS CONSTITUTIONAL RIGHT TO EFFECTIVE COUNSEL UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

**A.      Guilt Phase Trial.**

Numerous guilt phase in-court performance deficiencies and their prejudicial effect are identified elsewhere in this motion, particularly in the section addressing the testimony of the government's cooperating and expert witnesses. There were other counsel errors, including the failure to object to improperly admitted evidence and numerous improper jury arguments advanced by the government. Singly and cumulative, these errors denied Mr. Troya the effective assistance of his counsel pursuant to *Strickland v. Washington* and its progeny.

> **1.      Defense counsel forgot about the transcript of the co-defendant's statement and made an (accidentally) untruthful claim in the jury's presence that it had not been provided to the defense. Counsel also failed to object to the Court's comment, in the jury's presence, that what he said was not true.**

Early on in the trial, after the codefendant's statement was played and codefendant's counsel crossed, *See* T3627, 3640; GEX802, GEX803, counsel Eisenberg made a *Bruton* motion and the following occurred in the jury's presence:

> THE COURT: Thank you, Mr. Cohen.
> Would there be any other cross examination?
>
> MR. EISENBERG: Judge, we have no cross examination, but we
> have a Bruton motion.
>
> THE COURT: I will hear you later.
>
> MR. LERMAN: No questions, Judge.

153

THE COURT: That is a motion you made pretrial?

MR. EISENBERG: No, sir, we were handed this transcript two minutes ago.

MR. KASTRENAKES: I object to that.
THE COURT: **We all know that is not true. This transcript has been divulged earlier in discovery to counsel. It has been the subject of other matters.** We will deal with it later, all right?

MR. EISENBERG: All right. We will deal with it later.
Is there any redirect?

MR. KASTRENAKAS: There is, Your Honor.

T3649-50 (emphasis added)

After redirect and the jury was out, the Court noted that the statement was disclosed pretrial and was the subject of a motion to suppress and pretrial orders. T3654. Counsel said he "may have spoken in error, but Mr. Garcia and my joint recollection is that we didn't have the transcript. We had a report with the statement, we were aware of the statement, we didn't have the transcript." He believed the motion to suppress was settled by agreement, and apologized if he was in error. T3654. The Court observed there were a lot of documents, and agreed it was not purposeful.

Counsel then argued his *Bruton* issue, which centered on comments by the interrogating officer, Springer, about Mr. Troya's print being on the toll ticket, the two were "behind the 8 ball," and Sanchez's apparent affirmation. T3654-55. The Court observed the comments were those of the officer, who was subject to cross examination, and that the other comments of Mr. Sanchez were ambiguous. However, the Court noted that counsel could make a formal motion. T3656. The government noted it had turned over the transcript a year before and there was a hearing. Counsel did not follow up with a *Bruton* motion.

154

After asking counsel, the Court later told the jury:

> Ladies and gentlemen, if I might, there were a couple comments before we broke for lunch whether that transcript had or had not been presented earlier, and I want you to know, and I say this as I said throughout, we are so fortunate, we have simply superb lawyers on both sides.
>
> There has been enormous preparation in the case as you would anticipate and that has involved a lot of work, so it is very easy to have something -- you know, have something escape their attention that they may have seen earlier.
>
> Please don't draw any concern or inference from that at all. Okay?

T3659. But the damage had been done to the defense credibility, and it was self-inflicted.

### 2. Counsel failed to object to improper arguments by the government during guilt phase opening and closing.

During the first closing, AUSA Carlton made repeated improper arguments, some of which the defense objected to, and others not. The defense did not object to the following arguments of the government:

a. References to "thug mansion" T7101, and "pimp plaza," T7133 and throughout closing.  These derogatory descriptions were highly improper for descriptions a prosecutor to make as they essentially labeled the men on trial for their lives as thugs and pimps.

b. Description of government witness Doran as nervous and hesitant to testify; encouraging the jury to "to draw your common sense on why, as a close friend of Varela." T7144. This improper remark, telling the jurors how to assess the witness's demeanor, urged them to believe witnesses were in danger from the defendants.

c. Calling **Sanchez a liar** numerous times when recounting his statement. T7154.

d. Referring to a matching suitcase found in the van, which still had in it a hotel receipt from Yessica for October 11, T7159, and then arguing that, "the **suitcase is Yessica's way of speaking from the grave and identifying her killers."**

e. Improper commentary on the right to counsel:

155

> You've seen through your participation in this trial and your willingness to serve what a great system of justice that we have.
>
> No one gets convicted until a jury of his or her peers unanimously agrees beyond a reasonable doubt that the Government has proven its case. Each Defendant is entitled to the assistance of a lawyer, and you have seen those skilled lawyers assist their clients in this courtroom. Some even have two lawyers.
>
> The prosecution has no right to remark on a defendant's exercise of his constitutional right to counsel. T7178.

In its rebuttal closing argument, the government continued employing its virtual potpourri of improper arguments, all without objection. The prosecutor argued that being a juror is like serving ones country as a soldier in battle or war. T7412.

As discussed in more detail below, the government falsely and improperly vouched that law enforcement would continue to investigate and prosecute Mr. Varela for the murders:

> Rest assured, there are no deals from the United States of America with that drug kingpin, there are no deals. And this investigation is not over, and the investigators who have dedicated the last three years to this case will continue to look for evidence and gather evidence and when and if there is sufficient evidence to charge Mr. Varela with murder, it will be brought before a jury of his peers.
>
> T7414.[72]

The government vouched for the integrity, performance and character of law enforcement officers who investigated the case, and insisted that to acquit, the jury would have to disbelieve them:

---

[72] To the extent Mr. Varela did receive undisclosed promises or favorable treatment, these comments would further violate *Brady v. Maryland* and *Giglio v. United States*. Mr. Troya requires discovery to determine whether these statements were not only improper but false.

Mr. Gershman rails against the Government for an hour and calls the Government, United States and these fine agents unjust.

This case is not about a couple of things.

It is not about a referendum on the use of informants or inmates as witnesses.

Folks, this case does not rise or fall on the testimony of Malik Mullino, Carlos Rodriguez, Mario Calderon or Kevin Vetere.

They are icing on the cake.

Kevin Vetere is not the United States star witness. To acquit these Defendants, and Defendant Varela, you have to disbelieve not only them, you have to, also have to disbelieve the mountain of evidence that was gathered by people like detective – Deputy Halloren, Piatchek, Angela Culpepper, Sergeant Ufkin. I can go on and on.

You have seen it here. Not any of this evidence came from a cooperating witness.[73] This evidence was gathered by dedicated, hardworking law enforcement, whether it be through an undercover operation, or whether it be just through traffic stops or a search warrant.

You have to take all this evidence and get rid of it, also.

You have to disbelieve the lab technicians, fingerprint evidence, firearms, chemists.

T7415-16.

Later, continuing this line of argument improperly vouching for and lauding government law enforcement witnesses' goodness and accuracy  as if he was announcing the Academy Awards, all the while attacking defense counsel, the government also managed to comment improperly on facts outside the evidence in countering defense arguments:

Both Mr. Gershman and Mr. Garcia and, of course Mr. Lerman claim the police work in this case was inadequate. I heard the word

---

[73] In addition, this argument was false.

157

unjust. Mr. Garcia, I know he didn't mean this, put zeros next to all of these people. They are not zeros, they are not, okay?

You know, it is so funny in these halls of justice the Government can never get it right.

You either arrest too soon and it is a rush to judgment. Remember that, a rush to judgment. Or now we have heard this complaint from Mr. Gershman, we waited too long, the police had the audacity to make a better case by conducting an undercover operation on October 21st, and conducting surveillance and building a better case.

Wrong, we shouldn't be doing that, we should be rush to judgment, making arrests right away.

Folks, use your common sense.

Let's stop nitpicking and let's recognize the simple truth, that a number of law enforcement agencies together and independently did a fabulous job in solving this case.

St. Lucie County Sheriff's Office through Detective Wilson -- and by not mentioning some names, I don't mean to exclude anybody, there are a lot of good people. Detective Fred Wilson, Ms. Carmichael, Detective Parow. What a fabulous job Detective Parow did. Can you imagine watching tape after tape, knowing it is a Florida Turnpike, controlled highway, finding the casings at the scene, the dedication. No wonder they couldn't find them all. Mr. Garcia wants to hold that against the Government.

The Drug Enforcement Administration should be proud of the work they did in this case, not ashamed.

Agent Weeks, Agent Birch, fabulous job.

No matter what your verdict is in this case, this is the kind of work that we expect and demand as a community from our law enforcement, to work together, to work incredibly long hours and solve horrible crimes like this.

Palm Beach Sheriff's Office, Sheriff Bradshaw has a good group of people working for him, Ms. Culpepper, Deputy Halloren, Piatchek, Detective Johnson. Alcohol, Tobacco, Firearms, Barborini, Barbercheck, all these people work together. West Palm

158

> Beach Police Department, can't leave them out. Chief Bush has a good department. Mr. McCall came from that department.
>
> The effort and dedication, they deserve praise from this community, not criticism.

T7425-27.

By praising its witnesses at length, with no objection from the defense, the government left the jury with the impression that those producing evidence against Mr. Troya were trustworthy and deserving of praise. The prosecution is not permitted to vouch for witnesses nor to go so far as it did here in ensuring the excellence of their work.

The prosecution implied it was improper to disbelieve cooperators by telling the jury if you don't approve use of cooperators, write a letter to the United States Attorney, but don't acquit these drug dealers and killers. T7416.

The prosecutor demeaned defense counsel by saying he didn't think Mr. Garcia knew how to deal with witness Vetere. T7417.

The Assistant United States Attorney attacked codefendant counsel Lerman by accusing him of misstating the evidence to the jury. T7422.

The government commented again on facts not in evidence: "Well, Hambrick -- **it is not in evidence**, I can't go into what was in the letter, but you know…" then describing matters not in evidence, saying that as a result of evidence received by the DEA, they found out who Rodriguez was, and brought him from prison, at which point he gave them the same information that he gave in court. T7424 (emphasis added).

The prosecutor, again commenting on facts not in evidence and attacking defense counsel Garcia, said defense counsel tried to do **what I have seen over many, many years**, isolate each witness, misdirect you from taking everything into account, your job is not to look for gaps, but

159

for truth, only one truth. T7432. This also misstates the prosecution's burden of proof, since gaps in the evidence are highly material to whether the government has established each element of the alleged offenses beyond a reasonable doubt.

The prosecutor attacked both counsel Garcia and counsel Cohen; referring to the government witness Rich's testimony and the defense argument about the time of the shooting, the government argued Mr. Garcia said that witness Rich is a zero, but Cohen says she's the key to the government's case, and that it couldn't be both. Referring to codefendant counsel's argument that the witness who pegged the time at 2:24 a.m. could have been mistaken, the prosecutor asked where does 2:42 come from, if a pig had wings it could fly, that the witness had said 2:24, that testimony agrees with other evidence, and "come on, that is made up." T7433.

The prosecutor once again commented on facts not in evidence, saying the cases **don't get better than this**, that there was a mountain of circumstantial evidence pointing in one direction, to Sanchez and Troya as thug enforcers from Thug Mansion who were going to rip off 15 kilos of cocaine. T7437.  This also constituted further vouching for the prosecution case.

The Government accused defense counsel of disparaging the victims' family, arguing that attorneys Garcia and Cohen blamed Lou Escobedo for all of this, and while he has to answer to his maker for why he brought his kids and wife on 15 kilo deal, that was not a defense; it was not self-defense or insanity. T7438.

The prosecution drew a rebuke from the Court, but no defense objection by again arguing this was a military style execution, an operation by **thug enforcers.** T7445.

There was no objection to the improper use of the 404(b) evidence to argue Mr. Troya's alleged propensity for violence. The issue was raised on appeal as a sub-issue of another claim, and denied without comment. The argument made at trial was: "Is it really pushing credulity to

160

believe that a killer like Daniel Troya could execute an entire family? All you have to look at is the Haverhill shooting, all you have to look at is what he did to –" T7448. Later,

> MR. KASTRENAKES: The Haverhill shooting, they believed that was involved in casing Pimp Plaza, and they were going to identify that car. All three of the Defendants were in that car. Troya sprayed a car, not seeing anybody inside that car, not knowing who it was, and he strikes a young black lady in the leg. But for the Grace of God, she is alive. She could have been killed.
>
> 11 casings at the scene firing into a car you don't know who it is.
>
> This is Daniel Troya.
>
> This is the person who is seated before you and you will pass judgment on.
>
> This is the violence that is reeked [sic] on individuals who have no play in his criminal involvement. This young lady was not involved in anything. It was a guy who was in that car, or a car that looked like that car.
>
> T7449-50.

Objections were made and overruled, a motion reserved, T7449, and the issue was argued at T7459-62.  They are provided here as context and as cumulative error.

The prosecuting attorney suggested the only way for the jurors to do their duty was to convict. T7456

These improper arguments are held to be so for a reason: they detour the jurors from decision making based on the evidence at trial. Given the number and breadth of the comments, the direct disparagement of Mr. Troya and his counsel, and the wholly improper vouching for the government's evidence, these arguments were reasonably likely to have affected the outcome.

## B.     Sentencing Trial.

The defense made numerous serious errors at the sentencing phase of trial which, singly and collectively, deprived their client of a fair and reliable sentencing.

161

**Failures to respond to the prosecution's improper actions.**

> **1. Trial counsel allowed Crawford and related reliability errors to permeate the penalty phase, permitting the jury to consider unreliable evidence.**

Throughout sentencing, the defense failed to object to hearsay evidence improperly introduced in violation of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Only through hearsay was much of the government's aggravation "proven" and additional incriminating details presented to the jury at the sentencing trial. While hearsay is admissible under the FDPA, that does not (and did not at the time of trial) mean the government is permitted to attempt to prove a case for death with unreliable evidence in violation of the Confrontation Clause. Trial counsel failed to file a motion *in limine* addressed to the evidence before trial and to object to any of the government's hearsay evidence during the sentencing trial. That evidence was highly prejudicial, and likely to have affected the outcome.

> **A. Escape evidence.**

The government introduced hearsay testimony supporting its portrayal of the escape conviction primarily through the testimony of Inspector Glover. While he was the lead investigator, he was not present when the events happened, and in fact, did not even arrive at the institution until after the evidence had been collected. T8012 (witness got to institution after civilian clothes were bagged). Throughout his testimony, Inspector Glover relied on hearsay of guards, inmates, and others to describe the government theory of how the escape occurred and to introduce photographic evidence. He testified Mr. Troya and the other inmates were caught outside their dormitory in the prison yard. This area was separated from the outside by several security fences; the most interior one bore signs of attempts to lift or breach it. T7980-84, T7991-92, T8008, T8015. He testified an investigation by the prison revealed a plan to escape,

162

involving stolen and make-shift tools, home-made ropes, manikins, and disguises to escape detection. T7985-92.

The violation was pervasive and prejudicial. Examples during the Government's questioning of Inspector Glover include:

Q. Was Daniel Troya apprehended outside of his dorm assignment, outside of his cell at Brevard Correctional Institution?

A. Yes, sir.

Q. Where was he apprehended?

A. Between J dormitory and Mike dormitory.

T7983

Q. How was it that Daniel Troya was arrested outside in the yard? Can you explain that to us?

A. It happens one of the Sergeants was doing a security check in one of the other dormitories, and when he looked out the window, he observed three inmates out on the compound.

Q. What cell had Daniel Troya been assigned to?

A. Daniel Troya, I believe he was in Delta dorm and lived on the second floor with another inmate by the name of Jeffrey Burlson. (sic)

Q. And they were in the same cell together?

A. Yes, sir.

Q. And there was a third inmate also involved?

A. Yes, Eric Vonlydick. He lived on the first floor of the dormitory.

Q. In view of the Troya cell, tell us the method and manner by which Troya escaped from his prison cell observed by the inspectors related to this investigation.

A. It was found during the investigation that all three of the inmates made make shift dummies in the bunks. When the officers went around to do count, when you looked at the cell, it would appear there was a body in the bed at the time. They

163

also used a floor jack -- I am sorry, a screw jack from the motor pool to open up the window, the metal frame of the window so they could make their exit out the dormitory.

T7984-85.

Q. What had you guys as investigators uncovered to show how Troya and the other two inmates were able to effectuate their drop from the dormitory or from the roof to the ground?

A. From information received from other inmates in the dormitory, the three inmates climbed out the second story window up onto the roof of the dormitory. During a search of the roof of the dormitory, we found numerous makeshift ropes, work gloves, and we also found a piece of metal made into a screwdriver.

T7986.

Q. Did they also change clothing in a fashion to make it look like they were wearing civilian clothes?

A. Yes. They took the inmate jackets and had the lining of different colors. They cut the lining out of the jackets and made what was like civilian shirts out of them.

T7988.

Q. Are these the civilian clothes or clothes made to look like civilian clothes that Troya was caught in?

A. Yes, sir.

T7992.

Q. Now, you indicated that it was a closed quarters facility. How far, based on your investigation, did Troya get from actually escaping onto the public streets or public thoroughfares of Brevard County?

A. All three of them were no further than 60 yards from the perimeter fence.

Q. They were within 60 yards of getting out?

A. Yes, sir.

T7992.

164

### B.      The felony battery.

During its case in chief the Government introduced through Officer Birch the hearsay report of Ms. Pawlowski describing Mr. Troya punching her, without objection. T8023. (Ms. Pawlowski was deceased for unrelated reasons by the time of trial- T8024). Additionally, Birch continually made specific references to the statement of Aimee Viola to contradict and impeach defense witnesses, Karl Busch and Julio Perez. T8737, T8749, T8767. AUSA Kastrenakes also used the statement of Ms. Cass to impeach Karl Busch. T8749.

### C.      The fight with and striking of a girlfriend.

Yuslena Jarretta, a friend of Mr. Troya's then girlfriend, also testified to incriminating hearsay without objection. She testified Mr. Troya's girlfriend, Inessa, had called her crying, telling her that Mr. Troya had gotten into it with her the night before, that he had hit her, that she wanted to kill herself, and asked her to come help her remove herself. T8047. She also testified without objection that the girlfriend, Inessa, did not want to press charges, and had moved back to Brazil. T8053. On cross-examination, the witness also testified she did not know whether Mr. Troya fired the gun in the air after the pushing incident, and she learned it was a BB gun, though the government disputed that fact. T8060.

### D.      Evidence of introduction of contraband money and the supposed involvement of Mr. Troya's mother in the introduction to impeach her testimony.

On the cross-examination of Maria Troya, Mr. Troya's mother, the government asked whether she had learned of rules about sending money to loved ones in prison and about the accounts to book money for inmates as opposed to sending money directly to inmates, to which she answered in the affirmative. The government then accused her of just that, intentionally

165

violating the rule by sending money directly to Mr. Troya while he was incarcerated at Brevard. T8923.

During its rebuttal case the government later introduced evidence of this event over only a collateral impeachment, not constitutional, objection. T9235-36. The testimony was hearsay, and hearsay within hearsay, but there was no objection on that basis. During the testimony of Richard Birch, a law enforcement officer reading from Florida DOC records, Officer Birch read from what "appear[ed]" to be a disciplinary report, which was also admitted as evidence. GEX1015 (objection, but based only on prior relevance objection). Officer Birch told the jury the report said on May 31, 2002, there was an investigation regarding a conspiracy to introduce currency into Brevard on May 24, 2002.  He read and related to the jury that a search of incoming mail showed a card addressed to Daniel Troya contained two $10 bills concealed under the front cover. He further read that the author of the report had monitored telephone conversations between Daniel Troya and his mother and uncovered conspiracy between them to introduce contraband into Brevard through the mail. T9245. He further related Mr. Troya pled not guilty, said he knew nothing about the conspiracy, but had been found guilty, and lost thirty days of gain time. T9245-46. As admitted on cross, Agent Birch did not investigate these events, he just got the records, and he did not have the recorded telephone conversation. T9249.

There was certainly a substantial basis for counsel to have objected to this and additional government hearsay at the sentencing trial based on *Crawford v. Washington*, 541 U.S. 36 (2004), and a bevy of Fifth and Eighth Amendment cases requiring reliability in the death sentencing decision. The issue of admissibility of government sponsored hearsay in support of a death sentence had not been resolved at the time of trial, and there was decisional support for such an objection. *See United States v. Mills,* 446 F. Supp. 2d 1115, 1135-1139 (C.D. Cal.

166

2006)(Confrontation Clause and *Crawford* apply to both the eligibility phase and the selection phase of a capital sentencing hearing); *United States v. Sablan*, 2008 WL 700172 (D. Col. 2008)(rejecting decision of another circuit: " The Supreme Court has made clear since *Williams* that death is different, that there is a need for reliable information at a capital sentencing, and that there is a need for confrontation when there is constitutionally significant fact finding on the part of the jury"). Reasonably effective counsel in a death penalty case would have interposed objections to the government's hearsay evidence.

What was instead admitted was all damaging evidence: the escape would have persuaded the jury only a death sentence would keep Mr. Troya behind bars, and the evidence of violence for the Government's argument Mr. Troya supported its nonstatutory aggravator of other serious violent crimes and argued to show he was irredeemably violent and "evil."  It had to have affected the jury in reaching its death sentencing verdict.

> **2.    Trial counsel failed to object to misleading questions and an inaccurate portrayal of Daniel Troya as the leader of the attempted escape.**

A number of questions by the government of its witness Inspector Glover were improperly leading, and misleading, but counsel neglected to object to them. On the direct of Inspector Glover, AUSA Kastrenakes added his own opinion in his questioning, by prefacing a question with the statement "Troya along with his confederates…" T7989. This is a misleadingly false statement of fact, as there was ample proof available Mr. Troya was not the leader.

On another occasion, the government elicited testimony that Mr. Troya and others cut linings out of inmate jackets, making what looked like civilian shirts, and AUSA Kastrenakes referred to the items as having been found in the "Troya cell," as if it was in his personal space,

167

when the record showed it was a shared cell with Jeffrey Burleson and Eric Vonlydick. T7985, T7989.

> **3.**      **Counsel should have objected to improper testimony and argument of future danger and otherwise undermining life-without-parole as a valid sentencing option.**

With the same witness, the government without objection improperly undermined the effectiveness of a sentence of life without parole in this case by improperly and misleadingly characterizing Mr. Troya's release from prison as a mistake by the prison system. The government asked and the witness answered:

Q. I would like to talk to you a little bit about what happened with respect to how this conviction occurred subsequent, almost two years subsequent to the actual commission of the crime, if we could talk about that for a moment.

You are aware that Mr. Troya, Defendant Troya was sentenced on October of 2000 to a term of three years youthful offender plus two years probation, right?

A. Yes, sir.

Q. Now, was he released from that sentence despite the fact that he had tried to escape on November 26, 2002?

A. Yes, he was.

Q. And had you actually put a detainer in place to keep him from being released?

A. I filed criminal charges in February, 2003. He was released in April of 2003.

Q. In other words, the State of Florida Bureau of Corrections had went ahead and released Mr. Troya despite the fact you had a detainer there, some scrivener – some error in the administrative of the prison system?

A. Yes. There was an error there or in the Department of Corrections.

Q. And he got released in 2003?

A. Yes.

Q. The records show he goes back into prison in December, 2003, sir?

168

A. Yes, sir.

Q. The reason he had go back into prison, you said he had been on probation?

A. Right.

Q. Was there a violation of probation that had occurred?

A. Yes. He was sentenced in December, 2003 for grand theft auto.

Q. And that was a violation of probation?

A. Yes.

Q. Went back in prison, and got separately prosecuted for this escape which occurred two years previously?
A. Yes.

Q. And got additional approximately 20 months.

A. Yes.

T7993-95.

Inspector Glover's testimony as to Mr. Troya's mistaken release from prison was nothing less than a back door method to inject future dangerousness as a consideration.  In addition, the witness plainly did not know where the "error," if any, occurred. The testimony was completely misleading. In fact, the Florida DOC website shows no detainer was filed until February 24, 2004, by the Brevard County Sheriff's Office.[74] Yet the Government compounded the misleading testimony, arguing to the jury the prison system made a mistake, and let him go, and didn't catch the detainer. T9631. Prejudice from this error is demonstrated when Mr. Kastrenakes seized upon trial counsel's failure to object and argued the improperly admitted testimony about the escape at closing:

---

[74]http://www.dc.state.fl.us/InmateReleases/detail.asp?Bookmark=1&From=list&SessionID=694264376

> They didn't catch there was a warrant or detainer for the attempted escape. He is still serving his original sentence, three years, he gets out. He embraces that chance for two months to pursue a life to avoid crime? No. No. He goes back to stealing cars and gets picked up, violates probation and is sent back to prison . . . Did he take advantage of the two months that the prison system made a mistake and let him out on the street to change his way? No.

T9631-32.

The improper testimony and argument was allowed to be presented to the jury without objection, leaving them with the belief such a mistake could happen again and Mr. Troya would be accidentally released if not sentenced to death.

### 4.      Counsel failed to object to misleading testimony on whether Mr. Troya was wearing civilian clothes

On direct examination the government intentionally presented misleading testimony to the jury, without objection, referring to a photo and saying

> Q. Look at 1006.7. What are we looking at here?
>
> A. The blue pants, a pair of state issued pants cut into a pair of shorts. The shirt is the liner from an inmate issued jacket that is issued to the inmates.
>
> Q. Are these the civilian clothes or clothes made to look like civilian clothes that Troya was caught in?
>
> A. Yes, sir.

T7991-92.

In fact, it was the other two inmates, not Mr. Troya, who were caught with civilian type clothing on and by the time the government's witness arrived at the institution, the civilian clothes had already been bagged into evidence. T8011-12. He did not see Troya in civilian clothes, and no report related he was captured in civilian clothes. While the error was later brought to the jury's attention, the misleading testimony was left unstricken.

170

### 5. Trial counsel were ineffective in failing to object to comment on Mr. Troya's silence.

During the defense cross of Inspector Glover, the defense elicited from him that another participant, Vonlydick, told the witness he had planned the escape for a month and a half, pulled the others into it late, and that he was one who stole the jack. T8014. On further cross, the witness testified Vonlydick also told him Mr. Troya told Vonlydick he, Troya, was going to turn himself into authorities after getting away from the prison. The witness Glover also testified Vonlydick told him he, Vonlydick was the one who had the idea for the dummies, and planned the whole escape. T8014.

In an unlawful effort to undermine these answers from cross-examination, on redirect, AUSA Kastrenakes intentionally asked a question and received an answer in direct violation of Mr. Troya's right to remain silent.

> Q. Mr. Eisenberg spent some time going over what Vonlydick told you as an investigator?
>
> A. Yes.
>
> Q. That was not confirmed by Mr. Troya, correct, sir?
>
> A. Right.

T8017.

As the government well knew (and as defense counsel should have), the witness's report shows when he tried to question him, Mr. Troya invoked his right to remain silent. Appendix E.1 at 4. As it stood, the jury thought Mr. Troya had either said something contrary (and thus more incriminating) than what Vonlydick said, or that he refused to answer questions. The question and answer were unlawful and misleading.

171

**6.      Counsel's ineffective cross misrepresented facts to the jury, and counsel had to be corrected by the witness**

During cross, defense counsel inaccurately downplayed whether there were bars on the windows and the ease with which they could be breached, comparing them to windows from Home Depot. This representation was shown to be inaccurate on redirect. T8007, T8016.  Yet it continued into re-cross by defense counsel, who thought the window crank was on the windows at all times, when the testimony showed it had to be checked out, and was instead misappropriated. T8019.

**The Defense Case**

Trial counsel made numerous affirmative errors that prejudiced Mr. Troya's ability to secure a life sentence from the jury.

**7.      Counsel were ineffective for calling a witness they knew or should have known would invoke his right to remain silent in the jury's presence, significantly undermining the defense case for life.**

Karl Busch, the leadoff witness called by the defense, affirmatively damaged the case for life when he invoked his right to remain silent in the jury's presence in response to questions about his participation with Mr. Troya in other charged and uncharged criminal activities. His non-answers opened the door to the government drawing out facts inferring Mr. Troya had engaged in criminal activities the jury would think the defense was otherwise hiding from them. Though there was ample evidence available to the defense before trial, the defense was completely ignorant of this issue and stumbled into its introduction in their penalty phase case. Another witness who was called could have attested to the same helpful facts as did Mr. Busch, without the damage his testimony did.

The defense called Karl Busch as its first witness, primarily to dispute the purported facts of the felony battery on Mr. Busch's mother, Carol Pawlowski. Mr. Busch testified that his

172

mother was drunk and initiated the confrontation with Mr. Troya. He testified that on May 31, 2000, he was living with his mother, Carol Pawlowski, and was about 15 or 16 years old. He and Mr. Troya (then only 16 at the time?) were hanging out, working on bicycles, when his mother drove up and wrecked the car on the curb two feet from them. She was drunk, screaming and yelling, and when Mr. Troya tried to get on his bike, she grabbed him, and started slapping him on back of his head around the ear. Mr. Troya put up his hands, fumbled a bit, and made a defensive move.  Mrs. Pawlowski tripped and her face hit cinderblock, thus causing her injuries. T8707. He testified Mr. Troya did nothing to bring this about, and only acted defensively; had he not done so, she would have hit him a few more times. Busch testified Mr. Troya didn't use excessive force.  T8707.

After Mrs. Pawlowski fell, Mr. Troya looked at her son and asked what he should do. Busch said to leave and he would call an ambulance. The next door neighbor called an ambulance. His mother was abusive, and refused treatment, as hospital records also showed. T8709-10.

The government pounced. Its first questions on cross linked the witness to other, even more recent, criminal activity he had engaged in with Mr. Troya, which were the thefts of cars beginning in 1999. T8711. The witness invoked his right to remain silent. At sidebar, the government moved to strike the testimony and argued there was no Fifth Amendment right because the statute of limitations had passed. T8712-17. In particular, the government had evidence that just two days before this battery incident the witness and Mr. Troya stole a car together, a $45,000 BMW; The Government also presented that when Mr. Troya pled to that crime, he protected the witness from prosecution for it, so the witness could be said to have a bias in his favor. T8713. Having failed to conduct the appropriate investigation or trial

173

preparation, defense counsel Eisenberg was unaware of the conviction for stealing the BMW, telling the Court, he didn't think Mr. Troya had been convicted for that crime. T8713.

The Court counseled the government against striking the testimony, and the government relented. The Court instructed the witness he did not have a Fifth Amendment privilege not to answer since the statute of limitations had run on any potential charges. However, the Court advised the witness that he was under oath, and had to be truthful or be subject to criminal penalties, and to be careful. T8732. On continuing cross, Busch denied he was stealing cars with Mr. Troya from 1999 to 2000. T8733. He admitted he stole a golf cart with Mr. Troya in 2000, and pled guilty to that; there were burglary tools in the cart. T8734. However, as to the BMW, the witness unpersuasively said he didn't recall stealing it with Mr. Troya on May 27, 2000. T8734. Asked about the specifics of his plea to grand theft (of the cart) in adult court in 2001, the witness agreed he had pled to the charge, as well as to burglary, but it was hard to recall when. T8735.  The government thus turned a defense witness with helpful testimony into a liar lacking credibility.

The government was also apparently prepared to show Mr. Busch was not even at the scene at the time of the alleged battery on his mother, and confronted him with the statements of others by which they implicitly represented they could prove it. On continuing cross, the government asked Busch improper but unobjected-to questions whether police would be wrong or a witness (Viola) would be lying if they said Busch was not at house at the time of the incident, T8736, to which Busch answered yes. T8737. He denied he came to the house after it happened and Mr. Troya told him he had to punch his mom, and denied saying okay as long as you did not hurt her. He did not recall talking about him hitting his mother, T8739. He said he was there at the  scene the whole time, told Mr. Troya to leave the scene, Mr. Troya had

174

protected himself, shielded his face, he was trying to get out of my mother's way, she tripped, she hit her face on the pavement, T8747. Continued improper questions that the witness provided a reason why police and others would say he was not there went unobjected to. T8749, ("--Q: why would Aimee Viola say to police you weren't there, why would neighbor Mr. Cass say same thing, do you know of any motivation," T8750).

Inconsistently with his testimony on defense direct, the first defense witness also admitted on cross he also did not have an engineering degree; his father was an engineer; he did engineer work with motors, but never graduated from college.  T8739.   Defense counsel should have known the correct answers to the questions he posed to his own witness.

The Government (AUSA Kastrenakes) read the plea colloquy from Mr. Troya's plea at which the facts were that the victim returned home, found Mr. Troya, who had been warned not to be on the premises, and yelled at him to leave; that Daniel Troya said "get out of my face," then struck Mrs. Pawlowski with a closed fist on the left side, knocked her to the ground, and struck her again in face.  The further agreed-upon factual basis of the plea was that Ms. Pawlowski had an orbital blow-out, her cheek bone was shattered, the bridge across her temple and eye socket were broken, she needed eye surgery for reconstruction, she had permanent nerve damage, and she could not feel the top left of her mouth. T8742.  This damaging evidence – meant to establish Mr. Troya was violent earlier in life and in other situations, including against an older woman – would have been blunted if the defense had done its job.[75]

Finally, without objection, in a purported effort to impeach the witness on Mr. Troya being polite, the government asked a series of improper questions about whether the witness was there at a series of violent acts it had accused Mr. Troya of, knowing the witness was not there

---

[75] It was also very damaging to the credibility of Mr. Troya through that of his defense to present a witness which the jury surely thought was a liar.

(shooting up a house with an AK-47, T8744, pistol-whipping a young African American woman and using a 9mm to fire into a vehicle striking a person. T8745.).

There was no good reason to even call this witness. In fact, another witness who did not need to invoke his right to remain silent and could attest to similar facts about the Pawlowski incident, Julio Perez, was readily available. T8758 et seq. Though he had access to the information which would lead Busch to invoke the Fifth Amendment and be subject to other cross undermining his credibility and damage Mr. Troya's case, counsel took no action, plainly available, to totally avoid the damage and instead put the witness on the stand.

**8.      Trial counsel's failure to object to repeated, improper questioning of defense witnesses about the improper consideration of whether Mr. Troya was taught and knew right from wrong was prejudicial.**

The government repeatedly improperly asked mitigation witnesses, without objection, about knowing or teaching the defendant right from wrong. T8916 (Maria Troya), T8965 (Lorenzo Troya). These questions improperly stated the standard for mitigation, mental or otherwise, and are also violative of *Tennard v. Dretke,* 542 U.S. 274 (2004) because they linked mitigation to the crime, as did the government's closing argument referring to the standard.

**9.      Trial counsel's failure to move for a mistrial for improper cross examination of defense law enforcement witness was prejudicial.**

Officer Key testified to Mr. Troya's assistance in the investigation of the killing of John Kamel. During its cross-examination of that witness, the government engaged in patently improper cross-examination which was both unduly prejudicial and violative of the eighth amendment and *Tennard*, in implying there must be a link of mitigation to the crime charged. On cross, the government asked the following improper questions and received the following inadmissible answers:

176

BY MR. KASTRENAKES:

Q. Do you know, sir, if this shooting has any connection at all, sir, to Defendant Daniel Troya stealing cars?

A. No.

Q. Do you know if it has anything to do with Daniel Troya --

THE COURT: Let me stop so the record is clear. No, you don't know, or no, it has no connection?

THE WITNESS: No, I don't know.
BY MR. KASTRENAKES:

Q. Do you know, sir, if this shooting has any connection at all, sir, to Defendant Daniel Troya stealing cars?

A. No.

Q. Do you know if it has anything to do with Daniel Troya punching women or pistol whipping women?

MR. EISENBERG: Objection; relevance.

THE COURT: Sustained.

MR. EISENBERG: Move to strike.

BY MR. KASTRENAKES:

Q. Do you know whether this has anything to do with Daniel Troya murdering an entire family?

MR. EISENBERG: Objection. Same grounds.

THE COURT: Same ruling.

T9086-87.

Counsel failed to object initially, then when he did, failed to obtain a ruling on his motion to strike, and failed to move for a mistrial. The jury was never told to disregard the improper

177

questioning and testimony. While co-counsel Cohen moved for a mistrial on the issues related to *Tennard*, these questions and answers were not specifically referenced.

> **10.    Without objection, the government conducted knowingly misleading cross-examination of defense witnesses charging Uncle Tito was not actually at their home in the summer of 1995.**

A substantial portion of the defense mitigation case relied on the effect of the criminal character of Mr. Troya's Uncle Tito, who the defense said stayed with the family during the summer of 1995. Though the government knew its questions were based on a false understanding of the facts, it crossed the family witnesses and implied to the jury Uncle Tito was not at the house that summer.

During the cross of Mr. Troya's father, Lorenzo, the government asked whether he was not actually in prison in Jacksonville, Florida for a year beginning in July of 1995, to which Lorenzo Troya said he was not sure. T8971-72. During the cross of Mr. Troya's brother Alex, the government referred to his oath, implying he was lying about Uncle Tito being at their home in the summer of 1995. The prosecutor asked whether Alex had a specific recollection under oath that his uncle was there the entire summer of 1995, to which Alex answered he did not recall the time span, but he was here that summer. T9003. This forced the defense on redirect to ask whether he was making up Uncle Tito and to say let's not quibble about a couple weeks here or there, it may not have been the day school let out, but he was there over a considerable period of time, not just for a week or month, to which Alex answered "right." T9004.

However, the probation records the government tried to rely on did not support that theory at all. When on the government's rebuttal case John MacVeigh testified, it was revealed that in July of 1995, Tito had been sentenced to a *suspended sentence* of one year, probation, a fine, and community service. T9186.

**11.     Trial counsel 's ineffective neglect to timely and accurately proffer the testimony of its expert witness Cunningham which would have been admissible as outside the Court's order excluding prison conditions evidence.**

While counsel objected to the Court's exclusion of Dr. Cunningham's testimony, he failed to adequately and timely proffer to the Court those portions of his testimony which this Court would most likely have found admissible. The Eleventh Circuit concluded the exclusion was harmless, but its effect on the jury should be considered in assessing the cumulative nature of the prejudice resulting from counsel's neglect.

This Court invited the defense to proffer Dr. Cunningham's testimony. Both sides advised the court some of what Cunningham would testify to T7778, T7825.  Troya's counsel later submitted copies of Dr. Cunningham's original report, which had been shared with the government before the sentencing hearing, and a shorter, supplemental report that largely summarized the original one. Doc. 862-1; Doc. 1103-3. Making it clear it was only excluding prison conditions, not other testimony, this Court told trial counsel it wanted to make sure he understood, if there was something different the defense wanted to introduce aside from prison conditions, the Court would be happy to look at that. T8356. Counsel did not bring other matters Dr. Cunningham could attest to this Court's attention.

In fact, the later proffer shows Dr. Cunningham would have attested to mitigating matters that went far beyond prison conditions. To rebut the implications that Troya would be violent if sentenced to life and that prison provided a fertile setting for such conduct, Cunningham would have explained that his individual characteristics actually point to a diminished risk of assaultive conduct while incarcerated, below even the already low rate for maximum-security federal prisoners generally; that he would "likely make a positive prison adjustment (i.e., without serious violence)"; and that he could be safely managed given the security conditions in a United States

179

Penitentiary. Doc. 862-1; Doc. 1103-3. As Cunningham observed in his report, "prison represents a fundamentally different context from the community." Doc. 862-1 at 10. He would have explained how factors about Troya, cited in the government's evidence and summation comments, from which jurors would naturally infer dangerousness, are actually not associated with a greater incidence of prison violence, as empirical studies show. These factors include: (1) the seriousness of the capital crime, including the fact it involved multiple victims; (2) the fact it involved a criminal enterprise; (3) Troya's alleged record of other violence in the community; and (4) the fact he would be serving a life sentence without any hope of release. Doc. 862-1 at 10-11; Doc. 1103-3 at 2-3.

On the contrary, Cunningham would have described for jurors how these same studies show that inmates who share Troya's individual characteristics actually display a lower incidence of prison violence, thus indicating that he too would pose a diminished risk. (Doc. 862-1 at 12: "Troya's risk of violence in prison is considered to be well below the broad group rates."). These characteristics, as explained in Cunningham's reports, include:

> **(1) Age:** "Age is one of the most powerful predictive factors for prison misconduct, and aging inmates having progressively lower rates of misconduct." Troya was 25 years-old at the time of sentencing, and thus less of a risk that inmates in their late teens or early twenties.

Doc. 862-1 at 11-12; Doc. 1103-3 at 2.

> **(2) Education:** Troya had completed his GED in 2002, and "large scale studies have demonstrated" that inmates who have a high-school or equivalency diploma have "significantly lower rates of violence in prison," i.e., are "half as likely to be involved in assaultive conduct" in high-security prisons.

Doc. 862-1 at 12; Doc. 1103-3 at 2.

> **(3) "Continuing community relationships":** Through the time of trial, Troya received regular visits from his parents and sister, and routinely talked on the phone and corresponded with other family members. "Inmates who have

180

continuing contact with community members tend to have better prison adjustments."

Doc. 862-1 at 12; Doc. 1103-3 at 2.

> **(4) Correctional history:** Notwithstanding the escape attempt and the incident in which his mother sent him money without authorization, Troya had been incarcerated in state prison for more than four years, and in federal jail for more than two years without any incident involving a serious assault. This too pointed "to a continuing pattern of nonviolence in BOP."

Doc. 862-1 at 12; Doc. 1103-3 at 2.

That some of these factors, such as age and education, do not seem intuitively related to non-dangerousness made it all the more critical for the jury to hear Cunningham's testimony. Cunningham also would have testified that "rates of serious violent misconduct among inmates in BOP are relatively low, even at a United States Penitentiary level," and that "[c]orrectional procedures and security interventions are available in BOP to manage inmate conduct." Doc. 862-1 at 11, 13. The low base rates of violence were relevant rebuttal because they were needed to explain and convey the significance of Troya's posing a lesser risk than most other USP prisoners.

The security conditions were relevant to explain and bolster Cunningham's conclusions that Troya could be safely managed. And both the low violence rates and the security conditions were highly relevant to correct the misimpression, created by the codefendant's expert Aiken testimony (and by testimony that state prison officials had once mistakenly freed Troya), of the federal prison environment as a lawless community, barely under control, where contraband, weapons, fights, and assaults are prevalent.

Finally, Cunningham also could have reassured jurors that Troya would not pose an escape risk. He would have explained that, if sentenced to life, Troya would be confined to a USP or an even higher security institution. He would have described the security architecture,

181

staffing, and procedures of a USP, which are "vast[ly] different" from those of a state youthful-offender "dormitory." And he would have testified that escapes from USP's are "extraordinarily rare," with "only two instances . . . in the past 10 years." Doc. 862-1 at 13; Doc. 1103-3 at 2.

All of these factors are extremely likely to have affected the outcome of the sentencing verdict, especially taking them into account cumulatively with other evidence the jury did not hear due to counsel's ineffectiveness.

> **12. The government's improper and false vouching, along with its reference to non-record facts, in its assertion that it would continue to investigate and prosecute Varela for the murders was improper and unlawful; was met with no objection from the defense; and essentially canceled out the "culpable codefendant" mitigation presented by Mr. Troya.**

To counter the powerful mitigating fact the leader and organizer of the murders was not even facing the death penalty, AUSA Kastrenakes vouched for his office and law enforcement and to facts not in evidence, intentionally misleading the jury into believing that Varela was still being investigated and could and would in fact eventually be charged with the murders. Astonishingly, there was no defense objection to this profound misconduct on the part of the government in obtaining sentences of death.[76] Given the central importance of Varela's role to the case, and Mr. Troya's right to rely on his escaping the death penalty as a reason for not imposing death in this case, there is a more than reasonable likelihood that this improper argument influenced the outcome of the sentencing verdict.

---

[76] This issue was raised on direct appeal as plain error and rejected as without merit without further comment. *United States v. Troya and Sanchez ,* 733 F.3d  at ___  . Such treatment certainly cannot be considered a finding the argument was proper, since that is not the standard for plain error.  The plain-error standard requires that the error was obvious and that it violated the defendant's substantial rights. If so, the Court may grant relief, guided by whether the error affected the fairness, integrity or public reputation of the judicial proceedings. *See United States v. Olano*, 507 U.S. 725, 734-35 (1993); *United States v. Foree*, 43 F.3d 1572, 1579 (11th Cir. 1995); Fed. R. Crim. Pro. 52(b).

One of the primary defense themes in mitigation was that, according to the government's evidence, Varela was the leader of the drug-trafficking organization and was ultimately responsible for the deaths of the Escobedo's, yet did not face murder charges, let alone a death sentence. It was the first mitigator Troya's counsel turned to in summation, and the one he emphasized above all (calling it "huge" and something that "in and of itself demands" a life sentence). It was a statutory factor, explicitly recognized by Congress, that "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death." 18 U.S.C. § 3592(a)(4). The defense reminded jurors that the indictment had described Varela as an unnamed co-conspirator in the carjacking of the Escobedos. Doc. 854 at 4-7. Counsel also catalogued in detail how the government's trial presentation cast the murders as having "occurred to benefit Daniel Varela," who supposedly wanted to erase his "large debt of $187,000" to Escobedo. Moreover, argued Mr. Troya's attorney, the evidence about the defendants' interactions with Varela suggested that he "was in charge," that he "directed all of the others in this case," and that Danny Troya was, at most, just a "worker," a "follower." T9567-72, T9600.

The government's proof amply supported these arguments. It showed Varela employed Sanchez and Gutierrez in his drug business, and paid them to deliver drugs. T5972-73. Varela owned the cocaine that was seized when Lopez and Sanchez were each arrested several months before the killings, and thus it was, according to the government, Varela who owed a debt to Escobedo – not Troya or Sanchez. T6471-77.

Varela rented the Garden Court residence, in which a significant quantity of drugs and multiple weapons were stored. T4035-40, T4300-01, T5430. Varela is the one who decided Vetere could not accompany Sanchez and Troya when they went out on the night of the killings. T5446. Varela was in close phone contact with Sanchez in the hours leading up to them.

183

GEX760.1-760.15. Afterwards, he directed Vetere to hide the Escobedos' jeep at Vetere's grandmother's house T5465-66. Varela asked the owner of a body shop to alter the appearance of the van that was involved in the crime. T3672-74. And Varela kept the bulk of the 15 kilograms of cocaine that were taken from Escobedo's jeep. Indeed, the government itself would later invoke this litany of trial evidence at Varela's sentencing to argue that he was legally responsible for the deaths. And, in imposing the maximum available punishment, life imprisonment, this Court would find it was "absolutely satisfied far beyond a preponderance of the evidence that Danny Varela is as much responsible for the killings of the Escobedo family as Mr. Troya and Mr. Sanchez." As the court would put it, Varela "may not have been on the side of the Turnpike, he may not have had a gun in his hands, but he was calling the shots from his home base in Palm Beach County." Doc. 957 at 55.

But at Troya's sentencing hearing, the prosecutors undercut the amply proven, Congressionally recognized mitigator of Varela's non-exposure to a murder charge (let alone the death penalty) despite his (at least) equal culpability, with an unsupported and misleading argument: that the government would continue to investigate Varela and would re-prosecute him capitally as soon as it obtained enough evidence against him. This argument, which was both false and a flagrant form of vouching and reliance on non-record evidence, violated the Sixth and Eighth Amendments, and the Due Process Clause of the Fifth Amendment, as well as the FDPA, 18 U.S.C. § 3592(a).

The prosecutors planted this idea in their closing argument at the guilt trial:

> Rest assured, there are no deals from the United States of America with that drug kingpin, there are no deals. And this investigation is not over, and the investigators who have dedicated the last three years to this case will continue to look for evidence and gather

> evidence and when and if there is sufficient evidence to charge Mr. Varela with murder, it will be brought before a jury of his peers.[77]

T7414.

Anticipating the defense argument comparing Varela's culpability and the absence of any murder charge and consequent exposure to a death sentence, the government tried in its opening summation at sentencing trial to minimize Varela's role. T9497, 9616. But then later, the government unloaded its extraordinarily improper argument without objection:

> Danny Varela is not an equally culpable co-defendant not facing the death penalty. Have you heard any evidence that anybody from the Government's side of the table made some deal with Danny Varela? None, zero. There is no deal with Danny Varela. When the evidence is there, he will be prosecuted, and he will face another jury of his peers.

T9637-38.

On the verdict form, most of the jurors accepted *the fact* that Varela was equally culpable but was not presently facing the death penalty, as ten of them found the statutory mitigator. Doc. 859 at 12. But they yet may have given the factor little or no weight. Indeed, it appears from a newspaper article, published after trial, that jurors intently focused on Varela's culpability and punishment, but accepted the government's misleading argument and used it to help justify their death verdicts. Juror Rick DeCresce provided powerful evidence of the prejudice:

> There were two things . . . that DeCresce said jurors spent the most time discussing before returning their verdict. The first was what

---

[77] Jurors had further reason to trust that the investigators would doggedly continue to "gather evidence" against Varela, for, in summation, the prosecutor also improperly vouched for the "effort and dedication," as well as the skill, they had displayed thus far. (*See*, e.g., T7415-16: referring to government witnesses as "these fine agents," and noting the "evidence was gathered by dedicated, hard-working law enforcement"; T7426-27: "The Drug Enforcement Administration should be proud of the work they did in this case . . . . Agent Weeks, Agent Birch, fabulous job . . . Palm Beach Sheriff's Office . . . has a good group of people working for him . . . . The effort and dedication, they deserve praise from this community"; T7437: "Folks, the cases don't get better than this").

185

> they believed was the equal culpability of Danny Varela . . . . almost all of the jurors believed that Varela was behind the murders. "I'll say this, and I said this several times while we were back there, the biggest travesty in this case is that Danny Varela was not sitting at that table," he said. *Assistant U.S. Attorney John Kastrenakes provided the only explanation as to why that never happened, DiCresce said.Kastrenakes said authorities did not have enough evidence to charge Varela, but were still investigating.*[78]

There was no record evidence whatsoever of a continuing investigation of Varela for the murders. Unsurprisingly, as of the filing of this motion, Varela has not been charged with killing the Escobedos.

The prosecutors' comments were grossly improper. By deliberately suggesting a scenario that was totally unsupported by evidence at trial and urging jurors to trust the government's *post-trial* decision making, they violated due process. *See United States v. Agurs*, 427 U.S. 97, 103 (1976) (due process is violated where prosecutor presents false evidence he knew or should have known was false). They also violated the Eighth Amendment's reliability requirement. *See Johnson v. Mississippi*, 486 U.S. 578, 590 (1988) (reversing death sentence where "the jury was allowed to consider evidence that has been revealed to be materially inaccurate"). In addition to its falsity, the government's argument was a classic form of improper vouching, for it provided jurors an "assurance . . . based on either the prosecutor's personal knowledge, or other information not contained in the record." *United States v. Lee*, 612 F.3d 170, 195 (4th Cir. 2010). The Eleventh Circuit's decisions have focused criticism on prosecutorial vouching for a particular witness's credibility, but the principle here is the same: A prosecutor may not try to bolster his case before the jury by "plac[ing] the prestige of the government behind" it or by "indicating that information not presented to the jury supports" it. *United States v. Eyester*, 948

---

[78] Daphne Duret, Brutality to Children Left Juror No Doubts, Section A, Page 1A, Palm Beach Post (Apr. 3, 2009), available on Westlaw, 2009 WLNR 9072225 (emphasis added).

186

F.2d 1196, 1206 (11th Cir. 1991). Such vouching "severely impairs the likelihood of a fair trial." *Id*. This principle specifically prohibits a prosecutor from describing or touting his office's death-penalty decision making in the case. *See Brooks v. Kemp*, 762 F.2d 1383, 1410 (11th Cir.1985) (*en banc*) (argument "improperly implied to the jury that the prosecutor's office had already made the careful judgment that this case, above most other murder cases, warranted the death penalty"), vacated on other grounds, 478 U.S. 1016 (1986).

These are improper arguments any reasonably effective counsel would have objected to. The defense here did not. Without objection, the jury was permitted to consider the government's improper argument as a basis for a death sentence.

> **13.      There were a number of additional improper arguments to which counsel failed to object.**

The government also made the following improper arguments which defense counsel failed to object to or otherwise seek a cure for, thereby denying their client the constitutionally effective assistance of his counsel:

During opening summation, the government engaged in a number of improper arguments to which counsel failed to object:

> a.      That Mr. Troya exhibited a lack of remorse. T9508. This argument violates the Fifth and Eighth Amendments and Mr. Troya's right not have his silence used against him.
>
> b.      That the defense was engaged in a contest of how much mud can be thrown against a wall and how much it sticks. T9510. Such argument improperly denigrates mitigation and defense counsel.
>
> c.      The fact Mr. Troya's grandmother died was tragic, but there was not anyone on the jury who hadn't had that happen to. It was a fact of life, not a mitigator; it had nothing to do with whether he should receive the maximum punishment; it was merely a "distraction." T9514. This argument improperly denigrates mitigation, and improperly calls for a causal link to the crime.

d.     How many murders and attempted murders are required before you forfeit your right to exist in this society? T9516, 9519. Later, the government argued that if this crime doesn't fit the need for maximum penalty, where are we, if not this case, what case, how many more murders will it take, does it take 6, 20; that we have 4 here, and 2 little kids. T9521. That a line was crossed, and can't be "excused" with life without parole as if this was just like any other murder, as if they were just drug dealers; two little kids were murdered brutally, an entire family slaughtered. The government argued if this case doesn't qualify, he did not know what will ever. T9522. These arguments also minimize mitigation, suggesting no amount can be sufficient to outweigh aggravation when there are four murders, or murders of children. It also improperly compares cases not of record, and further leaves jurors with the sense that the prosecutor, who is privy to a range of cases, should be trusted to know which deserve death and which do not.

e.     That the defense will say there are many mitigators, but that is nothing more than a different translation of it's not my fault, to excuse conscious choice to take innocent lives, invoking community conscience, urging jurors not to fall for it. T9517, 9519, 9521-22. This argument minimizes and distorts mitigation by falsely calling it an" excuse," and invokes an improper "conscience of the community" argument when the only issue before the jurors was whether an individualized assessment of Mr. Troya's moral culpability led to death or life imprisonment as the proper punishment.

f.     That anything other than death would not be justice, but would be avoiding your duty, passing the buck. T9523. The argument that duty or justice requires the death sentence violates the Eighth Amendment.

During the concluding closing argument at the sentencing trial, the government made the following improper arguments to which the defense also failed to object:

a.     That the issue is the appropriate sentence for mass murderers, not whether Uncle Tito was in West Palm Beach for 30 or 60 days. That defense counsel talked a lot about that, but the trial was not about Uncle Tito, it is about Sanchez and Troya and the events of October 13, 2006. T9604.This argument improperly urged the jury to ignore mitigation. Trial counsel's failure to object to what was a litany of comments denigrating mitigation would reasonably have left the jurors believing that the government's presentation of the law and of their role was correct.

b.     Comparing jury service to serving one's country in war. T9605.

c.     Again, that jurors act to impose death as the conscience of the community. T9607.

188

d. That as to the co-defendant Sanchez, that there was no evidence that a rough childhood led to this brutal mass murder, it was ridiculous, and we know it's ridiculous because we tested for any effect. T9617. *See* T9633. This argument unlawfully minimizes mitigation and violates *Tennard* by requiring a causal connection; suggests that the same mitigation must exist for any defendant involved in an offense; and further tells the jury that mitigating evidence can be "tested for."

e. That there was no evidence Mr. Troya had below-average intelligence or learning disorder or that he did not know right from wrong or could not control his behavior. T9631. This argument relies upon a nonexistent standard for establishing mitigation (knowing right from wrong), and improperly invokes the absence of mitigation as aggravation, all in violation of the Eighth Amendment.

f. That Mr. Troya is "evil." T9634. This is improper name-calling, and a highly objectionable and dehumanizing argument in a capital case.

After closing, counsel Cohen cited *Tennard* and said mitigators need not relate to the offense, but AUSA Kastrenakes had left them three times with the impression they do. While counsel moved for a mistrial, which was denied, they did not seek a curative instruction for these wildly improper remarks. T9644. *See* T9663, T9666 (trial counsel's argument).

> **14. During sentencing summation, trial counsel ineffectively conceded Mr. Troya's involvement in two uncharged shootings which were included in the nonstatutory aggravating circumstance, contrary to the Fifth, Sixth and Eighth Amendments.**

In sentencing summation, trial counsel conceded Mr. Troya's involvement in two uncharged shootings, stating: "And we know … that Daniel did two other shootings[.]" T9558-59. Trial counsel's concession was objectively unreasonable; by admitting Mr. Troya committed these violent crimes, trial counsel conceded the nonstatutory aggravator that Mr. Troya had "participated in other, uncharged serious acts of violence." Trial counsel's deficient performance prejudiced Mr. Troya.

189

### A. Trial counsel's concession during summation that Mr. Troya had participated in two uncharged shootings constituted deficient performance.

Trial counsel has a duty to effectively represent a client throughout all stages of the trial, including closing arguments to the jury. *See*, *e.g.*, *Dobbs v. Zant*, 506 U.S. 357, 358-59 & n.1 (1993) (closing argument by defense counsel may be important basis for ineffective assistance of counsel claims reviewable in habeas corpus proceedings); *Dobbs v. Turpin*, 142 F.3d 1383 (11th Cir. 1998) (counsel found to be ineffective at capital sentencing stage of trial and writ granted because of, inter alia, inadequacy of counsel's closing argument). Here, trial counsel failed to provide effective representation in closing arguments to the jury because counsel inexplicably conceded Mr. Troya's guilt with respect to two uncharged shootings. *Francis v. Spraggins*, 720 F.2d 1190 (11th Cir. 1983) (counsel found to be ineffective at guilt-innocence stage of trial and writ granted because of counsel's concession of client's guilt in closing argument); *cf. Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001) (counsel found to be ineffective at guilt-innocence stage of trial and writ granted because of, *inter alia*, counsel's comment in opening statement that amounted to concession that client's taking witness stand would signal that prosecution had satisfied burden of proving charges); *Stouffer v. Reynolds*, 214 F.3d 1231 (10th Cir. 2000) (counsel found to be ineffective at guilt-innocence stage of trial and writ granted because of, *inter alia*, counsel's presentation of closing argument that was "ineffective at proffering any semblance of a defense theory").

Trial counsel's concession was not objectively reasonable. As noted above, the Government's evidence of Mr. Troya's participation in these uncharged crimes was weak: it relied exclusively on the uncorroborated testimony of a twice-convicted felon and a drug addict, Kevin Vetere, who had a significant interest in currying favor with the Government in order to

avoid a sentence of life imprisonment. Given that trial counsel's strategy was to attack Vetere's credibility for these very reasons, it was objectively unreasonable for trial counsel to then admit to the shootings in summation; doing so ran counter to its strategy of rebutting the non-statutory aggravator by highlighting the weakness of the Government's evidence as to these uncharged shootings. (Indeed, trial counsel contested the other uncharged crimes in its summation, including Yuslena Jarrett's uncorroborated account of a domestic violence incident T9565-66.).

### B.      Trial counsel's deficient performance was prejudicial.

As noted above, the Government relied heavily on the uncharged shootings in its arguments to the jury for why it should sentence Mr. Troya to death. The undersigned incorporate by reference the facts and arguments pled herein, as they similarly demonstrate that trial counsel's concession of the uncharged shootings in summation was prejudicial to Mr. Troya, and that but for counsel's deficient performance, there is  a reasonable probability that at least one juror would have struck a different balance with respect to the sentence.

These highly prejudicial arguments are reasonably likely to have affected the outcome of trial. If even a single juror may have been persuaded to choose the death penalty over life imprisonment due to the panoply of improper arguments by the prosecutor, Mr. Troya's death sentence must be reversed.

### XIII.   MR. TROYA'S CONVICTIONS FOR CONDUCT PRIOR TO THE AGE OF EIGHTEEN WERE UTILIZED IN AGGRAVATION TO OBTAIN A DEATH SENTENCE FOR MR. TROYA. COUNSEL'S FAILURE TO OBJECT TO THEIR USE AND THE CORRESPONDING SENTENCE VIOLATES THE SIXTH AND EIGHTH AMENDMENTS.

Mr. Troya's conviction for felony battery against Carol Pawlowski and arrest for battery at Palm Beach Public School and other arrests, adjudications, and convictions the Government presented to the jury in aggravation resulted from conduct prior to Mr. Troya turning eighteen. Use of these convictions and arrests obtained while Mr. Troya was a juvenile to enhance Mr.

Troya's sentence is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. Counsel's failure to object to the use of these convictions and conduct was ineffective and prejudiced Mr. Troya in violation of the Sixth Amendment.

The Eighth Amendment's prohibition against cruel and unusual punishment "guarantees individuals the right not to be subjected to excessive sanctions." *Roper v. Simmons*, 543 U.S. 551, 560 (2005). That right "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned'" to both the offender and the offense. *Id.* (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)). "The concept of proportionality is central to the Eighth Amendment." *Graham v. Collins*, 506 U.S. 461 (1993). The Supreme Court has viewed that concept less through a historical prism than according to "'the evolving standards of decency that mark the progress of a maturing society.'" *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86,101 (1958) (plurality opinion)).

In *Roper*, the Supreme Court made clear that juveniles - even when they are 16 years old - lack the maturity and responsibility of adults, and as such "their irresponsible conduct is not as morally reprehensible as that of an adult." *Roper*, 543 U.S. at 570 (internal quotations omitted); *see id.* ("Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment.") *Roper* ultimately established a categorical bar for sentencing juveniles to death. *Id.*

Here, in Mr. Troya's case the Government used a felony battery conviction as an aggravator. The offense date was May 31, 2000, when Mr. Troya was seventeen years old. Appendix F-1. Although Mr. Troya's case was transferred to adult court, he was clearly a juvenile and fell within the strictures and reasoning of *Roper*.

192

Likewise, the Government used an arrest for a simple battery in elementary school at Palm Beach Public in aggravation. This incident was deemed not even worthy of filing a delinquency petition in juvenile court and was not pursued by the State Attorney's Office. Appendix F-2.

The use of these arrests and convictions to enhance Mr. Troya's sentence based on arrests and convictions that occurred when he lacked the maturity and responsibility of an adult constituted cruel and unusual punishment. The failure of trial counsel to object constituted ineffective assistance of counsel. These failures constitute Sixth and Eighth Amendment error. Prejudicial use was made by the government of these arrests and convictions when it argued and adduced through testimony Mr. Troya had been engaged in a life of crime and had only been out of state custody for a short time during adolescence.  It is likely the jurors were affected by the evidence.

**XIV.  TRIAL COUNSEL FAILED TO PROPERLY CHALLENGE THE "THREE-STEP PROCESS" DURING THE SELECTION PHASE, WHICH UNLAWFULLY REQUIRED THE JURY TO MAKE A FINDING OF LAW REGARDING THE PROFFERED MITIGATING FACTORS.**

The jurors that condemned Mr. Troya were misinformed by the Government and the Court regarding the boundaries of their authority and trial counsel unreasonably failed to object.

Despite the fact that the Court had already made conclusions of law regarding which of the defense's proffered mitigating circumstances was, as a matter of law, evidence that must be considered in mitigation, the jury was advised by the Government and instructed by the Court that it was up to them to determine whether they believed mitigating circumstances presented to them on the basis of evidence presented during the selection phase was actually mitigating.  The Court then compounded this error by instructing the jurors similarly.  And, trial counsel failed to even seek a remedy.

193

The Government, in contravention of well-settled Eighth Amendment jurisprudence, repeatedly informed the jury that they could decide for themselves what constitutes mitigating evidence. According to the Government, the jurors had to undertake a "three-step process" with respect to mitigation wherein they determined: 1) whether the proffered mitigating factor was proven by a preponderance of the evidence, 2) whether the proffered mitigating factor was a valid mitigator, and 3) if it was a valid mitigator, decide what weight to assign it:

> That involves a three step process as opposed to a two step process. The three step process, the same proof, the Government must prove beyond a reasonable doubt; the Defendant by a preponderance of the evidence.
>
> The middle step is different, and that you must assess whether -- let's assume defense argued that the sun coming up tomorrow morning is a statutory mitigator. We know it is not on there, and it isn't. I am using that as an example. That is a step that would be proven by a preponderance of the evidence.
> The middle step is does that mitigate, lessen the crime, does it make the crime more susceptible to being life imprisonment sentence as opposed to a death sentence.
>
> So when we have nonstatutory mitigators and aggravators, you have to assert a middle step in your deliberative process, and that would be nonstatutory aggravators. Does that aggravating circumstance tend to support the imposition of the death penalty or as a mitigator, does it tend to support the position of a lesser sentence.
>
> Then the third step, the same as before – I hope I am not being confusing. The third step is the weighing process. If it is a nonstatutory mitigator proven by the preponderance of the evidence, and does tend to lessen the crime, the third step is what weight should I give that in the scheme of things.
>
> So with that understanding, and I know Judge Hurley will be much more artful than I was now in explaining that to you when we turn to the jury instructions, but that is basically the process and difference between statutory and nonstatutory aggravating circumstances and mitigating circumstances.

T9627-29.

194

This erroneous and unconstitutional approach to capital mitigation was unfortunately reaffirmed and sanctioned by the Court's charge to the jury, which similarly instructed the jurors about this second step. As the Court's charge made clear, the jury was to independently determine whether each proffered mitigating factor was a valid mitigating factor before it could move onto the next step and even consider that mitigating factor in its sentencing determination:

> If the defendant asserts something that is not set forth in the statute, well, of course, the first thing you need to decide is, A, did the Defendant prove by a preponderance of the evidence that the fact in it is true. *But you then also need to decide if it is true, does it constitute a mitigating factor under the definition of what is a mitigating factor.*

T9735. (Emphasis added). The Court repeatedly emphasized this second step to the jury throughout its charge:

> Obviously when you are looking at something that is nonstatutory, whether it be aggravating or mitigating, *you need to decide that fact, whether it is indeed a mitigating factor.*
>
> I mention this because there is a reported case where in a trial one defendant listed as a mitigating factor that he was a human being. Well, of course, that is true, *but the jury needed to go to the next step and say all right, but does that constitute a mitigating factor. That is for the jury to decide.*

T9736. (Emphasis added).

> In deciding whether these factors have been established and should be considered in the weighing process, each juror must determine whether the Defendant has proven by a preponderance of the evidence, number one, that the fact asserted in the mitigating factor is true, *and with respect to nonstatutory mitigating factors, you need to decide whether the fact is indeed a mitigating factor* as I have determined and defined that term on page 15 of these instructions.

T9737. (Emphasis added).

> If you are looking at a nonstatutory aggravating fact or a nonstatutory mitigating factor, *you need to go one step further and you have to say, okay, I find that the party proved this, but is this indeed an aggravating factor. Is this indeed a mitigating factor.*

T9728. (Emphasis added).

The Court repeated the instruction before it read Mr. Troya's and Mr. Sanchez's respective proffered mitigating factors and emphasized that just because the mitigating factors were asserted, they were not necessarily actually mitigating factors; that was for the jury to decide. *See* T9742-43. During its reading of each list of mitigating factors, the Court repeatedly paused to remind the jury, over and over, that they must first determine that a proposed factor was actually mitigating before considering it. *See*, *e.g.*, T9743 (Sanchez mitigating factor 2 regarding the influence of Varela); T9744 (Sanchez mitigating factor 4 regarding no prior felony convictions); T9747 (Sanchez mitigating factor 16 regarding relationship with family); T9751-52 (Troya mitigating factor 3 regarding relationship with family).

Trial counsel failed to properly object to this "three-step process" when the Government erroneously told the jury this was their duty, when the Government argued this process in closing, and when the Court authorized the use of this process in its charge to the jury. Specifically, counsel should have objected to the second step of the process – i.e., requiring the jury to decide if the proffered evidence was actually mitigating. Such a requirement was improper because the issue of whether proffered evidence constitutes relevant mitigation is a question of law, not a question of fact. *United States v. Sampson*, 335 F. Supp. 2d 166, 228-32 (D. Mass. 2004). A death sentence may not be assessed by jurors who are "mitigation-impaired" – that is, jurors who do not recognize certain evidence as mitigating. *See Morgan v. Illinois*, 504 U.S. 719, 739 (1992); *United States v. Fell*, 372 F. Supp. 2d 766, 771 (D. Vt. 2005) ("Other jurors may have biases regarding particular forms of mitigating evidence. For example, some

196

jurors may be unable to fairly consider any mitigating evidence relating to the defendant's background or upbringing. Such jurors must be excused for cause as the Supreme Court has emphasized that the sentencer may not refuse to consider evidence relating to the defendant's background or upbringing. *See Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978).").

The second step of the three-step process violates these fundamental principles of capital sentencing by impermissibly allowed juror nullification with respect to mitigation – that is, rejecting a proffered mitigating factor established by the preponderance of the evidence solely because the juror disagreed that the particular category of evidence constituted legally-cognizable mitigation.

Counsel's failure to properly object to the three-step process was objectively unreasonable. There was no strategic or tactical reason for counsel to refrain from raising this challenge and counsel's deficient performance in this regard resulted in prejudice to Mr. Troya. Specifically, there is a reasonable probability that the adoption of the three-step process, as reflected in the jury instructions, as well as the Government's closing argument, resulted in one or more jurors engaging in nullification and impermissibly refusing to consider constitutionally relevant mitigating evidence. But for counsel's error, there is a reasonable probability that the outcome of the selection phase proceeding would have been different.

**A.      Counsel's Failure to Properly Challenge the "Three Step Process" was Objectively Unreasonable and Constituted Deficient Performance.**

Trial counsel has a duty to ensure that a capital sentencing jury is instructed correctly concerning its deliberations in the penalty phase proceedings, especially with respect to its consideration of the proffered mitigating factors. This duty necessarily includes properly objecting to any aspects of the jury instructions or the verdict form that are inaccurate, confusing or legally incorrect. *See* ABA Guideline 10.11(K), 31 Hofstra Law. Rev 913, 1058 (2003) ("Trial

counsel should request jury instructions and verdict forms that ensure that jurors will be able to consider and give effect to all relevant mitigating evidence. Trial counsel should object to instructions or verdict forms that are constitutionally flawed, or are inaccurate, or confusing and should offer alternative instructions.")[79] Here, the argument that the jurors had to decide whether certain evidence was constitutionally mitigating was an incorrect and constitutionally flawed statement of the law. Specifically, the second step impermissibly required the jury to make a finding of law – namely, whether a proffered factor actually constituted relevant mitigating evidence. What constitutes "relevant" mitigation is clearly a legal question, and one which is vested with the Court.

Indeed, as the record demonstrates, the Court and the parties themselves recognized that the inquiry posed by the second step was fundamentally legal in nature and that any disputes about whether a proffered factor was mitigating was a legal question to be resolved by the Court. The Government, trial counsel, and the Court went through each proposed mitigating factor that was submitted on behalf of Mr. Troya and Mr. Sanchez, and the Court made legal findings as to whether each proffered factor constituted, as a matter of law, a constitutionally relevant mitigating factor that should be presented to the jury for its sentencing deliberations. *See* T9369-9458. As the Court explained, in reviewing each proposed mitigating factor, "the issue becomes *legally* are they mitigating factors." T9140 (emphasis added).

---

[79] *See also* Commentary to *ABA Guideline* 10.11(K), 31 Hofstra Law Rev. at 1068-69 ("It is essential that counsel object to evidentiary rulings, instructions, or verdict forms that improperly circumscribe the scope of the mitigating evidence that can be presented or the ability of the jury to consider and give effect to such evidence. ... [C]ounsel should request instructions that will ensure that the jury understands, considers, and gives effect to all relevant mitigating evidence. ... If the jury instructions are insufficient to achieve the purposes described [above] or are otherwise confusing or misleading, counsel must object, even if the instructions are the standard ones given in the jurisdiction.")

198

The Court, in fact, struck certain proffered mitigating factors on the ground that they did not constitute legally cognizable mitigating factors. *See* T9409 (striking proposed mitigating factor regarding the harshness of life without parole because "as a matter of law … it is not a constitutionally relevant mitigating factor"); T9426 (striking proposed mitigating factor regarding execution impact evidence because "it is not a constitutionally relevant mitigating factor"); T9437 (striking proposed mitigating factor regarding residual doubt because it is "not an appropriate mitigating factor"). As the Court later explained, it sought to determine which proposed mitigating factors were "cognizable" and "to make judgments as a matter of law if [a proposed mitigating factor] is excludable as a matter of law." T9476, T8487.

Having given the Government an opportunity to object to any of the proffered factors on the ground that the factors in question were not actually mitigating, and having ruled on those objections, the Court itself properly conducted the second step of the "three-step process" with respect to the defense-proffered factors. In other words, the list of proffered mitigating factors was properly screened to ensure that only those factors that were actually mitigating as a matter of law would be included on the special verdict form. In light of this fact, counsel should have objected to any argument or instructions that permitted the jury to overrule the Court's legal determination that these mitigating factors were actually legally cognizable and constitutionally relevant mitigating factors. Counsel, however, unreasonably failed to do so.

Counsel had numerous opportunities during the charge conference to object that the second step impermissibly required the jury to make a finding of law, but it made no such objection. For example, during the charge conference, the Court asked defense counsel: "Does defense take issue with the fact that they have an obligation to establish that the asserted ground is in fact a mitigator?" T9481. Counsel Eisenberg responded: "The general principle, we don't

199

have a problem with." T9481-82. Later, the Court stated: "[T]here is a two step process. The first is: Has the fact been established by a preponderance of the evidence, and, if established, is it something that mitigates? … [T]he jury has to decide [if] the fact is true and if it is true, *is it something which constitutes a mitigating factor*." T9482. (Emphasis added). Again, counsel did not object.

During breaks in between closing arguments and at the conclusion of those argument, the Court again affirmed its intention to instruct the jury that it needed to independently determine whether a proffered mitigating factor was valid before considering it, and once again, counsel failed to object. T9625, T9650-52, T9656, T9660, T9669. The Court gave the parties an additional opportunity to object to that instruction on mitigating factors immediately after that charge was read, T9738, and once again at the conclusion of the charge. T9762. Counsel repeatedly failed to make any objection that such an instruction would impermissibly require the jury to make a *legal* determination about whether a proposed mitigating factors on the verdict form actually "constitutes a mitigating factor."

No tactical or strategic rationale that can excuse counsel's deficient performance. Quite the contrary.  Motions and objections during jury selection make clear that it was trial counsel's strategy to preclude venire members who could not consider or give effect to mitigating evidence put forth by the defense from the jury.  During jury selection, trial counsel pointed out that the Court's voir dire would not identify "mitigation-impaired" jurors. On this record, it was objectively unreasonable for counsel to waive any prior objections it raised on this matter, or to otherwise fail to make an objection that was entirely consistent with the aim of insuring that its mitigating factors would be given due consideration by the jury. Trial counsel's failure to challenge the second step of the three-step process was objectively unreasonable.

200

At the time of Mr. Troya's trial, there was readily available case law that established the basis of the objection that counsel should have made. Although the Supreme Court has stated that trivial or unimportant evidence should be excluded as irrelevant to the issue of mitigation, *Tennard v. Dretke*, 542 U.S. 274, 286-87 (2004), the Court has long held the view that the standard for relevance with respect to mitigation is broad: "[T]he question is simply whether the evidence is of such a character that it might serve as a basis for a sentence less than death." *Id*. at 287 (internal quotation marks and citation omitted). Furthermore, there are certain categories of evidence that the Court has recognized always constitute relevant mitigating evidence as a matter of law – namely, information about a defendant's background and upbringing. As the Supreme Court has noted, evidence "about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background ... may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989).

Consequently, the Supreme Court has held that jurors who cannot fairly consider such mitigation evidence because they deem such evidence "irrelevant" are excusable for cause. *Morgan v. Illinois*, 504 U.S. at 739 (1992). Such jurors "not only refuse to give such evidence any weight but are also plainly saying that mitigating evidence is not worth their consideration and that they will not consider it." *Id*. at 736. As the Court recognized, a juror cannot properly refuse to consider a mitigating factor on the grounds that it is "irrelevant" because whether evidence constitutes relevant mitigation is a matter of law, and in order to serve on a trial, a juror must swear to impartially follow the law as set out by the court's instructions. *Id*. at 738-9.

Indeed, in several federal death penalty prosecutions that were tried prior to Mr. Troya's case, a number of district courts relied on *Morgan* and *Penry*, as well as other relevant Supreme

201

Court precedent, to find that jurors who evinced a bias against certain categories of mitigation were excusable for cause under *Morgan*, because such jurors had plainly demonstrated that they could not impartially consider the evidence in the case in reaching a sentencing decision. *See United States v. Fell*, 372 F. Supp. 2d 766, 771 (D. Vt. 2005); *United States v. Johnson*, 366 F. Supp. 2d 822 (N.D. Iowa 2005). *See also United States v. Sampson*, 335 F. Supp. 2d 166, 228-32 (D. Mass. 2004) (whether a factor is actually mitigating is a question of law, not a fact for the jury to decide).

Trial counsel failed to marshal this extant case law to object to the three-step process adopted by the Court. Not only is it axiomatic that a jury may not decide questions of law, but here there was relevant capital jurisprudence that addressed the question of what constituted relevant mitigating evidence and the proper role of a juror in assessing mitigation for its relevance. In light of this, counsel's failure to rely on favorable law to adequately challenge the second step of the three-step process was objectively unreasonable. This was especially so considering that the result of this failure was that the jury was instructed to engage in a deliberative process that was constitutionally unlawful.

### B. Counsel's Deficient Performance Resulted in Prejudice.

There is a reasonable probability that, but for counsel's deficient performance, one or more jurors would have struck a different balance during the selection phase and that the outcome of the proceeding would have been different. Counsel's failure to properly object to the three-step process had two distinct consequences which affected the jury's deliberations regarding mitigation. First, counsel's failure allowed the government to repeatedly argue to the jury that it could simply disregard any proffered factor that it deemed to be irrelevant for purposes of mitigation. Second, it resulted in an instruction to the jury that validated the

202

Government's incorrect statement of the law and effectively encouraged jury nullification with respect to the proffered list of mitigating factors.

With respect to the Government's closing, the record demonstrates the Government relied heavily on the three-step process as a tactic to encourage the jurors to simply disregard the proffered mitigating factors, even if the defense had met its burden and established a given factor by a preponderance of the evidence. Indeed, the Government repeatedly emphasized that it was the jury's prerogative, under the Court's instructions, to use the second step of the three step process to disregard the defense evidence on the ground that it did not constitute legally-cognizable mitigation. During its closing argument, the Government emphasized its erroneous instruction that it was the jury's prerogative to determine what evidence was constitutionally mitigating and essentially encouraged the jury to apply their own standards to the Eighth Amendment:

> Merely because you are required to consider something that is alleged to be mitigating does not mean that it is mitigating, that is number one. And number two, it is exclusively within your province, meaning your control and your discretion, how important those factors are. Okay?

> Notwithstanding what anybody may tell you, it is your call.

T9509.

The Government then used that instruction to argue that the mitigating factors proffered by the defense were not actually mitigating factors at all and were irrelevant to the jury's sentencing determination:

> The grandmother dies. That is tragic. Is there anybody on this jury panel that hasn't had a grandparent die? Everyone on this earth has a grandparent that dies at some point in time. It is a fact of life, *it is not a mitigator. It has nothing to do with whether or not Daniel Troya should receive the maximum punishment. It is merely a distraction.*

203

T9514.

> I don't care what your background is, I don't care if you have a low I.Q. or alcoholic father, or you slapped your mom when you were growing up or you had a learning disability or you saw a friend shot in seventh grade, or grandma died or next door neighbor committed suicide, or your uncle was a bad influence one summer. That has nothing to do with your choice later on in life on October 13th, 2006 in the middle of nowhere in St. Lucie County to choose to wipe out an entire family and to execute in cold blood two little kids.

T9521.

> This process, this phase is about what is the appropriate sentence for these mass murderers. As Mr. Carlton told you, it is not about whether Uncle Tito was in West Palm Beach for 30 days, 60 days, the entire summer of 1995.

> I heard Mr. Eisenberg spend a lot of time about that, and I was wondering what the trial was about. It is not about Uncle Tito, it is about Ricardo Sanchez and Daniel Troya, about the events that occurred October 13th, 2006.

T9604-05.

> The defense will say there are many mitigators. Those mitigators, I submit to you, despite the attempt to [clothe] them in a different title, are nothing more than a different translation of it's not my fault.

> To excuse a conscious choice exercised to take innocent lives, you should not fall for it, ladies and gentlemen.

T9516-17.

> Are four murders and three attempted murders really excused by domestic abuse, retarded brother, a low I.Q., a traumatization from a school shooting, spending a summer with a bad uncle? Is that what it comes down to, that those are the excuses?

T9519.

The Government's tactic was particularly egregious because, unbeknownst to the jury, the Government had previously been given an opportunity to object to any of the proffered

204

mitigating factors it believed did not constitute valid mitigators, and the Court accordingly made legal findings. Thus, the only mitigating factors that were actually presented to the jury were those that had been argued by the parties and had already been deemed by the Court to meet the legal threshold of being constitutionally relevant mitigating factors. *See* T9409-58.

There is no question that such argument, combined with the jury instructions, affected the outcome of the jury's deliberations regarding the mitigating factors. Indeed, the fact that the court's charge to the jury codified the Government's position provided the Government's closing arguments with the imprimatur of the law. And here, the Government's argument could not be any clearer – that is, under the law as it was given to them, the jury could disregard every piece of evidence it heard about Mr. Troya's background and upbringing as simply irrelevant to whether it mitigated the capital crime of which he had been found guilty. Had any juror voiced such an opinion in voir dire – i.e., that he or she could not fairly consider evidence of Mr. Troya's background and upbringing as relevant mitigation of the crime of which he was accused – there is no question that this juror would have been validly struck for cause. Such a juror would have been "mitigation-impaired" under *Morgan*, and therefore excludable for being unable to impartially consider relevant mitigation evidence. *Morgan*, 504 U.S. at 739.

The prejudice is demonstrable. For example, mitigator number 1 ("Daniel Troya was only 23 years old when he committed the crime in this case."), no jurors found to have been proven by a preponderance. This factor was not only uncontested, it was proven by the birthdate on numerous documents the *government* admitted into evidence to establish Mr. Troya's prior convictions. The only explanation for the zero on the verdict form is that the jurors accepted the government's improper argument and rejected that evidence as mitigating. The Supreme Court, however, has repeatedly held that youth is a constitutionally mitigating circumstance. *See*

205

*Johnson v. Texas,* 509 U.S. 350, 367 (1993) ("There is no dispute that a defendant's youth is a relevant mitigating circumstance that must be within the effective reach of a capital sentencing jury…"); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (capital statutory scheme that precludes effective consideration of defendant's age is unconstitutional; evidence of defendant's age is a constitutionally relevant mitigating circumstance which can serve "as a basis for a sentence less than death"); *Eddings v. Oklahoma*, 455 U.S. 104, 116 (1982) (age is a constitutionally relevant mitigating factor). The jury could have decided that Mr. Troya's age had little or no mitigating weight but it was not free to reject the mitigator completely and decide that it was not constitutionally mitigating.

Similarly, eleven jurors rejected mitigator number 7 ("While he was in prison Daniel Troya received a GED (8/28/02)"). This factor was also uncontested. The only explanation for why these jurors rejected what was uncontroverted evidence that an equally culpable co-defendant would not be punished by the death penalty is that they decided that the proposed factor did not constitute relevant mitigation.

These findings—inexplicable if the jurors had followed the law—lend credence to the fact that many of the jurors simply refused to consider relevant mitigation evidence about Mr. Troya's background and upbringing for an impermissible reason – i.e., they decided that, as a matter of law, such evidence was irrelevant to their sentencing deliberation. The implication of this pattern on the special verdict form is that even for factors which were contested by the Government, it is quite likely that the jurors who rejected these factors did so not because the defense failed to establish the fact by a preponderance of the evidence, but rather, because the jurors simply deemed the fact to be irrelevant for purposed of mitigation.

In *Wiggins v. Smith*, the Supreme Court noted that in a death penalty scheme where a non-unanimous jury spares the defendant's life, such as the federal system, confidence in the outcome is undermined where there is "a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. 510, 537 (2003). The Supreme Court has stressed that "the adjective ["reasonable"] is important" and has equated it with "a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). As explained in *Strickland* itself: "reasonable probability of a different result" is less than a preponderance of the evidence. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). It is present when an evaluation of all of the evidence that should have been before the jury is "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 693. Here, the jury's sentencing verdict is not worthy of confidence. The verdict form reflects that evidence regarding Mr. Troya's background and upbringing – that is, the kind of evidence that has been legally recognized to constitute valid, relevant mitigation which a jury is required to consider in its sentencing deliberations – was rejected on the basis of incorrect constitutionally flawed arguments and instructions that they received. There is a reasonable probability that at least one juror would have struck a different balance if the impermissible three-step process had not been injected into the jury's consideration of the mitigating factors. Therefore, Mr. Troya's death sentence should be vacated.

**XV.  TRIAL COUNSEL FAILED TO OBJECT TO IMPROPER QUESTIONING AND TO EFFECTIVELY CROSS-EXAMINE THE GOVERNMENT'S COOPERATING WITNESSES, SERIOUSLY PREJUDICING MR. TROYA IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS**

Even with the material the defense did have, counsel unfathomably failed to object to improper questioning, and made major missteps on cross examination. The consequent unearned credibility of the government witnesses harmful to the defense is by any measure reasonably likely to have affected the jury's verdicts.

**A.      Ineffective failure to adequately proffer and utilize impeaching information of government witnesses.**

Before its cooperating witnesses were set to testify at the guilt phase of Mr. Troya's trial, the government filed a motion in *limine* to restrict impeachment of government witnesses by "bad acts, including narcotics-related transactions." Doc. 691. When the issue was raised at the end of the first trial day, Counsel Eisenberg said he did not know what motion was filed and was not prepared to argue the issue. When reminded by AUSA Kastrenakes of the motion in *limine* pursuant to Rule 608-B, T3241, Counsel Eisenberg said he had written a response but it was on his desk, and asked if it could be argued the next day. The Court declined to wait, and ordered the parties to argue it then. T3255. Counsel Eisenberg's response was that he did not know what he was going to use for impeachment, because he did not have his file on Mr. Fernandez. T3259. The Court did not rule at that time.

Just before counsel Garcia's cross examination of Melvin Fernandez was set to begin, the issue was revisited, but counsel Eisenberg failed to adequately describe the testimony sought to be used to impeach government witnesses, so the Court excluded it. Counsel Eisenberg described in general terms the defense had information "this guy" (Melvin Fernandez) and Kevin Vetere sold innumerable illegal drugs including cocaine, Xanax, Ecstasy, and pot for a long period through 2006. He argued the witness gave false statements because he was afraid their drug dealing would be exposed, he was not at trial out of the goodness of his heart, and the impeachment went to bias. T3498. AUSA Carlton opposed such impeachment under Rules 608 and 609, arguing that type of cross is not permissible. T3498. The Court sustained the objection. T3498. As a result, the cross examination turned mostly to drug use – both of the witness and Mr. Vetere. T3502. Counsel Eisenberg tried to put on the record his objections (twice), and asked to make a proffer, but the Court interrupted him, (twice) saying it had already ruled.

208

T3501. Counsel had missed his opportunity to make a proffer, and failed to later make a written proffer of the impeachment testimony, which also would have impeached the main government cooperating witness Vetere.

Alternatively, appellate counsel ineffectively failed to raise this restriction on cross examination on appeal.

### 1.      Melvin Fernandez.

Mr. Fernandez testified for the government to incriminating statements purportedly made by Mr. Troya regarding the theft of 15 kilos in a "lick," and his recent purchase of a "donk," or classic car. T3489-91. As set forth above, counsel neglected to adequately describe for or proffer to the Court prior to cross examination the admissible bases for impeachment, resulting in the Court's denial of cross examination on these grounds. In violation of the right to effective appellate counsel, the issue was not raised on appeal.

### A.      Additional Impeachment.

Counsel could have presented impeaching testimony far beyond the weak cross conducted at trial. Carlos Bonilla knew Melvin Fernandez for many years. He could have testified Mr. Fernandez was dealing drugs through 2006 and he estimates he bought drugs from him about ten times between June and December of 2006. Melvin Fernandez was a "one stop shop" and sold everything: Viagra, Steroids, Roxys, Lorcets, Ecstasy, Xanax, weed and coke. He could and would have provided impeachment testimony about Fernandez at trial.

Alex Melendez could have similarly attested to Fernandez's drug dealing and usage.

### 2.      Kevin Vetere

The testimony of Kevin Vetere was critical to the government's case. It addressed the murder charges and was the single link to its accusation Mr. Troya had engaged in other acts of violence. *See Statement of Facts*. But counsel badly bumbled cross examination, drawing this

Court's intercessions, drawing out harmful testimony during cross, and opening the door to harmful testimony on redirect by the government. Counsel also failed to adequately object when the government improperly made a thinly veiled reference to supposed threats by Mr. Troya and to other improper questioning, described below. Finally, additional impeaching information was neglected by counsel.

### A.   More Marshals in the Courtroom.

Though well prior to the testimony of Kevin Vetere the Court brought to counsel's attention that at least one additional marshal would be present, counsel made no objection to this singularly magnified show of security for this witness. Well before Mr. Vetere was called, the Court observed a break would be needed, "if there is any extraordinary show of force, then we would take a break, I don't want that to happen in front of the jury," but did not think that would be the case. T5279. During a sidebar, the Court later advised counsel it had been told a couple of marshals would accompany Mr. Vetere when he walked in, and that the Court had been asked if the jury should be out when the witness was brought in. The Court noted the jury would know he was incarcerated and with every other incarcerated witness, civilian clothes were worn, a marshal accompanied them in and out and the Court did not see it as problem with that procedure, but wanted to run it by counsel.  The Court observed that while ten marshals would be different and show the witness had something to fear, two was no big deal. T5408. Counsel Eisenberg explicitly waived any objection to this show of extra security before the jury. T5408.

Unlike other witnesses who were in custody, in addition to having at least two marshals accompany him in the jury's presence, Mr. Vetere also wore a jacket that looked similar to a U.S. Marshal's jacket, to cover a bulletproof vest he was also provided. Such security unreasonably heightened the perception Mr. Vetere was in danger from Mr. Troya and the other

defendants because of his testimony, and so heightened the jurors' perception of their dangerousness.

### B.      Repeated improper reference to "Thug Mansion" and "Pimp Plaza"

When the government elicited from Mr. Vetere the first reference to the Garden Court residence as "Thug Mansion," T5571, counsel failed to object to this improper description. That reference was subsequently repeatedly and improperly referred to, both by government witnesses and by the government in closing, without objection. Similarly, the government elicited from Vetere cooperator Guiterrez's description of the prior residence as "Pimp Plaza" without objection then, or subsequently throughout trial and argument. T5590, 5593.

### C.      Counsel Garcia's bumbling cross examination brought out damaging testimony not touched on during direct.

**THE COURT: "None of this is appropriate cross examination…"**

T5730

While no testimony of any conversation with Mr. Troya about killing the children was elicited by the government on direct examination, Counsel Garcia inexplicably specifically directed the witness's (and the jury's) attention to it in the course of his cross examination of Mr. Vetere. In a cross composed primarily of reading back the transcript of the witness's interview with law enforcement, counsel Garcia posed this question and revealed the witness's prior answer to police:

BY MR. GARCIA:

Q. Then you go on and say, "Once I heard about the kids, I started second guessing myself as we rode around looking", and the word indiscernible, "And is that what it takes to spend a little extra money. **That's when I said, indiscernible, why did you all kill the kids?" And your answer continues, "I don't want to talk about that."**

Mr. DiVincenzo, line 11 says, "Who did you ask that?" And you said, Kevin Vetere, this is you. I asked that to Troya. He said he did not want to talk about it."

Right?

211

A. Yes.

T5723 (e.s.).  Counsel Garcia cringingly continued with this line of questioning for another page. *See* T5724. There is no sound reason for counsel Garcia to have brought this testimony to the attention of the jury, and every reason for him not to have done so. In addition to the extraordinary prejudice of the statement in itself, it also buttressed the later testimony of Carlos Rodriguez, who attested to a supposed conversation with Mr. Troya about killing the children.

After counsel fumbled through the transcript he was reading from, he advised the Court he could not find an answer he was looking for which he thought was inconsistent, so he withdrew the question T5729-30. With that, this Court called counsel to sidebar. It commented on counsel Garcia's cross examination, and the fact he was drawing out information not even touched upon during direct:

> THE COURT: Could I see counsel at sidebar for just a second, please?
>
> (Sidebar discussion on the record.)
>
> COURT: You know, as a judge, I don't want to second guess anybody, but I am very concerned about what is happening.
>
> **None of this is appropriate cross examination**, and I know the Government is sitting there not objecting because of the doors that are being opened, and I am just concerned about that.
>
> You have a statement by a witness that would never be admissible unless he has made an inconsistent statement, then you could nail him to the wall, and you are going through his statement line by line.
>
> I just want to make sure everybody understands what is happening. The Government is going to go through this thing top to bottom, and **there is things that have never come out during direct examination**.
>
> I am trying to look down the road. You folks are making strategic decisions, I don't question that. I want to make sure you are making knowledgeable decisions.
>
> Do you need a minute to talk?
>
> MR. EISENBERG: Sure.
>
> THE COURT: Okay.

T5730-32 (e.s.). Yet after his talk with co-counsel, counsel Garcia continued his inexplicable, improper, ineffective impeachment. Subsequent government objections to it for multiple improper questions were sustained by the Court. T5732, 5733, 5735.

Defense counsel's cross ended up hurting Mr. Troya more than helping, by drawing out otherwise unadmitted evidence relating to the killing of the children. Counsel's credibility with the jury was also completely undermined.

> **D.   The government engaged in prosecutorial misconduct, and it went unchecked when counsel ineffectively failed to properly object or move for a mistrial.**

> **1.   The purported prior threat.**

At sidebar prior to Mr. Vetere's testimony, the government aired its contention Mr. Vetere had been threatened by Mr. Troya through an intermediary. It announced its intent to draw out the alleged threat on redirect if the door was opened through questioning on cross about his (Mr. Vetere's) having been admitted to witness protection. T5402-04.  After a discussion of the kinds of questions which would or would not open the door to threat testimony, the Court announced if the door was opened, before it would let the government get into the threat, it would first need to hear from the person who heard the threat from Mr. Troya's mouth (not Mr. Vetere). T5406. But the government totally ignored this admonition. During redirect, without first seeking direction from the Court or otherwise proffering the testimony of the purported threat from the actual witness to it as the Court had ordered, the government unilaterally engaged in questioning through which it was made crystal clear to the jury its contention Mr. Troya had threatened the witness or done something else unacceptable to him.

> Q. Mr. Garcia asked you questions last week about **how close you had been to Defendant Troya**. Do you remember that?
>
> A. Yes.

Q. And in fact you've known Defendant Troya for the better part of your life; isn't that true?

A. Yes, it is.

Q. **But -- at some point in time, would it be accurate to say, I think it was either Mr. Garcia's words or your own words, that you had considered yourself inseparable from Daniel Troya at one point in time?**

A. Yes.

**Q. That is no longer true, is it?**

A. No.

**Q. Did there come a time not only your friendship ceased, but as a result of communications made to you, the exact opposite --**

MR. GARCIA: Objection, Your Honor. May we have a sidebar?

THE COURT: No. We don't need to. We are going to move to another area right away.

T5943-44 (e.s.). Counsel never pursued his objection, and never moved for a mistrial or sought other corrective action, though the government's misconduct cried out for such action.[80] There was already a heightened level of security in the courtroom. If there could be any doubt the government was trying to elicit the threat testimony without first presenting the witness who heard it, that doubt was erased by the government's later argument to the Court it should be permitted to explore the threat contention because counsel Garcia had opened the door on cross. T6056-60.

The government's implication threats were made by a defendant to a government witness is highly prejudicial to the jury's consideration of both guilt and sentencing. It greatly magnified the danger the jury perceived from Mr. Troya, far beyond the evidence actually admitted at trial.

---

[80] The government conduct independently violated the Due Process Clause of the Fifth Amendment.

### 2. Implication the Court and government vouched for the truthfulness of Mr. Vetere's testimony.

The government pushed far past the limits of its constitutionally permitted conduct when it engaged in its redirect of Mr. Vetere. Incredibly, it tried to persuade the jury Mr. Vetere was telling the truth because his plea agreement provided if he did not make a complete disclosure, or made false statements, the Court would have taken action to revoke his plea or otherwise punish him, and that because no such action had been taken against him by the Court, the U.S. Attorney's office or Probation, his testimony had the government and judicial imprimatur of truth:

BY MR. CARLTON:

Q. Now, with regard to your plea agreement, Mr. Vetere, did you plead guilty to every single count that you were charged with?

A. Yes, I did.

Q. Did the Government dismiss anything?

A. No, they didn't.

Q. Now, with regard to the time that you actually entered your plea, did you understand that the Government could take certain actions against you and not recommend two points, two point reduction for pleading guilty if you fail to do several things here? You see those?

A. Yes.

Q. If you fail to disclose to the probation office everything about the relevant offense conduct. Did you disclose everything?

A. Yes, I did.

Q. Were you penalized by The Court or U.S. Attorney's Office?

A. No.

Q. With regard to Subparagraph 3-B, misconduct, including, but not limited to, committing an offense or making any false statements or misrepresentations to any Governmental entity or official.

Was any action taken against you by The Court, probation office or the U.S. Attorney's Office by making any false statement?

THE COURT: I want to stop for just a second.

215

Ladies and gentlemen, this is very standard language, and you should not in any way draw any inference that the judge did not do something as somehow lending proof to the fact that The Court gave credence to that.

That is simply that nobody stood up and said something is wrong here.

So I am very concerned about this line of questioning. That is not proper at all.

These are standard provisions, and that simply indicates that no one said to, in this case myself, no one would have stood up and said, we think there is a problem, The Court should do this or that.

These are very standard provisions in plea agreements. Let's move on.

T5953-55.

No objection by counsel was made to any of this grossly improper questioning. It was the Court, not counsel, who stepped in to try to correct it. It was only after the Court directed the government to move on counsel Eisenberg belatedly piped up with a motion to strike, which was denied. T5955. Counsel should have, but failed to move for a mistrial or otherwise seek additional corrective action.

While the Court correctly intervened in an attempt to right the government's wrong, the jury was left with its ruling the improper questions and answers would stand. Further corrective action was required, and counsel should have moved for a mistrial.

### 3. Additional grounds for impeachment unexplored and overlooked by trial counsel.

Erasmo Garcia, a witness available to the defense, would have helped counter Mr. Vetere's testimony that in the morning hours of October 13 he had not been taking drugs and was sober. Mr. Garcia would have testified that around the time prior to the arrest, Mr. Vetere was heavily into drugs, and would carry around a baggie full of cocaine with a straw sticking out of it like a Capri Sun. He would have also testified Kevin Vetere was "bizarre." Appendix G at 11.

216

Carlos Bonilla, who had known Mr. Vetere since the two were young, would have testified to Vetere's constant use of all kinds of drugs, Xanax, cocaine, crack and weed, and that he had been dealing drugs since the age of 15. Carlos Bonilla would have testified Mr. Vetere never stopped using drugs: he used every day, all day. Mr. Bonilla would have also testified Kevin Vetere always "burned" people, did not have the money to pay (for drugs), even robbed people, broke into people's houses and stole things, even from his own friends. Kevin Vetere had ripped off Mr. Bonilla more than once. The witness would have testified Kevin Vetere was a liar and "master manipulator," and that he had that reputation. In addition, he would have testified contrary to the government theme at trial, Mr. Vetere never played organized baseball, and was certainly never "scouted" to play professional ball. He would have testified to other relevant, admissible impeaching evidence about Mr. Vetere.

Kevin Vetere was the single witness who connected Mr. Troya not only to the murders, but to other violent weapons crimes. The cross examination at trial fell well below the standards of that required of competent counsel in a death penalty case, and it is reasonable to conclude additional impeaching information would have affected the verdict.

### 3.    Carlos Rodriguez.

Mr. Rodriguez's testimony saying he overheard Mr. Troya make jailhouse inculpatory statements was misleadingly presented as far more incriminating than the witness actually said he heard, and it was so presented without the slightest objection from defense counsel.

In an effort to cure a potential *Bruton* violation for the codefendant Mr. Sanchez, but without objection by counsel for Mr. Troya, this Court ordered a cooperating witness to testify Mr. Troya said, "I have killed some people," when in fact the witness was claiming Mr. Troya had only said he was "involved in" killing some people, and had also used the term "we." This

alteration, resulting from the court's directive to change the plural to the singular to avoid unfair prejudice to the codefendant, was not necessary to safeguard the codefendant's confrontation rights, and it unfairly prejudiced Mr. Troya's defense.

Just before Carlos Rodriguez, a large-scale drug importer with four years left on his sentence (T4405-09; T4456-60), took the stand at trial, the government advised the court he would testify he had overheard Mr. Troya make several vague and collectively inculpatory statements to another inmate at the FDC jail in Miami two years before. According to the prosecutor, Mr. Rodriguez claimed he had heard Mr. Troya say "I did something very bad, or I have something to get off my chest," and then, later: "I was involved in killing some people, it involved children . . . I had to do it . . . . I got paid money and drugs." T4378-79, T4390. The prosecutor added that Mr. Troya had also used "the word 'we'" in the statements claiming to have been "involved" in killings. T4378-79, T4390-91.

The Court held *Bruton v. United States*, 391 U.S. 123 (1968), required eliminating the word "we" and having the witness alter his account and testify that Troya spoke only in the first person singular.[81] T4390-4391; T4431. The prosecutor concurred, and volunteered he had already "told" the witness of "the judge's ruling," and repeatedly instructed him "not to use the word 'we' to implicate any other codefendant . . ."[82] T4378; T4433.

So instructed, Mr. Rodriguez crucially altered his account. He testified to the jury he had overheard Mr. Troya's conversation with a cellmate who had served in the military in Iraq. Mr.

---

[81] The court instructed jurors that Rodriguez's testimony could only be considered against Troya. T4541.

[82] Although Troya's counsel had received no grand jury testimony or prior statements by Rodriguez as Jencks material (T4398), they did not seek further clarification of what Rodriguez had actually claimed Troya said, or how his testimony about those statements would now be altered.

Troya asked the cellmate "what is [it] like to have to kill . . . children." T4414. According to Mr. Rodriguez, Mr. Troya also said he had "something on his chest the he want to tell him about . . . . he say he done something very wrong . . . . There is some people involved. He say, he said *I have killed some people* . . . . Then he say, and those people were children involved . . .He say that is something he have to do." T4416-17; *see also* T4419-20.

Thus, before the jury, Rodriguez, apparently trying to follow the prosecutor's directive to avoid the plural, altered his testimony to create an allegation Mr. Troya had confessed, in the first person singular: "I have killed some people." The prosecutor's representation of what Mr. Rodriguez had told the government had included no such clear, direct, personal confession of guilt; rather, it had been limited to vague, collective acknowledgments of responsibility (*e.g.*, "I was involved in killing," "it involved children," *etc.*). If the debriefing of Mr. Rodriguez had solicited "I have killed some people," certainly the prosecutor would have relayed that to the court in his proffer. Indeed, the prosecutor seemed surprised by the version Mr. Rodriguez testified to, and asked him to repeat it (A: . . . he said, "I have killed some people." Q: "He said, I have killed some people?" A: "Yes, sir." (T4417)).[83]

Nonetheless, the damage had been done. In his main trial summation, the prosecutor argued Mr. Rodriguez's testimony that Mr. Troya had confessed that "I" — singular — "have killed some people":

> Carlos Rodriguez, the Federal prisoner from the Dominican Republic who was living in the Bahamas before he got caught up in drug trafficking, he testified during the trial and

---

[83] It was also telling that, when defense counsel broached it on cross examination, Mr. Rodriguez momentarily corrected him and retrenched to the actual version:
Q. And that later on he said that . . . . he had killed some people?
A. That he said he was involved in —
Q. In killing some people?
A. Killing some people.
T4462.

he is serving a 78 month sentence, and he just wants to serve that sentence. He has no agreement requiring him to cooperate in this case. He learned English in the Bahamas, his English was not perfect, but he recounted to you a conversation he had with Daniel Troya in which Troya confessed, I have done something very wrong, I have killed some people and those people were children involved.

T7173.

In rebuttal summation, the prosecutor returned to Mr. Rodriguez's testimony twice, including assuring jurors he "gave the same information" to law enforcement agents who first interviewed him "that he gave in court." T7422-24, T7455.

When the government introduces a criminal defendant's statement, it is elemental that the jury should be provided with an accurate, complete version, not a misleading, distorted one. Protection of a jointly tried codefendant's *Bruton* rights does not change this mandate and it is improper in trying to protect a jointly tried codefendant's *Bruton* rights to alter or redact the defendant's statement in a way that "effectively distorts the meaning of the statement or excludes information substantially exculpatory." *United States v. Range*, 94 F.3d 614, 621 (11th Cir. 1996).

Such distortion is exactly what occurred here when, without a peep from Mr. Mr. Troya's counsel, the court directed Mr. Rodriguez to alter his testimony to say Mr. Troya had admitted sole personal responsibility for the killings by saying only "I," rather than "we," and the witness used this directive to craft an apparently fictive statement from Mr. Troya, "I have killed some people."

Moreover, the ultimate prejudice proved to be quite substantial. While the actual remarks Mr. Rodriguez attributed to Mr. Troya, taken as a whole, suggested that he was involved in the crime but did not personally commit the killings, the altered version the jury heard, "I have killed some people," removed any doubt, if Mr. Rodriguez's testimony were believed. Notwithstanding the circumstantial evidence tying Mr. Troya generally to the incident, this statement ended up

220

being the *only* direct evidence he personally killed anyone; it further suggested he himself had actually murdered one or both children, the only crimes for which he was sentenced to death.

The prejudice is remarkable. The jury apparently rejected evidence of the involvement of a third person in the killings in rendering its guilt verdict, and it imposed death sentences only for the children who were killed. Mr. Rodriguez's testimony was the only evidence directly addressing both of these issues. Proper objection would have undoubtedly made a difference in the outcome of both guilt and sentencing.

XVI.   **THE GOVERNMENT VIOLATED** *BRADY V. MARYLAND* **AND** *GIGLIO V. UNITED STATES* **BY FAILING TO ACCURATELY REVEAL THE EXTENT OF THE PROMISES MADE TO COOPERATING WITNESSES, IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS**

A.     **The Government Shirked its** *Brady/Giglio* **Obligations.**[84]

Relying primarily on cooperating witnesses to make its case, the government assured the Court and counsel it had revealed all of its (supposed non) promises prior to trial.  But significant circumstances detailed below call those assurances into question. In addition to the extraordinary treatment of the cooperators upon the government's insistence after the trial was completed, the government has interfered with and ultimately halted the defense attempt to review its file to fully investigate this claim.

The defense diligently undertook to obtain the file in this prosecution of the United States Attorney of the Southern District of Florida, but as of this date the file still has not been

_____

[84] Mr. Troya cannot fully plead this (or any other claim) regarding the Government's failure to disclose material exculpatory and impeachment information with any more particularity at this time because the factual bases for such claims rests on information known only to the Government.

provided. The footnote below outlines the efforts of the defense to obtain the requested file. [85]

The government's (at least) negligent conduct has dramatically delayed the defense effort to obtain the file of the U.S. Attorney it has sought for many months. Nonetheless, significant information developed during the Section 2255 investigation lends far more than a suspicion the government withheld *Brady* and *Giglio* evidence.

## B.    The Cooperators.

### 1.    Melvin Fernandez

Melvin Fernandez testified on direct he had not received any promises from anyone for his testimony. T3494. On cross, Mr. Fernandez admitted he was concerned he could be charged

---

[85] Throughout the 2255 investigation, current counsel have worked diligently to secure the information in the prosecution's files relevant to these claims through FOIA requests, even communicating directly with the United States Attorney's office. On June 8, 2015, the defense emailed and mailed the Freedom of Information Request to the Executive Office for United States Attorneys was made June 8, 2015, and an acknowledgement was received on June 18. An amended request was later made, and treated as a duplicate request on July 28, 2015. When no file was received by the defense, inquiry was made of the Assistant U.S. Attorney on December 10, 2015, and email sent on February 2, 2016. It was then discovered the Department of Justice had sent correspondence to the wrong person and address, and having received no response, closed the file on October 30, 2015. Counsel brought the mistake to the Department's attention, and the Executive Office reopened the FOIA request. Though the defense has sent subsequent frequent followups on February 3, 4, 11, 16, 17, and 23. On February 23, 2016, the defense attempted to obtain information as to the fee amount to undertake the approval process for payment. It was not until February 25, 2016 the EOUSA informally advised it would be asserting exemption 7a under FOIA and will not be releasing the records. On March 14, 2016, the EOUSA advised it was told by the District's staff it may take a week (or a little over a week) for them to complete their review of the records and their 7A analysis.  Meanwhile, they understood the defense is seeking these records to assist in post-conviction litigation on behalf of Mr. Troya and thus, there was a desire to get these records as quickly as possible.  In order to help expedite the process, they were offering the defense an opportunity to narrow the search by specifying which particular records are most important to the defense. EOUSA said if the defense took such a step, they would provide this narrowed request to the district, and ask that they tailor their search per the request. On March 16, 2016, the defense respectfully declined the narrowing request, seeking the entire file and would respond to any claimed exemption. On March 18,2016,  the defense received an email from EOUSA saying they will not be assessing a search fee in light of the delay in processing our request. To date, no exemption assertion has been made and no files have been produced.

with lying to federal authorities. T3497. Subsequent search has found Mr. Fernandez was not charged with any federal crime since his testimony.[86]

### 2.     Kevin Vetere.

Prior to trial Mr. Vetere entered into a cooperation agreement and was sentenced to 144 months on January 23, 2008 (Doc 301) on Count 1, Conspiracy to Possess With Intent to Distribute at least 500 grams of cocaine and at least 50 grams of cocaine base. On government direct in this trial, Mr. Vetere testified that for his testimony he had "hope" for a reduction of his sentence if the government requested it and Judge Hurley approved, but that there were no promises. T5428. It was further revealed on cross that he had limited use immunity for his testimony. T5794, and that he was hoping for 40 or 50 percent off of his sentence. T5844. He had been told he could be prosecuted for guns and drugs in addition to what he was indicted on.

After trial, on October 8, 2009, (Doc 1058), Mr. Vetere's Rule 35 hearing was held. At that hearing, the government told the Court the significance of Mr. Vetere's cooperation could not be understood. The government publicly asked for a 40% reduction in his sentence, to 86 months. This Court agreed Mr. Vetere's testimony was "crucially important" to the prosecution of this case, and sentenced him to less than half of that, 42 months.

This extraordinary reduction in sentence and withholding of additional charges suggests Mr. Vetere had more than a hope of going free. The defense must be allowed to engage in discovery of the government's file to further explore the actual promises made to him regarding the time he was to serve or any other benefits.

---

[86] As noted earlier, Mr. Troya's current counsel cannot fully plead this claim without access to information in the possession of the Government.  Because based on the information currently available, it would appear that promises were made to these witnesses, counsel includes these claims at this juncture.

### 3.    Carlos Rodriguez.

Mr. Rodriguez was presented to the jury as a person who was testifying simply because it was his civic duty. On the government's questioning during direct examination, Mr. Rodriguez testified no promises were made to him. T4419. He continued to adhere to that position on cross examination, saying he had never spoken with the government about a deal, and that it was his cellmate (and former law enforcement officer) Mr. Hamrick who said he was going to contact the government. The DEA agent in fact later contacted Mr. Rodriguez. T4465. Mr. Rodriguez also said he was not aware the government could request an exemption from deportation to the Dominican Republic. T4469. On redirect examination by the government, Mr. Rodriguez described the scenario of his cooperation as having told his cellmate Hamrick he'd overheard the conversation with Mr. Troya, then DEA agents contacted him and asked what he had heard, but did not promise him anything. T4472. The government pointed out it had agreed to call his wife in Nassau and tell her he was okay. T4478.

In fact, the Section 2255 investigation revealed Mr. Rodriguez subsequently received a substantial reduction of his sentence, from 78 to 39 months, after the government filed a Rule 35 motion.  In his case, 07-60004-CR-ZLOCH/ROSENBAUM, the Rule 35 hearing was held on July 15, 2009, in Ft. Lauderdale, before the Hon. William Zloch. AUSA Carlton appeared and argued for a substantial reduction of Mr. Rodriguez's sentence. Case Agent Weeks also appeared. AUSA Carlton explained the circumstances of this case in which Mr. Rodriguez testified, and represented to the Court that he had testified without the benefit of a substantial assistance agreement. *See* Appendix M – Tx Re: Carlos Rodriguez Rule 35 HRG. In addition, the government represented neither Mr. Rodriguez nor his attorney had sought any "specific benefit" for his testimony. The government represented it had determined since his testimony that the assistance was substantial, and requested the Court reduce his sentence by 20 months, which

would be a 25 percent reduction, to 58 months. T5. The Court reduced his sentence to 39 months.

AUSA Carlton pointed out the significance of Mr. Rodriguez's testimony:

MR. CARLTON: Mr. Rodriguez was the *only individual who had direct knowledge* of a statement made by the defendant actually placing him at the scene of hurting children. … His testimony coupled with the circumstantial evidence, from the government's perspective, *tipped the scales* in a fairly heinous case. So I don't want to – we had circumstantial evidence, *but direct evidence* of the type that he had was absolutely important to the case.

T10-11 (emphasis added).

Counsel for Mr. Rodriguez echoed the government, but revealed then-AUSA Kastrenakes had sent him an email after trial that said "I was very impressed with Carlos. His credibility and demeanor were outstanding, and he never once mentioned a sentence reduction to me which is quite unusual in and of itself." T7.

This is extraordinarily lenient post-trial treatment of Mr. Rodriguez. That and the explicit back-channel communications between the government and his attorney, point to the strong possibility a promise of leniency was made directly to his defense counsel and communicated by counsel to Mr. Rodriguez, but withheld from the jury. The prejudice resulting from the relatively unimpeached testimony of Mr. Rodriguez has been articulated by the government: "Mr. Rodriguez was the *only individual who had direct knowledge* of a statement made by the defendant actually placing him at the scene of hurting children. … His testimony coupled with the circumstantial evidence, from the government's perspective, *tipped the scales* in a fairly heinous case." The defense is entitled to discovery of the government's file to further explore this claim.

**XVII.** **THE GOVERNMENT VIOLATED ITS OBLIGATIONS PURSUANT TO *BRADY V. MARYLAND* BY FAILING TO DISCLOSE EXCULPATORY INFORMATION TO THE DEFENSE THAT WAS MATERIAL TO THE GUILT AND PENALTY PHASES OF TRIAL.**

The Due Process Clause requires the government to disclose material, exculpatory evidence to a criminal defendant. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Evidence impeaching the credibility of a government witness falls within the *Brady* doctrine. *Giglio v. United States*, 405 U.S. 150, 153-56 (1972). As part of its *Brady* obligation, the government has a duty to learn of favorable evidence from others acting on its behalf, including the police. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The duty to enforce *Brady* "with painstaking care is never more exacting than it is in a capital case." *Kyles*, 514 U.S. at 422.

The government's failure to disclose *Brady* material requires a new trial when the exculpatory evidence would have been material to the trial. If there is any reasonable likelihood that the non-disclosure could have affected the judgment of the jury, relief must be granted. The materiality of suppressed evidence must be considered collectively, not item-by-item. *Kyles*, 514 U.S. at 436.

Due process is also violated when the government knowingly relies on false evidence. *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

Mr. Troya's due process rights were violated by the government's failure to disclose all exculpatory evidence in its possession and the government's knowing presentation of false evidence. Mr. Troya was prejudiced by the collective failure to disclose. Mr. Troya's Eighth Amendment rights were likewise violated in light of the heightened procedural requirements that attend capital prosecutions. To the extent trial counsel could or should have uncovered and/or presented any of this evidence or objected to the government's tactics, they were ineffective. *Strickland v. Washington*, 466 U.S. 668 (1984).

**A.** **The Government Failed to Disclose Material Exculpatory Information Regarding Danny Varela.**

Danny Varela was not charged with the murders of the Escobedo family. This is true despite the fact the government made clear from the beginning of trial its theory of the case was that the Escobedos were murdered in furtherance of a drug conspiracy headed by Mr. Varela. The government asserted in its opening statement that:

> The evidence will reveal that each of them [the Escobedos], although four separate lives born on four separate dates in four separate years, random dates, had one thing in common, that their lives were snuffed out in an instant, a[n] instant that was not random, a[n] instant that was traced to the drug trafficking activities of this man right here, Danny Varela, a man who hooked up in a drug trafficking link with Jose Luis Escobedo for several months, a drug trafficking link that involved large scale drug trafficking in West Palm Beach, drugs in police seizures and drug deaths [sic, debts] that arose as a result of the seizures. Those deaths [sic, debts] caused a schism between supplier and buyer and formed the motive for the tragic murder of an entire family.

T3041-42.

The government repeated the point throughout the course of trial:

The Court: Does the Government allege in the indictment that the murders on October 13 are an example of an overt act in furtherance of the conspiracy – of the drug conspiracy? Don't they do that?

Mr. Kastrenakes: We do, 924J count –

The Court: The answer is yes?

Mr. Kastrenakes: The 924J count, the weapon carried displayed and used was done in furtherance of the narcotics conspiracy as well as in furtherance of the carjacking. So everything is linked back into Count 1, and logically, Your Honor, this was a drug rip, they stole 15 kilos from the car that Mr. Escobedo was driving and distributing those drugs. Factually that fits in also.

227

T3277; *see also* T5508-10 (government explaining its theory of the case); T4714 (Court observing that "the Government is contending that all of the activities in the indictment are in fact interconnected. That is, that the murder of the Escobedo family is somehow involved in this larger drug distribution").

The government's theory Mr. Varela was the head of the drug organization was supported by numerous pieces of testimonial and documentary evidence. The government repeatedly used this evidence to cement its point in its guilt phase closing argument:

> If you lived in that house, you knew it was headquarters for drug trafficking operations of Danny Varela and there were guns available within short steps to confront any challenge to that ongoing narcotics activity.

T7093.

> [T]hey are members of a violent drug trafficking organization headed by Danny Varela who were willing to use weapons and reap violence when required to protect the ongoing activities of that group, and it didn't matter if they knew the person or if it was a stranger. If it threatened them, they were willing to carry guns, wear disguises and shoot, and they did that in this case.

T7180.

In addition to arguing the Escobedos were killed in furtherance of a drug conspiracy headed by Mr. Varela, the government also repeatedly argued co-conspirator liability is exceedingly broad. It noted with respect to Mr. Varela's liability in Count 2 of the indictment, for example, that:

> [E]ven though Varela is not there, he was responsible, and he should be held liable on this.

> His Honor will tell you with regard to a concept called co-conspirator liability, that even though Varela was not there, if he joined in the overall conspiracy charged in Count 1, he can then be liable for this count as well, so long as the offense charged in Count 2 was committed by a co-conspirator, meaning Lopez, during the existence of the conspiracy. A conspiracy is May, October, 2006. This was in May that the Defendant Varela was a knowing and willful member of that

228

same conspiracy, which he was, and that the commission of the offense by the co-conspirator Lopez in the May 10 stop was foreseeable to Varela.

That is easy, we have shown all of that.

T7105.

The government repeated its point about the sweeping nature of co-conspirator liability multiple times:

> If you find all four people are in the drug conspiracy, it matters not where the drugs were found.  It doesn't matter if it was in Varela's bedroom and Troya didn't know about it.  Doesn't matter if it was in the garage and Lopez didn't know about it.  Doesn't matter under co-conspirator liability if the Government proves all four are members of the conspiracy and drugs possessed by just one person as part of that conspiracy with the intent to distribute, and it is foreseeable to everybody else, you are stuck with the result.  That is the danger of the conspiracy.  In for a dime, in for a dollar.

T7117.

> But don't confuse the individuality of their trials with the fact that evidence of conduct of other people that you are in a conspiracy with is admissible against you.  In other words, Varela's trial in his trial, independent trial, evidence of the conduct of Liana Lopez, Sanchez, Troya, Flako, Vetere, all the people involved in this conspiracy is admissible against him.  The drugs gathered in those seizures are admissible against him, because this is a joint venture.

> So even though his trial is independent, and Troya's trial is independent, Sanchez's and Lopez's trial are independent of each other, the evidence that you can consider, you can consider the conduct of jointly undertaken activity, and you can consider the conduct of all of these co-conspirators with respect to your verdict as to those individual Defendants.

T7413; *see also* T3277-78 (Court noting that "this is why conspiracy is such a dangerous crime.  If the Government is contending that Ms. Lopez is a member of the drug conspiracy, and the purpose of the conspiracy is to go out and get drugs, I suppose normally you think that conspirators do that by just buying drugs from somebody else, but if the Government is able to put on evidence that the conspirators also decided here was a good place to steal drugs from

229

somebody, you know that concept of conspirator liability is so dangerous, it is so inclusive, and I guess it gets into whether the act was foreseeable and that kind of thing.").

In light of the government's evidence and argument (and the sweeping nature of co-conspirator liability), multiple defense counsel noted the peculiarity of the government's decision not to charge Varela with the murders in their guilt phase closing arguments. T7187 ("This is a surreal situation. How can the Government on one hand treat Sanchez and Troya worse than Varela when the Government's own theory is that Varela is the boss?") (counsel for Varela); T7189 ("The Government alleges Varela is the boss, calling the shots figuratively and literally. Government alleges Varela is the money man, houses, cars, telephones being passed out by him. When you see the third superseding indictment, you will see all the Defendants are charged in Count 1. Count 5, the conspiracy regarding the carjacking, is not all four Defendants, just Sanchez and Troya. Doesn't make sense on the one hand Sanchez and Troya are portrayed as Varela's grunts or gophers, go people making a weekly stipend, and on the other hand it is alleged that Sanchez and Troya independently on their own in Count 5, as if some rogue operatives have this plan, this plan to carjack and kill.") (counsel for Varela); T7342-43 ("That co-conspirator the Government alleged to be involved in these acts involving carjacking and murder is Danny Varela. We know he controlled that house, the one we are talking about, and we know he controlled these other matters. It is Danny Varela in case you are wondering. So it tells you, what did the Government really know about this case? Was Danny Varela indicted for murder? If he is the man who controlled this. Is he indicted for murder? Doesn't this tell you what the Government says about the case is a theory? They don't know what happened. If they can't come forward and indict the man who is in major part responsible for this, they are putting

230

this together haphazardly, that has no meat, that should come to mind when you are reviewing these types of things.") (counsel for Sanchez).

The government responded to these defense arguments in its rebuttal guilt phase closing argument by claiming it did not prosecute Mr. Varela for murder because it could not produce enough evidence to do so:

> Then Mr. Gershman put another question to you. Why isn't my client charged with murder, so to speak. I was asking why he asked a question like that. That answer comes because some evidence is not proof beyond a reasonable doubt, some evidence is not good enough in a courtroom in America.
>
> Sure, there is evidence that Sanchez and Troya called Varela after the murders. Sure, there is evidence that Varela participated in unloading the booty. Sure, there is evidence that Varela participated in the division of that booty, in fact gave one of those kilograms to Malik Mullino. That is not enough.
>
> What do we know from the evidence in this case? We know Varela was not on the Turnpike, we know that Varela did not make statements to other people, and we know that Varela was not pulling the trigger that killed an entire family.
>
> Rest assured, there are no deals from the United States of America with that drug kingpin, there are no deals. And this investigation is not over, and the investigators who have dedicated the last three years to this case will continue to look for evidence and gather evidence and when and if there is sufficient evidence to charge Mr. Varela with murder, it will be brought before a jury of his peers.

T7413-14.

The government made a similar argument during its penalty phase closing argument in an attempt to refute the defense argument Messrs. Sanchez and Troya were under Mr. Varela's control:

> There is no evidence whatsoever that Danny Varela was anywhere near that van. In fact, you will recall that the testimony of Agent Weeks, the telephone activity of Danny Varela's phone the entire night showed he was in West Palm Beach. He, Varela, was not forcing anybody to do anything. He is 50 miles away.

231

T9497 (initial government penalty phase closing argument).

The defense yet again pointed to the tenuousness of that argument in light of the government's theory of the case:

> Just a few minutes ago this prosecutor stood up and said Danny Varela was 50 miles away when this incident happened. What did they say during the trial? They said Danny Varela – this murder, this whole thing was all about Danny Varela cancelling a drug debt, and now they want you to execute Ricardo Sanchez. They are providing Danny Varela as an alibi. Is that being fair about the evidence and what brought us here?

T9532 (Sanchez penalty phase closing argument).

Counsel for Mr. Troya reprised the point in his penalty phase closing argument:

> That was in the first part of the trial, the first phase, guilt, innocence phase, Danny Varela is the person the indictment says is the co-conspirator in the carjacking. And Judge Hurley instructed you a co-conspirator is responsible for the criminal acts of the other co-conspirators, in addition to being part of the conspiracy.
>
> So where are we getting that Daniel Varela is not here for some reason because he was 50 miles away?

T9568-69 (Troya penalty phase closing argument); *id.* at 9570 ("Danny Varela did not know what was going on? Danny Varela was not involved? Where were we for a month of trial?") (Troya penalty phase closing argument).

The government did not relent in its penalty phase rebuttal closing argument. *See*, *e.g.*, T9616 ("Danny Varela was not on the Turnpike. We talked about this, remember, in the first phase of the argument. He is not following the family for eight hours. He is not shooting those family members on the Turnpike at 2:24 in the morning October 13th, 2006.") (rebuttal government penalty phase closing argument); T9636 ("Danny Varela is a convicted drug kingpin. You know he is not facing the death penalty because the Government did not have the evidence to convict him. He is not the shooter, he is not on the Turnpike. He is not the one that

232

pulls these people out of the car.   He is not the one massacring this family.") (rebuttal government penalty phase closing argument); T9637-38 ("Danny Varela is not an equally culpable co-defendant not facing the death penalty.  Have you heard any evidence that anybody from the Government's side of the table made some deal with Danny Varela?  None, zero.  There is no deal with Danny Varela.  When the evidence is there, he will be prosecuted, and he will face another jury of his peers.  That doesn't excuse these two shooters for what they did the morning of October 13th.") (rebuttal government penalty phase closing argument).

The government's argument regarding Mr. Varela's lack of liability for the murders because he was not present on the Turnpike contrasts markedly from its argument regarding his co-conspirator liability for Count 2 of the indictment.  T7105 ("even though Varela is not there, he was responsible, and he should be held liable on this.").  Indeed, these two arguments cannot be reconciled.

The notion the government did not charge Mr. Varela with murder (let alone seek the death penalty against him) because they could not produce the evidence to do so does not withstand scrutiny.  The government's entire argument on this point speaks to why, in the government's estimation, it did not have enough evidence to charge Mr. Varela under a principal theory of liability.  It does not remotely explain why it could not have charged him with the murders under a co-conspirator theory of liability as part of the drug conspiracy (Count 1).

If, as the government alleged, 1) there was a drug conspiracy; and 2) the murders were committed by co-conspirators during and in furtherance of the drug conspiracy, it necessarily follows that the murders were reasonably foreseeable to the leader of the drug conspiracy.  Mr. Varela is therefore liable for the murders as the leader of the drug conspiracy.

233

Indeed, during Mr. Varela's sentencing hearing, the Court stated it was "absolutely certain" that Mr. Varela had foreknowledge of the murders:

> And I want to be very clear, and I say this with full consideration of the seriousness of what I am saying. I am absolutely certain that Mr. Varela, Mr. Sanchez, and Mr. Troya were fully knowledgeable about what was being done with respect to the murder of the Escobedo family. That Mr. Varela is every bit as culpable as the people who actually held the guns and shot the bullets.

Doc. 957 at 86.

The Court sentenced Mr. Varela based on the evidence heard by the jury. If the Court was absolutely certain that Mr. Varela was guilty of the murders, the government unquestionably could have proven his guilt under the less-demanding beyond a reasonable doubt standard.

Trial counsel raised the issue of the government not seeking murder convictions or the death penalty against Mr. Varela by way of pre-trial *Brady* motion. Doc. 275 at 5-6. The government opposed the motion. Doc. 282. The Magistrate Court denied the motion, ruling that "Defendant Sanchez simply speculates as to why the Government has not sought the death penalty as to Varela," and that "[m]ere speculation about what could have or might have occurred is not a legitimate basis for *Brady* material." Doc. 307 at 16-17.[87]

The government's ostensible reason for not charging Mr. Varela with murder has now been explicitly stated. This justification – that the government could not prove his guilt beyond a reasonable doubt – collapses under the weight of the government's trial presentation. This Court's own sentencing determination for Mr. Varela makes this clear. The government's argument was improper and violated Mr. Troya's due process rights, as more fully developed in a separate claim.

---

[87] On consent, the court ordered any motion or objection by one defendant was automatically deemed adopted by every other defendant for purposes of appellate preservation, unless another defendant affirmatively opted out. (Doc. 245; T4052).

234

The government has also withheld information that further demonstrates Mr. Varela's direct connection to (and thus, liability for) the murders. The government did not disclose information from cooperating witness Mario Davis that Mr. Varela had direct involvement in the murders. The government also did not disclose information from Phillip Perez regarding Mr. Varela's large-scale drug trafficking and gun possession.

The information in the possession of the government that explains why it did not charge Mr. Varela with the murders – whether or not the government characterizes it as a "deal" – is exculpatory to Mr. Troya. It is information that Mr. Troya could have used to challenge the thoroughness of the law enforcement investigation and strengthen his penalty phase argument in support of the statutory mitigating circumstance that an equally culpable co-defendant was not sentenced to death.

The withholding of this exculpatory evidence was material as to both guilt and punishment, as made clear by a published media report following trial. Juror Rick DiCresce stated as follows:

> "I'll say this, and I said this several times while we were back there, the biggest travesty in this case is that Danny Varela was not sitting at that table, he said.
>
> Assistant U.S. Attorney John Kastrenakes provided the only explanation as to why that didn't happen, DiCresce said. Kastrenakes said authorities didn't have enough evidence to charge Varela, but were still investigating.

Daphne Duret, *Brutality to Children Left Juror No Doubts*, Palm Beach Post at A1A (Apr. 3, 2009). There is a reasonable probability that the jury would not have found Mr. Troya guilty or sentenced him to death had they been given the opportunity to hold the person they actually believed was most culpable – Mr. Varela – responsible. This is especially the case in light of one

235

of Mr. Troya's theme at the penalty phase – that there should be no death sentence since Varela would not even face one.

**B.      The Government Failed to Disclose Material Exculpatory Information Regarding Potential Third Party Guilt, Including Information Regarding Yessica Escobedo's Cell Phone.**

As stated in Claim X, *supra/infra*, it is not possible to determine from the available cell phone records whether Yessica Escobedo's cell phone traveled from Florida to Texas at some point on the evening of October 12, 2006, and defense counsel ineffectively failed to adequately investigate and gather additional records that would have enabled them to definitively establish this point.  In addition, the government, without disclosing the full extent of the cellular records necessary to establish the point, improperly suggested to the jury and to the Court that the phone had not traveled to Texas.

The fact the phone may have traveled to Texas would have powerful implications for the government's theory of the case, as it would suggest the presence of some third party on the night of the crime.  The phone plainly was not taken to Texas by Ms. Escobedo, Mr. Troya, or Mr. Sanchez.  Evidence a third party took Ms. Escobedo's phone to Texas immediately prior to her death would suggest that someone else may have been involved in the killings, and is thus exculpatory and material.  The government's failure to turn over any information it possesses regarding third party guilt, including the whereabouts of Ms. Escobedo's phone, violates *Brady*.

**C.      The Government Failed to Disclose Material Exculpatory Information Regarding the Alleged Drug Deal in Daytona Beach.**

The government's theory was that Mr. Sanchez and Mr. Troya killed the Escobedos, in part, to rob them of a substantial quantity of drugs.  In support of this theory, the government claimed that the Escobedos traveled from West Palm Beach up the coast to the Daytona Beach

236

area immediately prior to the murders in order to consummate a large drug deal.  *See*, *e.g.*, T7135 (government closing argument).

But the evidence supporting the drug robbery motive was thin.  It consisted primarily of brief statements allegedly made to cooperators and speculation that the purchase of a used Chevrolet and a necklace in the aftermath of the murders were made with proceeds from the robbery.  *Id.* at T7135-36.

And the evidence that a drug deal actually took place in Daytona Beach was essentially non-existent.  No evidence regarding the nature of the deal, the specific venue of the deal, or the other participants in the deal was presented.  Nor was any evidence of drugs or money that could be specifically traced to the deal presented.

One of two things is true regarding the alleged deal: 1) the deal did happen, in which case one or more people in the Daytona Beach area involved in large scale drug trafficking knew the Escobedos were traveling on October 13 with a large quantity of drugs or money, thus had the means, motive, and opportunity to commit the killings; or 2) the deal did not happen, in which case the government's entire theory that the killings involved a drug robbery is undercut.  In either event, any knowledge the government possesses about the alleged Daytona Beach drug deal constitutes *Brady* material.

**D.      The Government Failed to Disclose Material Exculpatory Information From the Security Booth at the Briar Bay Neighborhood.**

The government presented evidence, principally through witnesses Kevin Vetere and David Doran, that shortly following the murders Mr. Sanchez and Mr. Troya returned to the Garden Court house.  T3969-70 (testimony of David Doran that he observed the burgundy van and a dark-colored vehicle that may have been a Jeep SUV returning to the Garden Court house between 4:30 and 5:00 a.m. on October 13, 2006); T5451 (testimony of Kevin Vetere that he

237

observed Mr. Varela, Mr. Troya, Mr. Sanchez, and Mr. Gutierrez returning to the Garden Court house in the early morning hours of October 13, 2006, carrying bags); T5463 (testimony of Kevin Vetere that the bags being carried by these four individuals were of the type they typically used to transport kilos of cocaine).

The Garden Court house was located in a gated community. *See*, *e.g.*, T5468. Thus, in order for the van and Jeep to arrive at the Garden Court house, they would have needed to pass through the security gate. The government obtained, and provided in discovery, the security logs from that security gate on October 12 and 13, 2006. T6969-70. Those security logs did not indicate Mr. Sanchez or Mr. Troya entered the security gate at the time indicated by Mr. Vetere and Mr. Doran. T6975. The government, upon cross-examination of the law enforcement witness who was involved in the investigation of the logs, Special Agent Jim Matthews, elicited there was no way to know how accurate the logs were. T6983-83.

But defense counsel also elicited through Special Agent David Weeks that there were surveillance cameras at the Briar Bay security gate as well. T6968. Upon cross-examination by the government, Agent Weeks acknowledged he had viewed video footage from the Briar Bay surveillance cameras covering the time period from October 12 to October 14, 2006. T6974-75. Agent Weeks further testified he did not deem anything he received from Briar Bay "relevant to the investigation concerning the entry or exit of the vehicles concerning that development after 3:02 a.m. October 13th 2006." T6975.

This video footage was not turned over to the defense. Video footage, unlike a security log, is far less susceptible to a charge of inaccuracy due to human error. Given that the government did not introduce this video footage in its case, the only logical conclusion is that

238

they did not support Mr. Vetere's and Mr. Doran's testimony.  This evidence is therefore exculpatory within the meaning of *Brady.*

Failure to disclose the information was also material both as to guilt and punishment for Mr. Troya.  The government's theory of the case was that the Escobedos were killed as part of a drug robbery.  Mr. Vetere's testimony about the bags Mr. Varela, Mr. Troya, Mr. Sanchez, and Mr. Gutierrez were carrying in the middle of the night and his speculation about what those bags may have contained served as some of the only evidence that this was, in fact, a drug robbery.  If the defense had been able to use this video footage to undercut Mr. Vetere's testimony, it would have dealt a severe blow to the government's case.  There is a reasonable probability that, had the information been disclosed, Mr. Troya would not have been convicted and/or sentenced to death.

### E.    The Government Failed to Disclose Material Exculpatory Information of Mr. Troya's Lessened Culpability for the Murders.

The government did not provide the defense with material, exculpatory information in its possession that would have lessened Mr. Troya's role in the murders and would have therefore affected the jury's determination of his guilt and/or punishment.  The government did not provide material exculpatory evidence in its possession that Mr. Troya did not fire a weapon on October 13, 2006.

### XVIII.   THE GOVERNMENT FAILED TO DISCLOSE EXCULPATORY EVIDENCE ABOUT MR. TROYA'S BRAIN DAMAGE CONTRARY TO THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.

Shortly before trial, this Court held a hearing to discuss the discovery of the parties' experts' findings and raw data. During that hearing, the government told the Court it required the orginal PET scan of Mr. Troya's brain because they had "retained a neuropsychiatrist who is very familiar with PET Scans." T7775. After defense counsel reaffirmed at least one of their

experts would refer to the PET scan at trial, this Court ordered the original produced for the government neuropsychiatrist and Mr. Eisenberg promised to comply later that day. T7777.

The government never subsequently disclosed any information about the results of their expert's review of Mr. Troya's PET scan. Because the government specifically informed this Court that they had a neuropsychiatrist who had expertise in interpreting PET scans, the government was clearly not referring to the only expert they disclosed to Mr. Troya, Dr. Brannon. Dr. Brannon is a clinical psychologist, not a neuropsychiatrist, and thus was not qualified to read and interpret brain scans.

On information and belief, Mr. Troya alleges that the government neuropsychiatrist's review of Mr. Troya's PET scan revealed information helpful to the defense's punishment case and the failure to disclose that information was prejudicial.[88]  *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

**XIX.** **TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE MR. TROYA'S FELONY BATTERY CONVICTION THAT WAS UTILIZED IN AGGRAVATION TO OBTAIN A DEATH SENTENCE FOR MR. TROYA. COUNSEL'S FAILURE TO OBJECT TO THEIR USE AND THE CORRESPONDING SENTENCE VIOLATES THE SIXTH AND EIGHTH AMENDMENTS.**

The Government presented, *inter alia*, Mr. Troya's 2000 conviction for felony battery against Carol Pawlowski as evidence of aggravation in seeking to have the death penalty imposed. Mr. Troya originally wanted to contest the charge, and asked his defense attorney to contact the witnesses to the incident. *See* Appendix H-1. He took a plea only after his defense attorney lied to him about his witnesses and his chances at trial. *Id.*  Mr. Troya learned during the preparation for his capital sentencing hearing that his defense attorney had never talked to the witnesses back in 2000. *Id.*  Trial counsel failed to pursue collateral relief as to the battery

---

[88] Mr. Troya will formally move for discovery of this information during the course of these proceedings.

conviction and failed to otherwise challenge the use of this conviction to enhance Mr. Troya's sentence. Counsel's failure to object to the use of this conviction was ineffective and prejudiced Mr. Troya in violation of the Sixth and Eighth Amendments.

### A.  The Facts of the 2000 Battery

At the capital sentencing hearing, Karl Busch testified that in 2000, when he was around sixteen years old, he was friends with Mr. Troya. T8695, 8700.  Mr. Busch stated that back then his mother, Ms. Carol Pawlowski, was an alcoholic and was a "mean, nasty" drunk. T8701.  By the time of Mr. Troya's trial Ms. Pawlowski had died from cirrhosis of the liver. T8699.

Mr. Busch testified that on May 31, 2000, he was hanging outside his house with Mr. Troya and some friends, working on their bicycles. T8701-02.  Ms. Pawlowski drove up to the house aggressively and ran into the curb located two feet in front of the children. T8702.  If the car had not stopped when it hit the curb, then Ms. Pawlowski would have hit Mr. Busch or Mr. Troya with the car. T. 8702. Ms. Pawlowski stumbled out of the car, with her thermos of vodka and orange juice, slurring her words as she screamed and cursed at Mr. Busch about video equipment.  T8703-04.

Mr. Busch testified that he "knew he had to get away from [his mother]," so he walked across the street. T8703-04.  Mr. Busch said that Mr. Troya was "shocked" and seemed to be stunned "almost like a deer." T8705. Mr. Troya picked up his bicycle and tried to get on it to get away, when Ms. Pawlowski grabbed Mr. Troya and "started hitting him in the back of the head, around the ear."  T8705. Mr. Busch screamed at his mother to stop, telling her that Mr. Troya "doesn't have anything to do with this," but she continued to hit Mr. Troya. T8707. Mr. Troya put his hands up, blocking her blows, dropping his bike. T. 8705-06. Ms. Pawlowski then tripped over her own feet and fell, hitting the cinder blocks in the front yard. T8705-06.  Ms. Pawlowski was rendered unconscious by her fall. T8706.  Mr. Busch told Mr. Troya to leave and a neighbor

241

called for an ambulance. T8708.  But Ms. Pawlowski refused treatment and was verbally abusive to the police and medical technicians. T8708.  Ms. Pawlowski went to the ER later that night where she verbally abused and threatened the staff, until she finally left without treatment. T8109-10.

According to Mr. Busch, Mr. Troya did nothing to cause this incident. T8707.  Mr. Troya had only acted defensively and did not push Ms. Pawlowski. T8706. He explained that Ms. Pawlowski would go after the closest person and had done this to another friend of his, and that friend had not deserved it either. T8706-07.  Mr. Busch said that if Mr. Troya had not defended himself, then Ms. Pawlowski would have continued to hit him. T8707.

Julio Perez also testified at the capital sentencing hearing about the events of May 31, 2000.  Back then he was a friend of Mr. Troya and Karl Busch. T8758-8759.  And he corroborated Mr. Busch's story of his mother's unprovoked attack of Mr. Troya. T8758.

Mr. Troya's post-conviction investigator obtained an affidavit from Dennis Rivera, a friend of Mr. Troya, who used to work for Carol Pawlowski. *See* Appendix H-2. Mr. Rivera stated that Ms. Pawlowski was "an alcoholic who drank beer and vodka all day." *Id*. He also stated that she snorted cocaine and smoked marijuana. *Id*.  The post-conviction investigator also spoke with from Anelle Hernandez, a childhood friend of Mr. Troya's, and she stated that Ms. Pawlowski slept with young guys, was a falling down drunk, did drugs, and was abusive. *Id*. According to Ms. Hernandez, Ms. Pawlowski got into fights with several of her son's friends. *Id*.

### B.    The Claim of Ineffective Assistance of Defense of Counsel in 2000.

Mr. Troya was charged with felony battery based on the incident with Ms. Pawlowski. *See* Appendix H-1.  Mr. Troya told state trial counsel that he was innocent of the charges and asked him to contact Mr. Busch, Mr. Perez, and the two girls that were at Mr. Busch's home on the night of the incident. *Id.*  State trial counsel told Mr. Troya that he had contacted Mr. Busch

242

and Mr. Perez, but that neither was willing to testify on Mr. Troya's behalf. *Id.*   According to state trial counsel, Mr. Busch said that he was not going to testify against his own mother, and Mr. Perez said he did not want to get involved. *Id.*   State trial counsel told Mr. Troya that it would be a waste of time to contact the two girls, because the jury would convict him based on the injuries Ms. Pawlowski suffered from her fall. *Id.*   State trial counsel told Mr. Troya that he was going to be found guilty and sentenced to 15 years. *Id.*   If Mr. Troya took a plea, state trial counsel said the State had offered to have him sentenced to 36 months in a Boot Camp Program, followed by 36 months on probation. *Id.*   Mr. Troya ultimately pled guilty as charged and was sentenced to three years' imprisonment *Id.*

During the preparation for Mr. Troya's capital sentencing hearing, Kerry Sheehan, the mitigation specialist, spoke with Mr. Busch and Mr. Perez about the 2000 battery case. It turned out that neither man had ever spoken to state trial counsel. Mr. Busch and Mr. Perez told Ms. Sheehan that had state trial counsel asked them to testify for Mr. Troya, that they would testify that Ms. Pawlowski was the instigator and that Mr. Troya was not responsible for her injury..

As is clear from the record both men were willing to testify regarding the battery and their knowledge of the events surrounding the battery accusation. This testimony irrefutably supports the fact that trial counsel never spoke to either man and affirmatively misled Mr. Troya. Trial counsel did not take any action on this matter, but Ms. Sheehan did pass this information on to Mr. Troya.

After his capital trial was concluded, Mr. Troya attempted to overturn his battery conviction based on ineffective assistance of counsel and newly discovered evidence, *inter alia*. *See* Appendix H-3.  First, Mr. Troya filed a Rule 3.850 motion for post-conviction relief, which was denied. *Id.*   He appealed the denial, which was affirmed by the Fourth District Court of

Appeal. *Id.* He then filed a motion pursuant to 28 U.S.C. § 2254, which was later withdrawn after this Court issued warnings under *Castro v. United States,* 540 U.S. 375 (2003). *See* Case. No. 9:15-cv-80106, Doc. 10.

### C.      Trial Counsel Failed to Challenge the Use of the Battery Conviction.

Here, in Mr. Troya's case the Government used a felony battery conviction as an aggravator. Despite trial counsel's knowledge that Mr. Troya's conviction for battery was obtained through ineffective assistance of counsel, trial counsel did nothing to challenge the use of the conviction as an aggravator. Trial counsel did not ask for a stay or continuance of the trial and/or sentencing hearing in order to seek collateral relief in the state courts. Trial counsel did not ask the court to prohibit the Government from relying on the conviction as an aggravator. Not only did trial counsel fail to take these affirmative steps, trial counsel also did not object when the Government read Mr. Troya's plea colloquy from the 2000 battery conviction into the record. T8741-42.

The failure of trial counsel to challenge the use of the conviction constituted ineffective assistance of counsel. This failure constitutes Sixth and Eighth Amendment error. Prejudicial use was made by the Government of this conviction when the Government argued and adduced through testimony Mr. Troya had been engaged in a life of crime and had only been out of state custody for a short time during adolescence. It is likely the jurors were affected by the evidence.

**XX.      TRIAL COUNSEL INEFFECTIVELY FAILED TO OBJECT TO INSTRUCTIONS AND VERDICT FORM PERMITTING THE JURY TO FIND THE NONSTATUTORY AGGRAVATOR WITHOUT CONCLUDING UNANIMOUSLY AND BEYOND A REASONABLE DOUBT TROYA COMMITTED THE PARTICULAR UNCHARGED CRIMES, CONTRARY TO THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

At trial, the Government presented evidence to the jury of Mr. Troya's alleged participation in various other uncharged crimes. Specifically, the Government presented testimony that, while he was living with Varela, in the months before the Turnpike killings, Mr.

Troya engaged in several gun crimes for which he was never charged, including a shooting and an attempted shooting of innocent victims in separate incidents on Mercer and Haverhill Avenues, and an attempted armed home invasion against someone nicknamed "B Real." While other evidence from police investigators confirmed that the shootings occurred, the Government's evidence of Mr. Troya's participation in the shootings was extremely thin: only a single government cooperator, Kevin Vetere, implicated Mr. Troya in them. *See Statement of Facts.* Vetere's credibility was suspect; he was a twice-convicted felon and a drug addict who was known as "Crackhead Kevin," and who stayed in Varela's home and helped deliver cocaine. T5162, T5249. Moreover, Vetere had a significant incentive to curry favor with the prosecution: he was facing a sentence of life imprisonment, and needed the Government's help to secure a more lenient sentence. (In fact, Vetere received a sentence of only 42 months in return for his cooperation.)

At sentencing, the Government introduced evidence of another uncharged crime through a witness named Yuslena Jarrett. Jarrett claimed that several years earlier, she had seen Mr. Troya strike his then-girlfriend (a friend of Jarrett's) with a gun during an argument. Mr. Troya was never arrested or charged for this alleged crime, and the Government never corroborated Jarrett's accusations with any other evidence proving that this incident had ever occurred.

The Government introduced the above evidence of uncharged crimes in support of the following non-statutory aggravating factor:

> Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the Defendant, Daniel Troya, participated in other, uncharged serious acts of violence?

*See* Verdict Form at 9 (Doc. 859). With respect to this non-statutory aggravating factor, the Court instructed the jury in the same way:

245

> In our case the Government has alleged that **each of the Defendants participated in other serious acts of violence.** The Government has alleged that the Defendants killed the victims in order to eliminate them as potential witnesses to the Defendants' crimes, and, three, the Government has alleged that by causing the deaths of the victims, the Defendants have caused injury, harm and loss to the family of José Luis Escobedo, Yessica Guerrero Escobedo, Luis Damian Escobedo, and Luis Julian Escobedo.
>
> As I said, when we are looking at the non-statutory aggravating factors, you have to say to yourself, has the Government proven the underlying facts of this beyond a reasonable doubt.
>
> Second, does it meet the definition of being an aggravating factor, and to be used, every single member of the jury would have to agree with those decisions.
>
> Okay?
>
> These non-statutory aggravating factors are set out in the verdict form, and just as with the statutory factors, you must consider them separately. You must decide for each one whether you unanimously agree that it has been proven by the Government beyond a reasonable doubt and indicate your answer on the verdict form and continue until you have finished with them all.

T9728-29. (emphasis supplied)

Notably, neither the instructions nor the verdict form enumerated the various "uncharged serious acts of violence," and neither the form nor the instructions required the jurors to specify which of the uncharged acts had been proven unanimously and beyond a reasonable doubt.

The verdict form and instructions were erroneous because they permitted the jury to find this aggravating factor even if the jurors did not unanimously agree on which of the particular uncharged crimes had been proven beyond a reasonable doubt. Trial counsel's failure to object to the verdict form and instructions was objectively unreasonable and prejudiced Mr. Troya.

246

**A.**      **Trial counsel's failure to object to the verdict form and instructions constituted deficient performance.**

Trial counsel has a duty to ensure that that the verdict forms and instructions given to the jury are correct and comport with extant law. Failure to object to improper verdict forms and instructions, and/or to request proper instructions, is objectively unreasonable and constitutes deficient performance. *See*, *e.g.*, *Everett v. Beard*, 290 F.3d 500, 514-15 (3d Cir. 2000); *Luchenberg v. Smith*, 79 F.3d 388, 391 (4th Cir. 1996); *Gray v. Lynn*, 6 F.3d 265, 271 (5th Cir. 1993); *Combs v. Coyle*, 205 F.3d 269, 286 (6th Cir. 2000); *Kubat v. Thieret*, 867 F.2d 351, 370 (7th Cir. 1989); *Reagan v. Norris*, 365 F.3d 616, 621-22 (8th Cir. 2004).

Here, there is no question the verdict form and instructions were erroneous. Unlike any other aggravating factor in this case, the one accusing Mr. Troya of having "participated in other, uncharged serious acts of violence" collected together several completely unrelated incidents. *See United States v. Kee*, 2000 WL 863119, at *7 (S.D. N.Y. June 27, 2000) ("the aggravating factor of participation in other serious acts of violence is merely the aggregation of specific acts"). But the instructions did not require jurors to find proof beyond a reasonable doubt or to be unanimous about any individual act. Instead, they were only called on to answer the amorphous, global question whether Mr. Troya had "participated in other, uncharged serious acts of violence." Doc. 859 at 9; T9728.

Thus, some jurors might have believed he committed the assault on the girlfriend, to which Jarrett, a non-cooperator, testified. Others may have believed he was responsible for the Mercer Avenue shooting, since at least the ballistics evidence matched a gun from Varela's bedroom. *See Statement of Facts*.

These scenarios represent precisely the kind of "unfairness" that led the Supreme Court to condemn a similar charge permitting jurors to find a "continuing series of [drug] violations" in

247

a Continuing Criminal Enterprise case without having to "agree unanimously about which specific violations make up" the series. <u>*Richardson v. United States*</u>, 526 U.S. 813, 815 (1999). As the Court recognized, one risk of such an instruction is that "permitting a jury to avoid discussion of the specific factual details of each violation, will cover up wide disagreement among the jurors about just what the defendant did, or did not, do." Another is "that jurors, unless required to focus upon specific factual detail, will fail to do so, simply concluding from testimony . . . that where there is smoke there must be fire." *Id*. at 819.

Accordingly, the Court in *Richardson* interpreted the CCE statute to require "jury unanimity in respect to each individual 'violation.'" *Id*. at 824. While acknowledging that a federal jury need not always agree on the *means* by which a crime was committed, *id*. at 817, citing *Schad v. Arizona*, 501 U.S. 624, 631 (1991), the Court distinguished this from the fundamental issue of *which* criminal acts the defendant committed. 526 U.S. at 820 ("'We would not permit...an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday...'"), quoting *Schad*, 501 U.S. at 632-33 (Scalia, J., concurring). A failure to require specific unanimity in this context would "come close to, or...test...constitutional limits." 526 U.S. at 820.

Moreover, said *Richardson*, it would be out of step with history and tradition, including in federal non-capital sentencing: "If one looks to recidivism, one finds that commission of a prior crime will lead to an enhanced punishment only when a relevant fact finder, judge, or jury has found that the defendant committed that specific individual prior crime." *Id*. at 822.

The FDPA also prohibits a mix-and-match verdict on an aggravating factor embracing multiple uncharged crimes. To assure a high degree of confidence in death verdicts, Congress designed the sentencing process to require unanimous decision making beyond a reasonable

248

doubt on concrete, specific facts about the defendant, the capital offense, or the victim, before government allegations may be weighed in favor of a death verdict. Thus, statutory aggravating factors include, for example, that the defendant had previously been convicted of an offense "resulting in the death of a person," that he intentionally killed or attempted to kill "more than one person in a single criminal episode," and that the victim was a specified type of "Federal public servant." 18 U.S.C. § 3592(c)(3), (c)(14)(D), (c)(16).

Neither these nor any of the other enumerated aggravating factors is broad or amorphous like the "other acts of violence" one here. Congress required federal juries to apply the same standards to non-statutory aggravators and statutory ones: proof beyond a reasonable doubt, and juror unanimity. See 18 U.S.C. § 3593(c)-(d). This suggests it envisioned that non-statutory factors would similarly consist of concrete, specific facts, which the government would have to prove with the same high degree of confidence.

The defense failure to object permitted the government here to create a kitchen-sink aggravator and invite jurors to find it based on subsidiary facts not subject to those (or, indeed, any) standards of proof, contravening the entire aggravating-factor scheme and subverting Congress's core intent. Given the ample extant authority on which trial counsel could have relied to object to the verdict form and instructions, its failure to do so was objectively unreasonable.

### B.    Trial counsel's deficient performance prejudiced Mr. Troya.

The government's case in aggravation rested heavily on the non-statutory aggravating factor of "other, uncharged serious acts of violence." The government devoted substantial time to presentation of those crimes at the guilt phase, and made a forceful emotional appeal to the jurors during closing that these crimes demonstrated Mr. Troya should be put to death because he was "evil" and "embraces violence," among other related arguments. Without these uncharged crimes, the government's case for death would have been far weaker.

249

By failing to object to the fragmented, mix-and-match findings of different aggravating facts by different jurors, counsel also permitted the court's charge and verdict form to be used in violation of due process and the Eighth Amendment's requirement of reliable, non-arbitrary sentencing. The error also caused significant prejudice and affected Mr. Troya's substantial rights and the fairness and integrity of the proceeding. As discussed, allowing jurors to pass on broad, duplicitous allegations risks compromising reliable evaluation of the facts. *Richardson*, 526 U.S. at 819. And that risk was heightened here, for two reasons.

First, the government's proof of the uncharged crimes was highly questionable, and thus it is unlikely that jurors would have all agreed that each had been proven beyond a reasonable doubt. The significantly impeached testimony of Vetere, a government cooperator, represented the only evidence implicating Mr. Troya in the Haverhill and Mercer shootings and the attempted home invasion against "B Real". *See Statement of Facts*. Similarly, only a single witness, Jarrett, testified that Mr. Troya's then-girlfriend had suffered an attack years before and that Mr. Troya was responsible; there was no corroborating evidence from the purported victim or any police officer, nor any law-enforcement or medical records, to support her account.

Second, the government's summation arguments, which blended the various uncharged crimes, encouraged the jury to take an impressionist view of Mr. Troya's history of violence as a whole (and, indeed, that of both defendants, together) as a powerful justification for a death sentence.

Encapsulating this aggravating factor, the prosecutor argued: "Sanchez and Troya both made conscious choices to pursue a life of crime, a life of violence, unrepentant violence, unremorseful violence without regard to the consequences, and without caring who they

250

injured." T9507-08.  Moments later, he returned to the uncharged allegations of violence ("more attempted murders"), and, in mentioning each incident by name, quipped that, if Mr. Troya and Sanchez had shown "good aim" in those, "it would have been eight" victims. T9516.

The prosecutor continued to hammer home this theme, moments later again mentioning each incident, noting the victims of the uncharged crimes were "lucky" not to "get killed," and then asking: "How many murders and attempted murders are required before you forfeit your right to exist in this society?" T9518-19.

The evidence as a whole, said the prosecutor, showed Mr. Troya was "the absolute career criminal, brutal career criminal." He "embraced violence, he coveted violence, he continued a life of violence. He is the personification of violence, personification of brutality... He doesn't care who he hurts, when he hurts them, or how he hurts them." T9629-30; *see also* T9634. "Here is a man who embraces violence, does not shy away from violence, he is evil... Balance...this life of crime, this life of violence...").

The error here was ultimately so likely to have affected the outcome because the "uncharged violence" aggravator played a significant role at sentencing. The prosecutor himself entreated jurors to see that it was "huge in this case." T9632. And the government dwelt on it at length, not only in the passages quoted above, but elsewhere in opening statement and summation.[89] *See* T7924-25; T9501-05, T9615-16, T9631-32.

---

[89] The sentencing jury also heard evidence that Troya had a prior battery conviction, at age 17, for punching the mother of a friend in the face during an argument, and an escape conviction, at age 19, for trying to sneak out of a youthful-offender facility. T7981-8040; T8695-8770. Given the convictions, he does not challenge counsel's neglect to object to the failure of the jury instructions to require unanimous agreement that these incidents had been proven beyond a reasonable doubt. But the underlying conduct in those incidents was not nearly as serious as that attributed to Troya in the uncharged crimes, especially since neither involved a weapon. Thus, not surprisingly, the government devoted far less attention to the convictions than to the

251

Given the jurors' split verdicts on the capital counts (including a life sentence for one involving all the victims), the length of their deliberations (over four days), and the mitigating factors they found for Mr. Troya, there is a reasonable probability that the death verdicts were influenced by the uncharged-crimes aggravator, which the jury was allowed to find under erroneous standards of proof.

**XXI.** **DURING SENTENCING SUMMATION, TRIAL COUNSEL INEFFECTIVELY CONCEDED MR. TROYA'S INVOLVEMENT IN TWO UNCHARGED SHOOTINGS WHICH WERE INCLUDED IN THE NONSTATUTORY AGGRAVATING CIRCUMSTANCE, CONTRARY TO THE FIFTH, SIXTH AND EIGHTH AMENDMENTS**

In sentencing summation, trial counsel conceded Mr. Troya's involvement in two uncharged shootings, stating: "And we know … that Daniel did two other shootings[.]"T9558-59. Trial counsel's concession was objectively unreasonable; by admitting Mr. Troya committed these violent crimes, trial counsel conceded the non-statutory aggravator that Mr. Troya had "participated in other, uncharged serious acts of violence." Trial counsel's deficient performance prejudiced Mr. Troya.

> **A.** **Trial counsel's concession during summation that Mr. Troya had participated in two uncharged shootings constituted deficient performance.**

Trial counsel has a duty to effectively represent a client throughout all stages of the trial, including closing arguments to the jury. *See*, *e.g.*, *Dobbs v. Zant*, 506 U.S. 357, 358-59 & n.1 (1993) (closing argument by defense counsel may be important basis for ineffective assistance of counsel claims reviewable in habeas corpus proceedings); *Dobbs v. Turpin*, 142 F.3d 1383 (11th Cir. 1998) (counsel found to be ineffective at capital sentencing stage of trial and writ granted because of, inter alia, inadequacy of counsel's closing argument). Here, trial counsel failed to provide effective representation in closing arguments to the jury because counsel inexplicably

---

uncharged conduct. *See* T7924-25; T9501-05, T9507-08,T9615-16, T9618-19, T9629-32, T9634.

conceded Mr. Troya's guilt with respect to two uncharged shootings. *Francis v. Spraggins*, 720 F.2d 1190 (11th Cir. 1983) (counsel found to be ineffective at guilt-innocence stage of trial and writ granted because of counsel's concession of client's guilt in closing argument); *cf. Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001) (counsel found to be ineffective at guilt-innocence stage of trial and writ granted because of, *inter alia*, counsel's comment in opening statement that amounted to concession that client's taking witness stand would signal that prosecution had satisfied burden of proving charges); *Stouffer v. Reynolds*, 214 F.3d 1231 (10th Cir. 2000) (counsel found to be ineffective at guilt-innocence stage of trial and writ granted because of, *inter alia*, counsel's presentation of closing argument that was "ineffective at proffering any semblance of a defense theory").

Trial counsel's concession was not objectively reasonable. As noted above, the Government's evidence of Mr. Troya's participation in these uncharged crimes was weak: it relied exclusively on the uncorroborated testimony of a twice-convicted felon and a drug addict, Kevin Vetere, who had a significant interest in currying favor with the Government in order to avoid a sentence of life imprisonment. Given that trial counsel's strategy was to attack Vetere's credibility for these very reasons, it was objectively unreasonable for trial counsel to then admit to the shootings in summation; doing so ran counter to its strategy of rebutting the non-statutory aggravator by highlighting the weakness of the Government's evidence as to these uncharged shootings. (Indeed, trial counsel contested the other uncharged crimes in its summation, including Yuslena Jarrett's uncorroborated account of a domestic violence incident T9565-66.

**B.      Trial counsel's deficient performance was prejudicial.**

As noted above, the Government relied heavily on the uncharged shootings in its arguments to the jury for why it should sentence Mr. Troya to death. The undersigned incorporate by reference the facts and arguments pled herein, as they similarly demonstrate that trial counsel's concession of the uncharged shootings in summation was prejudicial to Mr. Troya, and that but for counsel's deficient performance, there is  a reasonable probability that at least one juror would have struck a different balance with respect to the sentence.

**XXII. Mr.Troya Received Ineffective Assistance Of Counsel, Where Counsel Failed To Challenge The Government's Evidence Regarding His Escape, By Failing To Properly Object To Testimony, Failing To Effectively Cross-Examine Inspector Glover, And Failing To Call Rebuttal Witnesses.**

Trial counsel unreasonably failed to challenge the evidence introduced regarding the prior escape conviction that the Government offered as evidence in aggravation in the penalty phase. Trial counsel's failure to object to the Government's witness's improper testimony is addressed in a separate sub-claim based on *Crawford v. Washington*, 541 U.S. 36 (2004), and Eighth Amendment reliability cases. Counsel failed to effectively cross-examine these same witnesses, and failed to call witness in rebuttal that were readily available.  Additionally, trial counsel's failure to present evidence as to the circumstances surrounding Mr. Troya's time in prison as a young man further demonstrated trial counsel's failure to present mitigation evidence. But for trial counsel's failure, it is reasonably likely the outcome of the sentencing trial may have been different.

A.      **Trial counsel was on notice that the Government would rely upon Mr. Troya's prior escape conviction as aggravation in their pursuit of obtaining a death sentence against Mr. Troya.**

Trial counsel knew as early as October 9, 2007, when the Government served written notice in letter form to Mr. Troya's trial counsel that the prior escape conviction would be used to enhance any sentence received by Mr. Troya. Doc. 399-1. This notice was reiterated within the Government's Notice of Intent to Seek the Death Penalty Against Defendant Daniel Troya and within the Government's Response in Opposition to Defendant Troya's Request for a Bill of Particulars Regarding the Notice of Intent to Seek the Death Penalty filed on February 20, 2008, and July 2, 2008, respectively. Docs. 311, 399.  Furthermore, trial counsel knew from the Government's witness list provided January 21, 2009, that the Government had only listed Inspector Glover and the Records Custodian for Florida Department of Corrections as possible witnesses regarding the escape. Inspector Glover worked for the Florida Department of Corrections, and in 2002 led the investigation of the escape from Brevard Correctional Institution. T7981-82.  He arrived at the facility after the inmates had already been apprehended. T8012.

Given trial counsel's knowledge of the government's intention to rely on Mr.Troya's escape conviction, trial counsel should have filed a motion in *limine* to prohibit Inspector Glover from relaying any information that was not within his personal knowledge, including, but not limited to, statements and reports of other officers, witnesses, or Mr. Troya. Also, defense counsel should have prepared and executed an effective cross-examination of Inspector Glover. Furthermore, defense counsel should have produced witnesses in rebuttal. By presenting rebuttal witnesses, trial counsel would also have had to opportunity to elicit testimony regarding the incredibly violent, frightening conditions at Brevard Correctional Institution and the

255

corresponding trauma and psychological damage inflicted upon Mr. Troya while housed at the institution, which would not only negate the use of the escape conviction as aggravation, but would have also supported his claim to mental health mitigation.

> **B.      Counsel failed to call witnesses in rebuttal to establish mitigation of the escape attempt, including the prison conditions that drove Mr. Troya to participate in the escape.**

Although trial counsel cross-examined Inspector Glover on a few points, trial counsel failed to present to the jury the complete story of Mr. Troya's time in the Brevard Correctional Facility.   Had trial counsel availed himself of the opportunity to effectively cross-examine Inspector Glover and present rebuttal witnesses, then he could have demonstrated for the jury that the escape incident was far less significant than the government version of events.

According to Inspector Glover, in October 2000, Mr. Troya was sentenced as a youthful offender to three years' imprisonment to be followed by two years' probation. T7994. Mr. Troya was originally an inmate in the minimal security work camp at the prison. T8003. On November 10, 2001, Mr. Troya reported that officers at the prison had assaulted him, punching and kicking him, while he was in the laundry room. T8000-2. The officers had also refused to take him for medical treatment. T8002.   After reporting the incident, Mr. Troya was then transferred to the main unit of the prison, a more secure facility, and placed in administrative confinement. T8002, T8004. It was there that he was placed in the cell of Jeffrey Burleson. T7985. On November 26, 2002, Mr. Troya, Mr. Burleson, and Eric Vonlydick escaped from their cells and were captured approximately 60 yards from the prison's perimeter fences. T7985, T7999, T7992. At the time of the escape, Mr. Troya had less than six months left to serve on his sentence. T8005.

In his testimony, Inspector Glover's testimony at points portrayed Mr. Troya as the leader of the escape plan, and provided other inaccurate and incomplete details. Had trial counsel called Erik Vonlydick, his testimony would have flatly contradicted the government's characterization

of Mr. Troya. Rebuttal witnesses would have also told the jury of the horrify cruelty of the Brevard Correctional Institution and helped explain why Mr. Troya felt desperate enough to escape with only months left on his sentence.

Mr. Vonlydick has provided an affidavit stating that he was available and willing to testify on Mr. Troya's behalf and would have testified as follows:[90]

On November 26, 2002, Mr. Troya, along with two other inmates, Jeffrey Burleson and Erik Vonlydick were apprehended outside the dorms and were charged with escape or attempted escape and were placed in administrative confinement. *See* Appendix E.

Mr. Vonlydick said that Mr. Troya had just been transferred from Work Camp and indicated that he had been beaten by guards while there. *Id*. Mr. Troya was sent back to the main unit and placed in a cell with Jeffrey Burleson. *Id*. Vonlydick and Burleson had been planning the escape for about a month and a half. *Id*. After Mr. Troya was put in the cell with Jeff, they had to let him in on the plan since it would take place in their cell. *Id*. Vonlydick's cell was on the first floor directly below Mr. Troya and Burleson. *Id*. The dorms were not locked at night because there were no bathrooms inside the cells. *Id*.

Mr. Vonlydick explained that Burleson was in a masonry class, so he had access to 2 x 12 boards, which he would mess up by spilling paint or varnish on them, then wash them off and place them outside the class building to dry out. *Id*. Vonlydick would go by and pick up the boards and place them in a recycle area wood pile as "recyclables" which wouldn't seem unusual. *Id*. They planned to escape by making a bridge of the 2 x 12 boards to cross over the razor wire fence. *Id*. They planned to overlap the boards end-to-end, tying them together using the rope he made by braiding strips of sheets together, and then walk across the bridge to the

---

[90] Attached Affidavit of Erik Vonlydick, Appendix I.

other side of the perimeter fence. *Id.* Vonlydick made a homemade screwdriver by filing off a piece of rebar on concrete and wrapped the end with the strips of sheets to make a handle. *Id.*

According to Mr. Vonlydick, Mr. Troya did not take part in any of the planning or preparation for the escape. *Id.* He went along with Vonlydick and Burleson, but planned to turn himself in after a couple of days. *Id.* He just wanted to get out of Brevard. *Id.* His release date was close, but things were so bad, he just wanted out, just like Vonlydick did. *Id.*

Mr. Volydick has stated that if he had been called to testify that he would have told the jury that Mr. Troya was hoping to be sent somewhere else after he turned himself in. *Id.* Mr. Troya was afraid, that because he was close to his release date, the officers would try to find a way to bring something up against him to extend his prison term, and he wanted a transfer to avoid that. *Id.*

Mr. Vonlydick stated that when they tried to escape, they only got about 60-70 feet from the window, before Officer Jernigan shined his flashlight on them from a nearby doorway. *Id.* Vonlydick had been monitoring the officer's routines / routes for weeks and Jernigan was seven minutes ahead of schedule, 3:23 a.m. instead of 3:30 a.m. *Id.*

Mr. Vonlydick said that once they realized they were caught, they stopped the escape attempt, lit up cigarettes and waited for the staff to arrive. *Id.* While they were waiting, Vonlydick threw a bag of tools he was carrying a bag of tools and he threw the bag on the roof of the building they were next to. *Id.* They turned and faced the wall with their hands above their heads. *Id.* Nobody resisted, but all three of them were beaten by the guards before they were placed in confinement cells. Vonlydick spent two years in confinement for the attempted escape. *Id.*

According to Mr. Vonlydick, everyone wanted out of Brevard, which is why Vonlydick and Burleson planned the escape in the first place. *Id*. Mr. Vonlydick recounted that right after the escape, there was a Mexican kid who used a mower blade to kill another kid on the compound. *Id*. The attack was a hit by a kid who was targeting a boy with the same name as the victim, but the inmate he killed was not the correct target. *Id*.

Mr. Pierrot Nicolas, a former inmate of Brevard Correctional Institution from 2001 to 2004, has provided an affidavit stating that he was available and willing to testify on Mr. Troya's behalf. Had Mr. Nicolas been called to testify, he would have corroborated Mr. Vonlydick's account of the condition at the Brevard Correctional Institution. Trial counsel never contacted Mr. Nicolas, but Mr. Nicolas informed Mr. Troya's post-conviction investigator as follows: [91]

Mr. Pierrot Nicolas called Brevard Correctional Institution a "Gladiator Camp." *See* Appendix I-2. He was 18 years old when he arrived there. *Id*. Prior to entering, he was warned by older inmates at the Florida Reception Center to "Don't let nobody try you." *Id*. He was told to step up (meaning fight) to earn respect and to show he was not afraid. *Id*. He got into his first fight while at the Florida Reception Center and he's never lost a fight. *Id*.

Mr. Nicolas stated that it was "crazy" in Brevard Correctional Institution and that the camp got you ready to survive any other camp. *Id*. He stated that "There was no time to think, you had to react." *Id*. Prisoners from other institutions assumed that if you were from Brevard, you were a maniac. *Id*. They saw Brevard as being all about fights and shanks. *Id*. Mr. Nicolas saw fights there every day. *Id*. He learned to pick a lock within the first five minutes of being in Brevard. *Id*.

---

[91] Affidavit of Pierrot Nicolas, Appendix I-2

According to Mr. Nicolas, if a new guy, usually a white male, arrived on the bus and had a black eye, he was automatically a target because it was assumed he had already lost a fight. *Id*. He was seen as weak or soft and he would be robbed of property. *Id*.

Mr. Nicolas said that inmates in the orientation dorm were "stepping down" on new guys that were newer than them. *Id*. One inmate had a sock hanging out of his pants pocket to make it look like he was holding a "lock in a sock". *Id*.  He used it to scare the new guys who had already heard about the lock in a sock weapon before they even got there. *Id*.  They were scared they were going to get hit, so they would open their locker and the inmate with the sock would take whatever he wanted. *Id*.  Some inmates slept with their possessions, like cigarettes and pictures - anything that was valuable so no one could steal it from them. *Id*.

Mr. Nicolas stated that there were 20 inmates to a pod and 60-70 inmates in the open bay area. *Id*.  Pods were usually occupied by inmates from the same gang affiliation or neighborhoods, but the open bay had mixed inmates, resulting in increased tension. *Id*. If you sensed tension in the dorms, you usually slept with your shoes tied and a shank close to you. You were always on guard. *Id*.  Nicolas saw an inmate slap another inmate really hard just because his name was not called at mail call. *Id*. He was mad because he did not get any mail. *Id*.

Shortly after he arrived at Brevard in 2001, he saw one inmate set another inmate on fire by filling an eyedropper with gasoline and spraying it on the other inmate. *Id*. He jammed the cell door shut to make it difficult for offers to get to him to help. *Id*. Afterwards, all doors were completely removed from cells. *Id*. The victim was transferred out of the facility. *Id*. After the doors were removed, nobody stole anything from you because everyone stayed with their own group in the pod. *Id*.  Occasionally, and inmate was in the shower or on bed rest by order so he was allowed to staying the dorms when everyone else was out on the recreation yard. *Id*. That

260

inmate could steal from or plant evidence in a cell to get another inmate sent to confinement. *Id*.[92]

Mr. Nicolas says his best fight at Brevard was against Mike Francis "War Daddy". *Id*. Even the officers watched them fight. *Id*. He lip was busted because he was biting his lip when he was punched in the mouth. *Id*. He was bleeding profusely and the officer said he might need stitches. *Id*. Mr. Nicolas did not want to stop the fight to go to medical, and kept fighting. *Id*. He still has a scar to this day. *Id*. Mike conceded to the fight and afterwards, they got along just fine. *Id*.

Mr. Nicolas was on close management for 18 months for hitting a guy with a lock. *Id*. It was over a Miami Heat game. *Id*. He lost the bet and would not pay him the twenty dollars owed so he hit him. *Id*. Mr. Nicolas said that if you did not make someone pay for doing you wrong, then you could become a target. *Id*.

Mr. Nicolas explained that the single officer assigned to each dorm could not watch everyone, everywhere. *Id*. Every pod had a blind spot called "the pit." *Id*. *Id*. If an inmate wanted to fight you inside, he would invite you to the pit. *Id*. If you were outside on the recreation yard, and someone wanted to fight you, you were invited to "the third," which was the third of the three handball courts in the recreation yard. *Id*. It was also out of sight of the officers. *Id*. One inmate would be on the lookout for approaching officers while the inmates fought, often those fights were bloody. *Id*. If an officer was coming, the inmates would stop fighting and present to play handball until the officer walked on by, then the fight would resume. *Id*. If you were on the main yard and someone wanted to fight you, you go to the "black top" an open space by the main gate between the warehouse and the auto shop. *Id*.

---

[92] Affidavit Pierrot Nicolas Appendix I-2

Mr. Nicolas recounted that one inmate, "Big Country" was tough and could fight, but he let it go to his head and he said one wrong word on the rec yard (a racial slur) and immediately became a target. *Id*. He lined his jacket with magazines so a shank could not penetrate it. *Id*. The officers knew the lining meant an inmate feared for his life so they put them in confinement until they could be transferred out. *Id*.   If an inmate filed a grievance and it made its way up to the Captain, he would be placed in confinement. *Id*. A grievance was supposed to go from the Captain to the Assistant Warden if it was not resolved by then. *Id*. There is speculation the grievances would not make it past the Captain, especially when it was a grievance against one of his officers. *Id*.

Mr. Nicolas stated that there were a lot of gangs at Brevard - the Latin Kings, the UK's (United Kings, a branch of the Latin Kings, but allowed blacks), Sur 13, Crips, Gangster Disciples and the Bloods. *Id*. The Sur 13 gang was a Mexican gang who went for weapons. *Id*. They got along well with the officers so they could get cell-reassignments. *Id*.

Mr. Nicolas reported that there was a riot in 2004. *Id*. All the gangs were in the yard in their groups when it started. *Id*. Three gangs grouped together and started walking toward another gang, and that gang rushed them. *Id*. While trying to escape, the Bloods climbed the fence and got cut up by barbed wire. *Id*. One member got stuck in the wire and an officer tried to pull him down, and blood started gushing from his arm. *Id*. Officers had to get a ladder to climb up and get him down. *Id*. All inmates were ordered to sit down on the yard. *Id*.   All the Bloods and a lot of other gang members were bussed out right after. *Id*. There were only five officers on the yard when it started and they only carried pepper spray. *Id*.

Mr. Nicolas stated that Brevard had the "Doom Squad", which consisted of four officers who would pull you from your cell and take you to the Sergeant's office between the C and D

262

drops and beat you up. *Id*. The Doom Squad officers were all white middle-aged males with no rank. *Id*. They were called the Doom Squad because if they were coming in, you knew they were going to cause doom. *Id*. If a shift sergeant reported problems on their shift, the Doom Squad would take the troublemaker out and beat him up. *Id*. Inmates never went to medical afterward since it would only make it worse for them. *Id*. They never beat an inmate up bad enough to need serious medical treatment. *Id*. If there was a fight and the officers wanted to know who was involved, they would take multiple inmates out and by the time the inmates came back to their cells, the Doom Squad knew who did it and who was involved. *Id*.  By taking several inmates out, no one knew who the snitch was unless the snitch admitted it. *Id*. Most inmates would rather be beaten by officers than be labeled a snitch because other inmates would assume you were a snitch every time you were taken out. *Id*.

According to Mr. Nicolas, some of the female officers wore tight uniforms and did not mind if inmates "whacked off" looking at them. *Id*. One female officer sold naked pictures of herself to the inmates, from the shoulders down. *Id*. This officer was close to two inmates. *Id*. One of them was "Jack Boy" who hanged himself after he left prison. *Id*. The other inmate was a Spanish guy. *Id*. She would send all of the inmates to the rec yard except for one of her boys. *Id*. Jack Boy would brag about it. *Id*. He would have cigarettes, weed and a cell phone that he got through her. *Id*. Jack Boy was the leader of the Gangster Disciples. *Id*. When officers searched his property, they found the nude photos of the officer, recognized by the tattoo removal scar on her right arm. *Id*.

Around 2004-2005, a white female officer was caught in the barbershop having sex with two inmates who were members of the Latin Kings. *Id*. She had no respect for any inmates who were not members of that gang. *Id*. She was fired on the spot and escorted off the grounds. *Id*.

263

Mr. Nicolas explained that there was a pecking order among the inmates. *Id*. The jun-jun's were inmates who could not fight, and were soft and scared. *Id*. *Id*. They had it rough; they were the targets, but only in the dorms. *Id*. On the rec yard, people did not know who the jun-juns were unless they were told. *Id*. There were two sides of the jun-juns. *Id*. There were the ones who used to hustle by trading services, like washing people's laundry for food and commissary - they were voluntary jun-jun's because they benefited from it. *Id*. Then there were the jun-jun's who were forced to do whatever they had to do to keep from being beaten up by bigger inmates. *Id*.

Mr. Nicolas recounted the violence that was visited on the inmates from other inmates. *Id*. In 2003, a kid named "CoCo" killed another kid "Dee." *Id*. Dee was two weeks from getting out, but he showed loyalty to somebody that had beef with the Kings, so he was hit because of that loyalty. *Id*. He was not the real target. *Id*. CoCo was the enforcer for the Kings. *Id*. He cut Dee across the lower stomach, holding his intestines in. *Id*. The officers called for medical staff, but when they put Dee on the stretcher, the other inmates saw his arm flop down, and they knew he was dead. *Id*. Also, people were hit in the head all the time at Brevard. *Id*. One inmate shoved another inmates head down into the water fountain so hard that he lost four or five teeth. *Id*. The inmates quit using the lock in a sock as a weapon because when you swung it, the sock might tear apart. *Id*. Instead, they hung the locks on their belts and swung with it. *Id*.

Jason Conley, a former inmate of the Brevard Correctional Institution, was housed in the same dorm as Mr. Troya when he tried to escape. Trial counsel never contacted Mr. Conley. Had Mr. Conley been called to testify, he would have corroborated Mr.Vonlydick's and Mr.

264

Nicolas's testimony as to the brutal violence that was commonplace at Brevard Correctional Institution

Jason Conley was a former inmate of the Florida Department of Corrections, from 2002 to 2004. He was initially assigned to the Reception and Medical Center in Lake Butler. While there, he was punched in the face and beat by a sergeant for being in the wrong line. At 16 years old, he was transferred from Lake Butler to Brevard Correctional Institution which housed offenders from 13 to 25 years old. It was called the "gladiator camp", an institution where nobody wanted to go. He was there for approximately six months in 2002 to 2003.

When the bus pulled up to Brevard, the guards told the inmates that whoever wanted to go into protective custody should go there immediately. Mr. Conley declined. While at Brevard, he was jumped and beaten up by officers at least once a week. Other inmates beat him up in between those beatings – the guards would be at the door watching and doing nothing to stop it. At times, a black gang, consisting of 7-8 members beat up on him, all at once. He learned to curl up in a ball while he was being beat and never sought medical attention. He would get black eyes, but no bones were ever broken. When he would go to the canteen, inmates would beat him up and steal his food, so he stopped going. He felt as though he needed to arm himself with a weapon, but did not have one. During his time at Brevard, he saw a 13 year old kid stab another kid.

Mr. Conley was housed in the same dorm as Mr. Troya, Mr. Vonlydick, and Jeff Burleson, and he recalls their attempted escape. He was sleeping when it happened and the guards woke them up and put them in confinement and questioned them about the incident. They had to move all the inmates off the unit until they could get the hole in the wall fixed.

265

Mr. Conley said that in 2003, he was placed in confinement for two to three weeks for fighting.  The confinement cells were 6' x 9' with a vent above the toilet and no windows.  The door had a tiny window.  He never left the cell.  He was given meals through the door.  He attempted to escape Brevard by crawling through the vent, but was caught and beaten by the guard(s).  He told them there were voices in his head – that he had to get out of that cell.  He was paranoid and claustrophobic.  After this incident, he was transferred to medical in the South Florida Reception Center.  He was treated with Zoloft and Paxil.  He grew tired of being beaten up every day, so he volunteered to go in protective custody.  He never filed a grievance on the abuse he suffered at Brevard because if you did, they would have beaten you more.

Dennis Rivera is yet another witness that was willing to testify as to the violence of Brevard Correctional Institution, but was never contacted by trial counsel.[93] *See* Appendix H-2. Mr. Rivera has provided an affidavit stating that Brevard Correctional Institution was a called a "Gladiator school," which meant it was an adult jail with inmates from age 17 to 24. *Id*. He described it as a "wannabe boot camp," where inmates fight every day multiple times a day. *Id*. Mr. Rivera commented that you better not have commissary, because if you do, you get jumped for it. *Id*. He said that if other inmates see you put something away, they fight you for it, take it, rob you and/or jump you. *Id*.

### C.      Trial counsel failed to present evidence to counter the inaccurate portrayal of Daniel Troya as the leader of the escape attempt.

A number of questions by the government of its witness Inspector Glover were improperly leading, and misleading, but counsel neglected to object to them. On the direct examination of Inspector Glover, AUSA Kastrenakes added his own opinion in his questioning, by prefacing a question with the statement "Troya along with his confederates…" T7989. This is

---

[93] Affidavit Dennis Rivera Appendix H-2.

a misleadingly false statement of fact, as there was ample proof available Mr. Troya was not the leader.

Had trial counsel objected then he would have prevented the jury from being misled, and then later he could have brought to the jurors attention the fact that Mr. Troya was a recent transfer into Mr. Vonldick's cell. Had trial counsel called Mr. Vonlydick as a rebuttal witness, then Mr. Vonlydick would have testified that he and Mr. Burlson had planned the escape attempt for over a month.  He would have testified that he and Mr. Burlson had worked out all the details of the escape plan, including the use of manikins. And he would have explained that Mr. Troya was only included in the plan because the escape was to occur in the cell he shared with Mr. Vonlydick.

## XXIII. MR. TROYA'S DEATH SENTENCES VIOLATE THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENTS.

Mr. Troya's death sentences are unconstitutional under the Eighth Amendment to the United States Constitution because the death penalty is inconsistent with evolving standards of decency, it is arbitrary and serves no valid penological purpose, and it is torturous.

Mr. Troya's death sentences were obtained pursuant to an arbitrary process that failed to limit the death penalty to the worst offenders and instead operated by means of and promoted discrimination on the basis of race. *Furman v. Georgia*, 408 U.S. 238 (1972). As a result, Mr. Troya's death sentence and continued confinement deprive him of his rights to due process; equal protection; and freedom from the infliction of torture and cruel and unusual punishment, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; decisional law, and other mandatory rules; and international law as set forth in treaties, customary law, and international human rights law.

Mr. Troya's sentences of death are further unconstitutional because Mr. Troya has been and will continue to be confined for a time that is unnecessarily lengthy, and under conditions that are torturous and inhumane.

Justices of the Supreme Court have increasingly opined that the delay that will transpire between a capital prisoner's conviction and his execution violates the Eighth Amendment in light of the current standards of decency because it subjects the prisoner, in addition to and in anticipation of the forfeiture of his life, to the endurance of many years living under sentence of death under extraordinary psychological duress, as well as extreme physical and social conditions and restrictions. *Lackey v. Texas*, 514 U.S. 1045 (1995) (Stevens, J., respecting denial of the petition for writ of certiorari); *Thompson v. McNeil*, 129 S. Ct. 1299 (2009) (Stevens, J., same); *Glossip v. Gross*, 135 S. Ct. 2726 (2015) (Breyer, J., dissenting).

It is well established that what is constitutionally tolerable under the Eighth Amendment is not static. "The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958). Moreover, "the Clause forbidding 'cruel and unusual' punishments 'is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice.'" *Gregg v. Georgia*, 428 U.S. 153, 171 (1976) (quoting *Weems v. United States*, 217 U.S. 349, 378 (1910)).

The allegations and supporting citations and exhibits included in other claims of this Petition are incorporated by this reference in support of this claim for relief.

268

**A.  The death penalty is a disproportionate sentence even for the gravest of offenses.**

The steady and progressive abandonment of capital punishment throughout the nation demonstrates that the death penalty, under current standards of decency, is a disproportionate punishment even for the most serious of offenses.

**1.  There is a national trend toward abolition.**

Jurisdictions throughout the country have increasingly repealed or abolished the death penalty, with greater frequency within the past few years, and thus the use of the penalty has become unusual within the meaning of the Eighth Amendment. New York's death penalty was declared unconstitutional in 2004, *People v. LaValle*, 3 N.Y. 3d 88 (2004), and no legislative or other attempt was made to reinstate it. New Jersey repealed the death penalty in 2007, and New Mexico repealed capital punishment in 2009. Following the commutation of all death sentences by the Illinois governor in 2003, the state abolished capital punishment in 2011. Connecticut repealed the death penalty in 2012, Maryland did so in 2013, and Nebraska did so in 2015.

Numerous other United States jurisdictions, while retaining the death penalty on the books, either have not carried out any executions in recent years or have carried out only a small few. The federal government has not carried out any executions since 2003. The military capital punishment system has not executed anyone since 1961. Seven states that legally authorize the death penalty have not carried out an execution in the past ten years[94]: California, Colorado, Kansas, New Hampshire, Oregon, Pennsylvania, and Wyoming. Seven additional states have carried out only a single execution in the last ten years; these are Arkansas, Kentucky, Louisiana, Nevada, Utah, Montana, and Washington. Of these seven states, those executed in Kentucky, Louisiana, Montana, and Nevada had abandoned their appeals.

---

[94] The years of consideration here are 2006 through 2016.

In only ten states have executions averaged more than one per year over the last ten years: Alabama, Arizona, Florida, Georgia, Mississippi, Missouri, Ohio, Oklahoma, Texas, and Virginia. These ten states accounted for 92% of all executions (393/428) over this time period, with a single state, Texas, responsible for over 42% (181/428).[95]

Even those states which still routinely employ the death penalty have seen a marked drop in executions, as reflected in a steady decline nationally. The high occurred in 1999, when 98 offenders were executed. The last ten years have shown a consistent decrease in executions (2006—53; 2007—42; 2008—37; 2009—56; 2010—46; 2011—43; 2012—43; 2013—39; 2014—35; 2015—28; 2016—10 to date).[96]

The decline in new death sentences is clear and stark. In 1995, 311 people were sentenced to death nationwide. In 2004, the number was less than half that, at 138. In 2008, the number was nearly halved again, with a total of 73 people sentenced to death, the lowest total since the death penalty was reintroduced in 1976. Three states accounted for half of the new death sentences in 2014: Florida with 11, Texas with 11, and California with 14.

A number of states that still authorize the death penalty have expressed reservations about its continued use. The legislatures in California, New Hampshire, Pennsylvania, and Tennessee have commissioned reports on their states' use of the death penalty, and Louisiana has established a Capital Punishment Fiscal Commission to investigate the cost of the death penalty. Four states that recently abolished capital punishment—New Jersey, Illinois, Connecticut, and Maryland—all commissioned reports before enacting legislation abolishing the death penalty.

---

[95] http://www.deathpenaltyinfo.org/views-executions (last visited April 6, 2016).

[96] *Id*. (note that the spike in executions in 2009 reflects the end of the stays of execution issued pending *Baze v. Rees*, 553 U.S. 35 (2008).

The executive branches of multiple states have demonstrated concerns about the fairness and appropriateness of the death penalty. Governors of Colorado, Oregon, Pennsylvania, and Washington have declared official moratoria on executions.

The United States Supreme Court has examined actual practices rather than simply whether the death penalty was legislatively authorized when assessing the constitutionality of the death penalty for categories of offenders, as well as the constitutionality of other punishments. *See, e.g.*, *Atkins v. Virginia*, 536 U.S. 304, 316 (2002) ("[E]ven among those States that regularly execute offenders and that have no prohibition with regard to the mentally retarded, only five have executed offenders possessing a known IQ less than 70 since we decided *Penry* [*v. Lynaugh*, 492 U.S. 302 (1989)]."); *Roper v. Simmons*, 543 U.S. 551, 564-65 (2005) (noting that although twenty states authorized capital punishment for juveniles, the practice was infrequent, with only three states, Oklahoma, Texas, and Virginia, actually executing juveniles in the prior ten years); *see also Graham v. Florida*, 560 U.S. 48, 62 (2010) ("Here, an examination of actual sentencing practices in jurisdictions where the sentence in question is permitted by statute discloses a consensus against its use. Although these statutory schemes contain no explicit prohibition on sentences of life without parole for juvenile nonhomicide offenders, these sentences are most infrequent."); *Miller v. Alabama*, 132 S. Ct. 2455, 2549 (2012) ("[S]imply counting legislative enactments can present a distorted view. . . .").

Capital punishment is infrequently practiced, other than in a very few states, and new death sentences are rapidly and consistently declining. The infrequency of the use of the death penalty, relative to the number of death eligible offenders, renders it "truly unusual" and it can now be concluded that a "national consensus has developed against it." *Atkins*, 536 U.S. at 316.

271

### 2. The death penalty is excessive.

The Eighth Amendment prohibits the imposition of excessive punishments. *Furman*, 408 U.S. at 325 (Marshall, J., concurring) (noting that the Court has concluded that "excessive punishments [are] as objectionable as those that [are] inherently cruel"). Punishments are excessive when, among other reasons, they "involve the unnecessary and wanton infliction of pain." *Gregg*, 428 U.S. at 173.

The acceptable goals of punishment—deterrence, retribution, incapacitation, and rehabilitation—form the baseline for analyzing excessiveness. The death penalty fails to significantly further these goals over life imprisonment.

Because the death penalty fails measurably to promote any of the permissible penological goals over life imprisonment, it is excessive. *Furman*, 408 U.S. at 279 (Brennan, J., concurring) ("If there is a significantly less severe punishment adequate to achieve the purposes for which the punishment is inflicted, the punishment inflicted is unnecessary and therefore excessive.") (internal citation omitted).

### 3. The United States is out of step with the international community's consensus against the death penalty.

The United States executed 35 people in 2014.[97] Only China, Iran, Saudi Arabia, and Iraq executed more.[98] With 73 new death sentences imposed in 2014, the United States ranked behind only China, Nigeria, Egypt, Pakistan, Bangladesh, Tanzania, and Iran.[99]

---

[97] Amnesty International, Death Sentences and Executions 2014 at 62 (2015) available at https://www.amnesty.org.uk/sites/default/files/death_sentences_and_executions_2014_en.pdf.

[98] *Id*.

[99] *Id*. at 63.

Since the 1970s, 82 countries have abolished the death penalty for all crimes, bringing the total number of abolitionist countries to 98. Thirty-five additional countries are abolitionist in practice because they have not carried out any executions during the last ten years and are understood to have an established policy or practice of not carrying out executions.[100] The General Assembly of the United Nations, comprising all 193 members of the UN, has repeatedly adopted resolutions calling for countries that still maintain the death penalty "to establish a moratorium on executions with a view to abolishing it."[101]

Mr. Troya's prolonged confinement under sentence of death violates international human rights law. The European Court of Human Rights has held that the protracted postconviction, pre-execution confinement is a human rights violation of sufficient magnitude to prohibit the United Kingdom from sending an accused to face such a fate. *Soering v. United Kingdom*, App. No. 14038/88, 11 Eur. H. R. Rep. 439 (1989) (six to eight year delay before execution in Virginia prohibited United Kingdom from extraditing potential capital defendant to that state). The Canadian Supreme Court cited such delays as a relevant consideration in deciding that extradition of a murder suspect to the United States without first obtaining assurances that the death penalty would not be imposed violated principles of fundamental justice. *United States v. Burns*, 1 S.C.R. 283, 353 (2001).

Courts in other countries, even those assuming the lawfulness of a death sentence, have held that "lengthy delay in administering a *lawful* death penalty renders ultimate execution

---

[100] DPIC, Abolitionist and Retentionist Countries, http://www.deathpenaltyinfo.org/abolitionist-and-retentionist-countries?scid=30&did=140 (last visited April 6, 2015); Amnesty International, Death Sentences and Executions 2014 at 64 (2015) available at https://www.amnesty.org.uk/sites/default/files/death_sentences_and_executions_2014_en.pdf.

[101] G.A. Res. 69/186 ¶ 4, U.N. Doc. A/RES/69/186 (Dec. 18, 2015), available at http://www.un.org/en/ga/search/view_doc.asp?symbol=A/RES/69/186.

273

inhuman, degrading, or unusually cruel." *Knight v. Florida*, 120 S. Ct. 459, 462 (1999) (Breyer, J., dissenting from denial of certiorari). Relying in part on international treaties and human rights law, the India Supreme Court commuted fifteen death sentences on the ground that pre-execution delays in the resolution of mercy petitions ranging from five to twelve years[102] constituted cruel and degrading treatment and/or punishment and were inordinate, unreasonable, and amounted to torture. *Shatrughan Chauhan & Anr., v. Union of India & Ors.*, No. 55 of 2013 (India Supreme Court, filed Jan 21, 2014), slip. op. at 31-33, available at http://judis.nic.in/supremecourt/imgs1.

The United States Supreme Court has routinely taken into account the climate of international opinion in its Eighth Amendment jurisprudence. *See, e.g.*, *Graham v. Florida*, 560 U.S. at 80 (it is appropriate to look "beyond our nation's borders for support for [the] independent conclusion that a particular punishment is cruel and unusual"); *Roper*, 543 U.S. at 575 ("[F]rom the time of the Court's decision in *Trop* [*v. Dulles*], the Court has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments.'").

**B.      The capital punishment schemes in the United States, including the Federal Death Penalty Act, are unconstitutional because they fail to ensure reliability, consistency, and equal protection of law.**

**1.      Reliability**

The risk of wrongful execution, that is, the execution of an innocent person, attends all death penalty schemes in the United States, including capital sentences imposed pursuant to the Federal Death Penalty Act. There is evidence of at least 156 exonerations in capital cases throughout the nation. Researchers have estimated that nearly one in twenty (4.1%) of those sentenced to death are actually innocent, an unacceptably high error rate given the consequences.

---

[102] At the time of the filing of this Petition, Mr. Sanchez has been on death row for nearly seven years.

274

Because due process of law protects the innocent, as long as there remains the possibility of exoneration, this right should not be foreclosed.

### 2. Arbitrariness

The Eighth Amendment's requirement to eliminate arbitrariness in capital sentencing is undermined by the conflicting demands of consistency in application, and a capital defendant's right to individualized sentencing. These requirements may ultimately be irreconcilable.

### A. Failure to narrow the class of eligible offenders

The Eighth Amendment prohibits the imposition of a death sentence unless the governing statute reasonably justifies the imposition of a more severe sentence on the defendant compared to others found guilty of murder. Thus, to pass constitutional muster, a death penalty statute must genuinely narrow the subclass of offenders upon whom a sentence of death may be imposed and provide a meaningful basis for distinguishing the few cases in which death is imposed from the many cases in which it is not, and suitably guide the sentencer's discretion. *See, e.g.*, *Furman v. Georgia*, 408 U.S. 238 (1972); *Zant v. Stephens*, 462 U.S. 862, 877 (1983).

In conflict with these clearly established United States Supreme Court mandates, many death penalty statutes, including the Federal Death Penalty Act, were designed to, and do, operate in the precise manner the Supreme Court found violated the Eighth Amendment in *Furman*. Death penalty statutes, including the Federal Death Penalty Act, fail to justify the imposition of a more severe sentence on defendants like Mr. Troya against whom the death penalty is sought compared to others found guilty of murder; permit the imposition of a freakish, wanton, arbitrary, and capricious judgment of death; and allow prosecutors to arbitrarily select defendants such as Mr. Troya for capital prosecution without providing consistent guidelines to ensure reliability.

The Federal Death Penalty Act sets forth sixteen statutory aggravating factors, some of which contain multiple parts. 18 U.S.C. § 3592(c). These include, but are not limited to, felony murder; previous violent felonies involving the use of a firearm; previous conviction of an offense for which a death sentence or life without parole was authorized; previous conviction of other serious offenses; grave risk of death to additional persons; heinous, cruel, or depraved manner of committing offense; financial gain from offense; conviction for two felony drug offenses; conviction for serious federal drug offenses; criminal enterprise involving drug sales to minors; offense against high public official; prior conviction for sexual assault or child molestation; and multiple killings or attempted killings. In addition to these sixteen statutory aggravating factors, the Federal Death Penalty Act permits the fact-finder to consider "any other aggravating factor for which notice has been given." 18 U.S.C. § 3592. As a result of the extraordinary breadth of the statute, individual federal prosecutors are afforded virtually unfettered discretion to determine whether to seek death, thereby creating a substantial risk of arbitrariness.

### 3. Racial discrimination

One of the fundamental goals of our criminal system is to ensure that justice is meted out fairly, in accordance with the law, and not on the basis of improper concerns such as race. Applying the death penalty in a discriminatory manner constitutes functional and structural error. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). The denial of equal protection is established where a defendant demonstrates that the prosecutorial authorities' selective enforcement decision is deliberately based upon an arbitrary classification, such as race, ethnicity, national origin, or gender. Furthermore, Congress enacted 21 U.S.C. § 848(o) in order to expressly grant capital defendants the "right . . . to justice without discrimination," requiring juries to certify that racial discrimination played no role in the imposition of the death penalty in specific cases.

Statistical evidence shows disproportionate prosecution of people of color under the federal death penalty statute. The prosecution of and imposition of the death sentence against Mr. Troya violated his rights under 21 U.S.C. § 848 to "justice without discrimination," and also contributed to "the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140 (1994).

Many studies have demonstrated the significant role that race plays in the criminal justice system generally, and on the administration of the death penalty in particular. These studies consistently reveal, even after accounting for legitimate non-racial case characteristics, that offenders who kill white people have a significantly higher chance of receiving a death sentence than offenders who kill people of other races. *See, e.g.*, U.S. General Accounting Office, *Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities* (GAO/GGD-90-57, Feb. 1990); David C. Baldus & George Woodworth, *Race Discrimination in the Administration of the Death Penalty: An Overview of the Empirical Evidence with Special Emphasis on the Post-1990 Research*, 39 Crim. L. Bull, 194, 196, 207-08 (2003).

Some states have invoked the persistence of discrimination as a basis for eliminating or restricting the use of the death penalty. Governor Martin O'Malley of Maryland, a state that repealed the death penalty, flatly declared that the death penalty "cannot be administered without racial bias."[103] Connecticut Governor Dannel P. Mallow, signing repeal legislation, observed that he saw discrimination in the administration of the death penalty.[104] Illinois Governor Pat Quinn,

---

[103] Ian Simpson, *Maryland Becomes Latest U.S. State to Abolish Death Penalty*, Reuters, May 2, 2013, available at http://mobile.reuters.com/article/idUSBRE9410TQ20130502.

[104] Governor Dannel P. Mallow, on Signing Bill to Repeal Capital Punishment (Apr. 25, 2012), available at http://portal.ct.gov/Gov-Malloy-on-Signing-bill-to-repeal-capital-punishment/.

277

signing repeal legislation, similarly commented that it is impossible to design a death penalty system that is consistent and free from discrimination on the basis of race.[105] And New Mexico Governor Bill Richardson, on approving the abolition of capital punishment, stated, "It bothers me greatly that minorities are overrepresented in the prison population and on death row."[106]

The governors of Colorado, Oregon, Washington, and Pennsylvania have declared moratoria on execution in their states, and each has cited concerns about racial discrimination and equal justice in support of the moratoria.[107]

**C.     The conditions under which Mr. Troya is confined under sentence of death, and the length of time under which he will be confined prior to execution, constitute conditions of physical and psychological torture and inhumane treatment.**

**1.     Physical conditions of confinement**

The physical and psychological conditions of Mr. Troya's lengthy confinement are so dehumanizing, brutal, and severe as to constitute unconstitutional torture.

Mr. Troya lives under conditions of extreme isolation in the Special Confinement Unit (SCU) at the United States Penitentiary – Terre Haute (USP-Terre Haute), where he and other federal death row inmates are confined. The amount of time Mr. Troya is permitted to be outside

---

[105] Press Release, Statement from Governor Pat Quinn on Seante Bill 3539 (Mar. 9, 2011), available                                                                                           at http://www3.illinois.gov/PressReleases/ShowPressRelease.cfm?SubjectID=2&REcNum=9265.

[106] Press Release, Governor Bill Richardson Signs Repeal of the Death Penalty (Mar. 18 2009), available at http://www.eji.org/files/03.19.09%20NM%20Press%20Release.pdf.

[107]    http:///www.deathpenaltyinfo.org/documents/COexecutiveorder.pdf;    William    Yardley, Oregon Governor Says He Will Block Executions, The New York Times, Nov. 22, 2011, http://www.nytimes.com/2011/11/23/us/oregon-executions-to-be-blocked-by-gov-kitzhaber.html; Governor Jay Inslee, Remarks Announcing a Capital Punishment Moratorium (Feb. 11, 2014), available at http://www.deathpenaltyinfo.org/documents/InsleeMoratoriumRemarks.pdf; Memorandum,   available   at   https://www.scribd.com/doc/255669059/Governor-Tom-Wolf-Announces-a-Moratorium-on-the-Death-Penalty-in-Pa.

his cell is extremely limited, and when he is transported, he is handcuffed behind his back and escorted by guards. Mr. Troya is confined to his cell and allowed out of his cell only to go to a small exercise cage in which he exercises alone, use the computer to conduct legal research, and make telephone calls; attend medical appointments and visits, and for limited religious or educational programs. He is not permitted to work. Mr. Troya eats his meals in his cell.

Mr. Troya is permitted to have only very limited personal property, including a limited number of legal materials, photographs, books, and magazines.

Mr. Troya's access to legal resources is restricted. SCU prisoners do not have access to hard-bound legal books or legal treatises, and are able to access only limited legal authority online, and only for a short time each day.

Human contact is generally restricted to brief interactions with corrections officers and occasional meetings with attorneys, family, and friends. Mr. Troya and other death row prisoners at USP-Terre Haute are shackled during their visits. Inside and outside of his cell, Mr. Troya is under the surveillance of correctional officers.

The deplorable and inhumane physical conditions under which Mr. Troya has been confined are so extreme as to have generated attention and litigation. In 2007 and 2008, the National Prison Project of the American Civil Liberties Union conducted an investigation into conditions of the SCU at USP-Terre Haute and concluded that the conditions "may violate the Eighth Amendment's proscription against cruel and unusual punishment." The National Prison Project's findings included but were not limited to the following:

Deficiencies in the medical and psychiatric treatment exacerbated the decrepit and chaotic physical conditions. The medical, dental, and mental health treatment of death row prisoners at USP-Terre Haute was characterized by deliberate indifference to the needs of

279

prisoners, constitutionally inadequate mental health care, denial of access to timely and adequate dental care, and exposure to incessant noise, resulting in sleep deprivation and physiological and psychological distress.

The call buttons designed to alert staff to medical emergencies did not function properly, and when they did function, staff failed to respond to them in a timely manner. Prisoners suffering cardiac and diabetic emergencies were made to wait for hours after reporting symptoms to receive medical assistance. Prisoners in the SCU were provided no standardized way to make requests for medical care for acute conditions short of emergencies, and the requests they did make were frequently ignored. Prisoners who suffered serious injuries, including head injuries, were not properly assessed and the medical staff failed to comply with follow-up treatment ordered by physicians at outside hospitals. Other prisoners with diagnosed serious medical conditions were made to endure months without treatment despite the medical staff's recognition that the conditions required immediate medical attention.

Preventive medical care was inadequate. Many prisoners were not administered flu shots and routine vaccinations, including measles/mumps/rubella, tetanus, and hepatitis A and B, contrary to Bureau of Prisons policy.

Prisoners on death row at USP-Terre Haute lacked access to minimally adequate mental health care. "Evaluations are cursory, programming is unavailable, and the Complex lacks an on-site psychiatrist. Treatment of mentally ill prisoners is minimal." Many prisoners who require psychotropic medications are not prescribed them, and those who are receive their prescriptions following teleconferences with an off-site psychiatrist, and their follow-up care in the same manner. Psychological staff members come to prisoners' cell fronts and ask them to engage in discussions about their mental health symptoms and conditions in the presence of all other staff

280

and prisoners on the unit, so there is no confidentiality. Many prisoners are uncomfortable describing their symptoms under these circumstances.

Dental care at USP-Terre Haute was "grossly and dangerously deficient." Prisoners waited for more than 13 months for routine dental care. For those with dental problems, extraction of teeth was frequently the only treatment offered. The prison failed to provide dentures to individuals who lacked teeth or had teeth extracted and had difficulty eating.

The lack of adequate medical and mental care has resulted in several inmates abandoning their death penalty appeals.

A prisoner in the SCU sued medical and correctional staff at USP-Terre Haute, claiming that the staff demonstrated deliberate indifference to his medical needs when they failed to approve surgery for pterygia, a condition that adversely affected the prisoner's vision, despite his repeated requests for the surgery, for a period of five years. Following denial of relief on summary judgment by the federal district court, the Court of Appeals for the Seventh Circuit ruled that the prisoner had demonstrated a genuine issue of material fact whether the doctor who had denied the surgery was deliberately indifferent to the prisoner's medical needs. *Ortiz v. Bezy*, 281 Fed.Appx. 594 (2008) (unpublished).

Death row at USP-Terre Haute is also an intensely loud environment, a circumstance with adverse physiological and psychological consequences. The National Prison Project found that prisoners in the SCU at USP-Terre Haute were subjected to "extreme, unbearable noise at all hours of day and night." The noise emanated from prisoners in the Secure Housing Unit (SHU) located immediately below the SCU, who screamed, banged, and pounded on walls, as well as from frequent fire alarms, which were also accompanied by strobe lights.

281

**2.      The psychologically torturous nature of the prolonged confinement under the conditions detailed above while under a sentence of death constitutes a violation of the Eighth Amendment ban on cruel and unusual punishment.**

The effect on Mr. Troya caused by the medieval conditions of confinement experienced by those housed at USP-Terre Haute is profoundly heightened by years of uncertainty.

The United States Supreme Court has in the past recognized the cruelty of a prolonged imprisonment under sentence of death and the torment suffered by those who must endure periods of uncertainty. *See In re Medley*, 134 U.S. 160, 172 (1890) (recognizing "terror" and "immense mental anxiety" of living under sentence of death as "a great increase of the offender's punishment"); *Lackey v. Texas*, 514 U.S. 1045 (1995) (Stevens, J., dissenting from denial of certiorari) (acknowledging that execution after prolonged incarceration implicates the Eighth Amendment and questioning whether state interests in deterrence and retribution are properly satisfied by such execution). The stress associated with not knowing when a prisoner will be executed exacts an immeasurable toll on that prisoner's mental health.

**D.      Method of execution**

Eighth Amendment concerns about the method of execution employed by the federal government causing constitutionally unacceptable levels of suffering have prompted litigation that is still pending. In 2005, several federal death row prisoners filed a lawsuit against the federal government alleging that the federal government's lethal injection protocol violated the due process clause of the Fifth Amendment, the right to be free from cruel and unusual punishment under the Eighth Amendment, and provisions of the federal Administrative Procedure Act, 5 U.S.C. § 551 et seq. (APA). *Roane et al. v. Gonzales et al.*, Case No. 1:05-cv-02337-RWR-DAR. The case survived the defendants' motion for summary judgment and is still pending adjudication.

The knowledge that the three drug protocol devised and actually implemented by the government to execute prisoners demonstrated a substantial risk of extreme pain has and will continue to be a direct and proximate cause of Mr. Troya's extreme distress, anxiety, and fear regarding an impending execution.

Since the filing of the lethal injection lawsuit, at least one of the drugs designated to be used in the lethal injection cocktail has become unavailable, and the government has not yet completed the process of determining what drug combination will be used instead. *Roane et al. v. Leonhart et al.*, 741 F.3d 147, 150 (D.C. Cir. 2014) (noting that the government "has merely suspended executions using the three-drug cocktail called for by the current protocol and has not yet issued a new protocol"). This has been the status since 2011. As a result, Mr. Troya has been confined under sentence of death for years without having any idea what method of execution will be imposed upon him in the event that he is actually executed.

Furthermore, Mr. Troya and the other prisoners under sentence of death following federal prosecutions have now suffered for many years and will continue to suffer anxiety and fear due to the continuing uncertainty about what method of execution the federal government will select. *See, e.g.*, The Capital Punishment Enforcement Act (to be codified as amended at Tenn. Code Ann. § 40-23-114 (May 22, 2014)) (Tennessee capital punishment statute recently amended to provide that if the correctional department commissioner certifies to the governor that "an essential ingredient" for lethal injection executions is unavailable, the mandatory method for carrying out the execution is by electrocution). Mr. Troya further is constantly exposed to the continuing, realistic fear that whichever method the government selects will not comport with constitutional requirements. *See, e.g.*, Mot. for TRO and TRO, *Taylor v. Apothecary Shoppe, LLC.*, No. 14-CV-063-TCK-TLW, (N.D. Ok. Feb. 11 and 12, 2014); ECF Nos. 3 and 8

283

(describing effect that uncertainty about whether drugs to be used in an execution are defective and therefore might cause significant pain and suffering upon administration has on the psychological state of a prisoner facing execution—and issuing temporary restraining order preventing delivery of compounded pentobarbital to department of corrections for use in execution).

### E.    Conclusion.

The arbitrariness, lack of valid penological purpose, delay, and torturous conditions of and under which Mr. Troya is serving a sentence of death render that sentence excessive under currently prevailing and evolving standards of decency under the federal Constitution, as well as international law. Accordingly, Mr. Troya's death sentences should be set aside.

### XXIV.    LIFE-THREATENING DANGERS IN AND AROUND MATAMOROS PRECLUDED THE TRIAL TEAM FROM INVESTIGATING THE DEFENSE CASE THERE, AND CONTINUES TO PRECLUDE POSTCONVICTION COUNSEL FROM INVESTIGATING IN THE AREA; TRIAL COUNSEL FAILED TO MOVE FOR APPROPRIATE RELIEF DUE TO THESE DANGERS, AND THIS COURT SHOULD GRANT RELIEF NOW.

Well before trial, it was obvious to Mr. Troya's defense team a substantial segment of their case at both guilt and sentencing would be to link the killings to the drug cartel in Matamoros, Mexico. In fact, they tried to at trial. While they wanted to, there was no way anyone on the defense team could conduct an investigation of this case in Matamoros prior to the trial of this case; it was just too dangerous. Instead of alerting the Court to this problem and seeking relief for their client, the defense team did nothing-they did not move for a continuance or other relief based on the demonstrably dangerous conditions which existed in Matamoros. Had counsel contacted an expert in the dangers then existing in Mexico, and thought to notify the Court and the Department of Justice of the problem, there is little doubt some form of relief would have been granted.

Unfortunately, the problem is no different now. While there has been some advance in imposing law in Matamoros, no attorney would send an investigator there at this time to look into the involvement of the cartel in these killings or other evidence in Matamoros. A continuance, or reduction to life in prison, is required.

While at trial the government presented the drug conspiracy and weapons case against Daniel Varela, there was undoubtedly far more information available to show his prior violent activity and immersion in drug dealing. One of the main mitigating factors urged at trial, correctly so, was that in spite of his participation in the murders Varela did not face the death penalty, and was not even charged. The government provided the defense little of what it knew of Varela's history of drug dealing, and counsel seeks the government's file to more fully explore it. The most fruitful location for investigation would have been the area in and around Matamoros, since there was evidence Lou Escobedo obtained cocaine from and had relatives there, and that Varela had traveled with him. But there is no safe way the defense could have then, or can now, conduct an investigation in or near Matamoros.

An extremely experienced expert on the troubles in Mexico has provided this Court with a well-documented risk assessment describing the dangers of investigating a case in Matamoros. Appendix J. Any reasonably competent lawyer looking to send someone to Matamoros to investigate the case in the years preceding trial, as well as the year preceding the filing of this motion, would realize such an investigation was impossible.

Mr. Warren relies on United States government warnings, backed up by media and other reports, documenting the dangers of any defense investigation in Matamoros, then and now. This is what postconviction counsel have developed recently, and what trial counsel would have discovered then, and obtained appropriate relief, had they just asked. In the years preceding trial,

285

the drug wars in Matamoros absolutely precluded a defense investigation there. Mr. Warren reports the overall risk both now and then is high to very high in this summary:

### A.    Overall Risk Summary

Many reliable sources confirm that Matamoros is at present too dangerous and unpredictable to permit a reasonably safe or minimally effective defense investigation. For example, over the past five years the U.S. Department of State has repeatedly advised American travelers to defer unnecessary travel to Matamoros and the surrounding region.[108] Even if an investigator could safely enter and move about the city during one of the periodic lulls in the violence, the risk of harm would still be unacceptably high: muggings, assaults and kidnappings are frequent, perpetrators are seldom apprehended, and there is evidence that Americans are treated as targets of opportunity. Furthermore, the Gulf Cartel is obsessed with controlling its territory and curtailing information about its activities: it has installed patrols, surveillance cameras, lookouts and informants throughout Matamoros, so that any outsider asking probing questions would be quickly detected and summarily dealt with.  From cab drivers to street vendors to journalists and police, virtually anyone an investigator would encounter could be acting as the eyes and ears of the Gulf Cartel. An investigator asking questions about the drug trade or its operatives would thus be at serious risk of exposure and swift retaliation.

For an investigation conducted between October 2006 and May 2009, routine background research by the investigator would have revealed a pattern of periodic but unpredictable outbursts of extreme violence dating back to the 1990s, mostly as a result of turf wars within the Gulf Cartel. By late 2006, the U.S. Department of State was warning of a sharp upswing in

---

[108]    See, e.g., *Travel Warning for Mexico April 22, 2011*, at http://matamoros.usconsulate.gov/twm08222011.html (advising Americans to "defer non-essential travel to the state of Tamaulipas").

cartel-related crime across Tamaulipas that included random shootings, kidnappings, execution-style killings and harassment of American visitors. In early 2007, security analysts detected the stockpiling of heavy weapons by criminal elements in Matamoros and predicted that another bloody power struggle was imminent. Moreover, the cartel domination of the community over many years suggests that most people would have been reluctant to speak to an investigator about anything related to cartel activities.[109] Appendix J at 3-4.

The supporting documentation of the dangers found in United States government warnings is irrefutable:

*October 2006 to May 2009 risk level: high to very high*

> Any investigator contemplating a trip to Matamoros between late 2006 and mid-2009 who took the basic precaution of researching the destination would have found extensive on-line information detailing the fluctuating and highly unpredictable security situation. As early as February of 2006, the State Department's Overseas Security and Advisory Council was reporting that Matamoros had experienced "an upswing in violence associated with the drug trade." Visitors had been "victims of armed robberies, sexual assaults, auto thefts and kidnappings," and U.S. citizens were "also frequent victims of such crimes."[110] Using language that would be repeated many times in the years to come, the report added that:
>
> > **Drug-related violence has increased dramatically** in the past year in the border region, and shows no sign of abating. While U.S. citizens not involved in criminal activities are generally not targeted, **innocent bystanders are at risk** from the increase in

---

[109] See, e.g., Los Angeles Times, *Drugs Seep Into Texas Despite Kingpin's Fall* (Oct. 20, 1996), at  http://articles.latimes.com/1996-10-20/news/mn-55938_1_garcia-abrego (1996  article noting that many residents of Matamoros "decline even to publicly discuss…the drug trade for fear of retribution."); Washington Post, *The Gifts of a Mexican Drug Lord* (June 10, 2004), at http://www.latinamericanstudies.org/drugs/gifts.htm (Gulf Cartel "received help from locals" as lookouts, while "others looked the other way, whether out of gratitude or fear.").

[110] U.S. Dept. of State Overseas Security and Advisory Council, Monterrey, Mexico: 2006 Crime and Safety Report (Feb. 10, 2006), at https://www.osac.gov/pages/ContentReportDetails.aspx?cid=2828

> violence in the streets of border cities and nearby towns. In Nuevo Laredo and Matamoros **shootings have taken place at busy intersections and at popular restaurants during daylight hours**.
> . . .
> The wave of violence has been aimed primarily at members of drug trafficking organizations, criminal justice officials and journalists. However, **foreign visitors and residents, including Americans, have been among the victims of homicides and kidnappings** in the border region.[111]

Appendix J at 6.

The report also cites a respected security firm's warning:

> By February of 2007, a U.S. security analysis firm was warning that **Matamoros was about to become the next major battleground in the cartel wars**, after a major military arms cache was apprehended in the city. The contents of the cache "suggest an effort is under way to equip or reinforce a heavily armed unit of enforcers for one of Mexico's two main drug cartels. The cartels, in other words, appear to be gearing up to fight for ultimate control of Matamoros." [112]

A number of media outlets reported increasing violence during the pretrial period as well, and "In April of 2007, the State Department warned travelers that "**cartel members have been known to follow and harass U.S. citizens** traveling in their vehicles, particularly in border areas including Nuevo Laredo and Matamoros."[113]  In February of 2008, the U.S. Consulate issued a crime and safety report on the region that emphasized both the increasing danger from the indiscriminate violence and the apparent inability of local authorities to address its consequences:

---

[111] Id.

[112] Stratfor Global Intelligence, *Mexico: The Coming Fight for Control of Matamoros?* (Feb. 17, 2007), at https://www.stratfor.com/geopolitical-diary/mexico-coming-fight-control-matamoros

[113] State Department Travel Warning (April 19, 2007), at http://banderasnews.com/0704/to-mexicotravelwarning.htm

> Drug-related violence has increased dramatically in the past year in the Matamoros-Reynosa region, and shows no sign of abating. While U.S. citizens not involved in criminal activities are generally not targeted, innocent bystanders are at risk from the increase in violence in the streets of border cities and nearby towns. . . . **Mexican authorities have failed to prosecute numerous crimes committed against American citizens, including murder and kidnapping**. Local police suffer from a lack of funds and training, and the judicial system is overworked and inefficient. [114]

*Warren rept*, at 8. There was a short pause in murders with the arrest of a cartel leader in December of 2008, but it was not long-lasting: "The security situation in Matamoros underwent another rapid deterioration in 2009." Appendix J at 8.

No competent investigator or mitigation specialist would have undertaken an investigation in Matamoros in the period preceding trial, and no competent lawyer would have exposed such staff to the dangers there. Given the necessity of uncovering information in Matamoros highly relevant to both guilt and sentencing, the only reasonably effective course of action would have been to seek a continuance or waiver of the death penalty. Counsel did neither.

In the years since trial, in particular the year preceding the filing of this motion, the situation in Matamoros has deteriorated even further. Postconviction counsel for Mr. Troya have been precluded from investigating in Matamoros as well. In fact, the violence in Matamoros is worse now than before:

*Current risk level: very high*

The most recent State Department travel advisory for Matamoros, issued in mid-January of 2016, is but the latest in a long series of dire warnings:

---

[114] U.S. Dept. of State Overseas Security and Advisory Council, *Mexico 2008 Crime and Safety Report: Matamoros* (Feb. 6, 2008), at https://www.osac.gov/Pages/ContentReportDetails.aspx?cid=6285

**Defer all non-essential travel** to the state of Tamaulipas. Throughout the state violent crime, including **homicide, armed robbery, carjacking, kidnapping, extortion, and sexual assault, pose significant safety risks**. State and municipal **law enforcement capacity is limited to nonexistent** in many parts of Tamaulipas. . . .

Matamoros…[has] experienced **numerous gun battles and attacks with explosive devices in the past year**. The **number of reported kidnappings in Tamaulipas is among the highest in Mexico**.[115]

**Not even U.S. consular personnel are safe**. All U.S. government [USG] employees "are prohibited from personal travel on Tamaulipas highways outside of Matamoros and Nuevo Laredo due to the tenuous security situation" and are subject to a curfew in the city between midnight and 6 a.m. In February 2013, "four masked and armed individuals attempted to kidnap a USG employee in Matamoros during daylight hours."[116]

Since 2010, the U.S. Consulate in Matamoros has issued more than twenty **emergency messages to U.S. personnel and citizens** residing in the district, alerting them to sudden outbreaks of extreme violence.[117] Two of those recent warnings offer representative illustrations of a security crisis that is entirely unpredictable and plainly out of control. On February 3, 2016, the Consulate asked that "official American staff shelter in place due to a potential increase in violence in the city this evening," sounding an "All Clear" message the following day. In February of 2015, the Consulate warned Americans in the area:

> Please be advised that there is a likelihood of increased violence in the Matamoros vicinity, reportedly between the Matamoros and Reynosa factions of the Gulf Cartel. Violence has spiked over the past few days and there have been **numerous reports of large convoys of armed members of Transnational Criminal**

---

[115] U.S. Dept. of State, *Mexico Travel Warning* (Jan. 19, 2016), at http://travel.state.gov/content/passports/en/alertswarnings/mexico-travel-warning.html

[116] U.S. Dept. of State, *Travel Warning: Mexico* (July 12, 2013), at http://monterrey.usconsulate.gov/acs_tw_mex_07122013.html

[117] U.S. Consulate in Matamoros, *Security Announcements: Tamaulipas Specific*, at http://matamoros.usconsulate.gov/securityannouncement/tamaulipas-messages.html

**Organizations** (TCO) driving through Matamoros.[118]

Appendix J *at* 4-5. Statistics from state agencies reflect similar increasing violence: State statistics illustrate a spike in reported violent crime across Tamaulipas between 2009 and 2014, at levels far above the national average.[119] Since even the most serious crimes often go unreported, the actual rates are probably much higher.

Postconviction counsel cannot fulfill their duty to fully investigate this case given the present state of affairs in Matamoros. This Court should reduce the death sentences to life, or order a continuance of any hearing, with the opportunity to present additional claims after the situation in Matamoros improves. And there is reason to believe the investigative dangers in Matamoros will decline dramatically in the coming years. Mr. Warren describes the prospects for an improved security situation in the near future there as good:

Although the current situation in Matamoros does not encourage optimism, there are some indicators of potential improvements on the horizon. First, state and local agencies developed the first overall security strategy for the region in 2014; although it has since been criticized as inadequate, the joint strategy at least offers a blueprint from which to build a better plan. Second, three new anti-kidnapping units were created in Tamaulipas in mid-2015. While it is likely too soon to assess the effectiveness of the new units, the newfound willingness of state authorities to address this chronic problem is a positive development. Third, there are the first glimmers of a rebirth of community groups in Matamoros that are prepared to work with municipal agencies to help reduce the incidence of local crime. These are all modest beginnings,

---

[118]  Emergency Message for U.S. Citizens: Expect Continued Violence in Northern Tamaulipas (February 4, 2015)

[119] Wilson Center Mexico Institute, Plan Tamaulipas: A New Security Strategy for a Troubled State (October 2014).

291

but they represent the same combination of factors that has helped bring some other Mexican border cities back from the brink of chaos, most notably Ciudad Juarez.  Appendix J *at* 32.

**XXV. TRIAL COUNSEL'S INVESTIGATION AND DEVELOPMENT OF MENTAL HEALTH EVIDENCE TO MITIGATE THE DEATH PENALTY IN MR. TROYA'S CASE FAILED TO MEET MINIMAL STANDARDS OF CAPITAL REPRESENTATION, PREJUDICING MR. TROYA CONTRARY TO THE FIFTH SIXTH AND EIGHTH AMENDMENTS.**

Mr. Troya has brain damage. There are significant abnormalities, likely caused by head trauma in his frontal lobe, the area of the brain that helps deal with stress, regulate emotions, and control impulsivity. This area is also responsible for interpreting feedback from the environment and when damaged often impairs the processing of information necessary for sound judgment. The damage to this "executive center" of Mr. Troya's brain was compounded by the circumstances in which he was raised, including exposure to violence, both as a victim and as a witness, and the neglect of a loving but poor and overburdened family unable to provide the support and attention his condition demanded. Due to counsel's deficiencies, the jury never learned about Mr. Troya's longstanding brain injury, which manifested in significantly compromised cognitive and psychiatric functioning and affected all aspects of Mr. Troya's life.

Capital cases are by their very nature complex.  Federal capital trials, especially with multiple co-defendants, are very difficult for counsel to organize and direct. No one expects— and the Constitution does not demand—that trial counsel make no errors during the course of their representation of a capital defendant. Occasional errors and oversights will happen, but few are, by themselves, irrevocably prejudicial.  Over the course of a long and complex capital case, there are opportunities to rectify those errors, change course, absorb mistakes and move forward. Unfortunately, the missteps that doomed Mr. Troya's mental health case began from the outset, even before any mental health experts were retained and each opportunity to correct those errors was squandered by further errors which compounded and amplified the harm to the case. As the

292

legal claims discussed below demonstrate, by the time trial counsel rose to address the jury in punishment phase the damage could not be undone.

These compounding errors accreted over the course of the preparation and trial and continued during the penalty phase, culminating with counsel's failure to keep the promise made to the jury in opening statement that the defense would explain crucial aspects of Mr. Troya's life through the testimony of mental health experts Dr. Krop and Dr. Maher.  By the end of the penalty phase, counsel had not presented a single shred of mental health testimony. Instead, because of counsel's omissions, the government was free to point out the absence of the mental health evidence defense counsel had promised and convince the jury that Mr. Troya was simply an "evil man", the "personification of violence [and] brutality" who had willfully "committed himself to a life of unrepentant violence".

There was little doubt that the development of mental health evidence would be extremely important in Mr. Troya's case. Trial counsel knew from the outset this case was about whether Mr. Troya would be sentenced to die. Yet from the start, counsel failed to abide by the prevailing standards of care in capital cases.

In capital cases, an accurate and reliable life history investigation is the foundation for developing mental health issues because it is impossible to select appropriate experts without first understanding the general issues related to the client. Capital guidelines mandate that counsel "choose experts who are tailored specifically to the needs of the case, rather than relying on an 'all-purpose' expert". *Commentary*, **ABA Guideline 10.7**, Hofstra L.Rev. 31:913 at 106. Only after the life history investigation is complete (or at least nearing completion) should trial counsel seek a mental health assessment of a capital client because only then can capital counsel properly seek out the appropriate expert and control the scope of the examination by framing the

293

referral questions for the expert. *See* Dudley & Leonard, *Getting it Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, Hofstra L.Rev. 36:963, 975 ("All too often, defense teams permit premature and inappropriate mental health evaluations to take place. Sometimes this includes needless and potentially harmful psychological testing.").

Mr. Troya's counsel failed to meet this standard of care. Prior to conducting almost any investigation and almost immediately after hiring a mitigation specialist, trial counsel engaged the services of Dr. Krop, a psychologist, and Dr. Maher, a psychiatrist. At the time, no meaningful, wide-ranging social history investigation had been done; the trial team had only spoken to a few family members and collected portions of basic primary documents such as school and incarceration records. Without a more comprehensive understanding of Mr. Troya's life history, trial counsel lacked the ability to reasonably focus the experts and limit the scope of their evaluation. Though this was most likely a case that would focus on punishment, trial counsel failed to restrict or divide the areas of their expert's inquiry. Contrary to well-established capital defense standards at the time of Mr. Troya's trial, counsel asked Dr. Krop to evaluate Mr. Troya for competency, mental state at the time of the offense, and "anything that might be mitigated in a death penalty case." This was a critical mistake. Trial counsel had no indication that Mr. Troya's mental state at the time of the offense was an issue in the case. Yet by allowing Dr. Krop to explore the facts of the crime with Mr. Troya, counsel undermined the use of any helpful mitigation evidence he might discover and thus jeopardized his effectiveness at punishment phase.

Mr. Troya's counsel also failed to do the basic task of screening their experts to ensure that they were qualified in areas specific to Mr. Troya's case and had no serious vulnerabilities

294

for impeachment. Instead, trial counsel chose Dr. Krop, an "all-purpose expert", whose resume noted that he had done forensic evaluations in capital cases as well as sex offender commitment cases, child custody matters, personal injury cases, battered women cases, Baker Act cases, sex abuse cases, wrongful death cases, eyewitness identification cases, and intellectual disability cases. Had counsel complied with the standard of practice in capital cases at the time of Mr. Troya's case, they would have investigated Mr. Troya's life history prior to seeking an expert and they would have learned of Mr. Troya's long history of head injuries and known that they needed a trained neuropsychologist with a specialty in traumatic brain injury. But, trial counsel retained a general expert and requested that he evaluate Mr. Troya as to guilt and punishment issues to discover "anything that might mitigate" him.

Moreover, had trial counsel done basic background research on Dr. Krop they would have learned that less than one month before Dr. Krop began work on Mr. Troya's case he had entered into a stipulated agreement with the Florida Board of Psychology to settle a complaint that had been filed against him on August 7, 2006. That complaint alleged, *inter alia*, that Dr. Krop conducted evaluations and psychological testing in a child custody case and issued a report that contained inaccurate information. It was alleged that Dr. Krop, for example, claimed to have done multiple home visits when he really only did one and he suggested that he had completed the home study evaluation when it was actually done by someone else. The complaint also alleged that Dr. Krop failed to use proper testing instruments and scored the ones he did use improperly.

In the stipulated agreement entered into by Dr. Krop on October 31, 2007, he neither admitted nor denied the allegations but agreed to certain terms of punishment. In February of 2008, shortly after Dr. Krop's first evaluation of Mr. Troya, the Florida Board of Psychology

295

rejected the stipulation and proposed a counter-stipulation which Dr. Krop accepted. Under the final resolution, Dr. Krop was ordered to pay costs and restitution, received a formal reprimand of his license, and was forever banned from practice in the area of child custody evaluations/determinations.  Appendix K-1.

In June of 2008, defense expert Dr. Joseph Wu, a psychiatrist who specializes in brain imaging, conducted a PET scan of Mr. Troya's brain and reported that he suffered from organic brain damage. Despite counsel's errors in development the mental health mitigation to this point, Dr. Wu's finding was a chance to right the ship. Brain damage is one of the most powerful mental health mitigating factors in capital cases and research has demonstrated it is the type of evidence that causes juries to vote for life despite the most horrendous facts. But trial counsel, inexplicably, never requested further information from Dr. Wu and never contacted him to discuss the results of his findings. Even though Dr. Wu recommended clinical correlation, trial counsel never contacted him again about the substance of the PET scan.

Trial counsel also failed to challenge, or limit the scope of, the government's mental health case. Despite a wealth of evidence—including the recantation of a government expert—demonstrating that testing for "psychopathy" was unreliable and irrelevant to a capital sentencing, counsel never objected to its use by the government expert, Dr. Brannon.

Counsel filed a motion to preclude Dr. Brannon from using the term "psychopathy", Doc. 804, conceding they had no disagreement with the government expert's diagnosis of Antisocial Personality Disorder, but arguing the term psychopath was unrecognized and unduly prejudicial. The motion was denied without prejudice to renewal at the penalty phase of trial. Doc. 808.

On March 13, 2009, three days before opening argument in penalty phase, counsel for the first time filed a *Daubert* motion to strike any testimony on the Psychopathic Personality Inventory-Revised, and challenging the reliability of that testing instrument. Doc. 811.

On March 18, 2009, counsel Eisenberg supplemented his initial motion to preclude Dr. Brannon from using the term psychopathy because the government had withdrawn its pursuit of future dangerousness. Doc. 820. Aside from the denial without prejudice, counsel never obtained a ruling on his motions to strike and for a *Daubert* hearing on the psychopathy issue.

Despite the litany of errors in the development of mental health evidence, it was plain in the weeks before trial, and even during guilt phase, that counsel intended to present mental health testimony in mitigation for Mr. Troya. Counsel Eisenberg provided notice prior to trial, and pursuant to a motion by the government, a Rules 12 and 16 procedure was fashioned for the government mental health expert (Dr. Brannon) to conduct an evaluation of Mr. Troya and report to be filed, sealed, with the Court by January 2, 2009. Doc. 598 (Entered December 11, 2008).

Following the guilt verdict, on March 5, 2009, Doc. 792, the Court ordered the parties confirm, by noon the next day, whether each was going to present mental health testimony. For each defendant so confirming, the government mental health expert Brannon was to release his report by 5 p.m. on March 6, 2009. Doc. 770. Any defendant intending to present mental health testimony was to disclose the expert report by March 9, 2009. On March 6, 2009, counsel Eisenberg formally confirmed the defense would be presenting mental health testimony at sentencing phase. Doc. 775.

Attorney Eisenberg provided reports of Dr. Krop and Dr. Maher to the government, as well as the PET scan report of Dr. Wu, and permitted Mr. Troya to be evaluated by the government's expert. The report of the government mental health expert Dr. Brannon was

provided to the defense (as well as the government) on March 6, 2009, ten days before the sentencing phase began. That report reflected Dr. Brannon's diagnoses of Axis I: Polysubstance Abuse Disorder, Axis II: Antisocial Personality Disorder (consider Psychopathic Personality), Axis III Two head injuries without loss of consciousness, Axis IV: Legal, and Axis V: 75.

At a status hearing on March 10, 2009, Eisenberg again reported he was going to present mental health mitigation. He said he would not call Dr. Wu, but that other experts may rely on the PET scan. T7775, T7776, T7779. Discussing the defense mental health discovery disclosure, Mr. Eisenberg said at that point, the interview of Mr. Troya may be missing, but he would get it for the government. Mr. Eisenberg revealed the mental health testimony would show Mr. Troya has features of PTSD relating to the shooting of his friend at age 15 (when actually he was 13), T7780, from both the testing and interviews of family members, T7781. Mr. Eisenberg also represented the problem was that Dr. Krop went into the hospital the day before for an abdominal operation, and he did not think he could have the complete report by Friday. He noted Sanchez was going first. T7784.

Just before his March 16, 2009, opening statement, counsel Eisenberg estimated two plus days for the defense case, and said he was not having the experts come until Monday of the next week. T7852.  In fact, prior to the beginning of the sentencing phase of trial, Mr. Eisenberg had not discussed in detail what testimony the defense experts might offer. He also neglected, until it was too late, to employ strategies for undermining government expert Brannon's psychopathy diagnosis. His neglect ended disastrously, as he changed his mind in the midst of the sentencing phase and declined to present any mental health testimony to the jury.

The case the jury heard at Mr. Troya's punishment phase rested on a faulty premise: that Mr. Troya engaged with the world with an intact, functioning brain. Due to counsel's errors, the

jury never learned Mr. Troya is brain-damaged and thus had no way to contextualize the evidence before them of his struggles in life, nor reason to conclude that his crimes and other failings were anything other than bad choices by a bad man, as the prosecution contended.

Courts reviewing capital sentencing claims in habeas have acknowledged the unique importance of evidence of organic or physical brain injury:

> Evidence of organic brain damage is something that we and other courts, including the Supreme Court, have found to have a powerful mitigating effect. . . . And for good reason—the involuntary physical alteration of brain structures, with its attendant effects on behavior, tends to diminish moral culpability, altering the causal relationship between impulse and action." *See Victor Hooks,* 689 F.3d at 1205 (citations omitted). Because of its central significance, where the defendant's circumstances put it in play, ordinarily it would be "patently unreasonable for [counsel] to omit this evidence from his case for mitigation." *Smith v. Mullin,* 379 F.3d 919, 942 (10th Cir.2004); *see id.* (noting "evidence of [petitioner's] mental retardation, brain damage, and troubled background constituted mitigating evidence" and, indeed, is "exactly the sort of evidence that garners the most sympathy from jurors").

*Littlejohn v. Trammell*, 704 F.3d 817, 860 (10th Cir. 2013) (footnote omitted).

No accurate picture of Danny Troya could have been presented without the central fact that his brain is damaged, and that damage was exacerbated by his repeated exposure to trauma. Nor could his jury reliably assess his moral culpability – the very purpose of a capital sentencing proceeding – without knowing about these disabilities. Trial counsel's failure to investigate and present this essential information undermined the reliability of his death sentence. *See Williams v. Taylor*, 529 U.S. 362, 370 (2000).

### A.    The Jury Never Heard Mr. Troya Was Brain Damaged Because of Trial Counsels' Failure to Adequately Investigate and Corroborate the PET scan.

Counsel retained Dr. Joseph Wu, a highly respected neuroimaging consultant, and arranged for a PET scan of Mr. Troya's brain on June 5, 2008. A week after the PET scan, Dr.

Wu provided counsel with a brief report describing an abnormal scan compatible with brain damage and other neuropsychiatric conditions, and an abnormally small cerebellum. Appendix K-2.  The report reads in part:

> **Scan finding:** The study is of good technical quality. There are metabolic asymmetries with left ventral frontal cortex lower than right. The cerebellum appears to be markedly smaller than normal.
>
> **PRELIMINARY IMPRESSION**: 1. Abnormal scan.
>
> **PRELIMINARY CONCLUSION**: The pattern is compatible with brain injury or other neuropsychiatric condition. The smaller cerebellum could be congenital or could be atrophy. Clinical correlation is recommended. Clinical records can be forwarded to UCI-BIC for further differential diagnostic consideration and citation of relevant medical literature for a clinical correlation report for PET scan.

Though counsel was informed by Dr. Wu the imaging showed Mr. Troya's brain was abnormal, likely due to traumatic brain injury or other neuropsychiatric condition, counsel did virtually nothing to with this information aside from forwarding the report to Drs. Maher and Krop. Dr. Maher is a psychiatrist and Dr. Krop a psychologist, and neither are trained to read or interpret PET scans. Astonishingly, despite a specific recommendation for "clinical correlation," *i.e.*, testing and social history, counsel neglected to follow up in any significant way with Dr. Wu. In the many months preceding trial, counsel never provided Dr. Wu with Mr. Troya's social history (the little counsel had) or other diagnostic testing conducted by a neuropsychologist. There is no indication trial counsel even asked Dr. Wu for a more detailed explanation of his findings or sought his advice in how to corroborate it. In fact, the defense team barely communicated with Dr. Wu after the PET scan except to ensure he provided a copy to a government expert.

Reasonably effective counsel defending their client's life would know a PET scan is not interpreted in a vacuum of information.  A PET scan finding is indisputable, tangible evidence of

existing brain damage, but to be presented effectively, trial counsel must first understand how that brain damage affects the client's ability to process information and interact with the world. This can only be done through repeated, detailed, in-person social history interviews with family, neighbors, teachers, spiritual leaders, medical providers, former attorneys and anyone else who has interacted with the client over the course of his life. In addition, because of Mr. Troya's history of head trauma, it is necessary for counsel to ensure that a complete neuropsychological battery be conducted by a neuropsychologist who specializes in traumatic brain injury and has up-to-date training in interpreting neuropsychological test data. After counsel had gathered accurate and reliable data about Mr. Troya's life history through witness interviews and a complete neuropsychological battery, counsel should have again engaged with Dr. Wu to determine the meaning of that data. Elsewhere this motion discusses counsels' investigative omissions as well as counsel's failures with regard to psychologist Dr. Krop. Those errors were compounded in the investigation of Mr. Troya's brain damage by counsel's failure to even try to speak to Dr. Wu again despite the fact that Dr. Wu was the only only expert qualified to interpret the brain imaging.

Had counsel effectively provided Dr. Wu with the required background, either he or another competent neuroimaging consultant would have attested to significant evidence in mitigation. As it turns out, had trial counsel provided the information to Dr. Wu that he requested, the jury would have heard that Mr. Troya's PET scan shows brain damage "consistent with traumatic brain injury and with chronic traumatic encephalophathy (CTE)." Appendix K-3. An expert such as Dr. Wu could have explained to the jury how an organic defect such as this causes cognitive deficits and impairments such as impulsivity, informational processing problems and poor decision making. Damage to the frontal lobe impairs a patient's ability to

301

respond to sensory perceptions, causing them great difficulty interpreting and responding appropriately to their environment. Dr. Wu could have taught the jury how this leads to poor judgment, risk taking, non-compliance with rules, getting stuck on a response, rigidity in thought, and other difficulties with even the simplest aspects of daily living.

Furthermore, Dr. Wu could have explained to the jury the synergistic effect of trauma and brain damage. As Dr. Wu notes experiences of trauma and neglect can be overcome "if an individual has an intact central nervous system but neurological impairment makes this much more difficult. Brain imaging abnormalities such as those noted on the PET of Mr. Troya can show there is a presence of brain dysfunction which would make Mr. Troya more vulnerable to the synergistic effect of childhood victimization." Appendix K-3. Victimization, in turn, "can adversely interact with brain dysfunction to create a negative synergistic situation with greater likelihood of violent behavior." Dr. Ouaou report Appendix K-4. Without support or professional intervention (neither of which Mr. Troya received), there is a vicious circle: the brain damage makes a person more vulnerable to victimization and the victimization exacerbates the effects of the brain damage such as impulsiveness, disinhibition, anger and frustration which again creates more vulnerability to further victimization.

Evidence that Mr. Troya has physiological brain damage would have presented the jury with a different view of Mr. Troya in many ways. For example, as discussed *infra* the finding of brain damage undercuts any implication that Mr. Troya has a personality disorder or even ADHD because the effects of a brain injury are often be misdiagnosed as ADHD or certain types of behavioral problems. Moreover, the **Diagnostic and Statistical Manual of Mental Disorders**, Fourth Edition, explicitly rules out diagnosis of a personality disorder when the behavior is due to "a general medical condition (e.g. head trauma)." *Id*. at 633.

Evidence of Mr. Troya's brain damage and traumatic life experiences would have significantly undermined the government's argument that he was merely an "evil" man who chose a violent life of crime. The government's efforts to secure a death sentence for Mr. Troya was based on showing jurors, at every stage of the proceedings, that he acted with and made deliberate "choices" that established his worthiness of death penalty. Without the evidence of brain damage at trial, "the prosecution was able to frame the mitigation defense as a mere collection of the social circumstances of the [defendant's] upbringing—circumstances that, while unfortunate, do not excuse murder. " *Littlejohn*, 704 F.3d at 864-65.

More importantly, with the evidence of Mr. Troya's brain damage, the jury could have learned that violence was not an inescapable part of his life. The picture of Mr. Troya that the government was able to put before the jury was essentially that he was a violent man who was predestined to be violent because he had chosen that life. Evidence of brain damage puts the lie to this assertion because although brain damage is irreparable, it is treatable. As the *Littlejohn* court wrote:

> [E]vidence [of brain damage] could have been used to powerful mitigating effect, indicating that Mr. Littlejohn's criminal past is a product of a physical condition that is treatable, such that his criminal past is not an accurate predictor of his future. That is, it could have indicated to a jury that Mr. Littlejohn was not a continuing threat. *See Victor Hooks,* 689 F.3d at 1205 ("Diagnoses of specific mental illnesses . . ., which are associated with abnormalities of the brain and can be treated with appropriate medication, are likely to [be] regarded by a jury as more mitigating than generalized personality disorders. . . ." (alterations in original) (quoting *Wilson,* 536 F.3d at 1094) (internal quotation marks omitted)); *cf. Gilson v. Sirmons,* 520 F.3d 1196, 1249–50 (10th Cir.2008) (holding that evidence of organic brain disorder— seemingly with no evidence as to possible treatment—would not have altered the jury's prejudice analysis because the "presentation of th[e] evidence would likely have weighed against [the petitioner] by erasing any lingering doubts that may have existed

> as to his role in [the underlying] murder, and by confirming the jury's conclusion that he represented a continuing threat, even if confined in prison for life").

*Littlejohn*, 704 F.3d at 33-34..

### B.     Trial counsel unreasonably failed to consult an expert in trauma, which prevented the jury from understanding a full picture of Mr. Troya's development and functioning.

Trial counsel's punishment phase case portrayed Mr. Troya's troubles in large part resulting from his witnessing the death of his friend at age 13, as well as the suicide of a neighbor who was a friend, and the death of his grandmother. The defense case for life, therefore, hinged in large part on the jury understanding how a child like Mr. Troya experienced trauma and how the effects of that trauma could reverberate throughout his life. Even though these events were central to the defense case for life, trial counsel never consulted with an expert in trauma[120] and thus the jury was deprived of crucial evidence with would have helped them to understand who Mr. Troya was and how the trajectory of his life led him to be caught up in the capital crime. Though he alluded to it in opening statement, trial counsel forewent presentation of any expert evidence about trauma and its effects, instead simply telling the jury at closing they "didn't need any expert testimony to understand Daniel Troya…" T9573. Rather than present any evidence which would have allowed the jury to comprehend the myriad ways traumatic events affect a person's brain and behavior, trial counsel merely asked the jury to "[i]magine what that kind of experience would do to anyone…" T9576. According to trial counsel "Do you need expert testimony? That is not a surprise that these tragic events cause people problems. We know that as far back as the Vietnam War when veterans came back and

---

[120] As discussed, *infra,* trial counsel did not even present the testimony of Dr. Maher who, although not a trauma specialist, could have at least discussed general aspects of trauma and its effects on the brain.

they have problems. We know from the Iraqi War when people come back and see all the violence." T9578.

This argument was both untrue and ineffective. As discussed below, it is very difficult for a lay person to understand the effects of trauma and those effects, without expert explanation, are often unfortunately perceived by jurors as willful, maladaptive, and antisocial behavior as they probably did in this case. Moreover, the lack of expert testimony allowed the government to undermine the true mitigating quality of this evidence by suggesting it was unproven, T9518. ("Counsel said you will hear from [mental health experts]…about how outside events had a resulting medical affect on Daniel Troya…Did we hear any of that? No. There is no evidence before you that any of those are an excuse for what Daniel Troya did.") and that it was untrue. T9513. ("If there had been some trauma associated with that [school] shooting, you would think that there would be some behavior by which Troya thereafter avoided guns because he was traumatized by the sound or the sight of guns…There is no trauma here.") Given the myriad "red flags" indicating traumatic events in Mr. Troya's life and the focus on his friend's shooting during punishment phase, it was unreasonable for trial counsel to fail to consult with an expert in trauma and to fail to present that evidence to the jury.

This failure prejudiced Mr. Troya. Had trial counsel consulted with the relevant expert, they would have learned how their client's impairments caused by brain damage were compounded by the effects of severe trauma during his childhood. Psychological trauma affects the way a person feels, thinks and interacts with the world; it has a profound impact on our biological, emotional and cognitive systems. Had trial counsel consulted with, and presented, the testimony of a trauma expert, the jury would have had the basis to contextualize the pervasive behavioral and cognitive effects of complex trauma, particularly on a person like Mr. Troya

305

whose brain was already damaged. Although the jury heard that Mr. Troya witnessed a traumatic event, there was no way they could have understood, absent expert testimony, the biological and emotional damage that trauma wreaks, especially in the brain. Nor could they have grasped how the many traumatic incidents to which Mr. Troya was exposed have a cumulative deleterious effect on his affected his functioning in the world.

In addition to learning about these events in Mr. Troya's life, the jury should have been provided an explanation of why they mattered to their consideration of his punishment. An expert in trauma could have explained to the jury what scientific research in the field has long shown: traumatic events, and the resulting terror produced by such events, affect the development of a child's brain. The brain adjusts to patterned, repetitive experiences that are understood through the senses, changing the very structure of the brain itself. Normal brain development creates neural pathways which help us process what we learn, how we feel and what we do. A trauma expert could have explained how traumatic events interfere with this process and ultimately damage the brain, resulting in serious impairments to normal functioning such as dissociation, hyper-arousal, emotional dysregulation, memory problems, distortions in thinking, and impulsivity, and others.

An expert could also have informed the jury that repeated trauma, like that which Mr. Troya experienced, is particularly toxic to areas of the brain such as the hippocampus and the pre-frontal cortex, areas involved in the management of impulses, the capacity to consider the broad implications of one's actions, and the consolidation and integration of memory. Damage to these brain structures creates the memory disturbances so commonly seen in trauma survivors. Traumatic memory tends to be fragmented, poorly integrated and indelible, and it tends to drive

306

behavior in ways that are distorted relative to current experience. These effects are corroborative of both Mr. Troya's neuropsychological test results and the PET scan administered by Dr. Wu.

Moreover, trauma research, which was well-known and available at the time of trial has shown that witnessing the physical and emotional abuse of another – particularly someone who should be protecting the child or whom the child feels a responsibility to protect – is just as traumatic as being the direct victim of abuse and also negatively affects brain development. Mr. Troya experiences included witnessing the shooting death of a physically handicapped friend that he cared for as well as witnessing—and enduring—abuse by other inmates and guards at the juvenile facilities where he was housed. A trauma expert could have explained to the jury what an extraordinary burden that would be for any child, let alone one who was already neurologically damaged.

An appropriate expert also could have explained to the jury how damage wrought by trauma may cause disorganized thinking, a symptom which prevented Mr. Troya from achieving short and long-term goals. In order for a person to function normally, his or her brain must be able to screen out distractions, to inhibit inappropriate ideas and impulses, to weigh alternative options, to delay gratification and to access one's sense of self in such a way that it can guide behavior. Unfortunately these are also the areas of the brain most vulnerable to the damaging influence of chronic stress, of the sort Mr. Troya experienced throughout his childhood.

Such an expert could also have explained how trauma had a serious effect on Mr. Troya's ability to regulate his emotions. Traumatized people struggle with periods of too much emotion (overwhelming floods of anger, fear, grief, despair, shame) as well as periods of too little emotion (the absence of certain expected feelings, numbness, and an inability to access and express their feelings). Exposure to trauma causes a person to fundamentally alter how he

perceives reality and how he thinks about himself, other people, and future aspirations. This problem is compounded when a young person has no adult caregiver to help explain difficult events or navigate complex emotional shoals. As explained in other sections herein, Mr. Troya, unfortunately, had no such consistent, functional caregiver.

Neglected children routinely have experiences that are emotionally and cognitively overwhelming but have no adult to provide the necessary emotional support or cognitive understanding of the experience. This leaves the child with feelings of terror, helplessness and abandonment and nowhere to turn for comfort or explanation. Notwithstanding their love for him, Mr. Troya's parents were unable to recognize or meet the needs of a brain-damaged child like Mr. Troya.

An expert could have explained how trauma and neglect, particularly when they occur in childhood or over a long period of time as was the case with Mr. Troya, are unique in their potential to change and damage the major systems necessary to human functioning: they disrupt how people manage and interpret emotions, leading to impulsivity and depression; they change and narrow how people process information, leading to distortions in how they interpret and respond to experience; and they alter the brain and the physiological systems that control human responses to threat, creating problems with emotional self-regulation, impulsivity, perception, planning, and memory.

An expert could have explained to Mr. Troya's jury that repeated trauma that occurs during childhood, often referred to as "complex trauma," is one of the most consistently damaging influences a child can endure and is clinically different from trauma people experience as adults.

> Although both adults and children may respond to a traumatic
> event with generalized hyperarousal, attentional difficulties,

308

> problems with stimulus discrimination, inability to self-regulate, and dissociative processes, these problems have very different effects on young children than they do on mature adults. For example, Pittman (1995) showed that people who developed PTSD secondary to child abuse had more profound physiological dysregulation in response to nontraumatic stimuli than people who developed PTSD as adults.

Van Der Kolk, B., *Traumatic Stress: The Effects of Overwhelming Experience on Mind, Body, and Society*, 184-185 (Guilford Press, 1996).

Contrary to what trial counsel told the jury, it is often difficult, both for victims of traumatic experiences and for observers who are not specifically trained, to discern the damage that results from complex trauma because the harm is woven into the individual's self (his basic biology, neurological pathways, characteristic emotional responses and habitual ways of functioning). As such, the results of exposure to trauma and neglect can look like an inherent part of an individual's personality, rather than the pathological outcome of exposure to damaging life circumstances.

With the testimony of a trauma expert (especially combined with the finding of organic brain damage), the jury could have understood that distorted patterns of thought and perception may well be active and observable under stressful or traumatic conditions but may be relatively quiet and undetectable in less stressful conditions. Thus, in calm settings where danger is not apparent, a person suffering from complex trauma like Mr. Troya might show no clearly observable symptoms. Yet, as an expert would have explained, in conditions that are or feel similar to the conditions which caused (or retrigger) the trauma, higher-order thinking takes a backseat to automatic responses. Thus, an expert in trauma could have explained to the jury how in situations where Mr. Troya perceived threat, for example, his traumatic experiences would skew the way he saw or reacted to things. Many times behavior—particularly in male children and adolescents—that is labeled "oppositional", "rebellious", "unmotivated" and "antisocial" is,

309

in reality, the attempt of a traumatized child to regulate their emotional distress in the face of the reminders of trauma.

Testimony from a trauma expert would have given the jury a very different and far more complete picture of who Daniel Troya is—a brain-damaged youth struggling with the heavy psychological and physiological effects of severe untreated trauma—rather than the portrait the government painted of an "evil" man who "embraced violence" and voluntarily chose a path of crime. T9634.

### C. Trial Counsel's Preparation Of The Mental Health Case Failed To Comply With The Standards Of Practice In Capital Cases.

#### 1. Counsel failed to adequately vet, direct and supervise the experts they hired.

Because of the highly specialized and complex nature of death penalty litigation, well-settled standards of practice related to the identification, hiring, and use of experts are more demanding than in non-capital cases. For example, where non-capital practitioners often hire a psychologist to do a general screening of a client to get a sense of potential issues, capital guidelines demand that counsel "choose experts who are tailored specifically to the needs of the case, rather than relying on an "all-purpose" expert…" *Commentary*, **ABA Guideline 10.7**, Hofstra L.Rev. 31:913 at 1061. Moreover, it is insufficient for capital counsel to simply hire an expert; in a capital case, the lawyer also has a duty to "remain current on developments in fields such as neurology and psychology" so that she can choose the correct expert for each case. *Id*. Because it is counsel's duty to screen a potential expert for vulnerabilities, biases, possible impeachment evidence, qualifications and experience, it is "critical for counsel…to investigate current standards of practice in any specialty or sub-specialty relevant to developing and presenting mitigating evidence." Dudley & Leonard, *Getting it Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, Hofstra L.Rev. 36:963 at n. 59.

310

Counsel failed to meet these standards. Rather than select an expert tailored specifically to Mr. Troya's possible impairments and limitations, counsel chose an "all purpose" expert, Dr. Krop, and scheduled an evaluation requesting that the expert find anything at related to guilt or punishment. In addition, as discussed above, Dr. Krop had recently been reprimanded by the Florida Board of Psychology for failing to meet professional standards in two areas crucial to Mr. Troya's case: selecting appropriate testing and accurately scoring it.

Unfortunately, these problems played out again in Mr. Troya's case. Without counsel's supervision and close involvement, Dr. Krop administered only a few selective subtests and neglected to administer what a neuropsychologist who specializes in traumatic brain injury would consider a competent neuropsychological test battery. In addition, Dr. Krop's test answer booklets (where the raw data is compiled) contained no scoring calculations or conclusions. Reasonably effective capital counsel would have reviewed and noticed the absence of scoring and followed up with a competent expert. Reasonable counsel who received a report of an abnormal brain scan, as did counsel in this case, would have been doubly alerted to the issue. If they had done so, they would have learned that even some of the results on Dr. Krop's abbreviated evaluation revealed neurocognitive deficits consistent with frontal lobe impairment and the PET scan. *See* Ouaou Report.

Both counsel and Dr. Krop's performance fell well below that considered reasonably competent in a capital case.

> **2.   Counsel neglected to timely provide the defense mental health experts with information about Mr. Troya's social history because he failed to timely investigate it.**

Counsel's failure to reasonably investigate and develop Mr. Troya's social history is set forth *infra.*

### 3. Trial counsel's litigation on the issue of psychopathy was objectively unreasonable.

Although psychologists have long used tests such as the Psychopathy Checklist – Revised (PCL-R) and the Psychopathic Personality Inventory – Revised (PPI-R) in many settings to predict the likelihood a person will continue to be violent or dangerous in the future, by the time of Mr. Troya's trial there was no dispute that such tests were unreliable and irrelevant in a capital sentencing. A diagnosis of psychopathy, as measured by these tests is not – and never has been – probative of, or a valid predictor of, an individual's future dangerousness in prison. This is a position that is fully supported by the forensic psychology community and, at the time of Mr. Troya's trial, proof of this fact was readily available to trial counsel including an admission by a government expert in a capital case that such testing was not reliable. Because of trial counsels' error, however, this Court was never provided this crucial information.

The PPI-R, the test used by government expert Dr. Brannon during Mr. Troya's evaluation, like the PCL-R, is an attempt to create a systematic measure of the concept of "psychopathy" developed by the psychiatrist Hervey Cleckley in the early 1940s. Although the PCL-R is better known, the PPI-R has been recognized as an alternative testing instrument for psychopathy-based risk assessment. *See e.g.* Kiehl & Sinnott-Armstrong, *Handbook on Psychopathy and Law*, Oxford University Press, 2013 at 44 et seq. However, just as with the PCL-R, it has long been recognized that the PPI-R has no ability to predict the future dangerousness of a person in prison. *See e.g.* Poythress & Edens, *"Criterion-Related Validity of the Psychopathic Personality Inventory in a Prison Sample"*, **Psychological Assessment**, 1998 Vol. 10, No 4, 426, 429 ("the relationship between the PPI and relevant outcome criteria (e.g., institutional violence, treatment response, recidivism) has yet to be established.").

For a period of time between 1997 and 2000, the government regularly presented expert testimony and evidence about psychopathy and future dangerousness. This all changed, however, in May of 2000 in the federal capital case *United States v. Willis Haynes*, No. PJM-98-0520 (D. Md.). In *Haynes*, Dr. Thomas V. Ryan, one of several experts the government routinely used to perform risk assessments in capital cases, was retained by the government to analyze the potential future dangerousness of the capital defendant using the PCL-R and give expert testimony regarding his potential psychopathy and future dangerousness.  In May of 2000, after the written report of his evaluation was submitted to counsel, the defense filed a motion seeking to exclude Dr. Ryan's expert testimony regarding the PCL-R and the diagnosis of psychopathy because the evidence was unscientific and not probative of future dangerousness. The motion was supported by five affidavits from prominent clinical and forensic psychologists who variously attested that there was no scientific basis for claiming that a high PCL-R score supported a future dangerousness determination.[121]   After reviewing these affidavits, Dr. Ryan re-evaluated his position on this issue, voluntarily withdrew his expert report in the *Haynes* case, and refused to testify regarding the PCL-R or psychopathy at the trial.

Subsequent to the *Haynes* case, Dr. Ryan was contacted by Dr. Stephen David Hart and Dr. Donald D. Bersoff, both of whom had filed affidavits in *Haynes*.  Dr. Hart had worked with Dr. Hare on the development and validation of the PCL-R, and in his expert opinion, he attested that there was "no direct scientific evidence that the PCL-R . . . [is] predictive of institutional violence in correctional offenders in the United States," and that the PCL-R is "not generally accepted within the scientific community of clinical-forensic psychologists for the purpose of predicting institutional violence in correctional offenders in the United States."   5/19/00

---

[121] Those affidavits are attached as Appendix K-5.

313

Affidavit of Dr. Stephen David Hart at ¶ 18 (hereafter "Hart Affidavit") (Appendix K-5 at p. 4).

Dr. Bersoff is an elected fellow of the American Psychological Association (APA) and an expert

in the standards and ethics of testifying as a psychological expert witness in legal proceedings.

He attested that Dr. Ryan had "acted below the professional standards of those holding

themselves out as forensic psychologists" in rendering the conclusion that the defendant was a

"relatively high risk of engaging in violence recidivism," because there was a "dearth of data

generally accepted in the relevant psychological community to support this opinion" and Dr.

Ryan had made "misleading use of the extant studies" regarding the PCL-R in order to render his

opinion. 5/24/00 Affidavit of Dr. Donald D. Bersoff at ¶ 21 (hereafter "Bersoff Affidavit")

Appendix K-5 at p. 25).[122]

Dr. Hart and Dr. Bersoff contacted Dr. Ryan because they were aware that he had

rendered a similarly unscientific and misleading expert opinion regarding psychopathy and

future dangerousness in another federal capital case that was tried prior to *Haynes – United*

*States v. Richard Thomas Stitt*, No. 2:98-CR-47 (E. D. Va.), a federal capital trial which was

tried in September and October of 1998. There, Dr. Ryan performed a risk assessment on the

defendant using the PCL-R and testified that based on the defendant's score on that instrument,

the defendant presented a high risk of future violence even in the context of a maximum security

federal prison, and that the defendant's psychopathy meant that he was not amenable to

---

[122] An ethical complaint was eventually filed against Dr. Ryan with the APA based on his misleading expert reports and/or testimony in three capital cases, including *Haynes*, on the issue of psychopathy and future dangerousness. *See* attached Appendix K-6. Additionally, a description of Dr. Ryan's conduct with respect to psychopathy and future dangerousness testimony in *Haynes* was published in a peer-reviewed journal for psychologists and described as "not only incompetent and factually misleading, but also highly unethical." Edens, J.F., *Misuses of the Hare Psychopathy Checklist-Revised in Court, Two Case Examples*, 16 Journal of Interpersonal Violence 1082-93 (2001).

rehabilitation and would continue to be a future danger if sentenced to life without parole.  The

defendant was ultimately sentenced to death.  Dr. Hart and Dr. Bersoff strongly encouraged Dr.

Ryan to review his testimony in that case and write a letter to the court indicating that his

testimony was inaccurate.[123]

Dr. Ryan ultimately provided a sworn declaration, which was filed with the court as part

of the *Stitt* § 2255 proceedings.  In that declaration, Dr. Ryan recanted his prior expert testimony

made at trial and disavowed the notion that a capital defendant's potential psychopathy is

predictive of his future dangerousness in prison:

> Based upon my current understanding of the literature and the
> obvious controversy about forensic clinicians' use of the PCL-R, I
> would choose not to use this instrument.  Although I did not
> recognize it at the time, I am aware now that the PCL-R is not, and
> was not, appropriately relied upon to assess an individual's future
> dangerousness in federal prison.  As an ethical and responsible
> clinician, I am informing all concerned that the statements about
> the defendant's future dangerousness that I made at trial were not
> grounded in current scientific literature and I do not stand by them
> now.
>
> . . .
>
> It was not and still is not possible to conclude to a reasonable
> degree of scientific certainty, based on studies that were published
> at the time of the *Stitt* trial or on relevant research published since
> then, that a correlation exists between high PCL-R scores and
> federal prison violence.

Ryan Declaration Appendix K-7.  *See also id.* at ¶ 10 ("Since withdrawing my report in the

[*United States v. Willis*] *Haynes* case [in the Spring of 2000], I have been retained by the

government in several other federal death penalty cases, and testified in those that went to trial.

In no case have I relied on the PCL-R, because I no longer believe that the PCL-R is a reliable

---

[123] *See* Testimony of Thomas V. Ryan, Ph. D., 7/15/04 Transcript of § 2255 Proceedings in *United States v. Stitt*, No. 2:98cr47 (E.D. Va.) at 59.

indicator of a defendant's future dangerousness in federal maximum-security prisons due to the lack of peer reviewed empirical studies. **Indeed, to the best of my knowledge, the government has not introduced testimony about the PCL-R or psychopathy in any trial since *Haynes*.**") (emphasis added).

As Dr. Ryan explained in his declaration in the *Stitt* case, a comprehensive review of the scientific literature demonstrated that "the position that PCL-R scores for any one offender provide much useful information regarding his relative or absolute risk for future institutional violence while incarcerated is untenable[.]" *Ryan Declaration* at ¶ 9 (internal citation omitted). At the evidentiary hearing in the *Stitt* § 2255 proceedings, Dr. Ryan was called as a witness and testified further regarding his current views on the PCL-R and psychopathy. His testimony made unmistakably clear that predictions about future dangerousness in prison based on a defendant's score on risk assessment tests based on alleged psychopathy are not valid. *See* Testimony of Thomas V. Ryan, Ph. D., 7/15/04 Transcript of § 2255 Proceedings in *United States v. Stitt*, No. 2:98cr47 (E.D. Va.) at 63 ("the Hare Psychopathy Checklist Revised is just not appropriate to be used in making predictive statements about adjustment within the prison system").

The *Stitt* court, although granting relief on different grounds, found that Dr. Ryan's testimony at trial was based on unsupported scientific assumptions and erroneous:

> The Court is reasonably satisfied that Dr. Ryan's testimony was erroneous. Dr. Ryan's material testimony predicted Petitioner's future dangerousness based upon a scientific instrument that Dr. Ryan now believes he inaccurately applied. At the time of Petitioner's trial, Dr. Ryan did not realize that the PCL-R was not an accurate predictor of prison violence, as opposed to future dangerousness in the community at large. (Decl. Dr. Ryan PP3, 5, 8.) Dr. Ryan indicates that the scientific literature has come to reflect the view that the PCL-R is not a reliable predictor of future dangerousness of individuals confined in a federal prison, and the Government has not provided any evidence to refute this claim. (*Id*. at PP9-10.) The Court has not found any precedent providing

> guidance in a situation where an expert witness has discovered that the scientific basis for a test used to support a material fact was incorrect. However, if a DNA test indicated that an individual was guilty of a crime, and the Government's DNA expert later discovered that a change in DNA science indicated that the old test was inherently flawed, the Court cannot conceive that this would not be sufficient basis for the Court to at least consider such a petitioner's collateral attack. Therefore, the Court finds that Dr. Ryan's testimony was erroneous and has been recanted.

*Stitt v. United States*, 369 F. Supp. 2d 679, 699 (E.D. Va. 2005), *affirmed by, remanded by United v. Stitt*, 441 F.3d 297 (4th Cir.), *recalled by, vacated by, appeal dismissed by United States v. Stitt*, 459 F.3d 483 (4th Cir. 2006).[124]

In short, at the time of Mr. Troya's trial, there was a wealth of readily available evidence, including admissions by a government expert, court opinions, and affidavits by leading scientists, that the use of psychopathy-based risk assessment instruments such as the PPI-R was unreliable, inappropriate, and irrelevant for predicting the future dangerousness of federal capital defendants.

---

[124] After hearing argument, the Fourth Circuit initially published an opinion affirming the district court's judgment in all respects and remanding the case for resentencing. *See United v. Stitt*, 441 F.3d 297 (4th Cir. 2006). However, prior to issuance of the mandate, the Fourth Circuit discovered that, since the defendant had not yet been resentenced, it lacked jurisdiction over the appeal. *See United States v. Stitt*, 459 F.3d 483 (4th Cir. 2006). In particular, the Circuit Court noted that under United States Supreme Court precedent, an order reversing a death in a § 2255 case sentence did not become final until resentencing had occurred. Additionally, the Circuit Court noted that it lacked jurisdiction over the district court's order denying the defendant relief as to his guilt phase claims, which also did not become final until resentencing. Accordingly, the Fourth Circuit vacated its previously issued decision, dismissed the appeal for lack of jurisdiction, and remanded the case for resentencing.

**4.      Trial Counsel Failed to Properly Challenge this Unreliable and Irrelevant Evidence.**

Despite the undisputed fact that the PPI-R was both unreliable and irrelevant to Mr. Troya's capital sentencing, at multiple points of Mr. Troya's trial counsel unreasonably failed to challenge this evidence.

**5.      Trial Counsel Failed to Object to use of the PPI-R by the government expert, Dr. Brannon in testing Mr. Troya.**

On November 14, 2008, the government filed a motion requesting that Mr. Troya, who was then housed at the Palm Beach County Jail, be committed to federal custody so that he could be examined by government mental health experts. Doc. 524. This Court granted the motion on November 25th, 2008. Doc. 539. On December 10, 2008, the government filed an unopposed motion in which it explained that it had intended to rely upon BOP doctors to evaluate Mr. Troya but, due to his continued detainment at the Palm Beach County Jail, the government was forced to hire a private psychologist, Dr. Michael Brannon. Doc. 590. *Id*. That motion was granted on December 11, 2008, Doc. 598, and Dr. Brannon met with Mr. Troya in the Palm Beach County Jail shortly after Christmas, 2008.

Despite the fact that the defense had been ordered to disclose the battery of tests used during their evaluations, trial counsel never once requested any information about the tests Dr. Brannon intended to use nor did they inquire about the scope of Dr. Brannon's evaluation. These omissions fell below a reasonable standard of practice in federal capital cases at the time of Mr. Troya's trial. *See e.g. United States v. O'Reilly,* 2010 WL 653188, at *5, ¶¶ 17, 18 (E.D. Mich. May 10, 2010) (Prior to any rebuttal examination, government must give defense counsel at least 5 days advance notice of the names and professions of its rebuttal experts and any tests the experts intend to administer; if defense objects to a government rebuttal expert or test, parties must diligently work to resolve the dispute; if resolution cannot be achieved informally, court

318

will hold a hearing, upon defense filing, within 3 days of receiving government notice, of written formal objections.); *United States v. Taylor*, 320 F. Supp. 2d 790, 794 (N.D. Ind. 2004) (based on defense objection, district judge prohibited the government's expert from using the PCL-R on the capital defendant in its pre-trial evaluation because "the uncertainty of the validity and reliability of the PCL-R as it is used in capital sentencing hearings" would undermine the reliability of the defendant's sentencing proceedings).

### 6.    Trial Counsel Failed to timely and adequately secure a ruling on the defense motion to exclude this improper evidence

Five days before punishment phase began, trial counsel filed a motion seeking to preclude Dr. Brannon from using the terms "psychopath" and "psychopathy", arguing that these words were overly inflammatory and not probative. Doc.804. In that motion, defense counsel never challenged the scientific reliability of Dr. Brannon's conclusions and even agreed that Mr. Troya met the DSM-IV criteria for Antisocial Personality Disorder, an erroneous conclusion which could have been debunked had the defense team effectively investigated Mr. Troya's life history and properly utilized mental health experts. *See infra*.

The following day, counsel filed a motion challenging the reliability of the PPI-R. Doc. 811. In that motion, counsel referred to two "papers" (without providing names or citations) which suggested that the PPI-R was not a valid instrument to predict future violence in prison. Counsel also pointed out that, because the government had already withdrawn the future dangerousness aggravator, the result of the PPI-R were no longer relevant to Mr. Troya's case. Trial counsel requested that this Court either preclude evidence of the PPI-R or, at a minimum, grant a *Daubert* hearing. *Id.*

Trial counsel never made this Court aware of the fact that other courts had excluded such testimony in federal death penalty cases nor of the fact that there were cases where the

319

government expert had revoked all reliance on this type of testing. This Court was also never informed that since government expert Dr. Ryan's recantation in 2000, psychopathic risk assessment has never again been introduced in a federal capital sentencing. In fact, as the *Stitt* court noted, when challenged, the government has never been able to produce any evidence to refute the unreliability of this testing. *Stitt v. United States*, 369 F. Supp. 2d 679, 699 (E.D. Va. 2005).

On March 18th, 2009, two days after counsel promised in opening argument that the jury would hear mental health testimony from both a psychologist and a psychiatrist, counsel filed a "supplement" to the motion to preclude use of the terms "psychopath" and "psychopathy". Doc. 820. This motion repeated the arguments in the previous pleading but highlighted the fact that the government had withdrawn the future dangerousness aggravator.

Despite the crucial aspect this evidence could potentially play in the punishment phase, trial counsel never secured a ruling on its admissibility before moving forward with Mr. Troya's mitigation case.[125] Because trial counsel did not know the content or the scope of the government's case, their decisions regarding punishment phase cannot be considered reasonable strategy. *See Wiggins*, supra; *see also Rolan v. Vaughn,* 445 F.3d 671, 682 (3d Cir.2006) (A

---

[125] Counsel for Sanchez had filed a motion requesting the court limit the testing to the narrow issue of Sanchez's intellectual functioning, Doc. 965 at 22, and that the court likewise limit the government testing of, and expert testimony about, Sanchez. The court declined. Doc. 965 at 22. Mr. Sanchez's counsel also filed a motion to limit testimony by the government's expert to the subject of Sanchez's intellectual functioning and to preclude introduction of any statement made by Sanchez during the exam "unless it relates to low intelligence." Doc. 822 at 3, since Sanchez had not submitted to such testing by the defense and would not present such expert testimony on his own behalf. Doc. 822 at 3. *See also* T9293. The government agreed not to introduce evidence of polysubstance abuse or personality disorders, but maintained it would rebut Dr. Reidy's risk factor testimony.T9176. This court admitted the testimony, finding Sanchez's statements and test results in the government examination were "relevant to the issues that were raised by the defense experts." T9270-71. The Eleventh Circuit affirmed on this issue. *Sanchez*, at 1138-40. This motion did not involve the psychopathy and antisocial personality disorder diagnoses at issue here.

320

"decision . . . cannot be according the normal deference to strategic choices [where] it was uninformed.")

Even if counsel had obtained a ruling, and the Court admitted the psychopathy and antisocial personality testimony, there would have been no strategic reason for counsel not to introduce the evidence of brain damage. As discussed above, the evidence of brain damage is powerfully persuasive standing alone, and would have entirely undermined such a diagnosis, thus providing fruitful fodder for cross examination of Dr. Brannon.

### 7. Trial counsel failed to fully investigate and develop evidence which would have undermined the assertion that Mr. Troya had Anti-Social Personality Disorder or Psychopathy.

Had counsel properly investigated Mr. Troya's history of trauma during his developmental years and his documented history of head injury it would have been clear that Mr. Troya was not, in fact, a person with ASPD or a psychopath.[126] Because the criteria for diagnosing ASPD is a constellation of general behavioral observations, the DSM-IV-TR[127] explicitly notes that an Antisocial Personality Disorder diagnosis should not be made without ruling out other causes for that behavior. For example, symptoms of a major mood disorder such as Bipolar Disorder are a rule out for an Antisocial Personality Disorder diagnosis because the symptoms of major mood disorders will often mimic the behavior of personality disorders. An ASPD diagnosis can also be "misapplied to individuals in settings in which seemingly antisocial behavior may be part of a protective survival strategy." DSM-IV-TR at 703-04. Moreover, the

---

[126] Psychopathy is actually not a recognized psychiatric or psychological disorder. Some psychologists believe it to be a subcategory or extension of antisocial personality disorder and others believe it to be synonymous but it has no accepted diagnostic criteria and is not recognized in the DSM. Because the traits that psychopathy tests look for are similar to the criteria for antisocial personality disorder, any discussion of psychopathy must also take into account the possibility of alternate causes of that behavior.

[127] The DSM-V was not yet released at the time of Mr. Troya's trial but it provides further confirmation of the argument in this section.

diagnosis does not apply where seemingly antisocial traits are accounted for as manifestations of other mental disorders or organic brain defects, *id*. at 689, and should be explicitly ruled out when the behavior is due to "a general medical condition (head trauma)." *Id*. at 633. Even recurring problems with temper, anger and defiance against authority are not necessarily part of antisocial behavior as such behavior "can occur in a wide range of other primary psychiatric diagnoses, including substance abuse disorder, ADHD … PTSD [and] … organic brain syndromes…" Kaplan and Sadock, **Comprehensive Textbook of Psychiatry**, 8th Ed. 2005 at 3347. Other conditions that are often associated with antisocial behavior (and thus need to be ruled out before a diagnosis is made) are malnutrition, lead poisoning, and head trauma. *Id.*

As discussed at length *infra*, had trial counsel followed up on the "red flags" signaling complex childhood trauma, potential traumatic brain injury and properly engaged relevant experts, there would have been no diagnosis of antisocial personality disorder or psychopathy in Mr. Troya's case. Neuroimaging in Mr. Troya's case definitively shows brain damage, most likely due to head trauma. As the experts in his case attest, this organic brain defect made him even more vulnerable to the neglect and trauma he endured in childhood, creating a greater likelihood of behavioral difficulties and substance abuse that could improperly be considered to satisfy the criteria of antisocial personality disorder. Given Mr. Troya's history of brain damage, head trauma, childhood neglect and complex trauma, PTSD and substance abuse, no diagnosis of ASPD or psychopathy should have been made in his case.

### 8. Failure to adequately investigate Mr. Troya's social history and to otherwise prepare a competent mental health case.

As set forth in this motion, much was missed and misinterpreted by the defense team in its investigation of Mr. Troya's childhood and upbringing. Reasonably competent experts would have concluded the mitigating aspects from a complete revelation of Mr. Troya's social history

322

were far stronger, and in some cases directly at odds with the defense case which was actually presented. In addition, defense expert Dr. Krop and counsel both completely missed the fact the testing conducted on Mr. Troya indicated significant brain damage, but that section went completely unscored.

> **D. In his opening statement, counsel ineffectively promised the jury they would hear mental health testimony, even naming the witnesses and describing their testimony, including the damaging detail of antisocial personality disorder, then did not call the witnesses.**

During the first part of his opening, counsel provided some of the factual basis mental health experts would use for their testimony. He said Mr. Troya was "a bit of a clumsy child" who would fall down, had flat feet, and received injuries to his back, which required stitches. Counsel told the jury the evidence would show Mr. Troya ran into a wall and hit his head, and "**you'll hear about importance of head injury later,**" T7961.

Defense counsel described traumas Mr. Troya was exposed to, introducing the discussion by saying it was the start of a series of "shocking, terrible events," T7966. He told the jury of Mr. Troya's "downward spiral" afterward: that he was arrested for stealing a car, even describing in pseudo-psychological terms that "in his subconscious mind" Mr. Troya was listening to and following his Uncle Tito by his association with Varela, T7970, who had fancy clothes, money, car, girls, and was "Mr. Cool," like his Uncle Tito. T7973.

The defense opening statement was interrupted for a lunch break. When the jury returned, Counsel Eisenberg devoted much of the concluding section of his opening statement representing to the jury how he would call in Mr. Troya's case for life two of the "most renowned mental health experts in Florida." First, counsel told the jury he would call Harry Krop, a psychologist from Gainesville. Counsel provided the jury with Dr. Krop's background, saying he got Ph.D. in clinical psychology, had practiced over thirty years, that he was an associate professor at the

University of Florida College of Medicine, Dept. of Psychiatry. T7975. Defense counsel continued, telling the jury they would also hear from Dr. Michael Maher, psychiatrist, and a medical doctor since 1979. Counsel also described Dr. Maher's background for the jury: that he practices in Tampa, and is an assistant professor there. T7976.

Defense counsel then described how the defense mental health experts conducted their evaluations, and what their diagnoses were. He told the jury the mental health experts evaluated Mr. Troya during multiple interviews, and with batteries of psychological tests; he told them that those experts reviewed records and interviewed family members. T7977. Counsel then represented to the jury the two mental health experts would explain to them how outside events affected Daniel Troya, resulting in a "medical effect," and how he suffered from a personality disorder, Post-Traumatic Stress Disorder, Mixed Personality Disorder, **Antisocial Disorder**, and Substance Abuse Disorder. T7977. Counsel Eisenberg told the jury the mental health experts would opine that these disorders came not from a choice Mr. Troya made, but that it was something you are born with, triggered by the environment. T7978. Finally, counsel represented to the jury the mental health experts would opine a person is a product of their genes, and said Daniel Troya had some like his uncle Tito. T7978.

Though he promised to present these specific opinions to the jury, defense counsel failed to do so, and called no mental health experts at all in mitigation. The jury could have only been left with the belief such testimony would have been damaging to Mr. Troya, that counsel Eisenberg's word could not be trusted, or both.

After the defense rested, at sidebar AUSA Kastrenakes brought up counsel's default, and sought to protect the record from an ineffective counsel claim. He observed that in opening, Mr. Eisenberg had discussed calling two mental health experts, and said he wanted to know if that is

324

a "strategic avenue." T9150. Counsel Eisenberg agreed he "contemplated" that, and provided a report, but that "we changed our mind." Co-counsel Garcia said he joined Mr. Eisenberg in that decision. T9151.

To no one's surprise, in the course of urging the jury to sentence Mr. Troya to death, the government directed the jury's attention to defense counsel's promise, and that he had reneged on it. In the initial closing, AUSA Carlton told the jury the defense has no obligation to present any evidence, that the government must prove aggravating factors beyond a reasonable doubt and that they are so bad they justify the death penalty. T9518. The government explained that if you are going to establish mitigating factors, the defense has the burden both to show it exists and it is mitigating. T9518. He reminded the jury that in opening statement, defense counsel had said the jury would hear from Dr. Krop and Maher, that they would testify how outside events had a resulting "medical effect" on Mr. Troya, that he had a personality disorder, Post-Traumatic Stress Disorder, and a Substance Abuse Disorder. "Did we hear any of that? No," so there was no evidence before them that any of those are an "excuse" for what Mr. Troya did. T9518.

In his closing, counsel Eisenberg tried, but failed, to adequately account for his misrepresentation. He "concede[d]" there was a "change" in the defense case from what he had told them would be presented during opening statement. He (falsely) told the jury that at the time he thought it was necessary to "bring forth" experts to talk about what happened to Mr. Troya in medical terms; however, he said, as Mr. Sanchez's team through Mr. Murrell put on their case, and as we listened to Reidy and Mr. Troya's family, it became "clear" expert testimony was not necessary, and "clear" we did not need any to understand Mr. Troya. So that was why the experts were "not brought." T9573. Counsel Eisenberg also relied on the risk assessment testimony

325

presented by the codefendant Sanchez's team. "And by the way, rely on Dr. Reidy because the instructions say you can rely on any evidence." T9577.

Counsel's misrepresentation to the jury that mental health evidence would be presented in mitigation is in and of itself ineffective, and certainly reasonably likely to have affected the outcome of the trial. "The failure of counsel to produce evidence which he promised the jury during his opening statement that he would produce is indeed a damaging failure sufficient of itself to support a claim of ineffectiveness of counsel." *McAleese v. Mazurkiewicz*, 1 F. 3d 159, 166 (3rd Cir. 1993); *accord, United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 259 (7th Cir. 2003)("Promising a particular type of testimony creates an expectation in the minds of jurors, and when defense counsel without explanation fails to keep that promise, the jury may well infer that the testimony would have been adverse to his client and may also question the attorney's credibility. In no sense does it serve the defendant's interests"); *see also Harris v. Reed*, 894 F.2d 871, 879 (7th Cir. 1990) ("When counsel failed to produce the witnesses to support this version, the jury likely concluded that counsel could not live up to the claims made in the opening.*"). See Anderson v. Butler*, 858 F.2d 16, 18 (1st Cir. 1988) (finding counsel was ineffective when he broke a promise he made in his opening statement to present key expert psychiatric witnesses).

### E. Mr. Troya Was Prejudiced By Trial Counsel's Failures.

Due to trial counsel's ineffectiveness, Mr. Troya's jury was deprived of crucial evidence it needed to decide whether Mr. Troya should be sentenced to die. These failures encompassed both evidence that counsel developed but couldn't present because they had bungled their work with their experts, and evidence they simply did not discover. Had Mr. Troya's lawyers effectively developed and presented evidence of his mental health issues, including brain damage

and complex trauma, it is reasonably likely that testimony would have affected the outcome of the sentencing.

Although trial counsel's investigation and development of mental health mitigation fell short overall of the standard required by the Sixth Amendment, counsel did in fact discover evidence that mitigated Mr. Troya's sentence. The jury, however, never heard any of that evidence because of the series of unreasonable errors discussed above. Counsel, for example, had evidence that Mr. Troya had post-traumatic stress disorder, a history of substance abuse, and neglect. There was also evidence (albeit poorly developed and largely ignored) that Mr. Troya's difficulties began much earlier than the incident where he witnessed the shooting death of his friend. Red flags in school records suggested that Mr. Troya was struggling academically as early as 2nd Grade but failed to receive appropriate support from the school system who simply placed him in an English-as-a-Second-Language program despite the fact that he and his parents were native English speakers. Trial counsel, as discussed above, also failed to follow up with Dr. Wu, whose brain imaging showed that Mr. Troya had organic brain damage.

With proper investigation and preparation, trial counsel could have shown Mr. Troya's jury the full picture of his life and they jury could have understood that he was not the "personification of evil" that the government alleged. Had trial counsel effectively litigated issues of Mr. Troya's mental health mitigation, the jury would have heard how Mr. Troya's behavior was affected by circumstances outside his control, including the effects of complex trauma and organic brain damage. They would have seen the PET scan, a tangible image showing the defect in Mr. Troya's brain and they would have learned that impulsivity, anger, frustration and even violent behavior were not volitional acts of a psychopath who had

327

"committed himself to a life of unrepentant violence" but rather the signs and symptoms of brain damage interacting with untreated trauma.

A trauma expert could have contextualized Mr. Troya's struggles in school explained to the jury how observed behavior assumed to be indicative of a personality disorder like anti-social personality disorder is much more consistent with the symptoms of untreated trauma. With the testimony of a trauma expert, the jury would have learned of the complex trauma Mr. Troya endured during his childhood, including his victimization at school, his witnessing of acts of violence and the constant stress of living in a dangerous and unpredictable neighborhood. A trauma expert would have told the jury about how Mr. Troya's family, although very loving, were unable to provide the necessary mental and emotional support that an impaired young man like Mr. Troya needed. The jury could have learned how these experiences—the trauma coupled with neglect—helped to shape the way Mr. Troya experienced and interacted with the world. Children, like Mr. Troya, who are exposed to persistent trauma or neglect often develop a breakdown of their capacity to process, integrate, and categorize stimuli appropriately. The jury could have learned how, left untreated, this leads to the brain of persons like Mr. Troya to jump immediately to a fight/flight response when faced with adverse stimuli such as fear. In many situations, the brain simply bypasses the ability to process the stimulus and act appropriately and jumps to the unregulated emotional state. A trauma expert would have taught the jury how this response is observed by others as "unmotivated," "defiant," of "antisocial," the very descriptions of Mr. Troya in late adolescence and early adulthood.

Had trial counsel engaged a neuropsychologist who specialized in traumatic brain injury, the jury would have heard how a complete and clinically appropriate neuropsychological evaluation fully corroborated the PET scan showing of brain damage. As Dr. Ouaou reported,

Mr. Troya "demonstrated perserverative responses and other impairments consistent with frontal lobe/executive dysfunction." Dr. Ouaou report, Appendix K-4. Had the jury heard this testimony, they would have learned that the executive functions, which were significantly impaired in Mr. Troya, are the:

> neuropsychological processes that allow an individual to plan, initiate, program sequence, and maintain goal-directed behavior, especially under novel circumstances. These complex cognitive functions also allow an individual insight into the intent of their behavior. Executive functions allow an individual to alter her/his behavior in order to meet the demands of a task or inhibit nonproductive behavior.

*Id.*

Moreover, had trial counsel properly investigated and developed Mr. Troya's social history, the opinions of these mental health experts would have been corroborated by significant detail from those who knew Mr. Troya in early his life and adolescence.

There is a reasonable probability the outcome of his case would have been different notwithstanding the aggravating facts of the crime had trial counsel properly developed and presented this evidence of Mr. Troya's mental health. As the Fifth Circuit has noted, the horrific nature of capital murder does not override *Strickland* prejudice:

> The State's stereotypical fall-back argument – that the heinous and egregious nature of the crime would have ensured assessment of the death penalty even absent [the error] – cannot carry the day here. … [O]ur decades of experience with scores of § 2254 cases from the death row of Texas teach an obvious lesson that is frequently overlooked: Almost without exception, the cases we see in which conviction of a capital crime has produced a death sentence arise from extremely egregious, heinous, and shocking facts. But, if that were all that is required to offset prejudicial legal error and convert it to harmless error, habeas relief based on evidentiary error in the punishment phase would virtually never be available, so testing for it would amount to a hollow judicial act.

*Walbey v. Quarterman*, 309 Fed. Appx. 795, 804 (5th Cir. 2009)(quoting *Gardner v. Johnson*,

247 F. 3d 551 (5th Cir. 2001)).

This is particularly true where the mitigation evidence is of type in Mr. Troya's case. As

the Tenth Circuit recently held in reversing the district court in a capital § 2255 case:

> Evidence of mental impairments "is exactly the sort of evidence that garners the most sympathy from jurors," *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004), and that **this is especially true of evidence of organic brain damage** . . .Organic brain damage is so compelling … because "the involuntary physical alteration of brain structures, with its attendant effects on behavior, tends to diminish moral culpability, altering the causal relationship between impulse and action." *Hooks* [*v. Workman*, 689 F.3d 1148, 1205 (10th Cir. 32012)].

*United States v. Barrett*, 797 F.3d 1207, 1231 (10th Cir. 2015) (emphasis added) (reversing death

sentence and remanding for an evidentiary hearing).

Empirical evidence provides additional support. Federal capital juries have rejected the

government's call for the death penalty and returned life sentence in cases that were at least

equally aggravated as the instant case:

- *United States v. Naeem Williams*, D. HI No. 06-00079: The defendant was convicted of beating to death his 5-year old daughter. The testimony at trial established that the defendant routinely assaulted and tortured the 5-year old for many months leading up to her death, frequently beating her with his fists and his belt, often after she soiled herself.

- *United States v. Steven Northington*, E.D. PA No. 2:07-CR-00550-RBS: The defendant was convicted of a 2004 arson fire that killed six people, including four children – ages 15, 12, 10 and 1. The fire was set to retaliate against a federal informant.

- *United States v. Steven Green*, W.D. KY No. 5:06-CR-00019-TBR: The defendant was convicted of the 2006 murders of a family of four, including two children, and the rape and murder of their daughter.

- *United States v. Chevy Kehoe*, E.D. AR No. 97-243: The defendant was convicted of the murder of a family of three – an Arkansas gun dealer, his wife, and their 8 year old daughter – in furtherance of a white supremacist racketeering enterprise. Along with her parents, the defendant disposed of the 8 year old girl's body by dumping her in a swamp.

- *United States v. Alexis Candelario-Santana*, D. PR No. 3:09-CR-00427-JAF: The defendant, who already had 13 prior murder convictions, was convicted of 20 murders, including the October 17, 2009 "Tombola Massacre," where eight people were killed and twenty wounded in a shooting at a bar, including an unborn child.

- *United States v. Thomas Pitera*, E.D. NY No. 90-0424 (RR): The defendant was a contract killer for the Mafia who was convicted of seven murders. Several of the murders involved torturing the victims, dismembering their bodies and burying them in a deserted marsh on Staten Island.

- *United States v. Mohamed Rashed Daoud Al-'Owhali*, S.D. NY No. S6-98-cr-1023: The defendant, an accomplice of Osama Bin Laden, was convicted of organizing two bombings of American embassies in Africa. The 1998 bombings in Kenya and Tanzania collectively killed 224 people, including 12 Americans, and more than 5,000 people were injured.

- *United States v. Tommy Edelin*, D. D.C. No. 98-264: The defendant was convicted of four murders that he ordered as the so-called "drug kingpin" of DC-area gang known as the "1-5 Mob." Two of those murders involved ordering the killing of a 14-year old boy and a 19-year old.

- *United States v. Samuel Stephen Ealy*, W.D. VA No. 00-CR-104: The defendant was convicted of the 1989 murder of a family of three – a husband, wife, and son. The husband and wife were found shot to death outside their home; their son was later found shot to death in a closet inside the home. 363 F.3d 292, 295 (4th Cir. 2004).

- *United States v. Tyrone Williams*, S.D. TX No. 03-CR-221: The defendant was convicted for smuggling alien smuggling operation that led to 19 peoples' deaths, including a 5-year-old child, by dehydration, overheating and suffocation in the back of a truck trailer driven by the defendant. The victims were so desperate for air they were clawing away at the insulation, trying to punch out the taillights and banging on the sides of the trailer.

- *United States v. Zacarias Moussaoui*, E.D. VA No. 01-CR-455: The defendant was convicted of being a co-conspirator in the September 11, 2001, terrorist attack on the World Trade Center and Pentagon, which killed over 3,000 people and resulted in four airline crashes in New York, Pennsylvania, and Washington, D.C.

Each of the above federal capital cases was tried to a jury, and despite the horrific and brutal facts surrounding these murders – many of which involved, as in Mr. Troya's case, the murder of children – the juries did not return death sentences.

**XXVI.   COUNSEL UNREASONABLY NEGLECTED TO TIMELY AND EFFECTIVELY INVESTIGATE MR. TROYA'S PERSONAL HISTORY AND BACKGROUND, RESULTING IN AN INACCURATE, A MISINFORMED AND POOR MITIGATION PRESENTATION TO THE JURY, CONTRARY TO FIFTH, SIXTH AND EIGHTH AMENDMENT REQUIREMENTS.**

Because the defense failed to conduct a timely and thorough investigation, counsel presented to the jury only the thinnest veneer of Daniel Troya's life history, and one that distorted its reality beyond recognition. The defense team early on settled on a false narrative that Mr. Troya came from a "good" family, neighborhood and schools, and neglected to investigate and pursue investigative information that would have led in other directions not only more meaningful in a case such as this but actually accurate. Investigation since trial has shown a family culture and previously unknown and unpresented stressors which disabled Mr. Troya's parents from any ability to manage the problems of children, and in particular Daniel Troya's problems, as they emerged.

Aside from the disparate treatment of codefendant Varela[128] and testimony that Danny Troya was loved by his family, the stool of the defense case for life defense counsel presented to the jury rested on three legs: (1) Daniel Troya's good deeds as a child volunteering at a retirement home, (2) the trauma resulting from a series of events but principally the death of his friend from a murder, and (3) the effect on him of the bad behavior of his Uncle Tito, who came to live with the family one summer. Expert explanation of the effect of these events was given up by counsel, as described in the mental health section of this motion. And even counsel's attempts at explaining Mr. Troya's actual life history counsel amounted to a bare-bones presentation given their failure to explore or timely investigate or the far more mitigating evidence what their client faced as a child and adolescent. This evidence, far more persuasive and meaningful in a difficult case like this one, was available.

---

[128] As noted elsewhere in this motion, the prosecution demolished the valid disparate treatment argument with the false claim that Mr. Varela might still receive the death penalty.

Apart from a cook, friend, and police officer, the only witnesses called to describe Mr. Troya's generational history, childhood and tragic upbringing were members of his own family. None of these family members had been interviewed effectively; had they been, as demonstrated below, far more compelling mitigating evidence would have been discovered. Other witnesses who were belatedly interviewed inexplicably were not called to testify. In addition to those witnesses identified early on by the defense team, there were many other witnesses who could have provided mitigating testimony, but they were never interviewed, or only interviewed at the last minute or even in the midst of trial when counsel were unprepared and unable to make use of them.  Substantial evidence demonstrating Mr. Troya's extended family's financial failings, closed culture, and frequent failure to provide the children with medical and other necessary assistance went unpresented, as did the mitigating information about the crime-filled neighborhood and schools in which young Daniel Troya simmered  as a child.

In addition, Mr. Troya's chaotic childhood, significant traumas, additional head injuries, and other mitigating evidence went utterly uninvestigated and unpresented. There is no strategic reason for the failure to adequately investigate and present Mr. Troya's history, and the failure to conduct such an investigation falls well below the Sixth and Eighth Amendment standards for counsel in a death penalty case.

The GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES (February, 2003) (hereinafter "ABA Guidelines") in effect at the time of trial required extensive investigation into the life history of the client, generations back, as well as mitigating aspects of events used by the government as aggravators.

The ABA Guidelines[129] stress that the work of developing mitigation and countering aggravation must commence at the earliest possible stage in the case:

> Investigation and planning for both phases must begin immediately upon counsel's entry into the case, even before the prosecution has affirmatively indicated that it will seek the death penalty. Counsel must promptly obtain the investigative resources necessary to prepare for both phases, including at minimum the assistance of a professional investigator and a mitigation specialist, as well as all professional expertise appropriate to the case. Comprehensive pretrial investigation is a necessary prerequisite to enable counsel to negotiate a plea that will allow the defendant to serve a lesser sentence, to persuade the prosecution to forego seeking a death sentence at trial, or to uncover facts that will make the client legally ineligible for the death penalty.

Commentary to Guideline 1.1, *Objective and Scope of Guidelines*, at pp. 5-6 (internal citations omitted).

The ABA Guidelines provide that "Counsel at every stage [of the proceedings] have an obligation to conduct thorough and independent investigations relating to the issues of both guilty and penalty."  Guideline 10.7.

> Because the sentencer in a capital case must consider in mitigation, "anything in the life of the defendant which *might* militate against the appropriateness of the death penalty for the defendant," "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history."  In the case of the client, this begins with the moment of conception.

ABA Guideline 10.7, Commentary, at 81 (emphasis added and citations omitted).  "It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others."  *Id.* at 83 (citations omitted).

---

[129] While the ABA Guidelines do not have a the force of law, they set out the norms prevailing at the time and provide all capital counsel with the standards of practice in the profession.

334

The mitigation investigation is time-consuming. Potential witnesses in mitigation and to counter aggravation must be identified and located. They must be interviewed in person. It is not possible to conduct an adequate mitigation investigation by other means, such as through telephone interviews, especially when sensitive, troubling information about the family may be at issue.  SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEFENSE PENALTY CASES, in 36 HOFSTRA. L. REV. 677 (2008) (hereinafter "Supplementary Guidelines") Guideline 10.11, *The Defense Case: Requisite Mitigation Functions of the Defense Team*, subsection (C) mandates the use of one-on-one, face-to-face interviews with witnesses "familiar with the client's life, history, or family history or who would support a sentence less than death."  Potential witnesses must be repeatedly interviewed. Establishing trust and gaining the confidence of witnesses can be a time-consuming process requiring multiple visits as detailed in the Supplementary Guidelines at 10.11 (D):

> . . .  Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation.  Team members must endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceedings.

The ABA Guidelines outline the duties and obligations of counsel in their representation of the defendant.  These Guidelines have "long . . .  [been] referred [to]" by the U.S. Supreme Court "as 'guides to determining what is reasonable'" *Wiggins v. Smith,* 539 U.S. 510, 524 (2003) (citing *Strickland*, 466 U.S. at 688, and *Williams v. Taylor*, 529 U.S. 362 396 (2000); *see also Rompilla v. Beard*, 545 U.S. 374, 387 n. 7 (2005) (discussing and applying the "set of [ABA] guidelines specifically devoted to setting forth the obligations of defense counsel in death penalty cases").

335

Death sentences from virtually every jurisdiction have been set aside due to trial counsel's failure to adequately investigate and present mitigating evidence regarding the defendant's background, character, or mental health.  *See, e.g.*, *Wiggins,* 539 U.S. at 525. (counsel failed to investigate and present life history evidence); *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (finding that "trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background"); *Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008) (holding counsel ineffective in failing to investigate and present mitigating evidence); *Brownlee v. Haley*, 306 F.3d 1043, 1074-75 (11th Cir. 2002) ("[O]ur confidence in the jury's balancing of the aggravating and mitigating circumstances, and its resulting recommendation of death, has been substantially undermined as a result of counsel's failure to present to the jury any of the powerful mitigating evidence that was available.").

**A.      Trial counsel's investigation and preparation of mitigating evidence was conducted largely during the weeks before the trial began and even after it had started.**

For no conceivable "strategic" reason, counsel neglected to adequately investigate and present powerful mitigating evidence which was available prior to trial. Some witnesses were belatedly interviewed by the defense around the time of and during trial. Many other witnesses who could have provided mitigating evidence were never interviewed at all. Below, counsel describes potential witnesses who were interviewed, but either not called at the sentencing hearing or underutilized. The prejudice from the deficiencies is presented separately, in a description of the mitigation evidence which could have been presented had counsel only properly investigated.

Shortly after he was appointed as learned counsel for Mr. Troya on May 21, 2007, Doc. 203,[130] counsel Eisenberg moved to appoint Kerry Sheehan as mitigation specialist for Mr. Troya, and that motion was granted. Doc. 218. A flurry of activity followed, with the mitigation specialist, sometimes with counsel Eisenberg, interviewing members of Mr. Troya's family, as well as a few other witnesses relevant to the sentencing phase. There are significant deficiencies in the way in which the social history investigation, even the minimal one that was conducted here, was undertaken. For instance, interview of Mr. Troya's family in Chicago was conducted in a group, and those interviewed were not spoken to separately. There were few if any follow-up interviews.

Counsel for Mr. Troya also moved for and was granted the appointment of mental health experts: Dr. Wu, Dr. Krop, and Dr. Maher.

In the course of the investigation of Mr. Troya's social history, counsel relied primarily on Dr. Harry Krop as the single witness who would summarize and put into context Mr. Troya's childhood and upbringing. For instance, Dr. Krop accompanied counsel and his mitigation specialist on a trip to Chicago to interview family members there, including Uncle Tito. This near-exclusive reliance on Dr. Krop for the development and ultimate presentation of the context of Mr. Troya's social history resulted in complete disaster when counsel decided not to call him as a witness at the sentencing phase of trial.

The defense and local United States Attorney reached agreement on a potential non-death sentence plea in this case around the summer of 2008. The DOJ protocols in 2008, similar to today's, required approval of the Attorney General for any plea agreement in a case in which the death penalty could be sought. In a case like this one in which notice of seeking the death penalty

---

[130] Ruben Garcia had been appointed as counsel for Mr. Troya on November 15, 2006. Doc. 34.

was already given, DOJ protocols were (and continue to be) even more onerous, requiring material changes to reverse the decision to seek death and approve of a plea.

**Rule 9-10.110 Plea Agreements** provided "[p]roposed plea agreements that would require withdrawing a previously filed notice of intent to seek the death penalty should follow the procedures described in 9-10.150, infra." That rule required the plea's personal approval of the Attorney General of the United States:

> **9-10.150 Withdrawal of the Notice of Intention to Seek the Death Penalty**
>
> Once the Attorney General has authorized a United States Attorney to seek the death penalty, the United States Attorney may not withdraw a notice of intention to seek the death penalty filed with the district court unless authorized by the Attorney General.

https://www.justice.gov/usam/usam-9-10000-capital-crimes#9-10.150

While the United States Attorney was directed by the protocol to continue to proceed as if this was a death case, a fact of which the defense should have been aware, they nevertheless acted as if the plea was a done deal. Lulled by the uninformed belief that the Attorney General would simply approve the plea agreement, counsel and his mitigation team virtually stopped work on investigation and preparation for the sentencing phase sometime in the summer of 2008. This remained the state of affairs until rejection of the plea was received around December 22, 2008. It is bedrock law, but bears repeating here, that defense counsel fails to provide effective representation if they cease working on a case when faced with the possibility of a plea. *The ABA Standards on Criminal Justice* even contain a specific guideline addressing this default: GUIDELINE 10.9.1—THE DUTY TO SEEK AN AGREED-UPON DISPOSITION. "G. The existence of ongoing negotiations with the prosecution does not in any way diminish the obligations of defense counsel respecting litigation." But the plea was not approved by the Attorney General, and when counsel was notified of that rejection around December 22, 2008,

338

the mad scramble to complete the sentencing phase investigation and preparation began *for a death penalty trial that was to start just weeks later.*

The sentencing phase interviews and development of mental mitigation stopped for a significant time generally corresponding to when the plea approval process began. Trial counsel's file is a virtual black hole of preparation during the approval waiting period. Regardless of why counsel stopped the investigation, to do so was constitutionally deficient performance.

In December 2008, when the defense team awakened to the reality that the case was going to trial, preparation for both guilt and sentencing was suddenly restarted for a trial set to begin January 7, 2009. Counsels' file, including that of mitigation specialist, shows a last-minute attempt to complete interviews of potential witnesses and collect records for the sentencing phase of trial, as well as for the guilt phase. There were no follow-up interviews to pursue mitigation of family members outside of those located in West Palm Beach, and for the first time the defense team interviewed:

1. Annette Allison (Danny Troya's former teacher interviewed December 10, 2008);
2. Dollie Daniels (Morse Geriatric worker interviewed January 23, 2009);
3. Mariellen Davis (Former teacher interviewed December 10, 2008);
4. Byron Todd Hamrick (Inmate Danny Troya purportedly made admissions to interviewed February 6, 2009);
5. Annelle Hernandez (Childhood friend interviewed  January 13, 2009 and March 1, 2009);
6. Magalis "Maggie" Munoz (Morse Geriatric worker interviewed January 23, 2009);
7. Julio Perez (Childhood friend, witness to Pawlowski battery interviewed March 4, 2009);
8. Juan Quinones (Maternal uncle interviewed January 26, 2009 and March 4, 2009);
9. Christina Schmidt (Kevin Vetere's aunt who knew Danny Troya since childhood interviewed February 4, 9, and 18, 2009);
10. Victor Sepulveda (Morse Geriatric worker interviewed January 23, 2009 and March 2, 2009);
11. Captain Starling (Correctional deputy interviewed February 5 and 20, 2009);

339

12.   Irma Torres (Maternal aunt interviewed February 5, 2009);

Whether counsels' work stoppage was because of the plea possibility or not, the sentencing investigation was extraordinarily deficient.

**B.    Although substantial mitigating evidence was available from witnesses the defense belatedly interviewed, trial counsel did not pursue the evidence or did not know how to effectively make use of it.**

As the defense should have anticipated, at sentencing the government challenged virtually every aspect of the defense mitigation case.  It had sent FBI agents to question defense mitigation witnesses prior to the penalty phase, and then during penalty phase questioned witnesses in such a misleading fashion as to lead the jurors to believe that Uncle Tito was not even at the Troya home for much time. The government questioned the extent of young Daniel's volunteer work at Morse Geriatric. It heartlessly challenged whether Daniel Troya was by his friend John Kamel's side as he lie dying, and whether even he was actually his friend. Yet with the exception of Karl Bush -- the defense's leadoff witness at sentencing who exercised his Fifth Amendment right to remain silent and initially declined to answer questions about uncharged criminal activity with Danny Troya, then misremembered them -- counsel presented only the barest minimum of mitigating evidence, mostly from Danny Troya's own family, to prove the events in support of the case for life, and to counter the government's challenge to that case. Even from what the defense knew, there were a number of witnesses who would have shored up weaknesses in the defense mitigation theory as it was pursued, as well as revealed startlingly new mitigating evidence and themes. However, they neglected for no good reason to use their testimony. The mitigation the witnesses could have offered is far more compelling than that presented, and more than reasonably likely to have affected the outcome of the sentencing trial had the jury learned of it.

> **1.      There were teachers available who could have testified about Mr. Troya, his family, and the neighborhood in which he was raised.**

The defense neglected to call two teachers whom it had belatedly interviewed in support of the case for life. On December 10, 2008, counsel and the mitigation specialist interviewed two of Daniel Troya's teachers from when he attended Palm Beach Public Elementary School. Mitigation specialist Sheehan wrote a report to counsel Eisenberg dated December 16, 2008, summarizing the interviews. Interview notes show the two would have testified as follows:

**Mariellen T. Davis** had worked at Palm Beach Public School for thirty years. She was at the time of the interview an art teacher, but when Danny was there, she taught a number of subjects including Spanish, social studies, and science. Ms. Davis knew the entire Troya family, since they lived within a half mile of her. She would have described the neighborhood where they lived as a bad area for children, but she said it was all the family could afford. The Troya home was near the railroad tracks. There were always cars driving up and down the street, and it was a very rough area.

When the children were young, she would see the Troya kids riding their bikes, and she got to know Mariette, Danny's older sister, very well. Ms. Davis described Mariette as a tough little girl, and she took Mariette under her wing. She recalled Mariette starting at Palm Beach Public in kindergarten.

Ms. Davis also knew Danny Troya when he was at the school. She would have testified Danny always helped the little kids who were being picked on, and helped to alleviate difficult situations. For instance, when someone was being picked on in the cafeteria, Danny would be there to catch a tray before it fell. One time in art class, a child had moved the chair of another child. Danny stepped in and said that the student could have been hurt. He looked out for

peoples' rights and always helped smaller kids. According to Ms. Davis, Danny always did his assignments and he helped the other kids with theirs.

While Danny was big- hearted and tried to look out for others while in elementary school – protecting smaller children who were picked on – Danny was dealing himself with being made fun of. He did not have the people skills to cope with other's poor treatment of him.  Ms. Davis also remembered that Danny did not do well in his studies.

Ms. Davis later saw Danny when he was older and worked at the Chevron gas station. He helped fill up her car. He was not there long. She would have said Danny had a very big heart, though he was not very attractive and not very bright.

Ms. Davis would have testified that because of her neighborhood, Mariette would stay inside her home as there were always threatening men driving up and down the street. Mariette would call Ms. Davis and she would talk to her on the phone and calm Mariette down. Ms. Davis said Mariette dreamed of being a child psychologist, but had neither the academic abilities nor the financial resources to do so.

Ms. Davis recalls when Mariette found out Lorenzo was not her father. Mariette had gone in a drawer and found a birth certificate which did not have Lorenzo's name on it. Ms. Davis did not go into details with her because Mariette just did not want to go into it.

Ms. Davis was instrumental in landing a landscaping job for Lorenzo next door to her. She said everybody loves Lorenzo, and you can see it when you go to Home Depot. He has always been a sweet guy.

Ms. Davis recalled when Danny's uncle came to their home to live, but only that the uncle was not very serious and was not a hard worker.

Ms. Davis describes Danny's little brother, Adrian, as a little backward, and said he did not have any friends.

Ms. Davis spoke with the Troya trial defense team when contacted before trial and cooperated with their investigation. Ms. Davis attended a portion of the trial and was willing and able to testify at trial; however, trial counsel failed to call Ms. Davis as a witness.

**Annette Allison** was also a teacher at Palm Beach Public School. She had Danny as a student for one year, in second grade. Ms. Allison described Danny as quiet, low academically, low in intelligence, and slow in processing. He was never a behavior problem with her. She does not recall Danny ever being sent to the office, or any discipline issues. Ms. Allison said she remembers students who cause trouble and Danny just was not one of those. He was always respectful. She believed his parents were always on top of him if he did not do his homework.

Ms. Allison spoke with the Mr. Troya's defense team when contacted before trial and cooperated with their investigation. Ms. Allison attended a portion of the trial and was willing and able to testify at trial; however, trial counsel failed to call Ms. Allison as a witness.

> **2.** **There were witnesses who could have testified about Danny Troya's experiences volunteering and the relationships he developed at Morse Geriatric Center**

It was not until January 23, 2009, that counsel even confirmed Mr. Troya had volunteered at the Morse Geriatric Center when he was a youngster. The mitigation specialist provided counsel with a memorandum to that effect, identifying three witnesses she had interviewed on that date: Victor Sepulveda, who was called to testify, as well as two others who were not presented to the jury but who had worked at Morse when Danny volunteered there, **Maggie Munoz** and **Dollie Daniels**. Both had unique, humanizing vignettes to tell about Danny Troya's time at the Center, as well as insights going far beyond those related by the single witness from

the Center presented by counsel. Counsel neglected to call either witness at the sentencing phase of trial.

**Magalis ("Maggie") Munoz** would have testified young Danny Troya was like a son to her. She had worked at the Morse Geriatric Center for twenty years at the time of trial. She would have testified she still remembered Danny, and would have described him as a very good boy. He started coming to the center with his grandmother when he was very young, approximately seven or eight years old. He was very nice and helped with whatever he was asked to do. Ms. Munoz would have described Danny as an excellent boy. He worked in the dining room, and helped wash dishes and clean tables. He also worked in the cafeteria. Danny also had contact with the elderly residents and got along with everybody. Ms. Munoz's sense was that they all loved him: he visited with them and made them happy. His sister volunteered as well.

Ms. Munoz said after he was grown Danny stopped by to see her. The two had lunch in the cafeteria and walked around the facility together. Maggie was on a walking program to lose weight and Danny accompanied her on her walk. Ms. Munoz would have also testified they don't let people volunteer who are so young anymore; you have to be twelve years old to volunteer now. She recalled Danny went there for a lot of years, a long time.

Ms. Munoz was on the defense witness list to be called as a witness, but trial counsel failed to call her.

**Dollie Daniels** would have testified she was a kitchen supervisor and chef who had worked at Morse Geriatric Center for twenty-four years at the time. Ms. Daniels could have corroborated Danny volunteered at Morse Geriatric and that he would come in to help fix the food and wash dishes. She would have said he was very helpful.

344

Trial counsel had learned Ms. Daniels was scheduled for surgery during part of the time of trial, but took no steps to preserve her potential testimony or otherwise ensure it was presented to the jury.

> **3.** **Also available were witnesses to the John Kamel shooting,  who saw Daniel Troya cradle the victim's head and were aware of his reactions in the aftermath, and could also have provided important testimony about the crime-filled neighborhood and schools to which the young Mr. Troya was exposed.**

Consistent with the dilatory defense approach to sentencing phase, one critical witness, **Anelle Hernandez**, was first interviewed by the mitigation specialist on January 13, 2009, and she and counsel met with the potential witness again on March 1, 2009. Ms. Hernandez went to school with Mr. Troya in elementary and middle school, witnessed his heartbreaking reaction to the shooting of his friend John Kamel; she had testimony to offer that was far more compelling than the sanitized version presented by trial counsel.  She also and knew of other important mitigating evidence. Counsel neglected to call her to inform the jury of what she knew, and did not provide her information to mental health experts. Counsel Eisenberg had a conflict of interest-he had represented this potential witness in her own drug prosecution in 2002.[131]

Had she been called, the jury would have heard Ms. Hernandez tell them the following:

Ms. Hernandez was attending Conniston Middle School and was an eyewitness to the shooting of John Kamel. She had known Danny a long time; they were friends from the neighborhood. She was in the 6th grade. She knew both Danny and John Kamel. She was not

---

[131] Indeed, Counsel Eisenberg may have decided not to put on Ms. Hernandez due to his own conflict of interest: he had represented her in her own drug prosecution in 2002 and may have wanted to shield her from questions about it. To the extent that such concerns influenced his decision making in Mr. Troya's case, he deprived his capital client of the conflict-free effective representation to which he was entitlted.

friends with John but did know him from school. She had seen Danny and Kamel walking through corridors together, and believes they were friends. She did not know the shooter.

She would have testified the bell usually rang between 8:00 and 8:15 a.m. There were about twenty students who had arrived at and were in front of the school between 7:15 and 7:30 a.m. All of a sudden, they heard the sounds of an argument. They turned around to look and Ms. Hernandez saw a shiny gun in a boy's hand. Then he shot the gun. Danny was near John at the time. Everybody fell to the ground, but Danny ran to Kamel and grabbed him. John was bleeding. Another kid called the police. Ms. Hernandez would have testified that John Kamel's head was resting on Daniel's arms. Daniel was kneeling down. Everybody had panicked except Daniel. Ms. Hernandez had hit the ground when she heard the first shot.

Ms. Hernandez would have further testified that Ms. Cooper, the administrator, came out a little later. Danny was wildly upset because he and John had been friends. Ms. Hernandez remembers Mrs. Cooper coming out and pushing everyone away. She specifically remembers her pushing Danny away. She recalls that when Ms. Cooper was pushing all the kids away, Danny was very emotional. He turned red and he was crying. He was saying he was not going to leave John. Daniel had blood on him.

Ms. Cooper was the first to come out of the school and she started yelling at everybody to get away from the "kid." Then the intercom announced for everyone to go into the classrooms. The shooter was still running around.

Ms. Hernandez had not been close to John Kamel and was not cradling him as Mr. Troya was, but she was traumatized by the shooting. Prior to the incident, Ms. Hernandez said that she had felt secure in her school, and that it was a safe place. There were some arguments but there

346

were no serious fights. After the incident, Anelle did not go to school for a week or so. A lot of parents took their kids out of the school.

Ms. Hernandez did not talk to Daniel about the incident except once, when Danny said that it was the worst day of his life. It is something she will never forget.

The government used witnesses and argument effectively to minimize the importance of this event, and its traumatic effects, on Danny Troya. Had trial counsel presented availabile witnesses such as Anelle Hernandez, they would have been able to  counter the government's arguments. Had they additionally presented a mental health specialist with expertise in trauma, the jury would have learned of the lifetime deleterious effects a violent incident like this can have on a young teenager. Ms. Hernandez could have also given extremely relevant mitigating testimony in other areas which was otherwise lacking from the defense case. She knew Danny as a person who would always try to get out of confrontations. He had a good heart. He was never a leader, always a follower. Her experience with him led her to believe that Danny became involved with stealing and similar offenses because others in the school were taking such actions and he wished to be accepted by them.

Ms. Hernandez also had her own problems with criminal charges, as shown by Ms. Sheehan's background check, yet this would have been powerful cohort testimony, showing how another child who grew up in the same area with Daniel Troya also ended up with significant criminal problems.[132] Anelle would have testified she did not complete high school but got her GED. She has worked as a receptionist in a doctor's office and as an office manager in an attorney's office. She has also worked as a cashier for Publix and she has had numerous other jobs. She has not worked for the past three years because she has two children. Her last child was

---

[132] Similarly, Anelle's brother, Jose "Joey" Hernandez, died last year after he had taken bad drugs.

premature and she has to stay home with her. She and her children are currently living with her parents who have been married for thirty-one years.

The defense conflict and other failings deprived Mr. Troya's jury of other powerful mitigation testimony that could have been presented through Ms. Hernandez. Indeed, she could have provided testimony about the troubled conditions within the neighborhood where she and Danny grew up and at Conniston Middle School.

Annelle Hernandez grew up in the same neighborhood as Danny. Ms. Hernandez and Danny have known each other since elementary school, even though Annelle went to Belvedere Elementary and Danny went to Palm Beach Public She went to Conniston Middle School at the same time with him, and they were friendly both in the neighborhood and at school. Had she been called, Ms. Hernandez could have testified to the terrible neighborhood conditions in which she and Mr. Troya were raised.

Ms. Hernandez could have related to the jury how there were prostitutes and crackheads on Dixie Highway and how the children could tell who they were, by the way they dressed and carried themselves. The kids would also see people exchanging drugs for money at the Green Terrace Apartment Complex. There would be drug paraphernalia and needles everywhere.

During Annelle and Danny's teenage years, people who come to into the neighborhood were regularly assaulted. Marijuana use was rampant, as was drug selling and stealing. Stabbing were so frequent that the younger children hid knives near the bodegas and carwashes in the neighborhood surrounding Conniston to protect themselves.

Conditions at Conniston Middle School were abysmal, according to Ms. Hernandez. She herself failed eighth grade twice and was transferred into the "Academy," the part of the school that was reserved for the failing students and those with disciplinary problems. At the Academy,

348

youngsters would bring guns and drugs to school. There was constant fighting and the quality of teaching was poor; students were given "A's" for little work.  Ms. Hernandez also could have described how teenagers from Forest Hill High School kids come over to  Conniston when their school let out, influencing the younger children when there were no parents or other adults to intervene.

Had she been called to testify, Ms. Hernandez could have described how prior to the shooting of John Kamel, there was extensive fighting between rival gangs at Conniston. These gangs were mostly divided by race, with the black children fighting with the Hispanics. The fights would happen all over the school --- hallways, staircases, the cafeteria. Typically, the fights were not in the classroom, although it was not uncommon for a student to assault a teacher.

Ms. Hernandez willingly spoke with the Mr. Troya's defense team when contacted before trial and cooperated with their investigation on January 13 and March 1, 2009. Ms. Hernandez was willing and able to testify at trial. However, due to the failure to ask important questions or properly prepare, the eleventh-hour attempts to put a penalty phase together, and a conflict of interest, trial counsel failed to make use of Ms. Hernandez as a witness

Had trial counsel questioned Ms. Hernandez properly, they would have learned she could also have testified about Danny's Uncle Tito. She remembers Tito selling and abusing drugs as well as pursuing young girls in the neighborhood.

Ms. Hernandez was a student at Conniston Middle School the day that John Pierre Kamel was shot. She heard the shots and threw herself in the bushes. As discussed earlier, she saw Danny holding John Pierre's head in his arms, red faced and upset.

349

Due to the last-minute rushed nature of the trial team's interviews, they did not know that Annelle could also testify Danny was devastated, he was upset, he cried, and then ultimately became angry. She could tell that he was deeply affected by the incident which became a sensitive subject that she came to avoid talking about with him. Because so many were affected at the school, therapists were brought in, but Ms. Hernandez remembers that they stayed barely two weeks and were not very helpful to the groups of children they briefly attended.

After the shooting, the school environment worsened. The students at Conniston they started skipping school more, not doing school work, and stealing. The young men in the neighborhood, including Danny, Karl Busch and Ms. Hernandez's brother were arrested for burglaries and drug offenses; Ms. Hernandez herself was arrested for breaking into houses and stealing cars and was sent to a juvenile facility. There was an increased police presence at Conniston, with many students dropping out, or hanging out in the streets. Ms. Hernandez remembers seeing Danny in the streets a great deal during this time.

Furthermore, Ms. Hernandez, also apparently unknown to trial counsel, could have testified to Mr. Troya's relationship with Danny Varela in 2006. She thought "DV" was not a good influence on her friend. She also knew of Kevin Vetere as a longtime snitch and thief who had long had drug connections and knew how to "set things up." Her testimony would have been useful at sentencing for giving the jury insight into the lives and credibility of the men who were testifying against Danny Troya.

> **4.     Other witnesses were available who could similarly have described the crime in the neighborhood and at Conniston, as well as given testimony about Danny Troya as a follower and loyal friend.**

On January 27, 2009, in the midst of the guilt phase of trial, the defense team mitigation specialist met with Danny's best childhood friend, **Julio Perez**. Perez is described in her notes as "the good" friend. He was present at the time of the incident with Ms. Pawlowski, and provided

350

trial testimony solely about how that incident actually unfolded.  But what went unpresented was his testimony about the neighborhood and Conniston, how Danny was a follower, and the sympathetic and credible details about how Daniel Troya was a loyal friend. His testimony would have also provided critical cohort comparison between Julio, whose life had structure, and Danny's, which did not. Counsel neglected to present the full testimony of this witness as well. It would have been extraordinarily effective; the government did not even try to impeach his testimony at trial, *See* T8766, and could not have, as any reasonably effective counsel would have known.

Had counsel effectively presented Mr. Perez's testimony, he would have related he had known Danny for ten years, and the two met at Conniston Middle School. However, Julio did not really know Danny at the time of the shooting of John Kamel, only getting to know Danny later. Julio would have told the jury how Danny used to ride a bike around the neighborhood. After Julio's parents bought a house on Lake Avenue, near the school, but no longer in the neighborhood, Danny saw Julio and stopped to say hello. He then used to come over and visit. He was always funny and outgoing. He was, a loyal friend. Julio never had any classes with Danny, but they were friends outside of school.

Julio said his own parents were very strict and he was always afraid of getting into trouble. Danny had respect for Julio's father and he never tried to get Julio involved in anything, even though Julio knew some of the people who got into trouble. Julio said he and Danny mostly rode their bikes, hung out and did the usual teenage stuff. Julio said that Danny just did not think about the things he did. He was impulsive.

The two used to hang out at Karl Bush's mother's house. Julio was present at the time Danny had his encounter with her. Julio would have testified, if asked, that Karl's mother was

351

drunk that day. She drove up and almost hit them. She started slapping Danny and he pushed her. She stumbled and fell along a sidewalk with some type of planter. Mr. Perez would have been a credible witness who could have countered evidence the government alleged in aggravation.

Julio had stayed in contact with Danny over the five or six years that he was locked up. He wrote to Danny and Danny wrote back. Danny asked about Julio's family and the people at home.

Julio would have also told the jury Danny was easy to like. When people met Julio and Danny, they gravitated toward Danny more than Julio.  Julio had troubles  in school as well but, but was able to change for the better and began to think more about his future when he turned eighteen years of age. His sense of Danny was that his incarceration as a youngster, and other problems, deprived him of that option..

Julio Perez, if asked, would have testified that Danny told him at the time about being beaten up by the prison guards. He always acted tough, but he did tell Julio about it. He said that they took him in and started beating him. Julio said that, when Danny first came out of prison, he looked for a job, and would think that he had it until the employer looked at his record.

Mr. Perez testified at Danny Troya's trial, spoke with the Mr. Troya's defense team when contacted before trial and cooperated with their investigation around January 27, and March 4. 2009. Mr. Perez would have related to the jury the additional information detailed above at trial if he was simply asked. Competent interview and presentation would have also brought out the additional facts about the neighborhood he and Danny grew up in, and the difficulties students faced at Conniston.

Mr. Perez could have told the jury how Conniston was riddled with gangs. While drugs were not a part of his life, there were a lot of them in the neighborhood. So were cars with loud

systems – the kinds of cars that drug dealers ride in. You would see prostitutes on Dixie Highway, but he did not live right next to it like Danny did. Where Mr. Perez was supervised by his family at night, Danny was not, and tended to get in trouble then.

He could have testified he was with John Pierre Kamel two weeks before he was shot when Tronneal Magnum shoved John after he asked for his watch back. He accompanied John to the principal's office to report the incident, after which, Tronneal would no longer be friends with him. Mr. Perez was late to school the day of the John Kamel shooting. There was a lot of commotion when he arrived; when his mother saw what had happened on the news, she came to the school and took him away. No one came for Danny.

Mr. Perez could have challenged the government's dismissal of the effects of the shooting because Danny Troya discussed it with him at the time. He told his friends that he had held John Kamel after he was shot, and that the full effect of the incident did not hit him until a day or so later, after which he became incredibly sad and filled with grief. If questioned and called, Julio Perez could have attested to the shock and grief Mr. Troya experienced.

Mr. Perez could have brought forth positive aspects of Mr. Troya's personality. He could have told the jury how Danny protected him by shielding him from his other, mainly older, friends. He got into trouble with. He would have testified that his friend was loyal and kind, but acted as a follower. When he hung with tough people, he adapted to them and their lifestyle.

### 5. Witnesses were available to testify, if asked, about the Troya home.

The mitigation specialist interviewed Juan Quinones on January 26 and March 3, 2009. On the March 3rd date, trial counsel Eisenberg also met with Mr. Quinones. The meeting went well enough that Mr. Quinones was placed on the defense witness list and testified at trial about Uncle Tito, witnessing Danny at the shooting of John Kamel, and noticing that he became a lot

quieter after.  However, he had far more mitigating evidence to offer had the trial team made the time and prepared effectively.

The trial team learned Mr. Quinones is the youngest brother of Maria Troya's. He was sent to live with the Troyas in West Palm Beach in an effort to get him away from the gangland influence in Chicago. Lydia Quinones, his and Maria Troya's mother, was concerned that Juan was going to be in a gang and/or die.

Once in West Palm Beach, Juan said he went his own way. He was more into sports, especially basketball. His brother, Ipolito a/k/a "Poli," was already living at the Troya's when he arrived. They were both sent down by their mother. Once Juan arrived, the Troyas had five boys and Danny's sister, Mariette, in their small home to care for.

Juan Quinones was called as a witness but because of the hasty, last-minute interviews, the defense failed to present additional information he could have provided.  Mr. Quinones could have testified that in his view, Danny had a protective personality, and was especially very protective of his sister Mariette.  He had friends and was warm and funny with them.

Juan Quinones said he only saw the beginning of Danny's troubles while he was still in West Palm Beach and that more serious problems began after he, Juan, left. Juan was there though long enough to see Danny come home with scraped knuckles or bruises after being in fights at school.  Additionally, he related Danny would stay out late and Maria Troya would wonder where he was. Sometimes, Juan would go out looking for him with her.

### 6.     Witnesses were available to address the effect on Danny of the suicide of his friend and neighbor.

Christina Schmidt was interviewed on three separate occasions by the mitigation specialist on February 4, February 9, and February 18, 2009. Additionally, trial counsel placed

Ms. Schmidt on the defense witness list. Although she was not called, she had mitigating evidence to provide.

Ms. Schmidt could have testified she was Kevin Vetere's aunt and had known the Troya family for twenty-four years at the time of trial. She lived in the neighborhood when the Troyas moved in after Lorenzo Troya retired from the military. The two families would celebrate Thanksgiving and Christmas together most every year.

When the Troyas first arrived the kids were small. Danny was a good kid, always at home, playing in the yard. Whenever she asked Danny for help he was always there for her, even after he was older. He always responded right away when she needed him.

She knew Maria and Lorenzo Troya to be hard working parents who did not have much, but worked to provide for their family. The two of them had taken in Maria's brothers from Chicago because of the bad influence they were under up there. They did not really have the room, but took them in anyway.

Ms. Schmidt remembered the shooting of John Kamel at Conniston. She was told Danny was holding the boy's head when he died. After the shooting Danny became very quiet. Maria Troya would sometimes tell Ms. Schmidt that Danny was doing this or that and they thought maybe it was because of what he had seen. Chris Schmidt said the incident was very traumatic for Danny.

At the time interviewed, Ms. Schmidt would have also testified she had recently realized the Kamel shooting was the same year her daughter, Lisa Schmidt, had killed herself. Ms. Schmidt would have told the jury how Danny and his sister, Mariette, had been close to her daughter, who was a little older and used to drive them around. Her daughter Lisa committed

suicide in 1997. She was twenty-seven years old when she died. She recalls that Danny became very quiet after her daughter's death in the same way he did after the John Kamel shooting

Ms. Schmidt would have testified Danny goes inward when he is upset. She believed something happened to him after John Kamel's death and that her daughter's death coming so close afterward also had a big impact on him. Ms. Schmidt stated she knew Danny saved Kevin's life. To her understanding there was some sort of contract out on Kevin for money he owed and Danny interceded on Kevin's behalf. Kevin and Danny had been friends a long time. She stated she believed that, for her nephew to be doing what he was doing, testifying against Danny, it was just to save his own skin.

Ms. Schmidt spoke with the Mr. Troya's defense team when contacted during trial, attended trial, and was willing and able to testify at trial, however, trial counsel failed to call her as a witness.

**7. Testimony mitigating the escape conviction and showing the brutality Danny was exposed to at Brevard Correctional Institution was also available but not investigated or presented by trial counsel.**

The information recounted by Mr. Vonlydick and available at trial would have presented a valuable counter to the incomplete and misleading second-hand testimony of Inspector Glover utilized by the Government. Mr. Vonlydick was interviewed on three occasions by the trial team for Danny Troya. On May 1, 2008, the mitigation specialist had a telephone interview with Mr. Vonlydick who was housed at Century Correctional at the time. Later on February 25, 2009, the mitigation specialist interviewed Mr. Vonlydick again at the Palm Beach County Detention Center. Then, trial counsel, Jim Eisenberg and Kerry Sheehan interviewed Mr. Vonlydick again at the Palm Beach County Detention Center. Based upon these interviews, Mr. Vonlydick was

placed on the defense witness list, and had been transferred upon a habeas application filed by defense counsel and an order signed by the Court. Counsel did not call him to testify.

Mr. Vonlydick could have testified to mitigating information about the deplorable conditions at Brevard Correctional Institution, and the escape attempt. These facts are covered in detail in the section regarding the defense failure to mitigate the escape conviction. Trial counsel failed to call Mr. Vonlydick and present the jury with important testimony explaining the escape attempt. Had trial counsel interviewed Vonlydick more effectively and more in-depth he would have found a wealth of mitigation regarding the conditions at Brevard Correctional that compelled Danny Troya to do whatever he could to get out of the facility.

**8.  Witnesses were available to provide a fuller family history of difficulties in the family, Tito's temper, and an explanation of Tito's summer stay at the Troyas.**

The first and only time the defense team contacted Ms. Irma (Torrres) Negron was on February 5, 2009, and that was by a phone call. Ms. Negron is Danny Troya's maternal aunt. During that phone call Ms. Negron said she knew Danny best as a child in Chicago. She described him as outgoing and a character, and would never have imagined his being involved in anything like this. Ms. Negron said when he was younger, if you needed something, Danny would give it to you. He was always respectful to his mother and father. He was a big goofball who always blended in with the other kids. She never saw him upset or lose his temper. The last time she saw him was at the Fourth of July gamily gathering when he had. gotten out of prison.

There was no defense followup with Ms. Negron, no in-person interview, and she was not called as a witness at the sentencing hearing.

Had the defense devoted more time to speaking with her, counsel would have found she had additional experience with and insight into the family and Danny's upbringing. She could

357

have spoken about the extended family's struggles in Chicago, surviving partly on food stamps and medical cards, and free school lunches. She would have also testified how she, too worked in the La Familia Grocery for food, running the cash register.

Ms. Negron could have also told the jury how her father Eugenio left when she was about eleven years old. As with other family members, there were few visits to the doctor except for required school vaccinations and the like. When she was sick with chicken pox she missed some of the third grade.

Ms. Negron said her brother "Tito" (Isidro) had a temper. She recalled the first time she saw him throw a temper tantrum; he was very young, maybe in elementary school. He was so mad he was shaking.

Ms. Negron recalls that after the eighth grade in Chicago, she went to Florida and stayed with her sister Maria and her family in West Palm Beach for a year. She attended Twin Lakes High School, then returned to Chicago at her mother's request. At that time Mariette was about four years old and Danny was around a year old when she stayed with the Troya family. When she returned to Chicago she was shocked at the gang culture all around her neighborhood.

After high school and marriage she would visit the Troyas three or four weekends a year. She recalls Maria telling her about how when he was younger Danny had orthopedic shoes and how hard and painful it was for him. She later saw Danny go through what she describes as normal teenage rebelliousness and puberty. He wanted to stay out later and he would break curfew. She also noticed his lingo started to change, and more "street talk", around ages 15-16, but he was still the jokester around her. She saw him mad once, and he bumped heads with his father Lorenzo. She describes Danny's mother Maria as passive and a peacemaker.

358

After she was married, her husband George joined the Navy, and they were eventually stationed in Jacksonville, living on base. Tito came to stay with Ms. Negron in Florida only once. She doesn't recall why he came to Florida, but said if she had known he was being sent to her or coming down because he was in trouble in Chicago, she would not have let him come. She thought Tito was working and attending school to get his GED when he stayed with her.  She recalls Tito went to West Palm Beach to Maria's home.  She vaguely recalls Maria telling her "I can't have him here because Danny looks up to him."

> **C.    The trial team's failures regarding available mitigation witnesses included one who had powerful evidence to offer but who was interviewed only in the days *after* the trial and sentencing.**

Though it is not clear when she called trial counsel, a teacher from Conniston Middle School was interviewed by their mitigation investigator on April 2, 2009, *after* the death verdict was rendered. The mitigation specialist's April 6th memo to counsel notes she was following up on the previous call to counsel to his office from Diane Beaudet, a Conniston teacher. She provided a memo to counsel containing a summary of her April 2 phone interview of Ms. Beaudet. Even in that single phone interview, Ms. Beaudet provided mitigating information the jury should have heard.

If called to testify, Ms. Beaudet would have said she remembered Danny as a nice twelve year old boy. She recalled that Danny would come to class to pick up Jean Kamel because he only had one leg. Danny would carry him from class to class. On the day of the shooting, she ran outside and remembers seeing Danny holding Jean's head in his lap. Ms. Beaudet reported she ran to call 911 and then to get all the kids into their classrooms. She actually wound up with Tronneal Mangum in her room. The police came in and arrested him.

359

Even years later, Ms. Beaudet vividly remembered how terrible the day was for everyone at the school and particularly for Danny. She would have testified, if timely interviewed, that Danny needed counseling and clearly needed help to cope with the shooting.

When it would have been helpful – prior to trial -- counsel did not seek out Ms. Beaudet, or other teachers who were at Conniston at the time of the shooting. Had they interviewed the teacher in person, and over time, they would have discovered she had considerable more mitigating evidence to testify to, including about the difficult conditions at Conniston and the Academy there, Danny's close friendship with John Kamel, and the reaction of the students to his murder.

Ms. Beaudet's recent affidavit shows she could have testified she was a teacher of longstanding, who retired from Palm Beach County Schools in 2015 after 37 years, and that much of her time teaching was at Conniston Middle School. While she did not remember having Danny Troya as a student, she did remember he would come to her class to pick up John Pierre Kamel and escort him to the next class. There were many fights in the hallways of Conniston, and Daniel would take John Pierre, who had a prosthetic leg, to classes to protect him from kids who might take advantage of his handicap.  At the time of the shooting, Danny Troya and John Pierre Kamel were both 7th graders taking 6th grade reading classes.

Ms. Beaudet could have offered testimony that Conniston Middle School was utterly chaotic. It was not unusual for students to disappear and/or get pregnant. Ms. Beaudet could also have testified about the violence at the school. She would have told the jury about the environment there, with fights between different groups of students, often based on race or national origin, being fairly constant. Gangs were present, and there was constant pushing and shoving in hallways. White parents in the community who could afford it sent their kids to

360

private school. The violence at Conniston was constant.  Students would steal teachers' wallets. Teachers were cursed at by students, and violent language and disrespect toward them was the norm. One time, after she had given a student Saturday detention, a female parent threatened her, saying "I'd like to f*ckin' kill you."

She would have testified how everything worsened at Conniston after the shooting of John Pierre Kamel.   Her strong sense was that everyone needed counseling, both students and teachers, but none was offered, and that nothing was done at all back then by the school or School Board to address the trauma and fear the students experienced.

Ms. Beaudet would have testified that for a while, Daniel was a student at the "Academy," a separate area at Conniston composed of a series of trailers to which kids who had seriously misbehaved were banished. Nominally it was called ACT, the Academy of Computer Technology, or something similar, but teaching was not even attempted there: it was basically babysitting. Teachers did not want to bother: they'd say to students, "Just copy page 37," and the students were well aware of the way they were being treated. Ms. Beaudet would have told the jury that for a student, being assigned to the Academy was very demoralizing. They had no contact with other students, nor help or counseling. Teachers would call in sick and substitutes would step in and tell the students to play tic-tac-toe. Being assigned to the Academy was anything but good and carried a stigma with it. Once a teacher came to the Academy with a gun lodged in the waist of his pants.

Ms. Beaudet would have told the jury there was a Plexiglas room where Academy students who acted out were isolated. Some banged their heads until they were bloody.  Teachers would have to wipe blood off the walls. They were kept in the room and not allowed to leave until the police were called. One Academy student somehow got on the roof of one of the

361

trailers. Ms. Beaudet encouraged him to come down, promising that nothing bad would happen to him. He jumped off the roof and broke his ankle.

Ms. Beaudet taught at the Academy briefly.  After teaching there for only a year, she said she wanted out because of this poor environment. She was allowed instead to teach sixth grade reading and then sixth grade math.

**D.  Information from witnesses interviewed before trial, as well as and from witnesses the defense team failed to interview at all, was not presented to the jury, and is reasonably likely to have affected the outcome of the sentencing hearing.**

"Either I go after the black sheep, or I try to save the rest of my family."
-Lorenzo Troya, Danny Troya's father.

**1.  Extraordinarily mitigating evidence unknown to the defense was not known to the jury because the trial team failed to properly investigate and present it.**

The jury who was to decide Mr. Troya's fate never knew extraordinarily mitigating information reasonably likely to have affected the outcome of the sentencing phase, and in a number of instances was totally misinformed about his life. The evidence unpresented to the jury could have been discovered before trial but was not, has been uncovered since trial by post-conviction counsel's defense team. It shows powerful mitigating evidence stemming from several events, and how misinformed the jury actually was about Mr. Troya's family and upbringing.

Counsel and the mitigation specialist conducted several interviews of Mr. Troya's immediate family who lived in West Palm Beach. These interviews were deficient in that they were cursory, and covered only the barest of the family's background and mitigating facts were obtained. Counsel's team met only once in person with Mr. Troya's extended family in Chicago, on May 13, 2008. On that date they met with Melida ("Mellie") Mendez, Manuel Mendez,

362

Magdalena Mendez, Mercedes Fortineaux and Isabel Torres (the mitigation specialist later emailed and spoke over the phone with Isabel Torres during trial). Moises Mendez was sick and unable to meet with them, but they never followed up with him. The team had previously visited Uncle Isidro, a/k/a "Tito," in prison and interviewed him on the same trip.

While the trial team did obtain some family background and history at that time, they failed to follow up on plainly important family issues, and presented little of the information they learned to the jury. Counsel violated one of the most fundamental rules of mitigation development during this single, group, meeting, with no individual follow-up: Guideline 10.11, *The Defense Case: Requisite Mitigation Functions of the Defense Team*, subsection (C) mandates the use of **one-on-one**, face-to-face interviews with witnesses "familiar with the client's life, history, or family history or who would support a sentence less than death." Potential witnesses must be repeatedly interviewed. Establishing trust and gaining the confidence of witnesses can be a time-consuming process requiring multiple visits as detailed in the Supplementary Guidelines at 10.11 (D):

> . . . **Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation.** Team members must endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceedings.

The memorandum summarizing the group interview is remarkable for its vagueness. As expected in a deficient group interview, the summary of it repeatedly refers to "the family" as having said this or that, and only rarely identifies the specific family member who had provided the information. The single interview only scratched the surface of the family's history. The defense team did gather from the group information which should have led to additional investigation and presentation such as:

► Daniel's mother Maria did not talk about problems but would have told them if she had problems with Uncle Tito while he was there;

► Uncle Tito had grown up in a gang-infested area;

► Isabel Torres told them Daniel's mother Maria was afraid to discipline her children because of the "Florida laws." She related somebody had threatened Maria with calling the police and taking the kids away, and one time the police were called and came to the door. Without further investigation, however, counsel never learned before trial that Daniel Troya's parents had actually twice been investigated by the Florida Department of Children and Families. The jury never learned that information, either.

► The defense team was misled from information they received from the group interview into believing Tito was the only one in the family who had been in trouble, and ended up presenting that false information to the jury.

The trial defense team neglected to seek out and interview a number of additional witnesses who have since been interviewed, and who could have testified to the extraordinarily mitigating facts set forth below.  The section below details Mr. Troya's actual social history, revealing the extent of his family's dysfunction, and the far more traumatic and life-altering events Mr. Troya was exposed to as a child and adolescent, but never presented to the jury. This evidence includes the mitigating facts that:

► Daniel's paternal grandfather was abandoned by his own father, and he had to work since he was a child. His paternal grandmother came from a large family, connected to the Castro regime and was a teacher.

► Daniel's paternal grandfather was forced into hard labor and his grandmother forced into poverty by the Castro regime. His father, his uncle and his grandparents had to leave Cuba with only the clothes on their backs, without money or possessions.

► Daniel's father and uncle had to start over and learn a new language once in the United States.

► The majority of the paternal extended family members remain in Cuba under Castro's rule.

► Daniel's maternal grandmother Lydia was one of five siblings born to four different fathers in Puerto Rico. She and her siblings lived in abject poverty, at times without running water or electricity.

364

► His maternal great-grandmother Bernardina received assistance in the form of commodities to feed her children, including Daniel's maternal grandmother.

► Daniel's maternal great-grandmother, grandmother and other extended maternal family members have died from disease at relatively young ages.

► Daniel Troya's mother is from a large extended family; one of twelve siblings, she was abandoned by her natural father. She and her siblings have three different fathers. She and her siblings were also temporarily abandoned by their mother after she took them to Puerto Rico and left them there with a strict and physically abusive grandmother.

► The family was secretive and did not talk about an aunt and uncle's birth father, who was the brother of Daniel's maternal grandmother's best friend.

► Daniel's mother grew up in a divided family.

► Daniel's mother grew up in a crowded house in a dangerous neighborhood. As a child she and her family had to scrimp on food and rely in part on government assistance to survive. She also had to work as a child to help her family.

► In Daniel's mother's family, there were no birthday celebrations, and little at Christmas. Her mom Lydia had to work extra to sell pasteles for the single gift each child in the family received.

► Daniel's maternal grandmother, Lydia, was verbally and physically abusive to her children, including his mother.

► Daniel's two maternal uncles, Tito and to a lesser extent Israel, both have criminal histories and convictions, having been involved in gangs and drugs.

► The maternal extended family is undereducated and many suffer from serious medical conditions.

► There is a family pattern of older children raising the younger ones.

► Daniel's mother Maria had her first child while she herself was still a child, and out of wedlock, at the age of 16. Two of her sisters also got pregnant while they were unwed teenagers.

► Daniel's mother Maria's father and stepfather both abandoned her.

► After the birth of Mariette, Daniel's mother had to leave high school before graduating.

365

► Daniel's maternal grandmother had two of her children during separate secret relationships with the same married man.

► There is a lengthy maternal family history of ignoring and hiding problems.

► Daniel was born to young unmarried parents.

► Daniel's father had to start school over in the United States after immigrating from Cuba as a child.

► Daniel's paternal grandfather worked hard at a slaughterhouse in Chicago.

► Daniel's father, Lorenzo, and uncle, Danny, occasionally witnessed the slaughtering of animals.

► Daniel's paternal grandparents bought and ran a grocery store in Chicago with other family members contributing time and money.

► The Troya and Sanchez/Mendez families, including Daniel's father and mother in their teens, all worked at the La Familia grocery store; the Troya children without pay and the Mendez children so his mother's family could get credit to buy food there.

► Daniel's father, Lorenzo, became a United States citizen in his teens, and during high school worked at the family grocery store after school every day as a cashier and butcher.

► The family kept the secret that Daniel's sister Mariette had a different father until she learned it on her own when she was 16 years old.

► Daniel's mother and her immediate family faced violence, addiction and abandonment from multiple father figures.

► As a child, Daniel lived in a dangerous Chicago Neighborhood with his family.

► Daniel's extended family suffered a devastating failure of their La Familia Grocery Store and near-bankruptcy; more family addiction and violence developed as a result.

► After the failure of the grocery store, the Troya family relocated (again) from their Chicago home to West Palm Beach.

► As a child, Daniel had to share what was described as a shack with numerous relatives in West Palm Beach.

► Young Daniel continued to be exposed to family alcoholism, depression and verbal abuse by adults.

► Daniel's parents always worked outside of the home, leaving little time for parenting.

366

► The Troya family split up when Lorenzo joined the Army and moved to Texas amid suspicions of Daniel's mother Maria's affair, and his father was not even present for Daniel's brother's birth.

► During the Army years, Daniel's father was frequently away from Daniel and the rest of the family.

► Lorenzo suffered a back injury in the military, resulting in his medical discharge and requiring the Troya family to move from their home again, back to West Palm Beach.

► Back in West Palm Beach, the Troya family had to move in with relatives in an overcrowded home again.

► The Troyas bought a modest home which was overcrowded enough for the immediate family and became even more so when extended family moved in with them for extended periods.

► Daniel grew up in a home in which his family struggled financially, with frequently absent parents who were too busy working and otherwise overwhelmed.

► As a child and adolescent, the neighborhood Danny grew up in in West Palm Beach was full of crime, drugs and gangs.

► Many other children who lived in and were exposed to the neighborhood in which the Troyas lived were also enlisted into gangs and crime.

► Both of young Daniel's parents were unable to rescue him because they had to focus on their other children and other problems.

► All the Troya children had (and have) problems, but little was done to help them (either) beyond efforts of the schools.

> **Mariette.** Described by a teacher as "tough," Mariette fought for Danny in school and got into troubles with the law. She also had problems in school and is a single mother of two living with her parents.

> **Alex.** Speech impediments, picked on in school, not able to get his high school diploma and lives at home with his parents.

> **Adrian.** Believed to have slight autism, but never treated. Has been exposed to many deaths of people he knows and also lives at home with his parents.

► Danny began school and made an impression as a good kid, but language problems soon emerged.

► Daniel Troya's parents were investigated by the Florida Department of Children and Families on at least two occasions, once for abuse.

367

► Young Danny Troya's volunteer time at Morse Geriatric Center was over an extended period, and he earned lifelong relationships there with adult employees.

► There are many stories about how members of the Troya family would not seek medical treatment due to the cost.

► Daniel Troya suffered many untreated physical (including head) injuries growing up, he was mercilessly bullied, and his mental and emotional problems also went unaddressed.

► When the unraveling of Daniel Troya's life intensified in adolescence, no one was available to rescue him.

► Conniston Middle School was a mess, and in his early teenage years Danny, was exposed to all the crime, drugs and gangs it had to offer.

► Daniel Troya saved his father from drowning.

► Daniel made Herculean efforts to be good, but was easily influenced by others. One value he learned and kept was to be loyal to his friends.

► Uncle Tito exerted his extensive and lasting bad influence on Danny, taking him under his criminal wing when Danny was only about thirteen years old, teaching him criminal enterprise while living in his sister's home while she and Daniel's father were working.

► Danny made friends with a disabled child, John Kamel, at Conniston, and protected and defended him.

► John Kamel's death, in Danny's arms, had profound effects on Danny that went unaddressed.

► Danny tried to commit suicide for the first time shortly after the Kamel killing.

► Danny was exposed to additional violence, gangs and drugs at Conniston.

► Danny's behavior became bizarre after the John Kamel shooting.

► There was additional mitigation of the felony battery of Ms. Pawlowski from witnesses other than Karl Busch – other witnesses interviewed since trial could have testified the incident occurred in a far different way than the government presented it.

► Daniel Troya was exposed to the adult criminal justice system at a young age, beginning soon after his Uncle Tito spent the summer with him.

► Daniel Troya, at age 17, was exposed as a juvenile to some of the most dangerous and violent prisons in Florida.

368

► Daniel engaged in more bizarre behavior in prison, and again attempted to commit suicide.

► Imprisonment in the "Gladiator Camp" and the brutal beatings by other inmates and correctional officers forever hardened Daniel Troya.

► The profound effects of gangs, inmate and guard violence, the doom squad and a slave culture was part of Daniel Troya's life experience in his late teens.

► Daniel Troya attempted suicide a third time while imprisoned, by swallowing razor blades, at the age of 19.

► The alleged escape attempt was just an effort to be transferred out of the brutal prison, as a number of additional witnesses could have attested.

► Daniel Troya was stigmatized by early adult convictions and incarceration, preventing him from obtaining gainful employment after his release from prison.

**Multigenerational Family History.**

**E.      It is the duty of the defense team members to aid counsel in the selection and preparation of witnesses who will testify, including but not limited to: . . . 2. Lay witnesses, or witnesses who are familiar with the defendant or his family, including but not limited to:**

**a. The client's family, extending at least three generations back…**

SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEFENSE PENALTY CASES, *in* 36 HOFSTRA. L. REV. 677 (2008) (hereinafter "Supplementary Guidelines") Guideline 10.11, *The Defense Case: Requisite Mitigation Functions*

Aside from brief references to time in Cuba, Chicago and Texas, not much was presented about the background and history of Mr. Troya's extended family. Little else explains why and how parents treat their own children as their own and how they were treated by their parents. Multigenerational history of stresses, mental health, and physical problems are also incredibly relevant to both mental health experts and jurors alike in assessing mitigating aspects of the conduct of the person on trial. Because the defense investigation was so cursory, and its presentation so minimal, the jury here was left with the impression Mr. Troya's family was

369

problem-free (with the single exception of Uncle Tito), and so was unlikely to vote for life. The truth was far from that rosy picture.

### Immigrant Experience: Cuba to the United States
### Lorenzo's family.

Daniel's paternal grandfather, **Francisco "Paco" Troya**, was born on January 22, 1932 in Cuba; immigrated to the United States in 1970 to escape the Castro regime - experiencing political unrest during the Communist party rule. Paco's mother is Luisa Troya, who had seven children; Paco was the youngest.[133]

#### Daniel's paternal grandfather never knew his own father, and he had to work since he was a child.

Paco grew up in a midsize town in San Nicolas de Bari, Cuba where the principle activities were a rice processing plant and sugar cane fields. His father abandoned him and his eight siblings – the only memories of him are when he would ride down from the fields on a white horse from time to time. He passed away when Paco was a child. Paco began working at an early age, perhaps 10 or 11, yet cannot recall his first job. He worked in a rice factory, also a sugar factory known as Central Gomez Mena where he collected water from wells and watered the sugar cane. He also had experience as a carpenter – doing woodworking as well as many other construction related work such as cement, plumbing, and bathroom and tile installation.

#### Daniel's paternal grandmother came from a large family, connected to the Castro regime.

Daniel's paternal grandmother **Maria Antonia Sanchez** also grew up in Cuba, born on June 14, 1939, with six siblings. Her parents are Marceleno "Ramon" Sanchez (DOB: 01/02/1888) and Vidalena Valdez (DOB: 02/28/1895). Grandmother Maria grew up in a higher, social class than Paco. Her father was the Sheriff of San Cristobal and was politically

---

[133] Affidavit of Maria Sanchez Troya, Appendix L-1

cooperative with the Castro regime. Her mother was a housewife who did not get involved in politics.

**Daniel's grandmother was a teacher.**

Maria became a teacher in her early twenties – working with kids in rural areas of Castro's government programs called *Combatir el analfabetismo* – the purpose of the program was to battle illiteracy. On one hand, it was a valuable program because it taught kids in rural areas to read and write. On the other hand, much of what they were reading and writing was propaganda about the Communist revolution.[134]

Maria always wanted to go the United States. When she was 12 years old, she had a cousin who moved the United States and she went to the airport to say goodbye to him. He promised her that he would send her money so she could come, but that was the last time she ever heard from him.[135]

Maria and Paco met in a city called San Cristobal in Pinar del Rio where he worked in construction and she worked at a school. She and the other teachers would pass through the park and Paco would always say hello to her. They were married in San Nicolas de Bari.

Father Lorenzo and Uncle Daniel attended school in Cuba and wore military style uniforms.[136]

**Daniel's paternal grandfather was forced into hard labor and his grandmother forced into poverty by the Castro regime.**

Years after Castro took power in Cuba (around 1965), one of Paco's sisters, Julia, who was already in the United States in Chicago, applied to sponsor Paco, Grandmother Maria, Lorenzo and Uncle Daniel to join her. As a punishment, the Castro government sent him to the

---

[134] Affidavit of Maria Sanchez Troya Appendix L-1
[135] Affidavit Maria Mendez Troya Appendix L-2; Affidavit Maria Sanchez Troya Appendix L-1
[136] Affidavit Lorenzo Troya Appendix L-3

country to cut sugar cane - effectively a forced labor camp. He worked with 250 to 300 men, all being similarly punished. They purposely planted the cane badly so they would not be called back to do it again. The living conditions were poor – living among all of those men, sharing two or three showers.

It took five years for Paco and Grandmother Maria to get approval from both the United States and Cuba, during which Paco was sent to these camps to either cut sugar cane, or plant and harvest vegetables. Meanwhile, Maria lived with her parents in San Cristobal. Between assignments in the hills, Paco would come to visit, but would only be able to stay for a day or two.[137]

Grandmother Maria was also punished having been sponsored to emigrate to the United States, she was considered a counter-revolutionary and was no longer allowed to teach school and earn a living. They had to forage for food. Friends in the country would occasionally provide her with a chicken or eggs. Other friends who were agricultural workers would give them vegetables like plantains or yucca.

**Grandparents had to leave Cuba with only the clothes on their backs, without money or possessions.**

In 1970, the Cuban government ordered them to leave immediately with nothing more than the clothes on their backs.[138] Grandmother Maria had to send someone to get her husband from the labor camp so they could leave together. They weren't allowed to take anything with them; however, Grandmother Maria snuck a photograph of her mother in her brassier but lost it during their travel to the US.[139] Once they arrived in Miami, they waited at the airport for two

---

[137] Affidavit Maria Sanchez Troya Appendix L-1
[138] Affidavit Maria Sanchez Troya Appendix L-1
[139] Affidavit Maria Sanchez Troya Appendix L-1

days, wearing the same clothes.[140] They did not have their birth certificates or any other paperwork, other than a visa and a Cuban passport.[141] They worked on their paperwork, received vaccinations, and arranged their relocation to Chicago. The United States government provided them with a small amount of money to rent an apartment and for clothing, shoes and food. They arrived at the Chicago O'Hare airport on January 30, 1970, in their summer clothes. One of their sons was wearing short pants and she recalls him saying "It's very cold". They found an apartment about twenty minutes by car from Paco's sisters.[142]

**Daniel's father and uncle had to start over and learn a new language once in the United States.**

When they immigrated to the United States, Lorenzo and Daniel did not speak English and basically had to start school over.[143] They were encouraged to speak English in the home so Paco and Grandmother Maria could learn. They were "here to be Americans".[144]

**Puerto Rico to the mainland United States**

**Mother Maria's family**

Daniel Troya's maternal grandmother, **Lydia Quinones** was born in Caguas Puerto Rico on August 13, 1942.[145] Her first husband, **Francisco Mendez-Quintana,** was born on August 8, 1930 in Caguas, Puerto Rico.[146] Lydia and Francisco were engaged when Francisco came to the US and got a job. He sent for Lydia later. The two married on October 20, 1958 in Cook County, Illinois, when she was just 16-years-old and Francisco was 28.[147] They had five children

---

[140] Affidavit Maria Sanchez Troya Appendix L-1

[141] Affidavit Maria Sanchez Troya Appendix L-1

[142] Affidavit Maria Sanchez Troya Appendix L-1

[143] Affidavit Lorenzo Troya Appendix L-3

[144] Declaration Daniel Troya Appendix L-4

[145] Lydia Quinones Death Record  Appendix L-5

[146] Affidavit Maria Mendez Troya Appendix L-2

[147] Lydia Quinones-Francisco Mendez Marriage Record Appendix L-6

together, the first when Lydia was 17-years-old –**Moises, Melida ("Millie), Manuel, Maria, and Magdalena ("Magda").**

>  **Daniel Troya's mother is from a large extended family; she was abandoned by her natural father, and she and her siblings are from three different fathers.**

Maria Mendez Troya (hereinafter referred to as "Mother Maria") is Daniel Troya's mother and was the fourth of 12 children her mother had with three different fathers. She was born on November 24, 1963 in Chicago, Illinois.[148] Her father Francisco Mendez was never really around and ultimately abandoned Lydia and their five children after the birth of their fifth child to live with another woman and raise her five children, rather than his own. Francisco attempted to see the kids once when they were in school. He was parked in a car with a woman. Lydia found out and transferred them to another school because she felt disrespected.[149]

>  **Daniel's mother and siblings were also temporarily abandoned by their own mother, sent to Puerto Rico and subject to a strict and physically abusive grandmother there.**

At some point, likely during the divorce from Francisco, Lydia took her children to Puerto Rico and stayed there for about two weeks to a month before she flew back to the United States, leaving her children behind with her mother. Lydia was pregnant with Daniel's Aunt Meche, and was so far along she was afraid the airlines would not let her fly. The siblings, Millie, Mother Maria, Moises and Manuel, spent a year to a year-and-a-half in Puerto Rico with their grandmother Bernardina Vega. They may have also lived with their aunt in San Juan. Magdalena was just a baby. Their grandmother was strict with them and would smack them around.[150]

---

[148] Maria Mendez-Troya Birth Certificate Appendix L-7
[149] Declaration Melida Mendez Appendix L-10
[150] Declaration Melida Mendez Appendix L-10; Declaration Magdalena Mendez L-8

The children never heard from their mother during that time, not even a phone call. Some of them recognized they missed their mother, but none of them speak of this abandonment as a traumatic experience. There is suspicion she was having an affair with Pablo Vargas during this time.[151]

Daniel's mother Maria's childhood in Puerto Rico was only a vague part of her consciousness. She knows some of her Puerto Rican cousins, but was not frequently in touch with them.

### Family secrets about an aunt and uncle's actual father.

Lydia's next relationship was with a married man, Pablo Vargas, whom some believed to be the love of her life. Pablo was a brother of a friend and neighbor of Lydia's. Lydia gave birth to her sixth child, Mercedes Mendez Fortineaux. Lydia was very "hush hush" about the identity of Mercedes' father. Mercedes was likely told that Francisco was not her father and Pablo was when she was a teenager.[152] Pablo has since passed away.

### Daniel's mother grew up in a divided family.

Lydia's last relationship was with her common law husband, Eugenio Torres, though they never formally married. He was a mechanic by trade.[153] He was not around a lot because he worked. They had five more children together – Irma, Israel, Isabel, Tito and Ipolito ("Poli"). Eugenio helped to raise the 11 children with Lydia. Mother Maria considered him to be a father. He supported Lydia financially and contributed money for food and clothing. As a family, they would go to church on Sundays and afterwards the children's treat was to eat hamburgers at

---

[151] Declaration Manuel Mendez L-9; Declaration Melida Mendez Appendix L-10
[152] Affidavit Maria Mendez Troya Appendix L-2
[153] Affidavit Maria Mendez Troya Appendix L-2

White Castle. When it was good weather, the family would go to Humboldt Park, and attend the Puerto Rican parade.[154]

**Family's life in Chicago.**

**Maria Mendez (Daniel Troya's mother).**

**Daniel's mother grew up in a crowded house in a dangerous neighborhood.**

Maria grew up in Chicago's North Side on North Sawyer Avenue near the La Familia Grocery Store. The apartment was three and one-half bedrooms and only had one bathroom. The apartment was on the third floor of a three story building, a walk-up with no elevator. The boys slept in one room and the girls in another.[155] The smallest children slept in a room with Lydia. The half bedroom was an enclosed deck, Moises slept there with a space heater. The apartment was an old building with large rooms, so some of the children did not think it was cramped.[156] They later moved to Albany Park, which was fraught with Latino gangs.[157]

> **As a child, Daniel's mother and her family had to scrimp on food and rely in part on government assistance to survive. She also had to work as a child.**

With so many children in the house, there was a lot of chaos and fighting. They would fight over everything, including food, particularly about some siblings getting treats while the others did not. They would also fight over who would answer the phone and talk on it. The mornings were chaotic with only one bathroom – there was always someone in there, and you always had to wait your turn.[158]

To survive, Lydia received welfare benefits and was also aided by Eugenio Torres, while he was around. If the children worked, most of the time they handed their paychecks to their mother, who would sometimes give them a small portion back, because she felt they deserved

---

[154] Declaration Magdalena Mendez Appendix L-8
[155] Declaration Moises Mendez Appendix L-11; Declaration Mercedes Fortineaux Appendix L-12
[156] Declaration Magdalena Mendez Appendix L-8
[157] Declaration Mercedes Fortineaux Appendix L-12; Declaration Magdalena Mendez Appendix L-8
[158] Declaration Melida Mendez Appendix L-10; Declaration Magdalena Mendez Appendix L-8

something. The whole family worked, assembling cardboard liners – the liners are inside boxes of wine and liquor, so the bottles can be stacked without bumping into each other.[159]

Lydia made sure there was food on the table - she made dinner every night, with the help of her daughters. She knew how to stretch out the meat among the kids. The children would eat breakfast and lunch at school, though sometimes they would come home for lunch. [160]

**In Daniel's mother's family, there were no birthday celebrations, and little at Christmas, and her mom Lydia had to work extra to sell pasteles for the single gift each child in the family received.**

Birthdays were not celebrated - there were no cakes or presents. They did, however, celebrate Christmas. Each child got one present - something small like a pair of socks or earrings. They weren't upset they did not receive more presents because they were used to it. There were no explanations about poverty or the Christmas spirit; it's just the way it was. For Lydia to be able to afford twelve presents, she made Puerto Rican *pasteles,* (tamales). She ground the corn with her own hands and the family helped and sold them to neighbors.[161]

**Daniel's maternal grandmother Lydia was verbally and physically abusive to her children, including his mother.**

A belt was Lydia's "friend" and she was not afraid of using it on her children. She had a certain way of looking at her children, and they knew it meant trouble. She was methodical about punishment as well as very violent. The children were all terrified of her. She did not yell or raise her voice; she just had a way of speaking. The children knew if they were told to do something, they had to do it. She also disciplined them by pulling on their ears, hitting them on the head

---

[159] Declaration Mercedes Fortineaux Appendix L-11; Declaration Magdalena Mendez Appendix L-8

[160] Declaration Moises Mendez Appendix L-12; Declaration Mercedes Fortineaux Appendix L-11; Declaration Melida Mendez Appendix L-10; Declaration Isabel Torres Appendix L-12; Declaration Magdalena Mendez Appendix L-8

[161] Declaration Mercedes Fortineaux Appendix L-11

with a broomstick, hitting them with switches she would pull from the trees in Humboldt Park, and making them get on their knees on top of raw rice.

Lydia required the children to walk in a straight line, and if they did not, she would grab a switch from one of the trees and hit them on the legs. One sister described her brothers holding her as Lydia beat her. One of the things that infuriated Lydia the most were bad grades and lying because if they got bad grades, she'd have to go in to school and talk to the teachers, and she did not have time to miss work. Lydia was also verbally abusive, and made them take castor oil and laxatives weekly, she said as preventive medicine. All siblings were treated equally. If one disobeyed and it was not clear who the culprit was, then all the kids would get their ears pulled. She would whistle for her children from across the street to come in. The children knew if she had to cross the street to get them, then she would smack them in front of whoever was there on the street.[162]

**Daniel's two maternal uncles, Tito, and to a lesser extent Israel, both have histories including criminal convictions after becoming involved in gangs and drugs.**

Most of the siblings stayed in line, although Mother Maria's sister Mercedes acted up a lot. Tito gave the family serious troubles, and became involved in gangs and street crime. He was always angry, often grunting and throwing things. At the same time Tito began going off the rails, Millie began having kidney failure and had to go for treatments that included dialysis. As such, Lydia had to spread herself very thin. The clinic where Millie got treatments was very near the juvenile institution where Tito was held and Lydia would walk back and forth between the

---

[162] Declaration Manuel Mendez Appendix L-9; Declaration Mercedes Fortineaux Appendix L-11; Declaration Melida Mendez Appendix L-10; Declaration Isabel Torres Appendix L-13

378

two, with short visits. Israel has been in jail and according to family members is a drug addict. Manuel is very cold – and has a lot of issues with Tito.[163]

**Maternal (and paternal) extended family is undereducated.**

Lydia only had an 8th grade education in Puerto Rico. She could read, write and do basic math. She could read the Bible in Spanish. She would help her children with their homework until they reached high school, and then they were on their own. The children had to explain to her what the grades on the report card meant. Some of the children were in special education classes (Moises, Manuel, and Mercedes) and struggled just to get by.[164]

The children always spoke English. Lydia always spoke to her children in Spanish and they would respond in English.[165]

**There is a family pattern of older children raising the younger ones.**

The older siblings took care of the younger ones. Moises considered himself the father figure and lived at home until he was 29 when he got married. After he left, Manuel assumed the responsibility as a father and mother – hitting his younger siblings with a belt if they misbehaved.[166]

**Daniel's mother Maria had her first child while she was still a child, and out of wedlock, at the age of 16.**

Mother Maria became pregnant at 15 years of age by her boyfriend Patricio Miguel Sardinas ("Miguelito") (DOB: 1963)[167] during her freshman year of high school. Miguelito was a classmate and also friends with her brother, Manuel.[168]

---

[163] Declaration Mercedes Fortineaux Appendix L-11; Declaration Melida Mendez Appendix L-10; Declaration Magdalena Mendez Appendix L-8

[164] Declaration Manuel Mendez Appendix L-9; Declaration Melida Mendez Appendix L-10; Declaration Isabel Torres Appendix L-13; Declaration Magdalena Mendez Appendix L-8

[165] Declaration Melida Mendez Appendix L-10

[166] Declaration Manuel Mendez Appendix L-9

[167] Affidavit Maria Mendez Troya Appendix L-2

[168] Declaration Manuel Mendez Appendix L-9; Affidavit Maria Mendez Troya Appendix L-2

379

**Daniel's mother Maria's father and stepfather both abandoned her.**

She hid her pregnancy with Mariette from her stepfather Eugenio, but not from her mother.[169] Lydia was frustrated and hurt when Maria became pregnant – as shown through her body language. But she also helped and guided her.[170] The pregnancy was never discussed in the house but things were a little tense. Abortion was never discussed as an alternative. She never told them about birth control.[171] Mother Maria, at age 16, gave birth to daughter Mariette on September 20, 1980.[172] Eugenio left when Mother Maria was six months pregnant. He came back to their apartment after Mariette was born and wanted to know whose kid it was. Mother Maria told him it was her baby. She was afraid to tell him who the father was.[173] He left and went to Puerto Rico and never returned, never again making contact with them.[174]

**Daniel's sister Mariette's birth father led a life of crime and never helped raise her with mother Maria. Daniel's mother had to leave high school before graduating.**

Mother Maria's boyfriend, Patricio Miguel Sardinas, had been on the streets and using drugs. He tried to convince Mother Maria (and baby) to run away with him to Miami, Florida, but she refused to go.[175] She continued to attend high school while her brother, Manuel, took care of the baby. Mother Maria quit school a couple of credits short of her high school diploma.[176] Patricio never showed any interest in Mariette. She found out later that he had got into some trouble while in Miami and has a criminal record – he was involved in gangs and drugs.[177]

---

[169] Affidavit Maria Mendez Troya Appendix L-2
[170] Declaration Mercedes Fortineaux Appendix L-11
[171] Declaration Mercedes Fortineaux Appendix L-11; Declaration Magdalena Mendez Appendix L-8
[172] Mariette Mendez birth certificate Appendix L-13
[173] Affidavit Maria Mendez Troya Appendix L-2
[174] Affidavit Maria Mendez Troya Appendix L-2; Declaration Mercedes Fortineaux Appendix L-11
[175] Affidavit Maria Mendez Troya Appendix L-2
[176] Affidavit Maria Mendez Troya Appendix L-2
[177] Affidavit Maria Mendez Troya Appendix L-2

**Daniel's mother's mom reignites her sort of secret relationship with a married man.**

After Eugenio left, Lydia had her twelfth child, Juan Quinones, with Pablo Vargas, the same man that fathered Mercedes fifteen years earlier. She got a job in a candy factory, working a shift that began at 7:30 am to 5:00 pm. She worked there until she became ill and couldn't.[178]

**There is a lengthy family history of ignoring and hiding problems.**

Lydia and Mother Maria never talked about things. They weren't very open to conversation with each other. Their attitude was, "It'll work itself out". Lydia never tried to get involved in Maria's family problems (when she was an adult). The topic of Mercedes having a different father (or her own relationship with Pablo) was never talked about at home. Lydia never said anything and the children never asked.[179]

**Lorenzo Troya (Daniel Troya's father)**

**Daniel's father had to start school over in the United States.**

Lorenzo was seven years old when his family immigrated to the United States. He started school in Cuba, but had to start over when he came to the United States. When he was young, his father would send him and his brother Daniel to run errands such as picking up a quart of milk. He would spit on the staircase and say, "I want you back before that spit dries". So Lorenzo would run to the store and back. He recalls how cold it was in Chicago.[180]

**Daniel's paternal grandfather worked hard at a slaughterhouse in Chicago.**

After arriving in Chicago, Paco soon found work as a keypunch operator, making "pieces for locomotive trains" in Chicago. A year and a half later, his sister, Julia, had a boyfriend in Belvidere, Illinois, approximately 75 miles from Chicago; he approached Paco about a job. The boyfriend wanted Paco to come work for him at a slaughterhouse, and helped him find a house

---

[178] Declaration Isabel Torres Appendix L-13
[179] Affidavit Maria Mendez Troya  Appendix L-2
[180] Affidavit Lorenzo Troya Appendix L-3

for $28,000, which they were able to occupy with a $500 down payment. Paco worked at the slaughterhouse where he killed and dressed down animals. He also delivered to butcher shops, restaurants and grocery stores, mostly selling to other Latinos.[181] He worked there for approximately six to seven years until Paco told Grandmother Maria, "I'm tired". They sold their $28,000 house for $33,000 and returned to Chicago. Grandmother Maria described their life in Belvidere as the best time in their lives.[182]

### Daniel's paternal grandparents bought and ran a grocery store in Chicago with other family members.

Once they were back in Chicago, in 1979, Paco and Grandmother Maria decided to buy a little grocery store, La Familia, located at Kedzie Avenue and West Ainsley Street in Chicago, Illinois.[183] Grandmother Maria was initially against it, but her husband wanted to open a business, so she supported him.[184] The store was on the ground floor of an apartment building, perhaps five stories tall.[185] Grandmother Maria went to work in the housekeeping department at the West Suburban Hospital in Oak Park. Her boss, wanted her to become the housekeeping supervisor, but Paco kept telling her that he could not run the store without her and she felt obliged to quit her job. Paco's nephew, Manny, bought into the store with Paco. When Paco became very involved with the market, Manny took over meat deliveries.[186]

Grandmother Maria's sister, Alba Moriyon and her husband Martin also left Cuba and lived in Chicago. They joined Grandmother Maria and Paco in purchasing the store.[187]

---

[181] Affidavit Maria Sanchez Troya Appendix L-1

[182] Affidavit Maria Sanchez Troya Appendix L-1

[183] Affidavit Maria Sanchez Troya Appendix L-1

[184] Affidavit Maria Sanchez Troya Appendix L-1

[185] Declaration Daniel Troya Appendix L-4

[186] Declaration Daniel Troya Appendix L-4; Affidavit Maria Sanchez Troya Appendix L-1; Affidavit Lorenzo Troya Appendix L-3

[187] Affidavit Maria Sanchez Troya Appendix L-1

**The Troya and Sanchez/Mendez families, including Daniel's father and mother in their teens, all worked at the La Familia grocery store; the Troya children without pay and the Mendez children so his mother's family could get credit to buy food there.**

Lydia and Grandmother Maria met at the Troya grocery store and became very good friends. Lydia would often come to the store after work at the candy factory. Oftentimes, Lydia needed credit for food to feed her 12 children and the Troyas were always helpful. Lydia, Mother Maria, Millie and Israel worked in the store as a way to pay for food.[188] Paco would often cook in the kitchen behind the store and they would all eat together.[189] There were also video games in the store that the kids who did not work there would play.[190] When Eugenio was around, he would pay off Lydia's debt to the store, every once in a while.[191] Additionally, Lorenzo worked at the same candy factory (Warner's Candy) as Lydia.[192]

**Daniel's father Lorenzo became a United States citizen in his teens, and during high school worked at the family grocery store after school every day as a cashier and butcher.**

On August 8, 1978, Lorenzo became a permanent U.S. citizen after living in the country for eight years.[193] He graduated from Steinmetz High School in 1981, three years after becoming a United States citizen. He rode the bus every day after school to work at La Familia. His father made sure he had whatever he needed in exchange for working at the store, but he did not get paid wages. He was a cashier and butcher. After high school, Lorenzo took an automotive mechanic's class for six months and graduated from ITT.[194]

---

[188] Affidavit Maria Sanchez Troya Appendix L-1
[189] Affidavit Maria Sanchez Troya Appendix L-1
[190] Declaration Melida Mendez Appendix L-10
[191] Affidavit Maria Mendez Troya Appendix L-1
[192] Affidavit Lorenzo Troya Appendix L-3
[193] Lorenzo Troya Certificate of US Citizenship Appendix L-14
[194] Lorenzo Troya High School Diploma Appendix L-15; Affidavit Lorenzo Troya Appendix L-3

Uncle Daniel worked at a nearby K-mart, selling shoes.[195] He hated the grocery store and avoided duties there.

**Daniel was born to young unmarried parents.**

Lorenzo met his wife Mother Maria in 1981 while working at La Familia grocery store together. Lorenzo immediately fell for Mother Maria; and although she was not initially attracted to him, she fell for him eventually and they ended up together at 18 or 19 years of age. Mother Maria already had her child, Mariette, who was walking at the time. After two years of dating, the unmarried couple gave birth to Daniel on April 22, 1983 at the Swedish Covenant Hospital in Chicago without any complications. He was born with a flat foot condition, just like his father Lorenzo, although not quite as bad.  Daniel's brother Alex was given the last name Mendez when he was born because Lorenzo was not present, but it was changed to Troya after the two were married.[196] Danny's godparents are his Uncle Danny Troya and a woman named Berenice, who was Moises's girlfriend at the time. Maria never knew her and the woman soon disappeared from Moises's life.[197]

**The family kept the secret that Daniel's sister Mariette had a different father until she learned it on her own when she was 16 years old.**

Lorenzo loved Mariette and raised her as his own, not telling her he was not her natural father until she was 16 years old.[198] He always worried Mariette's father might want to be involved with her one day, though it never happened.[199]

---

[195] Declaration Daniel Troya Appendix L-4
[196] Affidavit Maria Mendez Troya Appendix L-2
[197] Affidavit Maria Mendez Troya Appendix L-2
[198] Daniel Anthony Troya Birth Certificate L-16; Affidavit Lorenzo Troya Appendix L-3
[199] Affidavit Lorenzo Troya Appendix L-3

384

**Daniel's mother and her immediate family faced violence, addiction and abandonment from multiple father figures.**

Maria's biological father was never around. She met him once in 1987 when she was visiting Chicago and was disappointed in his attitude and lack of interest in her family. They spoke briefly, she learned that he was raising five other kids, but never raised his own. He may have worked at the airport as a chef. She never saw him again. He passed away several years ago and Maria did not attend the funeral, however all the other siblings did.[200]

Mother Maria remembers her stepfather Eugenio as a "good guy", although he drank a lot. According to her, drinking made him very happy and he would laugh loudly.[201] Some of the other siblings described Eugenio as a violent drunk – none of them missed him after he left the family. They recalled Eugenio drank beer and was not happy if he was not drinking. He cried a lot when he drank - mostly out of sentiment. Sometimes he smoked marijuana, which would cause arguments with Lydia since she did not like him smoking in the house. He mostly drank on the weekends, but if he went on a weekday, he would stop at a bar, drink, and then bring home bags of chips for the kids.[202]

He was not particularly affectionate, especially toward the children who weren't his. If a child ran up to him when he came home, that was not his, he would let go of them and go to his own kids, to whom he was only slightly more attached.[203]

Sometimes Eugenio had a temper. If he was in a bad mood, he would scream at the kids. There was an incident where he became upset about something and slammed Lydia against a wall and put a knife to her throat. Moises was in the room and grabbed a knife and threatened

---

[200] Affidavit Maria Mendez Troya Appendix L-2
[201] Affidavit Maria Mendez Troya Appendix L-2
[202] Declaration Mercedes Fortineaux Appendix L-11; Declaration Magdalena Mendez Appendix L-8
[203] Declaration Mercedes Fortineaux Appendix L-11; Declaration Magdalena Mendez Appendix L-8

Eugenio, saying that if he killed Lydia, then he would kill him. Eugenio left soon after that saying, "This boy has become a man. You don't need me anymore." Most of the fights between Eugenio and Lydia were verbal.[204] Mother Maria estimates he lived with the family for 10 years (around 1970 to 1979).[205]

### As a child, Daniel lived in a dangerous Chicago neighborhood.

At first, the Troya's store La Familia went well, and the neighborhood was a blend of ethnicities. But according to family members, the neighborhood changed dramatically after 1980, the year of the Mariel Boatlift – when the Cuban government announced that anyone who wanted to leave could do so. As many as 125,000 Cubans had made their way to the U.S., many to Chicago, including refugees who had been released from Cuban jails and mental health facilities. According to some members of the family, African Americans in the nearby Cabrini housing project would try to steal from the store. Nearby apartment complexes were condemned and severely damaged the economy of the area.[206] Again, according to family members, the Cuban immigrants and black people from the Cabrini housing project wanted to take over the neighborhood.[207] Nearby apartment complexes were condemned and severely damaged the economy of the area.[208] The area around their store became full of gang violence – people died every day.[209]

Although the store was in a bad area, it was often protected by gangs because Paco always offered food to people who needed it. Customers were often given credit, even if they couldn't pay it back. They believed this policy was better than having people steal from them.

---

[204] Declaration Moises Mendez Appendix L-12
[205] Affidavit Maria Mendez Troya Appendix L-2
[206] Declaration Daniel Troya Appendix L-4
[207] Affidavit Maria Sanchez Troya Appendix L-1
[208] Declaration Daniel Troya Appendix L-4
[209] Affidavit Lorenzo Troya Appendix L-3

They would tell people, "If you need to eat, let us know", and they would give them sandwiches. If he caught anyone stealing to feed their family, he would help them, not report them.[210]

One day, in 1983, when Grandmother Maria was alone in the store, a customer, Troy, a large blonde man, who came by the store every day just to say hello, began throwing apples around. Maria asked him what he was doing and Troy grabbed her and began to drag her around the store. She tried to run away, but he wouldn't let her leave, blocking the doorway. He began to strangle her with her own scarf. A small black man, a gang-member who was also a customer appeared, and began to shout at Troy, telling him to leave Grandmother Maria alone. He hit Troy with a bottle of Pepsi and Troy lost his balance. Grandmother Maria gave Troy a knee to the groin and she ran away to the nearby home of Grandmother Maria's family, but no one was home. It occurred to her that she left Troy alone at the cash register, so she ran back to the store. By then, the police had arrived. Troy told the officer that he was the owner of the store. At first, they did not believe Grandmother Maria's account and took her to the station house where she showed them the bruises on her neck. They believed her after seeing the markings. Grandmother Maria decided not to press charges but wanted some kind of formal way to designate that Troy was never allowed to return to the store. The officers made her write a letter to that effect. Two months later, Troy returned and apologized to her. She screamed at him and told him if he did not leave, she would call the police. He continued to apologize and eventually left.[211]

The store also became a physical hardship for Paco. He was delivering meat all over the city, picking it up 70 miles from the city at the slaughterhouse.

---

[210] Affidavit Lorenzo Troya Appendix L-3
[211] Affidavit Lorenzo Troya Appendix L-3; Affidavit Maria Sanchez Troya Appendix L-1

**Daniel's extended family suffered a devastating failure of the Grocery Store and near-bankruptcy; more family addiction (alcoholism) and violence developed as a result.**

Daniel's grandfather Paco began drinking more heavily once the store was failing. He had several drunken driving accidents. His behavior when drinking has been described by family members as "ugly". It would often cause arguments with his wife, Grandmother Maria. Paco would state, "I drink because I want to, not because I have to". Arguments in the home occurred frequently. Uncle Daniel's work began to decline in school and he spoke to a teacher about his father's drinking.[212]

The Troya family had the store for a total of three years – the first year things went alright; the second year, no one that worked there earned a salary; and the third year was an utter disaster and they abandoned the store on May 15 1983.[213]

**The true background and history of Daniel Troya's immediate family was ignored by the defense team.**

The defense team very early in its investigation settled on an uninformed belief Daniel Troya came from a "good" family with limited issues, and with those blinders on limited mitigation development to a tight circle of witnesses who reinforced that theme. Any evidence to the contrary that surfaced was ignored. There is no doubt Maria and Lorenzo Troya are good and nice people. But further investigation and close consultation with experts would have shown that while they did not engage in severe physical child abuse or the like, Daniel Troya's parents, in part because of their own upbringing, were uniquely unsuited to the tasks of juggling their jobs, their relationship with each other, and their loyalty to and housing of their extended family with the attention and time consuming tasks involved in raising children. The family had many stressors, financial and otherwise, and when additional stresses or problems occurred, such as

---

[212] Declaration Daniel Troya Appendix L-4
[213] Affidavit Maria Sanchez Troya Appendix L-1

their children's (or their own) physical injuries, emotional or school problems, they froze and did nothing.

**After the failure of the grocery store, the Troya family had to relocate (again) from its Chicago home to West Palm Beach.**

Daniel's great Aunt and Uncle, Alba and Martin, moved to West Palm Beach in 1981. Lorenzo went to visit them and when he returned to Chicago, he told his parents they needed to move there also. The family waited until Uncle Daniel graduated high school and then packed up and left.[214]

After they closed the store in 1983, Grandmother Maria and Paco lost everything they had – an investment of $250,000. They lived in West Palm Beach with Alba and Martin, with $400 to their names. Part of that money came from Uncle Daniel savings from his job at K-mart. They loaded up a step van and two or three cars, having very few things when they arrived in Florida.[215]

Lorenzo moved to Florida with his parents and brother on July 23, 1983 and found a job at the Coca-Cola plant stacking trucks.[216] Mother Maria came with Mariette and Daniel about a month later, waiting to move so she could have Mariette and Daniel baptized in Chicago.[217]

**As a child, Daniel had to share what was described as a shack with numerous relatives in West Palm Beach.**

The family lived altogether with Lorenzo's parents in a house across the street from Alba and Martin. The house was very small, a "shack" that flooded whenever it rained.[218]

**Young Daniel continued to be exposed to family alcoholism, depression and verbal abuse by adults.**

The loss of the store caused Paco to fall into a deep depression and he was never able to recover. He viewed it as the end of his career. There was no longer any professional or financial

---

[214] Affidavit Lorenzo Troya Appendix L-3; Affidavit Maria Mendez Troya Appendix L-2

[215] Declaration Daniel Troya Appendix L-4; Affidavit Maria Sanchez Troya Appendix L-1

[216] Affidavit Maria Mendez Troya Appendix L-2

[217] Affidavit Maria Mendez Troya Appendix L-2

[218] Declaration Daniel Troya Appendix L-4

advancement. He began to drink heavily (vodka and rum) and would lie in bed. Occasionally, he would exercise, clean the patio, take the dog for a walk or listen to the radio, but he was never the same man. He mostly sat or slept in the living room, drooling and crying. He was verbally abusive to Grandmother Maria who would get upset with his drunkenness. He would get loud and was always aggravated at whatever she said. Grandmother Maria understood that with her husband sitting or lying around, she would have to step up to the plate and support the household. Grandmother Maria got a job at Morse Life, an assisted living facility for senior citizens and provides home health care assistance for the elderly who are still able to live by themselves - defendant Daniel Troya volunteered there as a child with his grandmother. Lorenzo got a job at a pharmacy to help with the finances. Paco worked a little bit - renovating homes, but potential customers would always bargain with him and did not want to pay. He missed the big city in Chicago. He did not know how to get around and make money like he did before. He believed they lived decently in Chicago – owning a home, four cars and a U-Haul step truck.[219]

### Daniel's parents always worked outside of the home, leaving little time for parenting.

Lorenzo and Mother Maria eventually found a three-bedroom apartment down the street and moved into it when she was pregnant with their third child, Alex.[220] Mother Maria worked at a daycare center called Little Dude Ranch from 5:00 a.m. to noon. Lorenzo's Aunt Alba took care of the children while Mother Maria worked. Lorenzo continued to work at the pharmacy, Freddy's, as a manager.[221]

---

[219] Declaration Daniel Troya Appendix L-4; Affidavit Lorenzo Troya Appendix L-3
[220] Affidavit Maria Mendez Troya  Appendix L-2
[221] Affidavit Maria Mendez Troya  Appendix L-2

**The Troya family split up when Lorenzo joined the Army and moved to Texas amid suspicions of Mother Maria's affair, and he was not even present for Daniel's brother's birth.**

Daniel's mother Maria changed jobs to Toys 'R' Us and began a flirtation with the manager, Wayne, although there were no sexual relations between them and it was never serious. Maria confessed her infatuation to her sister Millie who was visiting them in Florida, saying that she was interested in him, despite being married to Lorenzo. She said he was tall, muscular and a little dark. Millie kept reminding her that she was married.[222] Lorenzo and his mother found out and became suspicious that Alex was not his child.

Lorenzo joined the Army and moved to Texas without pregnant Mother Maria. A friend had to take her to the hospital to give birth. Once Alex was born, on May 9, 1986, there was no doubt he was Lorenzo's – Wayne was black and Alex was identical to Lorenzo's family. Since Lorenzo was not present when Alex was born (in basic training), he was initially given Maria's last name, Mendez, until Lorenzo came home.[223]

**Daniel's father Lorenzo Troya honorably served his country in the military.**

Lorenzo joined the Army for a three-year term in March of 1986 and was sent to basic training in Fort Knox, Kentucky. Thereafter, he was stationed in Ft. Hood, in Killeen Texas on July 9, 1986. He wanted to do mechanics, but ended up driving and repairing tanks as an "M1 Tanker". The work was very difficult on his back.[224]  He has lots of "tank stories" – sinking in his tank in muck a couple of times and almost drowning inside once when it filled with mud and water.[225]

---

[222] Declaration Melida Mendez Appendix L-10

[223] Alexander Troya Birth Certificate L-18; Affidavit Maria Mendez Troya Appendix L-2

[224] Lorenzo Troya Military Records L-19; Affidavit Maria Mendez Troya Appendix L-2; Affidavit Lorenzo Troya  Appendix L-3

[225] Affidavit Lorenzo Troya Appendix L-3

**During the Army years, Daniel's father was frequently away from Daniel and the rest of the family.**

Mother Maria moved to Killeen, Texas with all three children shortly after Alex was born. The couple was married in July, 1986.[226] They lived in an apartment on or near the base.[227] Lorenzo worked the night shift so his family hardly ever saw him. He would also be gone for a month, or periods within a month at a time for trainings.[228] He was in Germany in 1988 to train with German troops on tank maneuvers, in advance of the Gulf War. He was there for approximately 30 to 40 days.[229]

**Lorenzo suffered a back injury in the military, was honorably discharged, requiring the Troya family to move from their home again, back to West Palm Beach.**

Lorenzo was injured in 1986 while changing a track on a tank and damaged disks L5 and L6 resulting in a medical discharge. The Army medical board did not find any disability resulting from his active duty injury. He received a small Veteran pension after serving for three years. His discharge was delayed for one month so he could get a medical discharge and veteran status.[230] He received an honorable discharge on May 31, 1989.[231] He receives a small monthly pension and has VA health benefits if he needs them, but also has health insurance through his current job at Home Depot.[232]

Lorenzo never had any intention to stay long in the military, but believes his wife Maria would have liked him to. He wonders where he would be now if he did stay on, but knows he also might have been wounded or killed. During Desert Storm, he saw the lieutenant with his

---

[226] Lorenzo Troya-Maria Mendez Marriage Certificate L-20; Lorenzo Troya Military Records Appendix L-19
[227] Affidavit Mariette Mendez Appendix L-21; Affidavit Lorenzo Troya Appendix L-4
[228] Affidavit Maria Mendez Troya Appendix L-2
[229] Affidavit Lorenzo Troya  Appendix L-3
[230] Affidavit Lorenzo Troya Appendix L-3
[231] Lorenzo Troya Military Records Appendix L-19
[232] Affidavit Maria Troya Appendix L-1

battalion on CNN, and realized that his battalion was over there. On one hand, he felt she should have been there, but on the other hand, he knew the average life span of a tanker was short.[233]

**Back in West Palm Beach, the Troya family had to move in with relatives in an overcrowded home again.**

After the Army discharge, the family was a little let down. They stayed with Lorenzo's parents, Paco and Grandmother Maria, in their two-bedroom house for six months – the children, Mariette, Daniel and Alex, would sleep in the living room.[234]

**The Troyas bought a modest home which was overcrowded enough for the immediate family, and became even more so when extended family moved in with them for extended periods.**

Lorenzo and Mother Maria were able to purchase their home on Upland Road in West Palm Beach on January 5, 1990 for $43,000 with a loan through the Federal Housing Authority. They still live there today, along with their adult children, Mariette Mendez, Alexander Troya, Adrian Troya and Mariette's two children, Daevyon Brown and Darrell Brown, Jr. The house was built in 1924 and is small, approximately 1,045 square feet of living area with three bedrooms - unsuitable for the number of occupants.

Family members would also come live with them throughout the years, making it even more crowded.[235] It was not unusual for four adults to sleep on the floor in a given bedroom. Several of Danny's aunts and uncles from Chicago came to live with them at various points – Isabel, Irma, Juan, Tito and Poli. Juan and Poli both graduated high school while living in their home.[236]Tito stayed for a summer. Poli stayed the longest.[237]  Maria's mother, Lydia lived with

---

[233] Affidavit Lorenzo Troya Appendix L-3
[234] Affidavit Mariette Mendez Appendix L-21
[235] Affidavit Mariette Mendez Appendix L-21
[236] Affidavit Lorenzo Troya Appendix L-3
[237] Affidavit Mariette Mendez Appendix L-21

them for four years.[238] She had ovarian cancer and Maria took care of her. When she became very sick, she returned to Chicago in December and died in February.[239]

**Daniel grew up in a home in which his family struggled financially, with frequently absent parents who were too busy working and otherwise overwhelmed.**

Lorenzo got a job at Home Depot, where he has worked for the last 26 years, and still works there today; he has worked in many areas of the store, including the electrical department, a fork-lift operator, and has done inventory and pricing.[240] The schedule was never set. He could be closing the store one evening, and opening it then next day. For two or three years, he worked the night shift until 11:00 p.m. or midnight. He also had to do overnights at the store.[241] Lorenzo never earns overtime – it doesn't exist there.[242]

Mother Maria found a job as a cashier with Phar-Mor, a pharmacy and dry goods store similar to Walgreens where she worked for 12 years.[243] The family also received welfare assistance.[244]

When Danny started going to juvenile jails, Mother Maria would tell him to stay out of trouble. He would explain to her that he couldn't be the "nice guy" in these institutions. She couldn't argue with him, having never been to such places before, but still try to convince him to keep his act clean. "Mom, in here I have to defend myself," he would say.[245]

---

[238] Affidavit Lorenzo Troya Appendix L-3
[239] Affidavit Maria Mendez Troya Appendix L-2
[240] Affidavit Lorenzo Troya Appendix L-3
[241] Affidavit Lorenzo Troya Appendix L-3
[242] Affidavit with Maria Mendez Troya Appendix L-2
[243] Lorenzo Troya Military Records Appendix L-19; Affidavit Maria Mendez Troya Appendix L-2
[244] Declaration Daniel Troya Appendix L-4
[245] Affidavit Maria Mendez Troya Appendix L-2

**Both of young Daniel's parents were unable to rescue him because they had to focus on their other children and other problems.**

Maria says she did not give up on her son Daniel, but she acknowledges she had to worry about the ones who were at home. He was in jail and she had a houseful of kids, including very little ones she needed to raise. She did not want Adrian and Alex to grow up with the same issues that Daniel had.[246] When Daniel went off the rails as a teenager, Lorenzo said to himself, "Either I run the streets finding my son and get sick and don't show up for work, or else I take care of the rest of my family." He worked long hours very hard at Home Depot, and if he took off time to look for Daniel, he wouldn't have made it to work. He had to make a cold calculation about what to do: "Either I go after the black sheep, or I try to save the rest of my family."[247]

As a teenager, Danny would disappear and Maria and Mariette would be out until 2:00 a.m. looking for him. She would go to his friends' houses unless it was very late, then she would just drive around. There was not a single time she caught up with him.[248] Lorenzo and Maria never talked about these excursions – Lorenzo worked until 11:00 p.m. or midnight at Home Depot. He believes that Maria hid her searches for Daniel from him. Certainly she never passed the burden to him; she dealt with it with Mariette.[249]

**All the Troya children had (and have) problems but little is done to help them (either) beyond efforts of the schools.**

**Mariette.**

Before the Troya family moved to Texas, Mariette was sent to Chicago to stay with her aunt Melida to attend kindergarten around 1984/1985 since she missed the cut off birth date in Florida. Mariette failed kindergarten in Chicago and had to repeat it in Florida when she rejoined

---

[246] Affidavit Maria Mendez Troya Appendix L-2
[247] Affidavit Lorenzo Troya Appendix L-3
[248] Affidavit Maria Mendez Troya Appendix L-2
[249] Affidavit Lorenzo Troya Appendix L-3

395

the family.[250] Mariette repeated kindergarten in school years 1985-86 and 1986-87 and earned a non-satisfactory in language.

She also failed first grade, attending August 1987 to June 1988 – performing poorly in reading, language and spelling, only missing one day of school.[251] She repeated first grade from 1988 to 1989 and successfully completed it, missing seven days of school.[252] From 1990 to 1991, Mariette passed third grade, but attended summer school after performing poorly in math, language, social studies and science. Behavioral problems arose.[253]

Mariette fought everybody on Daniel's behalf. The first time, was when the elementary and middle schools were across the street from each other. Once she looked across the street and saw that Daniel's neck, head and arms were very red. She asked what happened, and Daniel said that a kid named Tony had slammed him against the locker, then threw him on the floor and punched, kicked and stepped on him. Mariette says she "saw black," and that she was like a bull that has had a red cape waved in front of him. As for Tony, she "tore his ass up," to the point that she was sent to the principal's office and suspended from school.[254] [255]

Another time she had to beat up her best friend's cousin because he had picked on Daniel; the friend pleaded with her not to do it, but she felt she had to. The last time she remembers fighting for Daniel was when he and a kid named Nicky were in a fight. Daniel was winning. A girl named Amy — who was also supposedly Mariette's friend — grabbed a huge wrench and smashed Daniel's forehead with it. After that, Amy hid from Mariette forever, but

---

[250] Mariette Mendez-Palm Beach County School Records Appendix L-22
[251] Mariette Mendez-Palm Beach County School Records Appendix L-22
[252] Mariette Mendez-Palm Beach County School Records Appendix L-22
[253] Mariette Mendez-Palm Beach County School Records Appendix L-22
[254] Affidavit Mariette Mendez Appendix L-21
[255] Affidavit Mariette Mendez Appendix L-21

Mariette says that "I scared the living shit out of her." She beat up people ten or more times on Daniel's behalf until he finally began to fend for himself. [256] [257]

Mariette says her parents did not know Daniel was getting beaten up at Palm Beach Public. Neither she nor Daniel ever said anything at home. She wanted to be his protector. She got a big reputation, "If you messed with Mariette's brother, you better be ready for Mariette." She fought a lot of males. "Big guys," she says, "I didn't give a shit." She never got beat up by them. [258]

When Mariette was 16 years old, she learned that Lorenzo is not her biological father. She was very angry with her mother for keeping this a secret and she began to search for her father. She found him in South Florida, but her attempt to establish a relationship with him failed, although she did make contact with other paternal relatives as a result of her search.[259]

Mariette has been arrested several times for robbery, grand theft, burglary of a dwelling, petit theft and retail theft. When she was 22 years old, she was convicted and was sentenced to 10 months in county jail.

**Alex.**

Alex Troya was born on May 9, 1986, during the time his mother Maria worked at Toys R' Us and there was suspicion that Lorenzo was not his father. He attended the same schools as Daniel. While he was in elementary school, he had difficulties with speech impediments. His brain would work faster than his mouth and he would say things that did not come out quite the way he wanted. Alex was in both Language Impaired and Specified Learning Disabled (SLD) programs. He was picked on in elementary and middle school. He was not a fighter, but would

---

[256] Affidavit Mariette Mendez Appendix L-21
[257] Affidavit Mariette Mendez Appendix L-21
[258] Affidavit Mariette Mendez Appendix L-21
[259] Affidavit Mariette Mendez Appendix L-21; Affidavit Maria Mendez Troya Appendix L-2

fight back when provoked. Kids would make fun of his resemblance to the cartoon character, Homer Simpson (similarly to Danny). At Conniston, some of the teachers and staff members knew Alex was Danny's brother and had certain expectations that he would misbehave like his brother. Most of them were surprised to find that he was quite opposite. He saw the trouble that Danny and Mariette got into and learned from it, avoiding following the same path. In high school, Alex was never able to pass the FCAT exams, and therefore, never received his high school diploma.

During Danny's trial, with the strong resemblance to Danny, the family feared for Alex's safety. They thought someone on the street might mistake him for Danny and shoot or attack him, so he was sent to live with his Uncle Danny in Texas. He worked at Home Depot, however, the manager did not like him so he was forced to quit or be fired.

**Adrian.**

Adrian Troya was born on November 20, 1996, and is believed to have slight autism. He has a bad temper. He says some of the things that make him angry is that he knows people that have died. Two of his friends died in a shooting, killed by a drug dealer. He has known so many people that have been killed in drug deals, he said he is used to it. He received counseling from 5th to 12th grade. Students always messed with him – some of them said, "Your brother is a killer". In high school, there were four to five fights a day, he got used to it. He wouldn't start a fight, but would end it.

Daniel had been in jail most of Adrian's life and, therefore, he has little experience with him. Any time he got into trouble at school and was sent to the office, they always knew about Danny. Teachers would always tell him how much he looked like Danny and Alex. One teacher in particular never liked Adrian – saying he would grow up to be just like his brother Daniel.

Adrian claims he graduated high school by taking online courses in a program called E2020 (now Edgenuity) as he was unable to pass the FCATs after multiple attempts.

**As a child and adolescent, the neighborhood Danny grew up in in West Palm Beach was full of crime, drugs and gangs.**

The Troya residence was located next to Dixie Highway, where prostitutes would work at night. Mother Maria could see them from the window of her house, and if her children would ask what she was looking at, she'd say, "Those are prostitutes – go to your room and get your butt in bed".[260]

Lorenzo Troya did not know that there were areas of the neighborhood where there were drugs or drug related violence.[261] He never worried that his kids would get involved with drugs; he thought that he was teaching them by setting a good example for them, rather than talking about things. If he saw a problem he would address it; he did not need to ask his kids, "are you doing this, are you doing that." He figured the schools would tell them things.[262]

**Many other children who were exposed to the neighborhood in which the Troyas lived were also enlisted into gangs and crime.**

Amir Kamel grew up near Danny. He said the area was drug infested. There was crime all over the place, which has been cleaned up a lot since. Prostitution was exercised up and down the Dixie Highway – the worst of the worst. There were drugs all over the place. There were drive-by shootings. Amir heard gunshots all the time. He saw a guy shot in the leg – on a normal day.

Cindy Rivera said that drugs were openly sold on the street – principally cocaine, but also heroin, crack and marijuana. There were prostitutes – they are still there, they come out at night.

---

[260] Affidavit Maria Mendez Troya
[261] Affidavit Lorenzo Troya
[262] Affidavit Lorenzo Troya

She knew Danny stole cars, rims and radios – just to get by. It was just the way of life around here.[263]

Jose Navedo said boosting and selling drugs was a way of life in the neighborhood.

Anelle Hernandez grew up in the same neighborhood as Danny and has known him since elementary school. She said it was a bad neighborhood. She saw people exchanging bags of drugs for money at the Green Terrace Apartment Complex. There was also paraphernalia everywhere. There were prostitutes on Dixie Highway. You could tell they were crackheads the way they dressed and carried themselves. That's how they were raised. [264] She said Danny raised himself with his brothers and sister. She doesn't remember Danny's parents as being there much. They were always outside of the house, maybe working. Maria would be there sometimes.[265]

Dennis Rivera said there were constant gunshots in the neighborhood. There were many gangs — The Hawaiians, LTP, 18th Street, 40 Boys — and they were no joke. Dennis remembers someone getting tossed out of a van outside the Publix at Southern and Parker, stark naked. In those days the Forest Hill high school kids and the Conniston kids all hung out at a grocery store near Conniston called La Barata. The Forest Hill kids would go there to watch or get into fights. .[266]

Mildred Ruiz said that not only did she hear gunshots, she knew people who had guns. She also saw prostitutes on Dixie Highway near where Danny lived.[267]

---

[263] Affidavit Cindy Rivera Appendix L-23
[264] Affidavit Anelle Hernandez Appendix L-24
[265] Affidavit Anelle Hernandez Appendix L-24
[266] Affidavit Dennis Rivera Appendix L-25
[267] Affidavit Mildred Ruiz Appendix L-26

**Elementary School Years – *Palm Beach Public*.**

**Danny began school and made an impression as a good kid, but language problems soon emerged.**

After moving back from Texas, Mother Maria and Lorenzo enrolled Mariette and Daniel at Palm Beach Public Elementary. Palm Beach Public was a "well-to-do" school, in a nice area, and a percentage of underprivileged students were bused in, including Daniel and Mariette. Daniel was enrolled in first grade and was abused and tormented by other kids in school because of his small stature and his clowning around.[268] His sister Mariette protected him. He and his siblings were placed in special programs. He did relatively well in school, missed very few days, received awards and participated in activities.

**The Troya parents were investigated by the Florida Department of Children and Families at least twice.**

In 1990, DCF investigated the family after their grandparent's neighbor reported inappropriate sexual behavior by Danny and Mariette. They said Danny and Mariette were "messing" with their kids. Mariette recalls that the neighbor's parents would have sex with their door open and the kids may have simulated those acts with dolls.[269] Mariette and Danny had to get counseling through DCF after the incident.[270] This DCF investigation was later followed by another one, around 1993. Mariette, around 13 years old, was removed from the home for a week after the school called DCF to report bruising on her arms. Her mother reported that she had to force Mariette into the car after school when Mariette refused to get in. She stated the case was closed with no action taken.

In April, 1991, grandfather Paco was involved in a single car accident while driving his 1979 candy apple red Lincoln. He flipped the vehicle, it went airborne and landed on and

---

[268] Affidavit Maria Mendez Troya Appendix L-1
[269] Affidavit Mariette Mendez Appendix L-21
[270] Affidavit Mariette Mendez Appendix L-21

crushed the roof. 8-year-old Daniel and 11-year-old Mariette looked inside the car and saw the white leather interior covered with their grandfather's blood. The car sat in the yard at 3559 Genessee Avenue for some time. Young Danny would crawl inside to see the blood. Paco was hurt pretty badly.[271]

In second grade, Danny had perfect attendance, but language problems arose during the school year resulting in a referral to the ELL (English Language Learner) program due to Spanish being spoken in the home, even though he spoke English. He remained in the ELL program for two-years, until October 5, 1993.  One of his elementary school classmates was also one of his co-defendants, Kevin Vetere.[272]

Annette Allison was Danny's 2nd grade teacher at Palm Beach Public. Ms. Allison describes Danny as a not very motivated student and seemed a little down. He was low academically, low in intelligence, and slow in processing, but he was always willing to try. He was never a behavior problem with her. She does not recall Danny ever being sent to the office, or any discipline issues. She said she remembers students who cause trouble and Danny just was not one of those. He was always respectful. She believed his parents were always on top of him if he did not do his homework.

Third grade was relatively uneventful; Danny only missed three days of school. In fourth grade, he only missed five days of school. His aunt Isabel came to live with them with her three-year old daughter, Ashley and stayed for eight to nine months. Mother Maria and Lorenzo took care of her daughter when she went to work. Danny was a good kid and often played outside on his bike. The Troya children were not as respectful to Isabel – she was in their territory and it was a crowded house. They wouldn't listen to her if she told them to do something. Mother

---

[271] Affidavit Mariette Mendez Appendix L-21
[272] PBC School Records Appendix L-27

Maria would get frustrated with Danny – he would make smart remarks and refuse to do chores. Lorenzo and Mother Maria were at work at night.[273]

In fifth grade, Danny's attendance began to drop, missing 11 days. He continued to be tormented and bullied in school.

Mariellen Davis was also a teacher at Palm Beach Public and knew the entire Troya family since she lived within a half mile of them. She said the neighborhood was not a good area for children, but it was all the Troya family could afford. Their home was near the railroad track, there were always cars driving up and down, it was a rough area. When the kids were younger, she would see them outside riding their bikes.

Ms. Davis is closest to Mariette and describes her as a tough little girl and took her under her wing. When Danny was at Palm Beach, she taught a number of subjects including Spanish, social studies and science. She said Danny always helped the little kids who were being picked on, and helped to alleviate difficult situations. For instance, when someone was being picked on in the cafeteria, Danny would be there to catch a tray before it fell. One time in art class, a child had moved a chair of another child. Danny stepped in and said that the student could have been hurt. He looked out for people's rights and always helped smaller kids. Danny always did his assignments and helped other kids with theirs. She thought the Troya's were always very giving and hard-working people. Danny did not do well in his studies, however, he was big hearted and tried to look out for others. He tried to protect smaller kids that were picked on. Other kids would make fun of him and he did not have the people skills to put them in their place. He would just swallow their cruel comments and walk away.[274]

---

[273] Declaration Isabel Torres Appendix L-13
[274] Declaration Mariellen Davis Appendix L-28

Christina Schmidt, now deceased, was co-defendant Kevin Vetere's aunt and had known the Troya family since they moved back to Florida from Texas to her neighborhood. The two families celebrated Christmas together almost every year. She said Danny was a good kid, always at home playing in the yard. Whenever she asked Danny for help, he was always there for her, even when he was older. She said Maria and Lorenzo were hard working people who did not have much but provided for their family. They took in Maria's brothers even though they did not have the room.

**Young Danny Troya's volunteer time at Morse Geriatric Center was over an extended period and he earned lifelong relationships from adults he met there.**

When Daniel was a child (approximately 7-10 years old) he volunteered at the Morse Geriatric Center, where his grandmother Maria worked. Several people that worked there had powerful, positive things to say about Daniel, which were not heard by the jury.

Magalis ("Maggie") Munoz said that young Danny Troya was like a son to her and that he was a very good boy. He started coming to the center with his grandmother when he was very young, approximately seven or eight years old and volunteered there for years, a long time. He was very nice and helped with whatever he was asked to do. He worked in the dining room, and helped wash dishes and clean tables. He also worked in the cafeteria. Danny also had contact with the elderly residents and got along with everybody. They all loved him. He visited with them and made them happy. Ms. Munoz said after he was grown Danny stopped by to see her. The two had lunch in the cafeteria and walked around the facility together. Maggie was on a walking program to lose weight and Danny accompanied her on her walk.

Dollie Daniels was a chef and kitchen supervisor at Morse. She said that Danny was very helpful – always fixing food and washing dishes.

Victor Sepulveda said that Danny was never a problem, everyone would always ask for him and he would never say no. He was a hard worker, always smiling.

**There are many stories about how members of the Troya family would not receive medical treatment due to the cost.**

Lorenzo is an avid fisherman, and would often take Danny with him under Flagler Bridge. Once, he got a huge live bait fish hook caught on his lip while trying to tie his fishing line with his teeth. Good Sam's Hospital was down the street, but he figured treatment there would be expensive, and he would have to explain how he got the hook in his lip. A fisherman he knew around the area told him to go to the hospital. Somehow, he was able to pull the hook out, but fainted. Daniel, who was in elementary school, woke him up. Lorenzo told Danny not to tell his mother about the incident. It was the first thing he said as soon as he opened up his mouth.[275]

**Daniel Troya suffered many untreated physical (including head) injuries growing up, he was mercilessly bullied, and his mental and emotional problems also went unaddressed.**

In April 1986, Daniel Troya was diagnosed with a foot condition, Pes Planus and Calcaneovalgus Feet (flat foot, turned outward), and was prescribed orthopedic shoes since he was unable to walk long distances. He was treated from 1986 to 1988.[276] One day in 1986, three years-old, while staying at his grandparents' house in West Palm Beach, while wearing his orthopedic shoes, he was running around the house, tripped and went flying – hitting the bumper of a car with his head and mouth, knocking his teeth out.[277]

In March 1987, three years-old, Danny and two neighbors were playing in moving boxes, making forts and the still had the metal bar in it used for hanging clothes. When the box fell over

---

[275] Affidavit Lorenzo Troya Appendix L-3
[276] Ft.Hood Pediatrics Appendix L-29
[277] Ft. Hood Pediatrics Appendix L-29

and the neighbor kid dragged Danny off the box, the metal clothes hanging bar cut his back, requiring stiches.

At four years of age, Danny sustained another head injury in June 1987 when he ran face first into a wall while being chased by his sister, Mariette, and knocked out teeth. He hit the wall so hard, the drywall was broken. He did not receive any medical treatment.[278]

In 1988, Daniel showed the first signs of having Attention Deficit Hyperactivity Disorder (ADHD). It was difficult for him to sit still and he was always talking, but his mother just thought it was "the Cuban in him."  His mother describes him as a "cutup" and restless. He was always jumping around. He liked to break toys to see how they worked from the inside. He did not strictly misbehave, but he was always clowning. He would watch TV on the sofa with his feet in the air and his head on the floor. No evaluation or treatment was sought. He took skills tests. A teacher told Mother Maria, "Your son completed the tests – he is not dumb, he is just a smartass".

Daniel was tormented and bullied in elementary school and he was beat up by one of Mariette's friends due to his small size. He was little for his age.[279]

In June 1995, Daniel saw a psychiatrist or counselor and may have been diagnosed with ADHD. They wanted him to take medicine, but he did not.

In August, 1995, Daniel was hanging out with some kids in a park, and got hit in the back of the head with a bat. He came home and said, "look what I got." Lorenzo asked, "what the hell are you doing," and Daniel said he had got into a fight with his friends.

Juan Quinones lived with the Troya's and went to Conniston with Daniel. He sai0d Daniel was always in fights at school and would come home with scraped knuckles or bruises.

---

[278] Ft. Hood Pediatrics Appendix L-29
[279] Wu Report Appendix K-2

**When the unraveling of Daniel Troya's life intensified in adolescence, no one was available to rescue him**

**The *Conniston years.***

Mother Maria knew Danny was getting into a lot of fights at school and that he was bullied and tormented as a child. Prior to beginning middle school, Danny told his mother, "Mom, I'm done" which meant he was not going to be abused or tormented anymore.[280] Maria instilled in her kids the idea that you don't start a fight, but if someone hits you, then you have to hit back.[281]

He began attending Conniston Middle School in 1996. Conniston was a drastic change from Palm Beach Public – which was in a very nice area; it was a good school with a good reputation. Conniston, in contrast, was in such dire failure that it was supposed to be shut down and only stayed open because it was going to be improved to meet the standards of the school board.[282] Conniston was in a "bad area" of town and his sister who had always protected him, went to a different school. Mother Maria knew that Conniston was rough and that there were a lot of bad kids there, but she had no choice about where to send her kids to school.[283] Daniel acted out a lot while he was there. He would say silly things or go into outbursts and get sent to the principal's office. He did not argue; he would make a joke out of everything, or else he would shut up and not say anything at all.[284]

**Conniston Middle School was a chaotic mess, and in his early teenage years Danny was exposed to all the crime, drugs and gangs it had to offer.**

Conniston has been described by many former students as a gang riddled gladiator zone infested with drugs. Chris and Andrew Arrue said fights among students were a common

---

[280] Affidavit Maria Mendez Troya Appendix L-2
[281] Affidavit Maria Mendez Troya Appendix L-2
[282] Affidavit Lorenzo Troya Appendix L-3
[283] Affidavit Maria Mendez Troya Appendix L-2
[284] Affidavit Maria Mendez Troya Appendix L-2

407

occurrence. Fights were often among races – American blacks versus the Haitian blacks. Kids would wear flags of their countries on their sleeves and jewelry. Kids were challenged if they chose not to display their allegiance to a particular country, so they ended up having to fight anyway.  Amir Kamel said there were a lot of gangs, mostly Hispanic that went after everyone. If you weren't a part of it, then they would mess with you and you had to stand your ground and fight or else you would look like a coward**.** He reported one fight between a black and a Hispanic on the school bus. One kid pulled out the earrings of the other, and he was gushing blood.  The Hispanic, Tony Garcia, shot himself in the head years later. The police were called as a result of the worst fights, once or twice a week. If there was a small fight, there wouldn't be serious consequences – the offenders may be suspended for two or three days or an afternoon of detention.   There was no discipline. Students came and went as they pleased by the front gate. Most students did not pay any attention in school.

Anelle Hernandez said high school kids from Forest Hill would go and hang out at Conniston. Forest Hill ended at 2:45 p.m. and those students would go to Conniston and hang out in their cars and listen to music until the Conniston students were let out at 3:30 p.m. Everyone would hang out at a grocery store called La Barata. Kids would hang out while their parents were at work. Girls started to hang out with older kids and bad things would happen such as a sixth-grade girl would get pregnant by an older guy. [285] She said everyone smoked pot. The boys were selling and dealing. Stabbings happened all the time. Kids had knives in the bodegas and carwashes.[286]   Mildred Ruiz said many of her friends were scared of the school, but they had no choice about which school to go to if they lived in the area. [287]

---

[285] Affidavit Anelle Hernandez Appendix L-24
[286] Affidavit Anelle Hernandez Appendix L-24
[287] Affidavit Mildred Ruiz Appendix L-26

The principal of the school, Amelia Ostrosky would have testified Conniston was challenging. She said they had to watch students' body language all the time to prevent eruptions. There was a lot of gang activity at the school and she would meet with gang leaders to convince them to keep the eruptions off the school premises. The gangs were mostly Hispanic – Cubans, Mexicans, Colombians, and Guatemalans. They would get into fights all the time, occurring everywhere in the school. She said the biggest challenge was crowd control – the kids became the most disruptive in large areas. There were a lot of drugs at the school. The school district had a zero tolerance drug policy, but a student would only be suspended for two weeks then be back in school. She said she was used to students addressing her as "bitch". Emotionally disturbed children frequently assaulted teachers. Teachers had to be trained in takedowns and had to be able to handcuff kids.[288]

The Academy at Conniston was for problem students, not only Conniston students, but adolescents who had trouble at other middle schools in the district. The troubles weren't disciplinary; they were for kids who'd lost interest in school and weren't engaged. It was designed to teach students life skills and connections with the community. There was a computer lab and veterinary unit. If the students kept good attendance, they were rewarded with a bike ride on Fridays.[289]

The students seem to have a different perspective of the Academy program. Julio Perez said the students were divided into "A" and "B" groups. The divisions were arbitrary and nothing to do with performance or behavior. Anelle Hernandez said the Academy kids brought drugs and guns to school – there was constant fighting. The boys were selling and dealing and stabbings happened all the time. Mildred Ruiz never understood the Academy. She said they used to wear

---

[288] Affidavit Amelia Ostrosky Appendix L-30
[289] Affidavit Amelia Ostrosky Appendix L-30

409

red and black t-shirts. It was for the bad kids. The regular students were not allowed to talk them. The Academy students were excluded from the regular students.[290]

**Daniel Troya saved his father from drowning.**

When Danny was in middle school, Lorenzo and Danny were fishing and Lorenzo fell in the Boca Raton inlet. Danny saved his life by pulling him out of the water by his shirt. Lorenzo says he swims like a rock and is terrified of water. Lorenzo's legs were bloody from being banged against the rocks. Another time he fell into the Intercoastal Waterway.[291]

Mother Maria was told that when Daniel was a teenager, he saw a man stabbed to death in the neighborhood, but Daniel never mentioned the incident to her directly.[292]

**Daniel made Herculean efforts to be good, but was easily influenced by others; one value he learned and kept was to be loyal to his friends.**

Chris and Andrew Arrue said they and Danny tried not to participate in the race fights going on in the schools. They all thought it was stupid to be fighting over country allegiance when they were all mostly born in the United States.

Daniel hung out with his friend, Julio Perez, riding bikes and going over to Julio's mother's house. They would talk about the cars and joke about the people going in and out of the gas stations and strip clubs. They smoked weed together once or twice. Julio feels like Danny was himself around him. Danny never brought him along with his older friends, as a protection, since Julio was not into drugs and tried to stay out of trouble. He says that Danny is pure of mind, but when he hung out with tough people, he adapted to their lifestyle. He is the kind of guy that would step in if anyone threatens his friends because he is a caring protector.[293]

---

[290] Affidavit Julio Perez Appendix L-31
[291] Affidavit Lorenzo Troya Appendix L-3
[292] Affidavit Maria Mendez Troya Appendix L-2
[293] Affidavit Julio Perez Appendix L-31

**Uncle Tito exerted his extensive and lasting bad influence on Danny, taking him under his criminal wing, while living in his home with his parents' approval, when Danny was only thirteen years old. [294]**

Around the summer of 1996, after Danny was in the 6th grade (and prior to the Kamel shooting), Uncle Tito came to stay with the Troya family.[295] Tito would have testified he grew up on Sawyer Street and Chicago Avenue in Chicago with his mother, five brothers, six sisters and sometimes his cousin, Elvis, from Puerto Rico. Tito, by his own admission, was a bad kid – hard headed with a bad temper. He always fought with his brothers and sisters. The area surrounding his home was a gangland war zone. At one time or another all of his sisters had gangland boyfriends. His mother made his sisters take Tito with them when they went out somewhere. The sisters would lie and say there were going to the store, but it was actually to see their boyfriends, who were thieves and gang members. Milly went out with a guy named Fred, who she left for a gang member. Meche went out with Willie Rivera. Magda went out with a Colombian dealer, Juan, but cheated on him with a member of the Viceroys. Isabel went out with Salvador Velez (a/k/a Chocolate), who was later locked up for being a serial rapist. He witnessed his brothers, Moises and Manuel (the supposed straight ones) snort coke – his first exposure to the criminal world.[296]

---

[294] Declaration Isidro Torres Appendix L-32

[295] Kerry Sheehan interviewed Isidro "Tito" Torres telephonically on March 14, 2008, while he was in state prison in Illinois, personally on May 13, 2008, along with Troya trial attorneys, Jim Eisenberg and Reuben Garcia, and telephonically during trial on February 20, 2009. Additionally, defense expert, Dr. Harry Krop, also personally interviewed Mr. Torres (Dr. Krop was not called at trial). The meetings went well enough that Mr. Isidro "Tito" Torres was placed on the defense witness list. However, though young Danny Troya's exposure to Uncle Tito's influences was one of the central themes of the mitigation case, counsel neglected to call him as a witness.

[296] Declartion Isidro Torres Appendix L-32

Tito describes what he saw as a race war in the neighborhood during his early childhood. When Tito was in first or second grade, there was a group called the Syrian Eagles who were going to rumble with the neighborhood Puerto Ricans.[297] Tito started getting into fights in elementary school against blacks and Syrians. He doesn't remember why. It was a very divisive neighborhood between blacks, Haitians and Latino's.[298]

His family moved out of the neighborhood to the Humboldt Park area during the biggest gang explosion in the area. There were fights in school every day between various rival Latino gangs, black gangs and a gang known as the C-Notes (an acronym for the Chicago National Organization to Eliminate Spics). Tito and his bother Poli were light skinned so they weren't automatically pegged as Latino and often avoided getting beaten by the C-Notes.[299]

School was not as violent for his older siblings who'd already either graduated or dropped out. Most of the Mendez siblings finished school, while the Torres siblings did not. Irma, Poli and Juan graduated. Tito felt that none of his siblings related to him and instead, threw him to the wolves.

Tito passed all of his classes without struggling, however, no one was around to encourage him to study rather than fight and do drugs. To this day, when he is allowed, he studies in jail to be a drug counselor. He is almost accredited as a peer educator in a twelve-step program.[300]

Tito feels he had limited choices. Before he knew how to drive, he knew how to break-in and steal a car. He had no clothes, so he broke into houses to steal them. He did not have any

---

[297] Declartion Isidro Torres Appendix L-32
[298] Declartion Isidro Torres Appendix L-32
[299] Declartion Isidro Torres Appendix L-32
[300] Declartion Isidro Torres Appendix L-32

money so he would give what he stole from houses to other guys, who would fence the stolen goods for him.[301]

By the time he was in 6th grade, he joined the Imperial Gangsters and still has a tattoo on his leg to prove his membership. The sixth grade was his last year of officially going to school, although he continued to go sometimes in the seventh and eighth grade.  His gang called him Little Mad Dog, or Little M Dog, after the founder of the Imperial Gangsters who was called Mad Dog. There were fights at school every day, so he did not want to go.  He did not want to be with his siblings because he was afraid they would get caught up in gangs like he did. Poli might have turned out to be a gang member if he hadn't been sent to Florida to live as a teenager.[302]

When he was 12, a good friend of Tito's, Peter Cruz, was murdered by members of a rival gang, the Maniac Latin Disciples and it was all out war between the two gangs. Shortly before his 13th birthday, another friend, Hector Ramos, was murdered. Soon after, another friend name Baby was murdered after gang members threw him off the pier in Chicago. Tito went off the deep end after seeing so many of his friends murdered.

The Imperial Gangsters and Maniac Latin Disciples declared a truce, however, Tito shot another Maniac Latin Disciple anyway when he was 13 years old and was violated out of the gang. Meanwhile, he hooked up with a member of the Ashland Vikings and began to hang out with them. He wanted to continue to seek revenge against the Maniac Latin Disciples for killing his friends.[303]

He felt abandoned by his own family. Mercedes was the only one he felt he could count on, but she disappeared to Atlanta to escape her abusive husband. Tito began using drugs on a

---

[301] Declartion Isidro Torres Appendix L-32
[302] Declartion Isidro Torres Appendix L-32
[303] Declartion Isidro Torres Appendix L-32

413

daily basis to numb himself from his pain. He gradually went from smoking marijuana to heroin. He sold cocaine and crack. By the time his mother knew what was going on, it was too late. She was always too busy working. Older gang members taught him how to shoot and be an enforcer. He shot guys in their 30's and 40's; guys with children and homes. He robbed houses – one home had a stash of guns. Things began to heat up in Chicago and prices were put on his head.[304]

He began to hang out on the South side of Chicago with Carlos Fortineaux, Sr.'s brother, Pedro, who owned a shop, where no one knew him. One day at the shop, a Maniac Latin Disciple confused him with someone else and put a gun to his head, but the gun jammed up. Tito pulled out his own gun and shot him in the wrist and face, without killing him. Tito was locked up, but then sentenced to probation. Tito said it was since it was considered self-defense.

After a probation violation, he was sent to the St. Charles Youth Center at 15 or 16 years old. There was no mentoring or counseling. It was a free for all of fighting and rape. Prisoners were there until the age of 21. This is where Tito really learned how to fight. During a fight, someone broke his nose and busted his head. On baseball day, he took a bat and got his revenge on the guy that had beaten him. As a result, he was sent to the Illinois Youth Center in Harrisburg, which was where the worst juveniles were placed. He got into fights every day, not only with prisoners, but with guards as well. His nose was split open and is crooked to this day.[305]

Tito said he lost love in his heart after being in those places. He was never right afterward, and is still mistrustful. His mother, Lydia, sent him to Jacksonville to live with his sister, Irma, and her husband. He fell into another bad crowd while there. Street guns were much less expensive in Florida than they were in Chicago, so he would buy them in Florida and mail

---

[304] Declartion Isidro Torres Appendix L-32
[305] Declartion Isidro Torres Appendix L-32

them to his friends in Chicago, making a profit. Irma threw Tito out after one of his friends took her car for a spin, even though Tito did not know about it. He went back to Chicago and was back in gang activity. He sold crack. Many of the Imperial Gangsters had just been busted in Operation Diamond, so Tito packed his bag and went to live with Maria and Lorenzo. Danny was about 13 years old.[306]

Contrary to the government's contention at sentencing, Tito could have testified he and Danny spent a lot of time together. The house was crowded with all three children living there, as well as Poli. Tito wanted to know what West Palm was like so Danny took him everywhere and showed him around. They hung out every single day.[307]

Tito taught Danny how to pick up girls. Tito took Danny to one girls house while he had sex with her and Danny swam in the pool. She gave Tito a ring that belonged to her father, who was a jeweler. He advised Danny on how he got women when he said to Danny "have balls and approach the female".[308]

One day they were walking and witnessed a big argument between the Latinos and blacks. Danny wanted to move away from the argument, but Tito said it was nothing. He told Danny, "If this was the city, I would have come around and shot this group up".

He told Danny, if he did decide to commit a crime, to do it all out – not half steps. Danny really listened to him. He taught him how to steal cars and how gangs operated. Danny showed him the graffiti in the neighborhood, and Tito recognized it as Imperial Gangsters. Tito taught him about loyalty and friendship among gangs. Tito explained to Danny that the tattoos on his

---

[306] Declartion Isidro Torres Appendix L-32
[307] Declartion Isidro Torres Appendix L-32
[308] Declartion Isidro Torres Appendix L-32

415

body are significant to loyalty. If one of their guys died, 20 or 30 guys could have died in retaliation.[309]

Danny liked the way Tito dressed. Tito had a limited edition Roberto Clemente button down Pittsburgh Pirate shirt. Danny admired it so Tito gave it to him right off his back.[310]

Danny did not have a lot of friends during this time. He never shared any of his problems with Tito because he knew Tito would have done something to them.[311]

One day, outside a restaurant near Danny's house, they saw a Hispanic guy in a fight with two black guys. Tito stepped in to help the Hispanic guy, even though he was a total stranger. The Hispanic guy's brother was the biggest drug dealer in the area, and now Danny and Tito were connected to him. Two days later, the Hispanic guy picked up Tito and took him to his house – it was a beautiful neighborhood. He gave Tito a bag full of small bags of cocaine as a gift. Tito sold it, and Danny witnessed it since he was with him every day.[312]

Lorenzo recalled walking into the bedroom one day and Tito was talking about how in jail he went into a room and to show that he was not going to be pushed around, he broke a chair over the head of the biggest guy in the room. Lorenzo looked at Danny's face and it was like, "Wow, that was cool." Lorenzo told his wife that he did not think it was a good idea for Tito to be around Danny. Mother Maria asked Tito not to do "stupid shit" in front of Danny. Tito would say, "I know, I know". Meanwhile, Daniel thought Tito was the greatest Uncle and got along with him very well.[313]

---

[309] Declartion Isidro Torres Appendix L-32
[310] Declartion Isidro Torres Appendix L-32
[311] Declartion Isidro Torres Appendix L-32
[312] Declartion Isidro Torres Appendix L-32
[313] Affidavit Maria Mendez Troya Appendix L-2

**Danny made friends with a disabled child, John Kamel, at Conniston, and protected and defended him.**

John Kamel was a child with a prosthetic leg and was always picked on. Danny always protected John – picked him up from class and escorted him to his next class so he wouldn't be picked on. They often ate lunch together.

**John Kamel's death, in Danny's arms, had profound effects on Danny that went unaddressed.**

In seventh grade, 13-year-old Danny was traumatized when he witnessed his friend, John Pierre Kamel get shot to death at school by a schoolmate, Tronneal Lavor Magnum, on January 27, 1997.  Danny ran to his side and held him as he was dying and lost consciousness. John was transported to St. Mary's Trauma Center and died shortly thereafter. Danny was interviewed by the investigating officers and helped them identify the shooter. He later provided his testimony via deposition in the criminal case against Tronneal. He stated John and Tronneal weren't getting along a few weeks prior to the incident. Tronneal was bullying John - he borrowed a CD player and he never gave it back, took his watch from him, pushed him when he was holding ice cream so it got all over him and kicked him in the leg.

John told Danny he wanted to go to the principle to get his watch back – he also wanted to have a cousin, Tameron, go up to him and ask him about it since he was bigger. Tameron went to Forest Hills High School and knew gang members, but was not in one. There were threats made to Tronneal that people were "going to get him if he doesn't give the watch back". Word got out and talk of them fighting was building up. Tronneal did not want to fight anybody and grew worried that he would be beat up by John's cousins. Fights at the school were common, there were usually about four to five a month. Danny and Tronneal used to be friends, but Danny stopped hanging out with him because he was afraid of being beat up. Danny was with his uncle Juan at the time of the shooting and they both saw the entire incident. He came home and kept

417

saying, "I'm going to die, I'm going to die".[314] He never received counseling for this event. His attitude was, "I don't need nobody".[315]

Danny's uncle, Juan Quinones, who was about the same age as Danny, lived with the Troya's at the time of the Kamel shooting (sent by his mother to Maria to escape the gangs of Chicago) and was with Danny when Kamel was shot. Juan was also friends with Kamel, but not as close as Danny was. He saw Kamel get shot (about 10 yards away), saw him fall down and saw Danny run up to him and hold him. He said the school administrator came out and pushed everyone out of the way. Juan and Danny were shocked by the incident, but they never talked about it afterward. He says that Danny has a protective personality, especially towards his sister Mariette.

Christine Schmidt remembered the Kamel shooting and said Danny became very quiet afterwards – it was very traumatic for him. Maria confided in her that Danny was doing this or that (out of character behavior) because of what he had seen. Approximately seven months after the Kamel shooting, Christine's daughter Lisa Schmidt killed herself. Lisa and Mariette were very close – Danny also had a relationship with her. Christine recalled Danny becoming very quiet after Lisa's suicide, in the same way he became quiet after the Kamel shooting. She said Danny goes inward when he is upset and believed Kamel's and her daughter's deaths had a big impact on him.

**Danny tries to commit suicide for the first time.**

Shortly after the shooting, Danny attempted suicide for the first time. Mother Maria believes he "just lost it". He ran out of the house to the nearby train tracks and wedged himself in. He would not move or get up. His mother followed him and heard a train coming and

---

[314] Affidavit Maria Mendez Troya Appendix L-2
[315] Affidavit Maria Mendez Troya Appendix L-2

panicked. She finally forced Danny up by buckling his knees and pulled him up and away from the tracks just before the train passed by.[316]

Lorenzo said Danny went off the deep end quickly after seeing Kamel shot. He had no experience with this kind of situation and felt he and Maria were "out of their league". He had no idea what to do with Danny or how to ask him what he needed. They could not afford professional help and their house was filled up.[317]

Danny's grades began to drop drastically in school. He missed 31 days of class and behavioral issues emerged. He began to get into fights.[318] He stayed out late. One night, Danny wanted to go out and his father did not want to let him go. Lorenzo physically blocked the door and they got into a fistfight. Danny busted a window with his head and jumped out.[319] It occurred to Lorenzo that he must have been on drugs because of the way he talked and his attitude. Poli began to step in and take care of him, instead of Lorenzo beating down on him as a parent.[320] Maria thought it would work itself out.[321]

**Danny was exposed to additional violence, gangs and drugs at Conniston.**

Conniston Middle School experienced more violence following John Kamel's shooting. Daniel began hanging out with gang members that were ages 17 to 27. He recalls an incident where there were approximately 100 people hanging out across from Conniston in front of the little pink church, drinking liquor. Some black dudes came by screaming out the name of one of the cliques that the guy was in who killed "Homeboy." They pulled out a twelve gauge and

---

[316] Affidavit Maria Mendez Troya Appendix L-2
[317] Affidavit Lorenzo Troya Appendix L-3
[318] PBC School Records Appendix L-27
[319] Affidavit Maria Mendez Troya Appendix L-2
[320] Affidavit Lorenzo Troya Appendix L-3
[321] Affidavit Maria Mendez Troya Appendix L-2

everybody started ducking. Danny was one of the youngest in the group and the closest to John Kamel.

August 1997 to June 10, 1998, Danny failed eighth grade. His grades and behavior continue to decline, receiving multiple detentions, suspensions and unexcused absences. His neighbor, that was a close family friend, commits suicide. His grandmother Lydia falls ill with ovarian cancer and moves in with the family so Mother Maria can be her primary caregiver.[322] Mother Maria becomes so preoccupied with working and taking care of her mother that she neglects her children's needs.

**Danny's behavior became bizarre after the John Kamel shooting.**

Danny began exhibiting bizarre behavior by running around in circles in the school field and wouldn't stop. The school had to call Lorenzo to control him. When Lorenzo arrived, Danny said, "I just want to run" offering no further explanations.[323] He did not receive any counseling for it.[324]

**Defense Investigation and view of Juvenile and youthful offender imprisonments**

Daniel Troya was by any measure a nice, sweet young child whose problems began to blossom when he was around twelve, but then exploded as he became an extremely troubled adolescent.  By his teen years, he was exploring the streets as his parents (over)worked or were otherwise distracted by other family issues. His traumas-the bloodied death of a friend in his arms, for one- went ignored; he was arrested for various crimes, and committed others he was not arrested for. The defense team tried as best they could to suppress most of this, but reasonably competent counsel would have embraced it. What better way to demonstrate

---

[322] Affidavit Lorenzo Troya Appendix L-3
[323] Affidavit Maria Mendez Troya Appendix L-2
[324] PBC School Records Appendix L-27

something was not right in his home or head?  A demonstration of his inability to cope. Trauma after trauma was manifesting itself and yet the authoritiy figures in Daniel's life, parents and school, were not providing the needed care and counseling.

Juvenile records revealed significant issues in his life, and Daniel Troya's time as a youth, **not having even reached the age of 21**, in Florida's prisons, including a gladiator camp, hardened him almost beyond recognition.  His so-called attempted escape was a fiasco. But counsel again went minimalist, neglecting to aggressively investigate and present the mitigating circumstances of events occurring while Mr. Troya was imprisoned as a youth.

> **Daniel Troya was exposed to the adult criminal justice system at a young age, beginning soon after his exposure to Uncle Tito.**

Danny's first brush with the criminal justice system occurred on November 7, 1995 when he was accused of hitting a female student / classmate at school on November 7th. He was arrested on November 8, 1995, and was referred to JASP, the DJJ recommended 'no file' on battery on November 16, 1995 and the case was closed on December 4, 1995. Danny denied hitting her, but admitted to shoving her after she pushed a desk out of her way which hit him in the process. His parents were called to the school and he was suspended for five days. His father claims he later spoke to a student who said it did not happen the way it was portrayed. However, at trial it was brought out the girl's mother told police Danny's father told her if Danny had the reputation of being a bully her daughter should stay away from him.

On February 10, 1999, he was arrested for burglary and grand theft. Danny's friend Martin Corona had stolen a van and picked up Danny in it.[325] Shortly after, on March 4, 1999 he received school disciplinary action and arrest for disturbing the peace, interfering with school

---

[325] DJJ Records Appendix L-33

421

officials and resisting an officer without violence; he was suspended for 10 days.[326] On August 4, 1999 he was sentenced to juvenile probation and 100 hours of community service until March 6, 2000 for the February and March 1999 arrests. He was adjudicated delinquent. The juvenile court judge ordered Danny to go back to school and to enroll at Forest Hills High School where he hoped to play football. He was attempting to bring his grades up but he was kicked out school after school officials reviewed his academic and criminal history.[327]

In September 1999 Danny was ordered to attend anger management counseling with Choices".[328] From 1999 to 2000 he worked two jobs – McDonalds and Chevron near his home.[329] On April 29, 2000, he was arrested for larceny and possession of burglary tools. The burglary case was dropped; he was adjudicated delinquent for the larceny charge.[330] The Court ordered him to home detention. On May 27, 2000 he was arrested for burglary and grand theft. He refused to name a co-conspirator because he did not want to get a friend in trouble, and confessed to the offense.[331]

On May 31, 2000, Danny was involved in an incident for allegedly hitting his friend, Karl Louis Busch's mother, Carol Ann Pawlowski. In 2000, when he was 17 years old, Troya pled guilty to this felony battery. During the plea, it was agreed by counsel he struck the mother of a friend in the face with his fist, which knocked her to the ground, and then he struck her again. T8741. As a result, she suffered nerve damage and broken bones in her face and eye socket, requiring reconstructive surgery. T8741-42. The woman's son and another friend of Troya

---

[326] DJJ Records Appendix L-33
[327] PBC School Records Appendix L-27
[328] DJJ Records Appendix L-33
[329] DJJ Records Appendix L-33
[330] DJJ Records Appendix L-33
[331] DJJ Records Appendix L-33

witnessed the incident. They testified she initiated the physical confrontation, tripped, fell and hit a cinderblock; there was testimony she was drunk at the time. T8703, 8707, 8761-65, 8768-69.

Danny was arrested on June 19, 2000 for the felony battery. He pled guilty to battery, burglary and grand theft and was sent to Palm Beach County jail to await his three year sentence.[332] Carol Pawlowski passed away on April 28, 2006 at 49-years-old from Cirrhosis of the liver.[333]

Other potential witnesses to this event did not testify at trial, but could have had they been properly located and interviewed. **Anelle Hernandez** could have testified Carol Pawlowski was a witch, slept with young guys, and was a falling down drunk. She did drugs and was abusive, evil. All of Karl's friends got into fights with Karl's mother. Jerry Santiago, an older Puerto Rican guy with gold teeth, was abused and traumatized by Pawlowski.[334] **Dennis Rivera** was homeless from the age of 15 and could have testified when he was 16 or 17, he stayed with Carol. She would get contracts to refurbish the wooden parts of yachts — sanding and varnishing them — and Dennis would do all the work. She would get tens of thousands of dollars for these jobs and pay him $10 per hour. She drank the rest of the money. She was an alcoholic who drank beer and vodka all day. She snorted coke and smoked weed. She went after young guys.[335] Dennis says the incident changed Danny's whole life. Dennis, who was living with Carol at the time, arrived after the altercation, and Carol was sitting in a corner with her eyes swollen. He asked what happened and Karl said, "you know how Mom gets." He asked Danny what

---

[332] DJJ Records Appendix L-33; Affidavit Mariette Mendez Appendix L-21
[333] Carol Pawlowski SS Death Record Appendix L-34
[334] Affidavit Anelle Hernandez Appendix L-24
[335] Affidavit Dennis Rivera Appendix L-25

happened. He said Carol was drunk and came at him. He pushed her back, but she was drunk and fell on her face on the concrete.[336]

Julio Perez was also there for the Pawlowski incident. He testified at trial that Carol Pawlowski was drunk the entire day that day, which was typical. When she drove up, she almost ran into the boys. She started yelling and slapping Danny, he pushed her (to defend himself) and she stumbled and fell.[337]

While on juvenile probation, Danny took reading and math courses at the Palm Beach Regional Juvenile Center. He achieved C's in both classes.[338]

The Department of Juvenile Justice admitted Danny to the detention facility on June 7, 2000 for the Pawlowski incident as a Youth Offender while he awaited sentencing. [339] While there, he successfully completed education courses as well as completed a Career & Tech program, ranking 4th out of 42 in the class. [340]

**Daniel Troya, at age 17, was exposed as a juvenile to some of the most dangerous and violent prisons in Florida.**

Seventeen-year-old Danny entered the Florida Department of Corrections, South Florida Reception Center for screening on October 26, 2000 to serve a three-year sentence for battery, burglary and grand theft as a Youthful Offender.[341]

**Daniel engaged in more bizarre behavior in prison, and again attempted to commit suicide.**

Danny began exhibiting strange or bizarre behavior, according to medical staff on December 15, 2000. He was placed on administrative confinement "the hole". [342] Daniel

---

[336] Affidavit Dennis Rivera Appendix L-25
[337] Affidavit Julio Perez Appendix L-31
[338] PBC School Records Appendix L-27
[339] DJJ Health Appendix L-35
[340] PBC School Records Appendix L-27
[341] FL DOC Record Appendix L-36

attempted suicide for the second time on December 16, 2000. He overdosed by ingesting all the pills in his possession – including five (5) Claritin (10mg), six (6) Ibuprofen (600 mg), nine-to-ten Doxycycline (100 mg), two (2) Tylenol (325mg) and one (1) tube of toothpaste. He was taken to the South Bay Hospital emergency room and received treatment. The treating physician, Dr. James Davison, recommended suicide watch for the next two days and he was discharged.[343] He was taken to Zephyrhills Correctional institution from December 17-19, 2000 for suicide watch.[344] He was then transferred back to Hillsborough on December 19, 2000 and placed in administrative confinement for eight days. His reasoning for the suicide attempt was, "I got mad at the officer and took the pills".[345]

**Imprisonment in the "Gladiator Camp" and the brutal beatings by other inmates and correctional officers forever hardened Daniel Troya.**

On November 9, 2001, 18-year-old Danny was transferred from Hillsborough Correctional Institution to Brevard Correctional Institution, which inmates have nicknamed as the "Gladiator" prison.[346] It was a disciplinary transfer – he had been written up so many times at Hillsborough and continuously placed in the hole.

A number of witnesses could have testified to the brutality of the prison. This available testimony is discussed in more detail in the section on counsel's failure to adequately mitigate the escape charge. In summary, Dennis Rivera could have testified it is called Gladiator school when someone from 17 to 24 goes to adult jail. There were multiple fights a day. If an inmate

---

[342] FLDOC Medical Appendix L-37; FLDOC Record Appendix L-36
[343] FLDOC Medical Appendix L-37
[344] FLDOC Records Appendix L-37
[345] FLDOC Records Appendix L-37
[346] DJJ Records Appendix L-33

had commissary, he would get jumped for it. [347] When he was first sent there, he was horrified at the violence and predatory atmosphere.

On his first day in Brevard, Daniel was severely beaten by an older inmate, Robert Barnes. He kicked Danny in the head with his boot several times until he passed out. Danny did not seek medical treatment for his injuries. [348] Fights in this prison occurred regularly and staff rarely intervened, often beating the inmates themselves for violations. The institution had an open door policy, making it possible for inmates to enter cells and attack other inmates. Inmates slept with their shoes on, ready to either fight or run. Danny slept with a knife in his hand and another in his boot because he never knew if he was going to get attacked.

This institution also had a "slave culture" which broke down along racial lines. According to Erik Vonlydick, these "slaves," referred to as "jun-juns" would be used by bigger, older inmates to clean their cells, do their laundry, put money in their commissary accounts and anything else the bigger inmate wanted from them.[349] White inmates would stage their own fights to keep the other gangs from coming in and starting a fight with them. Although the fights were staged, they really fought or it wouldn't have been believable. [350] Pierrot Nicolas, [351] another former inmate of Brevard, from 2001 to 2004, also calls it a "Gladiator Camp". He was 18 years old when he arrived there. He was told to step up (meaning fight) to earn respect and to show he was not afraid. He got into his first fight while at the Florida Reception Center.[352]  He would have testified it was crazy in there and that camp got you ready to survive any other camp. Brevard was all about fights and shanks, and there were fights there every day. He learned to

---

[347] Affidavit Dennis Rivera Appendix L-25
[348] Appendix K-2
[349] Affidavit Erik Vonlydick Appendix I-1
[350] Affidavit Erik Vonlydick Appendix I-1
[351] Affidavit Pierrot Nicolas Appendix I-2
[352] Affidavit Pierrot Nicolas Appendix I-2

pick a lock within the first five minutes of being in Brevard.[353]  If a new guy, usually a white male, arrived on the bus and had a black eye, he was automatically a target because it was assumed he had already lost a fight. He was seen as weak or soft and he would be robbed of property.[354]

One inmate had a sock hanging out of his pants pocket to make it look like he was holding a "lock in a sock". New guys were scared they were going to get hit, so they would open their locker and the inmate with the sock would take whatever he wanted.[355]  Some inmates slept with their possessions, like cigarettes and pictures - anything that was valuable so no one could steal it from them.[356]  There was an open bay area. Pods were usually occupied by inmates from the same gang affiliation or neighborhoods, but the open bay had mixed inmates, resulting in increased tension.[357]  If you sensed tension in the dorms, you usually slept with your shoes tied and a shank close to you. You were always on guard.[358]  Nicolas saw an inmate slap another inmate really hard just because his name was not called at mail call. He was mad because he did not get any mail.[359]

Shortly after he arrived at Brevard in 2001, Nicolas saw one inmate light another inmate on fire by filling an eyedropper with gasoline and spraying it on the other inmate. He jammed the cell door shut to make it difficult for staff to get to him to help.[360] Nicolas said if you did not make someone pay for doing you wrong, then you could become a target.[361]

---

[353] Affidavit Pierrot Nicolas Appendix I-2
[354] Affidavit Pierrot Nicolas Appendix I-2
[355] Affidavit Pierrot Nicolas Appendix I-2
[356] Affidavit Pierrot Nicolas Appendix I-2
[357] Affidavit Pierrot Nicolas Appendix I-2
[358] Affidavit Pierrot Nicolas Appendix I-2
[359] Affidavit Pierrot Nicolas Appendix I-2
[360] Affidavit Pierrot Nicolas Appendix I-2
[361] Affidavit Pierrot Nicolas Appendix I-2

The single officer assigned to each dorm couldn't watch everyone, everywhere. Every pod had a blind spot called "the pit". If an inmate wanted to fight you inside, he would invite you to the pit.[362]  The blind spot used similarly in the recreation yard was called "the third," a handball court out of the officers' view. Often those fights were bloody.[363] The blind spot in the main yard for fighting was called "black top," an open space by the main gate near the warehouse and the auto shop.[364]  If anything happened that needed resolution, you were told to go to "the third".[365]

There were a lot of gangs at Brevard - the Latin Kings, the UK's (United Kings, a branch of the Latin Kings, but allowed blacks), Sur 13, Crips, Gangster Disciples and the Bloods. The Sur 13 gang was a Mexican gang you went to for weapons and cell-reassignments. They got along well with the officers so they could get cell-reassignments approved.[366] There was a riot in 2004. All the gangs were in the yard in their groups when it started. [367]

Brevard also had the "Doom Squad", which consisted of four officers who would pull you from your cell and take you to the Sergeant's office between the C and D dorms and beat you up. They were called the Doom Squad because if they were coming in, you knew they were going to cause doom. If a shift sergeant reported problems on their shift, the Doom Squad would take the troublemaker out and beat him up. Inmates never went to medical afterward since it would only make it worse for them. They never beat an inmate up bad enough to need serious medical treatment.[368] Most inmates would rather be beaten by officers than be labeled a snitch because

---

[362] Affidavit Pierrot Nicolas Appendix I-2
[363] Affidavit Pierrot Nicolas Appendix I-2
[364] Affidavit Pierrot Nicolas Appendix I-2
[365] Affidavit Pierrot Nicolas Appendix I-2
[366] Affidavit Pierrot Nicolas Appendix I-2
[367] Affidavit Pierrot Nicolas Appendix I-2
[368] Affidavit Pierrot Nicolas Appendix I-2

other inmates would assume you were a snitch every time you were taken out.[369] The Doom Squad officers were all white middle-aged males with no rank.[370] If an inmate filed a grievance and it made its way up to the Captain, the inmate would be placed in confinement for filing it.[371]

One female officer sold naked pictures of herself from the shoulders down to the inmates. This officer was close to two inmates. She would send all of the inmates to the receation yard except for one of her boys. One known as "Jack Boy" would brag about it. He would have cigarettes, weed and a cell phone that he got through her. Jack Boy was the leader of the Gangster Disciples. When officers searched his property, they found the nude photos of the officer, recognized by the tattoo removal scar on her right arm.[372] Around 2004-2005, a white female officer was caught in the barbershop having sex with two inmates who were members of the Latin Kings. She had no respect for any inmates who weren't members of that gang. She was fired on the spot and escorted off the grounds.[373]

Nicolas describes the "jun-jun's" as inmates who couldn't fight, were soft and scared. They had it rough; they were the targets, but only in the dorms. Some used the jun-jun system to hustle by trading services, like washing people's laundry for food and commissary - they were voluntary jun-jun's because they benefited from it. Then there were the jun-jun's who were forced to do whatever they had to do to keep from being beaten up by bigger inmates.[374]

Nicolas said in 2003, a kid called "CoCo" killed another kid "Dee". Dee was two weeks from getting out, but he showed loyalty to somebody that had a beef with the Kings, so he was

---

[369] Affidavit Pierrot Nicolas Appendix I-2
[370] Affidavit Pierrot Nicolas Appendix I-2
[371] Affidavit Pierrot Nicolas Appendix I-2
[372] Affidavit Pierrot Nicolas Appendix I-2
[373] Affidavit Pierrot Nicolas Appendix I-2
[374] Affidavit Pierrot Nicolas Appendix I-2

hit because of that loyalty. [375] People were hit in the head all the time at Brevard. One inmate shoved another inmate's head down into the water fountain so hard that he lost four or five teeth.[376]

The horrific situation at Brevard was left untouched at trial despite having Eric Vonlydick available to testify. Ample other inmates such as Pierrot Nicolas could have testified to the horrific conditions that made it no wonder Danny Troya wanted to escape and would have let the jury no the extensive trauma and hardship that formed who Danny was and is. Despite the troubles at Brevard, Danny was still able to earn his GED with the Florida Department of Education on August 28, 2002.[377]

**Daniel Troya attempted suicide a third time while imprisoned, by swallowing razor blades, at the age of 19.**

On September 11, 2002, shortly after earning his GED, 19-year-old Danny attempted suicide for a third time by swallowing razor blades while incarcerated. The medical staff reported he was somewhat disheveled and his behavior was quiet, suicidal, withdrawn. He felt depressed and hopeless. He was placed on suicide watch in special unit (SOS II). He was x-rayed the following day which revealed a foreign body to the right of the spine at the level of the L2 transverse process. He reported a history of suicide, that he swallowed 60-70 pills while incarcerated at Hillsborough C.I.  He stated he would do anything to get out of Brevard; it was such a bad place.[378]

Danny reported being assaulted by corrections staff in the laundry room of WA-Dorm while at the Brevard Work Camp on November 9, 2002. He reported being kicked and punched

---

[375] Affidavit Pierrot Nicolas
[376] Affidavit Pierrot Nicolas
[377] Affidavit Pierrot Nicolas
[378] FLDOC Medical

several times by the third shift staff, and that the first shift staff refused to take him to medical when he claimed a medical emergency.[379] The next day, he reported the assault to the Lieutenant's office at the Brevard Work Camp, declaring a medical emergency. After 18 days of being at the work camp, he was transferred back to the main unit and received medical care.[380]

**The supposed escape was just an effort to be transferred out of the brutal prison.**

On November 26, 2002, Daniel, along with two other inmates, Jeffrey Burleson and Erik Vonlydick were apprehended outside the dorms and were charged with escape or attempted escape and were placed in administrative confinement.[381] The government introduced extensive hearsay testimony about the escape at sentencing, and the defense did little to rebut it. The factual and legal bases for mitigating the escape conviction are discussed in more detail in a separate section. The defense did not call a number of witnesses to counter the government's factual narrative, including Erik Vonlydick, another participant.[382]

Vonlydick would have testified to a number of mitigating facts, including Danny did not take part in any of the planning or preparation for the escape, planned to turn himself in after a couple of days, and just wanted to get out of Brevard. He was afraid, that because he was close to his release date, the officers would try to find a way to bring something up against him to extend his prison term, and he wanted a transfer to avoid that.[383] According to Vonlydick, everyone wanted out of Brevard, which is why Vonlydick and Burleson planned the escape in the first place.[384]

---

[379] DEX 1 Appendix L-38
[380] FL DOC Medical Appendix L-37; DEX 1 Appendix L-38; FL DOC Records Appendix L-36
[381] FL DOC Recods Appendix L-36
[382] Affidavit Erik Vonlydick Appendix I-1
[383] Affidavit Erik Vonlydick Appendix I-1
[384] Affidavit Erik Vonlydick Appendix I-1

When Danny was released from Brevard on April 20, 2003, he was a changed man – more educated in criminal activity.[385]

### F. Trial counsel's failures to properly investigate, interview and present witnesses singly and together prejudiced Daniel Troya.

Whether because the trial team waited way too late to contact various witnesses, did not make the time to conduct appropriate mitigation interviews, weren't aware of just what mitigating evidence they had collected, or a combination of all of these deficiencies, defense counsel did not present the compelling mitigation that was available even from witnesses they were aware of. Had these witnesses been presented, they could have greatly supported the otherwise weak attempts counsel made to show the jury that Danny Troya endured traumatic experiences as a child and teenager; had positive traits; and was negatively influenced by an older relative in whose care he was left for long stretches of time.  Had defense counsel presented this evidence, the prosecution would not have been able to ridicule the themes they touched on at sentencing.  Moreover, had they effectively interviewed the available witnesses, the jurors would have learned far more about Mr. Troya, including about the violent and chaotic school, neighborhood and prisons in which he grew up; the neglect his parents, however well meaning, exhibited in raising him, including their failures to address the damaging environment at school, protect him from local violence, or shield him from the influences of his Uncle Tito; and the ability of many of those who met him to see the good he was capable of despite his flaws – all highly relevant to the jury's decision of whether he should live in prison or should die for his crimes. The failures of trial counsel to investigate and prepare these and other witnesses was deeply prejudicial to their client.

---

[385] Affidavit of Mariette Mendez Appendix L-21

**XXVII.    MR. TROYA'S CONVICTION AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE.**

Mr. Troya's convictions and sentences are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Mr. Troya's guilt and penalty phases violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, confront the witnesses against him, a reliable determination of guilt and penalty, fundamental fairness, and to be free of cruel and unusual punishment.[386]

Mr. Troya incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto. In addition, Mr. Troya re-urges all objections, arguments, and claims of error made at trial and during direct appeal proceedings, and incorporates by reference herein those prior objections, arguments and claims of error.

The cumulative effect of these errors resulted in an abridgment of the fundamental fairness of the trial process during all phases of the trial process. Each of these errors deprived Mr. Troya of important constitutional rights, including but not limited to his right to due process, equal protection, effective counsel, to present a defense and confront the witnesses against him, an impartial jury, and to be free of cruel and unusual punishment. Thus, even if the prejudice

---

[386] For example, even where individual error is insufficient to raise a probability that the outcome of a trial would have been different, the cumulative impact of *Brady* and *Strickland* error can suffice to warrant habeas relief. *See Kubat v. Thieret,* 867 F.2d 351, 370 (7th Cir. 1989) (relying on "errors" language from *Strickland* to find that "*Strickland* clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced");
*Dugas v. Coplan*, 428 F.3d 317, 335 (1st Cir. 2005) (adopting the reasoning from *Kubat*); *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001) (finding that "totality of the circumstances"
language from *Strickland* mandates an aggregate error analysis); *Richards v. Quarterman*, 566
F.3d 553, 564 (5th Cir. 2007) ("We will address each aspect of Davis's performance the district
court found deficient before considering whether Richards was cumulatively prejudiced thereby.");
*Phillips v. Woodford*, 267 F.3d 966 (9th Cir. 2001) (remanding for cumulative prejudice analysis of *Brady*
and *Strickland* error); and *Gonzales v. McKune*, 247 F.3d 1066, 1078
n. 4 (10th Cir. 2001), *vacated in part on other grounds*, 279 F.3d 922, 925–26 (10th Cir. 2002) (*en banc*)
(noting that language from *Strickland* "makes it clear that all acts of inadequate performance may be
cumulated in order to conduct the prejudice prong").

433

flowing from any single claim presented in this Petition fails to justify reversal, the cumulative prejudice that resulted from these errors deprived Mr. Troya of a trial that was fundamentally fair and make it likely that, but for these errors, the outcome of the trial could have been different. These constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless.

In any event, these violations of Mr. Troya's rights had a substantial and injurious effect or influence on the guilt and penalty judgments, rendering them fundamentally unfair. In particular, the imposition of death sentences at the conclusion of a trial as riddled with errors as this one was represents a substantial miscarriage of justice.

Finally, should this §2255 motion require amendment, the need is due to the unavailability of evidence despite the diligence of Mr. Troya and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Prayer for Relief**.

WHEREFORE, Movant Daniel Troya asks that this Court provide the following relief:

1. Permit Movant to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his Motion, and refute any defenses thereto raised by the Respondent's Answer;

2. Permit Movant to Amend this Petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Motion, and, to allow the amendment to relate back to the date of the filing of his Section 2255 Motion;

3. Require Respondent to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases in the United States District Court, identifying all proceedings conducted in Movant's case, including

any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

4.      Permit Movant to file a traverse to the Respondent's answer, responding to any affirmative defenses raised by the Answer;

5.      That Movant be permitted to file a Memorandum of Law in Support of this Motion in accordance with a briefing schedule established by this Court;

6.      Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Motion, or by Movant's Response to any Affirmative Defenses raised by the Respondent. Because Movant has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

7.      Permit oral argument as appropriate and required;

8.      Vacate Movant's convictions and sentences and order that appropriate retrial and/or sentencing hearings be conducted; and

9.      Grant such further and additional relief as may be just.

DATED this 31st day of May, 2016.

Respectfully Submitted,

/s/ *Steven H. Malone*
STEVEN H. MALONE
Steven H. Malone, P.A.
1217 South Flagler Drive
Second Floor
West Palm Beach, FL 33401
Tele: 561-805-5805
Email: stevenhmalone@bellsouth.net
Florida Bar No. 305545

/s/ *D. Todd Doss*
D. TODD DOSS
Assistant Federal Defender
Federal Defender's Office, MDFL
201 South Orange Ave., Ste. 300
Orlando, FL 32801
Tele: 407-648-6338
Email: todd_doss@fd.org
Florida Bar No. 0910384
*Counsel for Defendant Daniel Troya*

435

## CERTIFICATION PURSUANT TO RULE 2(b)(5)
## OF THE RULES GOVERNING SECTION 2255 PROCEEDINGS

The undersigned being authorized to sign for the movant, declares under penalty of perjury that the foregoing is true and correcti to the best of my knowledge.

Executed on: May 31, 2016

/s/ *D. Todd Doss*
D. TODD DOSS
Assistant Federal Defender
Federal Defender's Office, MDFL
201 South Orange Ave., Ste. 300
Orlando, FL 32801
Tele: 407-648-6338
Email: todd_doss@fd.org
Florida Bar No. 0910384

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 31, 2016, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record in this case, either via transmission of the Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic filing.

/s/ *Steven H. Malone*
STEVEN H. MALONE

/s/ *D. Todd Doss*
D. TODD DOSS

436