**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

Daniel A. Troya,
Movant,
v.                                                Civil Action No. 16-80700-Civ-Scola

United States of America,
Respondent.
_____

### MOVANT TROYA'S MOTION TO INTERVIEW JURORS

Pursuant to Local Rule 11.1(e), *Local Rules of the United States District Court, Southern District of Florida,* and the Fifth, Sixth and Eighth Amendments to the United States Constitution, Daniel Troya moves this Court for permission to interview all of the jurors who served on the trial jury of this case. Prior to filing the Section 2255 motion, the post-conviction defense team learned several jurors: Diane Gooch, Mark Sollenberger, Connie Thomas, Dorothy Barba, Donald E. Little, and Donald G. Boser, appear to have misrepresented material facts about their background in response to specific questions during voir dire. Good cause has been shown to interview both these and the remaining jurors to determine whether their verdicts at both guilt and sentencing are subject to legal challenge.

Undersigned has conferred with counsel for the government and is advised the government opposes this motion.

In support of this motion, Mr. Troya states:

Prior to filing the §2255 motion, Mr. Troya moved to interview jurors who served in this case. That motion was denied without prejudice to refile with notice to the government. Doc 1183. Since that time, Mr. Troya has filed his §2255 motion, which includes a claim of juror

1

misconduct.  *See* **Claim V**, P. 41.  Mr. Troya continues to seek to interview jurors, and so refiles this motion.

Local Rule 11.1(e) forbids attorneys from interviewing jurors without court order[1]:

> **(e) Relations with Jury.** Before, during, and after the trial, a lawyer should avoid conversing or otherwise communicating with a juror on any subject, whether pertaining to the case or not. Provided, however, after the jury has been discharged, upon application in writing and for good cause shown, the Court may allow counsel to interview jurors to determine whether their verdict is subject to legal challenge. In this event, the Court shall enter an order limiting the time, place, and circumstances under which the interviews shall be conducted. The scope of the interviews should be restricted and caution should be used to avoid embarrassment to any juror and to avoid influencing the juror's action in any subsequent jury services.

There is good cause to interview jurors who sat on this case, as demonstrated by the facts and law set forth below, and in the claim of juror misconduct in the Section 2255 motion.  *See* **Claim V**, P. 41.  Diane Gooch, Mark Sollenberger, Connie Thomas, Dorothy Barba, Donald E. Little, and Donald G. Boser all served on the jury that convicted Mr. Troya in the above-styled cause.[2] As in any trial, these jurors went through the *voir dire* process, including answering juror questionnaires and questioning under oath. In answering the *voir dire* questions, the listed jurors appear to have provided answers that were untrue and/or misleading. Specifically, the listed jurors failed to reveal certain telling personal information. If this critical information had been properly and truthfully disclosed, Mr. Troya would have challenged these jurors for cause and excluded them from jury service. Mr. Troya's attorneys now seek to contact and interview these and the remaining jurors to explore the circumstances of the misconduct and obtain the necessary

---

[1] The "Local Rules shall apply in all proceedings in civil and criminal actions except where otherwise indicated. " Rule 1.1.

[2] Dorothy Barba and Diane Gooch were alternate jurors who were excused prior to deliberations.

2

facts to successfully present the information to this Court in a fully pled § 2255 motion and evidentiary hearing.

As alleged in the § 2255 motion, Mr. Troya's defense team has preliminarily discovered the following information about the aforementioned jurors:

**A. <u>Diane Gooch</u> was a convicted felon and a cooperating government witness in a prior case and failed to disclose those and other facts.**

Diane Gooch served on the jury as an alternate, yet she was statutorily unqualified for jury service pursuant to 28 U.S.C.A. § 1865(b)(5), which disqualifies someone who: "has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored." Diane Gooch had been previously convicted of official misconduct, a crime punishable by imprisonment for over a year. During voir dire, Ms. Gooch was asked:

- *Jury Question #18*: "Have you or any family members or friends ever worked for, or applied to work for, any state attorney's office, United States Attorney's Office, **or any other** city, county, **state** or federal **office or agency**? If YES, who, and for what agency?" Mrs. Gooch responded, "No."

- *Jury Question # 20*: "Have you ever been a witness to a crime? If YES, please explain the circumstances:" Mrs. Gooch checked the "No" line, avoiding further explanation.

Mrs. Gooch **failed to disclose** she previously worked in the Title Section of New Jersey's State Department of Motor Vehicles from approximately 1997-2003. According to public records, while employed at this job Mrs. Gooch suffered a felony conviction for official misconduct and was sentenced to two (2) years of probation, 30 hours of community service, and was required to forfeit her public office position. *Appendix B-1*. The records show that on June 20, 1996, Ms. Gooch was originally indicted on one count of second degree felony of conspiracy

to commit the crime of Official Misconduct, one count of Official Misconduct in the second degree, and one count of Tampering with Public Records, all occurring on or about November 7, 1994. *Appendix B-1* at 8-14.[3] Allegedly, Mrs. Gooch received two checks made payable to the New Jersey Division of Motor Vehicles and the Automobile Insurance Surcharge Collection Fund. These checks were prepared and backdated by a co-conspirator for the purpose of restoring that co-conspirators driver's license prior to November 7, 1994; the date on which that co-conspirator was issued a summons for driving while license suspended. On October 15, 1996, she pled to and was adjudicated guilty of a lesser offense of third degree Official Misconduct on Count 2, and the other two counts were dismissed. *Appendix B-1 at 4*.

The 1994 version of the crime to which Ms. Gooch pled is at *Appendix B-2*. The statutory subsection to which she pled is 2C:30-2, which provides in part: "Official misconduct is a crime of the second degree. If the benefit obtained or sought to be obtained, or of which another is deprived or sought to be deprived, is of a value of $200.00 or less, the offense of official misconduct is a crime of the third degree." While she was ultimately sentenced to probation, the third degree crime to which Mrs. Gooch pled was a felony punishable by three to five years in prison pursuant to *N.J.S.* 2C:43-6 (3), which provides: "a. Except as otherwise provided, a person who has been convicted of a crime may be sentenced to imprisonment, as follows: ...(3) "In the case of a crime of the third degree, for a specified term of years which shall be fixed by the court and shall be between three and five years." *Appendix B-4*.

Had this felony been disclosed in response to the aforementioned question or the basic juror qualification questions, Mrs. Gooch would have been disqualified from jury service.

---

[3] The appendix has been previously filed with the §2255 motion.

The circumstances of the offense with which Mrs. Gooch was charged – a conspiracy – as well as the plea papers, show Mrs. Gooch was also a witness to a crime. In fact, as part of her plea she agreed to cooperate with the government as a witness. A condition of the plea was that "Diane Gooch will cooperate with state in all matters pertaining to this investigation." *Appendix B-1 at 7*. Mrs. Gooch had obviously been a witness to a crime, as well as a government cooperator, both extremely relevant to her ability to serve fairly, and both contrary to what she swore to in her *voir dire* answers.

During the trial, the Government brought to the Court's attention that a U.S. Probation Officer had received information that Diane Gooch was discussing the case while at work. The Court decided to not inquire into the matter because she was an alternate. *Appendix B-3 at 2-4*.

**B.  Mark Sollenberger failed to disclose the full nature and extent of various family members' problems with illegal drugs.**

Mark Sollenberger served on the jury at both guilt and penalty phases and was engaged in the following questions and answers during voir dire:

- *Jury Question #24:* **"Have you or any family members or friends ever had a problem with illegal drugs?"** Mr. Sollenberger stated, "yes", "three brother-in-law's – several convictions. DUI." The Court only probed to the point of asking if anything about their difficulties would affect his ability to judge the evidence in this case and he stated "no."

Contrary to Mr. Sollenberger's sworn statements, a number of his family members in addition to his brothers in law appeared to have substantial problems with illegal drugs, and those problems did not only include DUI's. Mr. Sollenberger **failed to disclose** his son, David Andrew Sollenberger, had been arrested in Florida on December 22, 2008, for drug paraphernalia – 11 counts – and for possession of cannabis. *Appendix B-5*. Mr. Sollenberger initially appeared before this Court for jury selection on January 06, 2009, a mere fifteen days after his son's arrest and first appearance on December 22, 2009. *Appendix B-5*.   The

Information was filed in Mr. Sollenberger's son's case on January 2 and 5, 2009, right on the eve of trial. Subsequently, while the trial was in progress Mr. Sollenberger's son resolved his case with a deferred prosecution agreement on January 29, 2009. *Id*. Mr. Sollenberger completely failed to disclose this information to this Court.

Mr. Sollenberger also **failed to disclose** that his brother, Robert Kent Sollenberger, was arrested in 1987 for possession of cocaine with intent to deliver and delivery of a controlled substance to a minor. *Appendix B-7*. Allegedly, Robert Sollenberger worked at American Prep School and was the target of an investigation about his receipt of cocaine from students in return for higher grades and extra credit. *Appendix B-7* at 14. Law enforcement reportedly placed a sixteen year-old confidential informant in the school who arranged a drug deal with Mr. Sollenberger. *Id*. Mr. Sollenberger assured the confidential informant that he had taken care of the grades. Then, the sixteen year-old confidential informant gave Mr. Sollenberger two grams of cocaine and Mr. Sollenberger gave the sixteen year-old three 500 mg. Darvon tablets and told him he should take them with beer. *Id*.

Additionally, Mr. Sollenberger **failed to disclose** that two of his brothers-in-law, Roy Livermore and Richard Livermore, had extensive criminal records which included drug charges.[4] Roy Livermore's criminal history reveals that between 1980 and 2006 he was convicted on three occasions of possession of a controlled substance, once for an aggravated assault, and once for a grand theft. These drugs reportedly include Quaaludes, Darvocet, and marijuana. *Appendix B-8 and B-9,*

Reportedly, during one criminal incident in March 1981, Roy Livermore was observed staggering and bumping into people at a bowling alley and generally causing a disturbance. A

---

[4] Mr. Sollenberger has been married to his wife since 1981.

search incident to arrest revealed 43 Lemmon 714 Quaaludes. *Appendix B-9 at 4*. Mr. Livermore's sentence included a term of probation, including a special condition of which was to attend the Spectrum Program for drug rehabilitation. *Id*.

Mr. Sollenberger further **failed to disclose** that a second brother-in-law, Richard Livermore, also has a long history of offenses between 1977 and 2006, including possession of weapons, possession of a controlled substance, obtaining a substance by fraud, assault, aggravated assault, aggravated battery, and cocaine possession. *Appendix B-10, B-11, B-12 and B-13*. In addition, Mr. Livermore has a 2006 felony DUI, which was generally disclosed by Mr. Sollenberger.

Richard Livermore's first criminal offense involving drugs occurred in 1986. He was convicted of obtaining a controlled substance by fraud and possession of Diazepam. *Appendix B-10*. Reportedly, a fraudulent prescription was called in for Diazepam, using someone's name other than Mr. Livermore's. *Appendix B-10 at 5*. When Mr. Livermore arrived at the pharmacy he was arrested, subsequently convicted, and sentenced to a term of probation. Ultimately, Mr. Livermore violated his probation and served time in prison. *Id*.

After serving his prison term, Mr. Livermore was again sentenced to two years of prison on May 1, 1989, for a drug offense, possession of cocaine. *Appendix B-12*. Mr. Livermore was reportedly observed by undercover officers buying crack cocaine and attempted to flee upon detection. *Appendix B-12 at 14*.

Shortly after his release from prison in late 1989, Mr. Livermore committed another drug offense and was convicted of possession of cocaine and possession of cannabis. *Appendix B-13*. Reportedly, Mr. Livermore was again observed by an officer buying crack cocaine. *Appendix B-13 at 12*.

**C. <u>Connie Thomas</u> failed to disclose information regarding the illegal firearms and drug problems of her family members.**

Connie Thomas served on the jury and engaged in the following questions and answers during voir dire:

- *Jury Question #18:* **"Have you or any family members or friends ever worked for, or applied to work for, any state attorney's office, United States Attorney's Office, or any other city, county, state or federal office or agency? If YES, who, and for what agency?"** Ms. Thomas answered "No."

Defense investigation reveals that Teresa Thomas, believed to be Connie Thomas' sister, has worked in the State Attorney's Office, however, the dates of her service are unclear. *Appendix B-14*.

- *Jury Question #23:* **"Have you or any family members or friends ever had a problem involving firearms, whether used legally or illegally? If YES, please explain."** Ms. Thomas answered "no".

Ms. Thomas **<u>failed to disclose</u>** that her ex-husband, John Thomas Mincey, Jr., did have a substantial problem involving the illegal possession of firearms. He was convicted during their marriage of possession of firearm by a convicted felon and sentenced on that charge in 1993. *Appendix B-15*.

Ms. Thomas also **<u>failed to disclose</u>** her ex-brother-in-law, John Burrows Hutchinson, Sr., served time in the Florida Department of Corrections for carrying a concealed firearm. *Appendix B-16*.

- *Jury Question #24:* **"Have you or any family members or friends ever had a problem with illegal drugs? If YES, please explain."** Ms. Thomas answered "Yes," "Possession / selling drugs. Never used." The Court questioned her about this response on 01/06/2009, pgs. 238-240. She explained it was her **nephew** and that she did not attend any of his court hearings.

Ms. Thomas further **failed to disclose** that her brother, Willie James Thomas, had an extensive criminal history involving problems with illegal drugs prior to the dates of *voir dire*. The convictions include trafficking cocaine, multiple possession of cocaine charges, possession of marijuana, and perjury. Her brother appears to have served at least 39 months in federal prison on a perjury charge and his supervised release was violated for separate incidents involving trafficking cocaine and possession of cocaine. *Appendix B-17 and B-18.*

Ms. Thomas additionally **failed to disclose** that her ex-brother-in-law, John Burrows Hutchinson, Sr., served time in the Florida Department of Corrections for purchase of cocaine in 1994. *Appendix B-19.*

### D. Dorothy Barba failed to disclose her family member's problem with illegal drugs.

Dorothy Barba served on the jury as an alternate and engaged in the following questions and answers during *voir dire*:

- *Jury Question #24:* **"Have you or any family members or friends ever had a problem with illegal drugs? If YES, please explain."** Mrs. Barba responded, "Yes," "My son 20 years ago for smoking pot." During voir dire she stated, "…I was glad he got caught." [5]

Mrs. Barba **failed to disclose** her grandson, Justin Patrick Guthrie, had a problem with illegal drugs. He had three arrests and two convictions for drug possession prior to her jury service. *Appendix B-21, B-22, and B-23.* It appears her grandson's drug issues were likely occurring during the time of her service as well. A mere two months after deliberations concluded, Mrs. Barba's grandson was arrested for trafficking oxycodone and obtaining drugs by fraud on June 15, 2009, obtaining drugs by fraud and marijuana

---

- [5] Accurint reveals her son, Dustin Walker, was sentenced with the Florida Department of Corrections on 09/23/1986 for constructive possession of controlled substance. Dustin Walker has not had any subsequent offenses except for one DUI.

possession on August 27, 2009, trafficking oxycodone and obtaining drugs by fraud on February 9, 2010, and multiple charges of possession with intent to sell on March 22, 2010. Mrs. Barba's grandson served time in the Florida Department of Corrections for these offenses. *Appendix B-21* at 7.

**E. Juror Donald Little failed to disclose information regarding the illegal firearms and drug problems of his family members.**

Donald Little served on the jury at both guilt and sentencing phases and provided the following answers to questions during voir dire:

- *Jury Questionnaire #23:* **"Have you or any family members or friends ever had a problem involving firearms, whether used legally or illegally? If YES, please explain."** Mr. Little answered: "No."

- *Jury Questionnaire #24:* **"Have you or any family members or friends ever had a problem with illegal drugs? If YES, please explain."** Mr. Little answered: "Yes" and further stated, "A step sister who passed away." When questioned further on 01/22/2009, he explained it was "… a new step sister, new family. My mother-in-law remarried, and I didn't know them that well".[6]

Mr. Little **failed to disclose** that his son-in-law, Juan Francisco Gonzales, was convicted of felonies involving firearms and violence, including the Florida offenses of possession of firearm by a convicted felon, delivery of cocaine, possession with intent to sell, burglary, grand theft, and robbery. These offenses spanned the time period from 1993-2007, before jury selection in this case began.

Records reveal that Mr. Gonzales was sentenced to four years in the Florida Department of Corrections for robbery with a firearm.[7] The armed robbery case ran concurrently with a four year sentence in the Florida Department of Corrections for burglary of a car, aiding and abetting the burglary of a conveyance, and aiding and abetting a grand theft. *Appendix B-24 and B-25*.

---

[6] If it was his mother-in-law, Betty Wineman Bentinoff, it would not be a step sister; it would be a step sister-in-law.

[7] Three years of the sentence was the mandatory minimum.

Subsequent to serving his prison sentence for the armed robbery and burglary of the car, Mr. Gonzales served time for delivery of cocaine. Mr. Gonzales was allegedly set up in a controlled buy of cocaine. *Appendix B-26 and B-27*.

Mr. Little further **failed to disclose** that another son-in-law, Cecil Astor Harper, was arrested for possession of cocaine with intent to sell and served time in the Florida Department of Corrections for aggravated battery with great bodily harm pursuant to a sentence imposed in 1998. Allegedly, Mr. Harper stabbed the victim with a broken bottle that caused great bodily harm. *Appendix B-28 and B-29*.

### F. **Donald G. Boser** failed to disclose the illegal drug problems of his brother-in-law.

Donald G. Boser served on the jury at both phases of the trial and gave the following questions and answers during voir dire:

- *Jury Question #24:* **"Have you or any family members or friends ever had a problem with illegal drugs?"** Mr. Boser stated, "no." The Court did not probe any further.

Mr. Boser **failed to disclose** that his brother-in-law, Robert Ries, has a long criminal history that indicates a substance abuse problem. Mr. Ries' criminal history between 1988 and 2006 includes arrests for possession of heroin, possession of cocaine, and possession of a controlled substance.[8] In addition, Mr. Ries appears to have served some time in prison in New York for a drug offense. *Appendix B-30, B-31, and B-32*.

### MEMORANDUM OF LAW

Mr. Troya should be afforded the opportunity to interview all sitting jurors to, in the language of Local Rule 11.1(e), "determine whether their verdict is subject to legal challenge." He has already demonstrated significant reason to believe the identified jurors misled the Court

---

[8] Mr. Boser has been married to his wife since 1999.

11

and counsel during voir dire about material and pertinent facts.  It appears at least these jurors violated their oaths, the Federal Death Penalty Act, and Mr. Troya's constitutional rights to a fair and impartial jury under the Fifth, Sixth and Eighth Amendments. The facts listed above are simply those that Mr. Troya's defense team was able to uncover through researching record databases, social media, and various internet sites. The veracity and scope of these and related facts must be explored further to ensure a jury was constitutionally seated. At a minimum, the above facts reveal several jurors were not fully forthcoming, and that some may have outright lied to the Court and counsel during *voir dire*. This possible deception, which could have resulted in a strike for cause, is sufficient for this Court to permit Mr. Troya's defense team to interview the jurors and alternates in this case. Without such interviews, Mr. Troya was only able to plead the facts as currently known without ever speaking to the listed jurors. *See S.D. Fla. Local R.* 11.1(e) (prohibiting attorneys from communicating with jurors after a trial in any manner without first obtaining leave of court. However, upon motion and a showing of good cause, Rule 11.1(e) permits juror interviews to determine whether the verdict is subject to legal challenge.) The facts as pled already show sufficient cause to believe the verdict is subject to legal challenge.

The facts pled *supra* and in the §2255 motion establish strong *prima facie* evidence that juror misconduct occurred. Time and time again, at least six jurors did not reveal in *voir dire* testimony material information regarding their own criminal history or that of family members that would have resulted in a valid strike for cause. For example, one juror, Diane Gooch, a convicted felon, was not even qualified to sit on the jury. *Appendix B-2*. "It is undisputed that a question about prior felony convictions is material to jury service and that an honest answer from this juror would have provided a basis to challenge her for cause." *Parker v. State of Alabama*

12

*State Tenure Comm'n*, 405 F.3d 1276, 1288 (11th Cir. 2005);  *see also United States v. Carpa,* 271 F.3d 962, 967 n.5 (11th Cir. 2001) (per curiam); *see also* 28 U.S.C. § 1865(b)(5) ("a person shall be deemed qualified to serve on a grand or petit jury unless he has a charge pending against him for the commission of, or has been convicted in State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored.").

Mrs. Gooch is the same juror suspected of further misconduct in discussing the case at work in contravention of this Court's daily admonition not to. The fact she is a convicted felon, for official misconduct and altering official documents no less, as well as having previously been a cooperating government witness, establishes good cause  for further inquiry now, as well as whether additional inquiry was warranted at trial regarding her discussing the case, not only at work, but with other jurors.

The fact Mrs. Gooch was an alternate is a distinction without a difference. As one district court observed:

> Juries necessarily act as a unit and the misconduct of any juror, actual or implied, which forestalls or prevents a fair and proper consideration of the evidence presented in a case, is misconduct of the entire jury, vitiating their verdict and requiring a new trial. *Mathisen v. Norton,* 187 Wash. 240, 60 P.2d 1 (1936). Courts have noted that the statement of an alternate juror to a regular juror prior to the start of deliberations may affect the jury's deliberations in a prejudicial manner, *Weathers v. Kaiser Foundation Hospitals,* 5 Cal.3d 98, 95 Cal.Rptr. 516, 521–22, 485 P.2d 1132, 1137–38 (1971); and that statements made to an alternate juror by an outside party may also prejudice a jury's verdict, *Parker v. Gladden,* 87 S.Ct. at 471 (1966) ("'[I]t would be blinking reality not to recognize the extreme prejudice inherent' in such statements that reached at least three members of the jury and **one alternate member.**") (emphasis added).

*Alejo Jimenez v. Heyliger*, 792 F. Supp. 910, 917 (D.P.R. 1992).

In another case involving questions concerning an alternate juror, the Eleventh Circuit addressed whether a post-trial letter sent by an alternate juror raised a colorable claim that any

13

external influences affected the jury's verdict and whether Rule 606(b) precluded any juror interviews to discover the content of the jury's internal deliberations. *U.S. v. Cuthel*, 903 F.2d 1381, 1382 (11th Cir. 1990). Part of the question turned upon whether an alternate juror was an "outside influence" that would qualify as an exception to Rule 606(b)'s prohibition against post-trial questioning of jurors to impeach their verdict. *Id.* at 1383. On that question, the Eleventh Circuit stated: "We reject appellant's characterization of the alternate juror as an outsider who influenced the jury: it is impossible for the alternate to have been an 'outsider' until the deliberations started; and, after deliberations did start, the alternate was separated from the rest of the jury." *Id.*

Absent juror interviews, the defense is blocked from determining whether this alternate juror might have similarly made statements to the regular jurors affecting the jury's deliberation in a prejudicial manner. Good cause for juror interviews has been established in light of proffered facts showing her mendacity during voir dire, combined with the trial record showing she most likely violated the court's order not to discuss the case with others.

Time and time again, jurors who actually sat on Mr. Troya's case failed to reveal critical material information that could have led to a successful challenge for cause. *See infra.* It is plain from the juror questioning the defense was concerned about potential jurors' experience with their own or family members' drug use and firearms. Rightly so, since it could be accurately anticipated the jurors would hear testimony describing killings and other crimes committed with firearms in the course of drug use and dealing. The defense post-trial investigation shows several jurors must have misled the Court on the very issues central to these concerns: whether family members had drug and firearm problems. Jury Question #24 was: "Have you or any family members or friends ever had a problem with illegal drugs?" Mr. Sollenberger stated,

14

"yes", "three brother-in-law's – several convictions. DUI." Contrary to Mr. Sollenberger's sworn statements, a number of his family members, including his own son, in addition to his brothers in law, appeared to have substantial problems with illegal drugs, and those problems did not just include DUI's.

Asked the same question, Ms. Thomas answered "no," and failed to disclose her brother had an extensive criminal history involving problems with illegal drugs prior to the dates of *voir dire*, and her ex-brother-in-law also had a drug conviction. Ms. Thomas also concealed information relevant to Jury Question #23: "Have you or any family members or friends ever had a problem involving firearms, whether used legally or illegally?" Answering "no" to that question, Ms. Thomas failed to disclose her ex-husband did have a substantial problem involving the illegal possession of firearms. He was convicted during their marriage of possession of firearm by a convicted felon and sentenced on that charge in 1993. Mrs. Barba failed to disclose that her grandson had a problem with illegal drugs. He had three arrests and two convictions for drug possession prior to her jury service, and from subsequent legal issues it appears her grandson's drug issues were likely occurring during the time of her service as well. Mr. Little failed to disclose one son-in-law was convicted of felonies involving drugs, firearms and violence, including the Florida offenses of possession of firearm by a convicted felon, delivery of cocaine, possession with intent to sell, burglary, grand theft, and robbery. These offenses spanned the time period from 1993-2007, before jury selection in this case began. Mr. Little further failed to disclose that another son-in-law was arrested for possession of cocaine with intent to sell and served time in the Florida Department of Corrections for aggravated battery with great bodily harm pursuant to a sentence imposed in 1998. Mr. Boser failed to disclose his brother-in-law has a long criminal history that indicates a substance abuse problem.

15

Mr. Troya seeks the requested juror interviews in order to more conclusively establish the circumstances surrounding this failure and more thoroughly address the factual basis for the juror misconduct in accord with established legal standards.

Section 2255 proceedings represent the best, and last, opportunity for Mr. Troya to investigate and litigate any potential juror misconduct claims. Recently, District Court Judge Sessions, in granting a new trial to a capital § 2255 litigant, Donald Fell, observed that juror misconduct claims are poorly suited to resolution on direct appeal, especially where evidence of misconduct does not appear in the trial record.[9] *United States v. Fell*, 2014 WL 3697810, 14 *n.5 (D. Vt. July 24, 2014). One reason is  the label "juror misconduct" is somewhat of a misnomer, because though personal misconduct is often involved, such a constitutional claim can be based upon other people's conduct and does not need to always involve deliberate or malicious conduct on the part of the juror. *See, e.g., Budoff v. Holiday Inns, Inc.*, 732 F.2d 1523, 1525-26 (6th Cir. 1984) (wrongful death verdict vacated and case remanded for new trial where child of an individual employed by counsel contacted juror's child and discussed case).

Section 2255 capital litigants such as Mr. Troya are in a very different procedural posture than § 2254 capital litigants bringing their habeas claims in federal court. By definition § 2254 capital litigants have already exhausted their federal claims in the state court and, many, particularly in Florida, have had extensive evidentiary hearings on those claims in the state courts.  However, a federal capital § 2255 litigant such as Mr. Troya has not yet been afforded that opportunity.  This further illustrates why Mr. Troya must be allowed to fully investigate and develop any possible juror misconduct claims in these current § 2255 proceedings; unlike state

---

[99] *See, e.g., Massaro v. United States*, 538 U.S. 500, 504-05 (2003)(comparable claims are not well suited for appellate review from the trial record:" When an ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose").

16

prisoners, who have had a prior opportunity to develop extra-record facts in a state collateral proceeding before entering federal court on §2254 petition, this §2255 proceeding represents Mr. Troya's one and only opportunity to investigate, develop, and present extra-record facts in support of his claims.

Heightening the necessity for permitting juror interviews is the fact Mr. Troya is required to bring all cognizable §2255 claims within his motion, including potential amendments. These claims must "state the facts supporting each ground [for relief], and any subsequent amendments must relate back to the originally pled claims. *See* Rule (b)(2) of the *Rules Governing Section 2255 Proceedings for the United States District Courts* (§ 2255 Rules); *see also*, *Mayle v. Felix*, 545 U.S. 644, 650 (2005).

Capital post-conviction counsel have an ethical obligation to investigate any possible cognizable claim of jury misconduct. Counsel "must investigate the possibility that the defendant was judged at either the guilt or penalty phase by one or more jurors who were not impartial." *see* American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (February 2003), 31 Hofstra L. Rev. 913, 1017, n.197 (Feb. 2003); *see also id.* at 1051-52, n.260 ("[C]ounsel investigating a capital case should be particularly alert to the possibility that, notwithstanding surface appearances, one or more jurors were unqualified to sit at either phase of the trial and make every effort to develop the relevant facts whether by interviewing jurors or otherwise. Such inquiries can be 'critical in discovering constitutional errors.'") (citations omitted); *Rompilla v. Beard*, 545 U.S. 374, 387, n.7 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) ("the standards for capital defense work articulated by the American Bar Association (ABA) [are] standards to which we have long referred as

17

'guides to determining what is reasonable'") (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).

The First Circuit, while reviewing a Government appeal from a grant of a new trial in a capital § 2255 petition, aptly articulated the legal framework that governs post-conviction claims of juror dishonesty:

> It is constitutional bedrock that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury.' U.S. Const. amend VI. An impartial jury is one 'capable and willing to decide the case solely on the evidence before it.' *McDonough*, 464 U.S. at 554, 104 S.Ct. 845 (internal quotation marks omitted). The right to an impartial jury is nowhere as precious as when a defendant is on trial for his life. *See Ross v. Oklahoma*, 487 U.S. 81, 85, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

*Sampson v. U.S.*, 724 F.3d 150, 163 (1st Cir. 2013).

District Court Judge Sessions further observed when granting a new trial to capital §2255 litigant, Donald Fell, that:

> The Federal Death Penalty Act ("FDPA") requires a unanimous jury to conclude that the death penalty is warranted. *See* 18 U.S.C. §§ 3593, 3594. "[E]ach juror has the power to decide that a defendant will live rather than die. Each juror must be able to make that decision based solely on the evidence, uninfluenced by personal experiences that he or she may have had." *United States v. Sampson*, 820 F. Supp. 2d 151, 157 (D. Mass. 2011) ("*Sampson I*"). "'When possible juror misconduct is brought to the trial judge's attention he has a duty to investigate and to determine whether there may have been a violation of the [S]ixth [A]mendment.'" *United States v. Lloyd*, 462 F.3d 510, 518 (6th Cir. 2006) (quoting *United States v. Shackleford*, 777 F.2d 1141, 1145 (6th Cir. 1985)). "If even one [partial] juror is empaneled" and the death sentence is imposed, "the [government] is disentitled to execute the sentence." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992).

*U.S. v. Donald Fell*, case no. 2:01-cr-12, Doc. 514 (D.Vt. Jul. 24, 2014).

This Court should grant Mr. Troya's application for his defense team to interview all jurors, including those  identified as most likely misleading the Court and counsel  to gather evidence in support of his §2255 motion. "To obtain a new trial for juror misconduct during *voir dire*, a party must: (1) demonstrate that a juror failed to answer honestly a material question on

18

*voir dire*, and then (2) show that a correct response would have provided a valid basis for a challenge for cause." *U.S. v. Carpa*, 271 F.3d 962, 967 (11th Cir. 2001) (citing *McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 556 (1984)). First, there must be a determination of whether the juror's answer(s) were honest and then a showing of bias that would disqualify a juror. *Id.*; *see also, Bank Atlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1473 (11th Cir. 1992); *U.S. v. Perkins*, 748 F.2d 1519, 1532 (11th Cir. 1984). If the first prong is met, the question then becomes would that juror be subject to a valid challenge for cause. Jurors are typically subject to challenges for cause if they are biased or do not meet the statutory qualifications. 2 Charles Alan Wright et al., **Federal Practice and Procedure** § 382 (4th ed. Updated Apr. 2013).

In light of the evidence proffered so far by Mr. Troya, it is respectfully submitted he has met the "good cause" requirement of Local Rule 11.1(e) and that this Court should permit juror interviews.

To not permit such interviews would violate Mr. Troya's Fifth Amendment due process and equal protection rights because many other similarly situated capital §2255 litigants have been permitted to conduct juror interviews. Indeed, many jurisdictions do not even have a prohibition against juror interviews or a rule requiring judicial approval to conduct juror interviews. For example, in *United States v. Fell*, 944 F. Supp. 2d 297 (D.Vt. 2013), there was no rule prohibiting post-conviction juror contact. Therefore, Mr. Fell's attorneys were able to freely contact and interview jurors, and thus develop relevant extra-record facts that ultimately convinced the district court to grant him a new trial based upon his juror misconduct claims. *U.S. v. Donald Fell*, case no. 2:01-cr-12, Doc. 514 (D.Vt. Jul. 24, 2014).

19

Mr. Fell's case is just one example of unrestrained access to jurors. Many other districts also do not have rules governing post-conviction contact with jurors. A review of all the capital § 2255 cases that have been filed within the last five years reveals that there has only been a single case out of 16 where a court has affirmatively denied a request to interview jurors. The table is reproduced below:

| Case Name | Dist./Case No. | §2255 Filing Date | No Rule Prohibiting Juror Interviews | If Rule in Place, Requested Interview | Prohibited From Conducting Interviews |
|---|---|---|---|---|---|
| Fell, Donald | D.Vt. 5:01Cr12 | 03/21/2011 | X | | |
| Basham, Brandon | D. SC 4:01Cr992-2 | 06/01/2011 | X | | |
| Rodriguez, Alfonso | D.ND 2:04Cr55 | 10/17/2011 | X | | |
| Davis, Len | EDLA 2:94cr00381 | 03/20/2012 | | X | |
| Lighty, Kenneth | D.MD 8:03Cr457 | 10/16/2012 | | X | X |
| Montgomery, Lisa | WDMO 4:12Cv8001 | 03/19/2013 | X | | |
| Caro, Carlos | WDVA 2:03Cr1 | 03/22/2013 | X | | |
| Barnette, Aquilia | WDNC 3:12Cv327 | 06/29/2013 | | ? | |
| Ebron, Joseph | EDTX 1:14Cv539 | 10/27/2014 | X | | |
| Garcia, Edgar | EDTX 1:13Cv723 | 02/24/2015 | X | | |
| Snarr, Mark | EDTX 1:13Cv724 | 02/24/2015 | X | | |
| Gabrion, Marvin | SDID 2:15Cv24 | 04/27/2015 | X | | |
| Hager, Thomas | EDVA 1:15Cv551 | 04/27/2015 | | | |
| Runyon, David | EDVA 4:08Cr16 | 10/05/2015 | | | |
| Lawrence, Daryl | SDOH 2:05Cr11 | 12/07/2015 | | | |
| Umana, Alejandro | WDNC 3:16Cr57 | 06/22/2016 | | | |
| | | | | | |

In the remaining fifteen cases, ten § 2255 litigants were free to conduct juror interviews (either because of a grant or because the local rules do not prohibit interviews), four involve cases where the local rule requires leave of court to conduct interviews but the § 2255 litigants have not yet raised the issue, and the remaining case was one for which the undersigned was unable to obtain the relevant data. If the four cases where the issue has not been raised are excluded (which is sensible to do given that these cases do not offer relevant data about grants or denials in this context), the data reveals that among all the capital § 2255 cases filed within the last 5 years, litigants were free to conduct juror interviews in more than 80% of the cases where this issue was ripe It would violate equal protection and fundamental fairness should Mr. Troya be deprived of access to and interview of jurors while those similarly situated throughout the United States are permitted as a matter of course the very interviews he seeks.

Significant disadvantages to defendants, particularly capital defendants, result when they are denied or only afforded limited access to jurors, as evidenced by the successful claims presented where juror interviews were not restricted. hese claims would have never been litigated much less discovered without the defendant having access to interview jurors.

Mr. Troya would be comparatively disadvantaged if this Court were to deny his request to interview jurors where other capital defendants have been able to do so without limitation. Mr. Troya should be granted the opportunity to effectively investigate potential juror claims to pursue in these § 2255 proceedings. Such an investigation is crucial in affording Mr. Troya the same rights other capital defendants have been afforded. Denying Mr. Troya the ability to investigate juror claims is tantamount to depriving him of the opportunity to litigate a valid claim his Sixth Amendment right to jury trial was violated.

The other capital postconviction defendants referred to above are similarly situated individuals, and Mr. Troya should be provided the opportunity to avail himself of the same rights and opportunities granted to them. To rule otherwise would deprive Mr. Troya of due process, equal protection, and the Eighth Amendment. Constitutional rights are not to be determined by the arbitrariness of mere geographical location. Eighth Amendment jurisprudence mandates that the government "apply its law in a manner that avoids arbitrary and capricious infliction of the death penalty." *See Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).

## CONCLUSION

Mr. Troya requests he be afforded the opportunity to contact and interview jurors and alternates that served in the above-styled cause.

DATED this 9th day of September 2016.

Respectfully Submitted,

/s/ *Steven H. Malone*
STEVEN H. MALONE
Steven H. Malone, P.A.
1217 South Flagler Drive, 2nd Floor
West Palm Beach, FL 33401
Tel: (561) 805-5805
Email: stevenhmalone@bellsouth.net
Florida Bar No. 305545

*Counsel for Defendant Daniel Troya*

/s/ *D. Todd Doss*
D. TODD DOSS
Assistant Federal Defender
Federal Defender's Office
201 South Orange Avenue, Suite 300
Orlando, FL 32801
Tel: (407) 648-6338
Email: todd_doss@fd.org
Florida Bar No. 0910384

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 9, 2016, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record in this case, either via transmission of the Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic filing.

/s/ *D. Todd Doss*
D. TODD DOSS