**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**DANIEL TROYA,**

        **Movant,**                                 **Civil Action No. 16-80700-Civ-Scola**
**v.**                                         **Crim. No.:  9:06-cr-80171-CR-DTKH-3**

**UNITED STATES OF AMERICA,**

        **Respondent.**

_____/

### PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Daniel Troya hereby propounds upon the United States of America the following Requests for Production of Documents. Respondent is requested to produce and/or permit the Movant to inspect and copy each of the requested documents that may be in any Respondent's possession, custody, or control, or those which are in the possession, custody, or control of that Respondent's attorneys, agents, or representatives. Pursuant to Rule 34(b)(2)(A), Respondent's responses to these Requests for Production must be provided within thirty days of service. Production of documents should be made to counsel for the movant, or at any other location and time to which counsel mutually agree.

### DEFINITIONS

As used herein, the following terms shall have the following meanings:

1.      "Respondent" refers to the United States of America, and to all persons who are employees, agents, or representatives of the United States, and to all other persons acting, or purporting to act, on behalf of the United States of America.

2.      The words "you," "yours," and/or "yourselves" means the respondent as well as any employees, agents, representatives or other persons acting, or purporting to act, on behalf of the respondent.

3.      "Document(s)" should be construed in the broadest sense permissible, and includes all "writings," "recordings," and "photographs," as those terms are defined in Rule 1001 of the Federal Rules of Evidence, as well as all "communications" as defined below. Accordingly, "document(s)" includes, but is not limited to, all written, printed, recorded or graphic matter, photographic matter, sound reproductions, electronic mail, or other retrievable data (whether recorded, taped, or coded electrostatically, electromagnetically, optically or otherwise on hard drive, diskette, compact disk, primary or backup tape, audio tape or video tape) from whatever source derived and however and by whomever prepared, produced, reproduced, disseminated or made.

4.      "Communication" means any meeting, conversation (face-to-face, telephonic, or otherwise), discussion, telex message, cable, correspondence, message, electronic mail, voice mail, exchange, provision or relay of a document, or other occurrence whereby thoughts, opinions, data, or other information are transmitted between or among one or more persons, or through any photographic, mechanical, electrical or electronic device or devices for receiving, transmitting, or storing data or other information.

5.      "Person" shall mean any individual, corporation, proprietorship, partnership, trust, association, or any other entity. "Person" includes the present and former officers, executives, partners, directors, trustees, employees, attorneys, agents, representatives, and all other persons acting or purporting to act on behalf of the person and also its subsidiaries.

6.      The word "including" shall have its ordinary meaning and shall mean "including but not limited to" and "including without limitation" and shall not indicate limitation to the examples or items mentioned.

7.      The singular shall include the plural and vice versa; the terms of each word shall be construed to include its plural and vice versa; the terms "and" or "or" shall be both conjunctive and disjunctive.

8.      The root word and all derivations (*i.e.*, "ing," "ed," etc.) shall be construed to

include each other.

9.      The word "each" shall be construed to include "every" and vice versa.

10.     The word "any" shall be construed to include "all" and vice versa.

11.     The present tense shall be construed to include the past tense and vice versa.

12.     The masculine shall be construed to include the feminine and vice versa.

13.     "Agent" shall mean any agent, employee, officer, director, attorney, independent contractor or any other person acting at the direction of or on behalf of another.

14.     The term "third party" or "third parties" refers to individuals or entities that are not a party to this action.

15.     The term "action" shall mean the case entitled *Daniel Troya v. United States of America*, Case No. **Civil Action No. 16-80700-Civ-Scola**, and its predecessor criminal case, *United States of America v. Daniel Troya et al.,* Crim. No.:   9:06-cr-80171-CR-DTKH-3 Southern District of Florida.

## INSTRUCTIONS

1.      Pursuant to Fed. R. Civ. P. 26(e)(1), these production requests are continuing in nature and Respondent shall provide supplemental answers and documents, which will augment or modify any answers contained in their responses.

2.      Each request herein constitutes a request for each document referred to or a true, complete, and legible copy thereof.

3.      Each request seeks documents that are in any way in any Respondent's possession, custody, or control from any source, wherever situated, including, but not limited to, the files, records, and documents of investigators or agents of the United States of America, including state, county and municipal agencies acting at the direction or in concert with the United States of America, and any agents or its attorneys hired or directed, and all documents to which the Respondent has access, including all documents in the possession, custody, or control

3

of agents, contractors, experts, or consultants.

4. A document is deemed to be in Respondent's "control" if Respondent or any of Respondent's attorneys have the right to secure the document or a copy thereof from another person or entity having actual possession of the document.

5. If a requested document was, but no longer is, in Respondent's possession, custody, or control, respondent shall identify the document, its current location, and the person who has possession, custody, or control of the document; if such information is unavailable, the defendant shall identify the last known location and person who had possession, custody, or control of the document and explain the reason for and circumstances under which the document left the Respondent's possession, custody, or control.

6. If Respondent does not answer any document request or part thereof, on the basis of privilege, the Respondent shall provide with respect to each such document the following:

    a. The nature of the document (letter, memorandum, chart, picture, report, etc.);

    b. The number of pages comprising the document and a description of any identifying marks or designations (*e.g.*, Bates numbers) if any, on the document;

    c. The date of the document;

    d. The name(s) of the author(s) and of any recipient(s) of the document;

    e. The name and address of any person who is not included in response to subpart (d) with respect to such document and who has access to or has seen, read, or heard any portion of the material in the document; and

    f. The nature of the privilege asserted.

7. For each request or part of a request that Respondent refuses to answer on grounds of burdensomeness, the Respondent shall explain in as much detail as possible the basis for its contention.

8.      If any Respondent objects to any request, or portion of a request herein, the Respondent must produce all documents covered by the request, or portion of the request, not subject to the objection. Similarly, if Respondent objects to production of a document, they must produce the parts of the document that are not subject to objection, redacting and clearly indicating the parts of the document that are subject to the objection.

9.      Respondent shall produce all documents as they are kept in the usual course of business and label them to correspond to the categories in the request.

10.      Respondent must produce all responsive documents in their original format.

## REQUESTS FOR PRODUCTION

A.

1. Documents concerning or referencing the criminal history of any seated juror, alternate juror, or family member thereof;

2. Documents concerning or referencing the former or current employment by a prosecutorial or law enforcement agency of any seated juror, alternate juror, or family member thereof;

3. Documents concerning or referencing the witnessing of a crime by any seated juror, alternate juror, or family member thereof; and

4. Documents concerning or referencing the prosecution's awareness of any undisclosed information relevant to the accuracy and completeness of the information provided by the jury venire.

5. Juror interviews.

B.

1. AO-12 Report pursuant to Administrative Order AO 1993-50 (for the period November 1993 – October 1997)

2. AO-12 Report pursuant to Administrative Order AO 2005-32 (for the period November 2005-October 2007)

3. Any other AO-12 or JS-12 reports during the period of April 1998 – March 2002 or 2005, 2006, 2007, or 2009 for the Palm Beach Division.

4. All current census estimates the Administrative Office of the Courts provided to the district clerk for each year of the AO12s referenced in the 2255 motion. Providing these estimates to the clerk is duty of

5

the Administrative Office, see Instructions for Part IV of AO, and provide the source of data for the population. These census estimates were not recorded by the clerk on the completed AO 12 forms.

2. All voter registration data that was used to fill the wheels. This information should have been received from the Secretary of State and should be maintained by the jury clerk's office.

3. Any underlying data from years 2007-2010 and explanations or discussions about how that data relates to census information. Mr. Troya specifically requests any documents discussing, mentioning, or relating to the discrepancies between the percentage of blacks and Hispanics reported in the AO12 and the accurate data in the census reports.

C.

1.  a. Any and all documents including opinions, reports (including interim or amended reports), memoranda, testing results, bench notes, and correspondence concerning the examination of the casings and projectiles collected from the crime scene, the casings and projectiles collected at Suwanee Drive and Mercer Avenue, the projectiles collected from Garden Court, and the AK-47 rifle collected from Garden Court;

b. Documents relating to the manufacturer and model of the microscopes used for comparison purposes, and any manuals describing proper uses and maintenance of the instrument;

c. Documents containing internal written policies and standards for toolmark comparisons and guidelines for rendering an opinion;

d. Any and all photomicrographs of the comparison subjects;

e. Diagrams or photographs of subject evidence at all stages of collection and testing;

f. Results of all test-firings of the recovered weapon, including notes, reports, opinions and photomicrographs of the test-firing subjects;

g. Copies of written procedures (often called Standard Operating Procedures (SOPs)) for evidence testing, including procedures for preparation, instrument analysis, instrument calibration, and all required quality control practices;

h. Laboratory quality manuals (however named) in effect at the time the subject work was performed;

i. Laboratory quality procedures (however named), including internal audit procedures, training and qualification procedures, and

6

document control procedures, in effect at the time the subject work was performed;

j. Internal and external audit reports generated or received by the laboratories;

k. For the analysts involved in the subject casework, a copy of the personnel file and all internal and external proficiency testing results for toolmark identification (including sponsoring agency, date(s) performed, responsible analyst, true values, reported results, raw data, scores, related correspondence, and corrective action records, as appropriate);

2.      Access by defense experts to the casings and projectiles collected from the crime scene, the casings and projectiles collected from Mercer Avenue and Suwanee Drive, the projectiles collected from Garden Court, and the AK-47 rifle collected from Garden Court.

3. a. Documents concerning or referencing the operational behavior, engineered capabilities, tuning and alignment, maintenance, and service history for cellular towers maintained by Verizon Wireless, T-Mobile, and MetroPCS in Florida during the applicable periods;

b. Documents concerning or referencing system information, cell site, and switch data for T-Mobile cellular towers in Florida and Texas for October 2006;

c. Cell phone records for all cell phones through search, seizure, or voluntary consent;

d. Call detail reports (CDRs) for (786) 853-8416 and (956) 266-2004 for October 2006.

D.

1. Documents that contain information that Kevin Vetere, Melvin Fernandez, Carlos Bonilla, and Carlos Rodriguez expected or received any benefit of any type from the government, whether or not that benefit accrued as a result of a formal deal or cooperation agreement;

2. NADDIS files for Jose Luis Escobedo (NN 4004649), Yessica Escobedo, Hugo Flores (NN 3239166), Jose Manuel Escobedo, Benito Rodriguez, Danny Varela, Daniel Troya, Liana Lopez, Ricardo Sanchez, Kevin Vetere, Juan Gutierrez, Andres Molina, Servando Salazar, Martin Soto, "Muneco," Oscar Flores-Venegas, Jose Luis Escobedo, Sr. (NN4004649), Belinda Guerra, Rudy Espinosa-Garza, Vicente Garcia, Guadalupe Garcia, Ana Jessica Garza, Fructuoso Garza, Eduardo Diaz, Leonel Diaz, Robert Ruiz, Roberto Carlos Iracheta-Gonzalez, Erlinda Garza, and Ramiro Nevarez, Jr.

7

3 a. Documents that contradict the government's stated reason for failing to charge Danny Varela with murder; namely, that the government purportedly did not have enough evidence to prosecute him. Such documents include, but are not limited to: any cooperation agreement between Mr. Varela and the government; documents indicating that Mr. Varela provided information to the government, whether or not such information was provided as part of a formal cooperation agreement; documents indicating that prosecution of Mr. Varela would adversely affect any criminal investigation or prosecution; and/or documents indicating that any improper conduct on the part of law enforcement rendered prosecution of Mr. Varela infeasible;

b. Documents that indicate that Mr. Varela was a co-conspirator in the carjacking conspiracy;

c. Documents that indicate that Mr. Varela participated in the murder of the Escobedos in any way, including as an accomplice; that Mr. Varela intended to murder the Escobedos; or that Mr. Varela knew that the murders of the Escobedos would occur beforehand;

d. Documents regarding cooperating witness Mario Davis that Mr. Varela had direct involvement in the murders and from Phillip Perez regarding Mr. Varela's large-scale drug trafficking and gun possession.

e. Documents indicating further investigation of Varela for the murders in case was conducted since trial.

E.

1. Documents that indicate or suggest that Yessica Escobedo's cell phone traveled to Texas on October 12th or 13th, 2006.

2. Documents that reveal the identity of the individual or individuals with whom the Escobedos allegedly conducted a drug deal in the Daytona Beach area on the night/morning of October 12th/13th and documents that provide information as to the details, nature, and scope of this drug deal.

3. Documents that contain video footage of the area around the Briar Bay security booth.

F.

1. Documents relating to Mr. Troya's character; economic, educational, and psychosocial background; mental health history; cognitive, intellectual, and adaptive functioning; and/or related to individuals involved in Mr. Troya's life and upbringing, that would tend to mitigate his convictions or lead to other mitigating evidence.

8

This information includes, but is not limited to, information about Mr. Troya's or his family members' substance abuse; physical, psychological, or sexual abuse; dysfunctional family patterns and dynamics; dysfunctional peer relationships; poverty and attendant economic disadvantages; poor educational or employment performance; racism; organic, neurological, or other medical problems; mental disorders; and developmental disabilities;

2. Documents concerning the government's mental health case, including the identity of any experts who were consulted and the content of those consultations; and any documents regarding Mr. Troya, including the reports and notes of experts. This request includes the firewalled U.S. Attorney's file.

G.

1. Documents relating to the investigation of a shooting on April 28, 2006, at 1305 Suwanee Drive, Apartment B, West Palm Beach; the investigation of a shooting on April 28, 2006, at 1910 Mercer Avenue, West Palm Beach; and the investigation of a shooting on September 11, 2006, on the 1300 block of Haverhill Road in West Palm Beach.

H.

1. Documents relating to prosecutors' discretion under the Federal Death Penalty Act that leads to the selection of defendants to prosecute capitally, including data regarding the seeking of the death penalty by location and jurisdiction; the criteria used by United States Attorneys to determine whether or not to seek the death penalty; and the criteria used by the United States Attorney General to determine whether or not to authorize the death penalty and whether or not to reject a settlement or to overrule a United States Attorney's decision not to seek the death penalty in a particular case;

2. Documents relating to the United States Attorneys' agreement to waive the seeking of the death penalty against Mr. Troya and the United States Attorney General's decision to reject the proffered settlement and direct the United States Attorney's Office to seek the death penalty against him;

3. Documents relating to the conditions of confinement on federal death row at United States Penitentiary – Terre Haute, including but not limited to interim and final reports of investigations into the provision of medical and mental health treatment to death row prisoners, and interim and final reports of investigations into the use of force by prison staff upon death row prisoners.

I.

1. Any investigation that was undertaken by the U.S. Government or cooperating agencies prior or subsequent to trial related to the charges in this case, and any measures taken by any investigators, law enforcement or otherwise to ensure their safety.

J.

1. Firearms that were withheld or redacted from Mr. Troya's record request dated June 22, 2015;

2. Documents requested from the DEA that were withheld or redacted from Mr. Troya's record request dated June 15, 2015;

3. Documents requested from the FBI that were withheld or redacted from Mr. Troya's record request dated June 22, 2015;

4. Documents requested from the Bureau of Prisons that were withheld or redacted from Mr. Troya's record request dated June 22, 2015;

5. Documents requested from the Florida Department of Law Enforcement that were withheld or redacted from Mr. Troya's record request dated July 14, 2015;

6. Documents that were requested from West Palm Beach Police Department purportedly held by DEA and not provided pursuant to Mr. Troya's record request dated June 15, 2015;

7. Documents that were requested from Greenacres Police Department purportedly held by DEA and not provided pursuant to Mr. Troya's record request dated July 14, 2015;

8. Documents requested from Crimestoppers and never provided.