*USA Response to Troya Petition*

# USA Exh. 6

# Cunningham report

# MARK D. CUNNINGHAM, PH.D., ABPP

*Board Certified in Clinical Psychology - Board Certified in Forensic Psychology*
*American Board of Professional Psychology*

417 Oak Bend, Suite 260    Lewisville, Texas 75067
972-459-0658   Fax 972-459-0958   mdc@markdcunningham.com

*Licensed psychologist: Arizona #3662, Arkansas #98-17P, Colorado #2305, Connecticut #846,*
*Idaho #PSY-379, Illinois #071-006010, Indiana #20041376A, Louisiana #794, New Mexico #0768,*
*New York #017111, Oklahoma #1002, Oregon #1333, South Carolina #764, Tennessee #2255, Texas #22351*

1-13-09

James Eisenberg, Esq.
Eisenberg & Fouts, P.A.
Attorneys at Law
Suite 704, One Clearlake Centre
250 Australian Avenue South
West Palm Beach, FL  33401

**Re:**    *U.S. v Daniel Troya*

Dear Mr. Eisenberg:

Thank you for providing me the opportunity to consult with you regarding the capital violence risk assessment for prison of your client, Daniel Troya. Please allow me to summarize my findings and opinions to date. These rely on my interview of Mr. Troya, review of records, and review of research findings and correctional data. Such procedures are reasonably relied upon by clinical and forensic psychologists in coming to their findings and opinions. Because my evaluation in this matter is ongoing, my findings and opinions may be modified or supplemented by additional information that is made known to me.

*Prison violence*

Analysis of a defendant's past behavior pattern (in a similar setting) and the particularized application of group statistical data are the two approaches that are most reliable in assessing likelihood of violent behavior in a prison context. Behavior pattern analysis that is specific to context is critically important because prison represents a fundamentally different context from the community – and prison violence does not predictably follow from pre-confinement violence or the capital offense of conviction. With these two approaches in mind, there are a number of factors that can be analyzed regarding how Mr. Troya is likely to adjust (i.e., whether he will commit serious violence) in the course of a life without possibility of release term in the federal Bureau of Prisons. These include the following:

1. Many of the factors that increase the risk of criminality and violence in a community setting are not replicated or are not predictive of violence in prison. Though some personality features, personality disorders, or personality testing profiles are associated with an increased risk of criminality in the community, none are reliably predictive of serious violence in American prisons (Cunningham & Reidy, 2002; Cunningham, Sorensen, & Reidy, 2005; Cunningham & Sorensen, 2006).

2. Group data demonstrate that the seriousness of the offense of conviction is not a good indicator of prison misconduct or violence. This is the conclusion of multiple studies, including a recent large-scale comparison of the disciplinary misconduct and institutional assaults of murderers with other prison inmates (Sorensen & Cunningham, in press).

3. Multiple group statistical studies indicate that the majority of individuals convicted of capital murder, including federal capital offenders sentenced to life terms, are not cited for violent misconduct in prison (Cunningham, 2007; Cunningham, Reidy, & Sorensen, 2008; Sorensen & Cunningham, in press). Several studies point to capital offenders having institutional assault rates that are lower or equivalent to rates among inmates serving shorter sentences (e.g., Cunningham, Reidy, & Sorensen, 2008; Cunningham, Sorensen, & Reidy, 2005; Cunningham & Sorensen, 2006). Involvement in a continuing criminal enterprise and/or the killing of multiple victims has not been found to be predictive of prison violence among federal capital inmates sentenced to life without possibility of release (Cunningham, Reidy, & Sorensen, 2008).

4. An 11-year comparative study of LWOP and parole-eligible inmates in a high-security prison demonstrated that LWOP inmates were half as likely to be involved in assaultive misconduct (Cunningham, Sorensen, & Reidy, 2005). In another large-scale study, LWOP inmates were not a disproportionate risk of prison violence as compared to inmates serving lengthy (10+ year) sentences (Cunningham & Sorensen, 2006).

5. Group data further demonstrates that rates of serious violent misconduct among inmates in BOP are relatively low, even at a U.S. Penitentiary level. Data from other large correctional samples has identified that assaults resulting in serious injury represent a very small fraction of total institutional assaults.

6. A number of factors are present that would be associated with a reduced risk of prison violence relative to broader categories of inmates or capital offenders.

    a. *Age*: Mr. Troya is 25 years old (dob 04-22-83). Age is one of the most powerful predictive factors for prison misconduct, with aging inmates having progressively lower rates of misconduct (Hirschi & Gottfredson, 1989; Kuanliang, Sorensen, & Cunningham, 2008; U.S. Department of Justice, 1989) and assaultive misconduct (Cunningham, Reidy, & Sorensen, 2008; Cunningham & Sorensen, 2006, 2007; Cunningham, Sorensen, & Reidy, 2005; Kuanliang, Sorensen, & Cunningham, 2008; Sorensen & Pilgrim, 2000). Thus, holding other factors constant, Mr.

Troya's risk of violence as a 25-year-old inmate is at a mid-level of risk: lower than inmates who are in their late teens or early twenties, but higher than that experienced by inmates age 30+. Even this risk would be expected to progressively decline as he ages in prison. Consistent with this expectation, the frequency of Mr. Troya's disciplinary infractions has declined since he was first confined in the Florida Department of Corrections in his late teens.

b. *Education*: Mr. Troya completed his GED in Bernard Correctional Institution in 2002. Recent large-scale studies have demonstrated that inmates who are more educated (i.e., high school diploma or GED) have significantly lower rates of violence in prison (Cunningham & Sorensen, 2006; Harer & Langan, 2001). Among inmates in a high-security state prison, inmates having this educational achievement were about half as likely to be involved in assaultive misconduct, holding other risk factors constant (Cunningham, Sorensen, & Reidy, 2005).

c. *Continuing community relationships*: Mr. Troya currently receives visitation from his mother, father, and sister. Prior to the implementation of SAMs, he had routine telephone and correspondence contact with a number of immediate and extended family, as well as friends. It is anticipated that this broader contact will resume when it is allowed. Inmates who have continuing contact with community members tend to have better prison adjustments.

d. *Correctional appraisal*: During 4+ years in the Florida Department of Corrections between October 2000 and December 2005, Mr. Troya was typically housed in general population where he had unshackled interactions with staff and other inmates, attended vocational training, and worked inmate jobs. During his pre-trial tenure on the current charge (arrested 10-25-06), he was in general population from January 2007 to April 2008 when the SAMs were implemented. His placement in general population at the Federal Detention Center appears reflective of the appraisal of institutional violence risk that he presents to staff or other inmates.

e. *Confinement history*: Mr. Troya served 4+ years in the Florida Department of Corrections and has been confined for 27 months pre-trial on the current charges. Having had a prior period of prison confinement is a factor associated with a modestly higher likelihood of prison violence. However, during this extended tenure, his disciplinary infractions have declined in frequency and those that have occurred have not involved serious assaults. This history of correctional adjustment without serious violence points to a continuing pattern of nonviolence in BOP.

7. In considering the impact of these risk-related factors, Mr. Troya's risk of violence in prison is considered to be well below the broad group rates. Utilizing various actuarial models developed from samples of state prison inmates, convicted murderers, and capital

offenders, inmates sharing important predictive characteristics with Mr. Troya are in the mid-range of risk as compared to other inmates.

8. As risk of violence is always a function of context, the above estimates of the risk of serious violence could be markedly reduced by ultra-secure confinement. Correctional procedures and security interventions are available in BOP to manage inmate conduct. Further, should the Department of Justice or BOP determine that Mr. Troya is disproportionately likely to perpetrate serious institutional violence, there are mechanisms to confine him, and perpetuate such confinement, under heightened security procedures such as those available at ADX Florence that involve single-celling, application of restraints with any movement, solitary or small group recreation, and other security measures. Under such conditions, any opportunity to engage in serious violence is substantially negated.

*Escape*

Several points are relevant to an analysis of the likelihood that Mr. Troya would escape from the federal Bureau of Prisons if sentenced to life without possibility of release.

1. First, if not designated to ADX, Mr. Troya would be assigned to a U.S. Penitentiary. This is a matter of regulation certainty:

> A male inmate with more than 30 years remaining to serve (including non-parolable LIFE sentences) shall be housed in a High security level institution unless the PSF [Public Safety Factor] has been waived. *Security Designation and Custody Classification Manual (5100.08, 9/12/06, Chapter 5, Page 9)*

2.   U.S. Penitentiaries are high-security prisons in BOP, characterized by double-perimeter fencing with razor wire, perimeter detection devices, gun-towers, concentric layers of security, controlled inmate movement, and intensive staffing. The architecture, staffing, and security procedures assume that all inmates at this level of security are motivated to escape and would attempt to do so if given the opportunity. There are vast differences between the architecture, security capabilities, and security procedures of a minimum security prison and a U.S. Penitentiary.

3.   Escapes from the secure perimeters of U.S. Penitentiaries are extraordinarily rare, with only two instances of such escapes to my knowledge in the past 10 years.

*Ordered violence in the community*

An analysis of the risk of an inmate ordering violence from prison to be perpetrated in the community is more complex than simply that the inmate made such a threat. Several factors should be considered in this analysis:

1.  The first factor to consider is whether the inmate, in fact, has a sustained motivation to enact such a threat or is simply "mouthing off." I have not been provided with information regarding the bases for the SAMs that would allow me to analyze this factor.

2.  A second factor is whether the threatening inmate has a criminal organization under his continuing direction and/or financial resources in the community to effect the threat. I have not been provided with evidence that Mr. Troya controlled or continues to control a criminal organization or possesses extensive financial assets to carry out such threats even if he did have sustained motivation to do so.

3.  A third factor is whether correctional authorities or law enforcement regarded the threats as sufficiently credible that steps were taken to protect the intended targets. I have not been provided with information regarding preventative/protective actions to ensure the safety of those allegedly targeted with these threats. It is acknowledged that the threat was regarded as sufficiently credible that Special Administrative Measures (SAMs) were applied to Mr. Troya pre-trial to restrict his communication with other persons.

4.  A fourth factor in the analysis relates to the capability of BOP to impose special conditions of confinement. To explain, in some federal capital sentencing proceedings there has been evidence that the defendant had the capability and/or history of ordering violence or criminal activity from prison. Thus, there may be well-founded concerns that the inmate might attempt to use phone privileges, visitation contacts, letters, or inmate communication to continue a criminal enterprise or to direct violence against others. It is important in considering the future likelihood of such directed violence, however, to be aware that there are capabilities within BOP for limiting the contact that an inmate may have with other inmates, the free community, or even their own attorney. Extraordinary limitations on defendant communications with other inmates and community members were ordered in *U.S. v. Luis Felipe* (1998) (head of the Latin Kings) and *U.S. v. Ramsi Yousef* (1998) (World Trade Center bomber). In *Felipe* the office of the U.S. Attorney submitted a brief in support of the authority of the sentencing federal judge, the Department of Justice, and the federal Bureau of Prisons to employ special conditions of confinement. The trial court's authority to order special conditions of confinement in *Felipe* was subsequently upheld by the 2nd Circuit Court of Appeals.

5.  I have not been provided with data that would support a conclusion that Mr. Troya would have either the motivation or means to successfully order/accomplish criminal violence in the community following his admission to BOP on a life without possibility of release sentence. However, should the Department of Justice or the Bureau of Prisons believe that there is such a probability, special restrictions on his communications could be imposed that would virtually negate any opportunity for Mr. Troya to carry out this agenda.

I anticipate that my testimony will be accompanied by numerous digital demonstrative

exhibits. Thank you for your consideration.

Best regards,

Mark D. Cunningham, Ph.D., ABPP

# Eisenberg & Fouts, P.A.

## Attorneys At Law

James L. Eisenberg
Florida Bar Board Certified Criminal Trial Lawyer
National Board of Trial Advocacy, Certified Criminal Trial Advocate
Kai Li Aloe Fouts

Ph: 561-659-2009
Fax 561-659-2380
www.eisenbergandfouts.com

---

March 9, 2009

John Kastrenakes, Asst. U.S. Attorney
500 S. Australian Avenue, Suite 400
West Palm Beach, FL 33401

Re:    U.S.A. v. Daniel Troya

Dear John,

Pursuant to court order, enclosed are copies of the reports from the following experts:

> Dr. Michael Maher
> Dr. Harry Krop
> Dr. Mark Cunningham

I am also enclosing a copy of raw data from a PET Scan done by a different doctor, Dr. Joseph Wu. I am providing Dr. Wu's data because it was provided to Dr. Maher and Dr. Krop and in some way was considered. The PET Scan itself is not a feature of the case and Dr. Wu will not be called. I checked my files and Dr. Wu did not provide a CD of the raw data. He just e-mailed what we have here for you. Note, your copy is the color copy.

The other psychological tests the doctors will testify about were given by Dr. Krop and the raw data for that is enclosed also.

Sincerely,

JAMES L. EISENBERG

JLE:gw
Enclosures
cc:    Ruben M. Garcia, Esquire
       Daniel Troya

Suite 704, One Clearlake Centre, 250 Australian Avenue So.
West Palm Beach, FL 33401