UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-80700-CV-SCOLA
(Case No. 06-80171-Cr-Hurley/Vitunac(s)(s)(s))


DANIEL TROYA,
          Movant,

vs.

UNITED STATES OF AMERICA,
          Respondent.
_____/

## UNITED STATES' RESPONSE IN OPPOSITION TO TROYA'S MOTION FOR DISCOVERY

THE UNITED STATES OF AMERICA, by and through its undersigned counsel, hereby files its response in opposition to Daniel Troya's ("Troya"), Motion for Leave to Conduct Discovery (CV-DE 34).   As demonstrated below, discovery should not be ordered in this case for a variety of reasons:   (i) Troya has failed to meet the requisite legal and factual standards justifying discovery in this collateral §2255 proceeding because his requests rest on mere speculation, not specific allegations demonstrating that discovery, if allowed, would support claims upon which Troya is entitled to relief; (ii) the United States already provided many of the items during pre-trial discovery and showed Troya's current counsel where and when such items were originally disclosed; and (iii) other items sought via a discovery order against the United States are obtainable from third parties by way of a duly issued subpoena.

### Legal Standard

A habeas petitioner is not automatically entitled to discovery.  *Bowers v. U.S. Parole Comm'n, Warden,* 760 F.3d 117, 1183 (11th Cir. 2014).   Discovery should be ordered only where there is good cause shown in advance supported by specific allegations that show reason to believe

that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief. *Arthur v. Allen*, 459 F.3d 1310, 1311 (11th Cir. 2006). Good cause cannot arise from mere speculation or hypothesis, that some helpful information may be found if discovery is ordered. *Id.* The legal standard for "good cause" is a high bar. Good cause for discovery requires a showing to be made with factual support, demonstrating that the evidence sought would raise sufficient doubt about the defendant's guilt to undermine confidence in the result of the trial. *Arthur v. Allen*, 459 F.3d 1310 (11th Cir. 2006) *citing Schlup v. Deo,* 115 S.Ct. 851 (1995).

Discovery requests based on mere speculation should be rejected because the habeas remedy was never intended to provide a means for conducting a fishing expedition for convicted defendants to explore their case in search of its existence. *Saucedo v. Brazelton*, 2015 WL 4481795 (N.D. Cal. 2015). Even in a death penalty case, bald assertions and conclusory allegations do not meet the "good cause" standard. *See Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001) (quoting *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 301 (3d Cir. 1991)); *see also Rivera v. Humphrey,* 2015 WL 3648052 (S.D. Ga. 2015) (order denying discovery in 2254 proceeding finding mere speculative discovery request unsupported by good cause).

If allegedly undisclosed information would not have impacted the jury's verdict, then the district court may properly deny discovery. *Smith v. United States*, 627 Fed. Appx. 852, 855 (11th Cir. 2015); *accord, Benford v. United States*, 2013 WL 6162670 (N.D. Ala. 2013*); see also, Heidler v. Chatman,* 2014 WL 725985 (S.D. Ga. 2014) (in death penalty case, court denied 2254 discovery on basis that there was not a reasonable probability that had the sought-after evidence been disclosed to the defense the result of the proceeding would have been different).

Troya seeks discovery in the speculative hope that a broad search of the files of the United

2

States might develop claims for which there is currently no factual basis. In each of the ten separate discovery requests, there has been no specific allegation showing, other than speculative hope, that some helpful information might be uncovered. Moreover, as to discovery requests C and G, the United States already provided this information during pre-trial discovery and has previously directed Troya to those disclosures.

A § 2255 proceeding is not a second opportunity to have a full-blown trial on the merits. Rather, the scope of the proceeding is really much narrower. It is designed to redress only "fundamental defect[s] which inherently [result] in a complete miscarriage of justice" and "omission[s] inconsistent with the rudimentary demands of fair procedure." *Hill v. United States,* 368 U.S. 424, 428 (1962) (citing 28 U.S.C. § 2255).

Troya claims that discovery is required because this Court's discretion is not very broad in deciding whether to grant an evidentiary hearing on claims raised in a § 2255 petition (CV- DE 34 at p. 5). Notably however, the only case cited supporting this proposition, *Stead v. United States,* 67 F.Supp. 1064 (D. S.D. 1999), actually declined to conduct an evidentiary hearing. Troya also claims that as a policy matter death penalty cases are special and therefore warrant discovery. In support of this position, Troya cites two cases, *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *McFarland, v. Scott,* 512 U.S. 849, 855 (1994). Neither case stands for the proposition that discovery must be ordered. *Woodson* held only that a North Carolina state statute mandating a death sentence for all first degree convicted murderers was unconstitutional because it lacked the individualized consideration required by the Eighth Amendment. *McFarland* held only that a capital defendant is entitled to a stay of execution if he invokes his constitutional right to assistance of counsel to initiate a habeas challenge to his conviction. Neither of these cases has anything to

do with ordering discovery in every § 2255 case, especially, as is the case here, where good cause has not been demonstrated.   The United States agrees that this case concerns serious matters, amongst other things, the murder of two children and their parents.   Nevertheless, following a meticulous trial at both the guilt and penalty stage, and an extensive appellate process, Troya must now meet the requisite legal standards when seeking discovery.   A review of his discovery motion evidences that he fails to meet those standards.

**Discovery Is Not Warranted Given the Vast Amount of Information
Disclosed in The Original Discovery Process**

The grand jury initially indicted Troya on November 3, 2006 (CR-DE 30).   Discovery commenced immediately.   The United States continued to provide pre-trial discovery in this matter after the return of the third superseding indictment adding capital counts in February, 2008 (CR-DE 305).   Discovery continued through trial of this matter as information was received by the United States.   Prosecutors kept meticulous records concerning the dates and substance of what was disclosed to defense counsel.   Between the beginning of the case all the way up until the eve of trial, the United States provided more than *fifty* discovery-related responses to defense counsel in this case, covering most but not all of the current discovery requests.   *See* Appendix A, (Index of USA Discovery Responses).

Moreover, since the filing of the § 2255 petition in this matter, Troya informally requested discovery from the United States.   The United States responded, providing detailed notice concerning information it already had disclosed in pre-trial discovery.[1]   In fact, the United States utilized its Index, Appendix A, *supra*, in preparing this communication.   Since providing that

---

1 A copy of the United States' detailed response to Troya's informal discovery request is attached as Appendix B.

detailed explanation as to pre-trial discovery items already provided, the United States – with one exception – has received no communication from the defense concerning their collective inability to find documents previously disclosed to predecessor counsel, or concerning the documents they now request in the discovery motion.   Rather, Troya has merely ignored the overture for the most part and continued to demand a detailed response to a boundless fishing expedition without initially making the requisite showing of good cause.

**Each of Troya's Ten Discovery Requests Should be Denied.**

Troya seeks discovery in ten (10) separate requests, to which the United States hereby responds *ad seriatim*.   The Court already has issued an Order Dismissing Claims (CV-DE 40).   When dismissing such claims, the Court also denied the related pending discovery requests (Requests A, B, D and E) (CV-DE 40 at 17).   While the Court did not explicitly deny Discovery Request H, that request relates to Troya's Eighth Amendment claim, which the Court dismissed (CV-DE 40 at 10-11).   Because the Court dismissed the underlying claim, the United States believes the Court intended to also deny Request H as moot.   In the event the United States' interpretation is erroneous, the United States would request an additional opportunity to respond to Request H.

Each of Troya's discovery requests are listed below, followed by the United States' response.

**Request A.   Documents about the alleged government investigation of prospective jurors** (without any specific allegation of bias extraneous influence on the selected jury) (Troya claim V, pp. 41-53 of his Petition).

Claim dismissed and discovery request already denied (CV-DE 40 at pp. 5-6 and 17).

**Request B.   Documents or information in the possession of the Clerk, United States District Court,** concerning the composition and selection of grand and petit juror members (Troya

5

claim VI, pp. 53-63 of his Petition).

Claim dismissed and discovery request already denied (CV-DE 40 at pp. 11-14 and 17).

**Request C. Documents about expert witnesses:**

**Sub-request C1. Documents about Firearms and Tool Mark Testimony** (Troya claim XI from p. 104 of CV-DE 25-1)

As to the firearms and tool mark requested discovery, the request is quite detailed:

> *a. Any and all documents including opinions, reports (including interim or amended reports), memoranda, testing results, bench notes, and correspondence concerning the examination of the casings and projectiles collected from the crime scene, the casings and projectiles collected at Suwanee Drive and Mercer Avenue, the projectiles collected from Garden Court, and the AK-47 rifle collected from Garden Court*

(CV-DE 34 at p. 11).

The United States responded to Troya's informal discovery request that this information

was previously provided in pre-trial discovery as follows:

> *[1] Discovery related to tool mark evidence was provided in pre-trial discovery as follows:*
>
> *1st Discovery Response, [DE 39, Sanchez (11/20/2006); DE 58, Troya (11/27/2006)] included inventory of search warrant, items take from search of Garden Court residence on October 25, 2006;*
>
> *5th Supplemental SDO Response, [DE #176, April 24, 2007]:*
> *m. ATF reported dated February 7, 2007 concerning testing of certain firearms by ATF Special Agent Steve Barborini, (copy attached to defense counsel copy of this response);*
>
> *n. additional ATF Exhibits as follows: Exhibits 7, 8, 11, 12, 13, 18, 19, 20, 21, 25, 26, 27 and 29, all of which relate to firearms and violations of federal firearms laws, (copies were attached to defense counsel copy of that response);*
>
> *Please note that paragraphs "m" and "n" cited above relate to firearms but are not believed to related to tool mark evidence, but*

6

*only operability.*

*Paragraph A. 6. of this same supplemental response also included the following information:*

> *a. firearms testing: see response listed under paragraph "A. 5n", supra;*
>
> *b. ballistics results: Indian River Crime Lab, ("IRCL"), two reports, (2), each dated October 25, 2006 from Mark A. Chapman, 4 pages and 1 page, respectively, (copies attached to defense counsel copy of this response);.*
>
> *c. attached to defense counsel's copy of this response are the curriculum vitae of IRCL employees Mark A. Chapman and Earl Ritzline, PBSO employee Beth Rosenthal, chemist, ATF Special Agents Steve Barborini and Jeff Kunz. **[only Chapman testified about tool mark evidence]***

*6th Supplemental SDO Response, [Docket Entry #202, filed 5/18/2007:]*
> *k.     Chain of custody form for projectile recovery reports from St. Lucie County medical examiner.*

*lab results & CV's:*

> *a.     amended ballistics report from Indian River Crime Lab, ("IRCL"), Mark A. Chapman; (copy attached to defense counsel copy of that response);*

*March 7, 2008, letter noting additional evidence:*

> *a. 404(b) notice on Suwanee & Mercer Avenue shootings;*
> *b. PBSO ballistics analysis by Quereau linking weapons for Suwanee & ballistics analysis for Mercer Ave shootings [Quereau]*
> *c.     Haverhill shootings by Troya and Sanchez;*

*March 27, 2008 Fed. Exp. packets, Index, papers, CD's, photos, etc., [post-SLSO & DEA review]:*
> *a. packets mailed only to: Ruben Garcia **[Troya]** , Michael*

7

Cohen *[Sanchez]*, Greg Lerman *[Lopez]*, Robert Gershman *[Varela]*
b. contents included:
> d. CD which consists of photographs of loaded magazines from Garden Court firearms (SLSO CD#72);

*April 24, 2008 letter enclosing the following:*
> b. CD labeled 06-110508 containing digital photos of Haverhill shooting;

*May 8, 2008 letter enclosing the following:*
> a. PBSO ballistics lab report, negative match on Haverhill [PBSO Omar Felix]

*June 23, 2008 letter enclosing the following :*
> IRCL ballistics report comparing homicide casings w/ Garden Ct. casings, [both .40 and 9 mm casings have consistent magazine markings]

*June 26, 2008 letter enclosing the following:*
> IRCL ballistics report comparing homicide casings with Garden Ct. casings, [both .40 and 9 mm casings have consistent magazine markings] & c.v. of Jimmie D. Thompson, IRCL adopting same report

*August 12, 2008 letter with attachments:*
> i. curriculum vitae of Omar Felix;
> iii. curriculum vitae of Alison Quereau

*October 17, 2008 discovery letter with attachments:*
> i. lab report of Jay Mullins, PBSO prelim. ballistics**; [note: not believed to be related to tool mark evidence]**

*October 22, 2008 discovery letter with attachments:*
> i. CD-ROM, Suwanee shooting photos;
> ii. CD-ROM, Mercer Ave., shooting photos;
> iii. CD-ROM w/ following attachments:
> > a. (a) crime scene diagram of Suwanee Drive shooting scene, [2 "pdf" files];
> > (b) crime scene diagram of Mercer Avenue shooting scene;

8

> *(c) curriculum vitae of Karin A. Crenshaw;*
> *(d) curriculum vitae of Vonda Bray;*
> *(e) photocopy of handwritten note intercepted on October 6, 2008 from Daniel Troya;*
> *(f) property receipts relating to various items of evidence [mostly spent bullets and casings] at each of the three separate shooting locations:*
>
> *November 21, 2008 supplemental discovery letter with enclosures:*
> *(c) Chapman chart on research on .40 caliber projectiles & potential weapons*

Appendix B at pp. 5-8. *See also* Appendix C, which contains letters of supplemental pre-trial discovery related to firearms, the three shootings, and tool mark evidence that the United States provided to Troya.

Troya also seeks the following additional tool mark discovery:

> b. *Documents relating to the manufacturer and model of the microscopes used for comparison purposes, and any manuals describing proper uses and maintenance of the instrument;*
>
> c. *Documents containing internal written policies and standards for tool mark comparisons and guidelines for rendering an opinion;*
>
> d. *Any and all photomicrographs of the comparison subjects;*
>
> e. *Diagrams and/or photographs of subject evidence at all stages of collection and testing;*
>
> f. *Results of all test-firings of the recovered weapon, including notes, reports, opinions and photomicrographs of the test-firing subjects;*
>
> g. *Copies of written procedures (often called Standard Operating Procedures (SOPs)) for evidence testing, including procedures for preparation, instrument analysis, instrument calibration, and all required quality control practices;*
>
> h. *Laboratory quality manuals (however named) in effect at the time the subject work was performed;*

9

> i.  Laboratory quality procedures (however named), including internal audit procedures, training and qualification procedures, and document control procedures, in effect at the time the subject work was performed;
>
> j.  Internal and external audit reports generated or received by the laboratories;
>
> k.  For the analysts involved in the subject casework, a copy of the personnel file and all internal and external proficiency testing results for tool mark identification (including sponsoring agency, date(s) performed, responsible analyst, true values, reported results, raw data, scores, related correspondence, and corrective action records, as appropriate); and
>
> l.  Access by defense experts to the casings and projectiles collected from the crime scene, the casings and projectiles collected from Mercer Avenue and Suwanee Drive, the projectiles collected from Garden Court, and the AK-47 rifle collected from Garden Court

(CV-DE 34 at pp 11-12).

As illustrated above, comprehensive and highly detailed tool mark and firearms evidence already was disclosed by the United States during pre-trial discovery.  *See* CR-DE 58, 176, 202, and Appendix C (ten separate letters of supplemental discovery provided on various dates between March 7, 2008 and November 21, 2008).   The United States did not disclose, nor does it possess, information about the firearms laboratory itself, or the personnel files of any employee of the Indian River Crime Laboratory.

Troya has failed to establish good cause on any of his requests concerning tool marks because he does not allege specific facts that, if disclosed, would demonstrate he is entitled to relief on this claim.   In fact, his request is devoid of any factual allegations that would establish "good cause."   Troya's discovery motion simply states in conclusory fashion that "[t]he backup

information requested is essential to demonstrating the significant deficiencies in the testimony and other evidence presented at trial regarding ballistics and firearm identification" (CV-DE 34 at 11).   There is no explanation of how the sought after information would bolster his arguments that the trial expert testimony should have been challenged under *Daubert v. Merrill Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), that the experts should have been restricted from determining ballistic "matches," that Troya's counsel conductive ineffective cross examination and should have called a defense expert on rebuttal, or that United States engaged in misconduct by presenting misleading testimony.   The discovery request is based on pure speculation that the requested items, if they even exist, will turn up something to support his claims.

Troya's recent retention of another tool mark expert does not create a cognizable claim under 28 U.S.C. § 2255 (CV-DE 25 at pp 122-143).   To the extent this new expert challenges or contradicts the trial testimony, such a finding seven years after the original trial is irrelevant.   New experts who have come to different conclusions, or who might in the future come to different conclusions than the United States' firearms experts, is insufficient to support an ineffective assistance claim.   *See Floyd v. Secretary*, 638 Fed. Appx. 909, 920 (11th Cir. 2016) (death penalty case); *Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir. 1997) ("[T]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial.") (death penalty case); *see also Horsley v. State of Alabama*, 45 F.3d 1486, 1495 (11th Cir. 1995) ("That experts were found who would testify favorably years later is irrelevant.") (death penalty case).

Rather, the proper test of whether Troya has been denied effective representation is judged by whether a reasonable lawyer would have acted similarly at trial.   And under this test, trial

11

counsel's conduct was constitutionally sufficient for all the reasons discussed in the United States'

Response to Troya's § 2255 motion, including co-defendant Sanchez's penalty counsel's vigorous

cross examination of the government's tool mark expert witnesses (CR-DE 758 at pp. 6355-6380;

CR-DE 764 at pp. 6660-6692).  *See Johnson v. Nagle, supra*, 58 F. Supp. 2d 1303 at 1340-

41(N.D. Ala. 1999), quoting *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992).

Allowing discovery into all of the minutia of the firearms laboratory, its policies and procedures,

its manuals, audit reports, and personnel files -- without specific factual allegations -- would not

be based on "good cause," but unfounded speculation, which is contrary to the prevailing case law.

*See, e.g. Arthur v. Allen, supra*, 459 F.3d 1310.

> **Sub-request C2.   Documents about cellular telephone evidence** (Troya claim XI from p. 144 of his Petition).

Troya's request here is also quite detailed:

> a.  *Documents concerning or referencing the operational behavior, engineered capabilities, tuning and alignment, maintenance, and service history for cellular towers maintained by Verizon Wireless, T-Mobile, and MetroPCS in Florida during the applicable periods;*
>
> b.  *Documents concerning or referencing system information, cell site, and switch data for T-Mobile cellular towers in Florida and Texas for October 2006;*
>
> c.  *Cell phone records for all cell phone through search, seizure, or voluntary consent;*
>
> d.  *Call detail reports (CDRs) for (786) 853-8416 and (956) 266-2004 for October 2006*

(CV-DE 34 at p. 13).

As to this information, the United States previously informed Troya:

> *[1] USAO does not have this information; if it exists it could be obtained from the cell carriers via subpoena from any party.*

> *[2-3] all records in the possession of the government relating to the evidence presented at trial was disclosed pre-trial in discovery; see our detailed response supra, wherein we described all evidence related to Yessica Escobedo's cell phone that we possessed.*

Appendix B at 10.

More specifically, the United States informed Troya:

> *USAO provided discovery of Yessica Escobedo's cell phone records [(956) 266-2004] and other persons' cell phone records at various stages of pre-trial preparation. See responses provided on the following dates: (i) 6th Supplemental SDO Response filed May18, 2007, sections (e) and (f) of that response; 8th Supplemental SDO Response filed August 6, 2007, section (vii) of that response; January 28, 2008, Supplemental Discovery response; November 17, 2008 Supplemental discovery letter from AUSA enclosing CDROM with T-Mobile cell site data; and November 25, 2008, supplemental discovery letter enclosing cell phone subscriber, tolls and cell sight records for Troya, and T-Mobile cell site data (Sanchez, 786-853-8416), all on CDR #1; see also supplemental letter response of December 22, 2008, enclosing a CD-ROM containing: two sets of T-Mobile business records recently received by the United States: (1) an Excel spreadsheet entitledVLR_List.xls which contains a list of telephone switches; and (2) an Excel spreadsheet entitled florida_041907(1) - T-Mobile Cell Site Locationsl.xls which contains a listing of cellular tower site locations;*
>
> *Note also, albeit unrelated to Yessica Escobedo's cell phone, that in the same December 22, 2008 supplemental response additional disclosure was provided concerning Sanchez cell phone records: "another copy of the subscriber and cell site location records for (786) 853-8416. We sent these out earlier but one or more photocopies may have been blocked when copying due to a post-it pad not being removed."*

Appendix B at p. 4.

All records in the possession of the United States relating to cellular telephones, including search warrants, were already disclosed during pre-trial discovery. *See, e.g.*, CR-DE 176, 202, 231; Appendix A at numbered paragraphs 8q, 9e, 9f, 11(i), 11(vii), 15, 17, 47, 49, 51, and 52; and Appendix D (five separate letters of supplemental discovery provided on various dates between January 25, 2008 and December 22, 2008).   The documented discovery the United States

13

provided included whatever information it possessed related to Troya's requests described above in Requests C2b through C2d.

More specifically, with regard to Troya's request in subparagraph C2d for CDRs for (786) 853-8416 and (956) 266-2004 for October 2006, the United States disclosed the CDRs (also known as toll records) for both of those phone numbers in its Sixth Supplemental Response to the Standing Discovery Order.   *See* Attachment E (CR-DE 202 and tables of phone record information disclosed as part of the United States' Sixth Supplemental Response to the Standing Discovery Order).   The first table in Attachment E reflects that the United States provided toll records for (786) 853-8416 from October 1 through October 14 of 2006 and toll records for (956) 266-2004 from September 9 through October 17 of 2006.   That time period includes days after the murders. At no time has the United States possessed additional toll records (or cell site records) that it did not disclose.

As to Troya's request C2a, which seeks operational data relating to the capabilities of the various systems operated by private carriers, i.e., Verizon Wireless, T-Mobile, and MetroPCS in Florida during the applicable periods, the United States does not have this private, proprietary information.   To the extent it exists, it could have been subpoenaed from those third parties in preparation for Troya's filing his § 2255 motion.   However, Troya still fails to make a sufficient factual showing to establish that there is reason to believe that the information sought from these third parties would allow him to prevail on a claim of ineffective assistance.   As noted above in response to Troya's tool mark related request, locating an expert long after the trial who might have provided favorable testimony is insufficient to support an ineffective assistance claim. *Davis*, 119 F.3d at 1475; *Horsley*, 45 F.3d at 1495.   Moreover, Troya's allegation that his trial

14

counsel was ineffective for failing to show "the misleading nature of cell tower tracking testimony" (CV-DE 34 at pp. 12-13), is belied by the records.   As the United States points out in its response to Troya's § 2255 motion, the trial testimony through direct and cross examination made clear that the evidence did not pinpoint the caller's actual location, but only the location of the cellular tower through which the call connected (CR-DE 756 at pp. 6007-6011 and 6094-6105; CR-DE 764 at pp. 6703-6824).   This request is another speculative fishing expedition in search of a claim that falls short of the "good cause" standard warranting discovery, even a court-authorized subpoena to a third party.

**Request D.   Documents concerning Brady and or Giglio claims concerning cooperating witnesses**, (Troya claim XVI from pp. 221-225, and claim XV-IAC, pp. 207-225 of his Petition).

Claim dismissed and discovery request already denied (CV-DE 40 at pp. 7-8 and 17).

**Request E.   Investigating Varela Further.**

Claim dismissed and discovery request already denied (CV-DE 40 at pp. 8-10 and 17).

**Request F.   Documents concerning Troya's brain damage** (Troya Claim XVIII at pp. 239-240), **mental health evidence** (Troya Claim XXV at pp. 292-332), **and personal history and background** (Troya Claim XXVI at pp.332-432).

The United States does not have any of these documents.   Dr. Michael Brannon was the only person who interacted with Troya or reviewed any documentation related to Troya for the issues cited above.   The United States disclosed all discoverable information on these issues prior to calling Dr. Brannon as a witness in the penalty phase.

In response to Troya's informal discovery request, the United States located documents from Dr. Brannon related to Troya, and provided those again to Troya's current counsel.   *See* Appendix F.   The documents were not used at trial, and Dr. Brannon offered no evidence against

15

Troya.[2/]

As to Troya's claim that the United States possesses records from a neuropsychiatrist's review of a PET scan performed by Troya's own expert, there simply are no such documents. While the United States did seek the original PET scan from Troya's counsel before the penalty phase began (CR-DE 795 at 7775), the United States ultimately did not engage the neuropsychiatrist to review or to interpret any PET scan.

> **Request G.   Documents relating to uncharged shootings proved at trial** (Troya Claim XXI, Section 14 at pp. 189-191).

Here, Troya seeks:

> *Documents relating to the investigation of a shooting on April 28, 2006, at 1305 Suwanee Drive, Apartment B, West Palm Beach; the investigation of a shooting on April 28, 2006, at 1910 Mercer Avenue, West Palm Beach; and the investigation of a shooting on September 11, 2006, on the 1300 block of Haverhill Road in West Palm Beach.*

The United States has already provided the documentation in its possession related to these shootings during pre-trial discovery.   In response to Troya's informal discovery request, the United States provided the following detailed outline of the pre-trial discovery it had provided to trial counsel on these shootings:

> *Broken down separately as Suwanee, Mercer & Haverhill:*
>
> *Suwanee:*
>
> *3/07/2008 letter of additional evidence:*
> > *a.    404(b) notice on Suwanee & Mercer Avenue shootings;*
> > *b.    PBSO ballistics analysis by Quereau linking weapons for Suwanee & ballistics analysis for Mercer Ave shootings [Quereau]*

---

2 The United States contacted former AUSA firewall counsel Jacqueline Arango concerning issues raised by Troya.   She confirmed via e-mail that she did not maintain records of any type relating to that assignment.   *See* Appendix G.

16

*10/22/08 discovery letter w/ attachments:*
      *i. CD-ROM, Suwanee shooting photos;*
      *iii.     CD-ROM w/ following attachments:*
            *a.     (a) crime scene diagram of Suwanee Drive shooting scene, [2 "pdf" files];*
            *(c) curriculum vitae of Karin A. Crenshaw;*
            *(f) property receipts relating to various items of evidence [mostly spent bullets and casings] at each of the three separate shooting locations:*

*Mercer Ave.:*

*3/07/2008 letter of additional evidence:*
      *a.     404(b) notice on Mercer Avenue shooting;*
      *b.     PBSO ballistics analysis by Quereau for Mercer Ave shootings [Quereau]*

*10/22/08 discovery letter w/ attachments:*
      *ii.     CD-ROM, Mercer Ave., shooting photos;*
      *iii.     CD-ROM w/ following attachments:*
            *(b) crime scene diagram of Mercer Avenue shooting scene;*
            *(f) property receipts relating to various items of evidence [mostly spent bullets and casings] at each of the three separate shooting locations:*

*Haverhill:*

*3/07/2008 letter of additional evidence:*
      *c.     Haverhill shootings by Troya and Sanchez; 4/24/08 letter enclosing the following:*
            *b.  CD labeled 06-110508 containing digital photos of Haverhill shooting;*

*5/8/08 letter enclosing the following:*
      *a. PBSO ballistics lab report, negative match on Haverhill [PBSO Omar Felix]*

Appendix B at pp. 6-7.

As with other claims for which Troya seeks Court intervention, the United States already specifically informed Troya about the pre-trial discovery it had previously provided and where to

find it.   Moreover, the United States provided in advance of direct examination any *Jencks* material it had prior to calling any witness with knowledge of these shootings, *e.g.,* Kevin Vetere, Kelly Ghumrawi, Traci Hayes, Elizabeth Rodon, Angela Culpepper, Neil Sielinski, Brandon Orr, and Jeff Cunningham, (*See* CR-DE 757 and 758 trial transcripts from February 18-19, 2009).

While Troya claims his trial counsel was ineffective for conceding his involvement in these shootings, he makes no effort to explain how additional discovery in this area would support his claim.   It appears, instead, that the discovery request is based on the speculative hope that a search through the files of local law enforcement might produce something helpful to his case.   He has not made a specific factual allegation demonstrating that he would be entitled to relief if discovery was allowed on the uncharged shootings beyond what was already provided pre-trial.   Because of this factual omission, good cause has not been demonstrated, and discovery should not be allowed.

**Request H.   Documents relating to alleged arbitrary application of the death penalty, including documents relating to post-conviction conditions of confinement at Terre Haute Penitentiary** (Troya Claim XXIII at pp. 267-284).

Claim dismissed (DE-CV 40 at pp. 10-11) and discovery believed to be moot.

**Request I.   Documents relating to dangers of traveling to Matamoros, Mexico** (Troya Claim XXIV at pp. 284-292).

On this request, Troya seek documents related to:

> *Any investigation that was undertaken by the U.S. Government or cooperating agencies prior or subsequent to trial related to the charges in this case, and any measures taken by any investigators, law enforcement or otherwise to ensure their safety.*

(CV-DE 34 at pp. 18-19).

Discovery should not be ordered on this request.   Defense counsel already have in their possession documents related to the dangers of traveling to Matamoros, Mexico. *See, e.g.,* CV-De

18

5-18 detailing Matamoros risk assessment.

Troya's claim that some still hidden key in Matamoros would have unlocked a potential defense or additional mitigation is wholly unsupported.   The most Troya indicates is that an investigation in Matamoros might have revealed additional information about Varela's drug trafficking history (CV-DE 25 at 304).   But Troya is silent about how such information would have changed the outcome of his case.   Further, neither any travel information nor Varela drug trafficking information would have helped Troya beyond what was already presented at trial. Connecting Varela to the Mexican Cartel would have resulted in connecting Troya to it as well, considering that the Third Superseding Indictment charged a drug trafficking conspiracy.   See also, USA 2255 Response at Issue "B".   This deficiency is especially problematic for Troya since his trial counsel successfully argued in mitigation that Varela was an equally culpable co-defendant who did not face the death penalty (CR-DE 859 at p. 12) (Ten jurors finding the mitigating factor that "[a]n equally culpable co-defendant, Danny Varela, will not be punished by the death penalty").   Accordingly, the unsupported request does not warrant discovery.

**Request J.   Documents withheld by the following agencies from Troya's prior written requests:** ATF, DEA, FBI, BOP, FDLE, West Palm Beach Police Department, and Greenacres City Police Department, and documents withheld by non-governmental entity Crimestoppers (Troya generally alleges relevant to all claims).

Troya seeks "all documents within the U.S. Attorney's file, since the file relates to all claims raised" (CV-DE 34 at p. 19).   Additionally, Troya requests records from ATF, DEA, FBI, BOP, FDLE, West Palm Beach and Greenacres Police Departments, and Crimestoppers.

The request for the entire U.S. Attorney's file deserves short shrift.   As noted above, Troya is not entitled to discovery unless he can show with specificity how such records would support a cognizable claim.   As detailed above, Troya has not made any such showing related to specific

19

records.   Accordingly, he certainly has not established with specificity how a wholesale review of the entire U.S. Attorney file would bolster any particular claim.

As to Troya's requests related to other agencies, the United States already notified Troya in response to his informal discovery request that the United States does not have this information and does not know what, if anything, was withheld by any organization.   *See* Appendix B at 12-14.   The Court should not order discovery for these separate entities.   Again, as described above, Troya has failed to show how records in the possession of these agencies are likely to support any of his allegations.   The Court should not countenance discovery requests premised on unsupported speculation.   *See Winthrop- Redin v. United States*, 767 F.3d 1210, 1218 (11th Cir. 2014) (*citing Machibroda v. United States*, 368 U.S. at 495, 82 S.Ct. 510 (1962)) ("The district court was not required to allow a fishing- expedition based only on [the defendant's] incredible allegations."). As this request falls short of the required "good cause" standard, it should be denied.

## Conclusion

In compliance with its pre-trial discovery obligations, the United States already provided a wealth of information.   Now, after an appeal rejected on its merits, Troya seeks additional discovery without demonstrating the legally-required factual support.   His claims are not based on the requisite showing of good cause.   Troya has not provided specific factual support demonstrating that the evidence sought via discovery would raise sufficient doubt about his guilt

to undermine confidence in the result of the trial or imposition of the death penalty.   For this

reason, his discovery requests should be denied.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By:   */s Stephen Carlton*
STEPHEN CARLTON
ASSISTANT UNITED STATES ATTORNEY
500 S. Australian Ave., Suite 400
West Palm Beach, Florida 33401-6235
Admin. No. A5500011
Tel. (561) 209-1053
Telefax (561) 659-4526
E-mail: Stephen.Carlton@USDOJ.GOV

21

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on November 14, 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.   I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: /s/   *Stephen Carlton*
Stephen Carlton
Assistant United States Attorney

22

## SERVICE LIST

**Daniel Troya v. United States**
**Case No. 16-80700-CV-SCOLA**
**United States District Court, Southern District of Florida**

**Stephen Carlton**
**Stephanie Evans**
**Brandy Galler**
Assistant U.S. Attorneys
Stephen.Carlton@usdoj.gov
Stephanie.D.Evans@usa.doj.gov
Brandy.Galler@usdoj.gov
U.S. Attorney's Office
500 S. Australian Ave, Suite 400
West Palm Beach, FL 33401
Telephone: (561) 820-8711
Facsimile: (561) 659-4526
**Attorney for United States**
[Service via CM/ECF]


**Steven H. Malone**
1217 South Flagler Drive
Second Floor
West Palm Beach, FL 33401
Phone:   (561) 805-5805
stevenhmalone@bellsouth.net
[Service via CM/ECF]


**D. Todd Doss**
Federal Defender's Office, MDFL
201 South Orange Ave., Ste. 300
Orlando, FL 32801
Phone:   (407) 648-6338
stevenhmalone@bellsouth.net
[Service via CM/ECF]