**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**DANIEL TROYA,**
    **Movant,**

v.                                                        **Case No.        16-80700-Civ-Scola**

**UNITED STATES OF AMERICA,**

    **Respondent.**

_____/

**MOTION TO REASSIGN CASE PURSUANT TO 28 U.S.C. § 455(a)**

The movant Daniel Troya, pursuant to 28 U.S.C. § 455 and the Fifth, Sixth, and Eighth Amendments to the United States Constitution, respectfully requests an order disqualifying and recusing the Honorable Robert Scola from further participation in this case. The grounds for this motion and supporting legal authority are set forth as follows:

## I.        Introduction

On May 3, 2016 Mr. Troya filed a § 2255 motion challenging his conviction and sentence of death. As part of that motion, Mr. Troya alleged several *Brady* claims pertaining to both phases of his trial. On September 12, 2016, in support of the claims raised in that motion, he requested discovery pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings (the "2255 Rules"). On November 14, 2016, the government responded to oppose all discovery alleging facts that contradict representations made in open court to the trial judge by then Assistant United States Attorney John Kastrenakes.[1]

These assertions raise an important question of fact going to the heart of Mr. Troya's *Brady* claim. To resolve it, Judge Scola must assess the credibility of his friend and former co-

---

[1] Mr. Kastrenakes is currently a circuit judge in the Fifteenth Judicial Circuit Court in Palm Beach County, Florida.

counsel, John Kastrenakes. Further, assessment of both the discovery motion and the *Brady* claim requires that Judge Scola make fact findings as to the government's representation of the practices and habits of the trial prosecution team, led by Mr. Kastrenakes.  As a former co-counsel of Mr. Kastrenakes in a capital prosecution, Judge Scola has a unique frame of reference and previously-acquired knowledge relevant to these factual determinations.

Mr. Troya was sentenced to die by jurors who were not made aware he has organic brain damage. In lay person's terms, the central question facing Judge Scola is why that happened. Was it ineffective assistance of counsel or a *Brady* violation by the government or some interaction between the two?  The judge who presides must wrestle with whether the government's narrative regarding what happened within the prosecution team in terms of the flow of information and retention of documents is realistic and believable.  That judge must identify missing information and assess whether, even if plausible, those practices were appropriate.  Because, as discussed *infra*, the government's response implicates Mr. Kastrenakes' credibility and raises questions regarding his practices and habits in capital prosecutions, in order to resolve both the discovery issues and the ultimate habeas claims, Judge Scola's continued participation in this case might reasonably cause questions of impartiality, and this case must be reassigned.[2]

---

[2] Although undersigned counsel were previously aware that Judge Scola and Mr. Kasternakes were former colleagues, as discussed *supra*, this alone does not support disqualification. Recusal has become necessary now, however, because of the government's response to discovery concerning Mr. Kasternakes and the implications it has on this Court's resolution of discovery and the ultimate merits of Mr. Troya's claim. *See e.g. United States v. Kelly*, 888 F.2d 732, n.26 (11th Cir. 1989) (disqualification request timely because motion "based not simply on the friendship between the judge's wife and Mrs. Willis as such, but also on the judge's expressed reaction to the problem during and after the trial, and on the related events at trial.")

## II.       The Standards Governing this Motion

Section 455(a) of Title 18 provides "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The test under §455(a) for determining whether a judge's impartiality might reasonably be questioned is "whether an objective, disinterested, lay observer fully informed of the facts underlying the ground on which recusal was sought would entertain a significant doubt about the judge's impartiality." *Parker v. Connors Steel Co.*  855 F. 2d 1510, 1523 (11th Cir. 1988). [3]  The §455(a) analysis does not call into question either the Court's actual impartiality or the Court's ability to remain impartial, as "a reasonable person may question impartiality without the presence of any evidence that a judge is subjectively biased." *In re Bulger*, 710 F.3d 42, 46 (1st Cir. 2013); *see also Murray v Scott*, 253 F.3d 1308, 1313 (11th Cir. 2001) ("Furthermore, we do not decide or hint today that Judge De Ment either has acted unfairly to the parties as he ruled on this case or has utterly disregarded his ethical duties.").

The Supreme Court has explained the goal of section 455(a) is to avoid even the appearance of partiality. *Liteky v. United States*, 510 U.S. 540, 548 (1994)("what matters is not the reality of bias or prejudice but its appearance"); *see also In re School Asbestos Litigation*,

---

[3]An objective standard creates problems in implementation. Judges must imagine how a reasonable, well-informed observer of the judicial system would react. Yet the judge does not stand outside the system; as a dispenser rather than a recipient or observer of decisions, the judge understands how professional standards and the desire to preserve one's reputation often enforce the obligation to administer justice impartially, even when an observer might be suspicious. Judges asked to recuse themselves hesitate to impugn their own standards; judges sitting in review of others do not like to cast aspersions. Yet drawing all inferences favorable to the honesty and care of the judge whose conduct has been questioned could collapse the appearance of impropriety standard under § 455(a) into a demand for proof of actual impropriety. So although the court tries to make an external reference to the reasonable person, it is essential to hold in mind that these outside observers are less inclined to credit judges' impartiality and mental discipline than the judiciary itself will be.

*Matter of Mason*, 916 F.2d 384, 386 (7th Cir. 1990)

977 F.2d 764, 782 (3d Cir. 1992) ("[t]he problem, however, is that regardless of actual impartiality, a reasonable person might perceive bias to exist, and this cannot be permitted."); *In re Murchison*, 349 U.S. 133, 136 (1955) ("Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way 'justice must satisfy the appearance of justice.'") (citation omitted).

There is no dispute that friendships and acquaintanceships alone do not require disqualification of a judge. *See e.g. United States v. Murphy*, 768 F.2d 1518, 1537 (7th Cir. 1985) ("…friendships among judges and lawyers are common…a judge need not disqualify himself just because a friend—even a close friend—appears as a lawyer.); *Hadler v. Union Bank and Trust Co. of Greenburg*, 765 F.Supp 976 (1991) ("Friendship means many things, but it is rarely adequate grounds upon which to seek recusal of a federal judge."). However, when a previous colleague or a friend has testimony to provide on a key issue such that a judge is required to judge his or her credibility, § 455(a) mandates disqualification based on the appearance of impartiality. *See e.g. United States v. Murphy*, 768 F.2d 1518 (7th Cir. 1985) (concluding judge should have disqualified himself where he and the prosecuting attorney were close friends and planned to vacation together immediately after the trial); *Parker v. Connors Steel Co.,* 855 F.2d 1510 (11th Cir. 1988) (holding trial judge should have disqualified himself where his law clerk's father—who himself had been the judge's law clerk—was a partner in the law firm representing one of the parties); *United States v. Kelly*, 888 F.2d 732 (11th Cir. 1989) (holding trial judge improperly failed to disqualify himself when, among other things, a close personal friend was a key defense witness); *Roberts v. Bailar*, 625 F.2d 125 (6th Cir. 1980)

(reversed for failing to disqualify where, in pretrial proceedings, the judge revealed he knew one of the parties and that he considered him an honorable man who would not discriminate).

In *Hadler v. Union Bank and Trust Co. of Greenburg*, 765 F. Supp. 976 (S.D. Ind. 1991), the court noted that, although mere friendship is an insufficient reason to disqualify, recusal was required where the judge's friend was to be a witness; his testimony would likely be pivotal; his testimony would "turn on his credibility as a witness"; the judge was to be the factfinder; and the friend had an interest in the outcome of the case. *Id.* at 978. Likewise, in *United States v. Ferguson*, 550 F.Supp. 1256 (S.D. NY. 1982), the judge's relationship with a former law clerk, whose testimony was crucial on a disputed issue, mandated disqualification. As the district judge noted,

> The issue then is not the Court's own introspective capacity to sit in fair and honest judgment with respect to the controverted issues, but whether a reasonable member of the public at large, aware of all the facts, might fairly question the Court's impartiality. This is an objective standard and "where the question is close, the judge whose impartiality might reasonably be questioned must recuse himself from the trial."…This situation is quite unlike the prior motion to disqualify because a former law clerk had been assigned to prosecute the case. The mere fact of close relationship did not require disqualification. *In this instance, however, credibility is a vital issu*e. The Court concludes that under all the circumstances here presented it is required to disqualify itself on the ground that its impartiality might reasonably be questioned.

*Id.* at 1259-60 (internal citations omitted) (italics added).

The need for disqualification to preserve the appearance of justice is even greater where, as here, the Court plays the role of factfinder. *See Hadler*, *supra; Alexander v. Primerica Holdings, Inc.,* 10 F.3d 155, 166 (3d Cir. 1993) ("When the judge is the actual trier of fact, the need to preserve the appearance of impartiality is especially pronounced."). Moreover, case law makes clear that judges must resolve any doubts they may have in favor of disqualification. *See e.g. Murray v. Scott*, 253 F.3d 1308, 1313 (11th Cir. 2001) ("federal judges must early and often

consider potential conflicts that may arise in a case and, in close cases, must err on the side of recusal"); *United States v. Kelly*, 888 F.2d 732, 744 (11th Cir. 1989) ("judges must resolve any doubts they may have in favor of disqualification).

### III.   The Need for Disqualification in this Case

In his § 2255 motion, Mr. Troya alleged that the government withheld evidence that would have supported or confirmed the fact that Mr. Troya suffers from organic brain damage, a fact that would have provided mitigation at the punishment phase of his trial. In support of this claim, Mr. Troya pointed to a hearing transcript where, prior to trial the government told the Court that they had hired an expert whose expertise was reading PET Scans and that the expert required the original PET scan of Mr. Troya's brain for review. The request was very specific, and indicated then-AUSA Kastrenakes had already spoken with the government neuropsychiatrist about the first disclosure trial counsel had provided:

> MR. KASTRENAKES: And I have retained a neuropsychiatrist who is very familiar with PET Scans. I need the original PET Scan to be able to supply to him for possible rebuttal testimony. I told Mr. Eisenberg that. He sent us a color copy of an e-mail which doesn't cut it as far as the doctor's ability to review the raw data.

T7775. After defense counsel reaffirmed that at least one of their experts would refer to the PET scan results at trial, the Court ordered the original produced for the government neuropsychiatrist and Mr. Eisenberg promised to comply later that day. T7777. What happened next is a matter of dispute.  Undersigned counsel have set out those facts that are known relevant to both the ineffectiveness claim CV-DE 25 Claim XXV, Pg. 292 and the *Brady* claim CV-DE 25 Claim XVIII, Pg. 240.

Based on this, as part of his § 2255 motion, Mr. Troya alleged that this evidence--the government expert's review and opinion of the PET Scan, referred to by AUSA Kastrenakes but

never disclosed to the defense—provided the basis for a *Brady* claim. Mr. Troya therefore sought discovery on this issue, both informally and by motion to this Court.

On July 20, 2016 the government responded to Mr. Troya's informal discovery request stating, in relevant part, that "[t]he only person retained by the government was Dr. Michael Brannon, and he examined Sanchez only" and "[t]here was no mental health aspect to the penalty case against Troy and no documents exist." *See* Exhibit 1. As this was clearly an erroneous statement (Dr. Brannon, for example, did evaluate Mr. Troya before trial), undersigned counsel contacted the government for clarification. On August 30, 2016, the government replied by letter explaining that after this further inquiry "I immediately began to review our files in detail, and contacted former AUSA John Kastrenakes (who handled most aspects of the penalty phase trial)." CV-DE 49-6 Appendix F.  Based on that review and discussion, the government found four separate folders of relevant documents and turned them over to the defense as a part of informal discovery. But the government then added: "The government did not retain a neuropsychiatrist; Kastrenakes misspoke about this retention." *Id*.

The government made a similar assertion in its formal reply to Mr. Troya's discovery request:

> While the United States did seek the original PET scan from Troya's counsel before the penalty phase began (CR-DE 795 at 7775), the United States ultimately did not engage the neuropsychiatrist to review or to interpret any PET scan.

CV-DE 49, Pg. 16. The government further related that it had contacted the AUSA who served as firewall counsel pretrial and she "confirmed via e-mail that she did not maintain records of any type relating to that assignment." *Id*.

The government's response demonstrates the need for further discovery as it raises more questions than it resolves.  The government's carefully worded response that there are "no such

documents" and that it "ultimately did not engage a neuropsychiatrist" does not resolve the relevant question of whether Mr. Kastrenakes ever spoke to, consulted with, or discussed the evidence of Mr. Troya's brain damage with a neuropsychiatrist, neuropsychologist, or neurologist. Similarly, the revelation that firewall counsel did not retain any documents about this issue also does not resolve whether that consultation took place and what it may have yielded. Counsel for Mr. Troya must directly question Mr. Kastrenakes to resolve these issues. If Mr. Kastrenakes has now told the government that he misspoke, what did he mean to say? Why did Mr. Kastrenakes represent to the Court that he had retained a neuropsychiatrist? Did Mr. Kastrenakes ever speak to a neuropsychiatrist about Mr. Troya's case? If so, who was the neuropsychiatrist and what did he or she say? Why wasn't the expert retained? What was firewall counsel's role and what communication did she have with the government's experts and Mr. Kastrenakes? A key issue before this Court on this claim, therefore, is the testimony and credibility of then AUSA Kastrenakes.

Counsel is aware that Judge Scola and Mr. Kastrenakes are former colleagues and have known each other for several decades.[4] Judge Scola and Mr. Kastrenakes joined the Miami-Dade State's Attorney's office in the same year where they were involved in cases together,

---

[4] Counsel make no assertion about the current status of the relationship between the Court and Mr. Kasternakes but respectfully request Judge Scola make a record of any information relevant to the question now before the Court. *See Porter v. Singletary*, 49 F.3d 1483, 1489 (11th Cir. 1995) ("In light of the Canons governing judicial conduct, we do not believe that an attorney conducting a reasonable investigation would consider it appropriate to question a judge…about the judge's lack of impartiality. Canon 3E(1) requires a judge to *sua sponte* disqualify himself if his impartiality might reasonably be questioned. The Commentary to Canon 3E(1) provides that a judge should disclose on the record information which the judge believes the parties or their lawyers might consider relevant to the question of disqualification.") (internal footnotes omitted).

including co-counseling at least one death penalty case.[5] Furthermore, in post-conviction proceedings Judge Scola and Mr. Kastrenakes defended themselves against prosecutorial misconduct claims such as the ones in Mr. Troya's motion.[6] As discussed above, this professional and personal connection does not, in itself, call for disqualification. However, where, as in Mr. Troya's case, Mr. Kastrenakes' credibility is at issue, recusal is required. *See Hadler, supra; Ferguson, supra.*

While counsel is not suggesting the Court actually harbors bias or prejudice, the appearance presented by these facts is troubling to a non-legal observer. A lay person observing these events would, in fact, have a reasonable doubt about the impartiality of the proceedings. To find that Mr. Troya's *Brady* claim is meritorious, Judge Scola would have to find Mr. Kastrenakes gave a misleading statement to the Court when he claimed to have retained a neuropsychiatrist and that he withheld evidence favorable to Mr. Troya.  Similarly, this Court now faces difficult decisions about discovery that could also be reasonably questioned by a lay person. Should this Court deny the discovery requested by Mr. Troya about Mr. Kastrenakes' discussions and preparation for the punishment phase, a hypothetical observer would reasonably suspect there was some desire to shield a former colleague and friend from the burden of answering discovery and testifying about what happened with the expert whom he claimed to have retained.

The unique circumstances of this case and the government's position on discovery has placed Mr. Kastrenakes' credibility at issue before this Court. This Court previously noted in a matter involving the credibility of a different prosecutor that its credibility could potentially be

---

[5] *See e.g. State v. Diaz*, F83-1891-B, 513 So. 2d 1045 (Fla. 1987) (listed in Judge Scola's Judicial Nomination Questionnaire, Exhibit 2 at 49).

[6] *See Diaz v. Dugger,* 719 So.2d 865, 867 n.2.

questioned. In his Judicial Nomination Questionnaire about its *sua sponte* recusal in *State v. Gonzalez and Franqui*, F92-2141 B & D, Judge Scola Court reasoned:

> I felt that there may someday be a claim of prosecutorial misconduct from the first trial and the credibility of the prosecutor who was my friend may be called into question. After the sentences were affirmed on direct appeal, and to avoid the appearance of impropriety, I *sua sponte* entered and order of recusal for all future post-conviction motions on the cases.

Exhibit 2 at 43. In *Gonzalez and Franqui*, this Court recused itself although no claim of prosecutorial misconduct had yet been lodged; here, such a claim has already been made, and the credibility of a colleague and friend is in fact in issue.

## CONCLUSION

Mr. Troya respectfully requests that his case be reassigned pursuant to 28 U.S.C. §455(a).

**Respectfully Submitted**,

| | |
|---|---|
| */s/ Steven H. Malone* | */s/ D. Todd Doss* |
| STEVEN H. MALONE | D. TODD DOSS |
| Steven H. Malone, P.A. | Assistant Federal Defender |
| 1217 South Flagler Drive | Federal Defender's Office, MDFL |
| Second Floor | 201 South Orange Ave., Ste. 300 |
| West Palm Beach, FL 33401 | Orlando, FL 32801 |
| Tele: 561-805-5805 | Tele: 407-648-6338 |
| Email: stevenhmalone@bellsouth.net | Email: todd_doss@fd.org |
| Florida Bar No. 305545 | Florida Bar No. 0910384 |
| *Counsel for Daniel A. Troya* | *Counsel for Daniel A. Troya* |

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 9, 2016, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record in this case, either via transmission of the Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic filing.

/s/ *Steven H. Malone*
STEVEN H. MALONE


/s/ *D. Todd Doss*
D. TODD DOSS

11