



**U.S. Department of Justice**

United States Attorney
Southern District of Florida

*500 S. Australian Avenue, Suite 400*
*West Palm Beach, FL 33401*
*(561) 820-8711 - Telephone*
*(561) 820-8777 - Facsimile*

July 20, 2016

STEVEN H. MALONE                  D. TODD DOSS
Steven H. Malone, P.A.            Assistant Federal Defender
1217 South Flagler Drive          Federal Defender's Office,
West Palm Beach, FL 33401         Second Floor,
                                  201 South Orange Ave., Ste. 300
                                  Orlando, FL 32801

Re: <u>Daniel Troya</u>

Gentlemen:

I write in response to your detailed requested discovery letter. This response is drafted in the spirit of providing  some limited information to you without waiving our official position that Daniel Troya is not entitled to discovery –without Court order—at this stage of a 2255 proceeding. Having preserved our litigation position let me provide responses that match the organization of your requests:

### *Documents contained in the trial file of the United States Attorney's Office*

This request seeks every record in our possession; it is overly broad and beyond the scope of either this District's Standing Discovery Order, or Rule 16,  Fed. R. Crim. Proc. Basically you are seeking broader discovery than you are entitled to receive, without any stated basis, or established "good cause". So, at this juncture we are not willing to entertain this request.

**<u>Requests</u>:**

• **Documents concerning or referencing the criminal history of any seated juror, alternate juror, or family member thereof;**

• **Documents concerning or referencing the former or current employment by a prosecutorial or law enforcement agency of any seated juror, alternate juror, or family member thereof;**

• **Documents concerning or referencing the witnessing of a crime by any seated Juror,**

**alternate juror, or family member thereof;**

**• Documents concerning or referencing the prosecution's awareness of any undisclosed information relevant to the accuracy and completeness of the information provided by the Jury venire;**

<u>**Response**</u>**:**

We have double-checked the retained files containing the jury selection notes, and the notes and records confirm my recollection:  we did not conduct the presumed research you have described. No such records exist.

<u>**Request**</u>**:**

**Juror interviews:**

<u>**Response**</u>**:**

Other than AUSA notes of responses to written juror questionnaires or the notes of juror responses to questions posed on the record, no other documents are known to exist. Those AUSA notes are work-product privileged and will not be disclosed absent court order.

<u>**Request**</u>**:**

**Documents that contradict the government's stated reason for failing to charge Danny Varela with murder; namely, that the government purportedly did not have enough evidence to prosecute him. Such documents include, but are not limited to:[1] any cooperation agreement between Mr. Varela and the government; [2] documents indicating that Mr. Varela provided information to the government, whether or not such information was provided as part of a formal cooperation agreement; [3] documents indicating that prosecution of Mr. Varela would adversely affect any criminal investigation or prosecution; and/or [4] documents indicating that any improper conduct on the part of law enforcement rendered prosecution of Mr. Varela infeasible;** [note that bracketed numbers added by USAO].

<u>**Response**</u>**:**

[1] there was no cooperation agreement with Varela, ever.  To the contrary the government did not even debrief Varela, and in fact filed a sentencing information enhancement under 21 USC 851 mandating a life sentence if convicted of some of the charged crimes.

[2] there are no documents indicating that Varela provided information to the government; see response to [1] above.

[3] there are no documents indicating that prosecution of Varela would adversely affect any criminal investigation or prosecution.

[4]  there are no documents indicating that any law enforcement officer, state, local or federal, acted improperly so as to render the prosecution of Varela infeasible.  This is a wildly inaccurate assumption on your part that has no good faith basis for the allegation; it did not happen.

**Request:**

**Documents that indicate that Mr. Varela was a co-conspirator in the carjacking conspiracy;**

**Response:**

The government provided Jencks materials to trial counsel concerning government witnesses Melvin Fernandez and Kevin Vetere; the government also provided  in discovery cellular telephone call records indicating cell tower activity on the night preceding, and the early-morning hours post-dating the homicides between Troya, Sanchez and Varela.  See also USA Trial Exhs. 755 and 760.1 through 760.15.

**Request:**

**Documents that indicate that Mr. Varela participated in the murder of the Escobedos in any way, including as an accomplice; that Mr. Varela intended to murder the Escobedos; or that Mr. Varela knew that the murders of the Escobedos would occur beforehand;**

**Response:**

The government has no information that Varela participated in the murders; to the contrary, eyewitnesses placed Varela in West Palm Beach, FL at that time. See, e.g., Testimony of David Doran, trial transcript at p. 3963, (February 2, 2009).  Moreover, the previously-disclosed cell phone tower records corroborated those witnesses' reports.  See trial testimony of Kevin Vetere concerning Varela's actions before and after the murders.

We do not believe any records exist tending to establish that Mr. Varela intended to murder the Escobedos or knew that they would occur before hand.

**Request:**

**Documents that indicate or suggest that Yessica Escobedo's cell phone traveled to Texas on October 12 or October 13, 2006 ;**

3

**Response**:

USAO provided discovery of  Yessica Escobedo's cell phone records [(956) 266-2004] and other persons' cell phone records at various stages of pre-trial preparation. See responses provided on the following dates: (i) 6th Supplemental SDO Response filed May 18, 2007, sections (e) and (f) of that response; 8th Supplemental SDO Response filed August 6, 2007, section (vii) of that response; January 28, 2008, Supplemental Discovery response; November 17, 2008 Supplemental discovery letter from AUSA enclosing CD-ROM with T-Mobile cell site data; and November 25, 2008, supplemental discovery letter enclosing cell phone subscriber, tolls and cell sight records for Troya, and T-Mobile cell site data (Sanchez, 786-853-8416), all on CDR #1; see also supplemental letter response of December 22, 2008, enclosing a CD-ROM containing: two sets of T-Mobile business records recently received by the United States: (1) an Excel spreadsheet entitled VLR_List.xls  which contains a list of telephone switches;  and (2) an Excel spreadsheet entitled florida_041907(1) - T-Mobile Cell Site Locationsl.xls which contains a listing of cellular tower site locations;

Note also, albeit unrelated to Yessica Escobedo's cell phone, that in the same December 22, 2008 supplemental response additional disclosure was provided concerning Sanchez cell phone records: "another copy of the subscriber and cell site location records for (786) 853-8416. We sent these out earlier but one or more photocopies may have been blocked when copying due to a post-it pad not being removed."

**Request**:

> • **Documents that reveal the identity of the individual or individuals with whom the Escobedos allegedly conducted a drug deal in the Daytona Beach area on the night/morning of October 12th/13th and documents that provide information as to the details,  nature, and scope of this drug deal;**

**Response**:

Investigative leads were followed relating to the possible source of the drugs obtained by Escobedo in the Daytona area on the night of October 12-13, 2006, and the users of telephone numbers in contact with Escobedo during that time.  Subscriber records for (561) 891-1220 (Jose Escobedo's phone) were disclosed in the 8th Supplemental Response (8/6/2007).  Moreover, a large volume of cellular telephone records were disclosed in the 4th Supplemental SDO Response, the Fifth (4/24/07); the 6th (5/18/07); the 8th (8/06/07; and a letter to Mr. Murrell  dated 1/28/08. While the investigation failed to develop any information sufficient to charge anyone else or any information materially favorable to the defendants, copies of those investigative reports are enclosed.

**Request**:

> • Documents that contain video footage of the area around the Briar Bay security booth;

4

**Response:**

See 8th Supplemental SDO Response, 8/6/2007:

A.  6 b. CD-ROM containing results of forensic examination of Briar Bay Computer hard drive, N-232.

**Request:**

**• Documents that contain information that Kevin Vetere expected or received any benefit of any type from the government, whether or not that benefit accrued as a result of a formal deal or cooperation agreement;**

**Response:**

*Giglio* information pertaining to Vetere was disclosed as follows:  (i) supplemental discovery response sent December 22, 2008 with attachments.  In Court notice and disclosure also provided prefatory to Vetere's testimony, see pp. 5402 through 5413, Vol. 21, February 11, 2009.

**Request:**

**Documents that contain information that Mr. Troya did not fire a weapon on October 13, 2006 and/or had a lesser role in the murders;**

**Response:**

There are no such documents. To the contrary, Troya provided an immunized statement not presented at trial during which he confessed to participating in the murders with Sanchez. This statement was witnessed by trial counsel, both guilt-phase and penalty-phase and documented in a DEA 6 which was turned over to Troya's counsel after it was given. It was disclosed on February 12, 2009.

**Request:**

**[1] Documents including opinions, reports (including interim or amended reports), memoranda, testing results, bench notes, and correspondence concerning the examination of the casings and projectiles collected from the crime scene, the casings and projectiles collected at Suwanee Drive and Mercer Avenue, the projectiles collected from Garden Court, and the AK -4 7 rifle collected from Garden Court;**

**Response:**

[1] Discovery related to tool mark evidence was provided in pre-trial discovery as follows:

1st Discovery Response, [DE 39, Sanchez (11/20/2006); DE 58, Troya (11/27/2006)] included inventory of search warrant, items take from search of Garden Court residence on October 25, 2006;

5th Supplemental SDO Response, [DE #176, April 24, 2007]:

m. ATF reported dated February 7, 2007 concerning testing of certain firearms by ATF Special Agent Steve Barborini, (copy attached to defense counsel copy of this response);

n. additional ATF Exhibits as follows: Exhibits 7, 8, 11, 12, 13, 18, 19, 20, 21, 25, 26, 27 and 29, all of which relate to firearms and violations of federal firearms laws, (copies were attached to defense counsel copy of that response);

Please note that paragraphs "m" and "n" cited above relate to firearms  but are not believed to related to tool mark evidence, but only operability.

Paragraph A. 6. of this same supplemental response also included the following information:

a. firearms testing: see response listed under paragraph "A. 5 n", *supra*;

b. ballistics results: Indian River Crime Lab, ("IRCL"), two reports, (2), each dated October 25, 2006 from Mark A. Chapman, 4 pages and 1 page, respectively, (copies attached to defense counsel copy of this response);.

c. attached to defense counsel's copy of this response are the *curriculum vitae* of IRCL employees Mark A. Chapman and Earl Ritzline, PBSO employee Beth Rosenthal, chemist, ATF Special Agents Steve Barborini and Jeff Kunz. **[only Chapman testified about tool mark evidence]**

6th Supplemental SDO Response, [Docket Entry #, filed 5/18/2007: ]

k.   Chain of custody form for projectile recovery reports from St. Lucie County medical examiner**.**

lab results & CV's:

a.   amended ballistics report from Indian River Crime Lab, ("IRCL"),  Mark A. Chapman; (copy attached to defense counsel copy of that response);

March 7, 2008, letter noting additional evidence:

      a. 404(b) notice on Suwanee & Mercer Avenue shootings;
      b. PBSO ballistics analysis by Quereau linking weapons for Suwanee
         & ballistics analysis for Mercer Ave shootings [Quereau]
      c.   Haverhill shootings by Troya and Sanchez;

March 27, 2008 Fed. Exp. packets, Index, papers, CD's, photos, etc., [post-SLSO & DEA review]:
      a. packets mailed only to: Ruben Garcia **[Troya]** , Michael Cohen **[Sanchez],** Greg Lerman **[Lopez],** Robert Gershman **[Varela]**
      b. contents included:
            d.  CD which consists of photographs of loaded magazines from Garden Court firearms (SLSO CD#72);

April 24, 2008 letter enclosing the following:
            b.  CD labeled 06-110508 containing digital photos of Haverhill shooting;

May 8, 2008 letter enclosing the following:
            a. PBSO ballistics lab report, negative match on Haverhill [PBSO Omar Felix]

June 23, 2008 letter enclosing the following :
            IRCL ballistics report comparing homicide casings w/ Garden Ct. casings, [both .40 and 9 mm casings have consistent magazine markings]

June 26, 2008 letter enclosing the following:
            IRCL ballistics report comparing homicide casings with Garden Ct. casings, [both .40 and 9 mm casings have consistent magazine markings] & c.v. of Jimmie D. Thompson, IRCL adopting same report

August 12, 2008 letter with attachments:
            i. curriculum vitae of Omar Felix;
            iii. curriculum vitae of Alison Quereau

October 17, 2008 discovery letter with attachments:
            i. lab report of Jay Mullins, PBSO prelim. ballistics**; [note: not believed to be related to tool mark evidence]**

October 22, 2008 discovery letter with attachments:
      i. CD-ROM, Suwanee shooting photos;
      ii. CD-ROM, Mercer Ave., shooting photos;
      iii. CD-ROM w/ following attachments:
            a. (a) crime scene diagram of Suwanee Drive shooting scene, [2 "pdf" files];
            (b) crime scene diagram of Mercer Avenue shooting scene;
            (c) curriculum vitae of Karin A. Crenshaw;

(d) curriculum vitae of Vonda Bray;

(e) photocopy of handwritten note intercepted on October 6, 2008 from Daniel Troya;

(f) property receipts relating to various items of evidence [mostly spent bullets and casings] at each of the three separate shooting locations:

November 21, 2008 supplemental discovery letter with enclosures:

(c) Chapman chart on research on .40 caliber projectiles & potential weapons;

**Request:**

**[2] Documents relating to the manufacturer and model of the microscopes used for comparison purposes, and any manuals describing proper uses and maintenance of the instrument;**

**[3] Documents containing internal written policies and standards for tool mark comparisons and guidelines for rendering an opinion;**

**[4] Any and all photomicrographs of the comparison subjects;**

**[5] Diagrams and/or photographs of subject evidence at all stages of collection and testing;**

**[6] Results of all test-firings of the recovered weapon, including notes, reports, opinions and photomicrographs of the test-firing subjects;**

**[7] Copies of written procedures (often called Standard Operating Procedures (SOPs)) for evidence testing, including procedures for preparation, instrument analysis, instrument calibration, and all required quality control practices;**

**[8] Laboratory quality manuals (however named) in effect at the time the subject work was performed;**

**[9] Laboratory quality procedures (however named), including internal audit procedures, training and qualification procedures, and document control procedures, in effect at the time the subject work was performed;**

**[10] Internal and external audit reports generated or received by the laboratories;**

**[11] For the analysts involved in the subject casework, a copy of the personnel file and all internal and external proficiency testing results for tool mark identification (including sponsoring agency, date(s) performed, responsible analyst, true values, reported results, raw data, scores, related correspondence, and corrective action records, as appropriate); and**

**[12] Access by defense experts to the casings and projectiles collected from the crime scene, the casings and projectiles collected from Mercer Avenue and Suwanee Drive, the projectiles collected from Garden Court, and the AK-47 rifle collected from Garden Court**

**Response:**

Items [2] through [12] as follows:

[2-11] USAO does not have this information; USAO does not have the personnel file of Indian River Crime Lab personnel; moreover there is no good faith basis, nor good cause for requesting this information.

[12]  Good cause has not been demonstrated to produce this information; moreover, USAO does not know if this evidence exists at this juncture.

**Request:**

**Documents relating to the investigation of a shooting on April 28, 2006, at 1305 Suwanee Drive, Apartment B, West Palm Beach; the investigation of a shooting on April 28, 2006, at 1910 Mercer Avenue, West Palm Beach; and the investigation of a shooting on September 11, 2006, on the 1300 block of Haverhill Road in West Palm Beach. Evidence relating to all three of these events was presented in the guilt phase against Mr. Sanchez as prior bad acts, and the jury argued that it supported aggravating factors argued at the penalty phase.**

**Response:**

Broken down separately as Suwanee, Mercer & Haverhill:

**Suwanee:**

3/07/2008 letter of additional evidence:
      a. 404(b) notice on Suwanee & Mercer Avenue shootings;
      b. PBSO ballistics analysis by Quereau linking weapons for Suwanee
        & ballistics analysis for Mercer Ave shootings [Quereau]

10/22/08 discovery letter w/ attachments:
      i. CD-ROM, Suwanee shooting photos;
      iii. CD-ROM w/ following attachments:
            a. (a) crime scene diagram of Suwanee Drive shooting scene, [2 "pdf" files];
              (c) curriculum vitae of Karin A. Crenshaw;

         (f) property receipts relating to various items of evidence [mostly spent bullets
           and casings] at each of the three separate shooting locations:

**Mercer Ave.:**

3/07/2008 letter of additional evidence:
      a. 404(b) notice on Mercer Avenue shooting;

b. PBSO ballistics analysis by Quereau  for Mercer Ave shootings [Quereau]

10/22/08 discovery letter w/ attachments:
  ii. CD-ROM, Mercer Ave., shooting photos;
  iii. CD-ROM w/ following attachments:
    (b) crime scene diagram of Mercer Avenue shooting scene;
    (f) property receipts relating to various items of evidence [mostly spent bullets and casings] at each of the three separate shooting locations:

**Haverhill:**

3/07/2008 letter of additional evidence:

  c. Haverhill shootings by Troya and Sanchez;

4/24/08 letter enclosing the following:
  b.  CD labeled 06-110508 containing digital photos of Haverhill shooting;

5/8/08 letter enclosing the following:
  a. PBSO ballistics lab report, negative match on Haverhill [PBSO Omar Felix]

**Request:**

**[1] Documents concerning or referencing the operational behavior, engineered capabilities, tuning and alignment, maintenance, and service history for cellular towers maintained by Verizon Wireless, T-Mobile, and MetroPCS in Florida;**

**[2] Documents concerning or referencing system information, cell site, and switch data for T-Mobile cellular towers in Florida and Texas for October 2006;**

**[3] Call detail reports (CDRs) for (786) 853-8416 and (956) 266-2004 for October 2006.**

**Response:**

[1] USAO doe not have this information; if it exists it could be obtained from the cell carriers via subpoena from any party.

[2-3] all records in the possession of the government relating to the evidence presented at trial was disclosed pre-trial in discovery; see our detailed response *supra*, wherein we described all evidence related to Yessica Escobedo's cell phone that we possessed.

**Request:**

**[1] Documents relating to Mr. Troya's character; economic, educational, and psychosocial background; mental health history; cognitive, intellectual, and adaptive functioning; and/or related to individuals involved in Mr. Troya's life and upbringing, that would tend to mitigate his convictions or lead to other mitigating evidence. This information includes, but is not limited to, information about Mr. Troya's or his family members' substance abuse; physical, psychological, or sexual abuse; dysfunctional family patterns and dynamics; dysfunctional peer relationships; poverty and attendant economic disadvantages; poor educational or employment performance; racism; organic, neurological, or other medical problems; mental disorders; and developmental disabilities;**

**Response [1]:**

USAO does not have any of these documents.  Note as stated earlier, Dr. Michael Brannon was the only mental health professional engaged by the United States. He is the only person who interacted with Ricardo Sanchez for the issues cited above. We disclosed all discoverable information on this issue prior to calling him as a witness in the penalty phase as to both  capital-punishment eligible defendants.

**Request:**

**Documents concerning the government's mental health case, including the identity of any experts who were consulted and the content of those consultations; and any documents regarding Mr. Troya, including the reports and notes of experts. This request includes the firewalled U.S. Attorney's file;**

**Response:**

The only person retained by the government was Dr. Michael Brannon, and he examined Sanchez only.  There was no mental health aspect to the penalty case against Troya and no documents exist.

**Requests [1 - 3]:**

**[1] Documents relating to prosecutors' discretion under the Federal Death Penalty Act that leads to the selection of defendants to prosecute capitally, including data regarding the seeking of the death penalty by location and jurisdiction; the criteria used by United States Attorneys to determine whether or not to seek the death penalty; and the criteria used by the United States Attorney General to determine whether or not to authorize the death penalty and whether or not to reject a settlement or to overrule a United States Attorney's decision not to seek the death penalty in a particular case;**

11

**Response [1]:**

USAO does not have this information.

**[2]  Documents relating to the United States Attorneys' agreement to waive the seeking of the death penalty against Mr. Sanchez and the United States Attorney General's decision to reject the proffered settlement and direct the United States Attorney's Office to seek the death penalty against him;**

**Response [2]:**

USAO possesses internal documents concerning the potential application of the death penalty to defendants Sanchez and Troya.  Deliberative process and attorney work product privileges apply to those documents.  The Department of Justice (Main) likely possesses similar documents, but likewise deliberative process and attorney work product privileges apply to those documents.

**[3] Documents relating to the conditions of confinement on federal death row at United States Penitentiary- Terre Haute, including but not limited to interim and final reports of investigations into the provision of medical and mental health treatment to death row prisoners, and interim and final reports of investigations into the use of force by prison staff upon death row prisoners.**

USAO does not have possession of, nor access to such documents. Such documents would be in the possession of the Bureau of Prisons.

**Request:**

**Documents requested from the Bureau of Alcohol, Tobacco, and Firearms that were withheld or redacted from Mr. Troya's record request dated June 22, 2015.**

**Response:**

USAO does not have this information; it does not know what, if anything was withheld by that organization.

**Request:**

**• Documents requested from the DEA that were withheld or redacted from Mr. Troya's record request dated June 15, 2015;**

**Response:**

USAO does not have this information; it does not know what, if anything was withheld by that organization.

**Request:**

**• Documents requested from the FBI that were withheld or redacted from Mr. Troya's record request dated June 22, 2015;**

**Response:**

USAO does not have this information; it does not know what, if anything was withheld by that organization.

**Request:**

**• Documents requested from the Bureau of Prisons that were withheld or redacted from Mr. Troya's record request dated June 22, 2015;**

**Response:**

USAO does not have this information; it does not know what, if anything was withheld by that organization.

**Request:**

**• Documents requested from the Florida Department of Law Enforcement that were withheld or redacted from Mr. Troya's record request dated July 14, 2015;**

**Response:**

USAO does not have this information; it does not know what, if anything was withheld by that organization.

**Request:**

**• Documents that were requested from West Palm Beach Police Department purportedly held by DEA and not provided pursuant to Mr. Troya's record request dated June 15, 2015;**

**Response:**

USAO does not have this information; it does not know what, if anything was withheld by that organization.

**Request:**

**• Documents that were requested from Greenacres Police Department purportedly held by DEA and not provided pursuant to Mr. Troya's record request dated July 14, 2015;**

**Response:**

USAO does not have this information; it does not know what, if anything was withheld by that organization.

**Request:**

**Documents requested from Crime Stoppers and never provided.**

**Response:**

USAO does not have this information; it does not know what, if anything was withheld by that organization.

**Request:**

NADDIS files for Jose Luis Escobedo (NN 4004649), Yessica Escobedo, Hugo Flores (NN 3239166), Jose Manuel Escobedo, Benito Rodriguez, Danny Varela, Daniel Troya, Liana Lopez, Ricardo Sanchez, Kevin Vetere, Juan Gutierrez, Andres Molina, Servando Salazar, Martin So to, "Muneco," Oscar Flores-Venegas, Jose Luis Escobedo, Sr. (NN4004649), Belinda Guerra, Rudy Espinosa-Garza, Vicente Garcia, Guadalupe Garcia, Ana Jessica Garza, Fructuoso Garza, Eduardo Diaz, Leone! Diaz, Robert Ruiz, Roberto Carlos Iracheta-Gonzalez, Erlinda Garza, Juan Carlos Santos, and Ramiro Nevarez, Jr.

**Response:**

NADDIS files are not discoverable; the government will not turn over any NADDIS information in DEA or DOJ files without a specific court order.

Should you have any questions concerning any of the previously-provided discovery, please contact me to discuss.   In the meantime, we would like to formalize the joint filing required by Judge Scola and get it finished.   Please notify me by no later than 12 noon tomorrow, June 24, 2016 to discuss authorization of our filing the last draft of that joint submission.  Thank you.

Sincerely

By:   */s Steve Carlton*
STEVE CARLTON
Assistant United States Attorney

**U.S. Department of Justice**
Drug Enforcement Administration

---

## REPORT OF INVESTIGATION

**Page 1 of 3**

| 1. Program Code | 2. Cross       Related Files File | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|
| 5. By: TFO David Weeks<br>At: West Palm Beach RO | ☒ M9-07-0008<br>☒ CS-07-124037<br>☐<br>☐<br>☐ | 6. File Title | |
| 7. ☐ Closed  ☐ Requested Action Completed<br>☐ Action Requested By: | | 8. Date Prepared<br>06-04-2007 | |

9. Other Officers: WPBPD Agent Richard Birch and SLSO Detective Fred Wilson

10. Report Re: Debriefing of Brownsville RO CS-07-12     on 05-22-2007.

---

### SYNOPSIS

On May 22, 2007, Drug Enforcement Administration (DEA) West Palm Beach Resident Office (WPBRO) TFO David Weeks and fellow investigators debriefed Brownsville Resident Office (BRO) CS-07-12    at the BRO in Brownsville, Texas, concerning information related to the murder of the Escobedo family on the Florida Turnpike on October 13, 2006.

### DETAILS

1. On May 22, 2007, DEA TFO Weeks, Assistant United States Attorney Steve Carlton, West Palm Beach Police Department (WPBPD) Agent Richard Birch, and St. Lucie County Sheriff's Office (SLSO) Detective Fred Wilson interviewed BRO CS-07-12   (CS). The following is a summary of the CS'S statements and is not purported to be a verbatim account.

2. The CS stated he obtained the following information from Martin SOTO in Mexico approximately one week after the murder of the Escobedo family on 10-13-06. According to the CS, SOTO is an associate of Oscar VENEGAS, a.k.a. "Muneco" (translated in English as "Doll")

3. According to the CS, Jose Luis ESCOBEDO (Luis ESCOBEDO) was in possession of fifteen kilograms of cocaine at the time of his murder. The CS stated the owner of the cocaine was VENEGAS.

---

| 11. Distribution:<br>    Division MFD, Brownsville RO | 12. Signature (Agent)<br><br>  TFO David Weeks | 13. Date |
|---|---|---|
|     District | 14. Approved (Name and Title)<br>Larry J. Reavis<br>Group Supervisor | 15. Date |
|     Other   SARI | | |

**DEA** Form  **- 6**
(Jul. 1996)
    DW

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION**<br><br>*(Continuation)* | | |
| | 3. File Title | |
| 4.<br>**Page   2   of   3** | | |
| 5. Program Code | 6. Date Prepared<br>06-04-2007 | |

4. The CS stated the "one with the grill" (referring to an individual with gold or platinum teeth) who was buying the cocaine from Luis ESCOBEDO in Florida, was upset about the poor quality of cocaine he (the buyer) was receiving.  The CS stated the cocaine was possibly being cut/diluted in Mexico prior to being shipped to the United States.

5. The CS stated the person who was buying the cocaine from Luis ESCOBEDO in Florida already owed Luis ESCOBEDO for ten kilograms of cocaine that had previously been delivered.

6. According to the CS, VENEGAS was charging Jose Manuel ESCOBEDO (Manuel ESCOBEDO) and Luis Escobedo $17,000 per kilogram of cocaine.  Luis ESCOBEDO was selling the kilograms for $18,000 and splitting the $1,000 profit with Manuel ESCOBEDO.  As part of the arrangement, VENEGAS was paying Luis ESCOBEDO'S rent and other bills.

7. According to the CS, Manuel ESCOBEDO was shipping Luis ESCOBEDO 30 – 50 kilograms of cocaine a week.  Proceeds from the sale of cocaine were returned to Mexico in a transport vehicle following the next shipment of cocaine.

8. The CS stated Luis ESCOBEDO spoke to Manuel ESCOBEDO approximately one hour prior to the homicide.  According to the CS, Luis Escobedo told his brother (Manuel ESCOBEDO) that they (unspecified) were still behind him (Luis ESCOBEDO) but was not concerned.

9. According to the CS, Manuel ESCOBEDO'S father-in-law is a homicide detective in Mexico.

**DEA** Form   **- 6a**
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | | |
|---|---|---|
| **REPORT OF INVESTIGATION**<br>*(Continuation)* | 1. File No. | 2. G-DEP Identifier |
| | 3. File Title | |
| 4.<br>**Page   3   of   3** | | |
| 5. Program Code | 6. Date Prepared<br>06-04-2007 | |

    3. VENEGAS-FLORES, Oscar
      No new information.

    4. ESCOBEDO, Jose Luis
      No new information.

    5. ESCOBEDO, Jose Manuel
      No new information.

---

**DEA** Form      **- 6a**
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | | | **Page 1 of 3** |
|---|---|---|---|
| 1. Program Code | 2. Cross  Related Files  File | 3. File No. | 4. G-DEP Identifier |
| 5. By: TFO David Weeks  At: West Palm Beach RO | ☐ ☐ ☐ ☐ ☐ | 6. File Title | |
| 7. ☐ Closed ☐ Requested Action Completed  ☐ Action Requested By: | | 8. Date Prepared  06-06-2007 | |
| 9. Other Officers: WPBPD Agent Richard Birch | | | |
| 10. Report Re: Debrief of I.C.E. Confidential Source on 05-23-2007. | | | |

**SYNOPSIS**

On May 23, 2007, West Palm Beach Police Department (WPBPD) Agent Richard Birch and Assistant United States Attorney (AUSA) Steve Carlton debriefed a Immigration and Customs Enforcement (ICE) Confidential Source (CS) in Brownsville, Texas, in reference to his/her knowledge of the murder of the ESCOBEDO family on 10-13-06 in Florida.

**DETAILS**

1. On May 23, 2007, WPBPD Agent Birch and AUSA Steve Carlton debriefed an ICE CS in Brownsville, Texas.  The following is a summary of the CS' statements and is not purported to be a verbatim account.

2. The CS stated in approximately 1999, he/she was buying a half to a whole kilogram of cocaine from Jose Luis ESCOBEDO every two to three days.  The CS stated he/she was paying ESCOBEDO $12,000 per kilogram of cocaine.  The CS stated he/she would also buy marijuana from ESCOBEDO.  After purchasing drugs from ESCOBEDO for a period of time, the CS stated he/she lost contact with ESCOBEDO for unknown reasons.

3. The CS stated in approximately 2001, he/she was purchasing kilograms of cocaine from an individual named Carlos Garcia (NOI).  The CS stated that during this time period he/she learned that Garcia was a middleman/broker for ESCOBEDO.  After learning this, the CS stated he/she went around Garcia and began purchasing directly from

| 11. Distribution:  Division MFD  District  Other SARI | 12. Signature (Agent)  TFO David Weeks | 13. Date |
|---|---|---|
| | 14. Approved (Name and Title)  Larry J. Reavis  Group Supervisor | 15. Date |

**DEA** Form  **- 6**
(Jul. 1996)
  DW

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | | 1. File No. | 2. G-DEP Identifier |
|---|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | 3. File Title | |
| 4. **Page  2  of  3** | | | |
| 5. Program Code | | 6. Date Prepared 06-06-2007 | |

ESCOBEDO.  The CS stated he/she had not seen ESCOBEDO in the past five years.

4. The CS stated that after the murder of the ESCOBEDO family, Felipe Guerrero (Yessica ESCOBEDO'S father) asked him/her to find out information about the homicides.

5. The CS stated that he/she spoke to one of his/her associates in Matamoros, Mexico who told him/her that the murder of the ESCOBEDO family was not committed by anyone in Mexico.  The associate told the CS that the murders were the result of a rip (robbery) committed by someone in Florida.  The associate also told the CS that someone from Matamoros had allegedly picked up $100,000 to $300,000 from Jose ESCOBEDO the day before the murders.  The CS identified his/her "associate" as a member of the Los Zetas cartel.

6. The CS stated that approximately two weeks before the murders, occupants of a green Chevrolet Suburban met with Jose ESCOBEDO in Florida to pickup money.  The CS stated the occupants of the Suburban were concerned that they may have been seen on video surveillance as a result of the homicide investigation.

7. The CS identified Martin Sosa (NOI) as a source of supply of cocaine for Jose Escobedo.

8. The CS provided the following information concerning other individuals he/she was involved with in drug trafficking.
   - The CS stated he/she previously delivered cocaine to individuals in Tampa, Bonita Springs, and Naples, Florida.  The CS stated he/she would fly on commercial airlines and would strap the cocaine to his/her body.
   - The CS stated Martin Sosa (NOI) would supply 20 to 30 kilograms of cocaine to an individual named Adolfo LNU in Naples, Florida. The CI stated he/she and several other unknown individuals would strap approximately 4 kilograms of cocaine on their person and travel to Florida.  The CS stated Adolfo would pick them up at the airport.

---

**DEA** Form   **- 6a**
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | | 1. File No. | 2. G-DEP Identifier |
|---|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | 3. File Title | |
| 4. **Page   3   of   3** | | | |
| 5. Program Code | | 6. Date Prepared 06-06-2007 | |

- The CS stated Adolfo was previously a customer of the Gulf Cartel located in Matamoros, Mexico.  The CS believes Adolfo was arrested in Florida on either State or Federal charges and spent approximately one year in prison.  The CS stated Adolfo's brother, Robert LNU, owned a car wash in Naples, FL.
- The CS stated that he/she also delivered cocaine to a female in Bonita Springs, Florida, known only to the CS as FNU Cisneros. According to the CS, Cisneros lived in a trailer park.
- The CS stated that he/she also delivered cocaine to a second male in Naples, Florida, known only to the CS as Cesar LNU.  The CS stated Cesar was arrested in Naples approximately five years ago.




  2. ESCOBEDO, Jose Luis
     No new information.

  3. ESCOBEDO, Yessica
     No new information.

**DEA** Form      **- 6a**
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | | | **Page 1 of 3** |
|---|---|---|---|
| 1. Program Code | 2. Cross        Related Files<br>File | 3. File No. | 4. G-DEP Identifier |
| 5. By: TFO David Weeks<br>   At: West Palm Beach RO | ☐ ☐ ☐ ☐ ☐ | 6. File Title | |
| 7. ☐ Closed ☐ Requested Action Completed<br>☐ Action Requested By: | | 8. Date Prepared<br>06-05-2007 | |
| 9. Other Officers: SLSO Detective Fred Wilson | | | |
| 10. Report Re: Interview of Victor Cortinas on 05-23-2007. | | | |

**SYNOPSIS**

On May 23, 2007, Drug Enforcement Administration (DEA) West Palm Beach Resident Office (WPBRO) TFO David Weeks and fellow investigators interviewed Victor Cortinas at the Brownsville Police Department in Brownsville, Texas, in reference to telephone number 956-243-7313, which was in contact with Jose Luis ESCOBEDO (Luis ESCOBEDO) on October 12, 2006.

**DETAILS**

1. On May 22, 2007, DEA TFO David Weeks and St. Lucie County Sheriff's Office Detective Fred Wilson interviewed Victor Cortinas at the Brownsville Police Department. Cortinas was the subscriber of a cellular telephone, number 956-243-7313, that was in contact with Luis ESCOBEDO several hours before ESCOBEDO and his (ESCOBEDO'S) family were murdered on 10-13-06. The following is a summary of Cortinas' statements and is not purported to be a verbatim account.

2. Cortinas told investigators that he (Cortinas) currently had five cellular telephone numbers subscribed in his name, which are used by members of his immediate family. After listing the telephone numbers for the five phones along with the users of the phones, TFO Weeks asked Cortinas if there were any additional phones subscribed in his

| 11.   Distribution:<br>      Division   MFD | 12. Signature (Agent)<br><br>    TFO David Weeks | 13. Date |
|---|---|---|
|       District | 14. Approved (Name and Title)<br>    Larry J. Reavis | 15. Date |
|       Other    SARI |     Group Supervisor | |

**DEA** Form    **- 6**
(Jul. 1996)
     DW

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. G8-06-0002 | 2. G-DEP Identifier YNC1B |
|---|---|---|
| *(Continuation)* | 3. File Title ROMAN-SALGADO, Demetrio | |

| 4. Page 2 of 3 | |
|---|---|
| 5. Program Code | 6. Date Prepared 06-05-2007 |

name.  Cortinas stated that the phone his brother was currently using was previously used by his brother-in-law, Juan SANTOS.

3. Cortinas stated the phone number assigned to the telephone SANTOS used was different from his (Cortina's) brother's current number. Cortinas stated that SANTOS, after using the phone for approximately ten months, stopped paying Cortinas for the phone.  Cortinas stated he contacted Nextel, changed the phone number, and gave the phone to his (Cortinas') brother.

4. Due to the fact that Cortinas could not remember the phone number for the phone SANTOS used, he (Cortinas) contacted Nextel for the phone number.  According to Nextel, the phone number previously assigned to the phone used by SANTOS was 956-243-7313.  Cortinas changed the phone number on the account on January 10, 2007.

5. Cortinas told investigators that SANTOS is self-employed.  According to Cortinas, SANTOS buys pallets of merchandise that has been returned to Wal-Mart and similar type stores, and sells the merchandise at flea markets.  Cortinas stated SANTOS drives a box truck.

6. Cortinas stated SANTOS' ex-wife, Norma Guzman, lives in Florida with their four children.  Cortinas stated SANTOS lives with his current wife, Sara LNU, and provided investigators with two addresses for the couple.

2. ESCOBEDO, Jose Luis
   No new information.

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION**<br>*(Continuation)* | 3. File Title | |
| 4.<br>**Page   3   of   3** | | |
| 5. Program Code | 6. Date Prepared<br>06-05-2007 | |

**3. SANTOS, Juan Carlos**

**Believed to have been associated with the delivery of 15 Kilograms of cocaine on 10-12-06 to Jose Luis ESCOBEDO in Florida.**

**DEA** Form      **- 6a**
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | **Page 1 of 3** | |
|---|---|---|---|
| 1. Program Code | 2. Cross ☐ File    Related Files | 3. File No. | 4. G-DEP Identifier |
| 5. By: TFO David Weeks<br>   At: West Palm Beach RO | ☐<br>☐<br>☐<br>☐<br>☐ | 6. File Title | |
| 7. ☐ Closed  ☐ Requested Action Completed<br>   ☐ Action Requested By: | | 8. Date Prepared<br>   06-05-2007 | |
| 9. Other Officers: WPBPD Agent Richard Birch | | | |
| 10. Report Re: Debriefing of Juan Carlos SANTOS on 05-24-2007. | | | |

**SYNOPSIS**

On May 24, 2007, Drug Enforcement Administration (DEA) West Palm Beach
Resident Office (WPBRO) TFO David Weeks and fellow investigators debriefed
Juan Carlos SANTOS at the Brownsville Police Department in Brownsville,
Texas, in reference to his association with Jose Luis ESCOBEDO.

**DETAILS**

1. On May 24, 2007, DEA TFO Weeks, Assistant United States Attorney
   (AUSA) Steve Carlton, and West Palm Beach Police Department (WPBPD)
   Agent Richard Birch debriefed SANTOS at the Brownsville Police
   Department.  SANTOS' attorney, Noë Garza, who was also at the
   debriefing requested that a Proffer Agreement be signed before his
   client made any statements.  AUSA Carlton agreed to this request and
   the agreement was signed.  The following is a summary of SANTOS'
   immunized statements and is not purported to be a verbatim account.

2. SANTOS stated he met ESCOBEDO in June or July 2006 while at a
   barbeque at a paint shop called Prestige in Brownsville, Texas.
   SANTOS stated that while he was at the barbeque, ESCOBEDO told him
   (SANTOS) that he bought and sold used cars.  SANTOS stated ESCOBEDO
   told him (SANTOS) to call him (ESCOBEDO) if he (SANTOS) ever came to
   Florida and that he (ESCOBEDO) may be able to help him find cars.
   SANTOS stated ESCOBEDO gave him his (ESCOBEDO) cellular telephone
   number.

| 11.  Distribution:<br>    Division  MFD<br><br>    District<br><br>    Other    SARI | 12. Signature (Agent)<br><br>    TFO David Weeks | 13. Date |
|---|---|---|
| | 14. Approved (Name and Title)<br>    Larry J. Reavis<br>    Group Supervisor | 15. Date |

**DEA** Form    **- 6**
(Jul. 1996)
    DW

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** | | |
| *(Continuation)* | 3. File Title | |
| 4. **Page  2  of  3** | | |
| 5. Program Code | 6. Date Prepared  06-05-2007 | |

3. SANTOS stated on approximately October 9, 2006, he (SANTOS) and his current wife, Sara Kianinejad, flew from Harlingen, Texas, to Orlando, Florida.  SANTOS stated he went to Florida to visit his four children who live with his (SANTOS') ex-wife in Florida.  SANTOS stated he was also looking to purchase used cars in Florida that he would resell in Texas.

4. SANTOS stated that upon arriving in Florida, a neighbor of his (SANTOS') ex-wife met him (SANTOS) and transferred custody of the four children to him (SANTOS) and his current wife.  SANTOS stated he (SANTOS) rented a PT Cruiser and traveled to Ocala where he, his wife, and the four children stayed in a hotel.

5. SANTOS stated that while he was in Florida, he called ESCOBEDO on October 12, 2006, at approximately 6:00 pm.  SANTOS stated this was the first time he had ever called ESCOBEDO.  SANTOS stated the purpose of the phone call was to ask ESCOBEDO if he knew of any good cars that were for sale.  SANTOS stated ESCOBEDO told him (SANTOS) that he was busy and that he (ESCOBEDO) would call him back.

6. SANTOS stated he called ESCOBEDO again approximately two hours later and asked ESCOBEDO the same question.  Once again, ESCOBEDO told SANTOS that he was busy and would call SANTOS back.  SANTOS stated that he never spoke to ESCOBEDO again and denied ever seeing ESCOBEDO during his (SANTOS') trip to Florida.

7. SANTOS repeatedly denied being involved in the drug trafficking activities associated with ESCOBEDO.

8. SANTOS stated the phone he used to call ESCOBEDO on October 12, 2006, was subscribed to his brother-in-law, Victor Cortinas.  SANTOS stated he (SANTOS) had been using the phone for approximately two months prior to 10-12-06.  SANTOS stated that after calling ESCOBEDO, he (SANTOS) lost the phone during his (SANTOS') trip to FL.

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | | 1. File No. | 2. G-DEP Identifier |
|---|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | 3. File Title | |
| 4. **Page   3   of   3** | | | |
| 5. Program Code | | 6. Date Prepared 06-05-2007 | |

**INDEXING**

   2. ESCOBEDO, Jose Luis
      No new information.

**3. SANTOS, Juan Carlos**

**Believed to have been associated with the delivery of 15 Kilograms of cocaine on 10-12-06 to Jose Luis ESCOBEDO in Florida.**

---

**DEA** Form   **- 6a**
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

## REPORT OF INVESTIGATION

**Page 1 of 4**

| 1. Program Code | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|
| 5. By: TFO David Weeks<br><br>At: West Palm Beach RO | ☐<br>☐<br>☐<br>☐<br>☐ | | 6. File Title | |
| 7. ☐ Closed  ☐ Requested Action Completed<br>☐ Action Requested By: | | | 8. Date Prepared<br>10-05-2007 | |

9. Other Officers: SLSO Detective Fred Wilson

10. Report Re: Interview of Norma Guzman on 10-01-2007.

### SYNOPSIS

On October 1, 2007, Drug Enforcement Administration (DEA) West Palm Beach Resident Office (WPBRO) TFO David Weeks and St. Lucie County Sheriff's Office (SLSO) Detective Fred Wilson interviewed Norma Guzman in reference to her ex-husband, Juan Carlos SANTOS, and his drug trafficking activities.

### DETAILS

1. Reference is made to a DEA Form-6 dated June 5, 2007, by TFO David Weeks titled "Debriefing of Juan Carlos SANTOS on 05-24-2007."

2. On October 1, 2007, at approximately 10:15 am, TFO Weeks and SLSO Detective Wilson interviewed Norma Guzman at her place of employment. The following is a summary of the statements made by Guzman and is not purported to be a verbatim account of her statement.

3. Guzman stated she met Juan Carlos SANTOS in approximately March of 1990 and began living with him approximately one month later in Brownsville, Texas.  Guzman stated that early on in the relationship she learned that SANTOS was involved in drug trafficking, specifically shipping marijuana to Florida.  Guzman stated on numerous occasions she was with SANTOS, when SANTOS would take her to a residence, where there would be a room filled with marijuana.  Guzman stated SANTOS employed females who would drive the marijuana to Florida in vehicles equipped with hidden compartments.

| 11. Distribution:<br>Division  MFD<br><br>District<br><br>Other  SARI | 12. Signature (Agent)<br><br>TFO David Weeks | 13. Date |
|---|---|---|
| | 14. Approved (Name and Title)<br>Larry J. Reavis<br>Group Supervisor | 15. Date |

**DEA** Form  **- 6**
(Jul. 1996)
    DW

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | |
| | 3. File Title | |
| 4. **Page   2   of   4** | | |
| 5. Program Code | 6. Date Prepared   10-05-2007 | |

4. Guzman stated SANTOS was employed as a mechanic with Valley Trucking in Brownsville, Texas, for approximately two years.  Guzman stated SANTOS was fired from this job in approximately January 2004.  Guzman stated the only other income SANTOS had, outside of drug trafficking and the mechanic work, was a paper route SANTOS worked for approximately a year and a half in the early 1990's.

5. Guzman stated she separated from SANTOS in approximately March 2004.  Guzman stated she then moved to Florida in approximately July 2004.  After moving to Florida, her friends in Brownsville told her that SANTOS was once again involved in drug trafficking.  Guzman stated that she believes that SANTOS is currently hiring individuals to transport drugs on his behalf to various locations.  Guzman stated that she believes SANTOS then travels via commercial airlines to these various locations to pickup the drug proceeds.

6. Guzman stated that during several of SANTOS' trips to Florida, arrangements were made for SANTOS to see the couples' (Guzman and SANTOS) children.  Guzman stated that while she could not recall the exact time frame of these meetings, she stated the first time involved her brother, Lorenzo Guzman, taking her children to meet SANTOS at a local Wal-Mart.  Guzman stated that according to her brother, as he (Lorenzo Guzman) and the children arrived at the Wal-Mart, SANTOS was exchanging suitcases with an unknown number of females in the parking lot.  Guzman stated that her children stayed with SANTOS for approximately four or five hours and never left the Bradenton, Florida area.  Guzman stated that according to her brother, SANTOS was driving a black Lincoln on this date.

7. Guzman stated the next time her kids saw SANTOS was at a Holiday Inn Express in Bradenton.  Guzman stated her neighbor, Jessica Teharte, drove her brother and the kids to meet SANTOS at the hotel.  Guzman stated that because she did not trust SANTOS, her brother stayed at the hotel with SANTOS and the kids for a couple days before returning home.

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | | |
|---|---|---|
| **REPORT OF INVESTIGATION**<br>*(Continuation)* | 1. File No. | 2. G-DEP Identifier |
| | 3. File Title | |
| 4.<br>**Page   3   of   4** | | |
| 5. Program Code | 6. Date Prepared<br>10-05-2007 | |

8. Guzman stated that on a different occasion Teharte took her children to meet SANTOS at a barbeque near Palmetto, Florida, just north of the Bradenton area.  Guzman stated that after spending a few hours with their father (SANTOS), Teharte brought the children back to her.

9. Guzman stated that in approximately June 2007, she (Guzman) drove her children to Tampa, Florida, where they met SANTOS.  Guzman stated that her children fly to Texas with SANTOS and spent the summer with him.  Guzman stated that when the children returned to Florida in August 2007, SANTOS dropped off her children at her work.  Guzman stated that Teharte later met SANTOS at a Comfort Inn in Bradenton where she picked up clothing and toys that SANTOS had purchased for the children.

10. In reference to SANTOS' statements concerning his travel to Florida on October 12, 2006, wherein he stated he spent the weekend with his children in a hotel in Ocala, Florida, and that Guzman's neighbor had met with him to drop off the kids; Guzman stated that this never happened.  Guzman stated she would have never allowed her children to travel to Ocala with SANTOS.

11. TFO Weeks showed Guzman a photograph of Gus MARTIN.  Guzman immediately identified MARTIN as "Gus Martin".  Guzman stated SANTOS and MARTIN have been friends for approximately 10 years.  Guzman stated SANTOS and MARTIN rent a ranch, approximately 10 to 20 acres, near the Port of Brownsville, on South Padre and Highway 511, in Brownsville, Texas.  Guzman stated SANTOS and MARTIN have cows and horses on the ranch.  Guzman stated that she did not know MARTIN to be involved in any criminal activity.

**INDEXING**

**DEA** Form      **- 6a**                     **DEA SENSITIVE**
(Jul. 1996)                              **Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | | 1. File No. | 2. G-DEP Identifier |
|---|---|---|---|
| **REPORT OF INVESTIGATION**<br>*(Continuation)* | | 3. File Title | |
| 4.<br>**Page   4   of   4** | | | |
| 5. Program Code | | 6. Date Prepared<br>10-05-2007 | |

2. SANTOS, Juan Carlos

    **Associate:      MARTIN, Gus**


3. MARTIN, Gus

    **Associate:      SANTOS, Juan Carlos**

**DEA** Form    **- 6a**
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | |
|---|---|
| **REPORT OF INVESTIGATION** | **Page 1 of 2** |

| 1. Program Code | 2. Cross File ☐ | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|

| 5. By: TFO David Weeks |
|---|
| At: West Palm Beach RO |

| 6. File Title |
|---|

| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | 8. Date Prepared 10-05-2007 |
|---|---|

9. Other Officers: n/a

10. Report Re: Interview of Juana BELTRAN on 10-02-2007.

## SYNOPSIS

On October 2, 2007, Drug Enforcement Administration (DEA) West Palm Beach Resident Office (WPBRO) TFO David Weeks and St. Lucie County Sheriff's Office Detective Fred Wilson, with the assistance of an interpreter, interviewed Juana BELTRAN in Pierson, Florida. The purpose of this interview was to determine the owner/user of prepaid cellular telephone number 386-785-5684 during the period of October 2006. This telephone number, subscribed in what is believed to be the fictitious name of David Blank, was in contact with Juan Carlos SANTOS numerous times on October 12, 2006.

## DETAILS

1. Reference is made to a DEA Form-6 dated June 5, 2007, by TFO David Weeks titled "Debriefing of Juan Carlos SANTOS on 05-24-2007."

2. Reference is made to a DEA Form-6 dated October 5, 2007, by TFO David Weeks titled "Interview of Juana Caro on 10-02-2007."

3. On October 2, 2007, TFO Weeks and Detective Wilson interviewed Juana BELTRAN. During this interview, Agents questioned BELTRAN in reference to telephone number 386-785-5684. The following is a summary of the statements made by BELTRAN and is not purported to be a verbatim account of her statement.

| 11. Distribution: Division MFD District Other SARI | 12. Signature (Agent) TFO David Weeks | 13. Date |
|---|---|---|
| | 14. Approved (Name and Title) Larry J. Reavis Group Supervisor | 15. Date |

**DEA** Form **- 6**
(Jul. 1996)
DW

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | | |
|---|---|---|
| **REPORT OF INVESTIGATION**<br><br>*(Continuation)* | 1. File No. | 2. G-DEP Identifier |
| | 3. File Title | |
| 4.<br>**Page   2   of   2** | | |
| 5. Program Code | 6. Date Prepared<br>10-05-2007 | |

4.  BELTRAN told investigators that she recognized telephone number 386-785-5684 as her previous telephone number.  BELTRAN stated that she bought the prepaid cellular telephone in Deland, Florida, and that she did not know the name in which the phone was subscribed in. BELTRAN stated the clerk at the cell phone store created the subscriber information.  BELTRAN confirmed that she had given the phone to Juana Caro, but could not recall exactly when this had taken place.  BELTRAN believes that it occurred sometime in 2007.

5.  BELTRAN stated that prior to giving the phone to Caro, she (BELTRAN) was the only person who used the phone.  BELTRAN denied ever allowing her brothers (believed to be Jose Candelario Beltran, Edgar Beltran, and Cecilio Beltran) or anyone else to use the phone.

6.  During the interview, TFO Weeks showed BELTRAN a photograph of Juan Carlos SANTOS and asked her if she recognized him.  Upon handing BELTRAN the photograph, BELTRAN sighed and gazed at the photograph for approximately a minute.  BELTRAN then denied knowing and/or having ever seen SANTOS before.  Based on her body language and the sigh, investigators were not convinced by her denial.

7.  When questioned about the numerous telephone calls between her (BELTRAN) cellular telephone and that of SANTOS' on October 12, 2006, BELTRAN was unable to explain the phone calls.




2. SANTOS, Juan Carlos
   No new information.

3. BELTRAN, Juana
   No new information.

---

**DEA** Form     **- 6a**
(Jul. 1996)                                   **DEA SENSITIVE**
                                   **Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | | | Page 1 of 2 |
|---|---|---|---|---|
| 1. Program Code | 2. Cross File   Related Files | | 3. File No. | 4. G-DEP Identifier |
| 5. By: TFO David Weeks<br>At: West Palm Beach RO | ☐<br>☐<br>☐<br>☐<br>☐ | | 6. File Title | |
| 7. ☐ Closed  ☐ Requested Action Completed<br>☐ Action Requested By: | | | 8. Date Prepared<br>10-05-2007 | |
| 9. Other Officers: n/a | | | | |
| 10. Report Re: Interview of Juana Caro on 10-02-2007. | | | | |

**SYNOPSIS**

On October 2, 2007, Drug Enforcement Administration (DEA) West Palm Beach Resident Office (WPBRO) TFO David Weeks and St. Lucie County Sheriff's Office Detective Fred Wilson, with the assistance of an interpreter, interviewed Juana Caro at her residence in Pierson, Florida.  The purpose of this interview was to determine the owner/user of prepaid cellular telephone number 386-785-5684 during the period of October 2006.  This telephone number, subscribed in what is believed to be the fictitious name of David Blank, was in contact with Juan Carlos SANTOS numerous times on October 12, 2006.

**DETAILS**

1. Reference is made to a DEA Form-6 dated June 5, 2007, by TFO David Weeks titled "Debriefing of Juan Carlos SANTOS on 05-24-2007."

2. On October 2, 2007, TFO Weeks and Detective Wilson interviewed Juana Caro.  During this interview, Agents questioned Caro in reference to telephone number 386-785-5684.  The following is a summary of the statements made by Caro and is not purported to be a verbatim account of her statement.

3. Caro told investigators that she recognized telephone number 386-785-5684 as a telephone number she previously used.  Caro stated that she had purchased the cellular telephone from a friend named Juana BELTRAN approximately six months ago.  Caro stated that approximately

| 11.  Distribution:<br>  Division  MFD<br><br>  District<br><br>  Other   SARI | 12. Signature (Agent)<br><br>  TFO David Weeks | 13. Date |
|---|---|---|
| | 14. Approved (Name and Title)<br>  Larry J. Reavis<br>  Group Supervisor | 15. Date |

**DEA** Form   **- 6**
(Jul. 1996)
    DW

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION**<br>*(Continuation)* | 3. File Title | |
| 4.<br>**Page   2   of   2** | | |
| 5. Program Code | 6. Date Prepared<br>10-05-2007 | |

one month ago she threw the phone away after it was damaged from being dropped in water.

4.  Caro identified Juana BELTRAN from a photograph shown to her by TFO Weeks.

**INDEXING**

2. SANTOS, Juan Carlos
   No new information.

**3. BELTRAN, Juana**

**Possible Associates: SANTOS, Juan Carlos**
**10/07 Identified as the user of telephone number 386-785-5684 during the period of October 2006.**

---

**DEA** Form     **- 6a**
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.