**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

DANIEL A. TROYA,
Movant,

v.                                                          Civil Action No. 16-80700-Civ-Scola

UNITED STATES OF AMERICA,
Respondent.

_____

**MOVANT'S REPLY TO RESPONSE OF UNITED STATES AND IN SUPPORT OF**
**EVIDENTIARY HEARING**

The movant Daniel Troya replies to the response of the United States and for an evidentiary hearing. He offers the following in support:

**Sections I and II of government response.**

The government correctly concludes the section 2255 motion is timely filed. In its discussion of the *Strickland* standards in Section II, the government urges this Court to give an "even stronger" presumption to the competence of trial counsel, contending the two were "very experienced [and] learned." CV Doc. 46 at 31-32. First, the view of the Eleventh Circuit on this issue must be put into perspective. In the case relied upon by the government, the Eleventh Circuit is careful to caution counsel's experience is only a "small" point in the equation. As the Court noted in *Chandler v. United States*, 218 F. 3d 1305, 1316 n. 18 (11th Cir. 2000):

> We accept that even the very best lawyer could have a bad day. No one's conduct is above the reasonableness inquiry. Just as we know that an inexperienced lawyer can be competent, *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 2050, 80 L.Ed.2d 657 (1984) (inexperienced does not mean ineffective), so we recognize that an experienced lawyer may, on occasion, act incompetently. Our point is a small one: Experience is due some respect.

Second, neither trial counsel are near as experienced as the government contends through reference to their online profiles. While Mr. Eisenberg is an experienced trial attorney, including

capital cases in state court, he had never handled a federal capital case before this one. Before his representation of Mr. Troya, Mr. Garcia had never even tried a murder case, much less a capital one. Mr. Garcia was appointed to this case when it only involved drug trafficking and before the murder indictment. When Mr. Garcia sought appointment of "Learned Counsel" for the case, he even acknowledged he "is not a panel attorney certified for capital cases." CR Doc 200. Even if Mr. Eisenberg's state capital experience is "due some respect," Mr. Garcia's total lack of such experience is most certainly not.

The government demeans movant's ineffectiveness claims by portraying them simply as allegations of "not calling certain witnesses, not seeking certain testimony from witnesses that were called, and not making certain motions and objections." Doc. 46 at 32. It forgets to mention the foundation of the ineffectiveness claims raised here: the failure of trial counsel to adequately investigate and prepare for the guilt and sentencing phases of trial, and the profound prejudice that resulted. The government acts as if counsel's conduct is insulated from constitutional inquiry in a capital case if they put on a few witnesses, ask a few questions, and make a few objections. Its position could not be further from the truth. There are times when "even an isolated error" if "sufficiently egregious and prejudicial" is prejudicially ineffective. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

The government accurately quotes to the circumstances under which courts owe deference to strategic judgments made by counsel: "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Crawford v. Head*, 311 F.3d 1288, 1298 (11th Cir.2002) (*quoting Strickland*, 466 U.S. at 690–

2

91, 104 S.Ct. at 2066). CV Doc. 46 at 32-33. The lack of a thorough factual and legal investigation is precisely why counsel were ineffective at Mr. Troya's trial here. "[T]he decision to limit an investigation "'must flow from an informed judgment.'" *Williams v. Allen*, 542 F. 3d 1326, 1337 (11th Cir.2008). Supposed "strategic choices"

> made after "less than complete investigation" are reasonable *only* to the extent that reasonable professional judgment supports the limitations on investigation. *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052; *accord Wiggins*, 539 U.S. at 527–28, 123 S.Ct. 2527 (finding ineffective assistance where "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible"); *Ford v. Hall*, 546 F.3d 1326, 1333–34 (11th Cir.2008) (holding that in evaluating the reasonableness of an investigation into mitigating circumstances "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further") (citations and quotation marks omitted).

*Ferrell v. Hall*, 640 F.3d 1199, 1226-27 (11th Cir. 2011).

And there can be no strategic decision, either, when counsel undertakes or neglects to undertake an action in mistake as to the law. *See Hinton v. Alabama*, 134 S.Ct. 1081 (2014)(counsel's conduct constitutionally unreasonable in retaining inadequate expert in firearms and toolmark evidence based on mistaken belief funding was limited; remanded for prejudice determination);

The government also argues "Complaints of uncalled witnesses and unoffered documents are disfavored and viewed with great caution as claims of ineffective assistance of counsel." CV Doc. 46 at 33. While it is generally true complaints of "uncalled witnesses" are disfavored in habeas, undersigned has conducted a thorough search and uncovered no case which include "unoffered documents" in that proposition. The government just unilaterally added that part to the mix. It is true claims involving uncalled witnesses are disfavored because such a decision is usually strategic, or a movant failed to credibly show what the witness would have testified to. But the disfavor of such claims is overcome where a petitioner, as here, demonstrates an

3

inadequate or prematurely truncated investigation is the cause of failing to call or properly inquire of the witness: "Constitutionally effective counsel must develop trial strategy in the true sense – not what bears a false label of "strategy" – based on what investigation reveals witnesses will actually testify to, not based on what counsel guesses they might say in the absence of a full investigation." *Ramonez v. Berghuis*, 490 F.3d 482, 489 (6th Cir. 2007).

In several cases, counsel have been found ineffective for not calling certain witnesses, and for not adequately drawing out helpful information from witnesses they do call: *Hinton v. Alabama*, 134 S.Ct. 1081 (2014)(counsel's conduct constitutionally unreasonable in retaining **inadequate expert in firearms and toolmark evidence** based on mistaken belief funding was limited; remanded for prejudice determination); *Gersten v. Senkowski*, 426 F.3d 588 (2nd Cir. 2005), *cert. denied sub nom. Artus v. Gersten*, 547 U.S. 1191 (2006)(counsel ineffective in child sex abuse case for failing to investigate the prosecution's medical and psychological evidence; testimony of **new experts** showed state's expert theories at trial no longer valid); *Richey v. Bradshaw*, 498 F.3d 344, 351-52 (6th Cir. 2007)( that trial counsel was ineffective for hiring an arson expert whose only training had come at two seminars conducted by the state arson experts utilized by the prosecution in the defendant's case, accepting the expert's agreement with the state's experts without question, and listing the expert as a trial witness before learning of his opinion, which led to the state calling him at trial and eliciting his agreement with its own experts on the critical issue of whether accelerants were used; prejudice also shown by the testimony of two **new arson experts** first presented in post-conviction proceedings); *Showers v. Beard*, 635 F.3d 625 (3rd Cir. 2011)(trial counsel ineffective for failing to present expert medical testimony by a forensic pathologist to rebut the prosecution's medical expert testimony; **new expert** testifying in postconviction opined death more likely resulted from suicide from overdose

4

rather than homicide); *Thomas v. Clements*, 789 F.3d 760 (7th Cir. 2015), *cert. denied,* 136 S.Ct. 1454 (2016)( trial counsel ineffective for failing to consult forensic pathologist to review the autopsy findings and evaluate the reliability of the conclusions reached by the prosecution's pathologist death resulted from intentional strangulation; **new expert** pathologist reconciled Thomas's statement and the evidence to conclude the strangulation was accidental). The cases cited above do not include the numerous ones in which relief was granted for failure to effectively use mental health expert evidence at the sentencing phase of a capital trial where new experts were presented post-conviction.

Similarly, the courts have found counsel ineffective at sentencing for not calling or inadequately examining witnesses: *Williams v. Allen*, 542 F.3d 1326, 1342 (11th Cir. 2008), *cert. denied*, 556 U.S. 1253 (2009)(penalty phase counsel deficient "by choosing to rely entirely" on petitioner's mother's account, which provided "an incomplete and misleading understanding of Williams' life history," where other uncalled witnesses and evidence "trial counsel failed to discover paints a vastly different picture of [petitioner's] background than that created by [his mother's trial] testimony."); *Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011)(counsel ineffective: though counsel credited for "obtaining expert assistance" to examine mental health issues, the expert had been given narrow mandate and virtually no materials, and though counsel's investigator interviewed a substantial number of lay witnesses, those interviews were limited to narrow questions about petitioner's character and failed to examine the "detailed information about [petitioner's] deeply troubled mental health and ... childhood" known to the witnesses. *Id*. at 1230.); *Cooper v. Secretary, Department of Corrections*, 646 F.3d 1328 (11th Cir. 2011).

As for the specific allegations in Mr. Troya's case, the government contends: "Troya's claims concerning uncalled witness[es], or areas of testimony that went unexplored are speculative and unsubstantiated or completely contradicted by the record." CV Doc. 46 at 34. A close review of Mr. Troya's Section 2255 motion shows the claims raised are anything but. The motion contains specific factual allegations spanning some 400 pages, every single one backed by sworn affidavits and expert reports. None are "completely contradicted" by the record, and the vast majority of the allegations raise new, extra-record facts and issues, none of which can be adequately answered by reference to the record and all of which require an evidentiary hearing.

Next the government broadly contends "With regard to Troya's claims concerning objections and motions that Troya's lawyer did not make, a lawyer has no obligation to raise meritless issues." CV Doc. 46 at 33. No argument from the movant in reply to that tautology. The merit of the issues raised is addressed in the Section 2255 motion and in this reply below.

As for the burden on the movant to demonstrate prejudice on his IAC claims, the government declares he "cannot establish" a reasonable likelihood of a different outcome at either phase of trial. CV Doc. 46 at 34. To support this unsupportable proclamation the government recites the supposedly "overwhelming" evidence of guilt such that the convictions could never be vacated, and says the "horrifying facts" of the killings "makes it highly unlikely Troya could have escaped the death penalty altogether, regardless of the quantity or quality of mitigation evidence." *Id*. Lots of other prosecutors have made similar arguments in lots of other cases, and those arguments have been roundly rejected.

**Guilt phase.**

The government correctly contends the strength of the evidence at guilt phase is a consideration in determining prejudice, but incorrectly says the evidence was "overwhelming."

6

There were significant gaps in the prosecution's proof. There was little forensic evidence, no confession to police, and no eyewitness testimony whatsoever that Troya killed any of the victims. His alleged statements to two felons were inconclusive and of questionable credibility. And the government could not account for another, close-by vehicle whose occupants may have been involved in the murders or a later cell phone call from one of the decedent's phone.

The government postulated, but never proved, exactly what happened by the side of the road, why Escobedo had driven to Daytona Beach, why Escobedo apparently had Sanchez and Troya caravan with him on this route, what Sanchez discussed in his phone calls with Escobedo and Varela along the way, or what Troya was thinking, saying, or hearing from Sanchez in the period leading to the robbery.

To fill these gaps in its proof, the government presented extensive trial testimony from one of its cooperators accusing Troya of three serious uncharged gun crimes — two drive-by shootings and an armed home invasion. The government says even if all errors are "corrected," convictions were inevitable. But the "overwhelming" evidence the government relies upon is precisely that which was inadequately crossed or otherwise countered by the defense.

**Sentencing Phase.**

There is no murder so horrifying a court can conclusively conclude not one reasonable juror would have voted for a life sentence if faced with new or different defense case in mitigation. The courts of this and other circuits certainly don't see the law at all as the government does. In the relatively recent case of *Cooper v. Secretary, Department of Corrections*, 646 F.3d 1328 (11th Cir. 2011), for instance, the Eleventh Circuit found counsel ineffective and granted death-sentencing relief where there were six aggravating factors. Prejudice was found though there were three murders: "the number of victims does not preclude

this Court from concluding prejudice has been established." *Id.* at 1356. Other courts have explained the reasons why the horrific nature of murders does not preclude a finding new mitigation and aggravation-lessening evidence sufficient to show a reasonable likelihood the sentencing phase would have been different. The Fifth Circuit has also noted the horrific nature of capital murder does not override *Strickland* prejudice:

> The State's stereotypical fall-back argument – that the heinous and egregious nature of the crime would have ensured assessment of the death penalty even absent [the error] – cannot carry the day here. … [O]ur decades of experience with scores of § 2254 cases from the death row of Texas teach an obvious lesson that is frequently overlooked: Almost without exception, the cases we see in which conviction of a capital crime has produced a death sentence arise from extremely egregious, heinous, and shocking facts. But, if that were all that is required to offset prejudicial legal error and convert it to harmless error, habeas relief based on evidentiary error in the punishment phase would virtually never be available, so testing for it would amount to a hollow judicial act.

*Walbey v. Quarterman*, 309 Fed. Appx. 795, 804 (5th Cir. 2009)(quoting *Gardner v. Johnson*, 247 F. 3d 551 (5th Cir. 2001)).

In *Hendricks v. Calderon*, 70 F.3d 1032 (9th Cir. 1995), *cert. denied*, 517 U.S. 1111 (1996), counsel was ineffective for failing to present mitigating evidence at the sentencing phase of petitioner's capital trial, and the court rejected the state's assertion prejudice could not be shown because the evidence of aggravation was "overwhelming." The court observed "the statutory factors give the jury broad latitude to consider amorphous human factors, in effect, to weigh the worth of one's life against his culpability," the "imposition of the death sentence is entrusted to the jury because it is a uniquely moral decision in which bright lines have a limited place."

Finally, the government says "The fact that Troya was able to escape the death penalty and receive life imprisonment for three of the five death penalty eligible counts is a testament to

8

the outstanding performances of counsel." CV Doc. 46 at 34. Whatever the reason for the life verdicts for the killings of the parents, who were drug dealers themselves, it was definitely not due to counsel's outstanding performances.

> ***Strickland* is a single ineffective assistance claim that defense counsel's deficient preparation and representation resulted in prejudice.**

The government invites this Court to commit error by splitting Mr. Troya's *Strickland* claim into discrete, individual claims and analyzing the prejudice of each as if it were a separate issue. According to the government, "bundling all of trial counsel's perceived errors, big and small, into one great mass with a Sixth Amendment denial of counsel label…is not approved by *Strickland*." Response at 185.[1] The government is incorrect. *Strickland*, and the Supreme Court cases that follow, make clear that, as the government describes it, bundling all claims, is exactly how a court must analyze a claim of ineffective assistance of counsel.

The gravamen of Mr. Troya's ineffective assistance claim is that trial counsel failed to adequately investigate the case and prepare for trial. This singular failure led to numerous errors and omissions that, viewed cumulatively, establish *Strickland* prejudice at both guilt phase and during punishment proceedings. Mr. Troya has presented copious, multifaceted relevant evidence to support his claim.[2] The government does not address whether trial counsel's failure to investigate and prepare for trial was deficient or whether there is "a reasonable probability

---

[1] The government makes this argument in response to Mr. Troya's cumulative error claim. This confuses two issues. Mr. Troya's claim of cumulative error requires an examination of the prejudice resulting from all of the errors in his case, including any *Brady* issues, *Strickland* issues, as well as the Court's error in excluding relevant evidence at punishment phase. Mr. Troya replies to this issue *infra.* A cumulative error claim has nothing to do with how the prejudice of a *Strickland* claim is analyzed.

[2] It is true that in pleading a *Strickland* claim, it is often easier and clearer to discuss trial counsel's failures discretely as Mr. Troya did in his 2255 Motion. However, this does not change the *Strickland* legal analysis of prejudice which requires the failures of trial counsel to be reviewed *in toto*.

that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Instead, it carves Mr. Troya's claim into smaller claims and argues that, with respect to each isolated fragment of the claim, Mr. Troya has proven neither deficient performance nor prejudice. In its response, the government subdivides the ineffectiveness issue into discrete, isolated claims about individual witnesses. *See*, *e.g.*, *Response Answer* at 89 ("As Troya cannot show deficient performance or prejudice as a result of Counsel's handing of Government witness Kevin Vetere, Troya's claims in this regard must be denied."); *Id.* at 93 ("As Troya has established neither deficient performance or prejudice with regard to Rodriguez's testimony, this claim of ineffective assistance of counsel must be denied.").

Of course, Mr. Troya never raises a "claim" about Mr. Vetere or a "claim" about Mr. Rodriguez. Mr. Troya has alleged and established a *Strickland* claim; a unitary claim based on a plethora of deficiencies which together demonstrate prejudice. The government's exercise provides the Court with no useful guidance for deciding Mr. Troya's ineffective assistance claim because the methodology is precluded by decades of Supreme Court precedent, starting with *Strickland* itself.

Deficient performance under the Sixth Amendment is proved by showing "that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. A petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id*. at 690. "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id*. *Strickland* thus requires a court to assess the totality of counsel's acts and omissions when deciding whether the representation was deficient.

10

Similarly, *Strickland* requires this Court to consider the cumulative effect of counsel's deficient performance when determining prejudice. *Id.* at 695. Contrary to the government's assertion, *Strickland* repeatedly describes a single IAC claim as comprising multiple errors or omissions that result in prejudice. *See*, *e.g.*, *Strickland*, 466 U.S. at 693 ("Even if a defendant shows that *particular errors* of counsel were unreasonable . . . the defendant must show that *they* actually had an adverse effect on the defense.") (emphasis added); *id.* at 694 (holding a petitioner must show "a reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different") (emphasis added).

"*Strickland* stands for the proposition that a multifaceted claim of ineffective assistance of counsel must be treated as a single claim," *Johnson v. United States*, 860 F.Supp.2d 663, 756 (N.D. Iowa 2012), a holding confirmed by the Supreme Court's post-*Strickland* decisions. *Williams v. Taylor*, involved trial counsel's failure to begin preparing for the sentencing phase of a capital case until a week before trial, failure to conduct an investigation "that would have uncovered extensive records graphically describing Williams' childhood," and failure "to introduce available evidence that Williams [had borderline intellectual disability]." 529 U.S. at 395–96 (internal quotation marks omitted). *Williams* identified multiple categories of mitigating evidence omitted by trial counsel's deficient mitigation investigation. *See id*. Nevertheless, those omissions were treated collectively as part of the singular failure of "trial counsel [to] fulfill their obligation to conduct a thorough investigation of the defendant's background." *Id.* at 396.

*Wiggins v. Smith* also demonstrates the impropriety of the government's fragmented analysis. In *Wiggins*, trial counsel's deficient investigation forfeited multifaceted mitigating evidence, including chronic family alcoholism, and emotional difficulties amplified by foster care, food deprivation, and sexual abuse. *See id.* at 516–17, 525. The Sixth Amendment violation

11

was predicated on multiple investigatory omissions, including a failure to investigate the facts behind a social service report and to commission a detailed social history. *See id.* at 525, 538. Yet, *Wiggins* treated the investigatory omissions and multiple categories of evidence as a single IAC claim: "In order for counsel's inadequate performance to constitute a Sixth Amendment violation, petitioner must show that counsel's *failures* prejudiced his defense." *Id.* at 534 (emphasis added).

*Porter v. McCollum* addressed an IAC claim in which counsel failed to learn about the client's "abusive childhood, his heroic military service and the trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity[.]" 558 U.S. at 33. *Porter* grouped all categories of mitigating evidence together *both* for the deficiency and prejudice analyses. *See id.* at 40 (finding single deficiency in "fail[ure] to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his military service"); *id.* at 40–41 (considering whether "that deficiency" prejudiced Porter by considering "the totality of the available mitigation evidence") (internal quotations omitted).

The Supreme Court's decisions applying *Brady v. Maryland*, 373 U.S. 83 (1963), are instructive because the IAC prejudice inquiry mirrors the *Brady* materiality analysis for an unconstitutional prosecutorial suppression of evidence. *See Strickland*, 466 U.S. at 694 ("[T]he appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution[.]") (citing leading *Brady* precedent). In *Kyles v. Whitley*, the Court repeatedly emphasized that both the IAC-prejudice and *Brady*-materiality analyses were cumulative. 514 U.S. 419, 436 (1995) (after noting identity between IAC prejudice and *Brady* materiality, explaining that, "[for materiality purposes], suppressed evidence [must be] be considered collectively, not item by item"); *id.* at 436 n.10 ("We evaluate

12

[the] cumulative effect [of undisclosed evidence] for purposes of materiality separately and at the end of the discussion . . . ."); *id.* at 441 ("The result . . . is incompatible with a series of independent materiality evaluations, rather than the cumulative evaluation required by [precedent].").

Adopting the government's claim-splitting analysis would undoubtedly convict this Court of error because other courts have squarely rejected it. *See Evans v. Secretary, Florida Dept. of Corrections*, 699 F.3d 1249, 1269 (11th Cir. 2012) ("While the prejudice inquiry should be a cumulative one as to the effect of all of the failures of counsel that meet the performance deficiency requirement, only the effect of counsel's actions or inactions that do meet that deficiency requirement are considered in determining prejudice.");  *United States v. Chisolm*, 2013 WL 5187361, at *16 (N.D. Fla. Sept. 13, 2013), *aff'd,* 641 F. App'x 932 (11th Cir. 2016) ("The validity of cumulative error claims, as premised on the ineffective assistance of counsel, is not in question. *See Strickland,* 466 U.S. at 694–96 (expressing prejudice inquiry in aggregate terms of reasonable probability counsel's *errors* affected outcome of proceeding)").

The Fifth Circuit Court of Appeals decision in *Moore v. Johnson*, 194 F.3d 586 (5th. Cir 1999), *superseded by statute on other grounds as stated in Hernandez v. Thaler*, 463 Fed. Appx. 349, 356 (5th Cir. 2012), provides clear application of these principles. Rejecting respondent's fragmentation of an ineffective assistance claim between guilt and punishment phases, the court declined to erect any partition between the IAC allegations:

> We reject this notion. When, as here, the same jury considered guilt and punishment, the question is whether the *cumulative errors* of counsel rendered the jury's findings, either as to guilt or punishment, unreliable. *See Strickland,* 104 S. Ct. at 2064 (relief is appropriate when "the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable").

*Id.* at 619 (emphasis added). Thus, the Fifth Circuit considered the totality of trial counsel's failures when deciding whether Moore was entitled to relief on his IAC claim:

> [*T*]*aken together*, counsel's failure to investigate Moore's proposed defense by interviewing and preparing for the state witnesses to Moore's extraneous conduct, counsel's inexplicable and illogical failure to require submission of exculpatory language in Moore's confession together with the inculpatory language submitted to the jury, counsel's damaging cross-examination of Officer Autrey, which in and of itself established most elements of the case-in-chief against Moore, and counsel's complete failure to either investigate, develop, or present available and potentially availing mitigating evidence supporting counsel's argument that the shooting was accidental, during the punishment phase of Moore's trial, including counsel's failure to offer an unredacted and available copy of Moore's purported confession in support of counsel's closing argument during the punishment phase that the shooting was accidental, *are sufficient to demonstrate prejudice within the meaning of Strickland.*

*Id.* at 621–22 (emphasis added).

The government's divide-and-conquer approach to Mr. Troya's ineffective assistance claim would fare no better in other circuits. *See United States v. Dado*, 759 F.3d 550, 563 (6th Cir. 2014) ("[E]xamining an [IAC] claim requires the court to consider 'the combined effect of all acts of counsel found to be constitutionally deficient, in light of the totality of the evidence in the case.'") (quoting *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006)); *Goodman v. Bertrand*, 467 F.3d 1022, 1030 (7th Cir. 2006) ("Rather than evaluating each error in isolation, . . . the pattern of counsel's deficiencies must be considered in their totality."); *Henderson v. Frank*, 155 F.3d 159, 165 (3d Cir. 1998) ("The Supreme Court has warned that judges should not misread habeas petitions in order to split single claims and conduct separate exhaustion analyses for each.") (citing *Engle v. Isaac*, 456 U.S. 107, 124 n.25 (1982)); *cf. Mak v. Blodgett*, 970 F.2d 614, 622, 624–25 (9th Cir. 1992) (finding, with respect to "cumulative errors . . . in the sentencing phase," that "[w]e do not need to decide whether these deficiencies alone meet the

14

prejudice standard because other significant errors occurred that, considered cumulatively, compel affirmance").

**The governing standards.**

This Court is required to conduct an evidentiary hearing on a number of Mr. Troya's claims "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . . ." 28 U.S.C. § 2255(b). Because the record of the trial will rarely contain sufficient information for the Court to make a determination under the *Strickland* standard, it is generally necessary to consider extra-record evidence. *Massaro v. United States*, 538 U.S. 500, 05 (2003). "The evidence introduced at trial . . . will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose the facts necessary to decide either prong of the *Strickland* analysis." *Ibid.* At a minimum, the record of the trial cannot be said to conclusively refute the evidence proffered with the Amended § 2255 Motion and the argument presented herein. Accordingly, this Court should enter an order providing Mr. Troya adequate notice of a hearing so his counsel may marshal all available evidence including through the use of discovery and this Court's subpoena power. R. Gov. § 2255 Proc. 8(c).

**I. Introduction: The Statutory Standard for Ordering a Hearing in § 2255 Proceedings**

The standard for ordering an evidentiary hearing in a § 2255 case is set out in 28 U.S.C. §2255, which states, in pertinent part:

> Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.

28 U.S.C. § 2255 (b).

The Rules Governing Section 2255 proceedings teach this language is intended to incorporate the standard governing evidentiary hearings in habeas corpus cases articulated by the United

States Supreme Court in *Townsend v. Sain*, 372 U.S. 293, 312 (1963). *See Advisory Committee Notes to Rule 8*, **Rules Governing Section 2255 Proceedings** (incorporating Advisory Committee Notes to Rule 8, Rules Governing Section 2254 Cases).[3] There, the Supreme Court articulated the following standard for determining when an evidentiary hearing is mandatory: "Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding." 372 U.S. at 312.[4]

In § 2255 cases, there is no prior habeas proceeding in which an evidentiary hearing could have been conducted on the movant's claims. However, the basic principle is the same: an evidentiary hearing is warranted when (1) there are disputed issues of fact that cannot be conclusively resolved on the basis of the extant record alone, and (2) those facts, if true, would entitle the movant to relief.

**II. Relevant Supreme Court Caselaw**

A. *Machibroda v. United States*

The United States Supreme Court addressed the issue of when an evidentiary hearing is required in a § 2255 proceeding in *Machibroda v. United States*, 368 U.S. 487 (1962).[5] There,

---

[3] The Advisory Committee Notes to Rule 8 of the Rules Governing Section 2255 Proceedings state: "The standards for § 2255 hearings are essentially the same as for evidentiary hearings under a habeas petition, except that the previous federal fact-finding proceeding is in issue [in determining whether a hearing is necessary] rather than the state's."

[4] As the *Townsend* court further explained, the litigant must also demonstrate that the facts alleged, if true, would entitle the litigant to relief. 372 U.S. at 312.

[5] *Machibroda* is cited in Rule 5 of the Rules Governing Section 2255 Proceedings, which concerns the government's answer and the movant's traverse. As the Advisory Committee Notes state:

> Numerous cases have held that the government's answer and affidavits are not conclusive against the movant, and if they raise disputed issues of fact a hearing must be held. *Machibroda v. United States*, 368 U.S. 487, 494, 495 (1962); *United States v. Salerno*,

16

the Court remanded for an evidentiary hearing to determine whether the movant's plea was involuntary because it was allegedly induced by promises made by the prosecuting attorney as to the length of the sentences that would be imposed. The district court had decided, without a hearing, that the movant's allegations were false.

The Supreme Court held the district court did not act in conformity with the provisions of § 2255. As it noted:

> This was not a case where the issues raised by the motion were conclusively determined either by the motion itself or by the "files and records" in the trial court. The factual allegations contained in the petitioner's motion and affidavit, and put in issue by the affidavit filed with the Government's response, related primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light. Nor were the circumstances alleged of a kind that the District Judge could completely resolve by drawing upon his own personal knowledge or recollection.

368 U.S. at 494-495. The Court rejected the government's argument that a hearing in the case would be futile because of the apparent lack of any other witnesses to the alleged occurrences, other than the movant himself and the AUSA:

> The petitioner's motion and affidavit contain charges which are detailed and specific.
> It is not unreasonable to suppose that many of the material allegations can either be corroborated or disproved by the visitors' records of the county jail where the petitioner was confined, the mail records of the penitentiary to which he was sent, and other such sources. Not by the pleadings and the affidavits, but by the whole of the testimony, must it be determined whether the petitioner has carried his burden of proof and shown his right to a discharge. The Government's contention that his allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence. On this record it is his right to be heard.

368 U.S. at 495 (citation and quotation marks omitted).

---

290 F.2d 105, 106 (2d Cir.1961); *Romero v. United States*, 327 F.2d 711, 712 (5th Cir.1964); *Scott v. United States*, 349 F.2d 641, 642, 643 (6th Cir.1965); *Schiebelhut v. United States*, 357 F.2d 743, 745 (6th Cir.1966); and *Del Piano v. United States,* 362 F.2d 931, 932, 933 (3d Cir.1966).

Advisory Committee Notes to Rule 5, Rules Governing Section 2255 Cases.

The Court was careful to note that its decision was not meant "to imply that a movant must always be allowed to appear in a district court for a full hearing if the record does not conclusively and expressly belie his claim, no matter how vague, conclusory, or palpably incredible his allegations may be. The language of the statute does not strip the district courts of all discretion to exercise their common sense." 368 U.S. at 495. However, the Court held that the specific and detailed factual assertions by the movant, "while improbable, cannot at this juncture be said to incredible. If the allegations are true, the [movant] is clearly entitled to relief. Accordingly, we think the function of [§ 2255] can be served in this case only by affording the hearing which its provisions require." 368 U.S. at 496.

B. *Sanders v. United States*

In *Sanders v. United States*, 373 U.S. 1 (1963), the Court dealt with the question of whether to grant a hearing on a successive § 2255 motion. The movant filed a second § 2255 motion, this time alleging that at the time of his trial and sentence he was mentally incompetent as a result of narcotics administered to him while he was held in the Sacramento County Jail pending trial with a supporting affidavit. The district court again denied the motion without hearing, stating that the movant should have raised these issues at the time that he filed the first motion, and also that the claims were meritless. The Ninth Circuit affirmed. In reversing and remanding for an evidentiary hearing,[6] the Court noted the district court's ruling that the "files and records of the case" refuted the movant's allegations was erroneous, as those allegations concerned facts which were necessarily outside the extant record:

> But the "files and records of the case," including the transcript, could not "conclusively show" that the claim alleged in the second motion entitled the petitioner to no relief. The

---

[6] In its opinion, the Supreme Court decided the waiver issue in favor of the movant and allowed the movant to proceed on a successive motion. That holding, however, is no longer good law, so it is not covered in this summary of the case.

18

crucial allegation of the second motion was that petitioner's alleged mental incompetency was the result of administration of narcotic drugs during the period petitioner was held in the Sacramento County Jail pending trial in the instant case. However regular the proceedings at which he signed a waiver of indictment, declined assistance of counsel, and pleaded guilty might appear from the transcript, it still might be the case that petitioner did not make an intelligent and understanding waiver of his constitutional rights. For the facts on which petitioner's claim in his second application is predicated are outside the record. This is so even though the judge who passed on the two motions was the same judge who presided at the hearing at which petitioner made the waivers, and the later hearing at which he was sentenced. Whether or not petitioner was under the influence of narcotics would not necessarily have been apparent to the trial judge. Petitioner appeared before him without counsel and but briefly. That the judge may have thought that he acted with intelligence and understanding in responding to the judge's inquiries cannot "conclusively show," as the statute requires, that there is no merit in his present claim.

373 U.S. at 19-20 (internal citations omitted).

C. *Fontaine v. United States*

In *Fontaine v. United States*, 411 U.S. 213 (1973), the movant filed a § 2255 motion to vacate his prior plea to federal robbery charge on the grounds that his plea had been induced by a combination of fear, coercive police tactics, and illness, including mental illness. The district court denied the motion without a hearing, reasoning that since the plea colloquy conformed with the requirements of Fed. R. Crim. Pro. 11, the movant could not now collaterally attack the record and deny his prior statements on the record attesting to the knowing, voluntary and intelligent nature of chis plea. The movant appealed the ruling, arguing that under the plain wording of § 2255 and the *Machibroda* decision, he was entitled to an evidentiary hearing on his claims.  In reversing and remanding for an evidentiary hearing, the Supreme Court began by noting that the movant's § 2255 motion "set out detailed factual allegations regarding alleged circumstances occurring after his arrest and before his appearance in court." 411 U.S. at 214. The motion described "physical abuse and illness from a recent gunshot wound that required hospitalization which was documented by records tendered in support of his petition. The records

19

also showed that a month following his plea he was again hospitalized for heroin addiction, for aggravation of the earlier gunshot wound and for other severe illnesses." *Id*. The movant also alleged in his motion that he was subjected to a prolonged interrogation during the period preceding his plea, and that the sum total of these circumstances resulted in a coerced confession, waiver of counsel, and the uncounseled plea of guilty. Id. Referring to the statutory standard, the Court stated that: "On this record, we cannot conclude with the assurance required by the statutory standard 'conclusively show' that under no circumstances could the petitioner establish facts warranting relief under § 2255[.]" *Id*.

### D. Eleventh Circuit law.

Unsurprisingly, the Eleventh Circuit tracks the statutory standard: "As we have previously stated, if the petitioner 'alleges facts that, if true, would entitle him to relief, then the district court should order an evidentiary hearing and rule on the merits of his claim.' *Holmes v. United States*, 876 F.2d 1545, 1552 (11th Cir.1989) (*quoting Slicker v. Wainwright*, 809 F.2d 768, 770 (11th Cir.1987)); *see also United States v. Yizar*, 956 F.2d 230, 234 (11th Cir.1992) (district court must hold an evidentiary hearing where court cannot state conclusively that the facts alleged by petitioner, taken as true, would present no ground for relief)." *Aron v. United States*, 291 F.3d 708, 714-15 & n.6 (11th Cir. 2002). By contrast, a hearing is not required on patently frivolous claims or those which are based upon unsupported generalizations, nor is a hearing required where the petitioner's allegations are affirmatively contradicted by the record. *Holmes,* 876 F.2d at 1553. In evaluating the movant's allegations, the district court must accept all of the petitioner's alleged facts as true and determine whether the petitioner has set forth a valid claim. *Diaz v. United States*, 930 F.2d 832, 834 (11th Cir. 1991).

**Argument in Reply and in Support of the Claims Raised.**

The government has not addressed the movant's claims in the order raised in the § 2255 motion. Instead, it has broken them out and lettered them, frequently addressing several claims from different parts of the motion under one letter. For ease of reference, this reply maintains the order of the claims as filed and references the letter and ECF page number at which the government's response can be located. Claims that have been dismissed are not addressed by the government, so there is no reply to them here.

**Reply to Govt. Response at**

**(VIII). (CV Doc. 25 Motion ECF Pg. 94) MR. TROYA WAS DENIED HIS RIGHT TO DUE PROCESS AND TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS WHEN HE WAS CHARGED WITH A NON-EXISTENT CRIME OF FELONY MURDER AND HIS JURY WAS ERRONEOUSLY INSTRUCTED THAT IT COULD RETURN A VERDICT OF GUILT ON 18 U.S.C. § 924(J)(1) BASED ON A PREDICATE CRIME THAT WAS LEGALLY INSUFFICIENT TO SUPPORT THE VERDICT OR AUTHORIZE ENHANCED SENTENCING. MR. TROYA WAS DENIED HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL AND DIRECT APPEAL COUNSEL FAILED TO CHALLENGE THIS CONVICTION AND SENTENCE, PREJUDICING MR. TROYA THEREBY.**

The government's response demonstrates a complete lack of understanding of Mr. Troya's claim he was illegally convicted of felony murder based upon a predicate crime that was legally insufficient to support the verdict or authorize enhanced sentencing. It speciously posits "Troya cites no case law for this proposition," despite the fact Mr. Troya cites over a dozen cases in his § 2255 petition in support of this claim. CV Doc. 46 at 39.

The government also muffs the law when it claims which crime is a predicate "is of no moment:"

> The Third Superseding Indictment unequivocally reflects that the law was violated in two different ways, by either committing a drug trafficking crime or a crime of violence. Section 1111 is referenced for the definition of "murder" only. *See e.g., United States v. Young*, 248 F.3d 260, 274-75 (4th Cir. 2001) (noting that

21

Section 924(j)(1), incorporates only the definition of murder contained in section 1111. That definition is found exclusively in section 1111(a)). Section 1111 is not charged in any of Counts Seven through Ten, and thus whether carjacking or drug trafficking crimes are predicate offenses of this statute is of no moment.

CV Doc. 46 at 39-40. Though the definition of murder the government cites to is correct, the applicable indictment fails to charge or reference any of the crimes contained within the felony murder context. Therefore, the Court's reading of a felony murder instruction was wholly inapplicable and inappropriate in Mr. Troya's case.[7]

The government argues "Section 1111 is referenced for the definition of 'murder' only." *Id.* It is precisely because carjacking is not contained within this definition of felony murder that Mr. Troya has a valid claim. The Court clearly defined the commission of a killing in the perpetration of a carjacking as felony murder. CR Doc. 769 at 22.  Yet a review of § 1111 dispels any notion that carjacking falls within that definition of murder, as it states:

the unlawful killing of a human being with malice aforethought.  Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary or robbery; … is murder in the first degree.

Any other murder is murder in the second degree.

18 U.S.C. § 1111(a).  § 1111 obviously does *not* define a killing committed in the perpetration, or attempted perpetration of, carjacking as first degree murder.  Nor is any one of the enumerated

---

[7] In instructing the jury on Counts 7 through 10, the Court told the jury it could find Mr. Troya guilty under § 924(j)  if they found the following facts : 1) "that [he] committed the crime of violence **or** drug trafficking crime charged in the indictment;"  2) "that during the commission of **that** offense, [he] knowingly carried or used a firearm during and in relation to **the** crime of violence **and/or** drug trafficking crime;"  3) "that in the course of using the firearm, [he] caused the death of the person described in the particular count of the indictment;" and 4) "that the killing was murder, that is, the unlawful killing of a human being with malice aforethought and premeditation in connection with the drug trafficking offense, **or**, the killing resulted from the perpetration of, or attempted perpetration of, the crime violence [sic] (the crime of carjacking)." Doc. 769 at 22.

22

types of felony murder identified in § 1111 a lesser included offense of carjacking. The *11th Circuit Pattern Jury Instruction* 45.2, 2003 ed., **Annotations and Comments** clearly states:

> In the case of felony murder the malice aforethought requirement of Section 1111 is satisfied if the murder results from the perpetration of the enumerated crime. *United States v. Thomas*, 34 F.3d 44, 49 *sic* (2d Cir.), *cert. denied*, 513 U.S. 1007, 115 S.Ct. 527, 130 L.Ed.2d 431 (1994). The felony murder statute "reflects the English common law principle that one who caused another's death while committing or attempting to commit a felony was guilty of murder even though he did not intend to kill the deceased." *United States v. Tham*, 118 F.3d 1501, 1508 (11th Cir. 1997). It applies to the accidental, self-inflicted death of a co-conspirator. *Id.* Second-degree murder is not a lesser included offense of felony murder under Section 1111(a) because the malice aforethought elements are different. Unlike second-degree murder, malice aforethought for felony murder is satisfied only by commission of a felony enumerated in Section 1111(a). *United States v. Chanthadara*, 230 F.3d 1237, 1258 (10th Cir. 2000).

Since § 1111 does not define a death that results from carjacking as a crime of murder, a verdict of guilt based on a jury determination that Mr. Troya committed a carjacking resulting in death is legally invalid and Mr. Troya's convictions and sentences must be vacated.

Reply to Government Response at

**(IX). (CV Doc. 25 at ECF 103)   MR. TROYA RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL, WHERE DEFENSE COUNSEL FAILED TO MOVE TO DISMISS HIS INDICTMENT DUE TO DUPLICITY AND APPELLATE COUNSEL FAILED TO RAISE THE ISSUE ON APPEAL IN VIOLATION OF HIS FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

In its response, the government relies on outdated, irrelevant caselaw predating *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Alleyne v. United States,* __ U.S. __ , 133 S.Ct. 2151 (2013). *Apprendi* and its progeny mandate any element of a crime must be found unanimously by a jury, and this requirement includes findings that increase the maximum sentence or minimum mandatory.  *Alleyne,* 133 S.Ct. at 2158. A recent Eleventh Circuit decision not cited by the government demonstrates the validity of Mr. Troya's duplicity claim. Within *In re: Gomez*, 830

23

F.3d 1225 (11th Cir. 2016), the Court reviewed an application to file a second or successive §

2255 motion based upon the Supreme Court's ruling in *Johnson v. United States*, 576 U.S. ____,

135 S.Ct. 2551 (2015), and the Court discussed the duplicity of the § 924(c) convictions. Mr.

Troya quotes the case at length here because it directly addresses the issues alleged in his

duplicity claim:

> Count 5, the § 924(c) count, charged Gomez with carrying and possessing a firearm "in relation to a crime of violence and a drug trafficking crime," and referred to two drug trafficking crimes (Counts 1 and 2); conspiracy to commit Hobbs Act robbery (Count 3); as well as the crime of attempted Hobbs Act robbery (Count 4), presumably offering each as a possible predicate for the § 924(c) charge. Of course, conspiracy to commit Hobbs Act robbery, attempted Hobbs Act robbery, and possession with intent to distribute are separate and distinct offenses. It follows, then, that a § 924(c) crime based on any one of these separate companion convictions would likewise be a separate offense. Indeed § 924(c) penalizes using, carrying, or possessing a firearm "during and in relation to any crime of violence or drug trafficking crime." 18 U.S.C. § 924(c)(1)(A) (emphasis added). The statute therefore establishes either "crimes of violence" or a "drug trafficking crime" as possible and alternative predicate offenses.
>
> In *United States v. Schlei*, 122 F.3d 944 (11th Cir.1997), we held that "[a] count in an indictment is duplicitous if it charges two or more 'separate and distinct' offenses." Id. at 977 (quotation omitted). We noted that "[a] duplicitous count poses three dangers: (1) A jury may convict a defendant without unanimously agreeing on the same offense; (2) A defendant may be prejudiced in a subsequent double jeopardy defense; and (3) A court may have difficulty determining the admissibility of evidence." *Id*.
>
> Gomez's indictment, which lists "a crime of violence and a drug trafficking crime" as the companion convictions for his § 924(c) offense, suffers from this infirmity. And his case demonstrates the "dangers" that may lurk in indictments that list multiple potential predicate offenses in a single § 924(c) count. Count 5 of his indictment alleges that he used and possessed a firearm during two drug trafficking offenses and an attempted Hobbs Act robbery on the same day, as well as an ongoing conspiracy to commit Hobbs Act robbery that lasted two weeks. It is certainly possible that the government may have presented evidence that Gomez "possessed" a firearm at some point during the ongoing Hobbs Act conspiracy. But, the evidence may likewise have shown that he left that firearm at home for the drug trafficking crimes, or the attempted robbery. And we can't know what, if anything, the jury found with regard to Gomez's connection to a gun and these crimes.

24

That is because the jurors had multiple crimes to consider in a single count, so they could have convicted Gomez of the § 924(c) offense without reaching unanimous agreement on during which crime it was that Gomez possessed the firearm. Or, they could have unanimously agreed that he possessed a firearm at some point during the Hobbs Act conspiracy, but not during the drug trafficking crime. Either way, a general verdict of guilty does not reveal any unanimous finding by the jury that the defendant was guilty of conspiring to carry a firearm during one of the potential predicate offenses, all of predicate offenses, or guilty of conspiring during some and not others.

This lack of specificity has added significance because § 924(c) "increases [the] mandatory minimum" based on a finding that the defendant "used or carried a firearm" (mandatory minimum of five years), "brandished" a firearm (seven years), or "discharged" a firearm (ten years). *See Alleyne v. United States*, ___ U.S. ___, 133 S.Ct. 2151, 2155, 186 L.Ed.2d 314 (2013). Alleyne held that because these findings "increase the mandatory minimum sentence," they are "elements and must be submitted to the jury and found beyond a reasonable doubt." Id. at 2158. An indictment that lists multiple predicates in a single § 924(c) count allows for a defendant's mandatory minimum to be increased without the unanimity Alleyne required. For example, half of the jury may have believed that Gomez used the gun at some point during his Hobbs Act conspiracy, and the other half that he did so only during the drug trafficking offense.

The way Gomez's indictment is written, we can only guess which predicate the jury relied on. It's possible that we can make a guess based on the PSI or other documents from Gomez's trial or sentencing. But Alleyne expressly prohibits this type of "judicial factfinding" when it comes to increasing a defendant's mandatory minimum sentence. *Id*. at 2155.

*Gomez*, 830 F.3d at 1226–28.[8]

The infirmities present in *Gomez* are also present here. The government's response unwittingly illustrates this fact when it states: "Each count is based on the murder of an individual member of the Escobedo family on or about October 13, 2006, and refers to the charges for the underlying crime of violence and drug trafficking offense, which are charged in Counts Six and One of the Third Superseding Indictment, respectively." CV Doc. 46 at 36. It is

---

[8] *Gomez* directly refutes the government contention that, "Troya claims that the counts are duplicitous as to the predicate offenses (crime of violence/drug trafficking offense). Troya cites to no case in support of this sub-claim. In truth, the undersigned could find no case to support Troya's argument." Doc. 46 at 38.

beyond peradventure the drug trafficking conspiracy charged in Count One is a separate crime than the carjacking alleged in Count Six. Indeed, that is why they are properly charged in separate counts. The duplicity occurs when the government conflates both the drug trafficking and carjacking into Counts 7-10 as the predicate crimes for the § 924(c) violation, which, in turn, is necessary to obtain a conviction for murder under § 924(j).[9] By conflating the charges, the government subjects Mr. Troya to the danger presented by a duplicitous count, that a jury may convict a defendant without the requisite unanimity. *See, Schlei*, at 977; *Gomez*,830 F.3d at 1227.

The proper method of charging the § 924(j) counts would have been for the government to pursue only the drug trafficking or only the carjacking as the § 924(c) predicate; or, alternatively, to charge them as separate counts, *i.e.,* a separate § 924(j) count for carjacking and a separate § 924(j) count for drug trafficking. Neither of these alternatives were undertaken by the government, nor was a verdict form utilized requiring the jury to find unanimously as to which count the death was caused during the commission of. This failure renders impossible a determination that the death of any of the alleged victims was found unanimously as to either of the predicate convictions for any of the § 924(j) counts. Therefore, this court should grant § 2255 relief as to Counts 7-10 due to their duplicitous nature and vacate the convictions and sentences.

Reply to government response at   :

**(X).   (CV Doc. 25 at ECF 109) MR. TROYA'S COUNSEL WAS INEFFECTIVE IN FAILING TO REQUEST THAT THE JURY BE INSTRUCTED ON MANSLAUGHTER; A CRIME THAT WAS PROPERLY CHARGED IN THE INDICTMENT IN VIOLATION OF HIS FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

Mr. Troya relies on the allegations of his motion.

---

[9] § 924(j)(1) states: "A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall (1) if the killing is a murder (as defined in section 1111) be punished by death or by imprisonment for any term of years or for life."

       **Reply to Government Response at**

**VII (XI). (CV Doc. 25 at ECF 112)**
**TRIAL COUNSEL INEFFECTIVELY FAILED TO RETAIN COMPETENT AND APPROPRIATE EXPERTS, FAILED TO CONSULT WITH THOSE WHO WERE RETAINED, TO FILE APPROPRIATE MOTIONS TO EXCLUDE GOVERNMENT EXPERT AND OTHER WITNESS EXPERT-LIKE TESTIMONY, TO EFFECTIVELY CROSS EXAMINE AND OBJECT TO IMPROPER TESTIMONY OF GOVERNMENT EXPERTS, AND TO INTRODUCE EXPERT TESTIMONY HELPFUL TO THE DEFENSE AT GUILT AND SENTENCING PHASES, ALL CONTRARY TO THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

**A.  Forensic pathologist.**

    **1.  Defense counsel failed to adequately challenge the government's case by failing to object to the impermissible testimony of a substitute medical examiner and failing to retain an independent forensic pathologist.**

    Mr. Troya has advanced claims that trial counsel was deficient for failing to assert a violation of Mr. Troya's right of confrontation and failing to utilize the services of an independent expert pathologist to counter the testimony and conclusions of the government's substitute medical examiner. CV Doc. 25 at ECF 93-104. The government's response was to argue that the crimes were so heinous it was sound strategy to not cross-examine the medical examiner whatsoever and that trial counsel should not be held responsible for a change in an unsettled area of the law. CV Doc. 46 at 55-63.

    Mr. Troya's confrontation clause claim centers upon the case of *Crawford v. Washington*, 541 U.S. 36 (2004), and its requirement that a defendant be permitted to directly confront the witnesses against him. The relevance here is that the government submitted a pre-trial motion, that was ultimately stipulated to by trial counsel, alleging that Dr. Diggs was unavailable to testify due to his retirement and subsequent health problems. CR Docs. 522, 531. The government and the Court relied upon outdated caselaw in admitting the testimony of substitute medical examiner, Dr. Mittleman, and Dr. Diggs autopsy report. *Id.*, T3255, 3395-96.

27

To demonstrate the legal error, Mr. Troya presented the case, *United States. v. Ignasiak*, 667

F.3d 1217, 1231 (11th Cir. 2012), where the Eleventh Circuit held that:

> Applying the reasoning of *Crawford*, *Melendez–Diaz*, and *Bullcoming,* we conclude that the five autopsy reports admitted into evidence in conjunction with Dr. Minyard's testimony, where she did not personally observe or participate in those autopsies (and where no evidence was presented to show that the coroners who performed the autopsies were unavailable and the accused had a prior opportunity to cross-examine them), violated the Confrontation Clause.

*Motion* at 100.

The government responds that *Ignasiak* was decided in 2012 and Mr. Troya's trial was in 2009; therefore, trial counsel should not be held responsible for a change in an unsettled area of the law. CV Doc. 46 at 59-61. Trial counsel has not been shown to have made any choice or indicated they thought the area of law was unsettled. The government is simply speculating. An evidentiary hearing on the issue is necessary to resolve the issue.

This resolution must necessarily center on exactly what was considered by trial counsel when deciding to stipulate to the inadmissible autopsy report and testimony. A misunderstanding of the law is not a strategic decision. *See Hardwick v. Crosby*, 320 F.3d 1127, 1163 (11th Cir. 2003) ("[A] tactical or strategic decision is unreasonable if it is based on a failure to understand the law").

*Crawford* is and was a seminal case that produced a dramatic change in the law and our understanding of confrontation rights. Necessarily, after *Crawford* in 2004, defense lawyers immediately began challenging long-held notions of what constituted adequate confrontation constitutionally. Indeed, the challenge in *Ignasiak* originated prior to the trial in Mr. Troya's case, as the trial there was from October 6, 2008 – November 3, 2008. Doc. 25 at 101. A reasonable criminal defense lawyer in 2009 would be aware of the plethora of confrontation clause challenges taking place. This phenomenon is evident due to the number of cases the

28

Supreme Court took in the years following the 2004 decision in *Crawford. See Davis v. Washington*, 547 U.S. 813 (2006) (narrowing definition of "testimonial");[10] *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). The activity in lower state and federal courts was exponentially more pronounced. To not know of the *Crawford* litigation an active criminal defense lawyer would have had to have his head in the sand. It is hard to accept that the government lauds Mr. Troya's trial counsel for their expertise and experience in one breath and in another excuses them from knowledge of well-known law.

### 2. Defense counsel was ineffective in failing to retain an independent forensic pathologist and that failure prejudiced Mr. Troya.

In response to Mr. Troya's claim that the substitute medical examiner, Dr. Mittleman, was improperly permitted to testify from Dr. Diggs autopsy reports, the government argues that the abject failure to engage in any cross-examination whatsoever was sound strategy because the murders were so heinous. Even the most heinous of murders can be mitigated and a life sentence obtained. *See U.S. v. Kaczynski*, 416 F.3d 971 (9th Cir. 2005) (Theodore Kaczynski - unibomber, 3 deaths 23 injured);  *U.S. v. McVeigh,* (5:95-cr-00110-RPM) (Western District of Oklahoma - 2nd Defendant) (Terry Nichols - accomplice to Tim McVeigh, 8 counts manslaughter); *U.S. v. Rudolph* (1:03-mj-00069) (Western District of North Carolina) (Eric Robert  Rudolph - Olympic Park Bomber, 2 killed, 120 injured); *State v. Cross*, 156 Wash. 2d 580, 132 P.3d 80 (2006), <u>as corrected</u> (Apr. 13, 2006) (Gary Leon Ridgeway - Green River Killer at least 49 murders - may be up to 71 or more (all female, including juveniles)); *Com. v. Malvo*, 63 Va. Cir. 22 (2003) (Lee Boyd Malvo aka John Lee Malvo - accomplice to John Allen Muhammad (sentenced to death) in Beltway sniper attacks, 1 murder, 1 attempted murder); *Perry v. State*, 357 Md. 37, 40, 741 A.2d

---

[10] *Hammon v. Indiana* was decided in the same opinion as *Davis v. Washington*, 547 U.S. 813 (2006).

1162, 1164 (1999) (Lawrence Horn - recording exec - hired hit man for triple murder, ex-wife, disabled son and nurse); *Com. v. Hernandez*, 471 Mass. 1005, 27 N.E.3d 380 (2015) (Aaron Josef Hernandez - NFL football player, 2 murders).

Speciously, the government then contends that some of the most incendiary facts, which could have been mitigated by Dr. Wetli's findings, are "of no moment." Doc. 46 at 58. Then the government cites to the facts that Dr. Wetli would have to concede as, ". . . the boy's lungs filled with blood after he was shot, and that blood ended up being aspirated through the toddler's nose and mouth before he died." CV Doc. 46 at 57. This begs the question because Dr. Wetli would be able to testify that the boy was not conscious while these agonizing injuries were occurring; as opposed to the government's substitute medical examiner stating that it was akin to the child drowning in his own blood. It is truly difficult to imagine a more incendiary fact than a child drowning in his own blood. The government's attempts to downplay the significance of such a fact rings hollow.

The government's arguments during the trial demonstrate the significance and prejudice engendered by the misleading testimony of their substitute medical examiner. Not only the misleading testimony that one of the children drown in his own blood, but the testimony that it appeared that the mother was protecting her children trying to shield them from the bullets. The government repeatedly emphasized these points to inflame the jury and obtain a murder conviction and death sentence for Mr. Troya. Examples include:

Guilt Phase, Gov't Opening (Carlton), T3043:

The three-year old, the medical examiner will testify that the autopsy revealed that the Three-year old boy was shot through the lungs and his heart, and that the death was not instant, and that the cause of death was basically drowning in his own blood.

Guilt Phase: Direct Exam – Dr. Roger Mittleman, M.E., T3458:

30

Q. What was -- based on your examination of the Medical Examiner's file, knowledge and experience, what was the mechanism of death for this three-year old child?

A. This would be the kind that would make it very difficult to breathe. In other words, going through the lungs, blood going in the air spaces, blood surrounding the lungs, making it more difficult to breath. The heart is gradually slowing down, becoming non-functional, so he would have a suffocating type of death, difficult breathing, like a drowning in one's own blood in part.

Guilt Phase, Gov't Closing (Carlton), T7161:

Count 7 involves using a firearm in connection with the carjacking to murder Damian Escobedo, Luis Damian Escobedo, he is the youngest child. Medical Examiner testified five gunshot wounds, stippling to the left cheek, powder burns, close shot, so close the powder coming out of the gun burned the child's cheek. This child was shot through the heart and lungs, and that the sensation suffered by this little boy was the same as drowning in one's own blood. A horrific way to die.

Guilt Phase, Gov't Closing (Carlton), T7164-7165:

MR. CARLTON: Thank you, Your Honor.

Before we left for lunch I was talking about the uncomfortable yet necessary evidence that must be discussed concerning the murder of this little boy, Damian Escobedo, and I was covering with you the fact this child suffered before he died according to the testimony of Dr. Mittleman and the child died in his own blood. Dr. Mittleman testified that this child suffered burn marks called stippling, S-T-I-P-L-I-N-G, which is basically gunpowder burns when human skin is so close –

THE COURT: I am sorry, please forgive me, and let me allow you to go back.

MR. CARLTON: Yes. The point I was raising in talking about the death of Damian Escobedo, I was mentioning that before the lunch break this child, according to Dr. Mittleman, after being shot through the heart and lung had drowned in his own blood.

Jury Selection – Juror, T811:

JUROR: About what happened. That -- well, I real the whole article, that these gentlemen had been accused of killing the family, and it had to do with a drug deal. And I remember reading that the mother was apparently trying to protect her children and had their pictures in the paper. And it said the trial was starting, and that they were going to start on Monday, according to that article, to try to pull the jury."

Jury Selection – Different Juror, T1123:

JUROR: Only that there were, like you said, four people killed, two of them children and the mother had lain over the children to protect them. And when it first started, when the police were still there, and covered up so no one could see what was going on.

I -- the issue I have is with children, very much so.

Guilt Phase, Gov't Closing (Carlton), T7171-7172:

Let's move to the mother, Yessica Escobedo, Dr. Mittleman testified she had 11 gunshot wounds, front, side, head, eight projectiles found in her body, four head shots. One wasn't good enough, three for good measure. The shots travel upward, indicating the person was down on the ground already and the shots traveled up. The shots were to her front and her torso, and according to Dr. Mittleman consistent with that mother twisting around backwards and forward in a manner to avoid getting shot.

I suggest to you that she is holding those little boys and trying to protect them when she was shot to pieces by two assassins, cold blooded, middle of the night, cowardly shooters.

Those shots entered her body according to the head shots according to Dr. Mittleman. Those exhibits are 1.2 and 1.7, which are photographs, and 6.11 through 6.13, 6.17, 6.16, 6.18, 26, and 31d.

You can see from this photograph the way these bodies were found that the mother was trying to protect both children and that she had her arms around them when she fell.

This is Exhibits 1.1 and 1.7.

Even the worst of us try to protect our offspring. It is the most innate thing in human behavior, whether it is an animal or human, that a mother tries to protect her offspring.

Gov't Closing, (Kastrenakes), T9622:

You know, after -- if you could put up the next picture. After executing José Luis Escobedo, admittedly involved in drugs, we never tried to hide the ball from you on that, executing him at close range, then as mom is trying to protect her children, that lady, look what they did to her. Eleven bullets throughout her entire body, four head shots. Mr. Carlton said front and side.  She was shot in the back, also. All over her body.

Then four-year old Julian who is not dead, the older boy, executed as he is laying on the ground. You heard the Medical Examiner testify to that.

And then Damian, the three-year old, through the heart.

All of these horrific facts could have been mitigated had trial counsel availed themselves of the money appropriated by Judge Hurley for their use in hiring an

independent forensic pathologist such as Dr. Wetli. Trial counsel failed to do so. This mitigation would have only been needed to sway one juror. A completely reasonable proposition if the jury were not persuaded to think the child drowned in his own blood, while his mother attempted to shield him from the gunshots. Dr. Wetli would have been able to explain his opinion regarding the child's death:

> From the materials examined, it is therefore my opinion to a degree of reasonable medical certainty that Luis Damian Escobedo died from a gunshot wound to his chest resulting in near immediate death because of the projectile damage to his heart and lungs, and that his mechanism of death was from destruction of these vital organs and not from "drowning in his own blood."

CV Doc. 5-2 Appendix D-1 at 2.

Clearly, there is a qualitative difference between an immediate death and one where a child drowns in his own blood. Without an independent medical examiner and an utter failure to cross-examine the substitute medical examiner whatsoever, the jury was left to ponder the agonizing death of the child to aggravate an already difficult murder case. The prejudice is patently obvious.

Trial counsel recognized the prejudice, which belies the entirely speculative claim of the government that somehow trial counsel made a strategic decision not to address the issue of the child's manner of death. Mr. Sanchez's counsel filed a motion in limine to preclude the government from arguing the manner of the child's death in the penalty phase, which the government did not ultimately oppose.

Penalty Phase, CR Doc. 810, Motion in Limine, T7898:

MR. MURRELL:

> Judge, I filed a motion in *limine* requesting The Court instruct the Government not to argue as to the victim Damian Luis Escobedo, that he died from a bullet wound that penetrated his lungs. If you recall the testimony during trial, the Medical Examiner said he drowned in his own blood and took 30 seconds to a minute to accomplish that.

33

Our position is at this stage of the proceedings under the allegations the Government has made that has no relevance whatsoever and prejudicial impact far outweighs any probative value it has.

The Government has to prove this was an intentional murder, and concededly they can argue a gunshot Wound to vital organs is evidence of intent. We have no dispute with that. The cause and manner to the extent of him suffocating has no bearing on the issues that the jury has to decide here, and we ask the Court to instruct the Government not to allow that argument.

THE COURT: All right. Let me turn to the Government. Mr. Burns?

MR. BURNS: Your Honor, as to that motion, the Government does not intend to address the manner of that child's death.

THE COURT: All right. That resolves that, then. Thank you.

The fact that trial counsel was aware of the problem and did nothing whatsover reeks of ineffectiveness. Trial counsel had been granted funds to expend on expert assistance and failed to even retain an expert, much less consult one. Contrary to the government's talismanic incantation that it is of no consequence that an expert was retained in post-conviction and provided vitally important expertise, opinions, and findings, the Seventh Circuit recently granted relief in a murder, sexual assault, and false imprisonment case. *See Thomas v. Clements*, 789 F.3d 760 (7th Cir. 2015). Although it was a § 2254 case, the posture the case was in resulted in *de novo* review which heightens its precedential value when deciding Mr. Troya's § 2255 motion.

In *Thomas*, the petitioner sought post-conviction relief on the ground that counsel should have consulted an independent expert, and supported his claim with expert testimony indicating that the autopsy findings were, in fact, "not inconsistent with" petitioner's account, and that, contrary to the claim of the prosecution's expert, there was "no physical evidence that 'intentional' pressure was applied to the neck." 789 F.3d at 765. For his part, trial counsel

34

testified that he simply never considered consulting an independent expert. The Seventh Circuit decided that petitioner was entitled to relief. *Id*. at 768.

With regard to deficient performance, the court quickly established that counsel's "failure to reach out to an expert was not a conscious decision – he just did not think to do so." *Id.* Petitioner was thus entitled to relief. *Id*. at 768. The court then explained that petitioner's intent, or lack thereof, had been the key issue at trial, that trial counsel clearly understood as much, and that, "[b]y not reaching out to an expert to review or challenge [the state's expert's] findings, counsel acquiesced to the state's strongest evidence of intent." *Id*. at 769. After further explaining that counsel's efforts to challenge the prosecution's expert through cross-examination alone "fell flat," the Seventh Circuit held that "counsel's failure to even reach out to an expert was deficient." *Id.* at 771.

The court found that the petitioner had been prejudiced, noting that "[t]he state's case was not ironclad by any stretch of the imagination," *id.*, and that the very points on which the prosecution's case were weakest were plausibly explained by the expert testimony presented in support of petitioner's ineffective assistance claim. *See id.* at 772 ("[The defense expert's] testimony reconciles Thomas's statement and the evidence, which leads to the logical conclusion that he did not commit the act intentionally."). "Had the jury been presented with this testimony, instead of just an argument unsupported by expert testimony as it was," the court concluded, "it is substantially likely that Thomas could have raised at least a reasonable doubt and had a different outcome at trial." *Id*.

Similarly, but more egregiously, trial counsel here had funds for an expert, but failed to even retain one, had the opportunity to cross-examine the substitute medical examiner, but failed to do so, and unreasonably made these decisions without a full investigation or knowledge of

what was being forfeited by these decisions. Clearly, the record does not support the government's rank speculation that trial counsel somehow made a *fully informed* strategic decision to forego retaining an expert or even minimally engaging in cross-examination of the substitute medical examiner.

The need for an evidentiary hearing on this claim is evident. The government unwittingly admits this fact by their observations in their response when discussing Dr. Wetli's findings:

> First, Troya makes reference to extra-record information by extensively citing to his newly-found medical examiner. These references, and the manner in which Troya argues them, are rife with factual and legal difficulties because, for example, we don't know what was asked of Dr. Wetli, or what Dr. Wetli was shown. Further, we don't even know if the information he provides would have been admissible for certain.

CV Doc. 46 at 56.

As discussed *infra,* an evidentiary hearing is warranted when (1) there are disputed issues of fact that cannot be conclusively resolved on the basis of the extant record alone, and (2) those facts, if true, would entitle the movant to relief. Here, Mr. Troya has provided extensive extra record evidence that, if true, establishes ineffective assistance of counsel and the resulting prejudice that flows therefrom. Therefore, Mr. Troya is entitled to an evidentiary hearing.

**B.     (CV Doc. 25 at ECF 123) Firearms and toolmark expert.**

**1.     Trial Counsel Rendered Ineffective Assistance of Counsel by Not Requesting a Daubert Hearing as to the General and Specific Methodology Utilized by Firearm/Toolmark Examiners in Mr. Troya's Case, By Not Moving In *Limine* to Restrict Terminology Regarding Supposed Matches of Casings, Cartridges and Firearms, By Failing to Rebut Testimony of Government Experts With Their Own Expert, and Ineffectively Cross-Examining the Government Experts, and the Government presented false or misleading expert testimony, all in Violation of Mr. Troya's Fifth, Sixth and Eighth Amendment Rights.**

Mr. Troya asserted trial counsel failed to provide effective representation and sufficiently challenge the government's expert testimony. The government had Mr. Chapman testify that a

36

casing from the homicide scene matched a live cartridge found at the Garden Court residence; and, Ms. Quereau testify that she compared the casings and projectiles from the Suwannee and Mercer shootings (FRE 404(b) evidence) and allege a purported match between them and an AK-47 found at the Garden Court residence.

Mr. Troya's claim of ineffectiveness centered upon trial counsel failing to challenge the expert testimony as unreliable and invalid. Specifically, that trial counsel failed to 1) retain an expert, 2) timely request a *Daubert* hearing to challenge the general and specific methodology employed by the government experts, 3) file a motion *in limine* to restrict terminology regarding supposed matches of casings, cartridges, and firearms, 4) rebut government's expert testimony with their own independent expert, and 5) effectively cross-examine the government expert.

Mr. Troya filed the affidavit of William Tobin to support his claims. Rather than address the substantive content of Mr. Tobin's findings, the government focuses on its disingenuous claim that the affidavit was prepared by other lawyers for a different case and that the affidavit is unsigned. First, the government focuses on footnote 79 of Mr. Tobin's submission to argue that:

> The affidavit references trial transcripts that support Tobin's conclusions, but these references do not appear to relate to the instant case. Instead of referring to actual trial testimony in this case offered by prosecution experts Quereau or Chapman, Tobin's affidavit makes references to witnesses named "Byrd" and "Balash" --- witnesses who never testified in this matter. Further support of this conclusion lies in the Affidavit's statement that his "curriculum vitae is appended to this affidavit in Appendix H." CV-DE 5-4 at 6. There is no 'Appendix H' attached to Troya's filing.

CV Doc. 46 at 71.

A review of the affidavit clarifies that Mr. Tobin was referring to these other cases as ones he reviewed where prosecution experts, as here, exhibited their opinions to an unstainable level of certainty. Tobin stated:

37

> In virtually every hearing and trial in which I have participated or for which I have reviewed testimony transcripts, such opinions are additionally expressed "to a reasonable [scientific, practical, or ballistic] certainty", such as are prevalent in the case *sub judice*. (Ref. Foot Note: 79 See Byrd T.tr. 1987 at 22, Balash T.tr. 267 at 2, 267 at 6, 269 at 4, and 273 at 6.)

CV Doc. 5-4, Appendix D-3 at 49.

To state that Mr. Tobin did not address testimony of government's experts Quereau and Chapman is simply not true. Besides undermining the claims of scientific underpinnings for the testimony of Quereau, Chapman, and the forensic discipline of firearm/toolmark identification generally throughout his affidavit, there are numerous instances where Mr. Tobin addresses specific testimony of the government experts:

> Unrealized by firearms/toolmarks examiners, specific source attributions such as the ones claimed in captioned matter, are inherently probabilistic (statistical). Probabilities range from zero (impossibility) to one (certainty). An individualization implies a probability of 1 (certainty), that no other firearm could have been the firing platform for certain cartridge cases or bullets, and implies an error rate of zero, an implication denounced by the NAS.26 Forensic firearms identification expert witnesses most frequently express their specific source attribution opinions in judicial proceedings with various claims of certainty, to include "100% certainty," "to a [reasonable, practical, ballistic] certainty", *inter alia*, such as Examiner **Mark Chapman** repeatedly asserted in trial testimony for the case *sub judice*. (Ref. Foot Note 27: See Chapman T.tr. pages 6643 at 2, 6644 at 21, 6653 at 7, 6666 at 7, 6666 at 17, and 6666 at 19 (to an "impractical impossibility" [sic].) There is no scientific foundation whatsoever for such claims.

CV Doc. 5-4, Appendix D-3 at 21.

> The forensic examiners in this case have summarily dismissed the possibility that the purported "individual" characteristics upon which they base their claims of specific source attribution are from the manufacturing (subclass) process(s) and are not "individual." It is simply not credible to claim characteristics are "individual" without any knowledge whatsoever as to the likelihood of how many other firearms may exist with confusingly similar characteristics such as from the same production lot. Both firearms identification examiners, **Mark Chapman and Alison Quereau**, in *Troya* matter testimonies, invoked the unfounded adjectives "unique" and "individual" throughout their testimonies repeatedly, *ad nauseam*.(Ref. Foot Note 31) As discussed, such claims are without scientific foundation.

38

There are far too many to reference here but, for examples, **see Quereau T.tr.** 6275 at 7; 6276 at 23; 6278 at 10, 12, 15, and 17; 6279 at 4; and 6288 at 1, *et al.*; **and Chapman** T.tr. 6607 at 10; 6607 at 22; 6609 at 12-19; 6610 at 1 (repeated throughout page); 6626 at 20; 6636 at 18; 6642 at 25; 6645 at 21 (repeated on page); 6653 at 3; 6665 at 15; 6666 at 5 (both 'unique' and 'individual'); *et al*.

*Id.* at 24

In the *Troya* matter testimony, Examiner Chapman asserts that certain characteristics observed on a cartridge case(s) are purportedly "individual", and thus unique, but admits that he has no idea as to what the item is that was the source of the putative "individual" characteristics. (Ref. Foot Note 35: **Chapman T.**tr. 6669 at 21) That position is patently absurd.

A scientifically acceptable reporting, at this stage of firearms/toolmarks practice development, would be similar to that adopted by The Centre of Forensic Sciences in ending use of the term 'match' in reporting DNA results and testimonies (Ref. Foot Note 36): that 'source A' [a particular firearm] cannot be excluded as the source of a particular fired bullet or cartridge case. This is both accurate and, unlike a word like "match" or phrase like "fired from the [X] pistol" or "fired from/in the same firearm" such as reported in the Palm Beach County Sheriff's Office Firearms Reports and the Indian River Crime Lab reports, and repeatedly asserted in the *Troya* testimonies, (Ref. Foot Note 37: See, for examples, Chapman T.tr. 6609 at 23; 6625 at 18; 6626 at 2; 6628 at 8; 6628 at 18; 6632 at 8 (& repeated on same page); 6645 at 1; 6645 at 12; 6694 and 6700, *et al.*; and Quereau T.tr. 6282 at 7; 6287 at 20; and 6289, *et al*., in addition to both agencies' crime lab reports.)  does not have inherent meaning that is at odds with its evidentiary value. Further, "cannot exclude" can be scaled up and down based on efforts by the individual examiner and by advances in the field.

*Id.* at 26.

The testimony transcripts of both **Chapman and Quereau** reveal repetitive claims of "same gun", "same firearm", "same rifle", "same tool", "unique", "individual", "reliable science", "scientific discipline", use of the "scientific method", and expressions of "scientific certainty" and "impractical impossibility" [sic], *inter alia.* These claims are patently unacceptable as without scientific foundation and constitute the exaggerated claims denounced by two separate National Research Council committees of the National Academy of Sciences. Ref. Foot Note 77 From both probabilistic and pragmatic perspectives, these constitute statements of certainty (probability of 1) which I, the unanimous consensus of my scientific colleagues, the U.S. Department of Justice, the National Institute of Standards and Technology (NIST), and the National Academy of Sciences conclude to be objectionable as scientifically unfounded.

39

*Id.* at 48

> In my reviews of underlying benchnotes and/or worksheets of firearms/toolmarks examiners, I most frequently see no acknowledgement, discussion, or reference to, subclass characteristics or "subclass carryover", considered to be the most critical consideration in eliminating the contribution of manufacturing characteristics ("subclass" characteristics) that are virtually analytically indistinguishable and repeat over hundreds, if not thousands, of firearms. Rather, I generally observe a direct leap from class characteristics to presumed "individual" characteristics. For example, in the case at bar, I see no discussion, reference, or acknowledgement as to the existence of subclass characteristics, or implicit indication as to how the examiner differentiated between subclass and purportedly individual characteristics. This intuited "leap of faith" is evident in the case at bar where **Examiner Chapman** declares that his opinion was "…based on an agreement of class and individual characteristics." (Ref. Foot Note: 51 *Troya* T. tr. of **Chapman** at 6607 at 10).

*Id.* at 33.

In addressing Tobin's affidavit, the government continues to take inconsistent positions. First, it is because the affidavit was unsigned. Yet later in their response the government tries to minimize Tobin's affidavit by quoting *Waters v. Thomas*, 46 F. 3d 1506, 1513-14 (11th Cir. 1995) for the proposition that affidavits are of "limited evidentiary value in a habeas case." *Resp*. at 101. Meanwhile in responding to the Sanchez § 2255, the government argues that motion is insufficient because affidavits were *not* filed in that case. *See* Case No. 16-80693, Doc. 37 at 32 and *passim* ("Sanchez has failed to provide any affidavits from any witnesses concerning the purportedly new testimony. The only proffer of how these witnesses might have testified comes from the petitioner's own self-serving allegations. Such speculation that these individuals would have provided exculpatory testimony is insufficient to establish that counsel were ineffective.").

The government engages in a separate argument that Mr. Tobin's affidavit should be discounted because he did not directly compare or review any cartridges cases, bullets, projectiles, magazines, or anything remotely connected to any firearm in this case. Doc. 46 at 71. This miscasts Mr. Troya's argument which centers on the fact that reliable principles and

40

methodologies were not used to analyze the firearm/toolmark evidence in this case. Both FRE 702 and *Daubert* necessarily require such a showing for evidence to be admissible, and even if the judge determines that evidence is admissible, that same line of attack demonstrating a lack of reliability can go to undermine the credibility and weight of the evidence admitted. Neither the government nor its experts have produced any evidence substantiating that there has been any testing validating matching live cartridges to cartridge casings based upon the uniqueness of that toolmark. There has been no evidence presented to demonstrate those are unique markings sufficient in their similarity that no other magazine or other tool could have made that mark.

Furthermore, Mr. Tobin's conclusions and findings could have been utilized to severely limit the testimony available to the government and its experts. The certainty with which their opinions are stated is not scientifically sound and overstates the precision that is currently achievable within the discipline. As Mr. Tobin summarized his findings,

> In summary, the forensic practice of firearms/toolmarks identification lacks the rigor of science and should not be represented to a finder of fact as a science. In addition, it should not be permitted to render inferences of specific source attribution (individualization), unfounded expressions of certainty of any kind (such as "to a reasonable degree of [ballistic, practical, *inter alia*] certainty"), or other conclusions implying an aura of precision generally associated with scientific endeavor, without comprehensive or meaningful scientific foundation. Based on the state of the current art (not science), the strongest opinion that is scientifically and forensically defensible is that, in the examiners' opinions, [a, the] specific firearm could not be eliminated as the firing platform for the [bullet(s), cartridge case(s)] examined.

CV Doc 5-4, Appendix D-3 at 51.

The government speculates that Mr. Troya's trial counsel actually retained a firearms/toolmark expert, that they consulted this expert, and acted upon the information received. Furthermore, the government assumes that Mr. Troya's trial counsel agreed and relied upon the decisions of Mr. Murrell as it related to the strategy to cross-examine Quereau and

Chapman. There simply is no evidence of such a strategic choice, nor is there evidence that Troya's counsel had enough information to make such a so-called strategic choice.

The Court should be able to ascertain that Mr. Troya has provided substantial extra-record evidence not refuted by the record, and if substantiated at an evidentiary hearing, would demonstrate the ineffectiveness and resulting prejudice from trial counsel's failures. The government has failed to even acknowledge, much less address the substantive problems with the analysis here. Mr. Troya outlined five pages of substantive problems with the specific analysis conducted by Quereau and Chapman not refuted by the record. CV Doc. 25 at ECF 116-120. The government fails to address these issues at all. An evidentiary hearing is warranted.

**C.     Trial Counsel's Failure to Challenge the Fingerprint Evidence Constitutes Ineffective Assistance of Counsel**

Mr. Troya has advanced a claim that trial counsel failed to effectively challenge fingerprint evidence at trial in this case. This failure was the direct consequence of trial counsel's ignorance to the Mr. Troya's need for expert testimony to: (i) effectively challenge the methodology utilized by the government's expert, Jack McCall; or (ii) undermine the notion that fingerprint examination is an exact, infallible science. CV Doc. 25 at ECF 143-162. Moreover, trial counsel deprived Mr. Troya of effective assistance of counsel by his catastrophic inability to adequately cross examine Mr. McCall. In their § 2255 response, the government wrongly assigns a wholly fabricated e duty of identifying a misidentification to establish a viable claim to Mr. Troya and claims that any *Daubert* challenge would have been misplaced due to the general admissibility of fingerprint evidence. CV Doc. 46 at 72-75. The government's arguments fail.

The government focuses on case law that holds that fingerprint evidence generally is admissible under FRE 702. CV Doc. 46 at 73. Mr. Troya's claim does not focus on the general admissibility of fingerprint evidence since "general admissibility" is not a legal standard for

scientific evidence. Rather, Mr. Troya asserts that the both the underlying methodology of fingerprint examination and the application of that methodology to Mr. Troya's case lacked the requisite reliability required by Rule 702. Simply put, the principles and methods are unreliable under FRE 702(c) and the expert did not reliably apply them to this case. FRE 702(d). FRE 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, if:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) The testimony is based on sufficient facts or data;
> (c) The testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principle and methods to the facts of the case.
> (e)

Mr. Troya's expert, Ms. Eldridge, details that the documentation provided was, "insufficient to demonstrate what procedures **should have** been followed, what procedures **were** followed, or what basis there was for the **validity of the conclusion.**" **CV** Doc. 5-10 Appendix E at 12. (emphasis in original).

The application of reliable principles and methods is just as critical as the reliability of the principles and methods themselves. Improper application of even reliable principles and methods (although Mr. Troya does not concede that the current practice of fingerprint examination is reliable) cloak unsupported, unreliable, and bogus opinions in a shroud of certainty (and thus guilt) when left unchallenged as in Mr. Troya's case. The drafters of FRE 702 realized this, stating:

> The Court in *Daubert* declared that the "focus, of course, must be solely on principles and methodology, not on the conclusions they generate." 509 U.S. at 595. Yet as the Court later recognized, "conclusions and methodology are not entirely distinct from one another." *General Elec. Co. v. Joiner*, 522 U.S. 136,

43

146 (1997). Under the amendment, as under *Daubert*, when an expert purports to apply principles and methods in accordance with professional standards, and yet reaches a conclusion that other experts in the field would not reach, the trial court may fairly suspect that the principles and methods have not been faithfully applied. *See Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). The amendment specifically provides that the trial court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case. As the court noted in *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994), "*any* step that renders the analysis unreliable . . . renders the experts's testimony inadmissible. *This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.*"

If the expert purports to apply principles and methods to the facts of the case, it is important that this application be conducted reliably.

FRE 702, Commentary 2000 Amendments.

Mr. McCall's approach to the fingerprint examination in Mr. Troya's case fell far below best practices in the discipline. Ms. Eldridge analyzed the deficiencies of the government's expert at length and with specificity. Among other things, she reviews how the documentation of latent print work in Mr. Troya's case was not sufficient to demonstrate the ACE-V fingerprint comparison method was reliably applied. CV Doc. 5-10, Appendix E at 6-12. The documentation also lacked contemporaneous bench notes; clear and discernible reporting; and standard operating procedures. In addition, Mr. McCall's trial testimony deviated from acceptable practices and it devolved into speculation and over-exaggeration. Each of these deficiencies were virtually unchallenged by trial counsel. Even when defending trial counsel's failures, the government acknowledges that the fingerprint evidence "was vastly unchallenged by the defense." CV Doc. 46 at 73.

Despite this acknowledgement of trial counsel's failure, the government stubbornly argues that it was sound strategy to fail to use an expert, request a *Daubert* hearing, or otherwise challenge the propriety of fingerprint expert testimony. *Id*. at 75. The government fails to meaningfully address the failures alleged in Ms. Eldridge's affidavit regarding the fingerprint

examiners failure to properly apply the ACE-V method belying their proposition that such evidence was admissible and reliable, and that this extra-record evidence is refuted by the record.

For instance, no standard operating procedures were produced for latent print training, processing, comparison, or report writing. CV Doc. 5-10, Appendix E at 6. Critically, Ms. Eldridge notes that, "Without SOPs, there is no way to know what methods were followed during the analysis and comparison of the latent print evidence, or during its verification." *Id*. Ms. Eldridge goes on to observe that, "Without appropriate quality measures in place for the verification process, its validity must be seriously called into question. Was a careful and thorough analysis done by the verifier, or was it simply a 'rubber stamp' where the verifier had prior knowledge of the conclusion? Without SOPs describing the process used, there is no way to know." *Id*.

The fingerprint examiners also failed to provide any bench notes from which the propriety of their methodology could be verified. This means that another examiner would never be able to replicate the examination. Ms. Eldridge observed:

> No bench notes relating to the Troya identification were provided. While there were photographs provided that allowed it to be inferred that ninhydrin processing was used; allowed both the original state, and processed state, of the evidence to be seen; and allowed the position of the latent print on the evidence to be seen, none of these demonstrates how the method was applied, or that it was applied reliably in this case.
>
> Without documentation of the analysis, we have no way of knowing what data was considered, how possible inconsistencies were explained, or whether the analyst found sufficient evidence to support an opinion of identification.
>
> Likewise, no notes were provided for any of the individuals who purported to have identified the latent print subsequently. Not one of them provided either written or visual notes in support of their opinions. Without these notes, it is impossible to evaluate the validity of their conclusions.
>
> CV Doc. 5-10, Appendix E at 7.

Likewise, the reports that the fingerprint examiners did provide lacked clarity, completion, and basic organization. *Id*. at 9. Ms. Eldridge observed in her affidavit:

> A clear, complete report of examination should include several basic elements, such as: the name of the agency, case number, victim name, name of analyst performing the work, date evidence was received and returned, dates of any conclusions, date of the report, page numbers, signature of the analyst performing the work and generating the report, signature of the technical reviewer, description of the evidence received, description of the analyses performed, and clear results for each item examined.
>
> None of the provided reports includes all of these elements.
>
> *Id*. at 9.

Ms. Eldridge cited the National Academy of Science Report regarding the need for documentation while applying the ACE-V method by stating:[11]

> Better documentation is needed of each step in the ACE-V process or its equivalent. At the very least, sufficient documentation is needed to reconstruct the analysis, if necessary. By documenting the relevant information gathered during the analysis, evaluation, and comparison of latent prints and the basis for the conclusion (identification, exclusion, or inconclusive), the examiner will create a transparent record of the method and thereby provide the courts with additional information on which to *assess the reliability of the method for a specific case*. Currently, there is no requirement for examiners to document which features within a latent print support their reasoning and conclusions.
> [emphasis added].
>
> *Id*. at 5.

Throughout his trial testimony, as detailed by Ms. Eldridge, the government's expert overstates his conclusions and expertise, as well as makes errors of fact. *Id*. at 9-11. The government's only attempt to address this problematic testimony is to state:

> Ms. Eldridge's opinion related to the methodology used by the Government's expert. Ms. Eldridge claims that the only way to demonstrate the validity of McCall's conclusion would have been for McCall to visually present the 14 points he found, in order that another competent examiner could assess its sufficiency for the conclusion. This is exactly what happened at trial.

---

[11] We know trial counsel had access to the report because of references that Sanchez's counsel made to it while cross-examining the government firearms experts. T6372, 6676-80.

46

CV Doc. 46 at 74.

The government's assertion that somehow a visual presentation to non-expert jurors satisfies the requirements of a properly documented, clearly reported examination sufficient to allow a competent examiner to assess his methodology is patently ridiculous. Jurors are necessarily hearing McCall testify because they lack the expertise to properly understand and assess such testimony without expert assistance. *See* FRE 702. Just as important, trial counsel had no fingerprint expert present for this testimony to assist in assessing McCall's methodology, generally assist in formulating questions for cross-examination, or testify about the methodological failure in such analysis and testimony.

The Court should be able to ascertain that Mr. Troya has provided substantial extra-record evidence not refuted by the record, and if substantiated at an evidentiary hearing, would demonstrate the ineffectiveness and resulting prejudice from trial counsel's failures.

**Reply to Govt. Response G. CV Doc. 46 at 76.**

**D.      (CV Doc. 25 at ECF 163) Cell Tower Tracking Expert.**

Here, the government reprises its argument about using "new" experts in post-conviction, CV Doc. 46 at 78, even though Fischbach is not a new expert at all, but as pointed out in the motion, is the very same expert retained by the defense prior to trial. It relies on codefendant counsel's "skillful cross-examination," CV Doc. 46 at 78-79, without specifically identifying what that was. Even if cross raised reliability issues, the government ignores the detailed post-conviction report of Fischbach which could have been used at trial to entirely undermine the misleading map created by the government witness Weeks, as described in the report incorporated into the motion at CV Doc. 25 at ECF 166-67.  The government quotes a sentence

47

from the Fischbach report to try to misdirect from the issue raised in the 2255 motion, saying "this affidavit that fails to establish that the government's evidence was inaccurate, *i.e.*, that the business records it had summarized were incorrect or flawed in any way." CV Doc. 46 at 79. It neglects to quote the portion of the report just before its clipped quote, which does demonstrate the misleading nature of the testimony and related map drawn from those records:

> In this case, the testimony at trial suggested that the cellular tower data could narrow the origination point of a call to a specific area one and a half to two miles from the location of the cellular tower that processed the call. Based on my examination of the records, the discovery produced at trial was patently insufficient to substantiate the whereabouts of an individual handset on a given date and time with such accuracy or precision.

CV Doc. 25 at ECF 166 & CV Doc. 5-7 Appendix D-6.

Even more troubling is the government's refusal in its response to even address the evidence Yessica Escobedo's cell phone made a call from Texas within hours of the homicides, or its misleading presentation of that call to the jury, as discussed fully in the motion at ECF 169-71.

**Reply to Govt. Response P. CV Doc. 46 at 143.**

**E.      (CV Doc. 25 at ECF  171) GIS Mapping Expert.**

The government reiterates counsel called some witnesses, repeats caselaw it relies on about experts, and that the crime is so horrible it is impossible to show prejudice, Resp at ECF 143-45, all of which Mr. Troya has responded to elsewhere in this reply. Counsel ineffectively failed to even consult with the GIS mapping expert, even though funding for her participation had been obtained by the defense. The maps that could have been shown to the jury would have greatly assisted in visualizing the patterns of education, crime and economics in the areas in which Mr. Troya was raised and the community risk factors to which he was exposed as a child

48

and adolescent. Failing to develop and present such readily available and fully-funded evidence pretrial was prejudicially ineffective.

**Reply to Govt. Response V. CV Doc. 46 at 164.**

**(XII). (CV Doc. 25 at ECF 172)**

**DEFENSE COUNSEL FAILED TO OBJECT TO NUMEROUS ERRORS BEFORE AND DURING THE TRIAL, THEREBY DEPRIVING MR. TROYA OF HIS CONSTITUTIONAL RIGHT TO EFFECTIVE COUNSEL UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

"It has long been recognized that prosecutorial misconduct may be grounds for reversal. *See Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). 'Part of this recognition stems from a systemic belief that a prosecutor, while an advocate, is also a public servant "'whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Brooks*, 762 F.2d at 1399 (*citing Berger*, 295 U.S. at 88, 55 S.Ct. 629). Judicial antipathy to such misconduct follows from its likely influence on a jury:

> It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge, are apt to carry much weight against the accused when they should properly carry none.

*Berger*, 295 U.S. at 88, 55 S.Ct. 629. Our review of such misconduct 'must be informed by an awareness that the prosecutorial mantle of authority can intensify the effect on the jury of any misconduct.' *Brooks*, 762 F.2d at 1399." *Farina v. Secretary, Florida Dept. of Corrections*, 536 Fed.Appx. 966, 983 (11th Cir. 2013) (per curiam) (unpublished), *cert. denied*, 135 S.Ct. 475 (2014).

After arguing most of its comments and arguments were proper and only grudgingly acknowledging the impropriety of others, the government returns to its talisman of potential strategy in an effort to insulate trial counsel's failings. It argues "[e]ven if Troya was able to

49

establish a legal basis for objection, it is not unusual for counsel to make a strategic decision

no[t] to object during argument to avoid highlighting the prosecutor's comments for the jury."

CV Doc. 46 at 164. Without an evidentiary hearing it is impossible to conclude strategy is the

basis for the failures to object, but it is possible to know the government's speculation is not

sufficient to dismiss these claims outright.  The government argument contravenes the Supreme

Court's admonition that "courts may not indulge *post hoc* rationalization for counsel's decision

making that contradicts the available evidence of counsel's actions." *Harrington v. Richter*, 562

U.S. 86, 108 (2011)(internal quotation marks omitted); *see also Wiggins v. Smith*, 539 U.S. 510,

526–27 (2003).

Similar arguments have been heard and rejected by the courts before. "By contrast [to

evidence objections], a failure to object to comments on witness credibility or derogatory

statements by the prosecutor is much less susceptible to the argument that it should be

considered reasonable trial strategy. *Cf. Washington*, 228 F.3d at 706 ("[A]ccepting as a proper

trial strategy a lawyer's doubts over the effectiveness of objections and curative instructions

would preclude ineffectiveness claims in every case such as this, no matter how outrageous the

prosecutorial misconduct might be.")." *Hodge v. Hurley*, 426 F.3d 368, 386 (6th Cir. 2005. The

Court further explains in a footnote:

> Although "interruptions of arguments, either by an opposing counsel or the presiding
> judge, are matters to be approached cautiously," *Young*, 470 U.S. at 13, 105 S.Ct. 1038,
> this does not mean that no objection should ever be made. At a minimum, an attorney
> who believes that opposing counsel has made improper closing arguments should request
> a bench conference at the conclusion of the opposing argument, where he or she can
> lodge an appropriate objection out the hearing of the jury. *Id.* at 13–14, 105 S.Ct. 1038.
> Such an approach preserves the continuity of each closing argument, avoids calling the
> attention of the jury to any improper statement, and allows the trial judge the opportunity
> to make an appropriate curative instruction or, if necessary, declare a mistrial. *See id.*;
> *Washington*, 228 F.3d at 706 n. 10.

50

426 F. 3d at386, at n. 25. (Finding itself "unable to articulate a sound professional reason why defense counsel did not object to this pattern of repeated misconduct," the majority concluded counsel's performance had been deficient.). *Accord, Earls v. McCaughtry*, 379 F.3d 489, 493-494 (7th Cir. 2004), noting counsel had not wanted to emphasize the prosecutor's argument by objecting before the jury, the Seventh Circuit observed that, "[e]ven if this was a reasonable decision – and we doubt it – it does not change the fact that counsel did not later move for a mistrial outside the presence of the jury."

In the context of objecting to evidence, a district court explained that although there could be instances when an attorney might reasonably choose not to object to inadmissible testimony, such a strategy "makes no sense" sometimes, because:

> A desire to not highlight improper evidence cannot be a magic talisman that insulates all decisions to refrain from objecting, and a contrary decision would permit any attorney to sit idly and allow a parade of inadmissible evidence to be presented, all in the name of preferring not to highlight it. Some impermissible evidence is of such a nature that, given the case, it cannot be reasonable strategy to do nothing.

*Gabaree v. Steele*, 2013 WL 4095941, *slip op*. at 10 (W.D.Mo. Aug. 13, 2013), *aff'd*, 792 F.3d 991 (8th Cir. 2015), *cert. denied*, 136 S.Ct. 1194 (2016).

The government also relies on the general instructions as a cure for improper argument, but there was no instruction directed specifically to the comments complained of here. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974) (noting the prosecutor's potentially improper remark was "followed by specific disapproving instructions");

### A. Guilt Phase Trial.

### 1. Reply to Govt. Response B. CV Doc. 46 at 52.

**Defense counsel forgot about the transcript of the co-defendant's statement and made an (accidentally) untruthful claim in the jury's presence that it had not been provided to the defense. Counsel also failed to object to the Court's comment, in the jury's presence, that what he said was not true.**

Avoiding entirely the main point of this claim, that counsel damaged his own credibility, the government focuses on the failure to object to the judge's comments instead. It argues the comment was a month before the verdict so the jury probably forgot about it, and that there is no legal basis for such an objection. CV Doc. 46 at 54. The government is mistaken. There is no doubt counsel must object to a judicial comment to preserve it for review or otherwise cure it:

> The third reason we reject Rodriguez's position is that it is demeaning to both judges and attorneys. Judges know that it is the role and duty of attorneys to represent their clients zealously and object to what they perceive to be errors or potential errors. Many objections have as their premise that the judge has violated, or but for the attorney's intervention would violate, some law, rule of procedure, or right of the attorney's client. That is the stuff of which objections are made. To suggest that judges, whose solemn duty it is to apply the law fairly and impartially to all parties before them, would vindictively respond to an attorney's objection by punishing the client is demeaning to the judiciary. And to suggest that lawyers, who perceive a valid basis for objection, would cower in their seats, fearing retribution from the bench if they do object, is demeaning to the bar.[] We reject any vindictive judge or cowardly counsel exception to the contemporaneous objection rule.[]

*United States v. Rodriguez*, 627 F.3d 1372, 1380 (11th Cir. 2010)(footnotes omitted).

It is extremely unlikely counsel's blunder and the Court's correction was forgotten, because "[j]uries are extremely sensitive to every word and intimation given by the judge." *United States v. Cox*, 664 F. 2d 257, 259 (11th Cir.1981). Judicial comment in the jury's presence which undermines the credibility of counsel is improper. *United States v. Harriston*, 329 F.3d 779 (11th Cir. 2003), though "[o]nly when the judge's conduct strays from neutrality is the defendant thereby denied a constitutionally fair trial." *United States v. Harris*, 720 F.2d 1259, 1262 (11th

Cir.1983) (*quoting Moore v. United States*, 598 F.2d 439, 442 (5th Cir.1979)). The critical court comment required an objection for prompt correction, but counsel shied away from making one. Trial counsel's conduct is one of several record instances showing counsel's lack of preparation for and performance at trial.

### Reply to Govt. Response V. CV Doc. 46 at 164.

#### 2.      Counsel failed to object to improper arguments by the government during guilt phase opening and closing.

**a**. Because without objection it elicited testimony from a witness using the pejorative terms "thug mansion" and "pimp plaza," the government argues it was proper to refer to Mr. Troya and the other defendants by reference to those terms.  That is no excuse for its repeated use of those terms attacking character.

**b.**  Description of government witness Doran as nervous and hesitant to testify -

Movant relies on the motion.

**c.** Calling Sanchez a liar -

It is patently improper for a prosecutor either to comment on the credibility of a witness or to express a personal belief that a particular witness is lying. *United States v. Young*, 470 U.S. 1, 17–19 (1985); *Berger*, 295 U.S. at 86–88 (citing prosecutor's statements suggesting he had personal knowledge a witness was not being truthful as one example of egregious prosecutorial misconduct);

**d.**  Here the government downplays its argument "[t]his red suitcase is Yessica Escobedo's way of speaking from the grave and identifying her killers," T7159, as mere "poetic license."  The improper argument is highly prejudicial.  *See Darden v. Wainwright*, 477 U.S. 168, 180–81 (1986) (observing that inflammatory and misleading argument is improper). In an analogous case as to prejudice, *Jensen v. Schwochert*, 2013 WL 6708767 (E.D.Wis. Dec. 18,

2013), *aff'd sub nom. Jensen v. Clements*, 800 F. 3d 892 (7th Cir. 2015). The district court granted relief in a murder case, finding the trial court's admission of the victim's out-of-court statements violated the Confrontation Clause: "In sum," the district court observed, "[the wife's] letter from the grave served as an unrebuttable and emotionally compelling accusation of guilt." Id. at 17.

**e.** The government's improper comment on the right to counsel and due process -

"The prosecution cannot use the defendant's exercise of specific fundamental constitutional guarantees against him at trial." *Burns v. Gammon*, 260 F.3d 892, 896 (8th Cir.2001). *See, e.g., Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (Fifth Amendment right to remain silent at trial commands that prosecutor and judge not make adverse comment about defendant's exercise of the right); In *Brooks v Kemp*, the Eleventh Circuit ruled:

> It is improper to urge that a criminal defendant's exercise of constitutional rights is a ground for discrediting his defense. Similarly, it is wrong to imply that the system coddles criminals by providing them with more procedural protections than their victims. A capital sentencing jury's important deliberation should not be colored by such considerations.

**f.** Comparing jury service to military service (guilt and sentencing) -

Similar argument was found unlawful in *Brooks v. Kemp*, 762 F.2d 1383, 1400 (11th Cir.1985) (en banc), *vacated on other grounds*, 478 U.S. 1016 (1986), *reinstated*, 809 F.2d 700 (11th Cir.1987). There, the Court found "the analogy of the death penalty to killing in a war was appropriate insofar as it implied that imposing death, while difficult, is at times sanctioned by the state because of compelling reasons (national security or deterring crime)". 762 F. 2d at 1412. However, it disapproved of the argument as negating the discretion of jurors in capital cases:

> Our acceptance of part of this argument cannot blind us to its obvious faults. The principal fault of the analogy is that a capital sentencing jury under the Georgia statutory

scheme is bound to exercise broad discretion in its determination of a just punishment. This discretion is simply not analogous to the role of a soldier who is ordered to kill the enemy. Using the soldier metaphor, and coupling it with a challenge to the jurors' patriotism—"When [the soldiers] did a good job of killing ..., we decorated them and gave them citations"; "if we can send a 17-year old young man overseas to kill an enemy soldier, is it asking too much to ask you to go back and vote for the death penalty in this case against William Brooks"—misrepresents the task the jury is charged by law to carry out. *See, e.g., Viereck v. United States*, 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734 (1943). The main thrust of death penalty jurisprudence since *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), has been the need for guided discretion in the sentencing body's individualized consideration of the capital defendant. *See, e.g., Zant v. Stephens, supra*. Conceiving of the jurors as soldiers undermines the crucial discretionary element required by the Eighth Amendment.

762 F. 2d at 1412-13.

In *Weaver v. Bowersox*, 438 F.3d 832, 840-41 (8th Cir. 2006) (corrected opinion), *cert. dismissed sub nom. Roper v. Weaver*, 550 U.S. 598 (2007) the Court similarly explained why the argument is improper:

Describing jurors as soldiers with a duty eviscerates the concept of discretion afforded to a jury as required by the Eighth Amendment. *See Zant v. Stephens*, 462 U.S. 862, 879, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). Not only was the main thrust of the prosecutor's argument diametrically opposed to the requirement that capital sentencing be at the jury's discretion, it also "diminished the jury's sense of responsibility for imposing the death sentence, in violation of the Eighth Amendment under *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

**g**. The government told the jury at both guilt and sentencing it would continue to investigate Varela, charge and bring him before a jury. This argument violates many prohibitions, which will be discussed in more detail below. Besides the unlawful argument, Mr. Troya can show the representation was entirely untrue, as responses to FOIA requests show the government has conducted no investigation whatsoever of Varela since trial.

**h.** The government portrays the prosecutor's extended and effusive salutations to the work done by each of the investigators as mere reference to the "mountain" of corroborating evidence.  Again, this is not the reality of what happened. Instead, the prosecutor plainly

55

personally vouched for and celebrated members of his law enforcement team. Bolstering occurs when " 'the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility.' " *United States v. Knowles*, 66 F.3d 1146, 1161 (11th Cir.1995) (*quoting United States v. Sims*, 719 F.2d 375, 377 (11th Cir.1983)). Improper vouching occurs in two different circumstances: (1) if the prosecutor "place [s] the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity," or (2) if the prosecutor "implicitly vouch[es] for the witness' veracity by indicating that information not presented to the jury supports the testimony." *United States v. Sims*, 719 F.2d 375, 377 (11th Cir.1983). This argument was beyond the pale, but still defense counsel did not object.

**B.      (CV Doc. 25 at ECF 160) Sentencing Trial.**

**Failures to respond to the prosecution's improper actions.**

**Reply to Govt. Response L.  CV Doc. 46 at 115.**

**1.      Trial counsel allowed *Crawford* and related reliability errors to permeate the penalty phase, permitting the jury to consider unreliable evidence.**

The *Crawford* issue has not yet been resolved by the United States Supreme Court; however, as cited to in the motion, significant caselaw would have alerted trial counsel to the duty to object to the hearsay and double hearsay evidence introduced by the government at sentencing phase.

**A. (CV Doc. 25 at ECF 181) Escape evidence.**

Mr. Troya relies on the allegations of the motion.

**B. (Cv Doc. 25 at ECF 184) The felony battery.  (response at --**

Mr. Troya relies on the allegations of the motion.

**C. The fight with and striking of a girlfriend.**

Mr. Troya relies on the allegations of the motion.

**D. Evidence of introduction of contraband money and the supposed involvement of Mr. Troya's mother in the introduction to impeach her testimony.**

Movant relies on the motion.

Under a separate letter (H), beginning at CV Doc. 46 at 93 and under a separate heading

"4. Government Witness Inspector Glover," the government responds to 2, 4 & 6, below.

**2. Trial counsel failed to object to misleading questions and an inaccurate portrayal of Daniel Troya as the leader of the attempted escape; 4. Counsel failed to object to misleading testimony on whether Mr. Troya was wearing civilian clothes; 6. Counsel's ineffective cross misrepresented facts to the jury, and counsel had to be corrected by the witness.**

On each, Mr. Troya relies on the allegations of the motion.

**3.** Counsel should have objected to improper testimony and argument of future danger and otherwise undermining life-without-parole as a valid sentencing option.

The government does not respond to this section. Mr. Troya relies on the motion.

**5.** Trial counsel were ineffective in failing to object to comment on Mr. Troya's silence.

The government does not respond to this claim. Mr. Troya relies on the motion.

**(CV Doc. 25 at ECF 170) The Defense Case**

**Reply to Govt. Response J.  CV Doc. 46 at 105.**

**7.** Counsel were ineffective for calling a witness they knew or should have known would invoke his right to remain silent in the jury's presence, significantly undermining the defense case for life.

Unable to dispute the record revealing the first witness called by defense counsel at sentencing phase invoked his right not to testify in the presence of the jury, the government says "there is no record evidence," but instead "bald assertions" counsel was ineffective for failing to investigate Bush's background and calling him as a witness. CV Doc. 46 at 107. Its reliance on the March 9, 2009 status conference at which trial counsel brought out the fact the FBI had interviewed defense witnesses and requested their notes does not at all show counsel had

57

conducted a proper investigation before putting their silent witness on the stand. The fact there is "no record evidence" of a failure to investigate is completely meaningless. Of course there is no record evidence of a lack of an investigation. Because counsel's investigation, and lack of it, is not of record. That's what evidentiary hearings are for.

Without support in the record, the government says objection to the improper cross of Bush was overruled. CV Doc. 46 at 110. Without support in logic, the government plows forward, defending counsel's indefensible conduct in presenting a witness who took the fifth in the jury's presence instead of using another one who would not. Its "no prejudice" argument is addressed elsewhere in this reply.

**Reply to Govt. Response M.  CV Doc. 46 at 120.**

**8.      Trial counsel's failure to object to repeated, improper questioning of defense witnesses about the improper consideration of whether Mr. Troya was taught and knew right from wrong was prejudicial.**

The government's questioning and closing argument focusing on the irrelevant issue whether Mr. Troya knew right from wrong was improper, and violated *Tennard,* among other cases. The government cites no law to fortify its improper conduct and counsel's inexcusable neglect to object.

**Reply to Govt. Response N.  CV Doc. 46 at 122.**

**9.      Trial counsel's failure to move for a mistrial for improper cross examination of defense law enforcement witness was prejudicial.**

The government reliance on codefendant counsel Sanchez's mistrial motion is inapt. While codefendant counsel Cohen moved for a mistrial on the issues related to *Tennard*, these questions and answers were not specifically referenced. P. 197.

**Reply to Govt. Response K. CV Doc. 46 at 111.**

**10.      Without objection, the government conducted knowingly misleading cross-examination of defense witnesses charging Uncle Tito was not actually at their home in the summer of 1995.**

This claim raises both knowing use of false testimony and ineffective counsel. Defending its wholly false presentation of evidence to the jury based on its ignorance of the truth, the government says it had a "good faith basis" for the questions, and counsel should not have objected when it had its witness falsely claimed Uncle Tito could not have been at the Troya home when defense witnesses said he was. The government's profession of ignorance should be subject to questioning under oath at an evidentiary hearing, as should counsel's failure to object when the unsupportable false testimony was presented.

**Reply to Govt. Response Q. CV Doc. 46 at 145.**

**11.      Trial counsel 's ineffective neglect to timely and accurately proffer the testimony of its expert witness Cunningham which would have been admissible as outside the Court's order excluding prison conditions evidence.**

Counsel presented a barebones proffer of Dr. Cunningham's proposed testimony to the presiding judge at trial, and the court excluded it. There was much more the expert could have attested to related to Mr. Troya's lack of future dangerousness, set forth in the motion, which would have fit within the trial judge's ruling excluding only prison conditions testimony. This is not at all a "pile on," as the government says, CV Doc. 46 at 145, but zealous advocacy. Had counsel made an accurate proffer of the testimony which Dr. Cunningham could have provided, the trial judge would have admitted it for the jury's consideration.

As framed in the motion, though the Eleventh Circuit concluded the exclusion of Dr. Cunningham's testimony was harmless, its effect on the jury should be considered in assessing the cumulative nature of the prejudice resulting from counsel's neglect. The government may

dismiss this as "repackaging," CV Doc. 46 at 145, but the law requires consideration of such evidence in determining the likelihood the outcome of the sentencing trial would have been affected.

**Reply to Govt. Response V. CV Doc. 46 at 182.**

**12.     The government's improper and false vouching, along with its reference to non-record facts, in its assertion that it would continue to investigate and prosecute Varela for the murders was improper and unlawful; was met with no objection from the defense; and essentially canceled out the "culpable codefendant" mitigation presented by Mr. Troya.**

To neutralize the powerful statutory mitigating factor the mostly culpable codefendant Varela would not face death, the government promised the jury without record evidence it would continue to investigate him, and "[w]hen the evidence is there, he will be prosecuted, and he will face another jury of his peers." T9637-38. The government does not contest here the impropriety of the argument, but says there is no prejudice because 10 jurors found the mitigator. The argument was highly improper, the finding of a mitigating factor does not at all reflect the weight given it by jurors, and failing to object was prejudicially ineffective.

**Reply to Govt. Response V. CV Doc. 46 beginning at page 164.**

**13.     There were several additional improper arguments to which counsel failed to object.**

During opening statement, the government engaged in a number of improper arguments to which counsel failed to object. The government's responses are unpersuasive in justifying their arguments:

**a. That Mr. Troya exhibited a lack of remorse. T9508. This argument violates the Fifth and Eighth Amendments and Mr. Troya's right not have his silence used against him.**

A prosecutor's argument violates the right to remain silent if "the statement was manifestly intended to be a comment on the defendant's failure to testify" or "the statement was

60

of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Knowles*, 66 F.3d 1146, 1162–63 (11th Cir.1995) (internal quotation marks omitted). The prosecutor's use of the word "unremorseful" plainly directed the jury to the fact neither Mr. Troya nor Mr. Sanchez testified otherwise.

> **b. That the defense was engaged in a contest of how much mud can be thrown against a wall and how much it sticks. T9510. Such argument improperly denigrates mitigation and defense counsel.**

The government excuses itself for its unlawful attack on counsel and mitigation, saying it was just part of an argument directed to the weight the jury should give mitigation. CV Doc. 46 at 174. There are two problems with the prosecutor's argument here. One is the attack on defense counsel, and "[a] prosecutor should not disparage an opponent's argument with comments like, 'put it up, hope it sticks.'" *United States v. Rodriguez*, 581 F.3d 775, 802 (8th Cir. 2009). To "discredit defense counsel in front of the jury is improper, and even subsequent jury instructions aimed at rectifying this error may not ensure that these disparaging remarks have not already deprived the defendant of a fair trial." *United States v. De La Vega*, 913 F.2d 861, 867 (11th Cir.1990). The related error is the wholesale denigration of the mitigation offered by the defense. "A prosecutor errs by directing the jury to ignore a proposed mitigating factor." *United States v. Rodriguez*, 581 F.3d 775, 800–01 (8th Cir.2009); *see also Tennard v. Dretke*, 542 U.S. 274, 285 (2004) ("[T]he 'Eighth Amendment requires that the jury be able to consider and give effect to' a capital defendant's mitigating evidence." (*quoting Boyde v. California*, 494 U.S. 370, 377–78 (1990). The arguments were improper and prejudicial to the defense case for life. But counsel sat idly by.

61

**c. The fact Mr. Troya's grandmother died was tragic, but there was not anyone on the jury who hadn't had that happen to. It was a fact of life, not a mitigator; it had nothing to do with whether he should receive the maximum punishment; it was merely a "distraction." T9514. This argument improperly denigrates mitigation, and improperly calls for a causal link to the crime.**

The government minimizes its conduct. CV Doc. 46 at 174. The argument is improperly

prejudicial for the reasons stated above.

**d. How many murders and attempted murders are required before you forfeit your right to exist in this society? T9516, 9519. Later, the government argued that if this crime doesn't fit the need for maximum penalty, where are we, if not this case, what case, how many more murders will it take, does it take 6, 20; that we have 4 here, and 2 little kids. T9521. That a line was crossed, and can't be "excused" with life without parole as if this was just like any other murder, as if they were just drug dealers; two little kids were murdered brutally, an entire family slaughtered. The government argued if this case doesn't qualify, he did not know what will ever. T9522. These arguments also minimize mitigation, suggesting no amount can be sufficient to outweigh aggravation when there are four murders, or murders of children. It also improperly compares cases not of record, and further leaves jurors with the sense that the prosecutor, who is privy to a range of cases, should be trusted to know which deserve death and which do not.**

The cases cited by the government are inapposite. The reference to non-record facts and

denigration of mitigation were improper and prejudicial for the reasons stated above.

**e. That the defense will say there are many mitigators, but that is nothing more than a different translation of it's not my fault, to excuse conscious choice to take innocent lives, invoking community conscience, urging jurors not to fall for it. T9517, 9519, 9521-22. This argument minimizes and distorts mitigation by falsely calling it an" excuse," and invokes an improper "conscience of the community" argument when the only issue before the jurors was whether an individualized assessment of Mr. Troya's moral culpability led to death or life imprisonment as the proper punishment.**

Contrary to the government's position, CV Doc. 46 at 175, the prosecutor at trial was not

at all arguing the difference between a "legal excuse" for a crime and mitigation. His arguments

violated the Eighth Amendment requirements set forth above, and effective counsel would have

objected.

62

**f. That anything other than death would not be justice, but would be avoiding your duty, passing the buck. T9523. The argument that duty or justice requires the death sentence violates the Eighth Amendment.**

Minimizing its misconduct, the government here says its arguments were "merely a comment on the jury's representative and policy role in the criminal justice system," CV Doc. 46 at 176. Its argument at trial was beneath the dignity of the United States, and defense counsel was required to object: "[i]t is improper for a prosecutor to suggest that a jury has a civic duty to convict." *Thornburg v. Mullin*, 422 F.3d 1113, 1134 (10th Cir.2005); *see also Malicoat v. Mullin*, 426 F.3d 1241, 1256 (10th Cir.2005); *Spears v. Mullin*, 343 F.3d 1215, 1247 (10th Cir. 2003); *Le*, 311 F.3d at 1022 (explaining such comments are "'offensive to the dignity and good order with which all proceedings in court should be conducted' " (*quoting Viereck v. United States*, 318 U.S. 236, 248 (1943).

The government also responds to the challenges to its concluding closing argument at the sentencing trial,

> **a. That the issue is the appropriate sentence for mass murderers, not whether Uncle Tito was in West Palm Beach for 30 or 60 days. That defense counsel talked a lot about that, but the trial was not about Uncle Tito, it is about Sanchez and Troya and the events of October 13, 2006. T9604.This argument improperly urged the jury to ignore mitigation. Trial counsel's failure to object to what was a litany of comments denigrating mitigation would reasonably have left the jurors believing that the government's presentation of the law and of their role was correct.**

The government says this argument is "misplaced," CV Doc. 46 at 177, but it is not. The denigration of mitigation was a constant theme throughout the government closing, and defense counsel didn't rise once to stop it.

**b. Comparing jury service to serving one's country in war. T9605.**

Challenging counsel to cite law showing its argument here was improper, CV Doc. 46 at

177-78, the government overlooks cases from both in and out of circuit. Such arguments were found improper in *Brooks* and *Weaver*, discussed in the guilt section above.

**c. Again, that jurors act to impose death as the conscience of the community. T9607.**

The impropriety of this argument is addressed above.

**d. That as to the co-defendant Sanchez, that there was no evidence that a rough childhood led to this brutal mass murder, it was ridiculous, and we know it's ridiculous because we tested for any effect. T9617. See T9633. This argument unlawfully minimizes mitigation and violates *Tennard* by requiring a causal connection; suggests that the same mitigation must exist for any defendant involved in an offense; and further tells the jury that mitigating evidence can be "tested for."**

As if the jury only took the government at its word for what it said about mitigation for one defendant, it says Mr. Troya has no "standing" to raise this argument. CV Doc. 46 at 178-79. The government's attempt to avoid responsibility for its conduct should be rejected. When it urges the jury to minimize mitigation based on improper argument, there is no doubt the jury will apply the reasoning to both defendants.

**e. That there was no evidence Mr. Troya had below-average intelligence or learning disorder or that he did not know right from wrong or could not control his behavior. T9631. This argument relies upon a nonexistent standard for establishing mitigation (knowing right from wrong), and improperly invokes the absence of mitigation as aggravation, all in violation of the Eighth Amendment.**

The government urges its argument should be read in "context," CV Doc. 46 at 180, but there is no context within which the government is permitted to misstate the law so thoroughly. It is impermissible to use the absence of mitigation in aggravation. *See Zant v. Stephens*, 462 U.S. 862, 885 (1983) ("Nor has Georgia attached the "aggravating" label to factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as for example the race, religion, or political affiliation of the defendant, *cf. Herndon v. Lowry*, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066 (1937), **or to conduct that actually should militate in favor of a**

**lesser penalty, such as perhaps the defendant's mental illness**. *Cf. Miller v. Florida*, 373

So.2d 882, 885–886 (Fla.1979). If the aggravating circumstance at issue in this case had been

invalid for reasons such as these, due process of law would require that the jury's decision to

impose death be set aside." (e.s.).

> **f. That Mr. Troya is "evil." T9634. This is improper name-calling, and a highly objectionable and dehumanizing argument in a capital case.**

A prosecutor may not use closing argument to inflame the passions and prejudices of the

jury. *See United States v. Young*, 470 U.S. 1, 8 n. 5 (1985) (discussing ABA STANDARDS FOR

CRIMINAL JUSTICE 3-5.8 (2d ed.1980). Calling Mr. Troya evil, taking literary license or not,

is prejudicial error, notwithstanding the government's argument it only happened once. CV Doc.

46 at 180-81.

> **Reply to Govt. Response S. CV Doc. 46 at 148.**

> **14.     During sentencing summation, trial counsel ineffectively conceded Mr. Troya's involvement in two uncharged shootings which were included in the nonstatutory aggravating circumstance, contrary to the Fifth, Sixth and Eighth Amendments.**

Repeating its view of the evidence in the case, CV Doc. 46 at 149-52, the government

concludes without any support counsel's concession to this aggravator was justified. Mr. Troya

has addressed the thin evidence of the shootings, the objective lack of strategy, as well as the

prejudice, in the § 2255 motion and relies upon it here.

**(XIII). (CV Doc. 25 at ECF 210)**
**MR. TROYA'S CONVICTIONS FOR CONDUCT PRIOR TO THE AGE OF EIGHTEEN WERE UTILIZED IN AGGRAVATION TO OBTAIN A DEATH SENTENCE FOR MR. TROYA. COUNSEL'S FAILURE TO OBJECT TO THEIR USE AND THE CORRESPONDING SENTENCE VIOLATES THE SIXTH AND EIGHTH AMENDMENTS.**

The government argues this claim is defaulted because it was not raised on appeal, n.44,

but it is not. Trial counsel failed to object, so any appeal claim would have had to have been

made under the onerous plain error standard. A Section 2255 movant is not required to allege appellate ineffectiveness in order to show trial counsel's. Otherwise, Mr. Troya relies on the allegations and caselaw set forth in the motion.

**(XIV) (CV Doc. 25 at ECF 212) TRIAL COUNSEL FAILED TO PROPERLY CHALLENGE THE "THREE-STEP PROCESS" DURING THE SELECTION PHASE, WHICH UNLAWFULLY REQUIRED THE JURY TO MAKE A FINDING OF LAW REGARDING THE PROFFERED MITIGATING FACTORS.**

Mr. Troya explained in his § 2255 motion how evidence that has been legally recognized as constitutionally mitigating was rejected by the jury on the basis of incorrect argument and jury instructions. CV Doc. 25 at 194-207. In response, the government raises several arguments, most of which attack a straw man and are entirely irrelevant to the issue before this Court. Mr. Troya addresses each argument in turn.

First, it appears the government misunderstands the crux of the issue Mr. Troya raised and how the instruction in his case conflicts with Eighth Amendment jurisprudence. The government claims that "Troya's argument begs the question of how a jury must go about determining whether a proposed non-statutory mitigation factor is, in fact, a mitigating factor." CV Doc. 46 at 160. This misses the entire point: Mr. Troya demonstrated that it is an Eighth Amendment violation **for a jury to determine what a constitutional mitigating factor is.** In a federal death penalty case, the jury is tasked with determining whether a mitigating factor has been proven by a preponderance and what weight to give a particular mitigating factor. But the question of whether evidence is constitutionally mitigating is a legal question grounded in the Eighth Amendment; it is not a fact-determination for a jury. Juries in capital cases are not free to continually redefine the scope of the Eighth Amendment on a case-by-case basis depending on their personal views. This would lead to arbitrary and absurd results: A jury in the Palm Beach division could decide for example that, pursuant to the Eighth Amendment, youth is a mitigating

66

factor while a jury in the Miami division could find that it is not constitutionally mitigating. Following the government's logic both of these results are permissible, even though the Supreme Court has unequivocally held that youth is, in fact, mitigating. *See Johnson v. Texas*, 509 U.S. 350, 367 (1993) ("There is no dispute that a defendant's youth is a relevant mitigating circumstance…").

The government ignores this distinction and confuses allowing the jury to decide what weight to assign evidence of mitigation (a fact-finding process) with allowing the jury to decide what kind of evidence is, in fact, mitigating (a legal determination). The former is an essential role of the jury; the latter is not permitted. In federal death penalty cases, the jury first must determine if the mitigating circumstance has been proven by a preponderance of evidence. If it so finds, it puts that factor on the scale to weigh against the aggravating evidence. It is impermissible to allow the jury to refuse to put a factor, proven by a preponderance, on the scale simply because a juror believes it is not mitigating.

The government recognizes *Lockett* and *Eddings* hold that the "Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by [the defendant]." *Boyde v. California,* 494 U.S. 370, 377-78 (1990). However, the government appears to conflate "consideration" and "giving effect". By eliding this distinction, the government incorrectly argues that "a sentencer's decision not to give weight to proffered non-statutory mitigating factors on the ground that the factors are not mitigating does not violate the rule of *Lockett* and *Eddings*." CV Doc. 46 at 161.   Several of the cases cited by the government highlight this distinction and underscore the government's confusion between these principles. In *United States v. Paul*, 217 F.3d 989 (8th Cir. 2000), the Eighth Circuit found no error because the jury was not "*required* to give mitigating effect to any factor, let alone this

67

one." *Id.* at 1000. However, the court explicitly noted that the "jury was certainly not precluded from considering Paul's youthful age as a mitigating factor." *Id.*[12]  Likewise in *Johnson v. Wainwright*, 778 F.2d 623 (11th Cir. 1985), the Eleventh Circuit held:

> Petitioner is correct that consideration of non-statutory mitigating factors is required under *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion). Neither of those cases establishes the weight which must be given to such evidence, however; "they simply condemn any procedure in which such evidence has no weight at all." *Barclay v. Florida,* 463 U.S. 939, 961 n. 2, 103 S.Ct. 3418, 3430 n. 2, 77 L.Ed.2d 1134 (1983) (Stevens, J., concurring in the judgment).

*Id.* at 629.

As noted above, a juror is allowed to give mitigation evidence little effect when weighing it against aggravating circumstances but the juror must be able to accept the evidence as mitigating. If a juror cannot accept certain evidence as mitigating, that juror is subject to being struck for cause. *See Morgan v. Illinois*, 504 U.S. 719, 729 (1992). Mr. Troya is not arguing that

---

[12] Other cases cited by the government are clearly distinguishable. Although the government finds comforting language in *United States v. Lawrence,* 555 F.3d 254 (6th Cir. 2009) and *United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002) the issue raised by Mr. Troya was not before the court in those cases.  In *Lawrence,* the trial judge gave proper instructions and did not inform the jury they were free to determine what constitutes mitigation. The issue before the court was the effect of jurors answering the same mitigation questions differently on separate counts of the verdict form. In speculating about why that may have occurred, the Sixth Circuit suggested that the jurors could have answered the question indicating both whether the fact had been proven and whether it carried weight. *Id*. at 267 ("That most jurors found the factor not established clearly indicates that they did not view the established fact of Lawrence's humanity as carrying, in and of itself, any mitigating weight. This determination was within each juror's prerogative."). In *Bernard*, the jury's findings themselves were challenged because no juror found the defendant to be 18 or 19 despite it being an undisputed fact. In resolving the issue, the court found that the jury form instructed the jury to consider whether each circumstance was mitigating and denied the claim noting that "appellants did not object to the jury instructions or verdict form…" Though the court went on to say that the jurors were entitled to decide that age was not mitigating, it is unclear whether that was because they were so instructed in Bernard's case or whether the court believed it was constitutional. Regardless, it is not necessary to the holding and is dicta.

his jury had to give a certain amount of effect to his mitigation evidence; his claim is that trial counsel failed to object to the erroneous instruction and argument that the jury could decide the Eighth Amendment question of what constitutes mitigation. In other words, the Court and the government could not tell the jury they were free to merely refuse to consider the evidence as mitigating.[13]

The case law the government relied upon in its response also highlights its misunderstanding of the issue. First, it appears the government is confused by the pre-*Hurst* death penalty scheme in Florida state courts whereby a judge made the final determination in the case based on a jury recommendation. The government cites this law for the proposition that "sentencing courts" must determine whether evidence in a case is properly considered mitigating. CV Doc. 46 at 160. However, what the government misses is that the "sentencing court" in Florida state courts was the judge and a judge is not only allowed to make legal determinations about the Eighth Amendment, he is required to do so. Because a judge (and not a jury) was responsible for the findings of fact and conclusions of law which determined the fate of a defendant, it is not improper for the "sentencing court" to determine whether submitted evidence was, in fact, mitigating. This unique process, however, in no way alters the fact that determining what constitutes mitigating evidence under the Eighth Amendment is a legal determination which, of course, must be made by a judge, not a jury. This is, in fact, clearly reflected in the authority the government asks this Court to adopt. *See e.g. Rogers v. Secretary,*

---

[13] The government as also claims that Mr. Troya alleged error because the "prosecutor made remarks indicating that the proposed non-statutory mitigating factors were entitled to little or no weight." CV Doc. 46 at 161. Mr. Troya made no such claim. He did, however, highlight the multiple occasions the prosecutor encouraged the jury to violate Mr. Troya's Eighth Amendment protections. *See e.g.* T9509 ("Merely because you are required to consider something that is alleged to be mitigating does not mean it is mitigating…"); T9627-29 ("The middle step is does that mitigate...").

*Department of Corrections,* 2010 WL 668261, at \*28 (M.D. Fla. Feb. 19, 2010) ("**whether a particular circumstance is truly mitigating in nature is a question of law and subject to de novo review by this Court"**) (emphasis added).

The government also erroneously argues that the "[t]he record conclusively establishes that counsel objected to [the Court's] instruction not once, but twice" and that "counsel cannot be found to be ineffective for failing to do something that he actually *did*." CV Doc. 46 at 159 (emphasis in original). The government also implies that the Eleventh Circuit has already reviewed this issue in Mr. Troya's case and "held that the instructions were legally correct." *Id*. at 154. These statements are misleading. Although the government is correct that trial counsel objected to this particular jury instruction, they objected **based on other grounds** and thus failed to raise the valid objection Mr. Troya identified in his § 2255 motion. Trial counsel argued that the instruction was erroneous because it would suggest to the jury that statutory and non-statutory mitigating factors were qualitatively different. Trial counsel failed to raise any Eighth Amendment issue like the one raised by Mr. Troya in §2255 proceedings. Trial counsels' failure to raise an objection on these grounds waived the issue. *See* Fed. R. Crim. P. 30 ("A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection…Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b)); *United States v. Baston,* 818 F.3d 651 (11th Cir. 2016) ("When a defendant objects to a jury instruction in the district court, but on different grounds than the ones he raises on appeal, we review the instruction for plain error.") Trial counsel failed to raise this issue before the district court and it certainly was never decided by the Eleventh Circuit on appeal.

70

**Reply to Govt. Response H.  CV Doc. 46 at 80.**

**(XV). (CV Doc. 25 at ECF 226)**
**TRIAL COUNSEL FAILED TO OBJECT TO IMPROPER QUESTIONING AND TO EFFECTIVELY CROSS-EXAMINE THE GOVERNMENT'S COOPERATING WITNESSES, SERIOUSLY PREJUDICING MR. TROYA IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS**

> **A.      Ineffective failure to adequately proffer and utilize impeaching information of government witnesses.**

> > **1.      Melvin Fernandez.**

Though there was evidence of the extensive drug-dealing of both Fernandez and Vetere on their own, counsel failed to adequately proffer and provide admissible reasons to use it on cross. The government now says a proffer of the proposed cross was adequately made, *Resp*. at 82, though it was silent as to that issue at trial and it is extremely doubtful it would have taken the same position had the issue been raised on appeal. Though now saying the proffer was adequate, the government says appellate counsel were effective though they did not raise it because there is no legal basis. CV Doc. 46 at 82-83.

"[T]he standard for admission is relaxed when the evidence is offered by a defendant," *United States v. Cohen*, 888 F.2d 770, 776–77 (11th Cir.1989), but "the party advancing the evidence [still] must demonstrate that it is not offered" as impermissible propensity evidence. *Id.* at 776. In the related 404(b) context, if the evidence "is shown to have a special relevance to a disputed issue, the court must balance the probative value against the possibility of unfair prejudice." *Id*. Here, had counsel described the evidence in more detail and the legal reasons for offering it, it would have been admitted; and if not, had counsel raised the issue on appeal, reversal would have been required.

There were witnesses available to the defense who would have backed up the proposed cross examination had the witness denied the independent drug-dealing. The government says

71

the related impeachment set forth in subsection A would not have been admisible, CV Doc. 46 at 82, but it is mistaken. "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). The testimony about the independent drug-dealing of Fernandez and Vetere would have been admissible as impeachment or under 404(b).

### 2. Kevin Vetere

Deflecting from the actual claim, the government poses this one as if Mr. Troya says Vetere should not have been crossed at all. It goes into great detail about the damage done to the defense by Vetere's testimony, CV Doc. 46 at 84-86, and congratulates counsel for his cross on what it says was impeachment material. CV Doc. 46 at 87. None of that negates the fact counsel flubbed cross, brought out harmful facts and had to be admonished by the Court for his deficient performance, all as described in the § 2255 motion.

**D.      The government engaged in prosecutorial misconduct, and it went unchecked when counsel ineffectively failed to properly object or move for a mistrial.**

1.      **The purported prior threat** -

The government does not respond to this claim.

2.      **Implication the Court and government vouched for the truthfulness of Mr. Vetere's testimony -**

The government does not respond to this claim.

3. **Carlos Rodriguez** -

Overcompensating on the codefendant's objection to Mr. Rodriguez retelling Mr. Troya's supposed jailhouse statement to him, but without objection from Mr. Troya's counsel, the Court ordered the witness substitute "I" for "we" in relating the statement about the killings.[14] Now the

---

[14] This issue was raised on direct appeal, but as plain error since there was no objection.

government argues this was not prejudicial as to either guilt or penalty, but when it assisted Mr.

Rodriguez in obtaining a substantial sentence reduction in representations made to another Court,

it argued the opposite. There, AUSA Carlton pointed out the crucial significance of Mr.

Rodriguez's testimony on this very point:

> MR. CARLTON: Mr. Rodriguez was the *only individual who had direct knowledge* of a statement made by the defendant actually placing him at the scene of hurting children. … His testimony coupled with the circumstantial evidence, from the government's perspective, *tipped the scales* in a fairly heinous case. So I don't want to – we had circumstantial evidence, *but direct evidence* of the type that he had was absolutely important to the case.

T10-11 (emphasis added). Failure to object to this highly incriminating alteration of the witness's

testimony was prejudicially ineffective.


**(XVIII).      (CV Doc. 25 at ECF 258) THE GOVERNMENT FAILED TO DISCLOSE EXCULPATORY EVIDENCE ABOUT MR. TROYA'S BRAIN DAMAGE CONTRARY TO THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

The movant has briefed replies to this response at length in the reply to the government's

response to the motion for discovery and the motion to reassign case.


**(XIX). (CV Doc. 25 at ECF 259)**

**TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE MR. TROYA'S FELONY BATTERY CONVICTION THAT WAS UTILIZED IN AGGRAVATION TO OBTAIN A DEATH SENTENCE FOR MR. TROYA. COUNSEL'S FAILURE TO OBJECT TO THEIR USE AND THE CORRESPONDING SENTENCE VIOLATES THE SIXTH AND EIGHTH AMENDMENTS.**

Mr. Troya relies on the allegations of his motion.

**(XX).  (CV Doc. 25 at ECF 263)**
**TRIAL COUNSEL INEFFECTIVELY FAILED TO OBJECT TO INSTRUCTIONS AND VERDICT FORM PERMITTING THE JURY TO FIND THE NONSTATUTORY AGGRAVATOR WITHOUT CONCLUDING UNANIMOUSLY AND BEYOND A REASONABLE DOUBT TROYA COMMITTED THE PARTICULAR UNCHARGED CRIMES, CONTRARY TO THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

Mr. Troya relies on the allegations of the motion.

**(XXI).  (CV Doc. 25 at ECF 271)**

**DURING SENTENCING SUMMATION, TRIAL COUNSEL INEFFECTIVELY CONCEDED MR. TROYA'S INVOLVEMENT IN TWO UNCHARGED SHOOTINGS WHICH WERE INCLUDED IN THE NONSTATUTORY AGGRAVATING CIRCUMSTANCE, CONTRARY TO THE FIFTH, SIXTH AND EIGHTH AMENDMENTS**

Mr. Troya relies on the allegations of his motion.

**(XXII).  (CV Doc. 25 at ECF 273)**

**Mr.Troya Received Ineffective Assistance Of Counsel, Where Counsel Failed To Challenge The Government's Evidence Regarding His Escape, By Failing To Properly Object To Testimony, Failing To Effectively Cross-Examine Inspector Glover, And Failing To Call Rebuttal Witnesses.**

Mr. Troya relies on the allegations of the motion.

**(XXIV). (CV Doc. 25 at ECF 303) Reply to Govt. Response B.  CV Doc. 46 at 41.**

**LIFE-THREATENING DANGERS IN AND AROUND MATAMOROS PRECLUDED THE TRIAL TEAM FROM INVESTIGATING THE DEFENSE CASE THERE, AND CONTINUES TO PRECLUDE POSTCONVICTION COUNSEL FROM INVESTIGATING IN THE AREA; TRIAL COUNSEL FAILED TO MOVE FOR APPROPRIATE RELIEF DUE TO THESE DANGERS, AND THIS COURT SHOULD GRANT RELIEF NOW.**

"The United States does not dispute that Matamoros was and is a violent area and does not disagree with Troya's claim that '[n]o competent investigator or mitigation specialist would have undertaken an investigation in Matamoros in the period pr[e]c[]eding trial, and no competent lawyer would have exposed such staff to the dangers there.'" CV Doc. 46 at 42. Yet it opposes the claim for relief on the theories that any evidence uncovered about Varela's associations and activities in Matamoros would not help Mr. Troya, CV Doc. 46 at 41-2 & n. 20, there was evidence and argument at trial about drug cartels, *passim,* and "the defense had considered the import of the violence of the Mexican drug cartels. CV Doc. 46 at 47. The argument that "dirtying up" Varela would not have helped is disingenuous, since the main

74

mitigation urged by the defense was that Varela did not face the death penalty. The other arguments directed to the discussion of drug cartels, do not address this issue at all.

The government also says the defense has not shown a legal basis for its claim. "At the heart of effective representation is the independent duty to investigate and prepare." *Goodwin v. Balkcom*, 684 F. 2d 794, 805 (11th Cir. 1982). This duty is no more important than when a client's life is at stake. It is plain any investigation, including mitigation, would have prior to trial, as well as now, required a lengthy stay, or series of trips, to one of the most dangerous places in the world. Trial counsel knew that, but sought no relief. The government knew that, but continued to seek the death penalty anyway. Trial counsel should have moved to preclude the death penalty, or at the very least for a continuance, until it was safe to fully investigate the case in Matamoros. Counsel could have argued the government's insistence on seeking the death penalty in the face of such dangers triggered a constitutional impasse, and the Supreme Court's jurisprudence makes clear that *any* act by the government which results in the preclusion of mitigating evidence is unconstitutional.  "The Constitution requires States to allow consideration of mitigating evidence in capital cases. Any barrier to such consideration must therefore fall. As was stated in *Mills*:

> Under our decisions, it is not relevant whether the barrier to the sentencer's consideration of all mitigating evidence is interposed by statute*, Lockett v. Ohio*, *supra*; Hitchcock v. Dugger, 481 U.S. 393 (1987); by the sentencing court, *Eddings v. Oklahoma, supra;* or by an evidentiary ruling, *Skipper v. South Carolina, supra*. *Whatever the cause, if petitioner's interpretation of the sentencing process is correct, the conclusion would necessarily be the same*:  'Because the [sentencer's] failure to consider all of the mitigating evidence risks erroneous imposition of the death  sentence, in plain violation of *Lockett,* it is our duty to remand this case for resentencing.' *Eddings v. Oklahoma*, 455 U.S., at 117, n. (O'Connor, J., concurring)"

75

*McKoy v. North Carolina*, 494 U.S. 433, 442 (1990)(emphasis added, other citations omitted)(*quoting Mills v. Maryland*, 486 U.S. 367, 375 (1988)). The danger continues, and this Court should order an evidentiary hearing and grant of relief.

**Trial counsel unreasonably failed to consult an expert in trauma, which prevented the jury from understanding a full picture of Mr. Troya's development and functioning.**

Mr. Troya demonstrated in his § 2255 motion that trial counsel were ineffective for failing to consult and present an expert in trauma in his case. CV Doc. 25 at ECF 323. This evidence was crucial for the jury to fully understand who Mr. Troya was and be able to determine if the death penalty was the appropriate sanction. The government attacks Mr. Troya's claim on several fronts, none of which are convincing.

First, the government faults Mr. Troya for failing to "cite to any expert report, by any 'trauma expert', that can explain how these experiences affected Troya's behavior." CV Doc. 46 at 139. As Mr. Troya has explained *infra*, this is not required to meet his burden of pleading under 28 U.S.C. § 2255. Indeed, as the Eleventh Circuit has succinctly explained, the § 2255 motion need only allege the relevant legal and factual bases for relief in order to obtain a hearing; any proof in support of those claims need not be submitted until the time of the hearing:

> The law is clear that, in order to be entitled to an evidentiary hearing, a petitioner need only *allege* – not prove – reasonably specific, nonconclusory facts that, if true, would entitle him to relief. If the allegations are not *affirmatively contradicted* by the record and the claims are not patently frivolous, the district court is *required* to hold an evidentiary hearing. *It is in such a hearing that the petitioner must offer proof.*

*Aaron v. United States*, 291 F.3d 708, 715 n.6 (11th Cir. 2002) (emphasis in original and emphasis added). Mr. Troya has alleged reasonably specific facts regarding trial counsels' failure to engage a trauma expert that, if true, would entitle him to relief. Further proof of this claim is not required until the evidentiary hearing.

The government latches onto a footnote in Mr. Troya's § 2255 motion wherein he opined that Dr. Maher "although not a trauma specialist, could have at least discussed the general aspects of trauma and its effects on the brain." CV Doc. 25 at fn. 120. The government apparently believes this footnote meant that Mr. Troya faults trial counsel for failing to use Dr. Maher as a trauma expert and proceeds to explain 1) his report has no mention of trauma, CV Doc. 46 at 139, and 2) Dr. Maher would not have been a good witness on this topic. CV Doc. 46 at 140-141. The government misunderstands Mr. Troya's claim. Dr. Maher's mention in a footnote was not to suggest that he should have been used as the trauma expert in Mr. Troya's case. As the footnote clearly states, he is not qualified to play that role. Rather, Mr. Troya was noting that trial counsels' investigation of the clinical aspects of trauma (and what effect that may have had on Mr. Troya's life) was so unreasonable that they even failed to discuss it with their hired clinical psychologist. The fact that there is no mention of clinical trauma in Dr. Maher's report, as the government points out, underscores trial counsels' ineffectiveness on this issue.

Finally, the government suggests that the evidence of trauma that Mr. Troya alleges should have been investigated, developed, and presented is cumulative and was contradicted by statements he made to the government's psychologist. CV Doc. 46 at 140-142. According to the government, the fact that Mr. Troya witnessed traumatic events was presented to the jury and a "trauma expert would have done little to advance the mitigation case beyond the evidence [trial counsel] already established through the family members…" CV Doc. 46 at 141. These statements are incorrect and actually are an excellent example of how lay persons have difficulty understanding the effects of trauma absent the knowledge of a trauma specialist. The fact that Mr. Troya may have denied "that these 'traumatic' experiences had any effect on him", CV Doc.

46 at 141, is an extremely common effect of the trauma itself. Because a person who has experienced trauma can re-experience that trauma when talking and thinking about the event, it is common for trauma victims to deny or minimize the effects. For this reason:

> Interviewers must be highly knowledgeable in their understanding of trauma dynamics in order to recognize the psychological meaning of the complex dynamics involved in interpersonal—often familial—violence…Interviewers must be conscious of the possibility of retraumatization during interviewing. They must have skills to avoid or minimize this possibility and knowledge of how to respond to witnesses who are flooded and overwhelmed during interviews. Interviewers must be aware that clients often disclose traumatic material in small increments, and be able to judge the client's limits and allow him to discuss at a pace that is psychologically tolerable… By virtue of differences in gender role socialization, women may be more likely than men to acknowledge vulnerability associated with traumatic events. Men, on the other hand, may be far less likely to acknowledge or articulate feelings of vulnerability (such as intense fear,
>
> helplessness, or horror), especially to strangers or in hostile environments. Their reluctance to disclose weaknesses, real or perceived, may be a deeply engrained aspect of social conditioning.

Kathleen Wayland, *The Importance of Recognizing Trauma Throughout Capital Mitigation Investigations and Presentations*, 36 Hofstra L Rev. 923, 960 (2008).

As Mr. Troya explained in his § 2255 motion, it is impossible for lay jurors to comprehend the full damage that results from repeated trauma such as Mr. Troya endured because the harm is biological; it disrupts how people manage and interpret emotions, leading to impulsivity and depression; it changes and narrows how people process information, leading to distortions in how they interpret and respond to experience; and it alters the brain and the physiological systems that control human responses to threat, creating problems with emotional self-regulation, impulsivity, perception, planning, and memory. As such, the results of exposure to trauma and neglect can look like an inherent part of an individual's personality, rather than the pathological outcome of exposure to damaging life circumstances. Mr. Troya devoted many

78

pages to explaining how this evidence could have altered the jury's view of Mr. Troya. Doc. 25 at 305-310. The government response fails to engage with this evidence, satisfied instead to ignore it and broadly assert that it would have added nothing new.

**Reply to Govt. Response O. CV Doc. 46 at 123.**

**(XXV). (CV Doc. 25 at ECF 311) TRIAL COUNSEL'S INVESTIGATION AND DEVELOPMENT OF MENTAL HEALTH EVIDENCE TO MITIGATE THE DEATH PENALTY IN MR. TROYA'S CASE FAILED TO MEET MINIMAL STANDARDS OF CAPITAL REPRESENTATION, PREJUDICING MR. TROYA CONTRARY TO THE FIFTH SIXTH AND EIGHTH AMENDMENTS.**

### Introduction – the failure of trial counsel to adequately prepare and present mental health testimony, including the social history and background of Mr. Troya.

Expressions of government admiration of defense counsel's performance at a capital sentencing phase more effusive than this one are hard to come by. Laughably lauding defense counsel for "zealous advocacy," CV Doc. 46 at 123, the government graciously forgives Mr. Troya's attorney for telling the jury in detail about the mental health testimony they were about to hear from the defense and then failing to present any. It boasts of its own mental health expert's scientifically infirm and unsupportable findings while downplaying defense counsel's failure to obtain a ruling they were. It invokes what it hopes is the sacrosanct "strategy decision" trial counsel supposedly made in not presenting powerful mental mitigation of Mr. Troya's damaged brain. It pleads counsel did all they could while it secured death verdicts from the jury. To read the response, trial counsel did everything the government approves of on the way to a death verdict. Fortunately, it is not the government that decides whether all this is so.

As the actual law described in this reply shows, ineffectiveness claims are not to be considered *seriatum*, but are instead considered *in toto*. The government continues to lawlessly try to parse out the detailed claims one from another. This legal analysis could not be more clearly wrong than when the government addresses the failure of trial counsel to present the

79

indisputable photographic evidence of Mr. Troya's brain damage. As set forth in the motion, the PET scan pictured the defects as Dr. Wu reported. But to effectively develop and present that PET scan, Dr. Wu sought, but never received from trial counsel, corroborative evidence.  That evidence was finally provided to him by post-conviction counsel, and is described in detail in his report and in the social history section, below, as well as the section about Mr. Troya's teenage years being beaten and abused in prison.

The claims of failure to adequately investigate and present the physical evidence of Mr. Troya's brain damage and the failure to investigate and present his social history are the most obvious claims to be considered in tandem. Among the many other defalcations of counsel here, the courts have described the failure of counsel to provide background information to their mental health expert as one of the most likely contributors to ineffectiveness.

For instance, in *Hardwick v. Secretary, Florida Dept. of Corrs.*, 803 F 3d 541 (11th Cir. 2015) the Eleventh Circuit found trial counsel's performance deficient, noting trial counsel "was aware of a number of red flags" and "potential sources of mitigating evidence," and had the benefit of a court-appointed expert's report **suggesting the need for further mental health investigation**, 803 F.3d at 553-54, yet made no effort to develop any of those leads. Similarly, in *Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011) the Eleventh Circuit granted penalty phase relief, and one of the bases for counsel's deficient performance was trial counsel's expert had been given an extremely narrow mandate and **virtually no materials**, and that counsel ignored "numerous, obvious indicators" of serious mental health issues that warranted further expert consultation and background investigation. 640 F.3d at 1228.

In *Hovey v. Ayers*, 458 F.3d 892 (9th Cir. 2006), the Ninth Circuit granted sentencing phase relief, finding trial counsel were ineffective **for failing to supply a key expert witness**

**with documentation** supporting the expert's schizophrenia diagnosis and other information about petitioner's conduct around the time of the offense: "Regardless of whether a defense expert requests specific information relevant to a defendant's background, it is defense counsel's 'duty to seek out such evidence and bring it to the attention of the experts.'" 458 F.3d at 925 (*quoting Wallace v. Stewart*, 184 F.3d 1112, 1118 (9th Cir. 1999)). In *Jacobs v. Horn*, 395 F.3d 92, 105-106 (3rd Cir.), *cert. denied sub nom. Jacobs v. Beard*, 546 U.S. 962 (2005), the Court found counsel ineffective in part because **the expert was not provided with any background or social history information about petitioner**. In *Bloom v. Calderon*, 132 F.3d 1267, 1278 (9th Cir. 1997), cert. denied, 523 U.S. 1145 (1998), the court granted relief from petitioner's convictions where trial counsel hired a psychiatric expert only days before trial to support his insanity defense, and failed to provide the expert, as well as other experts who had been called upon to evaluate petitioner, with highly relevant, readily available information that would have significantly altered their diagnoses in favor of petitioner. The court stated: "when the defense's only expert requests relevant information which is readily available, counsel inexplicably does not even attempt to provide it, and counsel then presents the expert's flawed testimony [which the prosecution turned against petitioner] at trial, counsel's performance is deficient."

In defense of the indefensible, the government first observes the obvious, that counsel retained mental health experts. CV Doc. 46 at 124 . Acting like some strategy was involved in the decision, it relates counsel told the Court it would not call Dr. Wu, whose Pet scan had actually provided images of Mr. Troya's brain damage, saying he instead might call someone else who could attest to the same thing. CV Doc. 46 at 124. It totally ignores Dr. Wu's report, contained in the appendix, which sets forth the undeniable facts that after counsel was provided with the blockbuster report that Mr. Troya suffered brain damage, and that corroborative

information was essential, trial counsel provided nothing in response. Counsel never again contacted Dr. Wu after the report his client suffered from brain damage, an allegation fully supported by Dr. Wu's post-conviction report but totally unanswered by the government in its response.

Dr. Brannon had been retained by the government and produced a report well before the sentencing phase. It quotes extensively from this report, as if it was something for defense counsel to fear, enough to not put on mental health testimony even after telling the jury he would do so. But the government confuses the timeline this Court must consider in urging Dr. Brannon's report was so damaging counsel could not risk his testimony. The government disclosed Dr. Brannon's report to the defense days before trial counsel gave his opening statement. Meanwhile, as the government recites, pp. 126-27, trial counsel had filed motions attacking it **but neglected even to get a ruling** on most. The government's strategy reason the government proffers for trial counsel falsely telling the jury mental health testimony would be presented, but then failing to present any, makes no sense. Trial counsel knew about Dr. Brannon's evaluation and report well before opening statement promising the jury it would hear mental health testimony, not after.  Dr. Brannon used outdated and unreliable testing, and would have been totally incompetent if he did not agree he could not find psychopathy unless he first excluded brain damage.

During trial, the government recognized the profound problem created by defense counsel's jury announcement mental mitigation would be presented but then failed to do so. It expressly sought and received a cover statement by counsel, which, of course, it now reproduces in its response.  The very fact the government was so concerned at trial by counsel's actions it thought it essential to have a "strategic" reason placed on the record shows it had a deep concern

then about the deficiencies in counsel's conduct. Counsel's self-serving statement for the record at trial is singularly unrevealing. It says nothing about the fact counsel totally neglected to even contact Dr. Wu after the PET scan, and neglected to provide him with any corroborative evidence now presented. The self-protective statement by trial counsel standing alone stand for nothing. *See Horton v. Zant*, 941 F.2d 1449 (11th Cir. 1991) (citing *Strickland* to reject trial lawyers' testimony that decisions were strategic because "merely invoking the word strategy to explain errors was insufficient since 'particular decision[s] must be directly assessed for reasonableness [in light of] all the circumstances.'") (internal citation omitted).

In its response, the government tries to discount the substantial errors committed by Mr. Troya's trial counsel by claiming it was sound trial strategy. The facts in the record and longstanding case law across the circuits and in the Supreme Court belie this assertion. In his § 2555 motion, Mr. Troya pled in detail the specific instances of ineffectiveness and how those failures combined to undermine confidence in the outcome of his case. CV Doc. 25 at ECF 293 et seq. For brevity's sake, he will not repeat that discussion here. Mr. Troya will, however, address numerous error of law and mistakes of fact alleged in the government's responsive pleading:

**Counsel were not effective merely because they prepared a case for trial**

The government suggests this Court should reject Mr. Troya's IAC claim simply because trial counsel hired experts and prepared for trial. *See* CV Doc. 46 at 123 ("The record shows that counsel retained several mental health experts, that these experts examined Troya and were willing to testify on his behalf"); *Id*. at 124 ("At a minimum, Troya's attorneys selected, retained, consulted with, and reviewed the reports of several experts…"). This superficial approach to Mr. Troya's ineffective assistance claim does not satisfy the Sixth Amendment. The fact experts

were hired is meaningless if counsel fails to effectively consult with the experts about potential defenses or fails to investigate and provide appropriate experts with necessary information. *See e.g. Caro v. Woodford*, 280 F.3d 1247, 1254–55 (9th Cir. 2002) ("…counsel has an affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health"); *Wallace v. Stewart,* 184 F.3d 1112, 1116 (9th Cir.1999), *cert. denied,* 528 U.S. 1105 (2000) (counsel has "a professional responsibility to investigate and bring to the attention of mental health experts who are examining his client, facts that the experts do not request[.]"); "This duty to provide the appropriate experts with pertinent information about the defendant is key to developing an effective penalty phase presentation." *Bean v. Calderon,* 163 F.3d 1073, 1079–80 (9th Cir.1998), *cert. denied,* 528 U.S. 922, 120 S.Ct. 285, 145 L.Ed.2d 239 (1999)").

In Mr. Troya's case, this Court cannot simply cursorily peruse the record as the government implies and satisfy *Strickland*. *See e.g. Frazier v. Huffman*, 343 F.3d 780, 796 (6th Cir. 2003) ("We do not believe that it is reasonable to infer that a trial strategy, which is on its face irrational and for which no justification has ever been produced, becomes reasonable simply because of "the thorough and professional manner" in which trial counsel otherwise performed.") The so-called "strategic choices" of trial counsel must be closely scrutinized in post-conviction[15] to determine what counsel knew at the time of each particular decision and compare that with what counsel could or should have known or discovered. *See  Williams v.*

---

[15] Merely because trial counsel told the Court they were acting strategically also does not end the inquiry. Because counsel's decision can only truly be strategic when they are based on constitutionally adequate knowledge of the law and effective investigation of the facts, a bare assertion that one's action is strategic does not resolve the issue. *See Horton, supra* ("merely invoking the word strategy to explain errors was insufficient since 'particular decision[s] must be directly assessed for reasonableness [in light of] all the circumstances.'") (internal citation omitted).

*Allen*, 542 F.3d 1326, 1337 (11th Cir. 2008) ("Under *Strickland,* 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation… Therefore, '[i]n assessing the reasonableness of an attorney's investigation, ... a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins,* 539 U.S. at 527, 123 S.Ct. at 2538").

**Counsels' decisions about evidence of psychopathy were not reasonable strategic decisions**

The government asserts that trial counsels' decision not to present any mental health evidence (after promising the jury they would hear such evidence) was a strategic decision that insulates any further review. According to the government, this is true because it prevented the government expert, Dr. Brannon, from testifying.  The government claims that "Dr. Brannon's report contained damaging evidence that any defense attorney would not want disclosed to a jury deciding Troya's fate, most notably that Troya was a psychopath and did not suffer from PTSD." CV Doc. 46 at 125.  Only if the defense pulled all of its mental health evidence, the government suggests, would it be able to keep Dr. Brannon from opining that Mr. Troya "was a psychopath." CV Doc. 46 at 123.   The government's argument misinterprets Mr. Troya's claim and contravenes the law.

As discussed, *infra*, this Court's analysis under *Strickland* cannot be so narrowly focused. As the Eleventh Circuit has stated "merely invoking the word strategy to explain errors was insufficient since 'particular decision[s] must be directly assessed for reasonableness [in light of] all the circumstances.' " *Horton v. Zant*, 941 F.2d 1449, 1461 (11th Cir. 1991).  Only light of all the circumstances—the effectiveness of the mitigation investigation, the adequacy of trial counsels' understanding of the mental health issues and the how the opinions of the experts

85

interrelate, and the thoroughness of legal research—can this Court determine whether trial counsels' decision were, in fact, strategic. As the Supreme Court held in *Sears v. Upton*, 561 U.S. 945, 953, (2010)

> that a theory might be reasonable, in the abstract, does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudiced [petitioner]. The "reasonableness" of counsel's theory was, at this stage in the inquiry, beside the point: [petitioner] might be prejudiced by his counsel's failures, whether his haphazard choice was reasonable or not.

Trial counsels' decision in Mr. Troya's case were "haphazard choices" not reasonable strategic decisions in light of all the circumstances in the case.  First, as the government's pleading itself makes clear, trial counsel made the decision to jettison the mitigation case it had promised to the jury without securing any rulings on what evidence the government would be allowed to introduce.  The government tries to excuse trial counsels' conduct by calling it a strategic decision made by trial counsel "presented with a fluid trial situation in which the Court had not precluded Dr. Brannon's potential testimony…" CV Doc. 46 at 127.  However, this problem was of trial counsels' own making.  Trial counsel filed the first motion in *limine* to preclude use of the terms "psychopathy" or "psychopath" **four** days before punishment phase began despite the fact that Dr. Brannon evaluated Mr. Troya and wrote his report **more than three months earlier**.  Furthermore, trial counsel never tried to secure a ruling on the motions before choosing to forgo all of the mental health testimony in punishment.  Whether counsels' decision to give up on the mental health case after opening statement was "reasonable" is beside the point: Mr. Troya was prejudiced by his counsel's failures, whether his haphazard choice was reasonable or not. *See Sears v. Upton, supra.*

The government also misunderstands the import of Mr. Troya's discussion of Dr. Ryan and the federal capital case of *United States v. Stitt* which the government claims "lacks any

86

basis in fact and is completely inapplicable to the actual trial that occurred." CV Doc. 46 at 127 fn 39. The government believes this evidence is irrelevant because 1) "Dr. Ryan did not examine Troya in this case…", 2) Dr. Brannon "did not utilize the PCL-R test", 3) Dr. Brannon's "report concerning Troya, which was never presented to the jury, also did not contain an opinion as to Troya's potential future dangerousness." *Id.* Based on these assertions, the government concludes "[c]ounsel cannot not [sic] be held accountable for failing to challenge a methodology which was never employed, and Troya can certainly not establish that counsel was ineffective for failing to tilt at windmills." *Id.*

These criticisms are misguided and misunderstand the nature of the PPI-R and the PCL-R and why this litigation was important to Mr. Troya's case. Mr. Troya's presented this evidence in his § 2255 motion not because the evidence was introduced at trial but rather to show that this evidence never would have been permitted to be introduced at trial at all. Therefore, trial counsel were utterly mistaken in their belief that they had to withdraw their mental health evidence to avoid allowing the jury to hear about psychopathy.

As Mr. Troya explained in his 2255 motion, the PPI-R, the test used by Dr. Brannon during Mr. Troya's evaluation, like the PCL-R, is an instrument used to determine risk assessment. Like the PCL-R, the PPI-R is an attempt to create a systematic measure of the concept of "psychopathy" and has been recognized as an alternative testing instrument for psychopathy-based risk assessment. *See e.g.* Kiehl & Sinnott-Armstrong, *Handbook on Psychopathy and Law*, Oxford University Press, 2013 at 44 et seq. Risk assessment is the purpose of these instruments and because the government had explicitly withdrawn the future dangerousness aggravator, this evidence was irrelevant to Mr. Troya's trial. If the government's claim that Dr. Brannon had no opinion about Mr. Troya's future dangerousness is true, Response

at fn. 127, this also proves Mr. Troya's argument: the PPI-R test was irrelevant and would have been excluded *in limine*.  *See e.g. United States v. Williams*, (Dist. Hawaii No. 1:06-cr-0079 8/16/10), Doc. 1275 at 23-25 (excluding evidence of psychopathy and Anti-Social Personality Disorder where future dangerousness was no longer issue at capital sentencing).

However, even if the purpose of the government's evidence was to suggest to the jury that Mr. Troya was dangerous, it would not have been admissible and thus should not have caused trial counsel to jettison their punishment phase case.  It has long been recognized that the PPI-R, like the PCL-R, has no ability to predict the future dangerousness of a person in prison. *See e.g.* Poythress & Edens, *"Criterion-Related Validity of the Psychopathic Personality Inventory in a Prison Sample"*, Psychological Assessment, 1998 Vol. 10, No 4, 426, 429 ("the relationship between the PPI and relevant outcome criteria (e.g., institutional violence, treatment response, recidivism) has yet to be established.").  Mr. Troya provided a detailed history of the government's use of Dr. Ryan, not because he evaluated Mr. Troya, but because his retraction of the PCL-R highlights the government's struggle with risk assessment instruments in capital sentencing cases.  As Mr. Troya explained in his motion, since Dr. Ryan's recantation in 2000 (well before Mr. Troya's trial) the government has never again introduced psychopathic risk assessment in a federal capital sentencing.  Had trial counsel adequately prepared and litigated this issue pre-trial they would have been aware of these issues and would not have abandoned their mental health case during trial. In light of these circumstances, trial counsels' decisions cannot be considered reasonable strategy.  *See Wiggins*, supra; *see also Rolan v. Vaughn,* 445 F.3d 671, 682 (3d Cir.2006) (A "decision . . . cannot be according the normal deference to strategic choices [where] it was uninformed.")

**Trial counsel were ineffective for failing to investigate, develop, and present readily available evidence of Mr. Troya's organic brain damage.**

Mr. Troya outlined in his § 2255 motion how trial counsel had Dr. Wu conduct a PET Scan of Mr. Troya's brain which revealed significant organic abnormalities.  Mr. Troya also demonstrated how trial counsel, despite learning that imaging had shown brain damage, did virtually nothing with this information aside from forwarding the report to Drs. Maher and Krop, neither of whom are trained to read or interpret PET scans.  Despite a specific recommendation for "clinical correlation," *i.e.*, testing and social history, counsel neglected to follow up in any significant way with Dr. Wu. In the many months preceding trial, counsel never provided Dr. Wu with Mr. Troya's social history (the little counsel had) or other diagnostic testing conducted by a neuropsychologist.  There is no indication trial counsel even asked Dr. Wu for a more detailed explanation of his findings or sought his advice in how to corroborate it.  Although   the government unabashedly asserts that trial counsels' decision not to call Dr. Wu was strategic, CV Doc. 46 at 135, it does not explain the alleged strategy.  It simply ignores the facts pled by Mr. Troya and fails to explain how trial counsels' decision could be reasonable given undisputed evidence that counsel never once discussed the abnormal PET Scan results with the only expert who was qualified to understand and interpret them.  This is deficient performance. *See Richey v. Bradshaw*, 498 F.3d 344, 362–63 (6th Cir. 2007) ("A lawyer cannot be deemed effective where he hires an expert consultant and then either willfully or negligently keeps himself in the dark about what that expert is doing, and what the basis for the expert's opinion is.").

The government also never addresses the fact it is undisputed that the PET Scan in Mr. Troya's case shows he has brain damage.  No expert—for the defense or the government— refutes the evidence shown by the imaging of Mr. Troya's brain.  In fact, Dr. Ouaou's neuropsychological evaluation corroborated the PET Scan findings.  The government fails to

89

address any of these issues. The government instead tries to discount this evidence by suggesting that it is unsubstantiated and conflicts with evidence that was known at trial. The government takes a scattershot approach, attacking Dr. Ouaou's report for not having a "sworn affidavit"; claiming that Dr. Ouaou did not "perform any medical testing"; arguing that the "test results are based on psychology, not medicine", that Mr. Troya's IQ is in the average range; and that he "achieved a high school degree." CV Doc. 46 at 134-36. These assertions suggest that the government misunderstands what brain damage is and the deleterious effects it can have. It also shows the government has confused proof of organic brain damage with evidence suggesting an etiology.

The government spends numerous pages arguing that Mr. Troya's claim fails because there is contradictory evidence about his history of head trauma. CV Doc. 46 at 135-137. According to government, this proves that the "evidence of actual brain trauma was so slight…" it fails to demonstrate *Strickland* prejudice. *Id*. at 137. The government also asserts that "unlike objective indicia supporting brain dysfunction such as blackout episodes, seizures, and memory loss…Troya himself reported to Dr. Brannon no history of dizziness, inattentiveness, loss of consciousness, memory loss, seizures, hallucinations, nightmares, headaches." *Id*. at fn 42. What the government misunderstands is that these are signs, not effects, of potential a mental dysfunction. This is not, contrary to what the government believes, the actual proof of brain damage. Coughing, fatigue, and labored breathing can be signs of lung cancer but absence of those signs (or contradictory information about those symptoms) does not mean lung cancer is not present when it is seen on an MRI. If a patient does not report such signs to a doctor yet a cancerous tumor is discovered with imaging, the medical conclusion is not that "the evidence of actual cancer is so slight".

90

Although both Dr. Ouaou and Dr. Wu suggest that Mr. Troya's brain damage discovered during imaging is consistent with head trauma, etiology is not a necessary feature of the diagnosis.  What the government ignores is that, whatever the cause of Mr. Troya's brain damage, this does not change the fact that his brain, especially his frontal lobe, is damaged and the jury never heard this crucial information.

The government's attempt to downplay the prejudice of this omission is less than compelling.  As explained in Mr. Troya's § 2255 motion, damage to the frontal lobe of the brain, like Mr. Troya has, impairs a patient's ability to respond to sensory perceptions, causing them great difficulty interpreting and responding appropriately to their environment.  This leads to poor judgment, risk taking, non-compliance with rules, getting stuck on a response, rigidity in thought, and other difficulties with even the simplest aspects of daily living.  Furthermore, as Dr. Wu explained, the synergistic effect of trauma and brain damage compound brain dysfunction.  Without support or professional intervention (neither of which Mr. Troya received), there is a vicious circle: the brain damage makes a person more vulnerable to victimization and the victimization exacerbates the effects of the brain damage such as impulsiveness, disinhibition, anger and frustration which again creates more vulnerability to further victimization. CV Doc. 25 at ECF 321.  As Mr. Troya previously noted courts reviewing capital sentencing claims in habeas have acknowledged the unique importance of evidence of organic or physical brain injury:

> Evidence of organic brain damage is something that we and other courts, including the Supreme Court, have found to have a powerful mitigating effect. . . . and for good reason—the involuntary physical alteration of brain structures, with its attendant effects on behavior, tends to diminish moral culpability, altering the causal relationship between impulse and action." *See Victor Hooks,* 689 F.3d at 1205 (citations omitted). Because of its central significance, where the defendant's circumstances put it in play, ordinarily it would be "patently unreasonable for [counsel] to omit this evidence from his case for mitigation." S*mith v. Mullin,* 379 F.3d 919, 942 (10th Cir.2004); *see id.* (noting "evidence of

91

> [petitioner's] mental retardation, brain damage, and troubled background constituted mitigating evidence" and, indeed, is "exactly the sort of evidence that garners the most sympathy from jurors").

*Littlejohn v. Trammell*, 704 F.3d 817, 860 (10th Cir. 2013) (footnote omitted).

The government never engages the actual prejudice of trial counsel's failures but instead implies that the severity of the crime for which Mr. Troya was convicted precludes relief even if evidence of brain damage was introduced unchallenged. CV Doc. 46 at 138. As Mr. Troya explained in his § 2255 motion, *see* CV Doc. 25 at ECF 329-331, this argument has been rejected by capital juries at trial and reviewing courts in habeas and should also be rejected by this Court. As the Fifth Circuit has recognized, if the shocking nature of the capital crime were all that were required to offset *Strickland* prejudice, "habeas relief based on evidentiary error in the punishment phase would virtually never be available, so testing for it would amount to a hollow judicial act." *Walbey v. Quarterman*, 309 Fed. Appx. 795, 804 (5th Cir. 2009)(quoting *Gardner v. Johnson*, 247 F. 3d 551 (5th Cir. 2001)).

Additionally, the two cases discussing prejudice the government relies upon are inapposite. For example, the government cites *Rose v. McNeil*, 634 F.3d 1224 (11th Cir. 2011) to suggest that evidence of brain damage would not demonstrate prejudice in Mr. Troya's case. Response at 138. However, the government fails to note that in *Rose*, the testimony only suggested "possible brain damage", was conceded by the defense expert to be "minimal", "needed further documentation and objective testing to confirm" and was disputed by other experts." *Id*. at 1244. In Mr. Troya's case, in contrast, there is a PET Scan showing organic brain damage which has never been disputed by any expert.

The other case the government cites, *Samra v. Warden, Donaldson Correctional Facility*, 626 Fed. Appx. 227 (11th Cir. 2015) is a post-*Harrington* § 2254 case. The analysis has limited

use for this Court because it was decided pursuant to the doubly-deferential § 2554 standard and, as the Eleventh Circuit clearly stated, "[t]he federal court does not ask whether the state decision is correct, but rather whether it is unreasonable." *Id*. at 240 (internal citation omitted).

Furthermore, the facts in *Samra* were very different where there was a finding of abnormal blood flow to the brain.  As the Eleventh Circuit noted, "there was no evidence that the blood flow level was so much an organic brain *problem*, as opposed to merely an organic brain anomaly to the extent that it was even anomalous." *Id*. at 241.

The government also invites this Court to commit error by applying a "nexus" requirement to Mr. Troya's evidence of brain damage. According to the government "[w]ithout the linkage of this supposed brain injury to the criminal conduct, this Court should conclude that Troya has not demonstrated prejudice required for relief." CV Doc. 46 at 135. The Supreme Court has repeatedly rejected the sort of screening test that the government proposes. *Tennard v. Dretke*, 542 U.S. 274 (2004); *see also Smith v. Texas*, 543 U.S. 37, 45 (2004) ("The state court also held that petitioner had offered 'no evidence of any link or nexus between his troubled childhood or his limited mental abilities and this capital murder.' We rejected the Fifth Circuit's "nexus" requirement in *Tennard...")(internal* citations omitted). This Court should reject the government's advice to adopt the same error.

**Reply to Govt. Response O 1.  CV Doc. 46 at 123.**

**D.     In his opening statement, counsel ineffectively promised the jury they would hear mental health testimony, even naming the witnesses and describing their testimony, including the damaging detail of antisocial personality disorder, then did not call the witnesses.**

Unable to directly confront the significant case law supporting the contention counsel for Mr. Troya was ineffective for not keeping his jury promise to call mental health witnesses, the government stoops to attacking post-conviction counsel and misstating movant's argument.  The

93

government inaccurately says Mr. Troya has "misrepresented" a case when he has done no such thing. Counsel did not misquote any of the cases cited or otherwise mislead this Court as to their holdings. Contrary to the government's repeated misrepresentation, Mr. Troya did not and does not contend the case law he quotes and cites hold the failure to keep a promise to call witnesses is "per se" ineffective. Mr. Troya does argue, with solid support by the accurate quotations and case law holdings, that in *this* case, "[c]ounsel's misrepresentation to the jury that mental health evidence would be presented in mitigation is in and of itself ineffective, and certainly reasonably likely to have affected the outcome of the trial." CV Doc. 25 at ECF 345.

In support of this argument, Mr. Troya accurately quotes from *McAleese v. Mazurkiewicz*, 1 F. 3d 159, 166 (3rd Cir. 1993), that "[t]he failure of counsel to produce evidence which he promised the jury during his opening statement that he would produce is indeed a damaging failure sufficient of itself to support a claim of ineffectiveness of counsel." Relief was not granted in that case, but Mr. Troya never said it was; however, relief was granted in the two cited in support of that quote, *Harris v. Reed*, 894 F.2d 871, 879 (7th Cir.1990), and *Anderson v. Butler*, 858 F.2d 16, 17-19 (1st Cir.1988).

The government does not even mention *Harris v. Reed*, 894 F.2d 871, 879 (7th Cir.1990), relied upon in the § 2255 motion. There the court found a Sixth Amendment violation where defense counsel failed to call witnesses whom he claimed in opening statement would support the defense version of shooting. The government says of another case relied upon by the movant, "*Anderson v. Butler*, 858 F.2d 16 (1st Cir. 1988), has not been followed in its own circuit." That analysis could not be more in error. In *Anderson*, the Court found a Sixth Amendment violation where counsel failed to present promised expert medical testimony that defendant had acted without cognizance of, or feeling for, actions. For its proposition *Anderson* has not been

94

followed in its own circuit, the government cites and quotes from *United States v. McGill*, 11 F. 3d 223, 227 (1st Cir. 1993), which renders the entirely uncontroversial holding that "[a]lthough a failure to produce a promised witness may under some circumstances be deemed ineffective assistance, *see, e.g., Anderson v. Butler*, 858 F.2d 16, 19 (1st Cir.1988), the determination of inefficacy is necessarily fact-based." *McGill* does not in any way show *Anderson* "has not been followed in the First Circuit," as the government contends. All cases are distinguishable, and *Anderson* has been distinguished as most cases are, but it remains good law and is accurately relied upon. As a fallback position, the government argues *Anderson* is from another circuit, and cites to Eleventh Circuit cases which unsurprisingly do not adopt a "per se" rule of ineffectiveness in most cases. Here, the government continues to pretend Mr. Troya argues a generalized "per se" rule of ineffectiveness, CV Doc. 46 at 130, when he has not and does not.

Continuing with its theme, the government says "Troya's cite to *United States ex rel Hampton v. Leibach*, 347 F.3d 219 (7th Cir. 2003), is also misleading. In that decision, the Seventh Circuit affirmed a District Court grant of a writ of habeas corpus for an underlying state court homicide conviction where the defense attorney failed to call available exculpatory witnesses who would have exonerated the defendant." Citation to *Leibach* is not misleading at all. Again, Mr. Troya accurately quoted from that decision the proposition highly relevant here and good to this day: "Promising a particular type of testimony creates an expectation in the minds of jurors, and when defense counsel without explanation fails to keep that promise, the jury may well infer that the testimony would have been adverse to his client and may also question the attorney's credibility. In no sense does it serve the defendant's interests"). The government says *Leibach* is not comparable, apparently because that case involved exculpatory witnesses as to guilt and this claim involves mental health experts, but the principle is the same.

95

Tellingly, the government cites to no cases approving of trial counsel breaking a promise to present certain testimony to the jury. There are other cases finding counsel ineffective based primarily upon that defalcation. In *Ouber v. Guarino*, 293 F. 3d 19 (1st Cir. 2002), the First Circuit affirmed the district court's grant of relief, finding trial counsel ineffective for repeatedly promising during opening statements the petitioner would testify in her own defense, then failing to deliver on those promises during trial when counsel ended up advising his client not to testify. As to the performance prong, the Court held:

> At the heart of this appeal lies a broken promise (or, more precisely put, a series of broken promises): defense counsel's repeated vow that the jurors would hear what happened from the petitioner herself. Thus, the error attributed to counsel consists of two inextricably intertwined events: the attorney's initial decision to present the petitioner's testimony as the centerpiece of the defense (and his serial announcement of that fact to the jury in his opening statement) in conjunction with his subsequent decision to advise the petitioner against testifying. Taken alone, each of these decisions may have fallen within the broad universe of acceptable professional judgments. Taken together, however, they are indefensible. Neither the state court nor the Commonwealth has managed to identify any benefit to be derived from such a decisional sequence, and we are unable to see the combination as part and parcel of a reasoned strategy. We therefore conclude that, in the absence of unforeseeable events forcing a change in strategy, the sequence constituted an error in professional judgment. *Cf. Anderson v. Butler*, 858 F.2d 16, 19 (1st Cir.1988) (finding a mistake, rather than a strategic choice, where nothing could be gained from counsel's approach).

293 F.3d at 27. In Mr. Troya's case, the events were not unforeseeable at all because trial counsel already had the government expert's report prior to opening. In *English v. Romanowski*, 602 F.3d 714 (6th Cir. 2010), the Sixth Circuit reversed the district court's grant of relief on petitioner's claim that trial counsel was ineffective for failing to call a witness to testify at his Michigan assault with intent to murder trial, but affirmed the grant of relief on the related claim that counsel was ineffective for promising to call the witness during his opening statement.

An evidentiary hearing is required on this claim.

**(XXVI).        (CV Doc. 25 at ECF 351) Reply to Govt. Response I.  CV Doc. 46 at 100.**

**COUNSEL UNREASONABLY NEGLECTED TO TIMELY AND EFFECTIVELY INVESTIGATE MR. TROYA'S PERSONAL HISTORY AND BACKGROUND, RESULTING IN AN INACCURATE, A MISINFORMED AND POOR MITIGATION PRESENTATION TO THE JURY, CONTRARY TO FIFTH, SIXTH AND EIGHTH AMENDMENT REQUIREMENTS.**

Though Mr. Troya has pled detailed facts with supporting affidavits and other documentation, the government urges dismissal of this claim based solely on the pleadings. The government continues to try to isolate individual ineffectiveness claims and address them as if the Court is to consider them standing alone. But as briefed above, while any single default may render counsel ineffective, the Court must look at counsel's performance in its entirety.  The government mischaracterizes parts of this claim and responds to the rest with wholly inapt arguments.

Based on a thorough review of trial counsel's files, the § 2255 motion describes their woefully deficient sentencing phase preparation and presentation in detail. The motion forthrightly describes both the witnesses who were and those who were not interviewed by the trial team, when potential witnesses were interviewed and under what circumstances, and even describes what those witnesses told trial counsel at the time. What information counsel neglected to uncover, and testimony which could have been presented to the jury, is also forthrightly described in detail.

From the dates and circumstances of the witness interviews, it is plain, as alleged, "[s]ome witnesses were belatedly interviewed by the defense around the time of and during trial. Many other witnesses who could have provided mitigating evidence were never interviewed at all." CV Doc. 25 at ECF 336. While trial was set to begin January 7, 2009, trial counsel did not even begin to identify and interview most potential witnesses for the mitigation case until

97

December 2008.  No reasonable counsel defending their client's life in a case such as this would have engaged in such dilatory behavior. Mr. Troya also alleges that from a review of counsel's file, "[t]he sentencing phase interviews and development of mental mitigation stopped for a significant time generally corresponding to when the plea approval process began. Trial counsel's file is a virtual black hole of preparation during the approval waiting period [summer through around December 22, 2008]."

Ignoring both the witnesses who were never interviewed at all by the trial team, as well as that team's total failure to interview several mitigation witnesses until the month before trial began, the government deflects its discussion to joking about a general "work stoppage" and sets out to prove from the record there wasn't one.  CV Doc. 46 at 100. The § 2255 motion specifically alleges it was the sentencing phase interviews and mental mitigation development which was paused by the trial team during the plea approval process, but the government chooses instead to defend its death sentences with citation to record activity during that time period showing almost exclusive work on guilt phase and jury issues. In fact, the government's recitation of the work trial counsel were doing in the run-up to trial supports the movant's contention the trial team put off its investigation of and preparation for sentencing phase until it was too late. By the time trial came, counsel were required to devote time to other trial preparation obligations, including review of hundreds of juror questionnaires.

The government misleadingly calls this Court's attention to pleadings filed and hearings attended by Mr. Troya's counsel in the interregnum of the Department of Justice's consideration of a plea or death waiver possibility as if they somehow demonstrate some investigative work outside of court, saying "[a] review of the docket in the underlying criminal case belies Troya's claim of a defense "work stoppage". CV Doc. 46 at 100. Mr. Troya made no claim of a general

"work stoppage," but instead claims, and can demonstrate, a sentencing phase investigation halt. The government's recitation of record activity does nothing to show this allegation is not true. The first set of pleadings it cites to are four template-based death penalty motions, filed May 30, 2008, before the summer of 2008. *See* CR Docs 372-375. The next defense pleading, July 1, is directed to easing the Special Administrative Measures as to defense experts because they were interfering with expert access to Mr. Troya. CR Doc. 397. Document 415, filed July 9, is a simple notice of adoption of a codefendant's motion to suppress and statement of standing. CR Document 416 is a response to the government's motion for mental health discovery, which again raised the problems with the SAM measures. CR Document 452, filed August 22, is a motion to suppress directed to guilt phase evidence. CR Documents 468, 469, 479, 493, 494, 506 and 507 are general one paragraph objections to the Magistrate's Report and Recommendations on various issues. CR Document 512, filed October 20, is a brief motion to adopt a codefendant's response regarding introduction of codefendant statements at trial. CR Document 544, filed November 28, is a motion to attend the government mental health expert's evaluation of Mr. Troya. CR Document 558, filed December 4, is a motion for immediate disclosure of witnesses and *Giglio* material. CR Document 598 is not a defense motion at all, but an order.

But then the government continues waving its false flags, arguing during the same time period counsel also "prepared for and argued at two suppression hearings (CR-Doc. 444, 472) and four status conferences at which the preparation of the mitigation case was discussed." Actually, the two "suppression hearings" referred to by the government were not at all. The "suppression hearing" of September 9, 2008 (CR Doc. 948) consists of about ten pages and relates only to standing; the August 14, 2008 "suppression hearing" (CR Doc. 1001) is a joint hearing consisting of about 30 pages with primarily Mr. Garcia for Mr. Troya discussing the

suppression motion and the Court pointing out the fact Mr. Troya's counsel had neglected to file such a motion before the motions deadline.

At the status conference of June 12 (CR Doc. 975), juror questionnaires, selection procedures, discovery issues and BOP's Special Administrative Measures with Mr. Troya were discussed. At that hearing counsel Eisenberg brought to the attention of the Court how the SAM measures and prior government "firewall" counsel's inaction had interfered with the defense investigation of mitigation. Counsel estimated that because of the government's interference the defense had lost six weeks to two months of penalty phase preparation with their client. The interference "threw our scheduling off that we didn't have access for phase two type discovery or developing phase two case with Mr. Troya for that period of time." CR Doc 975 at page 37. He felt those problems had since been resolved, however.

At the August 14th status conference (CR Doc. 976), the parties discussed discovery procedures for mental health evaluations and juror questionnaires, but again, nothing about preparation of mitigation. At the status conference of November 20th, (CR Doc. 977) the parties primarily discussed how to handle the mental health evaluations of the defendants, stipulations, juror questionnaires, pre-*voir dire* excusals. Preparation of mitigation was not discussed. However, counsel Eisenberg's recently-filed sealed motion to continue trial for two months was denied by the Court. In that motion, (CR Doc. 529), counsel invoked the very issue observed in the § 2255 motion: the potential settlement of the case was pending review in the Department of Justice, and counsel had "hoped" to get a response before the November 20 status conference.

The status of December 17, 2008 (CR Doc. 1089), at which agreed jury strikes, procedures for jury selection, and exchange of witness lists was discussed. Preparation of

100

mitigation was not discussed at that hearing at all, either. The government is mistaken in its assertions.

The government's citation to motions filed and hearings attended does nothing to rebut the allegation counsel paused preparation for penalty phase for a significant time. Instead, the issues discussed at the hearings highlight the necessity for an evidentiary hearing for an opportunity to prove the extra-record fact of counsel's extraordinary neglect of the investigation of the case for sentencing phase.

Next the government minimizes the sworn affidavits filed in support of the § 2255 motion here, even though in response to the Sanchez § 2255 it declares that motion deficient because affidavits were *not* filed in that case. *See* Case No. 9:16-Cv-80693, Doc. 37, p 32 and *passim* ("Sanchez has failed to provide any affidavits from any witnesses concerning the purportedly new testimony. The only proffer of how these witnesses might have testified comes from the petitioner's own self-serving allegations. Such speculation that these individuals would have provided exculpatory testimony is insufficient to establish that counsel were ineffective.").

Shifting to a wholly different gear here to urge dismissal of Mr. Troya's motion, the government quotes *Waters v. Thomas*, 46 F. 3d 1506, 1513-14 (11th Cir. 1995) for the proposition that affidavits are of "limited evidentiary value in a habeas case." The context of the Eleventh Circuit's quote skeptical of post-conviction affidavits (and of ineffective assistance claims generally) is revealing. In *Waters*, trial counsel extensively investigated the petitioner's mental health history and functioning at the time of the murders. "Counsel's extensive investigation bore fruit. At the guilt stage, counsel called six mental health experts who testified about Waters' mental problems…." 46 F. 3d at 1513. Counsel called no witnesses at penalty phase, instead relying on the mental health testimony *already presented to the jury at the guilt*

101

*phase*. The ineffective assistance claim was based on the failure to (re-)present the mental health testimony with more focus on penalty issues. In light of the mental health testimony actually presented at trial, the affidavits of the experts who had already been called were not persuasive to the majority of the Eleventh Circuit, which described them in some detail, at 1514-15. By way of contrast, in Mr. Troya's case no mental health testimony was presented by trial counsel at all, and the lay witnesses who have provided affidavits are written in their own words, not at all "carefully crafted."

The government next misreads the § 2255 motion, describing the proffered mitigation as only "a list of eleven individuals who were interviewed by the defense team in preparation of the mitigation case between December 2008 and early March 2009, [FN] but who were ultimately not called as witnesses during the penalty phase." CV Doc. 46 at 101. It also inaccurately claims "By Troya's own admission, the defense team interviewed each of the lay witnesses who were not called during the mitigation case, with one exception." CV Doc. 46 at 102. These statements are false, as is the similar one at footnote 35 of the response.[16] The government totally neglects to address the many additional witnesses who went uninterviewed prior to sentencing phase, as well as the fact counsel neglected to develop crucial mitigating evidence from the constitutionally inadequate interviews that were conducted. The government does not respond at all to the records petitioner has also proffered but which went uninvestigated by trial counsel.

---

[16] Together with supporting affidavits, Mr. Troya has described the available testimony of the following witnesses who were never interviewed at all by counsel, thought they were readily available and should have been contacted: Lay Witnesses: Diane Beaudet (Conniston Teacher-trial staff spoke to her by phone only AFTER penalty phase was over), Jason Conley (former Brevard inmate), Erasmo Garcia Jr. (friend), Pierrot Nicolas (former Brevard inmate), Amelia Ostrosky (frmr Conniston Principal), Cindy Rivera (friend), Dennis Rivera (friend), and Mildred Ruiz (friend). Family Witnesses: Magdalena Mendez (aunt), Manuel Mendez (uncle), Melida Mendez (aunt), Moises Mendez (uncle), Daniel Troya (uncle who was only contacted regarding another family member testifying).

The § 2255 motion describes the surface-scratching interviews conducted of the family and other witnesses, and how counsel far too early latched onto a totally inaccurate portrayal of Mr. Troya's childhood and background. Absent a thorough investigation, counsel settled on an inaccurate mitigation theory that Mr. Troya came from a good family but was led astray by Uncle Tito, was exposed to the murder of a close friend, volunteered at a retirement home in his childhood, may have attempted suicide, and hit his head a couple of times.

When this inaccurate theory was presented in thumbnail fashion at trial the jury was misled. As described in the motion, far from an idyllic home life, young Danny Troya was raised in houses which were frequently overcrowded, in gang and crime-filled neighborhoods. The school he attended was not different. The jury heard nothing of his extended family, which was exposed to child neglect and abuse, and poverty. While the grocery store they jointly owned in Chicago was portrayed as wholesome, and its sale provided the money to move, in actuality it became surrounded by crime and gangs, and its sale resulted in near-bankruptcy for the family.

He was raised by parents who were "good people," as presented at sentencing, but who were also in conflict much of the time, were ill-equipped and too busy working barely making ends meet, were on public assistance for a time, and unable to deal with the many problems their children encountered. The sanitized version of the family life presented at trial had little basis in reality. In fact, as shown in the motion but unknown to the jury, every child in the Troya family encountered substantial difficulties.

While the defense presented a bare-bones description of the trauma Mr. Troya suffered when one of his friends was murdered before his eyes, it failed to investigate the witnesses who could have described the details and longlasting effects, as well as countering the government's

103

contention Mr. Troya was not a friend of Mr. Kamel's at all. All of this and more is described in the detailed social history.

"*Post hoc* rationalization" of supposed strategy without supporting evidence cannot justify attorney action or inaction." *Wiggins v. Smith*,  539 U.S. 510, 526-26 (2003)("When viewed in this light, the 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing."); *See also Harrington v. Richter*, 562 U.S. 86, 109 (2011)(same, adding: "neither may they insist counsel confirm every aspect of the strategic basis for his or her actions.").

The governing law notwithstanding, the government singles out some witnesses and manufactures imaginative strategy decisions for counsel not to have called them. It points out Annelle Hernandez and Vonlydick had criminal histories "and the cross examinations of these witnesses could have hurt Troya more than helped him." CV Doc. 46 at 103. This is the stuff of fairy tales. Vonlydick was an inmate at the institution Mr. Troya was at, and the leader of the supposed escape attempt. Of course Vonlydick had a criminal history, every inmate does. Mr. Troya obviously did, and there was no hiding the fact he had previously been in prison. Getting in Vonlydick's statement about the escape through another witness did not change the fact the jury knew that. The movant has alleged far, far more, Vonlydick could have attested to about the cruel conditions Mr. Troya suffered as a teenage inmate (together with DOC records of Mr. Troya's) that was not introduced because counsel failed to ask him about it.  Annelle Hernandez's criminal record is actually helpful to Mr. Troya, since she grew up in the same neighborhood it would have provided important cohort analysis, as pointed out in the motion. The government neglects to mention Eisenberg's conflict in having previously represented Ms.

104

Hernandez, a far more likely reason he did not call her. And the government's made up strategy reason is shown to be the spurious one it is by the fact the first witness called by the defense, Karl Bush, had a known criminal record, yet the defense decided to call him anyway. Obviously, having a criminal record did not disqualify a witness as a part of defense strategy.

The government concocts a strategy for Christina Schmidt not being called because she was the aunt of Vetere and had been accused of "improper contact with a juror" during guilt phase. That she was the aunt of Vetere, a government witness, would have buttressed her credibility, and the "improper contact" issue was shown during trial to be completely bogus. She had otherwise riveting testimony to provide.

Some investigation such as conducted by trial counsel in no way insulates the conduct from a finding of ineffectiveness. "[T]he decision to limit an investigation "'must flow from an informed judgment.'" *Williams v. Allen*, 542 F. 3d 1326, 1337 (11th Cir.2008). Supposed "strategic choices"

> made after "less than complete investigation" are reasonable *only* to the extent that reasonable professional judgment supports the limitations on investigation. *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052; *accord Wiggins*, 539 U.S. at 527–28, 123 S.Ct. 2527 (finding ineffective assistance where "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible"); *Ford v. Hall*, 546 F.3d 1326, 1333–34 (11th Cir.2008) (holding that in evaluating the reasonableness of an investigation into mitigating circumstances "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further") (citations and quotation marks omitted).

*Ferrell v. Hall*, 640 F.3d 1199, 1226-27 (11th Cir. 2011).

No reasonable attorney defending a capital case where four people were murdered, two of whom were children, would have limited their investigation in the way counsel did here. The Eleventh and other circuits have granted relief where counsel truncated their investigation for sentencing phase. For instance, in *Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011) the petitioner

was convicted and sentenced to death for killing his grandmother and fifteen year-old cousin. The Eleventh Circuit granted penalty phase relief, finding trial counsel ineffective for failing to investigate and present available mitigating evidence even under the AEDPA. Counsel in that case had also conducted a mitigation investigation, ultimately presenting five witnesses at penalty phase. The Court determined that although counsel's investigator did interview a substantial number of witnesses, those interviews were limited to narrow questions about petitioner's character and failed to examine the "detailed information about [petitioner's] deeply troubled mental health and ... childhood" known to the witnesses. *Id*. at 1230. Trial counsel later explained that they chose to rely upon residual doubt "because they could find no other reason to offer the jury not to impose death," *id*., but the Eleventh Circuit found that claim unpersuasive: "The long and the short of it is that defense counsel had nothing else to rely on because they looked for nothing else." *Id.*

Similarly, in *Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008), cert. denied, 556 U.S. 1253 (2009), the Eleventh Circuit granted sentencing phase relief, finding that trial counsel were ineffective for failing to investigate and present available mitigating evidence.  After a detailed review of the evidence, the Eleventh Circuit found trial counsel performed deficiently "by choosing to rely entirely" on petitioner's mother's account, which provided "an incomplete and misleading understanding of Williams' life history." 542 F.3d at 1340. The court also found that "the information trial counsel did acquire" – including a psychologist's report indicating depression, poor self-esteem, possibility of suicide risk and a tendency to distort reality – "would have led a reasonable attorney to investigate further." 542 F.3d at 1340; *see also id*. ("A reasonable investigation into the leads in this case should have included, at a minimum,

interviewing other family members who could corroborate the evidence of abuse and speak to the resulting impact on Williams").

In *Cooper v. Secretary, Department of Corrections*, 646 F.3d 1328 (11th Cir. 2011), counsel's investigation consisted of conversations with petitioner and his mother, and a handful of phone calls to other potential witnesses, all of which "were dead ends," *id*. at 1347. Agreeing counsel's conduct was unreasonable, the Court explained that "[u]nder the prevailing standards in 1984," trial counsel's investigation had been too narrow, and had been unreasonably terminated despite ample indications that additional, more useful information was available. At 1351.

In *DeBruce v. Commissioner, Alabama Dept. of Corrections*, 758 F.3d 1263 (11th Cir. 2014), *cert. denied*, 135 S.Ct. 2854 (2015), the Eleventh Circuit granted penalty phase relief, also finding trial counsel ineffective for failing to investigate and present available mitigating evidence even under the AEDPA standards. Although counsel interviewed petitioner and his mother (and later called the mother as the only defense witness at the penalty phase), he conducted virtually no further investigation, and did not follow up on a social worker's pre-trial report reflecting that petitioner had attempted suicide several times, and had exhibited signs of significant cognitive and substance abuse problems. Rejecting strategy as a reason to curtail the investigation, the Court held:

> Here, even if we accept the state court's factual determination that Mathis made a strategic decision not to investigate mitigation evidence based on the results of the pre-trial report governing DeBruce's competency to stand trial, that decision could not have been reasonable as it would have been based on a failure to understand the law. Because no lawyer could reasonably have made a strategic decision to forego the pursuit of mitigation evidence based on the results of the pre-trial report governing competency to stand trial, the Alabama Court of Criminal Appeals' conclusion to the contrary constitutes an unreasonable application of Strickland's performance prong.

107

758 F.3d at 1273-74; see also id. at 1274 (describing "grossly inaccurate testimony" by petitioner's mother, made possible by counsel's failure to inquire about obvious discrepancies between her account and contents of social worker's report).

In *Hardwick*, the Eleventh Circuit also found the sentencing investigation in that capital case deficient, remanding for an evidentiary hearing, holding:

> 'An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence.' *Middleton*, 849 F.2d at 493. When preparing for the penalty phase in a capital case, trial counsel's performance is unreasonable where counsel either fails to investigate possible mitigating evidence or "makes only a desultory or cursory effort to find mitigating evidence." *Fortenberry*, 297 F.3d at 1229. We have enunciated the proper analysis for investigation omissions in a death-penalty case:
>
> > First, it must be determined whether a reasonable investigation should have uncovered such mitigating evidence. If so, then a determination must be made whether the failure to put this evidence before the jury was a tactical choice by trial counsel. If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end. If, however, the failure to present the mitigating evidence was an oversight, and not a tactical decision, then a harmlessness review must be made to determine if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Thus, it must be determined that defendant suffered actual prejudice due to the ineffectiveness of his trial counsel before relief will be granted.
>
> *Middleton*, 849 F.2d at 493 (citation omitted). The petitioner in *Middleton*, where we affirmed the district court's determination that a new sentencing proceeding was required, had strikingly similar circumstances to those of Hardwick, including a deprived and abusive childhood as well as favorable assistance from psychiatric experts. We recognized that " 'psychiatric mitigating evidence not only can act in mitigation, it also could significantly weaken the aggravating factors.' " Id. at 495 (*quoting Huckaby v. State*, 343 So.2d 29, 33-34 (Fla.1977)).

*Hardwick v. Crosby*, 320 F.3d 1127, 1181–82 (11th Cir. 2003). When the case was returned, the Eleventh Circuit affirmed the District Court's determination counsel was ineffective at penalty phase. *Hardwick v. Secretary, Florida Dept. of Corrs.*, 803 F3.d 541 (11th Cir. 2015)(counsel did not conduct even a rudimentary life history investigation; ineffective in part because  counsel

"was aware of a number of red flags" and "potential sources of mitigating evidence," and had the benefit of a court-appointed expert's report suggesting the need for further mental health investigation, 803 F.3d at 553-54, yet made no effort to develop any of those leads).

Next, the government says Mr. Troya has "provide[d] an extensive laundry list of facts" in support of the claim, which it tries to group into the weakest "categories" it can think of. Providing no specifics, the government contends:  "Some, if not all, of the evidence that Troya alleges should have been presented would have been cumulative of some of the testimony offered by the mitigation witnesses." CV Doc. 46 at 102. The government continues its campaign of demeaning mitigation the same as it unlawfully did at the sentencing phase of this case.

The government argues caselaw demonstrates "trial counsel is not required to present all available mitigating evidence during the sentencing phase," including all available witnesses. CV Doc. 46 at 103-04. This goes without saying, since strategic decisions made after an adequate investigation are presumptively deferred to by the courts.  But here counsel failed to conduct a complete mitigation investigation and thus could not make an actual strategic decision. This analysis is based on "the much more limited principle that 'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.' *Id*., at 690-691, 104 S.Ct. 2052. A decision not to investigate thus 'must be directly assessed for reasonableness in all the circumstances.' *Id.*, at 691, 104 S.Ct. 2052. *Wiggins v. Smith*, 539 U.S. 510, 533 (2003) (*citing Strickland*, 466 U.S. at 689, 104 S.Ct. 2052). Without an evidentiary hearing, such an assessment is impossible.

Finally, the government repeats its readily refuted contention the "affidavit testimony was not substantively different than the evidence actually presented to the jury" CV Doc. 46 at 105,

109

and argues Mr. Troya has not shown it was reasonably likely to have affected the outcome of the sentencing phase.  It again misstates and dismissively describes the substantial prejudice alleged as "a dozen extra witnesses," and makes the unsupportable argument that "Even if counsel had called every person with potential mitigation information, the facts of the instant case, specifically the execution-style murders of the two children, are so egregious, that it is unlikely that the testimony of a dozen extra mitigation witnesses would have made any difference in the penalty phase of this trial." CV Doc. 46 at 105.

The government asks this Court to adopt a legal analysis which has been thoroughly discredited already. There is no "some mitigation" exception to the assessment of prejudice. In a decision which could have been written for this case, *Sears v. Upton*, 561 U.S. 945 (2010) (per curiam), the Court granted certiorari, vacated the judgment denying state post-conviction relief, and remanded this Georgia capital case for further consideration of whether Sears was prejudiced by trial counsel's deficient failure to investigate mitigating evidence. After an evidentiary hearing, the state post-conviction court found "counsel conducted a penalty phase investigation that was 'on its face ... constitutionally inadequate.'" 561 U.S. at 946. However, while additional mitigating evidence presented at the post-conviction hearing showed Sears had significant brain damage that affected, *inter alia*, his ability to reason and plan, and that, contrary to the trial evidence, his childhood had not been privileged or tranquil, the state court believed itself unable to conduct the prejudice analysis mandated by *Strickland v. Washington*. Noting trial counsel had presented some evidence in support of a mitigation theory that Sears had come from a loving and stable family whose other members would be adversely affected by his execution, the state court explained "'[t]his case cannot be fairly compared with those where little or no mitigation evidence is presented and where a reasonable prediction of outcome can be made.'" 561 U.S. at

952. The state court went on to add "'it is impossible to know what effect [a different mitigation theory] would have had on [the jury],'" and that "'[b]ecause counsel put forth a reasonable theory with supporting evidence, [Sears] ... failed to meet his burden of proving that there is a reasonable likelihood that the outcome at trial would have been different if a different mitigation theory had been advanced.'" *Id*.

After reviewing the mitigating evidence that was available through reasonable investigation, and noting "the fact that some of such evidence may have been 'hearsay' does not necessarily undermine its value – or its admissibility – for penalty phase purposes," 561 U.S. at 950, the Supreme Court found "two errors in the state court's analysis ...." *Id*. at 953. "First, the court curtailed a more probing prejudice inquiry because it placed undue reliance on the assumed reasonableness of counsel's mitigation theory." *Id*. "[T]hat a theory might be reasonable, in the abstract," the Court added, "does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudiced Sears." *Id.* "Second, and more fundamentally, the [state] court failed to apply the proper prejudice inquiry." *Id*. at 954. Whereas the state court perceived a barrier to applying Strickland's "reasonable probability" inquiry in a case where some mitigating evidence was presented at trial, the Court emphasized that no such barrier exists:

> We certainly have never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant. To the contrary, we have consistently explained that the *Strickland* inquiry requires precisely the type of probing and fact-specific analysis that the state trial court failed to undertake below.[FN] In the *Williams* decision, for instance, we categorically rejected the type of truncated prejudice inquiry undertaken by the state court in this case. 529 U.S., at 397–398, 120 S.Ct. 1495. And, in *Porter*, we recently explained:
>
> > "To assess [the] probability [of a different outcome under *Strickland* ], we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweig [h] it

111

against the evidence in aggravation." 558 U.S., at ——[, 130 S.Ct., at 453–54] (internal quotation marks omitted; third alteration in original).

That same standard applies—and will necessarily require a court to "speculate" as to the effect of the new evidence—regardless of how much or how little mitigation evidence was presented during the initial penalty phase. Indeed, it is exactly this kind of probing inquiry that Justice SCALIA now undertakes, *post*, at 3268 – 3271, and that the trial court failed to do. In all circumstances, this is the proper prejudice standard for evaluating a claim of ineffective representation in the context of a penalty phase mitigation investigation.

561 U.S. at 955-56.

There is no murder so horrifying a court can conclusively conclude not one reasonable juror would have voted for a life sentence if faced with new or different defense case in mitigation. The Supreme Court, as well as the courts of this and other circuits certainly don't see the law at all as the government does. In the relatively recent case of *Cooper v. Secretary, Department of Corrections*, 646 F.3d 1328 (11th Cir. 2011), for instance, the Eleventh Circuit found counsel ineffective and granted death-sentencing relief in a case in which there were six aggravating factors. Prejudice was found though there were three murders: "the number of victims does not preclude this Court from concluding prejudice has been established." *Id.* at 1356. Other courts have explained the reasons why the horrific nature of murders does not preclude a finding new mitigation and aggravation-lessening evidence sufficient to show a reasonable likelihood the sentencing phase would have been different. The Fifth Circuit has also rejected this "stereotypical fall-back argument," noting the horrific nature of capital murder does not override *Strickland* prejudice:

> The State's stereotypical fall-back argument – that the heinous and egregious nature of the crime would have ensured assessment of the death penalty even absent [the error] – cannot carry the day here. … [O]ur decades of experience with scores of § 2254 cases from the death row of Texas teach an obvious lesson that is frequently overlooked: Almost without exception, the cases we see in which conviction of a capital crime has produced a death

> sentence arise from extremely egregious, heinous, and shocking facts. But, if that were all that is required to offset prejudicial legal error and convert it to harmless error, habeas relief based on evidentiary error in the punishment phase would virtually never be available, so testing for it would amount to a hollow judicial act.

*Walbey v. Quarterman*, 309 Fed. Appx. 795, 804 (5th Cir. 2009)(quoting *Gardner v. Johnson*, 247 F. 3d 551 (5th Cir. 2001)).

In *Hendricks v. Calderon*, 70 F.3d 1032 (9th Cir. 1995), *cert. denied*, 517 U.S. 1111 (1996), counsel was ineffective for failing to present mitigating evidence at the sentencing phase of petitioner's capital trial, and the court rejected the state's assertion prejudice could not be shown because the evidence of aggravation was "overwhelming." The court observed "the statutory factors give the jury broad latitude to consider amorphous human factors, in effect, to weigh the worth of one's life against his culpability," the "imposition of the death sentence is entrusted to the jury because it is a uniquely moral decision in which bright lines have a limited place."

An evidentiary hearing is required on this claim.

**(XXVII). (CV Doc. 25 at ECF 455)   MR. TROYA'S CONVICTION AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE.**

The government's argument that Mr. Troya is not entitled to relief under the cumulative error doctrine is both confused and fails to respond to the issue Mr. Troya raised. As discussed previously, the government conflates the cumulative nature of a *Strickland* prejudice inquiry with a claim of cumulative error.[17] A *Strickland* claim requires this Court to examine the cumulative prejudice of all counsel's failures. In contrast, a claim of cumulative error examines *all trial error* to determine if the cumulative prejudicial effect of those errors warrants relief. *See*

---

[17] Mr. Troya is not addressing the government's rejection on a *Cronic* claim because Mr. Troya did not plead a *Cronic* claim and the government's discussion is entirely irrelevant to the claims Mr. Troya did raise.

*e.g. Phillips v. Woodford*, 267 F.3d 966, 986 (9th Cir. 2001) (ordering evidentiary hearing to determine combined effect of IAC claim and state's use of false testimony).[18]

The only argument in the government's response germane to the actual issue Mr. Troya raised is the allegation that "the Eleventh Circuit has declined to adopt a 'cumulative error' theory as an independent basis for habeas relief." CV Doc. 46 at 186. In support the government cites several cases where the federal court declined to entertain cumulative error claim when reviewing a state court conviction in a § 2254 proceeding. However, the government actually cites other cases, such as *Morris v. Secretary, Dept. of Corrections*, 677 F.3d 1117, (11th Cir. 2012) where the Eleventh Circuit did, in fact, conduct such a review. *See id.* at 1132 ("We address claims of cumulative error by first considering the validity of each claim individually, and then examining any errors that we find in the aggregate and in light of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial."). Moreover, in federal cases the Eleventh Circuit has accepted and applied the cumulative error doctrine. *See United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005) ("The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal.") (internal quotations and citations omitted); *United States v. Ramirez*, 426 F.3d 1344, 1353 (11th Cir. 2005) ("[T]he 'cumulative effect' of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are non-reversible.") (quoting *United States v. Thomas*, 62 F.3d 1332, 1343 (11th Cir. 1995) and citing *United States v. Adams*, 74 F.3d 1093, 1099–1100 (11th Cir. 1996)).

---

[18] The government inexplicably accuses Mr. Troya of failing "to cite any case law in support of this claim." CV Doc. 46 at 184. In addition to *Phillips*, Mr. Troya cited at least five other cases from four other circuit courts. *See* CV Doc. 25 at ECF 452 fn. 386.

In Mr. Troya's case, there can be no dispute there was error. Indeed, on direct appeal the Eleventh Circuit held that "the district court abused its discretion by excluding Dr. Cunningham's testimony." *United States v. Troya*, 733 F.3d 1125 (11th Cir. 2013). Notwithstanding the fact that the trial court's error was found to be harmless on direct appeal, this Court must examine the effect of that error in combination with any of the other trial errors proven in this post-conviction process to determine if a new trial or sentencing is required. This distinct cumulative error analysis is required "even if the errors considered individually are non-reversible." *Ramirez*, *supra*.

**REQUEST FOR HEARING**

The movant requests an evidentiary hearing and argument on his § 2255 motion as detailed herein. The exact amount of time to complete a hearing is entirely dependent upon which claims the Court permits. Counsel requests an opportunity to address the evidentiary hearing issue in a separate hearing or status conference before the Court.

Wherefore, Mr. Troya requests this Court grant § 2255 relief after an evidentiary hearing in the above-styled cause.

**Respectfully Submitted**,

*/s/ Steven H. Malone*
STEVEN H. MALONE
Steven H. Malone, P.A.
1217 South Flagler Drive
Second Floor
West Palm Beach, FL 33401
Tele: 561-805-5805
Email: stevenhmalone@bellsouth.net
Florida Bar No. 305545
*Counsel for Daniel A. Troya*

*/s/ D. Todd Doss*
D. TODD DOSS
Assistant Federal Defender
Federal Defender's Office, MDFL
201 South Orange Ave., Ste. 300
Orlando, FL 32801
Tele: 407-648-6338
Email: todd_doss@fd.org
Florida Bar No. 0910384
*Counsel for Daniel A. Troya*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 19, 2016, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record in this case, either via transmission of the Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic filing.

/s/ *Steven H. Malone*
STEVEN H. MALONE


/s/ *D. Todd Doss*
D. TODD DOSS

116