**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**DANIEL TROYA,**

      **Movant,**

**v.**                                              **Case No.**      **9:16-CV-80700-BLOOM**

**UNITED STATES OF AMERICA,**

      **Respondent.**

_____/

**REPLY TO GOVERNMENT'S SUPPLEMENTAL RESPONSE TO DISCOVERY**

In his § 2255 Motion, Mr. Troya raised a *Brady* claim alleging the government consulted with a neuropsychiatrist about the defense evidence of Mr. Troya's brain damage and failed to disclose that information to trial counsel. Doc. 25, PP. 240-41. This claim was based, in part, on then-AUSA Kastrenakes' representation to the trial judge that the government had "retained a neuropsychiatrist who is very familiar with PET scans" and that expert needed to review the actual PET scan rather than just the color reproductions. T7775. Despite the government's very detailed account to the judge, trial counsel never received any information about this expert including his review of Mr. Troya's case, the content of any discussions the expert had with the government, or even his name. Though Mr. Troya raised this claim in his § 2255 Motion, the government has attempted to deny Mr. Troya and this Court access to evidence supporting it. Rather than provide accurate information in response to Mr. Troya's § 2255 claim, the government has instead has taken every opportunity to deny and belittle Mr. Troya's allegations while propounding a series of inaccurate and inconsistent scenarios ranging from a blanket denial any such expert existed to now admitting consulting an expert but claiming this somehow supports the government's legal position.

**A. The Government's story has changed with each response.**

On July 20, 2016, in reply to Mr. Troya's informal discovery request, the government denied there was any prosecution mental health case at all:

> The only person retained by the government was Dr. Michael Brannon, and he examined Sanchez only. There was no mental health aspect to the penalty case against Troya and no documents exist.

Letter to Troya's Counsel (Doc 49-2).

After counsel sent a letter to the government noting that Dr. Brannon did in fact examine Mr. Troya, the government answered with a supplemental response. In that letter AUSA Carlton stated he had since reviewed "our files in detail, and contacted former AUSA John Kastrenakes (who handled most aspects of the penalty phase trial)." *August 26, 2016 Letter to Counsel,* Attached as Appendix 1. AUSA Carlton noted he previously had "inaccurately indicated to Mr. Malone that we had received nothing from penalty-phase counsel Eisenberg concerning a PET scan." As a result of his new search, Mr. Carlton forwarded several documents he "found in four separate folders in our records." However, the government continued to insist Mr. Troya's claims were false and even suggested that then-AUSA Kastrenakes had misrepresented the facts to the trial judge: "The government did not retain a neuropsychiatrist; Kastrenakes misspoke about this retention." *Id.*

On November 14, 2016 the government filed a Response to Mr. Troya's Motion to Vacate wherein the government boldly asserted Mr. Troya's claim relied on "speculation that the government had an independent expert review Dr. Wu's work. **This allegation has no basis in law or fact**." Doc 46, Fn. 43 (emphasis added). According to the prosecution "**the United States ultimately decided that there was no need for the government to have an independent neuropsychiatrist review or interpret Troya's PET scan**. As such, the government does not,

and indeed has never possessed any notes or reports interpreting or reviewing Troya's PET scan other than Dr. Wu's report…As there is no factual or legal support for Troya's claim that [a] *Brady* violation occurred—and substantial support that it did not—this claim must be denied." *Id*. (emphasis added).

The same day, the government also filed a formal response to Mr. Troya's discovery request informing the Court that the government's firewall counsel had not kept any documents relating to Mr. Troya's prosecution and the government had no records about a neuropsychiatrist reviewing the defense expert's results. Doc 49 at 16. The government conceded it did seek the PET scan from trial counsel in discovery but categorically denied consulting an expert: "While the United States did seek the original PET scan from Troya's counsel before the penalty phase began…the United States ultimately **did not engage the neuropsychiatrist** to review or to interpret any PET scan." *Id*. (emphasis added).

In early December, counsel moved to disqualify Judge Scola because of his relationship to Mr. Kastrenakes and the fact it was becoming clear that Mr. Kastrenakes' decisions during Mr. Troya's punishment phase would be crucial to resolving this issue. The government opposed the request for reassignment. In its opposition pleading, the government, for the first time (contradicting previous filed pleadings), admitted it had consulted with an expert neuropsychiatrist. Doc 71 at 5. The government, however, continued to downplay the importance of this consult and asserted "Although an expert was contacted, **the United States never retained the expert by contract**…" *Id*. (emphasis added). In this pleading, the government also began to shift its response to focus on whether trial counsel Eisenberg ever provided the actual

PET scan in discovery,[1] *Id.* at 7, and whether the government expert "authored an opinion" or created a report.[2] *Id*. at 7-8.

Then, on February 15, 2017, the government filed a "Supplemental Response" to Mr. Troya's discovery request. Doc. 83. In that pleading, the government finally admitted it had retained a neuropsychiatrist and for the first time disclosed his name, Dr. Ray Lopez. Contradicting previous assurances to this Court, the government attached documentation showing this expert was indeed retained by contract and had done substantive work on Mr. Troya's case on behalf of the government. The documents showed that on March 5, 2009—five days before then-AUSA Kastrenakes approached the Court about the PET scan—the government requested authorization for $15,500 for Dr. Lopez to examine the case, prepare testimony, and testify in court. Doc. 83-1 at 3. That request was approved on March 11th and fully funded on March 12th. Dr. Lopez submitted an invoice on May 12th claiming fees for reviewing records for two hours on March 18th and meeting with the prosecution for one hour on March 20th.[3] Doc. 83-2. On May 26th, the government submitted a modified purchase order reflecting the reduced work of Dr. Lopez. None of these documents provide any information about the substance of Dr. Lopez's work or why his contract was so substantially reduced. This recent disclosure reaffirms

---

[1]  This remains an unresolved factual issue which warrants discovery. Presumably the government expert knows if he received the PET scan since he spent two (2) hours reviewing materials and one hour meeting with the prosecution during trial.

[2] The government's *Brady* obligation, as discussed below, extends to much more than simply prepared reports or authored opinions. This narrow view of Mr. Troya's claim is also contrary to the government's previously-stated understanding of the issue when it noted that Mr. Troya was also seeking "the identity of any experts consulted and the content of those consultations…" August 30, 2016 Letter to Counsel.

[3] This was well into Mr. Troya's punishment phase: the government rested its penalty phase case-in-chief on March 17th and the defense rested on March 23rd.

4

Mr. Troya's previous requests for discovery and suggests the need for additional discovery requests.[4]

**B. This Court should order the government to disclose additional documentary evidence.**

The government's recent disclosure creates more questions than it answers, and this Court should order the government to review its files and disclose any other documents— including but not limited to official forms, handwritten notes, emails, and interoffice memos— relevant to this issue. The government's disclosure demonstrates further good cause to support discovery and indicates that what has been disclosed so far is not complete. In fact, even the funding request form attached to the government's pleading appears incomplete; Part III of the form notes that the contract consists not only of the form but also two attachments 1) "Contract Terms, Conditions, and Procedures, consisting of 3 pages" and 2) a "Statement of Work." Mr. Troya has received neither of these attachments.

Although Mr. Troya believes the record establishes good cause under Habeas Rule 6 for discovery on this issue, he is also entitled to this evidence apart from Rule 6 simply because it is *Brady* evidence.  As the Court is aware, disclosure of exculpatory and impeachment information is part of the constitutional guarantee to a fair trial. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972). The law requires the disclosure of such

---

[4] The government oddly suggests that these documents—which directly contradict their previous assurances to this Court—"actually buttress the position of the United States." Doc. 83 at 2. This strained argument appears to be based on the government's narrow focus on a "report". According to the government, Mr. Troya's allegation was that "the United States failed to turn over a report" and under its view this evidence confirms there was no report. *Id*. This position is incorrect. First, Mr. Troya's claim was never solely about a report. As noted *supra*, even the government understood this when it noted that Mr. Troya was also seeking "the identity of any experts consulted and the content of those consultations…" August 30, 2016 Letter to Counsel. Second, this argument suggests that the Government misunderstands its obligations under *Brady*. These obligations are explained in detail in the next section of this pleading.

information when it is "material"[5] to guilt or punishment. *Brady*, 373 U.S. at 87; *Giglio*, 405 U.S. at 154. Because *Brady* and *Giglio* impose constitutional obligations on the prosecution, *Brady* and *Giglio* material must be disclosed regardless of whether the defendant makes an explicit request for exculpatory or impeachment evidence. *Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995); *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Recognizing it is sometimes difficult to assess the materiality of evidence, the Supreme Court has counseled that prosecutors should err on the side of disclosure. *Kyles*, 514 U.S. at 439. *See also United States v. Agurs*, 427 U.S. 97, 108 (1976) ("The prudent prosecutor will resolve doubtful questions in favor of disclosure."). Accordingly, the Government has an affirmative duty to search for, learn of, and disclose exculpatory and impeachment information in the possession of the members of the prosecution team, which includes federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant. *Kyles*, 514 U.S. at 437-38.[6] Moreover, "the duty to disclose is ongoing." *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987). *See also Imbler v. Pachtman*, 424 U.S. 409, 427 n.25 (1976) ("[A]fter a conviction the prosecutor … is

---

[5] Exculpatory and impeachment information is "material" if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). To satisfy the "reasonable probability standard," there must be "a probability sufficient to undermine confidence in the outcome." *Id*. A defendant need not show that an acquittal would have necessarily resulted with the disclosure of the withheld evidence. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Significantly, the materiality of the suppressed evidence must be considered collectively, rather than item by item. *Id*. at 435-36 ("One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.").

[6] *See also Barbee v. Warden*, 331 F.2d 842, 846 (4th Cir. 1964) ("[T]he police are also part of the prosecution, and … the taint on the trial is no less if they, rather than the State's attorney, were guilty of nondisclosure.").

bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction.")

Consistent with the constitutional obligations outlined above, in 2006, the Department of Justice amended the United States Attorney's Manual ("USAM") regarding *Brady*/*Giglio* obligations by requiring prosecutors to "take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence." USAM § 9-5.001 (B)(1).[7] The USAM also requires disclosure of "information that is inconsistent with any element of any crime charged against the defendant or that establishes a recognized affirmative defense, regardless of whether the prosecutor believes such information will make the difference between conviction and acquittal…" *Id.* at (C)(1). Subsequently, responding to several high profile cases involving *Brady* violations and related prosecutorial misconduct where courts sanctioned prosecutors and/or dismissed cases altogether,[8] the Department of Justice issued three memos on January 4, 2010, through then-Deputy Attorney General David Ogden (the "Ogden memos"). The Ogden memos included "Guidance for Prosecutors Regarding Criminal Discovery" ("Guidance Memo") and related training initiatives that outlined "a methodical approach to consideration of discovery obligations that prosecutors should follow in every case to avoid lapses that can result in consequences adverse to the Department's pursuit of Justice." Guidance Memo at 1.[9] Concurrent

---

[7] Available online at: http://www.justice.gov/usam/usam-9-5000-issues-related-trials-and-other-court-proceedings (last visited 2/21/17).

[8] *See*, *e.g*., Special Counsel Report to Hon. Emmet G. Sullivan of Investigation Conducted Pursuant to Court's Order, April 7, 2009 (documenting Government's failure to comply with *Brady* and *Giglio* obligations in prosecution of Senator Ted Stevens) (available online at https://s3.amazonaws.com/s3.documentcloud.org/documents/325801/court-report-on-stevens-ethics-case.pdf (last visited 2/21/17)).

[9] Available online at: http://www.justice.gov/dag/memorandum-department-prosecutors (last visited 2/21/17).

with issuance of the Guidance Memo, the Deputy Attorney General directed all United States Attorney's Offices to develop a discovery policy with which prosecutors in each respective office must comply, and that reflects circuit and district court precedent and local rules and practices.

The United States Attorney's Office for the Southern District of Florida announced its new criminal discovery policy in a memorandum ("*Brady* Memo") issued pursuant to the Deputy Attorney General's directive. The *Brady* Memo adopts the Guidance Memo as the District's criminal discovery policy and applies it to all prosecutors in the District. *Brady* Memo at 1.[10] The *Brady* Memo instructs that prosecutors conduct a thorough review process for all potentially discoverable material within the custody or control of the prosecution team. Among the many areas on which the *Brady* Memo instructs prosecutors to focus are the following, which are relevant to Mr. Troya's case:

> 1.      Substantive case-related communications. As the Memo notes, "substantive" communications include "factual reports about investigative activity, factual discussions of the relative merits of evidence, factual information obtained during interviews or interactions with witnesses/victims, and factual issues relating to credibility." Guidance Memo at 10. The memo makes clear these communications are most likely to occur among prosecutors and/or agents and between prosecutors and/or agents and witnesses and can be memorialized in emails, reports, memoranda, and/or notes. *Id* at 10. The memo directs that all of these communications should be preserved, regardless of form, and should be reviewed to determine what is subject to *Brady* disclosure. *Id.* at 11. The

---

[10] Available online at:
https://www.justice.gov/sites/default/files/usao/pages/attachments/2015/04/01/fls_discovery_policy.pdf  (last visited 2/21/17).

memo specifically instructs that "[i]f substantive case-related information in communicated in an email, the AUSA should save, print out, or otherwise document that email and maintain it with the case file for discovery review and possible production." *Id.* at n.10.

2.  <u>Disclosing Exculpatory Information in a Witness's Statements</u>

Although this section deals primarily with changes in a witness's statement, the Memo makes clear that "AUSAs should be vigilant for new or inconsistent information disclosed by the witness during a pre-trial preparation session. New information that is exculpatory or impeachment information should be disclosed consistent with the provisions of § USAM 9-5.001, even if the information is learned in a trial preparation session with a witness. *Id*. at 17. Moreover, the Memo cautions that the duty to disclose information arising from trial preparation or even informal discussions "cannot be avoided by failing to memorialize the statements." *Id*.

If the prosecution team in Mr. Troya's case complied with the requirements of the USAO, Southern District of Florida, it should have preserved all communications, including printing out and saving all emails, regarding substantive issues in Mr. Troya's case. Mr. Troya, therefore requests this Court order production of all relevant information, including but not limited to:

1)  Attachment 1 of the funding request: "Contract Terms, Conditions, and Procedures, consisting of 3 pages";

2)  Attachment 2 of the funding request: "Statement of Work";

3)  All other communications, regardless of form, concerning the hiring of Dr. Ray Lopez;

4)  All information, including but not limited to, emails and interoffice communications discussing the purpose and scope of Dr. Lopez's retention;

5) All notes, emails, or other communications between anyone involved in Mr. Troya's prosecution and Dr. Ray Lopez, including information concerning materials provided for Dr. Lopez's review;

6)  All notes, emails, or other communications about any conferences (whether in person or by phone) with Dr. Lopez.

Because the government's recent disclosure contradicts statements made to this Court and assurances made to Mr. Troya's counsel that all files had been reviewed, Mr. Troya further requests this Court order the government to provide information about how this new evidence was discovered, including, but not limited to:

1) If all files had previously been reviewed as the government assured counsel, where was this document located?

2) Are there now more boxes or files that had not previously been reviewed?

3) Who discovered this document? Do prosecution team members possess "side files" or personal files that are not part of the office's master file on this case? If so, who has reviewed those files and when was that done?

4) On August 30, 2016 Mr. Carlton informed counsel that he had spoken to former AUSA John Kastrenakes about the government's penalty phase case. In that letter, Mr. Carlton also stated that "The government did not retain a neuropsychiatrist; Kastrenakes misspoke about this retention." Where did this information come from? Was there a discussion about hiring a neuropsychiatrist? What did Mr. Kastrenakes say? Did Mr. Kastrenakes inform Mr. Carlton that he had given false information to Judge Hurley?

**C. This Court should allow a deposition of Dr. Ray Lopez and allow Mr. Troya to issue a subpoena duces tecum for Dr. Lopez's file in this case**.

Pursuant to Habeas Rule 6, Mr. Troya previously requested the depositions of former AUSA Kastrenakes, firewalled AUSA Jacqueline Arango, and the DOJ Attorney Richard Burns. Doc. 61 at 12. Based on the newly disclosed evidence, Mr. Troya now also requests a deposition of Dr. Ray Lopez. Mr. Troya's previous pleadings and the recently disclosed evidence demonstrate good cause for these depositions. *See e.g. Payne v. Bell*, 89 F. Supp. 2d 967, 975 (W.D. Tenn. 2000) (Order Granting in part and Denying in part Petitioner's Motion and

Supplemental Motion for Leave to Conduct Discovery and for Support Services) (granting habeas petitioner's request to take deposition of lead prosecutor; witness affidavit that the witness provided potentially exculpatory information to the prosecutor before trial established good cause and gave rise for the deposition request because the prosecutor's "testimony is directly relevant to most of [petitioner]'s *Brady* claims. Only [the prosecutor] knows what information was in his possession at the time of [petitioner]'s trial ... and [the prosecutor]'s testimony would assist in the determination of whether there is merit to [the *Brady*] claims." *United States ex rel. Pecoraro v. Page*, 1998 U.S. Dist. LEXIS 15746, *9-*15 (N.D. Ill. 9/21/1998) (Memorandum Opinion) (granting petitioner's request to take depositions of two prosecutors and two detectives to support the claim that the state withheld impeachment evidence concerning promise of lenience made to a material witness).

 **Respectfully Submitted**,

| | |
|---|---|
| */s/ Steven H. Malone* | */s/ D. Todd Doss* |
| STEVEN H. MALONE | D. TODD DOSS |
| Steven H. Malone, P.A. | Assistant Federal Defender |
| 1217 South Flagler Drive | Federal Defender's Office, MDFL |
| Second Floor | 201 South Orange Ave., Ste. 300 |
| West Palm Beach, FL 33401 | Orlando, FL 32801 |
| Tele: 561-805-5805 | Tele: 407-648-6338 |
| Email: stevenhmalone@bellsouth.net | Email: todd_doss@fd.org |
| Florida Bar No. 305545 | Florida Bar No. 0810384 |
| *Counsel for Daniel A. Troya* | *Counsel for Daniel A. Troya* |

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 22, 2017, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record in this case, either via transmission of the Notices

of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel

or parties who are not authorized to receive electronically Notices of Electronic filing.

/s/ *Steven H. Malone*
STEVEN H. MALONE

/s/ *D. Todd Doss*
D. TODD DOSS