**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 16-80700-CV-BLOOM**
**(Case No. 06-80171-Cr-Hurley/Vitunac(s)(s)(s))**

DANIEL A. TROYA,
      Movant,

vs.

UNITED STATES OF AMERICA,
      Respondent.

_____/

**GOVERNMENT'S AMENDED RESPONSE TO TROYA'S MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255**

COMES NOW the United States of America, by and through its undersigned counsel, and submits its amended response in opposition to Daniel Troya's Amended Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (CV-DE 25) pursuant to this Court's order dated February 17, 2017 and docketed on February 22, 2017 (CV-DE 86).

**ISSUES RAISED BY PETITIONER**

The United States has organized its response by subject area, followed by a citation to the actual issue number used by Troya, referred to herein as Troya or Petitioner,  in his amended petition.  CV-DE 25.[1]  Liberally construed, Troya's claims raise the following issues (numbered in accordance with this amended response):

    I.      Whether Troya's Motion to Vacate was timely filed.

    II.     Whether Troya established that his counsel were constitutionally ineffective under the *Strickland* standard.

        A.   Whether Troya's counsel were ineffective for failing to challenge Counts 7-10 of

[1] Page citations to the Troya Petition reference the ECF page number in the upper margin of the pleading, not the original page number printed at the bottom of each page.

the Third Superseding Indictment on grounds of duplicity and failure to state a crime (Troya Issues VIII & IX), and whether counsel was ineffective for failing to request a manslaughter instruction for these same counts (Troya Issue X);

B. Whether counsel were ineffective for failing to seek a continuance to allow for additional time to investigate in Matamoros, Mexico or to seek a waiver of the death penalty in light of the difficulties in conducting an investigation in Matamoros (Troya Issue XXIV);

C. Whether Troya's counsel were ineffective for failing to challenge the composition of the West Palm Beach grand and petit jury venires in violation of the Fifth, Sixth and Eighth Amendments; (Troya VI)

D. Whether counsel were ineffective for failing to object to the court's comments following counsel's objection to the introduction of the transcript of co-defendant Sanchez's statement (Troya Issue XII(A)(1))

E. Whether counsel were ineffective in their handling of the forensic pathology evidence (Troya Issues XI(A) & XXV(C)(3-7));

F. Whether counsel were ineffective in their handling of the government's toolmark expert witnesses (Troya Issue XI(B));

G. Whether counsel were ineffective in their handling of the government's fingerprint expert witness (Troya Issue XI(C));

H. Whether counsel were ineffective in their handling of government lay witness testimony (Troya Issues XII(B)((2-6, XV & XXII);

I. Whether counsel were ineffective in deciding not to call a cellular telephone expert (Troya Issue XI(D));

J. Whether counsel were ineffective in preparing and investigating the mitigation case (Troya Issue XXVI);

K. Whether counsel were ineffective in calling a defense mitigation witness who asserted his Fifth Amendment Rights during government cross-examination (Troya Issue XII(B)(7));

L. Whether counsel were ineffective for failing object to government cross examination of defense mitigation witnesses concerning Uncle Tito's visit during the summer of 1995 (Troya Issue XII(B)(10));

M. Whether counsel were ineffective for not objecting to hearsay testimony of government witnesses during the penalty phase (Troya Issues XII(intro) & XII(B)(1));

2

N.  Whether counsel were ineffective for failing to object to when the prosecutor asked whether Troya was taught right from wrong (Troya Issue XII(B)(8));

O.  Whether counsel were ineffective for failing to move to strike or move for a mistrial after their objection to a prosecutor's question was sustained (Troya Issue XII(B)(9));

P.  Whether counsel were ineffective in their decision not to put on any mental health evidence in mitigation  (Troya Issue XXV);

Q.  Whether counsel were ineffective in deciding not to call a GIS mapping expert in mitigation (Troya Issue XI(E));

R.  Whether counsel were ineffective in their proffer of the testimony of the prison conditions expert (Troya Issue XII (B)(11));

S.  Whether counsel were ineffective for failing to object to the admission of juvenile conduct in the penalty phase (Troya Issues XIII & XIX);

T.  Whether counsel were ineffective for conceding defendant's involvement in two uncharged shootings during penalty phase closing arguments (Troya Issues XII(B)(14) & XXI);

U.  Whether counsel were ineffective for failing to object to jury instructions concerning non-statutory mitigating factors (Troya Issue XIV);

V.  Whether counsel were ineffective for failing to object to portions of the penalty verdict form and jury instructions which relate to the non-statutory aggravating factor "uncharged acts of violence" (Troya Issue XX); and

W.  Whether counsel were ineffective for failing to object to the prosecutor's comments during guilt and penalty phase closing arguments (Troya Issues XII(A)(2), XII(B)(12) & XII(B)(13)).

III.  Whether Troya has established other constitutional violations that warrant vacatur of his conviction and sentence.

A.  Whether Troya's murder convictions and resulting death sentences were based on an impermissibly vague statute, Title 18, United States Code Section 924(c), in violation of the Fifth, Sixth and Eighth Amendments (Troya Issue VII);

B.  Whether petit jury misconduct deprived Troya of his right to a fair and impartial jury in violation of the Fifth, Sixth, and Eighth Amendments (Troya Issue V);

C.  Whether the United States violated its *Brady* or *Giglio* obligations during the trial

of this matter (Troya Issues XVI, XVII & XVIII); and

    D. Whether Troya's death sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment (Troya Issue XXIII).

IV.     Whether Troya is entitled to relief under the cumulative error doctrine (Troya Issue XXVII).

V.     Whether Troya's claims should be denied without a hearing.


## STATEMENT OF THE CASE

1.     Applicable Course of Proceedings. [2]

On February 14, 2008, a federal grand jury in the Southern District of Florida returned a 16-count third superseding indictment against defendants Daniel Troya and Ricardo Sanchez, Jr., and co-defendants Danny Varela and Liana Lopez. CR-DE 305. All of the defendants were charged with non-capital drug trafficking and firearms offenses, and Troya and Sanchez were additionally charged with capital offenses involving the murders of an entire family, father mother and two little boys, ages 3 and 4. (*Id.*).

Specifically, the grand jury charged Troya and Sanchez with: conspiring to possess with intent to distribute at least 50 grams of crack cocaine and at least five kilograms of cocaine, in violation of 21 U.S.C. § 846 and 841(b)(1)(A) (Count 1); conspiring to carjack a motor vehicle, in violation of 18 U.S.C.§ 371 and 2119(3) (Count Five); carjacking a motor vehicle with the intent to cause serious bodily harm and death, in violation of 18 U.S.C. § 2119(3) and 2 (Count Six); using and carrying a firearm during and in relation to a crime of violence and a drug trafficking crime and causing the death of a person by murder with malice aforethought, in violation of 18

---

[2] Some of the Course of Proceedings and the majority of the Statement of Facts are taken, with certain alternations, from the Response Brief of the United States in *United States v. Daniel Troya, et al.,* Case No. 09-12716-PP, filed in response to Sanchez and Troya's initial appeal explained in greater detail below.

U.S.C. § 924(j)(1), 1111, and (2) (Count Seven (murder of Luis Damian Escobedo); Count Eight (murder of Luis Julian Escobedo); Count Nine (murder of Yessica Guerrero Escobedo); and Count Ten (murder of Jose Luis Escobedo)); possessing with intent to distribute at least 50 grams of crack cocaine and at least 500 grams of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), (B), and 18 U.S.C. § 2 (Count Four (Sanchez only) and Count Thirteen); possessing firearms after previously having been convicted of a felony offense, in violation of 18 U.S.C. § 922(g)(1), 924(a)(2), and 2 (Count Three) (Troya only) and Count Fourteen); and using and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Fifteen).  CR-DE 305.

With respect to Counts Six through Ten of the third superseding indictment, the grand jury made the following special findings, in accordance with 18 U.S.C. § 3591(a)(2)(A)-(D) and 3592(c), as to Troya and Sanchez: (1) both were 18 years of age or older at the time of the charged offenses; (2) both intentionally killed the victims named in the charged offenses; (3) both intentionally inflicted serious bodily injury on the victims named in the charge offenses; (4) both intentionally participated in an act, contemplating that a life would be taken or intending that lethal force would be used, that resulted in the deaths of the victims named in the charged offenses; (5) both intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death and in reckless disregard for human life, that resulted in the deaths of the victims named in the charged offenses; (6) both committed the charged offenses with the expectation of pecuniary gain; (7) both committed the charged offenses after substantial planning and premeditation; and (8) both intentionally killed more than one person in a single criminal episode. CR-DE 305 at 16-21.  In addition, the grand jury specially found that two of the victims, ages three and four, were particularly vulnerable due to their youth. CR-DE 305 at 20.

On February 20, 2008, the government filed notices of intent to seek the death penalty against Troya and Sanchez as to Counts Six through Ten of the third superseding indictment. CR-DE 311, 312.

On January 6, 2009, Troya, Sanchez, and codefendants Varela and Lopez proceeded to a jury trial.  CR-DE 648. [3]   After two months of trial, the jury found all of the defendants guilty of all counts of the third superseding indictment, as charged.  CR-DE 791-93, 796 at 7694-7703.

Between March 16 and 31, 2009, Troya and Sanchez proceeded to the penalty phase of the jury trial.  CR-DE 818, 823-25, 845-48, 855-57.  At the conclusion of the penalty phase, the jury found that a sentence of death should be imposed on both defendants as to Counts Seven and Eight of the third superseding indictment, the counts charging the murders of Luis Damian Escobedo and Luis Julian Escobedo, respectively, and that a sentence of life imprisonment without the possibility of release should be imposed on both defendants as to Counts Six, Nine and Ten.  CR-DE 859, 860; CR-DE 857 at 9813-42.

On May 13, 2009, the district court conducted sentencing hearings.  CR-DE 895, 898-900, 955-56.  At the conclusion of the hearings, the court imposed on both Troya and Sanchez the death sentences pronounced by the jury as to Counts Seven and Eight and the life imprisonment sentences pronounced by the jury as to Counts Six, Nine, and Ten, with the life imprisonment sentences to run consecutively to all other sentences.  CR-DE 899, 900; CR-DE 955:30-34; CR-DE 956 at 16-23.  In addition, the court sentenced both defendants to concurrent terms of life imprisonment as to Counts One and Thirteen and 120 months of imprisonment as to Counts Five and Fourteen and a consecutive term of 60 months of imprisonment as to Count Fifteen.  (*Id.*);

---

[3] The grand jury had charged codefendants Juan C. Gutierrez and Kevin Vetere with non-capital drug trafficking offenses in earlier iterations of the indictment.  CR-DE 30, 113, 170.

6

Troya received a concurrent term of 120 months of imprisonment as to Count Three and Sanchez received a concurrent term of 480 months of imprisonment as to Count Four (*Id.*).  The court sentenced each defendant to a total term of 60 months of supervised release and a special assessment of $1,100 (*Id.*).[4]   Troya and Sanchez filed notices of appeal from the judgments against them.  CR-DE 901, 907.[5]

On October 3, 2013, the Eleventh Circuit affirmed all of the convictions and sentences against both Sanchez and Troya, including the capital counts.  CR-DE 1134.  The Court's mandate was issued on January 3, 2014.  The Supreme Court denied certiorari on May 4, 2015.  CR-DE 1151.

On May 3, 2016, Troya filed the instant motion to vacate under Title 28, United States Code, Section 2255 with sealed entries. CV-DE 1.  The case was assigned to Judge Scola.  Pursuant to Court order, Troya filed a complete, unredacted version of his § 2255 petition on May 31, 2016. CV-DE 25.[6]   On October 18, 2016, prior to expiration of the initial response period set for the United States, Judge Scola issued an order partially dismissing Troya's claims, and denying Troya's Motion to Interview Jurors. CV-DE 40.  In that order, Judge Scola dismissed Troya claims

---

[4] The district court imposed sentences of imprisonment on the codefendants as follows: Vetere, 144 months (CR-DE 301), later reduced to 42 months upon the government's motion (CR-DE 970, 1058-59); Gutierrez, 216 months (CR-DE 936); Lopez, 180 months  (CR-DE 937); Varela, life  (CR-DE 924).

[5] The appeals of Varela and Lopez were consolidated in a separate appeal under case number 09-12802.  On August 16, 2011, the Eleventh Circuit affirmed their convictions and sentences in United States v. Lopez, 649 F.3d 1222 (11th Cir. 2011).

[6] All record citations to the events in Petitioner's criminal case are denoted as "CR-DE #" and reference the docket in Southern District of Florida Case Number 06-80171-CR-Hurley.  All record citations to the events concerning Petitioner's instant motion to vacate, set aside, or correct sentence are denoted as "CV-DE #" and reference the docket in Southern District of Florida Case Number 16-80693-CV-BLOOM.

V, VI VII, XVI, XVII, and XXIII.[7]   The Government responded to the remaining claims on November 14, 2016.  CV-DE 46.  Troya then filed a motion to reassign his case, arguing that the court was biased in favor of the government due to the fact that Judge Scola and former AUSA John Kastrenakes, now Judge Kastrenakes, who was co-counsel for the Government during the investigation and trial of this matter, tried at least one capital case together in the 1980s, when they both worked at the Miami-Dade State Attorney's Office.  CV-DE 64.  Judge Scola recused himself on January 13, 2017, citing an appearance of impropriety.  CV-DE 72.  The case was subsequently assigned to Judge Dimitrouleas (CV-DE 72, 76), who later recused himself due to a long term friendship between himself and an attorney who shares office space with one of the defense attorneys who tried this matter.  CV-DE 75, 79.  The case was then assigned to Judge Bloom on February 8, 2017.  CV-DE 79.   Soon after this final transfer, the Court vacated Judge Scola's Order Dismissing Claims (CV-DE 40) and ordered the Government to file an amended response answering all of Troya's claims on or before April 3, 2017.  CV-DE 86.  This response follows.

2.      Facts Underlying Troya's Conviction and Sentence.

     a.  The Government's Case-In-Chief at Trial

### The Murders

On October 13, 2006, at 2:24 a.m., a couple who lived next to the Florida Turnpike, near mile marker 149 (Fort Pierce, Florida), were awakened by a series of "popping" noises that sounded like gunshots. CR-DE 728 at 3099-3103, 3129-30, 3221-26.  Several hours later, an individual driving down the turnpike in the same area saw what he thought was a family sleeping

---

[7] The Court's Order Dismissing Claims (CV-DE 40), denominated Troya's claims in a different numbering sequence than that used by Troya in CV-DE 25. To avoid confusion of issues, the United States will cite to the original issue number used in Troya's amended motion to vacate (CV-DE 25) and the respective ECF page number, as applicable.

on the side of the road.  CR-DE 728 at 3112-27.  Seeing no vehicle in the area, he pulled over to offer the family a ride.  *Id.*  When he approached the individuals, about 25 feet off the road, he saw that they had been shot.  *Id.*  At first, he thought that there were three individuals, including what looked like a mother holding a child.  *Id.*  Then, he noticed a fourth individual, a small boy, who appeared to have been "hiding under his mother's legs".  *Id.*  He called 911.  *Id.*

The murder victims were the Escobedo family: Jose ("Lou") Escobedo, age 28; his wife, Yessica Escobedo, age 25; and their two children, Luis Julian Escobedo, age 4, and Luis Damian Escobedo, age 3.  CR-DE 728 at 3207-08; CR-DE 729 at 3366-3466.  Each had died from multiple, close-range gunshots to the head and body.  *Id.*  Three of the Escobedos had died instantly from fatal wounds to the head; however, the youngest Escobedo, Damian, had suffered before dying.  *Id.* [8]

## **Background**

In 2003, codefendant Danny Varela, also known as "D.V.," was selling marijuana, and by 2005, he had become a successful cocaine trafficker in Palm Beach County, Florida.  CR-DE 751 at 4739; CR-DE 752 at 4990-99.  Varela normally delivered kilogram quantities of cocaine to customers on a weekly basis.  *See e.g.,* CR-DE 752 at 5005.  Frequently, Valera's cousin, Ricardo Sanchez, Jr., also known as "Rick," delivered the cocaine for Varela.  CR-DE 752 at 4993-5001, 5133-34.  On some occasions, Varela's girlfriend, Liana Lopez, also known as "Negra," delivered the cocaine on Varela's behalf.  CR-DE 738 at 4535-36; CR-DE 752 at 4998-5001.  Among Varela's other associates were Daniel Troya, also known as "Homer," whom Varela had met in

---

[8] As set forth below, the evidence established that Troya and Sanchez murdered the Escobedos. The government argued that their motive for the murders included erasing a drug debt owed to Lou Escobedo and robbing him of 15 kilograms of cocaine.  CR-DE 754 at 5507-10; CR-DE 766 at 7086-7182.

jail. CR-DE 758 at 6418, codefendant Juan Gutierrez, also known as "Flaco," and codefendant Kevin Vetere. CR-DE 752 at 5128-40.

In early 2006, Jose Luis Escobedo, also known as "Lou," lived in Brownsville, Texas, where he was involved in transporting drugs from Texas and Mexico to Florida. CR-DE 752 at 4972-76; CR-DE 753 at 5711. Escobedo lived in a house that he rented from Bonito Rodriguez, who lived in Palm Beach County, Florida. *Id.* Rodriguez was the uncle of both Varela and Sanchez. *Id.*

In the summer of 2006, Rodriguez, who traveled frequently between Florida and Texas, took his nephew, Varela, to Brownsville and introduced Varela to Escobedo. CR-DE 752 at 4974-76. Shortly thereafter, Escobedo moved to Greenacres, in Palm Beach County, Florida, with his wife, Yessica, and their two children, Luis Julian and Luis Damian. CR-DE 729 at 3468-74; CR-DE 738 at 4526-27. At that time, Escobedo drove a black Jeep Cherokee. CR-DE 729 at 3475.

After he had moved to Palm Beach County, Escobedo visited Rodriguez often (CR-DE 752 at 4976, 4985), and Escobedo became friends with Varela and Sanchez. CR-DE 752 at 4985-86. Escobedo and Varela were seen together often. CR-DE 730 at 3664-65; CR-DE 732 at 3969-72; CR-DE 738 at 4528-29, 6415-20. Escobedo was one of Varela's sources for cocaine. CR-DE 754 at 5492-97.

## The Drug Life

During the summer of 2006, Varela and his associates, including Escobedo, partied late into the early morning hours at strip clubs four or five nights a week. CR-DE 752 at 5128-38, 5142-43. At the clubs, Lopez distributed cocaine to the strippers. CR-DE 752 at 5139-40. When she ran out of cocaine, Varela instructed her to "go to the house" and get more. *Id.* The house, on

10

Purdy Lane in West Palm Beach, Florida, was a townhouse that the defendants referred to as "Pimp Plaza". CR-DE 752 at 5002, 5140-41, 5194-95; CR-DE 753 at 5570-71.

That summer, Escobedo's cousin, Crystal Salazar, visited him in Palm Beach County. CR-DE 738 at 4525-30. During Salazar's visit, Escobedo took his cousin and his wife and kids to Pimp Plaza. CR-DE 738 at 4530-31. There, Salazar observed that the Escobedo children were familiar with the house and knew their way around it. CR-DE 738 at 4531-36, 4545. Salazar met Sanchez and Lopez there, and Salazar observed Sanchez counting large stacks of money in the downstairs portion of the residence, which caused her to take the children upstairs. CR-DE 738 at 4537-38. Salazar quickly returned downstairs with the children after she observed a large number of firearms on a bed upstairs. CR-DE 738 at 4538-45. Sanchez told her that "they" had more guns in a closet in another room. CR-DE 738 at 4539.

On one occasion, a vehicle with a Miami Hurricanes license plate drove past Pimp Plaza and appeared to be casing the residence for a possible robbery. CR-DE 753 at 5624-28. Troya and Sanchez armed themselves with assault rifles from "Pimp Plaza". *Id.* Troya, carrying an AK-47, and Sanchez, carrying a smaller assault rifle, chased after the vehicle, which sped away. Id.

Sometime after the casing incident, Lopez and Escobedo were robbed at Pimp Plaza by home invaders. CR-DE 752 at 5140-42. During the robbery, Escobedo was pistol-whipped, and one of the robbers held a gun to his head until Lopez disclosed the location of cocaine. CR-DE 753 at 5569-70, 5590-95; CR-DE 756 at 5960-61. The robbers stole a kilogram of cocaine, $80,000 to $100,000 of cash, and guns (*Id.*).

Shortly after the robbery, in about August of 2006, Varela and his codefendants B Sanchez, Troya, Lopez, Gutierrez, and Vetere B moved to 6458 Garden Court, West Palm Beach, Florida, a house in a gated community. CR-DE 737 at 4297-4306; CR-DE 752 at 5143-44, 5157-66. The

11

defendants referred to their new residence as "Thug Mansion". CR-DE 753 at 5571. Varela instructed Troya not to tell Escobedo the address of "Thug Mansion", and Troya related that instruction to the others. CR-DE 752 at 5145.

The defendants were not legitimately employed; their income came from drug dealing, and they used "Thug Mansion" as their base of operations for distributing drugs, primarily cocaine, crack cocaine, and Ecstasy. CR-DE 752 at 5145-72; CR-DE 753 at 5558-79, 5624; CR-DE 754 at 5429-44. "Thug Mansion" was also used to cook crack cocaine and to package drugs for distribution. *Id.* The defendants kept firearms openly in every room of the residence for easy accessibility in order to thwart any future robbery attempts. *Id.*

Besides the threat from potential robbers, the police presented an obstacle to the defendants' drug distribution activities. On May 10, 2006, a Greenacres Police Department officer stopped Lopez in a white Cadillac and seized two kilograms of cocaine and $14,000 of cash from her; Varela's fingerprints were later lifted from the packages of cocaine. CR-DE 751 at 4886-4906, 4921-34. On June 10, 2006, a Palm Beach County Sheriff's deputy stopped Varela and Troya in a Chevy Lumina. CR-DE 754 at 5312-41. From Varela, the deputy seized $1,364 of cash; from the Lumina, the deputy seized marijuana and two pistols, a nine-millimeter and a .40 caliber, from a hidden compartment in the vehicle. *Id.* On July 10, 2006, a Palm Beach County Sheriff's Office deputy attempted to stop Sanchez in a white Ford Taurus, which had a stolen temporary tag. CR-DE 752 at 5071-5121. Sanchez sped away, crashed the Taurus into a tree, and then fled on foot, carrying a shoebox, which he dropped. *Id.* Sanchez was apprehended, and almost one kilogram of cocaine was seized from the shoebox that he had dropped. *Id.*

On September 11, 2006, Sanchez, Troya, and other defendants spotted the vehicle, with the Miami Hurricanes license tag, that they believed previously had cased "Pimp Plaza". The

12

vehicle, a gold GM Park Avenue, was parked at Sugar Daddy's Strip Club in Palm Beach County. CR-DE 753 at 5628-38. The defendants went to "Thug Mansion" to discuss a plan of action. *Id.* Troya dressed himself in black clothes, donned a wig, and announced that he was going to approach the vehicle and shoot whomever was sitting in the driver's seat. *Id.* When the defendants returned to the strip club, however, it was raining, so they decided instead to follow the vehicle, "shoot the car up," then drop the shooter off at a prearranged location. CR-DE 753 at 5638-39.

The Park Avenue car left the strip club at about 3:00 a.m. CR-DE 753 at 5639. Driving a Toyota Camry, Sanchez followed the Park Avenue car, with Troya in the passenger seat, armed with a nine-millimeter pistol. CR-DE 753 at 5640-42. After following the Park Avenue car for some time, Sanchez pulled next to the vehicle, and Troya leaned out of the Camry's window and fired at least 11 shots at the vehicle, causing it to swerve off the road; Sanchez sped away after the shooting, which occurred on Haverhill Road, between Summit Boulevard and Forest Hill Boulevard. CR-DE 753 at 5642-46; CR-DE 757 at 6190-6207. The Park Avenue car returned to the strip club, where law enforcement officers observed that one of the occupants of the vehicle, a woman, was bleeding profusely from a gunshot wound to her thigh. CR-DE 758 at 6394-99.

Sanchez and Troya were no strangers to violent acts involving firearms. On April 28, 2006, Troya had used an AK-47 assault rifle to "shoot up" a house at 1901 Mercer Avenue, West Palm Beach. CR-DE 753 at 5668-71; CR-DE 757 at 6162-89. Troya believed that someone who had "snitched" on him was present in the house. *Id.* Troya fired at least 12 rounds into the house, in which a woman and her two children were present. *Id.* Fortunately, the rounds struck no one in the house. *Id.* On the same day, Sanchez had used the same AK-47 to fire into a house at 1305 Suwanee Drive, West Palm Beach. CR-DE 753 at 5671-73; CR-DE 757 at 6208-94; CR-DE 758 at 6391-92. Sanchez believed that someone who had intended to rob him was present in the house.

*Id.* A male who was present in the house was struck in the right leg by one of the rounds from the AK-47 that Sanchez fired into the house. *Id.*

In early October of 2006, Sanchez, Troya, and some of the other defendants planned to obtain cocaine by stealing it, rather than by purchasing it, from someone whom Varela believed was a drug dealer. CR-DE 753 at 5653-56. In connection with the planned theft, they went to a military surplus store and purchased ski masks, gloves, and handcuffs. *Id.* Thereafter, they drove to the victim's residence, where Sanchez, carrying a crowbar, and Troya, armed with a nine-millimeter pistol, tried to enter the back door of the residence. CR-DE 753 at 5661-66. When someone inside the house began yelling, "I am going to call the police!", Sanchez and Troya ran back to their vehicle, and the defendants sped away. *Id.*

### The Murder Investigation

The first law enforcement officer on the murder scene was a trooper with the Florida Highway Patrol; he "secured" the crime scene until members of the St. Lucie County Sheriff's Office arrived. CR-DE 728 at 3128-36. Thereafter, a crime scene investigator recovered a total of 13 bullet casings and projectiles from the scene; the 13 items had come from two different firearms B a .40-caliber firearm and a nine-millimeter firearm. CR-DE 728 at 3137-3215.

Later that day (October 13, 2006), law enforcement officers went to the Escobedo residence. CR-DE 730 at 3748-60; CR-DE 731 at 3817-25, 3853-88; CR-DE 737 at 4367. There, they observed that a rear sliding glass door was open, that the door to the attic was open, and that the residence appeared to have been ransacked. *Id.* Inside the residence, the officers found drug packaging materials and traces of cocaine, a red suitcase labeled "Embark," and numerous documents. *Id.* Among the documents was a drug ledger, in Lou Escobedo's handwriting, that contained a number of names, initials, and notations. CR-DE 731 at 3871-75; CR-DE 758 at 6449-

14

79. The drug ledger contained several references to "D.V.," "Rick," and "Negra," adjacent to amounts such as "12 minus 3" and "12 2 minus 1" and notations such as "3 Negra first trip" and "1 Rick second trip" [9]. *Id.*   Among the documents were also two booking photographs, one for Liana Lopez ("Negra") pertaining to a narcotics offense, and the other for Ricardo Sanchez, Jr. ("Rick"), pertaining to traffic offenses[10]. CR-DE 731 at 3858-61, 3912.   In addition, the officers found a certificate of title for Lou Escobedo's black Jeep Cherokee[11].  CR-DE 731 at 3883-86, 3891-92.

Based on the Escobedo link to the black Jeep Cherokee, law enforcement officers began looking for that vehicle.  CR-DE 728 at 3226-29.  From the Florida Department of Transportation, which had installed cameras at every tollbooth on the Florida Turnpike, Detective John Parow obtained videotapes of the vehicles that had entered and exited the turnpike around the time of the murders. *Id.*

After hours of studying the videotapes, Det. Parow observed that a black Jeep Cherokee had entered the turnpike at the Fort Pierce toll plaza (mile marker 152), approximately three miles from the murder scene, at 2:18 a.m., on October 13, 2006.  CR-DE 728 at 3230-31. A few seconds later, a large van with scratches on its roof had followed directly behind the Jeep Cherokee onto the turnpike.  CR-DE 728 at 3232-38; CR-DE 729 at 3332-45.  The Jeep Cherokee had been issued

---

[9] An expert witness in narcotics trafficking opined that the notations involving "Negra" and "Rick" referred to a drug debt that they owed to their supplier.  CR-DE 758 at 6474-77.

[10] Lopez later told a friend that Lou Escobedo had shown the booking photos to "people in Mexico" to prove that Lopez and Sanchez had been arrested and that cocaine had been seized by the police. CR-DE 752 at 5187.

[11] The black Jeep Cherokee was registered to the wife of Eric Wiksten, who had sold the vehicle to Sanchez for cash.  CR-DE 754 at 5297-5305.

toll ticket number 5160 (GX 7)[12] ; the van had been issued toll ticket number 5161 (GX 8).  CR-DE 729 at 3287-3325.  At 3:02 a.m., both vehicles had exited the turnpike at the Okeechobee toll plaza in West Palm Beach.  *Id.*  The drivers of both vehicles had presented toll tickets and paid the required tolls; the driver of the van, however, had opened the vehicle's door to pay the toll rather than simply paying through the window.  CR-DE 729 at 3342-44.  Det. Parow obtained the toll tickets from both vehicles and law enforcement officers began looking for the van with the scratches on its roof in addition to the black Jeep Cherokee.  CR-DE 729 at 3337-40.

The van with the scratches on its roof was a maroon Dodge van, which Varela had purchased for cash on June 23, 2006, and had arranged to be registered to a straw owner.  CR-DE 731 at 3840-44; CR-DE 732 at 3857, 3941-56.  Kevin Vetere had ridden in the van on numerous occasions with Troya, Sanchez, and Varela when they distributed narcotics.  CR-DE 754 at 5421-44, 5457.

In the late afternoon of October 12, 2006, before the murders, Vetere had seen Troya and Sanchez leaving "Thug Mansion" in the Dodge van, and he had attempted to ride with them.  CR-DE 754 at 5444-47; CR-DE 756 at 5944-46.  Troya had told Vetere that he could not accompany them on that occasion.  *Id.*  Because that was the first time that Vetere had ever been told he could not ride in the van, he had asked Troya to check with Varela; Troya had called Varela, who had instructed Vetere to stay at "Thug Mansion".  *Id.*

Vetere did not see Troya and Sanchez again until the next day.  CR-DE 754 at 5447-48.  In the early morning hours of October 13, 2006, after 3:00 a.m., Vetere saw Troya and Sanchez, accompanied by Varela and Gutierrez, enter "Thug Mansion"; each was carrying a zippered sports

---

[12] References to "GX" refer to original trial exhibits introduced by the United States during the guilt and penalty phases.

16

bag with a handle, similar to the bags that they used for carrying kilograms of cocaine. CR-DE 754 at 5449-52, 5463; CR-DE 753 at 5697-98. Shortly thereafter, Vetere received a call from a stripper who wanted him to bring her marijuana, so Vetere retrieved the keys to the van from Sanchez's room and drove to the stripper's residence, about 10 minutes from "Thug Mansion". CR-DE 754 at 5453-58.

Not long after Vetere had reached the stripper's residence, Troya called him and told him to return to "Thug Mansion" because Varela was angry that he had taken the van. CR-DE 754 at 5458). Vetere complied; however, *en route* to "Thug Mansion", Varela called Vetere and instructed him to take the van to the home of Varela's uncle and park it. CR-DE 754 at 5459. Vetere did so, and while he was at the home of Varela's uncle, Vetere saw Lou Escobedo's black Jeep Cherokee parked behind the house. CR-DE 754 at 5460-64.

About 10 minutes after Vetere had parked the van at the home of Varela's uncle, Varela, Gutierrez, Troya, and Sanchez arrived there in a white Taurus. CR-DE 754 at 5465. Varela instructed Vetere to drive the Jeep Cherokee to the home of his (Vetere's) grandmother and park it. CR-DE 754 at 5466-71. Vetere complied, and a few minutes later, Gutierrez arrived in the van and picked Vetere up from his grandmother's house. *Id.* Gutierrez drove to a Denny's restaurant, where they met Varela, Troya, and Sanchez. CR-DE 754 at 5471-72. They all ate breakfast together as the sun came up. *Id.* [13]

Before the day was over on October 13, 2006, television and radio stations were airing news of the murders. CR-DE 729 at 3488. The same day, Troya purchased a convertible Chevrolet Impala, which he said he had bought with "a brick," meaning a kilogram of cocaine. CR-DE 729

---

[13] After October 13, 2006, Varela told his associates that the van was "hot" and instructed them not to drive it anymore and to leave it parked at his uncle's house. CR-DE 752 at 5175-77.

at 3490-92; CR-DE 756 5476-79.  Within a day or two of the murders, Troya told a friend that he had "licked somebody," meaning robbed someone, of 15 kilograms of cocaine.  CR-DE 729 at 3489-90.  At the same time, Vetere observed that Sanchez had a large amount of money and was bragging that he was going to buy a $5,000 "Cuban link" gold necklace.  CR-DE 753 at 5651-53.  When Vetere asked Sanchez about the money, Sanchez replied, "You going to knock off the next big timer" (*Id.*), which Vetere believed to be a reference to shooting someone.  CR-DE 756 at 5937-38.  Shortly thereafter, Sanchez purchased a gold necklace for about $2,500.  CR-DE 758 at 6573-75.

On October 14, 2006, Vetere learned of the murders from the Palm Beach Post newspaper, which carried a picture of Lou Escobedo.  CR-DE 754 at 5486.  Vetere immediately asked Troya if he had moved Escobedo's Jeep Cherokee from the home of Vetere's grandmother.  CR-DE 754 at 5487-88.  Troya replied that he had moved the vehicle.  *Id.*

On October 16, 2006, law enforcement officers found Escobedo's Jeep Cherokee parked in an industrial area of West Palm Beach.  CR-DE 731 at 3888-99.  The license tag had been removed from the vehicle, and on the ground near the vehicle were a book of matches and a five-gallon can full of gasoline.  *Id.*

When Vetere learned that the Jeep Cherokee had been found, he discussed the event with Troya.  CR-DE 754 at 5488-89, 5521-25.  Troya said that he had intended to burn the vehicle but that the police had "found it too quick".  *Id.*  Vetere expressed his concern that the police might recover fingerprints from the vehicle.  *Id.*  Troya said that he had "wiped the Jeep down real good" *Id.*  Vetere also asked Troya if he had been aware that the Florida Turnpike was equipped with video cameras.  *Id.*  Troya replied that he had driven the van and that when he paid the toll, he kept the window up, opened the door to pay with his outstretched arm, and had not waited to receive

18

his change from the tollbooth attendant.  *Id.*

Sometime later, Vetere was with Varela, Troya, and Sanchez when Sanchez received a telephone call from his father.  CR-DE 754 at 5531-35.  Sanchez's father asked, "Didn't you sell that [Jeep Cherokee] to Lou?"  *Id.*   Something about the way that his father asked the question made Sanchez believe that the police had questioned his father.  *Id.*  When Sanchez related the incident to the others, Vetere said, "The heat is on," and Varela said that it was "time to clean the house".  *Id.*  Thereafter, Vetere, Lopez, Troya, and Sanchez tried to rid "Thug Mansion" of as much drug paraphernalia and ammunition as they could.  CR-DE 754 at 5535-41; CR-DE 753 at 5558-79.

Besides arranging to destroy evidence at "Thug Mansion", Varela also arranged for a friend of his, the owner of a body shop ("Down South Customs"), to repaint the maroon Dodge van.  CR-DE 730 at 3660-75.  Gutierrez drove the van to the body shop and told the owner that Varela wanted the scratches on the roof of the van repaired and the van to be painted green.  *Id.*   The owner began to work on the van, but then he saw a television news report that law enforcement officers were looking for the van, so he called the police, who came and seized the van on October 17, 2006.  CR-DE 730 at 3675-77; CR-DE 731 at 3848-50.

Law enforcement officers searched the van.  CR-DE 731 at 3825-46.  From it, they seized a suitcase labeled "Embark".  *Id.*   The suitcase contained some toys and a hotel receipt.  *Id.*   The receipt was in the name of Yessica Escobedo and showed payment for a one-night stay, beginning on October 11, 2006, at a La Quinta Inn in Fort Meyers, Florida.  *Id.*

On October 25, 2006, after having obtained a warrant, law enforcement officers searched "Thug Mansion". CR-DE 730 at 3624-46; CR-DE 731 at 3902-11, 3918-24; CR-DE 732 at 3996-4164; CR-DE 737 at 4332-65; CR-DE 754 at 5382-86.  Present during the search were Troya,

19

Sanchez, Varela, Gutierrez, and Lopez, all of whom were arrested. *Id.* Despite the earlier efforts of the defendants to "clean house," the officers seized a drug ledger, bags containing cocaine and crack cocaine, drug paraphernalia, ski masks, gloves and wigs, handcuffs, body armor, a police scanner, a number of firearms, including an AK-47 assault rifle, ammunition, and ammunition clips. *Id.* The officers seized two cell phones and $3,327 of cash from Sanchez, and they seized two cell phones and $593 of cash from Troya. *Id.* They also seized a cell phone from Varela's automobile. *Id.*

The law enforcement officers advised Sanchez of his constitutional rights and questioned him. CR-DE 730 at 3626-46. When he was asked whether he had any knowledge of a black Jeep Cherokee, Sanchez said that he previously had sold that vehicle to Lou Escobedo. *Id.* When he was asked whether he had any knowledge of "a maroon van that [Varela] drove," Sanchez answered only that he did not "hang out" with people like Varela. *Id.*

### Corroborating Evidence

The government's forensic examination of the toll tickets established that Sanchez's fingerprints were on toll ticket number 5160 (GX7). CR-DE 730 at 3712-41. That ticket had been issued to Escobedo's black Jeep Cherokee when it entered the Florida Turnpike and had been returned to the tollbooth attendant when that vehicle exited the turnpike. In addition, Troya's fingerprints were on toll ticket number 5161 (GX8) (*Id.*), the ticket that had been issued to the maroon Dodge van when it entered the turnpike and that had been returned to the attendant when the vehicle exited the turnpike.

The government examined the pattern of activity that occurred on the cell phones that had been seized from Troya, Sanchez, and Varela. CR-DE 764 at 6703-6824. [14] Between 5:41 p.m.

---

[14] Sanchez and Varela used cell phones with numbers that were subscribed to by others; Troya used

20

on October 12, 2006, and the time of the murders (2:24 a.m. on October 13, 2006), there were no calls between Troya's cell phone and Sanchez's cell phone, but there were numerous calls between Sanchez's cell phone and Escobedo's cell phone.  CR-DE 764 at 6751-94.  During that period of nearly nine hours, those phone calls occurred along a northerly route from Lake Worth, Florida, to Daytona Beach, Florida, and then along a southerly route from Daytona Beach, Florida, to Fort Pierce, Florida. *Id.*[15]    After the murders, telephone activity commenced between Troya's cell phone and Sanchez's cell phone and between Troya and Sanchez's cell phones and Varela's cell phone.  CR-DE 764 at 6792-6811. [16]

Although the murder weapons were never recovered.  CR-DE 738 at 4511; CR-DE 767 at 7448), the government conducted a forensic examination of the projectiles and projectile casings that had been recovered from the scene of the Escobedo murders as well as the ammunition that had been seized from "Thug Mansion"  CR-DE 764 at 6599-6660).  Six of the seven .40-caliber projectile casings that had been recovered from the murder scene had "tool marks" on them, that is, "striated markings" on the sides of the casings  CR-DE 764 at 6643-44.  Those tool marks were similar to tool marks on the casing of one of the live rounds of .40-caliber ammunition seized from "Thug Mansion". *Id.*  All of the tool marks were consistent with marks that would have been left on the projectile casings by the lip of a magazine, leading the government's forensic expert to

---

a cell phone with a number in someone else's name as well as a cell phone with a number in his own name. CR-DE 756 at 5990-6053; CR-DE 758:6421-27, 6434-45, 6503-36, 6559-72.

[15] As set forth above, Troya and Sanchez had left "Thug Mansion" together in the maroon Dodge van in the late afternoon of October 12, 2006.  At about 9:00 p.m. that night, a police officer had seen the van heading north on I-95, about 15 miles from Daytona, Florida, and he had reported the license tag as a matter of routine road patrol.  CR-DE 758 at 6405-13.

[16] After the murders, as set forth above, Troya had said that he exited the turnpike in the van, so, according to the government's theory of the evidence, Sanchez exited the turnpike in Escobedo's black Jeep Cherokee.  CR-DE 766 at 7146-49.

21

opine that the live .40-caliber round seized from "Thug Mansion" and six of the seven .40-caliber casings recovered from the murder scene had come into contact with the same magazine   CR-DE 764 at 6645-50.

In addition, three of the four nine-millimeter casings that had been recovered from the murder scene had tool marks on them.  CR-DE 764 at 6654.  Those tool marks were similar to tool marks on the casings of two of the live rounds of nine-millimeter ammunition seized from "Thug Mansion".  CR-DE 764 at 6650-54.  All of those tool marks were consistent with marks that would have been left on the projectile casings by the lip of a magazine, leading the expert to opine that the two live rounds of nine-millimeter ammunition seized from "Thug Mansion" and three of the four nine-millimeter casings recovered from the murder scene had come into contact with the same magazine[17].  CR-DE 764 at 6657-60.

In the summer of 2007, while Troya was awaiting trial in the Federal Detention Center in Miami, Florida, he visited a friend of his, Byron Hambrick, who was also in custody.  CR-DE 737 at 4404-20.  Hambrick's cellmate, Carlos Rodriguez, overheard Troya tell Hambrick that he (Troya) had done something "very wrong," that he had "killed some people," and that there had been "children involved". *Id.*  Hambrick asked Troya why he had done it, and Troya replied that it was something that he had to do[18]. *Id.*

---

[17] The government's forensic tool mark testimony was presented by Mark Chapman, a firearms examiner for the Indian River Crime Laboratory in Fort Pierce, Florida.  CR-DE 764 at 6600. Chapman was a member of the Association of Firearms and Tool Mark Examiners (AAFTE).  CR-DE 764 at 6633.

[18] The government's theory of the case was that Lou Escobedo had supplied Varela with cocaine, some of which had been seized by police officers from Sanchez and Lopez and some of which had been stolen from Pimp Plaza, thereby creating a debt that Varela owed to Escobedo.  CR-DE 754 at 5507-10; CR-DE 766 at 7086-7182.  According to the government's theory, that debt was eliminated when Sanchez and Troya murdered Escobedo, after which they also robbed him of 15 kilograms of cocaine. *Id.*

b.  The Defense Case at Trial

Troya did not testify in his defense, and he did not present any evidence or witnesses on his own behalf.  CR-DE 765 at 6985.  In closing argument, his attorney argued that the government had not proved beyond a reasonable doubt that he had participated in the Escobedo murders and that anyone who had implicated him in those murders had lied.  CR-DE 766 at 7218-58; CR-DE 767 at 7268-85.

c.  The Penalty Phase of the Trial

(1) The Government's Case

Barry Glover, a senior prison inspector for the Florida Department of Corrections' Inspector General's Office, testified that in 2002, Troya had escaped from the highest security level of the Brevard Correctional Institute.  CR-DE 818 at 7980-95. At that time, Troya, who had been convicted as a youthful offender for felony battery, grand theft auto, and burglary, used a "screw jack" to pry open the window of his cell and left behind in his bunk a mannequin that had been fabricated from toilet paper, library books, bed sheets, and other materials. *Id.*

Officer Richard Birch, of the West Palm Beach Police Department, testified that on May 31, 2000, he had responded to a residence after a report of an injury. CR-DE 818 at 8020-28).
There, he met Carol Pawolski, who had been punched and slapped in the face by Troya.  *Id.*  She was taken to a hospital where she was treated for multiple broken bones in her face and nerve damage.  *Id.*  Troya later pleaded guilty to assaulting Pawolski.  *Id.*

Yuslena Jarrett testified that in July 2006, she saw Troya assault her friend, Inessa De Olivera.  CR-DE 818 at 8040-68. At that time, De Olivera was attempting to remove her personal belongings from the residence that she shared with Troya.  *Id.*  Troya pointed a gun at De Olivera, grabbed her by the neck, hit her on the neck with the gun, and knocked her to the ground.  *Id.*

23

Rita Flores testified that she was Lou Escobedo's sister. CR-DE 823 at 8100-10. She said that he had enjoyed hunting, fishing, and family gatherings. *Id.* She said that her two nephews, Luis Julian and Luis Damian, had enjoyed watching television and playing outside and that the younger boy, Luis Damian, had been very protective of his older brother. *Id.*

Sara Guerrero, Yessica Escobedo's mother, testified that of her three children, Yessica had been "the favorite child". CR-DE 823 at 8111-19. Guerrero said that Yessica had been a good sister, a good daughter, an intelligent student, an athlete, and a good mother. *Id.* She said that Yessica's children had loved her very much and could not bear to be apart from her. *Id.* She said that Yessica had been "everything" to her, that Yessica's murder had "destroyed the whole family," and that Yessica's murder had caused Guerrero's husband to "los[e] his mind" . *Id.*

Felipe Guerrero, Yessica's brother, testified that Yessica had been his "best friend" and that he had been very close to Luis Julian and Luis Damian. CR-DE 823 at 8122-31. He said that the two boys had loved to go fishing with their father and that the two boys had been very close to their mother. *Id.*

Monica Moreno, Guerrero's sister and Yessica's aunt, testified that Yessica had been humble, soft-spoken, polite, and helpful. CR-DE 823 at 8131-45. She said that Yessica had been "a great friend" and "a good listener" and that Yessica's murder had left a "hole" in her heart. *Id.*

(2) Troya's Case

Busch testified that Carol Pawolski was his mother and that Troya had been his childhood friend. CR-DE 825 at 8695-8711. He said that Pawolski was a "raging alcoholic," that she had attacked Troya on May 31, 2000, that Troya had not hit her, and that she had tripped and fallen on her face. *Id.*

On cross-examination, Busch conceded that Troya had admitted under oath that he had

24

struck Pawolski with his fist, had knocked her to the ground, had hit her again while she was on the ground, and had broken multiple bones in her face and caused her permanent nerve damage. CR-DE 825 at 8733-50.

Maria Troya, Troya's mother, testified that he was one of her three sons, that his childhood had been "happy and uneventful," and that he had been an "average" student. CR-DE 825 at 8771-8840; CR-DE 845 at 8894-8914. She said that around the age of eight years old, he had worked as a volunteer at a geriatric center. *Id.* She said that in 1995, when Troya was 12, her brother, Isidro, who was in his teens and had been involved in gang activity in Chicago, came to live with them; she suggested that Isidro had been a bad influence on Troya. *Id.* She said that in 1997, a friend of Troya's had been fatally shot at school and that the incident had changed Troya – he became "distant," his grades fell, and he began having behavioral problems at school. *Id.* She said that a few months later, their next-door neighbor's daughter committed suicide, and Troya became even more "withdrawn". *Id.*

Lorenzo Troya, Troya's father, testified that he had tried to provide the best possible environment for his family and that Troya had never been physically abused. CR-DE 845 at 8937-90. He said that the school shooting and the neighbor's suicide had changed Troya's life. *Id.* Some of Troya's other family members also testified that those events had changed Troya. CR-DE 845 at 8991-9022.

Victor Sepulveda testified that he had worked at the geriatric center at which Troya had volunteered. CR-DE 845 at 9023-33. He said that Troya had been a good worker and had a good attitude. *Id.*

Mercedes Fontineux, testified that she was Troya's aunt and Isidro's sister. CR-DE 845 at 9034-51. She said that Isidro had been involved in gang violence in Chicago, that he was

25

"problematic" in terms of his effect on the family, and that he had lived with the Troyas during the summer of 1995; she suggested that Isidro had been a bad influence on Troya. *Id.*

Juan Quinones, Troya's uncle, West Palm Beach Police Sergeant Gregory Key, and court reporter Judith Consor all corroborated the school shooting incident. CR-DE 845 at 9052-9105.

(3)     The Government's Rebuttal Case

FBI Special Agent John MacVeigh testified that he had reviewed probation and other records, which established that Isidro Torres – the brother of Maria Troya and Mercedes Fontineux – was not in Florida during the summer of 1995. CR-DE 846 at 9181- 94.

Officer Birch, who had responded to the scene of Troya's assault on Carol Pawolski, testified that he had interviewed Aimee Viola, who witnessed the assault. CR-DE 846 at 9218-24. Officer Birch said that Viola had stated that Troya knocked Pawolski to the ground with his closed fist and that he continued to hit her while she was on the ground and apparently unconscious. *Id.* Officer Birch also said that Viola had stated that Carl Busch was not present during the incident, and Officer Birch testified that Busch had not come forward as a witness at the time of the incident. *Id.* Officer Birch also testified that on November 7, 1995, Troya had pushed a desk against Cynthia Abraham, an 11- or 12-year-old schoolmate, causing her to fall down. CR-DE 846 at 9231-47.

Abraham had gotten up and had said, "That didn't hurt"; thereafter, Troya, who was 12 years old at the time, had punched her in the head with his closed fist, causing an abrasion on her head. *Id.* Because of that assault, Troya had been suspended from school. *Id.*

d. The Sentencing Hearings

At Troya's sentencing hearing, the district court advised the parties that it had two obligations: (1) the "ministerial task" of imposing the sentences previously determined by the jury as to certain counts; and (2) the obligation to weigh the statutory sentencing factors under 18

26

U.S.C. § 3553(a) in determining an appropriate sentence for those counts of conviction that were not the subject of the jury's determination.  CR-DE 955 at 21.

With respect to the § 3553(a) factor regarding the nature and circumstances of the offense, the district court found that the offense was "the most brutal and most extreme".  CR-DE 955 at 27. In this regard, the court observed that Troya, despite having grown up "with a wonderful family, [who] loved him very much," had joined a group of men and women "who were almost in a sense living the movie ["]Scarface["] fantasy, extraordinary violence, huge amount of drugs, dissolute lives, simply incredibly violent".  CR-DE 955 at 22-23. The court stated that the evidence was "overwhelming" that Troya and Sanchez had made a decision to steal drugs from Escobedo and "in the course of that to slaughter the Escobedo family," including "two beautiful children". CR-DE 955 at 26-27.  The court described the murders as "appalling" and as "a Chicago gangland type of slaying," with "multiple bullets, a mother writhing, contorting, trying to save her children, and the children executed in the most brutal fashion, shots to the head, horrible".  CR-DE 955 at 27.

With respect to the § 3553(a) factor concerning the history and characteristics of the defendant, the district court found that Troya was "someone who simply was willing to take human life, who was willing to use brutal force if necessary to safeguard his activities in the drug business".  CR-DE 955 at 28-29. In addition, the court found that he was "an enormously dangerous person who has no regard, no concern whatsoever with the taking of human life". CR-DE 955 at 26.

At the conclusion of Troya's sentencing hearing, the district court imposed the sentences as set forth above.  CR-DE 956 at 16-23.

3.  Troya's Direct Appeal.

27

Troya filed a direct appeal that raised a multitude of issues: (1) the trial judge wrongly allowed cooperator testimony accusing Troya of several other serious gun crimes involving innocent victims and the government improperly urged jurors to consider it as propensity evidence that he was a "killer" who could "execute an entire family."; (2) the trial judge plainly erred by prompting a cooperating witness to testify Troya said, "I have killed some people," when in fact the witness was claiming Troya had only said he was "involved in" killing some people, and had also used the term "we." This alteration, resulting from the court's directive to change the plural to the singular, was not necessary to safeguard a codefendant's confrontation rights, and it unfairly prejudiced Troya's defense; (3) the court erred in excluding critical expert testimony that, if sentenced to life, Troya would likely adjust well to prison and not pose a threat, and could be safely managed. This testimony was admissible, both to rebut evidence and argument suggesting he would be violent and present an escape risk if incarcerated, and independently as mitigating evidence; (4) the court wrongly kept out evidence of, and affirmatively instructed jurors to ignore as mitigation, the relationships Troya would maintain with his family were he allowed to live in prison, and the grief and loss they would suffer if he were executed; (5) no legally sufficient evidence supported the jury's important aggravation findings that Troya had substantially planned and premeditated the murders of the two child victims and that he did so to eliminate them as witnesses; (6) because the child victims were not more vulnerable than the adult ones to being killed by surprise gunshots from close range, nor were they targeted because they were children, their youth had no logical connection to their deaths. Thus, the evidence was legally insufficient to support the statutory aggravating factor that they were "particularly vulnerable due to their youth," and so the jury's reliance on it was error; (7) there was no evidence the children were killed in order to steal the cocaine in Escobedo's jeep. Accordingly, there was legally insufficient proof

28

to support the statutory aggravating factor that Troya murdered the children for pecuniary gain; (8) the court plainly erred in allowing the jury to base a death sentence on uncharged crimes attributed to Troya without finding, unanimously and beyond a reasonable doubt, that he had committed each (or, indeed, any particular) one of them; (9) the prosecutors blunted a key mitigating factor, Daniel Varela's non- prosecution for his equally culpable role in the murders, by improperly vouching to jurors that the government would continue its investigation, and would charge him with murder and seek the death penalty as soon as it gathered enough evidence; (10) the sentencing instructions erroneously conveyed to jurors that mitigation unrelated to the crime, and thus not "similar" to any statutory mitigating factor, presumptively carried less or perhaps no significance. The government exploited the error by arguing that Troya's mitigating factors were "excuses" that the jury should disregard because they had nothing to do with the shootings; (11) the Court erroneously failed to instruct jurors that, before they could vote for death, the government needed to establish "beyond a reasonable doubt" that aggravating factors sufficiently outweighed mitigating ones; and (12) the court instructions, including its false suggestion that a "lesser sentence" than life was an option for Troya, left jurors to speculate that a not-unanimous verdict might result in his eventual release. This misimpression may have helped coerce life-leaning jurors to change their votes.

With regard to the issues raised by Troya, the Eleventh Circuit rejected nearly all of them summarily without comment with the exception of two issues discussed in the decision: the district court's evidentiary rulings as to acts of misconduct involving firearms and drugs, and the exclusion of Troya-offered mitigation evidence from Dr. Cunningham a forensic psychologist on the issue of future dangerousness after the government had withdrawn that factor as a statutory aggravator supporting imposition of a capital sentence.

29

As to the first issue, the Eleventh Circuit indicated that the uncharged shooting incidents were admitted properly as either as 404(b) evidence with appropriate limiting instructions (Mercer Avenue and Suwanee Drive shootings), or as intrinsic evidence of the overall drug conspiracy (Haverhill Road shooting). *See United States v. Troya*, 733 F.3d 1125, 1132-33 (11th Cir. 2013), cert. denied, 135 S.Ct. 2048 (May 4, 2015).  On the penalty mitigation evidence however, the Eleventh Circuit indicated that the trial judge abused his discretion in excluding the proffered testimony of Dr. Cunningham on future dangerousness, but held that the error was harmless beyond a reasonable doubt. *Id.* at 1135-38. The Court upheld the convictions and the sentences imposed on Troya.

## MEMORANDUM OF LAW

### I.      PETITIONER'S MOTION WAS TIMELY FILED.

As a preliminary matter, the Government acknowledges that Petitioner's initial motion was filed within the time limit provisions set forth in Title 28, United States Code Section 2255.  In Section 105 of the Anti-Terrorism and Effective Death Penalty Act (AEDPA), P.L. 104 132, 110 Stat. 1214, Congress established a "1-year period of limitations" governing motions for collateral relief under § 2255.  Pursuant to 28 U.S.C. § 2255 (f)(1), Petitioner's convictions became final on May 4, 2015, when the Supreme Court denied Petitioner's writ of certiorari.  *See United States v. Troya*, 733 F.3d 1125, 1132-33 (11th Cir. 2013), *cert. denied*, __ U.S. __ 135 S.Ct. 2048 (2015); *See Nguyen v. United States*, 420 Fed. App'x 875, 877 (11th Cir. 2011).  Petitioner filed this § 2255 petition on May 3, 2016, within the one-year limitation.  Thus, the initial petition was timely filed.   To the extent that Troya has attempted to expand or alter the legal issues raised in his May 3, 2016, motion, the Government takes the position that these belated filings should be disregarded as untimely.

## II.   TROYA'S HAS FAILED TO ESTABLISH THAT HIS COUNSEL WERE CONSTITUTIONALLY INEFFECTIVE UNDER THE *STRICKLAND* STANDARD.

Claims of ineffective assistance of counsel under the Sixth Amendment are examined through the two-part test initially set forth by the U.S. Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).   In order to meet the burden of proving ineffective assistance, a movant must first show that "counsel made errors so serious that counsel was not functioning as the "counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687.   If this showing can be made, the movant must then demonstrate that the "deficient performance prejudiced the defense," which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*   Unless a movant can make both showings, he cannot prevail. *See id.*   The two prongs of *Strickland* are known respectively as the "performance" and "prejudice" prongs.

When a court evaluates the first prong, "[j]udicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action might be considered sound trial strategy." *Id.* at 689 (internal citations omitted).   In order to prove incompetence, "[a] petitioner must identify specific acts or omissions that were not the result of reasonable professional judgment, and a court should deem these acts or omissions deficient only if they 'were outside the wide range of professionally competent assistance.'" *Brownlee v. Haley*, 306 F.3d 1043, 1059 (11th Cir. 2002) (*quoting Strickland*, 466 U.S. at 690).   As the Eleventh Circuit has explained, "the deference afforded an attorney's decision is great and the bar for proving a Sixth Amendment violation is high." *Id.*   In light of the "strong presumption in favor of competence," a petitioner seeking to

31

prove a Sixth Amendment violation "must establish that *no* competent counsel would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1314-15 (emphasis added).

This presumption is even stronger where, as here, "the reviewing court is examining the performance of an experienced counsel." *Chandler v. United States*, 218 F.3d 1305, 1316 (11th Cir. 2000) (*en banc*); *see also Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir.1998) (stating that "strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel" and that "[t]he more experienced an attorney is, the more likely it is that his decision to rely on his own experience and judgment in rejecting a defense" is reasonable).   In the instant case, Petitioner was represented by two very experienced, learned, court appointed counsel: James Eisenberg and Ruben Garcia.   *See* USA Exh. 5[19] (screen print from Eisenberg's website listing his experience); *See* USA Exh. 7 (printout from internet site lawyers.com listing experience of Garcia).  Counsel's level of experience raises Petitioner's already high burden.

A movant can prevail under the second prong of *Strickland* only if he can "affirmatively prove prejudice" by showing that counsel's errors "actually had an adverse effect on the defense." 466 U.S. at 693.  In order to make this showing, the movant must demonstrate more than "some conceivable effect on the outcome of the proceeding." *Id.*  Although a movant need not show that the outcome of his case would more likely than not have been different absent counsel's ineffectiveness, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable

---

[19] References to "USA Exh." refer to exhibits filed in connection with this amended response. USA Exh. 1 through 4 were previously filed under seal and can be located at CV-DE 51.  USA Exh. 5 through 7 were filed with the Government's original response and may be located at CV-DE 46. USA Exh.  8 through 14 contain juror information and will be filed under seal in a separate pleading.  USA Exh. 15 through 18 will be filed with this amended response.

probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The Eleventh Circuit has cautioned that "this standard is difficult to meet." *Brownlee*, 306 F.3d at 1059. In fact, the cases in which a defendant can prove ineffectiveness are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994). When conducting the prejudice inquiry, a court must consider counsel's error in the context of "the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695.

In the instant case, Troya claims that his lawyers were ineffective for not calling certain witnesses, not seeking certain testimony from witnesses that were called, and not making certain motions and objections. When reviewing the propriety of these alleged acts or omissions, courts must give substantial deference to defense counsel's strategic judgments. *See Strickland,* 466 U.S. at 689-90. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Crawford v. Head*, 311 F.3d 1288, 1298 (11th Cir.2002) (*quoting Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066).

Complaints of uncalled witnesses and unoffered documents are disfavored and viewed with great caution as claims of ineffective assistance of counsel. *See Schwander v. Blackburn*, 750 F.2d 494, 500 (5th Cir. 1985). "'Complaints of uncalled witnesses are not favored in federal habeas review,'" *United States ex rel. Cross v. DeRobertis*, 811 F.3d 1008, 1016 (7th Cir. 1987) (*quoting Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir.1984)); *see also Buckelew v. U.S.*, 575 F.2d 515, 521 (5th Cir. 1978); *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) (allegations about possible testimony that might have been offered by a witness who was not called are viewed by the courts with great caution).

33

The Eleventh Circuit "has emphasized that '[w]hich witnesses, if any, to call . . . is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.'" *Allen v. Secretary*, 611 F.3d 740, 759 (11th Cir. 2010) (*quoting Waters v. Thompson*, 46 F.3d 1506, 1512 (11th Cir. 1995). *See also Chandler*, 218 F.3d at 1314 n. 13. Furthermore, the testimony of witnesses is often speculative, so the defendant has a difficult task in showing actual prejudice that the testimony of a witness would have changed the entire outcome of a trial. *See Blackburn*, 750 F.2d at 500.

With regard to Troya's claims concerning objections and motions that Troya's lawyer did not make, a lawyer has no obligation to raise meritless issues. "Because a defendant's lawyer has an obligation to be truthful and forthright with the court, he has "no duty to make a frivolous argument," *United States v. Rezin*, 322 F.3d 443, 446 (7th Cir. 2003) (emphasis in original), and indeed is barred by the rules of professional ethics from doing so. *See Smith v. Robbins*, 528 U.S. 259, 272 (2000); *Fuller v. United States*, 398 F.3d 644, 652 (7th Cir. 2005); *see also United States v. Quarry*, 60 F. App'x. 188, 190 (10th Cir. 2003) ("[C]counsel is not obligated to make factually or legally baseless arguments, no matter how strongly a client may regard the matter."); MODEL RULES OF PROF'L CONDUCT R. 3.1 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis . . . for doing so that is not frivolous.").

In the instant motion, Troya has failed to meet his burden of establishing deficient performance or resulting prejudice. Troya has not shown that trial counsel acted unreasonably in their representation of Troya in this capital case. Troya's claims concerning uncalled witnesses, or areas of testimony that went unexplored, are speculative and unsubstantiated or completely contradicted by the record. Assuming arguendo that Troya was able to establish that trial counsel's performance was constitutionally deficient, he has not established that he was prejudiced thereby.

34

To establish prejudice, Troya would have to establish that but for counsel's allegedly deficient action, the outcome of the proceeding would have been different.  This, Troya has not and indeed cannot establish.  The evidence of guilt in this case is so overwhelming that the correction of all of the alleged errors of counsel during the guilt phase would not have changed the jury's verdict.  Furthermore, the horrifying facts of this case, particularly the execution-style murders of two preschool aged boys, makes it highly unlikely Troya could have escaped the death penalty altogether, regardless of the quantity or quality of mitigation evidence.   The fact that Troya was able to escape the death penalty and receive life imprisonment for three of the five death penalty eligible counts is a testament to the outstanding performances of counsel.  As Troya has failed to meet his burden of establishing that his counsel were ineffective, the instant motion should be denied.

A. COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO MOVE TO DISMISS COUNTS SEVEN, EIGHT, NINE, AND TEN OF THE INDICTMENT OR TO OBJECT TO THE JURY INSTRUCTIONS REGARDING THESE SAME COUNTS AS THE INDICTMENT WAS PROPERLY DRAFTED AND THE JURY WAS PROPERLY CHARGED; COUNSEL CANNOT BE EXPECTED TO RAISE MERITLESS CHALLENGES TO PROPERLY DRAFTED INDICTMENTS AND JURY INSTRUCTIONS (RESPONSE TO TROYA ISSUES VIII & IX).

Troya claims that his counsel were ineffective for failing to challenge the indictment, and the jury instructions, with regards to Counts Seven, Eight, Nine and Ten of the Third Superseding Indictment.  For the reasons stated herein, Troya's claims concerning Counts Seven through Ten lack merit and should be denied.

Counts Seven through Ten were charged identically against Troya and Sanchez, the only difference being the named victim in each count:

> On or about October 13, 2006, in St. Lucie County, in the Southern
> District of Florida, the defendants,
>
> DANIEL TROYA

35

a/k/a/ "Homer," and

RICARDO SANCHEZ, JR.

a/k/a "Rick,"

did knowingly carry and use a firearm during, and in relation to, a crime of violence, and a drug trafficking crime, for which they may be prosecuted in a Court of the United States, that is, armed carjacking, in violation of Title 18, United States Code, Section 2119, as set forth in Count Six of this Third Superseding Indictment, and conspiracy to possess with intent to distribute one or more controlled substances, in violation of Title 21, United States Code, Sections 841(a)(l ) and 846, as set forth in Count One of this Third Superseding Indictment, respectively, which allegations are re-alleged and incorporated by reference herein, in violation of Title 18, United States Code, Section 924(c)(l ), and in the course of this violation caused the death of a person through the use of a firearm, which killing is a murder as defined in Title 18, United States Code, Section 1111, in that the defendants, with malice aforethought, did unlawfully kill Luis Damian Escobedo by shooting him with the firearm willfully, deliberately, and maliciously, and with premeditation, and in the perpetration of, and attempt to perpetrate, a robbery.

In violation of Title 18, United States Code, Sections  924(j)(1) and 2.

CR-DE 305 at 8 through 11.

Troya challenges the indictment and jury instructions with regard to these counts on a number of fronts.  First, Troya claims, in Section IX of his motion,  that Counts Seven, Eight, Nine and Ten of the Third Superseding Indictment are duplicitous and that counsel were ineffective in failing to challenge this duplicity.  This claim is factually baseless and legally without merit.

An indictment is duplicitous when it charges two or more separate and distinct crimes in a single count. *See United States v. Burton,* 871 F.2d 1566, 1573 (11th Cir.1989).   Even when a count of an indictment is duplicitous, it is only "impermissibly duplicitous" when the manner in which the count is charged "risks unfairness to the defendant." *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981). Troya's duplicity claim fails on the merits because counts seven,

36

eight, nine and ten do not charge two or more offenses in a single count.

Counts Seven, Eight, Nine, and Ten charge Troya with using and carrying (and aiding and abetting such using and carrying) a firearm in furtherance of a crime of violence and a drug trafficking offense, and in the course of doing so causing death through the use of the firearm which death was a murder, in violation of 18 U.S.C. § 924(j)(1) and 18 U.S.C. § 2. Each count is based on the murder of an individual member of the Escobedo family on or about October 13, 2006, and refers to the charges for the underlying crime of violence and drug trafficking offense, which are charged in Counts Six and One of the Third Superseding Indictment, respectively. The counts differ in only one respect: the identity of the murder victim. At the conclusion of each charge, the Indictment lists the applicable statutes of violation, 18 U.S.C. § 924(j)(1) and 18 U.S.C. § 2.

Section 924(j)(1) states: "A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall (1) if the killing is a murder (as defined in section 1111) be punished by death or by imprisonment for any term of years or for life." To prove a violation of Section 924(j)(1), the Government would have to plead and prove a violation of 924(c). To prove a violation of 924(c), the Government would have to establish that the defendant used or carried a firearm during or in relation to a crime of violence or drug trafficking offense. The Indictment set forth the elements required to prove this offense which include that Troya violated section 924(c)(1) by using or carrying (or aided and abetted the using or carrying) a firearm during and in relation to a crime of violence or drug trafficking offense. *See United States v. Nguyen,* 155 F.3d 1219, 1226 (10th Cir.1999). Of course, the indictment would need to specify what the crime of violence or drug trafficking offense was, and so it specified that these corresponded to Counts Six and One, respectively. Section 924(j) provides an enhanced

37

penalty when the possession of the firearm results in a death that is a murder as defined in Section 1111.   Again, the Government would need to provide notice of this enhancement by pleading Section 1111 within the text of the count, and providing the specific definition of murder.   The Government did so.   An indictment cannot be duplicitous where, as herein, the Government carefully tracked the statutory language and charged one offense per count.   *See Gonzalez-Lauzan v. United States*, No. 07-21144-CIV, 2008 WL 343492, at *13 (S.D. Fla. Feb. 5, 2008) (holding that a reference to 18 U.S.C. § 1111 within a count charging a violation of 18 U.S.C. § 924(j) did not render the count duplicitous as the text of § 924(j) specifically refers to § 1111 for the definition of murder).

Troya claims that the counts are duplicitous as to the predicate offenses (crime of violence/drug trafficking offense).   Troya cites to no case in support of this sub-claim.    In truth, the undersigned could find no case to support Troya's argument.   To the contrary, case law in this circuit supports the opposite conclusion.    In a case involving a charge of violating 18 U.S.C. § 641, the Eleventh Circuit squarely rejected the argument advanced by the Troya in the instant case, holding:

> Where a penal statute ... prescribes several alternative ways in which the statute may be violated and each is subject to the same punishment ... the indictment may charge any or all of the acts conjunctively, in a single count, as constituting the same offense, and the government may satisfy its burden by proving that the defendant, by committing any one of the acts alleged, violated the statute. The conjunctive allegations do not render the indictment duplicitous.

*Burton*, 871 F.2d at 1573 (*citations omitted*).   In the instant case, the Government plead and proved conjunctive allegations, that Troya used and carried the firearm in connection with a crime of violation *and* a drug trafficking offense.   Under *Burton*, this does not render the Indictment duplicitous.   *See United States v. Wilk*, No. 04-60216-CR, 2005 WL 7863525, at *6–7 (S.D. Fla.

Mar. 14, 2005), *report and recommendation adopted*, No. 04-60216-CR, 2005 WL 7863448 (S.D. Fla. Mar. 22, 2005). Troya's claim in this regard lacks merit.

Troya further claims that the Counts are duplicitous as to the charges of murder and manslaughter. In support of this claim, Troya states that the charging language in each count, "[i]n violation of Title 18, United States Code, Sections 924(j)(1) and 2" refers to 18 U.S.C. §§ 924(j)(1) (murder) and 924(j)(2) (manslaughter). There is absolutely no support for this claim. The body of the counts reference murder, as defined in Section 1111, and not manslaughter, which is defined in Section 1112. On the penalty sheet of the indictment, the reference is to murder, not manslaughter. On the first page of the indictment, under the Court caption, where all statutes are listed, there is no reference to 924(j)(2) or 1112. There is a reference to 18 U.S.C. § 2, the aiding and abetting statute, which was the statute referenced by the text "and 2" in Counts Seven, Eight, Nine and Ten. It is the common practice in this district, and indeed in every federal district, to charge 18 U.S.C. § 2 in every count where it could be applicable. Troya's claim that the reference to Section 2 is a reference to Section 924(j)(2) or Section 1112 lacks a factual basis of support and reflects a gross misinterpretation of federal criminal practice. Therefore, Troya's claims regarding Counts Seven, Eight, Nine and Ten and the charging of manslaughter must be denied.[20]

Troya also claims that his counsel were ineffective for failing to challenge Counts Seven through Ten of the Third Superseding Indictment, inasmuch as these counts fail to state a crime. Troya claims that because carjacking is not an enumerated offense under the federal murder statue,

---

[20] Troya also claims that his counsel were ineffective for failing to request a manslaughter jury instruction. In support thereof, Troya relies on his claim that Counts Seven, Eight, Nine and Ten charge manslaughter. For the reasons stated herein, these counts do not charge manslaughter, and a jury instruction for that offense would have been wholly inappropriate in this case. Petitioner's counsel cannot be required to request jury instructions that have no applicability to the indictment or the evidence in the case. Troya's claim concerning the jury instructions must also be denied.

18 U.S.C. § 1111, carjacking ending in death is a legally invalid basis for the death penalty.  CR-DE 25 at 95.  Troya further argues that the jury was not properly charged on this same basis.  CR-DE 25 at 94.   Troya cites no case law for this proposition and has failed to establish that the indictment is defective.

The Third Superseding Indictment unequivocally reflects that the law was violated in two different ways, by either committing a drug trafficking crime or a crime of violence.  Section 1111 is referenced for the definition of "murder" only.   *See e.g., United States v. Young*, 248 F.3d 260, 274-75 (4th Cir. 2001) (noting that Section 924(j)(1), incorporates only the definition of murder contained in section 1111). That definition is found exclusively in section 1111(a)).  Section 1111 is not charged in any of Counts Seven through Ten, and thus whether carjacking or drug trafficking crimes are predicate offenses of this statute is of no moment.

Troya further argues that the jury instructions were improper in that they did not require unanimity as to whether the jury found that the murders occurred in furtherance of a carjacking or a drug trafficking offense.  *Id.*   A review of the Third Superseding Indictment and the jury instructions illustrate that Troya is incorrect.

In keeping with the language of the Indictment, the Court specifically instructed the jury "as a matter of law, the crime of carjacking is in fact classified as a crime of violence" and noted that the crime was set forth in Count Six of the Third Superseding Indictment.  CR-DE 771 at 7538; *Id.*  at 7542 (Court repeating to jury that carjacking is a crime of violence).  The Court's jury instruction that carjacking is a crime of violence was a correct statement of the law.  *See United States v. Moore*, 43 F.3d 568, 573 (1994) (citing *United States v. Singleton*, 16 F.3d 1419, 1422 (5th Cir. 1994); *see also, In re Smith*, 2016 WL 3895243 (11th Cir., July 18, 2016) (noting that regardless of the validity of § 924(c)'s residual clause, Smith's § 924(c) conviction met the

40

requirements of that statute's force clause).

The Court instructed the jury on more than one occasion, that they had to be unanimous with regard to the crime of violence or the drug trafficking offense.  CR-DE 771 at 7543 (Court instructing jury: "[b]ut you must unanimously agree upon the way in which the defendant committed the violation"); *Id.* at 7544 (Court instructing the jury that if they "concluded that the Government had proven one of those other crimes beyond a reasonable doubt, I mean the crime of violence or the crime of the drug trafficking crime, the jury would have to be unanimous on that finding.").  The unanimity instruction was legally correct, and the failure to object cannot be the basis for a claim of ineffective assistance because there can be no prejudice where the objection would have been overruled as improper under the law.

In this case, the evidence established that the Troya used and carried a firearm during and in relation to carjacking and conspiracy to possess with the intent to distribute cocaine and in so doing used, or aided and abetted the use of, the firearm to kill four members of the Escobedo family.  These counts give proper notice to Troya of the crimes with which he is charged, and do not risk jury confusion or other unfairness to Troya. Indeed, the Court submitted the charge to the jury with a clear instruction regarding the applicable law. CR-DE 769 at 22-25.  The Indictment was properly drafted and the jury was properly instructed concerning Counts Seven through Ten, and therefore no deficient performance or prejudice arose from counsel's failure to challenge either the indictment or the jury instructions on that basis.   The Petitioner is thus entitled to no relief on this claim.

B. COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO SEEK A CONTINUANCE TO ALLOW FOR ADDITIONAL TIME TO INVESTIGATE IN MATAMOROS, MEXICO OR TO SEEK A WAIVER OF THE DEATH PENALTY IN LIGHT OF THE DIFFICULTITES IN CONDUCTING AN INVESTIGATION IN MATAMOROS (RESPONSE TO TROYA ISSUE XXIV).

Troya, in issue XXIV of his 2255 motion, alleges that his counsel were ineffective for failing to seek a continuance which would have allowed the defense team to travel to Matamoros and gather evidence "to link the killings to the drug cartel in Matamoros, Mexico" as well as to seek out information concerning co-defendant Varela's history of drug dealing.[21]  CV-DE 25 at 303, 304.  Troya states that the conditions in Matamoros made this investigation impossible.  CV-DE 25 at 303.  Troya then blames his counsel for failing to move for a continuance based on this issue.  CV-DE 25 at 303.  "Had counsel contacted an expert in the dangers then existing in Mexico, and thought to notify the Court and the Department of Justice of the problem, there is little doubt some form of relief would have been granted".  CV-DE 25 at 303.  Troya contends that this potential relief would include a continuance or a waiver of the death penalty.  CV-DE 25 at 304, 308. Troya cites to no law that would support such extraordinary relief.  Troya goes on to indicate that the problems in Matamoros continue to this day, and that even now there is no safe way to conduct an investigation in Matamoros, and attaches an expert's opinion concerning the situation in Matamoros.  CV-DE 25 at 304 & Appendix J.  Troya asks this Court to place the pending 2255

---

[21] In this same section of his motion, Troya also claims that "[t]he government provided the defense little of what it knew of Varela's history of drug dealing, and counsel seeks the government's file to more fully explore it."  CV-DE 25 at 304.  Varela was a co-defendant of Troya.  They were tried, and convicted, in a joint trial.  The end goal of this joint trial, from the Government's view, was to have a fair trial which would result in the jury returning guilty verdicts as to all defendants on all counts.   Petitioner's claim that the government had additional, incriminating information concerning Varela which the Government intentionally concealed during this joint trial (1) is unsupported and speculative; and (2) makes no sense considering the Government's end goal for this trial.  Surely if the Government had additional evidence incriminating Varela, it would have been introduced at trial, or the prosecution could have decided that such evidence would have been unnecessarily cumulative.  Furthermore, the evidence at trial showed that Troya worked hand in hand with Varela and was an enforcer for their drug trafficking organization.  Petitioner fails to show how "dirtying up" Varela and connecting him to a violent, Mexican drug cartel would have helped Troya, and the record strongly indicates that any such evidence would have hurt Troya and connected him to the same violent cartel.

in a type of suspense until the conditions in Matamoros improve or, conversely, to reduce the death sentences to life in prison.  CV-DE 25 at 310.   Again, Troya cites to no law --case or statutory-- in support of either of these requests.

The United States does not dispute that Matamoros was and is a violent area and does not disagree with Troya's claim that "[n]o competent investigator or mitigation specialist would have undertaken an investigation in Matamoros in the period preceding trial, and no competent lawyer would have exposed such staff to the dangers there."  CV-DE 25 at 308.  Troya is wrong, however in his assertions that Troya's trial counsel did nothing about this issue, or that trial counsel did not alert the Court and DOJ of the issue.  Troya is also wrong in his assertion that any relief is now, or was at trial, appropriate.

The record indicates that Trial Counsel did several things *vis-a-vis* the situation in Matamoros.   The Matamoros issue was first raised at the pre-trial status conference held on June 12, 2008:

> Mr. Murrell: The other problem, I think, as the Court may be aware, a lot of the background material in this case emanates from Brownsville, Texas and Matamoros area.   There is a State Department travel warning as to Matamoros.  We are reluctant to take the defense team down there.
>
> The Court: I understand what you are saying.

CR-DE 963, p. 20, lines 17-23.  All defendants and all of defendants' counsel were present at this hearing.

The Matamoros issue was also raised before the jury at trial, in opening, in direct examination, during cross-examination, and in each defendant's closing arguments.  In opening, Sanchez's counsel identified the connection between Matamoros and the killing of the Escobedo family:

You are going to learn October 13, 2006, after the bodies of the Escobedo family was found, that a search warrant was executed at 1244 Olympic Circle, right here in Greenacres, Florida, not too far away from the courthouse.

When Federal and State authorities executed that search warrant it became apparent that the Escobedos were involved in the drug business.

And among the papers found along -- among Jos, Escobedo's papers was a drug ledger.

In that drug ledger under the heading written in his own hand, money that needs to be paid, were the words Matamoros, and $187,000.00.

Now, I want to tell you a little bit about Matamoros. Matamoros is in Mexico. It is a border town between U.S. Texas border and Mexico. It is a short distance away from Brownsville, Texas where the Escobedos lived before they came to Florida.

Jos, Escobedo traveled back to Brownsville frequently, and in fact he was scheduled to return with his family back to Brownsville the day he died.

I want to also tell you that Brownsville is a major cocaine cartel for smuggling cocaine into the United States. That is fairly recent vintage. For years cocaine traffic came from Colombia through South Florida and was the major source of supply for cocaine. Now it changed in recent years. In recent years the cocaine traffic through cartels, just like Colombian cartels started coming into the United States through Matamoros, Brownsville and into South Florida.

The violence associated with the Mexican cartels spilled over into the United States, and in this case the night of October 13, 2006, that same violence spilled over to Central Florida where the Escobedo family was killed along with his wife and children.

You see, on the night of October 13, 2006, someone from Matamoros, Mexico sent a message to Louis Escobedo and his extended family.

As evidence of the 187,000 that I mentioned will show that 187,000 debt proved, if nothing else, that Jos, Escobedo was a bad businessman. He made little money himself, he owed a large amount of money to the people in Matamoros, drugs had been stolen and Yessica Escobedo and Jos, Escobedo were at risk.

The saddest part of this, is that knowing this, they put the children in harms way that night and the unfortunate and tragic death of that family including their children ensued.

44

> But you must understand that the tragic deaths of those children and of those two people was not the result of anything that Ricardo Sanchez will be responsible for. The evidence will fail to show that he was responsible in any way for the murder of that family.

CR-DE 728 at 3083 line15 - 3084 line 13.

During the cross of Detective John Parow, the defense was able to establish that there was an additional vehicle, a silver car, on the same section of the Turnpike as the victim and defendants, at around the same time as the victims and defendants.   CR-DE 729 at 3345-51.  Testimony that a ledger found in the Escobedo's home contained a reference to Matamoros and 187,000 came out on the direct examination of Detective Robert Barton, who participated in the search of the Escobedo's residence.  *Id.* at 3872, 3875.  During the cross of Crystal Salazar, Sanchez's counsel established that Brownsville, Texas and Matamoros are about ten to fifteen minutes apart by car. CR-DE 738, p. 4554.

During the cross of Government cooperator Kevin Vetere, Troya's Counsel elicited testimony of Escobedo's connection to Matamoros and the safety concerns that raised:

> Q.   And you were concerned, were you not, not only with law enforcement's interest in this case, you were also concerned about the repercussions from people in Brownsville, Texas or Matamoros, Mexico?
>
> A.   Yes.
>
> Q.   And what was your concern about that?
>
> A.   My safety.
>
> Q.   Would you be a little more specific?  What do you mean?
>
> A.   My safety from being killed, my safety from being in jail.
>
> Q.   And you were concerned about that because you knew that Lou Escobedo, Jos, Luis Escobedo, sometimes referred to here as Lou, was involved in Texas and Matamoros, Mexico, right?
>
> A.   Yes.
>
> Q.   And you knew that Lou Jos, Escobedo was bringing drugs from Brownsville and Matamoros, Mexico; is that right?

45

A. Yes.

CR-DE 753 at 5710 line 15 - 5711 line 9. In that same cross-examination, Troya's counsel elicited testimony that Vetere had heard that Escobedo had come to Florida because someone in Mexico wanted to kill Escobedo. *Id.* at 5725, lines 7-16.

Government expert witness Steven Hills testified as to Escobedo's drug ledger, and the reference to Matamoros. On cross, counsel for co-defendant Varela elicited testimony that Matamoros was a popular place for drugs. CR-DE 758 at 6483, lines 13-18. In this same cross-examination, defense counsel elicited the expert's opinion that violent retribution can occur when drugs are not paid for:

> Q. So going off on a different tangent for a moment, let's assume trust is established, cocaine fronted without payment being made for however many kilograms, ten or 11, let's say. Payment from intermediary is not given to the supplier from Matamoros. Let's assume those facts for a moment.
>
> A. All right
>
> Q. What is that person in Matamoros going to do to the intermediary or intermediary's family?
>
> MR. CARLTON: Objection; calls for speculation.
>
> THE COURT: If that is within your range of experience, you can answer, but we don't want you to guess.
>
> THE WITNESS: Right. They would want to make contact with the person to collect money.
>
> BY MR. GERSHMAN:
>
> Q. That comment is sort of gentle as to what they really want to do. They want to make contact and get paid. If not get paid, cause harm to that intermediary or intermediary's loved ones?
>
> A. That is possible.
>
> Q. That is reality, isn't it?
>
> A. That is a little beyond my expertise, but I know there is the threat of some kind of retribution if the money is not paid based on witnesses that I have interviewed and things like that.

46

Q.   So based on what you just touched on, what does that mean there is this possibility of threat to the intermediary? Just as specific as you can, what does that mean?

A.   As far as what people do in the drug business?

Q.   Yes, sure, of course.

A.   They do all kinds of things, kidnappings, all kind of violence to people.

Q.   Carjacking?

A.   Yes, sir.

Q.   Murders?

A.   Yes, sir.

*Id.* at 6486, line 19 - 6488, line 6.    In this same cross-examination, defense counsel obtained an expert opinion concerning the likelihood that Varela, who Escobedo was supplying with cocaine, would kill his supplier:

Q.   If the local, let's say South Florida group of people are making their livelihood off of the intermediary obtaining cocaine from Matamoros, let's assume that for a second, let's assume the following:

There is a person that supposedly doesn't have legitimate work, supposedly hasn't paid employee withholding or taxes of any sort, people have testified the person doesn't have a legitimate job and pays cash for everything, okay?   Using that as a base line briefly.

A.   These are the customers of the intermediary?

Q.   Just one.  Make it singular for our purposes.  One customer of the intermediary.

A.   Okay.

Q.   And that person, that customer has been living that lifestyle for a period of time, months or years, however long it is.

A.   Yes, sir.

Q.   Can you think of, based on your training and experience, why that person who is making that lucrative living from the intermediary, from the cocaine in Matamoros would want the intermediary dead?

A.   No, sir, I have no idea.

47

*Id.,* at 6494, line 25 – 6495, line 22. (2/19/2009)

Sanchez's trial counsel noticed an expert on the issue of Mexican cartels and their attendant violence.  CR-DE 515, 527, 571, 597.  This is an area of testimony that would have equally benefited Troya, and duplicative experts on this issue would not have been particularly helpful, so the fact that this testimony was noticed by Sanchez's lawyer, and not Troya's, is of no particular import.  So, clearly, the defense had considered the import of the violence of the Mexican drug cartels.  However, after the cross of Government expert Steven Hills and just prior to the Government resting its case in chief in the guilt phase, the defense team announced that it had decided that it no longer needed to call the expert on Mexican cartels.  CR-DE 758, at 6875.

Matamoros was also featured in the closing of Varela's counsel:

> There is also another saying that says we should not bite the hand that feeds us.
>
> According to the Government that hand feeding Varela was Escobedo.
>
> Crunching numbers briefly, if Varela is in fact dealing hundreds of kilos a month out of his home over the duration of the conspiracy -- let's say it is a six month conspiracy.  Let's say it is 100 kilos a month, 600 kilos, however much higher you wish to go.
>
> He is going to send his people to kill others in public on the side of the road for 15 kilos?  And that is a fraction of a percent.  That doesn't make sense.  Common sense or business sense.
>
> Besides it not making common sense, we must remember Government expert witness Steven Hills.
>
> Mr. Hills was honest and straightforward, knock on wood.
>
> You could see when he sat in that chair he was going to answer the questions truthfully and to the best of his knowledge no matter if it is they or I asking the questions.
>
> Mr. Hills tells you about his 20 plus years experience investigating drug trafficking, drug ledgers, interviewing, traveling the globe to gain his experience.  He tells you in his expert opinion a gentleman like Varela would not reasonably or realistically want to harm Escobedo, the intermediary.

48

> On the contrary, Matamoros and the Mexican suppliers therein want revenge and will exact that revenge against Escobedo and his family.

CR-DE 766, at 7198 line 14 - 7199 line 17.

Matamoros was also featured in closing by Troya's counsel:

> We then have Ms. Flores.
>
> She identified her brother's handwriting, and that handwriting was in the form of what has been described to you by an I.R.S. agent as a ledger, an accounting of who owed what money to who.
>
> Now, when you looked at that ledger, and please remember that Ms. Flores identified her brother's handwriting on that ledger, there is the figure of  $187,000.00.  That is a lot of money.
>
> And as the Government has said, in the drug business, when you owe that kind of money, it is serious if it isn't being paid.
>
> Ledger said to be paid.
>
> Now, why is that important?  It is important because Mr. Vetere testified that Jos, Luis Escobedo, known as Lou, had left Brownsville, Texas because he was he owed money.    That is the same Kevin Vetere who told you that because he owed $3,000.00 in drug money.  3,000 versus 187.
>
> Now, if you are afraid that something is going to happen to you that you get so paranoid that you won't go out of your house -- and by the way, he may have been paranoid just because he used crack.  If you are so scared and you think somebody is going to kill you over $3,000.00, then I think it is safe to assume that Jos, Luis Escobedo had a big problem if he owed 187 large, as they say in the trade. $187,000.00, and he leaves Brownsville because he is afraid.
>
> Did somebody come to collect?  I don't know. But since we are operating here on assumptions based on circumstantial evidence, then I think I am free to question did something else happen?
>
> \*\*\*
>
> He was an independent agent who I think if we are going to use circumstantial assumptions, had contacts in Texas, Brownsville, right across the border from Matamoros, Mexico and those people don't play.
>
> You don't owe those people money and just move out of town.

*Id.,* at 7251, line 23 – 7254, line 7.

In Sanchez's closing argument, counsel argued that the brutal manner in which the Escobedo family was killed and Escobedo's $187,000 drug debt to folks in Matamoros, "the home of violent Mexican cartels" (CR-DE 767, at 7304, line 6), indicated that the Escobedos were murdered by the cartel, and not the defendants. *Id.,* at 7293-94; 7304, lines 1-10; at 7313, lines 4-23.

The defense team's efforts to pin the Escobedo murders on an unnamed cartel member in Matamoros could not and did not create doubt in the minds of the jurors, who found that Troya murdered the four members of the Escobedo family beyond a reasonable doubt. The effort was not wasted, as eleven of the jurors found that the defense had proven the mitigating factor that Escobedo "engaged in criminal conduct that contributed to the circumstances leading to his family's death". CR-DE 859, at 14. This was the most agreed to mitigating factor; no mitigating factor received twelve votes.

Troya claims that his trial counsel were ineffective for failing to request a continuance of the trial until Matamoros became sufficiently safe such that investigation could be conducted there. Counsel has no right to unilaterally continue the trial date. It is purely speculative that the Court would have granted a continuance had counsel sought one. Speculation and conjecture does not satisfy the requirements of *Strickland. See Bradford v. Whitley,* 953 F.2d 1008, 1012 (5th Cir.), *cert. denied,* 506 U.S. 829 (1992). Matamoros was not safe at the time of the trial and it is still not safe today, over seven years after the trial of this matter and nearly ten years after the murders of the Escobedo family. The public has an interest in speedy, public trials. *See* 18 U.S.C. § 3161(h)(8). Such an open-ended request for continuance would have violated that interest, and Troya's speculative, conclusory claim that such an investigation would have benefitted him is not

sufficient to outweigh the public's right to a speedy trial.   Had Troya's counsel requested a continuance on the Matamoros basis, such a request would have been denied.  An attorney is not ineffective for failing to raise a meritless issue. *See Ladd v. Jones,* 864 F.2d 108, 109–10 (11th Cir.1989); *United States v. Winfield,* 960 F.2d 970, 974 (11th Cir.1992).  As Troya cannot show deficient performance, his claims concerning Matamoros investigation must be denied.

Troya has also not shown that he was prejudiced by counsel's decision not to seek a continuance to allow for a Matamoros investigation.  Troya contends that as a result of their failure to seek a continuance, counsel was prevented from investigating and presenting witnesses concerning the Matamoros connection to the Escobedo murders. This ground for prejudice is unconvincing for at least two reasons. First, Troya's assertion that the failure to seek a continuance hampered his attorney's investigation into the dangerousness of Matamoros and the victim's connection to Matamoros is simply not supported by the record.  To the contrary, it appears that the lack of an investigation in Matamoros did not hamper the defense team's ability to point the finger at Varela or the cartel.  The trial record reveals that the defense team was able to elicit testimony and argue to the jury that Escobedo owed $187,000 to his drug suppliers in Matamoros and that Escobedo was killed not by the defendants but by the Mexican cartel in retaliation for this debt.  Troya does not establish that an investigation in Matamoros would have allowed counsel to augment this argument, which brings us to the second reason why this ground from prejudice is unconvincing.  Troya has not established that the outcome of his trial would have been different had counsel moved for a continuance.  Even assuming, *arguendo*, that this continuance would have been granted by the Court, Troya has not established that an investigation in Matamoros would have resulted in additional witnesses who would support Troya's theory of the case.  Troya has presented no evidence which would indicate that witnesses who could corroborate his theory even

51

exist, and Troya has offered nothing more than pure speculation that additional time to investigate would have resulted in the presentation of their testimony. Given the nature of Matamoros, it is extremely unlikely that the defense team would have been able to get anyone to speak with them about the Escobedo murders.

"To prove prejudice from a trial attorney's failure to investigate potential witnesses, a Petitioner must show that the uncalled witnesses would have testified at trial and that their testimony would have probably changed the outcome of the trial." *Stewart v. Nix,* 31 F.3d 741, 744 (8th Cir.1994); *Cross v. O'Leary,* 896 F.2d 1099, 1100 (7th Cir.1990) ("speculation about what unidentified persons might have said cannot establish the 'prejudice' that, under *Strickland v. Washington,* is part of the Petitioner's burden." (*citation omitted*)); *Dell v. Straub,* 194 F.Supp.2d 629, 650 (E.D.Mich.2002) ("Defense counsel's failure to investigate, interview, or present alibi witnesses does not amount to the ineffective assistance of counsel, because petitioner has failed to identify these witnesses, indicate their availability, or specify the content of their testimony.").

In this case, Troya offers only speculation that a continuance would have allowed for additional investigation which, in turn, would have produced corroborative testimony of sufficient value to undermine confidence in the outcome of his trial. He has not identified the corroborating witnesses who would have been discovered through further investigation, demonstrated that they would have been available to testify at his trial, or established the content of the testimony they would have given. Because Troya has failed to make such a showing, he has not established that he was prejudiced by counsel's failure to seek a continuance to allow for further investigation in Matamoros. Troya also claims that his lawyer should have raised the difficulties of conducting an investigation in Matamoros as the basis for the Government waiving the death penalty. Troya cites

52

to no authority or policy which would support his claim that such a waiver would be available or be appropriate. The evidence of Troya's guilt was overwhelming.

As Troya has failed to meet his burden of establishing either deficient performance or prejudice, Troya's claim that his counsel was ineffective for failing to move for a continuance, or ask for a waiver of the death penalty based on conditions in Matamoros, Mexico, should be denied.

C.    <u>TROYA HAS NOT ESTABLISHED THAT HIS COUNSEL WERE INEFFECTIVE FOR NOT CHALLENGING THE COMPOSITION OF THE WEST PALM BEACH GRAND AND PETIT JURY VENIRES (RESPONSE TO TROYA ISSUE VI).</u>

Troya argues that his trial counsel was ineffective in not challenging the grand and petit jury venires for underrepresentation of Hispanics and African Americans. He alleges that these two groups were underrepresented on his juries, resulting in violations of the fair cross section requirement of the Sixth Amendment and the equal protection clause. CV-DE 25 at 74.

The Supreme Court has set forth three requirements to establish a prima facie violation of the fair cross-section requirement. The defendant must prove that "(1) a group qualifying as 'distinctive'; (2) is not fairly and reasonably represented in jury venires; and (3) "systematic exclusion" in the jury-selection process accounts for the underrepresentation." *Berghuis v. Smith*, 559 U.S. 314, 327 (2010) (citing *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). The prima facie elements under the equal protection clause are "virtually identical" to those under Sixth Amendment fair representation claims. *Machetti v. Linahan*, 679 F.3d 236, 241 n.6 (11th Cir. 1982), *cert. denied*, 459 U.S. 1127 (1983). Failure to meet any of these three elements is fatal. *United States v. Grisham*, 63 F.3d 1074, 1079 (11th Cir. 1995).

The United States does not dispute the first prong. Hispanics and African Americans are distinctive groups in the community. But that is the only prima facie requirement Troya meets. The reasons he cannot meet the second or third prongs are discussed in turn below. As Troya

cannot establish a prima facie case for his fair cross section claims, he fails to show that his trial counsel's failure to raise such challenges constituted ineffective assistance of counsel.

1. Troya has failed to establish either deficient performance or prejudice with regard to his counsel's lack of challenge to the grand jury venire.

Troya admittedly presents no data supporting his claim that Hispanics and African Americans were underrepresented in the grand jury that indicted him because he does not have "the AO 12 form for the relevant period that the grand jury was drawn from the wheel". CV-DE 25 at 77, n. 38. Accordingly, he cannot establish the second element of a prima facie case, namely, that the absolute disparity between the percent of Hispanics and African Americans on the grand jury venire was substantially lower than the percent of Hispanics and African Americans eligible for jury service. Furthermore, the posture of this claim makes the grand jury's role in finding of probable cause irrelevant. Troya contends, "[a] claim of racial discrimination in the grand jury process . . . is not subject to harmless error analysis." CV-DE at 73 n.35 (*citing Rose v. Mitchell*, 443 U.S. 545 (1979). Unlike *Rose*, however, Troya couches his claim in terms of ineffective assistance on the part of his trial counsel. CV-DE 25 at 72. Establishing ineffective assistance requires deficient performance and prejudice. *See Strickland*, 466 U.S. at 687. Because Troya has failed to establish that there was anything wrong with the racial composition of the grand jury venire, he has failed to establish that his counsel were deficient in not challenging the racial composition of the venire. Even if Troya had established that his counsel were deficient for failing to challenge the grand jury venire, he has failed to establish that he was prejudiced thereby. A petitioner shows prejudice due to ineffective assistance of counsel when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 693. As far as Troya's grand jury claim is concerned, he cannot establish prejudice because the evidence that came out at trial was sufficient to demonstrate probable cause,

and he would likely have been re-indicted. *See Hollis v. Davis*, 912 F.2d 1343 (11th Cir. 1990) (finding "no objective reason for concluding that a grand jury containing [members of the alleged disparate group] would probably have refused to indict or have charged a lesser offense."). "[W]here the evidence was 'so overwhelming that there is no question that he would have been re-indicted,' the petitioner has suffered no prejudice." *Id.* (*citations omitted*).

For all these reasons, Troya's claims of ineffective assistance of counsel with regard to challenges of the grand jury venire fail on the merits and must be denied.

2. <u>Troya has failed to establish deficient performance or prejudice with regard to his counsel's lack of challenge to the petit jury venire.</u>

    a. Troya cannot demonstrate that Hispanics and African Americans were unfairly represented in the pool from which his jury was chosen because he cannot show an absolute disparity exceeding 10%.

With regard to the second requirement, Troya's evidence falls far short of establishing that either racial or ethnic group was unfairly represented in the petit jury venire. In his attempt to show that Hispanics and African Americans were underrepresented in his venire, Troya outlines three different mathematical tests for measuring the extent of underrepresentation: absolute disparity, comparative disparity, and standard deviation. Only the first of these, however, is utilized in the Eleventh Circuit. "To determine whether the representation was fair and reasonable, we are only concerned with the 'absolute disparity' produced by the selection process." *United States v. Pepe*, 747 F.2d 632, 649 (11th Cir. 1984). The Eleventh Circuit has relied upon the absolute disparity test, to the exclusion of the comparative disparity or standard deviation tests, since before its inception. *See United States v. Maskeny*, 609 F.2d 183, 190 (5th Cir. 1980) ("declin[ing] appellant's invitation to focus on comparative or standard deviation disparity and find[ing] that the absolute disparities shown [in this case] do not make out a constitutional violation"); *United States v. Butler*, 611 F.2d 1066, 1070 (5th Cir. 1980) ("Like the Maskeny court,

we decline to abandon the absolute disparity method for dealing with jury challenges."). In more recent years, the Eleventh Circuit has continued to apply only the absolute disparity test. *See United States v. Carmichael*, 560 F.3d 1270, 1280 (11th Cir. 2009) (finding no prima facie case because the absolute disparity did not exceed 10%); *see also United States v. Pritt*, 458 F. App'x 795, 797 (11th Cir. 2012) ("To determine whether the representation of a group is fair and reasonable, we look only to the 'absolute disparity' produced in the selection process").

Absolute disparity analyzes whether distinctive groups were fairly represented in the jury pool by comparing "the difference between the percentage of [the group] in the population eligible for jury service and the percentage of [the group] in the pool. *Carmichael*, 560 F.3d at 1280 (citation omitted). "If the absolute disparity between these two percentages is ten percent or less, the second element is not satisfied" *Grisham*, 63 F.3d at 1078-79. The burden of showing a lack of fair representation lies squarely with the defendant. *See Carmichael*, 560 F.3d at 1281. The United States has "no obligation to rebut insufficient figures in order to prevail." *United States v. Else*, 743 F.2d 1465, 1475 (11th Cir. 1984), *overruled on other grounds by United States v. Blankenship*, 382 F.3d 1110, 1122 n.23 (11th 2004).

Troya's evidence does not show an absolute disparity exceeding ten percent for either Hispanics or African Americans. His claim suffers from two major proof problems. The first is that the AO 12 form he attached in his appendix (CV-DE 5-1) does not match the data he references in his brief (CV-DE 25 at 77). His appendix includes a two-page form related to this issue; it is an AO 12 form containing data for a Miami-based petit jury. CV-DE 5-1. Troya was tried by a jury selected in West Palm Beach. Thus, the single piece of evidence Troya presents on this point is completely irrelevant.

Even assuming Troya had provided an AO 12 form that reflected the data presented in his

brief, however, his claim suffers from a second proof problem.  He relies solely upon census data, which includes many individuals ineligible for jury service, to argue that Hispanics and African Americans were underrepresented.  Accordingly, he is unable to make the relevant comparison between the percentages of these groups in the venire to the percentages of these groups *in the population eligible for jury service* in Palm Beach County at the time.  His comparison of the percentage of Hispanics and African Americans in the pool to the percentage of *all* Hispanics and African Americans in Palm Beach County in 2010 misses the point.

In a nutshell, he alleges that the West Palm Beach venire from which his jury was selected consisted of 7.7% Hispanics (CV-DE 25 at 78) and 12.4% African Americans (CV-DE 25 at 79). He then disregards the third column of Part IV of the AO 12 form, which lists numbers for the percent of these classes found in "the citizen population of the jury division", alleging that those numbers are erroneous.  CV-DE 5-1 at 2.  Instead, Troya looks to census figures to argue that the percent of Hispanics and African Americans in Palm Beach County (the area from which West Palm Beach division juries are drawn) in 2009 was actually much higher than the data recorded on the AO 12 form (7.2% for Hispanics and 10.0% for African Americans).  Relying upon the 2010 census, Troya posits the actual percentage of these two groups in Palm Beach County was closer to 19% for Hispanics and 17.32% for African Americans. CV-DE 25 at 79-80.

Census data, however, is inherently problematic because it is not limited to eligible jurors. As the Eleventh Circuit has observed, census figures include citizens and non-citizens, as well as others ineligible for jury service, such as minors, convicted felons, and those unable to speak or understand English.  *See United States v. Rodriguez*, 776 F.2d 1509, 1512 n.6 (11th Cir. 1985) (noting one of the problems with appellants' evidence regarding the underrepresentation of Hispanics was that while census data was adjusted for age and citizenship, it was not further

57

confined to those eligible for jury service by eliminating people without an ability to understand English); *see Else*, 743 F.2d at 1474 n.14 (determining the district court did not err in taking judicial notice under Fed. R. Evid. 201(b)(1) that "many Hispanics within the area either did not speak English, were not citizens, or lacked some other prerequisite for jury duty").

Here, Troya simply relies upon the 2010 census data to allege that Hispanics and African Americans made up approximately 19% and 17.32%, respectively, of the population of Palm Beach County at the time his jury was selected. He has made no effort to narrow those figures to account for children, non-citizens, felons, or non-English speakers. Accordingly, this Court cannot rely upon Troya's cited census figures because they are a woefully inaccurate reflection of the percent of Hispanics or African Americans *who were eligible for jury service* in Palm Beach County at the time. This deficiency is fatal. *See Esle*, 743 F.2d at 1475 ("The fact that these figures were the best he could find does not mean that they automatically were sufficient to show unreasonable underrepresentation.")

Finally, even setting aside the proof problems, the claim fails with respect to African Americans because, as Troya concedes (CV-DE 25 at 80), the absolute disparity is only 4.92% (17.32% - 12.4%)-- well under the firmly established 10% threshold. *See Carmichael*, 560 F.3d at 1280 ("Under black letter Eleventh Circuit precedent, '[i]f the absolute disparity between these two percentages is ten percent or less, the second element is not satisfied") (*quoting Grisham*, 63 F.3d at 1078-79).

Accordingly, Troya has not established an absolute disparity in exceeding 10% with regard to either Hispanics or African Americans in the petit jury venire and so his claim in this regard must fail.

> b. Troya cannot demonstrate Hispanics and African Americans were systematically excluded from his petit jury venire.

The third element of a prima facie claim requires a showing that any disparity that exists is due to a "systematic exclusion" of the distinctive group from the jury pool. *Duren*, 439 U.S. at 364. The United States does not dispute that "jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinct groups in the community and then fail to be reasonably representative." *United States v. Green*, 742 F.2d 609, 610 (11th Cir. 1984) (*citing Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)) (holding that Green failed to "demonstrate that the jury wheels, pools of names, panel, or venires from which the present jury was drawn *systematically excluded* any distinct group in the community" (emphasis in original)).

The Eleventh Circuit has found systematic exclusion where a Georgia law allowed women to "opt out" of jury service "merely by sending written notice to the jury commissioners" which resulted in substantial underrepresentation of women on juries. *See Machetti*, 679 F.2d at 237-41. Similarly, our Circuit Court has found systematic exclusion where it was proven that the jury selection procedures were "'not racially [or sexually] neutral' and were 'susceptible of abuse.'" *Gibson v. Zant*, 705 F.2d 1543, 1547 (11th Cir. 1983) (*quoting Castaneda v. Partida*, 430 U.S. 482, 494 (1977)). In *Gibson*, venire members were chosen by jury commissioners who, aware of potential jurors' race and sex, used "their subjective judgment" to determine "which individuals were intelligent and upright." *Id*. at 1548 (finding the third element of the prima facie case met because the process was not "facially neutral" and "easily capable of being manipulated"). On the other hand, the Eleventh Circuit rejected an underrepresentation claim where jury pools were selected by choosing every fifth or third name from the voter registration lists because there was no evidence that the voter list from which these jury pools were selected had been tampered with in any way, and there was no showing that the practice provided an opportunity for discrimination. *See Cunningham v. Zant*, 928 F.2d 1006, 1013 (11th Cir. 1991). Troya concedes that his jury

venires were compiled randomly from voter registration records. Accordingly, his case bears no resemblance to *Machetti* or *Gibson*; it is like *Cunningham*, and requires the same result.

Troya's attempts to show systematic exclusion are unsupported and wholly misguided. First, he makes the bald assertion that "the voter registration list that was used to fill the wheel for both the grand and petit juries in [his] case underrepresented Hispanics and African Americans in Palm Beach County." CV-DE 25 at 80. The sole basis for this statement is "[o]n information and belief . . . as well as based on the previously aforementioned analysis." *Id.* Troya's analysis, however, was based upon census data, which we have illustrated does not accurately portray the percentage of the distinctive groups *among those eligible for jury service*. Any other "information" upon which Troya relies remains a mystery, and such an unsupported allegation cannot stand. *See United States v. Tuttle*, 729 F.2d 1325, 1327 n.4 (11th Cir. 1984) (rejecting an argument that jury lists are tainted by discrimination where "appellants do not assert that the judges . . . who adopted county voter registration lists as the sole source of names for the petit jury wheels, have themselves discriminated or that the procedures by which names on the voter registration lists are placed on jury wheels are discriminatory.").

Second, Troya complains that the wheel from which his jurors were obtained "excluded 18-21 year olds who were otherwise eligible to serve." CV-DE at 80-81. Troya presents no evidence that individuals in that age bracket constitute a disparate group, and the undersigned is not aware of any. To the extent Troya implies that the exclusion of this age group (a practical result of time passing between when the master wheel was created and a pool was drawn from it) somehow affected Hispanics or African Americans to a different degree than it affected other racial or ethnic groups, he provides no support for that contention. As such, it should be summarily rejected.

Finally, Troya attempts to illustrate systematic exclusion by arguing that there was a pattern of underreporting the percentages of Hispanics and African Americans in the third column of Part IV of the AO 12 form.  Specifically, he asserts forms for 1998, 2002, 2003, 2004, 2008 and 2010, consistently recorded a lower percentage of Hispanics and African Americans in the West Palm Beach jury division than reflected by census statistics.  CV-DE 25 at 82.  This argument is wrought with the same proof problems discussed above.[22]

However, there is another fundamental flaw.  Even if Troya could prove that the clerk routinely underreported the percentage of Hispanic and African American eligible jurors in Palm Beach County, that fact would not "make[] the process by which the grand and petit juries were selected susceptible to abuse" as he alleges.  CV-DE 25 at 82.  The particular statistic he attacks as inaccurate is merely used as a check for fair representation of disparate groups throughout the community; it has nothing to do with *how* members of the venire were selected, and Troya does not allege the selection of venire members was anything other than random.

There can be no reasonable inference of systematic exclusion where "names from the master wheel were randomly drawn from inclusive data."  *United States v. Aguero*, 248 F.Supp.2d 1150, 1157 (S.D. Fla. 2003) (citing *United States v. Pion*, 25 F.3d 18, 23 (1st Cir. 1994)).  Troya has not shown that his jury pool was generated by anything other than random selection of inclusive voter registration data.  Accordingly, he cannot establish systematic exclusion of any

---

[22] Without providing documentation, Troya essentially asks the Court to take his word that the forms contain the data he claims they do.  Additionally, even if he has accurately reported the percentages of Hispanics and African Americans "found in the citizen population of [Palm Beach County]" (CV-DE 5-1 at 2) recorded on the forms, any comparison of these figures to census data, including unknown numbers of ineligible jurors, is futile.  Accordingly, he cannot show that the clerk erroneously underreported the total percentages of Hispanics and African Americans eligible for jury service because the census data he cites sweeps far more broadly to include children, non-citizens, felons, and non-English speakers.

disparate group, and his claims in this regard should be denied.

3. Conclusion.

Troya has failed to establish a prima facie violation of the fair cross-section requirement with regard to either his grand jury or trial jury venires.  As such, he has failed to establish a problem with his jury venire of which his counsel could have meritoriously complained.  Counsel are not required to pursue meritless challenges.  Furthermore, Troya's failure to establish a prima facie violation of the fair cross-section requirement also means that Troya has failed to establish that he was prejudiced when counsel failed to challenge the venire.  For all these reasons, Troya has failed to establish that his counsel were ineffective for not challenging his grand jury or petit jury venires.[23]

D. <u>COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO OBJECT TO THE COURT'S COMMENTS FOLLOWING COUNSEL'S OBJECTION TO THE INTRODUCTION OF THE TRANSCRIPT OF CO-DEFENDANT SANCHEZ'S STATEMENT (RESPONSE TO TROYA ISSUE XII(A)(1))</u>.

Petitioner Troya, in issue XII(A)(1) of his 2255 motion, alleges that his counsel was ineffective for failing to object to the Court's commentary in overruling counsel's objection to the introduction of the recording and transcript of co-defendant Sanchez's statement.  CV DE 25 at 172-74.  On the morning of January 29, 2009, the second full day of trial testimony, the Government offered the recording and transcript of Sanchez's statement into evidence during the direct examination of Sergeant William Springer who took the statement.  CV-DE 730 at 3649.

---

[23] To the extent that Troya may argue that the petit jury selection plan is unconstitutional, irrespective of the ineffectiveness of counsel, such an argument would be procedurally barred.  A careful review of the record shows that appellate counsel was investigating the jury selection plan and sought to have and did have both the jury plan and questionnaires added to the record for the appeal.  See CR-DE 1111, 1112, 1115, 1116, 1117 & 1118.  Thus, the facts giving rise to any naked claim concerning the constitutionality of the jury selection plan were part of the record on appeal and could have been raised, but were not raised, on direct appeal. As such, any claim that the jury selection plan was unconstitutional would be procedurally barred unless and until Troya establishes cause and prejudice which, as of this writing, Troya has not.

Troya's counsel made a *Bruton* objection and indicated that the transcript had been provided only a few moments earlier, to which the Court commented: "We all know that is not true.  This transcript has been divulged earlier in discovery to counsel.  It has been the subject of other matters."  *Id.* at 3650.

A short time later, the Court excused the jury for the lunchtime recess.  *Id.* at 3653.  During this recess, the Court and the parties discussed the *Bruton* motion and the Court's comments.  The Court indicates, "[t]here is a huge sheave of documents, as the jury would think, there is a huge volume of preparation, and no one is purposefully making a misstatement.  I know that."  *Id.* at 3654.  Counsel had an opportunity to and did fully articulate the basis for the *Bruton* motion, after which time the Court denied the motion on the merits.  *Id.* at 3654- 3656.

After the lunchtime recess, but before the jury returned, the Government asked to put something on the record concerning discovery, and recounted when the transcript, the redacted transcript, and the recordings were provided to counsel.  *Id.* at 3657-58.  Once again, the Court's comments were discussed and the Court indicated that it would provide a curative instruction.  *Id.* at 3658.  This curative instruction was given as soon as the jury returned:

> Ladies and gentlemen, if I might, there were a couple comments before we broke for lunch whether that transcript had or had not been presented earlier, and I want you to know, and I say this as I we are so fortunate, we have simply superb lawyers on both sides.
> There has been enormous preparation in the case as you would anticipate and that has involved a lot of work, so it is very easy to have something -- you know, have something escape their attention that they may have seen earlier.
> Please don't draw any concern or inference from that at all.  Okay?
> Now, let me turn back to counsel for the Government and allow to you call your next witness.

CR-DE 730 at 3659.  The jury returned its guilt phase verdicts over one month later, on March 5, 2009.   CR-DE 792.

Petitioner now claims that his Counsel were ineffective for failing to object to the Court's truthful comment. Petitioner does not allege any possible legal basis for such an objection or give any rationale as to why such an objection would have been sustained. The Court made a truthful comment that, frankly, rescued the jury from the false perception that the Government had hidden or failed to disclose an important matter: the statement of a co-defendant. Petitioner fails to show how his counsel's performance was defective in failing to make such an objection. Furthermore, Petitioner fails to show how he was prejudiced by counsel's decision not to object. Had counsel made such an objection, it likely would have been overruled, given that the Court's comments were truthful and kept the jury from having a misperception concerning discovery. Even if the objection had been sustained, the most likely outcome would have been a curative instruction, which was given despite the lack of an objection. The Court gave a curative instruction shortly after the Court's comment during which time the Court praised counsel on both sides, calling them, "superb". Petitioner indicates that the Court's comments hurt his counsel's credibility. Petitioner points to no facts in the record in support of this assumption. The Court's comments were brief, were tempered by curative instruction, and occurred early on in a lengthy trial. There is no indication that the jury formed a negative perception of counsel from the comments, or that they carried this impression through to the verdict over one month later.

As Petitioner has not shown that Counsel's performance was deficient in choosing not to object to the Court's comments concerning Counsel's claim that the Sanchez transcript had not been provided in discovery and as Petitioner has not shown that he was prejudiced thereby, Petitioner claims in this regard must be denied.

E. COUNSEL WERE NOT INEFFECTIVE IN THEIR HANDLING OF THE FORENSIC PATHOLOGY EVIDENCE (RESPONSE TO TROYA ISSUES XI(A), XI(A)(1) & (3), and XXV(C)(3-7).

Troya argues that his trial counsel were ineffective because: 1) the testimony of a substitute medical examiner was inappropriately admitted into evidence without objection; 2) counsel chose not to cross examine this medical examiner; and 3) a medical examiner Troya hired post-conviction disagrees with the testimony at trial. For the reasons explained below, Troya is incorrect.

At the guilt phase in this matter, forensic pathologist Dr. Roger E. Mittleman testified as an expert witness for the United States concerning the autopsies of the Escobedo family. CR-DE 729 at 3355-3466. Dr. Middleman did not conduct the autopsies of the Escobedo family. That task was handled by another doctor who had retired, moved to another part of the state, and was undergoing dialysis, which made his travel difficult. *See* CR-DE 531. Prior to trial, on November 13, 2008, the Government filed a detailed motion to allow for the testimony of a substitute medical examiner. CR-DE 522. This motion was amended on November 20, 2008, to indicate that the motion was unopposed. CR-DE 531. The Court granted this motion on November 24, 2008. CR-DE 538. At a break during Dr. Mittleman's testimony, there was discussion about the fact that Dr. Mittleman had not conducted the autopsies in question, nor had he prepared the corresponding autopsy reports. CR-DE 729 at 3395-96. Specifically, the Court noted that because there was binding precedent holding that the autopsy reports were business records, the defense was not objecting to Dr. Mittleman's testimony concerning those reports. *Id.*

Troya argues that not objecting to the medical examiner's testimony constituted ineffective assistance of counsel because in 2016, some seven years after the trial, Troya has hired his a new forensic pathologist, Dr. Charles Wetle, who disagrees with facets of Dr. Mittleman's testimony. To support Troya's claim that his trial counsel were incompetent for not challenging Dr. Mittleman, or for not calling their own expert, Troya has submitted the affidavit of Dr. Charles

65

Wetli.  CV-DE 5-2.  Seemingly, Troya is making a prejudice argument prior to addressing the cause prong.  In any event, no matter which way his claims are examined, he is incorrect.  First, Troya refers to extra-record information by extensively citing to his newly found medical examiner.  These references, and the manner in which Troya argues them, are rife with factual and legal difficulties because, for example, we do not know what was asked of Dr. Wetli, or what Dr. Wetli was shown.  Further, we do not even know if the information he provides would have been admissible.  However, for the sake of argument, even accepting Troya's proffer as to what Dr. Wetli individual would have testified to, it is inconceivable that it would have made a difference in the overall outcome of either the guilt or penalty phases as it relates to Troya, and as such, Troya fails to demonstrate the prejudice required by Strickland.

Troya's main complaint appears to concern Dr. Mittleman's testimony concerning one of the murdered boys, Luis Damian Escobedo, and how Dr. Wetli's proffered testimony purportedly contradicts with that of Dr. Mittleman.  Troya's complaint lacks merit.  First, the newly proffered testimony does not directly conflict with the testimony at trial.  Second, even if Dr. Wetli had testified, it would not have changed the outcome of this trial.

As to the gunshot wound that pierced Luis Damian Escobedo's lungs and heart, Dr. Mittleman testified  "[t]his would be the kind that would make it very difficult to breathe.  In other words, going through the lungs, blood going in the air spaces, blood surrounding the lungs, making it more difficult to breath.  The heart is gradually slowing down, becoming non-functional, so he would have a suffocating type of death, difficult breathing, *like* a drowning in one's own blood in part." CR-DE 729 at 3458 (emphasis supplied).  Dr. Wetli's proffered testimony is not that different.  Specifically, Wetli concedes that unlike Julian Escobedo, whose gunshot wound to the head resulted in instantaneous death (CR-DE 729 at 3433-3436), Damian did not die instantly.

66

Instead, according to Wetli, Damian's wound perforated both lungs and his heart before exiting near his right armpit. CV-DE 5-7 at 3. Wetli expounds that as to this gunshot, "the effect would be to burst the heart and result in an immediate loss of blood pressure and loss of consciousness, with death occurring moments later. Even though death is nearly immediate, vegetative functions (such as breathing and heartbeat) continue for a short period. As a result, blood and tissue may be aspirated into the lungs." Wetli himself would admit that the child coughed up blood before he lost consciousness and died. Can it seriously be argued that the jury's outcome as to the guilt and penalty phases would be different if Wetli had provided this additional opinion? Wetli's opinion frankly is hardly at substantive odds with the conclusions of Dr. Mittleman. Even if Wetli testified, he does not contradict the indisputable fact that an entire family was murdered with multiple gunshots, including two little kids. Calling Dr. Wetli would not have made a difference; even he would have conceded that the little boy's lungs filled with blood after he was shot, and that blood was aspirated through the toddler's nose and mouth before he died. Dr. Mittleman had testified that the murder scene photos of Damian Escobedo showed "blood coming out of the nose and mouth, and this is very typical when a bullet goes through the lungs, because what happens is, the blood goes in the air spaces, and as the terminal respirations are taking place, the blood comes up and out." CR-DE 729 at 3458. Dr. Wetli does not dispute this. Troya cannot demonstrate prejudice for failing to call Dr. Wetli, or not questioning the medical examiner.

The fact is that this was not a case where disputing the cause of death would have been beneficial to Troya. This case was about four individuals, two adults and two minor children, who were gunned down on the side of a Florida public highway for the sake of cocaine. Troya would have us now believe that if he had presented a witness who would have testified to the minute

67

detail in which these children and adults were killed, somehow things would have gone better for him.    In attempting this line of attack, Troya apparently ignores the evidence in this case.

The evidence summarized above clearly illustrates that early on the day of the murders, four individuals were shot several times and then left to die on the side of the road. The fact that the victims were shot with the intent to kill them, while an element to be proven, was clearly evident by the heinous manner and means with which this crime was executed.  Further, Troya's argument now that somehow this new witness would have testified that the mother was not shielding her children in contravention of the medical examiner's testimony is of no moment. Other witnesses unequivocally testified concerning their perceptions that the children were behind their mother when discovered.  *See e.g.*, CR-DE 728:3112-27 (eyewitness who discovered bodies on the side of the road describing what looked like a mother holding a child and a small boy who appeared to be hiding under her legs); CR-DE 728 at 3131 (Florida Trooper testifying that he originally thought it was three bodies but upon closer inspection saw a small child); CR-DE 728 at 3207 (law enforcement discussing photographs taken of crime scene admitted into evidence). Besides, it is hard to imagine under any common sense scenario where it would make strategic sense to attempt to clarify that a mother was not attempting to shield her children at the moment they were being summarily executed by your client.

Likewise, Troya's complaint that his trial counsel were ineffective for not cross-examining Dr. Mittleman is likewise meritless.  None of the trial counsel did so.  CR-DE 729 at 3466.  One very logical reason was that they all understood that the jury would hear about these children being killed a number of times and wanted to lessen the repetition of that testimony.  "[E]xperienced advocates . . . have emphasized the importance of winnowing out weaker arguments on appeal. . .

68

"even though such arguments may have some merit." *Jones v. Barnes*, 463 U.S. 745, at 751-752 (1983).

Lastly, Troya takes the position that his trial counsel were ineffective because they failed to object to the admission of Dr. Mittleman's testimony and should have done so because such admission violated Troya's Sixth and Eighth Amendment rights and he was prejudiced by the testimony. Specifically, Troya now argues that trial counsel should have objected to the testimony on confrontation grounds based on *Crawford v. Washington*, 541 U.S. at 68. In *Crawford v. Washington*, the Supreme Court held that the Sixth Amendment's Confrontation Clause prohibits the admission of "testimonial" statements unless the witness is unavailable and there was a prior opportunity for cross-examination. *Crawford,* 541 U.S. at 68.

At the time that Troya and Sanchez went to trial, an autopsy report was considered a business record, as the district judge in this case had determined, and thus those reports were exempt from the Confrontation Clause. *See e.g., United States v. Rosa*, 11 F.3d 315, 331 (11th Cir. 1993), *accord Smith v. McDonough*, 2008 WL 2941149, *13 (S.D. Fla 2008). In 2012, the Eleventh Circuit decided *United States v. Ignasiak,* 667 F.3d 1217 (11th Cir. 2012), which held that autopsy reports constituted testimonial evidence given the particular Florida statutory framework and the related trial testimony of a medical examiner. *Id.* at 1231-32. To the extent that Troya would take the position that the law in this Circuit has changed and that his trial counsel should have anticipated this eventuality, he is patently incorrect.

As explained earlier, a claim of ineffective assistance of counsel has two components. "First, the defendant must show that counsel's performance was deficient," in that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. *Strickland*, 466 U.S. at 687. "Second, the defendant must show that the

deficient performance prejudiced the defense" in the sense that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687, 694. As mentioned, the Eleventh Circuit has referred to the first element as the "performance" prong and the second element as the "prejudice" prong. *See Reece v. United States*, 119 F.3d 1462, 1464 n.4 (11th Cir. 1997) (citations omitted). A court need not address both components if the defendant makes an insufficient showing on one. *See Strickland*, 466 U.S. at 687. "For performance to be deficient, it must be established that, in light of all the circumstances, counsel's performance was outside the wide range of professional competence." *Putman v. Head,* 268 F.3d 1223, 1243 (11th Cir. 2001). Courts must be highly deferential in reviewing counsel's performance, and must apply the strong presumption that counsel's performance was reasonable. *See Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (*en banc*). The test of reasonableness must be measured from the trial record that existed at the time of the trial not with a talisman's view of the future development of case. *See generally, Maryland v. Kulbicki,* 136 S.Ct. at 4. Under the case law that existed at the time, the decision to allow substitution and focus on other parts of the case as to guilt was reasonable.

With regard to issues such as the one presented by Troya here, a reviewing court must make every effort "to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Additionally, "as an acknowledgment that law is no exact science, the rule that an attorney is not liable for an error of judgment on an unsettled proposition of law is universally recognized." *Smith v. Singletary*, 170 F.3d 1051, 1054 (11th Cir. 1999); *see also Jones v. United States*, 224 F.3d 1251, 1258 (11th Cir. 2000) ("[W]e are not prepared to say categorically that counsel's failure to [preserve an argument] constituted prejudicial, ineffective nonfeasance while the law was still unsettled.").

70

In this case, these principles apply perforce. When this case was being litigated, the issue of whether *Crawford* applied to autopsy reports was unsettled at best, and there was ample case law noting the reports were business records and thus exempt from the Confrontation Clause. It is unclear what exactly Troya's counsel would have gained by even lodging an objection given the fact that there was case law - including one case cited by the district court here - that decided the matter against Troya.

Further, the fact that this issue was being contested in cases such as *Ignasiak* while Troya was being tried does not support his argument that his counsel was constitutionally ineffective for failing to raise a Confrontation Clause objection. While ignorance of well-defined legal principles is deemed inexcusable, an attorney is not liable for an error of judgment on an unsettled proposition of law. *See Smith*, 170 F.3d at 1054-55; *see e.g., Guyton v. United States*, 447 Fed. Appx. 136 (11th Cir. 2011) (because the question of whether Florida extortion statute was non-generic was unsettled at the time of sentencing, ineffective assistance claim failed). Therefore, Troya's trial counsel were far from constitutionally deficient when they did not challenge the use of a substitute medical examiner.

The decision not to challenge the medical examiner's testimony—through cross or rebuttal expert testimony—also rested on solid trial tactics. The government had no eyewitness to the murders, nor DNA or fingerprints tying them to the actual murder scene. Neither murder weapon was ever recovered. The government's evidence rested primarily on circumstantial evidence linking the defendants to the general area (toll ticket fingerprints and cellular tower geographical locations), a few shell casings from the murder scene that had similar marks to those found on ammunition recovered from the defendants' residence, and cooperator testimony about the defendants' admissions. It was a reasonable trial strategy to focus on the weaknesses in the

71

evidence tying Troya to the murders rather than contesting the fact that the Escobedo family was murdered, given the circumstances of this case, the grisly nature of the autopsy photos, and the youth of two of the victims.   Counsel's performances were not deficient with regard to their handling of the medical examiner evidence.

Significantly, as noted above, if a defendant fails to establish the deficient performance prong, the Court need not analyze the prejudice prong, and vice versa. *See Philmore v. McNeil*, 575 F.3d 1251, 1261 (11th Cir. 2009). However, even if Troya were to satisfy the first prong, which as illustrated above he cannot, it is also evident that Troya's prejudice argument is likewise flawed. Troya ostensibly complains about the fact that the Medical Examiner testified about how the murders were conducted.   However, he is really complaining about the fact that the Medical Examiner was allowed to testify concerning the deaths of two small children and both their parents who were then unceremoniously left on the side of a Florida public highway. It makes no difference in terms of prejudice whether the Medical Examiner was allowed to testify that the children were executed at close range, or whether they died instantly or within minutes of being shot.   None of Troya's arguments alter an indisputable fact:  amongst four individuals killed, there were two small children who were shot and left on the side of a public road.  The fact remains that ample testimony was admitted concerning the fact that two small children were killed by gunfire—and left on the roadway apparently shielded, to some extent, by their mother's body.  The very nature of this case given the victims, and the other evidence, made this a very strong case for the United States.  Although the United States wanted to make sure it met its burden, the fact remains that it was hardly an ambiguity or a close question in the trial whether or not the individuals who shot these children and their parents intended to kill them.

Therefore, for all of the foregoing reasons, Troya cannot establish that his counsel were

72

ineffective in their handling of the medical examiner testimony.

F.  COUNSEL WERE NOT INEFFECTIVE IN THEIR HANDLING OF THE GOVERNMENT'S TOOLMARK EXPERT WITNESSES (RESPONSE TO TROYA ISSUE XI(B)).

Troya claims, in Issue XI(B), that his trial counsel were ineffective in the investigation and challenge of the Government's toolmark evidence.  In detail, Troya complains that his trial counsel should have conducted a comprehensive investigation of the firearms evidence, challenged the admissibility of such evidence through a pre-trial motion filed under *Daubert v. Merrill Pharmaceuticals Inc.*, 509 U.S. 579 (1993), moved *in limine* to restrict terminology concerning supposed 'matches', called their own expert in rebuttal, and conducted an effective cross-examination.[24]

Troya is correct in that no *Daubert* motion was filed pre-trial by any defense attorney as to the opinions cited by any of the government's firearms experts.  CR-DE 757 at 6268-70.  This omission, and the attempt at a belated oral *Daubert* motion, however, does not establish that the defense attorneys' efforts were ineffective for purposes of Sixth Amendment analysis.  Even if counsel had filed a *Daubert* motion at the appropriate time, there is no guarantee that a *Daubert* hearing would have been held as a matter of right.  Formal *Daubert* hearings are not required in every case.  *See United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001) ("*Daubert* hearings are not required, but may be helpful in complicated cases involving multiple expert witnesses").  Moreover, contrary to Petitioner's assumption that he would have prevailed at a Daubert hearing resulting in the exclusion of the firearms' testimony, the underlying methodology of tool mark identification and ballistics identification has been well established and courts have repeatedly

---

[24] Troya also throws in a claim of purported prosecutorial misconduct for presenting misleading expert testimony. CV-DE 25 at 123-143.  Troya fails to establish why this claim was not raised in his direct appeal and, as such, this claim is procedurally defaulted.  Furthermore, as the expert testimony was not misleading, in any way, no prosecutorial misconduct occurred.

accepted this type of expert testimony. *See United States v. Ashburn*, 88 F. Supp.3d 239 (E.D.N.Y. 2015) (citing *United States v. Otero*, 849 F. Supp.2d 425, 427 (D. N.J. 2012)); *United States v. Taylor*, 663 F.Supp.2d 1170, 1179 (D. N.M. 2009); *United States v. Diaz,* 2007 WL 485967 (N.D. Cal. 2007); *United States v. Montiero*, 407 F. Supp. 2d 351, 365-72 (D. Mass. 2006) (Counsel does not perform deficiently when he or she fails to file motions regarding meritless issues).

In sum, had a *Daubert* motion been timely filed in this case, it would have been denied. And as such motion would have been denied had it been filed, Petitioner cannot show that he was prejudiced by the lack of filing. Inasmuch as the outcome would have been the same even if trial counsel had filed a *Daubert* challenge, Troya's current claim must fail because of the lack of deficient performance and prejudice. The failure to seek a *Daubert* hearing did not constitute ineffectiveness.

Once the Court denied the oral *Daubert* motion voiced by Sanchez's counsel, Donnie Murrell, Troya's counsel were faced with a choice—they could thoroughly challenge the opinions and methodologies of the government experts via a wide-ranging and detailed cross-examination or they could bolster the validity of tool marks by calling their own expert to testify. Sanchez's counsel chose the former and engaged in a challenge to the firearms' evidence. Troya's counsel did the same. This was a strategic decision. We know that this was a strategic decision, rather than a necessity caused by poor planning, because prior to trial the United States received notification from Sanchez's trial counsel that they had retained an expert in firearms' ballistics analysis. *See* CV-DE 37-3, *Sanchez v. United Sates*, Case No. 16-80693 (S.D. FL) (Reciprocal Discovery received by the prosecution concerning Dennis McGuire, ballistics expert). The fact that this notice came from Sanchez's counsel, rather than Troya's, is of no moment as joint defense strategies are common-place and reasonable strategic choices in multi-defendant cases. Troya has

essentially conceded that there was a joint defense strategy concerning the prosecution's firearms experts. CR-DE 25 at 126.

Government tool mark expert Allison Quereau linked an AK-47 firearm recovered during a search warrant at Garden Court (GX 202m) and eight of eleven casings recovered from a shooting on Mercer Avenue in West Palm Beach, FL (GXs. 602A, 602B and 602C). CR-DE 757 at 6287. Specifically, she testified that she identified the AK-47 recovered from "Thug Mansion" as having fired eight of the cases recovered from Mercer Avenue. *Id.* Contrary to the petition filed here, the Government did not proceed with the firearms' linkage testimony until it had established the *Daubert* foundation for admissibility.[25] CR-DE 757 at 6265 – 6270; 6295-97. *See United States v. Otero*, 557 Fed. Appx. 146 (11th Cir. 2014) (ample record evidence existed for trial court to conclude *Daubert* foundation had been laid to admit tool mark evidence). Importantly, the trial judge afforded defense counsel the opportunity to *voir dire* Quereau on aspects relating to her qualifications, and presumably the underlying science prior to the admission of her expert opinion (*Id.* at 6269-70), but defense counsel opted to wait until cross-examination to make any challenges.

Mr. Murrell, penalty counsel for defendant Sanchez, conducted extensive cross-examination of government expert Allison Quereau relating to her qualifications and the science of firearms examination. *See e.g.,* CR-DE 60 at 6354-6377. Trailing defense counsel, Troya attorney Ruben Garcia, focused his questions on the terminology Quereau used, specifically the term "characteristics" and the limits of her conclusions. CR-DE 60 at 6378-6380. Those examinations brought into focus for the jury a challenge to the underlying science of tool mark identification, and the alleged uncertainty of identifying the AK-47 to the exclusion of every other

---

[25] *See* Allison Quereau predicate questions for admissibility of expert opinion, CR-DE 757 at 6256-6270; *and see* Marc Chapman predications questions for admissibility, CR-DE 764 at 6599-6604.

AK-47 in the world.

This joint cross-examination was effective.  Moreover, the joint trial of Troya and Sanchez often occasioned detailed cross-examination by one defense attorney, whose efforts were not duplicated verbatim by a trailing defense attorney.  Such was the case here.   When an attorney "substantially impeache[s]" the witness, no claim for ineffectiveness can succeed unless Troya comes forward with "specific information" which "would have added to the impeachment of the State's witnesses." *See Aldrich v. Wainwright*, 777 F.2d 630, 636-37 (11th Cir.1985); *see also Card v. Dugger*, 911 F.2d 1494, 1506 (11th Cir.1990)**.**

Government expert witness Marc Chapman testified as to the long-term acceptability of the science of firearms and tool mark identification, that its known error or validation rate was 1%, and that he had been trained and qualified as an expert in this field seventy times in state court and one preceding time in federal court.  CR-DE 764 at 6600-6603.  *See United States v. Otero*, 557 Fed. Appx. 146 (11th Cir. 2014) (ample record evidence existed for trial court to conclude *Daubert* foundation had been laid to admit tool mark evidence).   Defense counsel deferred any *voir dire* on the witness's qualifications or the field of examination until cross-examination.  (*Id.* at 6604). Chapman testified that he examined nine millimeter casings recovered from the homicide scene and determined that they were all fired from the same, unrecovered weapon.  CR-DE 764 at 6607. He also testified that when he compared three of those casings to hundreds of live rounds found in the Garden Court search warrant, he determined that the tool marks on the casings matched the tool marks on two of the live rounds.  *Id.*  at 6694. Chapman voiced this conclusion by stating that it was his opinion that within a reasonable degree of scientific certainty the same unknown tool made the tool markings on three of the .9mm casings from the homicide scene and two live rounds found at Garden Court (*Id.*).   Chapman also testified that he examined seven individual forty

76

caliber casings recovered separately from the same homicide scene and determined that they were all fired from the same firearm, a second unrecovered weapon.   CR-DE 764 at 6609.   Chapman further testified that two of those homicide forty caliber casings bore tool marks that had individual characteristics that were identical to one live round found at Garden Court. *Id.* at 6695. He expressed this opinion by stating that within a reasonable degree of scientific certainty it was his opinion that the tool markings on two of the forty caliber casings and one live round recovered from Garden Court were made by the same unknown tool. *Id.*   These identifications were based on microscopic analysis and comparison of breach face marks and firing pin impressions or markings. *Id.*

Donnie Murrell, Sanchez's penalty counsel, initially conducted the cross-examination of government tool mark expert Chapman.   CR-DE 764 at 6660.[26] Murrell's cross-examination challenged Chapman's lack of accreditation, his limited experience, his laboratory's funding by law enforcement, and that Chapman's professional organization does not require testing or proficiency for competence. CR-DE 764 at 6663-65.   Murrell pointed out to the jury that Chapman's two published articles were unrelated to tool mark identification, that Chapman's report failed to disclose the methods he used to conduct his comparisons, and that neither his report nor his employing laboratory has any procedure for determining or disclosing known error rates or percentages of certainty for their work. *Id.*   at 6673-6683.   Murrell also conducted an effective cross-examination utilizing a learned journal in Chapman's field of professional work and pointed out that Chapman had not read the latest report, and that he and his laboratory were not in

---

[26] The United States notes Troya's concession that a joint defense strategy between Sanchez's and Troya's trial counsel provided that Donnie Murrell would handle the bulk of cross examination of the prosecution's firearms experts.  CR-DE 25 at 126. *See* CV-DE 37-2, Case No. 06-80693-CV-Scola, Murrell Resume for detailed listing of his experience.  The United States submits that joint defense strategies are commonplace and reasonable strategic choices in multi-defendant cases.

compliance with many of the recommended best practices published in the report. *Id.* at 6675-6680. Murrell also pointed out that all of the tool markings could have been made by a gun chamber, not just a magazine lip as raised on direct. *Id.*, *compare* 6641 *with* 6668. Finally, Murrell pointed out that Chapman could not identify the actual tool that made the marks, nor could his analysis establish who was holding either of the two weapons that had fired the recovered casings. *Id.* at 6667, 6691-92.

After Murrell's cross-examination pointed out the expert's limited experience, and the limitations of his examinations and opinion, it was up to the jury to make credibility determinations. A detailed review of the trial transcript of Murrell's examination indicates that it was thoroughly conducted and touched on areas of training, bias, expertise, and the lack of protocols to ensure accuracy. The examination raised questions for the jury concerning the credibility of the science and the certainty of the expert's opinions. After this thorough examination, no other defense attorney conducted additional cross-examination, notably because none was needed. CR-DE 764 at 6692.

Given the thorough nature of the cross examination, it would have been duplicative for Troya's counsel to have repeated the comprehensive attack on the foundations of Chapman's testimony. The substantial impeachment of Chapman's testimony by Sanchez's counsel makes any Troya challenge of alleged ineffectiveness particularly unworthy of being sustained. *See Aldrich*, 777 F.2d at 636-37; *see also Card*, 911 F.2d at 1506 *and United States v. McGill*, 11 F.3d 223, 227-228 (11th Cir. 1993) (failure to call rebuttal firearms expert not ineffective where cross-examination covered much of the same ground).

The proper test of whether or not a movant has been denied effective representation is judged by whether or not some reasonable lawyer would have acted similarly at trial. And under

78

this test, trial counsel's conduct was constitutionally sufficient.  "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.... We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately." *Johnson v. Nagle*, 58 F. Supp. 2d 1303 at 1340-41(N.D. Ala. 1999), quoting *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir.1992).

Troya also complains that the failure to challenge the firearms' evidence was magnified because ostensibly, the experts' testimony was the only evidence in the trial record linking Troya to the Haverhill, Suwanee and Mercer Avenue shootings.  CV-DE 25 at 140.  This is not accurate. Government witness Kevin Vetere described the involvement of Troya, Sanchez and others in the Haverhill shooting.  CR-DE 753 at 5636-48.  Vetere described Troya's involvement in the Mercer Avenue shooting.  *Id.* at 5669-72.  Vetere also described Sanchez's admitted involvement in using the AK-47 to shoot up a house in the Westgate area, the area where Mercer Avenue was located. *Id.*  at 5672.[27]  Maria Lopez, Sanchez's former girlfriend also testified that Sanchez had discussed with her firing a gun into a house in Westgate because he believed a friend of hers was inside the house.  CR-DE 758 at 6392.  Finally, numerous law enforcement witnesses also testified to these shootings, two of which occurred with the same gun on the same day.   The evidence linking these shootings to Troya was substantial and the exclusion of the tool mark evidence would not have severed the link between these shootings and Troya.

Finally, Troya claims that his attorney should have countered the Government's tool mark

---

[27] Suwanee Avenue is located near Westgate Avenue in West Palm Beach.  (Testimony of Angela Culpepper, CR-DE 757 at 6210).

evidence by presenting a defense expert who could explain the supposed weaknesses and flaws in the prosecution's firearms evidence. CV-DE 25 at ECF 130-38.   Seven years after the trial, Troya has finally found a new firearms expert to counter the government's evidence.   However, this purported development is of no moment.   As a preliminary matter, counsel is not ineffective for failing to call an expert witness where counsel's cross-examination of the government's expert witness covered much of the same ground the uncalled expert would have covered.  *See United States v. McGill*, 11 F.3d 223, 227-228 (11th Cir. 1993).  Furthermore, Troya cannot prevail simply because he now has found, or could find, new experts who have come to different conclusions than the government's firearms experts.  *See Floyd v. Secretary*, 638 Fed. Appx. 909, 920 (11th Cir. 2016); *Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir.1997) ("[T]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial."); *see also Horsley v. State of Alabama*, 45 F.3d 1486, 1495 (11th Cir.1995) ( "That experts were found who would testify favorably years later is irrelevant."); *Elledge v. Dugger*, 823 F.2d 1439 (11th Cir.1987). Troya has failed to establish deficient performance.

Assuming, *arguendo*, that Troya was able to establish that his counsel were deficient in failing to call their own expert, Troya has not, and cannot establish that he was prejudiced thereby. In support of his claim, Troya filed an affidavit by purported firearms expert, William A. Tobin, which discussed the areas of testimony Tobin would have provided had he been called to testify. *See, e.g*., CV-DE 25 at 132-34, and CV-DE 5-4.  There are numerous problems with the Tobin affidavit.  First, the Tobin "affidavit" submitted to the Court is unsigned and undated.  Second, instead of directly addressing the tool marks found by the Government experts, Tobin attacks the underlying field of firearms and tool mark identification and claims that the subject area is not a

science[28]. CV-DE 5-4 at 11.   Tobin asserts that the most that Quereau or Chapman should have testified to was not a "match" or an "identification" of a particular item, but instead that a particular firearm could not be excluded as the weapon that actually fired a particular projectile.  *Id.* at 26. However, Tobin's affidavit does not establish that the testimony of Quereau or Chapman was erroneous because Tobin has not reviewed any cartridge cases, bullets, projectiles, magazines or anything remotely connected to any firearm in this case. CV-DE 5-4.   He only reviewed the experts' reports and then claimed there was no scientific basis for the terms they used.  *Id.* Finally, the Court should note that Tobin's declaration appears to have drafted by lawyers in another, unrelated proceeding, and then just "plugged in" information related to this case.  A review of the Tobin Affidavit makes this apparent. CV-DE 5-4 at 49, fn. 79.   The affidavit references trial transcripts that support Tobin's conclusions, but these references do not appear to relate to the instant case.  Instead of referring to actual trial testimony in this case offered by prosecution experts Quereau or Chapman, Tobin's affidavit refers to witnesses named "Byrd" and "Balash"— witnesses who never testified in this matter.  Further support for this conclusion lies in the Affidavit's statement that his "curriculum vitae is appended to this affidavit in Appendix H." CV-DE 5-4 at 6.  There is no "Appendix H" attached to Troya's filing.

Assuming, for argument's sake, that Tobin's testimony is relevant, and would have been admitted at the trial of this matter—which is by no means assured—Troya has not met his burden of establishing that Tobin's testimony would have changed the outcome of this trial.  Tobin's affidavit is unsigned, he examined nothing related to this case, and his opinions seem to relate to another case entirely. Tobin's opinion that firearms and tool mark evidence is not a science is

---

[28] To the extent that Troya attempts to use the Tobin affidavit to support his *Daubert* related claims, case law directly contradicts this claim for the reasons stated above.

contradicted by the case law, and the trial court's holding in this case that the *Daubert* foundation for admissibility had been met by the prosecution. Troya's 2255 claims on this issue fail to establish that the outcome of the trial would have been different if he had been called as a witness.

Trial counsel made multiple objections to the admissibility of the government's tool mark evidence,[29] and vigorously cross-examined the government's tool mark expert witnesses. Although Sanchez's attorneys retained and noticed a comparative witness prior to trial, the entire defense camp thereafter made a strategic decision not to call this witness and to rely instead on their very effective cross-examination. Trial counsel's teamwork with Sanchez's counsel, coupled with their own cross-examination, provided constitutionally effective representation. Their performance with regard to the tool mark evidence was not deficient and did not constitute ineffective assistance of counsel.

G.    COUNSEL WERE NOT INEFFECTIVE IN THEIR HANDLING OF THE GOVERNMENT'S FINGERPRINT EXPERT WITNESS (RESPONSE TO TROYA ISSUE XI(C)).

Troya complains that his counsel were ineffective for failing to counter the expert testimony of Jack McCall, the government's fingerprint expert. Troya falls woefully short of establishing either deficient performance or prejudice.

Troya attempts to focus his attack on the certainty of McCall's opinion. It is worth noting that that the Eleventh Circuit has long noted the acceptance of fingerprint identification testimony under *Daubert*. *See United States v. Abreu*, 406 F.3d 1304, 1307 (11th Cir. 2005) (citations omitted); *see also United States v. John,* 597 F.3d 263, 274 (5th Cir. 2010). Other Circuits have

---

[29] By order of the Court, trial counsel automatically joined in every objection voiced by co-counsel unless they expressly opted out of the objection. CR-DE 648 at 12; CR-DE 961 at 27-28. Written pleadings were similarly viewed.  CR-DE  245.

upheld the admission of expert testimony concerning fingerprint examination as well. *See, e.g., United States v. Pena*, 586 F.3d 105, 110–11 (1st Cir. 2009) (the district court did not abuse its discretion by permitting expert testimony that was based on the ACE–V method); *United States v. Mitchell*, 365 F.3d 215, 221–22, 246 (3d Cir.2004) (same); *United States v. Baines*, 573 F.3d 979, 983, 989–92 (10th Cir. 2009) (same); *United States v. Crisp*, 324 F.3d 261, 266–70 (4th Cir. 2003) (upholding admission of fingerprint evidence under *Daubert*, and noting that "[f]ingerprint identification has been admissible as reliable evidence in criminal trials in this country since at least 1911."); *United States v. Havvard*, 260 F.3d 597, 600–02 (7th Cir. 2001).    Many of the studies cited by the defense as supposed support for the failure to challenge McCall's testimony occurred well after the trial date in 2009.  As mentioned earlier, the court's review necessarily must focus on what was known in 2009.  *See generally, Kulbicki,* 136 S.Ct. at 4 (2015). Given the long-held acceptability of fingerprint expert testimony, the trial court would have denied any *Daubert* motion counsel could have filed, likely without a hearing. *See John,* 597 F.3d at 274.

Once expert testimony meets the *Daubert* standard of admissibility it is entirely within the trial jury's province to decide how much or how little weight to accord to expert testimony.  In this case, the Government's expert opined that Troya's palm print was found on the Turnpike toll ticket.  CR-DE 730 at 3712-3733 and GXs. 533e.1, 533e.2, 8, 15.  This evidence was vastly unchallenged by the defense, which is not surprising given that Troya's trial counsel consulted with their own fingerprint expert who independently reviewed the questioned latent prints on the Turnpike toll ticket, and also concluded that Troya's print was on that ticket. *See, e.g.,* CR-DE 25 at  144 ("the defense did have an expert witness at its disposal"); *Id.* at 146 ("trial counsel simply accepted the defense expert's validation of the fingerprint…"); *Id.* at 146 ("it is true that the defense expert ratified the identification of Mr. Troya").  Frankly, given the [unidentified] defense

83

expert's agreement that Troya's print was on the Turnpike ticket, and the overwhelming case law supporting the use of expert testimony in this area, trial counsel cannot be faulted for not doing more cross-examination[30].

Even now, seven years after the trial, Troya has still failed to identify a contrary defense expert that would have disagreed with McCall's substantive conclusion.  Troya filed the affidavit of Heidi Eldridge in support of his claim that McCall's opinion was based on an improper methodology.   However, this affidavit is lacking in an important respect: it does not demonstrate that Ms. Eldrige has ever been qualified, in state or federal court, as an expert witness in the field of latent print examination.  CV-DE 5-6. Assuming for the sake of argument that Eldridge is qualified, and that her testimony would have been admitted, Troya has not established that her testimony would have changed the outcome of the trial.  Nowhere in the Affidavit of Heidi Eldridge does she claim that she has examined the latent print found on the original Turnpike toll ticket and found that it does not match the print of Daniel Troya. *See* CV-DE 5-6 at 1-12.  Ms. Eldridge's opinion related to the methodology used by the Government's expert.  Ms. Eldridge claims that the only way to demonstrate the validity of his McCall's conclusion would have been for McCall to visually present the 14 points he found, in order that another competent examiner could assess its sufficiency for the conclusion.  This is exactly what happened at trial.  *See, e.g.*, CR-DE 730 at 3713-3747.  The jury was read a stipulation, GX 723, in which the parties agreed that Government Exhibit (GX) 533e.1 contained the known prints of Daniel Troya. CR-DE 730 at 3725.  Thereafter, McCall identified GX 533e.2, (admitted at CR-DE 730 at 3726) and he testified,

---

[30]As to the failure to challenge non-testifying latent print examiners, this argument merits little response. First, there is no basis in fact or in the record for the assertion that McCall's opinion was based in whole or in part on looking at prior examiners' work product.  Second, as those examiners did not testify against Troya, counsel cannot be found ineffective for failing to cross-examine them.

using an enlarged image of GX 533e.2 that was published to the jury, that he "marked 14 points of I.D. (*sic.*) that [he] found on that latent versus the standard of Mr. Troya." CR-DE 730 at 3728. Finally, McCall identified and the Court admitted GX 15 (CR-DE 730 at 3732), a summary chart comparing for the jury the actual parts of Troya's palm print from the known standards with a photograph of the Turnpike toll ticket (GX 8) on which the latent was identified, along with the portion of the ticket wherein the latent print was found. CR-DE 730 at 3733. In short, McCall complied with the very alleged shortcoming Eldridge complained about; he did visually present to the jury the 14 points he had found. This is fatal to Troya's claim.

A habeas Petitioner who claims that his attorneys were ineffective at trial because they failed to call certain persons as witnesses must prove that the proposed witnesses would have testified favorably to his defense. *Johnson v. Nagle*, 58 F. Supp. 2d 1303, 1357 (N.D. Ala. 1999), *citing Aldrich,* 777 F.2d at 636-37. Troya has failed to establish any favorable aspect to Ms. Eldridge's purported testimony; he cannot establish that the result of his trial would have been different had his lawyers called Ms. Eldridge to testify. Ms. Eldridge did not examine any of the fingerprint evidence in this case, much less claim a misidentification, and she would have had to concede that her alleged shortcomings were actually fulfilled by McCall's thorough examination and testimony. Troya's counsel acted appropriately with regard to the fingerprint evidence. Although they did not request a *Daubert* hearing, or otherwise challenge the propriety of fingerprint expert testimony, this course of action was appropriate given the overwhelming acceptance of fingerprint analysis expert testimony in this and other federal circuits. Counsel retained an expert to examine the print, but the outcome of that examination only further incriminated Troya. Not calling this expert was a sound, strategic decision. Even today, Troya has yet to come forth with an expert who could counter the government's expert testimony.

85

Instead, Troya submits an affidavit from an untried "expert" whose only critique of the Government's expert is wholly belied by the record below. Troya has established neither deficient performance nor prejudice. As such, Troya's claim that his counsel were ineffective in their handling of the fingerprint expert must be denied.

H.     **COUNSEL WERE NOT INEFFECTIVE IN ITS HANDLING OF THE TESTIMONY OF GOVERNMENT LAY WITNESSES. (RESPONSE TO TROYA ISSUES XII(B)(2-6), XV & XXII).**

Troya, in issues XII (B)(subsections 2-6), XV, and XXII, of his § 2255 motion, alleges that his counsel were ineffective for failing to object to various portions of the government's direct examination of certain Government cooperators and in failing to conduct adequate cross examination of these same witnesses. *See* CV-DE 25, CM/ECF at 186-191, 226-240, and 273-286. For the reasons stated herein, Troya's claims must be denied.

1.   Government Witness Melvin Fernandez

Troya claims that his counsel were ineffective for failing to adequately proffer and utilize impeaching information concerning Government witness Melvin Fernandez. Fernandez was called to testify on January 28, 2009, the first full day of trial testimony, and testified that Troya had told him, shortly after Fernandez saw news reports concerning the murders of the Escobedo family, that he (Troya) had robbed someone of fifteen kilograms of cocaine. CR-DE 729 at 3488-89. Fernandez also testified that around this same time, Troya bought himself a car. *Id.* at 3490.

Prior to Fernandez's testimony, on January 19, 2009, a date during jury selection, the Government filed a motion *in limine* to preclude the defense from cross-examining Government's witnesses concerning uncharged prior bad acts, a type of cross-examination limited by Federal Rule of Evidence 609. CR-DE 691. The Government raised this issue on the afternoon of January 27, 2009, just prior to Fernandez's testimony, and indicated that it wanted to put everyone on

86

notice that this issue might come up during Fernandez's testimony, which might occur on the following day.  CR-DE 728 at 3255-57.  After a brief discussion of the rule and areas of impeachment, the Court indicated that it could not rule in the abstract and would address the issues at sidebar when they arose.  *Id.* at 3261, line 21 - 3262 line 1; 3262, at lines 20-24.  Troya's counsel agreed to this approach.   *Id.* at 3262 line 2; at 3262 line 25.

The following day, at the beginning of Fernandez's cross, Troya's counsel asked for a sidebar following the procedure that had been discussed and agreed to on the preceding day.  CR-DE 729, at 3497, lines 13-14.   During this sidebar, Troya's counsel proffered the area of cross-examination and the Court granted the Government's request to exclude this area of cross:

> MR. EISENBERG: We have information that this man along with Kevin Vetere was selling innumerable illegal drugs including cocaine, Xanax, Ecstasy and marijuana for a long period of time up through 2006.
>
> THE COURT:  Right.
>
> MR. EISENBERG:  That is what we want to cross examine him on. This guy isn't here out of the goodness of his heart.  He gave the false statement because he was afraid of his drug dealing being exposed, and that is why he is here.  It goes to bias to show he is seeking not to be charged with any drug dealing the same way he is seeking not to be charged with giving a false statement to a Federal agent.  He is currying favor with the Government.
>
> MR. CARLTON:  We object to that cross examination under 608-B and 609, 609 covering felony convictions, which this witness has none.  With regard to 608-B, we do not believe that the type of cross examination Mr. Eisenberg wants to engage in is permissible.
>
> THE COURT:  I will sustain the Government's objection.

*Id.* at 3497, line 20 – 3498, line17.  Counsel tried to change the Court's mind and asked to proffer again, but the Court declined to hear further argument.  *Id.* at 3500, line 24 – 3501, line 5.

Troya now claims that his counsel was ineffective for failing to make a proffer.  This allegation lacks any basis in fact.  As shown in the record, Counsel proffered the areas of cross-

87

examination and the Court simply ruled that these areas of cross were impermissible. *Id.* at 3497, line 20 – 3498, line17. Troya is asking this Court to find that his trial counsel was ineffective for failing to make a proffer when counsel actually did make such a proffer. This claim, which has no basis in fact, must be denied.

Troya alternatively claims that counsel failed to adequately describe the admissible bases for impeachment. CV-DE 25 at 228. However, Troya fails to state just how the description or proffer was inadequate. Troya also indicates that additional witnesses Carlos Bonilla and Alex Melendez could have been called to testify to Melvin Fernandez's drug dealing. Troya fails to state how this evidence would have been admissible under the Federal Rules of Evidence. The Court had already ruled that this would not be an appropriate area of cross-examination; Troya gives no reasoning or legal basis for the Court to allow for this same type of impeachment using such extrinsic evidence. Troya's claim that trial counsel was ineffective for giving an inadequate proffer is speculative, at best, and therefore must be denied.

Troya also claims that his appellate counsel was ineffective for raising this restriction on the area of cross-examination on appeal. CV-DE 25, at 228. Troya cites no law or facts that would support this assertion that appellate counsel's performance in this regard was deficient. Troya cites to no cases or rules of evidence that would support Troya's claim that this type of cross-examination is appropriate or that such a claim would be meritorious on appeal. Troya does not even state the legal standard that the appellate courts would use in evaluating such a claim. Troya's claim that appellate counsel was ineffective for failing to claim that the Court improperly restricted the cross examination of Fernandez is speculative, at best, fails to establish deficient performance or prejudice, and must therefore be denied.

2. Government Witness Kevin Vetere

Troya claims that his counsel was ineffective for failing to adequately cross-examine Government witness Kevin Vetere, failing to adequately object during Vetere's direct examination, and failing to object to the Court's plan to have Vetere escorted into the courtroom by two marshals in plain clothes. CV-DE 25 at 228-30.

First, Troya claims that his counsel failed to object to Government Witness Kevin Vetere's "improper" description of the various places that he and his co-defendants had lived as "Pimp Plaza" and "Thug Mansion". CV-DE 25 at 230. The failure to object to admissible evidence does not constitute ineffective assistance of counsel. *See Lovett v. State of Fla.*, 627 F.2d 706, 709 (5th Cir. 1980) (*citing Babers v. Estelle*, 616 F.2d 178, 181 (5th Cir. 1980)). Troya cites to no law or rule that could have supported an objection to these labels during Vetere's testimony. As such, Troya has not shown that his Counsel was deficient for failing make such an objection. Vetere was not the only witness who testified to the use of these labels. Government witness Elvia Castillo also testified that the townhouse where the defendants resided was called "Pimp Plaza". CR-DE 752 at 5140-41. The record indicates that "Pimp Plaza" and "Thug Mansion" were the labels that *Troya and his co-defendant*s used to describe the places where they lived, stored weapons, dealt narcotics, and defended from would-be robbers. The labels were therefore relevant to matters at hand. Had counsel chosen to object to Vetere's testimony concerning these labels, this objection would have likely been overruled. Troya cites to no legal authority or rule that would indicate that the objection would have been granted, and cannot show that he was prejudiced, in any way, from counsel's choice not to object to these labels.

Second, Troya claims that his trial counsel was ineffective during his cross of Vetere, specifically that Counsel brought forth Vetere's prior statement to police concerning Vetere's discussion with Troya about the murders of the Escobedo children. Troya claims that this evidence

89

did not come out on direct and that the cross examination hurt his case and undermined counsel's credibility with the jury.  CV-DE 25 at 232.

During his direct examination, Government witness Kevin Vetere gave damaging testimony against Troya and his co-defendants.  Vetere had been friends with Troya since the first grade, and had lived in "Thug Mansion" at the time of the murders.  Vetere testified that Troya and Sanchez had driven the maroon van that was used during the homicide, that he saw Troya and Sanchez leave "Thug Mansion" in that van on the night of the murders, and that he was rebuffed by Troya and Varela when he tried to go along.  Vetere also testified that he saw Troya and Sanchez return home in the early morning hours of October 13 and saw them carrying in black duffel bags.  CR-DE 754 at 5451, lines 11-24.  Vetere testified that he needed to leave the home shortly thereafter and noticed that everyone else had already left.  *Id.* at 5455, line – 5456, line 11.  Vetere did not have his own car, and having no one to ask permission to borrow a car, Vetere took the keys to the maroon van from Sanchez's room and left "Thug Mansion" in that vehicle.  *Id.* at 5455 line 13 – 5458 line 5.  Vetere testified that Troya called him and told him that Varela was furious that Vetere had taken the van and that Vetere needed to return it right away.  *Id.* at 5458, lines 14-19.  On his way back to "Thug Mansion", Vetere received a call from Varela who instructed Vetere not to return the van to "Thug Mansion" but to take it to the home of Varela's uncle.  *Id.* at 5458, line 20 – 5459, line 14.  When Vetere arrived at the uncle's house, he noticed that Escobedo's van was also parked at the house.  *Id.* at 5460, line 21 – 5461, line 11.  Varela and Troya arrived at the uncle's house shortly thereafter and Varela asked Vetere to drive Escobedo's jeep to the home of Vetere's grandmother and afterwards they would all have breakfast at Denny's.  *Id.* at 5465, line 2 - 5467, line 6.  Vetere drove the victim's jeep to his grandmother's house, as requested.  *Id.* at 5467, lines 16-18.  Then Vetere, Troya, and Varela all had breakfast at Denny's as the sun was

coming up on October 13—this was about the same time that the Escobedo's bodies were discovered on the side of the Florida Turnpike. *Id.* at 5471, line 22 – 5472, line 1. Vetere testified after that after he learned of the murders of the Escobedo family, he became concerned that the he had driven the victims' jeep to his grandmother's home immediately following the murders. Vetere testified that he raised these concerns with Troya and that Troya assured Vetere that he (Troya) had moved the jeep from the grandmother's house. *Id.* at 5487, lines 19-22. Vetere further testified that after the jeep was found by the police, Troya told him that he (Troya) intended to burn the jeep but the police found it too quick. *Id.* at 5488, line 2 – 5489, line 1. Vetere also testified that he had a conversation with Troya on October 16, 2007, after the jeep was found, during which time Vetere expressed concerns that the Turnpike had cameras. *Id.* at 5521, lines 14-23. Vetere testified that Troya stated that when he paid the toll he opened the door instead of rolling down his window up and did not wait for change. *Id.* at 5521, line 24 – 5522, line 12. During this same conversation, Vetere testified that he inquired as to whether his fingerprints and the fingerprints of Troya might be found in the victim's jeep. *Id.* at 5522, line 13 – 25. Vetere testified that Troya told him that he (Troya) had "wiped the jeep down real good". *Id.* at 5523, line 4. Vetere testified that later that same day, he and Troya got new cell phones. *Id.* at 5526, lines 14-22.

Counsel's cross-examination focused on the fact that Vetere had given multiple, conflicting statements to law enforcement. Counsel elicited that Vetere had given a statement on October 27, 2008, in which he denied any knowledge of the killings and stated that he had been at his grandmother's house on October 12, 2008. CR-DE 753 at 5709-5710, 5714. Counsel also elicited that Vetere gave another statement on May 4, 2007, in which Vetere admitted that he had not been at his grandmother's house all night—an inconsistency from his earlier statement. *Id.* at 5714.

Counsel showed that Vetere was inconsistent as to when and how he first learned of the murders: first indicating that he had not heard of the murders until "a couple days later, until I seen it on the news" (i*d.* at 5722, lines 8-12), and then testifying that he had heard of the murders when he saw the October 14 newspaper.   Counsel also elicited that during the October 27 interview, and again at the beginning of the May 4 interview, Vetere indicated that he had never had a conversation with Troya about the murders, but later on in the same interview claimed to have a very specific conversation with Troya.  *Id.* at 5712, lines 9-13; and p. 5728, line 8 – p. 5729, line 5.  It is the questions concerning this specific conversation with Troya that give rise to the instant claim.

To establish that counsel's cross was ineffective, Troya would have to show that no reasonable lawyer would conducted the cross examination in this manner.  *See Provenzano v. Singletary,* 148 F.3d 1327, 1332 (11th Cir.1998).   Throughout this cross-examination, counsel was attempting to and *did* show the inconsistencies in Vetere's prior statements and his testimony at trial.  Counsel also argued Vetere's inconsistent statements in closing. CR-DE 766 at 7254, line 18 – p. 7255, line 2.  Vetere's testimony, and his earlier interviews, all concerned a conspiracy to distribute cocaine and the murders of the Escobedo family, the patriarch of which was supplying cocaine to this conspiracy.   Nearly every statement Vetere made concerned criminal activity of Troya and his co-defendants.   Showing inconsistencies in these statements is therefore going to involve, to some extent, the repetition of statements that incriminate Troya.   To avoid this repetition, Counsel would have to refrain from attempting to impeach Vetere, an important Government witness who had made a number of inconsistent statements.  The Eleventh Circuit has found ineffective assistance where counsel fails to attempt such impeachment. *See Nixon v. Newsome,* 888 F.2d 112, 115-16 (11th Cir.1989); *Smith v. Wainwright,* 799 F.2d 1442, 1443-44 (11th Cir.1986) (*per curiam*).   Counsel's attempts to impeach Vetere were warranted and

reasonable, and Troya has not shown otherwise.

Troya has also not shown that he was prejudiced from counsel's impeachment of Vetere. While it is true that this impeachment resulted in the repetition of certain incriminating facts,[31] and the introduction of Troya's statement that he "didn't want to talk about that", these small snippets of testimony pale in comparison to the damaging effect Vetere's testimony had on the defense. Had the impeachment never been attempted, the remainder of Vetere's devastating testimony would still have come in—unchallenged.   Troya cannot establish that the outcome of his trial would have been different had the impeachment not been attempted.

Third, Troya claims that trial counsel was ineffective for failing to introduce extrinsic evidence of Vetere's rampant drug use.  Specifically, Troya claims that his lawyer was ineffective for failing to call Erasmo Garcia to testify that Vetere was "heavily into drugs" around the time of his arrest.[32]  CV-DE 25 at 235-36.  An affidavit of Erasmo Garcia is attached to Troya's motion as Appendix G.  The facts that Vetere was heavily into drugs before this arrest, was not in dispute, and the record shows that the jury was made aware of his drug use on more than one occasion. The jury was also aware that Vetere stole drugs and stole money to pay for drugs.  There was testimony that the Troya installed a safe in his room to prevent Vetere from stealing his things. CR-DE 752 at 5246.  The jury knew these things, and yet still chose to believe Vetere's testimony. It is hard to imagine that the testimony of two additional witnesses would have tipped the scale.

---

[31] Although the Court commented during sidebar that the Government could now introduce Varela's entire May statement.  CR-DE 753, at 5730, line 18 – 5731, line 7, the Government did not attempt to introduce this statement on re-direct and hence no prejudice resulted from the opening of this door.

[32] Petitioner also alleges that trial counsel was ineffective for failing to call Carlos Bonilla to impeach Vetere's credibility.  However, Petitioner did not provide an affidavit for Carlos Bonilla. As such, Petitioner's claims concerning uncalled witness Carlos Bonilla must be denied.

Further, it is not known how this testimony would have been received.   We do not know whether Mr. Garcia has a criminal record or knowledge of Troya's activities that could hurt Garcia's credibility or caused more problems for Troya.  Troya has failed to meet his burden of establishing that his counsel performed deficiently in not calling Garcia, and has also not shown that he was prejudiced by this omission.

Finally, Troya also claims that his counsel were ineffective for failing to object to the Court's plan to have government witness Kevin Vetere escorted in by two deputy marshals in plain clothes.  CV-DE 25 at 229-30.  Before Kevin Vetere was called as a witness by the government, the prosecutor informed the Court that Vetere had been placed in the Witness Protection Program operated by the U. S. Marshals due to a credible threat against himself and his family.   CR-DE 754 at 5403.  The trial judge invited argument from counsel prior to witness Vetere entering the courtroom, and a discussion ensued regarding the desirability of having him brought in and seated outside of the jury's presence.  Mr. Eisenberg was the singular attorney to respond, stating that he did not feel any differently than the trial judge – that two marshals was not a big deal.  Troya has argued that the additional marshal escort and Mr. Vetere's wearing a bulletproof vest under his suit jacket[33] were security measures that "unreasonably heightened the perception Mr. Vetere was in danger from Mr. Troya and the other defendants."  CV-DE 25 at 229-30.

The Supreme Court has considered whether the presence of identifiable security officers at trial created inherent prejudice to a criminal defendant, and in holding that it did not, stated as follows:

> The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might

---

[33] Troya has not shown that Vetere actually wore a vest, and there is no factual support in the record supporting the claim.  The United States denies the allegation.

> reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm.

*Holbrook v. Flynn*, 475 U.S. 560, 569 (1986) (assessing the impact of four uniformed law enforcement officers seated in the first spectator's row behind the several criminal defendants). The Court considered the scene presented to jurors to determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to the defendant's right to a fair trial. *Id.* The court went on to hold that, ". . . if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." *Id.* at 572.

That Mr. Vetere was escorted by two deputy Marshals rather than one, as were other incarcerated witnesses, hardly rises to the level of an inherently prejudicial show of security such that it violated Troya's constitutional rights. Because the law in *Holbrook* and other cases was so clear on this, it is not surprising that Troya's attorney did not object, and no prejudice attached to that failure to object. This argument is meritless.

As Troya cannot show deficient performance or prejudice as a result of counsel's handling of Government witness Kevin Vetere, Troya's claims in this regard must be denied.

3. Government Witness Carlos Rodriguez

Troya claims that his lawyers were ineffective in failing to object to the testimony of Carlos Rodriguez. Specifically, Troya claims that his lawyer was ineffective for failing to object when Rodriguez altered his testimony in response to the Court's *Bruton* ruling. Prior to Rodriguez's testimony, the Government asked for a sidebar and informed the Court that Rodriguez had overheard his cell mate Hambrick and Troya having a conversation in which Troya indicated that he had been involved in killing some people, including children, and wanted to know how Hambrick, a veteran of U.S. military action in the Middle East, felt about having to kill people. CR-DE 737 p. 4379, lines 6-20. When Hambrick asked why Troya had killed them, Troya responded that he had to do it and that he got paid money and drugs. *Id.* at 4379, lines 20-23. The Government further informed the Court that at one point, Troya used the term "we" but that the Government had already instructed the witness not to use the word "we" in describing Troya's statements. *Id.* at 4378, lines 19-23. After the Government's proffer, Sanchez's lawyer objected to the use of the word "we" and further indicated that he did not believe that the statement could be sanitized to remove any stigma to Sanchez given the evidence tying Sanchez and Troya together stating, "any confession elicited from Mr. Troya in this case because of the facts and circumstances of the particular way the Government has alleged this crime occurred necessarily implicates Mr. Sanchez. *Id.* at 4382, lines 15 – p. 4383, line 3. After a lengthy discussion on the law, the Court ruled that the change from "we" to "I" would satisfy the *Bruton* rule (*i.e.,* not implicating Sanchez) and that the statement that Troya was paid in money and drugs would not come in under the *Bruton* rule, as it implicated co-defendant Varela (for "paying" Troya). Troya's counsel objected to the exclusion of the payment details, but the Court overruled their objection and ordered the defense not to raise the issue. *Id.* at 4396-4398. The use of the phrase "involved in", which would imply that others played a role in the killings, was not discussed. Rodriguez was then brought in and

instructed before the Court, the defendant, and all counsel.  *Id.* at 4399, line 10 – p. 4300, line 6.

Between this instruction and Rodriguez's testimony, no other recesses were taken.

Subsequently, Rodriguez testified to Troya's statements:

Q.  Who is he?

A.  Mr. Troya, he say he done something very wrong.

Q.  What were the words he used; if you remember?

A.  I have done something very wrong.

Q.  And what –

A.   There is some people involved.  He say, he said, I have killed some people.

Q.  He said, I have killed some people?

A.  Yes, sir.

Q.  Did he tell Mr. Hambrick what kind of people he killed?

A.  Then he say, and those people were children involved.

Q.  Did he tell -- did Mr. Hambrick ask him why he did it?

A.  Yes.  Of course he did.

Q.  And what did Troya say?

A.  He say that is something he have to do.

*Id.* at 4416, line 21 – p. 4417, line 13.   The Government clarified the testimony with the following

question and answer:

Q.   When Troya was speaking to Hambrick about killing some people, was Troya making it clear to Hambrick from what you could hear that Troya was involved in killing some people including children?

A.  Yes, sir.

*Id.* at 4419, line # - p. 4420, line 2.

Troya claims that his counsel was ineffective for failing to object to the alteration of

Roriguez's testimony.  Troya claims that the alteration from his statement that he was "involved

in killing" some people, including children, to the statement that he "killed" some people,

including children prejudiced him.  First, the record indicates that the witness and/or the questioner sometimes used the word "involved" and sometimes did not, so the record is not clear that a material alteration in testimony occurred.  Second, even if the testimony had been changed to omit the phrase, "involved in", this appeared to be a distinction without a difference.  The thrust of Rodriguez's testimony was that Troya played a role in the killing of people, including children, and was seeking advice on how to deal with his conscience.  The use of the phrase "involved in" does not change the devastating character of this testimony.  Troya cites to no law or rule which would have formed the legal basis to Rodriguez's testimony and therefore has not shown that Counsel should have made such an objection.

Furthermore, Troya has not established that an objection would have changed the outcome of his trial.  Troya has the burden of showing (1) that such objection, if made, would have been sustained and (2) that a sustained objection, and the alteration of Rodriguez's testimony, would have changed the outcome of the trial.   Troya states that Rodriguez's testimony was the only evidence addressing Troya's involvement in the murders. CV-DE 25, p. 240.  This is simply not true.  Rodriguez's testimony could have been excluded altogether and the Government would still have proven Troya's guilt beyond a reasonable doubt.  The evidence from the crime scene and the medical examiner's reports showed that the family was killed together in a barrage of bullets on the side of the turnpike just south of Fort Pierce.  Casings from the scene had tool marks consistent with tool marks found on live rounds recovered from the residence of Sanchez and Troya.  Turnpike records showed that the maroon van and the Escobedos' Jeep entered the turnpike in Fort Pierce at the same time.  Phone records show that Sanchez called the Escobedos shortly thereafter.  A witness heard gunshots from the Turnpike moments after this call.  Approximately 30 minutes later, the Escobedos' Jeep and the Maroon van exited the turnpike at Okeechobee Boulevard in

98

West Palm Beach. The turnpike tickets for these vehicles contained latent prints which matched those of Sanchez and Troya. Testimony also indicated that Troya and Sanchez played a role in the movement and planned destruction of the Escobedos' Jeep. The Escobedos never made it off the Turnpike—their bodies were found on the side of the Turnpike the following morning as the sun came up, while Troya and Sanchez were having breakfast at Denny's.

As Troya has established neither deficient performance nor prejudice with regard to Rodriguez's testimony, this claim of ineffective assistance of counsel must be denied.

4.   Government Witness Inspector Glover

Troya claims that his counsel was ineffective for failing to adequately object during Inspector Glover's direct examination. CV-DE 25 at 273. Inspector Glover testified during the penalty phase only, and his testimony concerned Troya's unsuccessful attempt to escape from the Brevard Correctional Institution.

First, Troya claims that his counsel were ineffective for failing to object when the Government posed a question that included the statement, "Troya along with his confederates". CV-DE 25 at 186, 285-286. Troya claims that this was "a misleading statement of fact, as there was ample proof available that Mr. Troya was not the leader". CV-DE 25 at 186. The question posed by the Government does not indicate that Troya was a leader, only that he had "confederates". There is nothing misleading about this question, as Troya and two other inmates were caught escaping from prison together. Troya has not established that his counsel was deficient in failing to object to this question. The record shows that Troya's trial counsel explored this area on cross-examination and elicited testimony that the escape had been planned by another inmate and Troya intended to turn himself in to authorities after the escape. CR-DE 818, p. 8013, line 3 – p. 8015, line 20.

99

Second, Troya claims that his counsel were ineffective for failing to object when the Government posed a question which indicated that certain items used in the escape had been found in "the Troya cell". CV-DE 25 at 186-87.  Troya claims that the used of the phrase "the Troya cell" was objectionable as it implied that this was Troya's personal space.   CV-DE 25 at 186.  The items were, in fact, found in the cell where Troya was residing.  There is nothing misleading about this question.  Furthermore, the Government also solicited testimony from this same witness that Troya shared a cell with another inmate, Jeffrey Burlson, who was also involved in the escape. *Id.,* at 7984, line 17 – 7985, line 6; 7992, lines 16-20.  Troya has not established that his counsel were deficient in failing to object to this question.

Third, Troya claims that trial counsel were ineffective for failing to object and failing to move to strike Inspector Glover's testimony that Troya had been found in civilian clothes.  CV-DE 25 at 189.[34]  While it is true that trial counsel did not object to this testimony during Inspector Glover's direct examination, trial counsel did spend some time on this issue on cross-examination:

> Q.  Now, when they were apprehended, there is a point -- when they were apprehended, sir, you were talking about clothing that was made to somehow look like civilian clothing?
>
> A.  Yes, sir.
>
> Q.  Isn't it true Daniel Troya didn't have any of civilian type clothing on, it was only the other two?
>
> A.  It was the other two.  From what I got from security, the other two were the only ones that were wearing the civilian clothes.
>
> Q.  I thought, maybe I am mistaken, but on direct did you say Daniel Troya was wearing some of this civilian clothes?  Did you make a distinction between Daniel Troya and the other two who actually were?
>
> A.  No.  When I got to the institution, security had taken the evidence

---

[34] Petitioner also claims that in soliciting this testimony, the Government "intentionally presented misleading testimony to the jury".  CV-DE 25 at 189.   There is no evidence to support this conclusory allegation of Government misconduct.

100

and put it in a bag.

Q. What I am saying, sir, on direct examination by our prosecutor, you didn't say that Daniel Troya did not have these civilian type clothing?

A. Because I don't know if he did or not.

Q. All right. Well, if you look in the report, it shows that only the other two inmates had the civilian type clothes, does it not?

A. I believe so, yes, sir.

Q. Okay. So that leaves Daniel not with this, but with whatever inmate clothing is?

A. Yes.

*Id.* at 8011, line 15 – p. 8012, line 16. Trial counsel was quite adept at handling the issue in this manner and to the extent the direct testimony was misleading or incorrect with regard to Troya's clothing, it was certainly cleaned up during trial counsel's thorough cross-examination. Troya has not shown that his counsel's performance was deficient in handling the testimony in this manner. Furthermore, Troya has not established prejudice, that the jury would not have imposed the death penalty had the testimony concerning Troya's clothing been corrected during Inspector Glover's direct. The clothing issue was a minor issue, and did not add or detract from the overall evidence of the penalty phase.

Fourth, Troya claims that his counsel was ineffective for asking questions on cross concerning the type of windows from which Troya had escaped. CV-DE 25, p. 191. Specifically, Troya claims that his counsel misrepresented facts to the jury and had to be corrected by the witness. CV-DE 25, p. 191. Inspector Glover testified on direct that the inmates had appropriated a jack from the motor pool, used it to pry open the window they escaped from, and that the jack had been subsequently located in Troya's cell. CR-DE 818 at 7985, lines 15-18; p. 7986, lines 1-6.; p. 7989, lines 23- p. 7990, line 8; p. 7992, lines 18-22. On cross examination, trial counsel attempted to down play the use of the jack—which had been found in Troya's cell—by getting the

101

witness to admit that these were typical awning windows that could be purchased at Home Depot, and not special windows with bars on them. *Id.* at 8006, line 16 – p. 8007, line 16. On redirect, the witness backed off his agreement that the windows were of the same type that could be bought at Home Depot, indicating that the windows were stronger, could only be opened with a jack, and had no crank. *Id.* at 8015, line 21 – p. 8016, line 9. On re-cross, trial counsel showed the witness photographs from the escape which showed a crank on the window, at which time the witness admitted that there were window cranks but that an inmate had to sign out the crank from a corrections officer. *Id.* at 8018, p. 1-15. The witness repeated the sign out procedure during the second redirect, and indicated that no crank had been signed out and that the crank had been misappropriated. *Id.* at 8019, lines 5-20.

Inspector Glover's testimony concerning the windows and crank was confusing, as the description of the windows evolved with his testimony. Trial counsel's cross was effective in showing the inconsistencies of Glover's testimony and downplaying the use of the jack, which had been found in Troya's cell. It is true that the misappropriation of the crank did not come out until re-cross, but this evidence pales in comparison to the evidence that Troya escaped from his cell, had fashioned a mannequin to make it appear as if he was still in bed, had the jack that was used to open the windows in his cell, and was convicted of the escape. Trial counsel also used his cross-examination of Inspector Glover to establish that Troya did not use weapons throughout the escape and that Troya escaped only after he reported being beaten by guards. These were mitigating factors which were considered by the jury.[35] Troya has shown neither deficient

---

[35] CR-DE 859. The penalty verdict reflects that although both mitigators were submitted, all jurors rejected the weapon-less escape (#13) but six jurors found a valid mitigator in the evidence that Troya escaped following an incident where he had been beaten by guards (#14).

performance nor prejudice with regard trial counsel's questions concerning the window and crank to Inspector Glover.

Finally, Troya claims that his trial counsel was ineffective for failing to call witnesses who would have testified that Troya had not planned the escape and that the conditions of the Brevard Correctional Institution led Troya to participate in the escape attempt.   Specifically, Troya claims that trial counsel was ineffective for failing to call Troya's fellow inmates Eric Vonlydick, Pierrot Nicolas, and Dennis Rivera.

Complaints of uncalled witnesses are disfavored and viewed with great caution as claims of ineffective assistance of counsel.  *See Schwander v. Blackburn*, 750 F.2d 494, 500 (5th Cir. 1985).   "'Complaints of uncalled witnesses are not favored in federal habeas review,'" *United States ex rel. Cross v. DeRobertis*, 811 F.3d 1008, 1016 (7th Cir. 1987) (quoting *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir.1984)); *see also Buckelew v. U.S.*, 575 F.2d 515, 521 (5th Cir. 1978); *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) (allegations about possible testimony that might have been offered by a witness who was not called are viewed by the courts with great caution).  In addition, the Eleventh Circuit "has emphasized that '[w]hich witnesses, if any, to call ... is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess'." *Allen v. Secretary*, 611 F.3d 740, 759 (11th Cir. 2010) (*quoting Waters*, 46 F.3d at 1512). *See also Chandler*, 218 F.3d at 1314 n. 13.  Furthermore, the testimony of witnesses is often speculative, so the defendant has a difficult task in showing actual prejudice that the testimony of a witness would have changed the entire outcome of a trial. *See Blackburn*, 750 F.2d at 500.

Troya claims that Pierrot Nicolas and Dennis Rivera were housed at the Brevard Correctional Institution at the same time as the Troya and could have testified to the violent nature of that institution.  Such testimony would be only marginally relevant, at best.  Furthermore,

testimony that Troya was housed with such violent inmates may have hurt Troya as much as helped him, and the potential cross-examination of these inmates could have caused considerable damage to Troya.  In sum, the admissibility and potential effect of the testimony is just too speculative to establish deficient performance.  Furthermore, Troya has not established that he was prejudiced by this missing testimony.  The record shows that trial counsel was able to introduce evidence, through Inspector Glover, that Troya had complained that he was beaten by guards just prior to the escape attempt.  This testimony was powerful, as six jurors agreed to this mitigating factor. CR-DE 859 at 13.

Although Eric Vonlydick was not called to testify during the trial of this matter, his statements concerning the escape were admitted during trial counsel's cross-examination of Inspector Glover:

> Q.  Now, one other point, if I might.  You've reviewed the report, have you not?
>
> A.  Yes, sir.
>
> Q.  In your investigation, you, I believe it was you, correct me if I am wrong, spoke to another inmate named Eric Vonlydick?
>
> A.  Yes.
>
> Q.  As part of the investigation?
>
> A.  Yes.
>
> Q.  Eric Vonlydick, he was one of the three?
>
> A.  Yes.
>
> Q.  Eric Vonlydick gave you a statement that day, did he not?
>
> A.  Yes, he did.
>
> Q.  Eric Vonlydick told you, did he not, that he had planned this escape for a month and a half, did he not?
>
> A.  Yes, he did.
>
> Q.  And that Burleson, the other fellow, and Troya were not always in the plan, did he not?
>
> A.  That's true.

Q.  He would have done it alone if he had to?

A.  Yes, sir.

Q.  Vonlydick said it was he who stole the car jack out of the auto mechanic's classroom after he looked in the classroom and saw the jack, correct?

A.  Yes, sir.

Q.  No one else took it, just Vonlydick?

A.  That is what he said.

Q.  That is what he said?

A.  Yes.

Q.  And he is the one making himself out to be -- well, he doesn't get any benefit saying he did the stuff on his own, did he?

A.  Right.

Q.  And he also said that he talked to inmates Troya and Burleson about his plan and they decided to go with him?   Isn't that what he told you?

A.  Yes, sir.

Q.  He said they were all going to stay together once they got over the fence initially, did he not?

A.  Yes, sir.

Q.  He told you back then, and he is not getting any benefit from it, he told you back then that inmate Troya told him that he was going to turn himself into authorities after awhile?

A.  Yes, sir.

Q.  And -- okay.  He said Troya was going to turn himself in to authorities after awhile, that is what this fellow told you back then in '02?

A.  Yes, sir.

Q.  And this Vonlydick said it was his idea to put dummies in the bunk and he, Vanlidic, planned the entire escape; isn't that what he told you?

A.  Yes, sir.

CR-DE 818, p. 8012, line 17 – p. 8014, line 20.  Trial counsel adeptly put the facts before the jury

during the cross-examination of a law enforcement witness, thereby avoiding the Government's

cross-examination of ex-con Vonlydick. Such strategy cannot be seen as deficient; rather, it is experienced and skilled advocacy. And as Vonlydick's proffered testimony concerning the escape was introduced through another witness, counsel's failure to call Vonlydick had no detrimental effect on the penalty phase. Troya has failed to establish that counsel were ineffective with regard to their handling of Inspector Glover's testimony.

For all of the foregoing reasons Troya's claims that his counsel were ineffective with regard to their handling of lay witnesses must be denied.

I.     COUNSEL WERE NOT INEFFECTIVE IN DECIDING NOT TO CALL A CELLULAR TELEPHONE EXPERT (RESPONSE TO TROYA ISSUE XI(D)).

Petitioner complains that his trial counsel were ineffective for failing to retain and to call a cellular telephone tracking expert who could testify about the limits of the technology and the weakness of the government's summaries of cell phone tower traffic activity.[36] CV-DE 25 at 163-171. Troya's claims have no merit.

The United States in fact received pre-trial notice from Sanchez's trial attorneys that a cell phone expert had been retained by the defense. *See e.g.*, CV-DE 37-4, Case No. 06-80693-CV-Scola, Gov. Exh. 4 thereto, Jeffrey Fischback, cellular telephone expert notice. As indicated by the record below, the defense made a strategic decision not to go forward with their cellular telephone expert when they realized that the Government had decided not to call an expert of their own. CR-DE 713 at 2747-49; CR-DE 756 at 6014. Once again, the fact that this expert notice

---

[36] Troya further argues that the government knowingly mislead the jury about the nature of its evidence. This claim of government misconduct is procedurally barred as it was not raised on direct appeal and Sanchez has not established cause and prejudice for this lapse. Even if this claim were not procedurally barred, it would fail on the merits. For the reasons stated herein, the record flatly contradicts Troya's claim that the Government misled the jury into believing that cellular tower data could pinpoint a phone's exact location.

was filed by Sanchez's lawyer, and not Troya's, is of little import as joint defense strategies are common in multi-defendant cases.  This conclusion is reinforced by the fact that the Sanchez expert noticed at trial is the same one Troya complains his lawyers should have called (Jeffrey Fischback).

Instead of utilizing a cellular telephone expert, the government's trial evidence consisted of placing the cellular telephone business records, including cellular tower location data, in evidence through records custodians Larry Smith [Metro PCS] (CR-DE 756 at 5990-6053, (GXs. 701.3, 702, 705, 705.1, 70.2, 710 and 710.1) (CR-DE 757 at 6078—6091); Sue Johnson [T-Mobile]) (CR-DE 757 at 6118—6162) (GXs 605.1 through 605.6); Jennifer Varney [Verizon] (CR-DE 758 at 6503—6547) (GXs 706, 708, 709, 709.1, 765).   The government did not tender the records custodians as experts or argue that they were present to do anything other than explain the business records of the cellular providers.  Moreover, each of the records custodians conceded that the business records relating to cell tower activity did not pinpoint the actual location of a person placing a call. (Smith/Metro PCS at CR-DE 756 at 6011-12).  Smith even conceded that the closest tower might not be the one utilized to transmit a call if the tower was overloaded with activity, causing the call to be bumped to another nearby tower.  (*Id.*  at 6101-04).  Sue Johnson, the T-Mobile records custodian, did not testify to anything other than identifying the tower that transmitted a call; she conceded she did not know what happened technically when a cellular tower was overloaded with cellular traffic. CR-DE 757 at 6156-6158.  The Verizon representative, Jennifer Varney, admitted that she did not know the geographical range of Verizon's cell towers (CR-DE 758 at 6529-30,6545); and that she did not know if any particular call hit the tower closest to the caller's location. *Id.*

The Government summarized this cellular tower data through summary charts, GXs 760.1

107

through 760.12, which were admitted during the testimony of Agent Weeks. CR-DE 764 at 6703-6824 and GXs 760.1 through 760.12.  In his testimony, Weeks admitted that the government's summary charts merely showed the general geographic location of the various cellular towers that carried calls between various parties between October 12, 2006 and October 13, 2006.  CR-DE 764 at 6703-6824.  Moreover, Sanchez trial counsel engaged in a very extensive *voir dire* on certain charts that pointed out the limitations of what the charts did and did not summarize.  CR-DE 764 at 6740-6745.

Confrontation by Sanchez's defense counsel, either via *voir dire* or regular cross-examination, made apparent the limitations of the government's evidence, (*See* CR-DE 756 at 6007—6011; and 6094—6105), particularly that the records did not pinpoint the caller's actual location.  Both the direct examination and cross-examinations made clear that the government's summary charts of the cellular tower records merely summarized the business records, that is, the cell towers and their geographical location.

Although stated in the previous section, it bears repeating that Troya cannot prevail simply because he now has found, or could find, new experts who have contradicted the government's evidence.  *See Floyd v. Secretary*, 638 Fed. Appx. 909, 920 (11th Cir. 2016); *Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir.1997) ("[T]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial."); *see also Horsley v. State of Alabama*, 45 F.3d 1486, 1495 (11th Cir.1995) ( "That experts were found who would testify favorably years later is irrelevant."); *Elledge v. Dugger*, 823 F.2d 1439 (11th Cir.1987).

Fischback's purported testimony would have made no points more significant than those raised by Sanchez's counsel on cross-examination.  *See generally, United States v. McGill*, 11 F.3d

108

223, 227-28 (1st Cir. 1993) (noting trial counsel not ineffective for failing to call rebuttal expert where skillful cross-examination established the same points the uncalled expert would have raised).   Trial counsel were not ineffective in deciding not to call an expert following the cross-examinations of Agent Weeks and the records custodians.  First, no expert was needed as the limits of the business records were pointed out to the jury during cross-examination.  Second, any expert testimony would have been redundant following counsel's skillful cross-examination, which effectively pointed out the limits of the cellular tower records.  The decision not to call Fischback was strategic; deficient performance has not been shown.

Troya cannot meet the prejudice prong of *Strickland*.  The outcome of the trial likely would have been the same even if Fischback had been called as a witness.  Troya's attack on his trial counsel's alleged incompetence includes an affidavit from a Jeff Fischback. CR-DE 5-7, Troya Appendix D-1.  However, this affidavit that fails to establish that the government's evidence was inaccurate, i.e., that the business records it had summarized were incorrect or flawed in any way. The only evidence that Fischback would establish would be that the cellular records are only sufficient to "determine the location and engineered capabilities of the particular cellular tower that provided cellular service."  CV-DE 5-7 at 3.  However, this showing falls well short of the proof needed to demonstrate that the outcome of the trial would have been different if trial counsel had called Fischback to testify.

Fischback does not quibble with the business records that show the location of the particular tower that provided cellular service on the dates indicated.  Moreover, the United States did not argue that the business records and its summary charts showed the exact geographic location of certain cellular telephones. Rather, the government only argued that cell calls hit particular towers that were located at particular locations, and those calls occurred at specific times

prior to and immediately after the slaughter of the Escobedos.  CR-DE 764 at 6738 (Testimony of David Weeks); CR-DE 766 at 7130, 7142, 7155 and GXs 760.1 – 760.15 (closing argument). Fischback agrees with all that.   Troya cannot demonstrate prejudice; the outcome would have been the same even if Fischback had been called.

Troya has failed to establish that his trial counsel's performances were deficient.  The joint defense team retained a cellular telephone location expert prior to trial, but made a strategic decision not to use this expert when the Government failed to call an expert of its own.  Given the very effective cross by Sanchez's trial counsel, which effectively pointed out the limitations on the cellular tower records, any further cross by Troya's counsel would have been redundant, and perhaps counter-productive.  Furthermore, Troya has failed to establish that he was prejudiced, in any way, by counsel's performance vis-à-vis the cellular tower evidence.  Even now, seven years after the trial, he is unable to produce any unexplored area of cross-examination or new expert testimony that contradicted the evidence as trial.   For all the foregoing reasons, Troya's claim that his counsel were ineffective in their handling of the cellular tower location evidence must be denied.

J.      TRIAL COUNSEL WERE NOT INEFFECTIVE IN PREPARING AND INVESTIGATING THE MITIGATION CASE (RESPONSE TO TROYA ISSUE XXVI).

Troya, in issue XXVI of his § 2255 motion, alleges that his trial counsel was ineffective in their preparation and presentation of the mitigation case, claiming that counsel stopped working on the case during a six-month period while a plea deal was pending approval at the Department of Justice, interviewed but decided not to call other witnesses, and failed to present adequate evidence of Troya's upbringing in a poor, crime-ridden neighborhood and school.  CV-DE 25, at 351-451.

110

First, Troya claims that his lawyers were ineffective in that they engaged in a "work stoppage" between the summer of 2008 and December 22, 2008, while Troya's plea agreement was pending before the Department of Justice, and this caused the mitigation investigation to be "extraordinarily deficient". CV-DE 25 at 358-59. A review of the docket in the underlying criminal case belies Troya's claim of a defense "work stoppage". Between May 30, 2008 and December 22, 2008, Troya's counsel filed eleven motions (CR-DE 372, 373, 374, 375, 397, 414, 452, 512, 544, 558, 598) and nine responses/replies (CR-DE 415, 416, 468, 469, 479, 493, 494, 506, 507), prepared for and argued at two suppression hearings (CR-DE 444, 472) and four status conferences at which the preparation of the mitigation case was discussed (Transcripts of Status Conferences: CR-DE 963 (6/12/2008); CR-DE 964 (8/14/2008); CR-DE 965 (11/20/08); CR-DE 1089, and filed the mental health expert witness disclosure for the penalty phase CR-DE 470. It is clear from the record that no "work stoppage" occurred.

Second, Troya contends that trial counsel's investigation and presentation of mitigating evidence fell short of reasonable professional standards. In support of his claim that trial counsel could have obtained and presented additional mitigation evidence, Troya has submitted affidavits of a number of family members, friends, and fellow inmates. In *Waters v. Thomas,* the Eleventh Circuit commented on the relatively limited evidentiary value of such affidavits in a habeas case:

> It is common practice for Petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating circumstance evidence, had they been called or, if they were called, had they been asked the right questions. This case is no exception. But the existence of such affidavits, artfully drafted though they may be, usually proves little of significance. This case is no exception in that respect either. That other witnesses could have been called or other testimony elicited usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel. As we

111

> have noted before, in retrospect, one may always identify shortcomings, but perfection is not the standard of effective assistance. The widespread use of the tactic of attacking trial counsel by showing what "might have been" proves that nothing is clearer than hindsight— except perhaps the rule that we will not judge trial counsel's performance through hindsight.

*Waters,* 46 F.3d at 1513–14 (citation omitted). That is precisely the situation here.

In support of his claim, Troya provides a list of eleven individuals who were interviewed by the defense team in preparation of the mitigation case between December 2008 and early March 2009,[37] but who were ultimately not called as witnesses during the penalty phase. CV-DE 25 at 358. Troya also provides an extensive laundry list of facts --encompassing 100 pages of his § 2255 motion-- which Troya alleges could have been testified to at trial had defense counsel been more effective. CV-DE 25 at 351-451. These facts can be grouped into five categories: (i) Troya's family history; (ii) Troya's impoverished upbringing; (iii) Troya's exposure to violence and crime in his neighborhood, at school, in jail, and within his own family (Uncle Tito); (iv) childhood accidents; and (v) that Troya was a nice and helpful kid. Some, if not all, of the evidence that Troya alleges should have been presented would have been cumulative of some of the testimony offered by the mitigation witnesses. Many of the newly proffered facts were presented by counsel during the penalty phase. In fact, the jury found several of these factors in mitigation— no violent priors (6 jurors), prison escape followed a beating by prison guards (6 jurors), influence of Uncle Tito (7 jurors), trauma from the school shooting (9 jurors), and lack of grief counseling following the shooting (9 jurors). CR-DE 859.

This Court should not second-guess the decision of a defendant and his counsel regarding when enough mitigation evidence has been presented. The fact is, the opportunity to present such

---

[37]According to Troya's own filing, some of these witnesses were purportedly interviewed in early December, during the alleged "work stoppage".

112

evidence was given and there can be no constitutional violation when a defendant and his counsel decide that they have exercised that right to the fullest extent desirable. Demonstrating that there were other witnesses who could have testified at trial does not, by itself, prove that counsel was ineffective for not presenting them at trial.

This is not a case where no mitigation investigation was conducted. Troya's penalty-phase counsel, James Eisenberg, called twelve separate witnesses to support various mitigation points raised before the jury. Five of those witnesses were unrelated third parties: Carl Busch, Julio Perez, Victor Sepulveda, Gregory Key and Judith Consor. CR-DE 825 at 8695-8757; *Id.* at 8758-8771; CR-DE 845 at 9023-9034; CR-DE 845 at 9075 -8091; at 9091-9114). Eisenberg also called seven family members: Troya's mother and father, his two brothers, his grandmother, an uncle and an aunt. He presented evidence of Troya's volunteerism, the bad influence of an older uncle, trauma endured by Troya witnessing a murder at his middle school which was unaccompanied by any counseling, and the deaths of a grandmother and a close family friend.

By Troya's own admission, the defense team interviewed each of the lay witnesses who were not called during the mitigation case, with one exception.[38] Some of these witnesses were interviewed multiple times before the decision was made not to call them. Some of these uncalled witnesses --including Anelle Hernandez and Vonlydick-- had significant criminal histories and the cross examinations of these witnesses could have hurt Troya more than helped him. The cross examination of defense lead off witness Kevin Busch shows just how damaging such cross could

---

[38] Troya points to only one individual who was not interviewed prior to the trial or penalty phase—a teacher at Conniston Middle School during the time of the school shooting who could have testified to facts already in evidence concerning the school shooting, Troya's connection with the victim, and the dangerousness of the school. It is unclear how she came into contact with the defense team, but a memo was prepared of the interview with her post-verdict.

113

have been.   The defense was able to introduce Volyndick's statements concerning the inmate escape through Inspector Glover and was able to introduce testimony concerning the school shooting and neighborhood issues—facts that Hernandez could have testified to—through other witnesses as well.   Some uncalled witnesses had other issues that would make their testimony suspect.   One uncalled witness—Christina Schmidt, the Troya neighbor whose daughter died of an overdosed—was the aunt of government cooperator Kevin Vetere and was accused by the marshals and a juror of having improper contact with a juror during the guilt phase.   CR-DE 753, at 5547-5558; 5806-07; and CR-DE 845, at 8886-8891.   The defense was able to introduce evidence of the neighbor's death and the impact it had on Troya without calling Schmidt.   The defense team made strategic decisions about which witnesses to present, and these decisions should not be second-guessed by this Court.

Although Troya challenges trial counsels' failure to call a number of witnesses in mitigation, the Supreme Court has made clear that trial counsel is not required to present all available mitigating evidence during the sentencing phase. *See Wiggins v. Smith,* 539 U.S. 510, 533 (2003) (*citing Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). Similarly, the Eleventh Circuit has stated, "[t]he mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." *Waters v. Thomas,* 46 F.3d 1506, 1514 (11th Cir.1995) (*en banc*); *see also Putman v. Head,* 268 F.3d 1223, 1244 (11th Cir.2001) ("[A]t a sentencing proceeding, counsel is not required to present all mitigation evidence, even if additional mitigation evidence would have been compatible with counsel's strategy."); *Stevens v. Zant,* 968 F.2d 1076, 1082 (11th Cir.1992) ("[T]rial counsel's failure to present mitigating evidence is not per se ineffective assistance of counsel."). Furthermore, the decision of "'[w]hich witnesses, if any, to call . . . is the epitome of

114

a strategic decision, and it is one that we will seldom, if ever, second guess.'" *Allen v. Secretary*, 611 F.3d 740, 759 (11th Cir. 2010) (*quoting Waters v. Thomas,* 46 F.3d 1506, 1512 (11th Cir. 1995) (*en banc*)); *See also Chandler*, 218 F.3d at 1314 n. 13.  Troya has not established that counsel's performance was deficient.

Even assuming, *arguendo*, that Counsel's performance in filtering the mitigation witnesses and the areas of their testimony was deficient, Troya has not shown that he was prejudiced thereby. In order to establish prejudice, the Troya must show that "there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Putman v. Head,* 268 F.3d 1223, 1248 (11th Cir.2001); *see Callahan v. Campbell,* 427 F.3d 897, 936 (11th Cir.2005) ("When a defendant challenges a death sentence, we evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation.") (internal punctuation and citation omitted).

As stated above, the majority of the affidavit testimony was not substantively different from the evidence actually presented to the jury. Counsel was able to introduce relevant facts through other witnesses so evidence was not kept from the jury.  Duplicative testimony would not have tipped the balance in Troya's favor. *See Strickland,* 466 U.S. at 700, 104 S.Ct. 2052 (evidence that numerous people thought defendant was a good person "would barely have altered the sentencing profile presented to the sentencing judge"). Even if counsel had called every person with potential mitigation information, the facts of the instant case, specifically the execution-style murders of the two children, are so egregious, that it is unlikely that the testimony of a dozen extra mitigation witnesses would have made any difference in the penalty phase of this trial. At a minimum, Troya has not established that it would have made any difference. As such, his claims

115

with regard to Counsel's performance *vis a vis* the mitigation case must be denied.

K.   TRIAL COUNSEL WERE NOT INEFFECTIVE IN CALLING DEFENSE MITIGATION WITNESS CARL BUSCH (RESPONSE TO TROYA ISSUE XII(B)(7)).

Troya, in issue XII (B)(7) of his § 2255 motion, alleges that his trial counsel was ineffective for calling defense mitigation witness Carl Busch, claiming that counsel knew, or should have known that Busch would invoke his right to remain silent before the jury and that this invocation significantly undermined Troya's case for life imprisonment.  CV-DE 25, at 191- 195.

During its case-in-chief during the penalty phase, the Government introduced testimony that Troya had been convicted of felony battery for punching Carol Pawlowski, the mother of Troya's friend, Carl Busch, in the face and slapping her in the face after she had already been knocked unconscious.  CR-DE 818 at 8023, lines 18-21; 8027, lines 4-8.  Troya's violence caused significant injury to Ms. Pawlowski, including multiple broken bones in her face and nerve damage for which she had to have surgery.  *Id.* at 8026, line 25 –8027, line 3.  The Government used this conviction and the description of the offense, as an aggravating factor.

Carl Busch was called as a defense witness in the penalty phase.  Busch claimed to witness the incident that gave rise to Troya's battery conviction.  Busch testified that his mother was an alcoholic, that she instigated the altercation with Troya, that she injured herself when she lost her footing and hit her head on concrete blocks, and that Troya did nothing to bring about this injury.  CR-DE 825 at 8700, line 23- 8707, line 3.  Busch also testified, on direct, that he had been friends with Troya since they were 11 or 12 years old.  *Id.,* at 8698, lines 14-16.  The defense offered this testimony to negate the aggravating factor.

The cross examination of Busch began as follows:

CROSS EXAMINATION BY MR. KASTRENAKES:
Q.   Mr. Busch, I will remind you, you are under oath. First, Mr.

116

Troya was your friend, correct?

A.  Yes, sir.

Q.  In fact, starting in 1999, you stole cars with Mr. Troya; isn't that true, sir?

MR. EISENBERG:  Judge, I object.

THE COURT:  What is the legal basis of the objection?

MR. EISENBERG:  Improper impeachment.

THE COURT:  Overruled.

BY MR. KASTRENAKES:

Q.  Isn't that true, sir?  You are under oath.

THE WITNESS:  Do I have to answer this?

THE COURT:  You have a right not to answer a question if it would incriminate you.

THE WITNESS:  No, thank you.  I don't want to the answer this.

MR. KASTRENAKES:  Your Honor, I move to strike his entire testimony.

THE COURT:  You want to be heard sidebar?

(Sidebar discussion on the record.)

*Id.* at 8711, line 7 –8712, line 4.   During the sidebar, it was decided that the lunchtime recess would be taken and the parties would use the recess to research the statute of limitations for grand theft auto in the State of Florida.  Following the recess, counsel all agreed that the statute of limitations had passed. *Id.* at 8722, lines 7-17.  The Court agreed with this assessment. *Id.* at 8729, lines 21-25.  The Court then instructed Busch, outside the presence of the jury, that he could not assert his Fifth Amendment rights because the statute of limitations had expired for the alleged 1999 auto theft. *Id.* at 8731, lines 18- 8732, line 10.  The court then gave a similar instruction to the jury. *Id.* at 8732, line 14 –8733, line 8.  Busch continued with his testimony.

Troya claims that his counsel was ineffective for calling Busch to testify in that counsel knew, or should have known, that Busch would invoke his right against self-incrimination.  CV-DE 25 at 191.  Troya also claims that his counsel failed to conduct the appropriate investigation

117

or trial preparation with regard to Busch. CV-DE 25 at 192-93. There is no evidence in the record to support either of these allegations. To the contrary, previous statements by trial counsel indicate that counsel had been in contact with Busch, and that counsel knew that Busch had been questioned by, and gave statements to, a government investigator concerning his (Busch's) mitigation testimony—which statements would tend to make learned counsel believe that Busch was willing to testify and would not invoke. CR-DE 795 (Transcript of March 10, 2009, Status Conference) at 69-70. Other than his bald assertions, Troya has put forth no evidence to contradict counsel's statements concerning counsel's contacts with Busch and Busch's statements to government investigators.

Troya further claims that trial counsel was ineffective for failing to object when the Government asked Busch a series of questions concerning Troya's other, non-charged violent acts. CV-DE 25 at 191. On direct, Busch testified that Troya has always been a polite person, and not rude. This was not in response to any question posed of Mr. Busch, but his own *sua sponte* declaration:

> Q. So let me ask you, do you know a fellow by the name of Daniel Troya?
> A. Yes, sir.
> Q. Could you point him out in the courtroom?
> A. Right here (indicating).
> Q. And there are two fellows that you pointed to.
> A. He is the one here looks like Homer Simpson.
> Q. All right.
> MR. COHEN: Judge, can the record reflect that Mr. Busch has pointed out Daniel Troya?
> THE COURT: Yes.
> BY MR. EISENBERG:
> Q. That is a nickname that everybody gives him and has given him over the years, Homer?

118

A.   Yes.  He has always been a polite person, not rude towards people, and we named him Homer Simpson.  It fit him.

Q.   Is that because he looks like the cartoon people?

A.   Yes.  He wasn't with the curse language, but ebonics, however you want to call it.  He was very polite.

CR-DE 825 at 8697, line 9 – 8698, line 4.   Of course, once Busch testified Troya was polite, this opened the door to the Government questioning Busch about this opinion, which the Government did by asking Busch if he had heard of certain other violent acts perpetrated by Troya—acts which had already been testified about by other witnesses:

Q.   Now, you said on direct examination that the Defendant was always -- that the Defendant was a polite person and he was not rude.  Do you remember saying that on direct examination?

A.   Yes, sir.

Q.   Now, of course, have you been in touch with the Defendant since he went to prison in October of 2000 through today?  Have you seen him on the street?

A.    Once or twice.  This was -- I mean, over two years ago, you know, this is quite awhile back.

Q.   In the year -- it would have been in the year 2005 -- excuse me, 2006 when he was out of prison from December, '05 through October, '06, right?  Is that what we are talking about?

A.   Yes, sir.

Q.   During that ten month period of time he was at liberty, right?

A.   Yes, sir.

Q.   Were you with him when in April of 2006 he used a AK-47 and shot up a house on Mercer Avenue?

A.   No, sir.

Q.   Would you consider that kind of behavior polite?  Tell me?

A.   No, sir.

MR. EISENBERG:  Judge, objection.  Outside the scope of direct.

MR. KASTRENAKES:  I'm sorry, Your Honor --

THE COURT:  Wait a minute.  Overruled.  Let's go ahead.

BY MR. KASTRENAKES:

119

Q.  You don't consider that polite, do you, sir?

A.  I wasn't with him.

Q.  Tell me about that behavior.  That is not polite, is it?

A.  How can I say Danny did this?  I wasn't there.

MR. EISENBERG:  Objection; argument.

BY MR. KASTRENAKES:

Q.  On direct examination you used the words, not me, you used the words -- let me look at them here, polite person, not rude, right?

A.  Yes, sir.

Q.  Okay.  Do you consider shooting up a house with an AK-47 to be polite behavior?  Yes or no?

THE COURT:  Mr. Busch, let me explain the question to you, and you told us you were not there.  I think Mr. Kastrenakes is saying, if it were established that Mr. Troya had in fact done that, would you consider that to be polite behavior?  That is what he is asking.

THE WITNESS:  No, that is an outrage behavior. This is not nice.

BY MR. KASTRENAKES:

Q.   Were you present on July 22, 2006 when Daniel Troya pistol whipped a young African American lady?

A.  No, sir.

Q.  Do you consider that behavior to be polite behavior?

A.  This doesn't sound like the same person, sir.

Q.  Were you present September 11, 2006 when Daniel Troya used a nine millimeter pistol to fire into a vehicle striking a person in that vehicle?  Were you there?

A.  No, sir.

Q.  Did you talk to Daniel Troya about those events?

A.  Not at all.

Q.  Do you consider that polite behavior, sir?

A.  Not at all.

*Id.,* at 8742, line 24 – p. 8745, line 14.  Troya claims that his counsel did not object to this line of

questioning (CV-DE 25 at 194), but that is not factually correct.  Trial counsel objected to this line

of inquiry, but his objection was overruled.  This entire line of questioning was not brought forth

120

by trial counsel, but by Busch's repeated, *sua sponte* comments that his friend Troya was polite. Troya has not shown that his counsel's performance was deficient with regard to this line of questioning. And as the prior violent acts were already in evidence, the prosecutor's questions concerning these acts caused no prejudice to Troya.

Finally, Troya claims that his trial counsel was ineffective for calling Busch to testify when another witness—Julio Perez, was available to and did testify to the Pawlowski battery. CV-DE 25 at 195; CR-DE 825, p. 8757- 8771. The Eleventh Circuit "has emphasized that '[w]hich witnesses, if any, to call. . . is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.'" *Allen v. Secretary*, 611 F.3d 740, 759 (11th Cir. 2010) (*quoting Waters v. Thomas,* 46 F.3d 1506, 1512 (11th Cir. 1995) (*en banc*)); *see also Chandler*, 218 F.3d at 1314 n. 13. There exists a rational basis for calling Busch to testify. Busch had exculpatory information concerning Troya and the felony battery conviction put forth in aggravation. Busch was the son of the battery victim, a connection which would tend to bolster the credibility of his statements concerning Troya's lack of culpability for the injuries sustained by Busch's mother. The decision to call Busch was strategic, and should not be second-guessed by this Court.

Even assuming, *arguendo*, that Counsel's performance in calling Busch was deficient, Troya has not shown that he was prejudiced thereby. Counsel was able to call an additional eyewitness, Julio Perez, who also testified that Troya acted in self-defense. Countering this aggravating factor was an uphill battle, given that Troya had *pled guilty* to the offense. Even if counsel was able to effectively negate this conviction, the facts of the instant case, specifically the execution-style murders of the two children, are so egregious, that it is unlikely that a negation of a felony battery conviction would have made any difference in the penalty phase of this trial. At a minimum, Troya has not established that it would have made any difference. As such, his claims

121

with regard to Counsel's performance *vis a vis* defense witness Carl Busch must be denied.

L. COUNSEL WERE NOT INEFFECTIVE FOR FAILING OBJECT TO THE GOVERNMENT CROSS EXAMINATION OF DEFENSE MITIGATION WITNESSES CONCERNING UNCLE TITO'S VISIT DURING THE SUMMER OF 1995 (RESPONSE TO TROYA ISSUE XII(B)(10)).

Troya, in issue XII (B)(10) of his 2255 motion, alleges that his counsel was ineffective for failing to object to the government's allegedly misleading cross examination of several defense witnesses concerning the whereabouts of Mr. Isidro Torres (Troya's Uncle Tito) during the summer of 1995. *See* CV-DE 25 at 197.

During the penalty phase, Troya attempted to establish that he had been improperly influenced by Troya's smooth talking, criminal-in-training Uncle Tito (hereinafter referred to by his given name of Isidro Torres) who, according to defense witnesses, lived with Troya during the summer of 1995 when Troya was twelve years old. This was a mitigating factor which was ultimately found by seven members of the jury.

During the cross examination of these witness, the prosecution asked questions concerning Torres' whereabouts and asked whether Torres lived with Troya for the entire summer.

During the Government's rebuttal case, it called FBI Special Agent John McVeigh, who testified to the investigation that had been done concerning the whereabouts of Torres during the summer of 2005. McVeigh indicated that initially he had an NCIC report, which showed that Torres had been sentenced to a one-year term of imprisonment during the time in question, and that this report was the only report he had provided to the prosecutors. CR-DE 846 at 9188, lines 9- 9189, line 3. The NCIC report turned out to be inaccurate. *Id.* at 9203, line 8. However, this was not known at the time the Government asked its questions in cross-examination. *Id.* at 9204, lines 10 – 23. McVeigh also testified that when he obtained the records from the charging district, those records showed that the sentence had been suspended. *Id.* at 9189, lines 6-9. McVeigh

testified that the probation office records showed that Torres was in police custody in Jacksonville from April 28 through June 9, 1995, upon which time Torres was released on his own recognizance. *Id.* at 9183, line 7 - 9185, line 7. McVeigh also testified that the conditions of his bond stated that Torres had to remain in Duval County unless he received permission to leave, but that permission to leave was never requested. *Id.* at 9185, lines 9-14. McVeigh further testified that Mr. Torres told probation that he would be living in Chicago with his mother after July 6, 1995. *Id.* at 9185, line 24 –9187, line 6.

Troya claims that trial counsel was ineffective for failing to object to the Government's cross-examinations concerning Mr. Torres' whereabouts during the summer of 1995. Troya provides no legal basis for such an objection and as such, has not demonstrated or established that his Counsel was deficient in failing to make this objection. The record indicates that at the time of this cross-examination, the Government was in possession of an NCIC report for Mr. Torres which indicated that Mr. Torres was incarcerated in Duval County during the summer of 1995 and therefore the Government had a good faith basis in asking the questions. And even if the Government had received the Duval County probation reports prior to the cross examinations, the cross examination still would have been proper. The probation records showed that although Mr. Torres was at liberty from June 9, 1995, through the end of that summer, he did not have permission to be in West Palm Beach. As a good faith basis existed for the questions posed in cross-examination, any objection counsel had made would have likely been overruled. Thus, Troya has not established deficient performance or that he was prejudiced by counsel's decision not to object.

> M.   COUNSEL WERE NOT INEFFECTIVE FOR NOT OBJECTING TO PURPORTED HEARSAY TESTIMONY OF GOVERNMENT WITNESSES DURING THE PENALTY PHASE (RESPONSE TO TROYA ISSUE XII (INTRO) & XII(B)(1)).

123

In issue XII of his Motion, Troya attempts to make the argument that his trial counsel was ineffective because he failed to object to the testimony of various witnesses who testified during the penalty phase. CV-DE 25 at 181-88. Specifically, Troya appears to be arguing that trial counsel should have objected to the testimony because it introduced hearsay evidence and thus his confrontation rights under *Crawford*, 541 U.S. at 68, were violated. For a number of reasons, Troya is incorrect.

In an apparent attempt to meet his rather significant burden as to the performance prong, Troya argues that his trial counsel should have objected to certain testimony under *Crawford*, presumably because it was testimonial in nature. *See Strickland* 466 U.S. at 687 (noting that in order to prevail on a claim of ineffective assistance of counsel, it must first be demonstrated that trial "counsel's performance was deficient."). Troya informs us that "[w]hile hearsay is admissible under the FDPA, that does not (and did not at the time of trial) mean that the government is permitted to attempt to prove a case for death with unreliable evidence in violation of the Confrontation Clause." CV-DE 25 at 181. Troya cites two cases, *United States v. Mills*, 446 F. Supp. 2d 1115, 1135-39 (C.D. Cal. 2006), and *United States v. Sablan*, 2008 WL 700172, *2 (D. Cal. 2008). Troya mistakenly believes that because of these two cases, his trial counsel was obligated to make an objection on *Crawford* grounds to the reliable testimony that was introduced. As noted earlier, the law of this Circuit is clear that "an attorney is not liable for an error of judgment on an unsettled proposition of law. *Smith*, 170 F.3d at 1054-55, *see e.g., Guyton*, 447 Fed. Appx. at 138-39. There is a cascade of case law that contradicts Troya's position.

The reason for this is that Title 18, U.S.C. § 3593(c), which guides the proof of mitigating and aggravating factors during the penalty phase, authorizes the admission of "information, not

124

only "evidence." *See Jones v. United States*, 527 U.S. 373, 376-79 (setting forth and approving the FDPA's sentencing process); *United States v. Fell*, 360 F.3d 135, 144-46 (2nd Cir. 2004) (approving the FDPA's sentencing framework). Thus, the more reasoned position is to allow such evidence be admitted, and most of the case law, ignored by Troya, reflects that view.

Indeed, in *Fell*, 360 F.3d at 144-46, the Court emphasized that the U.S. Supreme Court in *Gregg v. Georgia*, 428 U.S. 153 (1976), noted that in order to attain the "heightened reliability" standard in the penalty phase of a capital proceeding,

> "more evidence, not less, should be admitted in the presence or absence of aggravating and mitigating factors: We think that the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at [a death penalty] hearing . . . . So long as the evidence introduced . . . . at the presentence hearing do not prejudice a defendant. It is preferable not to impose restrictions. We think it desirable for the jury to have as much information as possible when it makes its sentencing decision."

*Fell*, 360 F.3d at 143 (citing *Gregg*, 428 U.S. at 203-04 (omitting internal citations)). Along that same vein, the Court continued:

> This statement in *Gregg* follows a long line of Supreme Court cases that have emphasized the importance of allowing the sentencing body to have full and complete information about the defendant. In *Williams v. New York*, for example, the Court stated that "modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial." 337 U.S. 241, 247 (1949).

*Fell*, 360 F.3d at 143.

Lastly, in this respect, the Second Circuit wrote:

> Facts relevant to sentencing are far more diffuse than matters relevant to guilt for a particular crime. Adjudications of guilt

125

are deliberately cabined to focus on the particulars of the criminal conduct at issue and to avoid inquiries into tangential matters that bear on the defendant's character.  By contrast, in determining the appropriate punishment, it is appropriate for the sentencing authority, whether jury or judge, to consider a defendant's whole life and personal make-up.  ("Highly relevant – if not essential – to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.").  The Supreme Court has stated that in "determin[ing] whether a defendant eligible for the death penalty should in fact receive that sentence, [w]hat is important . . . is an individualized determination of the bases of the character of the individual and the circumstances of the crime."

*Tuilaepa v. California*, 512 U.S. 967, 972 (1994) (emphasis in original) (internal quotations and citations omitted).  *See Fell*, 360 F.3d at 143-44.

Indeed, post-FDPA, Circuits that have considered this issue have arrived at the same result, to wit, that the Confrontation Clause does not apply to the Sentence Selection component of capital sentencing proceedings.  *See United States v. Umana*, 750 F.3d 320, 346-48 (4th Cir. 2014), cert. denied, ___ U.S. ___, 135 S.Ct. 2856 (2015) (holding that Williams "squarely disposes" of Umana's argument that the Sixth Amendment should apply to capital sentencing; "We conclude that the Confrontation Clause does not preclude the introduction of hearsay statements during the sentence selection phase of capital sentencing."); *Muhammad v. Secretary, Florida Dept. of Corrections*, 733 F.3d 1065, 1073-77 (11th Cir. 2013), *cert. denied*, ___ U.S. ___, 134 S.Ct. 894 (2014) (relying on *Williams* and *Gardner*[39] : because the hearsay testimony was presented in open court, and because Muhammad had the opportunity to present his own witnesses at the capital sentencing proceeding, "Muhammad's rights under the Confrontation Clause were not violated

---

[39] *Gardner v. United States*, 430 U.S. 349, 353-58 (1977) (Confrontation Clause does not apply to the Sentencing Selection phase, but defendant must have access to evidence utilized).

126

because Mohammad had an opportunity to rebut the hearsay information. The hearsay was admissible at Muhammad's capital sentencing hearings." *Id*. at 1077); *United States v. Fields*, 483 F.3d 313, 326 & 338 (5th Cir. 2007) ("[W]e conclude that the Confrontation Clause does not operate to bar the admission of testimony relevant only to a capital sentencing authority's [sentence] selection decision;" [T]he principles underlying *Williams* are relevant, persuasive, and ultimately fatal to Field's Confrontation Clause challenge."); *Szabo v. Walls*, 313 F.3d 392, 398 (7th Cir. 2003) ("the Supreme Court has held that the Confrontation Clause does not apply to capital sentencing," and that the right to confrontation "applies through the finding of guilt, but not to sentencing, even when that sentence is the death penalty."); *Chandler v. Moore*, 240 F.3d 907, 918 (11th Cir.), *cert. denied*, 543 U.S. 1057 (2001) (hearsay is admissible at a capital sentencing and a defendant's rights under the Confrontation Clause are not violated if the defendant has the opportunity to rebut the hearsay); and *see United States v. Barrett*, 496 F.3d 1079, 1100 (10th Cir. 2007), (in dicta: "[i]t is far from clear that the Confrontation Clause applies to a capital sentencing proceeding"), citing *United States v. Higgs*, 353 F.3d 281, 324 (4th Cir. 2003) (same).

In *United States v. Umana, supra*, the hearsay statements admitted during the Sentencing Selection phase were the "statements of MS-13 members accusing Umana of committing the murders. Specifically, the court allowed detectives to testify at trial about their interviews with Luis Ramos, Luis Rivera, and Rene Arvelo. The court also allowed the government to introduce transcripts of the interviews with Rivera and Arevalo." 750 F.3d at 345.

The Eleventh Circuit, in *Muhammad v. Florida, supra*, at the 1996 capital re-sentencing proceeding from a 1975 trial, the hearsay testimony admitted over Confrontation Clause and hearsay objections included: (a) a summary witness describing some of the evidence presented in

the guilt phase of the 1975 trial, (b) the statements, including written reports, of the prior (since retired) lead investigator, (c) the former sworn testimony of Milton Marinek, one of the victims' co-workers, (d) the prior statements of (deceased) Howard Perry, who witnessed the defendant and one of the victim's arrive at the victims' home; and in the government's penalty phase rebuttal case, the following additional hearsay evidence was admitted: (i) the prior sworn statement of a helicopter pilot, and (ii) the sworn statement of an airplane pilot. 733 F.3d at 1068-69.

In *United States v. Fields, supra*, the hearsay information introduced at the Sentence Selection phase, over Confrontation Clause objections, included hearsay statements of five types: "(1) statements made about him by his mother and juvenile probation officers in various records introduced into evidence by a Juvenile Probation Department official; (2) statements made about him by correctional officers in prison records introduced into evidence by state prison officials; (3) statements made by officers in police reports introduced into evidence by someone other than the officer who made the report; (4) a detective's description, based on the investigation officer's report, of the drive-by shooting that led to Field's 1992 conviction of attempted murder; and 5) statements made by witnesses to police officers while the officers were investigation various past crimes in which Fields may have been involved but for which he was never charged (statements being described in the officer's testimony.)" 483 F.3d at 324-25.

Thus, at the sentencing selection stage of the penalty phase, the Confrontation Clause did not apply. An objection was therefore not compelled on those grounds. Similarly, there was no need to object on the basis that somehow Troya was prejudiced by the testimony.

Significantly, here again, Troya's motion while long on pages, is short on substance. Other than saying that the "violation was pervasive and prejudicial", he does not tell explain how this is so. CV-DE 25 at 182. In a § 2255 proceeding, even if a movant demonstrates deficient

128

performance, he must also prove that such flawed conduct prejudiced the defense" in the sense that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. at 687, 694.  If he cannot prove both the performance or prejudice prong, he cannot prevail. *Strickland*, 466 U.S. at 687.

As explained above, there was no "violation".  As for the assertion that Troya was somehow prejudiced by the testimony, Troya is likewise mistaken.  For starters, Troya's lack of explanation hinders the completeness of any possible response.  With regard, for example, to the testimony of Inspector Glover dealing with Troya's escape, Troya makes no effort to explain how, in light of the excerpts he cites, the testimony was testimonial hearsay, or how he was prejudiced by it.  CV-DE 25 at 182-83 (including two pages of isolated excerpts with no explanation).

How much Inspector Glover knew, or gathered from other sources he reviewed, is unclear from his testimony.  Just as significantly, the evidence that was presented by Inspector Glover was presumably part of what the jury considered when 6 members of the jury decided that Troya's escape was a mitigating factor.  *See* CR-DE 859 at 13 ("The attempted escape followed an incident wherein Daniel Troya was beaten by guards in a work camp.").[40]  Thus, it is difficult to discern how the evidence with regard to escape prejudiced Troya in light of the totality of all of the other evidence presented at the penalty phase.  The brief excerpts that Troya bundles together and complains of in his motion are even more problematic given their scant and perfunctory nature. For example, Troya complains that during the penalty case in chief, Officer Birch used the report containing the statements of Ms. Pawlowski who had stated that Troya had struck her.  But here again, the context is important.  Because if Ms. Pawlowski was reporting the incident, for example,

---

[40] The facts that related to the escape: (i)  Troya did not have a weapon; and (ii) that he surrendered when discovered, were not determined by the jury to be mitigating factors.  CR-DE 859 at 13.

in an attempt to gain protection from further violence, the statements might not be testimonial in nature.  *See e.g., Beltran v. Warden*, 2015 WL 7874326, *15 (N.D. Cal, December 4, 2015).

With regard to Troya's fleeting reference to the testimony of Jarretta, who was a friend of Troya's girlfriend, Troya again neglects to consider the context.  If Troya's girlfriend was confiding in Jarretta, "during what appear[ed] to be a spontaneous, private conversation that occurred shortly after [Troya struck her and [t]here is no dispute that [Jarretta] is not a government agent, nor is there any contention that [Troya's girlfriend] somehow expected [Jarretta] to report to the police what [s]he told her" the statements were not then testimonial under *Crawford*.  *Manuel v. Pollard*, 2006 WL 908035, *5 (W.D. Wis. April 7, 2006) (Report and Recommendation) (internal quotations and citations omitted), R&R Adopted by, *Manuel v. Pollard*, 2006 WL 3017132 (W.D. Wis. July 26, 2006); *Colon v. Taskey*, 414 Fed. Appx 735, 736-37 (6th Cir. 2010).

Troya also complains that testimony and evidence were introduced at trial involving a possible violation of the prison rules by Troya's mother, sending him money directly.  Again, Troya provides us with no foundational testimony or citation to where this information might have been gathered. It is axiomatic that every movant filing a § 2255 motion has the obligation to develop and support their arguments with appropriate legal precedent.  *See e.g., Argyropoulos v. City of Alton*, 539 F.3d 724, 739 (7th Cir. 2008) (undeveloped and legally unsupported arguments are waived even when those arguments raise constitutional issues); *Cody v. United States*, 249 F.3d 47, 53 n.6 (1st Cir. 2001) (undeveloped ineffective assistance of counsel claim raised in a perfunctory manner in § 2255 proceeding deemed waived).  Here, Troya has failed to do so and instead, has compiled testimony which he dislikes and somehow labels it prejudicial without telling us how this is so.

In any event, as explained above, Troya cannot meet the performance prong of his burden, because under the circumstances and in light of all of the evidence presented, there was no obligation to object to the testimony of which he now complains.  Further, he has not demonstrated how this testimony prejudiced him to the extent claimed.  For all of these reasons, he cannot prevail on these claims.

N.     <u>TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO OBJECT WHEN THE PROSECUTOR ASKED WHETHER TROYA WAS TAUGHT RIGHT FROM WRONG (RESPONSE TO TROYA ISSUE XII(B)(8)).</u>

Troya complains that his trial counsel were ineffective for failing to object when the prosecutor asked Troya's parents, Maria and Lorenzo Troya, if they had taught Troya right from wrong.  DE 25 at 195.  The trial record indicates however that no such question was ever asked of Maria Troya. CR-DE 845 at 8915-8936.  The question was asked of Lorenzo Troya, however.  CR-DE 845 at 8963.  Troya claims that his counsel was ineffective in failing to object to this question. In support of this claim, Troya argues that the government's question was improper insofar as it was improperly attempting to link mitigation evidence to the charged crime.  This argument is not supported by the trial record. *See* CR-DE 845 at 8937-8991.   A review of the record shows the context of the prosecutor's question:

> CROSS EXAMINATION BY MR. KASTRENAKES:
>
> Q.  Good afternoon, sir.
>
> A.  Good morning.
>
> Q.  You are right, good morning. I would assume that it was important for you as a parent to guide all of your children in the same fashion; is that right, sir?
>
> A.  Yes, sir.
>
> Q.  The guidance you gave as a parent was to explain to them what the difference was between right and wrong?
>
> A.  Yes.

131

Q. And you treated all your children equally in that respect?

A. I tried, yes.

Q. And you would punish them in whatever way you believe was the right way for punishment for bad behavior, correct, sir?

A. Yes.

Q. You never abused your children?

A. No.

Q. I guess in today's day and age there is dispute whether spanking is abuse or not, but in any event, there was never physical abuse, what you understand physical abuse to mean between you and any of your children, correct?

A. There was spanking, but no physical abuse, no.

Q. You never physically abused your son, Daniel Troya?

A. No.

*Id.* at 8962-63. Cross-examination of Lorenzo Troya was focused on the circumstances in which Daniel Troya and his siblings were raised, the level of discipline in the home, and whether there was abuse. There was no attempt to link any mitigating factor to the charged offense. At this time in the trial, the defense had not yet submitted its proposed mitigating factors. Whether Troya had been subjected to abuse was a fair area of inquiry. In fact, the complained of line of questioning did relate to a later defense-submitted mitigating factor: "Daniel Troya has a loving and caring relationship with his family, who continue to love him". CR-DE 859 at 12. There is nothing improper about the Government's question. Counsel is not required to object to proper questions. Had counsel objected to this question, the objection likely would have been overruled. As a result, Troya suffered no prejudice for counsel's failure to object. As Troya has not met his burden of establishing deficient performance or prejudice, Troya's claim must fail.

O. <u>COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO MOVE TO STRIKE OR MOVE FOR A MISTRIAL AFTER THEIR OBJECTION TO A PROSECUTOR'S QUESTION WAS SUSTAINED (RESPONSE TO TROYA ISSUE XII(B)(9)).</u>

Troya claims his penalty counsel was ineffective for failing to move to strike or for a mistrial after the government's allegedly improper questioning of a law enforcement witness. CV-DE 25 at 195. This argument involves the testimony of Officer Gregory Key whom Troya called to present mitigation evidence about Troya's witnessing a school murder when was young.  CR-DE 845 at 9075-9090.  On cross-examination, the prosecutor asked Key what relevance the school shooting had to do with Troya murdering a family. *Id.* at 9087. Penalty counsel objected to the question and the objection was sustained.  *(Id.)* Troya complains that counsel should have insisted on a ruling on his motion to strike as well, and that when no ruling occurred, he should have moved for a mistrial.  CV-DE 25 at 195. No error occurred here.

Sanchez's penalty counsel later moved for a mistrial on the ground that the prosecutor had impermissibly attempted to limit the mitigation evidence by linking it to the crime charged, citing to *citing Kennard v. Duetkee (sic.) qua   Tennard v. Dretke* 542 U.S. 274 2004, the case cited by Troya herein.  *See* CR-DE 847 at 9643.  Pursuant to the Court's pre-trial order, Troya's counsel joined in this motion for mistrial when he did not expressly opt out.  Thus, Counsel did not fail to move for a mistrial on these grounds.

And even if a motion for mistrial had not been made, Troya cannot show that this was the result of deficient prejudice or that he was prejudiced thereby.  Any harm caused by the prosecutor's question was cured by the district court sustaining an objection to the question. Moreover, early in the case the district court had advised jurors that when questions were objected to, followed by an order sustaining an objection, the jurors should just disregard the question. CR-DE 728 at 3033-34.  Because juries are presumed to follow the court's legal instructions to disregard improper questions, a motion to strike would have been unnecessary. *See e.g., United States v. Barshov*, 733 F.2d 842, 846-47 (11th Cir.1984) (inappropriate prosecutor comment cured

by curative instruction to the jury); *See United States v. Gainey,* 111 F.3d 834, 836-37 (11th Cir.1997) (prosecutor's inappropriate comment not prejudicial where it "was mitigated by the district court's curative instructions").   As such, Troya cannot establish deficient performance. Furthermore, it is hard to imagine that Troya was prejudiced by one unanswered question among months of trial testimony.   At a minimum, Troya has not established that he was prejudiced thereby.   As Troya has established neither deficient performance nor resulting prejudice, Troya's claim that his counsel was ineffective for failing to move to strike or move for a mistrial after counsel's objection to the prosecutor's question was sustained must be denied.

P.   <u>COUNSEL WERE NOT INEFFECTIVE IN THEIR DECISION NOT TO PUT ON ANY MENTAL HEALTH EVIDENCE IN MITIGATION (RESPONSE TO TROYA ISSUE XXV).</u>

Throughout his motion, Troya asserts that his counsel were ineffective for failing to introduce mental health evidence in mitigation.   In truth and fact, Troya's trial counsel did not present any expert mental health evidence.   This was not the result of negligent representation, however.   The record shows that counsel retained several mental health experts who had examined Troya and were willing to testify on his behalf.   The record also shows that counsel made a strategic decision not to present any mental health evidence in order to keep the Government's rebuttal mental health expert from testifying that the defense expert's conclusions were incorrect and that Troya was a psychopath.   This was a sound strategic decision, a well-reasoned example of zealous advocacy.   As Troya cannot establish that his counsel's decision not to present mental health evidence in mitigation constituted ineffective assistance of counsel, for the reasons set forth below, these claim should be denied.

Troya's claim that penalty-counsel Eisenberg grossly underperformed in preparing the mental health phase in mitigation simply does not match the trial record.   At a minimum, Troya's

134

attorneys selected, retained, consulted with, and reviewed the reports of several mental health experts including Dr. Wu, Dr. Harry Krop, and Dr. Michael Maher.   Ultimately, counsel indicated that it had made a strategic decision not to put forth any mental health testimony.  CR-DE 845 at 9149-50.

Prior to trial, counsel retained and caused Dr. Wu to conduct a PET scan on Troya and write a report interpreting this scan.   This report was provided to the Government in discovery. USA Exh. 4.   However, at the March 10, 2009, status conference occurring during the hiatus between the guilt and penalty phases, Counsel indicated that it had decided not to call Dr. Wu (CR-DE 795 at  7775-76)) but that other experts, specifically a psychologist, Dr. Krop, would testify concerning the Troya PET scan (CR-DE 795 at 7779-80)).  Dr. Harry Krop's report, which was provided to the government in discovery in the underlying criminal case, indicates that Troya suffers from Post-Traumatic Stress Disorder resulting from the shooting death of a friend when Troya was thirteen years old.  USA Exh. 2 (Krop Report).   The government also received the report of Dr. Michael Maher, who opined that Troya suffers from Polysubstance Abuse (in remission), Mixed Personality Disorder, and PTSD (in partial remission).  USA Exh. 3 (Maher Report).

After the government received notice of mental health testimony from Troya's counsel, it sought and received permission for its own expert, Dr. Michael Brannon, to examine Troya and provide an expert opinion. CR-DE 590, 598.  To avoid any issues of Fifth Amendment or Sixth Amendment interference, the Court directed that the examination results and any report be withheld from the prosecution team until the guilt-phase of the trial was over.  CR-DE 598. Thereafter, Dr. Brannon's report of examination was released and disclosed to all counsel.

Dr. Brannon's report contained damning evidence that any defense attorney would not

want disclosed to a jury deciding Troya's fate, most notably that Troya was a psychopath and did

not suffer from PTSD.[41] In a separate filing concerning the testimony of potential defense witness

_____

[41] Brannon's report went into great detail.  USA Exh. 1 (Brannon Report). Some of the more salient aspects of the Troya examination detailed in Dr. Brannon's report, which Dr. Brannon could have testified about if called as a witness, include the following:

- Troya denied that he was ever physically or sexually abused during his formative years;
- Troya denied ever observing domestic violence in his childhood home;
- Troya claimed unawareness of family history of mental health problems;
- Troya reported his childhood as "happy till I was about 12 or 13 years of age and I got exposed to the streets and things started to change for the worst…";
- Troya denied occurrence of domestic violence in any of his relationships;
- Troya reported failing the 1st and 8th grades;
- Troya admitted being expelled from school for "fighting, skipping and disrupting class";
- Troya denied ever being diagnosed with either a learning disability or Attention Deficit Hyperactivity Disorder (ADHD);
- Troya reported having numerous friends with whom he socialized on a daily basis;
- Troya reported "I don't get into physical altercations with people anymore. I play mind games with people because I have a better vocabulary now."
- Troya denied ever receiving psychiatric or psychological treatment services;
- Troya denied ever being hospitalized for psychiatric reasons, receiving psychotropic medication, or being counseled for psychiatric reasons;
- Troya denied any prior attempts at suicide or self-harm;
- Troya denied symptoms of depression, anxiety, or mania;
- Troya reported anger control problems throughout his life often accompanied by aggressive actions;
- Troya admitted being "bothered by my friend's death and I used to think about it a lot when I was a kid, but 1 don't really think much about it anymore."
- Troya denied having any nightmares or re-living of that event, or avoidance behaviors, depression, anxiety or triggering events that reminded him of that event (school shooting);
- Troya admitted use of cocaine, alcohol, marijuana, Xanax, and MDMA;
- Troya reported two separate head injuries, one from a car accident and a second from being "hit in the head" with a club during a fight; neither episode resulted in being hospitalized, and he further denied any gross neurological symptoms such as dizziness, memory loss, inattentiveness, seizures or headaches;
- Troya denied any suicidal or homicidal ideations;
- Brannon's examination of Troya's intelligence on the WAIS-III scale resulted in a full scale IQ score of 91 (average)
- Personality testing revealed potential for anger control problems, extroverted attention-seeking and manipulative;

136

Dr. Cunningham,  Troya's counsel explained the significance of Dr. Brannon's diagnosis of Troya: "[t]he significance of that diagnosis to the Government's expert and the jury may well be that mitigation does not matter, that no rehabilitation is possible and that future criminal violence is inevitable".  CR-DE 812 at 3 (internal quotations and citation omitted).

Following the disclosure of Dr. Brannon's report, Troya's counsel launched a flurry of motions to lessen the impact of Dr. Brannon's testimony.  On March 12, 2009, prior to commencement of the penalty phase of the trial, trial counsel Eisenberg filed a motion *in limine* to keep out Brannon's references to the term "psychopathy", arguing that the American Psychiatric Association's Diagnostic and Statistical Manual of Disorders, DSM-IV had replaced the phrase "Psychopathy" with the newly-coined term "Anti-Social Personality Disorder". CR-DE 804.  This initial motion was denied without prejudice and without elaboration on March 12, 2009.  CR-DE 808.  The next day, March 13, 2009, Eisenberg tried again, filing a more detailed substantive motion in which he tried to strike Brannon's report, challenging Brannon's use of the underlying PPI-R methodology, and seeking a *Daubert* hearing on the acceptability or reliability of that methodology.  CR-DE 811. [42]

- Using the PPI-R test (Psychopathic Personality Inventory – Revised (PPI-R), Brannon found Troya to be three standard deviations above the normative sample, and that Troya's scores were consistent with psychopathy;
- Troya's testing for malingering was a five, well below the cut-off score for that diagnosis;
- Troya did not meet the criteria for Post-Traumatic Stress Disorder (PTSD) under the DSM-IV definition, although he did have three of the five criteria for PTSD;
- Brannon concluded inter alia, that Troya suffered from Polysubstance Dependence Disorder, Axis I; Anti-Social Personality Disorder (Psychopathic Personality), Axis II; Two head injuries without loss of consciousness, Axis III.

[42] In issue XXV(C) of his motion, Troya argues that penalty-counsel Eisenberg was ineffective for failing to challenge Dr. Brannon's methodology, claiming that Brannon -who examined Troya but did not testify during the penalty phase- used an unreliable and inappropriate test (PCL-R) to base a conclusion on potential future dangerousness by Troya.  CV-DE 25 at 331-340. This argument

The March 13 motion was still pending on March 16, 2009, when the penalty phase began. During opening statements for the penalty phase, counsel previewed its mental health testimony for jury, indicating that Drs. Krop and Maher had examined Troya and would testify as to how Troya's mental health issues affected his behavior. *See* CR-DE 818 at 7975-78.

On March 18, 2009, Eisenberg supplemented his prior legal submissions with a motion to preclude the government from using the terms "psychopath" or "psychopathy". CR-DE 820. However, the penalty phase continued while this and other Dr. Brannon-related motions were pending. Presented with a fluid trial situation in which the Court had not precluded Dr. Brannon's potential testimony or his use of the words "psychopath" or "psychopathology" to describe Troya, Counsel and Troya made a mutual strategic decision to prevent any possible invocation of those terms by not introducing any mental health testimony. This decision kept Brannon from testifying that Troya did not suffer from any of the mental health disorders diagnosed by the defense experts Dr. Krop (PTSD) and Dr. Maher (Polysubstance Abuse in remission, Mixed Personality Disorder, and Post Traumatic Stress Disorder in partial remission). Most notably, however, this decision prevented Dr. Brannon from testifying that Troya was a psychopath who suffered from Anti-Social Personality Disorder. USA Exh. 1.

On March 23, 2009, both of Troya's trial attorneys confirmed for the trial judge that they

---

lacks any basis in fact and is completely inapplicable to the actual trial that occurred. For example, the petition attacks the alleged inappropriate use of a PCL-R test by a purportedly discredited expert, Dr. Thomas V. Ryan. *Id.* at 331-338. Dr. Ryan did not examine Troya in this case and he did not prepare a report utilizing this purportedly discredited PCL-R test. Furthermore, the Government expert who did examine Troya, Dr. Brannon, also did not utilize the PCL-R test and his report concerning Troya, which was never presented to the jury, also did not contain an opinion as to Troya's potential future dangerousness. No mental health expert testified about Troya, and no evidence was submitted to the jury concerning any Troya PCL-R test results or future dangerousness. Counsel cannot not be held accountable for failing to challenge a methodology which was never employed, and Troya can certainly not establish that counsel was ineffective for failing to tilt at windmills. For all these reasons, this claim should be denied.

had made a strategic decision not to call any of their mental health experts:

> MR. KASTRENAKES:  The only thing I wanted to make sure, Mr. Eisenberg in his opening discussed calling two mental health experts, and I want to know if that is a strategic avenue.  Those are mental health professionals that we received notice of.
> I talked to Mr. Eisenberg that if this were to happen, that it be another matter raised at a collateral matter later that he would be covered in that respect.
>
> THE COURT:  Do you want to speak to that Mr. Eisenberg?
>
> MR. EISENBERG:  No, I don't have a problem.
>
> THE COURT:  Is it true you contemplated bringing in a mental health expert and you provided a report from that expert?
>
> MR. EISENBERG:  Yes.
>
> THE COURT:  Is it fair to say after your discussion was Mr. Troya and consultation with Mr. Garcia, you have reached a determination that it would not be appropriate to call that person?
>
> MR. EISENBERG:  We changed our mind, yes.
>
> THE COURT:  And you have done it in full consultation with your client and co-counsel?
>
> MR. GARCIA:  For the record, I join Mr. Eisenberg in that decision.

CR-DE 845 at 9149-9150.

Counsel also explained this decision to the jury:

> Let's look at the mitigation case, if we could. There was a change -- I will concede there was a change in the case from our point of view from opening statements. In opening statements we thought it would be necessary to bring forth to you some well-respected experts to talk about what happened to Danny Troya in like medical terms. But as the case progressed, and as Mr. Murrell put on his case, which we were unaware of, as we listened to Dr. Reidy, and after listening to

139

the Troya family, it became clear to us that expert testimony just isn't necessary. And it became clear that we -- you, the jury, you didn't need any expert testimony to sit there and understand what this case is about.

You don't need any expert testimony to understand Daniel Troya, and that is why those people weren't brought in.

CR-DE 847 at 9572-73.

Troya now claims that counsel were ineffective for failing to call Dr. Wu to testify that Troya suffered from organic brain damage, for failing to call Dr. Maher or another expert to testify to the effect of emotional trauma on Troya's behavior, for selecting Dr. Krop, and for promising—in opening statement—that Drs. Krop and Maher would testify on behalf of Troya. Each of these claims will be discussed in turn.

1. <u>Counsel were not ineffective for promising, in opening statement, that Troya would present mental health expert testimony and then deciding not to present such testimony.</u>

In issue XXV(D) of his motion, Troya complains that Eisenberg's decision not to call the mental health experts he mentioned in his opening statement for the penalty phase was *per se* ineffective assistance of counsel. CV-DE 25 at 326. Troya cites to several cases in support this argument. Unfortunately for Troya, none of the cases cited establish that Counsel's performance was *per se* constitutionally ineffective.

For instance, the case of *McAleese v. Mazurkiewicz*, 1 F.3d 159 (3rd Cir. 1993), *cert. denied,* 510 U.S. 1028 (1993) has been misrepresented to this Court. In that decision, the Third Circuit actually reversed a District Court's grant of a writ of habeas corpus for failure to call an alibi witness during the guilt phase of a murder trial. The Third Circuit actually found that not calling the alibi witness was a sound strategic call because the alibi witness's testimony might have done more harm than good and because the cross examination would not have been limited

140

as the defense attorney desired.  *See Mazurkiewicz,* 1 F.3d at 171.   The court ultimately found that trial counsel provided assistance that comported with the Sixth Amendment even though he did not call a witness he had described to the jury in his opening statement. *See Mazurkiewicz*, 1 F.3d at 176.

Another case cited by Troya for the proposition that it is *per se* ineffectiveness to fail to call an expert previewed in opening statement, *Anderson v. Butler*, 858 F.2d 16 (1st Cir. 1988), has not been followed in its own circuit.   *See, e.g., United States v. McGill*, 11 F.3d 223, 227 (1st Cir. 1993) ("Although a failure to produce a promised witness may under some circumstances be deemed ineffective assistance, *see, e.g., Anderson v. Butler*, 858 F.2d 16, 19 (1st Cir. 1988), the determination of inefficacy is necessarily fact based. '[N]o particular set of rules can be established to define effective assistance....'").  Moreover, the *Butler* decision is from the First Circuit and does not constitute authority in this district.  In fact, case law in this and at least one other circuit rejects *per se* rules even when no mitigation evidence is offered following a reasonable mitigation investigation.  *See Mitchell v. Kemp*, 762 F.2d 886, 890 (11th Cir. 1985) (failure to present mitigation evidence in penalty phase following guilty plea not per se ineffective after reasonable sentencing investigation), *cert. denied*, 483 U.S. 1026 (1987).  "Having conducted a sufficient investigation, counsel may make a reasonable strategic judgment to present less than all possible available evidence in mitigation." *Kemp,* 762 F.2d at 889 (*citing Stanley v. Zant*, 697 F.2d 955, 961-62 (11th Cir. 1983)); and *Adams v. Wainwright,* 709 F.2d 1443, 1445-46 (11th Cir.1983), *cert. denied*, 464 U.S. 1063 (1984).  *See also, Turner v. Williams*, 35 F.3d 872(4th Cir. 1994) (valid strategic decision to not present mitigation case through experts, and not ineffective), *overruled sub nom. on other grounds, O'Dell v. Netherland*, 95 F.3d 1214 (4th Cir. 2001).

Troya's cite to *United States ex rel Hampton v. Leibach*, 347 F.3d 219 (7th Cir. 2003), is

also misleading. In that decision, the Seventh Circuit affirmed a District Court grant of a writ of habeas corpus for an underlying state court homicide conviction where the defense attorney failed to call available exculpatory witnesses who would have exonerated the defendant.  Counsel's strategic decision in the Troya trial concerning the mental health mitigation subject area is not comparable.  Counsel engaged mental health experts, reviewed their reports, including potential rebuttal evidence from the government, and, after consultation with each other and with Troya, made a strategic decision not to offer any mental health testimony because this testimony would have opened the door to damning rebuttal testimony that would ultimately hurt Troya.  Counsel's decision *not* to call these experts was a sound, strategic decision.

"The [*Strickland*] test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992). "[A] Petitioner must establish that no competent counsel would have taken the action that his counsel did take." *Hittson v. GDCP Warden*, 759 F.3d 1210, 1248 (11th Cir. 2014) (Tjoflat, J.) (death penalty case)(*citing Chandler,* 218 F.3d at 1315 (11th Cir.2000)); *see* also *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir.1998) (noting that counsel's conduct is unreasonable only if petitioner shows "that no competent counsel would have made such a choice").  Troya has not met this burden.

James Eisenberg is a very experienced criminal defense attorney[43] with a history of

---

[43] Eisenberg's web site provides the following biographical resume:  James L. Eisenberg, graduated with a Bachelor of Science (Industrial Engineering) Degree from the University of Michigan in 1971. After taking time off to travel, he moved to Florida and attended law school at the University of Miami, graduating with his Juris Doctor in 1976. While attending the University of Miami, College of Law, Mr. Eisenberg was on the Dean's List, and he received a "Book Award" as top student in his criminal law class. Mr. Eisenberg began the practice of law with the Office of the Public Defender in Palm Beach County. While practicing in that office, Mr. Eisenberg tried numerous jury trials at all levels of the court system. His trial work at the time included some of the most notorious murder cases of the day.  *See* USA Exh. 5.

homicide trials.    Accordingly, trial decisions made by him during a penalty phase are accorded strong deference.  When courts are examining the performance of an experienced trial counsel, the presumption that their conduct was reasonable is even stronger.  *See Provenzano,* 148 F.3d at 1332 (stating that "strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel" and that "[t]he more experienced an attorney is, the more likely it is that his decision to rely on his own experience and judgment in rejecting a defense" is reasonable).

In this context, penalty counsel's trial decision not to call a mental health expert --even after telling the jury that two would be called – does not establish ineffectiveness.  Penalty counsel is not required to present all mitigation evidence, even if the additional mitigation evidence would be consistent with counsel's original strategy.  *See Waters,* 46 F.3d at 1511.  "Considering the realities of the courtroom, more is not always better. Good advocacy requires 'winnowing out'" some arguments, witnesses, evidence, and so on, to stress others."  *Chandler v. United States,* 218

---

In 1980, Mr. Eisenberg went into private practice and started the law firm of Green, Eisenberg & Cohen, which has evolved into Eisenberg & Fouts, P.A. Mr. Eisenberg specializes in the defense of criminal and forfeiture cases and continues to practice in all Florida state and federal courts.

As an attorney, Mr. Eisenberg has served as President, Secretary and Director of the Palm Beach County Association of Criminal Defense Lawyers. In addition, he was a Charter Director and continues to be a member of the Florida Association of Criminal Defense Lawyers.

In recognition of his practice and work, the Florida Bar Association certified Mr. Eisenberg as a specialist in the area of Criminal Trial Law with the designation of Board Certified Criminal Trial Attorney. Additionally, Mr. Eisenberg has been recognized by the prestigious National Board of Trial Advocates and certified as a Criminal Trial Advocate. Mr. Eisenberg has been recognized as a top criminal defense attorney in the South Florida Legal Guide and Super Lawyers Magazine and has been listed by Martindale-Hubble Peer Review as an AV Rated Lawyer and a Preeminent Lawyer. Mr. Eisenberg serves as a member of the Select Committee which oversees the application of the Criminal Justice Act (CJA) for the United States District Court for the Southern District of Florida. http://www.eisenbergandfouts.com/james-l-eisenberg/ (USA Exh. 5).

F.3d 1305, 1320 (11th Cir. 2000), *cert. denied*, 531 U.S. 1204 | (2001) ("There is much wisdom for trial lawyers in the adage about leaving well enough alone.").    This is especially true where experts' findings are a mixed bag[44] and contain evidence or opinions both helpful and harmful to the defense.  The decision on whether to call such experts should and must rest within the discretion of an experienced trial counsel.

In *Hittson*, the Eleventh Circuit found that a penalty counsel's decision not to put on testimony of retained mental health experts was reasonable because their opinions were a mixed bag, and "[t]he defense team's judgment that the findings were more aggravating than mitigating [was] precisely the type of game-time decision that *Strickland* insulate[d] from Monday-morning quarterbacking". *Hittson, 759* F.3d at 1248-49 (*citing Waters,* 46 F.3d at 1512 ("[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.")).

The defense mitigation case may not have been perfect, but Counsel was able to save Troya from the death penalty on three of the five counts for which Troya was death eligible. It was constitutionally sufficient.

> With unlimited time and resources, there is always something more that might have been done in a capital case—such allegations "prove[ ] at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel."

*Waters,* 46 F.3d at 1514. Counsel presented a mitigation case, he engaged mental health experts, and he made strategic decisions about not calling them when faced with the potentially damning

---

[44] Eisenberg himself informed the penalty jury that his mental health experts did not agree 100 percent on all of their diagnoses or conclusions.  CR–DE 818 at 7977.

rebuttal testimony.  Eisenberg's decision not to call the available mental health experts allowed him to keep the lid on a harmful "Pandora's box" of harmful mental health observations about Troya that would have prejudiced him even more than the existing trial record.  This claim should be rejected

2.   <u>Counsel were not ineffective in deciding not to introduce testimony that Troya suffered from organic brain damage.</u>

Troya now claims, in issue XXV(A) of his motion, that his Counsel were ineffective for failing to elicit testimony that Troya suffered from organic brain damage.  CR-DE 25 at 311-32. In support of his claim, Troya filed statements from Dr. Wu, a neuropsychologist, (CV-DE 5-20, Appendix K-2) and Robert Ouaou, Ph.D   (CV-DE 5-22), which purportedly attest to Troya's affliction.   The statements are lacking in at least two important respects: (1) the medical evidence of Troya's organic brain damage is frankly unsubstantiated; and (2) neither expert is able to explain how this purported brain injury related to Troya's conduct.

Ouaou's report was prepared in 2016 after speaking with Troya, conducting some written and verbal examinations, and reviewing prior reports. Ouaou's report is not accompanied by a sworn affidavit.  There is no indication that Ouaou performed any medical testing.  Indeed, Ouaou is not a medical doctor.  The test results are based on psychology, not medicine.  Despite his conclusion that Troya suffers from an organic brain injury, Ouaou found that Troya has an average IQ of between 93-101, with average scores in Verbal Comprehension, Perceptual Reasoning, Immediate memory, Focused and Flexible Attention, Processing Speed, List Learning, Story Learning, Figure Learning, Word Recall, and low average scores in Working Memory, Story Recall and Figure Recall.  Ouauo claims that his findings of organic brain injury are supported by undisclosed witnesses and undisclosed medical records.  *Id.*  No medical evidence was provided in support of the prior head injury claims mentioned by Dr. Wu, either.

145

Furthermore, neither Ouaou's nor Wu's proffered testimony explains how Troya's supposed organic brain damage actually caused any mental impairment or affected Troya's behavior. CV-DE 5-21. Without the linkage of the supposed brain injury to the criminal conduct, this Court should conclude that Troya has not demonstrated prejudice required for relief. *See Lee v. Commissioner, Alabama Dept. of Corrections*, 726 F3d 1172, 1197 (11th Cir. 2013) (Court rejected habeas relief where "new" mitigating evidence failed to explain how the brain injury affected his actions at the time of the murder, and noting unlikelihood of mitigating factors newly outweighing aggravating factors).

Dr. Wu was actually retained by trial counsel. Counsel reviewed Dr. Wu's findings and decided not to call Dr. Wu but to allow another expert, psychologist Dr. Krop, to testify to Dr. Wu's findings. Ultimately, counsel indicated that it had made a strategic decision not to put forth any mental health testimony, including the testimony of Dr. Krop. CR-DE 845 at 9149-50. This was a strategic decision and not emblematic of deficient performance. The fact that Troya has now found, seven years after his trial, another professional-- Robert Ouaou, Ph.D--who could have also testified to Troya's alleged brain damage, does not change this analysis.

Even if Troya could show deficient performance, he has not and cannot show prejudice. Had either or both of Drs. Wu and Ouaou, testified at the trial of this matter, their testimony would have been largely, if not completely contradicted by other testimony. Troya has attempted to buttress the Wu and Ouaou statements with new declarations submitted by Troya's mother (CV-DE 6-2, Appendix L-2) and father (CV-DE 6-3, Appendix L-3) which detail additional head injuries purportedly suffered by Troya which were omitted from their respective trial testimonies. Both of these witnesses testified during the penalty phase of the trial about one head injury suffered by Troya. *Compare* CR-DE 825 at 8770 – 8841; *and* CR-DE 845 at 8893 – 8935 (Maria Troya)

146

and DE 845 at 8937 – 8990 (Lorenzo Troya). Troya's mother testified that Troya hit his head on a car bumper when he was a toddler. CR-DE 825 at 8770. Troya's father recalled an incident where Troya had claimed that he was hit in the head with a pipe during a fight in his teenage years. CR-DE 825 at 8957. The actual trial testimony concerning these two incidents mirror what Daniel Troya himself told Dr. Brannon during his court-ordered examination. *See* USA Exh. 1 (Report of Dr. Brannon detailing self-report by Troya of two incidents). The *history* of multiple, serious head injuries now reported conflicts not only with what Troya himself told Dr. Michael Brannon in 2009 (USA Exh. 1) (*Compare* 26-enumerated findings by Dr. Brannon, or factual statements by Troya to Brannon cited earlier in this response *with* CV-DE 5-22, Ouauo Report), but also with the trial testimony of both of Troya's parents. *Compare* Testimony of Maria Troya *and* Lorenzo Troya, CR-DE 825 at 8770 – 8841; and CR-DE 845 at 8893 – 8935 (Maria Troya) and CR-DE 845 at 8937 – 8990 (Lorenzo Troya).

Furthermore, the severe effect of these injuries also contradicts what was known at the time of the trial. Troya himself told Dr. Brannon that neither head injury resulted in hospitalization and that he never suffered blackouts, dizziness, headaches, seizures, or inattentiveness as result of any head injury. USA Exh. 1 at 3. Moreover, assuming these incidents actually occurred in Troya's past, his own mother admitted that of her four children, only Daniel achieved a high school degree, a G.E.D. which he earned in prison. CR-DE 6-2, Appendix L-2 at para. 103. Had either or both Drs. Wu and Ouaou testified at the trial of this matter, Troya's statements concerning the minor effect of these head injuries and the objective testing features noted in Brannon's report would have come out in rebuttal, negating any effect the new defense testimony might have had.

Given this large factual discrepancy between the new evidence and the evidence introduced or known at the time of trial, and the heinous nature of Troya's crimes, there is not a "reasonable

147

probability" that the jury would have concluded that the mitigating circumstances did not warrant the death penalty. *Putman,* 268 F.3d at 1248.   Moreover, the evidence of actual brain trauma was so slight in this case, lessened by Troya's own admissions to Dr. Brannon, that this evidence would not have sufficiently counter-acted the aggravating factors found by the jury.      Troya    was convicted of participating in a gruesome quadruple homicide that included the slaughter of two little boys, ages three and four.  The jury found multiple statutory and non-statutory aggravating factors had been proven beyond a reasonable doubt:  statutory aggravators (a) committing the murders in the expectation of the receipt of anything of pecuniary value; (b) committing the offenses after substantial planning and premeditation to cause the death of a person; (c) that Luis Damian Escobedo and/or Luis Julian Escobedo were particularly vulnerable due to youth;  (d) Troya  had killed or attempted to kill multiple victims in a single criminal episode; and non-statutory aggravators:  (a) Troya had participated in other, uncharged serious acts of violence; (b) that Troya killed the victims in order to eliminate them as potential witnesses; and (c) Troya caused injury, harm and loss to the family of the victim(s), as evidenced by their personal characteristics as human beings and the impact of their deaths on their family members.  CR-DE 859, Penalty Verdict.

The jury heard about mitigating factors elicited from family members and friends called by attorney Eisenberg.  Eisenberg called thirteen separate witnesses who provided testimony and support for the twenty-two separate mitigating factors he submitted to the jury.  *See* CR-DE 859 at 12-14.  That evidence covered the varying topics of family love, volunteer work with the elderly, earning a G.E.D. in prison, escaping from prison only after being beaten by jail guards, being influenced by a wayward Uncle "Tito", being traumatized in middle school by seeing a friend get shot and die, and the absence of middle school grief counseling.  *See* Defense penalty

148

case CR-DE 825 at 8695-end; CR-DE 845 at 8894-9120.

Given the seven aggravating factors, and the heinous nature of the murders it is highly unlikely that the proffered testimony of brain damage, even if it came in unchallenged, would have made a difference. *See Rose v. McNeil*, 634 F.3d 1224 (11th Cir. 2011) (finding that new mitigation evidence of *habeas* petitioner's brain damage did not reduce the weight of the statutory aggravating factors in a case involving a brutal double murder); *Samra v. Warden, Donaldson Correctional Facility*, 626 Fed. Appx. 227 (11th Cir. 2015) (finding counsel was not ineffective for failing to introduce mitigation evidence of petitioner's brain-impairment evidence in a quadruple homicide case involving two children in that the new evidence would have been unlikely to convince a jury that the killings were any less heinous, atrocious or cruel, or that those brain impairments outweighed the heinousness, atrociousness or cruelty of the four murders).[45]

As Troya has established neither deficient performance nor resulting prejudice, Troya's claim that his counsel were ineffective for choosing not to introduce evidence or organic brain damage must be denied.[46]

### 3.   Counsel were not ineffective for deciding not to call an expert in trauma.

In issue XXV (B) of his motion, Troya claims that penalty counsel was ineffective for failing to call a trauma expert to explain how the traumas suffered by Troya—namely, his

---

[45]   It should be noted that unlike objective indicia supporting brain dysfunction such as blackout episodes, seizures, and memory loss described by the Eleventh Circuit in discussing the case law, *Samra*, 626 Fed. Appx. at 242, Troya himself reported to Dr. Brannon no history of dizziness, inattentiveness, loss of consciousness, memory loss, seizures, hallucinations, nightmares, headaches (USA Exh. 1).

[46]   In a corollary argument contained in issue XVIII of his motion, Troya alleges that the United States committed a *Brady* violation by failing to turn over evidence that Troya suffered from organic brain damage. This issue is discussed and responded to in detail in Section III(C) of this response, *infra*.

witnessing of a school shooting and experiencing the death of a grandmother and the overdose death of a neighbor—affected his behavior. CV-DE 25 at 323-330.  Nowhere in his motion, however, does Troya cite to any expert report, by any "trauma" expert, that can explain how these experiences affected Troya's behavior.  Instead, Troya indicates, in a footnote, that mental health expert Dr. Michael Maher, although not an expert on trauma, could have testified generally about trauma and its effects on the brain.  *See* CV-DE 25 at 323, n. 120.  The Maher report, which was presented to the government in discovery in the underlying criminal case, contains only one statement concerning trauma: "Mr. Troya's life appears to be following expected developmental parameters until middle school when he witnessed the shooting death of a friend who 'died in my arms'.  Subsequently Mr. Troya experienced school failure, came under the influence of family members who introduced him to drug abuse and patterns of criminality, and began associating with peer groups which were also associated with drug use and criminal activities."  USA Exh. 3 at 2-3.  This statement reflects the trial testimony of lay witnesses, and does not appear to contain any expert opinions concerning trauma, its effects on the brain, or the specific effect any trauma had on Troya's brain or his conduct.  *See* USA Exh. 3.  Troya has not filed any new reports by any trauma expert that address these issues.  As such, Troya's claims concerning the uncalled trauma expert are speculative, at best, and should be dismissed.

Assuming, *arguendo*, that Troya had sufficiently substantiated this new trauma expert testimony to avoid summary dismissal, this claim would still fail on the merits as Troya cannot establish either deficient performance or prejudice.   If Maher had been called as a witness, he would have been subject to cross-examination on several facts contained in Maher's report (USA Exh. 3), including that Troya's PTSD was in partial remission; that there is no indication that Troya was legally insane at time of offense; that Troya engaged in the drug trade and associated with

150

persons and groups which were associated with drug use, the drug trade, and other criminal activities; that despite Mr. Troya's history of drug use, early school failure, and various antisocial activity he has never been diagnosed with a major psychiatric illness; that Troya's IQ was estimated in the normal range; and that Troya did not suffer from hallucinations, delusions, or other psychotic processes. In addition, if Maher's testimony was admitted, the government would have rebutted his testimony with the testimony of Dr. Brannon. Dr. Brannon would have testified that Troya denied that he suffered any hallucinations, depression, anxiety, mania, or suicidal or self-harm thoughts. USA Exh. 1, Brannon Report. With regard to the school shooting, Dr. Brannon would have testified that Troya denied having nightmares, vivid "re-living" of the shooting, avoidance behaviors, depression, anxiety or experiencing triggering events with regard to any memories of that shooting. *Id.* at 3. Dr. Brannon would have also testified to Troya's own statements concerning the traumas he experienced, specifically Troya's statement that "[I] was initially bothered by my friend's death and I used to think about it a lot while I was a kid, but I don't really think much about it anymore". *Id.* at 3. In short, the government's rebuttal evidence would have shown that Troya himself denied that these "traumatic" experiences had any effect on him, negating any affect the speculative new "trauma" expert testimony would have had. In fact, Troya surely benefitted from counsel's decision not to call a trauma expert, and to coincidently avoid the Government's damaging rebuttal testimony, as far as nine members of the jury agreed that Troya's school shooting trauma, and the fact that this trauma was not followed by grief counseling, were mitigating factors. *See* CR-DE 859. Had the jury known that Troya himself denied any effect this shooting had on him, it is likely that these mitigating factors could have been discounted altogether by the jury.

Evidence of each of these traumas—Troya's witnessing of a school shooting, experiencing

and the death of a grandmother and the overdose death of a neighbor—was introduced, at length, by penalty counsel. The trauma expert would have done little to advance the mitigation case beyond the evidence Eisenberg already established through the family members, and this new trauma evidence—speculative as it may be—certainly would not have outweighed the aggravating factors established at the trial.   *See generally,* S*amra,* 626 Fed. Appx. 227 (11th Cir. 2015); and *Rose,* 634 F.3d 1224 (11th Cir. 2011).   Additionally, Maher's testimony may have actually hurt the defense mitigation by opening the door to Brannon's rebuttal testimony. Taken together, it was an appropriate strategic decision not to call Maher. Even if a trauma expert and Maher both had been called, their combined effect still would have been unlikely to outweigh the aggravating factors already in the record. For all these reasons, Troya's claim that counsel was ineffective for failing to call a trauma expert should be denied.

### 4.   Counsel were not ineffective in selecting Dr. Krop.

Troya complains that penalty counsel were ineffective in retaining mental health expert Dr. Harry Krop.  CV-DE 25 at 330.  Specifically, Troya claims that his counsel should have selected a more specialized expert, such as a neuropsychologist, who did not have the alleged ethical shortcomings of Dr. Krop.  See CV-DE 5-19, Troya Appendix K-1.  Counsel did hire a neuropsychologist, Dr. Wu, and provided those finding to Dr. Krop.  The ethical shortcomings Troya complains of consist of one complaint in a child custody case for which the doctor was reprimanded.  Troya makes other various complaints about the methodologies employed by Dr. Krop in his examination of Troya.   None of these issues had any bearing on Troya's trial because   Dr. Krop was never called as a witness.

Counsel's strategic decision not to call Dr. Krop had nothing to do with the ethical

152

complaint, or Dr. Krop's methodologies, or his lack of specialization.  Counsel made a strategic decision not to put on any mental health evidence in mitigation to avoid the introduction of the Dr. Brannon report and expert opinion that Troya is a psychopath.    Regardless of who counsel selected, what methods they used, or how ethical they were, no mental health expert would have been called by the defense.

For the reasons stated above, Troya's claim that counsel were ineffective in retaining Dr. Krop must be denied.

Q.    <u>COUNSEL WERE NOT INEFFECTIVE IN DECIDING NOT TO CALL A GIS MAPPING EXPERT IN MITIGATION (RESPONSE TO TROYA ISSUE XI(E)).</u>

Troya claims that his counsel were ineffective for failing to call a GIS mapping expert testify that Troya grew up in low income and high crime areas during his childhood and adolescence. *See* CR-DE 25 at 152-153.  This claim fails on multiple fronts.

Troya's penalty-phase counsel, James Eisenberg, called twelve separate witnesses to support various mitigation points raised before the jury.  Five of those witnesses were unrelated third parties: Carl Busch, Julio Perez, Victor Sepulveda, Gregory Key and Judith Consor.  CR-DE 825 at 8695-8757; *Id.* at 8758-8771; CR-DE 845 at 9023-9034; CR-DE 845 at 9075 -8091; at 9091-9114).  Eisenberg also called seven family members: Troya's mother and father, his two brothers, his grandmother, an uncle and an aunt.  He presented evidence of Troya's volunteerism, the bad influence of an older uncle named Isidro, also known as Tito, trauma endured by Troya witnessing a murder at his middle school, unaccompanied by any counseling, and the deaths of a grandmother and a close family friend.

Troya has failed to show how Counsel's performance was deficient for choosing not to call a GIS mapping expert.   The decision not to call an expert in this area was a strategic one.  *See*

153

*Mills v. Singletary*, 63 F.3d 999, 1024 (11th Cir. 1995) ("The question is whether failing to present certain mitigating evidence to the jury, or ending an investigation short of exhaustion, was a reasonable tactical decision. If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end.") (internal quotation marks and citation omitted). "The Constitution requires a good deal less than maximum performance," and "to be effective[,] a lawyer is not required to pursue every path until it bears fruit or until all hope withers." *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir.1999) (internal quotations omitted). The strategic nature of this decision is borne out by Troya's concession that a GIS mapping expert was retained, but not called, by trial counsel. CV-DE 25 at 171. Troya has not established deficient performance.

Troya has also not established that he was prejudiced by counsel's decision not to call a GIS mapping expert. In order to establish prejudice, a Petitioner must show that "there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Putman v. Head*, 268 F.3d 1223, 1248 (11th Cir.2001). A "reasonable probability" of a different result here, as in regard to the guilt stage, is one sufficient to undermine confidence in the outcome. *See Tompkins v. Moore*, 193 F.3d 1327, 1333 (11th Cir. 1999) (*citing Strickland*, 466 U.S. at 690); *Weeks v. Jones*, 26 F.3d 1030, 1042 (11th Cir.1994) ("[T]he petitioner must show ... there is a reasonable probability that the sentencer would have weighed the balance of aggravating and mitigating factors to find that the circumstances did not warrant the death penalty."); *accord, Horsley v. Alabama*, 45 F.3d 1486, 1493 (11th Cir.1995). In order to decide whether omitted mitigating evidence was case changing, the Court looks at the mitigating circumstance evidence that was not presented, along with that which was presented, and considers the totality of it against the aggravating circumstances that were found. *See Tompkins*, 193 F.3d at 1333); *Callahan v.*

154

*Campbell*, 427 F.3d 897, 936 (11th Cir.2005) ("When a defendant challenges a death sentence, we evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation.") (internal punctuation and citation omitted).

Given the facts of this horrific case it is highly unlikely, not just improbable, that the sentencer would have re-weighed the balance in Troya's favor just because more mitigation evidence, specifically that Troya grew up in bad neighborhoods, was piled on.  The inherent weakness in Troya's argument lies in an uncomfortable and indisputable fact:  Troya murdered an entire family, including two preschool aged boys, in an execution-style manner and subsequently left their bodies on the side of the Florida Turnpike.

Troya's showing on this issue falls far short of the required showing mandating relief.  The mitigation evidence presented by counsel was sufficient to save Troya from the death penalty on three of the five counts for which it was available; it was just not enough to overcome the brutal, execution style murder of two preschool-aged boys.

For all the foregoing reasons, Troya's claims that counsel were ineffective for failing to call a GIS mapping expert must be denied.

R.   COUNSEL WERE NOT INEFFECTIVE IN THEIR PROFFER OF THE TESTIMONY OF THE PRISON CONDITIONS EXPERT (RESPONSE TO TROYA ISSUE XII (B)(11)).

In his petition, Troya re-packages his direct appeal complaint about the exclusion of Dr. Cunningham's proposed testimony on dangerousness in terms of ineffective assistance of counsel.  The District Court precluded the defense from presenting Dr. Cunningham's expert testimony as to how inmates like Troya would adjust to prison conditions after the government removed the non-statutory aggravator of "future dangerousness" from the penalty phase.  *See*

CR-DE 795 at 7823; *see also* USA Exh. 6 (Cunningham notice).  The petition correctly notes that the Eleventh Circuit held that exclusion of this mitigation testimony was harmless beyond a reasonable doubt. However, Troya now faults penalty counsel Eisenberg for not proffering to the district court additional Cunningham-related testimony—all of which still relate to how inmates like Troya would adjust to prison conditions. *See* CV-DE 25 at 198-201.  Additional proffer in this same area would have been redundant, and Troya has not established that counsel's decision not to "pile on" constituted deficient performance.

Furthermore, an additional proffer in the same area would not have changed the Court's decision to exclude Cunningham's testimony.  Troya has not established that he was prejudiced by Counsel's decision not to proffer additional evidence.  Assuming, arguendo, that the Court would have changed its ruling, and allowed Cunningham's testimony, Troya has not established that the inclusion of this testimony would have changed the outcome in this case and tipped the balance of aggravating and mitigating factors in Troya's favor given the egregious facts of this case.  As Troya can establish neither deficient performance nor prejudice, Troya's claim that counsel were ineffective for failing to proffer additional areas of Dr. Cunningham's testimony must be denied.

S.     TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO OBJECT TO THE ADMISSION OF JUVENILE CONDUCT IN THE PENALTY PHASE (RESPONSE TO TROYA ISSUES XIII & XIX).

Troya complains that his counsel were ineffective when they failed to object to the government's use of Troya's juvenile conduct during the penalty phase.[47] *See* CV-DE-25 at 210-

---

[47] Troya also complains that the government's use of his juvenile conduct in the penalty phase constituted cruel and unusual punishment under the Eighth Amendment. Troya has not explained why this claim was not raised on direct appeal or how he was prejudiced by this failure. As such, this claim is procedurally barred.   Even if it were not procedurally barred, it would fail on the

211. Troya cites *Roper v. Simmons*, 543 U.S. 551, 560 (2005) in a very misleading fashion. *Roper* merely stands for the proposition that the Eighth Amendment's prohibition against cruel and unusual punishment prevents the execution of an offender who was a juvenile at the time he committed the capital offense. *Roper* did not hold that adjudicated juvenile offenses could not be used as an aggravator against an adult offender who committed a capital offense after he was an adult, which is the factual circumstance presented here.

At the outset it is important to note that Troya has miscited the government's use of two violent episodes of juvenile conduct: (i) an episode of school violence in which Troya pushed a desk and then punched a female student in the face CR-DE 845 at 8965-8967; and (ii) an adult conviction for felony battery that occurred when Troya was a juvenile. *See* CR-DE 818 at 8027, *and* GX 1001a. The United States mentioned the school violence incident not as evidence of a non-statutory aggravator, but merely to rebut the defense mitigation case that Troya was a calm, non-violent person. *See e.g.,* Rebuttal Closing Argument, penalty phase at CR-DE 847 at 9629-30, (Kastrenakes rebuttal penalty closing, explaining that Troya's violent school desk incident not offered by government as evidence of non-statutory aggravator but instead to rebut defense mitigation case). This evidence was relevant and not improper. Counsel is not required to object to otherwise admissible testimony.

By contrast, the United States did use a felony battery conviction, which indisputably occurred while Troya was a juvenile, in support of the non-statutory aggravator, "other, uncharged serious acts of violence" by arguing that Troya should have been charged more severely for this offense. *See* CR-DE 859 at 4 (Troya Penalty Verdict form). The use of the felony battery conviction was entirely proper. Juvenile convictions involving violence may properly be

---

merits for the reasons stated herein.

considered as an aggravating factor in a capital case. *See generally, Melton v. Secretary, Florida Department of Corrections,* 778 F.3d 1234, 1237 (11th Cir. 2015); *see also, Taylor v. Thaler*, 397 Fed. Appx. 104 (5th Cir. 2010) (use of prior juvenile conviction was proper for enhancing adult crime to a capital offense and did not violate Eighth Amendment); *United States v. Davis*, 2003 WL 1873088 (E.D. La. 2003) (FDPA does not per se prohibit use of juvenile convictions in penalty phase of capital trial because "[i]t is desirable for the jury to have as much information before it as possible when it makes the sentencing decision."), *citing Gregg v. Georgia*, 428 U.S. 153, 204 (1976); *United States v. Stitt,* 760 F.Supp. 2d 370 (E.D. Va. 2010).

Troya claims that his penalty counsel did not object to introduction of this felony battery conviction. The record reflects otherwise. Eisenberg objected to the admission of this conviction and the trial judge overruled his objection. *See* CR-DE 818 at 7894-98. Counsel cannot be held accountable for failing to do something that he actually did. As Troya yet not established deficient performance, this claim should be denied[48].

---

[48] In a corollary argument contained in issue XIX of his motion, Troya claims that counsel was ineffective for failing to object to this state felony battery conviction on grounds that Troya's state court attorney did not adequately represent him. Troya claims that his state court lawyer told him that the eyewitnesses did not want to testify. Troya further claims that he learned during the capital trial that the defense eyewitnesses were not contacted by the lawyer and had they been contacted, they would have indicated that the victim was the instigator. Troya does not indicate that he ever told his Counsel of this alleged defect in his battery conviction. Even if Troya had communicated this information, and Counsel lodged an objection, there is no basis upon which the objection would have been sustained. At the time of the trial, this was a valid conviction obtained by a guilty plea when Troya was represented by counsel. The proffer for this plea shows that Troya admitted his guilt and the facts substantially match those the new eyewitnesses would have testified to. CR-DE 825 at 8741-42. In sum, Troya has shown no defect in his felony battery conviction. A counseled, voluntary guilty plea is not subject to collateral challenge. *See United States v. Broce*, 488 U.S. 563, 569 (1989). To the extent that Troya is alleging that the new eyewitnesses would provide him with an affirmative defense of self-defense, "A defendant's [unconditional] plea of guilty, made knowingly, voluntarily, and with the benefit of competent counsel, waives all non-jurisdictional defects in that defendant's court proceedings." *See United States v. Pierre*, 120 F.3d 1153 (11th Cir. 1997). Indeed, Troya has tried, and failed, to overturn this conviction in state court on the same grounds raised herein. *See* CV-DE 25 at 262-63. Moreover, Troya cannot show that

158

T.   COUNSEL WERE NOT INEFFECTIVE FOR CONCEDING TROYA'S INVOLVEMENT IN TWO UNCHARGED SHOOTINGS DURING PENALTY PHASE CLOSING ARGUMENTS (RESPONSE TO TROYA ISSUES XII (B)(14) and XXI).

Troya, in the identically worded issues XII (B)(14) and XXI of his § 2255 motion, alleges that his counsel were ineffective for conceding Troya's involvement in two uncharged shootings during closing arguments in the penalty phase.   *See* CV-DE 25 at 208-212 and 271-73. Specifically, Troya argues that counsel's concession was objectively unreasonable given that the evidence of Troya's involvement in these crimes was "weak" and "relied exclusively on the uncorroborated testimony of twice-convicted felon and drug addict, Kevin Vetere".  *See* CV-DE 25 at 190, 253.  This is not accurate.  There was substantial evidence of Troya's involvement in these shootings.

During the guilt phase, government witness Kevin Vetere testified that Troya had spoken about using an AK 47 to shoot up a house on Mercer Avenue after Troya was released from prison. Vetere testified that Troya believed that a co-defendant who had cooperated against Troya lived in that house.  CR-DE 753, at 5669, line 23 – 5671, line 3.  Vetere's testimony was corroborated by several additional witness and items of evidence.

Officer Khaled Ghumrawi, of the West Palm Beach Police Department, testified that on April 28, 2006, he responded to a call indicating shots fired at a house located at 1901 Mercer Avenue.   CR-DE 757 at 6162, line 3 – 6163, line 23.  Officer Ghumrawi testified that a mother and two children were in the home.  *Id.* at 6164, lines 9 – 12.  Officer Ghumrawi testified that he

---

he was prejudiced by the inclusion of this conviction given the evidence of other uncharged and more recent violent acts involving Troya's indiscriminate use of firearms in attempting to murder other people.  *See* Haverhill shooting incident references, CR-DE 753 at 5640-49 (Testimony of Kevin Vetere); CR-DE 758 at 6394-6405 (Testimony of Jeff Cunningham); *see* Mercer Avenue shooting incident, CR-DE 753 at 5670 (Testimony of Kevin Vetere); CR-DE 757 at 6188-6220 (Testimony of Kelly Ghumrawi, Traci Hayes, and Angela Culpepper); Id. at 6256-6294 (Testimony of Allison Quereau).

159

saw firearm casings in the street near the home and called a crime scene investigator.   *Id.* at 6163, line 24 – 6164, line 6.

Tracy Haynes, a crime scene investigator with the West Palm Beach police also responded to the shooting at 1901 Mercer Avenue. *Id.* at 6169, line 4 – 6170, line 16.  Haynes testified that she collected 11 casings, 2 projectiles, and took photos of 12 projectile strikes in and around the home. *Id.* at 6171, line 1 – 6172, line 23.  Haynes testified that there were three bullet holes in the door of the residence and 7 bullet holes in the stucco exterior of the home.  *Id.* at 6180, lines 1- 19. Haynes further testified that three of the bullets went into the interior of the home.  *Id.* at 6186, lines 1- 22.  Two of these bullets were recovered, one from the kitchen, and one from the living room near the couch.  *Id.* at 6187, line 10 – 6189, line 4.

A friend and family member attested that Troya was released from prison in December 2005 and was at liberty at the time of the shooting on Mercer Avenue.  CR-DE 825 at 8743, 8968-69.

Kevin Vetere also testified that he also had a conversation with co-defendant Sanchez about a shooting involving the AK 47.  CR-DE 753 at 5671, line 14- 5672, line 11. Vetere testified that he and Sanchez had been walking in the Westgate area of West Palm Beach when Sanchez began acting paranoid.  *Id.* at 5672, lines 12-19. Vetere testified that when he asked Sanchez why he was acting so paranoid, Sanchez told him that he (Sanchez) had used an AK 47 to shoot up a house in the West Gate area and a man was shot as a result.  *Id.* at 5672, line 19 – 5673, line 19.  Vetere's testimony concerning the Westgate shooting was corroborated by the testimony of law enforcement officers who responded to a shooting at 1305 Suwannee Drive, in the West Gate Area on April 28, 2006—the same date as the Mercer shooting.

160

Angela Culpepper, a crime scene specialist with the Palm Beach County Sheriff's office, testified that in the early morning hours of April 28, 2006, she responded to a call of shots fired at 1305 Suwannee Drive, in the Westgate area.  CR-DE 757 at 6208, line 3 – 6209, line 21. Culpepper testified that two residences were affected by the shooting, and that she found 16 bullet casings in front of the residence on Suwannee Drive.  *Id.* at 6209, line 11 – 6212, line 22.  Neil Sielinski, a crime scene investigator with the Palm Beach County Sheriff's Office, also responded to the shooting at Suwannee, and testified as to the bullet holes in the residences, bullets that were recovered from the residence, and blood on the floor of one of the residences.  *Id.* at 6219- 6245. Brandon Orr, who was working at the time as an officer with the Palm Beach County Sheriff's Office, testified that a man had been shot in the leg during the shooting at Suwanee on April 28, 2006, and that he had arranged for emergency transport for the shooting victim.  *Id.* at 6246-6255.

Maria Lopez, the mother of co-defendant Sanchez's child, testified during the guilt phase that Sanchez had confessed to the shooting in Westgate, indicating that he had shot at a house because he (Sanchez) believed that a friend of Lopez's was inside.  CR-DE 758 at 6389, line 20 – 6392, line 12.

The government recovered an AK 47 firearm from the execution of the search warrant on "Thug Mansion", the residence shared by Varela, Troya, Sanchez, and Vetere.   This firearm was introduced as evidence during the guilt phase of the trial, and was one of the firearms listed in Count Fourteen of the Third Superseding Indictment, which Count charged the Troya and Sanchez with possession of a firearm subsequent to a felony conviction. CR-DE 305.

During the guilt phase of the trial, the Government called firearms and tool mark expert Allison Quereau, who testified that she had examined the AK 47 recovered from "Thug Mansion", as well as bullet and casings recovered from the Mercer and Suwanee crime scenes.  Quereau

testified that she was able to identify eight of the cartridges from the Mercer Avenue crime scene as having been fired from the AK 47 recovered from "Thug Mansion". CR-DE 757 at 6286-87. Quereau testified that she was able to identify eight of the cartridges from the Suwannee Drive crime scene as having been fired from the AK 47 recovered from "Thug Mansion." *Id.* at 6341, line 18 – p. 6344, line 21. Quereau testified that she was able to identify an additional six of the cartridges from the Suwannee Drive crime scene were at least cycled through the AK 47 recovered from "Thug Mansion." *Id.* at p. 6346, lines 3-7.

During the guilt phase, government witness Kevin Vetere testified he witnessed Troya, who was wearing a distinctive wig with long, black dreadlocks, use a 9 mm handgun to shoot from a moving vehicle into another moving vehicle, gold in color with a Hurricane license plate, on Haverhill Road. CR-DE 753 at 5625, line 4 – 5630. Line 3; 5634, line 12- 5645, line 6. Vetere, Varela, Sanchez, and Troya were all present in the vehicle when this shooting occurred. They believed the car they were shooting at had been used to case "Pimp Plaza", a townhouse where Varela and Troya lived and stored narcotics. Vetere identified the wig worn by Troya as the same wig found during the search of the residence shared by Varela, Troya, and Sanchez. *Id.* at 5641, lines 8-20.

Inspector Rodon with the Palm Beach County Sheriff's Office testified that on September 11, 2006, she had responded to a call concerning a drive by shooting on Haverhill Road. CR-DE 757 at 6190, lines 8 – 6191, line 8. Rodon observed the car that had been shot at and identified bullet holes in the vehicle, the description of which matched the description given by Kevin Vetere. Rodon then collected eleven casings from the scene and identified them as 9mm caliber casings. *Id.* at 6203, line 21 – 6204, line 14. Deputy Jeff Cunningham of the Palm Beach County Sheriff's

162

Office testified that the woman who was driving the other vehicle had been shot in the thigh. CR-DE 758 at 6395-6397.

In light of this overwhelming evidence, during the penalty phase closing argument, counsel addressed the Mercer and Haverhill shootings and stated:

> And we know from, also, that Daniel did two other shootings, but they -- if you look at the overall scheme of things, they were part of the Varela conspiracy. They were part of the same overall crime that we have.
>
> Not additional, not anything separate.
>
> So overall the facts of the guilt/innocence, as serious and tragic as they are, we know don't by themselves justify the imposition of the death penalty.
>
> The Government knows that, too. The Government knows that too, ladies and gentlemen, because they could have, they could have come in here and when we started the proceedings, and the judge said you got anything to present, they could have said, Judge -- ladies and gentlemen of the jury, we rest on the evidence that was presented in the first phase of the trial. They could have said that if that had been sufficient, but they didn't because it wasn't.
>
> So let's now look at the additional evidence –

CR-DE 847 at 9558, line 14 – 9559, line 6.

"[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage . . . . [W]hich issues to sharpen and how best to clarify them are questions with many reasonable answers." *Yarbrough*, 540 U.S. at 6. By admitting to the uncharged shootings, counsel gained credibility with the jury. By lumping these shootings in with the Varela conspiracy, counsel was attempting to negate an aggravating factor—uncharged criminal conduct—by claiming that the shootings were part of the Varela conspiracy and were therefore charged conduct. Counsel was also able to argue that the Government

introduced additional evidence in the penalty phase because they did not believe that the original evidence was sufficient. Counsel was making the point that in comparison to the murders of the Escobedo family and the uncharged shootings, the other criminal conduct introduced by the government in the penalty phase—the escape, the felony battery, and the pistol-whipping of the girlfriend—were relatively minor. This was clearly a strategic decision. Here, Troya's counsel argued vigorously– and, with respect to Counts Six, Nine, and Ten of the Indictment, *successfully* – for life imprisonment in lieu of the death penalty. His performance was not constitutionally deficient.

Even if Troya was able to establish that counsel's concession constituted deficient performance, Troya has not established that he was prejudiced thereby. Given the strength of the government's case for aggravation and the brutal nature of Troya's crimes, Troya has not and indeed cannot establish that a different closing argument would have resulted in a lesser sentence or that counsel's remarks contributed to the jury's death recommendation. *See Windom v. Sec'y, Dep't of Corr.*, 578 F.3d 1227, 1252 (11th Cir. 2009).

As Troya has established neither deficient performance nor resulting prejudice, Troya's claim concerning counsel's concession of the uncharged shootings during penalty phase closing arguments should be denied.

U.     TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO OBJECT TO JURY INSTRUCTIONS CONCERNING NON-STATUTORY MITIGATING FACTORS BECAUSE COUNSEL JOINED IN CO-DEFENDANT'S OBJECTION TO THE INSTRUCTIONS AND EVEN IF HE HAD NOT, COUNSEL IS NOT REQUIRED TO OBJECT TO PROPERLY DRAFTED JURY INSTRUCTIONS (RESPONSE TO TROYA ISSUE XIV).

Troya complains that his counsel were ineffective for failing to object to allegedly erroneous jury instructions and government arguments relating to non-statutory mitigating factors and the jury's role in determining whether the factor was actually mitigating in nature. CV-DE 25

164

at 212-226.      The record belies Troya's claim.      By order of this Court, an objection by any defendant was an objection by all unless a defendant expressly opted out of the objection.  CR-DE 648 at 12; CR-DE 961 at 27-28.  Sanchez's counsel did, in fact, object to the allegedly erroneous instruction and Troya did not opt out of this objection.  CR-DE 847 at 9479-83.  In fact, Troya's counsel called the instruction "very prejudicial" and made sure that his objection was noted.  CR-DE 847 at 9484, lines 11-16; 9488, line 11. The court overruled Sanchez's objection and the Eleventh Circuit later held that the instructions were legally correct.[49]      There was no ineffectiveness here.

The Federal Death Penalty Act, ("FDPA") provides a list of seven factors, which, if established, must be considered as mitigating factors.  18 U.S.C. § 3592(a)(1)-(7).[50]  The FDPA also provides for the consideration of "other factors" under the catchall provision.  18 U.S.C. § 3592(a)(8) ("Other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against the imposition of the death sentence.").   In the instant case, in accordance with the FDPA, the Court and all of the parties agreed that, apart from the seven statutory mitigating factors that the jury was required to consider, if established, the jury also was required to consider any other factors in the defendant's background, record, or character, or any other circumstance of the offense that mitigated against the imposition of the death penalty. CR-DE 818 at 7862-66, 7901-16.  *See* 18 U.S.C. § 3592(a)(8) ("Other factors").  The parties did not agree as to how the jury would determine whether "other," i.e., non-statutory, factors proposed by the defendants were, in fact, mitigating factors.  CR-DE 845 at 9139-42; CR-DE 846 at 9369-

---

[49] *Troya*, 733 F.3d at 1129.

[50] The seven statutory mitigating factors, generally, are: (1) impaired capacity; (2) duress; (3) minor participation; (4) equally culpable defendant; (5) no prior criminal record; (6) disturbance; and (7) victim's consent.  18 U.S.C. §§ 3592(a)(1)-(7).

165

71, 9405-61.

In discussing the issue of how the jury was to consider a proposed non-statutory mitigating factor, the Court framed the issue thusly: "[I]f someone came in and said Joe Smith is a human being, or if someone came in and said it was raining on the day of the murders, we would all say, okay, you can establish that, but the question is, is that a mitigating factor". CR-DE 847 at 9473-75. Thereafter, the Court adopted the two-pronged approach set forth in *United States v. Lawrence*, 555 F.3d 254 (6th Cir. 2009) and informed the parties that it intended to instruct the jury that Congress had set out statutory mitigating factors, that those were presumed to have "some merit," but that a defendant was free to propose other factors as long as the defendant satisfied the burden of (1) establishing the facts underlying a proposed factor and (2) establishing that a proposed factor constituted a mitigating factor. CR-DE 847 at 9478.

Sanchez's counsel objected to the district court's approach on the ground that it would improperly imply to the jury that there was a "qualitative difference" between statutory and non-statutory mitigating factors. CR-DE 847 at 9479. Although defense counsel agreed with the "general principle" that the defense had the burden of establishing that a proposed non-statutory factor, if established, constituted a mitigating factor, Sanchez's counsel essentially argued that the jury should make that determination without any reference to the presumptive merits of statutory mitigating factors. CR-DE 847 at 9479-83. Troya's counsel echoed this objection to the two-step process, calling it "very prejudicial". CR-DE 847 at 9484, lines 11-16; CR-DE 847 at 9488, line 11.

The district court opined that the jury, in determining whether a proposed non-statutory factor constituted a mitigating factor, had "a right to consider the similarity between" the proposed non-statutory factor and the statutory mitigating factors. CR-DE 848 at 9680-81. In that regard,

166

the district judge stated, "I would think that the closer you get to the language of a statutory mitigating factor, the easier it probably would be for the jury to come to the conclusion, yes, this is a mitigating factor" because [i]t's very close to what Congress has said or close to the category of things that Congress has determined are mitigating factors". CR-DE 848 at 9681-82. Accordingly, the court advised the parties that it intended to inform the jury of the seven statutory mitigating factors so that the jury could compare those factors with the non-statutory factors proposed by the defense. *Id.* The court emphasized, however, that it would instruct the jury that the statutory mitigating factors were not entitled to any greater weight, simply by virtue of their designation by Congress, than a non-statutory mitigating factor. CR-DE 848 at 9682.

Thereafter, the district judge instructed the jury, in pertinent part:

> Now, you know that there are things called statutory aggravating factors and there are things called nonstatutory aggravating factors.
>     . . .
> Just like the government regarding statutory and nonstatutory, well, the same thing is true for the defense. The Federal Death Penalty Act actually lists some statutory mitigating factors, but a defendant has an absolute right to allege anything that [the] defendant feels constitutes a mitigating factor that the jury should consider.
>     . . .
> Congress has listed an aggravating factor in the statute, or listed a mitigating factor, Congress has made the judgment that if the facts underlying that particular factor are established, that they do constitute an aggravating factor or a mitigating factor, and they must be considered by the jury.
>
> Now, please understand, Congress has not in any way suggested what weight or value the jury should attach to it. That is up to the jury. But the Congress has said if the Government proves a statutory aggravating factor beyond a reasonable doubt, or if a Defendant proves a statutory mitigating factor by a preponderance of the evidence, it must be considered.
>     . . .
> Well, in any of these, the first thing you do, of course, you have to look and say did the party offering that, did they prove it. If it is an aggravating factor, you have to say did the Government prove this to me beyond a reasonable doubt. And as I mentioned, it has to be unanimous.
>
> For a Defendant, you have to say did the Defendant prove this [by] a

167

preponderance of the evidence, and [it] doesn't have to be unanimous.

If you are looking at a nonstatutory aggravating factor or a nonstatutory mitigating factor, you need to go one step further and you have to say, okay, I find that the party proved this, but is this indeed an aggravating factor. Is this indeed a mitigating factor.

. . .

Now, in these instructions I've laid out for you seven of the mitigating factors that Congress set out in the statute . . . and I have done it for a particular reason and I will explain it to you in more detail as we go along.

Let me lay out what the statute lists as seven statutory mitigating factors.

The first would be that the Defendant's capacity to appreciate the wrongfulness of the Defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

Two, the Defendant was under unusual or substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge.

Three, the Defendant is punishable as a principal in the offense, which was committed by another, but the Defendant's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge.

Four, another Defendant or Defendants, equally culpable in the crime, will not be punished by death.

Five, the Defendant did not have significant prior history of other criminal conduct.

Six, the [Defendant] committed the offense under severe mental or emotional disturbance.

Seven, the victim consented to the criminal conduct that resulted in the victim's death.

. . .

If the defendant asserts one of the statutory mitigating factors, and if they prove it, Congress says you must consider that.

If the defendant asserts something that is not set forth in the statute, well, of course, the first thing you need to decide is, A, did the defendant prove by a preponderance of the evidence that the fact in it is true. But you then also

168

need to decide if it is true, does it constitute a mitigating factor under the definition of what is a mitigating factor.

And by the way, and I will talk about this in a moment, when you look at what the Defendant -- a particular defendant has pled, I think you can also compare that to the statutory mitigating factor, and if you see that there is a close relationship between the two, I think that is a factor that you can consider in determining whether the nonstatutory assertion is in fact a mitigating factor.

And please understand, there is -- Congress does not in any way say what weight that you should apply to either a statutory or a nonstatutory factor. That is for you, the jury, to decide.

CR-DE 848 at 9705, 9727-28, 9730-31, 9733-36.[51]  These instructions were not erroneous. *See Troya*, 733 F.3d at 1129.

At the conclusion of the court's instructions, Sanchez's counsel renewed his objection to the instruction concerning the non-statutory mitigating factors. CR-DE 848 at 9763.  Sanchez's counsel stated that the court's instruction was "misleading" because it "tied the value" of the non-statutory mitigating factors to their "similarity" with the statutory mitigating factors (*Id.*).  Troya's counsel joined in this objection.  CR-DE 848 at 9763.

The backbone of the instant claim is Petitioner's allegation that counsel failed to object to the jury instruction concerning the proposed non-statutory mitigating factors and the jury's obligation to determine whether the proposed factor was, in fact, mitigating.  The record conclusively establishes that counsel objected to this instruction not once, but twice.  Counsel's objection was overruled, as the law was not on his side.  Counsel cannot be found to be ineffective for failing to do something that he actually *did*.  As the record does not support Troya's claim that

---

[51] In a related instruction, the district court defined "mitigating factors" generally as "considerations that suggest that a sentence of death should not be imposed" and stated that mitigating factors "need not justify or excuse the Defendant's conduct, but they do suggest that a punishment less than death may be sufficient to do justice in the case". CR-DE 848 at 9720-21.

his lawyer failed to object to this portion of the jury instructions, this claim should be denied.

Even if Counsel's objection did not fully articulate every ground set forth Troya's motion, Troya has still not established that counsel rendered ineffective assistance. To establish that Counsel was ineffective for failing to raise a particular legal issue, Troya would have to show that no competent counsel would have failed to raise that issue. Troya's arguments concerning the impropriety of the instructions relating to the non-statutory mitigating factors are legally unsound in that they are not supported by binding or persuasive case law. For support of his argument, Troya cites to *Sampson v. United States*, 335 F. Supp.2d 166 (D. Mass. 2004), an opinion of a single District Court in Massachusetts which expressly rejects the holdings of both the Eighth Circuit and the Fifth Circuit and which has apparently never been followed by any other court. Troya also cites to "mitigation impaired" jury selection cases, which are inapplicable to the case at bar as Troya does not claim that the jury selection process failed because trial counsel (or the Court) permitted "mitigation impaired" jurors to serve on his capital jury. As a result, his citations, and his attempt to conflate unrelated issues, must be rejected.

Troya's argument begs the question of how a jury must go about determining whether a proposed non-statutory mitigating factor is, in fact, a mitigating factor. His essential argument is that the jury is entitled to consider in mitigation *anything* that the defense proposes and that anything that the defense proposes is a mitigating factor by virtue of the fact that the defense proposed it. That argument, however, ignores the fact that proposed non-statutory mitigating factors are nothing more than alleged mitigating factors, and, as the district court aptly held, they are subject to a two-pronged approach:  the jury must determine not just (1) whether the facts alleged to be mitigating were sufficiently proven, the jury must also determine (2) whether those alleged facts are properly considered as mitigating the defendant's culpability. *See Lawrence*, 555

170

F.3d at 267; *see also Rogers v. Secretary*, *Department of Corrections*, 2010 WL 668261, *27 (M.D. Fla. Feb. 19, 2010) (unpublished) (holding that sentencing courts must apply two-pronged approach in addressing non-statutory mitigating factors). A jury is entitled to reject a submitted mitigating factor. In fact, several Supreme Court cases hold that the jury is not required to have given an undisputed factor any weight. *See, e.g., United States v. Paul*, 217 F.3d 989, 1000 (8th Cir. 2000) (finding no error in the failure of six jurors to find the defendant's age (which was not disputed) at the time of the offense as mitigating, because a juror is not required to give mitigating effect to any factor). *See also, United States v. Bernard*, 299 F.3d 467, 485-86 (5th Cir. 2002).

*Lockett v. Ohio*, 438 U.S. 586 (1978) and *Eddings v. Oklahoma*, 455 U.S. 104 (1982), address mitigating factors, but impose no requirement on a capital sentencing jury to give mitigating effect or weight to any particular evidence. Rather, *Lockett* and *Eddings* merely stand for the principle that the "Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by [the defendant]." *Boyde v. California*, 494 U.S. 370 at 377-78 (1990). Thus, a sentencer's decision not to give weight to proffered non-statutory mitigating factors on the ground that the factors are not mitigating does not violate the rule of *Lockett* and *Eddings*. *See Johnson v. Wainwright*, 778 F.2d 623, 629 (11th Cir. 1985); *accord Graham v. Collins*, 506 U.S. 461, 490 (1993).

The instructions provided a correct recitation of the law. Counsel objected to the proposed instruction on a reasonably sound basis; they were not constitutionally required to raise grounds that lack legal merit.

Additionally, Troya claims that his counsel were ineffective for failing to object when the prosecutor made remarks indicating that the proposed non-statutory mitigating factors were entitled to little or no weight. These remarks were consistent with the district court's instructions

171

that the weight to be attached to any mitigating factor was "up to the jury". CR-DE 848 at 9727. As such, the comments were proper and any objection to them would have been overruled.

As Troya has failed to establish that his counsel's performances with regard to the jury instructions for the non-statutory mitigating factors, and the prosecutor's comments regarding the same, were deficient, Troya has failed to establish this claim of ineffective assistance.  This claim should be denied.

V.    TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO OBJECT TO PORTIONS OF THE PENALTY VERDICT FORM AND JURY INSTRUCTIONS WHICH RELATED TO THE NON-STATUTORY AGGRAVATING FACTOR "UNCHARGED ACTS OF VIOLENCE" (RESPONSE TO TROYA ISSUE XX).

Troya complains that his attorney was ineffective for failing to challenge those portions of the jury instructions and penalty phase verdict form that related to the non-statutory aggravating factor "uncharged acts of violence". CV-DE 25 at 263-71.    In essence, Troya claims that the Court erred in not requiring the jury to specifically identify every violent incident proved beyond a reasonable doubt by the government. The non-statutory aggravating factor at issue here relates to "other, uncharged serious acts of violence."   CR-DE 859 at 9.  The government presented trial evidence of several different uncharged or undercharged serious acts of violence: (1) Troya's Mercer Avenue shooting; (2)  Troya and Sanchez's Haverhill Road shooting; (3) Troya and Sanchez's attempted home invasion robbery; (4) Troya's assault and battery on Carol Pawolski; (5) Troya's assault and battery on Inessa De Olivera; (6) Troya's escape from prison.  Each of those acts of violence was supported by sufficient evidence.

The trial court's jury instruction required the jury to find each non-statutory aggravating factor -including the factor that Troya had committed uncharged acts of violence- unanimously and beyond a reasonable doubt, but did not require the jury to be unanimous as to which individual

172

uncharged acts of violence had been proven beyond a reasonable doubt. Troya's counsel did not object to this instruction.

To establish that counsel was ineffective for failing to object to this instruction, Troya must establish that no competent counsel would have failed to make this objection. Troya has not met this burden. The FDPA requires that "[t]he burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt. 18 U.S.C. § 3593(c). As we have demonstrated, that requirement was met in this case - the district court instructed the jury that the existence of the non-statutory aggravating factor concerning uncharged crimes of violence had to be found unanimously and beyond a reasonable doubt. The FDPA is silent, however, on the question of whether each individual crime of violence supporting the factor has to be found unanimously and beyond a reasonable doubt.

Troya claims that the issue was addressed in *Richardson v. United States*, 526 U.S. 813, 119 S. Ct. 1707 (1999) and *Schad v. Arizona*, 501 U.S. 624, 111 S. Ct. 2491 (1991) (CV-DE 25 at 267). His reliance on those cases is misplaced because neither Supreme Court opinion addresses the issue of the burden of proving aggravating factors under the FDPA. *Richardson* involves the burden of proving elements of a Continuing Criminal Enterprise under 21 U.S.C. § 848, 526 U.S. at 815-18, 119 S. Ct. at 1709-10, and *Schad* involves the burden of proving alternative theories of premeditated and felony-murder under Arizona law. 501 U.S. at 630-31, 111 S. Ct. at 2496. Although at least one court has required the government to prove the specific uncharged crimes unanimously and beyond a reasonable doubt, s*ee United States v. Basciano*, 763 F.Supp.2d 303, 356 (E.D.N.Y. 2011), neither the Supreme Court or the Eleventh Circuit has ever addressed this issue directly. At best, this is an unsettled area of law.

173

As noted earlier, the law of this Circuit is clear that "an attorney is not liable for an error of judgment on an unsettled proposition of law". *Smith*, 170 F.3d at 1054-55, *see e.g., Guyton*, 447 Fed. Appx. at 138-39.  The Eleventh Circuit has held, many times, that "[r]easonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop." *Elledge v. Dugger*, 823 F.2d 1439, 1443, *modified in unrelated part*, 833 F.2d 250 (11th Cir.1987); *accord, Thompson v. Wainwright*, 787 F.2d 1447, 1459 n. 8 (11th Cir.1986); *Funchess v. Wainwright*, 772 F.2d 683, 691 (11th Cir.1985); *Spaziano v. Singletary*, 36 F.3d 1028, 1038-39 (11th Cir. 1994); *accord, Davis v. Singletary*, 119 F.3d at 1476 (11th Cir. 1997).  As the basis for Troya's complained about objection is, at best, an unsettled area of law, Troya has not and cannot, establish that his Counsel's performance was deficient in failing to object to the jury instructions and verdict form on this basis.  For this reason, the instant claim should be denied.

W.   <u>TROYA HAS FAILED TO ESTABLISH THAT HIS ATTORNEYS WERE CONSITUTIONALLY INEFFECTIVE FOR FAILING TO OBJECT TO THE PROSECUTOR'S ARGUMENTS DURING THE GUILT AND PENALTY PHASES (RESPONSE TO TROYA ISSUES XII(A)(2), XII(B)(12) & XII(B)(13))</u>.

Troya claims that his attorneys were constitutionally ineffective for failing to object to allegedly improper and prejudicial prosecution argument during the guilt and penalty phases. CV-DE 25 at 174-180; 201-208.  To prevail on of these claims, Troya must establish that no competent counsel would have failed to make the omitted objections.  As counsel is not required to raise meritless issues, Troya must establish a proper legal basis for each of the objections he claims should have been made.  Troya fails to make this showing.  Even if Troya was able to establish a legal basis for objection, it is not unusual for counsel to make a strategic decision not to object during argument to avoid highlighting the prosecutor's comments for the jury.  Troya cannot establish deficient performance.   And even if he had met his burden, which he has not, Troya

174

cannot and has not established that he was prejudiced thereby.  Troya must make a particularly

high showing with regard to the impact of his counsels' collective failure to make objections to

allegedly improper prosecutorial arguments:

> The defendant must show that there is a reasonable probability
> that, but for counsel's unprofessional errors, the result of the
> proceeding would have been different. A reasonable
> probability is a probability sufficient to undermine confidence
> in the outcome.

*Strickland*, 466 U.S. at 694. Stated differently, the question as applied to these issues becomes

whether in the absence of the attorneys' failures to object to the prosecutors' arguments the

factfinder would have had a reasonable doubt about guilt, or punishment.  Given the overwhelming

evidence of guilt and the heinous nature of his crime, Troya cannot show that the allegedly

improper comments tilted the balance against him.  In addition, comments made by the lawyers

are not evidence.  The jury instruction to this effect cured any possible prejudice.  For all the

reasons stated herein, Troya's claims that his counsel were ineffective for failing to objection to

closing arguments must fail.  We address the claims in the order raised.

    1.  Guilt Phase Complaints

Troya complains that his lawyers were ineffective for failing to object to the prosecutor's

references to "Thug Mansion" and "Pimp Plaza". CV-DE 25 at 174.  On the merits, prosecutors'

invocation of these monikers was not improper because it was premised on trial witness Kevin

Vetere's testimony, not the prosecution's improper invocation of a pejorative phrase.  CR-DE 753

at 5570-71. Prosecutors had a good faith and proper basis for repeating the co-conspirators' own

descriptions of their residences.  Kevin Vetere testified that the defendants called their first house

"Thug Mansion" and their second house, "Pimp Plaza".  CR-DE 753 at 5570-71.  These were not

175

labels invented by the prosecution, but names used by the co-conspirators themselves.  There was nothing improper about the use of these names and therefore no legal basis upon which to object.

Troya complains that his lawyers were ineffective for failing to object to the prosecutor's guilt-phase closing argument reference to witness David Doran, and asserts that the government's comment that Doran was nervous to testify was an improper suggestion that Doran was in danger from the defendants. *See* CV-DE 25 at 174.   The prosecutor's comments actually indicated that this nervousness likely came from Doran's close friendship with defendant Varela and his discomfort in being called as a government witness.  CR-DE 766 at 7143-44.   This was a proper comment the witness's bias in favor of Danny Varela.[52]   There was nothing improper about this comment and therefore no legal basis on which to object.

Troya complains that his lawyers were ineffective for failing to object when the prosecutor called Sanchez a liar. CV-DE 25 at 174.  The prosecution's comments about Sanchez having lied were supported by objective facts introduced during the trial that demonstrated that Sanchez had lied to Detective Springer when questioned after the homicides.  *See* CR-DE 766 at 7154-55 (arguing how a suspected murderer has an incentive to lie and pointing out how Sanchez lied about when was the last time he drove the Escobedo Jeep when the government had introduced Escobedo's Turnpike toll ticket bearing Sanchez's fingerprints the night of the murders; lied about not calling Escobedo on the phone; and falsely denied that he had been on the Turnpike.)  Because the prosecutor's comments were supported by evidence in the record, there was no error in the argument and therefore no legal basis on which to object.

---

[52] Troya's counsel conceded Doran's bias in favor of his friend, Danny Varela: "David Doran was called by the Government after that.  Doran through his mannerisms and the way he acted is a friend of Danny Varela.  He is here reluctantly. Anybody who watched body language could figure that out."  CR-DE 766 at 7320.

176

Troya complains that his lawyers were ineffective for failing to object when the prosecutor commented on the evidentiary significance of Yessica Escobedo's suitcase being found in the van driven by the killers when he stated, "[t]his red suitcase is Yessica Escobedo's way of speaking from the grave and identifying her killers." *Id.* at 7159.   Admittedly, the prosecutor invoked poetic license with the phrasing. However, the statement further referenced exhibits that supported this argument and where they could be found in the trial record: "Government Exhibits 102a.2, 100a.16, 106a, 302.8, 302.19, 302.20, 302.a, and 731". *Id.*  The prosecution was not suggesting that Yessica Escobedo either had the capacity to testify or had acted consciously to identify her killers. Rather, the prosecutor merely pointed out a circumstantial inference that could be drawn as to the significance of law enforcement locating her luggage in the van driven by the defendants on the Florida Turnpike on the night of the murders in the company of the Escobedo vehicle.   There was nothing improper about this argument and therefore no legal basis on which to object.

Troya complains that his lawyers were ineffective for failing to object when the government allegedly commented on his exercise of his right to counsel.  CV-DE 25 at 174.  A clear reading of the record indicates that the comment was not prejudicial in nature, but merely part of an argument concerning the rights afforded in the American justice system, including the opportunity to see the evidence against you, confront the government witnesses, and the right to counsel, and that these rights had been afforded to the defendant.  CR-DE 766 at 7177-7182. There was nothing improper about this comment and therefore no legal basis on which to object.

Troya complains that his lawyers were ineffective for failing to object when the government compared jury service to military service (CR-DE 25 at 175) when the prosecutor stated:

177

> Back in 1959 Judge Bolt, United States judge, talked about jury service in this fashion. Jury service honorably performed is as important in the defense of our country, its Constitution and laws and ideals and standards for which they stand as the service that is rendered by the soldier on the field of battle in the time of war. There is nothing short of serving your country in battle as a soldier of [as] being a juror. It is taking incredible time out of your daily lives, incredible amount of time to listen and pay attention. You have to be on every day, every day.

CR-DE 766 at 7412. The prosecutor merely had pointed out how important the jury's role was. There was nothing improper about this comment and therefore no legal basis on which to object.

Troya complains that his lawyers were ineffective for failing to object when the prosecutor commented that there had been no deals with Varela and the government would continue to investigate Varela. CV-DE 25 at 175. There was nothing improper about this statement. Varela went to trial with Sanchez and Troya. It was apparent to everyone that no deals had been made between the government and Varela. To the extent that Troya complains that the prosecutor introduced evidence not in the record, any harm was cured by the trial judge's repeated admonitions to the jury that the lawyers' comments did not constitute evidence. *See e.g.,* CR-DE 728 at 3024, 3036, 3037; CR-DE 767 at 7275; CR-DE 771 at 7490-91. Even if there had been an objection raised, it likely would have been overruled or answered anew by the trial judge with yet another reminder to the jury that the lawyers' comments were not evidence. Finally, to the extent that Troya claims he was prejudiced, ten of the twelve jurors found that Varela's status as an equally culpable defendant who was not being prosecuted for murder was a mitigating factor in Troya's favor. *See* CR-DE 859 at 12, mitigator #2.

Troya complains that his lawyers were ineffective for failing to object when the prosecutor allegedly vouched for the credibility of government witnesses. CV-DE 25 at 175-79. A close reading of the transcript reveals that the prosecutor conceded that the cooperators have a

178

motive to lie but focused on summarizing the mountain of evidence gathered against the defendants which corroborated those witnesses, *e.g.,* undercover operations, search warrants, traffic stops, fingerprints, firearms, chemists. CR-DE 766 at 7415-7417. This was a proper invited reply to the defense arguments concerning the supposed weakness of the prosecution's case and the credibility of its cooperators. *See e.g.*, CR-DE 767 at 7279 – 82 (Troya counsel Garcia suggesting that the government's case was based solely on circumstantial evidence and supposition); and CR-DE 767 at 7290-91 (Sanchez counsel Cohen suggesting that the prosecution's entire murder case against Sanchez rested on four bullets, and jury could take all the other evidence and throw it out). *See also United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir.2009) (recognizing, as an exception to the prohibition against vouching for a witness, that "a prosecutor [is entitled] to respond to arguments advanced by defense counsel in his or her statement to the jury'"). There was nothing improper about this argument and therefore no legal basis on which to object. In addition, any objection made would have likely been sustained.

Troya complains that his lawyers were ineffective for failing to object when a prosecutor purportedly demeaned Troya's counsel by stating that Mr. Garcia did not know how to deal with government witness Kevin Vetere (CV-DE 25 at 178). When read in context, the prosecution's comment was not an attack on counsel, but rather on the ironic difficulty of handling a witness who favorably indicated that Troya had sought to keep Vetere off drugs while at the same time implicating Troya in a gangland style murder. CR-DE 766 at 7417-20. Anyone present at the trial in person to view this paradox was clearly aware of the conundrum faced by defense counsel, although it may not now be apparent on a cold paper record. The prosecutor's comment was a permitted observation concerning the difficulty in handling such a witness. There was nothing improper about this argument and therefore no legal basis on which to object.

179

Troya complains that his lawyers were ineffective for failing to object when a prosecutor allegedly demeaned co-defendant Liana Lopez's lawyer, Gregg Lerman during his closing. CV-DE 25 at 178, fourth full paragraph.   Troya's argument is odd; he suffered no detriment by the comment, nor does he have standing to raise it. Viewed in context, the prosecutor merely directed the jury to specific evidence in the record that contradicted Lerman's closing argument claim that no evidence showed his client was known as "Negra". CR-DE 766 at 7420-22.  There was nothing improper about the argument; it was a proper invited response. There was nothing improper about this argument and therefore no legal basis on which to object.

Troya complains that his lawyers were ineffective for failing to object when the government prosecutor allegedly commented on evidence not in the record concerning a Mr. Hambrick.   CV-DE 25 at 178, second to last paragraph.   A detailed reading of the closing argument reveals that Troya's claim is baseless.   The prosecutor's reference to Hambrick was merely an introduction to the jury reminding them about the testimony of jailhouse informant Carlos Rodriguez and how he (Rodriguez) overheard a conversation between his cellmate Byron Hambrick and Troya.  CR-DE 737 at 4409-4420.  The prosecutor did not detail any evidence from Hambrick that was not in the record.   There was nothing improper about this argument and therefore no legal basis on which to object.

Troya complains that his lawyers were ineffective for failing to object when the prosecutor allegedly rebuked Troya counsel Garcia's method of isolating witnesses and misdirecting the jury from evaluating the case as a whole. CV-DE 25 at 178, last paragraph and continuing at 179.   The prosecutor's comments, albeit mentioning Garcia by name, constituted proper invited response on the defense closing.  Read in context, the prosecutor properly responded to defense arguments that the prosecution's individualized witnesses mostly had zero evidence against his client.

180

*Compare* Troya guilt closing, CR-DE 766 at 7184-7217, *and* CR-DE 767 at 726—86 *with* prosecution rebuttal, CR-DE 767 at 7410-7457.  The prosecution's comments about Garcia's closing on behalf of Troya constituted a proper "invited reply."  *See, e.g., United States v. Sarmiento*, 744 F.2d 755, 765 (11th Cir. 1984) (stating that the prosecution is entitled to respond to arguments of the defense and that issues raised by defense in closing argument are "fair game for the prosecution on rebuttal").  *See generally, Lawn v. United States,* 355 U.S. 339 (1958); *United States v. Rogers*, 981 F.2d 497, 499 (11th Cir. 1993).  *See also, United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984) (prosecutor is not limited to a bare recitation of the facts; he may comment on the evidence and express conclusions he contends the jury should draw from the evidence).  There was nothing improper about this argument and therefore no legal basis on which to object.

Troya complains that his lawyers were ineffective for failing to object when a prosecutor allegedly demeaned his counsel and counsel for Sanchez.  CV-DE 25 at 179, first full paragraph. A clear reading of the prosecution's argument, viewed in context, indicates that the prosecutor was identifying each counsel because their separate arguments were vastly different on behalf of their individual clients. The prosecutor pointed out the blatant inconsistencies between the different arguments and how the arguments did not overcome an overwhelming amount of circumstantial evidence.  CR-DE 766 at 7429-34.  The prosecutor's comments also constituted a proper "invited response" to the defense closings. *See Rogers,* 981 F.2d at 499.  This is particularly true as to the prosecutor's comment on the absurdity of the argument concerning the time gunshots on the Turnpike occurred at 2:42am and not 2:24 as testified to by government witness. *Compare* defense closing CR-DE 766 at 7302-06 *with* Rich Testimony, CR-DE 728 at 3098-3112 indicating gunshots awakened her at 2:24 a.m. *and* with prosecutor's invited reply,

181

CR-DE 766 at 7433.[53]   There was nothing improper about this argument and therefore no legal basis on which to object.

Troya complains that his lawyers were ineffective for failing to object when the prosecutor commented, "cases don't get better than this".   CV-DE 25 at 179, second full paragraph.   The prosecutor's comments constituted an invited reply on the purported weakness of the government's case.   CR-DE 766 at 7438. *See also, Smith v. United States*, 379 Fed. Appx. 811 (11th Cir. 2010) (affirming district court habeas finding of no prejudice where trial court instructed jury that counsel arguments were not evidence after prosecutor vouched for witness's credibility in response to defense closings); *United States v. Lopez,* 590 F.3d 1238, 1256 (11th Cir. 2009) (recognizing, as an exception to the prohibition against vouching for a witness, that "a prosecutor [is entitled] to respond to arguments advanced by defense counsel in his or her statement to the jury"). There was nothing improper about this argument and therefore no legal basis on which to object.

Troya complains that his lawyers were ineffective for failing to object when a prosecutor impugned defense counsel for blaming Lou Escobedo (the victim, and a drug dealer himself) for the murder of his children, and arguing that this was not a recognized defense like self-defense or insanity. CV-DE 25 at 179, third full paragraph.  This argument constituted proper invited reply. CR-DE 766 at 7438 (suggesting that the defense effort to blame Escobedo was an attempt to focus the jury's attention away from the evidence).  There was nothing improper about this argument and therefore no legal basis on which to object.  Moreover, Troya suffered no prejudice as a result

---

[53] AUSA Kastrenakes responded to Cohen's suggestion to the jury that the gun shots might have gone off at 2:42 a.m.as follows: "Mr. Cohen says, well, instead of being 2:24, what if it were 2:42? Where does that come from?  If pigs had wings, they would fly.  Come on, that is made up.  She says 2:24, that is the evidence in the case. Does it agree with the other evidence in the case?"

of this remark inasmuch as eleven of the jurors found that Jose Luis Escobedo's engagement in criminal conduct was a mitigating factor in the case. *See, e.g.*, CR-DE 859 at 14, mitigator #21.

Troya complains that his lawyers were ineffective for failing to object when the prosecutor commented that the murders involved a "military-style operation and execution by thug enforcers". CV-DE 25 at 179, second to last paragraph.   The trial court *sua sponte* instructed the prosecutor not to use the argument with reference to any particular defendant, and the prosecutor moved on with other discussion.   CR-DE 766 at 7445.   There was no need for counsel to object.

Troya complains that his lawyers were ineffective for failing to object when the prosecutor allegedly commented on 404(b) evidence and Troya's propensity to commit violence.   CV-DE at 179, bottom paragraph.   The record belies this complaint.   Trial counsel objected contemporaneously, but the trial court overruled the objection.   CR-DE 766 at 7449.   The trial judge ruled that that the Haverhill shooting was admitted properly as evidence of the drug conspiracy, and the prosecutor's comment was not an improper argument under Rule 404(b). The comment was not improper in any event, and counsel did in fact object, so there can be no deficient performance finding on this issue.

Troya complains that his lawyers were ineffective for failing to object when the rebutting prosecutor allegedly told the jury that it was their duty to convict.   CV-DE 25 at 180, second full paragraph.   A review of the transcript belies the factual assertion Troya has made. The prosecutor did not tell the jury that they had a duty to convict, period.   CR-DE 766 at 7456.   He told the jury that they should render a verdict of guilty because the defendants were guilty. *Id.* at 7457).   This is proper commenting on the evidence as an advocate. There was nothing improper about this argument and therefore no legal basis on which to object.

    2.   Penalty Phase Complaints

Troya complains that his lawyers were ineffective for failing to object when the prosecutor purportedly commented on Troya's right to silence. CV-DE 25 at 206. A clear reading of the penalty closing indicates that the comment was focused on the choices that Troya and Sanchez had made consciously and voluntarily, and not their right to remain silent:

> Sanchez and Troya both made conscious choices in this case to pursue a life of crime, a life of violence, unrepentant violence, unremorseful violence without regard to the consequences, and without caring who they injured.

CR-DE 847 at 9507-08. The argument was intended to focus the jury on Troya and Sanchez's voluntary decisions to commit repeated acts of violence. There was nothing improper about this argument and therefore no legal basis on which to object.

Troya complains that his lawyers were ineffective for failing to object when the prosecutor commented on defense counsel and the mitigation case by arguing, "this is not a contest of how much mud can be thrown against a wall and how much of it sticks." CR-DE 847 at 9510. The prosecution's penalty closing addressed the defense mitigation case by questioning or attacking the *weight* to be properly attributed to the mitigating factors submitted by the defense, mindful that ultimately the jury was required to weigh those mitigating factors against the aggravating factors. The prosecution's use of the mud phrase clearly was voiced in connection with this theme, e.g., "it is up to you to decide how important they are". *Id.* There was nothing improper about this argument and therefore no legal basis on which to object.

Troya complains that his lawyers were ineffective for failing to object when the prosecutor allegedly commented that the death of Troya's grandmother was not a mitigating factor. CV-DE 25 at 206, ¶ 13b. A review of the trial record indicates that the prosecutor was simply arguing that the death of a grandparent was a common event and the jury should attach little weight to

184

that factor. CR-DE 847 at 9514. There was nothing improper about this argument and therefore no legal basis on which to object.

Troya next complains in *seriatim* fashion that his lawyers were ineffective for failing to object when the prosecutor argued that the jury should give little weight to the mitigators as opposed to the gravity of the aggravating factors. *See, e.g.*, CV-DE 25 at 207, ¶¶ d, e and f. The prosecutor never argued that the jury should disregard or ignore the defendants' proposed mitigating factors; he argued only that the mitigating factors were entitled to little or no weight. Accordingly, his remarks were consistent with the district court's instructions that the weight to be attached to any mitigating factor was "up to the jury" CR-DE 848 at 9727. There was nothing improper about this argument and therefore no legal basis on which to object.

Troya also complains that his counsel were ineffective for failing to object when the government argued:

> A line was crossed that cannot be excused. It cannot be excused
> with life in prison that this is just like any other murder, just drug
> dealers. Two little kids murdered brutally, an entire family
> slaughtered. If this case doesn't qualify, I don't know what will,
> ever.

(CR-DE 847 at 9522). The prosecutor's comments were directed to the statutory and non-statutory aggravators submitted by the government, that is, (i) that the defendant murdered two little boys who were "particularly vulnerable due to youth" (CR-DE 860 at 8, ¶3); (ii) that the offense involved intentionally killing "multiple victims in a single criminal episode" (*Id.* at 8, ¶4); and (iii) that the victims were killed in order to eliminate them as potential witnesses (*Id.* at 10, ¶2). The argument was not improper and therefore counsel was not deficient for failing to object to it.

Troya complains that his lawyers were ineffective for failing to object when the prosecutor invoked the word "excuse" in connection with mitigation. The prosecutor used the word "excuse"

185

to emphasize the distinction between a legal excuse for the crime and a mitigating factor that might lessen the gravity of the crime.  His remarks were entirely proper.  *See Johnson,* 495 F.3d 951, 978-79 (8th Cir. 2007) (holding that prosecutor permissibly argued that mitigating factor did not excuse criminal conduct); *Bland v. Sirmons*, 459 F.3d 999, 1026 (10th Cir. 2006) (rejecting claim that prosecutor demeaned mitigating evidence by arguing it was nothing more than excuses for the defendant's conduct).  There was nothing improper about this argument and therefore no legal basis on which to object.

Troya complains that his lawyers were ineffective for failing to object when the prosecutor allegedly coerced a death sentence by exhorting the jury to do its duty.  CV-DE 25 at 207.  The prosecutor did not inappropriately direct the jury to return a death penalty as its duty. Rather, he argued to them that they should find that the aggravators outweighed the mitigators:

> It is for you to decide if the aggravators sufficiently outweigh the mitigators, four million stones, grains of sand.  As the conscience of this community, on this day, in this month, in this year, in this county, in state, and in this country, 12 of you are the conscience of the community and you must take a stand that this line which has been crossed in killing an entire family and executing in cold blood two little kids is inexcusable, and is not deserving of mercy.
>
> This case calls out for the maximum punishment.  You know in your heart that it does.  It is your obligation to review the evidence in an objective factor and in an objective manner and come to that conclusion that the community requires and that justice demands, and that is a sentence of death on all of the counts for this most heinous and inexcusable of crimes.

 CR-DE 847 at 9522-23.   Read in context, the comments were merely a comment on the jury's representative and policy role in the criminal justice system, and such comments are proper.  *See, e.g. Jenkins v. Byrd*, 103 F.Supp.2d 1350, 1379 (S.D. Ga. 2000) (finding lack of state prosecutorial misconduct where prosecutor asked jury to return verdict not based on community standards but

the evidence in the case).    The comments were proper, therefore there was no deficient performance in failing to object.

Troya complains that his lawyers were ineffective for failing to object when the prosecutor told the jury that the case was not about whether Troya's Uncle Tito was in Florida for 30 or 60 days.  Troya alleges that this was improper argument for the jury to ignore mitigation.  A reading of the penalty phase trial transcript reveals that this argument is misplaced. The prosecutor was actually referring to the trial disagreement concerning the time period Uncle Tito had actually been in West Palm Beach, not dismissing the Uncle Tito aggravating factor.  *Compare* CR-DE 845 at 8914-26 and 8962-8977 cross examination of Troya's parents *with* testimony of FBI Special Agent John MacVeigh, CR-DE 846 at 9181-9218 concerning discrepancy on time period of Tito's presence in West Palm Beach, FL versus Jacksonville, FL or Chicago, IL.   The comments were proper, therefore there was no deficient performance in failing to object.

Troya complains that his lawyers were ineffective for failing to object when the prosecution compared jury service to military service. CV-DE 25 at 207, ¶ b. The prosecutor actually stated:

> When we first started I discussed with you about Judge Bold, I won't read the quote again, he said jury service honorably performed is as important as serving your country in a time of war. I would say to you after these three months you probably would seriously entertain signing up in the military as an easier alternative than serving as jurors in this kind of a case. With all of the joking aside, you did not volunteer to be here, Judge Hurley told you that, that is the truth.
>
> You were subpoenaed to be here, and Judge Hurley painstakingly discussed the roles you would serve in the guilt phase and this possible phase which has happened, including this awesome task. There are no surprises.  We all counted on you and you all agreed that in the right case you could and would impose the death penalty.  You took an oath to follow the law.  Judge Hurley, when you had finished your initial deliberations, told you that you could hold your head high because you, irrespective of the verdict, had discharged your

> duty in accordance with your oaths and you followed the law. Whatever your verdict is after this phase, if you follow the law, and you discussed legal things, and you rendered a verdict that spoke the truth based on the evidence and the law, hold your head high, whatever your verdict, because you have discharged your duty.

CR-DE 847 at 9605-06.  Troya cites to no case law to support his claim that this argument was improper.  Indeed, these comments were not improper and therefore counsel was not deficient for failing to object.

Troya further complains that his counsel were ineffective for failing to object when the prosecutor argued, during the penalty phase rebuttal closing, that the jurors needed to act as the "conscience of the community":

> Whatever your verdict is after this phase, if you follow the law, and you discussed legal things, and you rendered a verdict that spoke the truth based on the evidence and the law, hold your head high, whatever your verdict, because you have discharged your duty…
>
> So as the *conscience of this community*, you need to speak with one voice as to the appropriateness of the penalty here.  It is the verdict of you each individually and it is the verdict of you as 12 jurors, as a voice of this community to tell us what the appropriate penalty is…
>
> It is that process, sharing viewpoints, re-examining what we actually originally may have thought, and coming to a conclusion that speaks the truth.  That is the hallmark of our justice system. Do it, talk, exchange your ideas, and reach a consensus.  Speak together with your unanimous verdict as the conscience of this community.

(CR-DE 847 at 9606-07) (italics supplied).  These comments were not improper and in fact echoed the Court's instruction to the jury on this same issue: "Your role is to be the conscience of the community in making a moral judgment about the worth of an individual life balanced against the societal value of what the Government contends is deserved punishment for the Defendant's offense."  (CR-DE at 9756).   Any objection as to the prosecutor's comment that the jury was the

188

"conscience of the community" would have been overruled.  Counsel were not deficient for failing to make this objection.

Troya complains that his attorneys were deficient for failing to object when the prosecutor commented that Sanchez's rough childhood did not excuse the murders. CV-DE 25 at 208 at ¶d. The prosecutor's comments did not relate to Troya, but Sanchez.[54]  CR-DE 847 at 9617.  Because the comments did not relate to him, Troya cannot show prejudice.  Troya argues that the comments were improper as they inappropriately linked mitigation to the crime. Once again, it is important to read the prosecutor's actual comments in context:

> Mr. Murrell spent some time with you in discussing the evidence that was presented during their phase of the trial.  And you know he spent a lot of time being very harsh on Mr. Sanchez's dad and very harsh on that family.
>
> You know, I comment to you about this, maybe his father wasn't a perfect father, but this man had a third grade education, and an I.Q. below 70.  He comes to this country, becomes a citizen, he holds down a steady job for 25 years, he provides for a family.  He buys a house, pays mortgage payments on a house, takes his family on trips, he feeds them, buys clothes for them.   That is a remarkable achievement for a man who came from another country with very little education.
>
> Prime minister of India Nehru back in the 1940's said, life is like a game of cards, the hand you are dealt is determinism, the way you play it is free will.
>
> That was a tough hand dealt to Ricardo Sanchez, Sr.  And his mom who worked in the field and worked with the crops, no education, they played it the best they could.  They did it the best they could.

---

[54] Sanchez counsel later objected to the prosecution linkage of mitigation to the crime under "Drettke", *qua Tennard v. Dretke*, 542 U.S. 274 (2004), and moved for a mistrial, which was denied.  CR-DE 847 at 9643-45. The denial of the mistrial motion was later re-stated by the trial court after additional review. *See* CR-DE 848 at 9679.  Troya's counsel automatically joined in the motion, so his failure to opt out indicates he did not act ineffectively by failing to object. By agreement, an objection for one defendant constituted an objection for all for purposes of preserving an issue for appellate review CR-DE 732 at 4052; see also CR-DE 245.

189

CR-DE 847 at 9612-13.        The above argument was entirely proper given the record evidence in the case concerning just how bad, or not so bad, the Sanchez household was during the defendant's formative years. *See* Testimony of Maria Sanchez, CR-DE 823 at 8148-8209, Testimony of Nydia Sanchez, *Id.* at 8272-8299, and rebuttal Testimony of Dr. Michael Brannon, CR-DE 846 at 9319, indicating Sanchez denied he had seen adults fighting at his home when growing up.  Nothing improper occurred, therefore counsel was not deficient in failing to object.

Troya further complains that his counsel were ineffective for failing to object when the prosecutor argued that there had been no showing the Troya was unable to determine right from wrong or unable to control his behavior. CV-DE 25 at 208 at ¶e.  Troya complains that the prosecution wrongfully equated the absence of mitigation as aggravation and thus misstated the law.  A reading of the entire rebuttal summation however does not support this conclusion.  On rebuttal, comments about Troya's background were related to the non-statutory aggravating factor "serious uncharged acts of violence" (CR-DE 847 at 9604-40), and as such they were entirely proper.  The prosecutor also is allowed to comment on the evidence and make argument about the weight the jury should allocate to mitigating factors versus aggravating factors.  In this context, the argument was proper.  There was no basis to object.

Troya complains that his attorneys were deficient for failing to object to the prosecutor's reference to him as "evil." CV-DE 25 at 208 ¶f.  The complained passage contains this reference during rebuttal summation:

> Here is a man who embraces violence, does not shy away from violence, he is evil.  In the heart of darkness Joseph Conrad wrote about evil, he said a belief in a super natural source of evil is not necessary.  Men alone are quite capable of every wickedness.

190

CR-DE 847 at 9634.   The prosecutor invoked Joseph Conrad's literary use of the word "evil" to argue that men are capable of evil deeds, without the necessary presence of a deity.  This is made plain by the prosecutor's citation to a well-known fiction novella, *Heart of Darkness,* Conrad, Jos. (1902 ed.) (*Id.*)  The prosecutor then argued that the plethora of violent acts committed by Troya supported the conclusion that he was "evil". This reference constituted one line of a thirty-six page rebuttal argument; it was not repeated.   Given its singular reference, the invocation of this description cannot be said to have infected the trial with unfairness.

Improper argument does not, per se, violate a defendant's constitutional rights. *Fields v. Woodford*, 309 F.3d 1095, 1109 (9th Cir.2002) (*quoting Thompson v. Borg*, 74 F.3d 1571, 1576 (9th Cir.1996)). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (internal quotation marks omitted). Rather, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly v. DeChriostofaro*, 416 U.S. 637, at 643 (1974). In *Darden*, during closing, the prosecutor referred to Darden as an "animal," and said that he should not be allowed out of a cell unless he was on a leash and that he wished that he could see Darden "sitting here with no face, blown away by a shotgun." *Darden,* 477 U.S. at 183. Nevertheless, the Court found that these improper statements did not deprive Darden of a fair trial, in part because of the substantial evidence against Darden, and because the trial court instructed the jury that the arguments made by counsel were not evidence. *Id.; see also Runningale v. Ryan*, 686 F.3d 758, 781 (9th Cir. 2012) (federal habeas review of state death sentence) (prosecutor told jury "evil was among us"); *Marks v. Davis* 2016 WL 5395958 (N.D. Cal. 2016)(death penalty case where prosecutor called defendant "a cold hearted, vicious, violent individual without a shred of

humanity in his total human being"); *Bland v. Sirmons,* 459 F.3d 999, 1029 (10th Cir. 2006) (death penalty habeas review where prosecutor referred to defendant as a "sniffling ... coward[ ]," a "heartless and vicious killer," and a "violent and evil man."); *Malicoat v. Mullin*, 426 F.3d 1241, 1256 (10th Cir. 2005) (death penalty habeas review where prosecutor had called defendant "evil" and "a monster"); *Andrews v. Cain*, 71 F.Supp.2d 560, 564 (E.D. La. 1999) (death penalty habeas review where prosecutor called the defendant "a horror and evil"). The prosecutor's singular description of Troya as "evil" did not deprive Troya of a fair trial. During the penalty phase instructions, the trial court reminded the jurors that the arguments of counsel did not constitute evidence, and their arguments were not binding on the jury CR-DE 847 at 9695-96. Because the comment did not deprive Troya of a fair trial, his attorneys' failure to object was not deficient performance.

Troya complains his counsel were ineffective for failing to object when the prosecutors asserted that the government would continue to investigate Varela in an attempt to lessen the impact of a mitigating factor, that someone equally culpable had not been charged. CV-DE 25 at 201. The prosecutor's rebuttal remarks did not affect the jury's decision. The great majority of the jurors *rejected* the prosecutor's argument that Varela was not an equally culpable codefendant. Ten of the twelve jurors found, as to both Troya and Sanchez, that "[a]n equally culpable co-defendant, Danny Varela, was not charged in these murders and will not be facing death". CR-DE 859 at 12; CR-DE 860 at 12. Because Troya suffered no prejudice from the prosecutor's comments, this claim must be denied.

3. Prejudice

Troya has simply not established that he would have been acquitted or escaped the death penalty had counsel objected to the prosecutor's comments. The recently proposed objections lack

192

merit and would have been overruled, for the reasons stated above.  Furthermore, the government's case was strong.  In fact, on direct review, the Eleventh Circuit described the evidence of guilt as "overwhelming".  *United States v. Troya*, 733 F.3d 1125, 1138 (11th Cir. 2013), *cert. denied*, 135 S.Ct. 2048 (2015).    The absence of the complained of arguments would not have made any difference in the outcome. At the very least, Troya has not established that it would.

When viewed in the context of a lengthy and convoluted trial, the prosecution comments were not so pervasive that they permeated the entire trial. The United States called its first of seventy-two guilt phase witnesses on January 27, 2009. CR-DE 728 at 3099.  Guilt phase closing arguments were completed on February 26, 2009. CR-DE 767 at 7457.  The penalty phase began on March 16, 2009 (CR-DE 818 at 7918), and ended with final arguments on March 25, 2009 (CR-DE 847 at 9640).  The three hours or so of government closing arguments were relatively isolated and did not permeate the atmosphere of the long trial.  For this reason, amongst others, this claim should be rejected.  *See, e.g., United States v. Mueller*, 74 F.3d 1152 (11th Cir. 1996) and *United States v. Kallen-Zury*, 629 Fed. Appx. 894 (11th Cir. 2015) (both cases upholding convictions despite prosecutorial comment error).

While the United States does not concede that its prosecutors erred in the closing penalty arguments, and indeed the record shows that they did not so err, any error was cured by the court's repeated instructions to the jury that the lawyers' comments were not evidence. CR-DE 728 at 3024, 3036, 3037; CR-DE 767 at 7275; CR-DE 771 at 7490-91.  These instructions cured any alleged error from the prosecution's statements.  *See Smith v. United States*, 379 Fed. Appx. 811 (11th Cir. 2010) (affirming district court habeas finding of no prejudice where trial court instructed jury that counsel arguments were not evidence after prosecutor vouched for witness's credibility in response to defense closings); *see also Sims v. Singletary*, 155 F.3d 1297, 1309 (11th Cir. 1998)

193

(no prejudice for failure to object where conviction supported by substantial independent evidence);*United States v. Gainey*, 111 F.3d 834, 836-37 (11th Cir.1997) (prosecutor's inappropriate comment not prejudicial where it "was mitigated by the district court's curative instructions"); *United States v. Barshov*, 733 F.2d 842, 846-47 (11th Cir.1984) (same).

The jury is presumed to have followed the court's instructions in this regard, therefore there was no prejudice to Troya.

### 4.  Conclusion

Troya has not met his burden of establishing that his trial counsel's failures to object to prosecution arguments constituted representation that was outside the wide range of reasonable professional conduct.   Troya also has failed to demonstrate prejudice inasmuch as any inappropriate argument was cured by the court's repeated instructions that the lawyers' comments did not constitute evidence and as Troya has not established that the failures to object affected the ultimate verdicts in the case.  For all these reasons, Troya's claims concerning counsel's failure to object to statements made during government argument should be denied.

**III.   TROYA HAS FAILED TO ESTABLISH OTHER CONSTITUTIONAL VIOLATIONS THAT WARRANT VACATUR OF HIS CONVICTION AND SENTENCE.**

A. TROYA'S MURDER CONVICTIONS AND RESULTING DEATH SENTENCES WERE BASED ON A VALID STATUTE, TITLE 18, UNITED STATES CODE SECTION 924(c), THAT IS NOT IMPERMISSIBLY VAGUE (RESPONSE TO TROYA ISSUE VII).

In claim VII, Troya argues that his murder conviction and resulting death sentences were based on "an impermissibly vague statute, in violation of due process and the Fifth, Sixth and Eighth Amendments."  CV-DE 25 at 82.  Specifically, Troya argues that his convictions for Counts Seven and Eight under 18 U.S.C. § 924(c) were improper because the statute is unconstitutionally vague, citing *Johnson v. United States*, ___ U.S. ___, 135 S.Ct. 2551 (2015).  In *Johnson*, the

194

United States Supreme Court held that the so-called "residual clause" of 18 U.S.C. § 924(e)(2(B) of the Armed Career Criminal Act ("ACCA") was unconstitutionally vague. Essentially, the Court concluded that the phrase "or otherwise involves conduct that presents a serious potential risk of physical injury to another," was constitutionally flawed. 18 U.S.C. § 924(e)(2)(B)(ii); *Johnson*, 135 S.Ct. at 2557-63. Distinct from the Armed Career Criminal Act, the statutory section under which Troya was convicted, that is, section 924(c), denoted that he could be guilty of a crime of violence premised on either a drug trafficking offense, or a carjacking in which a killing occurred, under 18 U.S.C. § 2119(3). It is Troya's assertion that carjacking does not qualify as a crime of violence. For any number of reasons Troya is clearly mistaken.

1.  Troya procedurally defaulted his claim

It is well settled that a defendant must raise a claim on direct appeal or the claim will be subject to the procedural default rule. *See Massaro v. United States*, 538 U.S. 500, 504 (2003); *Murray v. Carrier*, 477 U.S. 478, 490-92 (1986). In this case, Troya did not raise a constitutional challenge to the residual clause of § 924(c) as part of his direct appeal. Accordingly, that claim is procedurally barred. In order to overcome this default, Troya must demonstrate both cause for his failure to raise the claim earlier and prejudice from the alleged error. *See United States v. Frady*, 456 U.S. 152, 167-68 (1982). The "cause and prejudice" standard requires a prisoner to show not only that "some objective factor external to the defense impeded" his efforts to raise the issue earlier, *Coleman v. Thompson*, 501 U.S. 722, 753 (1991) (*quoting Murray*, 477 U.S. at 488), but also that the error he alleges "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170 (emphasis in original). Thus, "to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal" under the plain error standard of review.

a.   Troya cannot establish cause

Troya has not and cannot demonstrate any cause for failing to assert Claim VII on direct appeal.  Troya presumably would argue that his *Johnson*-based claim was likely to have been rejected had he raised it before the trial court or on direct appeal and that it was therefore futile.  But the perceived futility of raising an objection, even when existing precedent has already rejected such a claim, does not constitute "cause" excusing a default.  *See Bousley v. United States*, 523 U.S. 614, 623 (1998).

Although the novelty of a claim can in some circumstances constitute "cause" to excuse a procedural default, *see Reed v. Ross*, 468 U.S. 1, 16 (1984), the tools necessary to construct the vagueness argument that ultimately carried the day in *Johnson* existed long before the *Johnson* decision was issued.  *See Howard v. United States*, 374 F.3d 1068, 1073 (11th Cir. 2004) (where the "legal basis" for a claim existed, the claim was "not sufficiently unheard of to be novel for cause purposes").  On multiple occasions, the Supreme Court wrestled with the parameters of the ACCA's residual clause, indicating unresolved and "pervasive disagreement about the nature of the inquiry." *Johnson*, 135 S. Ct. at 2560.  *See also, e.g., Sykes v. United States*, 564 U.S. 1 (2011); *Chambers v. United States*, 555 U.S. 122 (2009); *Begay v. United States*, 553 U.S. 137 (2008); *James v. United States*, 550 U.S. 192 (2007).  Indeed, this continuing dispute over the ACCA's residual clause led the petitioner in *Johnson* to conclude that a claim of unconstitutional vagueness was viable and to raise it.  This history makes clear Troya's § 924(c) vagueness claim was not so "novel" as to support a claim of "cause" excusing his procedural default.

b.   Troya cannot establish prejudice.

Nor can Troya establish prejudice.  First, as explained below, as determined by binding Eleventh Circuit precedent, the armed carjacking offenses of which Troya was convicted under

196

section 924(c), clearly constitute crimes of violence under the force clause of that statute.  Second, and as further delineated herein, the *Johnson* decision is not applicable to section 924(c) for a host of reasons.  Therefore, Troya cannot establish the requisite prejudice.

        c.   Troya Cannot Show Actual Innocence.

To the extent that Troya attempts to argue that he is excepted from the cause and prejudice requirements because he is actually innocent of the section 924(c) offenses, he is again mistaken. *See e.g.*, CV-DE 25 at 95-96 n.4.  It is true that a defendant who cannot demonstrate both cause and prejudice may still obtain relief on collateral review if he can show that he is "actually innocent." *Bousley*, 523 U.S. at 623.  To establish the requisite probability of actual innocence, a defendant must show that it is "'more likely than not that no reasonable juror would have convicted him.'" *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).  Where a defendant has been convicted under a constitutionally invalid provision of a statute, the defendant is actually innocent of the offense because his conduct was not a crime.  However, Troya cannot satisfy the "actual innocence" exception to the procedural default rule because, as discussed below, *Johnson* cannot be extended to the residual clause of § 924(c), and because even if it could, Troya's predicate carjacking convictions are crimes of violence under the force clause of § 924(c)(3)(A).  In other words, the conclusion that Troya's claims fail on their merits necessarily leads to the conclusion that those claims have been procedurally defaulted.  Here, Troya cannot circumvent the procedural bar because he is not actually innocent of violating § 924(c).  Troya has not satisfied his burden to proceed on his claims.

In a § 2255 motion, the burden is on the movant to show that he is entitled to relief.  *See Rivers v. United States*, 777 F.3d 1306, 1316 (11th Cir. 2015) ("In making [the] determination [whether the district court correctly denied the § 2255 motion], we note that [the movant] bears

the burden to prove the claims in his § 2255 motion."); *LeCroy v. United States*, 739 F.3d 1297, 1321 (11th Cir. 2014) ("[O]n a § 2255 [motion, the burden of proof] belongs to the [movant]."); *see also United States v. Pettiford*, 612 F.3d 270, 277 (4th Cir. 2010) ("[T]he district court must determine whether the [§ 2255 movant] has met his burden of showing that his sentence is unlawful on one of the specified grounds."); *United States v. Trumblay*, 234 F.2d 273, 273 (7th Cir. 1956) ("On a motion to vacate, set aside or correct a sentence, a movant has the burden of proof."). The law to be applied to a § 2255 motion is the law that existed at the time of the conviction, plus any new substantive rules of law or "watershed rules of criminal procedure." *See Teague v. Lane*, 489 U.S. 288, 311 (1989).

Accordingly, in the context of a *Johnson* claim, the petitioner's burden is to show that his convictions and sentence were, in fact, affected by the challenged residual clause. The mere potential that the district court may have relied on the residual clause of § 924(c) is insufficient to satisfy Troya's burden. Rather, to meet his burden, the Troya must show that the district court necessarily relied on the residual clause. In the absence of explicit record evidence of the district court's reliance on the residual clause, Troya could satisfy this burden by showing that under the then-existing law, the district court must have relied on the residual clause (*i.e.*, then-existing law clearly precluded reliance on the force clause). In the instant case, however, there was no law precluding the district court's reliance on the force clause of § 924(c) to find carjacking to be a crime of violence and Troya's convictions fail within the scope of that clause. Therefore, Troya cannot meet his burden to show that his convictions and sentence were actually effected by the residual clause of § 924(c).

    2. Even Troya's claim attacking the validity of Section 924(c) was not procedurally barred, it would fail on the merits.

      a.   Troya's carjacking convictions qualify as crimes of violence under the force clause of 18 U.S.C. § 924(c)(3)(A).

Although Troya spends much space arguing that *Johnson*'s holding as to ACCA's residual clause applies to section 924(c), the Court may refrain from addressing that issue because Troya's carjacking convictions in Counts Seven and Eight, qualify as crimes of violence under 18 U.S.C. § 924(c)(3)(A), referred to as the force clause. *See United States v. Albertini*, 472 U.S. 675, 680 (1985) (noting that courts should generally exercise judicial restraint and construe statutes in a fashion that avoids constitutional questions). Therefore, even if *Johnson* were extended to the residual clause of § 924(c)(3)(B), Troya's convictions would still stand because his predicate carjacking convictions nevertheless qualify as crimes of violence under the force clause of § 924(c)(3)(A).

The § 924(c) counts in the Third Superseding indictment charged that that Troya committed the crime of using or carrying a firearm during the commission of a crime of violence, which in this case was carjacking. CR-DE 305 at 8-9. The jury was charged in accordance with that offense. CR-DE 771 at 7536-43. And, as fully explained below, Troya's carjacking offenses still qualify as "crimes of violence" post-*Johnson*.

To determine whether an offense constitutes a "crime of violence" as defined in 18 U.S.C. § 924(c), courts employ the "categorical approach." *See Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004); *United States v. Chitwood*, 676 F.3d 971, 976-77 (11th Cir. 2012) (quoting *James v. United States*, 550 U.S. 192, 202 (2007), *overruled on other grounds by Johnson*, 135 S. Ct. at 2551). "[T]he proper inquiry is whether the conduct encompassed by the elements of the offense, in the ordinary case," falls within the definition of a crime of violence, not whether "every conceivable factual offense covered by a statute" meets the statutory definition. *James*, 550 U.S. at 208.

Subsection 924(c)(3)(A) includes in § 924(c)(3)'s definition of a "crime of violence" any

felony offense that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). "[I]n the context of a statutory definition of [crime of violence], the phrase 'physical force' means *violent* force - that is, force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010) (construing "physical force" contained in elements clause of ACCA's violent felony definition); *see also United States v. Owens*, 672 F.3d 966, 971 (11th Cir. 2012) (observing that in accordance with *Johnson*, "physical force" under ACCA's elements clause means "strong physical force or a substantial degree of force").

The federal carjacking statute prohibits the taking of a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce, with the intent to cause death or serious bodily harm, from the person or presence of another, by force and violence or by intimidation, as well as attempts to accomplish the same.  18 U.S.C. § 2119.  Troya argues that because the taking of the vehicle may be accomplished by "intimidation," it does not necessarily involve the use, attempted use, or threatened use of violent force, as required for the offense to be considered a "crime of violence."  CV-DE 25 at 83, 91.

The argument fails because, as the plain language of the statute makes clear, an element of the offense is the defendant's "intent to cause either death or serious bodily harm." *See, e.g., United States v. Diaz*, 248 F.3d 1065, 1096 (11th Cir. 2001).  Thus, regardless of whether a carjacking is accomplished "by force and violence" or by "intimidation," each and every conviction under § 2119 necessarily requires evidence proving an intent "to seriously harm or kill." *See, e.g., United States v. LeCroy*, 441 F.3d 914, 923 (11th Cir. 2006) ("The carjacking statute requires, for any carjacking at all, a taking of a motor vehicle, with intent to cause serious bodily harm or injury . . . ."); *United States v. Fulford*, 267 F.3d 1241, 1244 (11th Cir. 2001) ("To constitute carjacking

200

under § 2119, the taking of a motor vehicle must be committed with the intent to cause death or serious bodily harm.") (internal quotation omitted); *Diaz*, 248 F.3d at 1096 (citing *Holloway v. United States*, 526 U.S. 1, 12 (1999)); *United States v. Kimble*, 178 F.3d 1163, 1166 (11th Cir. 1999). The Eleventh Circuit has acknowledged, after the Supreme Court's decision in *Holloway*, 526 U.S. at 12, that the requisite "intent to cause death or serious bodily harm" is sufficiently established if proof is adduced demonstrating that the defendant intended to cause the death or serious bodily harm only in the event that the victim refuses to relinquish control of the car. *See, e.g., Diaz*, 248 F.3d at 1096. This possibility does not take carjacking outside the scope of § 924(c)(3)(A), which expressly includes offenses involving the "threatened use of physical force." *See United States v. Davis*, 2015 WL 8311538, at *3 (E.D. Mich. 2015 Dec. 9, 2015) ("At the very least, then, carjacking by intimidation -which requires the defendant to demonstrate a willingness 'to seriously harm or kill the victim if necessary to steal the car' - involves the threatened use of physical force.") (quoting *Holloway*, 526 U.S. at 12) (internal alteration omitted).

It is not logically possible for death or serious bodily harm to result from the use of force unless that force is "violent force." If a particular type or amount of force is capable of causing "death or serious bodily harm," it is resultantly "force capable of causing physical pain or injury to another person" as contemplated by the Supreme Court in *Johnson*. Because every § 2119 offense involves the use, attempted use, or threatened use of such force, carjacking qualifies as a "crime of violence" pursuant to § 924(c)(3)(A).

Indeed, even prior to revision of the statute to require "intent to cause serious bodily harm or injury," the Eleventh Circuit held that carjacking qualified as a "crime of violence" pursuant to 18 U.S.C. § 924(c)(3)(A). *See United States v. Moore*, 43 F.3d 568, 572-73 (11th Cir. 1994). Relying on *Moore*, the Eleventh Circuit recently held - when confronted with a *Johnson*-based

201

claim identical to Troya's - that carjacking still qualifies a crime of violence under § 924(c)(3)(A). *In re: Jeffrey Smith*, 829 F.3d 1276 (11th Cir. 2016). There, the defendant petitioned the Eleventh Circuit for an order allowing him to file a second or successive § 2255 motion, arguing that his carjacking conviction no longer qualified as a crime of violence post-*Johnson*. *Id.* at 1277. The Eleventh Circuit denied the application, reasoning that even if *Johnson* invalidated § 924(c)(3)(B)'s residual clause, the elements of the defendant's underlying carjacking conviction qualified under § 924(c)(3)(A)'s force clause. *Id.* at 1280. The Court reasoned that "an element requiring that one take or attempt to take by force or violence or intimidation, which is what the federal carjacking statute does, satisfies the force clause of § 924(c), which requires the use, attempted use, or threatened use of physical force. In short, our precedent holds that carjacking in violation of § 2119 satisfies § 924(c)'s force clause, and that ends the discussion." *Id.* 1280-81 (citing *Moore*).

Other courts have overwhelmingly concluded that carjacking is a "crime of violence" under § 924(c)(3)(A). *See, e.g., Moberg v. United States*, 2016 WL 6156215, *3 (S.D. Ala. Sept. 29, 2016) ("The carjacking statute includes the element 'with the intent to cause death or serious bodily harm.' . . . The undersigned finds that this . . . element falls with the definition of physical force - or violent force - as contemplated by the [*Johnson*] court, a finding consistent with other district court holdings throughout the country.") (internal and other citations omitted); *Gray v. United States*, 2016 WL 4507118, *2 (E.D. Va. July 25, 2016); *Johnson v. United States*, 2016 WL 3200292, *4 (W.D. Mo. June 8, 2016); *United States v. Sandoval*, 2016 WL 632212, *3-*4 (D. Nev. Feb. 17, 2016); *Davis*, 2015 WL 8311538, at *3; *United States v. Mills*, 2015 WL 6672537, *3 (W.D.N.C. Oct. 30, 2015); *United States v. Cruz-Rivera*, 2015 WL 6394416, *3 (D. P.R. Oct. 21, 2015) ("[T]he court finds that carjacking under 18 U.S.C. § 2119 categorically fulfills the

requirements of a crime violence under 18 U.S.C. § 924(c)(3)(A).”); *United States v. Evans*, 2015 WL 6673182, *8 (E.D.N.C. Oct. 20, 2015) (holding that carjacking “is a crime of violence under the force clause set forth in 18 U.S.C. § 924(c) (3)(A) because it has an element the ‘use, attempted use, or threatened use of physical force”’).

Based on the weight of this authority - both binding and persuasive – Troya is not entitled to § 2255 relief because his underlying carjacking convictions qualified as crimes of violence under § 924(c)(3)(A)’s force clause.

> b.  Even if carjacking did not qualify as a violent felony under force clause of Section 924(c)(3)(A) but under the residual clause of Section 924(c)(3)(B), Troya’s murder convictions and resulting sentences would still be valid as *Johnson* does not extend to the residual clause of Section 924(c)(3)(B).

In *Johnson*, the Supreme Court held that the ACCA’s residual clause, *i.e.*, the provision that defines a “violent felony” to include an offense that “otherwise involves conduct that presents a serious potential risk of physical injury to another,” 18 U.S.C. § 924(e)(2)(B)(ii), is vague and, therefore, imposing an increased sentence under the residual clause “violates the Constitution’s guarantee of due process.”  135 S.Ct. at 2563.  The Court expressly limited its holding to the residual clause of the ACCA.  *See id.*  (“Today’s decision does not call into question application of the Act to the four enumerated offenses, or the remainder of the Act’s definition of a violent felony.”).  The Court did not extend its analysis of the ACCA to the residual clause of § 924(c)(3)(B).  *See id*. at 2561 (rejecting argument that striking down the ACCA’s residual clause would call into question other criminal statutes that “use terms like ‘substantial risk’”).

The residual clause of § 924(c)(3)(B) defines a “crime of violence” as “an offense that is a felony and – (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.”  In contrast, the residual clause in § 924(e)(2)(B)(ii) defines a “violent felony” as a felony that “is burglary, arson,

or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." There are at least five material differences between § 924(c)(3)(B) and the ACCA's residual clause.

First, the ACCA's residual clause refers to offenses that "involve[] conduct that presents a serious potential risk of physical injury to another," 18 U.S.C. § 924(e)(2)(B)(ii), while § 924(c)(3)(B) refers to an offense "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." Although both statutes require a court to examine the ordinary case of the offense – one feature of the ACCA that the Court found contributed to its indeterminacy, *see Johnson*, 135 S.Ct. at 2557-58 – that inquiry is far more targeted and straightforward in the context of § 924(c)(3)(B). By focusing on the use of physical force "in the course of committing the offense," § 924(c)(3)(B) confines the risk assessment to only those risks that arise during the commission of the offense. That averts a key factor that the Court found problematic in the ACCA risk analysis: the additional necessity for courts to go "beyond evaluating the chances that the physical acts that make up the crime will injure someone" and to evaluate the risk of injury even "after" completion of the offense. *Id*. at 2557; *see id*. at 2559 (noting that "remote" physical injury could qualify under the ACCA, but that the clause does not indicate "how remote is too remote"); *cf. Taylor*, 814 F.3d at 377 (noting that § 924(c)(3)(B) "permits no similar inquiry into conduct following the completion of the offense" and "does not allow courts to consider 'physical injury [that] is remote from the criminal act'" (*quoting Johnson*, 135 S.Ct. at 2559)); *United States v. Gonzalez-Longoria*, 831 F.3d 670, 676 (5th Cir. 2016) (distinguishing *Johnson* because § 16(b) requires that the risk of physical force arise 'in the course of committing' the offense, and noting that 18 U.S.C. § 16(b),

unlike the ACCA, does not allow courts to consider conduct or events occurring after the crime is complete.).

Second, and relatedly, § 924(c)(3)(B) focuses on the risk of the use of force, not a broader risk of injury. That restricts § 924(c)(3)(B) to a narrower category of conduct that can result in injury or property damage – i.e., conduct that is the product of the use of force. *See United States v. Hill*, 832 F.3d 135, 148 (2nd Cir. 2016) (finding terminology in § 924(c)(3)(B) and § 16 "both narrower *and* easier to construe" than terminology in § 924(e)(2)(B)(ii) in part because "risk that a defendant will use physical force in the commission of an offense is materially different from the risk that an offense will result in physical injury") (emphasis in original and internal quotations omitted).

Third, an additional determinative factor in *Johnson* was that the ACCA's residual clause is preceded by a list of enumerated offenses of widely differing risk levels ("burglary, arson, or extortion" or offenses "involving use of explosives"). The enumerated list had troubled members of the Court for years. *See, e.g.*, *James*, 550 U.S. at 215-216, 230 n.7 (2007) (Scalia, J., joined by Stevens and Ginsburg, JJ., dissenting) (stating that comparing a predicate offense with its closest analog among enumerated offenses is an unhelpful test if the analog is not obvious because the listed offenses have little in common). The Court also struggled with the enumerated list in *Begay v. United States*, where even the majority was concerned that "the examples are . . . far from clear in respect to the degree of risk each poses." 553 U.S. 137, 143 (2008).

The continuing confusion over how to interpret the list, in conjunction with the residual clause, ultimately convinced the *Johnson* Court of the ACCA's vagueness. For example, the Court attributed part of the "uncertainty about how much risk it takes for a crime to qualify" to the residual clause's structure, which "forces courts to interpret 'serious potential risk' in light of the

205

four enumerated crimes – burglary, arson, extortion, and crimes involving the use of explosives" which are "far from clear in respect to the degree of risk each poses." *Johnson*, 135 S.Ct. at 2558 (internal quotations omitted); *see id*. at 2557 (referring to "the inclusion of burglary and extortion among the enumerated offenses" and how it affected the "court's task" in evaluating risk of injury). The Court again referred to the enumerated crimes in explaining why its decisions in *Begay* and *Sykes v. United States*, 564 U.S. 1 (2011), *overruled*, *Johnson*, 135 S.Ct. at 2563, did "not succeed in bringing clarity to the meaning of the residual clause." *Johnson*, 135 S.Ct. at 2559 (*Begay*'s test, which turned on the similarity of the crime to the enumerated offenses, failed because "the enumerated crimes are not much more similar to one another in kind than in degree of risk posed"); *id*. ("common sense" used in *Sykes* was not reliable criterion because "[c]ommon sense has not even produced a consistent conception of the degree of risk posed by each of the four enumerated crimes"). Critically, the Court distinguished other statutes requiring risk-based assessments, in part, because they did not "link[] a phrase such as 'substantial risk' to a confusing list of examples." *Id*. at 2561.

The substantial risk clause of § 924(c)(3)(B), like the statutes the Court distinguished in *Johnson*, contains no link to a "confusing list" to cloud its analysis. *See Taylor*, 814 F.3d at 377 (noting that § 924(c)(3)(B) "does not complicate the level-of-risk inquiry by linking the 'substantial risk' standard, through the word otherwise, 'to a confusing list of examples'" (*quoting Johnson*, 135 S.Ct. at 2561)); *Hill*, 832 F.3d at 146 (rejecting vagueness challenge to § 924(c)(3)(B) because "[f]irst, and most obviously, the risk-of-force clause contains no mystifying list of offenses and no indeterminate 'otherwise' phraseology – a defining feature of the ACCA's residual clause" that in *Johnson* added "an additional layer of uncertainty" as to necessary risk needed for § 924(e)(2)(B)(ii)); *Gonzalez-Longoria*, 831 F.3d at 677 (distinguishing

206

*Johnson* because in § 16(b) "the amount of risk required – 'substantial risk' – is not linked to any examples" and "[i]nstead it is just like the 'dozens of federal and state criminal laws' that employ" terms of risk (*quoting Johnson*, 135 S.Ct. at 2561)).

Fourth, *Johnson* emphasized the Court's "repeated attempts and repeated failures" to develop a "principled and objective standard" for analyzing the residual clause of the ACCA. 135 S.Ct. at 2558; *see id*. at 2559 (noting that *Johnson* was the Court's "fifth [case] about the meaning of the [ACCA] residual clause"); *see also Sykes*, 564 U.S. at 34 (Scalia, J., dissenting) (stating that the Court's repeated failure in addressing the ACCA is "[w]hat sets ACCA apart" and "confirms incurable its vagueness"). The *Johnson* Court expressed frustration that its ACCA decisions had been a "failed enterprise." 135 S.Ct. at 2560. In contrast to its ACCA jurisprudence, the Supreme Court has never had occasion to resolve a disputed question about the meaning of § 924(c)(3)(B). *See Taylor*, 814 F.3d at 378 ("By contrast [to the ACCA], the Supreme Court has not unsuccessfully attempted on multiple occasions to articulate the standard applicable to the § 924(c)(3)(B) analysis"); *Gonzalez-Longoria*, 831 F.3d at 678 ("the Supreme Court invalidated the Armed Career Criminal Act's residual clause only after '[n]ine years' experience trying to derive meaning from the . . . clause,' 'repeated attempts and repeated failures to craft a principled and objective standard,' and years of 'pervasive disagreement' in the lower courts about how to conduct the categorical approach inquiry with respect to the clause, *Johnson*, 135 S. Ct. at 2558-60 – a record of unworkability not present here.").

Finally, § 924(c)(3)(B) has a different function than the ACCA. Unlike the ACCA, § 924(c)(3)(B) does not identify predicate convictions for the purpose of a recidivist enhancement. Rather, a "crime of violence" under that provision, if perpetrated with a sufficient nexus to a firearm, is a new offense. That narrows the type of offenses that might serve as predicate offenses

207

to ones that could be committed with a sufficient nexus to a firearm.  For example, it is implausible that the crime of driving under the influence – which was at issue in both *Leocal v. Ashcroft*, 543 U.S. 1 (2004) and *Begay* – would give rise to a § 924(c) prosecution.  No such required nexus exists between a prior conviction and a current offense under the ACCA, thereby elevating the seriousness of § 924(c) at the outset.

Both the Sixth Circuit and Second Circuit Courts of Appeals have upheld the constitutionality of § 924(c)(3)(B) in the wake of *Johnson*.  *See Taylor*, 814 F.3d at 375-380, and *Hill*, 832 F.3d at 149.  Further, the Fifth Circuit Court of Appeals has upheld the constitutionality of the similarly worded residual clause of 18 U.S.C. § 16(b).  *See Gonzalez-Longoria*, 831 F.3d at 677.  While the Seventh Circuit, Ninth Circuit, Sixth Circuit, and Tenth Circuit Courts of Appeals have come to a contrary conclusion with respect to the constitutionality of § 16(b)'s residual clause, *see United States v. Vivas-Ceja*, 808 F.3d 719 (7th Cir. 2015), *Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015), *cert. granted*, 137 S.Ct. 31 (2016), argued January 17, 2017 https://www.oyez.org/cases/2016/15-1498.[55]  *Shuti v. Lynch*, 828 F.3d 440 (6th Cir. 2016), and *Golicov v. Lynch*, 837 F.3d 1065 (10th Cir. 2016), the *Shuti* Court clarified why a finding that § 16(b)'s residual clause is unconstitutional is consistent with a finding that § 924(c)(3)(B) is constitutional: § 924(c) "is a criminal offense and creation of risk is an element of the crime. . . . [N]o doubt should be cast upon laws that apply a qualitative risk standard to *real-world facts* or *statutory elements*.  Unlike the ACCA and [§ 16(b)], which require a categorical approach to stale predicate convictions, 18 U.S.C. § 924(c) is a criminal offense that requires an ultimate determination of guilt beyond a reasonable doubt – by a jury, in the same proceeding.  This makes all the difference."  828 F.3d at 449 (internal quotations and citations omitted).  To date, only the

---

[55]  Troya bases a significant part of his argument on *Dimaya*.  CV-DE 25 at 87-89.

208

Seventh Circuit Court of Appeals has found § 924(c)(3)(B) unconstitutionally vague. *See United States v. Cardena*, 842 F.3d 959, 996 (7th Cir. 2016) (relying on its previous decision regarding § 16(b) in *Vivas-Ceja*).

While the *Johnson* Court believed that "the uncertainties in the [ACCA's] residual clause may be tolerable in isolation," their presence together led the Court to its holding. 135 S.Ct. at 2560. The same confluence of factors that led the Court to declare the ACCA's residual clause unconstitutional is simply not present in § 924(c). Accordingly, § 924(c)(3)(B) is not void for vagueness.

Therefore, for all of these alternative reasons, Troya's claim VII should be denied.

B. TROYA'S CLAIM THAT PETIT JURY CONDUCT DURING VOIR DIRE DEPRIVED HIM OF HIS RIGHT TO A FAIR AND IMPARTIAL TRIAL IN VIOLATION OF HIS FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS IS PROCEDURALLY BARRED AND FAILS ON THE MERITS (RESPONSE TO TROYA ISSUE V).

Troya claims he is entitled to a new trial based upon allegedly "untrue and/or seriously misleading" *voir dire* responses from four jurors who deliberated in his case and two alternates who were excused without ever deliberating. CV-DE 25 at 60. This claim is procedurally barred as it could have been, but was not raised on direct appeal. Even if it was not procedurally barred, Troya's claim fails on the merits because Troya does not show that jurors intentionally lied during *voir dire* or were biased against him.

1. Troya's claims concerning jury misconduct are procedurally barred.

A petitioner is procedurally barred from raising, for the first time in a collateral attack on his conviction, issues that were capable of being raised on direct appeal, unless the petitioner can demonstrate both: "(1) 'cause' excusing his . . . procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." *United States v. Frady*, 456 U.S. 152, 168

209

(1982); *see also Keeney v. Tamayo-Reyes*, 112 S. Ct. 1715, 1719 (1992) (cause and prejudice standard applicable to failure to take an appeal); *accord Coleman v. Thompson*, 501 U.S. 722, 111 S. Ct. 2546, 2565 (1991); *United States v. DeBernardo*, 880 F.2d 1216, 1227 (11th Cir. 1989) (failure to take an appeal may be raised as a bar to collateral relief).    Where a defendant makes no showing of cause and prejudice regarding the failure to raise issues on direct appeal that are raised for the first time in a Section 2255 motion, summary dismissal of those claims is warranted. *See Parks v. United States*, 832 F.2d 1244, 1246 (11th Cir. 1987).

A careful review of the record shows that appellate counsel was investigating the jury issues raised in Troya Issues V and VI and sought to have and did have both the jury plan and jury questionnaires added to the record for the appeal.  See CR-DE 1111, 1112, 1115, 1116, 1117 & 1118.  Thus, the facts giving rise to Troya's claim of juror misconduct were part of the record on appeal and could have been raised, but were not raised, on direct appeal.  Troya's claim concerning juror misconduct in *voir dire* is, therefore, procedurally barred unless and until Troya establishes cause and prejudice.  Troya has made no attempt to show cause or prejudice with regard to claims of juror misconduct that could have been raised on appeal.  As such, pursuant to Eleventh Circuit precedent, this claim is procedurally barred.

2.  Troya fails to show jurors were deliberately dishonest or biased against him.

Even if Troya's claim of juror misconduct was not procedurally barred, it would fail on the merits.  It is well established that a new trial is not warranted unless Troya can demonstrate that: 1) a juror failed to honestly answer a material question on *voir dire*, and 2) a correct response would have provided a valid basis for a challenge for cause.  *See McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 556 (1984).  For the first prong, it is not enough that a juror neglect to share something in response to a *voir dire* question that he knew at some point in time.  Rather,

there must be a determination that the juror "was aware of the fact that his answers were false." *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1473 (11th Cir. 1992) (quoting *United States v. Perkins*, 748 F2d 1519, 1532 (11th Cir. 1984)).  The second prong requires a showing of actual bias.  *Id.* (citing *Perkins*, 748 F2d at 1532; *United States v. Casamayor*, 827 F.2d 1509, 1515 (11th Cir. 1988)).  Actual bias can be established by "express admission" or through "specific facts showing such a close connection to the circumstances at hand that bias must be presumed."  *Perkins*, 748 F2d 1519, 1532 (11th Cir. 1984) (citing *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976)).  In other words, in order to prevail on his juror dishonesty claim, Troya must show that a juror "deliberately failed to disclose relevant information" and was actually biased against him.  *See United States v. Tutt*, 704 F.2d 1567, 1569 (11th Cir. 1983) (requiring a showing of "an actual, identifiable prejudice on the part of the juror").

Troya's claim fails because he has not shown that any of the twelve jurors who returned guilty and death penalty verdicts against him deliberately concealed information during *voir dire* or were biased against him, both of which he would need to establish to be entitled to a new trial. The accusations Troya makes regarding the jurors' honesty are purely speculative.  Troya presents no evidence that any of the jurors at issue were aware of their alleged family members' troubles. Moreover, Troya does not show how that led to prejudice against him.  This lack of evidence is particularly problematic given that all of the accused jurors responded in their written juror questionnaire[56] that there is nothing "about the subject matter of this case, or the points covered in this questionnaire, which creates a question in your mind as to whether you could be a fair,

---

[56] Before bringing venire persons to the courthouse for the oral *voir dire* process, the Court asked them to complete written questionnaires to "save us time so we can talk about issues that we really think we need to talk about in greater detail".  CR-DE 648 at 34.

211

objective and impartial juror in this case." USA Exh. 8, 9, 10, 11, 12 & 13 at 10[57].

Most of the alleged omissions relate to family members' troubles relating to drugs or firearms. To the extent Troya claims that these issues were "at the top of the list of bases for excusal by defense counsel" (DE-CV 25 at 69), the record belies such claim. Melissa Scibilia (CR-DE 687 at 1116), Joseph Morrison (CR-DE 712 at 2450), Mariam Boneta-Betancur (CR-DE 712 at 2576), Peggy Gandiaga (CR-DE 712 at 2588), and Daisy Phillips (CR-DE 713 at 2678-79) all disclosed family members' drug-related problems, and the defense did not challenge any of these venire persons for cause. Furthermore, the defense did not challenge Ms. Marye Allen for cause despite her sharing that she had extended family with drug problems (CR-DE 713 at 2669), and Ms. Allen was selected and served as a juror in the guilt and penalty phases.

Moreover, non-disclosures of a family member's troubles in the arena of drug and firearm problems would be more likely to lead to prejudice against the United States than Troya. *See United States v. Quilca-Carpio,* 118 F.3d 719, 722 (11th Cir. 1997). There, the Eleventh Circuit noted "it would be speculative to assume" a juror had been dishonest during *voir dire*, even where the juror explained after trial that his friends' arrests might make him biased in a drug case. *Id*. Addressing the prejudice prong, the court reasoned, "if there was any potential bias on [the jurors'] part, it likely would have inured to the benefit of the defendant rather than the prosecution." *Id*. The same logic applies here. Simply put, Troya presents no specific facts showing actual bias or how jurors' relatives' drug or firearms convictions are so closely connected to the circumstances of this capital murder case that bias must be presumed. *See Perkins*, 748 F2d at 1532.

---

[57] The written juror questionnaires (USA Exh. 8 through 13) are not identified by the juror's name, but rather by the juror's participant number. These participant numbers were cross-referenced with the trial court's CRD list (USA Exh. 14) to identify the juror questionnaires authored by the jurors Troya has challenged.

212

With that background, the United States will address Troya's allegations about each of the jurors in order of their seating on the jury or as alternates.[58]

a. Donald Little

Troya alleges that Mr. Little was dishonest during the *voir dire* because he did not disclose firearm and drug convictions of his two sons-in-law. CV-DE 25 at 67-68. This claim fails for multiple reasons. Before even considering whether Troya has established both of the *McDonough* prongs above, he has presented no evidence that the Juan Francisco Gonzales and Cecil Astor Harper named in the conviction records are Mr. Little's sons-in-law. Nor has Troya shown, even if Mr. Little's sons-in-law did sustain convictions for firearm and drug offenses as alleged, that Mr. Little had any knowledge of that criminal history. On those bases alone, Troya's claim must fail.

Moreover, even if Mr. Little was aware of the alleged convictions of his sons-in-law, there is no evidence that he intentionally concealed this information during the *voir dire*. To the contrary, the record shows that Mr. Little was forthcoming with the Court about his family's drug history.

---

[58] The court announced the twelve selected jurors in order: "Donald Little, Alan Creswick, Marye Allen, Robyn Keys, Benamin Yelverton, Mark Sollenberger, Jeffrey Manning, Donald Boser, Connie Thomas, Consuelo Minutoli, Esther Pearl, and Amerigo Dicreasce.". CR-DE 727 at 2930. The court also announced the six selected alternates, "Now, the first alternate is Mr. Lawrence Uline. The second alternate would be Mr. Richard Frisby. The third alternate would be Dorothy Barba. The fourth is Gilbert Lanham. The fifth would be Diane Gooch. And the sixth would be Mr. Steven Haskins". CR-DE 727 at 2944. The twelve initially selected jurors were the same twelve jurors who deliberated in the guilt phase and returned the guilty verdict. CR-DE 774 at 7705-06. Only the first three of the six alternates, Mr. Uline, Mr. Frisby, and Ms. Barba, were retained to observe the penalty phase trial. CR-DE 774 at 7722-23. Mr. Uline was excused for illness during the penalty phase trial, and the parties agreed to proceed with the two remaining alternates, Mr. Frisby and Ms. Barba. CR-DE 825 at pp. 8605-07. No alternate was ever needed, and the same initially selected twelve jurors who returned the guilty verdict deliberated in the penalty phase. CR-DE 848 at 9761-62 and returned the death sentence verdict. CR-DE 857 at 9842-43.

Mr. Little responded affirmatively on his Juror Questionnaire in response to Question 24 ("Have you or any family members or friends ever had a problem with illegal drugs?") and noted he had, "a step sister who passed away." USA Exh. 8 at 7.  During *voir dire*, the Court inquired further, asking, "Also, and I want to thank you for being so candid, but you mentioned you had a stepsister who had problems with drug use, and I wondered, was there anything about that that you thought would affect your ability to evaluate the evidence in this case?".   CR-DE 713 at 2666. Mr. Little responded, "Not at all." *Id*. at 2667.  The fact that Mr. Little disclosed a drug problem and subsequent death of a distant relative that he "didn't know . . . that well" indicates he was not attempting to hide his family's drug-related troubles.  Similarly, there is no indication Mr. Little intentionally tried to conceal his son-in-law's alleged firearms conviction.

Finally, even if this Court were to find that Mr. Little failed to honestly answer a material question during *voir dire*, Troya has made no showing that a correct response would have provided a valid basis for a challenge for cause, the second required *McDonough* prong.  Instead, the record shows Mr. Little firmly believed he was unbiased.  During *voir dire,* the Court asked him, "[D]o you think you could be a fair and impartial juror to all parties in the case?" and he responded, "Yes, I do."  CR-DE 648 at 51.  And the record is devoid of any evidence to the contrary.  In fact, if Mr. Little bore some ill will toward Troya, he likely would not have disclosed having been the victim of an assault.  Gov. Exh. 8 at 6.  Rather, Mr. Little was forthcoming about having been assaulted, and explained it would "not at all" "affect [his] ability to judge the evidence in this case."  CR-DE 713 at 2666.  Despite Mr. Little's prior personal victimization, neither Troya nor his co-defendants challenged Mr. Little for cause.  There is no reason to believe, therefore, that Mr. Little's sons-in-laws' alleged drug or firearms convictions would have even prompted a challenge for cause, let alone resulted in the Court's finding that Mr. Little could not be fair.

In sum, there is no evidence that Mr. Little was deliberately dishonest or should have been excused for cause.

b.  Mark Sollenberger

Troya claims that Mr. Sollenberger was dishonest during the *voir dire* for not disclosing his brother's alleged drug-related conviction and his son's arrest for marijuana and drug paraphernalia that was ultimately nolle prossed.  CV-DE 25 at 63-65.  Like the claim related to Mr. Little, this claim fails because Troya has presented no evidence that the David Andrew Sollenberger and Robert Kent Sollenberger named in the criminal history records are the juror's son and brother, respectively.  Nor has Troya shown, even if Mr. Sollenberger's son and brother were involved in the alleged drug offenses, that Mr. Sollenberger had any knowledge of it.  On those bases alone, Troya's claim must fail.

Moreover, assuming, *arguendo*, that Mr. Sollenberger was aware of his brother's and son's alleged drug offenses, Troya does not show that Mr. Sollenberger deliberately withheld this information.  Like Mr. Little, when asked on the Juror Questionnaire whether he had family members or friends who had a problem with illegal drugs," Mr. Sollenberger was not silent. USA Exh. 9 at 7.  Instead, he checked "Yes," and elaborated, "Three Brother In Laws" and then listed "several convictions" and "DUI."  During *voir dire* the Court addressed Mr. Sollenberger, "You told us that you've had some brothers-in-laws that had some problems" and asked, "Was there anything about their difficulties that you think would affect your ability to judge the evidence in this case?"  CR-DE 713 at 2672.  Mr. Sollenberger unequivocally replied, "No, sir."  *Id*. Accordingly, the record indicates Mr. Sollenberger was candid that his family had some drug problems, but clarified that those issues would not prevent him from being fair in this case.  Troya has given no reason to doubt the validity of his response.

Finally, even if the Court were to find Mr. Sollenberger intentionally concealed his brother's and son's alleged drug-related offenses, Troya fails to show Mr. Sollenberger was biased against him, forming a basis for a dismissal for cause. "The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *McDonough*, 464 U.S. 556. Simply put, Troya fails to meet his burden establishing that Mr. Sollenberger should have been dismissed for cause.

c. Donald Boser

Troya next accuses Mr. Boser of being dishonest during the *voir dire* for not disclosing his brother-in-law's alleged drug convictions. CV-DE 25 at 69. Yet, as with Mr. Little and Mr. Sollenberger, Troya does not show that the Robert Ries involved in drug-related crimes is Mr. Boser's brother-in-law or that Mr. Boser had any knowledge of Mr. Ries's criminal history. Each of those reasons is fatal to Troya's claim.

Furthermore, even if Mr. Boser was aware of the alleged convictions of his brother-in-law, there is no evidence that he intentionally concealed this information during the *voir dire*. Indeed, it is entirely possible that Mr. Boser's notion of "family" did not include siblings-in-law or that Mr. Boser was simply not close enough to this brother-in-law that Mr. Boser thought to mention his brother-in-law's alleged drug-related past. USA Exh. 10 (juror questionnaire of Donald Boser). In *McDonough*, the United States Supreme Court recognized that jurors are called "from all walks of life" and may interpret the same question differently. 464 U.S. at 554 (finding that a juror "apparently believed that his son's broken leg sustained as a result of an exploding tire" was not the sort of injury asked about during *voir dire* and that "a juror's mistaken, through honest response to a question" will not warrant a new trial). Similarly, District Court Judge Cohn found a juror's failure to disclose the extent of his past civil litigation, though "troubling," to be "innocent

216

omissions, due to his not remembering or not understanding the full scope of the question." *Suppa v. Costa Crociere*, 2008 WL 3926446 at \*4 (S.D. Fla. 2008).   Troya presents no evidence suggesting that Mr. Boser intentionally withheld his brother-in-law's criminal history.   To the contrary, the record shows that Mr. Boser, far from trying to hide relevant information during *voir dire*, was careful to supplement his responses to the juror questionnaire.   He explained, "I remember one of the questions being do you know anyone who owns a handgun.  I wrote no, and my father-in-law owns one, just recently".  CR-DE 648 at 198.    Mr. Boser then confirmed that nothing about that would affect his ability to fairly evaluate the case. *Id*.

Just as Troya provides no evidence that Mr. Boser deliberately gave false answers, he makes no showing that Mr. Boser exhibited actual bias toward him.  Even if he purposely failed to disclose his brother-in-law's issues with drugs, nothing beyond pure speculation bridges the gap between that and actual bias against Troya.   This is especially true considering Mr. Boser's affirmative response that "[w]hen all is said and done" he could be "a fair and impartial juror in the case". CR-DE 648 at 233.  Troya has not satisfied either prong of the *McDonough* test with regard to Mr. Boser.

d. Connie Thomas

Troya next alleges that Connie Thomas withheld during *voir dire* that her ex-husband had alleged problems with firearms, that her brother had alleged problems with drugs, and that her ex-brother-in-law had alleged problems with both. CV-DE 25 at 65-67.  Additionally, Troya contends Ms. Thomas did not disclose that her alleged sister Teresa Thomas had worked for the State Attorney's Office.  As with Troya's claims against the other jurors, these attacks are unsupported by any showing that the John Thomas Mincey, Willie James Thomas, John Burrows Hutchinson, Sr., and Teresa Thomas named in the records are Ms. Thomas's ex-husband, brother, ex-brother-

in-law, and sister, respectively. Similarly, even if these individuals are Ms. Thomas's relatives, Troya has presented no evidence that Ms. Thomas was aware of their drug or firearm problems or former employment. Accordingly, Troya's claim fails.

Even in the event Ms. Thomas was aware of her ex-husband's and ex-brother-in-law's alleged firearms convictions, Troya has not established that Ms. Thomas intentionally concealed such information during the *voir dire*. While the juror questionnaire inquired whether "you or any family members or friends ever had a problem involving firearms, whether used legally or illegally," it is entirely conceivable that she consciously no longer considered her ex-husband or ex-brother-in-law to be "family". USA Exh. 11 at 6. It is equally possible that she simply did not recall their alleged firearms convictions. Certainly, Troya falls far short of showing that Ms. Thomas deliberately withheld firearms-related information.

As for the question asking whether "you or any family members or friends ever had a problem with illegal drugs," Ms. Thomas candidly responded, "Yes," and wrote "Possession/selling drugs" and "never used them". USA Exh. 11 at 7. When asked follow-up questions during *voir dire*, Ms. Thomas explained she was referring to her nephew and clarified that there was nothing about that would affect her "ability to judge any of the issues in this case." (CR-DE 638 at pp. 239). Indeed, the Court pressed the matter with Ms. Thomas, "Let me put this to you. I think you understand there are drug charges in this case. I want to make sure, you know, when something happens to somebody close to use, we can't forget about that, we know it." *Id*. The Court then said, "I want to make sure you feel comfortable that you could isolate that and your nephew's situation would not affect how you evaluated the evidence in this case." *Id*. Ms. Thomas remained steadfast that she could be fair. Accordingly, the record indicates Ms. Thomas did not intend to hide relevant information about her family's problems with drugs or have any sort of bias

218

because of them.

We now turn to Troya's claim that Ms. Thomas's failed to disclose her sister's alleged former employment with the State Attorney's Office. CV-DE 25 at 66. The juror questionnaire asked, "Have you or any family members or friends ever worked for, or applied to work for, any state attorney's office, United States Attorney's Office, or any other city, county, state or federal office or agency." USA Exh. 11 at 5. Ms. Thomas checked "No," which seems inconsistent with her previous disclosure that she, herself, was currently employed as a Court Program Specialist with the Palm Beach County Courthouse. Perhaps she misunderstood the question. Regardless, there is nothing in the record to indicate that she intentionally hid her sister's alleged former employment with the State Attorney's Office.

Finally, even if Ms. Thomas, for some reason, chose to purposefully conceal her ex-husband's alleged firearm problem, her brother's alleged drug problem, her ex-brother-in-law's alleged drug and firearms problems, or her sister's former employment with the State Attorney's Office, there is no indication that she was biased against Troya. Without such demonstrated bias, a cause challenge would not have been founded, especially in light of Ms. Thomas's continued assurances to the Court that she would evaluate the evidence in the case without outside influence.

e.  Dorothy Barba and Diane Gooch

Additionally, Troya accuses Dorothy Barba of failing to disclose her grandson's alleged drug-related arrests and convictions and Diane Gooch of being ineligible for jury service because of an alleged felony conviction. CV-DE 25 at 60-63, 67; *see also* USA Exh. 12 (juror questionnaire of Dorothy Barba) and USA Exh. 13 (juror questionnaire of Diane Gooch). Both Ms. Barba and Ms. Gooch were selected as alternate jurors. CR-DE 727 at 2944. While they both observed the guilt phase, neither deliberated nor returned the guilty verdict. CR-DE 774 at 7705-06. Ms. Gooch

219

did not even observe the penalty phase (CR-DE 774 at 7722-23), and although Ms. Barba did (CR-DE 825 at 8605-07), she did not deliberate (CR-DE 848 at 9761-62) nor return the death sentence verdict (CR-DE 857 at 9842-43).  Accordingly, any claims that either Ms. Barba or Ms. Gooch were untruthful during *voir dire* or were ineligible to serve are simply irrelevant.

Binding precedent makes clear that claims of unfair or improper jury selection do not extend to nonparticipating alternate jurors. *See Smith v. Whisman*, 431 F.2d 1051 (5th Cir. 1970).[59] There, the Court considered allegations in a death penalty habeas case that venire persons were improperly excluded even though the record was allegedly unclear that they were unwilling to apply the death penalty under any circumstances. *Id*. at 1054.  The parties did not dispute that the person ultimately selected as the alternate juror did not participate in deliberations. *Id*.  The Court cited to a federal district court that faced a similar problem. *Id*. (quoting *Woodards v. Maxwell*, 303 F.Supp. 690, 693 (S.D. Ohio 1969) ("[B]ecause none of the alternate jurors participated in the deliberations or verdict at the conclusion of petitioners' trial, the Court will not consider their examination relevant in the discussion of the *Witherspoon* issue.")).  Adopting that reasoning, the Fifth Circuit held a death sentence is not voided for error related to jury selection of an alternate "as long as the alternate juror selected is not needed, does not sit in on the deliberation or participate in the verdict, and provided that there is no indication that he influenced the regular jurors or prejudiced the rights of defendant." *Id*. at 1055.  In other words, "[u]ltimately, the Constitution is concerned only that the jury which decides the defendant's fate be 'impartial and indifferent to the extent commanded by the Sixth Amendment.'" *Waldrop v. Thomas*, 2014 WL 1328138 at *95 (M.D. Ala. March 31, 2014) (quoting *Morgan v. Illinois*, 504 U.S. 719 (1992)).

---

[59] Decisions of the United States Court of Appeals for the Fifth Circuit on or prior to September 30, 1981, are binding precedent for the Eleventh Circuit. *Bonner v. City of Prichard, Alabama*, 661 F.2d 1206 (11th Cir. 1981).

Here, it is undisputed that Ms. Barba and Ms. Gooch did not deliberate or participate in either the guilt phase or penalty phase verdicts. Indeed, Ms. Gooch did not even participate in the penalty phase trial. There is also no indication that either Ms. Barba or Ms. Gooch "influenced the regular jurors or prejudiced the rights of defendant." *Smith*, 431 F.2d at 1055. At the conclusion of *voir dire* for the panel that included Ms. Barba and Ms. Gooch, the Court instructed the venire persons not to discuss the case stating, "[n]ow, what I would like to ask each one of you to do is, first, please don't talk to anybody about the case." CR-DE 687 at 1152. Then, again, immediately prior to opening statements in the guilt phase, the Court emphasized the importance of "not discuss[ing] the case in any manner among yourselves or with anybody else. . ." CR-DE 728 at 3025.

To the extent Troya may suggest that Ms. Gooch tainted other jurors based upon some indication that she may have discussed "either . . . the case or jury service" at her place of work (CV-DE 16-1 at 18), the allegation is meritless. During trial, the United States raised the matter that one of Ms. Gooch's co-workers told a third party (Mr. Fazio) who told a fourth party (Probation Officer Goldberg) that she "was speaking either about the case or jury service with other employees of Arrigo Dodge". CR-DE 771 at 7477). After confirming that Ms. Gooch was an alternate, and one of the last alternates, the Court proposed to postpone an evidentiary hearing until such time as she might be required to be substituted in as a deliberating juror. CR-DE 771 at pp. 7479. The parties agreed. *Id*.

It is critical to recognize the allegation was not of premature deliberations or any other improper communications between Ms. Gooch and other members of the jury. Rather, there was a concern that she might have discussed "the case or jury service" with her co-workers. Accordingly, there was no concern then that Ms. Gooch somehow improperly influenced other

221

jurors, and there should be no concern now that either Ms. Gooch or Ms. Barba somehow prejudiced Troya "based on a mere theoretical fear that the alternate juror[s] disobeyed the judge's instructions and tried to pressure the other jurors." *Smith*, 431 F.2d at 1055.

### 3.  Conclusion

The United States appreciates defendants' right to a trial by a fair and impartial jury, but Troya has made no showing that he received anything less.  His unsubstantiated allegations are a far cry from the cases to which he refers in his brief (CV-DE 25 at 70).

In *Sampson v. United States*, 724 F.3d 150 (1st Cir. 2013), during the trial *voir dire*, a juror omitted having been the victim of an abusive ex-husband and lied, saying she had only two sons, when she also had a daughter who had a drug problem.  Ultimately, the court found that the juror intentionally withheld the information because she could not accept that such problems could exist in her family and concluded that lying because of a "magnitude of . . . emotional distress" and "intense feelings about her own life experiences" "impaired her ability to decide the case solely on the evidence." *Sampson*, 724 F.3d at 162, 167.

None of the allegedly withheld information from Mr. Little, Mr. Sollenberger, Mr. Boser, or Ms. Thomas comes close to the sort of trauma the juror in *Sampson* apparently suffered.  The denial of the existence of a child because of drug-related shame is on a completely different level than the alleged omissions here.  Mr. Little, Mr. Sollenberger, and Ms. Thomas each shared some family drug-related problems, and each assured the Court they could nonetheless be fair and impartial.  Nothing in the record indicates any of these jurors were emotionally influenced at all by any of their family members' issues, let alone to the degree of the juror in *Sampson*.  While Mr. Boser did not bring up any family drug-related problems, his efforts to supplement his questionnaire with his father-in-law's recent firearm acquisition shows his attempt to fully disclose

anything that conceivably could be of interest to the court and parties.  In that light, his lack of mentioning his brother-in-law's drug problems (if he even has such a relative) suggests that it had no impact on him.

In *United States v. Donald Fell*, the District of Vermont ultimately granted a habeas petition for a new trial based on allegations of juror misconduct.  *Fell*, case no. 01-CR-00012-GWC, D. Vt., DE 514, July 24, 2014.  However, the court dismissed allegations of *voir dire* failures to disclose as unfounded.  The court considered how Juror 162 "seriously under-reported" her son's criminal history, but found this was not the result of dishonesty and did not establish bias.  *Id*. at 30-31, 44.  Similarly, the court found insufficient evidence that Juror 26 "intentionally withheld information, or that his responses were evidence of bias."  *Id*. at 86.  Indeed, the reason the court granted Fell a new trial had nothing to do with alleged *voir dire* non-disclosures, but rather Juror 143's "deliberately undertaking an independent investigation" by traveling "over two hours to view the crime scenes in knowing violation of the Court's orders" and viewing "extra-record information that was highly relevant to the aggravating and mitigating factors presented at trial."  *Id*. at 91.  Here, because there is no genuine assertion of extraneous influence on the jury and the *voir dire* allegations were unfounded in *Fell*, the case does not support Troya's plea for a new trial.

For all the foregoing reasons, Troya's claim concerning juror misconduct during voir dire should be denied without a hearing[60].

---

[60] Troya seeks to interview the jurors (which is the subject of a separate motion to which the United States will respond) and an evidentiary hearing related to his allegations of juror dishonesty.  CV-DE 25 at 72.  Such a hearing is not warranted.

To justify a post-trial hearing on juror misconduct, Troya "must do more than speculate; he must show 'clear, strong, substantial and incontrovertible evidence . . . that a specific nonspeculative impropriety has occurred.'" *United States v. Cuthel*, 903 F.2d 1381, 1383 (11th Cir. 1990) (quoting *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) (quoting *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983))).  "The more speculative or unsubstantiated the allegation of misconduct, the less the burden to investigate." *Id*. (quoting *United States v. Caldwell*, 776 F.2d 989, 998

C. THE UNITED STATES DID NOT VIOLATE *BRADY* OR *GIGLIO* IN ITS HANDLING OF COOPERATING WITNESSES OR THE DISCLOSURE OF EXCULPATORY EVIDENCE (RESPONSE TO TROYA ISSUES XVI, XVII & XVIII).

Troya claims that the Government engaged in misconduct by failing to disclose and withholding *Giglio* and *Brady* information.   Specifically, Troya claims that the Government: (1) failed to turn over information concerning promises made to Government cooperators Melvin Fernandez, Kevin Vetere and Carlos Rodriguez in violation of *Giglio* (Troya Issue XVI: DE 25 at 240-244); (2) violated *Brady* by failing to disclose exculpatory information concerning co-defendant Danny Varela, victim Yessica Escobedo's cell phone, a drug deal involving victim Jose Luis Escobedo in the day(s) preceding his murder, the video captured at the guard gate at Briar Bay development (where "Thug Mansion" was located), and other information which supposedly lessened Troya's culpability in the murders (Troya Issue XVII: CV-DE 25 at 245-258); and (3) failed to turn over *Brady* information concerning a Government expert retained to review Troya's PET scan for possible brain damage (DE 25 at 258-259).   Troya's claims of prosecutorial misconduct are procedurally barred and, even if they were not procedurally barred, fail on the merits.

A petitioner is procedurally barred from raising, for the first time in a collateral attack on his conviction, issues that were capable of being raised on direct appeal, unless the petitioner can demonstrate both: "(1) 'cause' excusing his . . . procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." *United States v. Frady*, 456 U.S. 152, 168

---

(11th Cir. 1985)).  This standard applies equally in cases alleging lack of juror candor during *voir dire*.  See *Quilca-Carpio*, 118 F.3d 719 (11th Cir. 1997) (finding no abuse of discretion where the trial court denied an evidentiary hearing where a juror later indicated he might have a drug-related bias).

Here, Troya has done nothing more than speculate.  He has not presented any evidence, let alone "clear, strong, substantial and incontrovertible evidence" that any of the jurors were deliberately dishonest during *voir dire* or would have been excused for cause if they had been completely forthcoming.  *Cuthel*, 903 F.2d 1381, 1383.

(1982); *see also Keeney v. Tamayo-Reyes*, 112 S. Ct. 1715, 1719 (1992) (cause and prejudice standard applicable to failure to take an appeal); *accord Coleman v. Thompson*, 501 U.S. 722, 111 S. Ct. 2546, 2565 (1991); *United States v. DeBernardo*, 880 F.2d 1216, 1227 (11th Cir. 1989) (failure to take an appeal may be raised as a bar to collateral relief).    Where a defendant makes no showing of cause and prejudice regarding the failure to raise issues on direct appeal that are raised for the first time in a Section 2255 motion, summary dismissal of those claims is warranted. *See Parks v. United States*, 832 F.2d 1244, 1246 (11th Cir. 1987).  Troya's claims of *Brady* and *Giglio* violations could have been raised by Troya on direct appeal but they were not.   As such, they are procedurally barred unless Troya can demonstrate how his claims of prosecutorial misconduct would qualify under an exception to the procedural bar rule.  Troya has failed to make this showing.

Moreover, Troya has not established that any *Brady* violations actually occurred.  The *Brady* legal framework is well settled. "There are three essential components of a true *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). To demonstrate prejudice, the petitioner must "convince us that there is a reasonable probability that the result of the trial would have been different if the [allegedly suppressed items] had been disclosed to the defense. In other words, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *High v. Head,* 209 F.3d 1257, 1267 (11th Cir.2000) (citations and internal quotation marks omitted*); see also Strickler*, 527 U.S. at 289-90, 119 S.Ct. at 1952 (" 'the question is not whether the defendant would more likely than not have received a different verdict with the

225

evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence' ") (citation omitted*) Johnson v. Alabama*, 256 F.3d 1156, 1188-89 (11th Cir. 2001).

Troya's Brady and *Giglio* claims have been procedurally defaulted, fail on the merits, or both, and should be summarily denied.

1. <u>Troya has failed to establish that the United States failed to disclose *Giglio* information concerning government cooperators Melvin Fernandez, Kevin Vetere and Carlos Rodriguez.</u>

Troya alleges that the United States shirked its *Giglio* obligations by failing to turn over all documents in its possession concerning promises made to Melvin Fernandez, Kevin Vetere and Carlos Rodriguez. CV-DE 25 at 240-244. In support thereof, Troya cites to the "extraordinary treatment of the cooperators upon the government's insistence after the trial was completed." CV-DE 25 at 240. Troya complains that the Government has yet to produce case files pursuant to a FOIA request, and insinuates that this is a delay tactic, but does not specify what records he seeks that would not be publicly available, as all motions, judgements and conviction orders, and hearing transcripts are publicly available. CV-DE 25 at 240-41.

Troya has failed to establish a *Giglio* violation and indeed, the Government submits that no *Giglio* violation occurred. The Government provided *Giglio* information on Vetere and Rodriguez in advance of trial on December 22, 2008, in accordance with the timing provisions of a Protective Order entered earlier in the case. USA Exh. 16. To the extent that Troya complains of the security benefits provided to witness Kevin Vetere in response to threats made by Troya, those facts were completely known to Troya's trial attorneys, Ruben Garcia and James Eisenberg.[61] Counsel were able to cross-examine both witnesses as to their hope of receiving a

---

[61] Troya had been subjected to Special Administrative Measures ("SAM") of pre-trial detention

Rule 35 reduction of sentence and related possible bias towards the government.  CR-DE 738 at 4458 line 8 – 4460 line 19 (Rodriguez);  CR-DE 738 at 4464, ln 22-25 (Rodriguez); CR-DE 754 at 5735 line 22- 5737 line 6 (Vetere); CR-DE 754 at 5738 ln 22 – 5739 ln 22 (Vetere); CR-DE 754 at 5778 ln 10 – 5781 ln 18 (Vetere); CR-DE 756 at 5823 ln 15- 5824 ln 12 (Vetere); CR-DE 756 p. 5842 ln 24 – 5845 ln 7 (Vetere).  The Court also instructed the jury with regard to the witnesses' hopes of receiving sentence reductions as a result of their testimony.  CR-DE 737 at 4401 ln 2 - 4404 ln 8 (Rodriguez); CR-DE 754 at 5421 ln 3-9 (Vetere).  Not only has Troya failed to establish a *Giglio* violation with regard to these witnesses and their hopes of a sentence reduction, the record indicates that counsel, the Court, and the jury were all made aware the witnesses' hopes of receiving such a reduction.

The fact that Vetere and Rodriguez subsequently received reductions in their sentences does not mean that there were extraordinary, undisclosed promises of leniency.  The grant of a reduction in sentence, and the extent of any reduction, lies wholly within the discretion of the District Court. The United States—in open, public hearings—advised the respective judges as to the extent of the cooperation provided, how the cooperation fit into the larger trial, and recommended a percentage reduction in the cooperator's sentence.  Thereafter, the District Court, in separate matters presided over by different judges, decided to reduce the sentences of Vetere and Rodriguez as they saw fit. The District Court granted those reductions as a matter of discretion by the Court not fiat by the Executive Branch.     Counsel is mistaken concerning the existence of, and failure to disclose, hidden promises of extraordinary leniency, and has cited no basis other than pure supposition.  The

---

due to Troya's proclivity to commit violence.  USA Exh. 15.  Prior to cross examination of Vetere it also was disclosed that the family had incurred moving expenses borne by the federal United States, and that Vetere was under the prospective protection of the Marshals Service. CR-DE 754 at p. 5403-12; and USA Exh. 16.

fact that the amount of reduction in both cases far exceeded that which the Government requested or advocated undercuts Troya's claim that the final sentence reductions were the result of undisclosed Government promises of extraordinary leniency.

Troya also claims that the government violated its *Giglio* obligations by failing to disclose a non-prosecution agreement concerning witness Melvin Fernandez's initial false statement to law enforcement which was inconsistent with Fernandez's later statements and testimony.   There was no non-prosecution agreement between the government and Fernandez.  Furthermore, the record shows that all defense counsel were aware of Fernandez's false statement to law enforcement as well as the fact that he had not been prosecuted for this crime.  Counsel sought to cross Fernandez on his desire to curry favor with the government (s*ee supra*, Section II(H)(1)) and Sanchez's counsel crossed Fernandez as to Fernandez's initial false statement to law enforcement, his concern of being charged with this crime, and the fact that the government had not charged him with this offense.  CR-DE 729 at 3495 line 21 – 3497 line 7.  Clearly, counsel were aware—and were able to show the jury—that the Government had not charged Fernandez with making a false statement.  There was no *Giglio* violation with regard to Fernandez, and Troya has not met his burden of establishing such a violation.  Mere speculation is insufficient to meet this burden.

Furthermore, as stated *supra*, Troya has procedurally defaulted on these *Giglio* claims by failing to raise them on direct appeal.  The defense knew of, and was able to cross-examine Fernandez concerning, the Government's failure to prosecute Fernandez for his false statement to law enforcement prior to the trial of this matter.  CR-DE 729 at 3495 line 21 – 3497 line 7.  Vetere and Rodriguez were resentenced on October 8, 2009, and July 15, 2009, respectively.  CR-DE 1058, 1059; *see  United States v. Carlos Rodriguez*, Case No. 07-CR-60004-Zloch (SDFL), docket entries 67 and 68.  Troya's appellate brief was filed in the Eleventh Circuit on March 26, 2012,

228

several years after all the facts giving rise to the instant claim were known to the defense. Troya waited to raise any claim related to these facts for nearly seven years after the facts were known to him. Troya has offered no explanation as to this cause for this delay as required by law. This claim is procedurally barred and should be summarily dismissed.

In sum, all required *Giglio* disclosures were made in advance of trial, and information was provided in time to utilize it for effective cross-examination. Counsel's unsupported suppositions concerning *Giglio* violations lack any factual support. Furthermore, Troya failed to raise this claim in his appellate brief and has offered no explanation as to why he waited nearly seven years after the salient facts were known to him to raise the instant claim. As this claim is procedurally defaulted, and as Troya has failed to meet his burden of proof on the merits of this issue, it should be summarily denied.

2. Troya has failed to establish that the Government failed to disclose exculpatory information concerning Danny Varela and, in any event, this claim is procedurally barred (Response to Troya Issue XVII(A)).

In issue XVII(A), Troya claims that United States failed to charge Danny Varela with the murders, that the Government must have information in its possession relating to why it did not charge Varela with the murders, and that this mystery information must be somehow exculpatory of Troya. No factual support has been provided for this assertion. "[M]ere speculation or allegations that the prosecution possesses exculpatory information will not suffice to prove 'materiality.' "United *States v. Jordan*, 316 F.3d 1215, 1252 n. 81 (11th Cir.2003).

The United States did not have a deal with Varela. In fact, the United States did not interview Varela, nor engage in a plea offer with him. To the contrary, the United States filed a mandatory sentencing enhancement under Title 18, United States Code, Section 851 requiring a life sentence upon Varela's conviction for the drug conspiracy in this case. CR-DE 518, First

Amended Drug Sentencing Information.  The government did not present an indictment charging Varela with the murders because the government did not have confidence that Varela would be convicted given the undisputed evidence that Varela was in West Palm Beach at the time of the murders.  *See* Testimony of David Weeks, CR-DE 764 at 6703, 6709-6800 and references to GXs 710.1 and 760.6; Testimony of David Doran, CR-DE 732 at 3962-3969.   No factual or legal support exists for the novel assertion that the government's discretionary decision not to prosecute one defendant creates *Brady* information concerning another defendant.   Troya has simply failed to meet his burden of proof on this issue

Furthermore, all the facts giving rise to this claim have been known to the defense for several years.  In fact, the Government's failure to charge Varela with the murders was used as a mitigating factor during the penalty phase.  The mitigating factors were submitted to the Court on or about March 24, 2009, three years before Troya's appellate brief was filed.  In fact, the prosecutor's comments concerning the Government's continued investigation of Varela's involvement in the murders was a salient part of that brief.  CV-DE 25-1, Troya's Appellate Brief at 195-203. Troya has offered no explanation as to why he did not raise this related *Brady* claim in his direct appeal.  As Troya has proved neither cause nor prejudice for failing to raise this issue in his appellate brief, the instant claim is procedurally barred.

3. Troya has failed to establish that the United States failed to disclose material exculpatory information concerning third party guilt relating to the location of murder victim Yessica Escobedo's cell phone, and this claim is procedurally barred (Response to Troya Issue XVII(B)).

At the trial of this matter, defense counsel argued that cell phone records showed that victim Yessica Escobedo's cellular telephone was in Texas on the night of her death and suggested that these records were an indication of the involvement and guilt of a third party who caused the phone to travel from Florida to Texas.  CR-DE 767 at 7350 ln 19 – 7352 ln 7; CR-DE 772 at 7654-61,

230

7682-85. Troya now alleges that the Government failed to produce material information in its possession concerning a third party's involvement in the movement of the cell phone owned or used by Yessica Escobedo. Troya provides no proof of this allegation, only speculation that the government must have such information. "[M]ere speculation or allegations that the prosecution possesses exculpatory information will not suffice to prove 'materiality.'" *Jordan*, 316 F.3d at 1252 n. 81. Troya has failed to meet his burden of proof on this issue.

Furthermore, the record flatly contradicts Troya's claim that the government withheld material, exculpatory information. The United States produced a multitude of cellular telephone evidence in the case, both forensically derived data and subpoenaed records. As relates to Yessica Escobedo, the United States produced cellular telephone records in its Sixth Supplemental SDO Response filed on or about May 18, 2007. USA Exh. 17. Those records pertained to Yessica Escobedo's cell phone assigned phone number 956-266-2004. The specific records consisted of: (a) cell site data from Sprint for the period September 9, 2006 through October 14, 2006; and (b) toll records from Sprint for 956-266-2004 for the period September 9, 2006 through October 17, 2006.

Additional cell telephone records for the cellular phone assigned number 561-891-1220 were also disclosed to the defense. The "1220" number was opened in the name of Yessica Escobedo, but was believed to have been actually used by her husband, Jose Luis Escobedo. As to the "1220" number, the United States produced cellular telephone records in its Sixth Supplemental SDO Response filed on or about May 18, 2007. These records consisted of records produced by Verizon as follows: (a) cell site data from October 1, 2006 through October 14, 2006; and (b) toll records from October 1, 2006 through October 14, 2006.

231

The United States had no information about the location of the actual telephones other than the cellular carrier records described above.  To the government's knowledge, the actual cellular telephones were never found. No *Brady* violation occurred here; the United States did not possess additional information concerning the location of the phones and it certainly did not withhold any such information from the defense.

In addition, the record contradicts any claim of prejudice on this issue.  Indeed, the record shows that Sanchez's guilt counsel, Michael Cohen, not only received the records but he introduced them to make the point that the government's cell phone evidence raised a reasonable doubt in the case.  CR-DE 767 at 7350 ln 19 – 7352 ln 7, referencing Sanchez Trial Exhibit 32; *see* Sanchez Trial Exh. List, CR-DE 815 p. 5, clearly listing as Sanchez Exh. 32, "T-Mobile Phone Records (956) 266-2004; CR-DE 772 at 7654-61, 7682-85.  This evidence and these arguments did not help the defendants, however, given the overwhelming evidence of defendant's involvement in the murders.

As Troya has failed to establish that the government possessed but failed to disclose any material, exculpatory information concerning Yessica Escobedo's phone and third party guilt, or that Troya was prejudiced thereby, this claim should be denied.

4. <u>Troya has failed to establish that the United States failed to disclose material, exculpatory information concerning a drug deal involving Jose Luis Escobedo in Daytona Beach on the days before his murder and, in any event, this claim is procedurally barred (Response to Troya Issue XVII(c)).</u>

At trial, the United States' theory of the murders was that victim Luis Escobedo was in possession of a multi-kilogram quantity of cocaine obtained from some unidentified source in the Daytona area, and that he and his family were murdered to steal the drugs and erase a pre-existing drug debt owed by Varela to Escobedo.   Troya alleges that the United States withheld material

232

information in its possession regarding the details of Escobedo's last drug deal, including the specific location of the deal and the identity of the other participant(s).

The United States never learned of the exact location where this deal occurred. However, the cell phone tower records, which were timely disclosed to the defense, showed the cellular telephone numbers that Escobedo was in communication with prior to his murder and which towers that those phones were hitting.

The Government took steps to identify the source of the cocaine, primarily by tracking down calls made from Escobedo's phone in the days immediately preceding his murder. However, the United States never learned the identities of the persons in the Daytona area from whom Escobedo obtained the cocaine before he was killed in St. Lucie County by the defendants. This was not surprising given the publicity surrounding the murders and the fact that an acknowledgement of involvement in the sale would have resulted in criminal liability for the narcotics transaction.

The United States recently turned over a series of DEA investigative reports, "DEA-6s", which relate to its post-homicide investigation concerning Escobedo's source of supply. CV-DE 49-2 at 5, 17-36. A review of these reports shows that they contain no material, exculpatory information.

The United States timely disclosed, and presented evidence from various associates and a drug co-conspirator, Kevin Vetere that established, in general, what had happened. CR-DE 754 at 5422-end; CR-DE 753 at 5558-5800; and CR-DE 756 at 5840-5985. Furthermore, the defense were able to discover, through due diligence, the same information that was disclosed in the recently disclosed DEA reports. Defense counsel were able to argue to the jury that murder victim Escobedo was a drug dealer involved with violent Mexican cartels and could have been killed by

233

other individuals. *See generally*, Section II (B), *supra*.   The persons interviewed in these reports were discovered through a review of Escobedo's calls in the days preceding the murders.   The United States produced subpoenaed telephone records relating to the cell telephones believed to have been in the Escobedos' possession prior to the murders; those records revealed the telephone numbers with whom the Escobedo's had contact before their murder.   As pointed out earlier in this same section, once defense counsel received the toll records relating to Yessica Escobedo and Jose Luis Escobedo they had the investigative ability to follow through with that information.   *See Wright v. Hopper*, 169 F.3d 695, 702 (11th Cir.1999) ("the state is not required to furnish a defendant with exculpatory evidence that is fully available through the exercise of due diligence").   Troya has not established that he was prejudiced, in any way, by the previously undisclosed DEA reports.

An examination of the recently disclosed DEA reports compels the conclusion that there is no likelihood that disclosure of the materials would have had any significant impact on the trial. Neither Troya's counsel nor Sanchez's counsel were prevented from presenting evidence and arguing to the jury that people other than Sanchez and Troya had a motive and opportunity to murder the Escobedos.   CR-DE 765 at 6931-6979 and Sanchez Trial Exhs. 1, 3-9, 32, 49, and 50; CR-DE 767 at 7310.   Even if the cumulative effect of all the alleged *Brady* material [undisclosed DEA-6 reports] is considered, the petitioner has not met his burden of establishing a reasonable probability that the result would have been different or that he did not receive a fair trial resulting in a verdict worthy of confidence.   *See Stricker,* 527 U.S. at 289-90.   Considering the entire trial record, Troya received a fair trial resulting in a verdict worthy of confidence.   Troya has simply failed to establish that the facts contained in the undisclosed DEA-6 reports were material or

exculpatory, or that he was prejudiced by their lack of disclosure.  As such, Troya has failed to meet his burden on this issue.

Furthermore, all the facts relevant to this issue were known at the time of the trial.  The government's theory was made clear from at least the start of the trial, and numerous witnesses testified to the Escobedo's and the defendants' travel to the Daytona area on the day of the murders and subsequent robbery and possession of cocaine by the defendants and their co-conspirators. Defense counsel knew of Escobedo's involvement in drug trafficking as early as August 18, 2007, when he read about it in the Palm Beach Post, and asked the Government for materials relevant to Escobedo's drug trafficking shortly thereafter.  CR-DE 260 at 2-3.  In fact, Troya filed a motion to compel discovery on this issue on October 2, 2007.  CR-DE 260.  The Court denied this motion on November 19, 2007, because it found that "the defendant's request, as asserted is 'mere speculation' and lacks the indicia of materiality required under *Brady*".  CR-DE 274 at 5.  If Troya continued to have concerns regarding the disclosure of information concerning Escobedo's drug trafficking, he could have pursued the issue at trial or on appeal.  Instead, Troya chose to wait more than eight years after his initial concerns to raise the issue in this 2255, and his claims are no less speculative than they were in 2007.  Troya has provided no cause for this delay, nor has he established resulting prejudice.  To the contrary, a review of the record indicates that counsel were able to argue reasonable doubt based on Escobedo's drug dealing and use this as a mitigating factor during the penalty phase.  This claim is procedurally barred and, even if it were not so barred, Troya has failed to meet his burden of proof.  For all these reasons, this claim should be denied.

5. Troya has failed to establish that the Government withheld material, exculpatory information concerning the guard gate video surveillance at the Briar Bay development, where "Thug Mansion" was located, and furthermore, this issued is procedurally barred (Response to Troya Issue XVII(d)).

235

Troya alleges that the United States committed a *Brady* violation by failing to turn over visitor logs and security gate videos from the Briar Bay development, where Thug Mansion" was located. No violation occurred. The United States produced all evidence in its possession relating to the security gate and the time period related to the homicides, including a clone copy of the hard drive from the computer located at the guard gate. However, there was no video recording contained on the data received from the security officials at Briar Bay. This discovery was provided by the United States to the defense in its Eighth Supplemental SDO Response filed on August 6, 2007. CR-DE 231, para. 6b therein. Sanchez's counsel obviously had this information because it was listed on his trial exhibit list. CR-DE 815, Exh. 40. Moreover, Sanchez's defense case included two Government agents (DEA Special Agents Weeks and Mathews) who testified for the defense concerning the lack of relevant evidence from the logs and video cameras in use at the Briar Bay guard gate. CR-DE 765 at  6967 ln 23- 6970 ln 2, 6976 ln 9 – 6978 ln 12,  6980 ln 7 – 6984 ln 24. The lack of corroborating evidence from the Briar Bay logs and cameras was also used by Sanchez's counsel during closing to argue that there was no corroboration for Vetere's testimony concerning the defendants' whereabouts on the night of the murders. CR-DE 767 at 7332 ln 19 –7333 ln 22. Not only has Troya failed to establish the existence of the *Brady* violation, but also the record clearly shows that the exculpatory nature of the Briar Bay logs and entry camera evidence was known to the defense.

Troya claims that DEA Special Agent David Weeks testified that he had viewed video footage from the Briar Bay security cameras covering the time period October 12 through October 14, 2006, which would include the night of the murders. The transcript citation provided by Troya is misleading at best. In fact, agent Weeks never testified that he viewed video footage from the night of the murders. CR-DE 765 at pp. 6975-6979. The relevant exchange occurred as follows:

236

Q. With regard to the Briar Bay and security cameras, you don't even know if the cameras were working in October, 2006, do you?

A. I have seen some video footage from that location, but --

Q. In fact --

THE COURT: Wait a minute.

MR. CARLTON: I'm sorry.

THE COURT: Let the witness finish answering the question.

THE WITNESS: I have seen some footage from that location. I don't know which cameras were working and which weren't.

BY MR. CARLTON:

Q. The video turned over from Briar Bay was from the time period October 12th to October 14th?

A. Yes.

Q. Isn't it true law enforcement determined after viewing that electronic whatever saved by Briar Bay was of no help whatsoever identifying anything?

MR. COHEN: Hearsay.

THE COURT: Sustained.

MR. EISENBERG: Move to strike.

THE COURT: Grant the motion to strike.

BY MR. CARLTON:

Q. Was there any evidence you received from Briar Bay that you determined relevant to the investigation concerning the entry or exit of the vehicles concerning that development after 3:02 a.m. October 13th, 2006?

A. No, sir.

CR-DE 765 at 6974 ln 15 – 6975 ln 19. Troya has cited to this exchange in an effort to establish that the Government was in possession of a video showing ingress and egress from the Briar Bay guard date on the night of the murders. This exchange does not establish the government's possession of such a tape, which could potentially corroborate or fail to corroborate Kevin Vetere's testimony concerning the actions of the defendants on the night of the murders. If the existence of such a video had become known at the end of such a lengthy and important trial, the defense

237

would have shouted for a mistrial, which they did not do. The defense did not move for a mistrial at this juncture because they understood the context of Agent Weeks testimony and also understood that there was no video from the Briar Bay security gate relevant to the night of the murders.

To put it bluntly, the video footage cited by the defense does not exist and was certainly never in the Government's possession. The United States endeavored to recover information believed to have been recorded on the hard drive of the security gate computer at Briar Bay, however no video recordings were recovered despite a forensic examination to uncover them. The results of that forensic examination and the CD containing a clone copy of the Briar Bay hard drive were produced to the defense in discovery. The allegation that the United States failed to produce a videotape in its possession is not true; the United States did not possess such a piece of evidence. The video tape evidence described by the defense did not exist. Defense counsel were well aware of this, as evidenced by the lack of calls for a mistrial following Agent Weeks' testimony and also considering the arguments made by counsel in closing. Troya has simply failed to meet his burden of establishing that the Government had in its possession, and yet withheld, potentially exculpatory information: to wit, the video showing movement into and out of the Briar Bay development, where Thug Mansion was located, at the time of the murders. The government cannot violate a requirement to provide exculpatory materials if the government does not possess those materials. *United States v. Meros*, 866 F.2nd 1304, 1308 (11th Cir. 1989)

Furthermore, assuming that Weeks' testimony establishes the government's possession of a video tape relevant to the defendants' movements on the night of the murders, Weeks testified on February 24, 2009, more than three years before Troya's appellate brief was filed. Troya was aware of all the facts giving rise to this claim prior to the filing of his appeal and could have, but

238

did not raise this issue therein. Troya provides no explanation of the failure to pursue this issue in a timely manner. As such, the issue is procedurally barred and should be summarily denied.

6. <u>There is no basis for Troya's allegation that the United States failed to produce material, exculpatory information of Troya's lessened culpability for the murders (Response to Troya Issue XVII(E)).</u>

In issue XVII(E) of his petition, Troya claims that the Government "did not provide material, exculpatory evidence in its possession that Mr. Troya did not fire a weapon on October 13, 2006" or "would have lessened Mr. Troya's role in the murders". CV-DE 25 at 258. This claim is speculative and lacking in the detail necessary to establish a *Brady* violation. Troya does not describe the nature of this evidence, how it would relate to the case as a whole, why it is material to the defense, or how/when the Government came to possess this mysterious evidence. As such, Troya's claim is based on mere speculation. "[M]ere speculation or allegations that the prosecution possesses exculpatory information will not suffice to prove 'materiality.'" *Jordan*, 316 F.3d at 1252 n. 81. As Troya has woefully failed to meet his burden of proof on this issue, this claim should be summarily denied.

7. <u>Troya has not established that the United States withheld material, exculpatory information concerning a Government's Expert's Review of Troya's PET scan for signs of brain damage and, in any event, this claim is procedurally barred. (Response to Troya Issue XVIII).</u>

Troya alleges that the United States committed a *Brady* violation by failing to turn over material, exculpatory information concerning a Government expert's review of Troya's PET scan for possible signs of brain damage. CV-DE 25 at 258. The factual support for Troya's belief that such a review was conducted and produced exculpatory information consists of comments made by former AUSA Kastrenakes during a status conference held on March 10, 2009, between the guilt and penalty phases of the trial:

MR. KASTRENAKES: Your Honor, I forgot to mention one thing. Mr. Eisenberg has been communicating back and forth by e-mail. There was a Dr. Wu, W-U, who administered a PET Scan, P-E-T scan of Mr. Troya. He, Mr. Eisenberg, said he is not calling Dr. Wu. However, it is up in the air as far as I am concerned. I don't know whether these other doctors are going to refer to the PET Scan. If they don't, I don't need filing. If they do, then I need it. And I have retained a neuro psychiatrist who is very familiar with PET Scans. I need the original PET Scan to be able to supply to him for possible rebuttal testimony. I told Mr. Eisenberg that. He sent us a color copy of an e-mail which doesn't cut it as far as the doctor's ability to review the raw data. That would be the extent of what I have for Mr. Troya.

THE COURT: Okay.

MR. EISENBERG: If I can respond in the order -- the opposite order, Dr. Wu. Dr. Wu is a doctor out of California who did a PET Scan on Mr. Troya. We are not going to bring in Dr. Wu, we are not going to make this a feature of the case.

THE COURT: Do you agree no other psychologist or any other expert will rely on it?

MR. EISENBERG: No.

THE COURT: No, they will not, or you don't agree?

MR. EISENBERG: I don't agree.

THE COURT: Then you need to produce the PET Scan. How do we do that?

MR. EISENBERG: Let me tell you what I produced.

THE COURT: No. Is any other expert you recall going to rely on the PET Scan?

MR. EISENBERG: Yes.

THE COURT: Then you need to produce the PET Scan. How do we do that?

MR. EISENBERG: I thought I did that. The exact information provided to the other experts, exact same information --

THE COURT: No. You need to give them what they need. They need the original. How do we get that?

MR. EISENBERG: I have to call Dr. Wu if The Court wants me to get the original. I want The Court to know the exact same information provided to my expert has been provided to theirs. If The Court wants the original, I will call Dr. Wu and have him do it.

THE COURT: I don't want to get to the trial and find out we are in a bind saying there hasn't been compliance, and the issue is, do we exclude relevant testimony. I don't want that. If they have an expert saying they need to see the original so they can counter what somebody else would say, let's do it now and get them the original and let them be able to respond.

MR. EISENBERG: All right. If they can -- I was going to suggest that gentleman call Dr. Wu. I have given them his telephone number in California.

THE COURT: It is your obligation to provide it.

MR. EISENBERG: I will do that this afternoon.

THE COURT: Okay. I can't ask any more than that.

CR-DE 795 at 7775 ln 4 – 7777 ln 16.  Troya did not put on any mental health evidence during his penalty case, as more fully discussed *supra* at Section II(P) of this response.  As a result of this decision, the Government did not call any mental health experts in rebuttal.

In response to the instant claim, the Government investigated whether any note or reports existed concerning the expert mentioned in the March 10, 2009, status conference.  In an effort to cooperate with Troya's counsel, and in response to an "informal discovery request," the government wrote to defense counsel on July 20, 2016, concerning a number of subjects, and explained that during the penalty phase, only one physician, Dr. Michael Brannon, had been retained to perform a mental health examination and only as to Sanchez, not Troya.  CV-DE 49-2. The government had come to this conclusion following a thorough review of the 42 boxes of trial materials retained at the West Palm Beach U.S. Attorney's Office concerning this matter and discovering that amongst the many witness folders found in these boxes, there was no folder containing information as to any doctor having reviewed Troya's mental or physical health.

241

Additionally, the Government found no copy of the original PET scan among the 42 boxes. This led the Government to the conclusion, held by many months and set forth in various pleadings, that no neuro psychiatrist had been officially retained to review Troya's PET scan. The witness folders and trial materials appeared to be otherwise complete and there was thus no reason to question that conclusion.

On August 26, 2016, defense counsel informed the government that the government was mistaken, and that Dr. Brannon had evaluated Troya. Defense counsel informed the government that they had Dr. Brannon's report regarding Troya in their possession.

On August 30, 2016, the government wrote a letter to defense counsel explaining that Judge Kastrenakes had been contacted, and that documents were located that could be responsive to Troya's "informal discovery request" as to any mental examination that had taken place regarding Troya. CV-DE 49-6. The government scanned and sent via e-mail the documents it had discovered. The government repeated that Dr. Brannon had been the only mental health expert to examine Troya and that the information pertaining to that examination had been turned over to Troya's counsel during the original proceedings. Upon information and belief, this latter statement remains true now.

The government also represented that contrary to defense counsel's belief, a neuropsychiatrist had not been retained to examine Troya, and any contradictory statement made by then AUSA Kastrenakes during the March 10, 2009, status conference had been in error[62]. CV-

---

[62] A significant issue that was discussed during this hearing was the government's need for an adequate copy of the PET scan if a review was to be conducted by any retained expert. Since that PET scan was in the possession of Troya's trial counsel, and the trial judge ordered him to turn it over to the United States, presumably he would know whether or not he did so. Despite having access to trial counsel, Troya has never proffered whether or not he provided the scan to the government, much less provided an affidavit or any other reliable evidence on this issue.

242

DE 49-6.  The government noted that a review of the government's files reflected only a three-page photocopy of a PET scan.  That scan was provided to defense counsel anew.

Sometime after that exchange, in order to explore every avenue at its disposal, and despite the fact that a review of the files had failed to turn up any records in this regard, the government requested that the fiscal department of the U.S. Attorney's Office conduct a review of its records. During that search, an incomplete agreement and invoice were discovered which reflected that the Government had officially retained Dr. Ray Lopez, and that Dr. Lopez had reviewed records for two hours on March 18, 2009 and had a 1-hour long telephone conference with then AUSA Kastrenakes on March 20, 2009.  CV-DE 83, 83-1, 83-2.   As soon as the incomplete agreement and invoice were received from the USAO fiscal department, they were provided to the defense.

The government subsequently contacted Dr. Lopez's office, and learned that Dr. Lopez suffered a debilitating stroke some time ago and is no longer able to communicate.  A search of the government's files again failed to turn up copies of any materials that may have been provided to or received from Dr. Lopez concerning Troya's mental or physical health.  Consequently, the government inquired and was permitted to inspect the materials in the possession of Dr. Lopez's medical office.

Dr. Lopez's file was found to contain: a CD-ROM labeled "Troya" that appeared to contain Troya's PET scan;  portions of the Government's contract which had not been retained by the USAO, which stated that Dr. Lopez was being hired "to evaluate the defense medical reports, review the defendant's PET scan and other brain imaging data, assist the government in cross-examination of defense experts and be prepared to testify in rebuttal, if necessary."; and a 30 page fax from AUSA Kastrenakes which included defense expert reports, curriculum vitae, and still images from Troya's PET scan.   The file did not appear to contain any indications that Dr. Lopez

243

formed any conclusions, or even made any notations, concerning the review of records or the telephone conference with former AUSA Kastrenakes listed on Dr. Lopez's invoice. The only handwritten notation in the file was a reference to Kastrenakes' contact information. Pages had been prepared for the doctor's notes, but those pages were devoid of any notes. It should be noted that neither Dr. Lopez's file nor the records retained in the USAO fiscal department indicate that any reports were ever authored or billed by Dr. Lopez.

Although the government regrettably and inadvertently provided incomplete and inaccurate information regarding whether more than one doctor was involved in a review of Troya's mental state, the conclusion remains the same: there do not appear to be any undisclosed reports or opinions concerning Troya's mental or physical health. Consistent with the prior representations made by the government, the incomplete agreement and invoice do not definitively reflect that Dr. Lopez had formed any opinions as to whether Troya's PET scan showed brain damage or that any report had been authored. March 20, 2009, the day of the telephone conference, was a Friday when Court was not in session. Troya rested his penalty case on Monday, March 23, 2009, without putting on any mental health evidence. It would make sense for the one hour March 20, 2009, telephone conference to concern potential cross-examination of noticed defense experts and to represent the last work Dr. Lopez did on this case as his services would have no longer been needed as of March 23, when the defense rested. Indeed, Dr. Lopez's invoice was dated March 24, 2009, the day after the defense rested in the penalty phase. Moreover, there certainly do not appear to be any records indicating that any material, exculpatory conclusions were drawn regarding Troya's PET scan.

As with many of the issues raised by Troya, this issue was raised without any proof, other than an allegation, that the government somehow had in its possession a report indicating that

244

Troya was not fit to stand trial, or to be put to death for the deaths of the two adults and two children for which he was convicted.  Even if such a report did exist, Troya has not established that he was prejudiced by its non-disclosure.  As set forth *supra* in Section II(P) of this response, Troya made a counseled decision not to put forth any mental health evidence in mitigation to avoid the Government's introduction of rebuttal expert testimony that Troya was a psychopath.   It is doubtful that one expert's conclusion that Troya's PET scan showed signs of brain damage would have caused Troya and his counsel to change their strategy with regard to the mental health evidence.  None of other testimony from Troya's family or friends indicated that Troya suffered from the type of mental and physical problems that manifest in someone with brain damage.  Furthermore, the damage that would have been inflicted from the Government's rebuttal evidence that Troya is a psychopath would have had significant impacts of the jury's verdict.  In sum, Troya has not established that material, exculpatory information was withheld or that the withholding caused Troya to suffer prejudice.

Furthermore, Troya's claim of a *Brady* violation with regard to Dr. Lopez is procedurally barred.  The facts underlying Troya's claim, namely that the government had retained an expert to review Troya's PET scan, has been known to the defense since at least March 10, 2009, three years before Troya's appellate brief was filed.  Troya has not explained why this *Brady* claim was not pursued on appeal, let alone establish cause and prejudice.  For these reasons, Troya's claim of a *Brady* violation with regard to Dr. Lopez is procedurally barred and, even if it were not procedurally barred, fails on the merits.

D.  TROYA'S CLAIMS THAT HIS DEATH SENTENCES VIOLATE THE EIGHTH AMENDMENT'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT ARE PROCEDURALLY BARRED AND FAIL ON THE MERITS   (RESPONSE TO TROYA ISSUE XXIII)

In his Motion, Troya claims that his sentence of death violates the Eighth Amendment's

245

prohibition against cruel and unusual punishments for four reasons: (1) the death penalty is disproportionate to Troya's crimes [CV-DE 25 at 288-93]; (2) the death penalty fails to ensure reliability, consistency, and equal protection [CV-DE 25 at 293-97]; (3) the conditions of Troya's confinement constitute physical and psychological torture and inhumane treatment [CV-DE 25 at 297-301], and (4) the method of execution is unconstitutional [CV-DE 25 at 201-03]. Troya failed to raise any of these claim in his direct appeal. *See generally United States v. Troya*, 733 F.3d 1125 (11th Cir. 2013), *cert. denied*, ___ U.S. ___, 135 S.Ct. 2048 (2015). As a result, these claims are procedurally defaulted and are barred.

A collateral attack is more limited than an appeal, and the doctrine of procedural default generally bars consideration of any claim that the movant failed to appropriately raise on appeal. *See United States v. Frady*, 456 U.S. 152, 165 (1982). The procedural default doctrine is adhered to by the courts to conserve judicial resources and respect the law's important interest in the finality of judgments. *See Massaro v. United States*, 538 U.S. 500, 504 (2003). This doctrine applies even in death penalty cases. *See Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005). Because these claims are procedurally barred, the Court should dismiss these claims without further consideration.

Notwithstanding the procedural bar which is fatal to Troya's claims, we will examine and respond *seriatim* to the substance of Troya's claims, each of which is without merit.[63]

---

[63] To the extent Troya intended to claim that the death penalty is unconstitutional as cruel and unusual punishment and a *per se* denial of due process, it should be noted that three separate phrases in the Fifth Amendment, including the Due Process Clause, specifically contemplate capital punishment:

No person shall be held to answer for a ***capital***, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury ...; nor shall any person be subject for the same offense to be twice put in jeopardy of **life** or limb; ... nor be deprived of **life**, liberty, or property, without due process of law....

1. <u>Troya has not established that the death penalty is disproportionate to his crimes. CV-DE 25 at 288-293.</u>

   a.  There is no national trend toward abolition.

Troya claims there is a "steady and progressive abandonment of capital punishment throughout the nation" and that therefore it has become a "disproportionate punishment even for the most serious of offenses."  CV-DE 25 at 288.  Troya says there is a "national trend toward abolition" and he points to New York, New Jersey, New Mexico, Illinois, Connecticut, Maryland, and Nebraska.  *Id.* ¶ 1.  Moreover, Troya says a group of states (California, Colorado, Kansas, New Hampshire, Oregon, Pennsylvania, and Wyoming) have not carried out an execution in the past decade, and several other states (Arkansas,  Kentucky, Louisiana, Nevada, Utah, Montana, and Washington) have only carried out one execution in the past decade.  CV-DE 25 at 288-89.  Troya claims that ten states account for 92% of all executions in the past decade, and there has allegedly been a "clear and stark" decline in the executions in those states.  CV-DE 25 at 289.  A number of states (California, New Hampshire, Pennsylvania, and Tennessee) have commissioned reports on their use of capital punishment; and Louisiana has begun to investigate the *financial*

---

U.S. Const. Amend. V (emphasis added).  This text plainly refutes any claim that due process requires a categorical ban on capital punishment.  *See Gregg v. Georgia*, 428 U.S. at 177 ("[i]t is apparent from the text of the Constitution itself that the existence of capital punishment was accepted by the Framers.") (joint opinion of Stewart, Powell, and Stevens, JJ.).  "To the extent our standards of decency have evolved since the enactment of the Constitution, they still permit punishment by death for certain heinous crimes such as murder."  *Id.*, at 186.  Moreover, it has repeatedly been held that the death penalty is not cruel and unusual and does not offend the requirements of due process.  *See, e.g., United States v. Sampson*, 486 F.3d 13, 29 (1st Cir. 2007), *cert. denied*, 553 U.S. 1035 (2008) ("Because *Gregg*, *Roberts [v Louisiana*, 428 U.S. 325, 331 (1976)]*, and *Chapman* [*v. United States*, 500 U.S. 453, 465 (1991)] are binding upon us, we reject Sampson's bedrock claim and hold that the death penalty itself is not unconstitutional.")  As a result, to the extent Troya might be seeking to advance such arguments, they are without merit, in any event.

*cost* of capital punishment.  *Id.*  Governors of Colorado, Oregon, Pennsylvania, and Washington have allegedly declared a moratorium on executions.  *Id.* at 90.  Troya correctly notes the Supreme Court has banned the execution of persons who are mentally retarded/intellectually disabled as well as those who were not 18 years old at the time of the capital murder.  *Id.*  Troya claims there is now a "national consensus" against the death penalty.  *Id.*

Troya's arguments are self-defeating.  Even under Troya's arguments, 31 states continue to support capital punishment.  *See* www.deathpenaltyinfo.org/states-and-without-death-penalty. Additionally, despite the fact that virtually every year bills are introduced in Congress to abolish the FDPA, Congress has never embraced such bills.  *See, e.g.*, 113 H.R. 3741, Federal Death Penalty Abolition Act of 2013; 112 H.R. 3051, Federal Death Penalty Abolition Act of 2011; 111 S. 650, Federal Death Penalty Abolition Act of 2009; 110 H.R. 6875, Federal Death Penalty Abolition Act of 2008; 110 S. 447, Federal Death Penalty Abolition Act of 2007; 109 H. R. 4923, "A bill to abolish the death penalty under Federal law" (2006); 109 S. 122, "A bill to abolish the death penalty under Federal law" (2006); 109 H. R. 379, "A bill to ensure equal protection and due process of law in capital punishment cases by imposing a moratorium on the imposition and carrying out of the death penalty in certain States" (2006).

Recent electoral activity in several states also runs counter to Troya's claim.  For example, on November 8, 2016, the citizens of Nebraska voted in a referendum, by a 61-39 margin, to reinstate the death penalty following 2015 legislation abolishing capital punishment.[64]

Further, in 2012, there was a general referendum (Proposition 34) in California on whether to abolish the death penalty.  Despite the fact that anti-death penalty special interests spent

---

[64] *See* www.electionresults.sos.ne.gov/resultsSW.aspx?text=Race&type=SW&map=CTY.

$7,000,000 in their partisan effort to convince voters to abolish the death penalty, the California electorate rejected Proposition 34 by some 6 percentage points. *See* www.mercurynews.com/ci_21943752/california-proposition-34-voters-decide-whether-keep-states.

In 2006, the state legislature in Wisconsin – which abolished the death penalty approximately 150 years earlier -- authorized a statewide referendum on whether its voters desired the reinstatement of capital punishment. In the July 2006 referendum, a majority of the Wisconsin electorate voted in favor of the reinstatement of capital punishment in Wisconsin. *See* www.ipsnews.net/2006/07/death-penalty-wisconsin-to-vote-on-reinstatement/

The history of capital punishment in Oregon is particularly instructive. Prior to 1864, Oregon did not have capital punishment. In 1864, Oregon first introduced capital punishment by statute. In 1914, by Constitutional Amendment, Oregon voters repealed capital punishment with 50.4% of the popular vote. However, in 1920, Oregon voters reinstated capital punishment with 56% of the popular vote. In 1964, Oregon voters repealed capital punishment with 60% of the popular vote. Thereafter, in 1978, Oregon voters reinstated capital punishment. However, in 1981, the Oregon Supreme Court struck down Oregon's death penalty statute because it directed the trial judge – not the jury – to determine whether the defendant was sentenced to death or life imprisonment. Thereafter, in 1984, 75% of the Oregon electorate voted in favor of Ballot Measure 7, which reinstated capital punishment – where it remains the law in Oregon to this day. *See* www.oregon.gov/doc/OC/Pages/cap_punishment/history.aspx. In 2012, despite well-organized and funded opposition to capital punishment in Oregon, 57% of Oregonians continued to support capital punishment (39% oppose capital punishment, and 4% are uncertain). *See* www.deathpenaltyinfo.org/documents/opbpoll.pdf.

249

On January 12, 2016, in *Hurst v. Florida*, 577 U.S. ___, 136 S.Ct. 616 (2016), the Supreme Court struck down Florida's death penalty statute (because the judge, rather than the jury, made the final decision on a sentence of death).  However, by March 7, 2016, the Florida legislature had passed legislation, and the Florida Governor had signed into law, a measure reinstating capital punishment in and for Florida.  *See* www.wlrn.org/post/death-penalty-back-books-florida.

Moreover, as confirmed by Gallop polling -- going back from 2015 to 1936 – in all but four years (1971, 1966, 1965, 1957) *more than* 50% of the American pubic have been "in favor of the death penalty for a person convicted of murder."   USA Exh. 18 ("Death Penalty/Gallup Historical Trends" www.gallup.com/poll/1606/death-penalty.aspx?version=print (7/2/2015)).[65] From 1976 to 2015, the percentage of Americans who are "in favor of the death penalty for a person convicted of murder" has ***never been below 60%***, and it was at or above 70% in 1985 (x2), 1986, 1988 (x2), 1991, 1994 (80%), 1995, 1999, 2002, and 2003.  *Id.*  Conversely, going back to 1936, there were only four years (1972, 1971, 1969, 1966) when 40% or more of the American public was <u>not</u> "in favor of the death penalty for a person convicted of murder."  *Id.*  Indeed, between 1972-2015, the <u>highest</u> percentage of Americans who were <u>not</u> "in favor of the death penalty for a person convicted of murder" was 37% (2015), and they were generally within the twentieth percentiles (1976, 1978, 1985, 1986, 1999, 2000 (x3), 2001 (x2), 2002, 2003, 2006 (x2), 2007, 2010)  or in the teens (1985, 1988 (x2), 1991, 1994, 1995 (13%)).  [*Id.*]

Moreover, to the extent Troya is arguing for "proportionality review," the Supreme Court

---

[65] <u>Note</u>:  The question repeatedly asked by Gallup for nearly 80 years did <u>not</u> include the limiting factors:   (1) *premediated or felony* murder, or (2) *involving Special Aggravating Factors/Circumstances*.  If the Gallup question was further refined – to comport with modern law – the results would, no doubt, show an even greater support for capital punishment among the American public.

and the various Circuits have consistently rejected such a claim as being neither necessary nor appropriate.  *See, e.g., Pulley v. Harris*, 465 U.S. 37, 43-45, 50-51 (1984); *United States v. Mitchell*, 502 F.3d 931, 980-81 (9th Cir. 2007); *United States v. Higgs*, 353 F.3d 281, 320-21 (4th Cir. 2003); *United States v. Jones*, 132 F.3d 232, 241 (5th Cir. 1998).

Thus, Troya's claims that there is "steady and progressive abandonment of capital punishment throughout the nation" and that there is currently a "national consensus" against the death penalty are simply untrue.

b.   The death penalty is not excessive.

Troya claims the death penalty is "excessive" because it allegedly involves" the unnecessary and wanton infliction of  pain." CV-DE 25 at 291, ¶ 2.  Troya also says that capital punishment fails to significantly further what he says are the "baseline" goals for analyzing excessiveness:  "deterrence, retribution, incapacitation, and  rehabilitation" and because (he claims) the death penalty does not measurably" promote any of the permissible penological goals over life imprisonment," Troya claims it is excessive.  *Id.*

In advancing his claim, Troya fails to properly acknowledge, much less forthrightly address, binding Supreme Court authority (including *Baze v Rees*, 553 U.S. 35, 47 (2008)) that forecloses his claim.  *See, e.g.*, *Glossip v. Gross*, ___ U.S. ___, 135 S.Ct. 2726 (2015) ("[W]e have time and again reaffirmed that capital punishment is not *per se* unconstitutional," *Id.*, 2739; "because it is settled that capital punishment is constitutional, '[i]t necessarily follows that there must be a [constitutional] means of carrying it out.'" *Id.* at 2732-33 (quoting *Baze*, 553 U.S. at 47 (2008)).  Nor does Troya attempt to grapple with the fatal tautological fact that "[i]t is impossible to hold unconstitutional that which the Constitution explicitly *contemplates*." *Glossip*, 135 S.Ct. at 2747 (Scalia, concurring).  For each of these reasons, Troya's arguments are without merit.

251

c. Troya's claim that the Court should consider international consensus against the death penalty as part of its Eighth Amendment analysis has no support in American law.

Troya says only China, Iran, Saudi Arabia, and Iraq have recently executed more people than the United States; and in 2014 only China, Nigeria, Egypt, Pakistan, Bangladesh, Tanzania, and Iran imposed more death sentences than did the United States. CV-DE 25 at 291, ¶ 3. In the past 50 years, Troya says, 82 countries have abolished the death penalty for all crimes and an additional 35 are "abolitionist in practice;" and the General Assembly of the United Nations "has repeatedly adopted resolutions calling for countries that still maintain the death penalty 'to establish a moratorium on executions with a view to abolishing it.'" CV-DE 25 at 292. Troya claims that his "prolonged confinement under sentence of death violates international human rights law" [*Id.*], and that other countries have held that "lengthy delay in administering a *lawful* death penalty renders ultimate execution inhuman, degrading, or unusually cruel" which "climate of international opinion," Troya says, American courts should take into consideration in their Eighth Amendment analyses. CV-DE 25 at 274.

Troya is unable to cite a single decision in the United States that supports his claim. The Supreme Court has repeatedly held that capital punishment is constitutional and proper. *See, e.g., Glossip v. Gross,* ___ U.S. ___, 135 S.Ct. 2726 (2015); *Kansas v. Marsh,* 548 U.S. 163 (2006); *McCleskey v. Kemp*, 481 U.S. 279, 302 (1987); *United States v. Gregg*, 428 U.S. 153, 189 (1976).

As a result, Troya's claims are without merit and should be denied.

2. Troya has failed to establish that the death penalty fails to ensure reliability, consistency, and equal protection. CV-DE 25 at 293-297.

a. Reliability.

Troya claims that the death penalty violates the Eighth Amendment because there is a "risk of wrongful execution, that is, execution of an innocent person" under the FDPA. Troya claims there is evidence of "at least 156 exonerations in capital cases throughout the nation. Researchers

have estimated that nearly one in twenty (4.1%) of <u>those</u> sentences of death are actually innocent, an unacceptably high rate given the consequences." [CV-DE 25 at 293-94 (emphasis provided)]

Putting aside that Troya's claims are enormously exaggerated and misleading with regard to <u>state</u> executions, there has never been a claim (much less a *credible* claim) that anyone executed pursuant to the FPDA was actually innocent. Moreover, the Supreme Court and various Circuit Courts have unanimously rejected Troya's claim, in any event. *See Herrera v. Collins*, 506 U.S. 390 (1993); *United States v. Mitchell*, 502 F.3d 931, 983 (9th Cir. 2009); *United States v. Sampson*, 486 F.3d 13, 27-29 (1st Cir. 2007); *United States Quinones*, 313 F.3d 49, 60-69 (2d Cir. 2002); *accord United States v. Briseno*, 2015 WL 163526 (N.D. Ind. 2015). As a result, Troya's claims are without merit and should be denied.

b. Arbitrariness.

Without citation or support, Troya claims that the "Eighth Amendment's <u>requirement</u> to <u>eliminate</u> arbitrariness in capital cases is undermined by the conflicting demands of consistency in application, and a capital defendant's right to individualized sentencing. These requirements are ultimately irreconcilable." CV-DE 25 at 294, ¶ 2 (emphasis provided). Troya says "the death penalty must genuinely narrow the subclass of offenders upon whom a sentence of death may be imposed and provide a meaningful basis for distinguishing the few cases in which death is imposed from the many cases in which is not, and suitably guide the sentencer's discretion." *Id.* He says because the FDPA "fail[s] to justify the imposition of a more severe sentence on defendants like Mr. Troya against whom the death penalty is sought compared to others found guilty of murder; permit the imposition of a freakish, wanton, arbitrary, and capricious judgment of death; and allow prosecutors to arbitrarily select defendants such as Mr. Troya for capital prosecution without providing consistent guidelines to ensure reliability." *Id.* Troya acknowledges, as he must, that

253

the FDPA sets forth sixteen statutory aggravating factors (some containing multiple sub-parts), *see* 18 U.S.C. § 3592(c), and additionally permits consideration of specified non-statutory aggravating factors "for which notice has been given," *see* 18 U.S.C § 3592, which he claims results in "extraordinary breadth of the statute, [affording] individual prosecutors … virtually unfettered discretion to determine whether to seek death, thereby creating a substantial risk of arbitrariness." CV-DE 25 at 276.

Troya's Motion essentially asserts that because the death penalty is sought and imposed in *few* cases, the FDPA operates arbitrarily and capriciously in violation of the Eight Amendment in *all* cases.  Given the boldness of his opening claim, Troya's Motion turns surprisingly bashful when it fails to apprise the Court that his argument has been routinely rejected by every other federal court before which it has been presented.  *See, e.g., McCleskey v. Kemp*, 481 U.S. 279, 306-07 (1987) (absent showing that death penalty operates arbitrarily and capriciously, defendant can't prove constitutional violation by showing similarly situated defendants did *not* receive death penalty); *United States v. Sampson*, 486 F.3d 13, 23-26 (1st Cir. 2007) (death penalty discretion must be directed so verdicts are reasoned and individualized; government process for seeking death penalty has numerous procedural safeguards; case summaries can't capture the factors unique to each case that lead to verdict; to prevail under Equal Protection Clause defendant must prove purposeful discriminatory in his own case); *United States v. Mitchell*, 502 F.3d 931, 981-83 (9th Cir. 2007) (no right to "inter-case proportionality review"; statistical data about disproportionate impact of death penalty is  insufficient to prove unconstitutionality; rarity of federal executions doesn't render FDPA unconstitutional); *United States v. Briseno,* 2015 WL 163526, *3-4 (N.D. Ind. 2015); *United States v. Taylor*, 648 F. Supp.2d 1237, 1239-41 (D.N.M. 2008) (and authorities cited therein).

254

Indeed, in *Kansas v. Carr*, 577 U.S. ___, 136 S.Ct. 633 (2016), the Supreme Court resolved that in death penalty cases, "[i]n the last analysis, jurors will accord mercy if they deem it appropriate, and withhold mercy if they do not, *which is what our case law is designed to achieve*." Slip op. at 10-11 (emphasis provided). Thus, in essence, Troya's Motion attempts to cast as a vice precisely that which the Supreme Court embraces as a virtue.

To be sure, *Furman* was a *per curiam* decision in which the Supreme Court struck down state death penalty statutes that offered no guidance to the sentencing body and were, therefore, unconstitutional. According to the Supreme Court, it was this lack of guidance that created the possibility that the penalty of death would be imposed capriciously or, even worse, in a discriminatory manner – a possibility that appears to have undermined confidence in the entire system. *See Furman*, 408 U.S. at 309-10 (Stewart, J., concurring).

However, in its post-*Furman* death penalty jurisprudence, the Supreme Court has made clear that its decision in *Furman* was not based on the frequency with which the death penalty was sought or imposed, but rather with the *manner* in which it was imposed. *See, e.g., Kansas v. Marsh*, 548 U.S. 163, 173-74 (2006); *United States v. Gregg*, 428 U.S. 153, 189 (1976); *and see United States v. Sampson*, 486 F.3d 12, 23 (1st Cir. 2007); *United States v. Taylor*, 648 F. Supp.2d at 1240. In so doing, the Supreme Court has explained, as a fundamental matter, that where discretion is afforded to the sentencing body that discretion must be suitably directed and limited to satisfy the Eighth Amendment. *See McCleskey v. Kemp*, 481 U.S. 279, 302 (1987) (*citing Gregg v. Georgia*, 428 U.S. 153, 189 (1976)); *see also United States v. Sampson*, 486 F.3d at 23 (explaining that "the primary emphasis of the Supreme Court's death penalty jurisprudence has been the requirement that the discretion exercised by juries be guided so as to limit the potential for arbitrariness.")

Subsequent to its decision in *Furman*, the Supreme Court clarified that a properly drawn death penalty statute "must (1) rationally narrow the class of death-eligible defendants, and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Kansas v. Marsh*, 548 U.S. 163, 173-74 (2006).  In *Gregg v. Georgia*, the Supreme Court explained, "the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." *Gregg*, 428 U.S. at 195.     Plainly, the FDPA does not lack the guidance or share the other flaws of the statutes at issue in *Furman* and it is the kind of "carefully drafted statute" contemplated by *Gregg* and the Supreme Court's other post-*Furman* death penalty decisions.  To the contrary, under the FDPA, the jury is carefully focused on the defendant and his crime and whether it should impose the death penalty.  The sequence and method with which the jury must determine punishment under the FDPA is well defined and clearly provides for necessary narrowing of the class of death-eligible defendants and an individualized sentencing determination.  *See* 18 U.S.C. §§ 3591-3593; *see also Jones v. United States*, 527 U.S. 373, 376-79 (1999) (detailing the FDPA's sentencing process); *United States v. Nguyen*, 928 F. Supp. 1525, 1532 (D. Kan. 1996) (same).     Accordingly, the FDPA fully meets the requirements of guided discretion, suitably directing and limiting the leeway afforded to the decision-makers. *United States v. Sampson*, 486 F.3d at 24; *see also United States v. Taylor*, 648 F. Supp.2d at 1240 ("[T]he FDPA sufficiently guides and limits the jury's discretion to make it constitutional under the Supreme Court's jurisprudence."); *see also United States v. Mitchell*, 502 F.3d 931, 983 (9th Cir. 2007) ("That federal executions are rare . . . does not render the FDPA unconstitutional.")[66]

---

[66]   To the extent that Troya is claiming that the FDPA runs awry of *Furman* because it grants the

256

Hence, other than Troya's misguided reliance on *Furman*, he offers no other authority for his claim that the FDPA is unconstitutional on the bases of infrequent application or broad prosecutorial discretion.  This is not surprising, because no such authority exists.  In fact, numerous courts have explicitly rejected Troya's argument for the reasons cited by the Government herein. *See, e.g., United States v. Sampson*, 486 F.3d at 23-24; *United States v. Mitchell*, 502 F.3d at 983 (9th Cir. 2007); *United States v. Briseno,* 2015 WL 163526, *3-4 (N.D. Ind. 2015); *United States v. Jacques*, 2011 WL 1675417, *2-3 (D. Vt. 2011), *vacated on other grounds*, 684 F.2d 324 (2d Cir. 2012); *United States v. Basciano*, 763 F. Supp.2d 303, 340 (E.D.N.Y 2011); *United States v. Aquart*, 2010 WL 4363414, *2-4 (D. Conn. 2010); *United States v. Cruz-Ramirez*, 2010 WL 1459446, *4-6 (N.D. Cal. 2010); *United States v. Johnson*, 2009 WL 1856240, *2-3 (E.D. Mich. 2009); *United States v. Barnes*, 532 F. Supp.2d 625, 633 (S.D.N.Y. 2008); *United States v. Taylor*, 2008 WL 217115, *4 (E.D. Tenn. 2008); *United States v. Green*, 2008 WL 4000943, *2 (W.D. Ky. 2008); *United States v. Sablan*, 2006 WL 1028780, *11 (D. Colo. 2006); *United States v. O'Driscoll*, 203 F. Supp.2d 334, 341 (M.D. Pa. 2002); *United States v. Hammer*, 25 F. Supp.2d 518, 546-47 (M.D. Pa. 1998).

In the face of this overwhelming authority, Troya reiterates a handful of selected statistics – regularly rejected by other courts – that at best suggest that the death penalty is rarely sought and obtained in federal courts.  Yet, as Troya well knows, this type of outcome-analysis was explicitly

---

Government unguided prosecutorial discretion to seek the death penalty and because the Government rarely seeks the death penalty, these claims must also be rejected.  This is so, because such claims grossly misconstrue *Furman*, which was not concerned with discretion afforded to the charging body, but rather, only to the sentencing body.  *See United States v. Sampson*, 486 F.3d 13, 23 (1st Cir. 2007) (holding that this same argument "mistakes the nature of the arbitrariness concern in the Supreme Court's jurisprudence" since *Furman*).  The fractured opinions of *Furman* limit only the authority of the sentencing body in imposing a death sentence, not the Government in seeking one.  *See McCleskey v. Kemp*, 481 U.S. 279, 307 (1987).

rejected by the Supreme Court in *Gregg v. Georgia*, 428 U.S. at 199 ("The existence of these discretionary stages [of prosecutions of capital cases] is not determinative of the issues before us.") Moreover, in *McCleskey v. Kemp*, the Supreme Court pronounced that "[t]he Constitution is not offended by inconsistency in results based on the objective circumstances of the crime." 481 U.S. at 307 n. 28. Indeed, as noted above, in its January 20, 2016, decision in *Kansas v. Carr*, the Supreme Court embraced that fact that in death penalty cases "[i]n the last analysis, jurors will accord mercy if they deem it appropriate, and withhold mercy if they do not, *which is what our case law is designed to achieve*." *Carr*, 136 S.Ct. at 633 (emphasis provided).

Troya's Motion has no response to these controlling precedents, nor could it.

For each of these reasons, Troya's claims that the FDPA imposes the death penalty in an arbitrary and capricious manner are without merit and should be denied.

  c. Racial Discrimination.

Troya says Congress enacted 21 U.S.C. § 848(o) for the express purpose of granting "capital defendants the 'right … to justice without discrimination,' requiring juries to certify that racial discrimination played no role in the imposition of the death penalty in specific cases." CV-DE 25 at 295, ¶ 3. Troya claims that "[s]tatistical evidence shows disproportionate prosecution of people of color under the [FDPA]," which he alleges violated his rights pursuant to Section 848(o). CV-DE 25 at 277. Ignoring the one comprehensive study – the 2006 RAND Corporation's $1.6 million "triple-blind" study -- that specifically investigated whether or not race played any role whatsoever in prosecutions under the FDPA (and found definitively it did not), Troya claims that "[m]any studies have demonstrated the significant role that race plays in the criminal justice system generally, and on the administration of the death penalty in particular. These studies reveal … that offenders who kill white people have a significantly higher chance of receiving a death sentence

258

than offenders who kill people of other races." *Id.*[67]  Finally, Troya then says that the Governors

of Maryland, Illinois, and New Mexico signed legislation in their states abolishing their state death

penalties claiming, in their view, that some form of bias existed in their state systems, and that the

Governors of Colorado, Oregon, Washington, and Pennsylvania "have declared moratoria on

execution[s] in their states [based on] concerns about racial discrimination and equal justice in

support of the moratoria." CV-DE 25 at 277-78.

Troya is unable to provide the citation to any case that directly supports his conclusion

while seeking to avoid the fact that his argument has routinely been rejected by other courts.

Inevitably, Troya's claim must fail for the simple reason that the studies and reports he cites do not

– and cannot – begin to meet the burden established by the Supreme Court in *McCleskey v. Kemp*,

481 U.S. 279 (1987), necessary to support either a Fifth Amendment or an Eight Amendment race-

based or geography-based claim.  Yet, Troya advances the same discredited reasoning – statistical

disparity – that has repeatedly been rejected by the federal courts in virtually identical claims.  *See*

*e.g., United States v. Sampson*, 486 F.3d at 26-27; *United States v. Jacques*, 2011 WL 1675417,

*5 (D. Vt. 2011), *vacated on other grounds*, 684 F.2d 324 (2d Cir. 2012); *United States v. Aquart*,

2010 WL 4363414, *4-*5 (D. Conn. 2010); *United States v. Johnson*, 2009 WL 1856240, *5-*6

(E.D. Mich. 2009); *United States v. Barnes*, 532 F. Supp.2d 625, 635-36 (S.D.N.Y. 2008); *United*

*States v. Taylor*, 2008 WL 217115, *5-6 (E.D. Tenn. 2008); *United States v. Sablan*, 2006 WL

1028780, *12 (D. Colo. 2006); *United States v. Llera Plaza*, 179 F. Supp.2d 444, 456 (E.D. Pa.

---

[67]  Troya ignores the concurring opinion of Judge Reena Raggi in *United States v. Fell*, 571 F.3d 264, 276-78 (2d Cir. 2009), in which she analyzes the state and federal capital experience and identifies as the most likely factor in juries' decisions to impose, or not impose, the death penalty is whether or not the victim of the capital murder is (or is not) an "innocent" victim; meaning was not himself/herself involved in criminal conduct, *Id.* at 276-78, which is a logical explanation of the jury's capital determinations in Troya's case.

2001); *United States v. Edelin*, 134 F. Supp.2d 59, 89 (D.D.C. 2001).  Each of these courts correctly recognized that generalized showings of statistical disparity -- without evidence of its applicability to the specific defendant – was foreclosed by the Supreme Court in *McCleskey v. Kemp*.

Because Troya does not, and cannot, identify any evidence demonstrating that unlawful discrimination was applied to him, Troya's claim is without merit and should be denied.

3.  <u>The Court lacks jurisdiction to entertain Troya's claims concerning the conditions of his confinement. CV-DE 25 at 297-301</u>.

Troya claims that the physical and psychological conditions of his confinement in the Special Confinement Unit (SCU) at the United States Penitentiary – Terre Haute (USP-Terre Haute),  where he and other federal death row inmates are confined, "are so dehumanizing, brutal, and severe as to constitute unconstitutional torture" (CV-DE 25 at 297, ¶ 1) which has been "profoundly heightened by years of uncertainty" (CV-DE 25 at 301, ¶ 2).  There is no jurisdiction over these claims in this case, because they are asserted using the wrong vehicle, and in the wrong forum.  The proper vehicle for these claims is a petition for habeas corpus under § 2241(a), and the proper forum for these claims is the judicial district where Troya is confined.   It is well established that the execution of a sentence is not cognizable in a motion to vacate under 28 U.S.C. § 2255.  "Challenges to the execution of a federal sentence are properly brought under 28 U.S.C.A. § 2241." *United States v. Little*, 392 F.3d 671, 679 (4th Cir. 2004).  Challenging the execution of a sentence on the basis of an alleged constitutional violation does not remove it from the ambit of § 2241.  *Id.*  As an alternative to a properly filed § 2241 petition, it appears that Troya could also file a *Bivens* action in his district of confinement challenging the specifics of his execution.  *See Bivens v. Six Unknown Fed. Narcotics Agents*,  403 U.S. 388, 415 (1971); *see also Hill v. McDonough*, 547 U.S. 573, 582 (2006) (permitting a  suit under 42 U.S.C. § 1983 to challenge method of execution).

District courts can grant § 2241 habeas relief only "within their respective jurisdictions." 28 U.S.C. § 2241(a). That statute requires "nothing more than that the court issuing the writ have jurisdiction over the custodian." *Braden v. 30th Judicial Circuit Court*, 410 U.S. 484, 495 (1973). Thus, "[w]henever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement." *Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004).

Troya is domiciled in the United States Penitentiary at Terre Haute, Indiana. Accordingly, this Court is not the proper venue for a § 2241 petition filed by Troya; the Southern District of Indiana appears to have jurisdiction over this question. Moreover, Troya has made no attempt to name his custodian, though the denomination of his pleading invokes both § 2241 and § 2255. In light of these two flaws, this Court should dismiss that aspect of the Petition that seeks the granting of habeas relief – specifically, Troya's challenge to the method of execution. *See United States v. Little*, 392 F.3d at 680; *see also Stanley v. California Supreme Court*, 21 F.3d 359, 360 (9th Cir. 1994) (holding that the failure to name the custodian as a respondent deprived the federal court of personal jurisdiction).

Furthermore, to the extent that Troya's Petition attacks the promulgation of the federal execution protocols, his claim appears to have fallen far afield of the limitations on § 2255 litigation. The statute provides jurisdiction to consider flaws in a criminal judgment, not in the legality of rules for implementing that judgment. *See United States v. Addonizio*, 442 U.S. 178, 185 (1979) (limiting the scope of § 2255 motions and holding that they do not encompass all claimed errors in conviction and sentencing); *see also Brown v. United States*, 610 F.2d 672 (9th Cir. 1980) (holding the motion can test only the sentence imposed and not the sentence as it is being executed).

261

Even if Troya filed his claims concerning his conditions of confinement in the appropriate forum, using the appropriate vehicle, Troya's claims would still fail on the merits. Troya's claims related to the conditions of his confinement and alleged psychological harm from such confinement are *Lackey* claims,[68] which are regularly rejected. *Lackey* claims are grounded in the constitutional principles that constrain the death penalty. While the death penalty can be justified by "retribution and deterrence of capital crimes by prospective offenders," an execution "cannot be so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg v. Georgia,* 428 U.S. 153, 183 (1976) (plurality opinion); *Smith v. Mahoney*, 611 F.3d 978, 998 (9th Cir. 2010). As noted by the Ninth Circuit in *Allen v. Ornoski,* 435 F.3d 946 (9th Cir. 2006), "[t]he Supreme Court has never held that execution after a long tenure on death row is cruel and unusual punishment." *Id.* at 958; *see also Knight v. Florida,* 528 U.S. 990 (1999) (Thomas, J., concurring in denial of certiorari) ("I am unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed.")

4. The Court lacks jurisdiction to entertain Troya's claim that the method of his execution violates the eight amendment and the claim is not yet ripe for review. CV-DE 25 at 282-84.

Troya claims the method of execution under the FDPA might cause "constitutionally unacceptable levels of suffering." CV-DE 25 at 301. Troya claims that the three-drug protocol previously used by the Government to execute prisoners "demonstrated a substantial risk of extreme pain" and will cause Troya "extreme distress, anxiety, and fear regarding [his] impending execution." *Id.* Troya avers that at least one of the drugs in the three-drug protocol "has become unavailable" and that, since 2011, the "government has not yet completed the process of

---

[68]   *Lackey v. Texas*, 514 U.S. 1045 (1995).

262

determining what drug combination will be used instead." *Id.* Thus, Troya complains, he has been "confined under a sentence of death for years without having any idea what method of execution will be imposed upon him…." *Id.* Further, Troya says, he and the other prisoners under sentences of death "have now suffered for many years and will continue to suffer anxiety and fear due to the continuing uncertainty about what method of execution the federal government will select," which exposes Troya to the "continuing, realistic fear that whichever method the government selects will not comport with constitutional requirements." *Id.*

Troya anticipates that the government will use the predominant method of execution by lethal injection to execute him. He further claims that the government may use "imported sodium thiopental" in Troya's execution, which will likely cause him "serious injury and needless suffering" in violation of the Eighth Amendment. As fully set forth above, the government submits that Troya fails properly to present this claim concerning his conditions of confinement or to bring it in the appropriate forum. Accordingly, this Court should summarily dismiss this claim.

In addition to the 2241 issue, Troya cannot challenge his prospective execution because the issue is not yet ripe. Article III of the Constitution extends the judicial power of the United States only to real cases or controversies. *See* U.S. Const. art. III, § 1; *see Kennedy v. Block*, 784 F.2d 1220, 1222 (4th Cir. 1986). Thus, federal courts cannot give advisory opinions in hypothetical cases. *See Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L. Ed. 435 (1806). Among other issues, the question of ripeness bears on a federal court's subject matter jurisdiction under Article III. *See New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1498-99 (10th Cir.1995). Before a plaintiff may obtain an injunction against future enforcement of a law he must show some substantial hardship – the enforcement must be certain and the only

263

impediment to the case's ripeness is delay before eventual prosecution. *See Steffel v. Thompson*, 415 U.S. 452, 462 (1974) (allowing an injunction against police when the plaintiff or his friends had twice before been arrested for distributing the same handbills at the same shopping center); *see Crosetto v. State Bar of Wisconsin*, 12 F.3d 1396, 1403 (7th Cir. 1993). The plaintiff bears the burden of alleging facts sufficient to demonstrate the appropriateness of a judicial resolution. *See Renne v. Geary*, 501 U.S. 312, 316 (1991).

In this case, Troya has made no effort to demonstrate ripeness of his complaints about the federal lethal injection protocol. Quite the opposite, he has premised the balance of this § 2255 motion on claims designed to avoid execution of his death sentence. Furthermore, he agrees that the execution protocol will be subject to amendment prior to his actual execution. Not only does Troya fail to allege facts sufficient to demonstrate ripeness, he affirmatively recognizes that this Court may decline to consider the case on ripeness grounds. Because Troya has failed to undertake any effort to demonstrate the justiciability of this Eighth Amendment claim, this Court should dismiss this claim.

In all, Troya's § 2255 Petition represents an inappropriate mechanism for considering potential problems with an execution that is not slated to occur in this District and might not occur for years to come. This Court should therefore dismiss this claim.[69]

Even if Troya had a ripe claim, had named the correct respondent, and filed his suit in the appropriate venue, he could not obtain relief. *Baze v. Rees*, 553 U.S. 35, 48-49, 61 (2008), is the standard by which Eight Amendment method of execution claims are governed. In *Baze*, the

---

[69] The government interprets Troya's claim as a narrowly focused challenge to the federal method of execution. To the extent that Troya claims a broader challenge to the categorical use of a lethal injection as a method of execution, such a challenge would be based on a new rule that is *Teague* barred.

Supreme Court noted that it has never invalidated a state's chosen procedure for carrying out a sentence of death.  553 U.S. at 48; a*ccord Glossip v. Gross*, ___ U.S. ___, 135 S.Ct. 2726, 2737 (2015).  As reiterated by the Supreme Court in *Glossip*:

> The controlling opinion in *Baze* first concluded that prisoners cannot successfully challenge a method of execution unless they establish that the method presents a risk that is "'*sure or very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent* dangers.' " *Id.,* at 50 (quoting *Helling v. McKinney,* 509 U.S. 25, 33, 34–35 (1993)).  To prevail on such a claim, "there must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" 553 U.S., at 50 (quoting *Farmer v. Brennan,* 511 U.S. 825, 846, and n. 9, (1994)).  The controlling opinion also stated that prisoners "cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative." 553 U.S., at 51.  Instead, prisoners must identify an alternative that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Id.,* at 52.
> The controlling opinion [in *Baze*] summarized the requirements of an Eighth Amendment method-of-execution claim as follows: "A stay of execution may not be granted on grounds such as those asserted here unless the condemned prisoner establishes that the State's lethal injection protocol creates a demonstrated risk of severe pain.  [And] [h]e must show that the risk is substantial when compared to the known and available alternatives."  *Id.,* at 61. The preliminary injunction posture of the present case thus requires petitioners to establish a likelihood that they can establish both that Oklahoma's lethal injection protocol creates a demonstrated risk of severe pain and that the risk is substantial when compared to the known and available alternatives.
>
> The challenge in *Baze* failed both because the Kentucky inmates did not show that the risks they identified were substantial and imminent, *Id.,* at 56, and because they did not establish the existence of a known and available alternative method of execution that would entail a significantly less severe risk, *id.,* at 57–60. Petitioners' arguments here fail for similar reasons. First, petitioners have not proved that any risk posed by midazolam is substantial when compared to known and available alternative methods of execution.  Second, they have failed to establish that the District Court committed clear error when it found that the use of midazolam will not result in severe pain and suffering.

*Glossip v. Gross*, 135 S.Ct. at 2737-38.

For all of his machinations, Troya has not, and cannot, establish that a *future* lethal injection protocol will "create[] a demonstrated risk of <u>severe</u> pain," nor can he establish that such risk is

*substantial when compared to the known <u>and available</u> alternatives*." *See, e.g., Glossip*, 135 S.Ct. at 2738 ("Petitioners do not seriously contest this factual finding [no alternative drugs are available], and they have not identified any available drug or drugs that could be used in place of those that Oklahoma is now unable to obtain.  Nor have they shown a risk of pain so great that other acceptable, available methods must be used.")

Any execution will cause the condemned some pain.  *See Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 464 (1947).  Thus, there is no requirement that the pain of death be totally averted by any method of execution, and this Court lacks jurisdiction to dictate that method unless there is a "substantial risk of serious harm," an "objectively intolerable risk of harm 'that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment," and Troya as identified an alternative that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Glossip*, 135 S.Ct. at 2737 (*quoting Baze*, 553 U.S. at 52), none of which has Troya done or can he do.

For each of these independent reasons, Troya's claims concerning the constitutionality and methods of enforcement of the death penalty are without merit and should be denied.

IV.   **TROYA IS NOT ENTITLED TO RELIEF UNDER THE CUMULATIVE ERROR DOCTRINE (RESPONSE TO TROYA ISSUE XXVII).**

Troya's last claim for relief asserts that he is entitled to have his convictions and sentences vacated due to "cumulative errors" in his trial and appeal.   Troya fails to cite any case law in support of this claim.  Under the cumulative error doctrine, even if individual judicial errors or prosecutorial misconduct would not suffice to warrant reversal, their effect may be evaluated cumulatively to determine if they denied the defendant a fair trial.  *See United States v. Lopez,* 590 F.3d 1238, 1258 (11th Cir. 2009).   "In addressing a claim of cumulative error, we must

examine the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." *Id.* (quotation omitted). Where there is no error or but a single error, there cannot be any cumulative error. *See United States v. Waldon,* 363 F.3d 1103, 1110 (11th Cir. 2004).

Here, the United States has demonstrated how Troya's individual claims of error have failed. The evidence against him was overwhelming. Regardless of the alleged errors discussed above, no reasonable jury could have acquitted Troya on this record, which established unquestionably that Troya had participated in a horrific act of wanton violence that resulted in the multiple members of an entire family, including two innocent little boys. No additional mitigation evidence would have changed the penalty verdict either. The jury rejected a multitude of defense-submitted mitigating factors supported by evidence that did not outweigh the prosecution-submitted aggravators. Under this record as a whole, Troya was afforded a fair trial, and his attorneys rendered constitutionally-sufficient representation.

"The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *Morris v. Secretary, Dept. of Corrections,* 677 F.33d 1117, 1132 (11th Cir. 2012) *citing United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir.2005) (internal quotation marks omitted). This court should address claims of cumulative error, if at all, by first considering the validity of each claim individually, and then examining any errors that found in the aggregate and in light of the trial as a whole to determine whether Troya was afforded a fundamentally fair trial. *See United States v. Calderon*, 127 F.3d 1314, 1333 (11th Cir.1997).

Troya's argument, without elaboration, appears to advance a volume discount theory, bundling all of trial counsel's perceived errors, big and small, into one great mass with a Sixth

267

Amendment denial of counsel label. This approach is not approved by *Strickland*.[70] Troya does not point to any Eleventh Circuit case recognizing the "cumulative error" claim as a basis for relief. In fact, at least one district court has noted that the Eleventh Circuit has declined to adopt a "cumulative error" theory as an independent basis for habeas relief. *See, e.g., Peterka v. McDonough, Sec'y Dept. of Corrections*, 2007 WL 1030078 (N.D. Fla. 2007); *see also Cargill v. Turpin*, 120 F.3d 1366 (11th Cir. 1997); *see generally, Jones v. McNeil*, 776 F.Supp. 2d 1323, 1369 (S.D. Fla. 2011) (indicating that unless the trial was rendered fundamentally unfair, the Eleventh Circuit Court of Appeals has declined to entertain "cumulative error" claims).

Trial counsel here, in both the guilt and penalty phases, vigorously contested the government's case, suggested alternative theories of the murders exonerating Troya, and presented a detailed presentation of Troya's background through family, third party and expert witnesses in mitigation. Counsel's alleged mistakes were not the sort of conduct that creates a presumption of harm under *United States v. Cronic*, 466 U.S. 684 (1984) (noting that if defense counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable). A denial of the Sixth Amendment right to counsel as envisioned in *Cronic* occurs where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 659. In such cases, the adversary process itself becomes presumptively unreliable and there is no requirement to show any specific prejudice. That is simply not what happened here. The entire trial record here, as demonstrated by the United States in this response, amply establishes that

---

[70] The United States does not concede that the cumulative error doctrine even survives the *Strickland* decision which set out the limited avenues available for 2255 relief. *See generally, Johnson v. Nagle,* 58 F. Supp. 2d 1303 at 1352 (N.D. Ala. 1999).

268

Troya's attorneys did not sit idle or fail to subject the prosecution's case to meaningful testing. Troya received a fair trial, and his attorneys rendered constitutionally sufficient representation. Merely lumping all of the allegations into the kitchen sink does not entitle him to relief where no single error has been established on its own merits.

## V.   IN CONCLUSION, TROYA'S MOTION SHOULD BE DENIED WITHOUT A HEARING

In his motion pursuant to Title 28, United States Code Section 2255, Petitioner claims that his conviction and sentence are unconstitutional. Petitioner's claims of ineffective assistance, though numerous and verbose, are either completely contradicted by the record below or are not substantiated by the level proof, or both, and otherwise lack merit. Petitioner's claims of prosecutorial misconduct are speculative, lack any indicia of reliability, are contradicted by the record below, fail to establish any actual constitutional violations, and are procedurally barred. Petitioner's claim of juror misconduct during voir dire is contradicted by the record below, is procedurally barred, and does not establish a constitutional violation. Petitioner's claims that he was convicted of violating an unconstitutionally vague statute and sentenced under an unconstitutional death penalty likewise are procedurally barred and lack legal merit.

It is well settled that the simple filing of a Section 2255 motion does not establish any right to a hearing. *See Newfield v. United States*, 565 F.2d 203, 207 (2d Cir. 1977). A petitioner must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact, which if proved at a hearing, would entitle him to relief. *See United States v. Aiello*, 900 F.2d 528, 534 (2d Cir. 1990); *Newfield*, 565 F.2d at 207. Where a defendant's claims, even if true, fail to state a claim upon which habeas relief can be granted, the claims are subject to dismissal without a hearing. *See Machibroda v. United States*, 368 U.S. 487, 495, 82 S. Ct. 510, 514 (1962); *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991), *cert. denied*, 502 U.S. 1105 (1992). Thus,

no evidentiary hearing is required where, as here, the Petitioner has failed to set forth specific facts supported by competent evidence and the written record conclusively shows that even if every allegation were accepted as true, the Petitioner is still not entitled to relief. *See Anderson v. United States*, 948 F.2d 704, 706 (11th Cir. 1991); *Tejada*, 941 F.2d at 1559; *Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (petitioner not entitled to an evidentiary hearing when his claims are merely "conclusory allegations unsupported by specifics" or "contentions that in the face of the record are wholly incredible.").

For the foregoing reasons, the United States requests that Troya's Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 should be denied in all respects without an evidentiary hearing.

Respectfully submitted,

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY

By:      /s Stephen Carlton
STEPHEN CARLTON
ASSISTANT UNITED STATES ATTORNEY
500 S. Australian Ave., Suite 400
West Palm Beach, Florida 33401-6235
Admin. No. A5500011
Tel. (561) 209-1053
Telefax (561) 659-4526
E-mail: Stephen.Carlton@USDOJ.GOV
*Attorney for the United States*

/s Stephanie Evans
STEPHANIE EVANS
ASSISTANT UNITED STATES ATTORNEY
500 S. Australian Ave., Suite 400
West Palm Beach, Florida 33401-6235
Fla. Bar  No. 255180
Tel. (561) 209-1038
Telefax (561) 659-4526
E-mail: Stephanie.D.Evans@USDOJ.GOV
*Attorney for the United States*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on April 3, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: /s/ *Stephen Carlton*

Stephen Carlton
Assistant United States Attorney

## SERVICE LIST

**Daniel Troya v. United States**
**Case No. 16-80700-CV-BLOOM**
**United States District Court, Southern District of Florida**

**Stephen Carlton**
**Stephanie Evans**
Assistant U.S. Attorneys
Stephen.Carlton@usdoj.gov
Stephanie.D.Evans@usdoj.gov
U.S. Attorney's Office
500 S. Australian Ave, Suite 400
West Palm Beach, FL 33401
Telephone: (561) 820-8711
Facsimile: (561) 659-4526
Attorneys for United States
[Service via CM/ECF]

**Donald Todd Doss**
201 S. Orange Avenue
Suite 300
Orlando, FL 32801
todd_doss@fd.org
Attorney for Plaintiff
[Service via CM/ECF]

**Steven Holt Malone**
1217 South Flagler Drive
Second Floor, Flagler Plaza
West Palm Beach, FL  33401
stevenhmalone@bellsouth.net
Attorney for Plaintiff
[Service via CM/ECF]

273