UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-80700-CV-Bloom
(Case No. 06-80171-Cr-Hurley/Vitunac(s)(s)(s))

DANIEL TROYA,
          Movant,

vs.

UNITED STATES OF AMERICA,
          Respondent.

_____/

### UNITED STATES' RESPONSE IN OPPOSITION TO TROYA'S MOTION FOR DISCOVERY

THE UNITED STATES OF AMERICA, by and through its undersigned counsel, hereby files its response in opposition to Daniel Troya's ("Troya"), Motion for Leave to Conduct Discovery (CV-DE 34).   As demonstrated below, discovery should not be ordered in this case for a variety of reasons:   (i) Troya has failed to meet the requisite legal and factual standards justifying discovery in this collateral §2255 proceeding because his requests rest on mere speculation, not specific allegations demonstrating that discovery, if allowed, would support claims upon which Troya is entitled to relief; (ii) the United States already provided many of the items during pre-trial discovery and showed Troya's current counsel where and when such items were originally disclosed; and (iii) other items sought via a discovery order against the United States are obtainable from third parties by way of a duly issued subpoena.

### Legal Standard

A habeas petitioner is not automatically entitled to discovery.  *Bowers v. U.S. Parole Comm'n, Warden,* 760 F.3d 117, 1183 (11th Cir. 2014).   Discovery should be ordered only where there is good cause shown in advance supported by specific allegations that show reason to believe

that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief. *Arthur v. Allen*, 459 F.3d 1310, 1311 (11th Cir. 2006). Good cause cannot arise from mere speculation or hypothesis, that some helpful information may be found if discovery is ordered. *Id.* The legal standard for "good cause" is a high bar. Good cause for discovery requires a showing to be made with factual support, demonstrating that the evidence sought would raise sufficient doubt about the defendant's guilt to undermine confidence in the result of the trial. *Arthur v. Allen*, 459 F.3d 1310 (11th Cir. 2006) *citing Schlup v. Deo,* 115 S.Ct. 851 (1995).

Discovery requests based on mere speculation should be rejected because the habeas remedy was never intended to provide a means for conducting a fishing expedition for convicted defendants to explore their case in search of its existence. *Saucedo v. Brazelton*, 2015 WL 4481795 (N.D. Cal. 2015). Even in a death penalty case, bald assertions and conclusory allegations do not meet the "good cause" standard. *See Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001) (quoting *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 301 (3d Cir. 1991)); *see also Rivera v. Humphrey,* 2015 WL 3648052 (S.D. Ga. 2015) (order denying discovery in 2254 proceeding finding mere speculative discovery request unsupported by good cause).

If allegedly undisclosed information would not have impacted the jury's verdict, then the district court may properly deny discovery. *Smith v. United States*, 627 Fed. Appx. 852, 855 (11th Cir. 2015); *accord, Benford v. United States*, 2013 WL 6162670 (N.D. Ala. 2013*); see also, Heidler v. Chatman,* 2014 WL 725985 (S.D. Ga. 2014) (in death penalty case, court denied 2254 discovery on basis that there was not a reasonable probability that had the sought-after evidence been disclosed to the defense the result of the proceeding would have been different).

Troya seeks discovery in the speculative hope that a broad search of the files of the United

2

States might develop claims for which there is currently no factual basis. In each of the separate discovery requests, there has been no specific allegation showing, other than speculative hope, that some helpful information might be uncovered. Moreover, as to discovery requests C and G, the United States already provided this information during pre-trial discovery and has previously directed Troya to those disclosures.

A § 2255 proceeding is not a second opportunity to have a full-blown trial on the merits. Rather, the scope of the proceeding is really much narrower. It is designed to redress only "fundamental defect[s] which inherently [result] in a complete miscarriage of justice" and "omission[s] inconsistent with the rudimentary demands of fair procedure." *Hill v. United States,* 368 U.S. 424, 428 (1962) (citing 28 U.S.C. § 2255).

Troya claims that discovery is required because this Court's discretion is not very broad in deciding whether to grant an evidentiary hearing on claims raised in a § 2255 petition (CV- DE 34 at p. 5). Notably however, the only case cited supporting this proposition, *Stead v. United States,* 67 F.Supp. 1064 (D. S.D. 1999), actually declined to conduct an evidentiary hearing. Troya also claims that as a policy matter death penalty cases are special and therefore warrant discovery. In support of this position, Troya cites two cases, *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *McFarland, v. Scott,* 512 U.S. 849, 855 (1994). Neither case stands for the proposition that discovery must be ordered. *Woodson* held only that a North Carolina state statute mandating a death sentence for all first degree convicted murderers was unconstitutional because it lacked the individualized consideration required by the Eighth Amendment. *McFarland* held only that a capital defendant is entitled to a stay of execution if he invokes his constitutional right to assistance of counsel to initiate a habeas challenge to his conviction. Neither of these cases has anything to

3

do with ordering discovery in every § 2255 case, especially, as is the case here, where good cause has not been demonstrated.  The United States agrees that this case concerns serious matters, amongst other things, the murder of two children and their parents.  Nevertheless, following a meticulous trial at both the guilt and penalty stage, and an extensive appellate process, Troya must now meet the requisite legal standards when seeking discovery.  A review of his discovery motion evidences that he fails to meet those standards.

### Discovery Is Not Warranted Given the Vast Amount of Information Disclosed in The Original Discovery Process

The grand jury initially indicted Troya on November 3, 2006 (CR-DE 30).  Discovery commenced immediately.  The United States continued to provide pre-trial discovery in this matter after the return of the third superseding indictment adding capital counts in February, 2008 (CR-DE 305).  Discovery continued through trial of this matter as information was received by the United States.  Prosecutors kept meticulous records concerning the dates and substance of what was disclosed to defense counsel.  Between the beginning of the case all the way up until the eve of trial, the United States provided more than *fifty* discovery-related responses to defense counsel in this case, covering most but not all of the current discovery requests.  *See* Appendix A, (Index of USA Discovery Responses).

Moreover, since the filing of the § 2255 petition in this matter, Troya informally requested discovery from the United States.  The United States responded, providing detailed notice concerning information it already had disclosed in pre-trial discovery.[1]  In fact, the United States utilized its Index, Appendix A, *supra*, in preparing this communication.  Since providing that

---

[1] A copy of the United States' detailed response to Troya's informal discovery request is attached as Appendix B.

4

detailed explanation as to pre-trial discovery items already provided, the United States – with one exception – has received no communication from the defense concerning their collective inability to find documents previously disclosed to predecessor counsel, or concerning the documents they now request in the discovery motion.   Rather, Troya has merely ignored the overture for the most part and continued to demand a detailed response to a boundless fishing expedition without initially making the requisite showing of good cause.

**Each of Troya's Ten Discovery Requests Should be Denied.**

Troya seeks discovery in ten (10) separate requests, to which the United States hereby responds *ad seriatim*.

Each of Troya's discovery requests are listed below, followed by the United States' response.

**Request A.   Documents about the alleged government investigation of prospective jurors** (without any specific allegation of bias extraneous influence on the selected jury) (Troya claim V, pp. 41-53 of his Petition).

The United States has no documents in its possession concerning investigation of petit jury venire members other than a single document, a juror questionnaire with an attached post-it note. The United States has been unable to identify the handwriting on that particular note. The United States will turn over this document separately to defense counsel.

**Request B.   Documents or information in the possession of the Clerk, United States District Court,** concerning the composition and selection of grand and petit juror members (Troya claim VI, pp. 53-63 of his Petition).

The Office of the United States Attorney, Southern District of Florida does not maintain, create, nor receive documentation concerning how the Clerk of the Court composes and selects members of the grand jury and petit jury panels. The request itself seeks discovery from the clerk of the Court, and not from the United States Attorney's Office.   Moreover, good cause has not been shown for discovery on this issue. The United States suggests that this issue has been procedurally defaulted, as it could and should have been raised on direct appeal; therefore, discovery should not now be ordered on such a claim.

5

**Request C.   Documents about expert witnesses:**

**Sub-request C1.   Documents about Firearms and Tool Mark Testimony** (Troya claim XI from p. 104 of CV-DE 25-1)

As to the firearms and tool mark requested discovery, the request is quite detailed:

> *a.   Any and all documents including opinions, reports (including interim or amended reports), memoranda, testing results, bench notes, and correspondence concerning the examination of the casings and projectiles collected from the crime scene, the casings and projectiles collected at Suwanee Drive and Mercer Avenue, the projectiles collected from Garden Court, and the AK-47 rifle collected from Garden Court*

(CV-DE 34 at p. 11).

The United States responded to Troya's informal discovery request that this information

was previously provided in pre-trial discovery as follows:

> *[1] Discovery related to tool mark evidence was provided in pre-trial discovery as follows:*
>
> *1st Discovery Response, [DE 39, Sanchez (11/20/2006); DE 58, Troya (11/27/2006)] included inventory of search warrant, items take from search of Garden Court residence on October 25, 2006;*
>
> *5th Supplemental SDO Response, [DE #176, April 24, 2007]:*
> *        m. ATF reported dated February 7, 2007 concerning testing of certain firearms by ATF Special Agent Steve Barborini, (copy attached to defense counsel copy of this response);*
>
> *        n. additional ATF Exhibits as follows: Exhibits 7, 8, 11, 12, 13, 18, 19, 20, 21, 25, 26, 27 and 29, all of which relate to firearms and violations of federal firearms laws, (copies were attached to defense counsel copy of that response);*
>
> *Please note that paragraphs "m" and "n" cited above relate to firearms but are not believed to related to tool mark evidence, but only operability.*
>
> *        Paragraph A. 6. of this same supplemental response also*

6

*included the following information:*

*a. firearms testing: see response listed under paragraph "A. 5n", supra;*

*b. ballistics results: Indian River Crime Lab, ("IRCL"), two reports, (2), each dated October 25, 2006 from Mark A. Chapman, 4 pages and 1 page, respectively, (copies attached to defense counsel copy of this response);.*

*c. attached to defense counsel's copy of this response are the curriculum vitae of IRCL employees Mark A. Chapman and Earl Ritzline, PBSO employee Beth Rosenthal, chemist, ATF Special Agents Steve Barborini and Jeff Kunz.* **[only Chapman testified about tool mark evidence]**

*6th Supplemental SDO Response, [Docket Entry #202, filed 5/18/2007:]*

*k.    Chain of custody form for projectile recovery reports from St. Lucie County medical examiner.*

*lab results & CV's:*

*a.    amended ballistics report from Indian River Crime Lab, ("IRCL"), Mark A. Chapman; (copy attached to defense counsel copy of that response);*

*March 7, 2008, letter noting additional evidence:*

*a. 404(b) notice on Suwanee & Mercer Avenue shootings;*
*b. PBSO ballistics analysis by Quereau linking weapons for Suwanee & ballistics analysis for Mercer Ave shootings [Quereau]*
*c.    Haverhill shootings by Troya and Sanchez;*

*March 27, 2008 Fed. Exp. packets, Index, papers, CD's, photos, etc., [post-SLSO & DEA review]:*
*a. packets mailed only to: Ruben Garcia* **[Troya]** *, Michael Cohen* **[Sanchez],** *Greg Lerman* **[Lopez],** *Robert Gershman* **[Varela]**
*b. contents included:*

7

> d.   CD which consists of photographs of loaded magazines from Garden Court firearms (SLSO CD#72);

*April 24, 2008 letter enclosing the following:*
> b.   CD labeled 06-110508 containing digital photos of Haverhill shooting;

*May 8, 2008 letter enclosing the following:*
> a. PBSO ballistics lab report, negative match on Haverhill [PBSO Omar Felix]

*June 23, 2008 letter enclosing the following :*
> IRCL ballistics report comparing homicide casings w/ Garden Ct. casings, [both .40 and 9 mm casings have consistent magazine markings]

*June 26, 2008 letter enclosing the following:*
> IRCL ballistics report comparing homicide casings with Garden Ct. casings, [both .40 and 9 mm casings have consistent magazine markings] & c.v. of Jimmie D. Thompson, IRCL adopting same report

*August 12, 2008 letter with attachments:*
> i. curriculum vitae of Omar Felix;
> iii. curriculum vitae of Alison Quereau

*October 17, 2008 discovery letter with attachments:*
> i. lab report of Jay Mullins, PBSO prelim. ballistics**; [note: not believed to be related to tool mark evidence]**

*October 22, 2008 discovery letter with attachments:*
> i. CD-ROM, Suwanee shooting photos;
> ii. CD-ROM, Mercer Ave., shooting photos;
> iii. CD-ROM w/ following attachments:
> > a. (a) crime scene diagram of Suwanee Drive shooting scene, [2 "pdf" files];
> > (b) crime scene diagram of Mercer Avenue shooting scene;
> > (c) curriculum vitae of Karin A. Crenshaw;
> > (d) curriculum vitae of Vonda Bray;
> > (e) photocopy of handwritten note intercepted on

8

> *October 6, 2008 from Daniel Troya;*
> *(f) property receipts relating to various items of*
> *evidence [mostly spent bullets and casings] at each*
> *of the three separate shooting locations:*

> *November 21, 2008 supplemental discovery letter with enclosures:*
> *(c) Chapman chart on research on .40 caliber*
> *projectiles & potential weapons*

Appendix B at pp. 5-8.  *See also* Appendix C, which contains letters of supplemental pre-trial

discovery related to firearms, the three shootings, and tool mark evidence that the United States

provided to Troya.   As of the date of this pleading, the United States has never received

notification from Troya's current counsel that the previously-provided discovery cannot be

located, or asking for additional copies of this data.

Troya also seeks the following additional tool mark discovery:

> b.  *Documents relating to the manufacturer and model of the*
> *microscopes used for comparison purposes, and any manuals*
> *describing proper uses and maintenance of the instrument;*

> c.  *Documents containing internal written policies and standards*
> *for tool mark comparisons and guidelines for rendering an*
> *opinion;*

> d.  *Any and all photomicrographs of the comparison subjects;*

> e.  *Diagrams and/or photographs of subject evidence at all stages*
> *of collection and testing;*

> f.  *Results of all test-firings of the recovered weapon, including*
> *notes, reports, opinions and photomicrographs of the test-*
> *firing subjects;*

> g.  *Copies of written procedures (often called Standard Operating*
> *Procedures (SOPs)) for evidence testing, including procedures*
> *for preparation, instrument analysis, instrument calibration,*
> *and all required quality control practices;*

> h.  *Laboratory quality manuals (however named) in effect at the time the subject work was performed;*
>
> i.  *Laboratory quality procedures (however named), including internal audit procedures, training and qualification procedures, and document control procedures, in effect at the time the subject work was performed;*
>
> j.  *Internal and external audit reports generated or received by the laboratories;*
>
> k.  *For the analysts involved in the subject casework, a copy of the personnel file and all internal and external proficiency testing results for tool mark identification (including sponsoring agency, date(s) performed, responsible analyst, true values, reported results, raw data, scores, related correspondence, and corrective action records, as appropriate); and*
>
> l.  *Access by defense experts to the casings and projectiles collected from the crime scene, the casings and projectiles collected from Mercer Avenue and Suwanee Drive, the projectiles collected from Garden Court, and the AK-47 rifle collected from Garden Court*

(CV-DE 34 at pp 11-12).

As illustrated above, comprehensive and highly-detailed tool mark and firearms evidence already was disclosed by the United States during pre-trial discovery.  *See* CR-DE 58, 176, 202, and Appendix C (ten separate letters of supplemental discovery provided on various dates between March 7, 2008 and November 21, 2008).   The United States did not disclose, nor does it possess, information about the firearms laboratory itself, or the personnel files of any employee of the Indian River Crime Laboratory.

Troya has failed to establish good cause on any of his requests concerning tool marks because he does not allege specific facts that, if disclosed, would demonstrate he is entitled to relief on this claim.   In fact, his request is devoid of any factual allegations that would establish "good

10

cause." Troya's discovery motion simply states in conclusory fashion that "[t]he backup information requested is essential to demonstrating the significant deficiencies in the testimony and other evidence presented at trial regarding ballistics and firearm identification" (CV-DE 34 at 11). There is no explanation of how the sought after information would bolster his arguments that the trial expert testimony should have been challenged under *Daubert v. Merrill Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), that the experts should have been restricted from determining ballistic "matches," that Troya's counsel conducted ineffective cross examination and should have called a defense expert on rebuttal, or that United States engaged in misconduct by presenting misleading testimony. The discovery request is based on pure speculation that the requested items, if they even exist, will turn up something to support his claims.

Troya's recent retention of another tool mark expert does not create a cognizable claim under 28 U.S.C. § 2255 (CV-DE 25 at pp 122-143). To the extent this new expert challenges or contradicts the trial testimony, such a finding seven years after the original trial is irrelevant. New experts who have come to different conclusions, or who might in the future come to different conclusions than the United States' firearms experts, is insufficient to support an ineffective assistance claim. *See Floyd v. Secretary*, 638 Fed. Appx. 909, 920 (11th Cir. 2016) (death penalty case); *Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir. 1997) ("[T]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial.") (death penalty case); *see also Horsley v. State of Alabama*, 45 F.3d 1486, 1495 (11th Cir. 1995) ("That experts were found who would testify favorably years later is irrelevant.") (death penalty case).

Rather, the proper test of whether Troya has been denied effective representation is judged

11

by whether a reasonable lawyer would have acted similarly at trial.  And under this test, trial counsel's conduct was constitutionally sufficient for all the reasons discussed in the United States' Response to Troya's § 2255 motion, including co-defendant Sanchez's penalty counsel's vigorous cross examination of the government's tool mark expert witnesses (CR-DE 758 at pp. 6355-6380; CR-DE 764 at pp. 6660-6692).  *See Johnson v. Nagle, supra*, 58 F. Supp. 2d 1303 at 1340-41(N.D. Ala. 1999), quoting *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). Allowing discovery into all of the minutia of the firearms laboratory, its policies and procedures, its manuals, audit reports, and personnel files -- without specific factual allegations -- would not be based on "good cause," but unfounded speculation, which is contrary to the prevailing case law. *See, e.g. Arthur v. Allen, supra*, 459 F.3d 1310.

> **Sub-request C2.   Documents about cellular telephone evidence** (Troya claim XI from p. 144 of his Petition).

Troya's request here is also quite detailed:

> a.  *Documents concerning or referencing the operational behavior, engineered capabilities, tuning and alignment, maintenance, and service history for cellular towers maintained by Verizon Wireless, T-Mobile, and MetroPCS in Florida during the applicable periods;*
>
> b.  *Documents concerning or referencing system information, cell site, and switch data for T-Mobile cellular towers in Florida and Texas for October 2006;*
>
> c.  *Cell phone records for all cell phone through search, seizure, or voluntary consent;*
>
> d.  *Call detail reports (CDRs) for (786) 853-8416 and (956) 266-2004 for October 2006*

(CV-DE 34 at p. 13).

As to this information, the United States previously informed Troya:

> *[1] USAO does not have this information; if it exists it could be obtained from the cell carriers via subpoena from any party.*
>
> *[2-3] all records in the possession of the government relating to the evidence presented at trial was disclosed pre-trial in discovery; see our detailed response supra, wherein we described all evidence related to Yessica Escobedo's cell phone that we possessed.*

Appendix B at 10.

More specifically, the United States informed Troya:

> *USAO provided discovery of Yessica Escobedo's cell phone records [(956) 266-2004] and other persons' cell phone records at various stages of pre-trial preparation. See responses provided on the following dates: (i) 6th Supplemental SDO Response filed May18, 2007, sections (e) and (f) of that response; 8th Supplemental SDO Response filed August 6, 2007, section (vii) of that response; January 28, 2008, Supplemental Discovery response; November 17, 2008 Supplemental discovery letter from AUSA enclosing CDROM with T-Mobile cell site data; and November 25, 2008, supplemental discovery letter enclosing cell phone subscriber, tolls and cell sight records for Troya, and T-Mobile cell site data (Sanchez, 786-853-8416), all on CDR #1; see also supplemental letter response of December 22, 2008, enclosing a CD-ROM containing: two sets of T-Mobile business records recently received by the United States: (1) an Excel spreadsheet entitledVLR_List.xls which contains a list of telephone switches; and (2) an Excel spreadsheet entitled florida_041907(1) - T-Mobile Cell Site Locationsl.xls which contains a listing of cellular tower site locations;*
>
> *Note also, albeit unrelated to Yessica Escobedo's cell phone, that in the same December 22, 2008 supplemental response additional disclosure was provided concerning Sanchez cell phone records: "another copy of the subscriber and cell site location records for (786) 853-8416. We sent these out earlier but one or more photocopies may have been blocked when copying due to a post-it pad not being removed."*

Appendix B at p. 4.

All records in the possession of the United States relating to cellular telephones, including search warrants, were already disclosed during pre-trial discovery. *See, e.g.*, CR-DE 176, 202, 231; Appendix A at numbered paragraphs 8q, 9e, 9f, 11(i), 11(vii), 15, 17, 47, 49, 51, and 52; and Appendix D (seven separate letters or pleadings of supplemental discovery provided on various

dates between May 18, 2007 and December 22, 2008).   The documented discovery the United States provided included whatever information it possessed related to Troya's requests described above in Requests C2b through C2d.

More specifically, with regard to Troya's request in subparagraph C2d for CDRs for (786) 853-8416 and (956) 266-2004 for October 2006, the United States disclosed the CDRs (also known as toll records) for both of those phone numbers in its Sixth Supplemental Response to the Standing Discovery Order.   *See* Attachment E (CR-DE 202 and tables of phone record information disclosed as part of the United States' Sixth Supplemental Response to the Standing Discovery Order).   The first table in Attachment E reflects that the United States provided toll records for (786) 853-8416 from October 1 through October 14 of 2006 and toll records for (956) 266-2004 from September 9 through October 17 of 2006.   That time period includes days after the murders. At no time has the United States possessed additional toll records (or cell site records) that it did not disclose.

As to Troya's request C2a, which seeks operational data relating to the capabilities of the various systems operated by private carriers, i.e., Verizon Wireless, T-Mobile, and MetroPCS in Florida during the applicable periods, the United States does not have this private, proprietary information.   To the extent it exists, it could have been subpoenaed from those third parties in preparation for Troya's filing his § 2255 motion.   However, Troya still fails to make a sufficient factual showing to establish that there is reason to believe that the information sought from these third parties would allow him to prevail on a claim of ineffective assistance.   As noted above in response to Troya's tool mark related request, locating an expert long after the trial who might have provided favorable testimony is insufficient to support an ineffective assistance claim.

14

*Davis*, 119 F.3d at 1475; *Horsley*, 45 F.3d at 1495.   Moreover, Troya's allegation that his trial counsel was ineffective for failing to show "the misleading nature of cell tower tracking testimony" (CV-DE 34 at pp. 12-13), is belied by the records.   As the United States points out in its response to Troya's § 2255 motion, the trial testimony through direct and cross examination made clear that the evidence did not pinpoint the caller's actual location, but only the location of the cellular tower through which the call connected (CR-DE 756 at pp. 6007-6011 and 6094-6105; CR-DE 764 at pp. 6703-6824).   This request is another speculative fishing expedition in search of a claim that falls short of the "good cause" standard warranting discovery, even a court-authorized subpoena to a third party.

> **Request D.   Documents concerning Brady and or Giglio claims concerning cooperating witnesses**, (Troya claim XVI from pp. 221-225, and claim XV-IAC, pp. 207-225 of his Petition).
>
> Troya seeks very specific information in this category:
>
>> **1.** Documents that contain information that Kevin Vetere, Melvin Fernandez, Carlos Bonilla, and Carlos Rodriguez expected or received any benefit of any type from the government, whether or not that benefit accrued as a result of a formal deal or cooperation agreement;

As to these requests, the United States notes as follows: *Giglio* information pertaining to Vetere was disclosed as follows: (i) supplemental discovery response sent December 22, 2008 with attachments. The United States provided in-court notice and additional disclosure prefatory to Vetere's testimony, *See* CR-DE 754 at pp. 5402 through 5413, (Vol. 21, February 11, 2009).   As to Melvin Fernandez, the government had no agreements with him of any type; there was no agreement to confer any type of benefit on Fernandez to secure his testimony. As to Carlos Bonilla, the undersigned lead prosecutor does not recall any such

15

person connected to this case, and did not call a witness by that name to testify.    AUSA

Carlton also previously caused the original trial team to be canvassed on this same name, and

no one recalled such a witness. As to Carlos Rodriguez, the United States provided

supplemental, delayed *Giglio* concerning him on December 22, 2008.   Other than the

potential for a prospective Rule 35 motion, the United States conferred no other potential

benefits on him in exchange for his trial testimony against Troya. *See, e.g.*, CR-DE 737 at

pp. 4377-78. His case had been resolved, and he was already serving a prison sentence at the

time Troya's case came to trial in January 2009.   (*See e.g.*, Case No. 07-60004-Cr-WJZ, CR-

DE 61 noting Judgment and Conviction entered May 29, 2007).

> 2. NADDIS files for Jose Luis Escobedo (NN 4004649), Yessica Escobedo, Hugo Flores (NN 3239166), Jose Manuel Escobedo, Benito Rodriguez, Danny Varela, Daniel Troya, Liana Lopez, Ricardo Sanchez, Kevin Vetere, Juan Gutierrez, Andres Molina, Servando Salazar, Martin Soto, "Muneco," Oscar Flores- Venegas, Jose Luis Escobedo, Sr. (NN4004649), Belinda Guerra, Rudy Espinosa- Garza, Vicente Garcia, Guadalupe Garcia, Ana Jessica Garza, Fructuoso Garza, Eduardo Diaz, Leonel Diaz, Robert Ruiz, Roberto Carlos Iracheta-Gonzalez, Erlinda Garza, and Ramiro Nevarez, Jr.

NADDIS files are not discoverable; the government will not turn over any NADDIS

information in DEA or DOJ files without a specific court order. The Drug Enforcement

Administration (DEA) maintains investigative files in its database and indexing system known as

NADDIS (Narcotics and Dangerous Drugs Information System).   These files contain confidential

law enforcement information pertaining to various individuals alleged to have some connection to

violations of federal drug laws, whether arrested, convicted, or merely suspected. The files contain

multiple levels of inadmissible hearsay and constitute investigative privileged materials not subject

16

to discovery.   The United States submits that "good cause" has not been demonstrated to exist meriting disclosure of such files, even if they exist.    Troya has not made a factual showing that disclosure of any NADDIS files would raise sufficient doubt about the defendant's guilt to undermine confidence in the result of the trial; and therefore, on this issue as well discovery is not warranted.  *Arthur v. Allen, supra*, 459 F.3d 1310.

### Request E.   Investigating Varela Further.

a. Documents that contradict the government's stated reason for failing to charge Danny Varela with murder; namely, that the government purportedly did not have enough evidence to prosecute him. Such documents include, but are not limited to: any cooperation agreement between Mr. Varela and the government; documents indicating that Mr. Varela provided information to the government, whether or not such information was provided as part of a formal cooperation agreement; documents indicating that prosecution of Mr. Varela would adversely affect any criminal investigation or prosecution; and/or documents indicating that any improper conduct on the part of law enforcement rendered prosecution of Mr. Varela infeasible;

b. Documents that indicate that Mr. Varela was a co-conspirator in the carjacking conspiracy;

c. Documents that indicate that Mr. Varela participated in the murder of the Escobedos in any way, including as an accomplice; that Mr. Varela intended to murder the Escobedos; or that Mr. Varela knew that the murders of the Escobedos would occur beforehand;

d. Documents regarding cooperating witness Mario Davis that Mr. Varela had direct involvement in the murders and from Phillip Perez regarding Mr. Varela's large-scale drug trafficking and gun possession.

e. Documents indicating further investigation of Varela for the murders in this case was conducted since trial.

Response.

[a] there was no cooperation agreement with Varela, ever. To the contrary the government did not even debrief Varela, and in fact filed a sentencing information enhancement under 21 USC 851

mandating a life sentence if convicted of some of the charged crimes.   Varela did not provide any information to the United States prior to trial or thereafter.   No documents are known to exist tending to establish that any prosecution of Varela would adversely affect any criminal investigation or prosecution.   As to Varela's potential involvement in the homicides, the government already provided pre-trial discovery of cellular telephone call records indicating cell tower activity on the night preceding, and the early-morning hours post-dating the homicides between Troya, Sanchez and Varela. See also USA Trial Exhs. 755 and 760.1 through 760.15. Good cause does not exist to order discovery on this request.   Defense counsel was not prevented from arguing that a more culpable person, Varela, was not prosecuted for the homicides; this argument was submitted as a mitigating factor to the jury. *See* CR-DE 859 at p. 12, (Mitigating factor #2).

[b] there are no known documents tending to show Varela was a co-conspirator in the carjacking conspiracy.   Prior to trial however, the United States did turn over cell phone records showing cell contact between Varela and either Troya or Sanchez shortly after the murders.   The tower records revealed however that Varela's phone was in the West Palm Beach area during such calls. The United States submits that good cause has not been shown warranting discovery on the issue of Varela being a conspirator in the car jacking conspiracy.   The non-prosecution of Varela for the homicides was argued at trial, submitted as a mitigator, and found by the jury to have been a mitigating factor. *See* CR-DE 859 at p. 12, (Mitigating factor #2).

[c] No documents are known to exist tending to establish that Mr. Varela participated in the murder of the Escobedos in any way, including as an accomplice; there are no known documents tending to show that Mr. Varela intended to murder the Escobedos; or that Mr. Varela knew that

18

the murders of the Escobedos would occur beforehand; The government has no information that Varela participated in the murders; to the contrary, eyewitnesses placed Varela in West Palm Beach, FL at that time. *See, e.g.*, Testimony of David Doran, trial transcript at p. 3963, (February 2, 2009). Moreover, the previously-disclosed cell phone tower records corroborated those witnesses' reports. *See* trial testimony of Kevin Vetere concerning Varela's actions before and after the murders. (CR-DEs 753, 754 and 756 at pp. 5422-6118). The United States does not believe any records exist tending to establish that Mr. Varela intended to murder the Escobedos or knew that they would occur before hand. Troya also provided an immunized statement prior to trial. The statement was witnessed real-time by Troya's trial counsel, and the defense trial team was provided a copy of a report prepared concerning the details of the statement. The United States submits good cause has not been shown on this request either; we adopt the arguments set out above in subsections [a] and [b].

[d] Documents regarding cooperating witness Mario Davis that Mr. Varela had direct involvement in the murders and from Phillip Perez regarding Mr. Varela's large-scale drug trafficking and gun possession. Government counsel does not have any knowledge of either Mario Davis's or Phillip Perez's existence, or their supposed participation in the charged conspiracy, and did not call them as witnesses. Moreover, Troya has made no factual showing with regard to either of those individuals, and therefore has not established "good cause". We adopt the same arguments made for subsections [a] and [b] above.

> **Request F.   Documents concerning Troya's brain damage** (Troya Claim XVIII at pp. 239-240), **mental health evidence** (Troya Claim XXV at pp. 292-332), **and personal history and background** (Troya Claim XXVI at pp.332-432).

Prior to trial, Troya's trial counsel retained and caused Dr. Wu to conduct a PET scan on

19

Troya and write a report interpreting this scan.    This report was provided to the Government in discovery.    Troya seeks documents consisting of the notes of the government's rebuttal-related expert neurologist or neuropsychiatrist who may have examined the original PET scan of Troya's brain taken by Dr. Wu, presumably at the direction of trial counsel Eisenberg.

In response to the instant claim, the Government investigated whether any note or reports existed concerning this supposed work.   In an effort to cooperate with Troya's counsel, and in response to an "informal discovery request," the government wrote to defense counsel on July 20, 2016, concerning a number of subjects, and explained that during the penalty phase, only one expert, Dr. Michael Brannon, had been retained to perform a mental health examination and only as to Sanchez, not Troya.   CV-DE 49-2.    The government had come to this conclusion following a thorough review of the 42 boxes of trial materials retained at the West Palm Beach U.S. Attorney's Office concerning this matter and discovering that amongst the many witness folders, there was no folder containing information as to any doctor having reviewed Troya's PET scan (commonly referred to as the "Dr Wu PET scan").    This led the Government to the conclusion, held by many months and set forth in various pleadings, that no neurologist or neuro psychiatrist had been officially retained by the government to review Troya's PET scan.   The witness folders and trial materials appeared to be otherwise complete and there was thus no reason to question that conclusion.

On August 26, 2016, defense counsel informed the government that the government was mistaken, and that Dr. Brannon had evaluated Troya.   Defense counsel informed the government that they had Dr. Brannon's report regarding Troya in their possession. The government returned

to its files, located the Brannon report of examination and provided to the defense a document it already had.

The government also contacted Palm Beach County Circuit Judge John Kastrenakes, who was previously an Assistant United States Attorney ("AUSA") and had substantially participated in the trial and penalty phases in this matter. In the division of duties with regard to this case, Judge Kastrenakes, then an AUSA, had handled the facets of the penalty phase pertaining to expert mental examinations.

On August 30, 2016, the government wrote a letter to defense counsel explaining that Judge Kastrenakes had been contacted, and that documents were located that could be responsive to Troya's "informal discovery request" as to any mental examination that had taken place regarding Troya. CV-DE 49-6. The government scanned and sent via e-mail the documents it had discovered. In response to Troya's informal discovery request, the United States had located documents from Dr. Brannon related to Troya, and provided those again to Troya's current counsel. See Appendix F. The documents were not used at trial, and Dr. Brannon offered no evidence against Troya. The government stated (erroneously) that Dr. Brannon had been the only mental health expert to examine Troya and that the information pertaining to *that* examination had been turned over to Troya's counsel during the original proceedings. Upon information and belief, this latter statement remains true now.

The government also represented that contrary to defense counsel's belief, a neuropsychiatrist had not been retained to examine Troya, and any contradictory statement made by then AUSA Kastrenakes during the March 10, 2009, status conference had been in error[2].

---

[2] At a status hearing on March 10, 2009 prior to the beginning of the penalty phase, then AUSA Kastrenakes had

CV-DE 49-6.   The government noted that a review of the government's files reflected only a three-page photocopy of a PET scan.   That photocopy of a PET scan was provided to defense counsel anew in 2016.

Sometime after that exchange, in order to explore every avenue at its disposal, and despite the fact that a review of the files had failed to turn up any records in this regard, the government requested that the fiscal department of the U.S. Attorney's Office (in Miami) conduct a review of its records to see if any other expert witnesses were retained by the United States Attorney's Office for the Troya trial.   During that search, an incomplete agreement and invoice were discovered which reflected that the Government had officially retained Dr. Ray Lopez, and that Dr. Lopez had reviewed records for two hours on March 18, 2009 and had a 1-hour long telephone conference with then AUSA Kastrenakes on March 20, 2009.   When the actual contract was located along with Lopez's bill it was provided to 2255 counsel in February 2017.   CV-DE 83, 83-1, 83-2. 3

The government subsequently contacted Dr. Lopez's office, and learned that Dr. Lopez suffered a debilitating stroke some time ago and is no longer able to communicate.   A search of the government's files again failed to turn up copies of any materials that may have been provided to or received from Dr. Lopez concerning Troya's mental or physical health.   Consequently, the

---

represented that the government had retained the services of a neuropsychiatrist.   A significant issue that was discussed during the hearing was the government's need for an adequate copy of the PET scan if a review was to be conducted by any retained expert.   Since that PET scan was in the possession of Dr. Wu in California, and the trial judge ordered Eisenberg to turn it over to the United States, presumably he would know whether or not he did so. Despite having access to trial counsel, Troya has never proffered whether or not he provided the scan to the government, or directly to Dr. Ray Lopez, much less provided an affidavit or any other reliable evidence on this issue.   The United States made this representation because the internal files of the prosecution in West Palm Beach did not contain records of this retention, and because lead counsel, AUSA Carlton, did not handle any aspect of the government's retention of, or consultation with mental health experts.

3 CV-DE 83-2 contains what appears to be a duplicate invoice dated May, 2009 after the initial invoice apparently did not get paid.

22

government inquired and was permitted to inspect the materials in the possession of Dr. Lopez's medical office.

Dr. Lopez's file was found to contain: (i) a CD-ROM labeled "Troya" that appeared to contain Troya's PET scan, (ii) portions of the Government contract which had not been retained by the USAO, which stated that Dr. Lopez was being hired "to evaluate the defense medical reports, review the defendant's PET scan and other brain imaging data, assist the government in cross-examination of defense experts and be prepared to testify in rebuttal, if necessary."; and (iii) a 30 page fax from AUSA Kastrenakes which included defense expert reports, curriculum vitae [pertaining to Dr. Wu], and still images from Troya's PET scan.   The file did not appear to contain any indications that Dr. Lopez formed any conclusions, or even made any notations, concerning his review of records or the telephone conference with then AUSA Kastrenakes billed in the Dr. Lopez invoice.   The only handwritten notation in the file was a reference to Kastrenakes's telephone contact information.   Pages had been prepared for the doctor's notes, but those pages were devoid of any notes.   It should be noted that neither Dr. Lopez's file nor the file invoice retained in the USAO fiscal department indicate that any reports were ever authored or billed by Dr. Lopez.

Although the government regrettably and inadvertently provided incomplete and inaccurate information regarding whether more than one doctor was retained to be involved in a review of Troya's mental state, the conclusion remains the same: there do not appear to be any undisclosed reports or opinions concerning Troya's mental or physical health.   Consistent with the prior representations made by the government, the incomplete agreement and invoice do not

23

definitively reflect that Dr. Lopez had formed any opinions as to whether Troya's PET scan showed brain damage or that any report had been authored.

March 20, 2009, the day of the status conference, was a Friday when Court was not in session. Troya rested his penalty case on March 23, 2009, without putting on any mental health evidence.   It would make sense, therefore, for the March 20, 2009, status conference to represent the last work Dr. Lopez did on this case as his services would have no longer have been needed. Indeed, the Dr. Lopez invoice was dated March 24, 2009, the day after the defense rested in the penalty phase.   Moreover, there certainly do not appear to be any records indicating that any material, exculpatory conclusions were drawn regarding Troya's mental state or brain damage.

The Eleventh Circuit has firmly held that "there is no suppression, and thus no *Brady* violation, if either the defendant or his attorney knows before trial of the allegedly exculpatory information." *Felker v. Thomas*, 52 F.3d 907 (11th Cir.1995) (*citing United States v. Valera,* 845 F.2d 923, 927–28 (11th Cir.1988)).   As there is no factual or legal support for Troya's claim that a *Brady* violation occurred—and substantial support that it did not—discovery should not be ordered.   Last, Troya's claim of a Brady violation with regard to Dr. Lopez is procedurally barred. The facts underlying Troya's claim, namely that the government had retained an expert to review Troya's PET scan, has been known to the defense since at least March 10, 2009, three years before Troya's appellate brief was filed.   Troya has not explained why this Brady claim was not pursued on appeal, let alone establish cause and prejudice.   For these reasons, Troya's claim of a Brady violation with regard to Dr. Lopez is procedurally barred and, even if it were not procedurally barred, fails on the merits, and discovery should not be allowed on such a claim.

24

**Request G.   Documents relating to uncharged shootings proved at trial** (Troya Claim XXI, Section 14 at pp. 189-191).

Here, Troya seeks:

> *Documents relating to the investigation of a shooting on April 28, 2006, at 1305 Suwanee Drive, Apartment B, West Palm Beach; the investigation of a shooting on April 28, 2006, at 1910 Mercer Avenue, West Palm Beach; and the investigation of a shooting on September 11, 2006, on the 1300 block of Haverhill Road in West Palm Beach.*

The United States has already provided the documentation in its possession related to these shootings during pre-trial discovery.   In response to Troya's informal discovery request, the United States provided the following detailed outline of the pre-trial discovery it had provided to trial counsel on these shootings:

> *Broken down separately as Suwanee, Mercer & Haverhill:*
>
> *Suwanee:*
>
> *3/07/2008 letter of additional evidence:*
>     *a.    404(b) notice on Suwanee & Mercer Avenue shootings;*
>     *b.    PBSO ballistics analysis by Quereau linking weapons for Suwanee & ballistics analysis for Mercer Ave shootings [Quereau]*
>
> *10/22/08 discovery letter w/ attachments:*
>     *i. CD-ROM, Suwanee shooting photos;*
>     *iii.    CD-ROM w/ following attachments:*
>         *a.    (a) crime scene diagram of Suwanee Drive shooting scene, [2 "pdf" files];*
>         *(c) curriculum vitae of Karin A. Crenshaw;*
>         *(f) property receipts relating to various items of evidence [mostly spent bullets and casings] at each of the three separate shooting locations:*
>
> *Mercer Ave.:*
>
> *3/07/2008 letter of additional evidence:*
>     *a.    404(b) notice on Mercer Avenue shooting;*
>     *b.    PBSO ballistics analysis by Quereau for Mercer Ave*

25

*shootings [Quereau]*

*10/22/08 discovery letter w/ attachments:*
        *ii.        CD-ROM, Mercer Ave., shooting photos;*
        *iii.       CD-ROM w/ following attachments:*
                *(b) crime scene diagram of Mercer Avenue shooting scene;*
                *(f) property receipts relating to various items of evidence [mostly spent bullets and casings] at each of the three separate shooting locations:*


*Haverhill:*

*3/07/2008 letter of additional evidence:*
        *c.        Haverhill shootings by Troya and Sanchez; 4/24/08 letter enclosing the following:*
                *b.   CD labeled 06-110508 containing digital photos of Haverhill shooting;*

*5/8/08 letter enclosing the following:*
        *a. PBSO ballistics lab report, negative match on Haverhill [PBSO Omar Felix]*

Appendix B at pp. 6-7.

As with other claims for which Troya seeks Court intervention, the United States already specifically informed Troya about the pre-trial discovery it had previously provided and where to find it.  As of the date of this amended response, the United States has never received any communication from Troya's current 2255 counsel that the discovery earlier provided by the United States either could not be located or that Troya's prior counsel did not turn such documents over to Troya's 2255 counsel.

Moreover, the United States provided in advance of direct examination any *Jencks* material it had prior to calling any witness with knowledge of these shootings, *e.g.,* Kevin Vetere, Kelly Ghumrawi, Traci Hayes, Elizabeth Rodon, Angela Culpepper, Neil Sielinski, Brandon Orr, and Jeff Cunningham, (*See* CR-DE 757 and 758 trial transcripts from February 18-19, 2009).

26

While Troya claims his trial counsel was ineffective for conceding his involvement in these shootings, he makes no effort to explain how additional discovery in this area would support his claim.   It appears, instead, that the discovery request is based on the speculative hope that a search through the files of local law enforcement might produce something helpful to his case.   He has not made a specific factual allegation demonstrating that he would be entitled to relief if discovery was allowed on the uncharged shootings beyond what was already provided pre-trial.   Because of this factual omission, good cause has not been demonstrated, and discovery should not be allowed.

**Request H.   Documents relating to alleged arbitrary application of the death penalty, including documents relating to post-conviction conditions of confinement at Terre Haute Penitentiary** (Troya Claim XXIII at pp. 267-284).

The United States Attorney's Office does not have possession of, nor access to such documents to our knowledge. Such documents would be in the possession of the Bureau of Prisons.

**Request I.   Documents relating to dangers of traveling to Matamoros, Mexico** (Troya Claim XXIV at pp. 284-292).

On this request, Troya seek documents related to:

> *Any investigation that was undertaken by the U.S. Government or cooperating agencies prior or subsequent to trial related to the charges in this case, and any measures taken by any investigators, law enforcement or otherwise to ensure their safety.*

(CV-DE 34 at pp. 18-19).

Discovery should not be ordered on this request.   Defense counsel already have in their possession documents related to the dangers of traveling to Matamoros, Mexico. *See, e.g.,* CV-DE 5-18 detailing Matamoros risk assessment.

Troya's claim that some still-hidden key in Matamoros would have unlocked a potential defense or additional mitigation is wholly unsupported.   The most Troya indicates is that an

27

investigation in Matamoros might have revealed additional information about Varela's drug trafficking history (CV-DE 25 at 304).   But Troya is silent about how such information would have changed the outcome of his case.   Further, neither any travel information nor Varela drug trafficking information would have helped Troya beyond what was already presented at trial. Connecting Varela to the Mexican Cartel would have resulted in connecting Troya to it as well, considering that the Third Superseding Indictment charged a drug trafficking conspiracy. This deficiency is especially problematic for Troya since his trial counsel successfully argued in mitigation that Varela was an equally culpable co-defendant who did not face the death penalty (CR-DE 859 at p. 12) (Ten jurors finding the mitigating factor that "[a]n equally culpable co-defendant, Danny Varela, will not be punished by the death penalty").   Accordingly, the unsupported request does not warrant discovery.

**Request J.   Documents withheld by the following agencies from Troya's prior written requests:** ATF, DEA, FBI, BOP, FDLE, West Palm Beach Police Department, and Greenacres City Police Department, and documents withheld by non-governmental entity Crimestoppers (Troya generally alleges relevant to all claims).

Troya seeks "all documents within the U.S. Attorney's file, since the file relates to all claims raised" (CV-DE 34 at p. 19).   Additionally, Troya requests records from ATF, DEA, FBI, BOP, FDLE, West Palm Beach and Greenacres Police Departments, and Crimestoppers.

The request for the entire U.S. Attorney's file deserves short shrift.   As noted above, Troya is not entitled to discovery unless he can show with specificity how such records would support a cognizable claim.   As detailed above, Troya has not made any such showing related to specific records.   Accordingly, he certainly has not established with specificity how a wholesale review of the entire U.S. Attorney file would bolster any particular claim.

As to Troya's requests related to other agencies, the United States already notified Troya

28

in response to his informal discovery request that the United States Attorney does not have this information and does not know what, if anything, was withheld by any organization. *See* Appendix B at 12-14. The Court should not order discovery for these separate entities. Again, as described above, Troya has failed to show how records in the possession of these agencies are likely to support any of his allegations. The Court should not countenance discovery requests premised on unsupported speculation. *See Winthrop- Redin v. United States*, 767 F.3d 1210, 1218 (11th Cir. 2014) (*citing Machibroda v. United States*, 368 U.S. at 495, 82 S.Ct. 510 (1962)) ("The district court was not required to allow a fishing- expedition based only on [the defendant's] incredible allegations."). As this request falls short of the required "good cause" standard, it should be denied.

## **Conclusion**

In compliance with its pre-trial discovery obligations, the United States already provided a wealth of information. Now, after an appeal rejected on its merits, Troya seeks additional discovery without demonstrating the legally-required factual support. His claims are not based on the requisite showing of good cause. Troya has not provided specific factual support demonstrating that the evidence sought via discovery would raise sufficient doubt about his guilt

to undermine confidence in the result of the trial or imposition of the death penalty.   For this reason, his discovery requests should be denied.

Respectfully submitted,

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY


By:     /s Stephen Carlton

STEPHEN CARLTON
ASSISTANT UNITED STATES ATTORNEY
500 S. Australian Ave., Suite 400
West Palm Beach, Florida 33401-6235
Admin. No. A5500011
Tel. (561) 209-1053
Telefax (561) 659-4526
E-mail: Stephen.Carlton@USDOJ.GOV

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on April 3, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.   I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: /s/   *Stephen Carlton*
Stephen Carlton
Assistant United States Attorney

31

## SERVICE LIST

**Daniel Troya v. United States**
**Case No. 16-80700-CV-BLOOM**
**United States District Court, Southern District of Florida**

**Stephen Carlton**
**Stephanie Evans**
Assistant U.S. Attorneys
Stephen.Carlton@usdoj.gov
Stephanie.D.Evans@usa.doj.gov
U.S. Attorney's Office
500 S. Australian Ave, Suite 400
West Palm Beach, FL 33401
Telephone: (561) 820-8711
Facsimile: (561) 659-4526
**Attorney for United States**
[Service via CM/ECF]


**Steven H. Malone**
1217 South Flagler Drive
Second Floor
West Palm Beach, FL 33401
Phone:   (561) 805-5805
stevenhmalone@bellsouth.net
[Service via CM/ECF]


**D. Todd Doss**
Federal Defender's Office, MDFL
201 South Orange Ave., Ste. 300
Orlando, FL 32801
Phone:   (407) 648-6338
stevenhmalone@bellsouth.net
[Service via CM/ECF]

32