IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
CASE NO. 9:16-cv-80700-BB


DANIEL TROYA,

     Plaintiff,                       June 2, 2017
                                   9:07 a.m.
     vs.

UNITED STATES OF AMERICA,

     Defendant.                  Pages 1 THROUGH 70

_____


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE BETH BLOOM
UNITED STATES DISTRICT JUDGE

Appearances:

FOR THE PLAINTIFF:   STEVEN H. MALONE, PA
                     STEVEN HOLT MALONE, ESQ.
                     1217 South Flagler Drive, 2nd Floor
                     West Palm Beach, Florida 33401

                     DONALD TODD DOSS, ESQ.
                     201 South Orange Avenue
                     Suite 300
                     Orlando, Florida 32801


FOR THE DEFENDANT:   UNITED STATES ATTORNEY'S OFFICE
                     STEPHEN CARLTON, AUSA
                     STEPHANIE D. EVANS, AUSA
                     500 South Australian Avenue, Suite 400
                     West Palm Beach, Florida 33401


COURT REPORTER:     Yvette Hernandez
                     U.S. District Court
                     400 North Miami Avenue, Room 10-2
                     Miami, Florida 33128
                     yvette_hernandez@flsd.uscourts.gov

(Call to order of the Court, 9:07 a.m.)

COURTROOM DEPUTY:  Calling Case Number 16-80700, Civil, Troya v. United States of America.

Counsel, please state your appearances for the record.

MR. CARLTON:  Good morning, Your Honor.  For the United States, Assistant US Attorney Stephen Carlton and Stephanie Evans.

THE COURT:  Good morning.

MR. MALONE:  Good morning, Judge.  On behalf of Mr. Troya, Steve Malone.  And with me is Todd Doss.  And Barbara Kowal is a paralegal in the Federal Public Defender's Office with Mr. Doss.

THE COURT:  Hi.  Good morning to each of you.

MR. CARLTON:  Good morning.

MR. MALONE:  Good morning.

THE COURT:  I've certainly had the benefit of reviewing all the briefing, but the Court did schedule for hearing today three motions:  The movant's motion for leave to conduct discovery, Docket Entry 34; the movant's motion to interview jurors, Docket Entry 33; and the Government's renewed motion for a court order finding the attorney-client privilege was waived.

Before we proceed to argument, I do wish to advise that the Court scheduled this for hearing and did anticipate giving you all the time that was necessary in order to make

additional argument.

Unfortunately, I have a funeral that I have to attend today at 11:00 so I would need to leave here at 10:30, but I certainly know that you have taken the time to be here.  And I'm happy to accommodate your schedules in the event that you cannot provide the answers to some of my questions and finish your arguments before 10:30.  I can be back this afternoon and we can proceed from 1:00 to 2:00.  And then following that, I have several matters this afternoon.  We could then pick up again at 3:00.

But I'm not certain what you anticipated.  Right now, we have the little less than 90 minutes and I would suggest that if the schedule works for each of you, that the movant would begin for 30 minutes and then the Government would then respond for 30 minutes and then there would be a rebuttable on each side since, obviously, Mr. Troya has two motions pending before the Court and the Government has one.

Would that schedule be acceptable or do you believe that you'll need additional time?

MR. MALONE:  That's acceptable, Judge.  I believe we've briefed all this, as Your Honor knows.

THE COURT:  You have.  You have.

MR. MALONE:  So, you know, to the extent the Court has any issues or questions, I think we're -- we're fully prepared to answer those.

MR. CARLTON:  We concur.

THE COURT:  All right.  Then let's see if we can use the time wisely.  I do have the benefit of your briefing and I would also like to take the time to conduct a status conference with regard to timing and scheduling and the like.

So with regard to the specific questions that the Court has, and giving each of you an opportunity to respond, I'll be very specific with regard to the claims.  As we know, there have been nine claims asserted by way of the movant's leave to conduct discovery and then one omnibus claim.  The Court does have a question and I'll actually list the questions and then you can take the time to respond.

With regard to Claim 5, my question would be to you, Mr. Malone, and that is:  Did the jury consultant that Mr. Troya retained look into the background of all of the jurors or at least the seven that are the subject of the claim for juror misconduct, and to what extent?  That would be the first question.

With regard to Claim 6 -- and that is the ineffective assistance of counsel based on the racial composition of the jury -- my question is:  Even assuming that the jury composition was not racially balanced, how would the documents that you're seeking assist you on the Strickland challenge?

With regard to Claim 11, also, the ineffective assistance of counsel for failure to retain and consult with

experts, my question is:  Would the records that you're seeking even have been available during the pretrial period; that is, for example, the personnel records that you're seeking?

And with regard to Claims 15 and 16, that is the -- relating to NADDIS, and those records for the 29 individuals, would those have even been discoverable during the pretrial phase before Judge Hurley.

Relating to the Government's motion for a leave to conduct discovery, while I -- I know that there are some issues and, certainly, the Court is in agreement that a Rule 6 motion with specific interrogatories would be most appropriate, as opposed to an order for the Court to enter an omnibus order relating to the attorney-client privilege.

My question is with regard to the ineffective assistance of counsel claims:  What portions of the trial counsel and appellate counsel's files will the movant be relying upon and will those counsel be testifying?  And if those claims are presented, are the documents underlying those claims, which are the basis of the request for production, discoverable?

And to the Government, Mr. Carlton, my question, which is obvious, is:  Haven't you somewhat skipped over the requirement to establish good cause for each of the interrogatories and request for production that you have made?  Putting aside, under Rule 33, it appears that the 77

interrogatories clearly have exceeded what is permitted.

So I would like to have those questions answered as part of your presentation and then we will address the issue of -- of a -- a scheduling order.

So Mr. Malone or Mr. Doss?

MR. DOSS:  Your Honor, if I may.  I -- I would address the question regarding the juror consultant.

Our understanding was a juror consultant was to be mutually shared.  We have not located any information that indicated that the juror consultant was able to conduct a thorough review of the questioned jurors that we have listed out in our motion for juror interviews and our claim within the Amended 2255 as well.

THE COURT:  I'm sorry.  When you say you haven't located, have you, in fact, determined whether the jury consultant conducted any type of background investigation?  I know that Judge Hurley gave counsel the questionnaires in advance.

Was there any investigation done by Mr. Troya's jury consultant during that period of time?

MR. DOSS:  From the records that we have, it appears that the jury consultant was more sitting in on the -- on the -- listening to the jurors' proposing questions and making suggestions as to who to strike or not to strike or any follow-up questions, is -- is what we've gleaned from the files

and from speaking with counsel.

THE COURT:  So, Mr. Doss, the answer would be that the jury consultant did no background investigation of any of the jurors, including the seven that are the subject of the motion to interview.

MR. DOSS:  That's our understanding.  Correct, Your Honor.

THE COURT:  All right.

And, Mr. Doss, since you're going to be addressing that, actually, my additional question with regard to Docket Entry 33, the motion to interview the jurors, is the following, and that is that:  You stated that you want to interview the jurors to -- and I'm quoting from Docket Entry 33, Page 2:  "To explore the circumstances of the misconduct and to obtain the necessary facts." However, you've also stated by way of that motion that all of the information was contained within the -- the questions that were asked.  And, specifically, on Docket Entry 104, Page 4, you stated:  "The false statements at issue in Mr. Troya's case were all made during voir dire proceedings before the jury was selected and sworn."

So if, in fact, all of that information was given by each of the jurors, my question to you is:  What specific questions would you be asking of the alternate Gooch, the juror Sollenberger, Livermore, Thomas, Barba, Little, or Boser.

MR. DOSS:  Our understanding, Your Honor, is -- is

that the test that's laid out as far as McDonough that we had cited, as well as the Fell and the Sampson cases that were capital 2255s, they kind of had a -- had a similar issue that, first, you have to determine was the juror being dishonest.

It appears so from what we've gleaned from the public records databases; however, we don't know the relationships between individuals.  We don't know how well they're acquainted with certain individuals to -- to make a full, if you will, a more ironclad demonstration of dishonesty, as opposed to maybe -- maybe they didn't know as to one of these -- to one of these relatives.

We all have relatives that are -- that are black sheeps, for -- for instance, that maybe -- maybe they didn't know and they didn't -- and they didn't respond because of that.  But it certainly appears on -- on its face that they were dishonest and it needs to go -- we need to be able to delve into that.

In both the Fell and Sampson cases, they also went in to discover the materiality of the responses and whether or not those, for instance, were situations where it was rather irrelevant as -- as to that particular juror or whether it would cause them some kind of issue to rise to the level of a -- of a challenge for cause.

Both, particularly in Fell, they had the benefit of -- there was no rule prohibiting them from -- from interviewing

the jurors and they actually spoke to the individuals in their -- in their homes, places of business and things of -- of that nature.

So they had a little bit more information going in than what we have. Yet, the Court still conducted the -- the interviews to get to the bottom of it, if you will, to determine exactly what kind of impact those have.

I -- I think we've all been in plenty of trials where sometimes these -- these types of responses lead to challenges for cause, and sometimes -- and sometimes not. And that's something that we need to be able to establish. And we've established it as much as we can without violating the local Rule 11 in interviewing the jurors. And I think that we fully pled a claim and that now we would be entitled to the -- to the discovery, if you will, of a judicially controlled interview of the jurors, as is contemplated by Rule 11.

THE COURT: So Mr. Doss, you gave the Court one question that you would ask because it certainly -- if the Court were to permit -- even putting aside the issue of the Court's local rule, if the Court were to permit the juror interview, it would not be a free-for-all, so to speak. There would be precise questions that would be asked.

So you've provided the Court with one question and that is whether the jurors, the particular jurors that have family members that it's disclosed that there are criminal

records -- whether the jurors knew of the family member's criminal background. What other specific questions would be asked of these sitting jurors?

MR. DOSS: Well, each -- each one has a -- a different situation, Your Honor. I don't know if you -- if you would like for me to go through each particular juror or -- or -- or more generally. I guess that -- maybe that was my -- my misunderstanding.

THE COURT: Well, that would be a general with regard to those individuals that had a criminal history. And you -- you've laid out the issues relating to the particular juror's background, but my question is what -- and perhaps it would be helpful, for example, let's just take Dorothy Barba. The claim is that she failed to disclose her family member's problem with illegal drugs.

What question would be asked of Ms. Barba?

MR. DOSS: Well, particularly as to Ms. Barba, we had -- we had discovered that her grandson, Justin Patrick Guthrie, had been arrested and it appears like during that period -- during the period of time of her service that he would have been possibly trafficking in Oxycodone based upon a subsequent arrest just a -- a month or two after the -- after the trial ended as well. That continued on into the next year. And that would be something that was directly germane to the Question 24, where she doesn't -- you know, whether -- where

she indicates that she had a -- her son had an issue with drugs. But she never indicates her grandson.

We would like to know whether or not she was aware of her grandson's problem, what extent she was aware of it, what -- how often she came into contact with her grandson, where he -- where he resided and she resided to be able to determine the nature and the extent of the contact between the two and whether or not she, in fact, had the knowledge, and with the follow-up question being: Would that knowledge -- you know, knowing that knowledge, I think at a trial, we would want to ask would that cause you -- would that cause you any -- any pause as far as being able to be impartial towards Mr. Troya? Since she had a -- a grandson that seemed to be going through a -- a serious drug addiction or dealing in drugs, as the case may be, as much as we can tell on the surface, Your Honor?

THE COURT: All right. Thank you.

MR. DOSS: I don't know if Your Honor wants me to do that as to -- as to each of the questioned jurors, or -- or -- or not, or if you would like for us to simply submit questions subsequent to the -- to the hearing for the -- Your Honor's review. I -- I can do it either way.

THE COURT: Well, it obviously leads to a question as to whether the -- the records -- and I'm not quite sure when Mr. -- although the documents reflect a date as to when this FOIA request was made and the documents were received.

But is there a dispute that these, in fact, are the records that belong to family members that are part of the jury panel?  And perhaps that question is to Mr. Carlton.

Is the Government conceding that these records that were attached to the 2255 are, in fact, records of the family members related to these jurors or is that a factual issue?

MR. CARLTON:  I think I have to stand in the nature of a demurrer.  The Government doesn't know.  There's been an allegation that persons who have -- whose records have been provided are family members of the jurors, but does the Government know that and/or has it conducted an independent investigation to verify that?  The answer is no, we have not.

I do not have any proof to contradict that.  But it's the Defendant's burden to establish that they are, in fact, family members.  I don't know that the record as it exists right now establishes that definitively.

THE COURT:  Understood.

So, Mr. Doss, just so that I understand, the questions would be asked, the extent of the awareness by the jurors and the one alternate juror as to the family members' criminal background and the effect that it may have had on their ability to serve?

MR. DOSS:  That is the subject matter that would be explored, Your Honor.

THE COURT:  Okay.

13

MR. DOSS:  And I believe that there's one or two that also have additional issues.  As the Court probably recalls, Diane Gooch was actually -- the records we have, it appears like she was a convicted felon and served as an -- as an alternate on the jury and specifically denied having any -- any such conviction.

As well, I believe it's Connie Thomas has relatives that may have been employed in the state attorney's office.  That would be something that we would need to verify that that, in fact, was her sister.

And so those are -- you know, we would -- we would verify those facts, but the best we can tell from the -- from the databases and connecting addresses and date of births and those types of things, we -- we do believe each one of these is a -- a family member as much as we can tell from the public records without directly asking the question to each one of the questioned jurors.

THE COURT:  So your questions would be specifically related to the documents that you have obtained and whether these jurors were aware of these particular circumstances.

MR. DOSS:  Right.  That would be the narrow focus, Your Honor, is establishing the knowledge of -- of the documents and the extent of contact with these individuals, which, again, would pertain to their -- to their knowledge indirectly as far as what kind of contact did they have with

the individuals.

THE COURT: All right. And the reason I -- I ask is that at another point in the briefing, the movant stated that absent juror interviews, the Defense is blocked from determining whether this alternate juror might have similarly made statements to the regular jurors, affecting the jury's deliberation in a prejudicial manner.

So my question really relates to the extent of the questioning. If it's solely to confirm that these are records of family members and whether there's an awareness of the family members' assumed criminal record, that's one thing. If it -- if they are questions that are going to be posed with regard to discussions that occurred during the trial before the alternate was discharged, then the Court would need to know the extent of the exploration.

MR. DOSS: Your Honor, the reason that -- and that is a unique one among -- among the seven only because it had come up -- my recollection from the transcript is Mr. Kastrenakes had raised the issue that one of the officers from federal probation and parole had indicated that he had word that Diane Gooch was talking about the case to coworkers at her place of employment, which my recollection is it was a car dealership where she was a title officer at the car dealership. And now knowing that she was potentially dishonest about being a -- a felon and that she was possibly talking there raises the issue

of whether she was discussing the case pre-deliberation with the other jurors.

And we would like to pose those questions to her as to whether there was any conversation prior to deliberations, fully acknowledging the 606(b) doesn't allow us to get into the deliberations themselves, but prior to the deliberations during the trial, I think that that would be an appropriate question for her based upon the unique circumstances as to Ms. Gooch.

THE COURT: And now that was a -- an issue that was raised by Mr. Kastrenakes before Judge Hurley during the trial?

MR. DOSS: That was correct. And Judge Hurley's -- and I'm paraphrasing, Your Honor, basically said: "We'll deal with it if she ends up being seated" -- or not seated, but going back in deliberations. She never was, and Judge Hurley believed that that took care of the problem.

THE COURT: So even had there been a request by trial counsel to interview that individual, Judge Hurley believed that that was not appropriate. It was implied by his statement that it would be -- I guess he would explore it if, in fact, she was part of the panel going back to deliberate?

MR. DOSS: Neither Defense counsel for either side nor the Government asked for an inquiry, Your Honor.

THE COURT: Understood.

And, Mr. Doss, is it your intention to interview the seven jurors or all sitting jurors?

MR. DOSS:  No, Your Honor.  These seven.

THE COURT:  All right.  Because I thought that I --

MR. DOSS:  I don't believe I can establish good cause for the other five at this time.

THE COURT:  All right.  So you're conceding that it would not relate to the entire panel, if, in fact, the Court allowed the interviews.

MR. DOSS:  That is correct, Your Honor.

THE COURT:  Okay.  Thank you, sir.

MR. DOSS:  You're welcome.

THE COURT:  Mr. Malone.

MR. MALONE:  Judge, on your second question, regarding Claim 6, what would our additional discovery request, if provided -- how would that assist the claim?

THE COURT:  How it would assist you on the Strickland challenge, yes.

MR. MALONE:  Well, on six is the -- is the cross-section claim.  Is that the one -- we're talking about the same claim?

THE COURT:  Yes.

MR. MALONE:  Yes.  So on the cross-section claim, we have to establish underrepresentation systematically or in Castaneda for a significant period of time.

We have -- we have obtained a number of AO-12 reports so we're not obviously seeking those again.  But to establish

17

the underrepresentation over a significant period of time, we're seeking the additional years for the -- the reports in the census data that the administrative office of the courts uses.

We've -- we've set forth a prima facie case, I believe, from just what we've gotten from those years, but our claim, you know, it requires us to show a significant period of time.

THE COURT:  And, Mr. Malone, I -- Claim 6 is -- is a claim of an effective assistance of counsel, is it not, based on the racial composition of the venire?

MR. MALONE:  Yes.

THE COURT:  Yes.  So with regard to that claim, could you apprise the Court, even assuming that these documents supported the -- the claim that -- that in this -- in this particular panel that there was not a balance, that is, in effect, there was, as you claim, a racial imbalance, how do the documents support your claim of ineffective assistance of counsel?

MR. MALONE:  There are documents, almost -- almost all, yes.  I think the ones that we requested would have been available for the -- for the years prior to trial and the trial counsel should have investigated and collected them.

THE COURT:  So the claim is that a reasonable attorney would have collected these documents at the time?

MR. MALONE:  And made a systematic challenge, same as we have, correct.

THE COURT:  All right.

MR. MALONE:  On Claim 11, dealing with the experts and how does that assist, how would discovery relate to that claim?

THE COURT:  Whether those records would have been even available during the pretrial --

MR. MALONE:  Would have been available.

THE COURT:  -- process.

For example, the personnel records, whether those records would have even been discoverable during that period of time.

MR. MALONE:  Well, if I could separate that out, Judge.

THE COURT:  Certainly.

MR. MALONE:  The records requested in terms of being discoverable under Rule 16 is a -- is a different standard from what we can get under Rule 6, the habeas Rule 6.  So I don't -- I don't think that that's the standard to look at as to whether under Rule 16 it would have been discoverable.  It's whether we can discover it now.

THE COURT:  Well, isn't it -- isn't it embodied within an ineffective assistance of counsel claim?

MR. MALONE:  Could counsel have -- could counsel have discovered the same things?  Yeah.  Well, to the extent these

are public records, just a Chapter 119 request to the state records would have been sufficient to get, for instance, personnel records.

THE COURT: So the claim with regard to Claim 11 is these personnel records would have been discoverable under a FOIA request?

MR. MALONE: Well, yeah, I believe the experts we're discussing here were State employees so under Chapter 119, they would have been discoverable.

THE COURT: All right.

MR. MALONE: I mean, we've talked about several experts in here. So I want to make sure I'm answering your questions.

If I could also add, Judge, that we have an alternative pleading that some of the Government's expert testimony was erroneous, misleading, and -- at Page 121-F.

So we have a separate claim -- not a separate claim, but a separate legal theory that -- that the -- the experts put on by the Government just presented testimony that was unreliable and misleading to the jury.

I don't know if that answers your questions, Your Honor.

THE COURT: It answers the question that the records that you're seeking, that you're claiming would have been available would have been by way of a FOIA request. And I'm --

MR. MALONE: Right.

THE COURT: -- for example, the personnel records.

MR. MALONE: Right.

THE COURT: Understood.

And with regard to Claims 15 and 16, the NADDIS records for the 29 individuals, would the same argument apply, that that would be discoverable through a FOIA request?

MR. MALONE: I suspect there would be a -- yeah. I suspect there would be an objection to a -- to a FOIA request and that anything would be redacted, if we got anything from a FOIA request. However, Rule 6 and Rule 16 itself would -- would not have permitted it. However, Rule 6, again, is broader than Rule 16 and, you know, that is partly ineffectiveness. But we also have Brady claims related to several of the individuals we've alleged.

So our legal theory for that would be that there was information that was -- you know, that was helpful to the Defense that was withheld from the NADDIS records.

THE COURT: But the --

MR. MALONE: Discoverable now.

THE COURT: But as I understand from the briefings, the Brady information with regard to the cooperators was already provided by the Government. You're seeking specifically the NADDIS records for 29 individuals.

And are you stating that because it's embodied within

an ineffective assistance of counsel claim that the inability to fully cross-examine these cooperators was because these NADDIS records were not available at the time or were not requested?  So are you advising the Court that these NADDIS records would have been available in -- by way of -- how would you -- how would trial counsel have accessed these?

MR. MALONE:  I don't believe trial counsel would have been able to get those records.  Am I correct?

THE COURT:  Well, doesn't that then undercut the ineffective assistance of counsel claim if trial counsel would be unable to obtain the records that you're now seeking?

MR. MALONE:  I agree.  But again, we have alternative claims of a Brady and Napue violations and Giglio violations.

And if I could -- if I could just say, Judge, that, yes, the Government pretrial disclosed what they said was their -- their cooperator benefits letters to -- to counsel.  But, again, under Rule 6, we're permitted to get memorandum of when -- when the US attorneys talked to them, the agents' -- agents' notes when they spoke with the witnesses.  It's much broader than Rule 16.

So that compliance with Rule 16 does not mean it's complied with Rule 6 of the habeas rule, is what I'm saying.

THE COURT:  I understood with regard to Rule 6.  I understand the basis for the discovery.  My question was more by way of the claim that was raised.

MR. MALONE:  I think the Court's observation is correct, that the trial counsel would not have been able to get the raw NADDIS records at trial.  Sure.

THE COURT:  All right.

MR. MALONE:  If I could add one more thing, Your Honor.  I -- I don't want to minimize.  We have a claim at the end of our discovery request that deals with FBI, DEA, and ATF records.

(System went down.)

THE COURT:  Okay.  Mr. Malone, I apologize.  The system is now up.

MR. MALONE:  Oh, no problem, Judge.

So we have the request for the FBI, DEA, and ATF files, Judge, and I think we put in our motion and explained to Your Honor that we made FOIA requests to all these and other agencies.  We got back, I would say, hundreds of pages -- hundreds of pages that just says:  "Redacted."  Right? Maybe -- maybe thousands.

So -- and Mr. Doss took appeals of those.  So those records we think at this point, the Court would be authorized or the Court has the authority to issue subpoenas duces tecum and if the agencies then have objections, we can air that out.

And if the Court needs, we have lists of documents, you know, we requested, and then lists of -- you know, we have their responses which shows the redacted numbers -- page

numbers.

THE COURT: You've actually set forth in your briefing the documents that were, in fact, redacted.

MR. MALONE: All right. Thank you, Judge.

THE COURT: That's on Page 19 of Docket 34 with regard to those four exhibits.

Mr. Malone, did you want to address the issue of the attorney-client privilege and what portions of trial counsel and appellate counsel's files the movant will be relying upon?

MR. MALONE: Judge, I don't -- when you asked that question, I started going through my mind the thousands of pages that are in the file. I can't even -- I know we would rely on Dr. Woo's PET scan, but I couldn't -- I couldn't list them now.

I mean, to the extent you need specific --

THE COURT: Well, I don't need specific, but as to those thousands of pages, would you agree that if the movant is going to be relying upon those documents in support of its ineffective assistance of counsel claims, that those documents would be discoverable and there would be no attorney-client privilege that would attach?

MR. MALONE: Whatever doc -- yes.

THE COURT: So have you identified for the Government -- and the reason I ask is the Government obviously is going to need to establish good cause with regard to the

24

request for production and the interrogatories that were attached to their motion. But my question to you is: I understand the argument with regard to a broad brush of the attorney-client privilege being waived for all purposes.

MR. MALONE: Right.

THE COURT: But addressing specifically the ineffective assistance of counsel claims and the documents that trial counsel and appellate counsel will be specifically relying upon, and you will, wouldn't those documents be discoverable?

MR. MALONE: Yes.

THE COURT: Have you made an effort to provide those documents to Mr. Carlton?

MR. MALONE: I have not gone through what we might rely on at an evidentiary hearing yet, Judge. I just haven't gotten that far. If -- should the Court order an evidentiary hearing, then I'd be able to do that.

THE COURT: I'm assuming at some point, you've reviewed them in support of the ineffective assistance of counsel claim.

MR. MALONE: Yes.

THE COURT: And the reason I ask is -- that is if, in fact, those documents are discoverable and the attorney-client privilege is waived, then perhaps it would obviate the need for the Government to set forth good cause when it's already been

somewhat conceded that there is good cause for these documents because the movant is going to be relying upon them as part of his claims.

MR. MALONE:  Yeah.  We agreed there's an implied -- there's an implied waiver that's very narrow and has to be, you know, carefully tailored.  And, certainly, Judge, if we're going to rely on a document, the Government's entitled to it.

THE COURT:  Would it be preferable for you to identify those documents that you're relying upon and then the Court would then find that as to those documents there is an implied waiver?

MR. MALONE:  I -- could I have just a moment, Judge?

THE COURT:  Certainly.

(Pause in proceedings.)

MR. MALONE:  Would this be anticipating that the Court orders an evidentiary hearing on the entire ineffective assistance claim?  I mean --

THE COURT:  Well, obviously, it's clear to the Court that with regard to that specific motion, that the Government has somewhat anticipated that these documents will be needed in preparation for an evidentiary hearing.  What I don't want to do at this point is make a determination that an evidentiary hearing is warranted.

MR. MALONE:  Right.

THE COURT:  The Government has stated that these

documents that they're seeking by way of the request for production are prospective in nature and only if the Court determines that there are contested issues of fact that would require an evidentiary hearing.

I think at this point, it would be important for the Court to know what documents are not in dispute in terms of those that the movant is going to be relying upon and then to provide those to the Government so that both sides can have the benefit of addressing any claimed disputed issues of fact.

MR. MALONE:  Yes, Judge.  Could I just say, theoretically, I've, you know, done a lot of ineffectiveness claims and I can -- from when I went through the file, I can identify things that the Government would want to rely on, for instance, in a hypothetical case.

So if you would ask me to identify what we're going to rely on, I could also figure that there's going to be some things that's in the file that the Government would need also to counter that.  So ...

THE COURT:  I'm just merely asking -- the documents that the movant is going to be relying upon, I'm certain that we will address the issue of the good cause for any additional documents, whether, in fact, they are not discoverable by virtue of an attorney-client privilege or even a work product privilege.

So putting that aside, I'm just addressing those

that you would -- by virtue of using them, conceding that the attorney-client privilege has been waived.

MR. MALONE: Right. Again, I can't identify them all now.

THE COURT: And I'm not expecting you to identify them today.

MR. MALONE: Right.

THE COURT: Perhaps I'm asking whether they can be identified at some point and then, certainly, that would obviate the need for the Court to address each document since it has already been subject to a waiver.

MR. MALONE: That can be done.

THE COURT: Okay. Thank you.

Mr. Malone, is there anything further, sir?

MR. MALONE: On those -- on those issues, not -- not at this point, Judge.

THE COURT: Is there anything further that you wanted to emphasize to the Court or anything that has taken place since the briefing?

MR. MALONE: Nothing further beyond what is in our briefing, Judge.

THE COURT: Okay. Thank you, sir.

Mr. Carlton or Ms. Evans?

MR. CARLTON: Thank you, Your Honor.

Let me address the issues in the order that they were

28

raised.

Our position with regard to Issue 5 concerning the Court's question as to whether or not Troya's jury consultant looked into the background of the jurors, our position is that the substantive ground raised could have been raised on a direct appeal. And there's a procedural bar there to raising this issue now.

The questions that are raised there, certainly, the employment of a juror consultant, the process that -- or the procedure, rather, that was used prior to trial was the submission of a large number of juror questionnaires that were distributed to the attorneys about a month ahead of time. Then the attorneys -- the trial lawyers worked together to weed out persons who obviously could not serve, whether due to a variety of different reasons; employment issues, illness, inability to serve, vacations, et cetera.

Only after that process was done did individual voir dire occur. That process took about three weeks and there was in the courtroom each day, either Monday through Thursday or Monday through Friday, a jury consultant that I believe both of the death penalty counsel jointly relied upon and, certainly, that person at that point in time had the ability to conduct detailed background investigation because the process that was utilized by Judge Hurley was to bring in one panel in the morning and one panel in the afternoon.

That process went on until around -- between six and nine different panels were conducted.  And then after all of the strikes had occurred, preliminary for cause strikes, the pool had been winnowed down and additional venire questions were posed by the Court and counsel.

And as a crossover with regard to the other issue concerning asking questions of individual jurors that's desired now, many of those questions were asked by Judge Hurley and the lawyers as to would anything in their background cause them to not be fair to either side in the case.

So it appears now that that would be somewhat superfluous since a careful review of the trial record is -- will review -- or, rather, will reveal that that was done in detail ahead of time during the actual trial.

With regard to the racial composition issue, that's one that is -- that issue also could have been raised.  We believe that it's procedurally barred for the reason that, if I'm not mistaken, we brought to the Court's attention the fact that appellate counsel caused the record on appeal to be supplemented by numerous docket entries that related to those types of issues.  And I believe that those entries were -- the criminal docket entries that were supplemented in the record on appeal, were 1,111 through 1,118.

Now, with regard to the Issue Claim 11, failure to consult experts, again, this issue was not claimed on appeal.

I believe that this issue at this point in time is limited to the following:  The issues that are claimed in the 2255 with regard to experts are confined to two or three, at the most, different subject areas.

The first is a firearms expert.  Firearms experts were utilized in two different areas.  The first was there was a tool mark expert called who was an employee of the Indian River State College crime lab, which is an independent crime lab affiliated with the State of Florida.  And I believe it's shared by several different law enforcement agencies serving that state judicial district, which would include the counties of Martin, St. Lucie, Indian River and Okeechobee counties. It's not a federal agency.

The data that counsel seeks now is not within the control -- when I say "the data," what I mean is proprietary information pertaining to that -- how that lab is operated; its testing, its protocols, its procedures; all of that type of -- of data that's internal or proprietary to that lab.

The US Department of Justice, the US Attorney's Office doesn't have -- we don't control that.  We don't have access to that.  That's something that -- that's available to the extent that it could be requested under the state statutes, which Mr. Malone referred to.  I think it's Chapter -- he called it Chapter 119, the Sunshine Act.

But those types of things were not covered within the

Rule 16 discovery.  What the Government did provide as it relates to the toolmark evidence -- and I believe that the witness whom we called was Mark Chapman.  It's either Chapman or Chapman.  I forgot the spelling.  He was the expert, the toolmark examiner from the Indian River County crime lab -- I misspoke -- the Indian River State College lab.

We turned over and made available in discovery not only his reports, but his CV.  There was extensive cross-examination done during the trial of the limits of his opinion and the challenges to the science itself.  Most of that cross-examination was done by Sanchez's defense attorney, death penalty qualified counsel, Donnie Murrell.  Most of that was done by him.

We did turn -- I don't believe there's currently a dispute that the Government turned over all of the Rule 16 discovery with regard to the tool mark examinations that Chapman did.

What that would consist of, so that the Court has an idea of the universe of data, is the following:  The murders occurred on the side of the Florida turnpike at Mile Marker 149 in St. Lucie County.  The crime scene evidence that was uncovered at the site of the quadruple homicides consisted of various shells and casings that were recovered at the scene, as well as bullets or fragments recovered from the bodies, which the medical examiner extracted upon autopsy.

That was one set of questioned evidence. And the testimony at trial was that two separate caliber weapons, two separate weapons were used to fire the shots that hit all four of the individuals, Mr. and Mrs. Escobedo and as well as the two little boys, Luis Damian and -- and Julian.

Those murders occurred October 13th around 2:30 in the morning of 2006. On October 25 of 2006, pursuant to ensuing investigation, a search warrant was conducted in Palm Beach County of the residence that was at trial identified by codefendant, Kevin Vetere, as Thug Mansion where all of the Defendants, Varela, Liana Lopez, Juan Gutierrez, who pled prior to trial, as well as Daniel Troya and Ricardo Sanchez lived. A large amount of narcotics, firearms and bullets were recovered there, bullets and ammunition. It was -- and as well as various magazine -- pistol magazines.

It was the comparison of ammunition recovered at the homicide scene compared to ammunition recovered at the site where Troya and Sanchez lived that was offered at trial, the tool mark comparison, in which Chapman testified that marks on unfired bullets had -- had etchings or markings that were consistent with ones found at the murder scene.

So we turned over everything with regard to that and I don't think that there's anything with regard to physical evidence, his opinion, his qualifications that is still at issue. I believe that they concede that we -- we, the US

Attorneys Office, under Rule 16 discovery, turned over all of that. The only thing that remains is whether the Court would order discovery as to the proprietary items that the Indian River State College crime lab may have.

With regard to the personnel file, there's been no allegation that there is any misconduct. It's frankly a fishing expedition to get Chapman's file to see if there's anything out there. There's been no good-faith basis cited to believe that there's anything in that file that would be discoverable in that regard.

The second issue of firearms testimony that occurred during the trial was with a firearms examiner who was employed by the Palm Beach County crime lab, which is affiliated with the sheriff's office. She testified with regard to an examination of projectiles that had been fired from an AK-47. The AK-47 was found at Thug Mansion. I believe it was in Danny Varela's closet -- bedroom closet. And she compared projectiles from that with two different unsolved shooting incidents, which were uncharged shootings that were tied -- that were presented at trial. One was in Westgate that the Government presented evidence that Ricardo Sanchez had attempted to murder someone whom he believed was messing around with his girlfriend, his ex-girlfriend, and the mother of his baby.

And the second one was -- actually, there were three

34

shootings. The second one was one that was in eastern West Palm Beach, that testimony was given was a shooting in which Daniel Troya was linked -- linked to and alleged to have fired a weapon into a house in an attempt to harm someone whom he believed had provided information to law enforcement that resulted in him being prosecuted in state court and sent to state prison.

Those were two of the incidents that that witness testified about. We turned over all of the ballistics. We turned over all of her resumé and her results. She was thoroughly cross-examined at trial.

And there was a third incident on Haverhill Road, which was tied to the drug conspiracy in which there was a shooting. There was testimony that -- I believe it was Mr. Troya and one other person of the Varela gang was involved in attempting to murder someone as they exited a strip club and were driving down -- and I think this was on Haverhill Road.

And as to that incident, there had been testimony that the basis or the reason for that shooting incident was the belief that the occupant of a vehicle seen driving away from the strip club, that the vehicle itself had been seen casing Thug Mansion.

And there was testimony that the group had been the subject of a violent home invasion in which a large quantity of cash and drugs were stolen from Liana Lopez and Jose Luis

35

Escobedo.  And as a result of that, the group decided to move to a different house.  That different house was Thug Mansion in suburban West Palm Beach.

And there was testimony from Kevin Vetere that it was believed by the gang members that a car with a Miami Hurricanes license plate was casing the Varela residence and the group feared that they might be the victim of another home invasion to -- to rob guns -- I mean money and drugs.  And so it was an anticipatory strike against what they believed to be a threat against the group.  That was the third shooting.

I don't believe that they are seeking any documents from the Palm Beach County Sheriff's Office or the personnel file of -- of that -- that firearms examiner.  And I think that there's no -- I do not believe that there's currently an issue that the Government did not comply with the Rule 16 discovery as to all of the evidence related to those three shooting incidents.  We presented evidence at trial, ballistics at all three scenes, and -- and expert testimony and her CV was disclosed ahead of time.

Now, with regard to the -- I don't think that there's an issue requesting discovery, but there was another issue that's raised in the 2255 and that has to do with the issue of the medical examiner; in other words, the -- a forensic pathologist.  If the Court will recall, and I don't want to digress more than about 30 seconds on this, but there was a

substitute medical examiner testimony at trial. That was done by consent.

At the time I believe that that was done, that certainly comported with existing law. The law has changed and we've addressed that in our brief. But I don't believe that there's any issue of discovery that they are seeking from any third party with regard to either the original medical examiner or the substitute medical examiner.

THE COURT: It's not contained within the briefings.

MR. CARLTON: I -- it's not there. Let me move on.

Let me move on to Claim 15, the NADDIS files. A couple of points are important here.

Number one, NADDIS files typically are -- NADDIS, N-A-D-D-I-S, all caps, is an acronym for the Narcotics and Dangerous Drugs Information System. It is a database maintained by the DEA which contains information that is background, investigatory in nature, concerning investigations of what are suspected to be trafficking in controlled substances.

Those files typically exist in the form of what's commonly known as a DEA 6, which is a memorandum of interview that an agent may have with an individual. At the end of those reports typically is an indexing section in which the agent is required to list any persons that might have been mentioned by the interviewee, and then there's a cross-reference with a

NADDIS number. If the reader wants follow-up information on a person who's mentioned in the Index section, it would be a cross-reference indicator.

In current parlance, almost like a hyperlink to -- it's -- it's not technically a hyperlink, but in current technology, in other words, giving that reference number would enable the reader to find another cross-reference mention of that same person.

These are not discoverable. I've been a assistant US attorney working criminal cases in this district for 27 years. I have never had a Rule 16 request -- not a request. I've never had a Rule 16 obligation to ever -- or a holding that these individual files are discoverable. They are filled with hearsay, double hearsay, triple hearsay, rumor, innuendo.

Where they are discoverable is in the situation where a individual is interviewed by the DEA and that person gives testimony at trial. To the extent that that witness agrees that the report constitutes his or her statement -- in other words, if it -- if the witness agrees that the report accurately reflects what he or she said to the DEA and therefore adopts it, it does become Jencks and the Government has an obligation to disclose it if it calls the witness at trial.

The Government also has an obligation if there is individual Brady or Giglio that might apply to one of its

witnesses, or Brady across the board -- it would have an obligation to turn over this information. The Government is, frankly, adamant that it did comply with its Brady and Giglio obligations in this case. The only individual that's listed in the Defense request for discovery who was called as a live witness is Kevin Vetere.

And the Government turned over a plethora of statements that Vetere had made in debriefings, in -- in trial prep. He was a -- an insider member of the conspiracy, an important trial witness. We turned over not only his statements, but a significant amount of Giglio on the individual.

There's also a discussion on the record -- I believe he testified on either February 11th or February 14th, I don't recall the exact date, but it's around -- it's between February 9th and February 14th of the trial transcript, in which it was revealed that Vetere's family had been provided benefits in connection with Vetere's anticipated testimony because there had been a confirmed death threat against the family in the case.

Those benefits were disclosed prior to him testifying. And the fact that he was in the -- it is a matter of public record that he was in -- he was given benefits by the Marshal's service as a result of a confirmed threat against himself, that was revealed. It was provided prior to direct examination and

cross-examination.  And the transcript will reflect that notwithstanding the significant nature of that Giglio that counsel made -- trial counsel made a conscious strategic decision not to cross-examine Mr. Vetere on that benefit that had been given to him in order to magnify -- in order to avoid magnifying the importance of the issue.

We continue to assert that there is -- the request for these NADDIS files are improper under either Rule 16 or Rule 6. There's been no showing -- none of the other people that are mentioned here were called as trial witnesses.  There's been no showing that they have suffered prejudice as a result of the Government not turning any of those over.

With regard to the -- and with regard to the other witnesses, we did turn over all Giglio information and prior statements in its possession with regard to two other cooperators, a jailhouse informant by the name of Carlos Rodriguez, and a Troya childhood or a boyhood friend by the name of Melvin Fernandez.  I believe that there's a concession that the Government has turned over all records in its possession that relates to those persons.  We -- we complied with our Rule 16 obligations.

With regard to the assertion that the Government should reveal information favorable to the Defense in terms of its agreements or reports with Danny Varela, there was no interview of Varela.  There was no plea agreement with Varela.

In fact, the Government filed a mandatory 851 sentencing enhancement notice under 21 USC Section 851, which resulted in -- after Varela was convicted of drug trafficking in this case, he was sentenced to mandatory life in prison.  There was no agreement with the Government not to prosecute him for the murders.  There was no agreement with him to do anything.  And there is no evidence, and there's been no showing that such records exist.

And, in fact, the independent evidence, as borne out by the Government's 851 filing, establishes corroboration for my representation to the Court as an officer of the Court that there was no agreement at any time with Danny Varela.

With regard to FOIA requests, requests made to the FBI, the ATF, the DEA, we concede those are federal agencies; however, I have never been provided the actual request sent to those agencies, nor been provided with a list by those agencies of what documents it was releasing or what -- what documents it was withholding or what documents it was redacting.  I have no knowledge of that process and that continues to this day.  I am aware that although Mr. Malone didn't mention it, there was a request filed with the US Attorney's Office, a Freedom of Information Act request.  I believe it was timely filed prior to the 2255 being filed here.  I am aware that in response to that, I prepared -- under the general request of the Department of Justice lawyers assigned to deal with that FOIA request, I

41

prepared a very, very detailed index of 42 boxes of records that are still in the Government's possession in my West Palm Beach office.

I provided that to them, but I'm not involved in the Government's response or decisions as to what documents to turn over, what documents to redact. I made recommendations, but other than giving them that index some time ago, I haven't had any involvement. And I do not know the current status. I asked for a report prior to coming today. I did not get one.

THE COURT: Sorry. Let me just stop you, Mr. Carlton.

You're saying that you're not aware whether the movant, Mr. Troya's counsel, has been provided those documents? You provided an index.

MR. CARLTON: I provided an index. I do not -- I have not received any information that they have been provided the documents under the FOIA request.

THE COURT: All right.

MR. CARLTON: Now, I don't have an explanation. I will candidly concede I don't have an explanation as to whether that -- where we are, where the Government is and the FOIA attorneys are in that process. I just don't know.

I will represent to the Court that I would assume that normally -- well, I -- I can't make assumptions. I would state that I would -- I would think that they would have contacted me to get copies. I know that we know how much -- how many

records there are.  There are approximately 78,000 pages of records based on our estimate of -- of how many pages per box and there are -- there are 42 boxes.

I will represent that all of those boxes contain the Rule 16 discovery that we've made.  About four of those boxes contain them.  The rest of the boxes contain legal research, copies of appellate briefs, our own investigative files, US -- AUSA work product, background research, et cetera, et cetera.

So it's not 42 boxes of evidence, per se.  It's just everything that was accumulated.  I made sure knowing that this was a very important case to keep everything that we had and everything that we had accumulated.  So ...

THE COURT:  All right.

MR. CARLTON:  I just wanted to inform the Court of that, in all candor.

THE COURT:  Thank you.

MR. CARLTON:  There are two other institutions for which public records requests have been made that the Government has either no knowledge of nor any control of.  That's the West Palm Beach Police Department.  The Greenacres Police Department.  That's a suburban Palm Beach County police department.  And finally Crime Stoppers, which I think is an independent third-party organization that may not even be subject to -- it's certainly not affiliated with the Federal Government or run by the Federal Government.  I don't know if

it's affiliated with the Palm Beach County Sheriff's Office.

With regard to -- does the Court wish -- may I address the attorney-client privilege issue?

THE COURT: You -- you may --

MR. CARLTON: Okay.

THE COURT: -- although I think the Court's made clear that the Government has an obligation under Rule 6 to set forth a fact-specific showing of good cause before the Court would allow the discovery.

MR. CARLTON: Yes. Let me address that, if I could.

This case is as unusual as it gets with regard to not only prosecution -- federal prosecution but also 2255s. This is the only federal capital prosecution that resulted in death verdicts in this district since the advent of the federal death penalty. It is a beast of its own. There is no other 2255 in this district ever that relates to -- you know what it is, basically four capital verdicts; two for Troya and two for Sanchez.

So it's a -- it's a -- the 2255 petition that was filed on behalf of Defendant Troya was 446 pages long. What the Government wants to do in the case -- and admittedly, inartfully, perhaps not technically complying with the rule, yes, we submitted a request that's more than the usual limit for interrogatories. I concede that point candidly.

As far as establishing good cause, I laid out and/or

attempted to lay out in the Government's motion, attempting to establish good cause or to articulate the various different issues that had been raised in the 2255 petition. And it's a table that has individual rows that go on for 10 pages.

And so, from -- candidly, from my perspective, it's almost impossible to comply with the normal limit on interrogatories. I believe that the Court has discretion to fashion a solution that will enable the Government to accomplish what it needs to do in order to protect the record and represent what happened here and defend against the 2255.

We certainly agree with Defense counsel, petition counsel's assertion and concern that we not obtain a carte blanche waiver across the board. We're not seeking that. What we want to accomplish at the end of the day -- and if we haven't done it -- if we have not done it to the Court's satisfaction, we ask for an opportunity or leave of court to try to comply with the Court's concerns in regard to this, that the Court limit the implied waiver to just the issues that have been raised against the -- in the 2255.

THE COURT: Well, I believe that that's what the Court attempted to do by asking Mr. Doss and Mr. Malone as to what documents they were going to be relying upon in support of their claims.

MR. CARLTON: We certainly welcome that comment and the -- what we want to try to accomplish -- we, being the

United States Attorney's Office -- is there have been many different allegations raised under the umbrella of ineffective assistance of counsel as to what trial or appellate counsel -- either -- that they either did incompetently or they omitted to do, that they failed to do something.

All we're asking for is a reasonable opportunity to interact with those attorneys and find out:  Okay.  You failed to cross-examine this witness.  Do you recall either independently or looking at your files, as to why -- why you did not conduct cross-examination?  Was it a strategic decision?  If so, what was the basis for that?  If it was an omission, oh, I just forgot, we're entitled to know that.

What we're struggling with is a situation where I had attempted to speak with the lawyers to try to figure out what their responses would be collectively -- well, I guess it's individually -- two trial lawyers, as well as appellate counsel, why were issues raised on appeal.  Why were other issues not raised.  I was shut down completely with the response across the board that:  We will not speak with the Government on this issue, period, on anything, unless and until the Court issues a finding or an order that the attorney-client privilege has been waived.

So starting with that very stark wall of no access, that Berlin Wall that I could not penetrate, I attempted, however inartfully it may have been done, to try to alert the

Court that at least as to the issues that have been raised in the 2255, the Government should be afforded an opportunity to inquire of the lawyers as to: Were you ineffective on this? Why did you not call an expert on this? Why did you not cross-examine? Was it a conscious decision? Were you thinking three steps ahead or were you just dropping the ball?

We have not been allowed to do that. And the Defense -- my interpretation of what they want is that my discussions with them have resulted in a statement that: Well, it's got to be a judicially sanctioned or judicially supervised procedure. They didn't suggest how that can be done. We're open to suggestions. Perhaps -- I mean, usually depositions could be done. In this particular case, if they're concerned about narrowly construing the waiver to limit it just to a particular issue, perhaps a situation could be addressed or availed or offered that the Government send a proposed set of written questions, like written depositions, which would give advance notice to the Defense.

And we would see if those -- after they have an opportunity to object to any of those questions, we could submit those and then if there's additional need for follow-up, the Government would apprise the Court.

I'm at a loss as to what the Government has -- and we're not seeking a wholesale review of their files.

THE COURT: I understand that, Mr. Carlton. And the

Court certainly recognizes that by way of the briefing that the parties want some direction since it is a privilege that exists with Mr. Troya.

So certainly, the Court is eager to give some guidance, but not by way of a blanket order with regard to the privilege.

So perhaps, Mr. Malone, and Mr. Doss, since you've taken the time to respond to the Government's briefing, the Government has taken the time to prepare Appendix A, which is found at -- at Document 98-1 -- perhaps we can use that as somewhat as a guide since it tracks the claims that have been made in the 2255 and refers to the specific trial counsel and appellate counsel who are responsible -- at least are involved with those particular issues.

Perhaps using that as a guide, may I ask if the movant has any objection to providing all documents that would support each of the claims? And the claims are set forth with reference to the page number of the 2255.

And the Court would specifically enter an order that with regard to those documents that are in support of the movant's claim, that those documents are not subject to an attorney-client privilege. And perhaps given that concession -- because I think that the movant must recognize that in order to assert these ineffective assistance of counsel claims, if documents are going to be relied upon, then those

documents are not subject to a privilege.

As well, testimony with regard to work done or the lack of work performed and the reasons behind that are contained within the interrogatories that the Government has prepared.

And perhaps the Defense can look at those interrogatories and use that as a guide as to whether there is truly an objection with regard to questions being answered by Mr. Eisenberg, Mr. Garcia, Mr. Fisher, and Mr. McGlasson with regard to those specific claims.

Is it possible at this time, Mr. Malone and Mr. Doss, to look first at Exhibit -- or Appendix A to Document 98-1 and advise the Court whether you see any objection to that?

MR. MALONE: Judge, I have reviewed this before. I -- we still contend that the Government hasn't gotten past the good cause because there's no fourth column which says what the question is, what the information is they seek.

THE COURT: I'm merely speaking of documents and then we'll move to testimony from trial counsel and appellate counsel.

With regard to documents that the movant would be relying upon --

MR. MALONE: Absolutely.

THE COURT: -- to the extent --

MR. MALONE: Any -- any document we're relying upon,

we would -- we would be required to give the Government.

THE COURT:  All right.  So then using Appendix A, 98-1, the Government's appendix that sets forth the issues as raised in the 2255 and the attorneys involved, to the extent that there are documents that the movant is relying upon, then I would then require that the movant identify those documents and, to that extent, those documents would not be subject to an attorney-client privilege.

Is that agreed?

MR. MALONE:  That's agreed.

THE COURT:  All right.  Now, looking at the interrogatories -- and I recognize that these are not parties to the action, James Eisenberg, Ruben Garcia, Robert McGlasson and Barry Fisher, that they are attorneys, but however, those are the attorneys that are the subject of the ineffective assistance of counsel claims.

Would there be any objection to the interrogatories, albeit, they are in excess of what Rule 33 requires -- would there be any objection to these interrogatories being answered by trial counsel and appellate counsel?

MR. MALONE:  I would have to go through those line by line, Judge, which I haven't done.  So I can see that there's some that -- that there would be no objection if it's within the implied waiver.

THE COURT:  All right.

MR. MALONE: But I --

THE COURT: Then let's start with the documents. And I will still hold the Government to its burden of establishing the fact-specific showing of good cause with regard to the additional questions to be asked of counsel.

But with regard to the documents, I believe that that's probably the first step, that those documents that the movant provides are not subject to attorney-client privilege because the movant is going to be relying upon them.

So that would be the order that the Court would enter with regard to those documents.

Mr. -- let me -- we'll use the time wisely.

Mr. Malone, I want to give you an opportunity to respond.

Mr. Carlton, are you -- have you concluded your argument, sir?

MR. CARLTON: Yes, I have except to this -- to this extent: The entire thought process underneath or behind the Government's request for some discovery was to attempt to clearly articulate in that table, which the Court identified, Appendix A to 98-1, each of the issues addressed -- and it appears -- I'm -- I guess I'm seeking guidance from the Court as to an allegation addressed that's a Sixth Amendment claim of ineffective assistance of counsel, either that counsel -- Defense counsel at trial or on appeal either did something

that -- affirmatively that was incompetent or wrong or no reasonable lawyer would have done it, or failed to do something. We have attempted to limit the inquiry just to the issue raised in the 2255.

And I'm at a loss to understand -- I -- I'm having a difficulty understanding what additional information the -- the Government is going to be required to show to establish good cause for discovery where we're -- we're only seeking information from Defense counsel, whether it's in their files or it's orally in their -- in their head, as to why they did or did not do something. And I'm unclear as to what additional elaboration the Court believes can or should be provided that we did not already provide.

And I apologize for being inartful in either not understanding what is required or not understanding how we would articulate that to the Court.

THE COURT: I'll give an example. And I recognize that the request for production is tailored to the claims.

But for example, all documents, records, or files relating to pretrial investigation or legal research conducted to support trial decisions to call or not to call witnesses related to Conniston Middle School.

I'm not certain -- and I don't -- I don't want to inject an issue that perhaps may not be there. But I'm not certain if some of those documents are documents that relate to

a work-product privilege that is separate and apart from an attorney-client privilege.

And that's perhaps an issue that may not be present, but I understand the Government's question and guidance you're requesting from the Court that it appears that your good cause is tied directly to the claims asserted in the 2255. And this is not an opportunity to do anything other than to find out the underlying basis of the claims.

So perhaps, Mr. Malone and Mr. Doss, if we could use the interrogatories and the request for productions as a basis to see whether, in fact, there are any issues other than an attorney-client privilege issue.

And assuming that the Court finds that there's good cause by virtue of the fact that these claims have been asserted in the movant's 2255 and that this is an attempt to determine what is the support, then perhaps you can look at the interrogatories and the request for production and advise the Court whether, in fact, there truly is an issue that would exist other than an attorney-client privilege claim, to which the Court can certainly find that it would be waived by virtue of the claims being asserted.

Would that be acceptable?

MR. MALONE: Are you asking if we go back and look at these line by line and then provide the Court with --

THE COURT: Well, I would -- I would suggest that we

53

look at the interrogatories and the request for production --

MR. MALONE: Right.

THE COURT: -- and advise the Court that to the extent that these are your claims, whether there would be any objection other than an attorney-client privilege to which the Court can certainly find that if it is a claim and if you have a burden to support the claim, then by virtue of the claim itself, the attorney-client privilege would be -- would be waived. Otherwise, the claim can be withdrawn.

I think that there's -- there's clear support from the Supreme Court and the Eleventh Circuit that if that is an issue that's raised, then there really is no attorney-client privilege that attaches.

MR. MALONE: I don't disagree. We briefed those cases to the Court. You know, our primary concern, first, is the Government showing good cause and getting over that hurdle, the extensive request it made that look like they are far beyond what is -- what is actually alleged.

I mean --

THE COURT: Well, that's what I'm asking. The good -- the good cause is embodied in the request itself; that is, the request is seeking to determine what information you have that would support your claim. So the good cause is somewhat shown by virtue of the fact that it refers to your claim.

If the response is: We're not asserting that as a

54

claim, then there really is no good cause to seek to obtain the information underlying the claim.

MR. MALONE: Correct. We are asserting all these claims.

THE COURT: Then would you agree that there's good cause to determine what information you may have that would support the claim?

MR. MALONE: To support the claim, yes. But don't forget, I mean, what the Government's asking to do is to sit down and talk to the trial attorneys about -- about matters that, in their view, would -- would negate our claims, like strategy.

I mean, that's -- that's what the Government initially wanted to do is sort of very, you know, broad based. But -- so I don't think we've ever disagreed there's an implied waiver by raising the claims. We primarily want this to be structured interviews, structured production of documents on -- on our side.

So I think we're -- I think I agree with what you're saying.

THE COURT: Okay. Then I think we're on the same page.

MR. MALONE: Yes.

THE COURT: And that is, Mr. Carlton, you've asked for guidance and I believe the Court is giving guidance to all the

parties. That we will start first with the documents that the movant will be relying upon. Those will be produced and the Court will enter an order to the extent that the movant is relying upon those documents in support of its claim, they are discoverable, and the attorney-client privilege has been waived.

Secondly, with regard to the request for production and interrogatories that are also embodied in Document 98-2, I ask that the Defense look at the specific interrogatories and the request for production, advise the Court -- putting aside because the Court is -- putting aside the issue of good cause to get to whether, in fact, there is a -- a claim other than attorney-client privilege that can be asserted.

MR. MALONE: Okay.

THE COURT: And if there is no other claim, and it's just the attorney-client privilege, and it relates specifically to the claims that Mr. Troya is asserting, then the attorney-client privilege would be waived.

The next question is the scope of the questions and whether there would be an additional objection with regard to these interrogatories.

MR. MALONE: Yes. And, Judge, yeah, when we get to that point, we're also going to be requesting an order protecting any information that gets disclosed from use in any other prosecution.

THE COURT:  Well, which would lead the Court to the scheduling of this case.  And I recognize that before this Court was assigned this case, and it was before Judge Scola, the parties did take the time to prepare a joint status report and a proposed scheduling order.  And I would like to address some of those issues.

But I -- let me say, Mr. Malone, is -- are there any points that you would like to raise in rebuttal to Mr. Carlton's argument and then we can get to the scheduling?

MR. MALONE:  If I could just quickly.

Mr. Carlton said there was a concession by us that the Government provided appropriate Brady/Giglio information under Rule 16 for Kevin Vetere, Melvin Fernandez, and Carlos Rodriguez.  And the statement is that the Government provided what they said was Brady/Giglio.  We obviously are seeking more in the form of memoranda and notes.

We've briefed previously the procedural default issues about whether things should have been raised on appeal so I don't need to -- I don't think we need to argue that here.

And on Number 11, the experts, I think Mr. Carlton's explanation of, for instance, how the tool mark evidence was used confirms our -- our showing of good cause on that discovery.

THE COURT:  All right.  Thank you, Mr. Malone.

Let me talk about scheduling and referencing the

Court's -- or the parties' proposed scheduling order. I would request that the parties submit to the Court an order that is found in Docket Entry 26, Subparagraph C. The parties had requested the Court enter an order that the United States shall inform any federal, state and local law enforcement officer that participated in the case to preserve whatever documentation it has in its possession.

I don't believe in looking at the docket that the -- I don't believe that any of my predecessor judges that had this case entered that order. And I would request that the parties submit that so the Court can sign that.

As well, there was a statement with regard to some overlapping issues with Ricardo Sanchez's case in Case Number 16-80693 to the extent -- and I'm not quite sure, Mr. Malone, if you are in contact with counsel in Mr. Sanchez's case, but there certainly are four overlapping issues relating to juror misconduct, the constitutionality of the statute that allows for the imposition of the death sentence, the claim of ineffective assistance of counsel and the composition of the jury, the issue relating to the toolmark expert and the cellular data and the Eighth Amendment claims. That appears, obviously, to overlap with Mr. Sanchez.

My concern is in coordinating the claims where Mr. Sanchez's counsel is with regard to those claims because we are on different tracks.

MR. MALONE: Right. Well, we -- we were hoping to get on the Sanchez track and we think that should we go to an evidentiary hearing, yeah, it would make the most sense for those claims to do them together.

THE COURT: Is there an objection to consolidating the tracks for purposes of the path to a conclusion of the 2255s?

MR. MALONE: No. No, Judge.

THE COURT: Mr. Carlton, is there an objection by the Government?

MR. CARLTON: The issue that we have is that Sanchez's opening brief is not due until October.

THE COURT: Uh-huh. That's correct.

MR. CARLTON: And given the tortured time-wise procedural history, this case was tried in 2009. I am -- as much as I do want to promote judicial economy, I don't know that the Court has to make that decision today with regard to -- because the Court, in looking at the -- all of the briefs and the discovery, it may be that the issues are significantly narrowed prior to a decision on the entire case on the merits.

I'd hate to commit to that track today because it -- it guarantees a significant period of delay in this case that the Government does not concede at this juncture is warranted.

So as much as I would want to promote judicial economy, I can't jump on that train with regard to this case given the significant amount of delay that would occasion

because of that.

THE COURT: All right. I just did want to hear on the record the parties' positions and the Court will take it under advisement with regard to -- an evidentiary hearing would be necessary on the -- on the claims that the -- the Court addressed.

But with regard to scheduling following the Court's order relating to discovery, I agree with the parties that the Court should allow the pleadings to be amended within 90 days of the close of any discovery. And then 90 days thereafter, the Government would file its response to any of the amended pleadings and Mr. Troya would then have 90 days to file any traverse or reply memorandum. And then 90 days after the parties file their respective memorandums and within 180 days of the respective files, an evidentiary hearing may be scheduled.

That was proposed by the parties and the Court does agree that that schedule is a reasonable schedule.

The parties had also advised that there are issues that the parties did want to address by way of scheduling and I refer specifically to Document 26.

Are there any issues that the Court needs to be aware of that we have not already addressed? And the reason I say that is specifically within that pleading, the parties requested an initial status conference at that time before

Judge Scola so the parties can raise the uniqueness and complexity of the case. But given the time period that the Court has provided, is that -- has that changed from the date that both parties submitted this request? Is that still a reasonable time period?

MR. MALONE: I believe that those are reasonable, yes, Judge.

MR. CARLTON: We -- we concur. We -- we consulted about that, the applicability of -- the continued applicability of those original time frames. We -- we do concur with that.

I -- I do feel compelled to ask for a little bit of clarification on the very first point that the Court raised with regard to -- with an eye towards the Court entering an order or sending a letter. My notes reflect that sending a letter to involved agencies to make sure they preserve all evidence and reports on the case. Could Your Honor elaborate on that point? Because I don't think I understood the point.

THE COURT: Yeah, it wasn't a letter. And I'm referring to the parties' proposed scheduling order, Docket Entry 26, Provision C, and it states specifically that the agreements by the parties with regard to preservation or disclosure of documents -- it states: "The Court shall enter an order that the United States shall inform any federal, state, and local law enforcement agency that substantially participated in the case to preserve the documentation it still

has in its possession relating to the investigation and prosecution."

Now, the Court does not need to enter an order, if, Mr. Carlton, you have already advised the agencies, but the parties had requested this and I noted that there is no order in the docket.

MR. CARLTON:  I will check our records.  If we have not, following today's hearing, I will initiate that, copy counsel with that to make sure that we've complied with that.

THE COURT:  All right.  So that was never submitted and I'm happy to sign an order directing those agencies.  If you can identify them in a proposed order.

MR. CARLTON:  Yes.  I will take care of that.  I now understand.

THE COURT:  For purposes of timing, if we can do that within a two-week period, so within 14 days.

MR. CARLTON:  Yes.

THE COURT:  As well, Mr. Malone, how much time is it going to take you to identify the documents that would be responsive looking at Appendix A?

And then apprising the Court, the Court will then enter an order that those documents are not subject to the attorney-client privilege.

MR. MALONE:  A long time.

THE COURT:  Okay.  And could you give the Court a

better understanding as to the time period?

MR. DOSS: Your Honor, if I may, we're talking about several thousand documents. We've got a file of over 100,000 documents. So would it be possible to have 120 days to be able to do that, Your Honor?

THE COURT: Is that acceptable to the Government?

MR. CARLTON: I would suggest 90.

THE COURT: Why don't we just say 100 days. How's that? So within a 100-day period. And the Court will set forth an order that provides a specific date.

Then following the production of those documents -- and the Court is going to enter an order that all of those documents that support the movant's claims related to ineffective assistance of counsel are expressly waived giving the movant 100 days to provide those documents.

As well, Mr. Malone, I would ask that you look at the interrogatories and the request for production and advise the Court within the 100-day period of any objections that you would have to the questions being asked of trial and appellate counsel, as well as the documents to be furnished that -- that do exist. And then we can address any of the objections at that time.

MR. MALONE: I will. I will.

THE COURT: Okay. And I think then we will address any of the issues relating to the attorney-client once we

address the request for production and the interrogatories.

And then, Mr. Carlton, with regard to your motion -- and that is Docket Entry 85, which is the -- the last -- excuse me.  I'm sorry -- 98, which is the -- the request for an omnibus order finding that the attorney-client privilege has been waived.  If there are additional questions that you want to have answered, you'll advise the Court as well following the movant's statement as to whether there are any objections to the request for production or interrogatories.  Would that be acceptable?

MR. CARLTON:  Yes, Your Honor.  But a clarification, please.

MS. EVANS:  Your Honor, if we could just clarify one point here.  I believe we've agreed that the Defense will have -- or the movant -- sorry, we still think of them as the Defense -- will have a hundred days to review their very lengthy file to see if there are documents that support their claims.

Since they are taking this time to do that and reviewing the file, if we can ask the Court to instruct Defense counsel to also review their files or documents that would support our defenses that we have laid out in our response, I think that would be the best use of that time.  So we don't have to go back later and then have them review their file again for documents that would be supportive of our defenses.

THE COURT: And when you say support your defenses, would Mr. Malone or Mr. Doss have any understanding as to what documents you would be requesting other than what's set forth in the Appendix A or the request for production?

MS. EVANS: Those two documents, Your Honor, in addition to the lengthy response that we filed to the 2255. I believe Mr. Malone already indicated that he is aware of documents in the file that would support our defenses.

And if there are documents in the file that show that decisions were made by Defense counsel that were strategic, that is certainly something that we would be entitled to and certainly something that they should be disclosing to us.

THE COURT: But that's already embodied in your request for production, is it not?

MS. EVANS: I believe so, Your Honor. But I'm not sure that everything would be in there.

If they find a document that's not specifically outlined in our request for production, they should certainly be having to provide it to us. Just as if we found something in our files that was helpful to them, we would be turning it over to them.

THE COURT: We've somewhat used a blueprint of Appendix A. So to the extent -- in order to protect Mr. Troya's attorney-client privilege that he holds, if there are additional documents that the Defendant or that the movant

is in possession of that are not responsive either to Appendix A or the request for production, then I would require, Mr. Malone, that you apprise the Court that additional documents exist.

And then, certainly, if there's still an objection with regard to the attorney-client privilege, then the Court can review those documents and make a determination in camera as to whether, in fact, they would be subject to disclosure.

MR. MALONE: In my theoretical case I gave you earlier about -- I don't -- I don't feel that I should be put in a position of identifying documents that support the defense of the Government to the case.

THE COURT: Well -- and I think that's why I asked Ms. Evans first and foremost is the request contained within Appendix A or the request for production.

And to the extent that your defenses are not embodied within these -- these two documents, then perhaps it would be the Government's obligation to specifically advise the movant and apprise the movant of the good cause for the documents to be provided.

So it's unclear now which documents you're requesting other than what the Court has in front of it by way of the request for production.

MS. EVANS: Your Honor, we believe that it is going to be included in our request for production or the request for

interrogatories and Appendix A, which we've talked about at length here today.

However, we've never had access to Defense counsel's file.  We don't know what's in there.  We've tried to make our -- you know, we're kind of in a Catch-22 here.  I mean, we need to make our request specific enough so they are not overly broad.

But at the same time, there are some very blanket arguments of ineffective assistance here.  And if they are able to find things or they just notice things that are in the file that are helpful to us that show that strategic decisions were made, they should be turning them over to us.

Now, we can't list every single document or every single possible document that could be in Defense counsel's file.  Our -- our request would be hundreds of pages long.  We have filed a detailed response to their 2255 and I know they have read it and they reviewed it.  In fact, they have replied to it.

If there's something in their file that supports something that we've stated in our 2255, surely, that would be something they would already be aware of and they could disclose it to us or at least inform the Court that it's in the file and the Court can make a determination.

THE COURT:  Well, let's do this.  Because I somewhat agree with Mr. Malone that it's not the defense's or the

movant's job to anticipate what documents may be responsive.

There is a request for production.  If, in fact, this request that the Court is going to require the Defense to review those documents and provide those documents that they would be producing anyway in support of their claim, with regard to the documents that are responsive, unless there is another privilege that the Court is unaware of, it would appear in looking at the -- this request that this would encompass all of the documents that would support the movant's claim or support the defense to the movant's claim.

So I don't see where the request for production wouldn't embody the defense.  To the extent that there are additional documents that the Government is seeking that are not contained within the request for production, specifically 98-3, which contains the request for production, then it's incumbent upon the Government -- and I would ask that you do that within the next 60 days -- to provide an additional request for production that may request certain documents so that the movant can respond.

All right.  So can we do that within 30 days?

MR. CARLTON:  Yes.

THE COURT:  Are there any other issues that we need to address?

MR. MALONE:  No, Judge.

THE COURT:  On behalf of the Government -- and my

apologies, but I do need to attend this funeral.

Anything further on behalf of the Government?

MR. CARLTON: Oh, could they just bifurcate or segregate -- we have two different lawyers. So if they are producing a file, we would like to know does it relate to Mr. Eisenberg or does it relate to Mr. Garcia.

We don't want to confuse the two lawyers. If they have joint files, they could -- they could identify that as such.

MR. MALONE: That's very difficult to tell from the files, Judge.

THE COURT: To the extent that they can be segregated, because they have been obtained from different files, then I would ask that the Defense or the movant provide that.

MR. MALONE: From which attorney's file?

THE COURT: Yes.

MR. MALONE: Okay. Sure.

THE COURT: Okay. All right.

Then I will expect to receive a proposed order with regard to the preservations of the documents. The Court will enter a proposed order regarding scheduling, as well as a decision on the pending motions that are before the Court, as well as a time period in which to provide these documents.

Is there anything further?

MR. CARLTON: Thank you, Your Honor, no.

69

THE COURT:  Okay.  All right.  Have a nice weekend.

(Proceedings concluded at 10:56 a.m.)

Yvette Hernandez, Official Court Reporter
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698

70

UNITED STATES OF AMERICA        )

ss:

SOUTHERN DISTRICT OF FLORIDA  )

C E R T I F I C A T E

I, Yvette Hernandez, Certified Shorthand Reporter in and for the United States District Court for the Southern District of Florida, do hereby certify that I was present at and reported in machine shorthand the proceedings had the 2nd day of June, 2017, in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that this transcript contains pages 1 - 70.

IN WITNESS WHEREOF, I have hereunto set my hand at Miami, Florida this 14th day of June, 2017.

/s/Yvette Hernandez
Yvette Hernandez, CSR, RPR, CLR
Certified Shorthand Reporter
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698
yvette_hernandez@flsd.uscourts.gov